IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| BALL CORPORATION, AN INDIANA CORPORATION AND FACTORY MUTUAL INSURANCE COMPANY, A RHODE ISLAND CORPORATION, AS SUBROGEE,     Plaintiff, | ) ) ) ) ) ) |
| v. | ) CAUSE NO. 4:16-CV-00042-TLS- ) |
| AIR TECH OF MICHIGAN, INC., A MICHIGAN CORPORATION,     Defendant. | ) ) ) |

---

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

Defendant, Air Tech of Michigan, Inc. ("Air Tech") respectfully submits this Memorandum in Support of Defendant's Motion for Summary Judgment. As explained herein, Air Tech is entitled to judgment as a matter of law.

## STATEMENT OF MATERIAL FACTS

In the very early hours of May 23, 2014, a fire occurred at Ball's beverage can manufacturing plant in Monticello, Indiana. (*See* Air Tech's Summary Judgment Appendix ("AT App."), p. 4). The most direct physical impact of the fire was extensive damage to a network of ducts associated with industrial ovens used by Ball to cure certain solvents applied to its cans during its manufacturing process. (*See* AT App. p. 9, 43:21-44:14. On May 22, 2014, Air Tech was onsite at Ball's Monticello facility to clean one of the aforementioned ovens:  internal bake oven number 2 ("IBO 2"). (*See e.g.* Dkt. No. 2, ¶14); (*see also* AT App. p. 167:21-168:4, 170:18-172:7, 176:1-178:15, 189:13-190:12, 194:8-15; 238:14-19, 252:16-17; 275:15-20). Ball and FMIC filed a three-count complaint which essentially stands for the central allegation that Air Tech did not appropriately clean IBO 2 and caused the May 23, 2014 fire. (Dkt. No. 1).

## I.     IBO Number 2's Basic Operation and Maintenance

According to its Operator's Manual ("Manual"), IBO 2 was "designed for curing lacquer on containers under controlled conditions, as they are transported on a conveyor through four temperature zones." (AT App. p. 289; (*see also* AT App. p. 394:25-396:22; 149:2- 150:25; 252:18-253; 429:12-14, 432:18-433:1).  Each of the four zones were heated by "burner boxes" which sat on top of IBO 2 and housed a natural gas-fueled flame. (AT App. p. 375:21-377:14; 153:24-156:7; 452:17-453:19, 455:11-456:10; 434:14-21).

1

The flames inside of the burner boxes were the only flames used to heat the body of IBO 2; there was no open flame inside of the body of the oven. *Id.*; (*see also* AT App. p. 274:1-17, 286:2-15).

Each burner box associated with IBO 2 was equipped with (1) an intake fan, which would bring fresh air from outside of the oven into the combustion chamber to assist in fueling the flame, and (2) recirculating fan(s), which would both draw the heated air from inside the burner box downward into the body of IBO 2, as well as recirculate the non-exhausted, heated air therein. *Id.*; (*see also* AT App. p. 378:2-12, 387:18-388:2; 153:24-158:3, pp, 228:21-234:2; 437:16-439:6). IBO 2 was also equipped with two "squirrel cage" exhaust blowers (or fans) at both the inlet and discharge ends of the oven which allowed some of the hot air forced into the body of the oven (as well as the vapors from the curing process) to be expelled through a network of ducts to a regenerative thermal oxidizer ("RTO") and, ultimately, out of the facility. (*See* AT App. p., 153:24-158:19; 437:16-439:6]. The ducts were constructed of a noncombustible metal, but were covered with a foam-based, aluminum backed insulating wrap on their exterior. (AT App. pp. 158:20-159:7; 381:24-382:16).

Ball's manufacturing process utilized two combustible liquids:  one to line the internal surface of the can (often referred to by Ball as "IC spray") and another (a "varnish") to coat the exterior of the cans. (AT App. p., 477; 146:14-147:13, pp. 149:2-150:25, p. 160:4-18; 500:22-501:4, pp. 503:7-504:1; 254:2-16; 430:22-24).  As an expected by-product of the curing of these liquids and the associated condensation of the combustible vapors produced by same, Ball knew and understood that solid

2

accumulations of combustible deposits would occur both inside of IBO 2 (and other curing ovens) and the associated ductwork. (AT App. p. 149:2- 150:25; pp. 165:16-166:10, pp. 173:1-175:17, p. 216:10-15; 379:24-380:3; 36:21-39:18; 504:5-12; 251:3-9, p. 254:2-16; 431:19-431:25; 314, 316-320; 477; 18). The by-product was known to typically manifest in two forms:  (1) in a true solid state where it would be hard and "flaky" or (2) a liquid-like state where it would have "gooey" consistency resembling tar. (*See e.g.* AT App. pp. 384:10-385:3, pp. 389:11-392:21, p. 393:8-22; 507:17-508:6; 173:24-175:2; 254:2-16; 510:24-511:6, p. 512:10-18, pp. 514:15-515:16, p. 517:4-14; 520:22-25, p. 527:3-14, pp. 528:15-529:7; 552:1-553:21; 481; 627). The latter form of the combustible by-product was more commonly encountered in the ductwork; the condensate inside of the oven typically displayed the hard and flaky characteristics. (*See e.g.* AT App. pp. 173:24-175:2; 254:2-16; (*but see* AT App., pp. 389:11-392:21, p. 393:8-22). In order to ensure the safe and efficient operation of Ball's manufacturing process, these accumulations of combustible by-products were supposed to be regularly cleaned from both the ovens and ductwork. (*See* AT App. pp. 314, 316-320; 404:6-24).

According to the Manual, cleaning of the above-referenced combustible accumulations was recommended to be completed once a month for an oven being operated twenty-four (24) hours a day, seven (7) days a week, as was Ball's IBO 2. (*See* AT App. pp. 314, 319, ).[1] 398:7-400:11; 249:24-250:9; 454:3-8). This entailed the use of

---

[1] That notwithstanding, there is no dispute that Ball only cleaned its ovens once every six (6) months, and the associated ductwork even less frequently at once every year. (AT App., pp. 151:7-152:10, pp. 161:24-162:5, pp. 162:24-163:14; 397:3-400:11, 403:4-14; 457:17-19; 502:3-16). In fact, Air Tech was asked to clean the ovens at Ball Monticello much less frequently than even other Ball locations at which it performed cleanings. (AT App. pp. 648:15-650:22, pp. 654:24-655:6).

scraping and wire-brush tools to "[t]horoughly clean duct passages[2], fan blades, panel walls, and steelwork" associated with the given oven, and the use of a vacuum to "remove as much dust as possible." (AT App. pp. 319, §4.5; 168:5-169:16). Once that is complete, the Manual's recommended cleaning procedure is to run the recirculating fans for a short period to force "any remaining dust [to] settle[] onto the oven floor," after which it should be removed with a vacuum cleaner. *Id.* The final step in the Manual's recommended cleaning process is to raise the temperature in the oven and run scrap metal, "heavily coated with old varnish or lacquer," until any remaining dust in the atmosphere of the IBO is removed via adhesion to same. *Id.*

## II.    IBO Number 2's May 22, 2014 Cleaning

On May 22, 2014, Ball engaged Air Tech solely for purposes of cleaning IBO 2, and not its associated ductwork. (AT App. p. 148:11-18, p. 170:18-21, pp. 171:3-172:11, pp. 192:23-193:14, p. 194:8-15). The expectation was that Air Tech would clean inside of IBO 2 to the squirrel cage exhaust fans, and as far into the ductwork above the exhaust assembly as the Air Tech personnel could reach (which was not very far). (AT App. p. 171:3-172:7, p. 194:8-15; 464:21-465:11; 526:3-8; 40:17-42:18)[3]. The job generally required Air Tech to disassemble the oven's removable panels and screens, clean its inside

_____

[2] The Manual also specifically advises that "[t]he risk of fire is substantially reduced by thorough and regular cleaning of the fume extract ducts," and warns that failure to do so can lead to "excessive fuming problems, building back to contaminate combustion chambers," or, in other words, the burner boxes. (AT App. pp. 318, § 4.2; 401:2-403:14).

[3]Air Tech was not asked to clean the burner boxes or the actual burners therein. (AT App. pp. 466:16-23; 164:12-14; 386:9-20; 665:19-666:15, p. 667:12-23). Notably, Ball never cleaned the burner boxes, but did clean the burners periodically. *Id.*; (*see also* AT App. pp. 276:23-277:9, 280:24-281:21, p. 282:11-14, p. 283:6-19; 444:21-446:20, p. 447:15-21).

surfaces and components of the combustible deposits from the curing process with wire-brushes and scrapers, vacuum as much dust and particulate as possible, and then reassemble the oven. (AT App. pp. 464:21-465:11; 168:5-169:16; 652:14-653:1; 525:9-25; 431:19-431:25; 659:17-24, pp. 660:19-661:12; 525:9-25; 673:13-22, 675:19-25, 676:8-22, p. 677:2-17). At that point, Air Tech would inform Ball that Air Tech's tasks were complete, Ball would inspect the work, and Air Tech would be dismissed. (AT App. p. 167:21-168:4, pp. 180:12-181:18, pp. 182:6-185:20, pp. 197:24-199:3, p. 211:18-23, p. 212:9, pp. 225:16-227:20; 410:21-416:19; 513:16-23, p. 516:5-15; 521:23-524:14; 674).

Ball knew and expected that once Air Tech's work was complete, there would still be a significant amount of dust and scraped particulate present inside of IBO 2 which had been loosened by the cleaning (*i.e.* scraping and brushing) process. (AT App. p. 405:23-409:21; 183:10-186:14; 284:12-24; 319 § 4.5). Accordingly, upon the completion of Air Tech's work on May 22, 2017, there still remained three additional steps to be completed in the cleaning process:  (1) running of the circulating fans to force airborne dust and particulate to settle onto the oven floor; (2) vacuuming the particulate from the oven floor; and, (3) running lacquered scrap metal through the oven to collect any lingering dust and particulate. *Id.*; (*see also* AT App. pp. 185:23-187:16; p. 461:11-463:13; 278:18-279:3; 668:20-670:5). Ball, alone, performed each of these last three cleaning tasks, as well as other start up and safety tasks, without any involvement or participation by Air Tech; indeed, Air Tech had no knowledge of how to operate the IBO and was not expected by Ball to do so. *Id.*; (*see also* AT App. p. 415:7-416:15; 464:3-20; 183:10-186:14, pp. 198:19-202:17; 257:13-258:12; 651:4-10; 425:13-23, pp. 426:9-429:4, pp. 435:19-436:4,

pp. 440:9-442:13]. Critically, although the Manual instructs that dust forced onto the oven's floor by the fans be removed by vacuuming, Ball admits that it never did so. (AT App. p. 405:23-409:21; 319 § 4.5].

## III.   The May 23, 2014 Fire

Air Tech completed the May 22, 2014 cleaning of IBO 2 without a hitch. (AT App. pp. 189:13-190:12, p. 191:13-19, p. 192:19-22, pp. 195:14-198:13). Subsequently, Ball performed its own tasks, including the running of the scrap metal to capture particulate, and encountered no problems or concerns. (AT App., pp. 198:14-205:25). IBO 2 then resumed normal production for several hours without incident. (AT App. p. 205:15-25; 459:1-461:2, p. 468:1-5; 679:8-11, p. 682:19-683:8; 239:18-25, p. 248:10-17, p. 264:25-265:2; 477; 20).

Shortly after midnight on May 23, Ball electronic technicians ("ETs") and millwrights received a page requesting they investigate IBO 2 due to reports (from some unidentified Ball personnel) of a smell of something hot and light smoke in the vicinity of the IBO 2 exhaust blower. (AT App. p. 684:23-686:16, p. 692:1-25, 695; 240:20-241:9, p. 242:3-16, 271; 20; 478).  Millwright Wes Krintz explained that these reports were not all that concerning at the time. (AT App. pp. 240:20-241:9, pp. 245:22-246:10). He knew that the oven had been cleaned during the previous shift and this could cause a smell of something hot, and even light smoke. *Id.*

Upon arrival, the reports of smoke were visually confirmed by Krintz, who witnessed it exiting a small, "pitot tube"[4] hole in the ductwork above the oven. (AT App. pp. 241:13-22, pp. 245:22-246:10, p. 247:8-16, pp. 255:7-256:8, p. 259:3-25, pp. 263:2-264:15, p. 267:7-22, pp. 268:21-269:12; (*see also* AT App. p. 458:3-22). ET, Bob Pellegrini, also observed a little smoke in the area, and both Pellegrini and Krintz confirmed the reports of a smell of something hot. (AT App. pp. _684:23-686:16; 267:15-22). Visual inspection of the nearby squirrel cage exhaust blower initially revealed nothing of concern. (AT App. pp. 266:2-16). Pellegrini checked IBO 2's control panel for any signs of temperature or air flow problems and found no indication of any ongoing problem inside of the oven that might explain the smell of smoke present. (AT App. pp. 686:17-689:10).

Pellegrini fetched a "heat gun" (*i.e.* a thermal imaging device) for purposes of checking the temperatures in the area in comparison with temperatures of analogous components on other ovens on the production floor. (AT App. pp. 680:11-681:9, p. 690:4-16). While smoke continued to be observed in the vicinity of the exhaust blower, the temperature readings Pellegrini initially obtained when he pointed the heat gun directly at the squirrel cage did not reveal any obvious ongoing problem. *Id.* In fact, Pellegrini testified that, initially, IBO 2's exhaust blower was *cooler* than that of an adjacent machine. *Id.*[5]

---

[4] A "pitot tube" is an instrument which Ball would periodically use to measure air flow inside of the facility's ductwork. (MTE App. pp. 419:13-422:21). Access holes for these measurements were located on a stretch of horizontal ductwork directly above IBO 2. *Id.*

[5] The accounts of Krintz, Pellegrini, and another millwright, Randy Crume begin to diverge at this point in the sequence of events. (AT App. pp. 701:17-702:7, 703:12-13). Pellegrini claims that the burners and

Shortly after the initial temperature readings by Pellegrini, Krintz and another millwright, Randy Crume, used a scissor lift to obtain an eye-level view of the exhaust end of IBO 2 in an effort to further investigate the presence of smoke. (AT App. pp. 705:23, p. 706:20-23; 262:4-22, p. 266:2-16). Krintz observed sparks and embers through the same pitot tube holes in the ductwork from which he had previously seen smoke emanating. (AT App. pp. 261:8-262:3). Crume observed thicker smoke from the area of the exhaust blower and paint on the exterior of the blower began to bubble. (AT App. pp. 707:4-708:2). Pellegrini continued to operate the heat gun, and, in addition to an increase in smoke, observed the temperature of the exhaust assembly steadily increase as high as 520° F. (AT App. pp. 693:17). Krintz and Crume attempted to spray a fire extinguisher into the small pitot tube hole, which appeared to make things worse. (AT App. pp. 262:4-22). The men ultimately decided to leave the area, the plant was evacuated, and the fire department was called.

When Captain Rocky Strange of the Monticello Fire Department arrived at the plant at approximately 12:53 a.m., Ball personnel informed him that a fire was ongoing in a "vent" above one of Ball's ovens. (AT App. pp. 565:23-570:20, 586). When Captain Strange arrived at the scene of the reported fire, he observed fire around the exterior of the vent and could see that the insulation wrapped around the ductwork was aflame. *Id.*; (*see also* AT App. pp. 571:23-572:16). Captain Strange and his crew tore into the

---

associated recirculating fans for IBO 2 were shut down while the other fans were left on. (AT App. pp. 690:4-691:22). Crume states that, to his knowledge, the burners were never shut down. (AT App. pp. 709:16-710:5). Krintz recalls that all at the scene discussed the need to shut all of the blowers off to avoid feeding air to any flame that might be present inside of the oven or ductwork, and that all ultimately agreed to do so. (AT App. pp. 243:16-244:5, p. 259:18-23, p. 260:18-21, p. 261:4-11).

ductwork and began spraying water directly into the exhaust vents in an effort to douse the fire. *Id.*; (*see also* AT App. pp. 582:1-21). After a long fight, the fire was ultimately brought under control. *Id.*; (*see also* AT App. pp. 583:16-584:20, p. 585:3-24).

The events in the early hours of May 23 left Ball's production floor an utter mess. (AT App. pp. 583:16-584:20, p. 585:3-24; 208:6-211:17).  The Monticello Fire Department had cut into the ductwork and its associated insulation as part of their efforts. *Id.*; (*see also* AT App. pp. 571:23-572:16). A high powered hose was sprayed into the various portions of the ductwork and oven, and dry chemical extinguishers had been utilized in an effort to suppress the flames. *Id.* As expected, all of this activity generated a significant amount of debris, dust, and particulate. *Id.*; (*see also* AT App. pp. 207:22-211:17, pp. 218:6-220:10, 236).

## IV.  <u>Prior Events</u>

As Captain Strange explained, the May 23, 2014 event was not the first time that he or the Monticello Fire Department had responded to a fire or smoke event at Ball's facility involving the ductwork and/or the ignition of Ball's manufacturing by-products. (AT App. pp. 573:21-574:10, p. 575:7-22, p. 578:11-580:4, 586, 610, 616). For example, on October 9, 2011, there was a reported fire in the ductwork in the vicinity of one of the ovens at Ball's facility. (AT App. pp. 610). Ball advised that it would disassemble the oven to check whether the fire might have spread from the ductwork to the oven, but there is no indication that any oven was actually involved in this event. (AT App. pp. 610; 576:21-577:24).

On April 3, 2013, Ball personnel reported a fire in a section of the ductwork exterior to the building. (AT App. pp. 616). Ball disclosed that it was "having trouble with the blower system." *Id*. This caused overheating and "burning off [of] accumulated debris inside the flues [*i.e.* the ductwork]." *Id.*; (*see also* AT App. pp. 580:14-581:1).

On July 11, 2013, Ball reported another fire. (AT App. p. 627). On this occasion, Ball informed the Monticello Fire Department that one of its ovens (referred to as a "furnace" in the report) had a "build up [*sic*] of can lubrication on and inside it that ignited." *Id.* The lack of adequate air flow, once again, caused an overheating situation which "cause[ed] the oily build up to catch fire." *Id.*

Captain Strange also independently recalled at least one other fire in the ductwork several years before the aforementioned. (AT App. p. 578:11-580:4). Strange, himself, was elevated via scissor lift to the ductwork above Ball's production floor where a fire was ongoing "right in the duct." *Id.* He created a hole large enough to insert a hose into the duct with a special attachment affixed which allowed him to extinguish the fire without having to get into the ductwork himself. *Id.*

# ARGUMENT[6] [7]

## I.   There is no competent evidence that Air Tech breached any duty to Ball.

Ultimately, the issue of breach comes down to whether Air Tech left something combustible inside of IBO 2 at the conclusion of the May 22, 2014 cleaning that, in the exercise of reasonable and ordinary care, it should not have. As a threshold matter, there is no dispute that Air Tech's charge did not require that it render IBO 2 completely free of combustible dust and particulate or that it become an insurer of the oven (or its ductwork) against any risk or accident. (AT App. p. 405:23-409:21; 183:10-186:14; 274:1-17, p. 284:12-24; 319 § 4.5); *see also Kostidis v. Gen. Cinema Corp.*, 754 N.E.2d 563, (Ind. Ct. App. 2001) (duty of reasonable care did not render defendant an insurer or guarantor against all risks or accidents). Indeed, it was Ball's expectation and understanding that combustible dust and particulate loosened by Air Tech's efforts would remain in the oven at the conclusion of Air Tech's task on May 22, 2014 and that Ball, itself, still had to perform the final three steps in the cleaning process before resuming normal production in IBO 2.  (AT App. pp. 405:23-409:21; 183:10-186:14; 274:1-17, p. 284:12-24; 319 § 4.5).

---

[6] Because this Court is sitting in diversity, and because Indiana has the most intimate contacts to the facts underlying this dispute, Plaintiffs' claims are controlled by Indiana law. *See e.g. Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, 779 F.Supp.2d 858, 879 (N.D. Ind. 2011); *see also Bell Microproducts, Inc. v. Mkt. Dev. Specialists, Inc.*, 2008 U.S. Dist. LEXIS 39420 *, 2008 WL 2074134*, (N.D. Ind. May 14, 2008);

[7] Plaintiffs' Complaint asserts a claim for "breach of implied duty of workmanlike performance." (Dkt. No. 1, Count II). In Indiana, this duty may give rise to a claim for either breach of contract or negligence, but does not function as a stand-alone cause of action. *See e.g. Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 336 (Ind. Ct. App. 2011). Plaintiffs assert claims for breach of contract and negligence, so Count II is entirely redundant; a grant of summary judgment on Count I and III would necessarily dispose of Count II. *Id.*

The foregoing is significant insofar as it demonstrates, unequivocally, that evidence which merely establishes that dust and particulate was present inside of IBO 2 at the time of the fire provides no reliable indication or reasonable inference of any fault attributable to Air Tech. That would be true even if, as Plaintiffs' cause and origin expert, Scott Howell ("Howell") has speculated, there were literal piles of combustible dust littering the oven. (*See* AT App., pp. 559:10-560:18).[8]  Indeed, the Manual contemplated that running the recirculating fans at the conclusion of the task performed by Air Tech (which Ball did do) would result in such piles that could (and should) then be vacuumed (which Ball did not do on the date at issue or, in fact, any date that the ovens were cleaned). (AT App. pp. 319 § 4.5; (*see also* AT App. pp. 405:23-409:21, pp. p. 415:7-416:15). Even assuming these "pile[s] of particulate" were present, Plaintiffs have adduced no evidence which would allow for a reasonable inference that they resulted from any failure or omission of Air Tech. (*See* AT App., pp. 559:10-560:18).

Even setting the foregoing aside, there is no reliable (or admissible) evidence that any loose combustible particulate was present inside of IBO 2 leading up to or at the time of the fire. Howell admits that he cannot identify, with any degree of certainty, the "first fuel" to suit his theory that this fire originated in the burner box then spread to the squirrel cage and, subsequently, the ducts. (AT App. pp. 549:16-551:19, pp. 559:10-560:18; 475). Nevertheless, his "Report of Findings" plainly expresses his opinion that

---

[8] Contemporaneously herewith, Air Tech is filing a motion to exclude Howell's would-be testimony as unreliable and entirely speculative. That motion is expressly incorporated by reference as if stated fully herein.

the "first fuel" was the "small particulate material scraped off of the interior of IBO 2 just prior to the fire." (AT App., pp. 475). He claims that the basis for this conclusion comes from a general description of the accumulations by former Ball employee Freddy Spencer, visual examination of cans found at the end of the line after the fire was extinguished, and "thought experiments". (AT App. pp. 538:9-539:9, p. 539:13-23, 540:4-541:16, p. 542:11-24, pp. 542:25-543:7, pp. 544:21-545:3, pp. 549:16-551:19; 698, 699, 475, 482).

There are two fundamental problems with Howell's leap of logic. *First,* Howell admits that no *actual* testing was performed to confirm that the dust observed on the cans was, in fact, the combustible condensate by-product of Ball's manufacturing process and Air Tech's subsequent scraping thereof. (AT App. pp. 549:16-551:19). Given that the same condensate was available for comparison from the ductwork, in which copious amounts of it allowed the fire to spread, he certainly could have done so. (*See* AT App. pp. 3). Howell offers no explanation for this failure.

*Second*, all of the cans subject to his "thought experiments" were at the end of the line, outside of IBO 2, when they were collected. (AT App. pp. 540:24-543:7, pp. 544:21-545:3; 698, 699, 482). As both Captain Strange and Dale Spencer (former production supervisor at Ball) explained, Ball's production area (particularly in the vicinity of IBO 2) was covered with debris, dust and particulate from seemingly innumerable sources, including not only the by-products of the fire, itself, but also the charred combustible accumulations from inside of the ductwork, which was cut open during the firefight. (AT App. pp. 583:16-584:20, p. 585:3-24; 208:6-211:17; 571:23-572:16; 207:22-211:17, pp.

13

218:6-220:10, 236; (*See also* AT App. p. 5). As Dale Spencer, himself, explained without some sort of testing, the little speck of supposed dust depicted on the photographs singled out by Howell in his report "could have c[o]me from anywhere." (AT App. pp. 218:6-220:10). Moreover, Howell's description of the dust observed on the can as displaying a "light gray" color is inconsistent with the description of Air Tech personnel (who actually scraped it loose) that it was black. (AT App. pp. 542:11-24; 659:17-24, pp. 661:19-662:6).  Under the circumstances, it would be entirely speculative to infer that any dust was present inside of IBO 2 at all. *See e.g. Gabb v. Wexford Health Sources, Inc.*, 2019 U.S. App. LEXIS 18097 *12 (7th Cir. June 17, 2019) (citing *Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018)) (mere speculation or conjecture cannot overcome a motion for summary judgment).

There is also no competent evidence that Air Tech failed to appropriately clean the areas of IBO 2 that fell within the scope of its work. Dale Spencer, who was the point of contact with Air Tech for the May 22, 2014 cleaning and periodically checked in on its progress, never assessed whether Air Tech did or did not appropriately clean the squirrel cage. (AT App. pp. 167:21-168:4, pp. 176:1-178:15, p. 179:8-21, pp. 197:14-198:13, pp. 217:6-227:20). He testified that he was not aware of any defect in Air Tech's performance, and could not say that Air Tech did anything that might have caused the May 23, 2014 fire. (AT App. pp. 188:5-12). Indeed, no Ball employee was able to do so. (*See* AT App. pp. 469:15-470:22; 443:19-22, p. 448:21-23, p. 449:19-22; 285:15-286:1, pp. 286:20-287:1; 704:16-18; 264:25-265:2; 682:19-683:8).

The foregoing notwithstanding, Howell posits that a "chunk" of material exhibiting honeycomb-like characteristics indicates that Air Tech failed to properly clean the squirrel cage blower. (AT App. pp. 537:4-12, pp. 554:13-555:11, p. 561:12-562:16; 496; 6970. However, as with the dust purportedly found on the cans, Howell performed no testing of the "chunk" in an effort to confirm that it was, in fact, the combustible condensate. (AT App. p. 557:4-24). Howell also acknowledges that a significant amount of tar-like accumulations, additional creosote-like solids, and other substances dislodged by the fire department were found in the same blower and appeared to have dropped down into the area of the squirrel cage from the ductwork above. (AT App. pp. 553:14-556:6; 494, Photograph 14). Once again, this failure to test artifacts is not explained by Howell.

Also important to note is that the tarry form of the condensate had a tendency to run down solid surfaces and even drip. (*See e.g.* AT App. pp. 552:1-553:21; 383:25-385:3, pp. 390:20-392:15, p. 393:8-22; 656:11-17, p. 657:6-18; 254:9-13). Even FMIC acknowledged that this dripping and running phenomenon was observed on the outside of the ductwork following the fire, but claimed the effects of combustion precluded observation this behavior inside of the ducts. (AT App. pp. 45:25-47:5). Both Air Tech's cause and origin expert Mike Vergon, and Howell *did* observe evidence of the running and dripping of the "goo" inside the exhaust system, including in the squirrel cage blower. (AT App. pp. 713:3-15, pp. 714:4-715:17; 481). This precludes any reliable inference that adhesion of accumulations to the metal surfaces in the fan housing, alone, reflected a failure by Air Tech. (AT App. pp. 716:17-717:9, pp. 719:14-

15

721:3, p. 723:1-25, p. 724:10-24, pp. 725:19-726:10). Such a determination simply cannot be made without further supporting evidence. Unfortunately for Plaintiffs, none exists.

In addition to the above, the honeycomb-like material Howell relies upon was collected during an inspection that occurred on September 1, 2015, ***more than a year after the fire and subsequent disassembly of the affected equipment.*** (AT App. pp. 718:2-9, p. 722:1-11, 729:15-19). The blower units had been removed from their operating position and kept in storage in the interim timeframe. Given that the blower units contained a considerable amount of the combustible accumulations, including in the "goo" and tar-like form, the removal, transport, and placement into storage certainly could have caused the accumulations to be moved from their position at the time of the fire and deposit elsewhere. This, too, precludes any reliable inference as to whether it was present before the fire in the absence of other evidence to that effect. (*See* AT App. pp. 716:17-717:9, pp. 719:14-721:3, p. 723:1-25, p. 724:10-24, pp. 725:19-726:10).

There is no reliable, admissible evidence that Air Tech inappropriately performed its task on May 22, 2014. Absent such there can be no breach. Absent breach, Plaintiffs cannot prevail on their claims. Summary judgment should be entered accordingly.

## II.     There is no competent evidence that Air Tech caused the fire.

Where it concerns matters not within a lay person's understanding, a plaintiff must present competent, reliable expert testimony to establish causation, particularly where there are multiple potential causes. *See e.g. Muncie State Transit Auth. V. Smith*, 743 N.E.2d 1214, 1217 (Ind. Ct. App. 2001). Indiana courts recognize that where

16

causation entails questions of cause and origin of a fire, expert testimony is required. *See State Farm Fire & Cas. Co. v. Niswander*, 7 N.E.3d 295, 299 (Ind. Ct. App. 2014). Even where expert testimony is advanced to that end, summary judgment is proper in favor of a defendant if the testimony fails to meet requisite elements of admissibility. *Lytle v. Ford Motor Co.*, 814 N.E.2d 301, 308 (Ind. Ct. App. 2004).

As explained more thoroughly in Air Tech's Motion to Exclude filed contemporaneously herewith, although Plaintiffs designated Scott Howell as an expert witness, his opinions are unreliable and inadmissible.[9] His analysis as to both the origin and cause of the subject fire did not comport with accepted fire investigation standards and, instead, was largely based upon unfounded assumption, conjecture, and speculation. Howell failed to "bridge the analytical gap" between the empirical evidence and data collected in connection with the fire and his opinions to the effect that Air Tech caused the fire. *Gaskin v. Sharp Elecs Corp.*, 2007 U.S. Dist. LEXIS 65532 *21-27, *30-31 (N.D. Ind. Aug. 31, 2007). For this reason, his opinion is unreliable, and cannot be asserted to support the existence of any genuine disputes which might preclude summary judgment.

It warrants reminding that (1) Ball did not expect Air Tech to deliver a particulate free oven, (2) Ball admits that it was responsible for the last three steps in the cleaning process; and (3) Ball admits that the first of these steps was not performed in compliance with the Manual and that the second step, vacuuming the particulate forced

---

[9] Air Tech's Motion to Exclude is hereby incorporated by reference as if fully stated herein.

to the oven floor, was never performed by Ball. (AT App. pp. 405:23-409:21; 183:10-186:14; 284:12-24; 319 § 4.5; 185:23-187:16; 461:11-463:13; 278:18-279:3; 668:20-670:5; 415:7-416:15; 464:3-20; 183:10-186:14, pp. 198:19-202:17; 257:13-258:12; 651:4-10; 425:13-23, pp. 426:9-429:4, pp. 435:19-436:4, pp. 440:9-442:13). Assuming some dust was, in fact, left in the oven, such would not provide any reliable indication that Air Tech did not perform exactly as was expected. Accordingly, if (as Plaintiffs theorize) dust inside of IBO 2 ignited and was exhausted out of IBO 2, establishing a genuine dispute as to causation demands competent evidence that this dust ignited something that Air Tech improperly left specifically in the eastern squirrel cage, as there is no dispute that Air Tech was not responsible for cleaning the ductwork on May 22 and it had been several months since Ball previously hired them to do so.

The only evidence Plaintiffs identify as supporting the theory that Air Tech caused the fire by failing to clean the squirrel cage is a sample of honeycomb-like material which they claim was collected from the eastern squirrel cage fan. However, it is plain that the sample they rely upon was actually recovered from the *west* exhaust assembly. (AT App. pp. 553:14-555:11; 725:19-726:10, 727; 734-740; 730:16-731:4; 751-762). Moreover, given that there the tar-like form of accumulations – which had a tendency to run down surfaces and drip – were observed inside of the blowers and that the inspection of the blowers (and collection of the sample in question) occurred only after the exhaust assemblies were removed, transported, and placed in storage for well over a year, there is absolutely no competent evidence that the fire was caused by something improperly left in the eastern squirrel cage. *Gabb v. Wexford Health Sources,*

*Inc.*, 2019 U.S. App. LEXIS 18097 *12 (speculation and conjecture cannot overcome a motion for summary judgment).

## <u>CONCLUSION</u>

For all of the above and foregoing reasons, this Court should grant Air Tech's Motion for Summary Judgment. There is no admissible evidence giving rise to any reasonable inference that Air Tech breached any obligation it might have owed to Plaintiffs, or that any such breach caused the May 23, 2014 fire in question. Air Tech is entitled to judgment as a matter of law.

Respectfully submitted,


/s/ Jacob M. O'Brien
Jacob M. O'Brien, ID # 31445-09
Andrew B. Miller, ID # 18795-45
Starr Austen & Miller, LLP
201 South Third Street
Logansport, IN 46947
P:  (574) 722-6676
Email: obrien@starrausten.com
       miller@starrausten.com


*ATTORNEYS FOR DEFENDANT*
*AIR TECH OF MICHIGAN, INC.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 16, 2019, I served the foregoing on counsel of

record via electronic mail.

Mark N. Senak
msenak@skgsmlaw.com

s/ Jacob M. O'Brien
Jacob M. O'Brien
Starr Austen & Miller, LLP
201 South Third Street
Logansport, IN  46947
(574) 722-6676
(574) 753-3299
miller@starrausten.com

100114.006/msj memo