**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA**


BALL CORPORATION, an Indiana )
corporation and FACTORY MUTUAL )
INSURANCE COMPANY, a Rhode )
Island corporation, as subrogee, )
                )
       Plaintiffs, )
                )     4:16-cv-00042-RL-APR
      v. )
                )
AIR TECH OF MICHIGAN, INC., )
a Michigan corporation, )
                )
       Defendant. )


**<u>PLAINTIFFS' RESPONSE DEFNDANT'S MOTION TO EXCLUDE</u>**


Mark N. Senak
SENAK KEEGAN GLEASON & SMITH, LTD
566 West Adams Street, Suite 750
Chicago, Illinois  60661
T: 312-214-1400 / F: 312-214-1401
Email: msenak@skgsmlaw.com

## INTRODUCTION

Defendant's Motion may make for good a cross-examination or closing argument, but it does not warrant the exclusion of Mr. Howell's testimony.  Defendant's Motion should be denied because Mr. Howell is well-qualified, his testimony is relevant, and his methodology complied with the rigors of the National Fire Protection Associations guidelines on fire investigation ("NFPA 921").  Because Mr. Howell's testimony satisfies each of these prerequisites for admissibility, the task of weighing his testimony and judging his credibility should be left to the jury.

## I.    PLAINTIFFS' CAUSE AND ORIGIN EXPERT COMPLIED WITH NFPA 921

Defendant's overarching contention is that Scott Howell, Plaintiffs' cause and origin expert, "did not consider or rely upon any of the types of information NFPA 921 identifies as the guideposts to a determination of the fire's origin."  [DE 96, p. 9 of 26] Despite this contention, Defendant's counsel never asked Mr. Howell if he complied with NFPA 921 during Mr. Howell's deposition.  Had defense counsel done so, Mr. Howell would have testified consistently with his Report, in which Mr. Howell affirmatively states:

> While performing our investigation we employed the methodology of fire investigation using the systematic approach as recommended in the current edition of the National Fire Protection Association 921 – Guide for Fire & Explosion Investigations.

Ex. 1, Rimkus June 9, 2017 Report.[1]  Even setting aside Mr. Howell's affirmation, when the steps taken by Mr. Howell are subjectively compared to the methodology recommended in NFPA 921, it becomes clear Mr. Howell complied with NFPA 921 when formulating his opinions on the origin and cause of the fire.

---

[1]  The exhibits to Plaintiffs' Response to Defendant's Motion for Summary Judgment and the exhibits to Plaintiffs' Response to Defendant's Motion to Exclude the testimony of Scott Howell are submitted in a combined Exhibit Index.

"Courts throughout the country have recognized that NFPA 921 offers a comprehensive, peer-reviewed, and detailed guide for fire investigation, and have held that its methodology is reliable for purposes of Rule 702." *Citizens Ins. Co. v. LG Elecs. USA, Inc*., 2012 WL 3294962, at *3 (S.D.Ind. 2012).  Section 4.4 of NFPA 921 outlines the "Basic Method of Fire Investigation," which includes: receiving the assignment (4.4.1); preparing for the investigation (4.2.2); conducting the investigation (4.4.3); collecting and preserving the evidence (4.4.4); analyzing the incident (4.4.5); and conclusion (4.4.6).  Ex. 5, NFPA 921 § 4.4 (2017 ed.)

### A.   NFPA 4.4.1: RECEIVING THE ASSIGNMENT

Rimkus Consulting Group, Inc., received the assignment from the Plaintiffs to investigate the origin and cause of the fire the day the fire was extinguished.  Ex. 2, Howell Dep., p. 7:13 – 8:2. *See also*, Ex. 3, Rimkus Job Assignment.

### B.   NFPA 4.4.2: PREPARING FOR THE INVESTIGATION

Rimkus assigned Mr. Howell and Otto Soyk, Rimkus's Western Regional Fire Division Manager, to conduct the investigation, and immediately dispatched Mr. Soyk to the fire scene to begin the investigation.  Ex. 2, Howell Dep., pp. 5:14 – 9:5.  Defendant does not challenge the qualifications of either Messrs. Howell or Soyk or the relevancy of Mr. Howell's testimony. [DE 96, p. 3 of 26].  Mr. Howell is a certified Fire Investigator, a Registered Professional Engineer, and has qualified to testify as an expert witness in the area of origin and cause in both state and federal court.  Ex. 4, Howell Curriculum Vitae and Testimony Report.

### C.   NFPA 4.4.3: CONDUCTING THE INVESTIGATION

The first task recommended by NFPA 921 is determine point of origin by conducting an initial scene assessment.  Ex. 5, NFPA 921 §§ 18.2.5, 18.3.1.  This includes, among other things, an examination of the structure to determine fire patterns and areas of fire damage (18.3.1.6);

consideration of any witness observations (18.3.3.15); and identification of the potential first fuels ignited and the characteristics of those fuels (18.3.3.2).  *Id.*  Messrs. Howell and Soyk took each of these steps.

### 1.    NFPA 18.3.1.6: EXAMINATION OF THE STRUCTURE

Mr. Soyk arrived at the Ball Monticello plant the morning after the fire and spent the next ten hours examining, documenting, and photographing the scene, interviewing witnesses, and conducting the initial phase of the investigation. *Id.* at pp. 8:17 – 25.  Ex. 6, Rimkus Invoices.   Mr. Howell personally examined the scene over a three day period before any repairs or alterations were made to IBO No. 2 or the adjacent ductwork.  Ex. 1, Rimkus June 2017 Report, p. 1.  He also conferred with Mr. Soyk regarding Mr. Soyk's examination of the scene, reviewed photographs taken by Mr. Soyk during his examinations,[2] and reviewed the Monticello Fire Department Report when it became available.  *Id.*  Over the next 16 months, Messrs. Howell and Soyk examined the fire scene and artifacts on seven separate occasions, spending a total of 117.20 hours conducting the investigation.  Ex. 6, Rimkus Invoice.

### 2.    NFPA 18.3.3.15: WITNESS STATEMENTS:

Ball employees Robert Pellegrini, Wes Krintz, Randy Crume, Justin Stout, and Mike Rodgers are the first known witnesses to the fire.  All five reported first seeing smoke coming from the area of the east exhaust blower on top of IBO No. 2, which contains an impeller or fan blades commonly referred to as the "squirrel cage." [3]  Below is a photograph of the exhaust blower (the

---

[2]      The collaboration between Mr. Howell and Mr. Soyk is expressly condoned by the NFPA.  NFPA 4.4.3.2 notes that "reliance on previously collected data and scene documentation should not be inherently considered a limitation in the ability to successfully investigate n incident.  [DE 97-3]

[3]      A "squirrel cage," also known as a centrifugal blower, is used to move air in a variety of applications. The device is so named because its construction looks similar to a hamster wheel. At the heart of the squirrel cage blower is an impeller, which is a circular or cylindrical mechanism with a series of curved vanes. As the impeller rotates centrifugal force is applied to the air, causing it to move radially outwards to the walls of the blower or fan housing. The air follows a spiral trajectory – increasing in pressure and velocity – until it exits the discharge end of the blower. *See*, https://www.pelonistechnologies.com/squirrel-cage-fans.

exhaust blower is connected to the ductwork).



Immediately after the fire, all five Ball employees who witnessed the fire provided signed handwritten statements regarding their observations.  Ex. 7, Handwritten Statements.  Messrs. Crume, Pellegrini, and Krintz were also deposed, and each testified consistent with their written statements.  Ex. 8, Crume Dep. pp.68:20 – 70:16; Ex. 9, Krintz Dep. pp. p. 131:15 – 132:3; Ex. 16, Pellegrini Dep. p.72:5-8; p. 100:12-24.  Mr. Crume testified after he saw smoke coming from the east exhaust blower the paint on the outside of the metal blower housing in the area of the squirrel cage began "bubbling."  Ex. 8, Crume Dep. p. 73:4-20.  Mr. Krintz stated that after he saw smoke in the area of the exhaust blower, the metal housing of the exhaust blower in the area of the squirrel cage began "glowing orange."  Ex. 9, Krintz Dep. p. 116:3-25.

One of the Ball employees, Robert Pellegrini, had the good judgment to take a series of photographs, one of which is shown below, evidencing elevated temperatures in the area of the squirrel cage relative to other parts of the exhaust blower housing.  Ex. 11, Infrared Photographs. Ex. 10, Pellegrini Dep. Spencer Dep. pp. 168:5 – 170:16.



Messrs. Krintz and Crume testified in their depositions that as smoke continued to emanate from the exhaust blower temperature readings being taken by Mr. Pellegrini of the area with the infrared camera reached 600° - 700° F.  Ex. 9, Krintz Dep. pp. 138:6 – 139:17.  Ex. 10, Crume Dep., p. 121:3 – 16.

Messrs. Howell and Soyk also interviewed Freddy Spencer, the Engineering Manager for the Monticello plant. Ex 1, Rimkus June 2017 Report.  Mr. Spencer stated the Defendant's employees had just completed cleaning IBO No. 2 six hours before the fire was detected.  *Id* at p. 3.  Mr. Spencer also stated the Defendant's scope of work included cleaning the east exhaust blower, including the area of the squirrel cage.  *Id.* at p. 4.

Messrs. Howell and Soyk returned to the plant on June 2, 2014.  *Id.* at p. 1.  Over the next four days, they continued examining the scene, gathering data, and inspecting and preserving artifacts from the fire.  *Id.* at p. 11, ¶ 1.  Ex. 2, Howell Dep. pp. 35:24 – 36:12.  This included: the interior of IBO No. 2, *Id.* at p. 34:22-25; the other ovens at the plant, *Id.* at p. 35:8-10; the ductwork, *Id.* at p. 67:3-11; the blower motor in the squirrel cage, *Id.* at pp. 19:9 – 20:8; and the ductwork above the squirrel cage, *Id.* at p. 34:4-7.

###### 3.    IDENTIFICATION OF FIRST FUEL: SECTION 18.3.3.2

Mr. Howell knew from his conversation with Mr. Spencer that dust and particulate remained in the oven after the Defendant finished cleaning it, and the Defendant finished cleaning the oven only six hours before the fire was discovered.  Thus, Mr. Howell postulated the first fuel could have been dust and particulate or an item, such as a rag, used by the Defendant's employees to clean the oven.  Ex. 2, Howell Dep. p. 48:7 - 15.  However, the post-fire inspection did not reveal any evidence of a rag being in the oven, leaving the dust and particulate as the most likely first fuel ignited.  *Id.* at 48:16-49:21.

###### D.    NFPA 4.4.4: COLLECTING AND PRESERVING EVIDENCE

Messrs. Howell and Soyk made handwritten notes and field diagrams to document their findings.  Ex. 2, Howell Dep. p. 68:14 – 72:12.  Ex. 12, Field Notes and Hand-drawn Diagrams of Fire Scene.  They also took extensive photographs (361 photos) and videotape of the inside and outside of IBO No. 2, the ductwork, the squirrel cage, and the plant in general. Ex. 3, Howell Dep. p. 14:5-15; pp. 56:22 – 58:1; pp. 58:20 – 59:13; p. 67:8-16.  Ex. 13, Sample Photographs.[4] Messrs. Howell and Soyk also collected approximately 160 samples of fire debris, scrapings from the ductwork, and debris from the exhaust blower. Ex. 14, Rimkus Evidence Custody Forms. They also had the exhaust blower, including the squirrel cage, and the ductwork leading from the exhaust blower removed, labeled, and stored in a secure warehouse for future examination.

Messrs. Howell and Soyk had the Data Paq from IBO No. 2 downloaded from the oven's Programmable Logic Control (PLC) and generated an "oven curve" from the data for the three month period before the fire, including the restart process, which showed the oven temperature and conveyor speed for IBO No. 2.  Ex. 15, Data Paq.  Messrs. Howell and Soyk also examined

---

[4]    Due to the volume of photographs, a limited sample has been included as the Group Exhibit.

the Chart Recordings for IBO No. 2, which showed the moment-by-moment oven temperatures of IBO No. 2 until the oven was shut down because of the fire.  Ex. 16, Chart Recording.  Messrs. Howell and Soyk compared the Chart Recording for IBO No. 2 with Chart Recordings from IBO No. 1 to determine whether any temperature excursions had occurred.

Messrs. Howell and Soyk next examined the Daily Reports, which showed the repair and maintenance history of IBO No. 2. Ex. 17, Daily Reports.[5] They also reviewed the Safety Checklist, which reflected conditions in the oven during the restart procedure and spoke to Mr. Spencer to determine whether there were irregularities in the oven's operation before the fire. Ex. 18, Safety Checklist.

Messrs. Howell and Soyk next obtained information and reviewed records reflecting the cleaning history of IBO No. 2 and the adjacent ductwork.  Ex. 19, Air Tech Invoices.  Mr. Spencer stated the Defendant had spent the entire day before cleaning IBO No. 2.  Ex. 1, Rimkus June 2017 Rpt., p. 3.  Further investigation revealed Air Tech completed the cleaning process six hours before the fire was reported.  *Id.*  Mr. Spencer further advised that the Defendant had cleaned the oven at regular quarterly intervals for the preceding several years.  *Id.*  There were no records indicating the Defendant had recommended cleaning the oven or the ductwork more frequently.  Ex. 1, Rimkus May 2018 Supplemental Report.

The maintenance records further showed the Defendant cleaned the ductwork throughout the plant, including the ductwork from the east exhaust blower above IBO No. 2 on an annual basis; the last cleaning being done six months before the fire.  Ex 20, Scholten Dep. p.25:11-20 (Ex. 6); Ex. 21, Freddy Spencer Dep. pp.91:1 – 92:25; p. 123:1-10.   Messrs. Howell and Soyk spoke again with Freddy Spencer, the Monticello plant Engineering Manager, regarding prior fires

---

[5]     Mr. Howell reviewed Daily Reports for the period 5/22/13 to 5/22/14, consisting of 729 pages of documents. Due to the voluminous nature of this material, a limited sample has been included as the Exhibit.

at the plant.  Mr. Spencer conveyed that while there had been prior fires at the plant, none had originated in an exhaust blower or occurred immediately after an oven cleaning.  Ex. 22, Affidavit of Freddy Spencer

Messrs. Howell and Soyk next examined the Operations Manual for IBO No. 2, including the schematic diagrams of the oven.  Ex 23, Operations Manual, Table of Contents.[6]  The diagrams showed that the oven contained various sources of air: four intake blowers and seven recirculating blowers. Ex. 24, Oven Schematics. The intake blowers directed outside air to the four burner, where it used for combustion.  *Id.*  The recirculating blowers pulled air from the main oven compartment, passed it through to the burner to increase the temperature, and then recirculated it back into the oven.  *Id.*  The air from inside the oven was then pulled out of the oven and directed into the ductwork by the exhaust blower, where it was eventually vented outside the plant.  *Id.* This information was confirmed by interviews with Freddy Spencer and a review of Mr. Spencer's deposition.  Ex. 21, Freddy Spencer Dep. p. 24:5-14, p. 27:13 – 23, p. 28:2-15; pp. 30:18 – 31:8; pp. 66:18 – 67:2; p. 102:4-8; p. 103:10-21.

Messrs. Howell and Soyk next explored the cleaning process used by the Defendant.  Mr. Spencer stated the Defendant used electric grinders, wire brushes, and metal scrapers to remove the residue created by evaporate from the spray liner.  Ex. 1, Rimkus June 2017 Report. This process created dust and particulate that accumulated inside the main body of the oven.  *Id.*  At the end of the cleaning process, the Defendant attempted to remove the dust and particulate with a vacuum, but due to the consistency and volume of the particulate, some of the residue remained in the oven. *Id.*  Mr. Spencer's description of the cleaning process was corroborated by the deposition testimony of the Defendant's President, Mr. Scholten, and the Defendant's employees.  Ex. 20,

---

[6]      Due to the voluminous nature of the Operations Manual, only the Table of Contents has been included as the Exhibit.

Scholten Dep.55:13-16; 61:10-19.  Ex. 25, Woody Dep., 39:16-40:13. Ex. 26, Silva Dep. 5:2-20; Ex. 27, Wall Dep. 24:3-14.  Mr. Howell also returned to the plant to personally observe first-hand the cleaning process of another Internal Bake Oven. Ex. 1, Rimkus November 2017 Supplemental Report

Messrs. Howell and Soyk then inquired into the process used to restart IBO No. 2 after the Defendant completed cleaning the oven.  To ensure the Defendant removed all the dust and particulate from the oven as part of the cleaning process, Ball ran sheets of aluminum coated with a varnish, known as "flypaper," though the oven to capture the remaining residue. Ex. 29, Dale Spencer Dep. pp. 108:4 - 110:8.  As the residue is blown through the oven by the recirculating blower, some of it is blown out of the oven and some sticks to the "flypaper." *Id.*

Messrs. Howell and Soyk next determined the chemical properties of the residue the Defendant was hired to remove from inside IBO No. 2.  IBOs are used to cure a liquid spray liner (product name WB Spray Liner 640C692) applied to the inside of the cans to preserve the product. Ex. 1, Rimkus June 2017 Report.  After the spray liner is applied, the cans pass through the IBO, where they are exposed to heat to "cure" or dry the spray liner.  *Id.*  The evaporate that is created as a byproduct of this process is then pulled out of the oven by the exhaust fan, passed through a regenerative thermal oxidizer (RTO) to eliminate any volatile organic compounds (VOC), and then vented to the atmosphere through a system of ductwork. Ex. 29, Dale Spencer Dep. p. 52:7-15.

Messrs. Howell and Soyk obtained the Material Safety Data Sheet (MSDS) for the spray liner. Ex. 30, MSDS for Spray liner.  The MSDS indicated the spay liner was "Combustible," and had a flashpoint of 125.6° F.  *Id.* at pp. 1, 5. The Spray liner had an HMIS[7] Flammability rating of

---

[7]     HMIS is the acronym for Hazardous Materials Identification System.  It is a voluntary hazard rating scheme developed by American Coatings Association (ACA) to help employers comply with the workplace labeling requirements of the U.S. Occupational Safety and Health Administration's (OSHA) revised Hazard Communication Standard (HCS).

2 of 4, indicating it "[m]ust be moderately heated before ignition can occur." *Id.* at p. 9 of 9. Ex 31, HMIS Ratings Table.  Ex. 2, Howell Dep. p. 50:24 – 52:3.

Messrs. Howell and Soyk next investigated the temperature of the burner on IBO No.2. The Operations Manual contained no detailed information regarding burner temperatures. Messrs. Howell and Soyk, therefore, consulted a variety of authoritative sources, one of which stated a burner of the kind installed in IBO No. 2 could reach operating temperatures of 2200° – 2900° F. Ex. 1, Rimkus November 2017 Supplemental Report.

Messrs. Howell and Soyk next examined the exhaust blower that had been removed from IBO No. 2 after the fire.  Mr. Howell, who is also a registered professional mechanical engineer, examined the shaft and bearings of the blower motor and found the shaft move freely, suggesting there was no bearing failure.  Mr. Howell also inspected the inside of the metal housing of the exhaust blower and did not observe any scrapping or other evidence of friction.  Ex. 1, Rimkus June 2017 Report. Ex. 2, Howell Dep. pp. 70:13-25.

The inspection of the exhaust blower housing did reveal another piece of evidence.  Messrs. Howell and Soyk located a chuck of "honeycombed" residue, approximately the size of a fist, attached to the sidewall of the exhaust blower housing underneath the fan blades of the squirrel cage.  Ex. 2, Howell Dep. p 56:2 – 58:11.  *See also*, Ex. 32, Photo of Honeycombed Chuck Residue. This residue was located below the squirrel cage in the east blower in the exact location where the thermal photographs showed elevated temperatures, and where the Ball employees observed paint bubbling and the metal "glowing orange." Ex. 1, Rimkus June 2017 Report.

E.      **NFPA 4.4.5: ANALYZING THE INCIDENT**

Once Mr. Howell completed examining the scene, collecting data, and inspecting the artifacts from the fire, he began to analyze the information to formulate a final hypothesis on the

origin and cause of the fire.  Mr. Howell noted the witness statements and infrared photographs indicated the first evidence of fire was the smoke emanating from the east exhaust blower of IBO No. 2.  Ex. 1, Rimkus June 2017 Report. Ex. 2, Howell Dep. p. 39:5-14; pp. 40:23 – 42:13.

Based on the oven curve, chart recordings, repair and maintenance records, Safety Checklist, and testimony from various Ball employees, Mr. Howell was able to conclude "IBO 2 had been operating properly and holding temperature properly before it had been shut down for cleaning" and "[t]here had been no process upsets or unusual operation as IBO 2 was restarted after the cleaning until the fire occurred."  Ex. 1, Rimkus June 2017 Report. Mr. Howell was therefore able to eliminate oven malfunction as a potential heat source.  *Id.*

Mr. Howell's inspection of the oven and review of the oven's schematics indicated another potential heat source: the motor of the exhaust blower.  Ex. 2, Howell Dep. pp. 76:2 - 78:11. However, Mr. Howell's inspection of the blower motor revealed no bearing failure or evidence of friction that would have produced sufficient heat to cause ignition, so Mr. Howell was able to eliminate the blower motor as a potential heat source.  *Id.*

Again, relying on his inspection of the IBO No. 2 and the oven schematics, Mr. Howell noted the only other heat source in the vicinity was the burner.  *Id.*  According to authoritative source material reviewed by Mr. Howell, burners of the kind installed in IBO NO. 2 generate heat in the range of 2200° to 2900° F.  Ex. 1, Rimkus November 2017 Supplemental Report.

Mr. Howell noted the sole purpose of IBO No.2 was to dry the spray liner applied to the interior of the cans.  Ex. 2, Howell Dep. p. 20:9-16.  The cans and spray liner were the only substances that passed through the oven. Ex. 1, Rimkus June 2017 Report.  When the spray liner was heated, solvents evaporating from the spray liner left a residue on the inside of the oven and attached ductwork.  The tools used by the Defendant (grinders and scrapers) to remove the residue

11

created dust and particulate inside the oven and exhaust blower, which the Defendant was required to remove as part of the cleaning process.  However, some of this material remained in the oven after the cleaning process was completed.  This was true because Ball Corporation tried to remove any remaining dust and debris during the restart procedure by running "flypaper" through the oven.

Mr. Howell next noted that the MSDS for the spray liner stated it was "combustible" and "flammable," which according to the HMIS rating, means it will ignite if "moderately heated." Ex. 2, Howell Dep. pp.  51:22 - 52:3. Ex. 31, HMIS Table.  Mr. Howell knew from this review of the oven's schematics that there were seven recirculating blowers that pull air from inside the oven and recirculate it back to the burner before forcing it back into the oven and then out through the exhaust blower.  *Id*. at 20:9-21:1. Thus, Mr. Howell concluded there was a mechanism by which any combustible particulate left in the oven after the cleaning process would come in contact with a competent heat source (the burner) that could cause ignition.  *Id* at 22:17-23:13.  The only remaining issue was whether there was any evidence the burner actually ignited the dust and particulate left in the oven, and could the ignited particulate reach the area of the exhaust blower. *Id*. at 25:13-26:9. This question was answered by the deposition testimony of Wes Krintz, one of the Ball employees present when the fire was first discovered.

Mr. Howell noted that Mr. Krintz testified that when he looked in a hole in the ductwork downstream from the exhaust blower, he saw burning embers being blown through the ductwork. *Id.* at p. 116: 3-17; pp. 118:4 - 120:22.  This observation established two key facts for Mr. Howell: the heat from the burner was sufficient to ignite the dust and particulate left in the oven, and the ignited dust and particulate were able to reach the area of the squirrel cage since the squirrel cage was upstream from the hole where Mr. Krintz observed the embers streaming through the ductwork.  This testimony closed the loop for Mr. Howell.

Based on Mr. Krintz's observations and the other data collected during the investigation, Mr. Howell formulated his opinion on the origin and cause of the fire.  The first fuel ignited was dust and particulate left in the oven by the Defendant during the cleaning process that was pulled out of the oven by the recirculating blower and directed to the burner where it was ignited.  Ex. 2, Howell Dep. pp. 18:15 - 19:8; pp. 22:13 - 23:13; p. 70:16-23.  The recirculating blower then forced the ignited particles back into the oven, where they were pulled out by the exhaust blower and directed into the ductwork.  Ex. 1, Rimkus Reports.  Absent any impediments, the ignited particulate would have simply traveled through the ductwork and been exhausted out of the plant.

But, in this case, the chunk of honeycombed residue Mr. Howell found under the squirrel cage not only impeded the flow of the ignited particulate, it also provide a spot for the ignited particles to embed.  As more ignited particles accumulated in the chunk of residue, more heat was generated.  This residue was evaporate from the spray liner, which was both combustible and flammable, so when enough embers accumulated in the chunk of residue the fire ignited and propagated through the ductwork, aided by the air stream created by the exhaust blower.

Mr. Howell further concluded the Defendant should have removed the chunk of honeycombed residue from the area of squirrel cage because Paul Scholten admitted cleaning the exhaust blower and squirrel cage were within the scope of work the Defendant agreed to perform when cleaning IBO No. 2.  Ex. 20, Scholten Dep. p. 58:4-8.   Mr. Howell testified that his conclusion was based on a reasonable degree of fire science certainty.  Ex. 2, Howell Dep., p. 87:5-21.  Mr. Howell's opinions and conclusions were also subjected to an administrative review process, as provided by NFPA 4.6.1, and approved by Thomas Young, Vice President, Fire Division, Rimkus Consulting.  Ex. 1, Rimkus June 2017 Report, p. 1.

F.    **NFPA 4.4.6: CONCLUSION**

Mr. Howell summarized his opinions and bases for his opinions in a series of reports, all of which were disclosed to the Defendant in compliance with Fed.R.Civ.P. 26(e).  Ex. 1, Rimkus Reports

## II.     MR. HOWELL DETERMINED THE POINT OF ORIGIN BASED ON NFPA GUIDELINES

The defendant is critical of Mr. Howell's conclusion because "while there was ample evidence of heat damage in the squirrel cage exhaust housing (on both sides of the oven) and ductwork itself, such was lacking in the interior of the oven."  [DE 96 p. 8 of 26]  This argument falls prey to the very type of "expectation bias" the NFPA guidelines warn against. Ex. 5, NFPA 921 § 4.3.9. As the NFPA cautions, "accurate determination of the origin of a fire by a single dominant fire pattern is rare."  *Id.* at § 18.4.1.  When determining point of origin, the NFPA counsels, "[n]o single item is sufficient in itself.  The investigator should use all available resources to develop origin and spread hypothesis."  *Id.* at § 18.2.1.2.  The NFPA also notes that

In particular, the NFPA advises investigators to pay particular attention to ventilation systems when analyzing burn patterns to determine the point of origin.  *Id.* at §18.4.1.4.  "Ventilation," according to the NFPA, "during a fire has a significant impact on the heat release and consequently on the extent of observable burn damage." *Id.* at § 18.4.1.4.  Mr. Howell's review of the Operations Manual for IBO No. 2 revealed the oven had a series of blowers, all of which created a high velocity of airflow through the oven and ductwork.  The Monticello Fire Department Report also noted an explosion occurred in the ductwork above IBO No. 2 while the firefighters were spraying water in the ductwork.  Ex. 33, Fire Department Report.  The explosion occurred at least 33 minutes after the fire was initially detected.[8]   Given this information, Mr. Howell

---

[8]      Wes Krintz's written statement prepared immediately after the fire states he was called to IBO No. 2 at 12:20 a.m. when smoke was reported coming the exhaust blower.  Ex. 10, Krintz Dep., p. 126:2-16.  The infrared photograph of the exhaust blower taken by Bob Pellegrini is time-stamped 12:37 p.m.  Ex 12, Infrared Photographs.  The

concluded that regardless where the fire may have originated, the most significant fire damage would likely be found downstream near the exhaust blower, where the explosion reportedly occurred.

### III.    TESTING IS NOT A PREREQUISITE TO ADMISSIBILITY

The Defendant repeatedly asserts that Mr. Howell's conclusions are too speculative because he performed no testing.  [DE 96, pp. 13 – 14, 19 – 20, 23 – 24 of 26]  This same argument has been considered and rejected by courts in this circuit and other jurisdictions.  *See,* Plaintiffs' Response to Defendant's Motion for Summary Judgment, Section IV, pp. 15 – 18.

### IV.    MR. HOWELL RIGHTFULLY RELIED ON THE PROCESS OF ELIMINATION IN FORMULATING HIS OPINION

The defendant is also critical of Mr. Howell for determining the origin and cause by excluding other potential ignition sources and fuels by the process of elimination.  [DE 96, 7 of 26]  A similar argument was addressed by the District Court in *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*, 2007 WL 1850860 (N.D.Ind.,2007).  In *Superior Aluminum*, the plaintiff brought an action against its insured seeking coverage for damage resulting from run-out of molten aluminum due to the failure of bricks in an industrial furnace.  *Id.* at *1.  Like Air Tech, the defendant in *Superior Aluminum* moved to exclude the opinions of the opposing expert claiming they were "unreliable because they are not supported by sound methodology or reliable data." *Id.* at *4.

The court in *Superior Aluminum* first noted that as part of the cause and origin investigation, the expert inspected the scene, photographed the furnace after the incident, interviewed witnesses, and examined the allegedly defective bricks.  *Id.* at *8.  The expert in

---

Monticello Fire Department Report states the alarm was received at 12:48 a.m., and the fire department arrived at the scene at 12:53 a.m.  Ex 34, Fire Department Report.  The explosion is reported to have occurred sometime thereafter.

*Superior Aluminum* also examined design documents for the furnace, reviewed the maintenance and repair records, and consulted other scientific data generate by others in the field.  *Id.*  After gathering these facts and data, the expert in *Superior Aluminum* ruled out other possible causes of the failure in formulating his opinion. *Id.*

In denying the motion to exclude the expert's testimony, the court in *Superior Aluminum* began by commenting, "[p]ersonal observation is deemed often to be the most reliable source of information." *Id.* at 8. (citing *Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 372 F.Supp.2d 1104, 1116 (N.D.Ill. 2005) (citing *Daubert*, 509 U.S. at 590, fn. 9)).  The *Superior Aluminum* court further observed that "[r]eview of ... scientific data generated by others in the field may suffice as a reasonable methodology upon which to base an opinion."  *Id.* at *11.

Finally, the court in Superior Aluminum instructed "[e]liminating possible causes of a loss is a scientifically valid method for determining causation in certain circumstances. *Id.* at *11.  *See, Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1237 (10th Cir. 2004) (eliminating possible alternative causes was sufficiently reliable scientific methodology to establish cause of a gas leak); *St. Paul Mercury Ins. Co., v. Viking Corp.*, 2007 WL 129063, at *12 (E.D.Wis. 2007) (the general methodology of process of elimination is reliable); *Rudd v. Gen. Motors,* 127 F.Supp.2d 1330, 1343 (M.D.Ala.2001) (engineer's conclusion based on the process of elimination was sufficiently reliable; "[i]nference chains built upon circumstantial evidence are a well-established feature of admissible expert testimony"). *Cf, Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (C.A.7 (Ind.),2007) (holding that differential diagnosis[9] is a reliable technique of identifying cause of a medical problem by eliminating the likely causes until the most probable one is isolated).  The

---

[9] Differential diagnosis," is "the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." Stedman's Medical Dictionary 492 (27th ed.1995).

*Superior Aluminum* court concluded by commenting that the reasons offered for exclusion "while perhaps a basis for cross-examination, do not lead to the conclusion that [the expert] should be precluded from testifying."  *Id.* at *6.

The methodology approved by the court in *Superior Aluminum* mirrors the steps taken by Mr. Howell in the present case.  Mr. Howell inspected and photographed the scene, reviewed the witness statements and deposition transcripts of the Ball employees, examined the design drawings and maintenance records for IBO No. 2, and consulted the MSDS for the spray liner and authoritative articles on burner temperatures.  Having gathered and reviewed this data, like the expert in *Superior Aluminum*, Mr. Howell eliminated other potential ignition sources and fuels, which, as noted in *Superior Aluminum*, is a reliable and permissible method under Rule 702 for determining origin and cause of fire.

### V.   THE LOCATION OF THE HONEYCOMBED FIRE DEBRIS IS IRRELEVANT TO WHETHER MR. HOWELL'S METHODOLOGY WAS RELIABLE

Sensing the weakness of its earlier arguments, Defendant next resorts to pure fiction by claiming that Mr. Howell erroneously recovered the honeycombed chunk of debris from the west rather than the east exhaust blower.  This contention is based on the deposition testimony or, perhaps it is better said, the change in the deposition testimony of Mike Vergon, Defendant's origin and cause investigator.  Mr. Vergon was asked three times during in his deposition whether he knew where the chunk of honeycombed debris came from and each time he responded with an unequivocating, "I don't."   Ex. 34, Vergon Dep. p.180: 9 - 23.  Then, after the deposition, Mr. Vergon changed his testimony.  Mr. Vergon noted on his errata sheet that instead of intending to say, "I don't," he really intended to say, "I do."  Ex. 35, Vergon Errata Sheet.  Mr. Vergon claims he had this epiphany after a "review of my photographs after [the] deposition;" something he apparently did not do when preparing for his deposition.  *Id.*

Little can be gained by previewing Mr. Vergon's cross-examination regarding the change in his sworn testimony. Suffice it to say that such a fundamental change tarnishes Mr. Vergon's credibility and, by implication, the Defendant's argument. More relevant to the present analysis is that even if Mr. Vergon is correct, it does not result in the exclusion of Mr. Howell's testimony.

As *Daubert* teaches, the relevant inquiry under Rule 702 "is the scientific validity and thus the evidentiary relevance and reliability" of the expert's opinions. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 594–95 (1993). "The focus," according to the court in *Daubert,* "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* This same analytical framework was endorsed by the Seventh Circuit in *Gopalratnam v. Hewlett-Packard Company*, 877 F.3d 771 (7th 2017).

Emphasizing the gatekeeper function focuses on the expert's methodology, the Seventh Circuit in *Gopalratnam* commented, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Id.* at 781. The Seventh Circuit cautioned that "[t]he district court usurps the role of the jury and therefore abuses its discretion if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." *Id.* Thus, while whether Mr. Howell removed the honeycombed chuck of debris from the left or right exhaust blower may affect his credibility before a jury, it is immaterial to whether his methodology was reliable and his testimony is admissible.

Claiming Mr. Howell put the "cart before the horse," Defendant claims identification of a heat source is not properly part of the analysis in determining the point of origin. [DE 96 p. 7 of 26] This argument appears counterintuitive. According to NFPA 921, "Point of Origin" is "the exact physical location where a ***heat source*** and ***fuel*** come in contact with each other and a fire

begins." Ex. 5, NFPA 921 § 3.3.142. It would seem illogical to exclude heat source from the point of origin analysis when heat source is part of the definition. Even the Defendant concedes, "testing of the origin hypothesis may certainly entail questions of whether there is a competent heat source." [DE 96, p. 7 of 26]

But, setting logic aside, NFPA 18.6.1, which "recommends a methodology to follow for determining the origin of a fire," challenges the investigator to answer the question: "Is there a competent ignition source at the hypothetical origin?" Ex. 5, NFPA 921 § 18.6.1. Section 18.6.1 goes on to advise that "[t]he lack of a competent ignition source at the hypothesized origin should make the hypothesis subject to increased scrutiny." *Id.* This is the precise methodology used by Mr. Howell to conclude the point of origin was in the oven.

The witness statements all suggest the point of origin was in the exhaust motor. But, rather than accept the knee-jerk conclusion the point of origin was the exhaust blower, Mr. Howell posed the question recommended by Section 18.6.1: Was there a competent heat source in the exhaust blower?

One potential heat source was the blower motor. So, Mr. Howell put on his blue jeans and work gloves, pulled the exhaust blower out of storage, and examined the motor. Mr. Howell found the shaft of the blower motor moved freely, indicating it had not seized, and there were no signs of scrapping on the inside of the metal housing that would indicate friction could have been a heat source for ignition. Thus, while the Defendant criticizes Mr. Howell for not following NFPA guidelines, Mr., Howell did precisely what the NFPA directs: he tested the hypothesis that the exhaust blower was the point of origin by testing whether the blower motor could produce enough heat to cause ignition. When he disproved this hypothesis, he then examined the other heat source in the oven: the burner. Mr. Howell researched the temperatures of similar burners and determined

19

burners of this kind could reach temperature of 2200° - 2900° F.  Having eliminated all other heat sources, Mr. Howell concluded the only competent heat source that could have ignited the fire was the burners in IBO No. 2.

### VI.    MR. HOWELL RELIED ON WITNESS STATEMENT IN DETERMINING POINT OF ORIGIN

Defendant contends Mr. Howell, "does not make any effort to explain how those statements [of the Ball employees] indicate an origin inside the furnace."  [DE 96, p. 8 of 26]   This argument overlooks the significance of the testimony of Wes Krintz.  Mr. Krintz testified he saw ignited embers streaming through the ductwork downstream from the exhaust blower soon after smoke was observed coming from the area of the squirrel cage.  Mr. Howell relied on Mr. Krintz's testimony to establish not only that the burner generated enough heat to ignite the dust and particulate from the spray liner, but that the ignited particulate could sustain combustion until it reached the exhaust duct and squirrel cage.  Ex. 1, Rimkus June 2017 Report.   Analyzing this data led Mr. Howell to the conclusion that based on the NFPA's definition of point of origin – the ***exact physical location*** where a heat source and fuel come in contact with each other – the burner inside IBO No. 2 was the point of origin.

The defendant is next critical of Mr. Howell's methodology because "no witness claimed to have seen any indicia of fire inside IBO No. 2 or its burner box.  [DE 96, p. 8 of 26]  A potential jury argument, but a red-herring when considering whether Mr. Howell complied with NFPA 921.  First, under normal operating conditions the inside of the oven and burner are not visible from the outside.  Ex. 29, Dale Spencer Dep. p. 71:12-18.  Thus, the absence of witness testimony regarding the conditions inside IBO No. 2 is understandable; there is no way to see inside the oven or the burner before the fire.

Also, when the Ball employees arrived at the scene, smoke was already emanating from

the exhaust blower.  It is understandable the Ball employees elected not to open the oven when signs of fire were already visible.  Finally, while the absence of testimony regarding the conditions inside the oven and burner may be relevant to the weight of Mr. Howell's testimony, these factors do not diminish the reliability of the method he used to determine the cause and origin of the fire.

The Defendant again attacks the credibility of Mr. Howell's conclusions, not the reliability of his methodology, by claiming "there is no reference to any electronic data which supports his theory of origin."  [DE 96 8 of 26]  This argument ignores that Mr. Howell considered the electronic data downloaded from the PLC for IBO No.2 and the chart recordings of oven temperatures.  Moreover, Defendant does not identify what other electronic data existed that Mr. Howell did not consider.  In essence, Defendant faults Mr. Howell for failing to consider that which does not exist.

Defendant next detours into the area of comparative fault by claiming that Factory Mutual's recommendation that sprinklers be installed in the ductwork is somehow material to whether Mr. Howell's opinion is reliable.  While sprinklers in the ductwork may have limited the spread of the fire, Defendant fails to explain how sprinklers in the ductwork would have prevented ignition of the fire.

The Defendant attempts to connect the dots of this argument by noting that Factory Mutual advised Ball Corporation that "excessive build-up of combustible deposits inside the ductwork" increased the risk of fire.  [DE 96, p. 11 of 26]  Missing from this argument is any evidence Mr. Howell ignored or disregarded that the ductwork above IBO No. 2 contained combustible residue. Mr. Howell was certainly aware of residue in the ductwork, but no reliable data was available showing the amount or depth of any actual buildup in the ductwork ***before*** the fire.  Nor does the Defendant offer any evidence of what amount of build-up constitutes "excessive" or creates a risk

of fire.  The defendant does not even offer any indication of how frequently the ductwork should have been cleaned, or that Ball Corporation failed to clean the ductwork with sufficient regularity.

The NFPA states any conclusions on origin and cause should be based on "empirical evidence," or evidence "capable of being verified or known to be true."  Ex. 5, NFPA 921 4.3.2. In the absence of any data showing the amount of actual buildup *__before the fire__* or any authoritative source establishing how much build-up is "excessive," Defendant's claim there was excessive build-up of residue in the ductwork cannot be verified.  It is, therefore, at best, an opinion that may be used during cross-examination, or wanton speculation that would not pass the test for admissibility, let alone serve as a basis to exclude Mr. Howell's opinion.

The Defendant further argues that Mr. Howell's opinion should be excluded because FMIC advised Ball, "the risk of fire would be substantially reduced by thorough and regular cleaning of the fume extract ducts."  [DE 96, p. 11 – 26]  Defendant fails to explain how this advice compromises the reliability of Mr. Howell's origin and cause investigation.  Moreover, there is no evidence that Ball failed to regularly and thoroughly clean the ductwork.  In fact, there is evidence to the contrary.

Freddy Spencer, the Monticello Engineering Manager, testified the ductwork above IBO No. 2 was cleaned in November 2013, six months before the fire.  Ex. 21, Freddy Spencer Dep. pp. 90:17-22. *See also*, Ex. 29, Dale Spencer Dep. pp. 68:23 – 69:11. Ex. 20, Scholten Dep. p. 63:3-16.  There is no evidence that within the ensuing six months, residue accumulated to the point of being "excessive."  As to whether the cleaning was "thorough," it is unlikely the Defendant would claim otherwise; the Defendant was company that cleaned the ductwork. Ex. 29, Dale Spencer Dep. pp. 84:8 - 84:11; pp. 85:13 - 86:3

The Defendant contends that because there were other fires at the Monticello plant, Mr.

Howell's conclusion that the fire did not originate in the ductwork is hopelessly flawed. [DE 96 11 of 26] Initially, Defendant does not argue that Mr. Howell failed to consider the prior incidents when analyzing the situation. Rather, Defendant faults Mr. Howell for not giving the prior incidents more weight when formulating his opinions. This criticism goes to the issue of Mr. Howell's credibility, not the reliability of his methodology.

Moreover, none of the prior fires reported at the Monticello occurred under sufficiently similar conditions to make them a valid indicator of the point of origin in the present case. Ex. 1, Rimkus May 2018 Supp. Report. The October 9, 2011, and July 7, 2013, fires originated in ovens, not in the ductwork. Ex. 22, Declaration of Freddy Spencer ¶¶ 8 – 16. The April 3, 2013 fire originated outside the plant, in the Regenerative Thermal Oxidizer, which is pollution control device used to treat the air from the plant's ventilation system before it is vented to the atmosphere. *Id.* at ¶¶ 17 - 21. Given the dissimilarity between these occurrences and the present fire, Mr. Howell rightfully gave these prior fires little weight in formulating his opinion on origin and cause.

Defendant next claims Mr. Howell's reliance on dust found on cans that were in the oven when the fire started is too speculative to support Mr. Howell's conclusion the fire started inside the oven. [DE 96, p. 12 – 26] Defendant ignores the dust on the can was but one piece of evidence Mr. Howell relied upon in forming his opinion on point of origin. Mr. Howell's opinion was based on his examination and photographs of the fire scene, witness statements and deposition testimony, examination of the Operations Manual, oven diagram, maintenance records, the specifications for the blower, the chemical properties of the spray liner, and his inspection of artifacts from the fire. Given the body of evidence Mr. Howell relied upon in formulating his opinion, his conclusion regarding the origin of the fire is neither speculative nor unreliable.

The Defendant also queries how Mr. Howell could have deduced the contaminates on the

cans he examined came from inside the oven.  First, Defendant does not challenge Mr. Howell's observation that there were contaminants on the cans that passed though IBO No. 2 immediately before the fire.  The defendant contends that since the cans were "***collected*** outside of IBO No. 2" the presence of the contaminants cannot be linked to the particulate from the spray liner that was inside the oven.

The Defendant's argument ignores that although the cans were ***collected*** outside IBO No. 2, they were inside the oven only moments before when the fire was first discovered.   Ex. 2, Howell Dep. pp. 25:13 – 27:25.  As previously discussed, evidence that particulate from the spray liner remained in the oven after it was cleaned came from virtually every witness with knowledge of the cleaning process.  Considering the cans were in the oven moments before the fire and the evidence that contaminants remained in the oven after the Defendant's cleaned the oven only hours before the fire, Mr. Howell's conclusion that the contaminants on the cans were residue from the spray liner has some basis in fact.

## CONCLUSION

Defendant's Motion to Exclude should be denied because Mr. Howell's opinions and conclusions are based on an extensive investigation into the origin and cause of the fire that complied with the guidelines and methodology prescribed by NFPA 921.  Defendant's criticisms of Mr. Howell's testimony are simply attacks on the credibility of his opinions, not on the soundness of the methodology he used to formulate them.  But, the accuracy of Mr. Howell's conclusions is not the proper focus when deciding whether his methodology complies with the requirement of *Daubert* and Rule 702.  Consideration of the quality of Mr. Howell's opinions and the bases for his opinions are factual matters to be determined by the jury.

October 7, 2019                                 Respectfully submitted,

                                                BALL CORPORATION and
                                                FACTORY MUTUAL INSURANCE COMPANY

                                                By:  _____*s/ Mark N. Senak*_____
                                                     Mark N. Senak, one of its attorneys


Mark N. Senak
SENAK KEEGAN GLEASON & SMITH, LTD
566 West Adams Street, Suite 750
Chicago, Illinois  60661
T: 312-214-1400 / F: 312-214-1401
Email: msenak@skgsmlaw.com


## CERTIFICATE OF SERVICE

        I, Mark N. Senak, hereby certify that on October 7, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Indiana by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


                                        By:  ___*s/ Mark N. Senak*_____