## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| BALL CORPORATION, an Indiana corporation and FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island corporation, as subrogee, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AIR TECH OF MICHIGAN, INC., a Michigan corporation, | ) ) ) |
| Defendant. | ) ) |

4:16-cv-00042-RL-APR

### PLAINITFFS' COMBINED EXHIBIT INDEX

Plaintiffs BALL CORPORATION, and FACTORY MUTUAL INSURANCE COMPANY (FMIC), submits the following Exhibits in opposition to Defendant's Motion to Exclude the Testimony of Scott Howell and Defendant's Motion for Summary Judgment.

Exhibit 1:    Rimkus Consulting Group, Inc., Report, dated June 9, 2017, First Supplemental Report, dated September 29, 2017;   Second Supplemental Report, dated November 30, 2017, and Third Supplemental Report, dated May 29, 2019.

Exhibit 2:    Deposition of Scott Howell, Rimkus Consulting Group, Inc.

Exhibit 3:    Job Assignment, Rimkus Consulting Group, Inc.

Exhibit 4:    Scott Howell Curriculum Vitae and Testimony Report

Exhibit 5:    NFPA 921 (excerpts)

Exhibit 6:    Invoices, Rimkus Consulting Group, Inc.

Exhibit 7:    Handwritten Statements of Ball Corporation employees Randy Crume, Wes Krintz, Robert Pellegrini, Mike Rodgers, and Justin Stout

Exhibit 8:    Deposition of Randy Crume, Machinist/Millwright, Ball Monticello Plant

Exhibit 9:    Deposition of Wes Krintz, Machinist/Millwright, Ball Monticello Plant

Exhibit 10:   Deposition of Robert Pellegrini, Electric Technician, Ball Monticello Plant

Exhibit 11:   Infrared Photographs.

Exhibit 12:   Field Notes and Hand-drawn Diagrams of Fire Scene

Exhibit 13:   Sample Photographs

Exhibit 14:   Evidence Custody Forms, Rimkus Consulting Group, Inc.

Exhibit 15:   Oven Curves from Data Packs for IBO No. 2

Exhibit 16:   Chart Recorder for IBO No. 2

Exhibit 17:   Daily Reports for IBO No. 2

Exhibit 18:   Safety Checklist for IBO No. 2

Exhibit 19:   Invoices, Air Tech of Michigan, Inc.

Exhibit 20:   Deposition of Paul Scholten, President of Air Tech

Exhibit 21:   Deposition of Freddy Spencer, Engineering Manager, Ball Monticello Plant

Exhibit 22:   Declaration of Freddy Spencer

Exhibit 23:   Operations Manual, Table of Contents.

Exhibit 24:   Oven Schematics for IBO, No. 2

Exhibit 25:   Deposition of Oscar Woody, Air Tech employee

Exhibit 26:   Deposition of Gonsalo Silva, Air Tech employee who cleaned IBO No.2

Exhibit 27:   Deposition of Ken Wall, Air Tech employee who supervised cleaning of IBO No. 2.

Exhibit 28:   Deposition of Ruben Jimenez, Air Tech Employee who cleaned IBO No. 2

Exhibit 29:   Deposition of Dale Spencer,

Exhibit 30:   Material Safety Data Sheet (WB Spray Liner 640C692)

Exhibit 31:   Hazardous Materials Identification System (HMIS) Table

Exhibit 32:   Photograph of Honeycomb Residue

Exhibit 33:   Monticello Fire Department Report

Exhibit 34:   Deposition of Michael Vergon, Defendant's cause and origin investigator

Exhibit 35:   Errata Sheet for Vergon Deposition

Exhibit 36:   Deposition of Air Tech 30(b)(6) Deponent (Paul Scholten)

Exhibit 37:   "Inside a Ball Beverage Can Plant."

Exhibit 38:   Diagram of Internal Bake Oven

2

# Exhibit 1



Rimkus Consulting Group, Inc.
7501 South Quincy Street, Suite 160
Willowbrook, IL 60527
(866) 746-5871 Telephone
(630) 321-1847 Facsimile

# Report of Findings

## BALL CORPORATION INDUSTRIAL BUILDING FIRE

### RCG File No: 50901985

### Prepared For:

### SENAK, KEEGAN, GLEASON, SMITH & MICHAUD
### 621 PLYMOUTH COURT STE. 100
### CHICAGO, IL 60605

### Attention:

### MR. MARK SENAK



Otto W Soyk
Digitally signed by: Otto W Soyk
DN: CN = Otto W Soyk C = US O =
IdenTrust ACES Business Representative
OU = RIMKUS CONSULTING GROUP INC
Date: 2017.06.09 18:07:05 -06'00'

**Otto W. Soyk, Jr., IAAI-C.F.I.**
**Western Regional Fire Division**
**Manager**

Scott M Howell
Digitally signed by: Scott M Howell
DN: CN = Scott M Howell C = US O =
IdenTrust ACES Business
Representative OU = RIMKUS
CONSULTING GROUP INC
Date: 2017.06.09 17:58:01 -06'00'

**Scott Howell, IAAI-C.F.I., P.E.**
**062-053212**
**Principal Consultant**

June 9, 2017

# TABLE OF CONTENTS

I.   Introduction ........................................................................ 1

II.  Conclusions ........................................................................ 2

III. Discussion .......................................................................... 3

IV.  Basis of Report ................................................................. 11

V.   Attachments....................................................................... 13

    A. Photographs

    B. Scholton Airtech Email

    C. Curriculum Vitae

# Section I
# INTRODUCTION

A fire occurred at the Ball Corporation manufacturing plant on May 23, 2014, at approximately 12:20 a.m. The plant was located at 501 North 6th Street in Monticello, Indiana. The fire was extinguished by the Monticello Indiana Fire Department. Artifacts A through V were recovered during this investigation.

Rimkus Consulting Group, Inc. was retained to conduct an investigation into the origin and cause of this fire. Our investigation was conducted on May 24 and 31 2014, June 2, 3, 4, and 5 2014, and September 1, 2015. This investigation was conducted by Otto William Soyk C.F.I., Western Region Fire Division Manager, and Scott Howell, C.F.I., P.E., Principle Consultant. This report was reviewed by Thomas Young, IAI-C.F.I., Vice President Fire Division.

This report was prepared for the exclusive use of Senak, Keegan, Gleason, Smith & Michaud and was not intended for any other purpose. Our report was based on the information available to us at this time, as described in the **Basis of Report**. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

# Section II
# CONCLUSIONS

1. This fire originated in internal body oven 2 (IBO 2) at the east end. The fire then extended into the ductwork servicing IBO 2.

2. The cause of this fire was the ignition of combustible contaminants left in IBO 2 following the cleaning of the unit by Airtech, Inc. The burners ignited the contaminants which then ignited combustible build-up material in the blower assembly and ductwork above the oven that should have been removed by Airtech, Inc. The contaminants included small particulate material scraped off of the interior of IBO 2 just prior to the fire.

# Section III
# DISCUSSION

The structure involved was a commercial manufacturing plant owned and operated by Ball Corporation. The plant was approximately 375,000 square feet, with about 225,000 square feet being manufacturing area. The plant was built in 1964 and converted to aluminum can production in 1988 (**Photographs 1, 2, and 3**). The building had a fire sprinkler system, but no fire protection in the ovens or ducts exhausting the ovens. The plant consists of five manufacturing lines labeled 1, 2, 3, 4, and 5. The manufacturing lines included internal body ovens labeled IBO 1, 2, 3, 4, and 5.

On the date of the fire, a contractor, Airtech, Inc., cleaned IBO 2. Airtech, Inc. began work at approximately 7:30 a.m. on May 22, 2014, and completed their work at approximately 6:00 p.m. on May 22, 2014. There had been no problems with the run before manufacturing line 2 had been shut down for cleaning. The oven had been operating for about four hours after the cleaning before the fire was discovered.

IBO 2 was a drying oven manufactured by Metal Box Engineering (**Photograph 4**). The oven ran east to west with two burners and blower assemblies. Burner and blower assemblies were located toward the east and west ends of the oven. Each burner had two ducts to convey heated air into the oven. This created a four-zone arrangement, each with separate temperature control. The set temperature for Zone 1 was 225 degrees Fahrenheit (°F), Zone 2 was 350°F, Zone 3 was 400°F, and Zone 4 was 390°F. The oven was approximately 55 feet 10 inches long by 10 feet 6 inches wide by 7 feet tall. The building ceiling height was approximately 28 feet 2 inches from the floor. The east burner assembly was approximately 8 feet from the east end and the west burner assembly was approximately 12 feet from the west end. The east blower assembly was approximately 16 feet from the east end. The west blower assembly was approximately 8 feet from the west end. There was metal ducting attached to the tops of the blower assemblies. Eighteen-inch-diameter ducts were bolted directly to each blower. These two ducts were then manifolded into a single 20-inch-diameter duct over the oven. The

duct then traveled beneath the ceiling to the north and was manifolded with IBO 1. The combined duct beyond IBO 1 was about 30 inches in diameter. The duct ran out onto the roof as it increased in size to about 36 inches in diameter. The ductwork for IBO 5 manifolded into the line and created a 54-inch-diameter duct. The duct then terminated at a thermal oxidizer.

The manufacturing process used WB Spray Liner 640C692 (liner) and Water Reducible Varnish PPG3805801 (varnish). Both substances are combustible liquids. After the aluminum can bodies were formed, they were sprayed with the liner on the interior and the varnish on the exterior. From the spraying stations the can bodies entered the west end of the oven to begin the drying process. The can bodies traveled through the oven at about 13.5 feet per minute. During the drying process, combustible vapors condense in the oven, and to a lesser degree in the ductwork above the ovens.

The cleaning of IBO 2 was to remove the hardened residue from the interior of IBO 2 that was deposited as the liner and varnish dried. The cleaning was accomplished using wire brushes, powered grinders with wire brush attachments, and scrapers which turned the residue into a fine particulate material that was to be removed from the interior of the oven by Airtech, Inc. upon completion of the cleaning process. The cleaning process was to include the exhaust blowers for IBO 2. After Airtech, Inc. had completed the cleaning process, Ball Corporation employees operated the oven and blower and ran sheets of aluminum stock coated with varnish on the conveyor to collect stray particulate materials left in the oven that were caught in the air stream. There had been no process challenges or upsets in bringing IBO 2 back on line after the cleaning until the time the fire was discovered.

### Interviews

Interviews were conducted with employees of Ball Corporation over the course of this investigation. In summary, they gave the following information.

**Freddie Spencer:** Mr. Spencer has been employed by Ball Corporation for 28 years. He has been the engineering manager for 12 years. In that time he has observed

cleaning of the IBO between 40 and 50 times and managed the startup following cleaning numerous times. The cleaning of the oven is accomplished by first shutting down the oven. Lock-Out, Tag-Out procedures were then followed. The perforated panels and door hardware was removed. The interior of the oven is then cleaned using scrapers, wire brushes, and a grinder equipped with a wire brush head. The cleaning is to include all areas including the blower housing. The oven is divided into four zones referenced as Zones 1, 2, 3, and 4. Zones 1 and 2 are serviced by one blower unit and Zones 3 and 4 are serviced by the second blower unit. This fire originated in Zones 1 and 2 blower unit.

Prior to startup, a safety check is performed on the oven. This typically takes approximately one hour. At startup, the heat for the oven is turned on to a low setting, typically around 200°F. Aluminum sheet stock coated with varnish is then run through the oven to collect any stray particulates. Any product that is contaminated with particulates had to be discarded. The oven is then turned to operating.

**Mike Rogers:** Mr. Rogers was called to IBO 2 at approximately 12:20 a.m. because smoke was observed at the exhaust inside the building. Electricians had been called for earlier because employees smelled smoke. They shut down the burners but kept the blowers running to cool down the oven because the temperature on IBO 2 was about 20 degrees hotter than IBO 1. He was called back to IBO 2 at approximately 12:45 a.m. because the smoke had become heavier. He instructed the employees to use fire extinguishers on the oven through the inspection port. He returned to his office when he was informed that the oven now had open flames observed. The fire department was notified and the building evacuated.

**Justin Stout:** Mr. Stout was called to IBO 2 at approximately 12:20 a.m. because smoke was observed at the east exhaust fan for IBO 2. Temperatures were normal as measured with an infrared gun. Airflow was okay. They shut off the burners. The temperatures fluctuated, going down at first then spiking to 500°F at the east blower (**Figures A, B, and C**). Hand-held portable fire extinguishers were used without

success.  Open flames were observed at the blower.  The fire department was called and the building evacuated.



**Figure A**



**Figure B**



**Figure C**

**Randy Crume:** Mr. Crume observed the east exhaust blower smoking. The airflow was good. The heat at IBO #2 was originally at approximately 270°F, then went up to 700°F. He then observed flames at the east blower. He shut down the burners but left the blowers running. He observed a puff of smoke, then saw flames emanating from the blower. He used a portable fire extinguisher to try to extinguish the fire through the access hatch. The fire started to spread. The fire department was called and the building evacuated.

**Robert Pellegrini:** Smoke was seen emanating from the east exhaust fan housing. Mr. Stout asked for an infrared gun. Temperature at the east blower was measured at approximately 275°F. Line 1IBO was measured at approximately 255°F for comparison. Burners for IBO 2 were shut down and the fans left running. The temperature initially dropped, then spiked to approximately 520°F. He observed the insulation burning on east blower. The exhaust fans were shut down and fire extinguishers were used to attempt to extinguish the fire. Flames were observed at the exhaust inlet. The fire department was called and the building evacuated.

**Wes Krintz:** Mr. Krintz was called to line2 IBO because of smoke emanating from east blower. They checked the temperature with a heat gun and compared the temperature with line 1IBO . They were within 20°F of each other. The IBO 2 burners were turned off, but the blowers left on to cool down the oven. He continued to observe smoke at

the east blower.  They obtained a scissor lift and used fire extinguishers in an attempt to extinguish the fire.  The fire continued to grow.  He observed the east blower fully involved in fire on the interior.  The supervisor was then notified.  The fire department was notified and the plant evacuated.

**Scene Examination**

We observed discoloration to the ductwork connected to IBO 2 indicative of internal fire/heat damage inside of the ductwork.  The underside of the roof was discolored adjacent to the duct work due to heat and fire exposure (**Photographs 5 through 9**).  The 18-inch-diameter duct was connected to exhaust fans on the east and west sides.  The ducts from the exhaust blowers then connected to a "Y" that combined the two exhaust streams into one 22-inch-diameter duct that ran through the roof.  This allowed the fire and heat to extend to the ductwork for both the east and west exhaust fans.

The exterior of the ductwork where it entered into IBO 2 was coated with a tar-like substance that had liquefied and run due to heat exposure (**Photograph 10**).  The interior of the east exhaust fan housing contained a significant amount of the tar-like substance that had sustained heat and fire exposure damage (**Photographs 11 through 13**).  The exhaust fan housing had discolored as a result of heat and fire exposure.  We observed a substance similar to fire-damaged creosote on the interior of the east fan housing (**Photographs 14 through 16**).  This tar-like material was to have been removed prior to the fire during the cleaning process.

We examined the cans that had been run by IBO 2 prior to the fire (Artifact J).  We observed small particles adhering to the exterior of the cans consistent with the material scraped off during cleaning not having been removed after it had been scraped off (**Figures C and D**).



**Figure C**



**Figure D**

This material would have been the remains of the combustible liquid coatings used in the manufacturing process that had been loosened by the cleaning process and left within the oven.

Inspection of the east blower assembly on September 1, 2015, found that the bearings were still intact and operating after the fire. There was no scraping of the impeller against the blower body noted. The blower was not the ignition source for the fire. Significant buildup of materials was noted deep within the blower (**Photograph 17**). This material should have been removed by Airtech, Inc. during the cleaning hours earlier.

IBO 2 had been operating properly and holding temperatures properly before it had been shut down for cleaning. There had been no process upsets or unusual operation as IBO 2 was restarted after the cleaning until the fire occurred. The only ignition source within the oven was the main burner. The fire could only have occurred as a result of combustible materials being left in close proximity to the main burners of the east burner assembly. Only Airtech, Inc. employees had been inside the oven during the cleaning process. Airtech, Inc. was responsible for properly disposing of the materials. The east blower assembly for IBO 2 had sustained a noticeably greater degree of discoloration and heat damage as compared to the west blower assembly.

## Section IV
## BASIS OF REPORT

1. Examination of the fire scene on May 24 and 31, 2014, and June 2, 3, 4, and 5, 2014.

2. Artifact examination September 1, 2015.

3. Interview with Employee Wes Krintz.

4. Interview with Employee Robert Pellegrini.

5. Interview with Employee Randy Crume.

6. Interview with Employee Justin Stout.

7. Interview with Employee Mike Rogers.

8. Interview with employee Freddie Spencer.

9. Examination of recovered artifacts on September 1, 2015.

10. Review of Monticello Indiana Fire Department Report.

11. Material Safety Data Sheets for WB Spray Liner 640C692, liner, and Water Reducible Varnish PPG3805801.

12. Infrared photographs taken at the time the fire was discovered.

13. FM Global loss report.

14. Airtech, Inc. invoice.

15. Monticello plant daily report.

16. Operations manual for IOB 2.

17. Email from Scholten at Airtech, Inc.

18. Exemplar cans.

19. While performing our investigation we employed the methodology of fire investigation using a systematic approach as recommended in the current edition of National Fire Protection Association 921 – Guide for Fire & Explosion Investigations.

# Section V
# ATTACHMENTS

A. Photographs

B. Scholton Airtech Email

C. Curriculum Vitae

**Section V**

**ATTACHMENT A**

# Photographs

Photographs taken during our inspection, which were not included in this report, were retained in our files and are available to you upon request.

**Photograph 1**
Building exterior.



**Photograph 2**
Building exterior.





**Photograph 3**
Building exterior.



**Photograph 4**
Identifiers on IBO 2.



**Photograph 5**
Exhaust duct above IBO 2.



**Photograph 6**
Exhaust duct above IBO 2.



**Photograph 7**
Ceiling above IBO 2.



**Photograph 8**
Ceiling and duct above IBO 2.



June 9, 2017
RCG File No. 50901985

**Photograph 9**
Ceiling and duct above IBO 2.



**Photograph 10**
Tar-like material on internal duct work for IBO 2.



June 9, 2017
RCG File No. 50901985

**Photograph 11**
Interior of IBO 2 by east exhaust fan.



**Photograph 12**
Interior of IBO 2 by west exhaust fan.



**Photograph 13**
East exhaust fan.



**Photograph 14**
Interior blower assembly for east exhaust fan.



**Photograph 15**
Blower for east exhaust fan with debris removed.



**Photograph 16**
Tar-like substance on east fan.



**Photograph 17**
Material recovered from the interior fan housing for the east exhaust fan.



**Section V**

**ATTACHMENT B**

# Scholton Airtech Email

## Paul Scholten

| | |
|---|---|
| **From:** | Paul Scholten <pscholten@sbcglobal.net> |
| **Sent:** | Tuesday, May 27, 2014 4:04 PM |
| **To:** | 'rmarler@ball.com' |
| **Subject:** | FW: Paul with Air tech |

Rodney I did talk Dale Spencer at Monticello after the fire and went over the cleaning with my guys as well. There are 2 fan housings that we clean on top of the IBO ovens that lead to the main exhaust. The cleaning requires us to open the access panel to the fan and clean out the fan and fan housing. This is a process we do every time and did do this time as well. I believe the fire started in the area above the fan housing where we cannot reach unless the duct above the fan housing is removed by maintenance giving access to the main duct. Cleaning above the fan housing is not part of a normal IBO cleaning process. I hate that this happen and maybe from now on the section above the fan housing should be removed so it can be checked and prevent a reoccurrence of this situation. Because we did a normal cleaning I do not feel that this is our responsibility but there needs to be a determination as to where the fire actually started.  If you have any questions or need more information my number is 616-836-2352.

Thank you.
Paul Scholten
Air Tech

**From:** Paul Scholten [mailto:pscholten@sbcglobal.net]
**Sent:** Tuesday, May 27, 2014 2:47 PM
**To:** 'Spencer, Jonathan D (Dale)'
**Subject:** Paul with Air tech

Dale I had a meeting with the guys to go over the cleaning for line 2. Everything in the 2 fan housings was cleaned as normal and all the debris was vacuumed out. What was also discussed is maybe what should happen from now on is to have maintenance unbolt and remove the section of the duct above the fan housing so we can get higher into the ductwork above. I have to believe that is where the fire started  more in the duct that goes into the main higher above the fan which  is not on a normal oven cleaning.  I just want to make sure that something like this never happens again. We do good work and I hate to see something like this happen

Paul

0067

**Section V**

**ATTACHMENT C**

# Curriculum Vitae





## OTTO WILLIAM SOYK, C.F.I., C.A.I., S.C.L.A.
## WESTERN REGION FIRE DIVISION MANAGER

Mr. Soyk holds a Master of Arts Degree and Bachelor of Arts Degree from Governors State University in Illinois, in addition to numerous specialized training classes in specific areas. He is an Adjunct Professor at Penn Foster College where he developed and teaches a course in fire investigation and National Fire Protection Association, NFPA, 921 with a target participant of fire fighters and law enforcement. He is a Certified Fire Investigator through the International Association of Arson Investigators, a Certified Arson Investigator through the Illinois State Fire Marshall's office, and a Senior Claims Law Associate through the American Education Institute. Mr. Soyk holds certificates from Moraine Valley Community College in Automotive Technology. Mr. Soyk has testified as an expert witness in arbitration hearings as well as state criminal and civil courts and has been recognized as an expert in fireplace installations in arbitration hearings.

Mr. Soyk has an extensive background in fire investigation, criminal investigation, and insurance fraud investigation. His professional experience includes fire, and explosion investigation, electric fire ignition experimentation, full scale fire testing of ignition scenarios, as well as computer fire modeling.

Mr. Soyk has conducted numerous live fire training tests for fire fighters, as well as fire investigators using authentic room furnishings. In addition, he has prepared and presented numerous training sessions for law enforcement, fire fighters, claims adjusters, and the public. He has conducted over 2000 fire investigations including large multi-million dollar commercial losses.

### EDUCATION AND PROFESSIONAL ASSOCIATIONS

Adjunct Professor - Penn Foster College
Master of Arts – Governors State University
Bachelor of Arts – Governors State University
Certified Arson Investigator - Illinois State Fire Marshall Office
Certified Fire Investigator - International Association of Arson Investigators
Certificate in Automotive Drive Train Technology MVCC
Breath-Alcohol Testing Operator
Member - International Association of Arson Investigators
Member - International Association of Arson Investigators (Illinois Chapter)
Past Member - International Association of Special Investigations Units
Past Member - International Association of Special Investigations Units (Illinois Chapter)

### EMPLOYMENT HISTORY

| | |
|---|---|
| 2004 – Present | Rimkus Consulting Group, Inc. |
| 1989 – 2004 | American Family Insurance |
| 1975 – 1989 | Midlothian Police Department |

**OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.**

**DETAILED PROFESSIONAL EXPERIENCE:**

**RIMKUS CONSULTING GROUP, INC.**                                    **2004- PRESENT**

Western Region Fire Division Manager

Performs timely on scene investigation and analysis of fire and explosion incidents including origin and cause determination in structures and vehicles. Analyzes of the performance of fire detection and suppression systems. Determines products and circumstances surrounding the initiation of the fire, and supports other engineering divisions within Rimkus Consulting Group. Responsible for the technical training and report reviews for the fire investigators within a multi-Regional area which constitutes multiple states. Responsible for development and presentation of continuing education training for claims adjusters.

**AMERICAN FAMILY INSURANCE**                                        **1989 – 2004**

Senior Investigator Special Investigations Unit                      2002-2004

Investigation of all types of insurance claims specializing in fire Origin and Cause including many large commercial, and liability losses. Responsible for complete investigations including background checks, interviewing, and liaison with Legal for Depositions, Arbitrations, Examinations under oath, and subrogations. Worked with claims to ascertain their requirements to specific loss investigation.

Assigned as Special Projects Manager Special Investigations Unit      2001 - 2002

Develop job descriptions. Acted as liaison between SIU and other divisions of the company. Assisted in the development and implementation of data base tracking systems.

Field Manager Special Investigations Unit                            1996 - 2001

Supervised 15 Investigators in a three state area. These Investigators were responsible for the investigation of all types of losses including low velocity vehicle impacts, life, and Fire Origin and Cause investigations. Responsible for the supervision of major case investigations, and large commercial fire losses. Responsible for hiring, and disciplining of investigators who reported to me. Assisted in the development and implementation of company policy as it related to the Special Investigations Unit.

Senior Investigator                                                  1989 – 1996

Responsible for the investigation of all types of losses with specific emphasis on Fire Origin and Cause Investigations.

**MIDLOTHIAN POLICE DEPARTMENT**                                      **1977– 1989**

Acting Detective Sergeant                                            1982-1989

Responsible for the supervision of the Detective Division of the Midlothian Police Department. This included the Juvenile division, and the evidence collection and preservation division. Responsible for making presentations to the general public on personal safety, and protection. Gave interviews to the media including radio, TV, and print media. Responsible for the investigation of al types of criminal activities including arson, murder, armed robbery, burglary, and mysterious deaths.

### OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.

Detective                                                                    1981 – 1982

Responsible for the investigation of all types of criminal activities including Arson, Murder, Armed Robbery, Burglary, and mysterious deaths.

Patrolman                                                                    1977 – 1981

Responsible as a first responder to all types of criminal activities, and the enforcement of criminal statutes.

### PROFESSIONAL LICENSES

Private Detective State of Illinois #115.002075 /PERC 129.271551
Private Detective State of Wisconsin #16626-62
Private Detective State of Louisiana #6622-031907-LA
Private Detective State of Florida #C2700367
Private Detective State of Indiana
State of Michigan Private Detective license #3701205835
Private Detective State of Ohio 200721001277
Private Detective State of Minnesota
Private Detective State of Iowa
Private Detective State of Missouri

### DESIGNATIONS

**INSURANCE**
Senior Claim Law Associate
Fraud Claim Law Specialist
Fraud Claim Law Associate
Property Claim Law Associate
Workers Compensation Claim Law Associate
Certificate in Automotive Drive Train Technology MVCC
Hazwoper
Bendix Commercial Brake Systems

**LAW ENFORCEMENT**
Youth Officer
Breathe Analyzer Operator
Certified Arson Investigator

### LAW ENFORCEMENT CERTIFICATION

Basic Law Enforcement
Breath-Alcohol Testing Operator
Northeastern Metropolitan Enforcement Group (Drug) 40 Hours
Homicide the Law and Investigative Technique
NEMEG
Evidence Handling and Forensic Science Techniques
Law Enforcement Photography
Basic Arson Investigation
Crime Scene Processing and Laboratory Procedures
Investigators in-service Training Course
Patent and Latent Fingerprint Evidence Collection
Intra-Familial Child Sexual Abuse
Reid Technique of Interviewing and Interrogation
Illinois Youth Officers Conference

## OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.

Child Abuse and Exploitation Investigative Techniques Training
Youth Officer Training
Satanic and Occult  Worship
NEMEG (40 Hours)
Ritualistic Child Abuse, Adolescent Involvement and Teen Suicide
Implied Consent

### FIRE CLASSES – INSTRUCTOR

CE Training Nationwide Automotive Adjusters 04/12
Develop Fire Investigation Course for Penn Foster College
In-service Training January 2011
In-Service Training December 2010
Guest Instructor Moraine Valley Community College – 4/22/1996
Live burn training City of Kankakee – 10/26/1994
Live Burn Training Greeley, Colorado – 5/6/1993
Live Burn Training Davenport, Iowa – 10/17/1991
CE in-service training Travelers Insurance        09/21/07
CE in-service training commercial vehicle fires Great American Insurance 10/12/07
Live Burn Training Posen, Illinois 08/14/08
NTHECC CE Training 10/04/08
Live Burn Training 08/27/09 Posen, Illinois
Live Burn Training Posen, Illinois 08/10
Live burn training Blue Island, Illinois 08/13
Live Burn Training Jacksonville, Mississippi 06/13
Live burn training Blue Island, Illinois 08/14
Subrogation Execusummit 03/13
Numerous presentations within Rimkus Consulting Group, Inc.

### INSURANCE CLASSES – INSTRUCTOR

Adjuster Fire Investigation Class - June 2011
Adjuster Fire Investigation Class - May 2011
Adjuster Fire Investigation 4/10
Adjuster Vehicle Fire Training Columbia, MO 01/28/09
Adjuster Vehicle Fire Training St. Louis, MO 10/03/08
Adjuster Vehicle Fire Training Aurora, IL 08/05/08
Agent Fraud Training – 10/24/2001
Agent Fraud Training – 10/31/2000
EXCEL – 6/26/2000
Med Services Fraud Training – 11/3/1999
EXCEL – 6/28/1999
EXCEL – 1/28/1999
LVI Eden Prairie, MN – 1/12/1999
EXCEL – 11/18/1998
LVI St. Louis, MO – 8/11-12/1998
LVI Duluth, WI – 7/28/1998
LVI Wausau, WI – 4/21-22/1998
LVI Milwaukee, WI – 4/7/1998
LVI Eau Claire, WI – 3/17/1998
LVI Milwaukee, Wisconsin – 1/22/1998
LVI Madison, Wisconsin – 5/19/1997
LVI Training for SIU Madison, Wisconsin – 4/7-11/1997
Fraud Recognition Appleton, Wisconsin – 12/19/1996

**OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.**

EXCEL – 7/30-31/1996
Personal Safety – 5/3/1996
Personal Safety – 4/24/1996
Agent Fraud Training – 4/17/1996
SIU Training – 4/10-11/1996
EXCEL – 2/27-28/1996
EXCEL – 1/29/1996
Fraud Recognition Burr Ridge, IL – 10/24/1995
EXCEL – 8/1-3/1995
Fraud Recognition Burr Ridge, IL – 2/1/1995

## CONTINUING EDUCATION

### INSURANCE
Effective Interviewing (Inter-Company) – 9/3/2003
Evidence Guidelines (Inter-Company) – 9/3/2003
IASIU Conference – 9/9-13/2001
IASIU Annual Conference – 9/10-15/2000
Inter-Company SIU Class – 11/10-11/1998
IASIU International – 9/21-24/1998
IASIU Annual Conference – 9/14-19/1997
IASIU International – 8/5-9/1996
Introduction to Construction Techniques – 12/15/1992
Traumatic Injury – 4/28-30/1992
Medical Terminology – 1/29/1992
Intermediate Property Underwriting – 8/23/1990

### FIRE
IAAI ATC Las Vegas, NV 2014
IAAI Orlando, FL 2010
IAAI ATC Denver, CO 2008
IAAI ATC St. Louis, MO. 2005
IAAI ATC Denver Co. 2006
IAAI ATC Victoria BC 2007
Illinois Chapter IAAI - 09/15-19/2003
IAAI International Training Conference - 05/19-24/2002
Wisconsin Chapter IAAI - 06/04-08/2001
Wisconsin Chapter IAAI - 06/05-09/2000
ICAC Conference - 01/16-20/2000
IASIU Annual Conference - 09/13-17/1999
IAAI Wisconsin Chapter - 01/07-10/1999
ICAC Annual Conference - 01/18-22/1999
Wisconsin Chapter IAAI - 06/01-06/1998
Wisconsin Chapter IAAI - 06/02-06/1997
Illinois Chapter IAAI -09/07-11/1996
Illinois Chapter IAAI - 09/11-14/1995
Gas Appliance Fire Training - 03/20-21/1995
Illinois Chapter IAAI - 09/20-24/1994
Computer Fire Modeling - 07/25/1994
Illinois Chapter IAAI -09/15-19/1993
Illinois Chapter   IAAI - 09/16-20/1992
Advanced Arson Investigation (ATF) - 08/17-21/1992
Lightning Damage Seminar – 10/20/1993
Illinois Chapter IAAI – 9/14-19/1993

**OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.**

Arson Investigation – 5/1-6/1993
Arson Seminar – 2/21-22/1992
Arson Investigation – 10/15-17/1991
Illinois Chapter IAAI – 9/11-15/1991
Fire Explosion Phenomena – 1/7-9/1991
Illinois Chapter IAAI – 9/26-30/1990
Fire Chiefs Fire Seminar – 2/23-24/1990
Illinois Chapter IAAI – 9/6-10/1989
Advanced Arson Investigation – 11/15-19/1982
Basic Arson Investigation – 8/23 – 9/3/1982

**AUTOMOTIVE**
Basic Automotive Technology MVCC 2005
Basic Automotive Electronics  MVCC 2005
Advanced Automotive Electronics MVCC 2006
Manual Transmissions MVCC 2006
Automatic Transmissions MVCC 2007
Automotive Engine Rebuilding MVCC 2007
Bendix Commercial Brake Certificate 2013





### SCOTT M. HOWELL IAAI CFI, P.E.
### PRINCIPAL CONSULTANT

Mr. Howell holds a bachelor degree in Mechanical Engineering from the Illinois Institute of Technology in addition to an associate degree in Fire Science from the College of DuPage. He is an IAAI Certified Fire Investigator, Illinois State Certified Fire Investigator, Firefighter, Fire Officer and Paramedic

Mr. Howell has an extensive professional background in the areas of firefighting, fire investigation and gas and propane fired appliance failure evaluation. His professional experience includes fire and explosion investigation, electric fire ignition experimentation, product testing for ignition hazards, fuel gas leaks and ignitions, full scale fire testing of ignition scenarios, fire protection and detections system performance analysis, as well as commercial kitchen hood and duct evaluations.

Mr. Howell has conducted over 100 room size fires as training aides for firefighters and fire investigators using authentic room furnishings. Many ignition scenarios were utilized from flammable liquids to small explosive devices on ordinary combustibles. As a member of the Federal Emergency Management Agency's Major Fire Investigation Team, he has investigated major fires throughout the country publishing reports for use by fire departments nationally.

He was a wildlands firefighter with the California Division of Forestry. During his career with the Naperville, IL Fire Department he responded to fire incidents, investigated fires and conducted life safety inspections. As a fire investigator he routinely examined fire and explosions scenes to determine the origin and cause of the event.  Criminal investigations were conducted and presented for prosecution.

Since joining Rimkus Consulting Group in 2000 Mr. Howell has performed hundreds of investigations involving fire origin and cause, propane and natural gas explosions and mechanical failures.  Issues involved include operation of fire sprinkler systems, and restaurant hood and duct systems. Mr. Howell has been recognized as an expert and has extensive trial and deposition testimony experience in a variety of venues including Canada.

 Mr. Howell has experience in investigation of frozen pipes ranging from residential to commercial to industrial including domestic and fire protection systems. Energy usage records as well as building envelope investigation have been to determine specific cause of loss.

Analysis of accidents involving heat producing equipment is another area of expertise. Examples include lyophizers, commercial steamers, and space heaters.

**SCOTT M. HOWELL, P.E.**

## EDUCATION AND PROFESSIONAL ASSOCIATIONS

A.A.S. – Fire Science, College of DuPage, Glen Ellyn, Illinois, 1983
B.S. – Mechanical Engineering, Illinois Institute of Technology, Chicago, Illinois, 1993
Registered Professional Engineer – Illinois License # 062-053212
Registered Professional Engineer – Ohio License # E-67289
Registered Professional Engineer – Michigan License # 6201049929
Registered Professional Engineer – Wisconsin License # 35743-006
Registered Professional Engineer – Indiana License # PE10302123
Registered Professional Engineer – Iowa License # 16399
Registered Professional Engineer – Kansas License # 21211
Registered Professional Engineer – Minnesota License #49457

Member:     National Fire Protection Association
            Society of Fire Protection Engineers
            American Society of Mechanical Engineers

### EMPLOYMENT HISTORY

| | |
|---|---|
| 2000 – PRESENT | Rimkus Consulting Group, Inc. |
| 1994 – 2000 | Triodyne Fire and Explosion Engineers |
| 1987 – 1989 | Engineering Systems Incorporated |
| 1978 – 1989 | City of Naperville Fire Department |
| 1977 – 1978 | Pleasantview Fire Protection District |
| 1976 | California Division of Forestry |

## DETAILED PROFESSIONAL EXPERIENCE:

## RIMKUS CONSULTING GROUP, INC.                                  2000 – PRESENT

Principal Consultant

Timely on-scene investigation and analysis of fire and explosion incidents including origin and cause determination, analysis of fire detection and suppression systems, products and circumstances surrounding the initiation of the fire, and support to other engineering divisions within Rimkus Consulting Group.

## TRIODYNE FIRE AND EXPLOSION ENGINEERS                         1994 – 2000

Senior Engineer

Forensic engineering responsibilities including fire origin and cause determination. Extensive laboratory experience in reconstructing fire ignition scenarios for plausibility, including potential for residential electrical service to ignite various combustibles, radiant heating effects on wiring and ordinary combustibles, and small appliance evaluation for compliance with codes and standards. Experience included fuel gas releases and ignitions, restaurant hood and duct systems, sprinkler system performance and vehicle fire investigation.

## ENGINEERING SYSTEMS INCORPORATED                              1987 – 1989

Engineering Technician

Assemble and participate in experimental recreations of failure scenarios.

**SCOTT M. HOWELL, P.E.**

**CITY OF NAPERVILLE FIRE DEPARTMENT**                                  **1978 – 1989**

Fire Investigator, Firefighter – Paramedic

Conducted over 100 room size structural fires for training firefighters and fire investigators. Many ignition scenarios were used from flammable liquids to small explosive devices to open flame devices on ordinary combustibles. Practical instruction given on fire growth, smoke spread and bum pattern recognition during these exercises. Conducted fire investigations to determine origin and cause. Worked within a task force framework to build criminal cases. Prepared and presented department-wide training in several subject areas. Conducted fire and life safety inspections review automatic sprinkler designs for compliance with local codes.

**PLEASANTVIEW FIRE PROTECTION DISTRICT**                              **1977 – 1978**

Firefighter

Respond to and mitigate emergency incidents.

**CALIFORNIA DIVISION OF FORESTRY**                                    **1976**

Firefighter

Wildlands firefighting.

**PROFESSIONAL TRAINING**

Fire Finding Laboratories
Investigation of Gas and Electrical Appliance Seminar

Vehicle Fire Investigation, by Lee Cole
Origin and Cause of Vehicle Fire

National Fire Protection Association
NFPA 13 Automatic Sprinkler Design

National Fire Protection Association
NFPA 72 National Fire Alarm Code

National Fire Protection Association
Design of Smoke Control Systems

Illinois Fire Service Institute
Hazardous Material First Responder

Chicago Fire Department
Electrical Fire Investigation

Fire and Arson investigation
National fire Academy

Illinois Department of Transportation
Hazardous Materials Seminars

Page 3

**SCOTT M. HOWELL, P.E.**

**TECHNICAL REPORTS AND SEMINARS PRESENTED**

"Known As Arc, In Line and Wet Electrical Fires", Triodyne Safety Bulletin August 1998 (with John Campbell)

Presented Residential Natural Gas Explosion Seminar To Northern Illinois Arson Task Force. May 1998, Rosemont, Illinois

Entrapment in Garage Kills One Firefighter, San Francisco, California, March 1995 (Report #084), United States Fire Administration

Manufacturing Mill Fire, Methuen, Massachusetts, December 1995 (Report #110), United States Fire Administration

St. George Hotel Complex 18 Alarm Fire, Brooklyn, New York, August 1995 (Report #108), United States Fire Administration

Davis & Young 2004 Annual Law Seminar, Large Loss Property Claims: Investigation and Defense Strategy



**Rimkus Consulting Group, Inc.**
**7501 South Quincy Street, Suite 160**
**Willowbrook, IL 60527**
**(866) 746-5871 Telephone**
**(630) 321-1847 Facsimile**

September 29, 2017

Mr. Mark Senak
Senak, Keegan, Gleason, Smith & Michaud
621 Plymouth Court Ste. 100
Chicago, IL 60605

Re:    Style:          Ball Corporation/Factory Mutual Insurance Company vs.
                       Air Tech of Michigan, Inc.
       RCG File No:    50901985
       **Subject:        Supplemental Report of Findings**

Dear Mr. Senak:

A fire occurred at the Ball Corporation manufacturing plant on May 23, 2014, at approximately 12:20 a.m. The plant was located at 501 North 6th Street in Monticello, Indiana. The fire was extinguished by the Monticello Indiana Fire Department. Artifacts A through V were recovered during this investigation.

Rimkus Consulting Group, Inc. was retained to conduct an investigation into the origin and cause of this fire. Our investigation was conducted on May 24 and 31, 2014, June 2, 3, 4, and 5, 2014, and September 1, 2015. This is a supplement to our **Report of Findings** dated June 9, 2017. This report was reviewed by Otto William Soyk, Western Region Fire Manager.

Since the June 9, 2017, **Report of Findings** additional materials have been reviewed and considered. These materials include:

- Vergon and Associates fire investigation report dates August 18, 2017

- Envista Forensics Forensic Report dated August 18, 2017

- The deposition testimony transcript of Rubin Jimenez dated August 30, 2017

- The deposition testimony transcript of Oscar Woody dated August 30, 2017

- The deposition testimony transcript of Ken Wall dated August 30, 2017

September 29, 2017
RCG File No. 50901985                                                                      Page 2

## Conclusions

Our conclusions from that report remain unchanged and are listed below for the reader's convenience.

1. This fire originated in internal body oven 2 (IBO 2) at the east end. The fire then extended into the ductwork servicing IBO 2.

2. The cause of this fire was the ignition of combustible contaminants left in IBO 2 following the cleaning of the unit by Airtech, Inc. The burners ignited the contaminants which then ignited combustible build-up material in the blower assembly and ductwork above the oven that should have been removed by Airtech, Inc. The contaminants included small particulate material scraped off of the interior of IBO 2 just prior to the fire.

## Discussion

The Vergon and Associated report takes issue with several portions of the Rimkus Consulting Group investigation. The Vergon report claims that no witnesses were interviewed by Rimkus investigators in the course of our investigation. This is not true. Mr. Soyk interviewed Misters Krintz, Pellegrini, Crume, Stout, Rogers, and Spencer as indicated on page 11 in the "Basis of Report" of our June 9, 2017, **Report of Findings.**

Mr. Vergon seems to imply that we did not apply NFPA 921 properly when evaluating this fire loss. During the investigation the scientific method was utilized extensively. The gathering of facts, analysis of available information including fire damage patterns, electronic and witness data, and fire dynamics were considered. Hypotheses were constructed and tested against the facts and information gathered. As explained in Mr. Howell's deposition testimony there is only one hypothesis that stands up to the testing. That hypothesis then became our opinion as to the ignition scenario of this fire. The fact that Mr. Vergon was not able to determine the cause of the fire does not mean it is not possible to determine the cause of the fire.

The first two conclusions in the Envista report do not contradict our opinions as stated in the June 9, 2017, **Report of Findings**. Conclusion 3 states "No information was discovered that the fire in the ventilation exhaust duct was a result of the poor workmanship by Airtech." The conclusion itself states that there was poor workmanship by Airtech. Additionally, debris was found in the east blower during the September 1, 2015, artifact inspection. At that inspection, loose debris was found and removed from the east blower. In an almost inaccessible portion of that blower solid debris fused to the inside of the blower housing was also found. When this was found, Rimkus advised the other experts of the change in the form and consistency of the material in the blower and encouraged other experts to take note. Both Mr. Vergon and Mr. Honaker inspected the material. It was obvious to all that this material was different in both

September 29, 2017
RCG File No. 50901985                                                        Page 3

location and form than that which had fallen from the duct above during the fire. This was the material that had not been removed from the blower during the cleaning.

As a result of the additional material reviewed and analyzed there are no changes to our opinions.

This report was prepared for the exclusive use of Senak, Keegan, Gleason, Smith & Michaud and was not intended for any other purpose. Our report was based on the information available to us at this time. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

Thank you for allowing us to provide this service. If you have any questions or need additional assistance, please call.

Sincerely,
RIMKUS CONSULTING GROUP, INC.

**Scott M Howell**
Digitally signed by: Scott M Howell
CN = Scott M Howell C = US O = nTrust ACES Business
representative OU = RIMKUS CONSULTING GROUP INC
Date: 2017.09.29 11:15:25 -06'00'

Scott M. Howell., P.E.
Indiana Engineering Number PE103021
Principal Consultant

*Otto William Soyk*
Otto William Soyk IAAI-CFI (V)
Western Region Fire Manager

Attachment: Curriculum Vitae

September 29, 2017
RCG File No. 50901985

# Curriculum Vitae

**RIMKUS**
CONSULTING GROUP, INC.



### SCOTT M. HOWELL IAAI CFI (V), P.E.
### PRINCIPAL CONSULTANT

Mr. Howell holds a bachelor degree in Mechanical Engineering from the Illinois Institute of Technology in addition to an associate degree in Fire Science from the College of DuPage. He is an IAAI Certified Fire Investigator, Illinois State Certified Fire Investigator, Firefighter, Fire Officer and Paramedic

Mr. Howell has an extensive professional background in the areas of firefighting, fire investigation and gas and propane fired appliance failure evaluation. His professional experience includes fire and explosion investigation, electric fire ignition experimentation, product testing for ignition hazards, fuel gas leaks and ignitions, full scale fire testing of ignition scenarios, fire protection and detections system performance analysis, as well as commercial kitchen hood and duct evaluations.

Mr. Howell has conducted over 100 room size fires as training aides for firefighters and fire investigators using authentic room furnishings. Many ignition scenarios were utilized from flammable liquids to small explosive devices on ordinary combustibles. As a member of the Federal Emergency Management Agency's Major Fire Investigation Team, he has investigated major fires throughout the country publishing reports for use by fire departments nationally.

He was a wildlands firefighter with the California Division of Forestry. During his career with the Naperville, IL Fire Department he responded to fire incidents, investigated fires and conducted life safety inspections. As a fire investigator he routinely examined fire and explosions scenes to determine the origin and cause of the event. Criminal investigations were conducted and presented for prosecution.

Since joining Rimkus Consulting Group in 2000 Mr. Howell has performed hundreds of investigations involving fire origin and cause, propane and natural gas explosions and mechanical failures. Issues involved include operation of fire sprinkler systems, and restaurant hood and duct systems. Mr. Howell has been recognized as an expert and has extensive trial and deposition testimony experience in a variety of venues including Canada.

Mr. Howell has experience in investigation of frozen pipes ranging from residential to commercial to industrial including domestic and fire protection systems. Energy usage records as well as building envelope investigation have been to determine specific cause of loss.

Analysis of accidents involving heat producing equipment is another area of expertise. Examples include lyophizers, commercial steamers, and space heaters.

---

# SCOTT M. HOWELL, P.E.

## EDUCATION AND PROFESSIONAL ASSOCIATIONS

A.A.S. – Fire Science, College of DuPage, Glen Ellyn, Illinois, 1983
B.S. – Mechanical Engineering, Illinois Institute of Technology, Chicago, Illinois, 1993
Registered Professional Engineer – Illinois License # 062-053212
Registered Professional Engineer – Ohio License # E-67289
Registered Professional Engineer – Michigan License # 6201049929
Registered Professional Engineer – Wisconsin License # 35743-006
Registered Professional Engineer – Indiana License # PE10302123
Registered Professional Engineer – Iowa License # 16399
Registered Professional Engineer – Kansas License # 21211
Registered Professional Engineer – Minnesota License #49457

Member:    National Fire Protection Association
           Society of Fire Protection Engineers
           American Society of Mechanical Engineers

## EMPLOYMENT HISTORY

| | |
|---|---|
| 2000 – PRESENT | Rimkus Consulting Group, Inc. |
| 1994 – 2000 | Triodyne Fire and Explosion Engineers |
| 1987 – 1989 | Engineering Systems Incorporated |
| 1978 – 1989 | City of Naperville Fire Department |
| 1977 – 1978 | Pleasantview Fire Protection District |
| 1976 | California Division of Forestry |

## DETAILED PROFESSIONAL EXPERIENCE:

**RIMKUS CONSULTING GROUP, INC.**                                    **2000 – PRESENT**

Principal Consultant

Timely on-scene investigation and analysis of fire and explosion incidents including origin and cause determination, analysis of fire detection and suppression systems, products and circumstances surrounding the initiation of the fire, and support to other engineering divisions within Rimkus Consulting Group.

**TRIODYNE FIRE AND EXPLOSION ENGINEERS**                          **1994 – 2000**

Senior Engineer

Forensic engineering responsibilities including fire origin and cause determination. Extensive laboratory experience in reconstructing fire ignition scenarios for plausibility, including potential for residential electrical service to ignite various combustibles, radiant heating effects on wiring and ordinary combustibles, and small appliance evaluation for compliance with codes and standards. Experience included fuel gas releases and ignitions, restaurant hood and duct systems, sprinkler system performance and vehicle fire investigation.

**ENGINEERING SYSTEMS INCORPORATED**                               **1987 – 1989**

Engineering Technician

Assemble and participate in experimental recreations of failure scenarios.

**SCOTT M. HOWELL, P.E.**

**CITY OF NAPERVILLE FIRE DEPARTMENT**                                  **1978 – 1989**

Fire Investigator, Firefighter – Paramedic

Conducted over 100 room size structural fires for training firefighters and fire investigators. Many ignition scenarios were used from flammable liquids to small explosive devices to open flame devices on ordinary combustibles. Practical instruction given on fire growth, smoke spread and burn pattern recognition during these exercises. Conducted fire investigations to determine origin and cause. Worked within a task force framework to build criminal cases. Prepared and presented department-wide training in several subject areas. Conducted fire and life safety inspections review automatic sprinkler designs for compliance with local codes.

**PLEASANTVIEW FIRE PROTECTION DISTRICT**                              **1977 – 1978**

Firefighter

Respond to and mitigate emergency incidents.

**CALIFORNIA DIVISION OF FORESTRY**                                     **1976**

Firefighter

Wildlands firefighting.

**PROFESSIONAL TRAINING**

Fire Finding Laboratories
Investigation of Gas and Electrical Appliance Seminar

Vehicle Fire Investigation by Lee Cole
Origin and Cause of Vehicle Fire

National Fire Protection Association
NFPA 13 Automatic Sprinkler Design

National Fire Protection Association
NFPA 72 National Fire Alarm Code

National Fire Protection Association
Design of Smoke Control Systems

Illinois Fire Service Institute
Hazardous Material First Responder

Chicago Fire Department
Electrical Fire Investigation

Fire and Arson investigation
National fire Academy

Illinois Department of Transportation
Hazardous Materials Seminars

## SCOTT M. HOWELL, P.E.

### TECHNICAL REPORTS AND SEMINARS PRESENTED

"Known As Arc, In Line and Wet Electrical Fires", Triodyne Safety Bulletin August 1998 (with John Campbell)

Presented Residential Natural Gas Explosion Seminar To Northern Illinois Arson Task Force. May 1998, Rosemont, Illinois

Entrapment in Garage Kills One Firefighter, San Francisco, California, March 1995 (Report #084), United States Fire Administration

Manufacturing Mill Fire, Methuen, Massachusetts, December 1995 (Report #110), United States Fire Administration

St. George Hotel Complex 18 Alarm Fire, Brooklyn, New York, August 1995 (Report #108), United States Fire Administration

Davis & Young 2004 Annual Law Seminar, Large Loss Property Claims: Investigation and Defense Strategy





**OTTO WILLIAM SOYK, C.F.I.(V), C.A.I., S.C.L.A.**
**WESTERN REGION FIRE DIVISION MANAGER**

Mr. Soyk holds a Master of Arts Degree and Bachelor of Arts Degree from Governors State University in Illinois, in addition to numerous specialized training classes in specific areas. He is an Adjunct Professor at Penn Foster College where he developed and teaches a course in fire investigation and National Fire Protection Association, NFPA, 921 with a target participant of fire fighters and law enforcement. He is a Certified Fire Investigator through the International Association of Arson Investigators with a vehicle fire endorsement, a Certified Arson Investigator through the Illinois State Fire Marshall's office (expired), and a Senior Claims Law Associate through the American Education Institute. Mr. Soyk holds certificates from Moraine Valley Community College in Automotive Technology. Mr. Soyk has testified as an expert witness in arbitration hearings as well as state criminal and civil courts and has been recognized as an expert in fireplace installations in arbitration hearings.

Mr. Soyk has an extensive background in fire investigation, criminal investigation, and insurance fraud investigation. His professional experience includes fire, and explosion investigation, electric fire ignition experimentation, full scale fire testing of ignition scenarios, as well as computer fire modeling.

Mr. Soyk has conducted numerous live fire training tests for fire fighters, as well as fire investigators using authentic room furnishings. In addition, he has prepared and presented numerous training sessions for law enforcement, fire fighters, claims adjusters, and the public. He has conducted over 2000 fire investigations including large multi-million dollar commercial losses.

## EDUCATION AND PROFESSIONAL ASSOCIATIONS

Adjunct Professor – Penn Foster College
Master of Arts – Governors State University
Bachelor of Arts – Governors State University
Certified Arson Investigator - Illinois State Fire Marshall Office
Certified Fire Investigator - International Association of Arson Investigators
Vehicle Fire Endorsement- International Association of Arson Investigators
Certificate in Automotive Drive Train Technology MVCC
Breath-Alcohol Testing Operator
Member - International Association of Arson Investigators
Member - International Association of Arson Investigators (Illinois Chapter)
Past Member - International Association of Special Investigations Units
Past Member - International Association of Special Investigations Units (Illinois Chapter)

## EMPLOYMENT HISTORY

| | |
|---|---|
| 2004 – Present | Rimkus Consulting Group, Inc. |
| 1989 – 2004 | American Family Insurance |
| 1975 – 1989 | Midlothian Police Department |

## OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.

**DETAILED PROFESSIONAL EXPERIENCE:**

**RIMKUS CONSULTING GROUP, INC.**                                          **2004 – PRESENT**

### Western Region Fire Division Manager

Performs timely on scene investigation and analysis of fire and explosion incidents including origin and cause determination in structures and vehicles. Analyzes of the performance of fire detection and suppression systems. Determines products and circumstances surrounding the initiation of the fire, and supports other engineering divisions within Rimkus Consulting Group. Responsible for the technical training and report reviews for the fire investigators within the Western Region which constitutes multiple states. Responsible for development and presentation of continuing education training for claims adjusters.

**AMERICAN FAMILY INSURANCE**                                          **1989 – 2004**

### Senior Investigator Special Investigations Unit                                          2002 – 2004

Investigation of all types of insurance claims specializing in fire Origin and Cause including many large commercial, and liability losses. Responsible for complete investigations including background checks, interviewing, and liaison with Legal for Depositions, Arbitrations, Examinations under oath, and subrogations. Worked with claims to ascertain their requirements to specific loss investigation.

### Assigned as Special Projects Manager Special Investigations Unit                    2001 – 2002

Develop job descriptions. Acted as liaison between SIU and other divisions of the company. Assisted in the development and implementation of data base tracking systems.

### Field Manager Special Investigations Unit                                          1996 – 2001

Supervised 15 Investigators in a three state area. These Investigators were responsible for the investigation of all types of losses including low velocity vehicle impacts, life, and Fire Origin and Cause investigations. Responsible for the supervision of major case investigations, and large commercial fire losses. Responsible for hiring, and disciplining of investigators who reported to me. Assisted in the development and implementation of company policy as it related to the Special Investigations Unit.

### Senior Investigator                                          1989 – 1996

Responsible for the investigation of all types of losses with specific emphasis on Fire Origin and Cause Investigations.

**MIDLOTHIAN POLICE DEPARTMENT**                                          **1977 – 1989**

### Acting Detective Sergeant                                          1982 – 1989

Responsible for the supervision of the Detective Division of the Midlothian Police Department. This included the Juvenile division, and the evidence collection and preservation division. Responsible for making presentations to the general public on personal safety, and protection. Gave interviews to the media including radio, TV, and print media. Responsible for the investigation of all types of criminal activities including arson, murder, armed robbery, burglary, and mysterious deaths.

**OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.**

Detective                                                                       1981 – 1982

Responsible for the investigation of all types of criminal activities including Arson, Murder, Armed Robbery, Burglary, and mysterious deaths.

Patrolman                                                                       1977 – 1981

Responsible as a first responder to all types of criminal activities, and the enforcement of criminal statutes.

**DERBY FOODS INC.**                                                            **1972 – 1981**

Maintenance Mechanic. Responsible for maintenance, repair and construction of manufacturing equipment. Trained in welding and electrical installations. Attended specialized courses in hydraulics and flow pipe installations. Trained in the operation of high-speed manufacturing equipment.

## PROFESSIONAL LICENSES

Private Detective State of Illinois #115.002075 /PERC 129.271551
Private Detective State of Wisconsin #16626-62
Private Detective State of Louisiana #6622-031907-LA
Private Detective State of Florida #C2700367
Private Detective State of Indiana
State of Michigan Private Detective license #3701205835
Private Detective State of Ohio 200721001277
Private Detective State of Minnesota
Private Detective State of Iowa
Private Detective State of Missouri

## DESIGNATIONS

**INSURANCE**
Senior Claim Law Associate
Fraud Claim Law Specialist
Fraud Claim Law Associate
Property Claim Law Associate
Workers Compensation Claim Law Associate
Certificate in Automotive Drive Train Technology MVCC
Hazwoper
Bendix Commercial Brake Systems

**LAW ENFORCEMENT**
Youth Officer
Breathe Analyzer Operator
Certified Arson Investigator

## LAW ENFORCEMENT CERTIFICATION

Basic Law Enforcement
Breath-Alcohol Testing Operator
Northeastern Metropolitan Enforcement Group (Drug) 40 Hours
Homicide the Law and Investigative Technique
NEMEG
Evidence Handling and Forensic Science Techniques

Page 3

## OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.

Law Enforcement Photography
Basic Arson Investigation
Crime Scene Processing and Laboratory Procedures
Investigators in-service Training Course
Patent and Latent Fingerprint Evidence Collection
Intra-Familial Child Sexual Abuse
Reid Technique of Interviewing and Interrogation
Illinois Youth Officers Conference
Child Abuse and Exploitation Investigative Techniques Training
Youth Officer Training
Satanic and Occult Worship
NEMEG (40 Hours)
Ritualistic Child Abuse, Adolescent Involvement and Teen Suicide
Implied Consent

### FIRE CLASSES – INSTRUCTOR

Penn Foster- Fire Investigation
CE Training Nationwide Automotive Adjusters 04/12
Develop Fire Investigation Course for Penn Foster College
In-service Training January 2011
In-Service Training December 2010
Guest Instructor Moraine Valley Community College – 4/22/1996
Live burn training City of Kankakee – 10/26/1994
Live Burn Training Greeley, Colorado – 5/6/1993
Live Burn Training Davenport, Iowa – 10/17/1991
CE in-service training Travelers Insurance        09/21/07
CE in-service training commercial vehicle fires Great American Insurance 10/12/07
Live Burn Training Posen, Illinois 08/14/08
NTHECC CE Training 10/04/08
Live Burn Training 08/27/09 Posen, Illinois
Live Burn Training Posen, Illinois 08/10
Live burn training Blue Island, Illinois 08/13
Live Burn Training Jacksonville, Mississippi 06/13
Live burn training Blue Island, Illinois 08/14
Subrogation Execusummit 03/13
Live Burn Event, RImkus Consulting Group Minneapolis Mn 2017
Live Burn Event, Rimkus Consulting Group Blue Island Il 2015
CE Training Minneapolis Mn 2017
Numerous presentations within Rimkus Consulting Group, Inc.

### INSURANCE CLASSES – INSTRUCTOR

Adjuster Fire Investigation Class - June 2011
Adjuster Fire Investigation Class - May 2011
Adjuster Fire Investigation 4/10
Adjuster Vehicle Fire Training Columbia, MO 01/28/09
Adjuster Vehicle Fire Training St. Louis, MO 10/03/08
Adjuster Vehicle Fire Training Aurora, IL 08/05/08
Agent Fraud Training – 10/24/2001
Agent Fraud Training – 10/31/2000
EXCEL – 6/26/2000
Med Services Fraud Training – 11/3/1999
EXCEL – 6/28/1999

## OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.

EXCEL – 1/28/1999
LVI Eden Prairie, MN – 1/12/1999
EXCEL – 11/18/1998
LVI St. Louis, MO – 8/11-12/1998
LVI Duluth, WI – 7/28/1998
LVI Wausau, WI – 4/21-22/1998
LVI Milwaukee, WI – 4/7/1998
LVI Eau Claire, WI – 3/17/1998
LVI Milwaukee, Wisconsin – 1/22/1998
LVI Madison, Wisconsin – 5/19/1997
LVI Training for SIU Madison, Wisconsin – 4/7-11/1997
Fraud Recognition Appleton, Wisconsin – 12/19/1996
EXCEL – 7/30-31/1996
Personal Safety – 5/3/1996
Personal Safety – 4/24/1996
Agent Fraud Training – 4/17/1996
SIU Training – 4/10-11/1996
EXCEL – 2/27-28/1996
EXCEL – 1/29/1996
Fraud Recognition Burr Ridge, IL – 10/24/1995
EXCEL – 8/1-3/1995
Fraud Recognition Burr Ridge, IL – 2/1/1995

### CONTINUING EDUCATION

**INSURANCE**
Effective Interviewing (Inter-Company) – 9/3/2003
Evidence Guidelines (Inter-Company) – 9/3/2003
IASIU Conference – 9/9-13/2001
IASIU Annual Conference – 9/10-15/2000
Inter-Company SIU Class – 11/10-11/1998
IASIU International – 9/21-24/1998
IASIU Annual Conference – 9/14-19/1997
IASIU International – 8/5-9/1996
Introduction to Construction Techniques – 12/15/1992
Traumatic Injury – 4/28-30/1992
Medical Terminology – 1/29/1992
Intermediate Property Underwriting – 8/23/1990

**FIRE**
IAAI Automotive fire investigation 2017
IAAI Automotive drive train investigations 2017
IAAI-ATC II 2015
IAAI ATC Las Vegas, NV 2014
IAAI Orlando, FL 2010
IAAI ATC Denver, CO 2008
IAAI ATC St. Louis, MO. 2005
IAAI ATC Denver Co. 2006
IAAI ATC Victoria BC 2007
Illinois Chapter IAAI - 09/15-19/2003
IAAI International Training Conference - 05/19-24/2002
Wisconsin Chapter IAAI - 06/04-08/2001
Wisconsin Chapter IAAI - 06/05-09/2000
ICAC Conference - 01/16-20/2000

**OTTO WILLIAM SOYK, C.F.I., C.A.I., C.I.F.I., S.C.L.A.**

IASIU Annual Conference - 09/13-17/1999
IAAI Wisconsin Chapter - 01/07-10/1999
ICAC Annual Conference - 01/18-22/1999
Wisconsin Chapter IAAI - 06/01-06/1998
Wisconsin Chapter IAAI - 06/02-06/1997
Illinois Chapter IAAI -09/07-11/1996
Illinois Chapter IAAI - 09/11-14/1995
Gas Appliance Fire Training - 03/20-21/1995
Illinois Chapter IAAI - 09/20-24/1994
Computer Fire Modeling - 07/25/1994
Illinois Chapter IAAI -09/15-19/1993
Illinois Chapter  IAAI - 09/16-20/1992
Advanced Arson Investigation (ATF) - 08/17-21/1992
Lightning Damage Seminar – 10/20/1993
Illinois Chapter IAAI – 9/14-19/1993
Arson Investigation – 5/1-6/1993
Arson Seminar – 2/21-22/1992
Arson Investigation – 10/15-17/1991
Illinois Chapter IAAI – 9/11-15/1991
Fire Explosion Phenomena – 1/7-9/1991
Illinois Chapter IAAI – 9/26-30/1990
Fire Chiefs Fire Seminar – 2/23-24/1990
Illinois Chapter IAAI – 9/6-10/1989
Advanced Arson Investigation – 11/15-19/1982
Basic Arson Investigation – 8/23 – 9/3/1982

**AUTOMOTIVE**
Basic Automotive Technology MVCC 2005
Basic Automotive Electronics  MVCC 2005
Advanced Automotive Electronics MVCC 2006
Manual Transmissions MVCC 2006
Automatic Transmissions MVCC 2007
Automotive Engine Rebuilding MVCC 2007
Bendix Commercial Brake Certificate 2013



Rimkus Consulting Group, Inc.
7501 South Quincy Street, Suite 160
Willowbrook, IL 60527
(866) 746-5871 Telephone
(630) 321-1847 Facsimile

November 30, 2017

Mr. Mark Senak
Senak, Keegan, Gleason, Smith & Michaud
566 West Adams Street, Ste. 750
Chicago, IL 60661

Re:  Cause No:      416CV00042RLAPR
     Style:         Ball Corporation/Factory Mutual Insurance Company vs.
                    Air Tech of Michigan, Inc.
     RCG File No:   50901985
     **Subject:**       **2nd Supplemental Report of Findings**

Dear Mr. Senak:

A fire occurred at the Ball Corporation manufacturing plant on May 23, 2014, at approximately 12:20 a.m. The plant was located at 501 North 6th Street in Monticello, Indiana. The fire was extinguished by the Monticello Indiana Fire Department. Artifacts A through V were recovered during this investigation.

Rimkus Consulting Group, Inc. was retained to conduct an investigation into the origin and cause of this fire. Our investigation was conducted on May 24 and 31, 2014, June 2, 3, 4, and 5, 2014, and September 1, 2015. This is the second supplement to our **Report of Findings** dated June 9, 2017. This report was reviewed by Otto William Soyk, Western Region Fire Division Manager.

Since the September 29, 2017, **Supplemental Report of Findings** we attended the cleaning of an exemplar internal body oven (IBO) at the Ball plant in Monticello, Indiana, and reviewed publications referencing pre-mixed natural gas flame temperatures.

November 30, 2017
RCG File No. 50901985                                                    Page 2

## Conclusions

Our conclusions from our previous reports remain unchanged and are listed below for the reader's convenience.

1      This fire originated in internal body oven 2 (IBO 2) at the east end.  The fire then extended into the ductwork servicing IBO 2.

2      The cause of this fire was the ignition of combustible contaminants left in IBO 2 following the cleaning of the unit by Airtech, Inc.  The burners ignited the contaminants which then ignited combustible build-up material in the blower assembly and ductwork above the oven that should have been removed by Airtech, Inc.  The contaminants included small particulate material scraped off of the interior of IBO 2 just prior to the fire.

## Discussion

IBO 2 was a convection oven with a conveyor which moved aluminum cans through the oven.  Two burner boxes were mounted on the front top of the oven, one to the east and one to the west.  The burners burn natural gas which was mixed with air before entering the combustion chamber.  This is the definition of a pre-mixed flame.

A circulating blower was mounted on top of the IBO adjacent to each of the burner boxes.  These circulating blowers moved air to the downstream side of the burner to dilute the heated combustion products.  As a result of the IBO being a convection oven, the air circulated from the top of the oven to the bottom, then up the sides through ducts into a plenum.  The plenum allowed a portion of the air from the oven to be exhausted.  The majority of the air was recirculated past the burner box where additional outside air was again added by the circulating blower.  This was the mechanism by which loose debris can move from an area inside the oven to the burner section of the oven.

Research, (**Attachment 1**) found that the adiabatic flame temperature of a pre-mixed methane flame is approximately 2900 degrees Fahrenheit (F).  This temperature is for a perfectly mixed flame, real-life operation results in a reduction of that number.  It is generally accepted that the temperature of a pre-mixed burner flame will be in the area of 2200 degrees F.  2200 degrees F is a potent ignition source.  Even without direct flame impingement significant radiant flux is created which will ignite any combustible material in the general area of the burner box.

This report was prepared for the exclusive use of Senak, Keegan, Gleason, Smith & Michaud and was not intended for any other purpose.  Our report was based on the information available to us at this time.  Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on

November 30, 2017
RCG File No. 50901985

Page 3

our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

Thank you for allowing us to provide this service. If you have any questions or need additional assistance, please call.

Sincerely,
RIMKUS CONSULTING GROUP, INC.

Scott M Howell



Digitally signed by: Scott M Howell
CN = Scott M Howell C = US
RIMKUS CONSULTING
GROUP INC OU = RIMKUS
CONSULTING GROUP INC
Date: 2017.11.30 13:43:34 -06'00'

Scott M. Howell P.E.
Engineering Number PE 10302123
Principal Consultant

Attachments: Temperatures in Flames and Fires, Curriculum Vitae

November 30, 2017
RCG File No. 50901985

# Temperatures in Flames and Fires



# Fire Science and Technology Inc.

## Temperatures in flames and fires

by Dr. Vytenis Babrauskas, *Fire Science and Technology Inc.*

### Introduction

It is unfortunately not too rare to find that fire investigators estimate flame temperatures by looking up a handbook value, which turns out to the *adiabatic flame temperature*. Statements are then made about whether some materials could have melted, softened, lost strength, etc., based on comparing such a flame temperature against the material's melting point, etc. The purpose of this short paper is to point out the fallacies of doing this, and to present some more appropriate information for a more realistic assessment.

First, we must point out that measuring of flame temperatures to a high degree of precision is quite difficult, and many combustion research scientists have devoted decades to studying the task. The difficulties come from two sources: (1) intrusiveness of instrumentation; and (2) interpretation difficulties due to the time-varying nature of the measurement. Non-intrusive (e.g., optical laser techniques) methods are available, but these are difficult and expensive to make and are generally not applied to the study of building fires. In most cases, thermocouples are used for temperature measurement. These have a multitude of potential errors, including surface reactions, radiation, stem loss, etc. A whole textbook is available on the subject of instrumentation for studying flames [1]. As we see below, the flames of most interest for unwanted fires are turbulent. This time fluctuation presents tremendous difficulties in making measurements and in interpreting them meaningfully. Such flames move about in little packets. Thus, a measurement at a single location returns a complicated average value of reacting and unreacting packets flowing by. Some of these issues are elucidated in [2].

Even careful laboratory reconstructions of fires cannot bring in the kind of painstaking temperature measuring technologies which are used by combustion scientists doing fundamental research studies. Thus, it must be kept in mind that fire temperatures, when applied to the context of measurement of building fires, may be quite imprecise, and their errors not well characterized.

### Flame types

Before we discuss details of flame temperatures, it is important to distinguish between some of the major flame types. Flames can be divided into 4 categories:

- laminar, premixed
- laminar, diffusion
- turbulent, premixed
- turbulent, diffusion

An example of a laminar premixed flame is a Bunsen burner flame. Laminar means that the flow streamlines are smooth and do not bounce around significantly. Two photos taken a few seconds apart will show nearly identical images. Premixed means that the fuel and the oxidizer are mixed before the combustion zone occurs.

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 61 of
1167
Temperatures in flames and fires                                                Page 2 of 4

A laminar diffusion flame is a candle. The fuel comes from the wax vapor, while the oxidizer is
air; they do not mix before being introduced (by *diffusion*) into the flame zone. A peak
temperature of around 1400°C is found in a candle flame [3].

Most turbulent premixed flames are from engineered combustion systems: boilers, furnaces,
etc. In such systems, the air and the fuel are premixed in some burner device. Since the flames
are turbulent, two sequential photos would show a greatly different flame shape and location.

Most unwanted fires fall into the category of turbulent diffusion flames. Since no burner or
other mechanical device exists for mixing fuel and air, the flames are diffusion type.

## Adiabatic flame temperature

When one consults combustion textbooks for the topic of 'flame temperature,' what one
normally finds are tabulations of the *adiabatic flame temperature*. 'Adiabatic' means without
losing heat. Thus, these temperatures would be achieved in a (fictional) combustion system
where there were no losses. Even though real-world combustion systems are not adiabatic, the
reason why such tabulations are convenient is because these temperatures can be computed
from fundamental thermochemical considerations: a fire experiment is not necessary. For
methane burning in air, the adiabatic flame temperature is 1949°C, while for propane it is
1977°C, for example. The value for wood is nearly identical to that for propane. The adiabatic
flame temperatures for most common organic substances burned in air are, in fact, nearly
indistinguishable. These temperatures are vastly higher than what any thermocouple inserted
into a building fire will register!

## Flames temperatures of open flames

For convenience, we can subdivide the turbulent diffusion flames from unwanted fires into two
types: flames in the open, and room fires. First we will consider open flames.

The starting point for discussing this topic can be the work of the late Dr. McCaffrey, who made
extensive measurements [4] of temperatures in turbulent diffusion flames. He used gas burners
in a "pool fire" mode (i.e., non-premixed) and studied various characteristics of such fire
plumes. He described three different regimes in such a fire plume:

1. Slightly above the base of the fire begins the *continuous flame* region. Here the
   temperatures are constant and are slightly below 900°C.
2. Above the solid flame region is the *intermittent flame* region. Here the temperatures are
   continuously dropping as one moves up the plume. The visible flame tips correspond to a
   temperature of about 320°C.
3. Finally, beyond the flame tips is the thermal plume region, where no more flames are
   visible and temperature continually drop with height.

French researchers at the University of Poitiers recently made the same types of measurements
and reported numerical values [5] indistinguishable from McCaffrey's. Cox and Chitty [6]
measured similar plumes and obtained very similar results: a temperature of 900°C in the
continuous flame region, and a temperature of around 340°C at the flame tips. The latter value
does not appear to be a universal constant. Cox and Chitty later measured slightly higher heat
release rate fires, and found a flame tip temperature of around 550°C. In a later paper [7],
researchers from the same laboratory examined turbulent diffusion flames under slightly
different conditions, and found peak values of 1150-1250°C for natural gas flames, which is
rather higher than 900°C. The above results were from fires of circular or square fuel shape.
Yuan and Cox [8] measured line-source type fires. They found a temperature of 898°C in the
continuous flame region, and a flame tip temperature of around 340°C. This suggests that such
results are not dependent on the shape of the fuel source.

In studying fires in a warehouse storage rack geometry, Ingason [9] found an average solid-

flame temperature of 870°C. At the visible flame tips, the average temperature was 450°C, but the range was large, covering 300~600°C. In a related study, Ingason and de Ris [10] found typical flame tip temperatures of 400°C for burner flames of propane, propylene, and carbon monoxide fuels.

Sullivan et al. [14] cite Australian studies on wildfire flames, finding that flame tip temperature corresponds to 300°C, while peak values around 927°C can be expected.

Heskestad [11] adopts a criterion of 500°C *rise* as defining the flame tip temperature, i.e. an actual temperature of about 520°C.

Taking all of the above information in account, it appears that flame tip temperatures for turbulent diffusion flames should be estimated as being around 320~400°C. For small flames (less than about 1 m base diameter), continuous flame region temperatures of around 900°C should be expected. For large pools, the latter value can rise to 1100~1200°C.

## Flame temperatures in room fires

There is fairly broad agreement in the fire science community that flashover is reached when the average upper gas temperature in the room exceeds about 600°C. Prior to that point, no generalizations should be made: There will be zones of 900°C flame temperatures, but wide spatial variations will be seen. Of interest, however, is the peak fire temperature normally associated with room fires. The peak value is governed by ventilation and fuel supply characteristics [12] and so such values will form a wide frequency distribution. Of interest is the maximum value which is fairly regularly found. This value turns out to be around 1200°C, although a typical post-flashover room fire will more commonly be 900~1000°C. The time-temperature curve for the standard fire endurance test, ASTM E 119 [13] goes up to 1260°C, but this is reached only in 8 hr. In actual fact, no jurisdiction demands fire endurance periods for over 4 hr, at which point the curve only reaches 1093°C.

The peak expected temperatures in room fires, then, are slightly greater than those found in free-burning fire plumes. This is to be expected. The amount that the fire plume's temperature drops below the adiabatic flame temperature is determined by the heat losses from the flame. When a flame is far away from any walls and does not heat up the enclosure, it radiates to surroundings which are essentially at 20°C. If the flame is big enough (or the room small enough) for the room walls to heat up substantially, then the flame exchanges radiation with a body that is several hundred °C; the consequence is smaller heat losses, and, therefore, a higher flame temperature.

## Temperatures of objects

It is common to find that investigators assume that an object next to a flame of a certain temperature will also be of that same temperature. This is, of course, untrue. If a flame is exchanging heat with a object which was initially at room temperature, it will take a finite amount of time for that object to rise to a temperature which is 'close' to that of the flame. Exactly how long it will take for it to rise to a certain value is the subject for the study of *heat transfer*. Heat transfer is usually presented to engineering students over several semesters of university classes, so it should be clear that simple rules-of-thumb would not be expected. Here, we will merely point out that the rate at which target objects heat up is largely governed by their thermal conductivity, density, and size. Small, low-density, low-conductivity objects will heat up much faster than massive, heavy-weight ones.

## References

[1] Fristrom, R. M., **Flame Structure and Process**, Oxford University Press, New York (1995).

[2] Cox, G., and Chitty, R., Some Stochastic Properties of Fire Plumes, *Fire and Materials* **6**, 127-134 (1982).

[3] Gaydon, A. G., and Wolfhard, H. G., **Flames: Their Structure, Radiation and Temperature**, 3rd ed., Chapman and Hall, London (1970).

[4] McCaffrey, B. J., Purely Buoyant Diffusion Flames: Some Experimental Results (NBSIR 79-1910). [U.S.] Natl. Bur. Stand., Gaithersburg, MD (1979).

[5] Audoin, L., Kolb., G., Torero, J. L., and Most., J. M., Average Centerline Temperatures of a Buoyant Pool Fire Obtained by Image Processing of Video Recordings, *Fire Safety J.* **24**, 107-130 (1995).

[6] Cox, G., and Chitty, R., A Study of the Deterministic Properties of Unbounded Fire Plumes, *Combustion and Flame* **39**, 191-209 (1980).

[7] Smith, D. A., and Cox, G., Major Chemical Species in Turbulent Diffusion Flames, *Combustion and Flame* **91**, 226-238 (1992).

[8] Yuan, L.-M., and Cox, G., An Experimental Study of Some Line Fires, *Fire Safety J.* **27**, 123-139 (1997).

[9] Ingason, H., Two Dimensional Rack Storage Fires, pp. 1209-1220 in *Fire Safety Science-Proc. Fourth Intl. Symp.*, Intl. Assn. for Fire Safety Science, (1994).

[10] Ingason, H., and de Ris, J., Flame Heat Transfer in Storage Geometries, *Fire Safety J.* (1997).

[11] Heskestad, G., Flame Heights of Fuel Arrays with Combustion in Depth, pp. 427-438 in *Fire Safety Science--Proc. Fifth Intl. Symp.*, Intl. Assn. for Fire Safety Science (1997).

[12] Babrauskas, V., and Williamson, R. B., Post-Flashover Compartment Fires, *Fire and Materials* **2**, 39-53 (1978); and **3**, 17 (1979).

[13] Standard Test Methods for Fire Tests of Building Construction and Materials (ASTM E 119). American Society for Testing and Materials, Philadelphia.

[14] Sullivan, A. L., Ellis, P. F., and Knight, I. K., A Review of Radiant Heat Flux Models Used in Bushfire Applications, *Intl. J. Wildland Fire* **12**, 101-110 (2003).

Written 28 April 1997; revised 25 February 2006. *Copyright © 1997, 2006 by Fire Science and Technology Inc.*

**Vyto Babrauskas, Ph.D.**
**Fire Science and Technology Inc.**
**926 Hayes Avenue**
**San Diego, CA 92103**
**phone: (858) 501-7739**
**email: vyto@doctorfire.com**

November 30, 2017
RCG File No. 50901985

# Curriculum Vitae





## SCOTT M. HOWELL IAAI CFI (V), P.E.
## PRINCIPAL CONSULTANT

Mr. Howell holds a bachelor degree in Mechanical Engineering from the Illinois Institute of Technology in addition to an associate degree in Fire Science from the College of DuPage. He is an IAAI Certified Fire Investigator, Illinois State Certified Fire Investigator, Firefighter, Fire Officer and Paramedic

Mr. Howell has an extensive professional background in the areas of firefighting, fire investigation and gas and propane fired appliance failure evaluation. His professional experience includes fire and explosion investigation, electric fire ignition experimentation, product testing for ignition hazards, fuel gas leaks and ignitions, full scale fire testing of ignition scenarios, fire protection and detections system performance analysis, as well as commercial kitchen hood and duct evaluations.

Mr. Howell has conducted over 100 room size fires as training aides for firefighters and fire investigators using authentic room furnishings. Many ignition scenarios were utilized from flammable liquids to small explosive devices on ordinary combustibles. As a member of the Federal Emergency Management Agency's Major Fire Investigation Team, he has investigated major fires throughout the country publishing reports for use by fire departments nationally.

He was a wildlands firefighter with the California Division of Forestry. During his career with the Naperville, IL Fire Department he responded to fire incidents, investigated fires and conducted life safety inspections. As a fire investigator he routinely examined fire and explosions scenes to determine the origin and cause of the event. Criminal investigations were conducted and presented for prosecution.

Since joining Rimkus Consulting Group in 2000 Mr. Howell has performed hundreds of investigations involving fire origin and cause, propane and natural gas explosions and mechanical failures. Issues involved include operation of fire sprinkler systems, and restaurant hood and duct systems. Mr. Howell has been recognized as an expert and has extensive trial and deposition testimony experience in a variety of venues including Canada.

Mr. Howell has experience in investigation of frozen pipes ranging from residential to commercial to industrial including domestic and fire protection systems. Energy usage records as well as building envelope investigation have been to determine specific cause of loss.

Analysis of accidents involving heat producing equipment is another area of expertise. Examples include lyophizers, commercial steamers, and space heaters.

## SCOTT M. HOWELL, P.E.

### EDUCATION AND PROFESSIONAL ASSOCIATIONS

A.A.S. – Fire Science, College of DuPage, Glen Ellyn, Illinois, 1983
B.S. – Mechanical Engineering, Illinois Institute of Technology, Chicago, Illinois, 1993
Registered Professional Engineer – Illinois License # 062-053212
Registered Professional Engineer – Ohio License # E-67289
Registered Professional Engineer – Michigan License # 6201049929
Registered Professional Engineer – Wisconsin License # 35743-006
Registered Professional Engineer – Indiana License # PE10302123
Registered Professional Engineer – Iowa License # 16399
Registered Professional Engineer – Kansas License # 21211
Registered Professional Engineer – Minnesota License #49457

Member:     National Fire Protection Association
            Society of Fire Protection Engineers
            American Society of Mechanical Engineers

### EMPLOYMENT HISTORY

| | |
|---|---|
| 2000 – PRESENT | Rimkus Consulting Group, Inc. |
| 1994 – 2000 | Triodyne Fire and Explosion Engineers |
| 1987 – 1989 | Engineering Systems Incorporated |
| 1978 – 1989 | City of Naperville Fire Department |
| 1977 – 1978 | Pleasantview Fire Protection District |
| 1976 | California Division of Forestry |

### DETAILED PROFESSIONAL EXPERIENCE:

**RIMKUS CONSULTING GROUP, INC.**                              **2000 – PRESENT**

Principal Consultant

Timely on-scene investigation and analysis of fire and explosion incidents including origin and cause determination, analysis of fire detection and suppression systems, products and circumstances surrounding the initiation of the fire, and support to other engineering divisions within Rimkus Consulting Group.

### TRIODYNE FIRE AND EXPLOSION ENGINEERS                    1994 – 2000

Senior Engineer

Forensic engineering responsibilities including fire origin and cause determination. Extensive laboratory experience in reconstructing fire ignition scenarios for plausibility, including potential for residential electrical service to ignite various combustibles, radiant heating effects on wiring and ordinary combustibles, and small appliance evaluation for compliance with codes and standards. Experience included fuel gas releases and ignitions, restaurant hood and duct systems, sprinkler system performance and vehicle fire investigation.

### ENGINEERING SYSTEMS INCORPORATED                         1987 – 1989

Engineering Technician

Assemble and participate in experimental recreations of failure scenarios.

SCOTT M. HOWELL, P.E.

### CITY OF NAPERVILLE FIRE DEPARTMENT                    1978 – 1989

Fire Investigator, Firefighter – Paramedic

Conducted over 100 room size structural fires for training firefighters and fire investigators. Many ignition scenarios were used from flammable liquids to small explosive devices to open flame devices on ordinary combustibles. Practical instruction given on fire growth, smoke spread and burn pattern recognition during these exercises. Conducted fire investigations to determine origin and cause. Worked within a task force framework to build criminal cases. Prepared and presented department-wide training in several subject areas. Conducted fire and life safety inspections review automatic sprinkler designs for compliance with local codes.

### PLEASANTVIEW FIRE PROTECTION DISTRICT                    1977 – 1978

Firefighter

Respond to and mitigate emergency incidents.

### CALIFORNIA DIVISION OF FORESTRY                    1976

Firefighter

Wildlands firefighting.

### PROFESSIONAL TRAINING

Fire Finding Laboratories
Investigation of Gas and Electrical Appliance Seminar

Vehicle Fire Investigation, by Lee Cole
Origin and Cause of Vehicle Fire

National Fire Protection Association
NFPA 13 Automatic Sprinkler Design

National Fire Protection Association
NFPA 72 National Fire Alarm Code

National Fire Protection Association
Design of Smoke Control Systems

Illinois Fire Service Institute
Hazardous Material First Responder

Chicago Fire Department
Electrical Fire Investigation

Fire and Arson investigation
National fire Academy

Illinois Department of Transportation
Hazardous Materials Seminars

### SCOTT M. HOWELL, P.E.

### TECHNICAL REPORTS AND SEMINARS PRESENTED

"Known As Arc, In Line and Wet Electrical Fires", Triodyne Safety Bulletin August 1998 (with John Campbell)

Presented Residential Natural Gas Explosion Seminar To Northern Illinois Arson Task Force. May 1998, Rosemont, Illinois

Entrapment in Garage Kills One Firefighter, San Francisco, California, March 1995 (Report #084), United States Fire Administration

Manufacturing Mill Fire, Methuen, Massachusetts, December 1995 (Report #110), United States Fire Administration

St. George Hotel Complex 18 Alarm Fire, Brooklyn, New York, August 1995 (Report #108), United States Fire Administration

Davis & Young 2004 Annual Law Seminar, Large Loss Property Claims: Investigation and Defense Strategy



Rimkus Consulting Group, Inc.
7501 Quincy Street, Suite 160
Willowbrook, IL 60527
Telephone: (866) 746-5871

May 20, 2019

Mr. Mark Senak
Senak, Keegan, Gleason, Smith & Michaud
566 West Adams Street Ste. 750
Chicago, IL 60661

Re:    Insured:           Ball Corporation
       Rimkus File No:     050901985
       **Subject:          Third Supplemental Report of Findings**

Dear Mr. Mark Senak:

A fire occurred at the Ball Corporation manufacturing plant on May 23, 2014, at approximately 12:20 a.m. The plant was located at 501 North 6th Street in Monticello, Indiana. The fire was extinguished by the Monticello Indiana Fire Department.

Rimkus Consulting Group, Inc. (Rimkus) was retained to investigate the origin and cause of the fire. This report was reviewed by Otto William Soyk C.F.I. (V), Regional Fire Manager.

In the course of our work for this third supplemental report, we reviewed and analyzed the deposition transcripts of Mr. Glen Olberding, Mr. Dale Spencer, Mr. Freddy Spencer, Mr. Rocky Strange, Mr. Paul Scholten, Mr. Robert Pelligrini, Mr. Gregory Kyger, Mr. Michael Russell, Mr. Wesley Krintz, Mr. Randy Crumem, and Mr. Silva Gonzalo.

## Conclusions

We affirm our conclusions 1 and 2 made in our original **Report of Findings**. The conclusions from our original **Report of Findings** are provided below for reference.

1. This fire originated in internal body oven 2 (IBO 2) at the east end. The fire then extended into the ductwork servicing IBO 2.

2. The cause of this fire was the ignition of combustible contaminants left in IBO 2 following the cleaning of the unit by Airtech, Inc. The burners ignited the contaminants which then ignited combustible build-up material in the blower assembly and ductwork above the oven that should have been removed by Airtech, Inc. The contaminants included small particulate material scraped off of the interior of IBO 2 just prior to the fire.

May 20, 2019
Rimkus File No. 050901985                                                    Page 2

## Discussion

In the deposition of Mr. Freddy Spencer, the point was brought up that the Internal Bake Oven, IBO, manual recommended internal cleaning of the IBO monthly. While Ball Monticello cleaned the oven semi-annually the oven had been cleaned by Air-Tech less than 12 hours before the fire was discovered. Clearly the oven cleaning frequency was not a causative factor in the initiation of this fire.

Air-tech cleaned the ducts at the Monticello Ball Plant from at least 2010 until the date of the fire, May 23, 2014. Air-Tech never recommended to Ball, in writing, that more frequent cleaning was necessary. Ball depended on Air-Tech for their expertise in the duct cleaning. The IBO manual does not address how often the ducts above the IBO should be cleaned. The ducts had been cleaned in November of 2013, about 6 months before the fire by Air-Tech.

The build-up of materials on surfaces, whether in the IBO or the ducts, was a function of air temperature and air velocity. The hotter the air carrying the material, the less material would be deposited. The higher the air velocity, the less deposition would occur. The fire was first discovered at the exhaust blower. The portion of the duct immediately downstream the exhaust blower would have had the greatest air temperature and the greatest air velocity and thus, the least deposition of materials on the inside surfaces of the duct. However, the air temperature would have been lower than that of the oven temperatures. This fact excluded the air temperature flowing through the duct from being the ignition source for any material deposited on the inside surface of the duct. The materials deposited in the duct became ignited after the fire in the blower grew large enough to ignite them.

Previous fire experience at the Monticello Ball Plant did not indicate it was necessary to increase the duct cleaning frequency. The only previous fire in any part of the duct system of the IBOs was at the Regenerative Thermal Oxidizer, RTO. The RTO is located outside the building at the termination of the duct. The RTO produces heat to "burn off" impurities in the air stream of the duct before releasing the air from the duct system into the atmosphere. The RTO was a potential ignition source in the duct system. In fact, the Factor Mutual Insurance Company (FMIC) internal investigation into the previous duct fire concluded that the RTO had failed and was the ignition source for that fire. A damper had later been installed upstream the RTO to keep a fire originating at the RTO from following the duct back into the building.

The FMIC, documents produced in Glen Olberding's deposition reference a buildup of materials 1/4 inch thick in the duct system. Observations of 1/4 inch of buildup of material, seen both before the fire and after the fire, were made near the RTO, Olberding page 210 lines 14 through 18. The RTO was remote from the area of fire origin in the May 23, 2014 fire.

The FMIC recommendation for the duct to have fire sprinklers installed also related to the duct at the RTO, Olberding page 216 lines 12 through 14. A damper was installed in lieu of the fire sprinklers. The damper would isolate the RTO and adjacent duct from the rest of the plant should a fire occur at the RTO.

There is no fire code requirement that mandated the installation of fire sprinklers in the duct. FMIC was making recommendations that go above and beyond the fire codes.

The building was equipped with a fire sprinkler system. Per Mr. Olberding's testimony, after the fire it was discovered that some of the fire sprinkler heads at the ceiling above the IBOs did not activate and were found to be covered in a lacquer-type material. FMIC recovered a number of the fire sprinkler heads for testing. Using a standard test method, the fire sprinkler heads were tested to determine their activation time. The poorest activation time indicated a lag of about 2 minutes as opposed to an uncoated head. This lag was within the test parameters and all the fire sprinkler heads tested passed. Mr. Freddy Spencer testified that Ball had no knowledge that the fire sprinkler heads had become coated. The fire protection system had been inspected yearly per the National Fire Protection Association Standard 25, NFPA 25. The company that performed these inspections did not notify Ball in writing that these heads were a problem or needed attention.

A fire sprinkler inspection per NFPA 25 only requires the contractor to inspect the fire sprinkler heads visually from the floor level. These heads were not visible from the floor so their condition would remain undiscovered in a proper annual inspection.

The fire was within the duct system until well after the fire department arrived. A short delay in the activation of these heads, well into the fire, did not make an appreciable difference in the outcome of the event, if any difference at all.

In the deposition of Mr. Wesley Krintz, he stated that shortly after he arrived at IBO 2 on May 23, 2014, he observed sparks through a hole in the ductwork upstream the exhaust blowers. This was after the burner had been turned off; the exhaust blowers were still operating. The sparks were moving with the air flow that was from the IBO toward the exhaust blower. He was observing the sparks through an inspection hole for measuring air flow.

Mr. Crume stated that he tested the airflow at about that time and it was normal.

Both further state that they initially saw smoke from the inspection hole and the exhaust blower. Shortly after the burner was turned off, the paint on the blower housing began to blister. This testimony supports Rimkus' Conclusion 2, that combustible material left in the IBO after cleaning ignited and was carried to the blower where it lodged in materials left in the blower to start the fire.

There was no indication that IBO 2 was not operating properly at the time of the loss. Electronic Technicians checked the temperatures and other operating parameters as the oven was starting up and at the time the fire was discovered. No excursions were noted. The bearings at the subject exhaust blower were checked during the fire event

May 20, 2019
Rimkus File No. 050901985                                                                 Page 4

and found to be in good operating condition. After the loss Rimkus' inspection of the bearing found that they were still in good operating condition.

This report was prepared for the exclusive use of Senak, Keegan, Gleason, Smith & Michaud and was not intended for any other purpose. Our report was based on the information available to us at this time. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

Thank you for allowing us to provide this service. If you have any questions or need additional assistance, please call.

Sincerely,
RIMKUS CONSULTING GROUP, INC.

**Scott M Howell**
Digitally signed by: Scott M Howell
DN: CN = Scott M Howell C = US
O = RIMKUS CONSULTING
GROUP INC OU = RIMKUS
CONSULTING GROUP INC
Date: 2019.05.20 16:42:49 -06'00'



Scott M. Howell, C.F.I. (V), PE
Engineering Number IL 062-053212
Expires 11/29/2019
Principal Consultant

Attachment: Curriculum Vitae

May 20, 2019
Rimkus File No. 050901985

# Curriculum Vitae



**FORENSIC ENGINEERS AND CONSULTANTS**



# Scott M. Howell, P.E., CFIV
Principal Consultant
Fire Division

## Background

Along with a B.S. in Mechanical Engineering and an A.A. in Fire Science, Mr. Howell is an IAAI Certified Fire Investigator, Illinois State Certified Fire Investigator, Firefighter, Fire Officer and Paramedic. He has an extensive professional background in the areas of firefighting, fire investigation and gas and propane fired appliance failure evaluation. His professional experience includes fire and explosion investigation, electric fire ignition experimentation, product testing for ignition hazards, fuel gas leaks and ignitions, full scale fire testing of ignition scenarios, fire protection and detections system performance analysis, as well as commercial kitchen hood and duct evaluations.

Mr. Howell has conducted over 100 room size fires as training aides for firefighters and fire investigators using authentic room furnishings. Many ignition scenarios were utilized from flammable liquids to small explosive devices on ordinary combustibles. As a member of the Federal Emergency Management Agency's Major Fire Investigation Team, he has investigated major fires throughout the country publishing reports for use by fire departments nationally. He was a wildlands firefighter with the California Division of Forestry. As a fire investigator he routinely examined fire and explosions scenes to determine the origin and cause of the event. Criminal investigations were conducted and presented for prosecution.

As a forensic investigator, Mr. Howell has performed hundreds of investigations involving fire origin and cause, propane and natural gas explosions and mechanical failures. Issues involved include operation of fire sprinkler systems, and restaurant hood and duct systems. Mr. Howell has been recognized as an expert and has extensive trial and deposition testimony experience in a variety of venues including Canada. Mr. Howell has experience in investigation of frozen pipes ranging from residential to commercial to industrial including domestic and fire protection

### Contact Information
(630) 321-1846
smh@rimkus.com

7501 S. Quincy Street,
Suite 160
Willowbrook, IL 60527



systems. Energy usage records as well as building envelope investigation have been to determine specific cause of loss.


FORENSIC ENGINEERS AND CONSULTANTS

## Professional Engagements
- Subject Matter Expert Presentations
  - Investigation & Defense Seminar – Cleveland, OH (2004), Presented seminar at the Davis & Young 2004 Annual Law Seminar about investigation and defense best practices
  - Residential Natural Gas Explosion Seminar – Rosemont, IL (1998), Presented seminar on natural gas explosions investigations to Northern Illinois Arson Task Force
  - Large Loss Property Claims: Investigation and Defense Strategy

- U.S. Fire Administration Investigations
  - Residential Fire - San Francisco, CA (1995), As part of Major Fires Investigation Project conducted by Varley-Campbell and Associates, Inc. to the U.S. Fire Administration, Federal Emergency Management Agency, investigated residential fire that killed a firefighter (TR-084: "Entrapment in Garage Kills One Firefighter")
  - Manufacturing Mill Fire – Methuen, MA (1995), As part of Major Fires Investigation Project conducted by Varley-Campbell and Associates, Inc. under contract to the U.S. Fire Administration, Federal Emergency Management Agency, investigated an explosion and fire in an industrial complex that injured 37 people and destroyed nearly one million square feet of manufacturing space. Several workers were critically burned by the initial explosion and six firefighters received minor injuries as the incident progressed. The ensuing fire, driven by 40 mile per hour winds, destroyed several large buildings in the complex, which straddled the municipal boundary between the cities of Lawrence and Methuen (TR-110: Manufacturing Mill Fire)
  - St. George Hotel Complex 18 Alarm Fire – Brooklyn, NY (1995), As part of Major Fires Investigation Project conducted by Varley-Campbell and Associates, Inc. to the U.S. Fire Administration, Federal Emergency Management Agency, investigated fire that began in vacant nine-story building and spread to several adjacent exposures, including an occupied 31-story apartment building. More than 700 firefighters operating over 100 pieces of firefighting apparatus were needed to control a fire that involved several large interconnected buildings in a crowded neighborhood. It was the largest fire in New York City in more than 20 years, and one of the largest in the city's history. (TR-208: St. George Hotel Complex 18 Alarm Fire)

## Forensic Engagements
- Fire Origin and Cause Investigations



**FORENSIC ENGINEERS AND CONSULTANTS**

- Varied Locations (2000-2018), Multiple investigations of all property types from single family residential to complex commercial and industrial losses. Also led multi-disciplinary investigative teams in complex investigations.

- Fire Protection System Evaluations
  - Varied Locations (2000-2018), Assessed fire sprinkler operation, restaurant hood and duct system operation and effectiveness.

- Propane and Natural Gas Fire and Explosion Events
  - Varied locations (2000-2018), Evaluated cause and origin of many single-family home explosions caused by propane and natural gas systems.
  - Illinois (2016), Evaluation of origin, cause and in-rack fire protection sprinkler system operation in a fire causing over $100M in damage at a furniture warehouse.
  - Milwaukee, WI (2006), Evaluated cause and origin of $70M explosion from underground liquid propane line.
  - Varied Locations (2004), Evaluated cause and origin of natural gas flash fires, which results in recall of commercial equipment pilot safety valve (Robert Shaw TS-11, CPSC release #05-081).

- Heat Producing Equipment Investigations
  - Varied Locations (2000-2018), Analyzed accidents involving heat producing equipment such as space heaters

## Professional Experience
- Rimkus Consulting Group, Inc.                                            2000 - Present
  - Principal Consultant - Fire Division
    Responsible for timely on-scene investigation and analysis of fire and explosion incidents including origin and cause determination, analysis of fire detection and suppression systems, products and circumstances surrounding the initiation of the fire, and support to other engineering divisions.

- Triodyne Fire and Explosion Engineers                                    1994 - 2000
  - Senior Engineer
    Responsible for forensic engineering investigations including fire origin and cause determination. Relied on extensive laboratory experience to reconstruct fire ignition scenarios for plausibility,



FORENSIC ENGINEERS AND CONSULTANTS

including potential for residential electrical service to ignite various combustibles, radiant heating effects on wiring and ordinary combustibles, and small appliance evaluation for compliance with codes and standards. Experience included fuel gas releases and ignitions, restaurant hood and duct systems, sprinkler system performance and vehicle fire investigation.

- Engineering Systems Inc.                                         1987 – 1989
  - Engineering Technician
    Assemble and participate in experimental re-creations of failure scenarios

- City of Naperville Fire Dept.                                    1978 – 1989
  - Fire Investigator/Firefighter/Paramedic
    Conducted over 100 room-size structural fires for training firefighters and fire investigators. Many ignition scenarios were used from flammable liquids to small explosive devices to open flame devices on ordinary combustibles. Practical instruction given on fire growth, smoke spread and bum pattern recognition during these exercises. Conducted fire investigations to determine origin and cause. Worked within a task force framework to build criminal cases. Prepared and presented department-wide training in several subject areas. Conducted fire and life safety inspections review automatic sprinkler designs for compliance with local codes.

- Pleasantview Fire Protection District                           1977 – 1978
  - Firefighter
    Responsible for responding to and mitigating emergency incidents.

- California Division of Forestry                                       1976
  - Firefighter
    Responsible for fighting wildlands fires.

## Education and Certifications
- Fire Science, A.S.: College of DuPage (1983)
- Mechanical Engineering, B.S.: Illinois Institute of Technology (1993)
- Registered Professional Engineer: Illinois, Indiana, Iowa, Kansas, Michigan, Minnesota, Ohio, and Wisconsin

## Continuing Education



FORENSIC ENGINEERS AND CONSULTANTS

- National Fire Protection Association (NFPA): NFPA 13 Automatic Sprinkler Design; NFPA 72 National Fire Alarm Code; Design of Smoke Control Systems
- Other: Investigation of Gas and Electrical Appliance Seminar (Fire Finding Laboratories); Origin and Cause of Vehicle Fire (Vehicle Fire Investigation); Hazardous Material First Responder (Illinois Fire Service Institute); Electrical Fire Investigation (Chicago Fire Department); Fire and Arson Investigation (National Fire Academy), Hazardous Materials Seminar (Illinois Dept. of Transportation)

## Publications
- "Known as Arc, In Line and Wet Electrical Fires." *Triodyne Safety Bulletin*, Aug. 1998

# Exhibit 2

# In The Matter Of:

*Ball Corporation, et al. vs.*
*Air Tech of Michigan, Inc.*

---

*Scott M. Howell, P.E.*
*July 28, 2017*

---

*Midwest Reporting, Inc.*
*1448 Lincoln Way East*
*South Bend, Indiana 46613*
*reporters@midwestreporting.net*
*574-288-4242*

Original File Howell Scott.txt

Min-U-Script® with Word Index

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 82 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

**Page 1**

```
1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF INDIANA
2
  BALL CORPORATION, AN INDIANA  )
3 CORPORATION AND FACTORY       )
  MUTUAL INSURANCE COMPANY, A   )
4 RHODE ISLAND CORPORATION,     )
  AS SUBROGEE,                  )
5                               )
           Plaintiffs,          )
6                               )    Cause No.:
    vs.                         )  4:16-CV-00042-RL-APR
7                               )
                                )
8 AIR TECH OF MICHIGAN, INC.,   )
  A MICHIGAN CORPORATION,       )
9                               )
           Defendant.           )
10 - - - - - - - - - - - - - -  )
11   The deposition of SCOTT M. HOWELL, P.E.
12   Date:  Friday July 28, 2017
13   Time:  8:59 a.m.
14   Place: Law Offices of Thiros and Thiros
                200 East 90th Drive
15              Merrillville, Indiana
16   Called as a witness by the Defendant
17   in accordance with the Federal Rules of
18   Civil Procedure for the Northern District
19   of Indiana, pursuant to Notice
20
21 Before Michelle Soffa, Court Reporter
   Notary Public, Porter County, Indiana
22
23           MIDWEST REPORTING
             1448 Lincolnway East
24         South Bend, Indiana 46613
               (574) 288-4242
25
```

**Page 2**

```
1 APPEARANCES:
2
3   MR. MARK N. SENAK
      Senak Keegan Gleason Smith & Michaud, Ltd.
4       621 South Plymouth Court, Suite 100
        Chicago, Illinois  60605
5       msenak@skgsmlaw.com
6 on behalf of the Plaintiffs;
7   MR. JAMES H. AUSTEN
    MR. JACOB O'BRIEN
8       Starr Austen & Miller, LLP
        201 South 3rd Street
9       Logansport, Indiana 46947
        austen@starrausten.com
10 on behalf of the Defendant.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1              I  N  D  E  X
2          THE DEPOSITION OF
           SCOTT M. HOWELL, P.E.
3
4 DIRECT EXAMINATION
5   By Mr. Austen...................... Page  4
6 CROSS-EXAMINATION
7   By Mr. Senak...................... Page 81
8 REDIRECT EXAMINATION
9   By Mr. Austen...................... Page 87
10
11          E X H I B I T S          MARKED
12 Exhibit 19...................... Page  5
      (Curriculum Vitae)
13
14 Exhibit 20...................... Page  5
      (Howell Expert Testimony)
15 Exhibit 21...................... Page 17
      (Howell Report)
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1          SCOTT M. HOWELL, P.E.,
2   called as a witness by the Defendant,
3   having been first duly sworn, was examined
4   and testified as follows:
5          DIRECT EXAMINATION
6 BY MR. AUSTEN:
7  Q  State your full name, please.
8  A  Scott M. Howell.
9  Q  May I call you Scott?
10 A  You may.
11 Q  Please call me Jim.  Jim Austen, I represent Air
12    Tech in the litigation this you're retained as an
13    expert in.  You probably have testified enough you
14    know the drill so I will get right at it.
15        Where are you currently employed, sir?
16 A  Location or company?
17 Q  Both.
18 A  Rimkus Consulting Group.  The local office is in
19    Willowbrook, Illinois.
20 Q  I assume that's a suburb of Chicago?
21 A  It is.
22 Q  What areas of expertise do you feel you are
23    qualified to render expert opinions in this case?
24 A  Fire investigation and mechanical engineer.
25 Q  Are there any other areas that you possess
```

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

**Page 5**

1  expertise in that would allow you to testify on
2  opinion evidence you're aware of?
3 A My practice is fire protection, pretty much
4  anything that does with fires.
5 Q I have got buried in here someplace what we are
6  probably gonna end up calling Exhibit 19 because if
7  I recall that's where we left off.
8  (Exhibit 19 was marked for identification.)
9 BY MR. AUSTEN:
10 Q Which I will show you for identification purposes,
11  see if that's a current copy of your resume or
12  vitae as you prefer?
13 A Yeah, looks to be.
14 Q Okay. And let me -- who is -- I'll butcher the
15  name. Who is Mr. Soyk?
16 A Soyk.
17 Q Soyk.
18 A He is a fire investigator that works in our office.
19  He is what they call the western region fire
20  manager. He recruits and hires and trains fire
21  investigators for the western half of the country
22  for our company.
23 Q We'll come back to him in a second.
24  (Exhibit 20 was marked for identification.)
25

**Page 6**

1 BY MR. AUSTEN:
2 Q Show you what's been marked for identification
3  purposes as Exhibit 20. Is that a current list of
4  your deposition and testimony -- in-court testimony
5  as an expert witness?
6 A Best as I've been able to keep track, yes.
7 Q I suspect that goes beyond the federal court
8  requirement of a few years. That looks to be
9  everything you may have ever testified in?
10 A Again, as best as I've been able to keep track of.
11  I have testified many times more than this just not
12  a record that I'm real good keeping up.
13 Q Have you ever had a case involving can
14  manufacturing similar to what we are dealing with
15  in this matter?
16 A A can manufacturing plant specifically --
17 Q Yes.
18 A -- probably not.
19 Q If in the course of the day something comes to mind
20  and you do remember that, please let me know.
21 A Certainly.
22 Q How did you first get contacted about this case?
23 A I believe we were contacted by Paul Anderson, the
24  adjuster for FM Global.
25 Q Do you recall when that occurred?

**Page 7**

1 A I can give you a good idea.
2 Q Help yourself.
3 A Maybe, I can't.
4      MR. AUSTEN: Off the record a
5   second.
6   (A short discussion was held.)
7 A Unfortunately I have only got one page of our job
8  sheet it looks like here. I saw that (indicating)
9  there, I assumed the whole thing was there and it's
10  not. That would give us the date that this was
11  written up.
12 BY MR. AUSTEN:
13 Q Show you what has been marked as the non-party
14  responses, Rimkus 72 to 74, inclusive, 72, 73, 74.
15  Is that what you're looking for?
16 A That's what I'm looking for.
17 Q Fair enough.
18 A We got this -- we were called on the 23rd of May,
19  2014.
20 Q As I understand it then that would be later in the
21  day the fire occurred?
22 A Most likely, yeah. The -- I mean, the fire was
23  right at midnight. So it would have been later
24  that day.
25 Q Late on the 22nd, early on the 23rd is the fire

**Page 8**

1  event we are talking about?
2 A Yes.
3 Q And you say you were called by Mr. Anderson at FM
4  Global?
5 A Yes.
6 Q Have you worked with him before?
7 A I have.
8 Q Do you recall how many different occasions?
9 A That would be a vague answer, several, 5 to 10
10  maybe over the last 15 years.
11 Q First name basis with him?
12 A Yes.
13 Q What were you asked to do at that time?
14 A Figure out what happened.
15 Q What caused the fire?
16 A What caused the fire.
17 Q What did you do then in response to that request?
18 A At that point I believe Mr. Soyk went down there
19  pretty directly and that probably happened because
20  I was tied up at that point.
21 Q All right. So someone from Rimkus went to the
22  scene of the fire in Monticello on the 23rd?
23 A Twenty-third or 24th, something like that. If I
24  had the billing records we could come up with that
25  completely, yes.

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

Page 9

1  Q  Fair enough. When did you first go to the scene,
2     if you recall?
3  A  I believe I was there the following week. I would
4     have been there on the 31st.
5  Q  What did you do on the 31st?
6  A  Tried to get my feet on the ground, see what we had
7     there. I already talked to Mr. Soyk, looked at his
8     photographs, wanted to get down there and see what
9     we could get for operating parameters of the
10    system, whatever information we could collect
11    essentially and tell them what information we would
12    still like to have.
13 Q  What's the nature of your relationship with
14    Mr. Soyk at Rimkus? In other words, does one of
15    you supervise the other, would you be considered
16    equals working in same area?
17 A  At that time I was the manager of the office in
18    Chicago. So he was an employee that worked in
19    Chicago under my management. As I say, though, he
20    is also a -- a technical supervisor within the
21    company. So from that point of view he could be my
22    peer reviewer on certain reports, certain losses
23    that I cover. But I would be his administrative
24    manager if that makes sense.
25 Q  All right. When you were there on the 31st, how

Page 10

1     long were you there that day?
2  A  Again, I would have to look at the billing records.
3     As I recall it was a long day.
4  Q  Do you have your billing records?
5  A  I do not. I believe those were produced.
6  Q  I believe they were, too. I was hoping you were
7     gonna find your copy quicker than I'm gonna find my
8     copy but give me a minute.
9        I'm gonna show you what have been produced as
10    Rimkus 140 to 149, see if I managed to grab the
11    right stack there.
12 A  Let's see.
13 Q  Actually let me add to your stack Rimkus 128 to
14    139.
15 A  Most of these invoices are for the artifacts
16    storage.
17 Q  Right.
18 A  They are not actually time invoices. According to
19    the billing records the first time I was out there
20    would have been June 3rd.
21 Q  Okay.
22 A  And we stayed over into June 4th. So on the 3rd I
23    billed about six and-a-half hours on the 4th was 12
24    and-a-half.
25 Q  Does that refresh your memory for what you might

Page 11

1     have done on the 3rd of June while you were at the
2     site?
3  A  Again, both of those days are gathering the
4     information we can, trying to understand their
5     process, trying to understand what happened, trying
6     to understand the system that it happened within
7     and then document what we could document.
8  Q  Let me see if I can get more specifics from you on
9     what you did.
10       Do you recall people at Ball that you would
11    have talked to that day or on the 4th, either one?
12 A  Freddie Spencer was the primary contact we had out
13    there. He is the only one I remember by name that
14    I would have dealt with that day. I'm sure they
15    had other people out there in the plant while we
16    were there making sure that we were operating
17    safely according to their -- their standards. But
18    he was our primary point of contact.
19 Q  Okay. Did you collect evidence that day that you
20    have retained?
21 A  During that period from 6/2 to 6/4, there were a
22    number of -- number of artifacts we did collect,
23    yes.
24 Q  May want to halfway keep those handy, we may come
25    back and talk about them in a little while.

Page 12

1  A  Sure.
2  Q  Let me do this, get this material back from you so
3     I can keep it in order.
4        My law firm had sent out on a prior occasion a
5     non-party request to Rimkus for your file. And
6     what we received back in response was hard
7     documents that we have printed out and marked as
8     Rimkus 1 through 317. We also got some cds or dvds
9     so there would have been photographs and videos in
10    there. Is that, in fact, the entire file for
11    Rimkus on this particular matter?
12 A  I believe there is -- there was more that we got
13    after that file was produced.
14 Q  Okay.
15 A  That I brought with me today.
16 Q  Fair enough. The production occurred in the
17    March 2017 time frame?
18 A  Correct.
19 Q  So you think you have got additional material since
20    March?
21 A  I believe so. I think I got your investigator's
22    file after that and several other things.
23       MR. AUSTEN: Let's just go off the
24    record then.
25    (A short break was was held.)

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 85 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

**Page 13**

1  BY MR. AUSTEN:
2  Q  Scott, the additional material that you have given
3     me that you have received yourself since the March
4     production of your file, Rimkus' file to my firm
5     appears to be documents that are Bates stamped Ball
6     1128 -- well, I'm just gonna read the page numbers
7     off because they are not in sequence, 1128, 1129,
8     1126, 1125, 1124, 1127, 1130 to 1134, T-O, 1134.
9     These do appear to be sequential so it would be
10    Ball 1184 to 205 -- excuse me, 184 to 205. I'll
11    amend that, hopefully for the last time, to 207.
12    Air Tech's response to request for production in
13    this case and Air Tech's answers to interrogatories
14    and then a document that's been marked FMIC271 to
15    279 and 751-766.
16         Then the remaining documents that you have
17    given me were actually produced to us prior to the
18    March --
19  A  Okay.
20  Q  -- production, they were part of the March
21    production.
22  A  Just trying to be thorough.
23  Q  Appreciate that, thorough is good. Let's kind of
24    go back then to June of 2013 -- 2014. You spent a
25    couple of days out there talking to people,

**Page 14**

1     gathering some evidence that you have stored in
2     general.
3          Did you do any other type of work in that time
4     frame?
5  A  Again, the whole idea was trying to get familiar
6     with the -- the systems, gather the information we
7     can on the incident and start to put together a
8     plan for investigation.
9  Q  I appreciate the summary. I'm just trying to find
10    out if there is any other specific types of work
11    that you would have done in that time frame you can
12    recall.
13  A  Obviously we took photographs.
14  Q  Okay.
15  A  Some video.
16  Q  Okay.
17  A  I can't think of anything else.
18  Q  Fair enough. June 4 may have been the date that
19    other parties were also in to inspect the premises.
20         Is that your recollection?
21  A  I believe so.
22  Q  Mr. Miller at my office may have been there if I
23    remember from the sign-in sheet.
24  A  We have the sign-in sheet. I believe it was
25    June 4th.

**Page 15**

1  Q  Okay. After June 4 what's the next time you worked
2     on this matter?
3  A  The next time I worked on it?
4  Q  Yes. You need your billing sheets again?
5  A  I do.
6  Q  I took them back from you. There you go.
7  A  Looked like in 8/31 of 15.
8  Q  What happened on that day?
9  A  I believe we looked at the artifact with -- the
10    artifacts with your folks.
11  Q  Okay. Was that at Ball Corporation's plant in
12    Monticello?
13  A  I believe that's what went on, yeah.
14  Q  Anything else that you have noted that you did in
15    the way of work on this file on that occasion?
16  A  No.
17  Q  And you can see where I'm heading. I'm just kind
18    of walking you through the work you have done and
19    what happened.
20         When's the next time you worked on this
21    matter?
22  A  Next time we billed for -- next time I did work was
23    on September 23rd I went down to Monticello. They
24    were doing some cleaning of the ovens down there so
25    I was able to see some other aspects of the oven as

**Page 16**

1     it was being cleaned.
2  Q  Is that in 2015 again?
3  A  That was '15 yeah.
4  Q  Who was doing the cleaning?
5  A  I don't remember the name of the company.
6  Q  All right, all right. They had the oven partially
7     disassembled to do the cleaning?
8  A  Yes -- yep.
9  Q  Anything else that occurred that day other than you
10    observed the interior of the oven?
11  A  Again every time we were down there, we talked with
12    Mr. Spencer looking for additional details,
13    additional facts that we could gather.
14  Q  Anything else that you can think of that occurred
15    that day?
16  A  Not particularly, no.
17  Q  When's the next time you worked on this matter?
18  A  The next time we would have worked on this would
19    have been when we started to start the work toward
20    preparing the report.
21  Q  Is that something that you have got an invoice for
22    that allows you to give me a date?
23  A  These (indicating) are yours.
24  Q  Thank you.
25  A  That would have started June 1st of this year.

---

USDC IN/ND case 4:16-cv-00042-TLS   document 105-1   filed 10/07/19   page 86 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

**Page 17**

1  Q  Okay.  Of 2017?
2  A  Seventeen, yeah.
3  Q  Okay.  When was your report completed?
4  A  According to this it says 6/9.  That's the date of
5     the report.
6     (Exhibit 21 was marked for identification.)
7  BY MR. AUSTEN:
8  Q  Show you what's been marked for identification
9     purposes as Exhibit 21.
10       Is that the report that you just referenced
11    less Exhibits C and D, which would be the vitaes
12    for Mr. Soyk and yourself?
13 A  Yes, I believe it is.
14 Q  Have you done any additional work on this matter
15    then since you prepared that report?
16 A  Other than reviewing for today I don't believe we
17    have.
18 Q  Okay.  Have you been asked to do any other work
19    that you have not completed yet?
20 A  No, I don't believe so.
21 Q  Do you anticipate any other work that you think you
22    need to do that you have not completed yet?
23 A  Depends on where this all goes.  If we get to the
24    point where there's depositions of facts witness,
25    certainly love to see those.  If we end up with a

**Page 18**

1     report from your expert, I certainly intend to look
2     at that and if Mr. Senak asks us to do work based
3     on that information, it's still open, yeah.
4  Q  Sure.  As far as reaching an opinion about the
5     cause of the fire do you feel you have done
6     everything you need to do in order to be able to
7     reach that opinion?
8  A  With the information that I have, yes.
9  Q  So the only way that opinion might change is if you
10    got new information you don't have now?
11 A  Certainly.
12 Q  Well, let's start going through your report a
13    little bit.
14 A  Cool.
15 Q  What caused this fire in your opinion?
16 A  Well, the -- the only ignition source that we have
17    that we can't rule out is the main burner.  All
18    indications are that the main burner was operating
19    wonderfully both before the cleaning started and
20    after the cleaning.  There is no fuel up there to
21    be burned except for what would have been left up
22    there by Air Tech.
23       So the main burner somehow ignited whatever
24    fuel was left up there, whether it's something like
25    a rag or something like that or just a compilation,

**Page 19**

1     a pile of some kind of accumulation of the dust.
2     And then that got blown through up into the -- or
3     pulled through up into the boiler -- to the fan,
4     excuse me.
5  Q  That tells me that it is your opinion the fire
6     started in the oven itself as opposed to the
7     ductwork above the oven.  Is that a fair statement?
8  A  That is correct.
9  Q  What leads you to that opinion that the --
10 A  Again, the --
11 Q  -- place it started is in the oven?
12 A  Again, there is -- one of the ways to approach this
13    is what is -- what are the potential ignition
14    sources, what are the competent ignition sources
15    for any potential fume.  And between -- in the oven
16    we have only the burner that is hot enough to do
17    anything real.  And outside of the oven there is
18    potential that a -- something could happen in that
19    blower that could cause a friction or heat to
20    ignite something up there.  So we did that
21    inspection in the parking lot of the blower with --
22    your people were there.
23       As I said in the report there is no indication
24    of any scraping or misalignment of the blades of
25    that.  I spun -- I spun the blades, they were fine,

**Page 20**

1     there was no scraping.  We physically inspected the
2     inside.  There is no evidence of scrapings.  The
3     bearings are exterior but the bearings were still
4     in good shape.  There is really no ignition source
5     at the blower.
6        So now we are left with one competent ignition
7     source within that whole system and that brings us
8     back to the main burner.
9  Q  Okay.  Let's see if we can describe without
10    necessarily drawing it on a piece of paper this
11    mechanism that we are gonna be talking about today.
12       My understanding is that this is a long
13    continuous line oven that cans crawl through to dry
14    off certain chemicals that have been applied to
15    them; is that your understanding?
16 A  Essentially, yeah.
17 Q  Above the oven itself there is blowers and
18    ductwork.  Correct?
19 A  Yes.
20 Q  There is blowers to insert heat into the oven and
21    blowers to take the heat back out of the oven?
22 A  Correct.
23 Q  The blower that is on the exhaust side of this
24    mechanism leads to ductwork that ultimately goes
25    through the roof of the building?

USDC IN/ND case 4:16-cv-00042-TLS   document 105-1   filed 10/07/19   page 87 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

**Page 21**

1  A  Correct.

2  Q  I have heard the blower that is removing the hot

3     air or the exhaust part of the system referred to

4     as a squirrel cage. Does that term have meaning to

5     you?

6  A  Sure.

7  Q  On the other hand, the ignition source that you

8     have mentioned is an open gas flame; is that

9     correct?

10 A  Yes.

11 Q  And does that have a blower associated with it as

12    well?

13 A  It does.

14 Q  And that sits on, I think, the east and the west

15    end of the furnace?

16 A  There is two, yes.

17 Q  So you can zone temperatures within the furnace?

18 A  Yeah. There's four -- four temperature zones in

19    the furnace.

20 Q  So you have got a blower, in other words a fan, and

21    bearings and an electric motor near the ignition

22    source and then the second fan and electric motor

23    and bearings on the exhaust side?

24 A  Correct.

25 Q  Is it possible that a fire can start in ductwork in

---

**Page 22**

1     the exhaust side above the squirrel cage where the

2     hot air is being blown out?

3           MR. SENAK: Object to form.

4  A  Virtually anything's possible. Unfortunately for

5     that theory, there is no ignition source there to

6     ignite it. There is potential fuel there but there

7     is no ignition source.

8  BY MR. AUSTEN:

9  Q  In other words, you don't think the air in that

10    section of the mechanism is hot enough to ignite

11    any material that's in there?

12 A  Oh, no, not even close.

13 Q  Other than your opinions then that the fire started

14    in the oven somewhere and then was blown into the

15    ductwork, what other opinions do you have in this

16    case based on your investigation?

17 A  Well, in the report we say that the fire originated

18    in IBO 2 at the east end. The fire then extended

19    into the ductwork servicing IBO 2 and the cause of

20    the fire was ignition of combustible contaminates

21    left in IBO 2 following the cleaning of the unit by

22    Air Tech. The burners ignited the contaminates,

23    which then ignited combustible buildup material in

24    the blower assembly and the ductwork above the oven

25    that should have been removed by Air Tech. The

---

**Page 23**

1     contaminates include small particulate material

2     scraped off the interior of the oven just prior to

3     the fire.

4  Q  Okay. You have paraphrased, close to quoting, a

5     section of Page 2 of your report?

6  A  Yes.

7  Q  Does Page 2 of Exhibit 21 then contain all of your

8     conclusions in this case?

9  A  Well, yeah, implied in that second conclusion is

10    that that blower was not cleaned properly. And

11    that's why the -- the material that was ignited and

12    came through the oven was able to spread to the

13    blower and then ultimately into the ductwork.

14 Q  Okay. And, you know, one of my main functions here

15    is to determine what opinions you have so that we

16    don't get down the road and all the sudden find out

17    about another opinion that we didn't realize.

18    That's the reason I'm asking these questions. Is

19    there anything else in the way of your opinions

20    other than that that's contained on Page 2 of your

21    report and what you have just explained to me?

22 A  Not that I can think of right now. But I'll

23    certainly speak up if something comes to mind.

24 Q  That would be most appreciated. Let's back up then

25    and kind of walk through these opinions in a little

---

**Page 24**

1     more detail.

2           What material did you receive that allowed you

3     to formulate opinions on the work that Air Tech was

4     supposed to do?

5  A  Again, talking to Mr. Spencer there is a -- an

6     email from one of the Air Tech people to

7     Mr. Spencer that indicates that -- that they do

8     clean the -- the blowers, they were expected to

9     clean the blowers. Seems to me there is one more

10    piece but I'm not coming up with it right now.

11 Q  The email you referenced, is that the one that's in

12    Exhibit B of your report?

13 A  Yes, it is.

14 Q  Okay. So between that email and talking to Mr.

15    Spencer those are the main bases for what work Air

16    Tech was supposed to do as far as you understand

17    it?

18 A  Yeah. I'm not a contract lawyer but it seems that

19    both -- both entities understood that the blowers

20    were supposed to be cleaned.

21 Q  How far up in the blower was Air Tech supposed to

22    clean?

23 A  Well, when you say clean the blower, I would expect

24    to the output -- the output side of the blower

25    where it meets the ductwork.

---

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

**Page 25**

1 Q  We're saying blower, same thing as a squirrel cage?
2 A  Squirrel cage is a type of blower, yeah, the
3     exhaust blower.
4 Q  Was -- is it your understanding that Air Tech was
5     supposed to clean the ductwork on the exhaust side
6     of the squirrel cage, in other words above the
7     squirrel cage?
8 A  No, just -- just through the blower.
9 Q  Okay.  Did you find any artifacts in your
10    investigation in this case that allowed you to
11    reach your opinion the fire started in the oven as
12    opposed to some other location in the system?
13 A  Well, the artifacts include the cans that we
14    collected at the end of the -- at the end of the
15    oven that showed there was still dust being blown
16    up several hours into the process.
17       Ball goes through a process to clean that oven
18    after it's been cleaned.  They put sheets through
19    that have a sticky material, a lacquer essentially,
20    to try to collect all that dust.  So this would be
21    something I'd love to have flushed out again with
22    Mr. Spencer but I'm assuming that they didn't start
23    running cans through until they got the oven clean.
24       So the fact that three or four hours into a
25    production run we, again, have dust coming through

**Page 26**

1  indicates something changed within the system.  And
2  that's at about the time the fire was discovered.
3  So that's why -- that's one of the indications that
4  there was an accumulation of dust somewhere
5  upstream of where those cans were going that was
6  being blown through the cans.
7     Again, that takes us back to the only ignition
8  source we have in the system up -- back up to
9  the -- to the burner.
10 Q  Did you collect and retain any of the cans --
11 A  Yes.
12 Q  -- that were in the room?
13     It may take you a second but can you direct me
14  to any of the photographs that show those cans?
15 A  We included several in the report.
16 Q  I'm looking at Page 9, there is a Figure C and
17  Figure D.  And the reason I say Page 9, Figure C
18  and D is there is a Figure C on Page 7 that may be
19  a typo --
20 A  I apologize.
21 Q  That's all right.  Figure C and D on Page 9 are
22  these pictures of the can --
23 A  Yes.
24 Q  -- you're talking about?
25 A  Yep.

**Page 27**

1 Q  Do you have any pictures that are a little farther
2     away that would allow me to know that this is a can
3     as opposed to a picture of somebody's tie clasp?
4 A  Sure.  Give me a moment, I'll go through here and
5     see if we can't --
6 Q  Sure, take your time.
7 A  These are all --
8        MR. AUSTEN: We can go off the
9     record.
10    (A short break was held.)
11 A  I don't -- I don't see any in the hard copy of
12    photographs that I have got in front of me here.
13    There should certainly be some of when they were
14    collected and I believe your investigators were on
15    site when they were collected.  They were collected
16    on 4th, I believe, June 4th.
17 BY MR. AUSTEN:
18 Q  In your file that was produced to our office,
19    Rimkus 173 on is mostly photographs.  I think there
20    is a couple other things in there.  Take a look
21    through there if you want.
22        MR. AUSTEN: We can go off.
23    (A short break was held.)
24 A  I pulled out two pages that showed the -- that show
25    the cans on the line before they were collected.

**Page 28**

1 BY MR. AUSTEN:
2 Q  We have got Rimkus 286 and Rimkus 292.  Correct?
3 A  I can't see the numbers from here.  Those are the
4     two I pulled out.
5 Q  Let's just make sure.  There's --
6 A  286 and 292, correct.
7 Q  On 286 there are nine photographs on here.
8     Do all of the photographs show the cans or
9     just some of the photographs?
10 A  The one in the upper right shows the cans.
11 Q  All right.  Looks like they are just laying on the
12    belt at the end of the line?
13 A  Correct.
14 Q  What about on 292?
15 A  We -- the upper left and center and the center and
16    center lower.
17 Q  Who actually took these photographs?
18 A  I would have to go back in our files and look.  I
19    believe that I took them but I'm relying on my
20    feeble memory, which can be dangerous.
21 Q  And Mr. Soyk is --
22 A  Right.
23 Q  -- another one that could have taken these
24    photographs?
25 A  He could have taken those also, he or I, yes.

---

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 89 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

**Page 29**

1 Q I was gonna say does that get us down to the
2 universe here --
3 A Yes.
4 Q -- it's either one of the two of you?
5 You have had a chance to look through the
6 photographs fairly carefully. Are you satisfied
7 those are the only photographs that show the cans
8 we have been discussing?
9 A Those are the ones that I found. I can't say that
10 they are the only.
11 Q Can you describe to me in any more detail what
12 these pictures in C and D are showing?
13 A Again, they show the contaminants that's on the can
14 at the end of the line, which is the dust, the
15 material that had been cleaned out or dislodged by
16 Air Tech.
17 Q And since we don't have a photograph, at least that
18 I have seen, that's either -- that's not as closeup
19 or not as far away, is this something that is on
20 the exterior of the can?
21 A Yes.
22 Q What color is it, light, dark?
23 A It's a -- I would -- I would characterize it as
24 light gray.
25 Q Okay. And how do you know that this is a --

**Page 30**

1 something -- a contaminant that's not supposed to
2 be on the can?
3 A The way that Mr. Spencer described how they
4 endeavor to clean the residual dust out before they
5 start to do runs and then we have we have exactly
6 the dust that is inside there coming out on cans
7 four hours later.
8 Q Let's talk about that process for a minute. That's
9 probably a good point to move to it.
10 As I recall in your report Air Tech finished
11 their work on the 22nd of May somewhere around
12 6:00 o'clock in the evening?
13 A Six p.m. or so, yes.
14 Q What is your understanding of what Air Tech's
15 employees did at that point? Did they leave the
16 premises entirely? Did they stick around for a
17 while and watch what Ball was doing? What do you
18 know about that?
19 A I don't think I know anything about what
20 specifically they did other than turn the oven
21 over.
22 Q Once they turned the oven over, Ball employees then
23 began to fire the oven back up?
24 A The way I understand it, there is about an hour of
25 checking and safety stuff that Ball does. Then

**Page 31**

1 they take an hour or more to run the sheet aluminum
2 through with lacquer on it to try and catch
3 residual dust. And they then -- they then start
4 production after that.
5 Q Is your understanding gained from your conversation
6 with Mr. Spencer?
7 A Yes.
8 Q Is there any other source then other than your
9 conversations with Mr. Spencer for this
10 understanding?
11 A Not that I recall right now, no.
12 Q We just had the sheet out there that I think you
13 have referred to. I think it's Rimkus 12.
14 Is that the safety checklist you're talking
15 about that they -- the procedures that Ball has to
16 go through in order to start the oven back up?
17 A I can't say that I specifically know exactly what
18 this sheet is.
19 Q Fair enough. But Ball goes through a process where
20 the oven is turned back on and they run sheets
21 through it until they get clean sheets?
22 A That's my understanding, yes.
23 Q Did you get any information that led you to believe
24 that process did not work in this case, that, in
25 fact, they ran a sheet through and it looked clean

**Page 32**

1 so they started can --
2 A I don't think it's one sheet, I think it's an
3 interval process until they get where they need to
4 be.
5 Q But ultimately on the 22nd of May in 2014, did they
6 reach that point where a clean sheet ultimately
7 came through the oven and they were satisfied?
8 A Yes.
9 Q So they started production again?
10 A Well, there are -- then they instrument a can and
11 send it through to make sure that the -- that the
12 zones have the proper temperatures then they start
13 production. It's a process to get going.
14 Q You just threw one at me, "instrument a can," what
15 does that mean?
16 A They have a -- a -- a can that they can equip with
17 thermocouples that they send through to make sure
18 Zone 1 temperatures are right, Zone 2, Zone 3 and
19 Zone 4 and that they got the speed of the conveyor
20 right and those type of things.
21 Q Literally is this a single can that's going through
22 as opposed to a group?
23 A I believe they put it in -- within a group.
24 Q So after they get a clean sheet of aluminum, just a
25 flat sheet, they run a set of cans through with

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 90 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

**Page 33**

1 thermocouples, make sure the temperatures are right
2 for the zone and then they start running cans
3 through on a production basis?
4 A  That's my understanding, yes.
5 Q  Do you know what time of the evening they started
6 running cans through on a production basis, in
7 other words, that they had completed this work?
8 A  It was somewhere around 8:30.
9 Q  From 8:30 then to roughly midnight, give or take,
10 no problem?
11 A  Things are operating well.  At some point we end up
12 with this contamination on the cans that we have at
13 the end of the line when the line stopped for the
14 fire.
15 Q  Do you have an understanding of what process Ball
16 does, if any, to inspect cans when they come out of
17 the oven to see if they are getting contaminants on
18 them?
19 A  I do not know how often they sample their quality
20 control samples.
21 Q  So you got some cans that we have referenced here
22 that you still have stored at your facility in
23 Chicago that show this contamination?
24 A  Yes.
25 Q  Is there any other artifact that you collected, not

**Page 34**

1 a photograph, an artifact you collected that shows
2 this contamination?
3 A  No.
4 Q  You had a chance to inspect the ductwork that would
5 be above the squirrel cage, in other words, on the
6 exhaust side of the squirrel cage?
7 A  Yes.
8 Q  Was there heat damage to that ductwork?
9 A  Yes.  We're talking about the east side, I assume,
10 where the fire was discovered?
11 Q  Yeah, let's kind of nail that down a little bit,
12 too, since you brought that up, that's a good
13 point.
14     The west end of the oven, did it have heat
15 damage, any of the components on the far west end?
16 A  The duct work pretty much through and through was
17 heat damaged, yes.
18 Q  How about the squirrel cage on the west end?
19 A  Yeah, it did.
20 Q  Had heat damage?
21 A  Yep.
22 Q  Any other components on the west end of the oven
23 that had heat damage that you observed?
24 A  Pretty much all I saw, the interior of the oven
25 didn't look bad.

**Page 35**

1 Q  Other than that heat damage east west, as long as
2 it was Oven 2 there was some heat damage to it?
3 A  To the exhaust, yes.
4 Q  Did you look at the other three ovens that are at
5 this facility or artifacts from them?
6 A  The -- interesting the way you say artifacts 'cause
7 I don't know what you mean by artifacts from them.
8 Q  Let's break it down.  Did you look at the other
9 three ovens while you were at the site?
10 A  Looked at, yes.  Inspected, no.
11 Q  Did you see any heat damage from looking at them?
12 A  I don't really recall the ductwork.  The exhaust
13 ductwork throughout the plant was badly damaged.
14 So I don't know where you're drawing the line from
15 oven to ductwork.  I don't know that the internal
16 of any of the other ovens were specifically
17 damaged.
18 Q  Certainly you were never asked to inspect those and
19 determine if they were damaged?
20 A  No.  I wasn't asked to and my -- my look at them,
21 my quick look at them, did not indicate that there
22 was any reason for me to consider those a cause of
23 the fire.
24 Q  Is there any reason to believe you would have
25 missed heat damage to the other three ovens just

**Page 36**

1 from your quick look?  You think it would have been
2 obvious?
3 A  I think if it was anything that would have -- that
4 would have been significant I would have seen it in
5 the look.  We have, relatively, a witnessed fire.
6 So just a tour of the plant was able to tell me
7 that there was no reason to disbelieve that.
8 Q  Okay.  The ductwork, though, exhaust ductwork in
9 particular throughout the plant was heat damaged
10 throughout?
11 A  Yeah.  I believe there was heat damage all the way
12 to the oxidizer, yeah.
13 Q  It's your opinion that this is -- this is because
14 the fire spread from starting in the IBO 2 oven
15 into the ductwork and then just spread throughout?
16 A  Well, yeah, that's -- I mean, that's obvious by the
17 witnesses' statements, by the fire department
18 report.  Fire department does a pretty good job of
19 chronicling the spread of the fire.
20 Q  Why don't we kind of digress a second there.
21     Rimkus 28 through 31 are some news articles
22 that are in your fire -- or in your file.  Who
23 obtained those?
24 A  Mr. Soyk.
25 Q  Do you know when he obtained those?

USDC IN/ND case 4:16-cv-00042-TLS   document 105-1   filed 10/07/19   page 91 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

Page 37

1  A  5/23/14.

2  Q  Sounds like the first day he was on site?

3  A  Probably trying to get a little background to know
4     what he was walking into.

5  Q  And when's the first time that you saw those?

6  A  I really haven't looked at these closely at all.

7  Q  Do you know why Mr. Soyk would have collected
8     those?

9  A  Again, so he would have a clue what he was walking
10    into.  It's always nice to know if the building's
11    on the ground or if it's actually standing.  It's
12    always interesting to gather a little information
13    if you can up front.

14 Q  In those articles there is a reference to quotes
15    from the fire department personnel that were on the
16    scene talking about the fire starting in the oven.

17    Do you see those portions that I'm talking
18    about?  I could probably point them out to you if
19    you're having trouble finding them.

20 A  Call came in reporting a fire in an oven and
21    discovered -- when crews checked inside they
22    discovered fire had spread from the oven to the
23    ductwork.

24 Q  There you go.

25 A  Is that what you are referencing?

---

Page 38

1  Q  That is, that's one.  That's -- we can deal with
2     that one.

3     And those articles were posted online on May
4     23, I think?

5  A  That's when Bill got them off line, yeah.

6  Q  They were online no later than May 23?

7  A  Yeah.  Looks like it might be, yeah, the Monticello
8     Herald Journal.

9  Q  How would the fire department personnel be able to
10    reach that conclusion that quickly?

11    MR. SENAK: Objection, form and
12    foundation.

13 A  You would have to ask them.  You would have to ask
14    them.  They -- my speculation would be that they
15    did a -- from what they saw and from what they
16    heard from the witnesses.

17 BY MR. AUSTEN:

18 Q  You're telling me, though, that these articles
19    really didn't factor into your conclusions or
20    opinions at all?

21 A  This is the first I have read that.

22 Q  Fair enough.  Let's take a look at your report
23    again.  You, in Section III, Discussion, starting
24    on Page 4 and following for a few pages, it looks
25    like through Page 8, reference some interviews that

---

Page 39

1     were conducted of various employees that are listed
2     in the report, employees of Ball Corporation.

3     Did you conduct all of these interviews
4     yourself?

5  A  I believe those were in-house interviews.  I don't
6     believe we participated in those.  Mr. Soyk may
7     have other information but that's my understanding.

8  Q  Have you relied on these interviews in formulating
9     your opinions and conclusions in this case?

10 A  To some degree, yes.  To the degree that they are
11    very consistent with the timing, very consistent
12    with our observations and the thermal images that
13    they took that are mentioned in those are
14    important, also.

15 Q  You think the interviews were done in-house, were
16    they recorded?

17 A  Certainly on paper they are recorded.

18 Q  How do you know what these people said in order to
19    put it in your report, what did you see?

20 A  Again, I used the best information I have available
21    at the time and that's -- I said very early on if
22    we get it -- if we get some fact witnesses I would
23    love to review their testimony.

24 Q  I'm a little more basic than that.  You got a
25    description of what Freddie Spencer, for example,

---

Page 40

1     said.

2     How do you know this is what he said?  Did you
3     read a report, did you see a statement?

4  A  Again, we had -- we did talk to Freddie Spencer on
5     many occasions.  That's a compilation of the
6     information we gained from Freddie Spencer.  I
7     don't believe he wrote out a statement as some of
8     the other workers did.

9  Q  Well, sticking with Mr. Spencer for a second, you
10    did interview him yourself?

11 A  I gathered information from him.  I don't know that
12    I had any particular one time where I sat down for
13    a quote, unquote interview.  But I would ask
14    questions and get answers as the process went on.

15 Q  And did you record those questions and answers
16    other than just taking handwritten notes yourself?

17 A  I'm not sure I have even got handwritten notes,
18    frankly.

19 Q  Let's kind of do the same series of questions with
20    Mr. Rogers.

21    Did you actually speak to Mr. Rogers yourself?

22 A  I don't -- it would have been incidental if I did.

23 Q  But on Page 5 of your report there is some
24    description of what Mr. Rogers has told somebody.

25    How did you get that description?

---

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

Page 41

1  A  Again, that's in the written -- the written
2     material that we obtained. If you didn't have it
3     before it was in the material that I brought today.
4  Q  Is this in the FM Global loss report that we are
5     talking about?
6  A  I don't believe so.
7  Q  Because I don't know that I have seen anything that
8     ascribes statements to Mr. Spencer so you need to
9     point that out to me.
10  A  The material we brought today.
11  Q  Okay, thank you. You're referring to Ball 1128 and
12     1129, which is a handwritten statement that
13     apparently has been made by Mike Rogers?
14  A  Yes.
15  Q  Then we have got a Justin Stout and Ball 1126 is a
16     handwritten statement that on its face purports to
17     be that of Mr. Stouts'?
18  A  Yes, that looks like his signature.
19  Q  Next to your typewriting, I know that the next
20     statement is Randy Crume because his handwriting
21     quality rivals mine as far as the signature. I'm
22     not sure it's quite as bad as mine but he is
23     trying. Again, this is Ball 1125, purports to be
24     his statement?
25  A  It appears to be, yes.

Page 42

1  Q  Ball 1124 is that of Mr. Pellegrini. How did I do
2     on pronunciation?
3  A  Fine by me.
4  Q  Then Ball 1127 is Wes Krintz?
5  A  Yes.
6  Q  Looks like Ball 1130, they are typewritten -- are
7     these typewritten versions of the handwritten
8     statements?
9  A  I believe so. I believe they tried to help us out.
10  Q  Fair enough. This is material that you rely upon
11     in formulating your opinions and conclusions?
12  A  Yeah, it is, it is. Along with the thermal images
13     that are mentioned in there, yes.
14  Q  Fair enough. According to your report we can --
15     now that we have identified the source material --
16     check and see if this is an accurate recitation
17     Mr. Spencer said the fire originated in the Zones 1
18     and 2 blower unit, if you look at the -- it's Page
19     5 next to -- end of the next to the last paragraph.
20  A  Again, I don't believe Mr. Spencer has a written --
21     a written statement. This is information we would
22     have gathered from Mr. Spencer. Where are we
23     looking now?
24  Q  The very last sentence on Page 5 before the last
25     paragraph pertaining to Mr. Spencer. This says,

Page 43

1     "This fire originated in Zones 1 and 2 blower
2     unit." Do you see that?
3  A  I do see that line, yes.
4  Q  Is that an indication Mr. Spencer believed it
5     originated in the blower unit?
6  A  No. That may have been -- that is -- that is my
7     comment on his -- actually Mr. Soyk's, I believe,
8     comment on what Mr. Spencer said.
9  Q  Okay. Do you have any reason to think Mr. Soyk got
10     it wrong?
11  A  Oh, no. Everything in this report I believe.
12  Q  So in this report Mr. Spencer, at least, has
13     rendered his opinion that it occurred in the --
14     started in the blower unit?
15  A  No. As I -- maybe I didn't articulate that well.
16     That last line, the fire -- "This fire originated,"
17     that's Mr. Soyk making his comment on what Mr.
18     Spencer said above.
19  Q  Okay.
20  A  He has a different writing style.
21  Q  Well, I don't want to panel this one too hard but
22     the language appears to be someone stating what Mr.
23     Spencer told them?
24        MR. SENAK: Object to the form.
25  A  Maybe you need to talk to Mr. Soyk about -- about

Page 44

1     that particular portion. My take on that is
2     knowing his writing style he tends to interject
3     things like that into a report.
4  BY MR. AUSTEN:
5  Q  Did Mr. Soyk prepare this report?
6  A  It was a combined effort. He put much of the
7     background information in there and then I put my
8     parts in there. It's very -- there is not a Soyk
9     section and a Howell section.
10  Q  Would Mr. Soyk have prepared this portion that we
11     are talking about on Pages 4 and 5 discussing an
12     interview with Freddie Spencer?
13  A  My recollection he did.
14  Q  So is Mr. Soyk saying in this last sentence that
15     this is his opinion of what Mr. Spencer believes?
16        MR. SENAK: Object to form and
17     foundation.
18  A  Why don't we just leave that rather than me
19     speculating on what Mr. Soyk is saying. We will
20     leave that -- if that's really important to you,
21     you may have to talk to him.
22  BY MR. AUSTEN:
23  Q  Okay.
24  A  And certainly if we get a chance to get the fact
25     witnesses, you would be able to ask that question

---

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 93 of
                                      1167

Ball Corporation, et al. vs.                                          Scott M. Howell, P.E.
Air Tech of Michigan, Inc.                                                  July 28, 2017

Page 45

1   of Mr. Spencer.
2   Q   Have you ever talked to Mr. Spencer yourself about
3       where he thought the fire originated?
4   A   I tend not to ask people that. I tend to ask more
5       factual questions other than opinion questions.
6       That would not be a question that I would ask
7       anybody, any insured, any representative.
8   Q   Even though you might not have asked it in that
9       form, did you ever talk to Mr. Spencer about what
10      he observed when he first arrived at the scene on
11      night of the loss?
12  A   I believe Mr. Spencer was there significantly
13      later. I don't know that he was on site at that
14      time.
15  Q   Let's turn to Mr. Rogers then. Have you ever
16      talked to Mr. Rogers yourself?
17  A   I don't believe so. Like I -- as I say, all these
18      other witnesses other than Mr. Spencer, if I had
19      contact it was incidental contact while we were at
20      the site.
21  Q   And the section regarding Mr. Rogers on Page 5 of
22      Exhibit 21 is, again, this is a section that Mr.
23      Soyk prepared in the report?
24  A   I believe so, that's my recollection.
25  Q   Have you ever compared this to the statement we do

Page 46

1   have from Mr. Rogers to --
2   A   Yes.
3   Q   -- see if it matches up, if you will?
4   A   It's a good summary.
5   Q   All right. And Mr. Rogers has observed exhaust at
6       the inside of the building -- or smoke, excuse me,
7       at the exhaust inside the building and this is at
8       approximately 12:20 a.m.?
9   A   Yes.
10  Q   What do you understand Mr. Rogers does at Ball
11      Corporation?
12  A   I don't know it it's mentioned in the statement or
13      not. I don't have that off the top of my head.
14  Q   I would assume that there is an employee or
15      employees at Ball Corporation that are charged with
16      operating these. Is that a fair assumption, do you
17      know?
18  A   I have no idea if that's a fair assumption.
19  Q   So if there is someone you don't know any more than
20      I do who it is or whether there even is such a
21      person?
22  A   Again, it may be in the statements, I don't have
23      that off the top of my head right now.
24  Q   They mentioned the fact that -- at least Mr. Rogers
25      mentions the fact that they shut the burners down

Page 47

1   at this point and kept the exhaust squirrel cage,
2   if you will, running?
3   A   Yeah. The fan's running to try and cool things
4       off.
5   Q   Yeah. Then there is a reference in his statement
6       that he apparently leaves and then comes back about
7       20, 25 minutes later because now they have got open
8       flames observed in the oven?
9   A   This is all taken from the statement.
10  Q   Okay. Is there anything about these statements,
11      the fact that several of them reference smoke from
12      the exhaust system that you utilized in formulating
13      your opinions and conclusions?
14  A   Again, part of it is -- is the observation of where
15      they -- where they saw the fire, the timing of what
16      they saw and the relative consistency of the
17      statements to help us understand where the fire was
18      first observed.
19  Q   Okay. Is there anything in these statements that
20      you rely upon then to reach your opinion that the
21      fire started in the oven as opposed to in the
22      ductwork?
23  A   No. This doesn't eliminate the blower, the exhaust
24      blower as an ignition source.
25  Q   Okay. Let me kind of direct you back to your

Page 48

1   conclusions again that are on Page 2 of your
2   report. The very last sentence, The contaminants
3   include -- included small particulate matters
4   scraped off of the interior of IBO 2 just prior to
5   the fire.
6       How did you reach that conclusion?
7   A   Well, you know, we have got -- we obviously have a
8       fire. Now we have to find the ignition source and
9       the first fuel and then the means to spread that to
10      where it went. The only ignition source we have is
11      the burner. We have eliminated everything else.
12      So the only potential fuels are something left
13      in there by Air Tech. And just as way of an
14      example, some kind of a rag or something
15      combustible or the particulate material.
16  Q   This last sentence, though -- at least it reads to
17      me that it's your opinion the material in question
18      that actually started this fire is particulate
19      matter scraped off the interior of the oven prior
20      to the fire.
21  A   I can say with -- I can say with certainty that
22      there was particulate material left in there. I
23      can say with certainty that something happened
24      about four hours into that run that changed the
25      state of some particulate matter within the oven by

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 94 of
1167
Ball Corporation, et al. vs.                                                    Scott M. Howell, P.E.
Air Tech of Michigan, Inc.                                                          July 28, 2017

Page 49

1    the cans that we see and that they started the
2    production is an indication they didn't have that
3    flying around to start with.
4  Q  Okay.
5  A  So that is certainly something that I can say with
6    confidence to a reasonable degree of engineering
7    certainty was present within the oven. I cannot
8    rule in or rule out, as I say, a rag or something
9    combustible being left in there. I don't have the
10   physical evidence of that. But that is
11   certainly -- certainly a possibility, also.
12 Q  From that it sounds like we keep coming back to the
13   cans that you found at the end of the oven and that
14   we have already discussed.
15       Is that the basis for your opinion that it had
16   to be a particulate matter that was left in the
17   oven?
18 A  That's the basis for me saying that there was a
19   significant amount of particular -- particulate
20   matter that was dislodged shortly before the fire
21   or at the ignition of the fire.
22 Q  Have you done any testing on the cans or the
23   material you found on the cans to try and determine
24   what that material is?
25 A  Again, I think I can say to a reasonable degree of

Page 50

1    engineering certainty that that is the byproduct of
2    the evaporation process of the materials that
3    were -- the can liner and the lacquer on the
4    outside of the can or varnish on the outside.
5  Q  My question is slightly different.
6        Have you done any testing to determine that?
7    Or did you just look at it and say this looks like
8    particulate matter coming off the oven?
9  A  No. We haven't done any testing of it.
10 Q  So you're reaching this conclusion because of your
11   visual observations?
12 A  Visual observations and thought experiments, yeah.
13 Q  What do you mean by "thought experiments"?
14 A  As I just explained, as I just explained. One of
15   the reasons that I was able to draw those
16   conclusions was seeing a cleaning in process to see
17   what the material looked like that they were
18   getting out of the oven, which is very similar to
19   what we see on the cans.
20 Q  Has anyone at Ball Corporation looked at these cans
21   that you retained as artifacts and discussed with
22   you what's on the cans?
23 A  No, I don't believe so.
24 Q  Would you agree that the WB Spray that's used in
25   the manufacturing process prior to the cans going

Page 51

1    into the oven is flammable?
2  A  You talking about -- is that the can liner or the
3    or --
4  Q  I think the WB Spray is the stuff that goes on the
5    outside of the can. Mr. Senak will correct me if
6    I'm wrong, I assume, as opposed to the varnish that
7    goes on the inside of the can.
8  A  I think it's the other way -- I think the varnish
9    is on the outside.
10 Q  I'll accept your --
11 A  I believe both of them are classified as
12   combustible, not flammable.
13       MR. SENAK: I think he mentions that
14       in his report. But, you know --
15 A  The WB is the spray liner and the varnish is on the
16   outside.
17 BY MR. AUSTEN:
18 Q  Among the other material that are -- that is in
19   your file, there is MSDSes for both of these
20   products?
21 A  Correct.
22 Q  And the MSDS for the WB Spray shows a flashpoint of
23   125.6 degrees Fahrenheit?
24 A  That makes it combustible liquid. Depends on what
25   classification method they are using. I used the

Page 52

1    NFPA guidelines. That would make it a combustible
2    liquid. Flashpoint is over a hundred degrees
3    Fahrenheit.
4  Q  How does this factor into your opinions, if at all?
5  A  Gives us a characteristic of the -- not
6    particularly. It's just something that gives us
7    the characteristics of the material.
8  Q  Okay. You don't think the WB Spray then is a
9    potential ignition source?
10       MR. SENAK: Object to form.
11 A  I need a lot more information. I mean, if we have
12   a -- I could ignite the bucket of it, yeah.
13   Rephrase the question for me.
14 BY MR. AUSTEN:
15 Q  Absolutely. Do you have an opinion as to whether
16   the WB Spray is a potential source of ignition that
17   caused the fire in question in this case?
18       MR. SENAK: Same objection.
19 A  I don't know any way that it could be the ignition
20   source.
21 BY MR. AUSTEN:
22 Q  Let's go back to your report again. And Pages -- I
23   guess just -- Page 6 and 7.
24 A  (Witness complies.)
25 Q  You have got the Figure A, Figure B, Figure C on

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 95 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

Page 53

1    Page 7. What are these?
2  A  These are thermal images -- thermal imagings that
3    the Ball employees took when they were suspecting a
4    problem up by the east exhaust blower.
5  Q  Okay. Do you know how these images are taken?
6  A  Probably with a FLIR.
7  Q  Okay. A -- you're --
8  A  FLIR, F-L-I-R.
9  Q  I was gonna say she's gonna ask you to spell it
10   anyway. I think I knew what you were saying.
11     You're talking about a type of camera, if you
12   will?
13  A  Yeah. It's a camera that's designed for finding
14   temperatures on things.
15  Q  And then they digitally transmitted these to you?
16  A  Yeah, I believe so.
17  Q  These are all of the exhaust systems, these Figure
18   A, B and C?
19  A  Yeah, these are all of the east blower.
20  Q  None of these are of the oven?
21  A  Correct.
22  Q  Do you know if anyone at Ball took thermal images
23   of the oven itself or anything below the squirrel
24   cage, if you will?
25  A  I don't believe that they did.

---

Page 54

1  Q  To your knowledge then these images were taken on
2    the date and time that appears imprinted on each
3    picture? So, for example, Figure A was taken at
4    12:32:34 a.m. on May 23 of 2014?
5  A  I -- we can assume that. I honestly don't know if
6    their cameras set up time right.
7  Q  Did anyone represent to you when they transmitted
8    these to you that those dates and times were
9    accurate?
10  A  The statements indicate that these are essentially
11   accurate.
12  Q  Let me direct your attention to Page 8 of your
13   report. All the way at the bottom where you're
14   stating, "We examined the cans that had been run by
15   IBO 2 prior to the fire" and you reference an
16   Artifact J. "We observed small particles adhering
17   to the exterior of the cans consistent with the
18   material scraped off during cleaning not having
19   been removed after it had been scraped off." And
20   then you reference back to Figures C and D. And
21   that's the second Figure C on Page 9.
22  A  Rub it in.
23     MR. AUSTEN: Off the record.
24     (A short break was held.)
25

---

Page 55

1  BY MR. AUSTEN:
2  Q  Scott, before the break we were talking about Page
3    8 of your report and at the very bottom of that
4    page you discuss small particles adhering to the
5    exterior of the cans consistent with the materials
6    scraped off during cleaning not having been removed
7    and then you referenced Figures C and D.
8      First question, those are the Figures C and D
9    on Page 9?
10  A  Correct.
11  Q  But that area also mentions cans that had been run
12   by IBO 2 prior to the fire, Artifact J. Are those
13   the same cans we have been talking about, the ones
14   that you retained and have in storage?
15  A  Yes.
16  Q  I couldn't tell for sure if you were talking about
17   cans that had been run earlier in the evening or
18   the ones that were there -- left there when the
19   fire was discovered?
20  A  These are the ones that are at the end of the line
21   when we were there doing our work.
22  Q  Right above that you also discuss your examination
23   of the exhaust fan housing.
24     We've been referring to this as the squirrel
25   cage, too, at least that area. Correct?

---

Page 56

1  A  Yes.
2  Q  And you observed a substance similar to
3    fire-damaged creosote on the interior of the east
4    fan housing and referenced Photographs 14 through
5    16. And you state that this tar-like material was
6    to have been removed prior to the fire during the
7    cleaning process. First question what's the basis
8    of your understanding that this material was to
9    have been removed prior to the fire?
10  A  Again the --
11  Q  The email?
12  A  The email is -- Mr. Spencer's discussion with us
13   and the email.
14  Q  Okay. The tar-like material that you observed,
15   could it have gotten there in any other way other
16   than not being removed prior to the fire and then
17   melting during the fire?
18  A  Yeah. There is that potential that some of it
19   could have been there. But the way it was
20   deposited in many areas was not consistent with it
21   dripping down from up above.
22  Q  You kind of headed in the direction I was going.
23   Is this substance similar to the fire-damaged
24   creosote that you're referencing, could it have
25   been ignited in the fire and dripped down from the

---

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 96 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

Page 57

1    vents above the squirrel cage?

2  A   It's certainly evident in photograph 14. We are
3      looking through an inspection port in that blower.
4      I'll wait til you catch up.

5  Q   I'm with you.

6  A   We are looking through that inspection port there.
7      And it is full of well-charred material. That's
8      what I would expect to see coming down from up
9      above. And the blower, obviously, wouldn't operate
10     with all this blowing in there. I wouldn't expect
11     Air Tech to leave anything close to this in there.

12  Q   Okay.

13  A   What we did find when we did the inspection of the
14     parking lot is shown in 17. And you can see the
15     very different characteristics of that material.
16     That was up underneath the blades in an area that
17     was very hard for me to reach. But we couldn't get
18     this fall down into that area. We couldn't get
19     unburned, like melt down into that area. This
20     honeycomb material was there before the fire. And
21     this is where the fire spread to when it came out
22     of the oven is to this honeycomb material and then
23     from there we went up into the vent.

24  Q   So photograph 17, in your opinion, shows material
25     that was in the squirrel cage near the blades?

Page 58

1  A   Underneath the blades as I reached back in there.

2  Q   Underneath the blades and it was there prior to the
3      fire and burned up in the fire?

4  A   This is where the fire -- it started at the
5      burner -- spread to.

6  Q   Okay.

7  A   Then from here we went up into the duct.

8  Q   Is it your understanding that Air Tech was supposed
9      to have removed the materials shown in photograph
10     17?

11  A   Yeah. It was inside the blower.

12  Q   I have asked you several questions about your
13     understanding of what Air Tech was supposed to do.
14     I'm gonna assume at this point unless you tell me
15     differently that those assumptions are based on
16     what you have already told me several times, your
17     conversations with Mr. Spencer and the email in the
18     exhibit to your report. Okay?

19  A   Yes.

20  Q   So I don't have to keep asking you that and having
21     you tell me the same thing.

22         But the material that you have shown in
23     photograph 14, this is not material that you think
24     Air Tech left in there and should have been taken
25     out?

Page 59

1         MR. SENAK: Just object to the form,
2      go ahead and answer.

3  A   The material that -- that is piled within there I
4      believe is from the duct up above. As that burned
5      and turned from a semi liquid into a solid and fell
6      down.

7  BY MR. AUSTEN:

8  Q   Okay.

9  A   That was dislodged by the fire department
10     activities and those type of things. There is
11     other material here that is being referenced in the
12     in the report that's a little harder to visualize,
13     just don't have good photographs of it.

14  Q   All right. Do you have an understanding of whether
15     Air Tech was supposed to clean past the squirrel
16     cage and into the ductwork?

17  A   My understanding is they were supposed to clean to
18     the flange at the top of the blower. So they
19     weren't supposed to clean from the flange up, just
20     from the flange down.

21  Q   That would be above the electric motor and the fan
22     blades, the flange at the top of the blower? If
23     you got a photograph that illustrates this, I would
24     love to --

25  A   Maybe not in report we can certainly find a

Page 60

1      photograph in the photographs.

2  Q   We might go back to here. I'm gonna turn the
3      exhibit two pages back in just to make it easier
4      for you.

5  A   This makes it real easy, in Rimkus 000173 that
6      shows a blower on the pallet and the flat side
7      that's up on top. In the lower right-hand corner,
8      that photograph, that's the flat area right on top.
9      That's the flange going up to the ductwork. They
10     were responsible for cleaning up to that. So
11     everything you see on that pallet they were
12     responsible for cleaning.

13  Q   Thank you. That helps.

14         Let me show you Rimkus 13. This is one of a
15     series of evidence custody forms that I'm gonna
16     walk through with you. You may have a cleaner
17     copy of that with you or you may not.

18         Can you tell me what evidence you are taking
19     custody of based on that form?

20  A   Exhibit V, as in Victor, is all I can tell you.

21  Q   Not to hold out on you but Rimkus 14 may have a
22     picture of that.

23  A   Judging by the date that would have been when I was
24     down there for the cleaning, when I was able to
25     observe the cleaning.

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

**Page 61**

1 Q   So can you tell me what this is that's referenced
2     in Rimkus 13 and 4?
3 A   That would have been some of the particulate
4     material that I was able to collect at that point.
5 Q   Do you know where this sample was taken from?
6 A   I think it was -- I believe it was oven two, yeah.
7 Q   Do you know where at in the oven, though?
8 A   Up near the blower.
9 Q   Okay.  And you still have these?
10 A   We should, yeah.
11 Q   I'm gonna do the same type of thing for several
12     other evidence custody forms, mainly because they
13     are so hard for me to read based on the copies we
14     have --
15 A   Pink doesn't copy well.
16 Q   I will agree with you on that.  Let me show you
17     Rimkus 15 through 18 and see if you can tell me
18     what artifacts you have retained that's referenced
19     in those documents?
20 A   Probably be easier if I got my copies out.
21 Q   By all means.
22 A   Let me see which one is which --
23 Q   You probably don't have the stamping on your
24     copy --
25            MR. SENAK: I'm looking for those

**Page 62**

1            and --
2 A   Okay.  Fifteen was collected on 5/31/14.
3            MR. SENAK: I'm just trying to find
4     the Bates stamped ones that are clearer
5     on my computer and I can't -- I may yet
6     accomplish that so we can actually sort
7     of correspond the Bates numbers to the
8     ones -- but he has -- he has the
9     non-Bates version.  I'm just not sure
10     that --
11 A   I can read the information into the record if you'd
12     like.
13 BY MR. AUSTEN:
14 Q   As long as you are confident that what you're
15     reading from matches up with these Bates numbers.
16 A   Yes.  I would do nothing less.
17            MR. SENAK: Let's try that and I'll
18     keep looking to see if I can get access
19     to those.  I just have to VP into my
20     system to see if I can get to them.
21            MR. AUSTEN: Fair enough.
22 A   So what are your questions on 15?
23 BY MR. AUSTEN:
24 Q   On 15 what artifact is being retained and stored?
25     What is this stuff?

**Page 63**

1 A   On 15 it's Exhibits A through C, A, B and C and
2     it's -- looks like glass tubes of burned material.
3 Q   Okay.  What about 16?
4 A   Sixteen is a bunch of stuff.
5 Q   Before you start then I got one more question that
6     just occurred to me I forgot.
7            Do you know where on the oven or exhaust
8     system the A, B and C samples were collected that
9     are reflected in Rimkus 15?
10 A   I do not.  Mr. Soyk collected those.
11 Q   So what I'm doing is trying to find out what you
12     got and where it came from in the -- among the
13     various components of the oven if you can tell me
14     for each of those.
15            Let's go to 16, you got a bunch of stuff.
16            THE DEPONENT: Can we go off for a
17     moment?
18            MR. AUSTEN: Absolutely.
19            (A short discussion was held.)
20 BY MR. AUSTEN:
21 Q   Scott, I'm gonna hand you Rimkus 95 through 112
22     inclusive.  Take a look.  But based on our
23     off-the -- record discussions it would seem that
24     these are duplicates of Rimkus 13 through 18
25     inclusive in the sense that everything in 13

**Page 64**

1     through 18 is also included in the ones I have just
2     handed you plus some additional material.
3 A   We can put on the record that this form comes in
4     triplicate.  The pinks that you're trying to read
5     before are the part that are in my file.  The
6     whites are the administrative copy.  The yellows
7     actually stay with the artifacts themselves.
8 Q   You have got the whites and the yellows you just
9     referenced plus some photographs of the actual
10     artifact in question now?
11 A   Correct.  Our procedure is before they get logged
12     into evidence, she takes a photograph of what she
13     is logging in.
14 Q   Okay.  "She" being?
15 A   Melissa at our office, our evidence administrator.
16 Q   Let's start walking through the white copies then
17     because those seem to be the most legible.  My
18     question is what is it that is represented in a
19     given artifact and where it came off the system, if
20     you know?
21 A   Again, I can -- these were collected by Mr. Soyk.
22     I will read what I can on them.
23 Q   All right.
24 A   I don't know specifically where all of them came
25     from, not written on here that I can read.

---

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 98 of
1167
Ball Corporation, et al. vs.                                                                              Scott M. Howell, P.E.
Air Tech of Michigan, Inc.                                                                                  July 28, 2017

Page 65

1   Q   Fair enough.
2   A   The first one we started to talk about is Exhibit
3       A. There are three, looks like, glass jars of
4       burned material and they are labeled A1, A2 and A3.
5   Q   That's on Rimkus?
6   A   Ninety-five.
7   Q   All right.
8   A   Rimkus 96 is Letter O through U, as in union. O is
9       a gallon metal container and I can't read the rest
10      of it. P is another gallon container. And he does
11      have the locations here. I can read something
12      with -- from E blower, I assume that's east blower
13      but I don't know specifically where.
14  Q   Okay.
15  A   Q is a -- again, I can't read his writing. R is
16      plastic bag of something from -- looks like W
17      blower, west blower. S is going to be gallon can
18      with something again from W blower. T is a Ziploc
19      bag with something from west blower. U is a glass
20      jar with, again, something from west blower.
21          Bates Stamp 97 is Exhibits B through M. Let's
22      see, B is a glass jar scrapings from west end of
23      Oven Number 2, I believe -- duct, number two duct.
24      C is a glass jar with scrapings. It looks like
25      second, 2nd west end oven duct. D is a glass jar

Page 66

1       scraping east end Oven 2 duct. E is glass jar
2       scrapings east end Oven 2 duct. F is glass jar
3       scrapings east end roof duct. G is glass jar
4       scrapings east end roof duct. H is glass jar
5       scraping vacuum east end exit Oven 2. I is glass
6       jar scraping vacuum east exit Oven 2. J is 32 cans
7       from the end of run Oven 2. K is glass jar with
8       scrapings from east exhaust west vent. L is glass
9       jar with scrapings from east exhaust east vent. M
10      is a plastic bag with debris from blower over to
11      exit side. Again I'm doing the best I can with
12      Bill's writing.
13  Q   You have repeatedly referenced glass jar scrapings.
14          These aren't scrapings of a glass jar, these
15      are scrapings he took from someplace on the oven
16      and put in a glass?
17  A   I believe that's true. Again, I'm trying to give
18      you what's on the sheet.
19  Q   I understand.
20  A   Bates stamp number 98, Exhibit N is four boxes of
21      cans with 40 in each box.
22          You want me to correlate these with these
23      (indicating)?
24  Q   I don't think we need to the correlate the whites
25      with the yellows as long as you think we have now

Page 67

1       gone through all of the artifacts that Mr. Soyk
2       collected?
3   A   I believe we have, I believe we have.
4   Q   Have you actually looked at any of these artifacts
5       we have discussed? I know you talked about looking
6       at the cans. But any of these artifacts have you
7       looked at them yourself?
8   A   I seen all of the them, yeah, and I saw the
9       conditions of the ducts, I saw the conditions of
10      the area where they were taken before they were
11      taken.
12  Q   Are any of these particularly important in arriving
13      at your opinions regarding the origin of the fire
14      in the oven?
15  A   Other than that chunk that I showed -- it's shown
16      in photograph 17 of the report --
17  Q   Right.
18  A   -- I think everything else we collected was more
19      for documentation for other folks if we need to
20      down the line.
21  Q   Have you or anyone at Rimkus done any further
22      analysis of these artifacts, any kind of testing to
23      see what they are, anything like that?
24  A   No.
25  Q   Let me try and get my file put back together here

Page 68

1       for a second. Showing you Rimkus 53 appears to me
2       to be some type of computer generated diagram of
3       the overall plant in Monticello. Is that your
4       understanding?
5   A   Yes.
6   Q   Is this something you got from Ball Corporation?
7   A   Yes.
8   Q   This wasn't generated by you as a result of your
9       inspection?
10  A   Correct.
11  Q   There is several more of a similar ilk in the
12      Rimkus file. Are they all from Ball Corporation?
13  A   Yes.
14  Q   It looks like one on 53, Rimkus 53, has even got
15      some handwritten notes near the ovens that are in
16      question in this case, maybe trying to label which
17      one is 3 and which one is 2, that sort of thing.
18      Is that your handwriting?
19  A   It is not.
20  Q   Is that Mr. Soyk's?
21  A   Yes.
22  Q   How am I doing on the pronunciation of his name?
23  A   Soyk. Strong German name.
24  Q   So real quick housekeeping note, Rimkus 150 is an
25      email from Melissa at your office to Michael

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 99 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

**Page 69**

1  Wiseman. First of all, who is Mr. Wiseman?

2  A  He is one of the vice presidents in our Houston
3  office.

4  Q  References the fact that we have requested this
5  file and Mr. Senak is coming to review it.

6  Was anything removed from the file based on
7  Mr. Senak's review, to your knowledge?

8  A  I don't believe so. Typically that would go out
9  when we get a notice of deposition. We have a --
10  she has a checklist of things to do and Mr. Wiseman
11  looks things over to make sure they are not asking
12  us to bring our first born and that type of thing.

13  MR. SENAK: Jim, just by way of my
14  review, nothing was removed from the file
15  at my direction.

16  MR. AUSTEN: It did not appear to me
17  that anything was but I was trying --

18  MR. SENAK: I just wanted to make
19  sure so there is no ambiguity.

20  MR. AUSTEN: That's fine. Most of
21  the time things aren't removed but
22  occasionally you'll stumble across
23  something you think a privilege does
24  apply to. If we had that issue I want to
25  get that --

**Page 70**

1  MR. SENAK: Right. You have to ask
2  that question.

3  MR. AUSTEN: Certainly not implying
4  anything untoward --

5  MR. SENAK: Understood.

6  MR. AUSTEN: On this occasion.

7  BY MR. AUSTEN:

8  Q  Let me show you Rimkus 309. This may be the email
9  trail where the thermal images were transmitted to
10  you digitally, maybe from an email to Mr. Anderson
11  first and then on to you?

12  A  That probably -- yeah.

13  Q  All right. Rimkus 6 and 7 we got some and
14  handwritten notes and a diagram.

15  Is this Mr. Soyk again?

16  A  No, this would be me.

17  Q  Okay. What are we talking about here on these
18  handwritten notes?

19  A  These are from the inspection we had of the blower
20  in the parking lot.

21  Q  Okay.

22  A  In September 1st of '15. Marking down what the --
23  what the bearings were on the motor, that the
24  blower wheel turns, that there is no scraping,
25  about the chunk that we found in the back.

**Page 71**

1  Q  Okay.

2  A  The west blower, interestingly enough, it didn't
3  turn.

4  Q  The west blower did not?

5  A  Did not. That's what it says here, shaft does not
6  turn.

7  Q  Any reason --

8  A  Sticky material had dripped down from above.

9  Q  Okay.

10  A  Then I was able to get -- once I realized what the
11  problem was, I could get it to turn. It was just
12  sluggish.

13  Q  Rimkus 22 through 24 are some more diagrams and
14  handwritten notes.

15  Are we still looking at your product again?

16  A  No. This is Mr. Soyk this time.

17  Q  Okay. Can you read it sufficiently to tell me what
18  we are discussing in these notes?

19  A  Looks like he's got a general -- general diagram of
20  the -- the oven showing the burners, the blowers,
21  the ductwork generally. That's on 22. You want me
22  to read his notes into the record?

23  Q  Not necessary if you can just give me a substance
24  of what's being discussed.

25  A  Doesn't say who he is interviewing here, it says he

**Page 72**

1  has got the specifications on the oven. And then a
2  general rundown, smelled fire, you know, basically
3  a summary of what all the statements say. This
4  looks like it's something he put together at his
5  desk before he went out there just because it's way
6  too neat. Field notes are never this neat.

7  Q  Okay.

8  A  That information, again, he was gathering before
9  he went out. But the sketch was obviously done on
10  site.

11  Q  That's on 22?

12  A  Is that the number? Yes.

13  Q  Is -- can you tell from review of this who, if
14  anyone, Mr. Soyk would have been talking to when he
15  was compiling this information?

16  A  I don't see that on there.

17  Q  There is a note at the top of Rimkus 24, Timeline,
18  looks like, 1129-Airtech?

19  A  That's what it looks like, I don't know what it
20  means.

21  Q  No idea what it references. Looks like right
22  underneath that, "any other fires." Same thing
23  don't --

24  A  Again, I didn't take them so. I don't -- I don't
25  know what any of that means other than what it

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

Page 73

1    says.
2  Q  Okay.  Next we have got Rimkus 49 through 52?
3  A  Again these are Mr. Soyk's notes.
4  Q  Okay.
5  A  He's got in there that Mr. Pellegrini, the electric
6    tech's been there 12 years, da, da, da, da, da.
7    Apparently he talked to -- or got some information
8    about Pellegrini, one of the interviews we have
9    information on.
10  Q  Okay.  Looks like he has got a wiring diagram on
11    49?
12  A  I think he is asking for a wiring diagram.
13  Q  And 50 there is a diagram of --
14  A  That's his sketch of some part of the system.
15  Q  Show you Rimkus 70 through 71.  These are pretty
16    short and sweet.  I don't know if those are yours
17    or not?
18  A  No, they are not.
19  Q  Mr. Soyk again?
20  A  Uh-huh.
21  Q  Got to give me yes or no.
22  A  Yes, I'm sorry.
23  Q  That's the first time today, that's pretty good.
24  A  Trying to read and listen at the same time,
25    multitasking is a bad thing.

Page 74

1  Q  Do you know what these notes reference?
2  A  I do not.  May I see that top one?
3  Q  You may.
4  A  No, I don't know what that might be.
5  Q  Phoenix Industrial, maybe, Internal Bake Oven, is
6    that referencing a manufacturer of the often?
7  A  (Witness shrugs.)
8  Q  You looked at me and shook your head, you don't
9    know?
10  A  I have no clue.
11  Q  Rimkus 75 and 76, are those your handwritten notes?
12  A  Yes, they are.  Seventy-five should have been in
13    the trash can, doesn't belong in this file.
14  Q  Not even referencing this case?
15  A  It is not.  The guy I was interviewing Thursday at
16    10:00 a.m. for a job, my bad.
17    This is a -- 76 is just some of the
18    information I was looking for from the plant, the
19    operating parameters of the oven, testing schedule,
20    calibration of the oven, operation records from the
21    last month before the fire.
22  Q  Okay.
23  A  You can have both.
24  Q  Thank you.  I got to hang onto both of them.
25    The one note that we saw from Mr. Soyk

Page 75

1    appeared to be, at least, interested in whether or
2    not there had been other fires.
3    Do you have information on any other fires
4    that have occurred at the Ball plant prior to May
5    of 2014?
6  A  I have seen some records about -- about previous
7    fire department responses.  I didn't see anything
8    that looks substantially similar to this event but
9    they have had some fires, some smoke events with
10    some of the ovens.  Unfortunately the fire
11    department records don't say which oven.  And,
12    again, that would be interesting information to get
13    from the fact witnesses.
14  Q  Are you aware of whether there had been any fires
15    in a temporal time relationship to when Air Tech
16    has been there cleaning?
17  A  Not that I know of, no.  I didn't see anything to
18    link any other event to the fire event.
19  Q  Okay.  Is that something that would be of interest
20    to you?
21  A  Any more information I get on the fire event would
22    probably be interesting.
23    THE DEPONENT:  Good time to take a
24    break?
25    MR. AUSTEN:  Absolutely.

Page 76

1    (A short break was held.)
2  BY MR. AUSTEN:
3  Q  Scott, where I'm ending up here is that your
4    opinion is that the fire started in the oven, not
5    in the squirrel cage or the ductwork -- exhaust
6    ductwork above the squirrel cage.  Correct?
7  A  Correct.
8  Q  That opinion's, in large part, not exclusively, in
9    large part based on the cans that were at the end
10    of the oven and the discussions with Mr. Spencer?
11  A  No.  You have completely misunderstood then.
12  Q  Okay.
13  A  The analysis, we have to have an ignition source.
14  Q  Okay.
15  A  And the system, from what we know about where the
16    fire was first seen, there is only two ignition
17    sources, the blower and the burner.
18  Q  Let me interrupt you just a second, I appreciate
19    that I'm interrupting you.  Where was the fire
20    first seen and by whom?
21  A  At the blower, at the east exhaust blower.
22  Q  Who saw that?
23  A  Any number of the witnesses.
24  Q  All right.
25  A  We have got the thermal images relatively

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 101 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

**Page 77**

1 contemporaneously with their observations.
2 Q Their observations are that the fire first was seen
3 in the blower?
4 A The smoke was first seen coming from the -- from
5 the blower, yeah.
6 Q Smoke or the fire?
7 A Smoke initially then a fire. First they had a
8 smell. They called some electricians to see if
9 they could figure out what the smell was. Then
10 they observed smoke and then they observed fire.
11 Q All right. When they observed fire were they
12 observing fire at the squirrel cage or exhaust fan
13 as well?
14 A Again, all I've got is the statements to go by. So
15 I haven't been able to flush that out. But that's
16 my understanding, they saw fire at the blower.
17 Q I interrupted you and I apologize, go ahead.
18 A So to have a fire, we have got to have an ignition
19 source. We only have two in the part of the system
20 that -- anywhere close to where the fire was
21 discovered. If we reach farther up the ducts
22 downstream from the blower, there is absolutely
23 nothing to create heat to ignite anything there.
24 Until we get all the way to the thermal oxidizer,
25 which is hundreds of feet away. So we got two

**Page 78**

1 ignition sources, I can rule out the blower very
2 easily. The bearings are external, the bearings
3 are still in great shape. The thing still turns
4 very nicely. There is no scraping, there is no
5 mechanical interference. So we eliminate that
6 ignition source, that brings us back strictly into
7 the oven at the main burner. So the cans
8 relatively confirm that -- that analysis.
9 So it's much more than just what Mr. Spencer
10 said and the cans. It's the analysis of the system
11 looking for an ignition source.
12 Q And in connection with that, it is your opinion
13 that the heat immediately above the squirrel cage
14 is not sufficient to serve as an ignition source?
15 A Correct. It hasn't been for years. There is no
16 reason that it would start now.
17 MR. AUSTEN: Let's take a minute, I
18 think we are close.
19 MR. SENAK: Okay.
20 (A short break was held.)
21 BY MR. AUSTEN:
22 Q Scott, do you have any knowledge of -- other than
23 what we have already discussed, I think you're
24 doing this by elimination. You didn't see Air Tech
25 clean this place. Correct?

**Page 79**

1 A Correct.
2 Q Do you have knowledge about what is a good job or a
3 bad job for Air Tech to have done in this
4 particular case?
5 MR. SENAK: Object to form.
6 A Other than to look at the areas that they were
7 supposed to clean and make sure they were down to
8 bare metal, no.
9 BY MR. AUSTEN:
10 Q I think that this is already in the record but
11 let's make sure we got it clear. Your belief is
12 that something in the oven ignited and started the
13 fire and it could be debris that was left that Air
14 Tech should have cleaned up, could have been a rag,
15 you're not sure which?
16 A I can't tell you with certainty what the first fuel
17 was. I can tell you with certainty that there was
18 a significant amount of the particulate material
19 left in the oven that was unleashed about the time
20 of the fire.
21 Q And you say "unleashed," that's kind of the
22 implication.
23 How do you explain running sheets through,
24 getting a clean sheet and then running the oven for
25 a while before this fire starts if it's something

**Page 80**

1 that Air Tech did or failed to do?
2 A I can give you one possibility as relatively an
3 analogy.
4 Q All right.
5 A But let's say that there was a small, for lack of a
6 better word, pile of the particulate material in
7 the area of the burner and the radiant heat over
8 time ignites that little pile. As it's -- as it's
9 smoldering, it's gonna change its form and at some
10 point collapse on itself.
11 Then we get airborne sparks, we get airborne
12 material. So that is one way to explain the
13 particulate material that's on the cans that was
14 stirred up by that small collapse of the pile. And
15 also gets us with the burning material going up
16 into the blower. So that's one example of a
17 possibility. I can't tell you specifically what
18 the configuration was but that's one example.
19 Q Are there other examples you can think of?
20 A If I did some thinking about it, yes.
21 Q That's the one that comes to mind off the top of
22 your head?
23 A That's the easy one to explain right now.
24 MR. AUSTEN: No further questions.
25 Thank you for your time.

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 102 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

Page 81

```
 1            CROSS-EXAMINATION
 2   BY MR. SENAK:
 3   Q   I just have a couple on the -- you were asked some
 4       questions about what assumptions you made or what
 5       was the bases for your opinion on what was the
 6       scope of work for Air Tech.  Do you recall those?
 7   A   Yes.
 8   Q   One of those was your information provided to you
 9       by Mr. Spencer.  True?
10   A   Correct.
11   Q   And then the email from Mr. Scholten?
12   A   Correct.
13   Q   In your file you also had interrogatory answers
14       that were provided by Air Tech.  I want you to look
15       at the answer to interrogatory number two.
16          And my question is is that also a basis for
17       your opinion on what the scope of work that Air
18       Tech would have performed?
19   A   Yeah.  The interrogatory says that this -- the
20       cleaning was to the squirrel cage fan and the fan
21       blades were also cleaned.  That seems like a very
22       fine line to make, that the scope would be up to it
23       and then clean a little bit part of this appliance.
24   Q   Certainly Mr. Scholten's email clarifies what the
25       scope of work would have been as shown in
```

Page 82

```
 1       interrogatory number two?
 2   A   I think he is very clear in his email, yeah.
 3   Q   In your report on Page 11 you list what the bases
 4       for your opinions are?
 5   A   Yes.
 6   Q   Number 14 on that list is Air Tech invoice?
 7   A   Yes.
 8   Q   I take it you would have considered the Air Tech
 9       invoice, which I believe is attached to the
10       defendant's production request, in formulating your
11       opinion?  There is a series of invoices actually
12       attached.
13   A   That was one of the things we looked at, yes.
14   Q   And in addition to the bases of your report -- or
15       in addition to the items listed on Pages 11 and 12
16       of your report reflecting what the bases of the
17       your opinions are, that would include what you have
18       testified to here today?
19   A   Certainly.
20   Q   With respect to the knowledge of the presence of
21       the particulate matter in the oven, you indicated
22       that you looked at the cans.  True?
23   A   Correct.
24   Q   And then you spoke with Mr. Spencer about the
25       process of cleaning the oven?
```

Page 83

```
 1   A   Correct.
 2   Q   And then I want to go back to interrogatory number
 3       two, there is a description of the scope of work.
 4          Did you also rely upon the content of
 5       interrogatory number two in concluding that there
 6       was particulate matter that would have remained in
 7       the oven after the Air Tech cleaning?
 8   A   Certainly, certainly.
 9   Q   If you look at exhibit -- if you look at the
10       response in interrogatory number two, can you tell
11       me what were the specifics in interrogatory number
12       two that you relied upon in concluding that
13       particulate matter would have resulted from Air
14       Tech cleaning the oven and that it would have been
15       in the oven when they finished?
16   A   I'm not able to locate it right this second.
17   Q   Let me ask you this.  Was there something about the
18       type of tools that were used by Air Tech in
19       cleaning the oven --
20   A   Oh --
21   Q   -- that would indicate to you that particulate
22       matter would be a byproduct of the cleaning
23       process?
24   A   Certainly.  I observed it when I observed the
25       cleaning in 2015.  But also with the wire wheels
```

Page 84

```
 1       and the brushes and all that type of thing, it's --
 2       it's very robust material that's scraping off.
 3   Q   And what is it about that type of -- those types of
 4       tools do you believe would create the particulate
 5       matter that you are relying upon?
 6   A   Again, they are designed to chip off very small
 7       pieces.  Ideally I'm sure they would like to be
 8       able to scrape the metal and get big chunks off but
 9       they are vacuuming afterwards, they're trying to
10       pick up all the little debris.  The tools
11       themselves create very small particulate debris.
12   Q   With respect to photographs that would have
13       reflected the condition of the blower housing that
14       you observed or where you observed the accumulation
15       of debris that had remained after the fire -- and
16       this is the debris that I think you testified to
17       you have an opinion was present before the fire and
18       was not dropped down debris --
19   A   Correct.
20   Q   -- do you recall that?
21          If you take a look at the photographs and if
22       you could just go through them, there is a series
23       of them that you brought with you, and tell us
24       whether any of the photographs that are shown in
25       the group that I have handed to you -- if you could
```

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 103 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

**Page 85**

1  just refer to the Bates number -- reflect what you
2  observed during your inspection of the blower
3  motor?
4  A  Sure. We included one of the photographs in the
5  report, photograph 17. We have also got
6  photographs shooting up inside on Bates stamp 178.
7  There are several on the left-hand side and in the
8  center that show that material in place before we
9  removed it. Again, we gave the opposing expert an
10  opportunity to inspect that and see that also and
11  then we pulled out that chunk.
12  Q  When you say "that chunk," you're referring to the
13  photograph shown in your report --
14  A  Photograph 17, yes.
15  Q  -- photograph 17. Correct?
16  A  Yes.
17  Q  If could you just go through that and tell us
18  whether there is any other photographs that reflect
19  the condition of the blower at the time you
20  inspected it after the fire?
21  A  Oh my goodness, many of them.
22  Q  If you could just read the Bates numbers into the
23  record that would make it easier for, I think,
24  everyone.
25  A  Okay. One seventy-four, 175, 176, 177, part of

---

**Page 86**

1  178, those are the ones that I'm finding here.
2  Those are the ones that the artifact exam appears.
3  Q  You were asked questions about whether what you
4  believe to be the fuel source for the ignition --
5  A  I'm -- excuse me --
6  Q  Go ahead, I'm sorry.
7  A  Going back to the last question, also 253, 254 show
8  it also.
9  Q  Okay. Thank you. You were asked about what the
10  fuel source was, the first fuel that ignited and --
11  with the idea that there was some contaminates left
12  in the oven by Air Tech. True?
13  A  Correct.
14  Q  And the issue or the question posed, I believe,
15  asked you about whether it was particulate matter
16  or some other substance like a rag or anything
17  else. True?
18  A  Correct.
19  Q  Did you find any evidence of any rags that were
20  left in there?
21  A  No. I wouldn't expect to in a fire of this
22  magnitude. The rag is completely combustible. So
23  it's gonna burn to completion. And the air flow is
24  gonna move whatever small pieces of it are left
25  around.

---

**Page 87**

1  Q  But you did find -- or at least you believe there
2  is some evidence of particulate that would have
3  been left in the oven after the cleaning was done?
4  A  There was evidence, yes.
5  Q  Is it your belief that the particulate matter was
6  more likely the first fuel that was ignited than
7  some other contaminate that you can't find?
8  A  I believe that's more likely than not. But there
9  is other -- there are other possibilities.
10  Q  In terms of reasonable degree of fire science
11  certainty, is it your opinion that the particulate
12  was the first fuel that ignited then, was
13  communicated up to the area of the blower that
14  you've already identified?
15  A  With the information we have got now, yes.
16  Q  That particulate, in your mind, should have been
17  removed as part of the cleaning process?
18  A  Certainly.
19  Q  Have all of your opinions been based on a
20  reasonable degree of fire science certainty?
21  A  Correct.
22       MR. SENAK: That's all I have.
23       REDIRECT EXAMINATION
24  BY MR. AUSTEN:
25  Q  What are the other possibilities you just

---

**Page 88**

1  mentioned?
2  A  Again, I used a rag as an example. There is any --
3  whatever they use that's combustible that could
4  have been left up there.
5  Q  I think you mentioned during direct examination
6  you're not a contract lawyer?
7  A  Correct.
8  Q  You're not rendering any opinion on whether Air
9  Tech did what it was supposed to do under the
10  contract or did not do what it was supposed to do
11  under its contract?
12  A  I'm -- what I'm doing is I'm stating the facts as
13  I know them, that Air Tech acknowledged that they
14  were supposed to do cleaning through that blower
15  and that was Mr. Spencer's understanding of what
16  their job was also. So I'm just simply stating the
17  facts as I have them and then drawing the
18  conclusions that I draw from the facts.
19  Q  You're not trying to render an opinion that Air
20  Tech did a bad job?
21       MR. SENAK: Object to form.
22  A  I'm -- what I'm saying is that Air Tech did not
23  perform what they were contracted to do according
24  to what Air Tech and Ball both believe they were
25  supposed to do.

---

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 104 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

---

**Page 89**

BY MR. AUSTEN:

1  
2  Q  Okay. Does Ball have any obligation to inspect the
3     oven after it's cleaned and after Air Tech leaves
4     before they start it up?
5           MR. SENAK: Object to the
6     foundation, beyond the scope.
7  A  It's not something that I have explored. I believe
8     it's reasonable for them to rely on Air Tech to do
9     a proper job. That's as far as I can go with that.
10          MR. AUSTEN: That's all I have.
11          MR. SENAK: Signature is reserved.
12    (Deposition concluded and Witness
13          excused at 11:44 a.m.)
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 90**

1                    CERTIFICATE
2        I, Michelle D. Soffa, a competent and duly
3   qualified court Reporter and a Notary Public within
    and for the County of Porter, State of Indiana, do
4   hereby certify that there appeared before me the
    deponent, SCOTT M. HOWELL, at 200 E. 90th Drive,
5   Merrillville, Indiana on the 28th day of July 2017,
    who was thereupon first duly sworn by me to testify
6   the truth and nothing but the truth in response to
    questions propounded to said deponent relating to
7   the above-captioned cause now pending and
    undetermined in said court.
8        I further certify that I then and there
9   reported in machine shorthand the testimony so
    given at said time and place, and that the
10  testimony was then reduced to typewriting from my
    original shorthand notes, and the foregoing
11  transcript is a true and accurate record of said
    testimony given by said deponent at said time and
    place.
12
13       I further certify that I am not related by
    blood or marriage to any of the parties to said
14  suit, nor am I an employee of any of the parties or
    of their attorneys or agents, nor am I interested
15  in any way, financially or otherwise, in the
    outcome of said litigation.
16       I further certify the reading and signing of
17  the foregoing deposition by the witness was not
    waived.
18  Dated at Merrillville, Indiana, this    11
19
20       day of    August
21
22                    Michelle D. Soffa
23  My commission expires:
24  January 31, 2024
25  County of Residence:   Porter

---

**Page 91**

1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
2
    BALL CORPORATION, AN INDIANA   )
3   CORPORATION AND FACTORY        )
    MUTUAL INSURANCE COMPANY, A     )
4   RHODE ISLAND CORPORATION,      )
    AS SUBROGEE,                   )
5                                  )
            Plaintiffs,            )
6                                  )
        vs.                        )   Cause No.:
7                                  )   4:16-CV-00042-RL-APR
                                   )
8   AIR TECH OF MICHIGAN, INC.,    )
    A MICHIGAN CORPORATION,        )
9                                  )
            Defendant.             )
10  - - - - - - - - - - - - - - - -)
11              SCOTT M. HOWELL, P.E.
12       I hereby acknowledge that I have read the
    foregoing deposition transcript regarding the case
13  of Ball Corporation, et al. v. Air Tech, taken on
    Friday, July 28, 2017, and that the same is a true
14  and correct transcription of the answers given by
    me to the questions propounded, except for the
15  additions of or changes, if any, as noted on the
    attached errata sheet.
16
17
18              SCOTT M. HOWELL, P.E.
19       Subscribed and sworn to me this
    _____ day of _____,
20  20_____,A.D.
21
22
23       Notary Public or Witness
    State of _____
24  County of _____
    My Commission expires:_____
25

---

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

## A

**A1 (1)**
65:4
**A2 (1)**
65:4
**A3 (1)**
65:4
**able (15)**
6:6,10;15:25;18:6;
23:12;36:6;38:9;44:25;
50:15;60:24;61:4;
71:10;77:15;83:16;
84:8
**above (16)**
19:7;20:17;22:1,24;
25:6;34:5;43:18;55:22;
56:21;57:1,9;59:4,21;
71:8;76:6;78:13
**Absolutely (4)**
52:15;63:18;75:25;
77:22
**accept (1)**
51:10
**access (1)**
62:18
**accomplish (1)**
62:6
**According (5)**
10:18;11:17;17:4;
42:14;88:23
**accumulation (3)**
19:1;26:4;84:14
**accurate (3)**
42:16;54:9,11
**acknowledged (1)**
88:13
**across (1)**
69:22
**activities (1)**
59:10
**actual (1)**
64:9
**Actually (12)**
10:13,18;13:17;
28:17;37:11;40:21;
43:7;48:18;62:6;64:7;
67:4;82:11
**add (1)**
10:13
**addition (2)**
82:14,15
**additional (6)**
12:19;13:2;16:12,13;
17:14;64:2
**adhering (2)**
54:16;55:4
**adjuster (1)**
6:24
**administrative (2)**
9:23;64:6
**administrator (1)**

**64:15**
**afterwards (1)**
84:9
**Again (46)**
6:10;10:2;11:3;14:5;
15:4;16:2,11;19:10,12;
24:5;25:21,25;26:7;
29:13;32:9;37:9;38:23;
39:20;40:4;41:1,23;
42:20;45:22;46:22;
47:14;48:1;49:25;
52:22;56:10;64:21;
65:15,18,20;66:1,11,17;
70:15;71:15;72:8,24;
73:3,19;75:12;77:14;
84:6;85:9;88:2
**agree (2)**
50:24;61:16
**ahead (3)**
59:2;77:17;86:6
**Air (45)**
4:11;13:12,13;18:22;
21:3;22:2,9,22,25;24:3,
6,15,21;25:4;29:16;
30:10,14;48:13;57:11;
58:8,13,24;59:15;
75:15;78:24;79:4,13;
80:1;81:6,14,17;82:6,
8;83:7,13,18;86:12,23;
88:8,13,19,22,24;89:3,
8
**airborne (2)**
80:11,11
**allow (2)**
5:1;27:2
**allowed (2)**
24:2;25:10
**allows (1)**
16:22
**Along (1)**
42:12
**aluminum (2)**
31:1;32:24
**always (2)**
37:10,12
**ambiguity (1)**
69:19
**amend (1)**
13:11
**Among (2)**
51:18;63:12
**amount (2)**
49:19;79:18
**analogy (1)**
80:3
**analysis (4)**
67:22;76:13;78:8,10
**and-a-half (2)**
10:23,24
**Anderson (3)**
6:23;8:3;70:10
**anticipate (1)**
17:21

**anything's (1)**
22:4
**apologize (1)**
26:20;77:17
**apparently (3)**
41:13;47:6;73:7
**appear (2)**
13:9;69:16
**appeared (1)**
75:1
**appears (6)**
13:5;41:25;43:22;
54:2;68:1;86:2
**appliance (1)**
81:23
**applied (1)**
20:14
**apply (1)**
69:24
**Appreciate (3)**
13:23;14:9;76:18
**appreciated (1)**
23:24
**approach (1)**
19:12
**approximately (1)**
46:8
**area (10)**
9:16;55:11,25;57:16,
18,19;60:8;67:10;80:7;
87:13
**areas (4)**
4:22,25;56:20;79:6
**around (5)**
30:11,16;33:8;49:3;
86:25
**arrived (1)**
45:10
**arriving (1)**
67:12
**articles (4)**
36:21;37:14;38:3,18
**articulate (1)**
43:15
**artifact (9)**
15:9;33:25;34:1;
54:16;55:12;62:24;
64:10,19;86:2
**artifacts (15)**
10:15;11:22;15:10;
25:9,13;35:5,6,7;
50:21;61:18;64:7;67:1,
4,6,22
**ascribes (1)**
41:8
**aspects (1)**
15:25
**assembly (1)**
22:24
**associated (1)**
21:11
**assume (7)**
4:20;34:9;46:14;

**51:6;54:5;58:14;65:12**
**assumed (1)**
7:9
**assuming (1)**
25:22
**assumption (2)**
46:16,18
**assumptions (2)**
58:15;81:4
**attached (2)**
82:9,12
**attention (1)**
54:12
**AUSTEN (42)**
4:6,11;5:9;6:1;7:4,
12;12:23;13:1;17:7;
22:8;27:8,17,22;28:1;
38:17;44:4,22;51:17;
52:14,21;54:23;55:1;
59:7;62:13,21,23;
63:18,20;69:16,20;
70:3,6,7;75:25;76:2;
78:17,21;79:9;80:24;
87:24;89:1,10
**available (1)**
39:20
**aware (2)**
5:2;75:14
**away (3)**
27:2;29:19;77:25

## B

**back (28)**
5:23;11:25;12:2,6;
13:24;15:6;20:8,21;
23:24;26:7,8;28:18;
30:23;31:16,20;47:6,
25;49:12;52:22;54:20;
58:1;60:2,3;67:25;
70:25;78:6;83:2;86:7
**background (2)**
37:3;44:7
**bad (6)**
34:25;41:22;73:25;
74:16;79:3;88:20
**badly (1)**
35:13
**bag (3)**
65:16,19;66:10
**Bake (1)**
74:5
**Ball (28)**
11:10;13:5,10;15:11;
25:17;30:17,22,25;
31:15,19;33:15;39:2;
41:11,15,23;42:1,4,6;
46:10,15;50:20;53:3,
22;68:6,12;75:4;88:24;
89:2
**bare (1)**
79:8
**based (9)**

**18:2;22:16;58:15;
60:19;61:13;63:22;
69:6;76:9;87:19
**bases (5)**
24:15;81:5;82:3,14,
16
**basic (1)**
39:24
**basically (1)**
72:2
**basis (7)**
8:11;33:3,6;49:15,
18;56:7;81:16
**Bates (9)**
13:5;62:4,7,15;
65:21;66:20;85:1,6,22
**bearings (2)**
20:3,3;21:21,23;
70:23;78:2,2
**began (1)**
30:23
**belief (2)**
79:11;87:5
**believes (1)**
44:15
**belong (1)**
74:13
**below (1)**
53:23
**belt (1)**
28:12
**Best (4)**
6:6,10;39:20;66:11
**better (1)**
80:6
**beyond (2)**
6:7;89:6
**big (1)**
84:8
**Bill (1)**
38:5
**billed (2)**
10:23;15:22
**billing (5)**
8:24;10:2,4,19;15:4
**Bill's (1)**
66:12
**bit (3)**
18:13;34:11;81:23
**blades (8)**
19:24,25;57:16,25;
58:1,2;59:22;81:21
**blower (58)**
19:19,21;20:5,23;
21:2,11,20;22:24;
23:10,13;24:21,23,24;
25:1,2,3,8;42:18;43:1,
5,14;47:23,24;53:4,19;
57:3,9;58:11;59:18,22;
60:6;61:8;65:12,12,17,
17,18,19,20;66:10,10;
70:19,24;71:2,4;76:17,
21,21;77:3,5,16,22;

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 106 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

78:1;80:16;84:13;85:2,
19;87:13;88:14
**blowers (7)**
20:17,20,21;24:8,9,
19;71:20
**blowing (1)**
57:10
**blown (5)**
19:2;22:2,14;25:15;
26:6
**boiler (1)**
19:3
**born (1)**
69:12
**Both (10)**
4:17;11:3;18:19;
24:19,19;51:11,19;
74:23,24;88:24
**bottom (2)**
54:13;55:3
**box (1)**
66:21
**boxes (1)**
66:20
**break (9)**
12:25;27:10,23;35:8;
54:24;55:2;75:24;76:1;
78:20
**bring (1)**
69:12
**brings (2)**
20:7;78:6
**brought (5)**
12:15;34:12;41:3,10;
84:23
**brushes (1)**
84:1
**bucket (1)**
52:12
**building (3)**
20:25;46:6,7
**building's (1)**
37:10
**buildup (1)**
22:23
**bunch (2)**
63:4,15
**buried (1)**
5:5
**burn (1)**
86:23
**burned (5)**
18:21;58:3;59:4;
63:2;65:4
**burner (11)**
18:17,18,23;19:16;
20:8;26:9;48:11;58:5;
76:17;78:7;80:7
**burners (3)**
22:22;46:25;71:20
**burning (1)**
80:15
**butcher (1)**

5:14
**byproduct (2)**
50:1;83:22

**C**

**cage (20)**
21:4;22:1;25:1,2,6,7;
34:5,6,18;47:1;53:24;
55:25;57:1,25;59:16;
76:5,6;77:12;78:13;
81:20
**calibration (1)**
74:20
**call (4)**
4:9,11;5:19;37:20
**called (4)**
4:2;7:18;8:3;77:8
**calling (1)**
5:6
**came (7)**
23:12;32:7;37:20;
57:21;63:12;64:19,24
**camera (1)**
53:11,13
**cameras (1)**
54:6
**can (74)**
6:13,16;7:1;11:4,8;
12:3;14:7,11;15:17;
16:14;20:9;21:17,25;
23:22;26:13,22;27:2,8,
22;28:20;29:11,13,20;
30:2;32:1,10,14,16,16,
21;37:13;38:1;42:14;
48:21,21,23;49:5,25;
50:3,4;51:2,5,7;54:5;
57:14;59:25;60:18,20;
61:1,17;62:6,11,18,20;
63:13,16;64:3,21,22,
25;65:11,17;66:11;
71:17,23;72:13;74:13,
23;78:1;79:17;80:2,19;
83:10;89:9
**cans (40)**
20:13;25:13,23;26:5,
6,10,14;27:25;28:8,10;
29:7;30:6;32:25;33:2,
6,12,16,21;49:1,13,22,
23;50:19,20,22,25;
54:14,17;55:5,11,13,
17;66:6,21;67:6;76:9;
78:7,10;80:13;82:22
**carefully (1)**
29:6
**case (13)**
4:23;6:13,22;13:13;
22:16;23:8;25:10;
31:24;39:9;52:17;
68:16;74:14;79:4
**catch (2)**
31:2;57:4
**cause (5)**

18:5;19:19;22:19;
35:6,22
**caused (4)**
8:15,16;18:15;52:17
**cds (1)**
12:8
**center (4)**
28:15,15,16;85:8
**certain (3)**
9:22,22;20:14
**Certainly (21)**
6:21;17:25;18:1,11;
23:23;27:13;35:18;
39:17;44:24;49:5,11,
11;57:2;59:25;70:3;
81:24;82:19;83:8,8,24;
87:18
**certainty (8)**
48:21,23;49:7;50:1;
79:16,17;87:11,20
**chance (3)**
29:5;34:4;44:24
**change (2)**
18:9;80:9
**changed (2)**
26:1;48:24
**characteristic (1)**
52:5
**characteristics (2)**
52:7;57:15
**characterize (1)**
29:23
**charged (1)**
46:15
**check (1)**
42:16
**checked (1)**
37:21
**checking (1)**
30:25
**checklist (2)**
31:14;69:10
**chemicals (1)**
20:14
**Chicago (4)**
4:20;9:18,19;33:23
**chip (1)**
84:6
**chronicling (1)**
36:19
**chunk (4)**
67:15;70:25;85:11,
12
**chunks (1)**
84:8
**clarifies (1)**
81:24
**clasp (1)**
27:3
**classification (1)**
51:25
**classified (1)**
51:11

**clean (19)**
24:8,9,22,23;25:5,17,
23;30:4;31:21,25;32:6,
24;59:15,17,19;78:25;
79:7,24;81:23
**cleaned (8)**
16:1;23:10;24:20;
25:18;29:15;79:14;
81:21;89:3
**cleaner (1)**
60:16
**cleaning (25)**
15:24;16:4,7;18:19,
20;22:21;50:16;54:18;
55:6;56:7;60:10,12,24,
25;75:16;81:20;82:25;
83:7,14,19,22,25;87:3,
17;88:14
**clear (2)**
79:11;82:2
**clearer (1)**
62:4
**close (5)**
22:12;23:4;57:11;
77:20;78:18
**closely (1)**
37:6
**closeup (1)**
29:18
**clue (2)**
37:9;74:10
**collapse (2)**
80:10,14
**collect (6)**
9:10;11:19,22;25:20;
26:10;61:4
**collected (14)**
25:14;27:14,15,15,
25;33:25;34:1;37:7;
62:2;63:8,10;64:21;
67:2,18
**color (1)**
29:22
**combined (1)**
44:6
**combustible (9)**
22:20,23;48:15;49:9;
51:12,24;52:1;86:22;
88:3
**coming (8)**
24:10;25:25;30:6;
49:12;50:8;57:8;69:5;
77:4
**comment (3)**
43:7,8,17
**communicated (1)**
87:13
**company (4)**
4:16;5:22;9:21;16:5
**compared (1)**
45:25
**competent (2)**
19:14;20:6

**compilation (2)**
18:25;40:5
**compiling (1)**
72:15
**completed (4)**
17:3,19,22;33:7
**completely (3)**
8:25;76:11;86:22
**completion (1)**
86:23
**complies (1)**
52:24
**components (3)**
34:15,22;63:13
**computer (2)**
62:5;68:2
**concluded (1)**
89:12
**concluding (2)**
83:5,12
**conclusion (4)**
23:9;38:10;48:6;
50:10
**conclusions (8)**
23:8;38:19;39:9;
42:11;47:13;48:1;
50:16;88:18
**condition (2)**
84:13;85:19
**conditions (2)**
67:9,9
**conduct (1)**
39:3
**conducted (1)**
39:1
**confidence (1)**
49:6
**confident (1)**
62:14
**configuration (1)**
80:18
**confirm (1)**
78:8
**connection (1)**
78:12
**consider (1)**
35:22
**considered (2)**
9:15;82:8
**consistency (1)**
47:16
**consistent (5)**
39:11,11;54:17;55:5;
56:20
**Consulting (1)**
4:18
**contact (4)**
11:12,18;45:19,19
**contacted (2)**
6:22,23
**contain (1)**
23:7
**contained (1)**

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 107 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

23:20
**container (2)**
65:9,10
**contaminant (1)**
30:1
**contaminants (3)**
29:13;33:17;48:2
**contaminate (1)**
87:7
**contaminates (4)**
22:20,22;23:1;86:11
**contamination (3)**
33:12,23;34:2
**contemporaneously (1)**
77:1
**content (1)**
83:4
**continuous (1)**
20:13
**contract (4)**
24:18;88:6,10,11
**contracted (1)**
88:23
**control (1)**
33:20
**conversation (1)**
31:5
**conversations (2)**
31:9;58:17
**conveyor (1)**
32:19
**Cool (2)**
18:14;47:3
**copies (3)**
61:13,20;64:16
**copy (8)**
5:11;10:7,8;27:11;
60:17;61:15,24;64:6
**corner (1)**
60:7
**Corporation (6)**
39:2;46:11,15;50:20;
68:6,12
**Corporation's (1)**
15:11
**correlate (2)**
66:22,24
**correspond (1)**
62:7
**country (1)**
5:21
**couple (3)**
13:25;27:20;81:3
**course (1)**
6:19
**court (1)**
6:7
**cover (1)**
9:23
**crawl (1)**
20:13
**create (3)**
77:23;84:4,11

**creosote (2)**
56:3,24
**crews (1)**
37:21
**CROSS-EXAMINATION (1)**
81:1
**Crume (1)**
41:20
**current (2)**
5:11;6:3
**currently (1)**
4:15
**custody (3)**
60:15,19;61:12

**D**

**da (5)**
73:6,6,6,6,6
**damage (9)**
34:8,15,20,23;35:1,2,
11,25;36:11
**damaged (5)**
34:17;35:13,17,19;
36:9
**dangerous (1)**
28:20
**dark (1)**
29:22
**date (6)**
7:10;14:18;16:22;
17:4;54:2;60:23
**dates (1)**
54:8
**day (12)**
6:19;7:21,24;10:1,3;
11:11,14,19;15:8;16:9,
15;37:2
**days (2)**
11:3;13:25
**deal (1)**
38:1
**dealing (1)**
6:14
**dealt (1)**
11:14
**debris (7)**
66:10;79:13;84:10,
11,15,16,18
**Defendant (1)**
4:2
**defendant's (1)**
82:10
**degree (6)**
39:10,10;49:6,25;
87:10,20
**degrees (2)**
51:23;52:2
**department (7)**
36:17,18;37:15;38:9;
59:9;75:7,11
**Depends (2)**
17:23;51:24

**DEPONENT (2)**
63:16;75:23
**deposited (1)**
56:20
**deposition (3)**
6:4;69:9;89:12
**depositions (1)**
17:24
**describe (2)**
20:9;29:11
**described (1)**
30:3
**description (4)**
39:25;40:24,25;83:3
**designed (2)**
53:13;84:6
**desk (1)**
72:5
**detail (2)**
24:1;29:11
**details (1)**
16:12
**determine (4)**
23:15;35:19;49:23;
50:6
**diagram (6)**
68:2;70:14;71:19;
73:10,12,13
**diagrams (1)**
71:13
**different (4)**
8:8;43:20;50:5;
57:15
**differently (1)**
58:15
**digitally (2)**
53:15;70:10
**digress (1)**
36:20
**DIRECT (5)**
4:5;26:13;47:25;
54:12;88:5
**direction (2)**
56:22;69:15
**directly (1)**
8:19
**disassembled (1)**
16:7
**disbelieve (1)**
36:7
**discovered (6)**
26:2;34:10;37:21,22;
55:19;77:21
**discuss (2)**
55:4,22
**discussed (5)**
49:14;50:21;67:5;
71:24;78:23
**discussing (3)**
29:8;44:11;71:18
**discussion (4)**
7:6;38:23;56:12;
63:19

**discussions (2)**
63:23;76:10
**dislodged (1)**
29:15;49:20;59:9
**document (3)**
11:7,7;13:14
**documentation (1)**
67:19
**documents (4)**
12:7;13:5,16;61:19
**done (13)**
11:1;14:11;15:18;
17:14;18:5;39:15;
49:22;50:6,9;67:21;
72:9;79:3;87:3
**down (24)**
8:18;9:8;15:23,24;
16:11;23:16;29:1;
34:11;35:8;40:12;
46:25;56:21,25;57:8,
18,19;59:6,20;60:24;
67:20;70:22;71:8;79:7;
84:18
**downstream (1)**
77:22
**draw (2)**
50:15;88:18
**drawing (3)**
20:10;35:14;88:17
**drill (1)**
4:14
**dripped (2)**
56:25;71:8
**dripping (1)**
56:21
**dropped (1)**
84:18
**dry (1)**
20:13
**duct (10)**
34:16;58:7;59:4;
65:23,23,25;66:1,2,3,4
**ducts (2)**
67:9;77:21
**ductwork (25)**
19:7;20:18,24;21:25;
22:15,19,24;23:13;
24:25;25:5;34:4,8;
35:12,13,15;36:8,8,15;
37:23;47:22;59:16;
60:9;71:21;76:5,6
**duly (1)**
4:3
**duplicates (1)**
63:24
**During (7)**
11:21;54:18;55:6;
56:6,17;85:2;88:5
**dust (9)**
19:1;25:15,20,25;
26:4;29:14;30:4,6;31:3
**dvds (1)**
12:8

**E**

**earlier (1)**
55:17
**early (2)**
7:25;39:21
**easier (3)**
60:3;61:20;85:23
**easily (1)**
78:2
**east (18)**
21:14;22:18;34:9;
35:1;53:4,19;56:3;
65:12;66:1,2,3,4,5,6,8,
9,9;76:21
**easy (2)**
60:5;80:23
**effort (1)**
44:6
**either (3)**
11:11;29:4,18
**electric (4)**
21:21,22;59:21;73:5
**electricians (1)**
77:8
**eliminate (2)**
47:23;78:5
**eliminated (1)**
48:11
**elimination (1)**
78:24
**else (8)**
14:17;15:14;16:9,14;
23:19;48:11;67:18;
86:17
**email (13)**
24:6,11,14;56:11,12,
13;58:17;68:25;70:8,
10;81:11,24;82:2
**employed (1)**
4:15
**employee (2)**
9:18;46:14
**employees (6)**
30:15,22;39:1,2;
46:15;53:3
**end (26)**
5:6;17:25;21:15;
22:18;25:14,14;28:12;
29:14;33:11,13;34:14,
15,18,22;42:19;49:13;
55:20;65:22,25;66:1,2,
3,4,5,7;76:9
**endeavor (1)**
30:4
**ending (1)**
76:3
**engineer (1)**
4:24
**engineering (2)**
49:6;50:1
**enough (14)**

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 108 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

4:13;7:17;9:1;12:16;
14:18;19:16;22:10;
31:19;38:22;42:10,14;
62:21;65:1;71:2
**entire (1)**
12:10
**entirely (1)**
30:16
**entities (1)**
24:19
**equals (1)**
9:16
**equip (1)**
32:16
**essentially (4)**
9:11;20:16;25:19;
54:10
**evaporation (1)**
50:2
**even (6)**
22:12;40:17;45:8;
46:20;68:14;74:14
**evening (3)**
30:12;33:5;55:17
**event (5)**
8:1;75:8,18,18,21
**events (1)**
75:9
**everyone (1)**
85:24
**evidence (13)**
5:2;11:19;14:1;20:2;
49:10;60:15,18;61:12;
64:12,15;86:19;87:2,4
**evident (1)**
57:2
**exactly (2)**
30:5;31:17
**exam (1)**
86:2
**EXAMINATION (4)**
4:5;55:22;87:23;
88:5
**examined (2)**
4:3;54:14
**example (6)**
39:25;48:14;54:3;
80:16,18;88:2
**examples (1)**
80:19
**except (1)**
18:21
**exclusively (1)**
76:8
**excuse (4)**
13:10;19:4;46:6;
86:5
**excused (1)**
89:13
**exhaust (24)**
20:23;21:3,23;22:1;
25:3,5;34:6;35:3,12;
36:8;46:5,7;47:1,12,

23;53:4,17;55:23;63:7;
66:8;9;76:5,21;77:12
**Exhibit (15)**
5:6,8,24;6:3;17:6,9;
23:7;24:12;45:22;
58:18;60:3,20;65:2;
66:20;83:9
**Exhibits (3)**
17:11;63:1;65:21
**exit (3)**
66:5,6,11
**expect (4)**
24:23;57:8,10;86:21
**expected (1)**
24:8
**experiments (2)**
50:12,13
**expert (5)**
4:13,23;6:5;18:1;
85:9
**expertise (2)**
4:22;5:1
**explain (3)**
79:23;80:12,23
**explained (3)**
23:21;50:14,14
**explored (1)**
89:7
**extended (1)**
22:18
**exterior (4)**
20:3;29:20;54:17;
55:5
**external (1)**
78:2

**F**

**face (1)**
41:16
**facility (2)**
33:22;35:5
**fact (10)**
12:10;25:24;31:25;
39:22;44:24;46:24,25;
47:11;69:4;75:13
**factor (2)**
38:19;52:4
**facts (5)**
16:13;17:24;88:12,
17,18
**factual (1)**
45:5
**Fahrenheit (2)**
51:23;52:3
**failed (1)**
80:1
**Fair (13)**
7:17;9:1;12:16;
14:18;19:7;31:19;
38:22;42:10,14;46:16,
18;62:21;65:1
**fairly (1)**

29:6
**fall (1)**
57:18
**familiar (1)**
14:5
**fan (9)**
19:3;21:20,22;55:23;
56:4;59:21;77:12;
81:20,20
**fan's (1)**
47:3
**far (7)**
18:4;24:16,21;29:19;
34:15;41:21;89:9
**farther (2)**
27:1;77:21
**federal (1)**
6:7
**feeble (1)**
28:20
**feel (2)**
4:22;18:5
**feet (2)**
9:6;77:25
**fell (1)**
59:5
**few (2)**
6:8;38:24
**Field (1)**
72:6
**Fifteen (1)**
62:2
**Figure (13)**
8:14;26:16,17,17,18,
21;52:25,25,25;53:17;
54:3,21;77:9
**Figures (3)**
54:20;55:7,8
**file (18)**
12:5,10,13,22;13:4,
4;15:15;27:18;36:22;
51:19;64:5;67:25;
68:12;69:5,6,14;74:13;
81:13
**files (1)**
28:18
**find (13)**
10:7,7;14:9;23:16;
25:9;48:8;57:13;59:25;
62:3;63:11;86:19;87:1,
7
**finding (3)**
37:19;53:13;86:1
**fine (4)**
19:25;42:3;69:20;
81:22
**finished (2)**
30:10;83:15
**Fire (94)**
4:24;5:3,18,19,20;
7:21,22,25;8:15,16,22;
18:5,15;19:5;21:25;
22:13,17,18,20;23:3;

25:11;26:2;30:23;
33:14;34:10;35:23;
36:5,14,17,18,19,22;
37:15,16,20,22;38:9;
42:17;43:1,16,16;45:3;
47:15,17,21;48:5,8,18,
20;49:20,21;52:17;
54:15;55:12,19;56:6,9,
16,17,25;57:20,21;
58:3,3,4;59:9;67:13;
72:2;74:21;75:7,10,18,
21;76:4,16,19;77:2,6,7,
10,11,12,16,18,20;
79:13,20,25;84:15,17;
85:20;86:21;87:10,20
**fire-damaged (2)**
56:3,23
**fires (6)**
5:4;72:22;75:2,3,9,
14
**firm (2)**
12:4;13:4
**first (27)**
4:3;6:22;8:11;9:1;
10:19;37:2,5;38:21;
45:10;47:18;48:9;55:8;
56:7;65:2;69:1,1,12;
70:11;73:23;76:16,20;
77:2,4,7;79:16;86:10;
87:6,12
**flame (1)**
21:8
**flames (1)**
47:8
**flammable (2)**
51:1,12
**flange (5)**
59:18,19,20,22;60:9
**flashpoint (2)**
51:22;52:2
**flat (3)**
32:25;60:6,8
**FLIR (2)**
53:6,8
**F-L-I-R (1)**
53:8
**flow (1)**
86:23
**flush (1)**
77:15
**flushed (1)**
25:21
**flying (1)**
49:3
**FM (3)**
6:24;8:3;41:4
**FMIC271 (1)**
13:14
**folks (2)**
15:10;67:19
**following (3)**
9:3;22:21;38:24
**follows (1)**

4:4
**forgot (1)**
63:6
**form (12)**
22:3;38:11;43:24;
44:16;45:9;52:10;59:1;
60:19;64:3;79:5;80:9;
88:21
**forms (2)**
60:15;61:12
**formulate (1)**
24:3
**formulating (4)**
39:8;42:11;47:12;
82:10
**found (4)**
29:9;49:13,23;70:25
**foundation (3)**
38:12;44:17;89:6
**four (6)**
21:18,18;25:24;30:7;
48:24;66:20
**frame (3)**
12:17;14:4,11
**frankly (1)**
40:18
**Freddie (5)**
11:12;39:25;40:4,6;
44:12
**friction (1)**
19:19
**front (2)**
27:12;37:13
**fuel (10)**
18:20,24;22:6;48:9;
79:16;86:4,10,10;87:6,
12
**fuels (1)**
48:12
**full (2)**
4:7;57:7
**fume (1)**
19:15
**functions (1)**
23:14
**furnace (3)**
21:15,17,19
**further (2)**
67:21;80:24

**G**

**gained (2)**
31:5;40:6
**gallon (3)**
65:9,10,17
**gas (1)**
21:8
**gather (3)**
14:6;16:13;37:12
**gathered (2)**
40:11;42:22
**gathering (3)**

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 109 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

11:3;14:1;72:8
**gave (1)**
85:9
**general (4)**
14:2;71:19,19;72:2
**generally (1)**
71:21
**generated (2)**
68:2,8
**German (1)**
68:23
**gets (1)**
80:15
**given (3)**
13:2,17;64:19
**Gives (2)**
52:5,6
**glass (16)**
63:2;65:3,19,22,24,
25;66:1,2,3,4,5,7,8,13,
14,16
**Global (3)**
6:24;8:4;41:4
**goes (7)**
6:7;17:23;20:24;
25:17;31:19;51:4,7
**gonna (17)**
5:6;10:7,7,9;13:6;
20:11;29:1;53:9,9;
58:14;60:2,15;61:11;
63:21;80:9;86:23,24
**good (12)**
6:12;7:1;13:23;20:4;
30:9;34:12;36:18;46:4;
59:13;73:23;75:23;
79:2
**goodness (1)**
85:21
**grab (1)**
10:10
**gray (1)**
29:24
**great (1)**
78:3
**ground (2)**
9:6;37:11
**Group (4)**
4:18;32:22,23;84:25
**guess (1)**
52:23
**guidelines (1)**
52:1
**guy (1)**
74:15

---

**H**

**half (1)**
5:21
**halfway (1)**
11:24
**hand (2)**
21:7;63:21

**handed (2)**
64:2;84:25
**handwriting (2)**
41:20;68:18
**handwritten (10)**
40:16,17;41:12,16;
42:7;68:15;70:14,18;
71:14;74:11
**handy (1)**
11:24
**hang (1)**
74:24
**happen (1)**
19:18
**happened (7)**
8:14,19;11:5,6;15:8,
19;48:23
**hard (5)**
12:6;27:11;43:21;
57:17;61:13
**harder (1)**
59:12
**head (4)**
46:13,23;74:8;80:22
**headed (1)**
56:22
**heading (1)**
15:17
**heard (2)**
21:2;38:16
**heat (17)**
19:19;20:20,21;34:8,
14,17,20,23;35:1,2,11,
25;36:9,11;77:23;
78:13;80:7
**held (8)**
7:6;12:25;27:10,23;
54:24;63:19;76:1;
78:20
**Help (3)**
7:2;42:9;47:17
**helps (1)**
60:13
**Herald (1)**
38:8
**hires (1)**
5:20
**hold (1)**
60:21
**honestly (1)**
54:5
**honeycomb (2)**
57:20,22
**hopefully (1)**
13:11
**hoping (1)**
10:6
**hot (4)**
19:16;21:2;22:2,10
**hour (2)**
30:24;31:1
**hours (5)**
10:23;25:16,24;30:7;

48:24
**housekeeping (1)**
68:24
**housing (3)**
55:23;56:4;84:13
**Houston (1)**
69:2
**HOWELL (3)**
4:1,8;44:9
**hundred (1)**
52:2
**hundreds (1)**
77:25

---

**I**

**IBO (7)**
22:18,19,21;36:14;
48:4;54:15;55:12
**idea (5)**
7:1;14:5;46:18;
72:21;86:11
**Ideally (1)**
84:7
**identification (6)**
5:8,10,24;6:2;17:6,8
**identified (2)**
42:15;87:14
**ignite (5)**
19:20;22:6,10;52:12;
77:23
**ignited (9)**
18:23;22:22,23;
23:11;56:25;79:12;
86:10;87:6,12
**ignites (1)**
80:8
**ignition (26)**
18:16;19:13,14;20:4,
6;21:7,21;22:5,7,20;
26:7;47:24;48:8,10;
49:21;52:9,16,19;
76:13,16;77:18;78:1,6,
11,14;86:4
**III (1)**
38:23
**ilk (1)**
68:11
**Illinois (1)**
4:19
**illustrates (1)**
59:23
**images (8)**
39:12;42:12;53:2,5,
22;54:1;70:9;76:25
**imagings (1)**
53:2
**immediately (1)**
78:13
**implication (1)**
79:22
**implied (1)**
23:9

**implying (1)**
70:3
**important (3)**
39:14;44:20;67:12
**imprinted (1)**
54:2
**incident (1)**
14:7
**incidental (2)**
40:22;45:19
**include (4)**
23:1;25:13;48:3;
82:17
**included (4)**
26:15;48:3;64:1;
85:4
**inclusive (3)**
7:14;63:22,25
**in-court (1)**
6:4
**indicate (2)**
35:21;54:10;83:21
**indicated (1)**
82:21
**indicates (2)**
24:7;26:1
**indicating (3)**
7:8;16:23;66:23
**indication (3)**
19:23;43:4;49:2
**indications (2)**
18:18;26:3
**Industrial (1)**
74:5
**information (27)**
9:10,11;11:4;14:6;
18:3,8,10;31:23;37:12;
39:7,20;40:6,11;42:21;
44:7;52:11;62:11;72:8,
15;73:7,9;74:18;75:3,
12,21;81:8;87:15
**in-house (2)**
39:5,15
**initially (1)**
77:7
**insert (1)**
20:20
**inside (8)**
20:2;30:6;37:21;
46:6,7;51:7;58:11;85:6
**inspect (6)**
14:19;33:16;34:4;
35:18;85:10;89:2
**inspected (3)**
20:1;35:10;85:20
**inspection (7)**
19:21;57:3,6,13;
68:9;70:19;85:2
**instrument (2)**
32:10,14
**insured (1)**
45:7
**intend (1)**

18:1
**interest (1)**
75:19
**interested (1)**
75:1
**interesting (4)**
35:6;37:12;75:12,22
**interestingly (1)**
71:2
**interference (1)**
78:5
**interior (6)**
16:10;23:2;34:24;
48:4,19;56:3
**interject (1)**
44:2
**internal (2)**
35:15;74:5
**interrogatories (1)**
13:13
**interrogatory (8)**
81:13,15,19;82:1;
83:2,5,10,11
**interrupt (1)**
76:18
**interrupted (1)**
77:17
**interrupting (1)**
76:19
**interval (1)**
32:3
**interview (3)**
40:10,13;44:12
**interviewing (2)**
71:25;74:15
**interviews (6)**
38:25;39:3,5,8,15;
73:8
**into (30)**
10:22;19:2,3;20:20;
22:14,19;23:13;25:16,
24;36:15;37:4,10;
38:19;44:3;48:24;51:1;
52:4;57:18,19,23;58:7;
59:5,16;62:11,19;
64:12;71:22;78:6;
80:16;85:22
**investigation (4)**
4:24;14:8;22:16;
25:10
**investigator (1)**
5:18
**investigators (2)**
5:21;27:14
**investigator's (1)**
12:21
**invoice (3)**
16:21;82:6,9
**invoices (3)**
10:15,18;82:11
**involving (1)**
6:13
**issue (2)**

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 110 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

69:24;86:14
**items** (1)
  82:15

**J**

**jar** (13)
  65:20,22,24,25;66:1,
  2,3,4,6,7,9,13,14
**jars** (1)
  65:3
**Jim** (3)
  4:11,11;69:13
**job** (8)
  7:7;36:18;74:16;
  79:2,3;88:16,20;89:9
**Journal** (1)
  38:8
**Judging** (1)
  60:23
**June** (9)
  10:20,22;11:1;13:24;
  14:18,25;15:1;16:25;
  27:16
**Justin** (1)
  41:15

**K**

**keep** (7)
  6:6,10;11:24;12:3;
  49:12;58:20;62:18
**keeping** (1)
  6:12
**kept** (1)
  47:1
**kind** (12)
  13:23;15:17;19:1;
  23:25;34:11;36:20;
  40:19;47:25;48:14;
  56:22;67:22;79:21
**knew** (1)
  53:10
**knowing** (1)
  44:2
**knowledge** (5)
  54:1;69:7;78:22;
  79:2;82:20
**Krintz** (1)
  42:4

**L**

**label** (1)
  68:16
**labeled** (1)
  65:4
**lack** (1)
  80:5
**lacquer** (3)
  25:19;31:2;50:3
**language** (1)
  43:22

**large** (2)
  76:8,9
**last** (11)
  8:10;13:11;42:19,24,
  24;43:16;44:14;48:2,
  16;74:21;86:7
**Late** (1)
  7:25
**later** (6)
  7:20,23;30:7;38:6;
  45:13;47:7
**law** (1)
  12:4
**lawyer** (2)
  24:18;88:6
**laying** (1)
  28:11
**leads** (2)
  19:9;20:24
**least** (7)
  29:17;43:12;46:24;
  48:16;55:25;75:1;87:1
**leave** (2)
  30:15;44:18,20;
  57:11
**leaves** (2)
  47:6;89:3
**led** (1)
  31:23
**left** (19)
  5:7;18:21,24;20:6;
  22:21;28:15;48:12,22;
  49:9,16;55:18;58:24;
  79:13,19;86:11,20,24;
  87:3;88:4
**left-hand** (1)
  85:7
**legible** (1)
  64:17
**less** (2)
  17:11;62:16
**Letter** (1)
  65:8
**light** (2)
  29:22,24
**likely** (3)
  7:22;87:6,8
**line** (13)
  20:13;27:25;28:12;
  29:14;33:13,13;35:14;
  38:5;43:3,16;55:20;
  67:20;81:22
**liner** (3)
  50:3;51:2,15
**link** (1)
  75:18
**liquid** (3)
  51:24;52:2;59:5
**list** (3)
  6:3;82:3,6
**listed** (2)
  39:1;82:15
**listen** (1)

73:24
**Literally** (1)
  32:21
**litigation** (1)
  4:12
**little** (12)
  11:25;18:13;23:25;
  27:1;34:11;37:3,12;
  39:24;59:12;80:8;
  81:23;84:10
**local** (1)
  4:18
**locate** (1)
  83:16
**Location** (2)
  4:16;25:12
**locations** (1)
  65:11
**logged** (1)
  64:11
**logging** (1)
  64:13
**long** (6)
  10:1,3;20:12;35:1;
  62:14;66:25
**look** (21)
  10:2;18:1;27:20;
  28:18;29:5;34:25;35:4,
  8,20,21;36:1,5;38:22;
  42:18;50:7;63:22;79:6;
  81:14;83:9,9;84:21
**looked** (13)
  9:7;15:7,9;31:25;
  35:10;37:6;50:17,20;
  67:4,7;74:8;82:13,22
**looking** (14)
  7:15,16;16:12;26:16;
  35:11;42:23;57:3,6;
  61:25;62:18;67:5;
  71:15;74:18;78:11
**looks** (22)
  5:13;6:8;7:8;28:11;
  38:7,24;41:18;42:6;
  50:7;63:2;65:3,16,24;
  68:14;69:11;71:19;
  72:4,18,19,21;73:10;
  75:8
**loss** (2)
  41:4;45:11
**losses** (1)
  9:22
**lot** (4)
  19:21;52:11;57:14;
  70:20
**love** (4)
  17:25;25:21;39:23;
  59:24
**lower** (2)
  28:16;60:7

**M**

**magnitude** (1)

86:22
**main** (7)
  18:17,18,23;20:8;
  23:14;24:15;78:7
**mainly** (1)
  61:12
**makes** (3)
  9:24;51:24;60:5
**making** (2)
  11:16;43:17
**managed** (1)
  10:10
**management** (1)
  9:19
**manager** (3)
  5:20;9:17,24
**manufacturer** (1)
  74:6
**manufacturing** (3)
  6:14,16;50:25
**many** (5)
  6:11;8:8;40:5;56:20;
  85:21
**March** (5)
  12:17,20;13:3,18,20
**marked** (8)
  5:8,24;6:2;7:13;
  12:7;13:14;17:6,8
**Marking** (1)
  70:22
**matches** (2)
  46:3;62:15
**material** (48)
  12:2,19;13:2;22:11,
  23;23:1,11;24:2;25:19;
  29:15;41:2,3,10;42:10,
  15;48:15,17,22;49:23,
  24;50:17;51:18;52:7;
  54:18;56:5,8,14;57:7,
  15,20,22,24;58:22,23;
  59:3,11;61:4;63:2;
  64:2;65:4;71:8;79:18;
  80:6,12,13,15;84:2;
  85:8
**materials** (3)
  50:2;55:5;58:9
**matter** (18)
  6:15;12:11;15:2,21;
  16:17;17:14;48:19,25;
  49:16,20;50:8;82:21;
  83:6,13,22;84:5;86:15;
  87:5
**matters** (1)
  48:3
**May** (27)
  4:9,10;6:9;7:18;
  11:24,24;14:18,22;
  26:13,18;30:11;32:5;
  38:3,6;39:6;43:6;
  44:21;46:22;54:4;
  60:16,17,21;62:5;70:8;
  74:2,3;75:4
**Maybe** (8)

7:3;8:10;43:15,25;
  59:25;68:16;70:10;
  74:5
**mean** (6)
  7:22;32:15;35:7;
  36:16;50:13;52:11
**meaning** (1)
  21:4
**means** (4)
  48:9;61:21;72:20,25
**mechanical** (2)
  4:24;78:5
**mechanism** (1)
  20:11,24;22:10
**meets** (1)
  24:25
**Melissa** (1)
  64:15;68:25
**melt** (1)
  57:19
**melting** (1)
  56:17
**memory** (2)
  10:25;28:20
**mentioned** (7)
  21:8;39:13;42:13;
  46:12,24;88:1,5
**mentions** (3)
  46:25;51:13;55:11
**metal** (3)
  65:9;79:8;84:8
**method** (1)
  51:25
**Michael** (1)
  68:25
**midnight** (2)
  7:23;33:9
**might** (6)
  10:25;18:9;38:7;
  45:8;60:2;74:4
**Mike** (1)
  41:13
**Miller** (1)
  14:22
**mind** (4)
  6:19;23:23;80:21;
  87:16
**mine** (2)
  41:21,22
**minute** (3)
  10:8;30:8;78:17
**minutes** (1)
  47:7
**misalignment** (1)
  19:24
**missed** (1)
  35:25
**misunderstood** (1)
  76:11
**moment** (2)
  27:4;63:17
**month** (1)
  74:21

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 111 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

**Monticello (5)**
  8:22;15:12,23;38:7;
  68:3
**more (19)**
  6:11;11:8;12:12;
  24:1,9;29:11;31:1;
  39:24;45:4;46:19;
  52:11;63:5;67:18;
  68:11;71:13;75:21;
  78:9;87:6,8
**Most (5)**
  7:22;10:15;23:24;
  64:17;69:20
**mostly (1)**
  27:19
**motor (5)**
  21:21,22;59:21;
  70:23;85:3
**move (2)**
  30:9;86:24
**MSDS (1)**
  51:22
**MSDSes (1)**
  51:19
**much (5)**
  5:3;34:16,24;44:6;
  78:9
**multitasking (1)**
  73:25

**N**

**nail (1)**
  34:11
**name (7)**
  4:7;5:15;8:11;11:13;
  16:5;68:22,23
**nature (1)**
  9:13
**near (4)**
  21:21;57:25;61:8;
  68:15
**neat (2)**
  72:6,6
**necessarily (1)**
  20:10
**necessary (1)**
  71:23
**need (9)**
  15:4;17:22;18:6;
  32:3;41:8;43:25;52:11;
  66:24;67:19
**new (1)**
  18:10
**news (1)**
  36:21
**next (12)**
  15:1,3,20,22,22;
  16:17,18;41:19,19;
  42:19,19;73:2
**NFPA (1)**
  52:1
**nice (1)**

**37:10**
**nicely (1)**
  78:4
**night (1)**
  45:11
**nine (1)**
  28:7
**Ninety-five (1)**
  65:6
**non-Bates (1)**
  62:9
**None (1)**
  53:20
**non-party (2)**
  7:13;12:5
**note (3)**
  68:24;72:17;74:25
**noted (1)**
  15:14
**notes (12)**
  40:16,17;68:15;
  70:14,18;71:14,18,22;
  72:6;73:3;74:1,11
**notice (1)**
  69:9
**number (15)**
  11:22,22;65:23,23;
  66:20;72:12;76:23;
  81:15;82:1,6;83:2,5,10,
  11;85:1
**numbers (5)**
  13:6;28:3;62:7,15;
  85:22

**O**

**Object (8)**
  22:3;43:24;44:16;
  52:10;59:1;79:5;88:21;
  89:5
**Objection (2)**
  38:11;52:18
**obligation (1)**
  89:2
**observation (1)**
  47:14
**observations (5)**
  39:12;50:11,12;77:1,
  2
**observe (1)**
  60:25
**observed (17)**
  16:10;34:23;45:10;
  46:5;47:8,18;54:16;
  56:2,14;77:10,10,11;
  83:24,24;84:14,14;
  85:2
**observing (1)**
  77:12
**obtained (3)**
  36:23,25;41:2
**obvious (2)**
  36:2,16

**Obviously (4)**
  14:13;48:7;57:9;
  72:9
**occasion (3)**
  12:4;15:15;70:6
**occasionally (1)**
  69:22
**occasions (2)**
  8:8;40:5
**occurred (8)**
  6:25;7:21;12:16;
  16:9,14;43:13;63:6;
  75:4
**o'clock (1)**
  30:12
**off (25)**
  5:7;7:4;12:23;13:7;
  20:14;23:2;27:8,22;
  38:5;46:13,23;47:4;
  48:4,19;50:8;54:18,19,
  23;55:6;63:16;64:19;
  80:21;84:2,6,8
**office (8)**
  4:18;5:18;9:17;
  14:22;27:18;64:15;
  68:25;69:3
**off-the (1)**
  63:23
**often (2)**
  33:19;74:6
**Once (2)**
  30:22;71:10
**one (42)**
  7:7;9:14;11:11,13;
  19:12;20:6;23:14;24:6,
  9,11;26:3;28:10,23;
  29:4;32:2,14;38:1,2;
  40:12;43:21;50:14;
  60:14;61:22;63:5;65:2;
  68:14,17,17;69:2;73:8;
  74:2,25;80:2,12,16,18,
  21,23;81:8;82:13;85:4,
  25
**ones (9)**
  29:9;55:13,18,20;
  62:4,8;64:1;86:1,2
**online (2)**
  38:3,6
**only (12)**
  7:7;11:13;18:9,16;
  19:16;26:7;29:7,10;
  48:10,12;76:16;77:19
**onto (1)**
  74:24
**open (3)**
  18:3;21:8;47:7
**operate (1)**
  57:9
**operating (6)**
  9:9;11:16;18:18;
  33:11;46:16;74:19
**operation (1)**
  74:20

**opinion (27)**
  5:2;18:4,7,9,15;19:5,
  9;23:17;25:11;36:13;
  43:13;44:15;45:5;
  47:20;48:17;49:15;
  52:15;57:24;76:4;
  78:12;81:5,17;82:11;
  84:17;87:11;88:8,19
**opinions (16)**
  4:23;22:13,15;23:15,
  19,25;24:3;38:20;39:9;
  42:11;47:13;52:4;
  67:13;82:4,17;87:19
**opinion's (1)**
  76:8
**opportunity (1)**
  85:10
**opposed (6)**
  19:6;25:12;27:3;
  32:22;47:21;51:6
**opposing (1)**
  85:9
**order (4)**
  12:3;18:6;31:16;
  39:18
**origin (1)**
  67:13
**originated (6)**
  22:17;42:17;43:1,5,
  16;45:3
**out (38)**
  8:14;10:19;11:12,15;
  12:4,7;13:25;14:10;
  18:17;20:21;22:2;
  23:16;25:21;27:24;
  28:4;29:15;30:4,6;
  31:12;33:16;37:18;
  40:7;41:9;42:9;49:8;
  50:18;57:21;58:25;
  60:21;61:20;63:11;
  69:8;72:5,9;77:9,15;
  78:1;85:11
**output (2)**
  24:24,24
**outside (6)**
  19:17;50:4,4;51:5,9,
  16
**oven (83)**
  15:25;16:6,10;19:6,
  7,11,15,17;20:13,17,
  20,21;22:14,24;23:2,
  12;25:11,15,17,23;
  30:20,22,23;31:16,20;
  32:7;33:17;34:14,22,
  24;35:2,15;36:14;
  37:16,20,22;47:8,21;
  48:19,25;49:7,13,17;
  50:8,18;51:1;53:20,23;
  57:22;61:6,7;63:7,13;
  65:23,25;66:1,2,5,6,7,
  15;67:14;71:20;72:1;
  74:5,19,20;75:11;76:4,
  10;78:7;79:12,19,24;

**opinion (continued)**
  82:21,25;83:7,14,15,
  19;86:12;87:3;89:3
**ovens (2)**
  15:24;35:4,9,16,25;
  68:15;75:10
**over (8)**
  8:10;10:22;30:21,22;
  52:2;66:10;69:11;80:7
**overall (1)**
  68:3
**oxidizer (2)**
  36:12;77:24

**P**

**page (24)**
  7:7;13:6;23:5,7,20;
  26:16,17,18,21;38:24,
  25;40:23;42:18,24;
  45:21;48:1;52:23;53:1;
  54:12,21;55:2,4,9;82:3
**pages (6)**
  27:24;38:24;44:11;
  52:22;60:3;82:15
**pallet (2)**
  60:6,11
**panel (1)**
  43:21
**paper (2)**
  20:10;39:17
**paragraph (2)**
  42:19,25
**parameters (2)**
  9:9;74:19
**paraphrased (1)**
  23:4
**parking (3)**
  19:21;57:14;70:20
**part (11)**
  13:20;21:3;47:14;
  64:5;73:14;76:8,9;
  77:19;81:23;85:25;
  87:17
**partially (1)**
  16:6
**participated (1)**
  39:6
**particles (2)**
  54:16;55:4
**particular (6)**
  12:11;36:9;40:12;
  44:1;49:19;79:4
**particularly (3)**
  16:16;52:6;67:12
**particulate (24)**
  23:1;48:3,15,18,22,
  25;49:16,19;50:8;61:3;
  79:18;80:6,13;82:21;
  83:6,13,21;84:4,11;
  86:15;87:2,5,11,16
**parties (1)**
  14:19
**parts (1)**

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 112 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

44:8
past (1)
  59:15
Paul (1)
  6:23
PE (1)
  4:1
peer (1)
  9:22
Pellegrini (3)
  42:1;73:5,8
people (7)
  11:10;15;13:25;
  19:22;24:6;39:18;45:4
perform (1)
  88:23
performed (1)
  81:18
period (1)
  11:21
person (1)
  46:21
personnel (2)
  37:15;38:9
pertaining (1)
  42:25
Phoenix (1)
  74:5
photograph (15)
  29:17;34:1;57:2,24;
  58:9,23;59:23;60:1,8;
  64:12;67:16;85:5,13,
  14,15
photographs (23)
  9:8;12:9;14:13;
  26:14;27:12,19;28:7,8,
  9,17,24;29:6,7;56:4;
  59:13;60:1;64:9;84:12,
  21,24;85:4,6,18
physical (1)
  49:10
physically (1)
  20:1
pick (1)
  84:10
picture (3)
  27:3;54:3;60:22
pictures (3)
  26:22;27:1;29:12
piece (2)
  20:10;24:10
pieces (2)
  84:7;86:24
pile (4)
  19:1;80:6,8,14
piled (1)
  59:3
Pink (1)
  61:15
pinks (1)
  64:4
place (3)
  19:11;78:25;85:8

plan (1)
  14:8
plant (1)
  6:16;11:15;15:11;
  35:13;36:6,9;68:3;
  74:18;75:4
plastic (2)
  65:16;66:10
please (3)
  4:7,11;6:20
plus (2)
  64:2,9
pm (1)
  30:13
point (16)
  8:18,20;9:21;11:18;
  17:24;30:9,15;32:6;
  33:11;34:13;37:18;
  41:9;47:1;58:14;61:4;
  80:10
port (2)
  57:3,6
portion (2)
  44:1,10
portions (1)
  37:17
posed (1)
  86:14
possess (1)
  4:25
possibilities (2)
  87:9,25
possibility (3)
  49:11;80:2,17
possible (2)
  21:25;22:4
posted (1)
  38:3
potential (8)
  19:13,15,18;22:6;
  48:12;52:9,16;56:18
practice (1)
  5:3
prefer (1)
  5:12
premises (2)
  14:19;30:16
prepare (1)
  44:5
prepared (3)
  17:15;44:10;45:23
preparing (1)
  16:20
presence (1)
  82:20
present (2)
  49:7;84:17
presidents (1)
  69:2
pretty (5)
  5:3;8:19;34:16,24;
  36:18;73:15,23
previous (1)

75:6
primary (2)
  11:12,18
printed (1)
  12:7
prior (13)
  12:4;13:17;23:2;
  48:4,19;50:25;54:15;
  55:12;56:6,9,16;58:2;
  75:4
privilege (1)
  69:23
probably (12)
  4:13;5:6;6:18;8:19;
  30:9;37:3,18;53:6;
  61:20,23;70:12;75:22
problem (3)
  33:10;53:4;71:11
procedure (1)
  64:11
procedures (1)
  31:15
process (17)
  11:5;25:16,17;30:8;
  31:19,24;32:3,13;
  33:15;40:14;50:2,16,
  25;56:7;82:25;83:23;
  87:17
produced (5)
  10:5,9;12:13;13:17;
  27:18
product (1)
  71:15
production (13)
  12:16;13:4,12,20,21;
  25:25;31:4;32:9,13;
  33:3,6;49:2;82:10
products (1)
  51:20
pronunciation (2)
  42:2;68:22
proper (2)
  32:12;89:9
properly (1)
  23:10
protection (1)
  5:3
provided (2)
  81:8,14
pulled (4)
  19:3;27:24;28:4;
  85:11
purports (2)
  41:16,23
purposes (3)
  5:10;6:3;17:9
put (10)
  14:7;25:18;32:23;
  39:19;44:6,7;64:3;
  66:16;67:25;72:4

Q

qualified (1)
  4:23
quality (2)
  33:19;41:21
quick (3)
  35:21;36:1;68:24
quicker (1)
  10:7
quickly (1)
  38:10
quite (1)
  41:22
quote (1)
  40:13
quotes (1)
  37:14
quoting (1)
  23:4

R

radiant (1)
  80:7
rag (7)
  18:25;48:14;49:8;
  79:14;86:16,22;88:2
rags (1)
  86:19
ran (1)
  31:25
Randy (1)
  41:20
rather (1)
  44:18
reach (8)
  18:7;25:11;32:6;
  38:10;47:20;48:6;
  57:17;77:21
reached (1)
  58:1
reaching (2)
  18:4;50:10
read (15)
  13:6;38:21;40:3;
  61:13;62:11;64:4,22,
  25;65:9,11,15;71:17,
  22;73:24;85:22
reading (1)
  62:15
reads (1)
  48:16
real (4)
  6:12;19:17;60:5;
  68:24
realize (1)
  23:17
realized (1)
  71:10
really (5)
  20:4;35:12;37:6;
  38:19;44:20
reason (8)
  23:18;26:17;35:22,

24;36:7;43:9;71:7;
  78:16
reasonable (5)
  49:6,25;87:10,20;
  89:8
reasons (1)
  50:15
recall (12)
  5:7;6:25;8:8;9:2;
  10:3;11:10;14:12;
  30:10;31:11;35:12;
  81:6;84:20
receive (1)
  24:2
received (5)
  12:6;13:3
recitation (1)
  42:16
recollection (3)
  14:20;44:13;45:24
record (12)
  6:12;7:4;12:24;27:9;
  40:15;54:23;62:11;
  63:23;64:3;71:22;
  79:10;85:23
recorded (2)
  39:16,17
records (7)
  8:24;10:2,4,19;
  74:20;75:6,11
recruits (1)
  5:20
REDIRECT (1)
  87:23
refer (1)
  85:1
reference (7)
  37:14;38:25;47:5,11;
  54:15,20;74:1
referenced (10)
  17:10;24:11;33:21;
  55:7;56:4;59:11;61:1,
  18;64:9;66:13
References (2)
  69:4;72:21
referencing (4)
  37:25;56:24;74:6,14
referred (2)
  21:3;31:13
referring (3)
  41:11;55:24;85:12
reflect (2)
  85:1,18
reflected (2)
  63:9;84:13
reflecting (1)
  82:16
refresh (1)
  10:25
regarding (2)
  45:21;67:13
region (1)
  5:19

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 113 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

relationship (2)
9:13;75:15
relative (1)
47:16
relatively (4)
36:5;76:25;78:8;
80:2
relied (2)
39:8;83:12
rely (4)
42:10;47:20;83:4;
89:8
relying (2)
28:19;84:5
remained (2)
83:6;84:15
remaining (1)
13:16
remember (4)
6:20;11:13;14:23;
16:5
removed (6)
22:25;54:19;55:6;
56:6,9,16;58:9;69:6,14,
21;85:9;87:17
removing (1)
21:2
render (2)
4:23;88:19
rendered (1)
43:13
rendering (1)
88:8
repeatedly (1)
66:13
Rephrase (1)
52:13
report (41)
16:20;17:3,5,10,15;
18:1,12;19:23;22:17;
23:5,21;24:12;26:15;
30:10;36:18;38:22;
39:2,19;40:3,23;41:4;
42:14;43:11,12;44:3,5;
45:23;48:2;51:14;
52:22;54:13;55:3;
58:18;59:12,25;67:16;
82:3,14,16;85:5,13
reporting (1)
37:20
reports (1)
9:22
represent (2)
4:11;54:7
representative (1)
45:7
represented (1)
64:18
request (4)
8:17;12:5;13:12;
82:10
requested (1)
69:4

requirement (1)
6:8
reserved (1)
89:11
residual (2)
30:4;31:3
respect (2)
82:20;84:12
response (4)
8:17;12:6;13:12;
83:10
responses (2)
7:14;75:7
responsible (2)
60:10,12
rest (1)
65:9
result (1)
68:8
resulted (1)
83:13
resume (1)
5:11
retain (1)
26:10
retained (6)
4:12;11:20;50:21;
55:14;61:18;62:24
review (5)
39:23;69:5,7,14;
72:13
reviewer (1)
9:22
reviewing (1)
17:16
right (35)
4:14;7:23;8:21;9:25;
10:11,17;16:6,6;23:22;
24:10;26:21;28:10,11,
22;31:11;32:18,20;
33:1;46:5,23;54:6;
55:22;59:14;60:8;
64:23;65:7;67:17;70:1,
13;72:21;76:24;77:11;
80:4,23;83:16
right-hand (1)
60:7
Rimkus (36)
4:18;7:14;8:21;9:14;
10:10,13;12:5,8,11;
27:19;28:2,2;31:13;
36:21;60:5,14,21;61:2,
17;63:9,21,24;65:5,8;
67:21;68:1,12,14,24;
70:8,13;71:13;72:17;
73:2,15;74:11
Rimkus' (1)
13:4
rivals (1)
41:21
road (1)
23:16
robust (1)

84:2
Rogers (11)
40:20,21,24;41:13;
45:15,16,21;46:1,5,10,
24
roof (3)
20:25;66:3,4
room (1)
26:12
roughly (1)
33:9
Rub (1)
54:22
rule (4)
18:17;49:8,8;78:1
run (9)
25:25;31:1,20;32:25;
48:24;54:14;55:11,17;
66:7
rundown (1)
72:2
running (7)
25:23;33:2,6;47:2,3;
79:23,24
runs (1)
30:5

**S**

safely (1)
11:17
safety (2)
30:25;31:14
same (9)
9:16;25:1;40:19;
52:18;55:13;58:21;
61:11;72:22;73:24
sample (2)
33:19;61:5
samples (2)
33:20;63:8
sat (1)
40:12
satisfied (2)
29:6;32:7
saw (1)
7:8;34:24;37:5;
38:15;47:15,16;67:8,9;
74:25;76:22;77:16
saying (6)
25:1;44:14,19;49:18;
53:10;88:22
scene (4)
8:22;9:1;37:16;
45:10
schedule (1)
74:19
Scholten (1)
81:11
Scholten's (1)
81:24
science (2)
87:10,20

scope (6)
81:6,17,22,25;83:3;
89:6
SCOTT (8)
4:1,8,9;13:2;55:2;
63:21;76:3;78:22
scrape (1)
84:8
scraped (6)
23:2;48:4,19;54:18,
19;55:6
scraping (8)
19:24;20:1;66:1,5,6;
70:24;78:4;84:2
scrapings (11)
20:2;65:22,24;66:2,
3,4,8,9,13,14,15
second (12)
5:23;7:5;21:22;23:9;
26:13;36:20;40:9;
54:21;65:25;68:1;
76:18;83:16
section (7)
22:10;23:5;38:23;
44:9,9;45:21,22
seeing (1)
50:16
seem (2)
63:23;64:17
Seems (3)
24:9,18;81:21
semi (1)
59:5
Senak (25)
18:2;22:3;38:11;
43:24;44:16;51:5,13;
52:10,18;59:1;61:25;
62:3,17;69:5,13,18;
70:1,5;78:19;79:5;
81:2;87:22;88:21;89:5,
11
Senak's (1)
69:7
send (2)
32:11,17
sense (2)
9:24;63:25
sent (1)
12:4
sentence (4)
42:24;44:14;48:2,16
September (2)
15:23;70:22
sequence (1)
13:7
sequential (1)
13:9
series (4)
40:19;60:15;82:11;
84:22
serve (1)
78:14
servicing (1)

22:19
set (2)
32:25;54:6
Seventeen (1)
17:2
Seventy-five (1)
74:12
seventy-four (1)
85:25
several (10)
8:9;12:22;25:16;
26:15;47:11;58:12,16;
61:11;68:11;85:7
shaft (1)
71:5
shape (2)
20:4;78:3
sheet (13)
7:8;14:23,24;31:1,
12,18,25;32:2,6,24,25;
66:18;79:24
sheets (5)
15:4;25:18;31:20,21;
79:23
shook (1)
74:8
shooting (1)
85:6
short (9)
7:6;12:25;27:10,23;
54:24;63:19;73:16;
76:1;78:20
shortly (1)
49:20
show (17)
5:10;6:2;7:13;10:9;
17:8;26:14;27:24;28:8;
29:7,13;33:23;60:14;
61:16;70:8;73:15;85:8;
86:7
showed (3)
25:15;27:24;67:15
showing (1)
29:12;68:1;71:20
shown (7)
57:14;58:9,22;67:15;
81:25;84:24;85:13
shows (5)
28:10;34:1;51:22;
57:24;60:6
shrugs (1)
74:7
shut (1)
46:25
side (10)
20:23;21:23;22:1;
24:24;25:5;34:6,9;
60:6;66:11;85:7
signature (3)
41:18,21;89:11
significant (3)
36:4;49:19;79:18
significantly (1)

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 114 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

45:12
sign-in (2)
    14:23,24
similar (6)
    6:14;50:18;56:2,23;
    68:11;75:8
simply (1)
    88:16
single (1)
    32:21
site (7)
    11:2;27:15;35:9;
    37:2;45:13,20;72:10
sits (1)
    21:14
six (2)
    10:23;30:13
Sixteen (1)
    63:4
sketch (2)
    72:9;73:14
slightly (1)
    50:5
sluggish (1)
    71:12
small (9)
    23:1;48:3;54:16;
    55:4;80:5,14;84:6,11;
    86:24
smell (2)
    77:8,9
smelled (1)
    72:2
smoke (7)
    46:6;47:11;75:9;
    77:4,6,7,10
smoldering (1)
    80:9
solid (1)
    59:5
somebody (1)
    40:24
somebody's (1)
    27:3
somehow (1)
    18:23
someone (3)
    8:21;43:22;46:19
someplace (2)
    5:5;66:15
somewhere (4)
    22:14;26:4;30:11;
    33:8
sorry (2)
    73:22;86:6
sort (2)
    62:6;68:17
Sounds (2)
    37:2;49:12
source (23)
    18:16;20:4,7;21:7,
    22;22:5,7;26:8;31:8;
    42:15;47:24;48:8,10;

52:9,16,20;76:13;
77:19;78:6,11,14;86:4,
10
sources (4)
    19:14,14;76:17;78:1
Soyk (29)
    5:15,16,17;8:18;9:7,
    14;17:12;28:21;36:24;
    37:7;39:6;43:9,17,25;
    44:5,8,10,14,19;45:23;
    63:10;64:21;67:1;
    68:23;70:15;71:16;
    72:14;73:19;74:25
Soyk's (3)
    43:7;68:20;73:3
sparks (1)
    80:11
speak (2)
    23:23;40:21
specific (1)
    14:10
specifically (7)
    6:16;30:20;31:17;
    35:16;64:24;65:13;
    80:17
specifications (1)
    72:1
specifics (2)
    11:8;83:11
speculating (1)
    44:19
speculation (1)
    38:14
speed (1)
    32:19
spell (1)
    53:9
Spencer (35)
    11:12;16:12;24:5,7,
    15;25:22;30:3;31:6,9;
    39:25;40:4,6,9;41:8;
    42:17,20,22,25;43:4,8,
    12,18,23;44:12,15;
    45:1,2,9,12,18;58:17;
    76:10;78:9;81:9;82:24
Spencer's (2)
    56:12;88:15
spent (1)
    13:24
spoke (1)
    82:24
Spray (6)
    50:24;51:4,15,22;
    52:8,16
spread (8)
    23:12;36:14,15,19;
    37:22;48:9;57:21;58:5
spun (2)
    19:25,25
squirrel (20)
    21:4;22:1;25:1,2,6,7;
    34:5,6,18;47:1;53:23;
    55:24;57:1,25;59:15;

76:5,6;77:12;78:13;
81:20
stack (2)
    10:11,13
Stamp (3)
    65:21;66:20;85:6
stamped (2)
    13:5;62:4
stamping (1)
    61:23
standards (1)
    11:17
standing (1)
    37:11
start (15)
    14:7;16:19;18:12;
    21:25;25:22;30:5;31:3,
    16;32:12;33:2;49:3;
    63:5;64:16;78:16;89:4
started (18)
    16:19,25;18:19;19:6,
    11;22:13;25:11;32:1,9;
    33:5;43:14;47:21;
    48:18;49:1;58:4;65:2;
    76:4;79:12
starting (3)
    36:14;37:16;38:23
starts (1)
    79:25
State (3)
    4:7;48:25;56:5
statement (12)
    19:7;40:3;7;41:12,
    16,20,24;42:21;45:25;
    46:12;47:5,9
statements (10)
    36:17;41:8;42:8;
    46:22;47:10,17,19;
    54:10;72:3;77:14
stating (4)
    43:22;54:14;88:12,
    16
stay (1)
    64:7
stayed (1)
    10:22
stick (1)
    30:16
sticking (1)
    40:9
sticky (2)
    25:19;71:8
still (9)
    9:12;18:3;20:3;
    25:15;33:22;61:9;
    71:15;78:3,3
stirred (1)
    80:14
stopped (1)
    33:13
storage (2)
    10:16;55:14
stored (3)

14:1;33:22;62:24
Stout (1)
    41:15
Stouts' (1)
    41:17
strictly (1)
    78:6
Strong (1)
    68:23
stuff (5)
    30:25;51:4;62:25;
    63:4,15
stumble (1)
    69:22
style (2)
    43:20;44:2
substance (4)
    56:2,23;71:23;86:16
substantially (1)
    75:8
suburb (1)
    4:20
sudden (1)
    23:16
sufficient (1)
    78:14
sufficiently (1)
    71:17
summary (3)
    14:9;46:4;72:3
supervise (1)
    9:15
supervisor (1)
    9:20
supposed (16)
    24:4,16,20,21;25:5;
    30:1;58:8,13;59:15,17,
    19;79:7;88:9,10,14,25
sure (22)
    11:14,16;12:1;18:4;
    21:6;27:4,6;28:5;
    32:11,17;33:1;40:17;
    41:22;55:16;62:9;
    69:11,19;79:7,11,15;
    84:7;85:4
suspect (1)
    6:7
suspecting (1)
    53:3
sweet (1)
    73:16
sworn (1)
    4:3
system (15)
    9:10;11:6;20:7;21:3;
    25:12;26:1,8;47:12;
    62:20;63:8;64:19;
    73:14;76:15;77:19;
    78:10
systems (2)
    14:6;53:17

T

talk (7)
    11:25;30:8;40:4;
    43:25;44:21;45:9;65:2
talked (7)
    9:7;11:11;16:11;
    45:2,16;67:5;73:7
talking (19)
    8:1;13:25;20:11;
    24:5,14;26:24;31:14;
    34:9;37:16,17;41:5;
    44:11;51:2;53:11;55:2,
    13,16;70:17;72:14
tar-like (2)
    56:5,14
Tech (28)
    4:12;18:22;22:22,25;
    24:3,6,16,21;25:4;
    29:16;30:10;48:13;
    57:11;58:8,13,24;
    59:15;75:15;78:24;
    79:3,14;80:1;81:6,14,
    18;82:6,8;83:7,14,18;
    86:12;88:9,13,20,22,
    24;89:3,8
technical (1)
    9:20
Tech's (4)
    13:12,13;30:14;73:6
telling (1)
    38:18
tells (1)
    19:5
temperature (1)
    21:18
temperatures (5)
    21:17;32:12,18;33:1;
    53:14
temporal (1)
    75:15
tend (2)
    45:4,4
tends (1)
    44:2
term (1)
    21:4
terms (1)
    87:10
testified (6)
    4:4,13;6:9,11;82:18;
    84:16
testify (1)
    5:1
testimony (3)
    6:4,4;39:23
testing (5)
    49:22;50:6,9;67:22;
    74:19
theory (1)
    22:5
thermal (8)

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 115 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

39:12;42:12;53:2,2,
  22;70:9;76:25;77:24
thermocouples (2)
  32:17;33:1
thinking (1)
  80:20
thorough (2)
  13:22,23
though (6)
  9:19;36:8;38:18;
  45:8;48:16;61:7
thought (3)
  45:3;50:12,13
three (5)
  25:24;35:4,9,25;65:3
threw (1)
  32:14
throughout (4)
  35:13;36:9,10,15
Thursday (1)
  74:15
tie (1)
  27:3
tied (1)
  8:20
til (1)
  57:4
Timeline (1)
  72:17
times (3)
  6:11;54:8;58:16
timing (2)
  39:11;47:15
T-O (1)
  13:8
today (7)
  12:15;17:16;20:11;
  41:3,10;73:23;82:18
together (3)
  14:7;67:25;72:4
told (3)
  40:24;43:23;58:16
took (8)
  14:13;15:6;28:17,19;
  39:13;53:3,22;66:15
tools (3)
  83:18;84:4,10
top (9)
  46:13,23;59:18,22;
  60:7,8;72:17;74:2;
  80:21
tour (1)
  36:6
toward (1)
  16:19
track (2)
  6:6,10
trail (1)
  70:9
trains (1)
  5:20
transmitted (3)
  53:15;54:7;70:9

trash (1)
  74:13
Tried (2)
  9:6;42:9
triplicate (1)
  64:4
trouble (1)
  37:19
true (5)
  66:17;81:9;82:22;
  86:12,17
try (6)
  25:20;31:2;47:3;
  49:23;62:17;67:25
trying (17)
  11:4,5,5;13:22;14:5,
  9;37:3;41:23;62:3;
  63:11;64:4;66:17;
  68:16;69:17;73:24;
  84:9;88:19
tubes (1)
  63:2
turn (6)
  30:20;45:15;60:2;
  71:3,6,11
turned (3)
  30:22;31:20;59:5
turns (2)
  70:24;78:3
Twenty-third (1)
  8:23
two (16)
  21:16;27:24;28:4;
  29:4;60:3;61:6;65:23;
  76:16;77:19,25;81:15;
  82:1;83:3,5,10,12
type (11)
  14:3;25:2;32:20;
  53:11;59:10;61:11;
  68:2;69:12;83:18;84:1,
  3
types (2)
  14:10;84:3
typewriting (1)
  41:19
typewritten (2)
  42:6,7
Typically (1)
  69:8
typo (1)
  26:19

U

ultimately (4)
  20:24;23:13;32:5,6
unburned (1)
  57:19
under (3)
  9:19;88:9,11
underneath (4)
  57:16;58:1,2;72:22
understood (2)

24:19;70:5
Unfortunately (3)
  7:7;22:4;75:10
union (1)
  65:8
unit (5)
  22:21;42:18;43:2,5,
  14
universe (1)
  29:2
unleashed (2)
  79:19,21
unless (1)
  58:14
unquote (1)
  40:13
untoward (1)
  70:4
up (52)
  5:6;6:12;7:11;8:20,
  24;17:25;18:20,21,24;
  19:2,3,20;23:23,24;
  24:10,21;25:16;26:8,8;
  30:23;31:16;33:11;
  34:12;37:13;46:3;53:4;
  54:6;56:21;57:4,8,16,
  23;58:3,7;59:4,19;
  60:7,9,10;61:8;62:15;
  76:3;77:21;79:14;
  80:14,15;81:22;84:10;
  85:6;87:13;88:4;89:4
upon (5)
  42:10;47:20;83:4,12;
  84:5
upper (2)
  28:10,15
upstream (1)
  26:5
use (1)
  88:3
used (5)
  39:20;50:24;51:25;
  83:18;88:2
using (1)
  51:25
utilized (1)
  47:12

V

vacuum (2)
  66:5,6
vacuuming (1)
  84:9
vague (1)
  8:9
various (2)
  39:1;63:13
varnish (4)
  50:4;51:6,8,15
vent (3)
  57:23;66:8,9
vents (1)

57:1
version (1)
  62:9
versions (1)
  42:7
vice (1)
  69:2
Victor (1)
  60:20
video (1)
  14:15
videos (1)
  12:9
view (1)
  9:21
Virtually (1)
  22:4
visual (2)
  50:11,12
visualize (1)
  59:12
vitae (1)
  5:12
vitaes (1)
  17:11
VP (1)
  62:19

W

wait (1)
  57:4
walk (2)
  23:25;60:16
walking (4)
  15:18;37:4,9;64:16
watch (1)
  30:17
way (17)
  15:15;18:9;23:19;
  30:3,24;35:6;36:11;
  48:13;51:8;52:19;
  54:13;56:15,19;69:13;
  72:5;77:24;80:12
ways (1)
  19:12
WB (6)
  50:24;51:4,15,22;
  52:8,16
week (1)
  9:3
well-charred (1)
  57:7
weren't (1)
  59:19
Wes (1)
  42:4
west (14)
  21:14;34:14,15,18,
  22;35:1;65:17,19,20,
  22,25;66:8;71:2,4
western (2)
  5:19,21

what's (8)
  6:2;9:13;15:1;17:8;
  50:22;56:7;66:18;
  71:24
wheel (1)
  70:24
wheels (1)
  83:25
When's (3)
  15:20;16:17;37:5
white (1)
  64:16
whites (3)
  64:6,8;66:24
whole (3)
  7:9;14:5;20:7
Willowbrook (1)
  4:19
wire (1)
  83:25
wiring (2)
  73:10,12
Wiseman (3)
  69:1,1,10
within (9)
  9:20;11:6;20:7;
  21:17;26:1;32:23;
  48:25;49:7;59:3
without (1)
  20:9
witness (6)
  4:2;6:5;17:24;52:24;
  74:7;89:12
witnessed (1)
  36:5
witnesses (6)
  38:16;39:22;44:25;
  45:18;75:13;76:23
witnesses' (1)
  36:17
wonderfully (1)
  18:19
word (1)
  80:6
words (6)
  9:14;21:20;22:9;
  25:6;33:7;34:5
work (21)
  14:3,10;15:15,18,22;
  16:19;17:14,18,21;
  18:2;24:3,15;30:11;
  31:24;33:7;34:16;
  55:21;81:6,17,25;83:3
worked (7)
  8:6;9:18;15:1,3,20;
  16:17,18
workers (1)
  40:8
working (1)
  9:16
works (1)
  5:18
writing (4)

USDC IN/ND case 4:16-cv-00042-TLS   document 105-1   filed 10/07/19   page 116 of 1167

Ball Corporation, et al. vs.
Air Tech of Michigan, Inc.

Scott M. Howell, P.E.
July 28, 2017

13:7;41:12
**1129-Airtech (1)**
  72:18
**1130 (2)**
  13:8;42:6
**1134 (2)**
  13:8,8
**1184 (1)**
  13:10
**12 (4)**
  10:23;31:13;73:6;
  82:15
**12:20 (1)**
  46:8
**12:32:34 (1)**
  54:4
**125.6 (1)**
  51:23
**128 (1)**
  10:13
**13 (4)**
  60:14;61:2;63:24,25
**139 (1)**
  10:14
**14 (5)**
  56:4;57:2;58:23;
  60:21;82:6
**140 (1)**
  10:10
**149 (1)**
  10:10
**15 (9)**
  8:10;15:7;16:3;
  61:17;62:22,24;63:1,9;
  70:22
**150 (1)**
  68:24
**16 (3)**
  56:5;63:3,15
**17 (7)**
  57:14,24;58:10;
  67:16;85:5,14,15
**173 (1)**
  27:19
**175 (1)**
  85:25
**176 (1)**
  85:25
**177 (1)**
  85:25
**178 (2)**
  85:6;86:1
**18 (3)**
  61:17;63:24;64:1
**184 (1)**
  13:10
**19 (2)**
  5:6,8
**1st (2)**
  16:25;70:22

---

13:20;44:2;65:15;
  66:12
**written (6)**
  7:11;41:1,1;42:20,
  21;64:25
**wrong (2)**
  43:10;51:6
**wrote (1)**
  40:7

---

## Y

**year (1)**
  16:25
**years (4)**
  6:8;8:10;73:6;78:15
**yellows (3)**
  64:6,8;66:25
**yep (3)**
  16:8;26:25;34:21

---

## Z

**Ziploc (1)**
  65:18
**zone (6)**
  21:17;32:18,18,18,
  19;33:2
**zones (4)**
  21:18;32:12;42:17;
  43:1

---

## 0

**000173 (1)**
  60:5

---

## 1

**1 (4)**
  12:8;32:18;42:17;
  43:1
**10 (1)**
  8:9
**10:00 (1)**
  74:16
**11 (2)**
  82:3,15
**11:44 (1)**
  89:13
**112 (1)**
  63:21
**1124 (2)**
  13:8;42:1
**1125 (2)**
  13:8;41:23
**1126 (2)**
  13:8;41:15
**1127 (2)**
  13:8;42:4
**1128 (3)**
  13:6,7;41:11
**1129 (1)**

---

## 2

**2 (22)**
  22:18,19,21;23:5,7,
  20;32:18;35:2;36:14;
  42:18;43:1;48:1,4;
  54:15;55:12;65:23;
  66:1,2,5,6,7;68:17
**20 (3)**
  5:24;6:3;47:7
**2013 (1)**
  13:24
**2014 (5)**
  7:19;13:24;32:5;
  54:4;75:5
**2015 (2)**
  16:2;83:25
**2017 (2)**
  12:17;17:1
**205 (2)**
  13:10,10
**207 (1)**
  13:11
**21 (4)**
  17:6,9;23:7;45:22
**22 (3)**
  71:13,21;72:11
**22nd (3)**
  7:25;30:11;32:5
**23 (3)**
  38:4,6;54:4
**23rd (4)**
  7:18,25;8:22;15:23
**24 (2)**
  71:13;72:17
**24th (1)**
  8:23
**25 (1)**
  47:7
**253 (1)**
  86:7
**254 (1)**
  86:7
**279 (1)**
  13:15
**28 (1)**
  36:21
**286 (3)**
  28:2,6,7
**292 (3)**
  28:2,6,14
**2nd (1)**
  65:25

---

## 3

**3 (2)**
  32:18;68:17
**309 (1)**
  70:8
**31 (1)**
  36:21
**317 (1)**
  12:8
**31st (3)**

---

9:4,5,25
**32 (1)**
  66:6
**3rd (3)**
  10:20,22;11:1

---

## 4

**4 (6)**
  14:18;15:1;32:19;
  38:24;44:11;61:2
**40 (1)**
  66:21
**49 (2)**
  73:2,11
**4th (6)**
  10:22,23;11:11;
  14:25;27:16,16

---

## 5

**5 (6)**
  8:9;40:23;42:19,24;
  44:11;45:21
**5/23/14 (1)**
  37:1
**5/31/14 (1)**
  62:2
**50 (1)**
  73:13
**52 (1)**
  73:2
**53 (3)**
  68:1,14,14

---

## 6

**6 (2)**
  52:23;70:13
**6/2 (1)**
  11:21
**6/4 (1)**
  11:21
**6/9 (1)**
  17:4
**6:00 (1)**
  30:12

---

## 7

**7 (4)**
  26:18;52:23;53:1;
  70:13
**70 (1)**
  73:15
**71 (1)**
  73:15
**72 (2)**
  7:14,14
**73 (1)**
  7:14
**74 (2)**
  7:14,14

---

**75 (1)**
  74:11
**751-766 (1)**
  13:15
**76 (2)**
  74:11,17

---

## 8

**8 (3)**
  38:25;54:12;55:3
**8/31 (1)**
  15:7
**8:30 (2)**
  33:8,9

---

## 9

**9 (5)**
  26:16,17,21;54:21;
  55:9
**95 (1)**
  63:21
**96 (1)**
  65:8
**97 (1)**
  65:21
**98 (1)**
  66:20

---

# Exhibit 3

**COMPANY CONFIDENTIAL**

**RIMKUS CONSULTING GROUP, INC.**
**JOB ASSIGNMENT**

**ASSIGNMENT NO.** 50901985

DATE REC'D: 05/23/2014
DATE ISSUED: 04/08/2016
ORIG: MARIBICH

ADMIN EMAIL: MARIBICH

MANAGER: PFQUINN

OFFICE LOCATION: CHICAGO

PROJECT MGR: OWSOYK

| DIVISION: FIRE | ASSIGNMENT TYPE: | FIRE CAUSE & ORIGIN |
|---|---|---|

**INSURANCE COMPANY**                              ORDERING CLIENT: ____  PAYING CLIENT: ____
Name   FM GLOBAL INSURANCE COMPANY                                    Client # 062518
Address   300 SOUTH NORTHWEST HWY., STE. 100          Tel. #  262-287-4739      Ext ____
City, State, Zip   PARK RIDGE, IL 60068        Mobile ____          Fax ____
Contact   Mr. Paul Anderson        Title ____   Email  paul.anderson@fmglobal.com
Claim # ____                    Policy # ____
Claimant ____                          Home ____
Insured   Ball Corporation                      Home ____

**CORPORATION**                              ORDERING CLIENT: ____  PAYING CLIENT: ____
Name ____                                    Client # ____
Address ____          Tel. # ____      Ext ____
City, State, Zip ____        Mobile ____          Fax ____
Contact ____        Title ____
Email ____        Corp. Ref # ____

**ADJUSTMENT FIRM**                              ORDERING CLIENT: ____  PAYING CLIENT: ____
Name ____                                    Client # ____
Address ____          Tel. # ____      Ext ____
City, State, Zip ____        Mobile ____          Fax ____
Contact ____        Title ____
Email ____        Adj Firm File # ____

**PLAINTIFF LAW FIRM**                          ORDERING CLIENT: X   PAYING CLIENT: X
Name   SENAK, KEEGAN, GLEASON, SMITH & MICHAUD                      Client # 915507
Address   621 PLYMOUTH COURT STE. 100          Tel. #  312-214-4415      Ext ____
City, State, Zip   CHICAGO, IL 60605        Mobile  312-714-7149       Fax  312-214-1401
Attorney   Mr. Mark Senak        Email  msenak@skgsmlaw.com        Other Contact ____
Law Firm's Client   Ball Corp/FM Global        Law Firm File # ____

**DEFENDANT LAW FIRM**                          ORDERING CLIENT: ____  PAYING CLIENT: ____
Name ____                                    Client # ____
Address ____          Tel. # ____      Ext ____
City, State, Zip ____        Mobile ____          Fax ____
Attorney ____        Email ____        Other Contact ____
Law Firm's Client ____        Law Firm File # ____

**LEGAL INFORMATION**
Representing  D   Cause # ____          Court ____
Style ____
____ vs ____

**ASSIGNMENT TITLE**   Ball Corporation - Industrial Building Fire
**INVOICE INSTRUCTIONS**   Senak Keegan Gleason Smith & Michaud
**SPECIAL INVOICE INSTRUCTIONS**
**REPORTS TO**   Senak Keegan Gleason Smith & Michaud    # of copies  2    When needed
**TYPE OF REPORT**              CONFLICT CHECK                          **PRIORITY**
  BOTH              By  jsholden   Date  05/28/2014   Results  NO

**RATE SCHEDULE:**   RATE 22 COMMERCIAL LINES
**SHARED FEE**   NO    If yes, CLIENT PERCENT   100.00000000    CAT FILE  NO    If yes, CAT # ____
**RETAINER AMOUNT** ____                      **REPORT DUE BY** ____
**ESTIMATE**  $4,565.00        DO NOT EXCEED   $- ____        **DNE NOTES** ____

**CONFIDENTIAL**

RIMKUS000303

**DATE OCCURRENCE:** 05/23/2014    **ASSIGNMENT NO.** 50901985

**LOC OCCURRENCE:** 501 North 6th Street    CITY Monticello

**COUNTY** _____    **STATE** IN    **COUNTRY** USA    **ZIP** 47960

**DESCRIPTION: (WHAT, WHERE, WHEN, ETC.)**
Insured reports a fire to their manufacturing / industrial building. The insured are suppliers of metal and plastic packaging to the beverage and food industries.

Contact is Mr. Paco Aldardo - Director of Engineering at 303-807-7923

DO NOT CONTACT INSURED OR FM Global CLIENT, DO NOT SEND CORRESPONDENCE TO FM Global. ALL CONTACT IS TO BE MADE WITH Senak Keegan Gleason Smith & Michaud

**ADDITIONAL CLAIMANT CONTACT:**    Work _____    Mobile _____

**ADDITIONAL INSURED CONTACT:**    Work _____    Mobile _____

**WHAT DOES THE CLIENT WANT FROM THE RIMKUS CONSULTING GROUP?**
Determine the cause & origin of the fire

**CLIENT INSTRUCTIONS:**    No special instructions.

**HOW DID YOU HEAR ABOUT RIMKUS?**    REPEAT CLIENT

Location of Ad/Name of referral, seminar topic: _____

| IS THIS AGREEMENT A TAXABLE INSURANCE SERVICE? | YES | NO |
|---|---|---|
| Is the client doing business in Texas? | | X |
| Is the incident in Texas? | | X |
| Is the client an insurance company? | X | |
| If not an insurance company, is the client representing an insurance company, or are recovery of damages expected to be paid by an insurance company? | | X |

**PAYING CLIENT INFORMATION**

Name:    SENAK, KEEGAN, GLEASON, SMITH & MICHAUD

Care of: _____

Address:    621 PLYMOUTH COURT STE. 100

City, State, Zip:    CHICAGO IL, 60605

Contact/Attention:    Mark Senak    Tel:    312-214-4415

CONFIDENTIAL    RIMKUS000304

# Exhibit 4





### SCOTT M. HOWELL IAAI CFI, P.E.
### PRINCIPAL CONSULTANT

Mr. Howell holds a bachelor degree in Mechanical Engineering from the Illinois Institute of Technology in addition to an associate degree in Fire Science from the College of DuPage. He is an IAAI Certified Fire Investigator, Illinois State Certified Fire Investigator, Firefighter, Fire Officer and Paramedic

Mr. Howell has an extensive professional background in the areas of firefighting, fire investigation and gas and propane fired appliance failure evaluation. His professional experience includes fire and explosion investigation, electric fire ignition experimentation, product testing for ignition hazards, fuel gas leaks and ignitions, full scale fire testing of ignition scenarios, fire protection and detections system performance analysis, as well as commercial kitchen hood and duct evaluations.

Mr. Howell has conducted over 100 room size fires as training aides for firefighters and fire investigators using authentic room furnishings. Many ignition scenarios were utilized from flammable liquids to small explosive devices on ordinary combustibles. As a member of the Federal Emergency Management Agency's Major Fire Investigation Team, he has investigated major fires throughout the country publishing reports for use by fire departments nationally.

He was a wildlands firefighter with the California Division of Forestry. During his career with the Naperville, IL Fire Department he responded to fire incidents, investigated fires and conducted life safety inspections. As a fire investigator he routinely examined fire and explosions scenes to determine the origin and cause of the event. Criminal investigations were conducted and presented for prosecution.

Since joining Rimkus Consulting Group in 2000 Mr. Howell has performed hundreds of investigations involving fire origin and cause, propane and natural gas explosions and mechanical failures. Issues involved include operation of fire sprinkler systems, and restaurant hood and duct systems. Mr. Howell has been recognized as an expert and has extensive trial and deposition testimony experience in a variety of venues including Canada.

Mr. Howell has experience in investigation of frozen pipes ranging from residential to commercial to industrial including domestic and fire protection systems. Energy usage records as well as building envelope investigation have been to determine specific cause of loss.

Analysis of accidents involving heat producing equipment is another area of expertise. Examples include lyophizers, commercial steamers, and space heaters.



# SCOTT M. HOWELL, P.E.

## EDUCATION AND PROFESSIONAL ASSOCIATIONS

A.A.S. – Fire Science, College of DuPage, Glen Ellyn, Illinois, 1983
B.S. – Mechanical Engineering, Illinois Institute of Technology, Chicago, Illinois, 1993
Registered Professional Engineer – Illinois License # 062-053212
Registered Professional Engineer – Ohio License # E-67289
Registered Professional Engineer – Michigan License # 6201049929
Registered Professional Engineer – Wisconsin License # 35743-006
Registered Professional Engineer – Indiana License # PE10302123
Registered Professional Engineer – Iowa License # 16399
Registered Professional Engineer – Kansas License # 21211
Registered Professional Engineer – Minnesota License #49457

Member:    National Fire Protection Association
           Society of Fire Protection Engineers
           American Society of Mechanical Engineers

## EMPLOYMENT HISTORY

| | |
|---|---|
| 2000 – PRESENT | Rimkus Consulting Group, Inc. |
| 1994 – 2000 | Triodyne Fire and Explosion Engineers |
| 1987 – 1989 | Engineering Systems Incorporated |
| 1978 – 1989 | City of Naperville Fire Department |
| 1977 – 1978 | Pleasantview Fire Protection District |
| 1976 | California Division of Forestry |

## DETAILED PROFESSIONAL EXPERIENCE:

**RIMKUS CONSULTING GROUP, INC.**                                    **2000 – PRESENT**

Principal Consultant

Timely on-scene investigation and analysis of fire and explosion incidents including origin and cause determination, analysis of fire detection and suppression systems, products and circumstances surrounding the initiation of the fire, and support to other engineering divisions within Rimkus Consulting Group.

**TRIODYNE FIRE AND EXPLOSION ENGINEERS**                          **1994 – 2000**

Senior Engineer

Forensic engineering responsibilities including fire origin and cause determination. Extensive laboratory experience in reconstructing fire ignition scenarios for plausibility, including potential for residential electrical service to ignite various combustibles, radiant heating effects on wiring and ordinary combustibles, and small appliance evaluation for compliance with codes and standards. Experience included fuel gas releases and ignitions, restaurant hood and duct systems, sprinkler system performance and vehicle fire investigation.

**ENGINEERING SYSTEMS INCORPORATED**                               **1987 – 1989**

Engineering Technician

Assemble and participate in experimental recreations of failure scenarios.

SCOTT M. HOWELL, P.E.

**CITY OF NAPERVILLE FIRE DEPARTMENT**                              1978 – 1989

Fire Investigator, Firefighter – Paramedic

Conducted over 100 room size structural fires for training firefighters and fire investigators. Many ignition scenarios were used from flammable liquids to small explosive devices to open flame devices on ordinary combustibles. Practical instruction given on fire growth, smoke spread and burn pattern recognition during these exercises. Conducted fire investigations to determine origin and cause. Worked within a task force framework to build criminal cases. Prepared and presented department-wide training in several subject areas. Conducted fire and life safety inspections review automatic sprinkler designs for compliance with local codes.

**PLEASANTVIEW FIRE PROTECTION DISTRICT**                          1977 – 1978

Firefighter

Respond to and mitigate emergency incidents.

**CALIFORNIA DIVISION OF FORESTRY**                                1976

Firefighter

Wildlands firefighting.

**PROFESSIONAL TRAINING**

Fire Finding Laboratories
Investigation of Gas and Electrical Appliance Seminar

Vehicle Fire Investigation, by Lee Cole
Origin and Cause of Vehicle Fire

National Fire Protection Association
NFPA 13 Automatic Sprinkler Design

National Fire Protection Association
NFPA 72 National Fire Alarm Code

National Fire Protection Association
Design of Smoke Control Systems

Illinois Fire Service Institute
Hazardous Material First Responder

Chicago Fire Department
Electrical Fire Investigation

Fire and Arson investigation
National fire Academy

Illinois Department of Transportation
Hazardous Materials Seminars

Page 3

**SCOTT M. HOWELL, P.E.**

**TECHNICAL REPORTS AND SEMINARS PRESENTED**

"Known As Arc, In Line and Wet Electrical Fires", Triodyne Safety Bulletin August 1998 (with John Campbell)

Presented Residential Natural Gas Explosion Seminar To Northern Illinois Arson Task Force. May 1998, Rosemont, Illinois

Entrapment in Garage Kills One Firefighter, San Francisco, California, March 1995 (Report #084), United States Fire Administration

Manufacturing Mill Fire, Methuen, Massachusetts, December 1995 (Report #110), United States Fire Administration

St. George Hotel Complex 18 Alarm Fire, Brooklyn, New York, August 1995 (Report #108), United States Fire Administration

Davis & Young 2004 Annual Law Seminar, Large Loss Property Claims: Investigation and Defense Strategy

# FIMKUS CONSULTING GROUP, INC.
## TESTIMONY REPORT
### COMPANY CONFIDENTIAL

**FCG CONSULTANT: HOWELL, SCOTT M.**

| File No. | Date Test | Depo/Trial | P/D/S | Plaintiff Law Firm/Attorney 2nd Plaintiff Law Firm/Attorney | Defendant Law Firm/Attorney 2nd Defendant Law Firm/Attorney | Cause No. & Court | Style | State | Country |
|---|---|---|---|---|---|---|---|---|---|
| 9411724 | 02/06/2017 | Depo | P | CARL METZ FALK METZ LLC 20 SOUTH CLARK STREET SUITE 1900 CHICAGO, IL 60603 | BRYAN JOHNSON COZEN O'CONNOR 123 NORTH WACKER DRIVE SUITE 1800 CHICAGO, IL 6006 | 19 L 2752 STATE OF ILLINOIS CIRCUIT COURT OF THE COUNTY OF COOK | MID-CENTURY INSURANCE COMPANY AS SUBROGEE OF TAK ASSOCIATES V. ARCH-H, LLC, ET AL | IL | US |
| 9411995 | 11/22/2016 | Depo | D | KARL WEYLAND, JR. 5140 STATE STREET SUITE 200 SAGINAW, MI 48603 | WILLIAM HSRIZKES VANDEVEER GARCIA, P.C. 840 WEST LONG LAKE ROAD SUITE 600 TROY, MI 48094 | 15-000400-NP STATE OF MICHIGAN CIRCUIT COURT FOR THE COUNT OF WAYNE | CINCINNATI INSURANCE COMPANY ASO FOX HILLS REAL ESTATE, LLC V. HARBOR FLOOR COVERING, INC. ET AL | MI | US |
| 9089914 | 07/06/2016 | Depo | P | LEAH EIRENBERG & FRANKEL LTD ROBERT OSTOJIC | LEIFHEER WESTON CRAIG PLC J. MICHAEL WESTON | LACV079839 IOWA DISTRICT COURT FOR JOHNSON COUNTY | LIBERTY MUTUAL FIRE INSURANCE AS SUBROGEE OF BRUEGGERS ENTERPRISES INC, V HELLWIG ELECTRIC LLC | IL | US |
| 9096534 | 06/23/2016 | Trial | P | ERICKSON DAVIS MURPHY JOHNSON & WALSH LTD JACK KILEY | SKARZYNSHI BLACK LLC WILLIAM KOLB | 2:13-CV-2037 UNITED DISTRIC COURT FOR THE CENTRAL OF ILLINOIS | TATE AND LYLE LLC V GLATT AIR TECHNIQUES | IL | US |
| 5822272 | 09/13/2016 | Depo | P | JOE MIROSHALL MIROSALLI DURKIN & RUDIN | JON MALARTISIK PAULSEN MALLEC & MALARTSIK | 10 L 5155 CIRCUIT COURT OF COOK COUNTY, COUNTY, ILLINOIS COUNTY DEPARTMENT-LAW DIVISION | LEON BENGUICHE VS GREAT LAKES SERVICE INC | IL | US |
| 5063484 | 04/07/2016 | Depo | P | STOLZENBERG GELLES FLYNN & ARANGO LLP CHARLES FLYNN | LENNON MILLER O'CONNOR & BARTOSIEWIEZ PLC TYREN CUDNEY | 15014SINO CIRCUIT COURT OF KALAMAZOO | VINCENTE GONVALEZIDAVSI SORIANO ROAS VS LILAC LANE/VILLAGE OF KALAMAZOO APARTMENTS | MI | US |
| 0006726 | 01/06/2016 | Depo | P | SNECKENBERG, THOMPSON AND BRODY STEVEN THOMPSON | SAMPLES AND RHODES LARRY TYRL | 12CA-CI-04225 CIRCUIT COURT OF CASS COUNTY STATE OF MISSOURI | FARMERS INSURANCE EXCHANGE V COMPLETE HOME CONCEPTS | MO | US |

Tuesday, May 30, 2017

| File No. | Date Test | Depo Trial | P/D/S | Plaintiff Law Firm/Attorney / 2nd Plaintiff Law Firm/Attorney | Defendant Law Firm/Attorney / 2nd Defendant Law Firm/Attorney | Cause/No. & Court | Style | State | Country |
|---|---|---|---|---|---|---|---|---|---|
| 00846594 | 10/22/2015 | Depo | P | ERICKSON, DAVIS & MURPHY JACK KILEY | SKARZENSKI BLACK LLC THOMAS CELLILLI | 2:13-CV-2037 (EIL) UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF ILLINOIS | TATE AND LYLE V GLATT AIR TECHNIQUES, INC | IL | |
| 00846124 | 04/20/2015 | Trial | P | DAVID AXELROD AND ASSOCIATES DAVID AXELROD | KRALOVEC & MARGUARD, CHARTERED PHILIP DOMAGALSKI | 10 CH 5700 CIRCUIT COURT OF COOK COURT ILLINOIS COUNTY DIVISION (CHANCERY DIVISION) | MOLLOY V ABT | IL | US |
| 50901040 | 01/05/2015 | Depo | P | KENNETH ALLEN LAW GROUP BRYAN BRADLEY | CASSIDY SCHADE LLP HEATHER TI GILBERT | 45011-1207-CT-0140 STATE OF INDIANA COUNTY OF LAKE SUPERIOR COURT | LEBERES V WALSH CONSTRUCTION ET AL | IL | US |
| 50822230 | 10/08/2014 | Depo | D | HELLER AND RICHMOND OTTIE ANDRE BRYANT | LAW OFFICES OF EDWARD KOZEL DAVID SORENSON | 2012 L 6346 CIRCUIT COURT OF COOK COUNTY ILLINOIS LAW DIVISION | M LECZKO V SOUTHFORK RESTAURANT | IL | US |
| | 10/08/2014 | Depo | D | HELLER AND RICHMOND OTTIE A BRYANT | LAW OFFICES OF EDWARD KOZEL DAVID SORENSON | 2012 L 6346 CIRCUIT COURT OF COOK COUNTY ILLINOIS LAW DIVISION | M LECZKO V SOUTHFORK | IL | US |
| 00846124 | 12/19/2013 | Depo | P | DAVID AXELROD AND ASSOCIATES CHICAGO ROBERT COHEN | LAW OFFICES OF MEACHUM & STARK CHICAGO JOHN POTTER | 10 L 5172 CIRCUIT COURT OF COOK COUNTY ILLINOIS COUNTY DEPARTMENT, LAW DIVISION | MOLLOY VS ABT ELECTRONICS, INC | IL | US |
| 00987221 | 11/22/2013 | Depo | P | SNECKENBURG THOMPSON AND BRODY CHICAGO, IL EMILIE KAPLIN | RATZEL AND ASSOCIATES BROOKFIELD, WI JAMES RATZEL | 12-CV-1182 STATE OF WISCONSIN CIRCUIT COURT DANE COUNTY | FARMERS INSURANCE EXCHANGE SUBROGEE OF BACKSTREET'S LLC V MARTIN MORA DBA TAQUERIA PANGERIA ST AL | WI | US |
| 00986598 | 10/01/2013 | Depo | D | BOWMAN AND BROOKE PAUL O'NEIL | LAW OFFICES OF JAMES HICKS | 2:11-CV-1642 DISTRICT COURT OF TEH UNITED STATES FOR RTHE EP STERN DISTRICT OF MICHIGAN SOUTHERN DIVISION) | NATIONAL UNION VS MICHIGAN MARINE TERMINALS, D'NECOL, HM ENVIRONMENTAL AND D'NECOL AND HM ENVIRONMENTAL VS BAYS WELDING SERVICES | MI | US |

| File No. | Date Test | Depo Trial | P/D/S | Plaintiff Law Firm/Attorney / 2nd Plaintiff Law Firm/Attorney | Defendant Law Firm/Attorney / 2nd Defendant Law Firm/Attorney | Cause No. & Court | Style | State | Country |
|---|---|---|---|---|---|---|---|---|---|
| 008407 | 09/18/2013 | Trial | P | SNECKENBURG THOMPSON AND BRODY / CHICAGO, IL / STUART BRODY | LUDENS, POTTER AND MELTON / MORRISON, IL / THOMAS POTTER | 2010 CJ 123 / 15TH JUDICIAL CIRCUIT / JO DAVIESS COUNTY, ILLINOIS | ILLINOIS FARMERS A/S/O FALESE V B&D AIR CONDITIONING, INC | IL | US |
| 008388 | 08/01/2013 | Trial | P | FISHER KANARIS / CHICAGO, IL / MATTHEW COHEN | RAJKOWSKI HANSMEIER, LTD / GORDAON HANSMEIER | 58-CV-12-373 / STATE OF MINNESOTA / DISTRICT COURT OF THE / COUNTY OF PINE TENTH / DISTRICT | HARTFORD AS SUBROGEE OF CARLSTROM VS FEDERATED CO-OPS, INC | IL | US |
| 009407 | 07/22/2013 | Depo | P | SNECKENBURG THOMPSON AND BRODY / CHICAGO, IL / STUART M. BRODY | LUDENS POTTER MELTON & CALVO / MORRISON, IL / THOMAS J. POTTER | 09 L 19 / CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT JO DAVIESS COUNTY, IL | ILLINOIS FARMERS INSURANCE COMPANY A/S/O RONALD AND KAREN FALESE VS B & D PLUMBING & AIR CONDITIONING, INC | IL | US |
| 009625 | 06/05/2013 | Trial | P | BRADSHAW, FOWLER, PROCTOR & FAIRGRAVE, P.C. / 801 GRAND AVENUE, SUITE 3700 / DES MOINES, IA 50309-8004 / SEAN M. O'BRIEN | SHUCK LAW FIRM, PC / 501 PIERCE STREET / SUITE 205 / SIOUX CITY, IA 51101 / DANIEL SHUCK | 4:10-CV-00084-TJS / UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF IOWA CENTRAL DIVISION | CONTINENTAL WESTERN INSURANCE COMPANY V. TITANIUM COMPANY | IA | US |
| 007409 | 02/08/2013 | Depo | P | FISHER KANARIS, P.C. / MATTHEW COHEN | RAJKOWSKI HANSMEIER, LTD / GORDON HANSMEIER | 58-CV-12-373 / STATE OF MINNESOTA / DISTRICT COURT / COUNTY OF PINE TENTH / DISTRICT | HARTFORD AS SUBROGEE OF CARLSTROM V FEDERATED CO-OPS, INC | MN | US |
| 002470 | 10/22/2012 | Depo | P | PHELPS DUNBAR / DOUG KLEEMAN | LAW OFFICES OF KENNETH R ANTEE JUNIOR / KENNETH R. ANTEE, JUNIOR | 11 CV-01973 / US DISTRICT COURT / WESTERN DISTRICT OF LOUISIANA SHREVEPORT DIVISION | SCOTTSDALE INSURANCE VS LOGANSPORT GAMING LLC | LA | US |
| 002415 | 09/15/2012 | Depo | P | HEIDMAN LAW FIRM / ALAN FREDREGILL | MYERS-MASTER, GOODE, WEST, HANSELL & O'BRIEN / KEVIN COLLINS | LACV 021999 / IOWA COURT FOR SIOUX COUNTY | FARMERS MUTUAL INSURANCE ASSOCIATION, IOWA AS SUBROGEE OF BILL MCUIV V KATOPLIGHT CORPORATION | IA | US |
| 007072 | 04/05/2012 | Depo | D | COZEN O'CONNOR / MARISSA SABER | KAPLIN, MASSAMILLO & ANDREWS, LLC / ROBERT BRAIN | 2010-L-007175 / CIRCUIT COURT OF COOK COUNTY, LAW DIVISION | ALLSTATE INSURANCE CO. A/S/O LUZ LEAL V. AIRCOR HEATING AND AIR CONDITIONING, INC. | IL | US |

| File No. | Date Test | Depo/Trial | P/D/S | Plaintiff Law Firm/Attorney — 2nd Plaintiff | Defendant Law Firm/Attorney — 2nd Defendant | Cause No. & Court | Style | State / Country |
|---|---|---|---|---|---|---|---|---|
| 01834 | 02/05/2012 | Depo | P | | DEBORAH LUSCHE / LAW OFFICES OF ROBERT MARTIER | CIRCUIT COURT OF COOK COUNTY, LAW DIVISION / 08 L 11653 | FIRST SPECIALTY INSURANCE AND NEW HARRISON HOTEL V. CHARMING FOOD NETWORK | IL |
| | 12/03/2010 | Depo | D | A. LEO WIGGINS | SMITH AMUNDSEN / KEN PERRY | CIRCUIT COURT OF COOK COUNTY / 08 L 009503 | GALVAN V LASALLE NATIONAL BANK ET AL | IL US |
| 00004 | 12/02/2010 | Depo | D | CLAUSEN MILLER, PC / W. GREGORY AIMONETTE | PURCELL AND WARDROPE, CHTD / BRADFORD PURCELL | CIRCUIT COURT OF COOK COUNTY, ILLINOIS / 08 L 011284 | MEPT MCGUIRG COURT ET AL V THE LUSE COMPANIES | IL US |
| 00092236 | 11/02/2010 | Depo | D | WUNDERLICH LAW OFFICE / GARY WUNDERLICH | FORAN, GLENNON, PALANDECH & PONZI / DOUGLAS ALLEN | 08 L 2??? | T&S AUTO RECYCLING V EFR EQUIPMENT COMPANY | IL US |
| 00100 | 09/20/2010 | Depo | P | LEAHY EISENBERG AND FRANKEL / ROBERT OSTOJIC | CRAY HUBER HORSTMAN AND VANAUSDAL / STEPHEN HEIL | CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT, WILL COUNTY, ILLINOIS / 09CV1576 | F&M BUILDING PARTNERSHIP V. WINSTON COMPANY | IL US |
| 00095 | 09/23/2010 | Depo | D | CANEL, KING & JONES / KASEY FOLK | JOHNSON AND BELL / JON GOKIN | UNITED STATES FEDERAL COURT, EASTERN DIVISION / COOK COUNTY ILLINOIS / 09 CV 0807 | JAY ROBERTS ANTIQUE WAREHOUSE V FIREMANS FUND INSURANCE COMPANY | IL US |
| 00036 | 01/12/2010 | Arb | D | VAUGH COX | MACLEOD DIXON LLP / ALAN NUDASOFF | COURT OF THE QUEEN'S BENCH OF ALBERTA / 0503204-4 | HOA PING TRADING COMPANY LTD, 99 SUPER MARKET LTD, AND 728684 ALBERTA LTD V/S LAWRENCE MECHANICAL SERVICES 1984 LTD, LAWRENCE MUSURICHAN, ET AL | CANADA |
| 00032 | 08/17/2009 | Depo | P | LAW OFFICES OF EDWARD MOLTZEN / EDWARD MOLTZEN | | CIRCUIT COURT OF COOK COUNTY ILLINOIS / 08-L2601 | SUPARDSSA V LAKESIDE BANK AND TRUST COMPANY | IL US |
| 00010 | 12/17/2008 | Depo | D | BLACK, DUGAN & MOSS P.C. / BRUCE MOSS | CURRIER AND BATCHELOR, P.C. / GENE CURRIER | STATE OF MICHIGAN IN THE CIRCUIT COURT OF THE COUNTY OF OAKLAND / 07-087306-NZ | LIBERTY MUTUAL V DETROIT FIRE EXTINGUISHER | MI |

Tuesday, May 30, 2017

| File No. | Date | Test/Trial | Depo/Trial | P/D/S | Plaintiff Law Firm/Attorney / 2nd Plaintiff Law Firm/Attorney | Defendant Law Firm/Attorney / 2nd Defendant Law Firm/Attorney | Cause No. & Court | Style | State | Country |
|---|---|---|---|---|---|---|---|---|---|---|
| 0550 | 11/2/2008 | | Depo | D | GRZANKA, GRET MCDONALD / JON V. CORETTI | VANDEVEER GARZIA, P. C. / DONALD BROWNELL, LAUREN WORZTMNIK | STATE OF MICHIGAN IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE | ALLIED PROPERTY V MARIO LITTLES | MI | US |
| 04705 | 09/12/2008 | Trial | | P | SNECKENBERG, THOMPSON AND BRODY / STEVE THOMPSON | DENRDORF SIMPSON / ARTHUR SIMPSON | 07 CV/907227 STATE OF WISCONSIN CIRCUIT COURT OF MILWAUKEE | ROHDE V J.M. BRENNAN | WI | US |
| 04733 | 09/19/2008 | | Depo | P | SNECKENBERG THOMPSON AND BRODY / STEVEN THOMPSON | GRANT ROSS AND FANNING / GARY FRESEN | 09 L 008878 CIRCUIT COURT OF COOK COUNTY ILLINOIS | ILLINOIS FARMERS V BARRINGTON POOLS | IL | US |
| 04235 | 05/20/2008 | | Depo | D | TERHHAAR, ARCHIBALD, PFEFFERLE & GRIEBEL / STEVEN PFEFFERLE | COZEN AND O'CONNOR / JAMES TARMAN / CRIVELLO, CARLSON & MENTKOWSKI / JAMES NIQUET | 08 CV/980 CIRCUIT COURT OF SAUK COUNTY WISCONSIN | ZURICH ET AL V FIREYE ET AL | WI | US |
| 04205 | 05/01/2008 | | Depo | D | COZEN & O'CONNOR / SEAN P. O'DONNELL | GOODELL, DEVRIES, LEECH AND DANN / E.CHARLES DANN, JR | 07 CV/A1543 JFM UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND (NORTHERN DISTRICT) | LANDMARK INSURANCE ET AL V HENNY PENNY ET AL | MD | US |
| 04705 | 04/18/2008 | | Depo | P | SNECKENBERG, THOMPSON AND BRODY / STEVE THOMPSON | SIMPSON & DESARDONFF, S.C. / ARTHUR SIMPSON | 07 CV/907227 STATE OF WISCONSIN CIRCUIT COURT OF MILWAUKEE COUNTY | ROHDE V BRENNAN | WI | US |
| 00697 | 03/27/2008 | | Depo | P | CLAUSEN MILLER PC / W. GREGORY AIMONETTE | JOSEPH BARATTA / CONDON & COOK | 09 L 769 CIRCUIT COURT FOR THE TWELFTH JUDICIAL CIRCUIT WILL COUNTY, ILLINOIS | SUPERMERCADO LA LOMA, ERIE INSURANCE V FIRE SCIENCE TECHNIQUES, LTD | IL | US |
| 00548 | 12/07/2007 | | Depo | D | LIPKIN & HIGGINS / MICHAEL HIGGINS | BRUCE, FARREL, DORN & ASSOCIATES / RICHARD ARONSON | 09 L 0397 THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS COUNTY DEPARTMENT LAW DIVISION | PERCILLA HUNT V ROSA HALL | IL | US |

| File No. | Date Test/Trial | Depo/Trial | P/D/S | Plaintiff Law Firm/Attorney 2nd Plaintiff Law Firm/Attorney | Defendant Law Firm/Attorney 2nd Defendant Law Firm/Attorney | Cause No. & Court | Style | State | Country |
|---|---|---|---|---|---|---|---|---|---|
| 0074 | 10/17/2007 | Depo | D | TORSHEN, SLOBIG, GENDEN DRAGUTINOVICH & AXEL, LTD ROBERT SLOBIG | HEYTOW & WARNICK, P.C. JEFFERY WARNICK | 04 L 7662 CIRCUIT COURT OF COOK COUNTY ILLINOIS LAW DIVISION | PERFECT MULCH V F.D.A., INC DBA CHICAGOLAND WHOLESALE MULCH | IL | US |
| 0092700 | 08/06/2007 | Trial | P | PRESBREY & ASSOCIATES, P.C. CHARLES PETERSON | CONDON AND COOK STANLEY KITZINGER | 02 LK 176 18TH JUDICIAL CIRCUIT KANE COUNTY ILLINOIS | BILLY ROBBINS V ALLSTATE INSURANCE COMPANY | IL | |
| 0093839 | 10/20/2006 | Depo | P | SNECKENBURG THOMPSON AND BRODY 161 NORTH CLARK STREET SUITE 3575 CHICAGO, IL 60601 STUART BRODY | | 04 L 016145 COOK COUNTY ILLINOIS | | IL | |
| 0093986 | 10/14/2006 | Depo | P | COZEN AND O'CONNOR ANTHONY MARONE | | 06C34547 | ILLINOIS FARMERS V GRINNEL FIRE PROTECTION | IL | |
| 0091988 | 09/29/2006 | Depo | P | COZEN AND O'CONNOR JOHN FLAHERTY | | 05CV5770 US DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS | NATIONWIDE V LEVITON MANUFACTURING | IL | |
| 0091457 | 09/06/2006 | Depo | P | SNECKENBURG, THOMPSON & BRODY, LLP MR. STUART M. BRODY | LABARGE, CAMPBELL & LYON, LLC MR. BRUCE W. LYON | 04 L 010740 CIRCUIT COURT OF COOK COUNTY, IL COUNTY DEP. LAW DIVISION | ILLINOIS FARMERS INSURANCE COMPANY, AS SUBROGEE OF KATHY LANG, PLAINTIFF VS ANDERSON PLUMBING & HEATING, INC., DEFENDANT | IL | USA |
| 0093119 | 02/23/2006 | Depo | P | SAFRIN AND ASSOCIATES 8229 DELEGATES ROW SUITE 490 INDIANAPOLIS, IN 46240 FRANKLIN SAFRIN | NEWBY, LEWIS, KAMINSKI & JONES 916 LINCOLNWAY LAPORT, IN 46350 MICHAEL BRANCO | 45D05-0511-CT-444 LAKE COUNTY INDIANA SUPERIOR COURT | LISA YESREENOV V KLAWINSKI, INC | IN | |
| 0093700 | 01/20/2004 | Depo | P | JOSEPH VOILAND | | 02 LK 176 CIRCUIT COURT FOR 18TH JUDICIAL CIRCUIT KANE COUNTY, IL | BILLY D. ROBBINS V ALLSTATE INSURANCE COMPANY | IL | |

Tuesday, May 30, 2017

| File No. | Date Test Trial | Depo/Trial | P/D/S | Plaintiff Law Firm/Attorney | 2nd Plaintiff Law Firm/Attorney | Defendant Law Firm/Attorney | 2nd Defendant Law Firm/Attorney | Cause No. & Court | Style | State | Country |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 000621 | 04/08/2003 | Trial | D | | | BOYD, KRONLINNAN & SMALLWOOD PLLC 860 EAST RIVER PLACE, SUITE 206 JACKSON, MS 39202 ROBERT BOYD | | NORTHERN DISTRICT OF MS | WATTLE V BARRO | MS | |
| 000611 | 07/26/2002 | Depo | D | | | CHEATUM, EBTES & HOLMAN 5777 WEST MAPLE ROAD # 130 WEST BLOOMFIELD, MI 48325-6002 CHRISTOPHER JELINEK | | 00-361-NZ CALHOUN COUNTY, MI | MONTGAM FIBRE V ADVANCED ORGANICS | MI | |
| 0090100 | 02/12/2002 | Depo | D | | | BENSINGER, COTANT, MENKES & AARDEMA 8913 SPAULDING AVE, SE GRAND RAPIDS, MI BOB AARDEMA | | 01-93645 KENT COUNTY, MI | JONES V CAPITAL INVEST | MI | |
| 000622 | 08/11/2001 | Trial | P | | | WARD, MURRAY, PACE & JOHNSON, P.C. 202 EAST FIFTH STREET STERLING, IL 61081 OLE BLYE PAGE | | NO. 97 L 29 OGLE COUNTY, IL | JAUQUET V ART CASTING | IL | |
| 00092 | 11/21/2000 | Trial | P | | | | | BROWN COUNTY, WI | MOKER V VERHA TRUCKING | WI | |
| 00092 | 08/11/2000 | Depo | P | | | | | BROWN COUNTY, WI | VERIHA V FREIGHTLINER | WI | |
| 00092 | 07/06/2000 | Depo | P | | | | | 92-08530-CA DUVAL COUNTY, FL | MARVIN V MARVY | FL | |
| 000611 | 07/06/2000 | Depo | D | | | CHEATUM, EBTES & HOLMAN 5777 W MAPLE ROAD #130 WEST BLOOMFIELD, MI 48325-6002 CHRISTOPHER JELINEK | | 98-5401-CZ CALHOUN COUNTY, MI | AMVID V ADVANCED ORGANICS | MI | |
| 000629 | 08/12/2000 | Depo | D | | | CONKLIN, MURPHY & CONKLIN THOMAS CONKLIN SR | | 97-L-14893 COOK COUNTY, IL | BURNETT V EAST LAKE VILLAGE | IL | |

| File No. | Date Test | Depo Trial | P/D/S | Plaintiff Law Firm/Attorney 2nd Plaintiff Law Firm/Attorney | Defendant Law Firm/Attorney 2nd Defendant Law Firm/Attorney | Cause No. & Court | Style | State Country |
|---|---|---|---|---|---|---|---|---|
| 05/08 | 05/17/2000 | Trial | D | | | MILWAUKEE COUNTY, WI | MENNING V ADOBEAIR | WI |
| 05/08 | 05/05/2000 | Depo | P | | | 99-CV-003525 MILWAUKEE, WI | MENNING V ADOBE AIR | WI |
| | 01/01/1999 | Depo | D | | | 99-L-12784 | | |
| | 01/01/1999 | Depo | D | | | COOK COUNTY, IL | | IL |
| | 01/01/1998 | Depo | D | | | 97-4419-NP MACOMB COUNTY, MI | MCGUIRE  V BEHR PROCESS CORP | MI |
| | 01/01/1998 | Trial | D | | | 96-CV-228 SAUK COUNTY, MI | VIKING VILLAGE V MAC ALLEN | MI |
| | 01/01/1997 | Depo | D | | | 2000 96-7276-NZ WAYNE COUNTY, MI | AMERICAN CASUALTY V MCDANIELS | MI |
| | 01/01/1997 | Depo | | | | 88 L 13902 | KLEITCH V ZENITH | MA |
| | 01/01/1993 | Trial | P | | | 85 OF 11726 COOK COUNTY IL | ILLINOIS V O'DONNELL | IL |
| | | | | | | DUPAGE COUNTY, IL 96-7279-NZ LEWANVEE COUNTY, MI 84595 DIVISION "B" LAFOURCHE PARISH, LA | SHOP RITE V KEATING | |

# Exhibit 5

for Fire Safety Science, 1986. *Proceedings, 1st International Symposium.* C. E. Grant and P. J. Pagni, eds. New York, NY: Hemisphere Publishing Corp., pp. 75–86.

Snyder, E. Health Hazard Evaluation Report 2004–0368–3080, Bureau of Alcohol, Tobacco, Firearms and Explosives, Austin, TX, January 2007.

Society of Fire Protection Engineers. *SFPE Handbook of Fire Protection Engineering,* ed. J. Hurley. New York: Springer, 5th edition.

Stoll, A., and L. C. Greene. "Relationship Between Pain and Tissue Damage Due to Thermal Radiation," *Journal of Applied Physiology* 14 (1959): 373–83.

Stoll, A., and M. A. Chianta. "Method and Rating System for Evaluation of Thermal Protection," *Aerospace Medicine* 40 (1969): 1232–38.

Thomas, P. "The Growth of Fire-Ignition to Full Involvement." In *Combustion Fundamentals of Fire,* ed. G. Cox. London, UK: Academic Press, 1995.

Wood, P. G. *Fire Research Note #953.* Borehamwood, UK: Building Research Establishment, 1973.

Via, P., J. Orloff, and A. Levatson. "Assessment of Material Flammability with the FG Propagation Model and Laboratory Test Methods," Thirteenth Joint Panel Meeting of the UJNR Panel on Fire Research and Safety, Gaithersburg, MD, 1996.

## 2.4 References for Extracts in Advisory Sections.

NFPA 3, *Recommended Practice for Commissioning of Fire Protection and Life Safety Systems,* 2015 edition.

NFPA 13, *Standard for the Installation of Sprinkler Systems,* 2016 edition.

NFPA 53, *Recommended Practice on Materials, Equipment, and Systems Used in Oxygen-Enriched Atmospheres,* 2016 edition.

NFPA 68, *Standard on Explosion Protection by Deflagration Venting,* 2013 edition.

NFPA 70®, *National Electrical Code®,* 2014 edition.

NFPA 72®, *National Fire Alarm and Signaling Code,* 2016 edition.

NFPA 318, *Standard for the Protection of Semiconductor Fabrication Facilities,* 2015 edition.

NFPA 654, *Standard for the Prevention of Fire and Dust Explosions from the Manufacturing, Processing, and Handling of Combustible Particulate Solids,* 2013 edition.

## Chapter 3   Definitions

**3.1 General.**   The definitions contained in this chapter shall apply to the terms used in this guide. Where terms are not defined in this chapter or within another chapter, they shall be defined using their ordinarily accepted meanings within the context in which they are used. *Merriam-Webster's Collegiate Dictionary,* 11th edition, shall be the source for the ordinarily accepted meaning.

**3.2 NFPA Official Definitions.**

**3.2.1\*   Approved.**   Acceptable to the authority having jurisdiction.

**3.2.2\*   Code.**   A standard that is an extensive compilation of provisions covering broad subject matter or that is suitable for adoption into law independently of other codes and standards.

**3.2.3\*   Guide.**   A document that is advisory or informative in nature and that contains only nonmandatory provisions. A guide may contain mandatory statements such as when a guide can be used, but the document as a whole is not suitable for adoption into law.

**3.2.4\*   Recommended Practice.**   A document that is similar in content and structure to a code or standard but that contains only nonmandatory provisions using the word "should" to indicate recommendations in the body of the text.

**3.2.5\*   Standard.**   An NFPA Standard, the main text of which contains only mandatory provisions using the word "shall" to indicate requirements and that is in a form generally suitable for mandatory reference by another standard or code or for adoption into law. Nonmandatory provisions are not to be considered a part of the requirements of a standard and shall be located in an appendix, annex, footnote, informational note, or other means as permitted in the NFPA Manual of Style. When used in a generic sense, such as in the phrase "standards development process" or "standards development activities," the term "standards" includes all NFPA Standards, including Codes, Standards, Recommended Practices, and Guides.

## 3.3 General Definitions.

**3.3.1\*   Absolute Temperature.**   A temperature measured in Kelvins (K) or Rankines (R).

**3.3.2 Accelerant.**   A fuel or oxidizer, often an ignitible liquid, intentionally used to initiate a fire or increase the rate of growth or spread of fire.

**3.3.3 Accident.**   An unplanned event that interrupts an activity and sometimes causes injury or damage or a chance occurrence arising from unknown causes; an unexpected happening due to carelessness, ignorance, and the like.

**3.3.4 Active Fire Protection System.**   A system that uses moving mechanical or electrical parts to achieve a fire protection goal. [**3,** 2015]

**3.3.5 Ambient.**   Someone's or something's surroundings, especially as they pertain to the local environment; for example, ambient air and ambient temperature.

**3.3.6 Ampacity.**   The maximum current, in amperes, that a conductor can carry continuously under the conditions of use without exceeding its temperature rating. [**70,** Article 100]

**3.3.7 Ampere.**   The unit of electric current that is equivalent to a flow of one coulomb per second; one coulomb is defined as $6.24 \times 10^{18}$ electrons.

**3.3.8 Arc.**   A high-temperature luminous electric discharge across a gap or through a medium such as charred insulation.

**3.3.9 Arc Mapping.**   The systematic evaluation of the electrical circuit configuration, spatial relationship of the circuit components, and identification of electrical arc sites to assist in the identification of the area of origin and analysis of the fire's spread.

**3.3.10 Arc Site.**   The location on a conductor with localized damage that resulted from an electrical arc.

**3.3.11 Arcing Through Char.** Arcing associated with a matrix of charred material (e.g., charred conductor insulation) that acts as a semiconductive medium.

**3.3.12 Area of Origin.** A structure, part of a structure, or general geographic location within a fire scene, in which the *"point of origin"* of a fire or explosion is reasonably believed to be located. *(See also 3.3.142, Point of Origin.)*

**3.3.13 Arrow Pattern.** A fire pattern displayed on the cross-section of a burned wooden structural member.

**3.3.14 Arson.** The crime of maliciously and intentionally, or recklessly, starting a fire or causing an explosion.

**3.3.15 Autoignition.** Initiation of combustion by heat but without a spark or flame.

**3.3.16 Autoignition Temperature.** The lowest temperature at which a combustible material ignites in air without a spark or flame.

**3.3.17 Backdraft.** A deflagration resulting from the sudden introduction of air into a confined space containing oxygen-deficient products of incomplete combustion.

**3.3.18 Bead.** A rounded globule of re-solidified metal at the end of the remains of an electrical conductor that was caused by arcing and is characterized by a sharp line of demarcation between the melted and unmelted conductor surfaces.

**3.3.19 Blast Pressure Front.** The expanding leading edge of an explosion reaction that separates a major difference in pressure between normal ambient pressure ahead of the front and potentially damaging high pressure at and behind the front.

**3.3.20 BLEVE.** Boiling liquid expanding vapor explosion.

**3.3.21 Bonding.** The permanent joining of metallic parts to form an electrically conductive path that ensures electrical continuity and the capacity to conduct safely any current likely to be imposed.

**3.3.22 British Thermal Unit (Btu).** The quantity of heat required to raise the temperature of one pound of water 1°F at the pressure of 1 atmosphere and temperature of 60°F; a British thermal unit is equal to 1055 joules, 1.055 kilojoules, and 252.15 calories.

**3.3.23 Burning Rate.** See 3.3.105, Heat Release Rate (HRR).

**3.3.24\* Calcination of Gypsum.** A fire effect realized in gypsum products, including wallboard, as a result of exposure to heat that drives off free and chemically bound water.

**3.3.25 Calorie.** The amount of heat necessary to raise 1 gram of water 1°C at the pressure of 1 atmosphere and temperature of 15°C; a calorie is 4.184 joules, and there are 252.15 calories in a British thermal unit (Btu).

**3.3.26 Cause.** The circumstances, conditions, or agencies that brought about or resulted in the fire or explosion incident, damage to property resulting from the fire or explosion incident, or bodily injury or loss of life resulting from the fire or explosion incident.

**3.3.27 Ceiling Jet.** A relatively thin layer of flowing hot gases that develops under a horizontal surface (e.g., ceiling) as a result of plume impingement and the flowing gas being forced to move horizontally.

**3.3.28 Ceiling Layer.** A buoyant layer of hot gases and smoke produced by a fire in a compartment.

**3.3.29 Char.** Carbonaceous material that has been burned or pyrolyzed and has a blackened appearance.

**3.3.30 Char Blisters.** Convex segments of carbonized material separated by cracks or crevasses that form on the surface of char, forming on materials such as wood as the result of pyrolysis or burning.

**3.3.31 Clean Burn.** A distinct and visible fire effect generally apparent on noncombustible surfaces after combustible layer(s) (such as soot, paint, and paper) have been burned away. The effect may also appear where soot has failed to be deposited because of high surface temperatures.

**3.3.32\* Combustible.** Capable of undergoing combustion.

**3.3.33\* Combustible Gas Indicator.** An instrument that samples air and indicates whether there are ignitible vapors or gases present.

**3.3.34 Combustible Liquid.** Any liquid that has a closed-cup flash point at or above 37.8°C (100°F). *(See also 3.3.85, Flammable Liquid.)*

**3.3.35 Combustion.** A chemical process of oxidation that occurs at a rate fast enough to produce heat and usually light in the form of either a glow or flame.

**3.3.36 Combustion Products.** The heat, gases, volatilized liquids and solids, particulate matter, and ash generated by combustion.

**3.3.37 Competent Ignition Source.** An ignition source that has sufficient energy and is capable of transferring that energy to the fuel long enough to raise the fuel to its ignition temperature. (See 19.4.2.)

**3.3.38 Conduction.** Heat transfer to another body or within a body by direct contact.

**3.3.39 Convection.** Heat transfer by circulation within a medium such as a gas or a liquid.

**3.3.40 Creep.** The tendency of a material to move or deform permanently to relieve stresses.

**3.3.41 Current.** A flow of electric charge.

**3.3.42 Deductive Reasoning.** The process by which conclusions are drawn by logical inference from given premises.

**3.3.43 Deflagration.** Propagation of a combustion zone at a velocity that is less than the speed of sound in the unreacted medium. [68, 2013]

**3.3.44 Density.** The mass of a substance per unit volume, usually specified at standard temperature and pressure. The density of water is approximately one gram per cubic centimeter. The density of air is approximately 1.275 grams per cubic meter.

**3.3.45 Detection.** (1) Sensing the existence of a fire, especially by a detector from one or more products of the fire, such as smoke, heat, infrared radiation, and the like. (2) The act or process of discovering and locating a fire.

**3.3.46 Detonation.** Propagation of a combustion zone at a velocity greater than the speed of sound in the unreacted medium. [68, 2013]

**3.3.47 Diffuse Fuel.** A gas, vapor, dust, particulate, aerosol, mist, fog, or hybrid mixture of these, suspended in the atmosphere, which is capable of being ignited and propagating a flame front.

**3.3.48 Diffusion Flame.** A flame in which fuel and air mix or diffuse together at the region of combustion.

**3.3.49 Drop Down.** The spread of fire by the dropping or falling of burning materials. Synonymous with "fall down."

**3.3.50 Effective Fire Temperatures.** Temperatures reached in fires that produce physical effects that can be related to specific temperature ranges.

**3.3.51 Electric Spark.** A small, incandescent particle created by some arcs.

**3.3.52\* Empirical Data.** Factual data that is based on actual measurement, observation or direct sensory experience rather than on theory.

*N* **3.3.53 Energy.** A property of matter manifested as an ability to perform work, either by moving an object against a force or by transferring heat.

**3.3.54 Entrainment.** The process of air or gases being drawn into a fire, plume, or jet.

*N* **3.3.55 Explosible.** A material with a pressure ratio (maximum pressure/pressure at ignition, in absolute units) equal to or greater than 2.0 in any test when tested using the explosibility or Go/No-Go screening test described in Section 13 of ASTM E1226, *Standard Test Method for Explosibility of Dust Clouds.* [68, 2013]

**3.3.56 Explosion.** The sudden conversion of potential energy (chemical or mechanical) into kinetic energy with the production and release of gases under pressure, or the release of gas under pressure. These high-pressure gases then do mechanical work such as moving, changing, or shattering nearby materials.

*N* **3.3.57 Explosion Dynamics.** Study of how chemistry, physics, fire science, engineering disciplines of fluid and solid mechanics, and heat transfer interact to influence explosion behavior.

**3.3.58 Explosive.** Any chemical compound, mixture, or device that functions by explosion.

**3.3.59 Explosive Material.** Any material that can act as fuel for an explosion.

**3.3.60 Exposed Surface.** The side of a structural assembly or object that is directly exposed to the fire.

**3.3.61 Extinguish.** To cause to cease burning.

**3.3.62 Failure.** Distortion, breakage, deterioration, or other fault in an item, component, system, assembly, or structure that results in unsatisfactory performance of the function for which it was designed.

**3.3.63 Failure Analysis.** A logical, systematic examination of an item, component, assembly, or structure and its place and function within a system, conducted in order to identify and analyze the probability, causes, and consequences of potential and real failures.

**3.3.64 Fall Down.** See 3.3.49, Drop Down.

**3.3.65 Finish Rating.** The time in minutes, determined under specific laboratory conditions, at which the stud or joist in

contact with the exposed protective membrane in a protected combustible assembly reaches an average temperature rise of 121°C (250°F) or an individual temperature rise of 163°C (325°F) as measured behind the protective membrane nearest the fire on the plane of the wood.

**3.3.66 Fire.** A rapid oxidation process, which is a chemical reaction resulting in the evolution of light and heat in varying intensities.

**3.3.67 Fire Analysis.** The process of determining the origin, cause, development, responsibility, and, when required, a failure analysis of a fire or explosion.

*N* **3.3.68 Fire Area.** The boundary of fire effects within a scene in which the area of origin will be located. The fire area is characterized by identifying the border between damaged and undamaged areas, which are distinguishable by fire effects and patterns created by flame, heat, and smoke.

**3.3.69 Fire Cause.** The circumstances, conditions, or agencies that bring together a fuel, ignition source, and oxidizer (such as air or oxygen) resulting in a fire or a combustion explosion.

**3.3.70\* Fire Dynamics.** The detailed study of how chemistry, fire science, and the engineering disciplines of fluid mechanics and heat transfer interact to influence fire behavior.

*N* **3.3.71 Fire Effects.** The observable or measurable changes in or on a material as a result of a fire.

**3.3.72 Fire Hazard.** Any situation, process, material, or condition that can cause a fire or explosion or that can provide a ready fuel supply to augment the spread or intensity of a fire or explosion, all of which pose a threat to life or property.

**3.3.73 Fire Investigation.** The process of determining the origin, cause, and development of a fire or explosion.

**3.3.74 Fire Patterns.** The visible or measurable physical changes, or identifiable shapes, formed by a fire effect or group of fire effects.

**3.3.75 Fire Propagation.** See 3.3.78, Fire Spread.

**3.3.76 Fire Scene Reconstruction.** The process of recreating the physical scene during fire scene analysis investigation or through the removal of debris and the placement of contents or structural elements in their pre-fire positions.

**3.3.77\* Fire Science.** The body of knowledge concerning the study of fire and related subjects (such as combustion, flame, products of combustion, heat release, heat transfer, fire and explosion chemistry, fire and explosion dynamics, thermodynamics, kinetics, fluid mechanics, fire safety) and their interaction with people, structures, and the environment.

**3.3.78 Fire Spread.** The movement of fire from one place to another.

**3.3.79 First Fuel Ignited.** The first fuel ignited is that which first sustains combustion beyond the ignition source.

**3.3.80 Flame.** A body or stream of gaseous material involved in the combustion process and emitting radiant energy at specific wavelength bands determined by the combustion chemistry of the fuel. In most cases, some portion of the emitted radiant energy is visible to the human eye. [72, 2013]

**3.3.81 Flame Front.** The flaming leading edge of a propagating combustion reaction zone.

**3.3.82 Flameover.** The condition where unburned fuel (pyrolysate) from the originating fire has accumulated in the ceiling layer to a sufficient concentration (i.e., at or above the lower flammable limit) that it ignites and burns; can occur without ignition of, or prior to, the ignition of other fuels separate from the origin.

**3.3.83 Flammable.** Capable of burning with a flame.

**3.3.84 Flammable Limit.** The upper or lower concentration limit at a specified temperature and pressure of a flammable gas or a vapor of an ignitible liquid and air, expressed as a percentage of fuel by volume that can be ignited.

**3.3.85 Flammable Liquid.** A liquid that has a closed-cup flash point that is below 37.8°C (100°F) and a maximum vapor pressure of 2068 mm Hg (40 psia) at 37.8°C (100°F). *(See also 3.3.34, Combustible Liquid.)*

**3.3.86 Flammable Range.** The range of concentrations between the lower and upper flammable limits. [68, 2013]

**3.3.87 Flash Fire.** A fire that spreads by means of a flame front rapidly through a diffuse fuel, such as dust, gas, or the vapors of an ignitible liquid, without the production of damaging pressure.

**3.3.88 Flash Point of a Liquid.** The lowest temperature of a liquid, as determined by specific laboratory tests, at which the liquid gives off vapors at a sufficient rate to support a momentary flame across its surface.

**3.3.89 Flashover.** A transition phase in the development of a compartment fire in which surfaces exposed to thermal radiation reach ignition temperature more or less simultaneously and fire spreads rapidly throughout the space, resulting in full room involvement or total involvement of the compartment or enclosed space.

**3.3.90 Forensic (Forensic Science).** The application of science to answer questions of interest to the legal system.

**3.3.91 Fuel.** A material that will maintain combustion under specified environmental conditions. [53, 2011]

**3.3.92 Fuel Gas.** Natural gas, manufactured gas, LP-Gas, and similar gases commonly used for commercial or residential purposes such as heating, cooling, or cooking.

**3.3.93 Fuel Load.** The total quantity of combustible contents of a building, space, or fire area, including interior finish and trim, expressed in heat units or the equivalent weight in wood.

**3.3.94 Fuel-Controlled Fire.** A fire in which the heat release rate and growth rate are controlled by the characteristics of the fuel, such as quantity and geometry, and in which adequate air for combustion is available.

**3.3.95\* Full Room Involvement.** Condition in a compartment fire in which the entire volume is involved in combustion of varying intensities.

**3.3.96 Gas.** The physical state of a substance that has no shape or volume of its own and will expand to take the shape and volume of the container or enclosure it occupies.

**3.3.97 Glowing Combustion.** Luminous burning of solid material without a visible flame.

**3.3.98 Ground.** A conducting connection, whether intentional or accidental, between an electrical circuit or equipment and earth or to some conducting body that serves in place of the earth.

**3.3.99 Ground Fault.** An unintended current that flows outside the normal circuit path, such as (a) through the equipment grounding conductor; (b) through conductive material in contact with lower potential (such as earth), other than the electrical system ground (metal water or plumbing pipes, etc.); or (c) through a combination of these ground return paths.

**3.3.100 Hazard.** Any arrangement of materials that presents the potential for harm.

**3.3.101\* Heat.** A form of energy characterized by vibration of molecules and capable of initiating and supporting chemical changes and changes of state.

**3.3.102 Heat and Flame Vector.** An arrow used in a fire scene drawing to show the direction of heat, smoke, or flame flow.

**3.3.103 Heat Flux.** The measure of the rate of heat transfer to a surface or an area, typically expressed in $kW/m^2$ or $W/cm^2$.

**3.3.104\* Heat of Ignition.** The heat energy that brings about ignition.

**3.3.105\* Heat Release Rate (HRR).** The rate at which heat energy is generated by burning.

**N 3.3.106 Heat Transfer.** The exchange of thermal energy between materials through conduction, convection, and/or radiation.

**3.3.107 High Explosive.** A material that is capable of sustaining a reaction front that moves through the unreacted material at a speed equal to or greater than that of sound in that medium [typically 1000 m/sec (3000 ft/sec)]; a material capable of sustaining a detonation. *(See also 3.3.46, Detonation.)*

**3.3.108 High-Order Damage.** A rapid pressure rise or high-force explosion characterized by a shattering effect on the confining structure or container and long missile distances.

**N 3.3.109\* Hybrid Mixture.** An explosible heterogeneous mixture, comprising gas with suspended solid or liquid particulates, in which the total flammable gas concentration is ≥10 percent of the lower flammable limit (LFL) and the total suspended particulate concentration is ≥10 percent of the minimum explosible concentration (MEC). [68, 2013]

**3.3.110 Hypergolic Material.** Any substance that will spontaneously ignite or explode upon exposure to an oxidizer.

**3.3.111 Ignitible Liquid.** Any liquid or the liquid phase of any material that is capable of fueling a fire, including a flammable liquid, combustible liquid, or any other material that can be liquefied and burned.

**3.3.112 Ignition.** The process of initiating self-sustained combustion.

**3.3.113 Ignition Energy.** The quantity of heat energy that should be absorbed by a substance to ignite and burn.

**3.3.114\* Ignition Temperature.** Minimum temperature a substance should attain in order to ignite under specific test conditions.

**3.3.115 Ignition Time.** The time between the application of an ignition source to a material and the onset of self-sustained combustion.

**3.3.116 Incendiary Fire.** A fire that is intentionally ignited in an area or under circumstances where and when there should not be a fire. (See also Chapter 24, and 28.8.2.)

**3.3.117 Inductive Reasoning.** The process by which a person starts from a particular experience and proceeds to generalizations. The process by which hypotheses are developed based upon observable or known facts and the training, experience, knowledge, and expertise of the observer.

**3.3.118 Interested Party.** Any person, entity, or organization, including their representatives, with statutory obligations or whose legal rights or interests may be affected by the investigation of a specific incident.

**3.3.119 Investigation Site.** For the purpose of Chapter 29, the terms "site" and "scene" will be jointly referred to as the "investigation site," unless the particular context requires the use of one or the other word.

**3.3.120 Investigative Team.** A group of individuals working on behalf of an interested party to conduct an investigation into the incident.

**3.3.121 Isochar.** A line on a diagram connecting points of equal char depth.

**3.3.122 Joule.** The preferred SI unit of heat, energy, or work. A joule is the heat produced when one ampere is passed through a resistance of one ohm for one second, or it is the work required to move a distance of one meter against a force of one newton. There are 4.184 joules in a calorie, and 1055 joules in a British thermal unit (Btu). A watt is a joule/second. [See also 3.3.22, British Thermal Unit (Btu), and 3.3.25, Calorie.]

**3.3.123 Kilowatt.** A measurement of energy release rate.

**3.3.124 Kindling Temperature.** See 3.3.114, Ignition Temperature.

**3.3.125 Layering.** The systematic process of removing debris from the top down and observing the relative location of artifacts at the fire scene.

**3.3.126 Low Explosive.** An explosive that has a reaction velocity of less than 1000 m/sec (3000 ft/sec).

**3.3.127 Low-Order Damage.** A slow rate of pressure rise or low-force explosion characterized by a pushing or dislodging effect on the confining structure or container and by short missile distances.

**3.3.128 Material First Ignited.** The fuel that is first set on fire by the heat of ignition; to be meaningful, both a type of material and a form of material should be identified.

**3.3.129 Minimum Explosible Concentration (MEC).** The minimum concentration of a combustible dust cloud that is capable of propagating a deflagration through a uniform mixture of the dust and air under the specified conditions of test. [68, 2013]

**3.3.130* Noncombustible Material.** A material that, in the form in which it is used and under the condition anticipated, will not ignite, burn, support combustion, or release flammable vapors when subjected to fire or heat.

**3.3.131 Nonflammable.** (1) Not readily capable of burning with a flame. (2) Not liable to ignite and burn when exposed to flame. Its antonym is *flammable*.

**3.3.132 Ohm.** The SI unit of electrical impedance or, in the direct current case, electrical resistance.

**3.3.133 Origin.** The general location where a fire or explosion began. (See 3.3.142, Point of Origin, or 3.3.12, Area of Origin.)

**3.3.134 Overcurrent.** Any current in excess of the rated current of equipment or the ampacity of a conductor; it may result from an overload (see 3.3.136), short circuit (3.3.167), or ground fault (3.3.99).

**3.3.135 Overhaul.** A fire fighting term involving the process of final extinguishment after the main body of the fire has been knocked down. All traces of fire must be extinguished at this time.

**3.3.136* Overload.** Operation of equipment in excess of normal, full load rating, or of a conductor in excess of rated ampacity that, when it persists for a sufficient length of time, would cause damage or dangerous overheating. A fault, such as a short circuit or ground fault, is not an overload.

**3.3.137 Oxygen Deficiency.** Insufficiency of oxygen to support combustion. (See also 3.3.200, Ventilation-Controlled Fire.)

N **3.3.138 Passive Fire Protection System.** Any portion of a building or structure that provides protection from fire or smoke without any type of system activation or movement. [3, 2015]

**3.3.139 Piloted Ignition Temperature.** See 3.3.114, Ignition Temperature.

**3.3.140* Plastic.** Any of a wide range of natural or synthetic organic materials of high molecular weight that can be formed by pressure, heat, extrusion, and other methods into desired shapes.

**3.3.141 Plume.** The column of hot gases, flames, and smoke rising above a fire; also called *convection column*, *thermal updraft*, or *thermal column*.

**3.3.142 Point of Origin.** The exact physical location within the area of origin where a heat source and a fuel first interact, resulting in a fire or explosion.

N **3.3.143 Power.** A property of a process, such as fire, which describes the amount of energy that is emitted, transferred, or received per unit time and is measured in joules per second (J/s) or watts (W).

**3.3.144 Premixed Flame.** A flame for which the fuel and oxidizer are mixed prior to combustion, as in a laboratory Bunsen burner or a gas cooking range; propagation of the flame is governed by the interaction between flow rate, transport processes, and chemical reaction.

**3.3.145 Preservation.** Application or use of measures to prevent damage, change or alteration, or deterioration.

**3.3.146 Products of Combustion.** See 3.3.36, Combustion Products.

**3.3.147 Protocol.** A description of the specific procedures and methodologies by which a task or tasks are to be accomplished.

**3.3.148 Proximate Cause.** The cause that directly produces the effect without the intervention of any other cause.

**3.3.149 Pyrolysate.** Product of decomposition through heat; a product of a chemical change caused by heating.

**3.3.150 Pyrolysis.** A process in which material is decomposed, or broken down, into simpler molecular compounds by the effects of heat alone; pyrolysis often precedes combustion.

**3.3.151 Pyrophoric Material.** Any substance that spontaneously ignites upon exposure to atmospheric oxygen.

**3.3.152 Radiant Heat.** Heat energy carried by electromagnetic waves that are longer than visible light waves and shorter than radio waves; radiant heat (electromagnetic radiation) increases the sensible temperature of any substance capable of absorbing the radiation, especially solid and opaque objects.

**3.3.153 Radiation.** Heat transfer by way of electromagnetic energy.

**3.3.154 Rate of Heat Release.** See 3.3.105, Heat Release Rate (HRR).

**3.3.155 Rekindle.** A return to flaming combustion after apparent but incomplete extinguishment.

**3.3.156 Responsibility.** The accountability of a person or other entity for the event or sequence of events that caused the fire or explosion, spread of the fire, bodily injuries, loss of life, or property damage.

**3.3.157 Risk.** The degree of peril; the possible harm that might occur that is represented by the statistical probability or quantitative estimate of the frequency or severity of injury or loss.

**3.3.158 Rollover.** See 3.3.82, Flameover.

**3.3.159 Scene.** The general physical location of a fire or explosion incident (geographic area, structure or portion of a structure, vehicle, boat, piece of equipment, etc.) designated as important to the investigation because it may contain physical damage or debris, evidence, victims, or incident-related hazards.

**3.3.160 Scientific Method.** The systematic pursuit of knowledge involving the recognition and definition of a problem; the collection of data through observation and experimentation; analysis of the data; the formulation, evaluation and testing of hypotheses; and, where possible, the selection of a final hypothesis.

**3.3.161 Seat of Explosion.** A craterlike indentation created at the point of origin of some explosions.

**3.3.162 Seated Explosion.** An explosion with a highly localized point of origin, such as a crater.

**3.3.163 Secondary Explosion.** Any subsequent explosion resulting from an initial explosion.

**3.3.164 Self-Heating.** The result of exothermic reactions, occurring spontaneously in some materials under certain conditions, whereby heat is generated at a rate sufficient to raise the temperature of the material.

**3.3.165 Self-Ignition.** Ignition resulting from self-heating, synonymous with *spontaneous ignition.*

**3.3.166 Self-Ignition Temperature.** The minimum temperature at which the self-heating properties of a material lead to ignition.

**3.3.167 Short Circuit.** An abnormal connection of low resistance between normal circuit conductors where the resistance is normally much greater; this is an overcurrent situation but it is not an overload.

**3.3.168 Site.** The general physical location of the incident, including the scene and the surrounding area deemed significant to the process of the investigation and support areas.

**3.3.169 Smoke.** The airborne solid and liquid particulates and gases evolved when a material undergoes pyrolysis or combustion, together with the quantity of air that is entrained or otherwise mixed into the mass. [318, 2012]

**3.3.170 Smoke Condensate.** The condensed residue of suspended vapors and liquid products of incomplete combustion.

**3.3.171 Smoke Explosion.** See 3.3.17, Backdraft.

**3.3.172 Smoldering.** Combustion without flame, usually with incandescence and smoke.

**3.3.173 Soot.** Black particles of carbon produced in a flame.

**3.3.174 Spalling.** Chipping or pitting of concrete or masonry surfaces.

**3.3.175 Spark.** A moving particle of solid material that emits radiant energy due either to its temperature or the process of combustion on its surface. [654, 2013]

**3.3.176 Specific Gravity (air) (vapor density).** The ratio of the average molecular weight of a gas or vapor to the average molecular weight of air.

**3.3.177 Specific Gravity (of a liquid or solid).** The ratio of the mass of a given volume of a substance to the mass of an equal volume of water at a temperature of 4°C.

**3.3.178 Spoliation.** Loss, destruction, or material alteration of an object or document that is evidence or potential evidence in a legal proceeding by one who has the responsibility for its preservation.

**3.3.179\* Spontaneous Heating.** Process whereby a material increases in temperature without drawing heat from its surroundings.

**3.3.180 Spontaneous Ignition.** Initiation of combustion of a material by an internal chemical or biological reaction that has produced sufficient heat to ignite the material.

**3.3.181 Suppression.** The sum of all the work done to extinguish a fire, beginning at the time of its discovery.

**3.3.182 Target Fuel.** A fuel that is subject to ignition by thermal radiation such as from a flame or a hot gas layer.

**3.3.183\* Temperature.** The degree of sensible heat of a body as measured by a thermometer or similar instrument.

**3.3.184 Thermal Column.** See 3.3.141, Plume.

**3.3.185\* Thermal Expansion.** The increase in length, volume, or surface area of a body with rise in temperature.

**3.3.186 Thermal Inertia.** The properties of a material that characterize its rate of surface temperature rise when exposed to heat; related to the product of the material's thermal conductivity $(k)$, its density $(\rho)$, and its heat capacity $(c)$.

**3.3.187 Thermodynamics.** The branch of physics that deals with the relationship between heat and other forms of energy.

**3.3.188 Thermometry.** The study of the science, methodology, and practice of temperature measurement.

**3.3.189 Thermoplastic.** Plastic materials that soften and melt under exposure to heat and can reach a flowable state.

**3.3.190 Thermoset Plastics.** Plastic materials that are hardened into a permanent shape in the manufacturing process and are not commonly subject to softening when heated; typically form char in a fire.

**3.3.191 Time Line.** Graphic representation of the events in a fire incident displayed in chronological order.

**3.3.192 Total Burn.** A fire scene where a fire continued to burn until most combustibles were consumed and the fire self extinguished due to a lack of fuel or was extinguished when the fuel load was reduced by burning and there was sufficient suppression agent application to extinguish the fire.

**3.3.193 Trailer.** Solid or liquid fuel used to intentionally spread or accelerate the spread of a fire from one area to another.

**3.3.194 Understanding or Agreement.** A written or oral consensus between the interested parties concerning the management of the investigations.

**3.3.195 Upper Layer.** See 3.3.28, Ceiling Layer.

**3.3.196 Vapor.** The gas phase of a substance, particularly of those that are normally liquids or solids at ordinary temperatures. (*See also 3.3.96, Gas.*)

**3.3.197 Vapor Density.** See 3.3.176, Specific Gravity (air) (vapor density).

**3.3.198 Vent.** An opening for the passage of, or dissipation of, fluids such as gases, fumes, smoke, and the like.

**3.3.199 Ventilation.** Circulation of air in any space by natural wind or convection or by fans blowing air into or exhausting air out of a building; a fire-fighting operation of removing smoke and heat from the structure by opening windows and doors or making holes in the roof.

**3.3.200 Ventilation-Controlled Fire.** A fire in which the heat release rate or growth is controlled by the amount of air available to the fire.

**3.3.201 Venting.** The escape of smoke and heat through openings in a building.

**3.3.202 Volt (V).** The unit of electrical pressure (electromotive force) represented by the symbol "E"; the difference in potential required to make a current of one ampere flow through a resistance of one ohm.

**3.3.203 Watt (W).** Unit of power, or rate of work, equal to one joule per second, or the rate of work represented by a current of one ampere under the potential of one volt.

**3.3.204 Work Plans.** An outline of the tasks to be completed as part of the investigation including the order or timeline for completion. See Chapter 15, Planning the Investigation.

## Chapter 4  Basic Methodology

**4.1\* Nature of Fire Investigations.** A fire or explosion investigation is a complex endeavor involving skill, technology, knowledge, and science. The compilation of factual data, as well as an analysis of those facts, should be accomplished objectively, truthfully, and without expectation bias, preconception, or prejudice. The basic methodology of the fire investigation should rely on the use of a systematic approach and attention to all relevant details. The use of a systematic approach often will uncover new factual data for analysis, which may require previous conclusions to be reevaluated. With few exceptions, the proper methodology for a fire or explosion investigation is to first determine and establish the origin(s), then investigate the cause: circumstances, conditions, or agencies that brought the ignition source, fuel, and oxidant together.

**4.2 Systematic Approach.** The systematic approach recommended is based on the scientific method, which is used in the physical sciences. This method provides an organizational and analytical process that is desirable and necessary in a successful fire investigation.

**4.3 Relating Fire Investigation to the Scientific Method.** The scientific method (*see Figure 4.3*) is a principle of inquiry that forms a basis for legitimate scientific and engineering processes, including fire incident investigation. It is applied using the following steps outlined in 4.3.1 through 4.3.10.

**4.3.1 Recognize the Need.** First, one should determine that a problem exists. In this case, a fire or explosion has occurred and the cause should be determined and listed so that future, similar incidents can be prevented.

**4.3.2 Define the Problem.** Having determined that a problem exists, the investigator or analyst should define the manner in which the problem can be solved. In this case, a proper origin



**FIGURE 4.3  Use of the Scientific Method.**

and cause investigation should be conducted. This is done by an examination of the scene and by a combination of other data collection methods, such as the review of previously conducted investigations of the incident, the interviewing of witnesses or other knowledgeable persons, and the results of scientific testing.

**4.3.3 Collect Data.** Facts about the fire incident are now collected by observation, experiment, or other direct data-gathering means. The data collected is called empirical data because it is based on observation or experience and is capable of being verified or known to be true.

**4.3.4\* Analyze the Data.** The scientific method requires that all data collected be analyzed. This is an essential step that must take place before the formation of the final hypothesis. The identification, gathering, and cataloging of data does not equate to data analysis. Analysis of the data is based on the knowledge, training, experience, and expertise of the individual doing the analysis. If the investigator lacks expertise to properly attribute meaning to a piece of data, then assistance should be sought. Understanding the meaning of the data will enable the investigator to form hypotheses based on the evidence, rather than on speculation.

**4.3.5\* Develop a Hypothesis (Inductive Reasoning).** Based on the data analysis, the investigator produces a hypothesis, or hypotheses, to explain the phenomena, whether it be the nature of fire patterns, fire spread, identification of the origin, the ignition sequence, the fire cause, or the causes of damage or responsibility for the fire or explosion incident. This process is referred to as inductive reasoning. These hypotheses should be based solely on the empirical data that the investigator has collected through observation and then developed into explanations for the event, which are based upon the investigator's knowledge, training, experience, and expertise.

**4.3.6\* Test the Hypothesis (Deductive Reasoning).** The investigator does not have a valid or reliable conclusion unless the hypothesis can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis against all the known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident. A hypothesis can be tested either physically by conducting experiments or analytically by applying scientific principles or by referring to scientific research. When relying on research results, the investigator must ensure that the research is applicable to the specific set of circumstances and variables of the incident being analyzed. If the hypothesis cannot withstand an examination by deductive reasoning, it should be discarded as not valid, and the investigator should develop and test a new hypothesis. This process may continue until one or more hypotheses are demonstrated to be valid or until all hypotheses are disproved. Deductive testing proves nothing to be correct and can only determine that the hypothesis can or cannot be disproved and was determined

to be uniquely consistent with the facts and with the principles of science. If no hypothesis can withstand an examination by deductive reasoning, the issue should be considered undetermined.

**4.3.6.1\*** Any hypothesis that is incapable of being tested either physically or analytically, is an invalid hypothesis. A hypothesis developed based on the absence of data is an example of a hypothesis that is incapable of being tested. The inability to refute a hypothesis does not mean that the hypothesis is true.

**4.3.7 Select Final Hypothesis.** The final step in applying the scientific method is to select the final hypothesis. Once the hypothesis has been tested, the investigator should review the entire process to ensure that all credible data are accounted for and all feasible alternate hypotheses have been considered and eliminated. When using the scientific method, the failure to consider alternate hypotheses is a serious error. A critical question to be answered is, "Are there any other hypotheses that are consistent with the data?" The investigator should document the facts that support the final hypothesis to the exclusion of all other reasonable hypotheses.

**4.3.8 Avoid Presumption.** Until data have been collected, no specific hypothesis can be reasonably formed or tested. All investigations of fire and explosion incidents should be approached by the investigator without presumption as to origin, ignition sequence, cause, fire spread, or responsibility for the incident until the use of the scientific method has yielded testable hypotheses, which cannot be disproved by rigorous testing.

**4.3.9 Expectation Bias.** Expectation bias is a well-established phenomenon that occurs in scientific analysis when investigator(s) reach a premature conclusion without having examined or considered all of the relevant data. Instead of collecting and examining all of the data in a logical and unbiased manner to reach a scientifically reliable conclusion, the investigator(s) uses the premature determination to dictate investigative processes, analyses, and, ultimately, conclusions in a way that is not scientifically valid. The introduction of expectation bias into the investigation results in the use of only that data that supports this previously formed conclusion and often results in the misinterpretation and/or the discarding of data that does not support the original opinion. Investigators are strongly cautioned to avoid expectation bias through proper use of the scientific method.

**4.3.10\* Confirmation Bias.** Different hypotheses may be compatible with the same data. When using the scientific method, testing of hypotheses should be designed to disprove a hypothesis (i.e., falsification of the hypothesis), rather than relying only on confirming data that support the hypothesis. Confirmation bias occurs when the investigator relies exclusively on data that supports the hypothesis and fails to look for, ignores, or dismisses contradictory or nonsupporting data. The same data may support alternate and even opposing hypotheses. The failure to consider alternate or opposing hypotheses, or prematurely discounting seemingly contradictory data, without appropriate analysis and testing can result in incorrect conclusions. A hypothesis can be said to be valid only when rigorous testing has failed to disprove the hypothesis. Disproving the hypothesis is a process in which all the evidence is compared against the proffered hypothesis in an effort to find why the hypothesis is not true.

**Method of a Fire Investigation.** Using the scientific method ... fire or explosion incidents should involve the ... 4.4.1 through 4.4.6.

... **Assignment.** The investigator should be ... incident, told what his or her role will be, and what he or she is to accomplish. For example, the investigator ... know if he or she is expected to determine the ... responsibility; produce a written or oral ... for criminal or civil litigation; make suggestions ... enforcement, code promulgation, or changes; make ... to manufacturers, industry associations, or governmental ... action; or determine some other results.

... **Preparing for the Investigation.** The investigator should ... his or her forces and resources and plan the conduct ... investigation. Preplanning at this stage can greatly ... the efficiency and therefore the chances for success of ... investigation. Estimating what tools, equipment, and ... (both laborers and experts) will be needed can ... the initial scene investigation, as well as subsequent investigative examinations and analyses, go more smoothly and be more productive.

**4.4.3 Conducting the Investigation.**

**4.4.3.1** It is during this stage of the investigation that an examination of the incident fire or explosion scene is conducted... fundamental purpose of conducting an examination of any incident scene is to collect all of the available data and document the incident scene. The investigator should conduct an examination of the scene if it is available and collect data necessary to the analysis.

**4.4.3.2** The actual investigation may include different steps and procedures, which will be determined by the purpose of the assignment. These steps and procedures are described in detail elsewhere in the document. A fire or explosion investigation may include all or some of the following tasks: a scene inspection or review of previous scene documentation done by others; scene documentation through photography and diagramming; evidence recognition, documentation, and preservation; witness interviews; review and analysis of the investigations of others; and identification and collection of data from other appropriate sources.

**4.4.3.3** In any incident scene investigation, it is necessary for at least one individual/organization to conduct an examination of the incident scene for the purpose of data collection and documentation. While it is preferable that all subsequent investigators have the opportunity to conduct an independent examination of the incident scene, in practice, not every scene is available at the time of the assignment. The use of previously collected data from a properly documented scene can be used successfully in an analysis of the incident to reach valid conclusions through the appropriate use of the scientific method. Thus, the reliance on previously collected data and scene documentation should not be inherently considered a limitation in the ability to successfully investigate the incident.

**4.4.3.4** The goal of all investigators is to arrive at accurate determinations related to the origin, cause, fire spread, and responsibility for the incident. Improper scene documentation can impair the opportunity of other interested parties to obtain the same evidentiary value from the data. This potential impairment underscores the importance of performing comprehensive scene documentation and data collection.

**4.4.4 Collecting and Preserving Evidence.** Valuable physical evidence should be recognized, documented, properly collected, and preserved for further testing and evaluation or courtroom presentation.

**4.4.5 Analyzing the Incident.** All collected and available data should be analyzed using the principles of the scientific method. Depending on the nature and scope of one's assignment, hypotheses should be developed and tested explaining the origin, ignition sequence, fire spread, fire cause or causes of damage or casualties, or responsibility for the incident.

**4.4.6 Conclusions.** Conclusions, which are final hypotheses, are drawn as a result of testing the hypotheses. Conclusions should be drawn according to the principles expressed in this guide and reported appropriately.

**4.5 Level of Certainty.** The level of certainty describes how strongly someone holds an opinion (conclusion). Someone may hold any opinion to a higher or lower level of certainty. That level is determined by assessing the investigator's confidence in the data, in the analysis of that data, and testing of hypotheses formed. That level of certainty may determine the practical application of the opinion, especially in legal proceedings.

**4.5.1** The investigator should know the level of certainty that is required for providing expert opinions. Two levels of certainty commonly used are probable and possible:

(1) Probable. This level of certainty corresponds to being more likely true than not. At this level of certainty, the likelihood of the hypothesis being true is greater than 50 percent.

(2) Possible. At this level of certainty, the hypothesis can be demonstrated to be feasible but cannot be declared probable. If two or more hypotheses are equally likely, then the level of certainty must be "possible."

**4.5.2** If the level of certainty of an opinion is merely "suspected," the opinion does not qualify as an expert opinion. If the level of certainty is only "possible," the opinion should be specifically expressed as "possible." Only when the level of certainty is considered "probable" should an opinion be expressed with reasonable certainty.

**4.5.3 Expert Opinions.** Many courts have set a threshold of certainty for the investigator to be able to render opinions in court, such as "proven to an acceptable level of certainty," "a reasonable degree of scientific and engineering certainty," or "reasonable degree of certainty within my profession." While these terms of art may be important for the specific jurisdiction or court in which they apply, defining these terms in those contexts is beyond the scope of this document.

**4.6 Review Procedure.** A review of a fire investigator's work product (e.g., reports, documentation, notes, diagrams, photos, etc.) by other persons may be helpful, but there are certain limitations. This section describes the types of reviews and their appropriate uses and limitations.

**4.6.1 Administrative Review.** An administrative review is one typically carried out within an organization to ensure that the investigator's work product meets the organization's quality assurance requirements. An administrative reviewer will determine whether all of the steps outlined in an organization's procedure manual, or required by agency policy, have been followed and whether all of the appropriate documentation is

present in the file, and may check for typographical or grammatical errors.

**4.6.1.1 Limitations of Administrative Reviews.** An administrative reviewer may not necessarily possess all of the knowledge, skills, and abilities of the investigator or of a technical reviewer. As such, the administrative reviewer may not be able to provide a substantive critique of the investigator's work product.

**4.6.2 Technical Review.** A technical review can have multiple facets. If a technical reviewer has been asked to critique all aspects of the investigator's work product, then the technical reviewer should be qualified and familiar with all aspects of proper fire investigation and should, at a minimum, have access to all of the documentation available to the investigator whose work is being reviewed. If a technical reviewer has been asked to critique only specific aspects of the investigator's work product, then the technical reviewer should be qualified and familiar with those specific aspects and, at a minimum, have access to all documentation relevant to those aspects. A technical review can serve as an additional test of the various aspects of the investigator's work product.

**4.6.2.1 Limitations of Technical Reviews.** While a technical review may add significant value to an investigation, technical reviewers may be perceived as having an interest in the outcome of the review. Confirmation bias (attempting to confirm a hypothesis rather than attempting to disprove it) is a subset of expectation bias (see 4.3.9). This kind of bias can be introduced in the context of working relationships or friendships. Investigators who are asked to review a colleague's findings should strive to maintain a level of professional detachment.

**4.6.3 Peer Review.** Peer review is a formal procedure generally employed in prepublication review of scientific or technical documents and screening of grant applications by research-sponsoring agencies. Peer review carries with it connotations of both independence and objectivity. Peer reviewers should not have any interest in the outcome of the review. The author does not select the reviewers, and reviews are often conducted anonymously. As such, the term "peer review" should not be applied to reviews of an investigator's work by coworkers, supervisors, or investigators from agencies conducting investigations of the same incident. Such reviews are more appropriately characterized as "technical reviews," as described above.

**4.6.3.1** The methodologies used and the fire science relied on by an investigator are subject to peer review. For example, NFPA 921 is a peer-reviewed document describing the methodologies and science associated with proper fire and explosion investigations.

**4.6.3.2 Limitations of Peer Reviews.** Peer reviewers should have the expertise to detect logic flaws and inappropriate applications of methodology or scientific principles, but because they generally have no basis to question an investigator's data, they are unlikely to be able to detect factual errors or incorrectly reported data. Conclusions based on incorrect data are likely to be incorrect themselves. Because of these limitations, a proper technical review will provide the best means to adequately assess the validity of the investigation's results.

**4.7 Reporting Procedure.** The reporting procedure may take many written or oral forms, depending on the specific responsibility of the investigator. Pertinent information should be reported in a proper form and forum to help prevent recurrence.

## Chapter 5  Basic Fire Science

**5.1 Introduction.** The fire investigator should have an understanding of ignition and combustion principles and should be able to use them to help in the identification and interpretation of evidence at the fire scene and in the development and testing of hypotheses regarding the origin and cause of the fire. The body of knowledge associated with combustion and fire could easily fill several textbooks. The discussion presented in this chapter should be considered introductory. (See Annex A and Annex C for additional information.)

**5.1.1\*  Fire and Energy.** Fire is a rapid oxidation process, which is an exothermic chemical reaction, resulting in the release of heat and light energy in varying intensities. It is important that the fire investigator understands the basic concepts of energy, power, and heat flux and how the units of measurement for each are used to describe the behavior of fire.

**5.1.2 Energy.** Energy is a property of matter that manifests as an ability to perform work, either by moving over a distance against a force or by transferring heat. Energy can be changed in form (e.g., from chemical to mechanical energy), or transferred to other matter, but it can neither be created nor destroyed. Energy is measured in joules (J), calories (cal), or British thermal units (Btu). A joule is the heat produced where one ampere is passed through a resistance of one ohm for one second, or it is the work required to move over a distance of one meter against a force of one newton. A calorie is the amount of energy required to raise the temperature of 1 g of water by 1°C (e.g., from 14°C to 15°C); a calorie is equal to 4.184 J. A Btu is the quantity of heat required to raise the temperature of 1 lb of water 1°F at a pressure of 1 atmosphere and temperature of 60°F; a British thermal unit is equal to 1055 J, and 252.15 cal.

**5.1.3 Power.** Power is a property that describes energy released per unit time. The same amount of energy is required to carry a load up a flight of stairs whether the person carrying it walks or runs, but more power is needed for running because the work is done in a shorter amount of time. Raising the temperature of a volume of water requires the same amount of energy whether the temperature increase takes place in 10 sec or in 10 min. Raising the temperature more quickly requires that the energy be transferred more quickly. Power is measured in joules per second (J/s) or watts (W).

**5.1.4 Heat Flux.** Heat flux is a term that describes the amount of power transferred per unit area. A kilowatt spread over 1 m² is approximately equal to the radiant heat flux outdoors on a sunny day. If that same kilowatt is concentrated using a magnifying glass and only spread over .05 m² (500 cm²), there may be sufficient energy transferred to that area to cause ignition of combustibles. Heat flux is measured in kW/m² or W/cm².

**5.1.5 Fire Tetrahedron.** The combustion reaction can be characterized by four components: the fuel, the oxidizing agent, the heat, and the uninhibited chemical chain reaction. These four components have been classically symbolized by a four-sided solid geometric form called a tetrahedron.

... and Rate of Pressure Rise for Combusti... E1226). This test method, from ASTM ... *Pressure and Rate of Pressure Rise for Combus-* ... used to measure composition limits of explo-... ignition, and explosion pressures of dusts and ...

... Visible Smoke Release Rates for Materials ... Using an Oxygen Consumption Calorimeter. ... from ASTM E1354, *Standard Test Method for* ... *Smoke Release Rates for Materials and Products* ... *Consumption Calorimeter*, is a bench-scale labora-... for measuring heat release rate, radiant igniti-... production, mass loss rate, and combustion ... such gases as carbon monoxide and ... from burning materials.

... Ignition Properties of Plastics (ASTM D1929). ... method from ASTM D1929, *Standard Test Method for* ... *Ignition Temperature of Plastics*, covers a laboratory ... of the self-ignition and flash-ignition tempera-... using a hot-air ignition furnace.

... Dielectric Withstand Voltage (Mil-Std–202F Method ... test method, from Mil-Std–202F, *Test Method for Elec-*... *...*, also called high-potential, over-... voltage breakdown, or dielectric strength test, ... the application of a voltage higher than rated volt-... specific time between mutually insulated portions of a ... part or between insulated portions and ground.

... Insulation Resistance (Mil-Std–202F Method 302). ... from Mil-Std–202F, *Test Method for Electronic and Electri-*... *...* measures the resistance offered by the insulat-... members of a component part to an impressed direct ... tending to produce a leakage current through or on ... of these members.

... Sufficiency of Samples. Fire investigators should be ... with capabilities and limitations of the scientific labora-... equipment. Not understanding these limitations can result ... the fire investigator collecting a quantity of physical evidence ... too small to examine or test.

... Certainly, the fire investigator will not always have ... opportunity to determine the quantity of physical evidence ... he or she can collect. Often, the fire investigator can collect ... that quantity that is discovered during his or her investiga-...

... Each laboratory examination or test requires a ... minimum quantity of physical evidence to facilitate ... and accurate results. The fire investigator should be ... with these minimum requirements. The laboratory ... examines or tests the physical evidence should be consul-... concerning these minimum quantities.

... Comparative Examination and Testing.

... During the course of certain fire investigations, the ... investigator may wish to have appliances, electrical equip-... or other products examined to determine their compli-... with recognized standards. Such standards are published ... the American Society for Testing and Materials, Underwrit-... Laboratories Inc., and other agencies.

... Another method of comparative examination and ... testing involves the use of an exemplar appliance or product. ... Utilizing an exemplar allows the testing of an undamaged

example of a particular appliance or product to determine whether it was capable of causing the fire. The sample should be the same make and model as the product involved in the fire.

**17.11 Evidence Disposition.**

**17.11.1** The fire investigator is often faced with disposing of evidence after an investigation has been completed. The investigator should not destroy or discard evidence unless proper authorization is received. Circumstances may require that evidence be retained for many years and ultimately may be returned to the owner.

**17.11.2** Criminal cases such as arson require that the evidence be kept until the case is adjudicated. During the trial, evidence submitted — such as reports, photographs, diagrams, and items of physical evidence — will become part of the court record and will be kept by the courts. Volatile or large physical items may be returned to the investigator by the court. There may be other evidence still in the investigator's possession that was not used in the trial. Once all appeals have been exhausted, the investigator may petition the court to either destroy or distribute all of the evidence accordingly. A written record of authorization to dispose of the evidence should be kept. The criminal investigator should be mindful of potential civil cases resulting from this incident, which may require retention of the evidence beyond the criminal proceedings.

## Chapter 18   Origin Determination

**18.1 Introduction.** This chapter recommends a methodology to follow in determining the origin of a fire. The *area of origin* is defined as a structure, part of a structure, or general geographic location within a fire scene, in which the "point of origin" of a fire or explosion is reasonably believed to be located. The *point of origin* is defined as the exact physical location within the area of origin where a heat source and the fuel interact, resulting in a fire or explosion. The origin of a fire is one of the most important hypotheses that an investigator develops and tests during the investigation. Generally, if the origin cannot be determined, the cause cannot be determined, and generally, if the correct origin is not identified, the subsequent cause determination will also be incorrect. The purpose of determining the origin of the fire is to identify in three dimensions the locations at which the fire began.

**18.1.1** This chapter deals primarily with the determination of origin involving structures; however, the methodology generally applies to all origin determinations. Separate chapters address the particular requirements for determining origin in non-structure fire incidents (motor vehicles, boats, wildfire, etc.).

**18.1.2** Determination of the origin of the fire involves the coordination of information derived from one or more of the following:

(1) *Witness Information and/or Electronic Data.* The analysis of observations reported by persons who witnessed the fire or were aware of conditions present at the time of the fire as well as the analysis of electronic data such as security camera footage, alarm system activation, or other such data recorded in and around the time of the fire event

(2) *Fire Patterns.* The analysis of effects and patterns left by the fire (see Chapter 6)

(3) *Arc Mapping.* The analysis of the locations where electrical arcing has caused damage and the documentation of the involved electrical circuits *(see Section 9.10)*

(4) *Fire Dynamics.* The analysis of the fire dynamics [i.e., the physics and chemistry of fire initiation and growth *(see Chapter 5)* and the interaction between the fire and the building's systems *(see Chapter 7)*]

**18.2 Overall Methodology.** The overall methodology for determining the origin of the fire is the scientific method as described in Chapter 4. This methodology includes recognizing and defining the problem to be solved, collecting data, analyzing the data, developing a hypothesis or hypotheses, and most importantly, testing the hypothesis or hypotheses. In order to use the scientific method, the investigator must develop at least one hypothesis based on the data available at the time. These hypotheses should be considered "working hypotheses," which upon testing may be discarded, revised, or expanded in detail as new data is collected during the investigation and new analyses are applied. This process is repeated as new information becomes available. *(See Figure 18.2.)*

**18.2.1** Testing any origin hypothesis requires an understanding of the associated fire events as well as the growth of the fire and how the fire spread through the structure. A narrow focus on only identifying the first item ignited and a competent ignition source fails to take into account important data that can be used to test any origin hypothesis. In such a narrow focus, the growth and spread of the fire and the resulting fire damage are not well considered.

**18.2.1.1** The purpose of the fire spread analysis is to determine whether the resulting physical damage and available data are consistent with the area of origin hypothesis. For example, a fire starting in a wastebasket is a plausible working hypothesis, but the resulting fire damage would be highly dependent on the position of the initial fuel and any subsequently ignited fuels. If the wastebasket had been located in an area with no adjacent fuel, then the results may be significantly different than if the wastebasket had been located next to a polyurethane sofa. Both hypotheses posit the same first item ignited, but the outcome is very different. Thus, if the origin hypothesis is not consistent with the resulting growth and spread of the fire, it is not a valid hypothesis. Fire spread scenarios within a compartment or building should be analyzed using the principles of fire dynamics presented in Chapter 5 and fire pattern development in Chapter 6.

**18.2.1.2** In some instances, a single item, such as an irrefutable article of physical evidence or a credible eyewitness to the ignition, or a video recording, may be the basis for a determination of origin. In most cases, however, no single item is sufficient in itself. The investigator should use all available resources to develop origin and spread hypotheses and to determine which hypotheses fit all of the evidence available. When an apparently plausible hypothesis fails to fit some item of evidence, the investigator should try to reconcile the two and determine whether the hypothesis or the evidence is erroneous.

**18.2.1.3** In some cases, it will be impossible to fix the point of origin of a fire. Where a single point cannot be identified, it can still be valuable for many purposes to identify the area(s) of origin. In such instances, the investigator should be able to provide plausible explanations for the area of origin with the supporting evidence for each option. Not identifying an origin and origin will not necessarily preclude determining an origin and



**Example of Applying the Scientific Method to Origin Determination**

**Recognize the Need**
A fire has occurred
The origin is unknown

**Define the Problem**
Determine the origin

**Collect Data**
Basic site data
Determine pre-fire conditions
Documentation of post-fire conditions
Excavation, examination, and reconstruction of the scene
Witness statements and observations
Fire department information
Alarm, detector, and security data

**Analyze the Data**
Pattern analysis
Identify ventilation-generated patterns
Heat and flame vector analysis
Origin matrix analysis
Depth of char and calcination surveys
Arc mapping
Event sequencing
Fire dynamics consideration
Building construction and occupancy considerations

**Develop Hypotheses**
Initial origin hypotheses
Working origin hypotheses
Alternate hypotheses

**Test the Hypotheses**
Is there a competent ignition source at the origin?
Does the origin explain the data?
Are contradictions resolved?
Does an alternate origin explain the data equally well?

**Select Final Hypothesis**
Area of origin
Point of origin
Origin insufficient to determine cause

**FIGURE 18.2   An Example of Applying the Scientific** [...] **to Origin Determination.**

cause. In some situations, the extent of the damage may [...] the ability to specifically identify the point of origin [...] removing the ability to put forward credible origin [...] hypotheses.

**18.2.2 Sequence of Activities.** The various activities [...] to determine the origin using the scientific meth[...] collection, analysis, hypothesis development, and [...] testing) occur continuously. Likewise, record[...] note taking, photography, evidence identification [...] interviews, cause investigation, failure analysis, and [...] collection activities may be performed simultane[...] these efforts. Generally, the various activities of [...] nation will follow a routine sequence, while the aspe[...] within each activity may be taking place at the same [...]

**Sequential Pattern Analysis.** The area of origin may be [determined] by examining the fire effects and fire patterns. The [investigator should] in the fire scene record all of the fire patterns generated during the lifetime of the event, from ignition through extinguishment, although these patterns may be altered, overwritten, or obliterated after they are produced. The key to determining the sequence of a fire is to determine the sequence in which the patterns were produced. Investigators should strive to identify and collect sequential data and, once collected, organize the information into a sequential format. An important factor in determining the sequence of pattern production is considering whether the pattern can be accounted for in the ventilation.

**Systematic Procedure.** Investigators should establish a systematic procedure to follow for each type of incident. By following a familiar procedure, the investigator can concentrate on the incident at hand and need not dwell on the details of what the next step in the procedure will be. By doing so, the investigator may avoid overlooking significant evidence and will avoid forming premature conclusions about the origin.

**18.2.5 Recommended Methodology.** This chapter discusses a recommended methodology for the examination of the fire scene. This methodology consists of an initial scene assessment, development of a preliminary fire spread hypothesis, an in-depth examination of the fire scene and reconstruction of the fire scene, development of a final fire spread hypothesis, and identification of the fire's origin. Origin identification may occur earlier in the process, depending on the types and time of arrival of various data. This recommended methodology serves to inform the investigator but is not meant to limit the origin determination to only this procedure. Investigators, within the scope of their investigations, should consider all aspects of the fire event during the investigation. Witness statements, the investigator's expertise, and fire-fighting procedures all play important roles in the determination of the fire origin.

**18.3 Data Collection for Origin Determination.** This section describes the data collection process for origin determination, including initial scene assessment, excavation and reconstruction, and collection of additional data from witnesses and other sources.

**18.3.1 Initial Scene Assessment.** An initial assessment should be made of the fire scene. As the investigator starts the initial scene assessment, data collection for the determination of the origin begins. Care should be taken during each of the steps within the initial scene assessment to protect the investigator from scene hazards and preserve the scene. The purpose of this initial examination is to determine the scope of the investigation, such as equipment and manpower needed, to determine the safety of the fire scene, and to determine the areas that warrant further study.

**18.3.1.1 Safety Assessment.** The investigator should first make an initial safety assessment. The investigator should determine if it is safe to enter the scene. If it is not safe to enter, the investigator must determine what steps are required to provide for personal safety or to render the scene safe to enter. Each of the hazards described in Chapter 13 should be assessed. There is no reason the investigator should compromise safety.

**18.3.1.2 Scope of the Examination.** After safety issues have been addressed, the investigator may begin the initial scene assessment. The purpose of this initial assessment is to deter-mine the complexity and extent of the investigation, identify required equipment and staffing, and determine the areas that warrant further analysis.

**18.3.1.3 Order of the Examination.** This assessment may take place concurrently with the initial documentation of the scene. The assessment should include an overall look at the entire scene or structure, both exterior and interior, and all pertinent areas. The order in which the assessment takes place may vary, depending on scene conditions. Some investigators prefer to start with the least damaged area and move toward the most damaged area. Some investigators prefer to start at the highest point in a scene and work downward. Whatever order is selected for a particular scene, the point is to assess all areas that are pertinent to the origin and spread of the fire.

**18.3.1.4 Surrounding Areas.** Investigators should include in their examination the site or areas around the scene. These areas may exhibit significant evidence or fire patterns, away from the main body of the scene, that may enable the investigator to better define the site and the investigation. Anything of interest should be documented as to its location in reference to the scene. This phase of the examination can be used to canvass the neighborhood for witnesses to the fire and for persons who could provide information about the incident.

**18.3.1.5 Structure Exterior.** An inspection of the entire perimeter of the structure may reveal the extent and location of damage and may help determine the size and complexity of the scene. The general construction method and occupancy classification should be noted. The construction refers to how the building was built, types of materials used, exterior surfaces, previous remodeling, and any unusual features that may have affected how the fire began and spread. A significant consideration is the degree of destruction that can occur in a structure consisting of mixed types and methods of construction.

**18.3.1.5.1** The occupancy classification refers to the current use of the building. Use is defined as the activities conducted and the manner in which such activities are undertaken. The number and circumstances of those individuals occupying the space may also be relevant. If the occupancy classification or use of the structure has changed, this should be considered and noted. Changes in use and occupancy classification sometimes require modifications to the structural, architectural, or fire protection features in accordance with applicable codes. Such modifications may or may not have been undertaken.

**18.3.1.5.2** The fire damage and evidence of significant smoke, heat, and flame venting on the exterior should be documented and considered to assist in determining those areas that warrant further study. An in-depth examination of fire effects and patterns is not necessary at this point in the investigation.

**18.3.1.6 Structure Interior.** On the initial assessment, investigators should examine all rooms and other areas that may be relevant to the investigation, including those areas that are fire damaged or adjacent to the fire- and smoke-damaged areas. The primary purpose of this assessment is to identify the areas that need more detailed examination. The investigator should be observant of conditions of occupancy, including methods of storage, nature of contents, housekeeping, and maintenance. The type of construction, interior finish(es), and furnishings should be noted. Areas of damage and extent of damage in each area (e.g., severe, minor, or none) should be noted. The investigator should attempt to identify which compartments

became fully involved (i.e., ventilation-controlled) and which did not. This damage should be compared with the damage seen on the exterior. During this examination, the investigator should reassess the soundness of the structure.

**18.3.1.7 Post-Fire Alterations.** During this assessment, the investigator should document any indication of post-fire alterations. Such alterations may affect the investigator's interpretation of the physical evidence. Alterations may include debris removal or movement, contents removal or movement, electrical service panel alterations, changes in valve positions on automatic sprinkler systems, and changes to fuel gas systems. If alterations are indicated, attempts should be made to contact the person(s) who altered the scene. They should be interviewed as to the extent of the alterations and the documentation they may have of the unaltered site.

**18.3.1.8** At the conclusion of the preliminary scene assessment, the investigator should have determined the safety of the fire scene, the probable staffing and equipment requirements, and the areas around and in the structure that will require a detailed examination. The preliminary scene assessment is an important aspect of the investigation. The investigator should take as much time in this assessment as is needed to make these determinations. Time spent in this endeavor may save significant time and effort in later stages of the investigation.

**18.3.2 Excavation and Reconstruction.** Fire scene excavation (the examination, layering, and removal of debris) and reconstruction allows the investigator to observe patterns on exposed surfaces and to locate evidence that can assist in making an accurate origin analysis. The purpose of fire scene reconstruction is to recreate, as nearly as practicable the pre-fire positions of contents and structural components. Interviews, diagrams, photographs, and other means can be helpful in establishing pre-fire conditions.

**18.3.2.1 Scope of Excavation and Reconstruction.** *[text obscured]*

**18.3.2.2 Safety.** Safe work practices throughout this effort are required. Debris excavation and removal can weaken a structure and cause it to collapse. Debris removal can also expose hazardous substances, uncover holes in the floor, and can expose energized electrical wiring. All significant risks that may be encountered during an investigation should be minimized before the investigation continues. See Chapter 13 for a detailed discussion on safety.

**18.3.2.3 Excavation.** Adequate debris removal is essential for a thorough fire investigation. Inadequate removal of debris and the resultant exposure of limited portions of the fire patterns and other evidence may lead to an incorrect analysis. A fire scene investigation normally involves dirty and strenuous work. Acceptance of this fact is essential in conducting a proper fire investigation.





**FIGURE 18.3.2.1  Walls and Ceiling Reconstructed on Floor to Observe Patterns.**

**18.3.2.3.1** The removal of debris during the overhaul stage of fire suppression operations is an area of concern for the fire investigator. Firefighters may disturb the scene, thus making origin determination more difficult. Only those overhaul and suppression operations necessary to ensure complete extinguishment should be conducted. When these operations call for substantial scene alterations, an attempt should be made to document the fire scene with photography and notes prior to the alterations, if practical.

**18.3.2.3.2** Investigators should consider where debris will be placed during removal. In some instances, it may be desirable to move the debris to a secure location. Debris should only be moved to an area that has already been examined or has no future need for examination or documentation. Moving debris twice is counterproductive. Debris removal should be performed in a planned and systematic fashion. This means that debris should be removed in layers, with adequate documentation as the process continues. If more than one investigator is doing the removal, they should discuss the purpose of the debris removal prior to starting. A discussion may prevent one investigator from discarding something the other investigator considers important. Each layer should be examined for significant artifacts as the debris is being removed.

**18.3.2.3.3** During the excavation of a scene there is a danger of evidence destruction. Although it is desirable to work efficiently, the use of heavy equipment to remove debris should only be undertaken if it is not practical to use hand tools to accomplish the task. Inappropriate use of mechanized digging equipment can potentially destroy more evidence than it reveals.

**18.3.2.4 Heavy Equipment.** An investigation may require the use of heavy equipment such as cranes, backhoes, or front-end loaders. The condition of the fire scene may require the removal of building components or contents. Because they constitute a safety hazard, are blocking access, or need to be removed during the systematic examination of the scene. Before using heavy equipment, the scene should be documented in the same manner as in all investigations. Documentation should also be conducted at frequent intervals while the equipment is being used.

**18.3.2.4.1** Working with heavy equipment can be dangerous and noisy. One investigator should be appointed to *[text cut off]*

ORIGIN DETERMINATION

the heavy equipment operator. A briefing session setting the goals for this section should be held with the operator as the investigation advances into new physical areas. The speed at which fire investigations occur is substantially lower than the ordinary speed at which heavy equipment operates. A commonly understood set of hand signals should be determined before beginning to use heavy equipment so that the operator is clear from where direction comes and what the meaning of hand signals indicating specific actions. To reduce the risk of personal injury, the operation of heavy equipment should cease whenever a person enters the area of and where the machine is operating.

18.3.2.4.2 Prior to the use of heavy equipment, areas where the presence of ignitible liquid residue is suspected should be identified, if practicable. When possible, the samples should be collected prior to the use of equipment in those areas. The heavy equipment should be inspected and any leaks of petroleum products should be noted. Fueling of the equipment should occur in a designated area, removed from the areas of interest, that will not contaminate the scene or items entering the scene. If contamination is of concern, samples of the equipment fluids should be collected for comparison.

18.3.2.4.3 It is preferable to utilize the heavy equipment in a manner that has the least impact on the scene. The least destruction is usually accomplished by positioning the equipment outside the building and using the equipment to lift or move items from the inside to the outside of the building. When lifting a potential piece of evidence, rigging can be used to minimize damage to the removed item. If large components such as walls need to be demolished, it is preferable to do so in a manner that does not change or add debris to the underlying area to be examined. Safety concerns and site constraints can preclude this practice. Shoring should be considered as an alternative to demolition when possible and appropriate.

18.3.2.4.4 Items that are removed from the building can be examined and documented, and can remain at the fire scene if needed for further investigation. The removal of debris offsite can limit further investigation, but is sometimes necessary. Removal off site should be well documented.

18.3.2.4.5 Some investigations will require the use of heavy equipment inside the scene. In such cases, equipment should be used in a manner that is the least disruptive of the scene. One method involves using the equipment to systematically progress into a building. The equipment is initially positioned outside the building and used to aid the examination of a portion of the interior of the building. Once that area is examined, documented, and the debris removed, the heavy equipment is brought onto that cleared location. From that new position, the equipment is used to aid in the examination of adjacent areas. This progression is repeated as many times as needed. At all times, the equipment is only located in areas that have been previously examined and documented. At all times, the equipment operator should be under the direction of a fire investigator. The collection and unloading of each load should be observed for relevant evidence. Preplanning the progression of the examination can help to limit unnecessary alteration of the scene.

18.3.2.5 Avoiding Spoliation. During the excavation, care should be taken to avoid damaging ignition sources, fuels, or other potentially important evidence within the scene. If the investigator's area of interest contains important evidence,

consideration should be given to suspending the investigation and putting potentially interested parties on notice, to give them an opportunity to see the evidence in place. For more guidance on the subject of avoiding spoliation, refer to Chapter 12.

18.3.2.6 Avoiding Contamination. To avoid scene contamination, extreme care should be taken with respect to the use of portable liquid-fueled equipment, such as gasoline-powered saws. Re-fueling of such equipment should be done away from the structure.

18.3.2.7 Washing Floors. After adequate debris removal has occurred, necessary samples have been taken for examination or testing, and proper scene documentation is completed, it may be useful to flush the floor or surface with water. This flushing may help to better reveal fire patterns. The use of high pressure and straight streams should be used with caution because such activities may harm significant evidence. [See Figure 18.3.2.7(a) and Figure 18.3.2.7(b).]

18.3.2.8 Contents. Any contents, or their remains, uncovered during debris removal should be documented as to their location, condition, and orientation. Once the debris has been removed, the contents can be placed in their pre-fire positions for analysis.



**FIGURE 18.3.2.7(a)** Washing Floors May Assist in Identifying Patterns.



**FIGURE 18.3.2.7(b)** Washing Floors May Assist in Identifying Patterns.

**18.3.2.8.1** When the contents have been displaced during fire suppression or overhaul, post-fire reconstruction becomes much more difficult. The position where the item was located may exhibit a protected area or other indicator from the item, such as table legs leaving small clear spots on the floor. The problem is knowing which leg goes to which spot. If a definite determination is not possible by scene analysis or witness identification, then all potential orientations should be considered. Otherwise, the orientation should not be included in the fire scene reconstruction. A guess as to how contents were oriented may be wrong, thereby contributing false data to the analysis process. An alternative is to document the contents in all probable positions in the hope that later information will pinpoint the accurate location.

**18.3.2.8.2** In addition to the replacement of contents, reconstruction may also include the replacement of structural elements (e.g., doors, joists, studs, sections of walls and floors) that may have recorded fire patterns.

**18.3.3 Additional Data Collection Activities for Origin Determination.** The following paragraphs describe activities in addition to the scene examination and reconstruction, which will lead to the development of data useful in the determination of the origin.

**18.3.3.1 Pre-Fire Conditions.** The pre-fire conditions of the structure should be determined to the extent practicable. Details such as the state of repair, condition of foundations and chimneys, insect damage, the presence and condition of fire protection systems, and so forth may prove to be significant data. Obtaining pre-fire photographs or video may be beneficial, but be aware that changes may have occurred between the time the photograph was taken and the time of the fire. Owners, employees, or occupants may be able to provide information and diagrams of pre-fire conditions. Checking with neighbors may also provide photographs showing the structure. Some jurisdictions now offer pre-fire photographs of the structure on tax record websites. There are companies specializing in aerial photography, primarily of commercial structures, which may offer pre-fire views. Satellite images are also available for many areas and may offer pre-fire documentation of both the site and the surrounding area. Additional information may be available from the fire department, which could include photographs, structure diagrams, special hazards, and fire protection systems. Other government agencies may also have pre-fire information and records.

**18.3.3.2 Description of Fuels.** The investigator should identify the fuels present in the building or area of interest and the characteristics of those fuels. When considering the area of origin, the type, quantity, and specific location of structural and content fuels should be identified to assist in the analysis of the fire patterns, fire growth, and spread characteristics. In this process, it is not only important to identify the potential first fuel ignited, but also to identify subsequent fuels involved.

**18.3.3.3 Structure Dimensions.** The physical dimensions of a structure are important data. In many instances, the post-fire structure provides the only means of obtaining dimensions. Dimensions should be recorded for all areas of the structure that may be used to understand fire growth, and smoke and fire spread. Dimensions should include the width, length, and height of a room or structure. The location, size, and condition (opened/closed) of all openings should be recorded, as well as any structures or obstructions that would affect the flow of fire gases. The effort associated with obtaining the dimensions can

be time consuming and the amount of information collected may be limited depending on the extent of destruction. Specific dimensional information is necessary to reconstruct the fire event via a fire model or hand calculations (*see Chapter 22*). When the scene is no longer available, information may be obtained from the investigative photographs, notes and diagrams of previous investigators, or from architects, engineers, contractors, insurance companies, or government offices such as building departments. The investigator should assess the accuracy of the plans and whether the plans actually represent the "as-built" structure. (*See the discussion of building design in 7.2.2.6.*)

**18.3.3.4 Building Systems and Ventilation.** Building systems may cause fires or influence the fire spread. The investigator should consider collecting information regarding the pre-fire conditions of the electrical, HVAC, fuel gas, and fire protection systems in a structure. This collection should be performed in all cases when a system is believed to be involved in the cause, detection, spread, or extinguishment of a fire.

**18.3.3.5 Weather Conditions.** The investigator should document weather factors that may have influenced the fire. The surrounding area may provide evidence of the weather conditions. Wind direction may be indicated by smoke movement or by fire damage sustained by structures or vegetation. Additionally, post-fire weather may cause changes to the physical condition of the scene.

**18.3.3.6 Electrical Systems.** The electrical system should be documented. The means used to distribute electricity should be determined, and damage to the systems should be documented. The documentation process should begin with the incoming electrical service. The main panel amperage and voltage input should be noted. The type, rating, position (tripped/off), and condition of the circuit protection devices may be relevant to the investigation and should be documented.

**18.3.3.7 Electrical Loads.** Note the location of receptacles and switches within the room or area of interest. Electrical items plugged into the receptacles should be identified and documented. The investigative process may include the tracing of circuits throughout a structure. The purpose of tracing these circuits is to identify the switches, receptacles, or fixtures on a particular circuit, as well as which overcurrent device protects that circuit, and its position and condition. Electrical appliances and loads should be noted. More detailed documentation of electrical systems and loads may be necessary where they are believed to be the fire cause or contributing factor, or when arc mapping is used, or especially when interpreting damage to electrical wiring and devices because it may be difficult to distinguish cause from effect. For a more detailed explanation of electrical systems, see Chapter 9.

**18.3.3.8 HVAC Systems.** The air movement through HVAC systems can affect the growth and spread of a fire and transport combustion products throughout a structure. The investigator should record the location, size, and type (supply/return/exhaust) of vents in the area of origin and whether the vent was open, closed, or covered at the time of the fire. Checking filters may provide evidence regarding smoke damage and soot deposition to determine whether the HVAC system was operating at the time of the fire. Some systems are equipped with detectors designed to cause operation of the system in case of fire. Some systems are equipped with manual or automatic dampers designed

movement, or airflow. Where these devices are [pre]sent, location and condition should be noted [and loc]ation records should be obtained. The location [of any] thermostats, switches, or controls for the [devices] should be identified and documented.

Gas Systems. The fuel gas supply should be [examined and] documented. The purpose of this examination is [in] determining whether the fuel gas contributed to the [fire. If ex]amination reveals that fuel gases may have been a [relevant] factor, then the system should be examined and [tested] in detail. This examination should include testing [where] possible, and determining the supply pressure, if [As] with electrical systems, it may be difficult to distin-[guish] evidence of cause and effect. Fires can, and [do,] compromise the integrity of gas distribution [systems. The] investigator should document the condition and [position (] open/closed) of system valves. Valves are frequently [operated] during fires, so an attempt should be made to ascer-[tain if] anyone operated any valves during the event.

Liquid Fuel Systems. A variety of liquid fuel systems [appli]ances exists. These may be permanent systems, such [as] space heaters and water heaters, or portable systems, [like kero]sene or white gas heaters. In either case, the loca-[tion and] quantity of fuel present should be documented. [Fuel] lines and valves to connected fuel supplies in remote [areas] should also be documented. If the device contains an [attached] or integral tank, the amount of fuel remaining in the [tank] should be estimated or measured. If the heating device [is a sus]pected cause, or its fuel is believed to have contributed [to the] spread of the fire, a sample of the fuel should be [preserved.]

18.3.3.11 Fire Protection Systems. The examination of all [invol]ved fire protection systems (fire detection, fire alarm, and [fire sup]pression systems) is important in determining if each [system] functioned properly, and can assist in tracking the [growth] and spread of a fire. If the system was monitored, [records] should be obtained from the monitoring service. In [some] instances, information can be downloaded from the [central] panel to indicate alarm and trouble signal locations and [times.] This is volatile data and care must be taken in extracting [it] from the alarm panel. Extracting this data generally requires [specific] knowledge and equipment. A qualified technician [should] be employed for downloading the data as substantial [permanent] loss of data can occur if this is done incorrectly. In [many] cases, building electrical power may be discontinued [after] a fire so that a limited amount of time is available for [re]covering the data while the system is operating on its backup [battery.] This limited time window should be taken into account [when] ordering scene activities.

18.3.3.12 Fire Protection System Data. Device locations and [conditions] should be documented, including the height of [wall-mounted] devices or the distance of ceiling-mounted devi-[ces] from walls. Which sprinklers activated should be considered [when] examining fire spread patterns. Both detector activation [and] sprinkler activation may provide sequential data. In some [cases,] the specific location or zone of the first activating detec-[tor] or sprinkler can be used to narrow down an area of origin, [allowing] an investigator to assess specific ignition sources in [that] area. Some systems provide only alarm or water flow data, [and] do not specify a particular zone. This information can be [helpful] in comparing the time of system activation to the time

and observations of first arriving fire fighters or other witness, in assessment of the growth and spread of the fire.

18.3.3.13 Security Cameras. Security cameras that monitor buildings or ATMs may be very useful, particularly for provid-ing "hard" times (see the discussion of timelines in Chapter 25). Events before or during the fire including, in some cases, the actual ignition and development of the fire may have been recorded. The video recorder may be found in a secure area or a remote location. It should be recovered and reviewed even if damaged.

18.3.3.14 Intrusion Alarm Systems. An intrusion system may activate during a fire due to heat, smoke movement, the destruction of wiring, or loss of power. A monitored intrusion system may send a trouble signal to the monitoring station if a transmission line is compromised or power is lost. As with fire alarm systems, attempts should be made to recover the alarm panel history before the alarm system is reset. This frequently requires special expertise. Some alarm systems may record the identity of persons entering and leaving the building.

18.3.3.15 Witness Observations. Observations by witnesses are data that can be used in the context of determining the origin. Such witnesses can provide knowledge of conditions prior to, during, and after the fire event. Witnesses may be able to provide photographs or videotapes of the scene before or during the fire. Observations are not necessarily limited to visual observations. Sounds, smells, and perceptions of heat may shed light on the origin. Witness statements regarding the location of the origin create a need for the fire investigator to conduct as thorough an investigation as possible to collect data that can support or refute the witness statements. When witness statements are not supported by the investigator's interpreta-tion of the physical evidence, the investigator should evaluate each separately.

18.4 Analyze the Data. The scientific method requires that all data collected that bears upon the origin be analyzed. This is an essential step that must take place before the formation of any hypotheses. The identification, gathering, and cataloging of data does not equate to data analysis. Analysis of the data is based on the knowledge, training, experience, and expertise of the individual doing the analysis. If the investigator lacks the knowledge to properly attribute meaning to a piece of data, then assistance should be sought from someone with the neces-sary knowledge. Understanding the meaning of the data will enable the investigator to form hypotheses based on the evidence, rather than on speculation or subjective belief.

18.4.1 Fire Pattern Analysis. An investigator should read and understand the concepts of fire effects, fire dynamics, and fire pattern development described in Chapters 5 and 6. This knowledge is essential in the analysis of a scene to determine the origin of the fire.

18.4.1.1 Consideration of All Patterns. All observed patterns should be considered in the analysis. Accurate determination of the origin of a fire by a single dominant fire pattern is rare, as in the case of very limited fire damage where there may be only one fire pattern.

18.4.1.2 Sequence of Patterns. While fire patterns may be the most readily available data for origin determination, the investi-gator should keep in mind that the damage and burn patterns observed after a fire represent the total history of the fire. A major challenge in the analysis of fire pattern data is to deter-

mine the sequence of pattern formation. Patterns observed in fires that are extinguished early in their development can present different data than those remaining after full room involvement or significant building destruction. Patterns generated as a result of a rekindle may impact the perception of the fire's history or sequence of pattern production.

**18.4.1.3 Pattern Generation.** The investigator should not assume that the fire at the origin burned the longest and therefore fire patterns showing the greatest damage must be at the area of origin. Greater damage in one place than in another may be the result of differences in thermal exposure due to differences in fuel loading, the location of the fuel package in the compartment, increased ventilation, or fire-fighting tactics. For similar reasons, a fire investigator should consider these factors when there is a possibility of multiple origins.

**18.4.1.3.1** The size, location, and heat release rate of a fuel package may have as much effect on the extent of damage as the length of time the fuel package was burning. An area of extensive damage may simply mean that there was a significant fuel package at that location. The investigator should consider whether the fire at such a location might have spread there from another location where the fuel load was smaller.

**18.4.1.3.2** Fuel packages of identical composition and equal size may burn very differently, depending on their location in a compartment. The possible effect of the location of walls relative to the fire should be considered in interpreting the extent of damage as it relates to fire origin. In making the determination, the possibility that the fuel in the suspected area of origin was not the first material ignited and that the great degree of damage was the result of wall or corner effects should be considered.

**18.4.1.4 Ventilation.** Ventilation, or lack thereof, during a fire has a significant impact on the heat release rate and consequently on the extent of observable burn damage. The analysis of fire pattern data should, therefore, include consideration that ventilation influenced the production of the pattern. Ventilation-controlled fires tend to burn more intensely near open windows or other vents, thereby producing greater damage. Knowledge of the location and type of fuel is important in fire pattern analysis. During full room involvement conditions, the development of fire patterns is significantly influenced by ventilation. Full room involvement conditions can cause fire patterns that developed during the earlier fuel-controlled phase of the fire to evolve and change. In addition, fires can produce unburned hydrocarbons that can be driven outside the compartment through ventilation openings. This unburned fuel can mix with air and burn on the exterior of the compartment, producing additional fire patterns that indicate the fire spread out of the original compartment. Thus, knowledge of changes in ventilation (e.g., forced ventilation from building systems, window breakage, opening or closing of doors, burn-through of compartment boundaries) is important to understand in the context of fire pattern analysis. Determination of what patterns were produced at the point of origin by the first item ignited usually becomes more difficult as the size and duration of the fire increases. This is especially true if the compartment has achieved full room involvement.

**18.4.1.5 Movement and Intensity Patterns.** As discussed in Chapter 6, fire patterns are generated by one of two mechanisms: the spread of the fire or the intensity of burning. As discussed above, fuel composition, rate of heat release, location, and ventilation differences may lead to differences in the



**FIGURE 18.4.2(a)    Heat and Flame Vector Analysis Diagram Associated Vectors of the Physical Size and Direction of Heat Travel of the Fire Patterns and Demonstrating a Fire Origin in the Area of Vectors 7, 8, and 10.**

intensity patterns that do not necessarily point to the area where the first fuel was ignited. Patterns that arise from the growth and movement (spread) of the fire are invariably better indicators of the area of origin. It may be difficult, however, to distinguish movement patterns from intensity patterns. Further, some patterns display a combination of intensity and movement (spread) indicators.

**18.4.1.6\*** Every pattern should be evaluated to determine whether it can be accounted for in terms of ventilation. Ventilation-generated patterns may not be produced early in the fire. Patterns that cannot be accounted for in terms of ventilation are the patterns that need careful examination.

**18.4.2\* Heat and Flame Vector Analysis.** Heat and flame vector analysis, along with accompanying diagram(s), is a tool for fire pattern analysis. Heat and flame vectoring is applied by constructing a diagram of the scene. The diagram should include walls, doorways and doors, windows, and any pertinent furnishings or contents. Then, through the use of arrows, the investigator notes the interpretations of the direction of heat and flame spread based upon the identifiable fire patterns present. The size of the arrows should reflect the scaled magnitude (actual size) of the individual patterns depicted. The arrow can point in the direction of fire travel from the heat source or point back toward the heat source, as long as the direction of the vectors is consistent throughout the diagram. The investigator should identify each vector as to the respective fire pattern it represents. In a legend accompanying the diagram, the investigator may give details of the corresponding fire pattern, such as height above the floor, height of the vertex of the vector, the nature of the surface upon which the pattern appears, the pattern geometry, the particular fire effect which comprises the pattern, and the direction(s) of fire spread which the pattern(s) represent. For example, as shown in Figure 18.4.2(a) through Figure 18.4.2(f), Vector #7 represents fire damage on the carpet with decreasing fire damage as one moves northeast, Vector #8 represents comparison of fire damage differences between the two sides of the chair, with the south side displaying more severe damage, and Vector #10 represents a truncated cone pattern, with decreasing fire damage and increasing height to the line of demarcation as one moves north.

ORIGIN DETERMINATION



FIGURE 18.4.2(e)    Photograph associated with Vector #11.



18.4.2(b)    Photograph associated with Vector #7.





FIGURE 18.4.2(c)    Photograph associated with Vector #8.



FIGURE 18.4.2(d)    Photograph associated with Vector #10.

FIGURE 18.4.2(f)    Photograph associated with Vector #6.

**18.4.2.1 Complementary Vectors.** Complementary vectors can be considered together to show actual heat and flame spread directions. In that case, the investigator should clearly identify which vectors represent actual fire patterns and which vectors represent heat flow derived from the investigator's analysis of these patterns. An important point to be made regarding this discussion is the terminology heat source and source of heat. These terms are not synonymous with the origin of the fire. Instead, these terms relate to any heat source that creates an identifiable fire pattern. The heat source may or may not be generated by the initial fuel. It is imperative that the use of heat and flame vector analysis be tempered by an accurate understanding of the progress of the fire and basic fire dynamics. A vector diagram can give the investigator an overall viewpoint to analyze. The diagram can also be used to identify any conflicting patterns that need to be explained. The ultimate purpose of the vector analysis is to discuss and graphically document the investigator's interpretation of the fire patterns.

**18.4.2.2 Heat Source.** A heat source can be any fuel package that creates an identifiable fire pattern. The pattern may or may not be produced by the initial fuel. Consider a fire that spreads into a garage and ignites flammable liquids stored there. The burning liquid represents a new heat source that leaves fire patterns on the garage's surfaces. Therefore, it is imperative that fire pattern analysis be tempered by an accurate understanding of the progress of the fire and basic fire dynamics.

**18.4.2.3 Additional Tools for Pattern Visualization.** When fire patterns are not visually obvious, a depth of char or depth of calcination survey may help the investigator to locate areas of greater or lesser heat damage and recognized lines of demarcation defining patterns. Survey results should be plotted on a diagram. On such diagrams, the depth of char or calcination measurements are recorded to a convenient scale. Once the depth of char or calcination measurements have been recorded on the diagram, lines can be drawn connecting points of equal, or nearly equal, char or calcination depths. The resulting lines may reveal identifiable patterns. *[See Figure 16.4.2(f).]*

**18.4.3 Depth of Char Analysis.** Analysis of a depth of charring is most reliable for evaluating fire spread rather than for the establishment of specific burn times or intensity of heat from adjacent burning materials. By measuring the relative depth and extent of charring, the investigator may be able to determine what portions of a material or construction were exposed the longest to a heat source. The relative depth of charring — from point to point as the key to appropriate use of charring — locating the places where the damage was most severe, due to exposure, ventilation, or fuel placement. The investigator may then deduce the direction of fire spread, with decreasing char depths being farther away from a heat source. Certain key variables affect the validity of depth of char pattern analysis. These factors include the following:

(1) Single versus multiple heat or fuel sources creating the char patterns being measured. Depth of char measurements may be useful in determining more than one fire or heat source.

(2) Comparison of char measurements, which should be done only for identical materials. It would not be valid to compare the depth of char from a wall stud to the depth of char of an adjacent wooden wall panel.



**FIGURE 18.4.3.2(a)    Dial Calipers with Depth Probes.**

(3) Ventilation factors influencing the rate of burning. Wood can exhibit deeper charring when adjacent to a ventilation source or an opening where hot fire gases can escape.

(4) Consistency of measuring technique and method. Each comparable depth of char measurement should be made with the same tool and same technique. *See Figure 18.4.2(a).* It is important that a consistent amount of pressure is applied with the probe every time it is employed.

(5) Suppression and/or overhaul efforts can modify or destroy char patterns typically used for this type of analysis.

**18.4.3.1 Depth of Char Diagram.** Lines of demarcation that may not be visually obvious can often be identified for analysis by a process of measuring and charting depths of char on a grid diagram. By drawing lines connecting points of equal char depth (isochars) on the grid diagram, lines of demarcation may be identified.

**18.4.3.2 Measuring Depth of Char.** Consistency in the method of measuring the depth of char is the key to generating reliable data. Sharp-pointed instruments, such as pocket knives, are not suitable for accurate measurements because the end of the knife will have a tendency to cut into the non-charred wood beneath. Thin, blunt-ended probes, such as certain types of calipers, tire tread depth gauges, or specifically modified metal rulers are best. Dial calipers with depth probes of round cross-section, shown in Figure 18.4.3.2(a), are excellent for their use. The same measuring tool should be used for any of comparable measurements. Consistent pressure for each measurement while inserting the measuring device is necessary for accurate results.

**18.4.3.3** Char depth measurements, illustrated in Figure 18.4.3.3, should be made at the center of char blisters, rather than in or near the crevasses between blisters.

**18.4.3.4 Missing Wood.** When determining the depth of charring, the investigator should take into consideration any burned wood that may have been completely destroyed by the fire and add that missing depth of wood to the overall measurement.

**18.4.3.5 Depth of Char Surveys with Fuel Gases.** When active fuel gases are the initial fuel sources for fires, they produce relatively even depths of char over the often wide areas they cover. Progressive changes in depth of char that are used by investigators to trace fire spread might exist only in the areas to which the fire spreads from the initial location.



USDC IN/ND case 4:16-cv-00042-TLS document 105-1 filed 10/07/19 page 154 of 1167

FIGURE 18.4.3.2(b) Using Dial Calipers to Measure Depth of Char.

FIGURE 18.4.3.3 Measuring Depth of Char.

pocketed fuel gases. Deeper charring might exist in close proximity to the point of gas leakage, as burning might continue there after the original quantity of gas is consumed. This charring may be highly localized because of the pressurized gas jets that can exist at the immediate point of leakage and may assist the investigator in locating the leak.

**18.4.4 Depth of Calcination Survey.** Relative depth of calcination can indicate differences in total heating of the fire-exposed gypsum wallboard. Deeper calcination readings indicate longer or more intense heating (heat flux), and the higher temperatures that those areas of the wallboard achieved during the fire. Certain key variables affect the validity of depth of calcination analysis. These factors include the following:

(1) Single versus multiple heat or fuel sources, creating the calcination patterns being measured, should be considered. Depth of calcination patterns may be useful in determining multiple heat or fire sources.
(2) Comparisons of depth of calcination measurements should be made only from the same material. It should be recognized that gypsum wallboard comes in different thicknesses, is made of different materials of construction, and changes with time. The investigator should carefully consider sections of walls or ceilings that may have had new sections inserted as a repair.
(3) The finish of the gypsum wallboard (e.g., paint, wallpaper, stucco) should be considered when evaluating depth of calcination. The investigator should recognize that some of these finishes are combustible and may affect the patterns if they are ignited.
(4) Measurements should be made in a consistent fashion to reduce errors in this data collection.
(5) Gypsum wallboard can be damaged during suppression, during overhaul, and post-fire by hose streams and standing water. Wetting of the calcined wallboard can soften the gypsum to the point where no reliable measurements can be made.

**18.4.4.1 Depth of Calcination Diagram.** A depth of calcination diagram can be produced in the same manner as that for depth of char.

**18.4.4.2* Measuring Depth of Calcination.** [illegible]

**18.4.5 Arc Surveys or Arc Mapping.** Arc surveys (also known as arc mapping) is a technique in which the investigator uses the identification of arc locations or "sites" to aid in determining the area of fire origin. This technique is based on the predictable behavior of energized electrical circuits exposed to a spreading fire. The spatial relationship of the arc sites to the structure and to each other can be a pattern, which can be used in an analysis of the sequence in which the affected parts

921-212



**FIGURE 18.4.4.2(a)    Two Instruments That Can be Used to Measure the Depth of Calcination.**



**FIGURE 18.4.4.2(b)    Measuring Depth of Calcination on a Piece of Gypsum Wallboard.**

of the electrical system were compromised. This sequential data can be used in combination with other data to more clearly define the area of origin. There are circumstances, such as complete destruction of the branch circuits, melting of conductors from fire exposure, post-fire re-energizing of the electrical system, or the inability to recognize arc damage on conductors, that make it more difficult or impossible to use this technique. The identification of arc sites in the area of fire origin may help to identify a potential ignition source(s) for consideration. The investigator is cautioned to consider that conductors only pass through certain areas, and therefore, the distribution of the conductors available will be limited by the spatial amount of information available for arcing. Mapping of arcs on conductors that are exposed to the developing fire, such as appliance cords or branch circuit conductors that are in the compartment of the fire, may provide the most useful information. Branch circuits that are located behind some type of thermal barrier, such as gypsum board or plywood, may not provide useful arc mapping information, as the circuit protec-

tion may open prior to the fire damaging the conductors located behind ceilings and walls.

**18.4.5.1 Suggested Procedure.**  One procedure to perform an arc survey is as follows:

(1)  Identify the area that will be surveyed.
(2)  Sketch and diagram the area as completely and accurately as possible.
(3)  Identify zones within the survey area, such as ceiling, floor, north wall, south wall, etc.
(4)  Identify all conductors of the electrical circuits passing through the zone, noting, when possible, loads on each circuit, direction of power flow (upstream versus downstream), locations of junction boxes, outlets, switches (or any such control), size of each conductor, and the overcurrent protection size, type, and status.
(5)  Select a zone for examination and begin the process of systematically examining each of the conductors in that zone.
(6)  Examine and feel each conductor, for the purpose of identifying surface anomalies or damage, such as beads and notches. When it is necessary to remove conductors from conduits, take care to prevent damage to the conductors.
(7)  Determine if the surface anomaly occurred from arcing, environmental heat, or eutectic melting (alloying of metals).
(8)  Locate the arc site on the sketch and document its physical characteristics (faulted to another conductor in same cable, faulted to conductor from another cable, completely severed conductor, partially severed conductor, faulted to grounded metallic conduit, or a conductive building element).
(9)  Flag the location of the arc site(s) with a suitable marking and document such location(s).
(10)  Preserve the items as evidence, when warranted.

**18.4.5.2 Arc Survey Diagram.**  The drawing used to plot the arc sites should be as detailed as possible. The use of a sketch of the drawing will aid in reducing errors in the subsequent analysis. When setting the boundaries of each zone, keep in mind that some or all of the conductors may be routed through other zones as well. Having a compass or reference direction on the drawing is particularly useful. When analyzing the status of the overcurrent protection device for each circuit, note the type of device such as fuse, circuit breaker, ground-fault circuit interrupter (GFCI), or arc fault circuit interrupter (AFCI).

**18.4.5.3 Documenting Arc Sites.**  To document arc sites, add visible markers such as colored ribbon, colored cable markers, tape to the conductors and document using photographs or videotape. Should the need exist to take as evidence the product of the arc survey, then one can collect the electrical circuits in the structure. Collecting each circuit, both those that arced and those that did not, will be of value, only if the spatial relationship of the circuits is maintained. The relationship itself of the arc sites to those conductors that did not arc and the individual arc sites, not the fire-damaged conductors taken out of context, are the significant evidence. (See Figure 18.4.5.3.)

**18.4.5.4 Arc Survey Evidence Collection.**  Take care to properly identify, tag, and collect electrical conductors. The conductors are sometimes brittle and can be quite fragile. Handling may result in fractures, which make labeling and tagging even more tedious. Attachments to the conductors, such as the



**Red Wire Ties Used to Flag Arc Sites.**

FIGURE 18.4.5.3

... become loose and fall away, which can potentially prevent any future circuit tracing.

**Arc Survey Utilization.** The utility of arc mapping is in the analysis of the data to determine the sequence of events, but it should be noted that arc mapping can be useful when formulating and testing hypotheses. Clearly, if a conductor is arc-severed, it can be correctly concluded that any fire events electrically downstream of the arc-severed point happened before the severance. Exceptions to this rule exist when the conductors are back-fed through a pre-fire wiring error, an uninterruptible power supply (UPS) systems, or generators. Further, if an area is hypothesized as the origin of a fire, in the absence of contrary evidence, one would expect to see that the origin area would be one of the first areas where the electrical system was compromised.

**18.4.5.6 Arc Survey Limitations.** Arc surveys can identify areas where the fire had damaged energized electrical conductors at some point in the fire's development. Likewise, the spatial relationship of arc sites can identify a specific space where the fire was located before electrical energy to that space was cut off. While each of these investigative tools can be helpful in the origin determination, the accuracy of the effort, however, is directly dependent upon the investigator correctly identifying arc damage on the wires. Fire damage to copper conductors can mimic arc damage, and visual inspection at the fire scene site may not be sufficient to correctly identify validate arc sites. If the analysis of the circuits incorrectly identifies damage on the conductors as arcing, hypotheses formed from the analyses will be based on flawed data and will be incorrect. The investigator may want to collect each perceived arc site for more detailed evaluation and verification.

**18.4.6 Analysis of Sequential Events.** The analysis of the timing or sequence of events during a fire can be useful in determining the origin. Much of the data for this analysis will come from witnesses. In some instances, a witness may be found who saw the fire in its incipient stage and can provide the investigator with an area of fire origin. Such circumstances create a burden on the fire investigator to conduct as thorough an investigation as possible to find facts that can support or refute the witness's statements. Means to verify such statements

could include patterns analysis, arc mapping, or matching smoke detector, heat detector, and security detector activation times with the witness's observations. This analysis can identify gaps or inconsistencies in information, assist in developing questions for additional witness interviews, and provide support in the analysis and reconstruction of the progression of the fire. A more detailed discussion of time lines is included in Section 22.2.

**18.4.7 Fire Dynamics.** Fundamentals of fire dynamics can be used to analyze the data to aid in the development of origin hypotheses and to complement other origin determination techniques. Such analyses can help in the identification of potential fuels that may have been the first item to ignite, the sequence of subsequent fuel involvement, the recognition of other data that may need to be collected, the analysis of fire patterns, and the identification of potential competent ignition sources.

**N 18.4.7.1\*** One of the most important fire dynamics considerations is the availability of oxygen. If the area of origin becomes oxygen deprived as a result of full room involvement, there may be less damage around the origin than elsewhere. The most damaged areas may have been damaged solely as a result of increased ventilation that occurred late in the fire. Basing an origin determination solely on the degree of damage has led to erroneous origin determinations in test fires.

**N 18.4.7.2\*** One tool a fire investigator may consider is to divide for the history of the various fire patterns observed is to divide each compartment into volumes, and then consider the extent of the damage expected before and at flashover, a short time after flashover, and a long time after flashover, given an origin in each of the volumes. This analysis has been called an origin matrix analysis.

**N 18.4.8\* Origin Matrix Analysis.**

**18.4.8.1** Figure 18.4.8.1 is an example of the origin matrix analysis applied to a simple rectangular room with a single ventilation opening. Consideration of the fire patterns alone may be of limited assistance in determining the origin in the case of a fire that burns for a long duration after full room involvement. Damages resulting from ventilation-related fire exposures may create new patterns that may eventually obscure or obliterate origin-related fire patterns. However, origin-related damages located remotely from ventilation-related fire exposures may persist. In a general sense, timing cannot be quantified beyond "short" and "long" durations as indicated by Figure 18.4.8.1 because they will ultimately be scenario dependent.

**18.4.8.2\*** Multiple ventilation openings can complicate an origin matrix analysis, as can consideration of an origin located above floor level, such as on a stovetop. (See 5.10.3.)

**18.5 Developing an Origin Hypothesis.** Based on the data analysis, the investigator should now produce a hypothesis or group of hypotheses to explain the origin and development of the fire. This hypothesis should be based solely on the empirical data that the investigator has collected. It is understood that when using the scientific method, an investigator may continuously be engaged in data collection, data analysis, hypothesis development, and hypothesis testing. An investigator may develop an origin hypothesis early in the investigative process, but when the process is completed, regardless of the order of steps followed, the investigator should be able to describe how

**FIGURE 18.4.8.1  Origin Matrix Analysis Example.**

those steps conform to the scientific method. Figure 18.2 shows how the procedures set forth in this chapter follow the scientific method.

**18.5.1 Initial Hypothesis.** The initial origin hypothesis is developed by considering witness observations, by conducting an initial scene assessment, and by attempting to explain the fire's movement through the structure. This process is accomplished using the methods described in earlier sections of this chapter. The initial hypothesis allows the investigator to organize and plan the remainder of the origin investigation. The development of the initial hypothesis is a critical point in the investigation. It is important at this stage that the investigator attempt to identify other feasible origins, and to keep all reasonable origin hypotheses under consideration until sufficient evidence is developed to justify discarding them.

**18.5.2 Modifying the Initial Hypothesis.** The investigation should not be planned solely to prove the initial hypothesis. It is important to maintain an open mind. The investigative effort may cause the initial hypothesis to change many times before the investigation is complete. The investigator should continue to reevaluate potential areas of origin by considering the additional data accumulated as the investigation progresses.

**18.6 Testing of Origin Hypotheses.** In order to confirm the scientific method, once a hypothesis is developed the investigator must test it using deductive reasoning. The deductive reasoning is based on the premise that if the hypothesis is true, *then* the fire scene should exhibit certain characteristics, assuming that the fire did not subsequently alter those characteristics. For example, if a witness stated a specific door was closed during the fire, then there may be a protected area on the door jamb, which would tend to support the hypothesis that the door was closed. (*See Chapter A.4.3.6.*)

**18.6.1 Means of Hypothesis Testing.** During the fire, the investigator may develop and test many hypotheses about the progress of the fire. For example, means may exist to determine whether a door or window was open or closed. Ultimately, the origin determination is arrived at by testing of origin hypotheses. A technically valid determination is one that is uniquely consistent with the facts. In testing the hypothesis, the questions identified through 18.6.1.5 should be answered.

**18.6.1.1** Is there a competent ignition source at the physical origin? The lack of a competent ignition

ORIGIN DETERMINATION

investigator should make the hypothesis subject to change. Investigators should be wary of the trap of thinking the cause of the fire was at one time necessarily the point of origin, the investigator who eliminates an ignition source because it is "not in the area of hypothesized origin," needs to be especially diligent in testing the hypothesis and in considering alternate scenarios. (See Section 19.2.) This is particularly true in cases of fire involvement. Unless there is reliable evidence to the contrary to a particular portion of the room, every ignition source in the compartment of origin should be considered as a possible cause.

For a fire starting at the hypothetical origin result in the observed damage? The investigator should be cautious in deciding on an origin just because a readily ignitible fuel and/or ignition source are present. The sequence of events linking the ignition source and the fuel together and with observed damage indicates the origin, and ultimately the cause. The hypothetical origin should not only account for the damage to the structure and contents, but also for the injuries of occupants to the fire environment.

Is the growth and development of a fire starting at the hypothetical origin consistent with available data at a given point(s) in time? Few data are more damaging to an origin hypothesis than a contradictory observation by a credible eyewitness. Any data can be contradictory to the ultimate hypothesis. The data must be taken as a whole in considering any hypothesis, with each piece of data being analyzed for its reliability and value. Ultimately, the investigator should be able to explain how the growth and development of a fire, starting at the hypothesized origin, is consistent with the data.

**18.6.2 Analytical Techniques and Tools.** Analysis techniques and tools are available to test origin hypotheses. Using such tools and techniques to analyze the dynamics of the fire can provide an understanding of the fire that can enhance the technical basis for origin determinations. Such analyses can help to identify gaps or inconsistencies in the data. The utility of fire dynamics tools is not limited to hypothesis testing. They may also be used for data analysis and hypothesis development. Techniques and tools include time line analysis, fire dynamics analysis, and experimentation.

**18.6.2.1 Time Line Analysis.** Time lines are an investigative tool that can show relationships between events and conditions associated with the fire. These events and conditions are generally time-dependent, and thus, the sequence of events can be used for testing origin hypotheses. Relevant events and conditions include ignition of additional fuel packages, changes in ventilation, activation of heat and smoke detectors, flashover, window breakage, and fire spread to adjacent compartments. Much of this information will come from witnesses. Fire dynamics analytical tools (see 22.4.8) can be used to estimate time-dependent events and fire conditions. A more detailed discussion of time lines is included in Section 22.2.

**18.6.2.2 Fire Modeling.** Fundamentals of fire dynamics can be used to test hypotheses regarding fire origin. Such fundamentals are described in the available scientific literature and are incorporated into fire models ranging from simple algebraic equations to more complex computer fire models (see 22.4.8). The models use incident-specific data to predict the fire environment given a proposed hypothesis. The results can be compared to physical and eyewitness evidence to test the origin

hypothesis. Models can address issues related to fire development, spread, and occupant exposure.

**18.6.2.3 Experimental Testing.** Experiments can be conducted to test the hypothesized origin. If the experimental results match the damage at the scene, the experiment can be said to support the hypothesis. If the experiment produces different results, a new origin hypothesis or additional data may need to be considered, taking into account potential differences between testing and actual fire conditions. The following is an example of such an experiment. The hypothesized origin is a wicker basket located in the corner of a wood-paneled room. The data from the actual fire shows the partial remains of the basket, undamaged carpet in the corner, and wood paneling still intact in the corner. A fire test replicating the hypothesized origin totally consumes the carpet, the wicker basket, and the wood paneling. Thus (assuming the test replicated the pre-fire conditions), testing revealed that this hypothesized origin is inconsistent with the damage that would be expected from such a fire.

**18.7 Selecting the Final Hypothesis.** Once the hypotheses regarding the origin of the fire have been tested, the investigator should review the entire process, to ensure that all credible data are accounted for and all credible alternate origin hypotheses have been considered and eliminated. When using the scientific method, the failure to consider alternate hypotheses is a serious error. A critical question to be answered by fire investigators is, "Are there any other origin hypotheses that are consistent with the data?" The investigator should document the facts that support the origin determination to the exclusion of all other potential origins.

**18.7.1 Defining the Area of Origin.** Although *area of origin* is common terminology used to describe the origin, the investigator should describe it in terms of the three-dimensional space where the fire began, including the boundaries of that space.

**18.7.2 Inconsistent Data.** It is unusual for a hypothesis to be totally consistent with all of the data. Each piece of data should be analyzed for its reliability and value — not all data in an analysis has the same value. Frequently, some fire pattern or witness statement will provide data that appears to be inconsistent. Contradictory data should be recognized and resolved. Incomplete data may make this difficult or impossible. If resolution is not possible, then the origin hypothesis should be re-evaluated.

**18.7.3 Case File Review.** Other investigators can assist in the evaluation of the origin hypothesis. An investigator should be able to provide the data and analyses to another investigator, who should be able to reach the same conclusion as to the origin. Review by other investigators is almost certain to happen in any significant fire case. Differences in opinions may arise from the weight given to certain data by different investigators or the application of differing theoretical explanations (fire dynamics) to the underlying facts in a particular case.

**18.8 Origin Insufficiently Defined.** There are occasions when it is not possible to form a testable hypothesis defining an area that is useful for identifying potential causes. The goal of origin investigation is to identify the precise location where the fire began. In practice, the investigator has an origin hypothesis when first arriving at a fire scene. The origin is the scene. Sometimes, it is not possible to find an area or volume that is any smaller than the entire scene. Thus, a conclusion of origin investigation can be the identification of a volume of

2017 Edition

FIRE AND EXPLOSION INVESTIGATIONS

space too large to identify causal factors, or where no practical boundaries can be established around the volume of the origin. An example of such an origin can be a building that has been totally burned, with no eyewitnesses. Such fires are sometimes called total burns. The area of origin is the building, but in reality no further testable origin hypothesis can be developed because there is insufficient reliable data.

**18.8.1 Large Area Adequate for Determination.** There are cases in which a lack of an origin determination does not necessarily hinder the investigation. An example is a case in which a fire resulted from the ignition of fuel gas vapors inside a structure. The resulting damage may preclude the defining of the location where the fuel combined with the ignition source. However, probable ignition sources may still be hypothesized.

**18.8.2 Justification of a Large Area of Origin.** The origin analysis should identify the data that justify the conclusion that the area of fire origin cannot be reduced to a practical size. Examples of such data could include establishing the fact that there were no significant patterns to trace, or that other methods combustible materials were consumed, or that other methods of origin determination were attempted but no reasonable conclusion could be established.

**18.8.3 Eyewitness Evidence of Origin Area.** If the origin is too large to be useful, then the determination of the fire's cause may become very difficult, or impossible. In some instances, where no further testable origin hypothesis can be developed by examination of the scene alone, a witness may be found who saw the fire in its incipient stage and can provide the investigator with an area of fire origin.

## Chapter 19  Fire Cause Determination

**19.1 Introduction.** This chapter recommends a methodology to follow in determining the cause of a fire. Fire cause determination is the process of identifying the first fuel ignited, the ignition source, the oxidizing agent, and the circumstances that resulted in the fire. Fire cause determination generally follows origin determination (see Origin Determination chapter). Generally, a fire cause determination can be considered reliable only if the origin has been correctly determined.

**19.1.1 Fire Cause Factors.** The determination of the cause of a fire requires the identification of those factors that were necessary for the fire to have occurred. Those factors include the presence of a competent ignition source, the type and form of the first fuel ignited, and the circumstances, such as failures or human actions, that allowed the factors to come together and start the fire. Device or appliance failures can involve, for example, a high-temperature thermostat that fails to operate. The device may have failed due to a design defect. Human contributions to a fire can include a failure to monitor a cooking pot on the stove, failure to connect electrical wiring tightly resulting in a high-resistance connection, or intentional acts. For example, consider a fire that starts when a blanket is ignited by an incandescent lamp in a closet. The various factors include having a lamp hanging down too close to the shelf, putting combustibles too close to the lamp, and leaving the lamp on while not using the closet. The absence of any one of those factors would have prevented the fire. The function of the investigator is to identify those factors that contribute to the fire.

**19.1.2 First Fuel Ignited.** The first fuel ignited is that which first sustains combustion beyond the ignition source. For example, the wood of the match would not be the first fuel ignited, but paper, ignitible liquid, or draperies would be, if the match were used to ignite them.

**19.1.3 Ignition Source.** The ignition source will be at or near the point of origin at the time of ignition, although in some circumstances, such as the ignition of flammable vapors, the two may not appear to coincide. Sometimes the source of ignition will remain at the point of origin in recognizable form, whereas other times the source may be altered, destroyed, consumed, moved, or removed. Nevertheless, the source should be identified in order for the cause to be proven. There are, however, occasions when there is no physical evidence of the ignition source, but an ignition sequence can be hypothesized based on other data.

**19.1.4 Oxidant.** Generally, the oxidant is the oxygen in the earth's atmosphere. Medical oxygen, such as that stored in cylinders or produced by oxygen concentrators, and certain chemical compounds may support or enhance combustion reactions (see Oxidizing Agents in the Basic Fire Science chapter).

**19.1.5 Ignition Sequence.** A fuel by itself or an ignition source by itself does not create a fire. Fire results from the combination of fuel, an oxidant, and an ignition source. The investigator's description of events, including the ignition sequence, (the factors that allowed the ignition source, fuel, and oxidant to react) can help establish the fire cause.

**19.2 Overall Methodology.** The overall methodology for determining the cause of the fire is the scientific method as described in the Basic Methodology chapter. This methodology includes recognizing and defining the problem to be solved, collecting data, analyzing the data, developing a hypothesis or hypotheses, and, most importantly, testing the hypothesis or hypotheses. In order to use the scientific method, the investigator must develop at least one hypothesis based on the data available at the time. These initial hypotheses should be considered "working hypotheses," which upon testing may be discarded, revised, or expanded in detail as new data is collected during the investigation and new analyses are applied. This process is repeated as new information becomes available. (See Figure 19.2).

**19.2.1 Consideration of Data.** In some instances, a single item, such as an irrefutable article of physical evidence or a credible eyewitness to the ignition, or a video recording, may be the basis for a determination of cause. In most cases, however, no single item is sufficient in itself to allow determination of the fire cause. The investigator should use all available resources to develop fire cause hypotheses and to determine which hypotheses fit all of the credible data available. When an apparently plausible hypothesis fails to fit some item of data, the investigator should try to reconcile the two and determine whether the hypothesis or the data is erroneous.

**19.2.2 Sequence of Activities.** The various activities required to determine the cause using the scientific method (data collection, analysis, hypothesis development, and hypothesis testing) occur continuously. Likewise, recording the scene, note taking, photography, evidence identification, witness interviews, origin investigation, failure analysis, and other data collection activities may be performed simultaneously with these efforts. Investigators should refer to the other sections

**Example of Applying the Scientific Method to Cause Determination**

**Recognize the Need**
A fire has occurred
The cause is unknown

↓

**Define the Problem**
The origin has been determined
Determine the cause

↓

**Collect Data**
Identify fuels in area of origin
Identify potential ignition sources
Identify oxidizing agent
Identify circumstances

↓

**Analyze Data**
Analyze fuel (ignition temperature, quantity)
Analyze ignition source (temperature, energy, time)
Analyze oxidizer, especially if other than air
Analyze potential ignition sequences

↓

**Develop Cause Hypotheses**
Separate hypothesis for each potential ignition source
Consider absent ignition sources
Propose a first fuel for each ignition source
Consider alternate hypotheses

↓

**Test the Hypotheses**
Is (or was) the hypothesized ignition source located at the origin?
Can the hypothesized ignition source ignite the first fuel?
Did the hypothesized ignition source have sufficient time?
Is the hypothesized cause consistent with all known facts?
Are contradictions resolved?
Does another cause hypothesis explain the data equally well?

↓

**Select Final Hypothesis**
Cause of the fire
List of potential causes
Insufficient information to determine the cause

**FIGURE 19.2    An Example of Applying the Scientific Method to Cause Determination.**

this guide that deal with these specific activities. Similarly, investigators need to remain aware of potential spoliation and scene contamination issues and should refer to the chapters on Legal Considerations and Physical Evidence.

**19.2.3 Point and Area of Origin.** In some cases, it will be impossible to determine the point of origin of a fire within the area of origin. Where a single point cannot be identified, it can still be valuable for many purposes to identify the area(s) of origin. In such instances, the investigator should be able to provide reliable explanations for the area of origin with the supporting evidence for each option. In some situations, the extent of the damage may reduce the ability to specifically

identify the point of origin, without removing the ability to put forward credible origin and cause hypotheses.

**19.3 Data Collection for Fire Cause Determination.** Data collection processes for cause determination include identification of fuel packages, ignition sources, oxidizers, and circumstances. Data should be collected to identify all potential fuels, ignition sources, and oxidants within the area or areas of origin. Data may also need to be collected from outside the area of origin. Examples of this would be unburned fuel samples or exemplar ignition sources located in other areas. Data on the circumstances bringing the fuel, ignition sources, and oxidizer together may come from many different sources. If available, a review of pre-fire documentation of possible areas of origin can be of value.

**19.3.1 Identify Fuels in the Area of Origin.** The investigator should identify the fuels present in the area of origin at the time of ignition. One of these fuels will be the first fuel ignited. The type, quantity, and specific location of structural and content fuels should be identified.

**19.3.1.1** Identifying the initial fuel is necessary for evaluating the competency of potential ignition sources and understanding the events that caused the fire. Sometimes a portion of the first ignited fuel will survive the fire, but often it does not. The initial fuel must be capable of being ignited within the limitations of the ignition source. The components in most buildings are not susceptible to ignition by heat sources having low energy, low temperature, or short duration. For example, flooring, structural lumber, wood cabinets, and carpeting do not ignite unless they are exposed to a substantial heat source. The investigator should identify easily ignited items that, once ignited, could provide the heat source to damage or involve these harder-to-ignite items. *(See Basic Fire Science chapter, Fuel Load.)*

**19.3.1.2** The initial fuel could be part of a device that malfunctions or fails. Examples include insulation on a wire that is heated to its ignition temperature by excessive current, or the plastic housing on an overheating coffee maker.

**19.3.1.3** The initial fuel might be something too close to a heat-producing device. Examples are clothing against an incandescent lamp or a radiant heater, wood framing too close to a wood stove or fireplace, or combustibles too close to an engine exhaust manifold or catalytic converter.

**19.3.1.4** Certain fuels produce residues not typically found after a fire. These residues differ from construction and contents materials that are normally present in the area of origin. Examples include residues of ignitible liquids or pyrotechnic materials, such as flares.

**19.3.1.5** Gases, vapors, and combustible dusts can be the initial fuel and can cause confusion about the location of the point of origin, because the point of ignition can be some distance away from where sustained fire starts in the structure or furnishings. Also, flash fire may occur with sustained burning of light density materials, such as curtains, that are located away from the initial vapor-fuel source.

**19.3.1.6** Information should be sought from persons having knowledge (such as occupants) about recent activities in the area of origin and what fuel items should or should not have been present. Information should also be obtained about the construction of the structure in the origin area. Construction details could include information about the floor, ceiling and wall coverings, type of doors, type of windows, or other infor-

2017 Edition

mation necessary for the analysis. The age of construction materials and attachment methodologies may be relevant. This information could reveal the initial fuel for the fire. This information would also be helpful to an investigator to prevent overlooking secondary and subsequent fuels that were present in the origin area that would contribute to fire growth. The investigator should refer to the chapters on Basic Fire Science, Fire Patterns, Building Systems, and Sources of Information when analyzing an origin area for the initial fuel.

**19.3.2 Identify Source and Form of the Heat of Ignition.** The investigator should identify and document all heat-producing items in the area of origin. Heat-producing items include devices, appliances, equipment, and self-heating and reactive materials. The investigator should also identify devices or equipment that are not normally heat producing, but may produce enough heat for ignition through misuse or malfunction.

**19.3.2.1** Potential sources of ignition for gases, vapors, or dusts include open flames, arcs from motors and switches, electric igniters, standing pilots or flames in gas appliances, hot surfaces, and static electricity.

**19.3.3 Identify Items and Activities in Area of Origin.** Information should be obtained from owners and occupants about recent activities in the area of origin and what appliances, equipment, or heat-producing devices were present. This information is especially important when potential ignition sources are not identifiable post-fire. The information would also be helpful in alerting an investigator to small or easily overlooked items when examining the area of origin. When electrical energy sources are considered as potential ignition sources, the investigator should refer to the chapters on Electricity and Appliances. Information on purchase, such as new or used, how and when they were used, repair history, and problems should also be gathered.

**19.3.4\* Identify the Oxidant.** The most common oxidant (oxidizer or oxidizing agent) within a fire is the oxygen in earth's atmosphere and no special documentation is required. However, other oxidants, as described in 19.3.4.1 through 19.3.4.3, should be identified and documented when they are in or near the area of origin.

**19.3.4.1** Sometimes oxygen exists at greater than the normal atmospheric concentration, such as in hyperbaric chambers, oxygen tents, or around oxygen generation, concentration and storage equipment.

**19.3.4.2** Some chemicals other than molecular oxygen are classified as oxidants. Certain common chemicals, such as pool sanitizers, may also act as oxidants.

**19.3.4.3** Some chemical mixtures, such as solid rocket fuel, contain an oxidizer as well as a fuel and require no external oxidizing source.

**19.3.5 Identify Ignition Sequence Data.** The investigator should develop data that can be used to analyze the events that brought the fuel and ignition source together (ignition sequence). This information on the conditions surrounding the coincidence of fuel, ignition source, and oxidizer may be available through observations, witness accounts, or weather data. Time lines can be useful in organizing and analyzing this data. (See chapter on Failure Analysis and Analytical Tools.) Additional data collection may be necessary in order to determine the circumstances that brought the fuel, ignition source, and

oxidizer together. Data collection may continue even after the fire scene has been processed and could require specialized laboratory equipment. Such additional data may result in modification or rejection of previously developed hypotheses or reconsideration of previous rejected hypotheses.

**19.4 Analyze the Data.** The scientific method requires that all data collected that bears upon the fire cause be analyzed. Analyzing the data requires the examination and interpretation of each component of data collected that bears upon the fire cause. This is an essential step that must take place before the formation of any hypotheses. The purpose of the analysis is to attribute specific meaning to the results of the examination and interpretation process, which will ultimately play a role in hypothesis development and testing. The identification, gathering, and cataloging of data does not equate to data analysis. Analysis of the data is based on the knowledge, training, experience, and expertise of the individual doing the analysis. If the investigator lacks the knowledge to properly attribute meaning to a piece of data, then assistance should be sought from someone with the necessary knowledge. Understanding the meaning of the data will enable the investigator to form hypotheses based on the evidence, rather than on speculation or subjective belief.

**19.4.1 Fuel Analysis.** Fuel analysis is the process of identifying the first (initial) fuel item or package that sustains combustion beyond the ignition source and identifying subsequent target fuels beyond the initial fuel.

**19.4.1.1 Geometry and Orientation.** An understanding of the geometry and orientation of the fuel is important in determining if the fuel was the first material ignited. The physical configuration of the fuel plays a significant role in its ability to be ignited. A nongaseous fuel with a high surface-to-mass ratio is much more readily ignitible than a fuel with a low surface-to-mass ratio. Examples of high surface-to-mass fuels include dusts, fibers, and paper. As the surface-to-mass ratio increases, the heat energy or time required to ignite the fuel decreases. Gases and vapors are fully dispersed (in effect, an extremely high surface-to-mass ratio) and can be ignited by a low heat energy source instantly.

**19.4.1.2 Ignition Temperature.** The fuel must be capable of being ignited by the hypothesized ignition source. The ignition temperature of the fuel should be understood. It is important to understand the difference between piloted ignition and autoignition temperatures. The components in most buildings are not susceptible to ignition by heat sources of low energy, low temperature, or short duration. For example, flooring, structural lumber, wood cabinets, and carpeting do not ignite unless they are exposed to a substantial heat source.

**19.4.1.3 Quantity of Fuel.** The first material ignited may not result in fire growth and spread if a sufficient quantity of fuel does not exist. For example, if the lighter fluid used to start a charcoal fire is consumed before enough heat is transferred to the briquettes, the fire goes out. The investigator should conduct an analysis of the quantity of fuels (initial, secondary, tertiary, etc.) to determine that it is sufficient to explain the resulting fire.

**19.4.2 Ignition Source Analysis.** The investigator should evaluate all potential ignition sources in the area of origin to determine if they are competent. A competent ignition source must have sufficient energy and be capable of transferring

fuel long enough to raise the fuel to its ignition [temperature].

[Heat]ing of the potential fuel will occur by the energy [source]. Each fuel reacts differently to the energy that [is] based upon its thermal and physical properties. [Energy] reflected, transmitted, or dispersed through the [fuel,] only the absorbed energy causing the fuel [temperatu]re to rise.

Flammable gases or liquid vapors, such as those from [a] release, travel a considerable distance from their original [re]lease before reaching a competent ignition source. [Before] specific conditions will ignition take place, the [most im]portant condition being concentration within the flam[mable] limits and an ignition source of sufficient energy located [in the fla]mmable mixture.

**Oxidant.** The oxidant is usually the oxygen in the [air. In] some cases alternate or additional oxidants may [be] present and the investigator should consider this [possib]le of such conditions in ignition and spread.

[19.4.]1. If the existence of an oxidant other than atmospheric [is] suspected based upon the presence of residue, that [residu]e should be collected and analyzed in a laboratory. Typi[cally] the oxidant does not survive in its original form, but may [have] characteristic residues.

**[19.4.]4 Ignition Sequence.**

[19.4.4.]1. The ignition sequence of a fire event is defined as the [progre]ssion of events and conditions that allow the source of [ignition,] the fuel, and the oxidant to interact in the appropri[ate] quantities and circumstance for combustion to begin. [Simply] identifying a fuel or an ignition source by itself does not [and] cannot describe how a fire came to be. Fire results from [the] interaction of fuel, an oxidant, and an ignition source. [There]fore, the investigator should be cautious about deciding [on a] cause of a fire just because a readily ignitible fuel, poten[tial] ignition source, or any other of an ignition sequence's [e]lements is identified. The sequence of events that allow the [s]ource of ignition, the fuel, and the oxidant to interact in the [a]ppropriate quantities and circumstances for combustion to [b]egin, is essential in establishing the cause.

[19.4.4.]2 Analyzing the ignition sequence requires determin[in]g events and conditions that occurred or were logically neces[sar]y to have occurred, in order for the fire to have begun. [Additionally], in describing an ignition sequence, the order in [whic]h those events occurred should be determined.

[19.4.4.2.]1 In each fire investigation, the various contributing [fac]tors to ignition should be investigated and included in the [ult]imate explanation of the ignition sequence. These factors [sho]uld include the following:

(1) How and sequentially when the first fuel ignited came to [b]e present in the appropriate shape, phase, configura[ti]on, and condition to be capable of being ignited.
(2) How and sequentially when the oxidant came to be [p]resent in the right form and quantity to interact with the [fi]rst fuel ignited and ignition source and, allow the [c]ombustion reaction.
(3) How and sequentially when the competent ignition [s]ource came to be present and interact with the fuel



**19.4.4.3** There are times when there is no physical evidence of the ignition source found at the origin, but where an ignition sequence can be inferred using other data. Any determination of fire cause should be based on evidence rather than on the absence of evidence; however, there are limited circumstances when the ignition source cannot be identified, but the ignition sequence can logically be inferred. This inference may be arrived at through the testing of alternate hypotheses involving potential ignition sequences, provided that the conclusion regarding the remaining ignition sequence is consistent with all known facts (*see Basic Methodology chapter*). The following are examples of situations that lend themselves to formulating an ignition scenario when the ignition source is not found during the examination of the fire scene. The list is not exclusive and the fire investigator is cautioned not to hypothesize an ignition sequence without data that logically supports the hypothesis.

**(A)** Diffuse fuel explosions and flash fires.

**(B)** When an ignitible liquid residue (confirmed by laboratory analysis) is found at one or more locations within the fire scene and its presence at that location(s) does not have an innocent explanation. (*See Incendiary Fires chapter.*)

**(C)** When there are multiple fires. (*See Incendiary Fires chapter.*)

**(D)** When trailers are observed. (*See Incendiary Fires chapter.*)

**(E)** The fire was observed or recorded at or near the time of inception or before it spread to a secondary fuel.

**19.5 Developing a Cause Hypothesis.** The investigator should use the scientific method (*see the Basic Methodology chapter*) as the method for data gathering, hypothesis development, and hypothesis testing regarding the consideration of potential ignition sequences. This process of consideration actually involves the development and testing of alternate hypotheses. In this case, a separate hypothesis is developed considering each individual competent ignition source at the origin as a potential ignition source. Systematic evaluation (hypothesis testing) is then conducted with the elimination of those hypotheses that are not supportable (or refuted) by the facts discovered through further examination. The investigator is cautioned not to eliminate a potential ignition source merely because there is no obvious evidence for it. For example, the investigator should not eliminate the electric heater because there is no arcing in the wires or because the contacts are not stuck. There may be other methods by which the heater could

2017 Edition

FIRE AND EXPLOSION INVESTIGATIONS

921-220

have been the ignition source other than a system failure, such as combustible materials being stored too close to it. Potential ignition sources should be eliminated from consideration only if there is reliable evidence that they could not be the ignition source for the fire. For example, an electric heater can easily be eliminated from consideration if it was not energized.

**19.5.1** Devices present at the point/area of origin which are either heat-producing, or are capable of heat production when they sustain a fault or failure (e.g., electrical devices of various kinds) should always be placed on the list of hypotheses, even if, for some reason, they are easy to eliminate.

**19.5.2** The investigator should carefully consider potential ignition sources which do not correspond to a physical device that can be recovered. Such potential ignition sources include open flames where the device does not remain (e.g., a cigarette lighter was used, but not left at the scene) and static electricity discharges (including lightning). Given the lack of a physical device, other evidence is needed to establish the presence or absence of an ignition source.

**19.5.3** For each potential ignition source in the area of origin, it must be established that there existed a fuel or fuels, in an appropriate form and configuration, for which the potential ignition source could be considered a competent ignition source. A cause hypothesis can be developed even in the absence of being able to state specifically which of these fuels was the first ignited.

**19.5.4** There may be multiple competent ignition sources in the area of origin with a known first fuel. A cause hypothesis can be developed in the absence of being able to state specifically which of these competent ignition sources ignited the known first fuel. Where propane leaks into a cellar, the furnace may have been the ignition source, however post-fire it may not be possible to definitively determine which of the two ignited energies.

**19.6 Testing the Cause Hypothesis.** Each of the alternate hypotheses that were developed must then be tested using the Scientific Method. If one remaining hypothesis is tested using the scientific method and is determined to be probable, then the probable cause of the fire is identified.

**19.6.1 Scientific Method.** Use of the Scientific Method dictates that any hypothesis formed from analysis of the data collected in an investigation must stand the test of careful and serious challenge, by the investigator testing the hypothesis or by examination by others. *[See the Basic Methodology chapter and Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579, 113 S. Ct. 2786 (1993).]*

**19.6.2 Deductive Reasoning.** Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all the known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident. Ultimately, the cause determination is arrived at through the testing of cause hypotheses.

**19.6.3 Hypotheses Testing Questions.** In testing a cause hypothesis, the following questions should be answered:

(1) Is the hypothesized ignition source a competent ignition source for the first fuel ignited?

(2) Is the required time for ignition consistent with the time line associated with the cause hypothesis and facts of the incident?

(3) What were the circumstances that brought the ignition source in contact with the first fuel ignited?

(4) What, if any, were the failure modes required for ignition to occur?

**19.6.4 Means of Hypothesis Testing.** When testing a hypothesis, the investigator should attempt to disprove, rather than to confirm, the hypothesis. If the hypothesis cannot be disproved, then it may be accepted as either possible or probable. Hypothesis testing may include: any application of fundamental principles of science, physical experiments or testing, cognitive experiments, analytical techniques and tools, and systems analysis.

**19.6.4.1\* Scientific Literature.** The use of the scientific literature is an important means to develop information that can be used in hypothesis testing. A review of the literature may include descriptions of experiments and testing that can also be applied to the investigator's specific case. "Gateways" to the scientific literature can include Internet databases, technical libraries, textbooks, and handbooks. The validity of the information in the literature should be considered by the investigator.

**19.6.4.2 Fundamental Principles of Science.** A cause hypothesis is disproved if it violates the fundamental laws of physics or thermodynamics. Water does not burn — a hypothesis positing the ignition of water would be wrong.

**19.6.4.3 Physical Experiments or Testing.** Experiments can be conducted to test the hypothesized cause. Care must be exercised in developing an experimental protocol that will produce reliable and applicable results for the specific fire or explosion incident. For more information, see the section on Fire Testing in the chapter on Failure Analysis and Analytical Tools.

**19.6.4.4 Cognitive Experiments.** In a cognitive experiment, one sets up a premise and tests it against the data. An example of a cognitive experiment is: "If it were posited that the door was open during the fire and the hinges were found with mirror image patterns, then the hypothesis would be disproved." For more information see the chapter on Basic Methodology.

**19.6.4.5 Time Lines.** In the context of testing a cause hypothesis, the time frame may be a discriminator for determining if an ignition scenario is consistent with the available data related to time frames.

**19.6.4.6 Fault Trees.** Fault trees can be used to test the probability of a hypothesized fire cause. Fault trees are developed by breaking down an event into causal component parts. The components are then placed in a logical sequence of events. If conditions necessary to produce the event. If the conditions in sequence are not present then the hypothesis is disproved.

**19.6.4.7 Additional Techniques.** Additional analytical techniques and tools in the chapter on Failure Analysis and Analytical Tools can be helpful in hypothesis testing.

**19.6.5\* Appropriate Use.** The process of elimination is an integral part of the scientific method. All potential ignition sources present or believed to be present in the area of origin should be identified and alternate hypotheses developed, considered and challenged against the facts. Failure to consider testable hypothesis by disproving the hypothesis with reliable evidence is a fundamental part of the scientific method. However, the process of elimination can be misused...

ignition source for a fire by believing to ... all ignition sources found, known or suspected, ... present in the area of origin and ... evidence exists, is referred to by some investigators ... Determination of the ignition source ... or data or logical inferences drawn from that ... corpus has typically been used in classifying fires, ... although the process has also been used to char... classified as accidental. The negative corpus proce... consistent with the scientific method, is ... and should not be used because it generate... eses, or that result in incorrect determina... ignition source and first fuel ignited. Any hypothe... of the causal factors (e.g., first fuel, ignition ... ignition sequence) must be based on the analysis ... valid inferences that flow from those facts. Those ... ferences are derived from evidence, observa... ... experiments, and the laws of science. Specu... ... cannot be included in the analysis.

**Cause Undetermined.** In the circumstance where all ... fire causes have been eliminated and the investi... ... with no hypothesis that is evidenced by the facts of ... investigation, the only choice for the investigator is to ... that the fire cause, or specific causal factors, remains ... It is *improper* to base hypotheses on the ... of any supportive evidence. That is, it is improper to ... specific fire cause, ignition source, fuel or cause classifi... that has no evidence to support it even though all other ... hypothesized elements were eliminated.

**Ignition Source vs Fire Cause.** The investigator ... remember that the cause of a fire is defined as "the ... circumstances, conditions, or agencies that bring together a ... ... ignition source, and oxidizer (such as air or oxygen) ... ... in a fire or a combustion explosion" (*see the Definitions ... Fire Cause*). The identification of an ignition source and ... first fuel is not sufficient to determine a cause. Determining a ... cause and ignition sequence requires that any proposed ... hypothesis include consideration of the relationship between ... the competency of the ignition source and the first fuel ignited. ... The investigator should determine if the proposed ignition ... ... is a competent ignition source for the proposed first ... ... ignited (*see 19.4.2, Ignition Source Analysis*).

**19.7 Selecting the Final Hypothesis.** Once the hypotheses ... regarding the "cause" of the fire have been tested, the investi... ... should review the entire process, to ensure that all credi... ... data are accounted for and all credible alternate cause ... hypotheses have been considered and eliminated. When using ... the Scientific Method, the failure to consider alternate hypoth... ... is a serious error. A critical question to be answered by fire ... investigators is, "Are there any other cause hypotheses that are ... consistent with the data?" The investigator should document ... the facts that support the cause determination to the exclusion ... of all other reasonable causes.

**19.7.1 Establishing the Cause.** Although cause is common ... terminology, the investigator should describe it in terms of the ... competent ignition source providing enough heat to ignite the ... first fuel, and the circumstances of how they came together. ... The fuels involved after the first fuel should be noted, this may ... be especially true when the first fuel is part of the source, such ... as an appliance. In such a case the subsequent fuels may be the ... combustibles that are located near the appliance where the fire ... originated.

**19.7.2 Inconsistent Data.** It is unusual for all data items to be ... totally consistent with the selected hypothesis. Each piece of ... data should be analyzed for its reliability and value. Not all data ... in an analysis has the same value. Frequently, some analysis or ... witness statement will provide data that appears to be inconsis... tent. Contradictory data should be recognized and resolved. ... Incomplete data may make this difficult or impossible. If reso... lution is not possible, then the cause hypothesis should be re-... evaluated.

**19.7.3 Safety Devices and Features.** Safety devices and ... features are often engineered and built to prevent fires from ... occurring. The cause determination will need to account for ... the actions of safety devices.

**19.7.4 Undetermined Fire Cause.** The final opinion is only as ... good as the quality of the data used in reaching that opinion. If ... the level of certainty of the opinion is only "possible" or ... "suspected," the fire cause is unresolved and should be classi... fied as "undetermined." This decision as to the level of ... certainty in data collected in the investigation or of any hypoth... esis drawn from an analysis of the data rests with the investiga... tor.

## Chapter 20  Classification of Fire Cause

### 20.1 Classification of the Cause.



**20.1.1 Accidental Fire Cause Classification.** Accidental fires ... involve all those for which the proven cause does not involve an ... intentional human act to ignite or spread fire into an area ... where the fire should not be. When the intent of the person's ... action cannot be determined or proven to an acceptable level ... of certainty, the correct classification is undetermined. In most ... cases, this classification will be clear, but some deliberately igni... ted fires can still be accidental. For example, in a legal setting, ... a trash fire might be spread by a sudden gust of wind. The ... spread of fire was accidental even though the initial fire was ... deliberate.

**20.1.2 Natural Fire Cause Classification.** Natural fire causes ... involve fires caused without direct human intervention or ... action, such as fires resulting from lightning, earthquake, wind, ... and flood.

**20.1.3 Incendiary Fire Cause Classification.** An incendiary ... fire is a fire that is intentionally ignited in an area or under ... circumstances where and when there should not be a fire (*see ... 3.3.116*).

# Exhibit 6



# RIMKUS
### Consulting Group, Inc.

P.O. BOX 4673
HOUSTON, TEXAS 77210
(630) 321-1846

FEDERAL ID: 76-0163936

---

| | |
|---|---|
| SENAK, KEEGAN, GLEASON, SMITH & MICHAUD | Invoice Number: 6411332 |
| 621 PLYMOUTH COURT STE. 100 | Invoice Date: July 15, 2014 |
| CHICAGO, IL 60605 | File Number: 50901985 |
| CONTACT: MARK SENAK | |

Re:  BALL CORPORATION - INDUSTRIAL BUILDING FIRE 501 NORTH 6TH STREET-
MONTICELLO, IN

Insured:  BALL CORPORATION

---

### FOR PROFESSIONAL SERVICES RENDERED

### CURRENT BILLING

| | |
|---|---|
| Consulting Fees | $15,088.00 |
| Expenses | 1,674.30 |
| State Taxes | 0.00 |
| Other | 0.00 |
| Total Current Charges | $16,762.30 |

*(see attached pages for detail)*

### Outstanding Invoices

| Date | Invoice | Invoice Amount | Date Paid | Payment Received | Balance |
|---|---|---|---|---|---|
| 07/08/14 | 6410181 | $300.00 | | $0.00 | $300.00 |
| | | | | | $300.00 |

BILLS ARE DUE AND PAYABLE UPON RECEIPT

PLEASE REFERENCE OUR FILE NUMBER AND INVOICE NUMBER ON CHECK
AND MAKE PAYABLE TO:

RIMKUS CONSULTING GROUP

CONFIDENTIAL

# RIMKUS

Consulting Group, Inc.

File Number: 50901985
Invoice Number: 6411332

July 15, 2014
Page 2

**Total Now Due**          <u>**$17,062.30**</u>

# RIMKUS

Consulting Group, Inc.

File Number: 50901985
Invoice Number: 6411332

July 15, 2014
Page 3

---

### DETAILS OF CURRENT CHARGES

### PROFESSIONAL SERVICES

| Date | Init. | Title | Description of Services | Hours | Rate | Amount |
|------|-------|-------|------------------------|-------|------|--------|
| 05/24/14 | OWSO | DIVISION MGR | TRAVEL TO SCENE. DOCUMENT SCENE. INTERVIEW WITNESSES. CONDUCT INITIAL O&C. | 10.20 | 170.00 | 1,734.00 |
| 05/27/14 | GJPE | DIVISION MGR | INITIAL COMMUNICATIONS TO CLIENT, AND TO BILL SOYK AND JON HIGGINS. | 0.70 | 220.00 | 154.00 |
| 05/31/14 | OWSO | DIVISION MGR | TRAVEL TO LOSS SITE. MEET WITH CLIENT AND ATTORNEY. INSPECT SCENE. COLLECT EVIDENCE. TRAVEL TO SECURE STORAGE FACILITY. LOG EVIDENCE INTO EVIDENCE FACILITY. | 9.50 | 170.00 | 1,615.00 |
| 06/02/14 | OWSO | DIVISION MGR | TRAVEL TO LOSS SITE. BEGIN ARTIFACT RECOVERY AND DOCUMENTATION. | 12.50 | 170.00 | 2,125.00 |
| 06/03/14 | OWSO | DIVISION MGR | CONTINUED ARTIFACT RECOVERY AND DOCUMENTATION. | 10.50 | 170.00 | 1,785.00 |
| 06/03/14 | SMH | DISTRICT MGR | TRAVEL TO MONITCELLO INDIANA. MEET WITH ADJUSTOR, ATTORNEY AND SOYK. INSPECT PROPERTY AND FIRE SCENE. | 6.40 | 225.00 | 1,440.00 |
| 06/04/14 | OWSO | DIVISION MGR | CONTINUED ARTIFACT COLLECTION AND DOCUMENTATION. | 11.50 | 170.00 | 1,955.00 |
| 06/04/14 | SMH | DISTRICT MGR | CONTINUE SCENE INSPECTION AND DOCUMENTATION. ASSIST IN ARTIFACT REMOVAL. TRAVEL TO CHICAGO. | 12.60 | 225.00 | 2,835.00 |
| 06/05/14 | OWSO | DIVISION MGR | COMPLETE ARTIFACT RECOVERY. TRANSPORT EVIDENCE TO SECURE STORAGE. | 8.50 | 170.00 | 1,445.00 |
| | | | **Total Fees:** | **82.40** | | **$15,088.00** |

RIMKUS000134

# RIMKUS
Consulting Group, Inc.

File Number: 50901985  
Invoice Number: 6411332

July 15, 2014  
Page 4

---

### TIME SUMMARY

| Title | Hours | Fees |
|-------|-------|------|
| DISTRICT MGR | 19.00 | 4,275.00 |
| DIVISION MGR | 63.40 | 10,813.00 |
| | 82.40 | $ 15,088.00 |

### EXPENSE SUMMARY

| Expense | Amount |
|---------|--------|
| CAMERA USAGE | 50.00 |
| AUTOMOBILE MILEAGE | 713.60 |
| DELIVERY SERVICE | 1.60 |
| PHOTOGRAPHS | 45.00 |
| TRIP EXPENSES | 816.74 |
| PARKING AND TOLLS | 32.60 |
| MATERIALS | 14.76 |

| | |
|---|---|
| **Total Expenses:** | **$ 1,674.30** |
| **Total Fees and Expenses:** | **$ 16,762.30** |
| **Balance Due From Previous Invoice(s):** | $300.00 |
| **Total Amount Due:** | **$ 17,062.30** |

CONFIDENTIAL

RIMKUS000135



# RIMKUS
### Consulting Group, Inc.

P.O. BOX 4673
HOUSTON, TEXAS 77210
(630) 321-1846

FEDERAL ID: 76-0163936

| | |
|---|---|
| SENAK, KEEGAN, GLEASON, SMITH & MICHAUD | Invoice Number: 6458526 |
| 621 PLYMOUTH COURT STE. 100 | Invoice Date: October 13, 2015 |
| CHICAGO, IL 60605 | File Number: 50901985 |
| CONTACT: MARK SENAK | |

Re:      BALL CORPORATION - INDUSTRIAL BUILDING FIRE 501 NORTH 6TH STREET-
MONTICELLO, IN

Insured:    BALL CORPORATION

## FOR PROFESSIONAL SERVICES RENDERED

### CURRENT BILLING

| | |
|---|---|
| Consulting Fees | $7,518.00 |
| Expenses | 1,404.39 |
| State Taxes | 0.00 |
| Other | 0.00 |
| Total Current Charges | $8,922.39 |

*(see attached pages for detail)*

### Outstanding Invoices

| Date | Invoice | Invoice Amount | Date Paid | Payment Received | Balance |
|---|---|---|---|---|---|
| 07/08/14 | 6410181 | $300.00 | 05/28/15 | $300.00 | $0.00 |
| 07/15/14 | 6411332 | $16,762.30 | 05/28/15 | $16,762.30 | $0.00 |

BILLS ARE DUE AND PAYABLE UPON RECEIPT

PLEASE REFERENCE OUR FILE NUMBER AND INVOICE NUMBER ON CHECK
AND MAKE PAYABLE TO:

RIMKUS CONSULTING GROUP

**CONFIDENTIAL**

# RIMKUS

Consulting Group, Inc.

File Number: 50901985
Invoice Number: 6458526

October 13, 2015
Page 2

| | | | | | |
|---|---|---|---|---|---|
| 10/08/14 | 6419336 | $300.00 | 05/28/15 | $300.00 | $0.00 |
| 01/09/15 | 6428380 | $300.00 | | $0.00 | $300.00 |
| 04/08/15 | 6437402 | $300.00 | | $0.00 | $300.00 |
| 07/08/15 | 6446617 | $300.00 | | $0.00 | $300.00 |
| | | | | | $900.00 |

**Total Now Due** **$9,822.39**

**CONFIDENTIAL**

**RIMKUS000141**

# RIMKUS

Consulting Group, Inc.

File Number: 50901985

Invoice Number: 6458526

October 13, 2015

Page 3

## DETAILS OF CURRENT CHARGES

### PROFESSIONAL SERVICES

| Date | Init. | Title | Description of Services | Hours | Rate | Amount |
|------|-------|-------|-------------------------|-------|------|--------|
| 08/31/15 | SMH | DISTRICT MGR | REVIEW FILE MATERIALS NEEDED FOR INNSPECTION. TRAVEL TO JOB SITE. | 5.60 | 235.00 | 1,316.00 |
| 08/31/15 | OWSO | DIVISION MGR | TRAVEL TO MONTICELLO FOR EXAM ON 09/01 | 2.50 | 175.00 | 437.50 |
| 09/01/15 | SMH | DISTRICT MGR | MEET WITH ATTORNEY SENAK. INSPECT AND DOCUMENT ARTIFACTS OF INTEREST. COLLECT EVIDENCE AS NEEDE D. RETURN TRAVEL TO CHICAGO, NOTES TO FILE. | 10.60 | 235.00 | 2,491.00 |
| 09/01/15 | OWSO | DIVISION MGR | CONDUCT EXAMINATION. RECOVER EVIDENCE. TRANSPORT EVIDENCE TO SECURE STORAGE FACILITY. | 8.50 | 175.00 | 1,487.50 |
| 09/23/15 | SMH | DISTRICT MGR | ROUND TRIP TRAVEL TO MONTICELLO, IN. | 4.80 | 235.00 | 1,128.00 |
| 09/23/15 | SMH | DISTRICT MGR | INSPECT OVEN AND COLLECT SAMPLE | 2.80 | 235.00 | 658.00 |
| | | | **Total Fees:** | **34.80** | | **$7,518.00** |

### TIME SUMMARY

| Title | Hours | Fees |
|-------|-------|------|
| DISTRICT MGR | 23.80 | 5,593.00 |
| DIVISION MGR | 11.00 | 1,925.00 |
| | 34.80 | $ 7,518.00 |

### EXPENSE SUMMARY

| Expense | Amount |
|---------|--------|
| AUTOMOBILE MILEAGE | 920.00 |
| TRIP EXPENSES | 466.79 |

**CONFIDENTIAL**

RIMKUS000142

# Exhibit 7

12:20AM    IBO Exit East blow smoking
Check air flow, Airflow was good .13; Heat gun
Temp 270° + 280° then fire up to 700°, Ckeck all
Exit blows temp were the same Itell fire was comy out.
Shut Burn Down, blowers were Running to Cool Down then
Big Puff of snoke and Fire out of Blower in and use
Fire ~~Extinguisher~~ Extinguisher to put out fire out of
3/4" Asut hole then flame start spread to the other pipe & blower
and fire Deparment got Called.


5/22/14
Rong Cue


**PRIVILEGE AND CONFIDENTIAL**        **BALL 001125**

<u>**12:20AM**</u>    IBO exit exhaust blower smoking. Check air flow, airflow good. .13, Heat gun temp 270* + 280* then fire up to 700*. Check all exit blowers. Temp were the same. Then fire was coming out. Shut burners down, blowers were running to cool down then big puff of smoke and fire out of blower on, and used fire extinguisher to put out fire out of ¾" access hole. Then flames started to spread to other pipe and blower and the fire department got called.

5-22-2014

Randy Crume

**PRIVILEGE AND CONFIDENTIAL**        **BALL 001132**

Called out to line 2 IOO for light smoke from discharge blower. @ 12:20 Inspect Blower seemed Normal. Its got Heat Cam and was same as other blower. Close within 90 deg of other. shut down barners temp lowered some. With barners off and Blower on white smoke Began to discharge from Blower. got scisor lift and fire extinguisers and Attempted To put fire out, which made it worse. Discharge Blower fully ingulfed inside. Ext didn't help. called 911.

supervisor

5/22/14

Called out to line 2 IBO for light smoke from discharge blower @ 12:20. Inspected blower seemed normal. Et's got heat cam and was same as other blower. Close between 20*of other. Shut down burners temp lowered some. With burners off and blowers on white smoke began to discharge from the blower. Got scissor lift and fire extinguishers and attempted to put fire out which made it worse. Discharge blower fully engulfed inside. Extinguisher didn't help. Supervisor called 911.

5-22-2014

Wes Krintz

**PRIVILEGE AND CONFIDENTIAL**                    **BALL 001134**

approx 12:20AM Justin ask for heat gun
smoke was see comming from near exhaust
Fan housing. Looked at temp 275 as compared to
line 1   255
we shut down Burners ~~###~~ temp went down 270
within 3 to 5 min Large amount of smoke came
out the housing Temp gun shown 480° to 520°
insulation started on fire   I shut exhaust fans Down
Milwrights use two fire extinguisher at same
Time Flames started at inlet exhaust
call for them to come down and get out
we went to evaaution area
after Roll call went with Mike Rogers to
assist fire department if needed
we were asked to go in handy, was an myself
I was asked to shut down panel then we
three ~~stood~~ stood ~~in 75~~ by IC a few minutes
then told fire department we were going outside
we stood outside in front of cooling towers.


5-22-14
Robert Pellegrini

PRIVILEGE AND CONFIDENTIAL            BALL 001124

Approx. 12:20 AM Justin ask for heat gun smoke was seen coming from rear exhaust fan housing. Looked at temp 275* compared to line 1 255*. We shut down burners. Temperature went down 270* within 3 to 5 minutes. Large amount of smoke came out the housing. Temp gun shown 480* to 520* insulation started on fire. I shut exhaust fans down millwrights used two fire extinguishers. At same time flames started at inlet exhaust call for them to come down and get out. We went to evacuation area. After roll call went with Mike Rogers to assist fire department if needed. We were asked to go in Randy, Wes and myself. I was asked to shut down panel then we three stood by IC a few minutes. Then told fire department we were going outside in front of cooling towers.

5-22-2014

Robert Pellegrini

**PRIVILEGE AND CONFIDENTIAL**    **BALL 001133**

5-22-14        York

At 12:20 AM I was called to the IBO because there was smoke coming from the exhaust on line 2 IBO exit. People had smelled a burning scent and called electricians and millwrights to the area. They were there when I arrived. I talked to ET Box at that time and I decided on his recommendation to shut the burners off and keep the blowers running to try and cool it down. At that point the temp on that blower was about 20° hotter than line 1 IBO. I went to the office to call the manager to let him know we had equipment down. Before I got that call made Justin Stout (ET) called me back to the area. When I got back there around 12:45 AM the smoke was heavier. I instructed them to use an extinguisher on it and told them I was going to call Freddy Spenser. I just got back to the office and Chad Armstrong (chief) came in the office and said there were now flames. I called 911 and I instructed Chad to call Freddy. At the same time Chad Jacobs called on the PA to evacuate the building. Justin Stout came in at the same time and pulled the fire alarm. While I had 911 on the line I told Chad Armstrong to tell Freddy to call the other saleried personel. We then got out of the building too.

**PRIVILEGE AND CONFIDENTIAL**        **BALL 001128**

We all met up by the pump house and roll call was taken based from the premise report. Marty Garwood was performing the roll call when I got there. All were accounted for. I then got the shop and ET personel and went to the North overhead door to assist the fire department. Wes Krintz and Randy Crusne gave the firefighters some tools to remove the door from the FBO. The fire department was in control of it at that time. All of this happened between 12:20 and 12:50.

Mike Rogers
5-22-14

**PRIVILEGE AND CONFIDENTIAL**          **BALL 001129**

At 12:20 AM I was called to the IBO because there was smoke coming from the exaust on line 2 IBO exit. People has smelled a burning sent and called electricians and millwrights to the area. They were there when I arrived. I talked to ET Bob at that time and I decided on his recommendation to shut the burners off and keep the blowers running to try and cool it down. At that point the temp on that blower was about 20* hotter than line 1 IBO. I went to the office to call the managers to let them know we had equipment down. Before I got that call made Justin Stout (ET), called me back to the area. When I got back there around 12:45 AM the smoke was heavier. I instructed them to use an estinguisher on it and told them I was going to call Freddy Spencer. I just got back to the office and Chad Armstrong (Chief)came in to the office and said there were now flames. I called 911 and I instructed Chad to call Freddy. At the same time Chad Jacobs called on the PA to evacuate the building. Justin Stout came in at the same time and pulled the fire alarm. While I had 911 on the line I told Chad Armstrong to tell Freddy to call the other salaried personel. We then got out of the building too. We all met up by the pump house and roll call was taken based from the Premise report. Marty Garwood was performing the roll call when I got there. All were accounted for. I then got the shop and ET personel and went to the North overhead door. Wes Krintz and Randy Crume gave the firefighters some tools to remove the doors from the IBO the fire department was in control of it at that time. All of this happened between 12:20 and 12:50.

Mike Rogers

5-22-14

**PRIVILEGE AND CONFIDENTIAL**          **BALL 001130**

We got called to line 2 IBO around 12:20am for smoke in rear exhaust. Temp's were normal with IR Gun. Millwrights check air flow was ok. Then we shut the Burner's off. Temps went Down with IR Gun at first then spiked to near 500°F. Millwrights used fire ~~extinguisher~~ and fire was out of control ~~the up~~ fire Patinguisher Department was called and alarm was pulled.

Justin Stout
5-22-14

**PRIVILEGE AND CONFIDENTIAL**          **BALL 001126**

We got called to line 2 IBO around 12:20 AM for smoke in rear exhaust. Temp's were normal with IR gun. Millwrights check airflow was ok. Then we shut the burners off. Temps went down with IR gun at first then spiked to near 500*F. Millwrights used fire extinguisher and fire was out of control.  Fire department was called and alarm was pulled.

Justin Stout

5-22-2014

**PRIVILEGE AND CONFIDENTIAL**            **BALL 001131**

# Exhibit 8

*In the Matter Of:*

BALL CORPORATION

-vs-

AIR TECH OF MICHIGAN, INC.

RANDY CRUME

March 07, 2018



CONNOR REPORTING

111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

3

```
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
 2
           CAUSE NO. 4:16-CV-00042-PPS-APR
 3
   BALL CORPORATION, an Indiana  )
 4 Corporation, and FACTORY      )
   MUTUAL INSURANCE COMPANY, a   )
   Rhode Island Corporation, as  )
 5 Subrogee,                     )
                                 )
 6                               )
        Plaintiffs,              )
 7                               )
             -vs-                )
 8                               )
   AIR TECH OF MICHIGAN, INC., a )
 9 Michigan Corporation,         )
                                 )
10      Defendant.               )
11
12
13       DEPOSITION OF RANDY GENE CRUME
14
15     The deposition upon oral examination of
16 RANDY GENE CRUME, a witness produced and sworn
   before me, Diane Zeyen, RPR, a Notary Public in and
17 for the County of Hamilton, State of Indiana, taken
   on behalf of the Defendant, at Ball Metal Beverage
18 Packaging, 501 North 6th Street, Monticello,
   White County, Indiana, on the 7th day of March,
19 2018, at 1:06 p.m., pursuant to the Federal Rules of
   Civil Procedure with written notice as to time and
20 place thereof.
21
22
23
24
25
```

```
 1         I N D E X   O F   E X A M I N A T I O N
 2                                             PAGE
 3 DIRECT EXAMINATION ............................4
   Questions by Andrew B. Miller
 4 CROSS-EXAMINATION ...........................116
   Questions by Mark N. Senak
 5
 6
 7
 8         I N D E X   O F   E X H I B I T S
 9                                             PAGE
10 Crume Deposition Exhibit No.:
11 Exhibit 1 - Typewritten  . . . . . . . . . .101
              Statement/Handwritten Statement
12 Exhibit 2 - Colored Photograph  . . . . . .119
   Exhibit 3 - Colored Photograph  . . . . . .119
13 Exhibit 4 - Colored Photograph  . . . . . .124
   Exhibit 5 - Colored Photograph  . . . . . .124
14 Exhibit 6 - Colored Photograph  . . . . . .124
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1              A P P E A R A N C E S
 2
 3 FOR THE PLAINTIFF(S):
 4       Mark N. Senak
         SENAK KEEGAN GLEASON SMITH & MICHAUD, LTD.
 5       566 West Adams Street, Suite 750
         Chicago, IL  60661
 6       312.214.1400
         msenak@skgsmlaw.com
 7
 8
 9 FOR THE DEFENDANT(S):
10       Andrew B. Miller
         STARR AUSTEN & MILLER, LLP
11       201 South 3rd Street
         Logansport, IN  46947
12       574.722.6676
         miller@starrausten.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1              RANDY GENE CRUME,
 2     Having been duly sworn to tell the truth,
 3  the whole truth, and nothing but the truth
 4  relating to said matter was examined and
 5  testified as follows:
 6
 7  DIRECT EXAMINATION,
 8     QUESTIONS BY ANDREW B. MILLER:
 9  Q  Good afternoon.  Can you please state your full
10     legal name for the record?
11  A  Randy Gene, G-E-N-E, Crume, C-R-U-M-E.
12  Q  Mr. Crume, have you ever been deposed before?
13  A  No.
14  Q  Do you understand what a deposition is?
15  A  Yes.
16  Q  What is your understanding of a deposition?
17  A  Tell you what happened on the day of the
18     occurrence.
19  Q  Correct.  With the important distinction that
20     you have been placed under oath, just like you
21     were in a courtroom.  Okay?
22  A  Yes, sir.
23  Q  So the oath that you take today is the exact
24     same that you take in a courtroom.
25        We have got a court reporter transcribing
```



5

1  both my questions and your answers, so it is
2  important that we not talk at the same time.
3  Okay?
4  A  Yes.
5  Q  Because our court reporter can't transcribe two
6  people talking at once. So allow me to complete
7  my question before you answer, and I will try
8  and remember also to allow you to answer,
9  complete your answer before I ask my next
10  question.
11     You're probably going to forget that or I
12  will forget that during the course of today's
13  deposition. If I remind you of that, it is not
14  to be discourteous. It is just to make sure
15  things are easy on our court reporter. Okay?
16  A  Yes.
17  Q  Because our court reporter is transcribing your
18  answers, it is important that you answer both
19  audibly and verbally. And by audibly I mean yes
20  or no or a more extended answer rather than a
21  nod or a shake of the head, as that requires our
22  court reporter to make judgments, and we want to
23  make sure that the testimony is your own. Okay?
24  A  Yes, sir.
25  Q  Also answer verbally yes, no, or a more extended

6

1  answer rather than uh-huh or huh-uh, as that,
2  again, requires our court reporter to make
3  judgments. Okay?
4  A  Yes, sir.
5  Q  If I ask you a question today and you don't hear
6  me, ask for me to repeat it. Okay?
7  A  Okay.
8  Q  I know that it is an incredibly noisy
9  environment that you work in. Have you suffered
10  from any hearing loss?
11  A  No.
12  Q  If I ask you a question today and you don't
13  understand my question, ask for me to rephrase
14  it. Okay?
15  A  (Witness nods head up and down.)
16  Q  You have got to answer out loud.
17  A  Yes, sir.
18  Q  If I ask you a question and you answer, I'm
19  going to both presume that you have heard and
20  understood my question. Is that a fair
21  presumption?
22  A  Yes.
23     MR. SENAK: Object to form.
24  Q  I see you have got a Grand Industrial hat on.
25  Are you an employee of Grand?

7

1  A  No.
2  Q  Have you ever worked for Grand in the past?
3  A  No, sir.
4  Q  They just give it to you?
5  A  Yes, sir.
6  Q  How would you like for me to refer to you today?
7  A  Randy is fine.
8  Q  Thank you, Randy. Randy, what is your current
9  address?
10  A  5265 West South River Road, Logansport, Indiana,
11  46947.
12  Q  How long have you lived at that address?
13  A  Since 2004.
14  Q  Do you have any present intent of moving from
15  that address in the next year to 18 months?
16  A  No, sir.
17  Q  And you're a current Ball employee; true?
18  A  Yes.
19  Q  What's your date -- when did you hire on?
20  A  May 24th, 2004.
21  Q  And then have you worked here continuously since
22  that time?
23  A  Yes, sir.
24  Q  Have you worked at any other Ball locations
25  other than the Monticello plant?

8

1  A  No, sir.
2  Q  When you hired in back in '04, was it a
3  Ball Manufacturing Corporation plant?
4  A  Yes, sir.
5  Q  So the only employer that you have had from '04
6  through the current time is Ball Manufacturing?
7  A  Yes.
8  Q  Do you have any side jobs or, you know, home
9  businesses or anything like that that you work
10  with?
11  A  Just got some livestock.
12  Q  What kind of stock do you raise?
13  A  Cattle and pigs.
14  Q  Cattle. Beef cattle or --
15  A  Beef cattle and show pigs.
16  Q  Oh, okay. Are your kids in 4-H?
17  A  Yes, sir.
18  Q  It is pig buying season.
19  A  Yeah.
20  Q  I think you testified that you have never been
21  deposed before today?
22  A  No, sir.
23  Q  What's your educational background, Randy?
24  A  Graduate of Logansport, K through 12. That's
25  it.

Randy Crume
March 07, 2018

**9**

1  Q  When did you graduate from Logansport High
2      School?
3  A  1999.
4  Q  After graduation have you received any
5      additional education?
6  A  No, sir.
7  Q  After graduation from high school, have you
8      received any vocational training?
9  A  No, sir.
10  Q  From '99 through '04 what did you do?
11  A  I worked at Quality Die Set in Flora.
12  Q  Quality Die Set?
13  A  Yeah.
14  Q  Did you say in Flora?
15  A  Yeah, Flora, Indiana.
16  Q  And what did you do for Quality Die Set?
17  A  I was a machinist.  Landis Plastics.
18  Q  Let's slide back to Quality Die Set.  What
19      length of time did you work for them?
20  A  From '99 to maybe 2001, not for sure.
21  Q  And then where did you go?
22  A  To Landis Plastics.
23  Q  L-A-N-D-I-S?
24  A  Yes.
25  Q  Where was that at?

**10**

1  A  Just up the road from Ball Corp.
2  Q  Monticello?
3  A  Yes.
4  Q  What did you do for Landis Plastics?
5  A  I was a machinist.
6  Q  I think I probably know the answer, but why did
7      you move from Quality Die Set to Landis
8      Plastics?
9  A  I got laid off.
10  Q  At Quality Die Set?
11  A  Yeah.
12  Q  Was that a dip in their business, they were just
13      overstaffed?
14  A  Lack of funds.
15  Q  Did they go out of business?
16  A  No, sir.
17  Q  And then how long did you work for Landis
18      Plastics?
19  A  I think almost three years.
20  Q  So would that have been from '01 to '04?
21  A  Yeah.  Probably.
22  Q  And then did you move from Landis Plastics to
23      Ball?
24  A  I went to Kirby Risk in Lafayette for three
25      months.

**11**

1  Q  Do you recall when that was?
2  A  No.
3  Q  Just three months in '04?
4  A  Yeah.
5  Q  Okay.
6  A  Then I came to Ball Corp.
7  Q  Why did you move from Landis Plastics to Kirby
8      Risk?
9  A  Landis closed their business.
10  Q  So Landis is no longer in existence?
11  A  No.
12  Q  Okay.
13  A  They got bought out by a different company.
14  Q  Are they still in the plastic manufacturing
15      process?
16  A  Yeah.  Yes, sir.
17  Q  When Landis sold, did they just terminate
18      everybody and then the new owner hired its own
19      staff?
20  A  They offered a handful of people jobs, like
21      different locations.
22  Q  But you were not one of those employees where
23      you chose not to move?
24  A  I didn't want to leave my family.
25  Q  And then Kirby Risk, what was your position

**12**

1      there?
2  A  CNC operator.
3  Q  And what were they manufacturing on the CNC?
4  A  They made parts for Caterpillar and John Deere.
5  Q  And then did you come to Ball Corp. from
6      Kirby Risk?
7  A  Yes, sir.
8  Q  And why did you leave your employment at
9      Kirby Risk after three months?
10  A  Closer to here and better -- closer to home and
11      better benefits.
12  Q  And what is your position at Ball Corp.?
13  A  Machinist millwright.
14  Q  And you said you hired on May 24 of '04; right?
15  A  Yes, sir.
16  Q  From your hire-in date to the current date have
17      you always been a machinist millwright?
18  A  First three months of 2004 I was a front end
19      maintainer.
20  Q  What's that?
21  A  They make the cans on the front end.
22  Q  Is that just like kind of a line worker?
23  A  Production, yeah, line worker production.
24  Q  So did you hire in as that line worker in
25      production and then --



13

1  A  Yes, sir.
2  Q  You got to let me finish.
3  A  Sorry.
4  Q  That's okay.  We are going to -- both of us will
5     forget that.
6         But you hired in as a production worker and
7     then you moved into the millwright position;
8     true?
9  A  Yes, sir.
10 Q  Were you asked to move into that position or was
11    there a job posting and you applied for it?
12 A  There was a job posting.
13 Q  So when you hired in as a production person, did
14    you view that as getting your foot in the door
15    so that you could go into a different position
16    or did it not matter to you?
17 A  Yeah.  I wanted to pursue machinist.
18 Q  Because a machinist was your prior experience
19    with Quality Die Set and Landis Plastics; right?
20 A  Yes, sir.
21 Q  Generally speaking, define for me what a
22    machinist millwright is.
23 A  A machinist millwright, well, here at Ball Corp.
24    the millwright part would be adjusting and
25    moving machinery, setting up of new equipment

14

1     and maintaining stuff, production equipment in
2     the plant.
3         A machinist would be taking a piece of
4     metal, machining a new part of it for the
5     production line or fabrication or something for
6     the company, and welding.
7  Q  Let me see if I understand this correctly.  A
8     machinist does fabrication and repair of parts
9     for machines and the machines themselves?
10 A  Yeah.
11 Q  And a millwright adjusts and moves machines or
12    maintains the machines?
13 A  Yes, set it up.
14 Q  So that's like just more -- a millwright would
15    do the kind of standard maintenance on a piece
16    of machinery; true?
17 A  Yes.
18 Q  And the machinist, if, you know, a part for the
19    conveyor belt fractures or breaks or whatever,
20    you would then make a new part to put on it?
21 A  Make a repair.
22 Q  And since you moved into that machinist
23    millwright position, have you had any other
24    positions?
25 A  No.

15

1  Q  And did you say you were in the production role
2     for like three months?
3  A  Yes, sir.
4  Q  So it would have been since about August, late
5     August of '04 that you were in this machinist
6     millwright position?
7  A  Yeah.
8  Q  So from 8/04 through the current time you have
9     held the machinist millwright?
10 A  Yes, sir.
11 Q  And from 5/04 through 8/04 production?
12 A  Yes.
13 Q  Have you ever had any education or training in
14    the machinist or millwright trades?
15 A  Just when I was in high school.
16 Q  When you were in high school, did you go to the
17    Century Career Center?
18 A  El Tip WA.
19 Q  Oh, it was back in the El Tip WA days?
20 A  Yeah.
21 Q  And was there a specific machinist millwright
22    course of study?
23 A  There was a program for that.
24 Q  And how long was that program?
25 A  Junior year and senior year.

16

1  Q  So you would spend, what, half a day at
2     El Tip WA for those courses and the rest of the
3     day at the high school for the academic courses;
4     right?
5  A  Yes, sir.
6  Q  Now at the conclusion of that two-year period,
7     did you receive any certificates or
8     certifications from El Tip WA?
9  A  I think so.
10 Q  Do you recall what they were?
11 A  Just a piece of paper saying that I completed
12    the El Tip WA program.
13 Q  But was it specific to machinist millwright or
14    was it just kind of --
15 A  I don't know.
16 Q  Back when it was El Tip WA, was it -- was your
17    course of study just limited to machinist
18    millwright work or was it broader than that and
19    just a variety of kind of technical skills?
20 A  Just machinist.
21 Q  Do you recall whether or not at that time, did
22    you receive like a technical honors diploma?  Or
23    back when you were in high school, were the
24    diplomas not --
25 A  I am not for sure.

**17**

1   Q   But you got a diploma from Logansport High
2       School; true?
3   A   Yes, sir.
4   Q   And you got a certificate of completion from
5       El Tip WA?
6   A   Yes, sir.
7   Q   Randy, what did you do to prepare for today's
8       deposition?
9   A   I have been at work all day.  That's about it.
10  Q   Did you meet with Mr. Senak?
11  A   For maybe two minutes.
12  Q   And when would that -- today?
13  A   This morning.
14  Q   Prior to meeting with him for two minutes today,
15      had you ever met with him in the past?
16  A   Maybe two months ago.
17  Q   And do you remember how long that meeting took?
18  A   Maybe an hour.
19  Q   Were there other people involved in that meeting
20      or was it just you?
21  A   Just me and him.
22  Q   And was that here at the plant?
23  A   Yes.
24  Q   Now, during the course of that meeting, were you
25      shown any documents?

**18**

1   A   Yes.
2   Q   Do you recall what you were shown?
3   A   My written statement of the day it happened and
4       just pictures from an imaging camera.
5   Q   So a thermal imaging camera?
6   A   Yeah.
7   Q   And do you recall when those photographs were
8       taken?
9   A   No, sir.
10  Q   And that was a couple of months ago that you
11      were shown those documents and those photos?
12  A   Probably January.
13  Q   And that was within the one-hour meeting?
14  A   Yes, sir.
15  Q   So other than that one-hour meeting and the two
16      minutes today, have you ever met with Mr. Senak
17      previously?
18  A   No.
19  Q   To prepare for the deposition, did you look at
20      any documents?
21  A   Just two months ago.
22  Q   But since that time you have not looked at any
23      other documents?
24  A   No, sir.
25  Q   Other than the thermal imaging photographs, have

**19**

1       you reviewed any photographs?
2   A   No.
3   Q   Have you talked to any witnesses?
4   A   No.
5   Q   Have you talked to any of your co-employees that
6       I have already deposed?
7   A   I don't think so.
8   Q   Have you talked to anybody about the fact you
9       were being deposed today?
10  A   Just one of them.
11  Q   Who was that?
12  A   Wes Krintz.
13  Q   And what did Wes tell you?
14  A   Just talked about, we figured it already had
15      been settled, taken care of.
16  Q   No.  Did you talk at all about what questions I
17      asked or what information topics we went over or
18      what he answered?
19  A   No.
20  Q   Is machinist millwright, is that your kind of
21      job title or is that just your function?
22  A   That's my job title.
23  Q   How many machinist millwrights are here at the
24      plant?
25  A   We have 14.

**20**

1   Q   And are those 14 machinist millwrights, are they
2       divided between the four shifts?
3   A   Yeah.
4   Q   Or is there like one day shift and then three
5       that float?
6   A   There are a couple on days and the rest are
7       floaters.
8   Q   Are you on days or are you a floater?
9   A   I am on days, Tuesday through Friday.
10  Q   And what hours do you work?
11  A   Six to 4:30.
12  Q   So 6 a.m. to 4:30?
13  A   Yes, sir.
14  Q   I hope I can get you out of here on time.
15          So Tuesday through Friday you work 6 a.m.
16      to 4:30 and you work, what, 50 weeks a year, if
17      you get two weeks' vacation?
18  A   I get three weeks' vacation.
19  Q   So you work 49 weeks a year?
20  A   Yeah.
21  Q   And are you an hourly or salaried employee?
22  A   Hourly.
23  Q   And who is your direct supervisor?
24  A   Ray Miller.
25  Q   And how long has Ray Miller been your

21

1 supervisor?
2 A Over a year.
3 Q Who was your supervisor before that?
4 A Greg Kyger.
5 Q And how long was Greg Kyger your supervisor?
6 A A couple months.
7 Q Do you recall who your supervisor was in May of
8 2004?
9 A I think Jerry Morgan.
10 Q Do you recall how long he was your supervisor?
11 A Maybe five years.
12 Q Is there a lot of turnover in that supervisor's
13 position?
14 MR. SENAK: Object to foundation. I am
15 sorry, to form and foundation.
16 Q You can answer.
17 A Yes.
18 Q Are you aware of what causes that turnover?
19 A No, sir.
20 Q Have you ever been a supervisor?
21 A No, sir.
22 Q Do you want to be a supervisor?
23 A No.
24 Q It seems like probably a lot of people feel that
25 way.

22

1 What does a supervisor do that you don't
2 do?
3 A He works parts for us, directs us on what we
4 need to do on a daily basis.
5 Q Is there a supervisor on each shift?
6 A No, just one.
7 Q Just one overall?
8 A Overall.
9 Q Is that supervisor, is he a day shift person?
10 A Yes.
11 Q So the supervisor for the machinist millwrights
12 works day shift, but the night shift is still
13 supervised by that individual?
14 A No. They are supervised if there is a problem
15 or situation by the night shift production
16 supervisors.
17 Q So when the machinist millwright supervisor is
18 not on site, the machinist millwrights that are
19 on that shift are supervised by the production
20 supervisor?
21 A On nights.
22 Q On nights?
23 A Yes.
24 Q Have you ever worked nights?
25 A Yes, sir.

23

1 Q How long have you been working this day shift?
2 A Since I want to say January probably.
3 Q Of this year?
4 A January of this year.
5 Q Oh, so it is relatively recent?
6 A Yes, sir.
7 Q Is this a permanent day shift position?
8 A Yeah, for now. This is a temporary one-year
9 trial.
10 Q For your position specifically?
11 A For the five day shift guys that work 6 to 4:30.
12 Q What, to see if that is kind of convenient?
13 A Yeah. I have a certain job that I do, so they
14 have me there so I can be caught up on it, keep
15 caught up on it.
16 Q What is that job that you have?
17 A Rebuild cartridges, trimmer cartridges.
18 Q And you have been doing that since January?
19 A No. I have been doing that since I came to the
20 shop.
21 Q Back in August of '04?
22 A '04.
23 Q Is that your job then, to rebuild trimmer
24 cartridges?
25 A My primary job for the day.

24

1 Q But what about, I thought you said that you have
2 been doing that job, it stretches all the way
3 back to August of 2004?
4 A Yes. They want me on days to do that job.
5 Q So your job duties haven't changed?
6 A No.
7 Q Just the hours?
8 A Just the hours.
9 Q And before January of this year, did you work
10 that floating shift.
11 A Yeah.
12 Q So sometimes you were on days, other times you
13 were on nights?
14 A Yes.
15 Q Were there just two shifts or were there three
16 different shifts that you could work on?
17 A There's four shifts.
18 Q There's four shifts?
19 A Yeah.
20 Q What are those four shifts?
21 A They have Monday -- they have a four on/four off
22 rotation. And they have day shift on those
23 days, and they have a day/nights on the other
24 four days.
25 Q Do you recall what shift you were working in May



25

1 of 2014?
2 A No.
3 Q You said your primary job function is to rebuild
4    trimmer cartridges; is that right?
5 A Yes.
6 Q What is a trimmer cartridge?
7 A It trims the aluminum can to height.
8 Q How many trimmer cartridges are here at the
9    plant?
10 A Three for each machine. I need a calculator to
11    give you a -- there is 3 for each machine and
12    there is 8 machines on each line and we have got
13    4 lines and there's like 14 spares on the shelf.
14 Q And is it a constant process, that as soon as
15    you get through that entire amount of trimmer
16    cartridges, you got to start with number one
17    again and work your way through?
18 A Yeah. I am always rebuilding them.
19 Q And is that what you do all four days a week
20    that you work?
21 A When I have time, if I am caught up, I will do
22    different floor calls and other repairs in the
23    shop we will have out on the floor.
24 Q The work that you do repairing or rebuilding
25    trimmer cartridges, is that done in a shop area

26

1    or kind of out on the production floor?
2 A In our shop.
3 Q So will you then go to the machine, disassemble
4    or remove the trimmer cartridge and then take it
5    back to your shop?
6 A No. The production people do that.
7 Q The production people remove the trimmer
8    cartridge?
9 A Yes.
10 Q And then deliver it to your shop?
11 A Yes.
12 Q Do you have spares that are then mounted on?
13 A We have 14 spares.
14 Q So they remove one, bring it to be repaired, but
15    there is no downtime on the machine?
16 A No.
17 Q So as they are dropping it off, you give them a
18    new cartridge and they put it on?
19 A Yes, sir.
20 Q Are any tools required to either remove or
21    replace a trimmer cartridge?
22 A Just one Allen wrench.
23 Q And where do they get that Allen wrench from?
24 A It is their personal Allen wrench.
25 Q Does each employee have, in production, have an

27

1    Allen wrench?
2 A They should have. They have a parts list.
3 Q How do they know when a trimmer cartridge needs
4    rebuilt?
5 A That's sent to the printer. It is up to them
6    and their supervisor and chief.
7 Q Okay. Do you have any idea how long a trimmer
8    cartridge lasts before it needs rebuilt?
9 A They can last up to a week or two years.
10 Q What percentage of your time is spent rebuilding
11    these trimmer cartridges?
12 A Every week is different.
13 Q But you work 49 weeks a year; true?
14 A Yes.
15 Q Can you estimate for me, of those 49 weeks a
16    year, how much of your time is spent rebuilding
17    trimmer cartridges as opposed to something else?
18 A Probably 75 percent of my time.
19 Q Now, Randy, are you kind of the trimmer
20    cartridge specialist here at Ball, that that's
21    what you do personally?
22 A Yeah.
23 Q Okay.
24 A Yeah. I just trained an individual to help me.
25 Q Before training this individual, were you the

28

1    only guy that was doing it?
2 A I had the gentleman that retired train me before
3    he left. I was his backup.
4 Q And how long ago was it that he left?
5 A Eight years, maybe ten years.
6 Q Ten years ago he retired?
7 A Yeah. Probably.
8 Q So for eight or ten years you have been the
9    primary guy doing the trimmer cartridge rebuild?
10 A Yes, sir.
11 Q So if my math is correct, you have been doing
12    this, the trimmer cartridge rebuild since 2008
13    or 2010; true?
14 A I have been doing since I hired in in '04. Now
15    solely myself, for the last probably, I don't
16    know, when he retired back eight years ago, I am
17    by myself.
18 Q So would it then be accurate to say in the last
19    eight or ten years, since this other guy
20    retired, you have been spending 75 percent of
21    your time in the shop area?
22 A Yeah.
23 Q As opposed to being out on the floor?
24 A Yes.
25 Q Will there be days at a time where you will just



29

1   be working in the shop?
2   A   Yes.
3   Q   So the entire, you know, what, eight and a half
4   hours that you are here on site will be spent in
5   the shop area?
6   A   Yes.
7   Q   Where is that shop area located?
8   A   Out this door, turn right, go all the way to the
9   next door, and that's the entrance to the
10   machine shop.
11   Q   And is the machine shop, it is located away from
12   the production facility?
13   A   Yes.
14   Q   From the machine shop, are there windows in the
15   machine shop where you can look out on the
16   production floor?
17   A   No.  There's two doors, with windows on them.
18   Q   Do you have like a specific workbench that you
19   work at when you do the rebuilding of these
20   trimmer cartridges?
21   A   Yes, sir.
22   Q   Is that kind of your workspace and nobody
23   else's?
24   A   Yes.
25   Q   From your workspace, can you see IBO #2?

30

1   A   No.
2   Q   Is there a solid wall or something that prevents
3   you from seeing that?
4   A   It is a good ways away from our shop.
5   Q   From anywhere in the machine shop, can you see
6   IBO #2?
7   A   No.
8   Q   So you have no visual contact with IBO #2 from
9   your work area?
10   A   No.
11   Q   The other 25 percent of your time where you're
12   not rebuilding these trimmer cartridges, what
13   are you doing?
14   A   I am out on floor calls, fixing equipment, doing
15   additional rebuilds.
16   Q   Anything else?
17   A   That's about it.
18   Q   The floor calls that you talk about, is that
19   where somebody calls you and says that something
20   needs done out on the production floor area?
21   A   Yeah.  Someone calls for millwright or our
22   supervisor tells us that we need to go out and
23   work on the floor to repair stuff.
24   Q   And how are you notified of that?
25   A   Either he tells us or it goes over our PA

31

1   system.
2   Q   When he tells you, is that because he has been
3   notified over the PA or somebody has telephoned
4   him?
5   A   Telephoned him.
6   Q   And then you say fixing equipment, when you are
7   fixing equipment, are you doing that out on the
8   floor or are you doing that in the machine shop?
9   A   If it's a part that we can bring back, we will
10   bring back to the shop.  If it is something that
11   we have to fix out there, we fix out there.
12   Q   And then the third component, the additional
13   rebuilds, is that done on the floor or in the
14   machine shop?
15   A   In the machine shop.
16   Q   So the only thing that you -- the only component
17   of your job that requires you to go out in the
18   production area is floor calls and some of the
19   equipment fixing that you do?
20   A   Yeah.
21   Q   So 25 percent of your work hours are consumed
22   with floor calls, fixing equipment, and
23   additional rebuilds; right?
24   A   Yeah.
25   Q   Of that 25 percent, what percentage of time do

32

1   you spend out on the floor?
2   A   I don't know.  It just depends.
3   Q   Can you give me any kind of an average?
4   What I am trying to figure out, Randy, is
5   how much of your overall work time do you spend
6   in the machine shop as opposed to out on the
7   production floor?
8   A   On a week, it could be 5 to 15 hours a week out
9   on the floor.
10   Q   Out on the floor.  And then so somewhere between
11   25 and 35 hours will be in the machine shop?
12   A   Yeah.
13   Q   So would it be accurate to say that consistently
14   you spend most of your time in the machine shop?
15   A   Yes.
16   Q   The time that you spend out on the production
17   floor, the 5 to 15 hours a week, is that
18   scattered throughout the entire plant?
19   A   Yes.
20   Q   And is that, those kind of percentages of time
21   remain about the same from your hire-on date
22   in -- or since the time that you have been a
23   machinist millwright in August of '04 through
24   the current time?
25   A   Yeah.



**33**

1  Q  Prior to coming to work here at Ball
2     Manufacturing, did you ever have any prior
3     experience in beverage can fabrication?
4  A  No.
5  Q  Before you came to work at Ball, did you have
6     any prior experience with IBO ovens?
7  A  No.
8  Q  Have you ever had to work on a temporary
9     assignment at other Ball locations?
10 A  No.
11 Q  The work that you have done on IBOs, that's been
12    entirely during your employment with Ball;
13    correct?
14 A  Yes.
15 Q  How many IBOs have you personally worked on
16    while here at Ball Corporation?
17 A  All four of them, five of them.
18 Q  And IBO #2 that was involved in this fire, I
19    understand that that's no longer here at the
20    plant; true?
21 A  Yeah.
22 Q  And when was that taken out?
23 A  I am not for sure.
24 Q  You had mentioned that part of the job of a
25    millwright is moving equipment; true?

**34**

1  A  Yes.
2  Q  Were you involved in moving IBO #2 out of the
3     plant?
4  A  No.
5  Q  Were other millwrights involved in that?
6  A  I'm not for sure.
7  Q  Do you know whether that was done by an outside
8     contractor?
9  A  I am not for sure.
10 Q  During your employment with Ball, did you work
11    on IBO #2?
12 A  Yes.
13 Q  Okay.  Do you recall how often you worked on
14    IBO #2?
15 A  Just if they had mat tracking issues.
16 Q  If they had a what?
17 A  Mat tracking.
18 Q  What is mat tracking?
19 A  There is a steel mat, stainless mat that goes
20    through the whole oven.  And if it goes too far
21    one way, it can alarm, so you have to readjust
22    it.
23 Q  Would that be like the conveyor belt that moves
24    product through the oven?
25 A  Yeah.

**35**

1  Q  So if the conveyor belt got off track, you would
2     have to go out and adjust it?
3  A  Yeah.
4  Q  Were you able to adjust that from the outside of
5     the oven?
6  A  Yes.
7  Q  Did the oven have to be shut off in order to
8     adjust it?
9  A  No.
10 Q  Did the oven temperature have to be adjusted to
11    affect it?
12 A  No.
13 Q  So is it just adjustment screws that are --
14 A  Yes, sir.
15 Q  I would assume that like turning the screw to
16    the right may cause the conveyor to shift one
17    way, whereas turning it to the left would cause
18    it to shift back the other way; true?
19 A  Yes, sir.
20 Q  How many adjustment screws are there?
21 A  It is a go forward and backwards.  That's all a
22    hydraulic Fife unit.
23 Q  I am not understanding.
24 A  That mat is controlled by a paddle.  When the
25    mat touches that paddle, the Fife unit, it is a

**36**

1     hydraulic that tells it to go south, north,
2     whichever way it needs to track.
3  Q  But how many adjustment --
4  A  Just one bolt.
5  Q  Just one bolt?
6  A  Yes.
7  Q  That will adjust the entirety of the length of
8     the machine?
9  A  Yes.
10 Q  How long is that stainless conveyor mat?
11 A  Eight feet, I think.
12 Q  Other than adjusting that conveyor mat, did you
13    ever perform any other work on IBO #2?
14 A  If we got called out for vibrations or like a
15    bearing failure.
16 Q  Where would those vibrations or bearings be on
17    the machine?
18 A  In any of the blowers for the air flow, suck the
19    air into the burners and for the exhaust fans,
20    any of the blowers that's on top.
21 Q  Do you recall how many times you had to either
22    adjust the fans or change the bearings on any of
23    the fans associated with IBO #2?
24 A  No.
25 Q  Do you know how many fans were on IBO #2?

Randy Grume
March 07, 2018

37 to 40

---

**37**

1  A  No.

2  Q  My understanding is that the fire occurred at
3     some point on May 22, May 23, 2014.  Does that
4     meet with your recollection?

5  A  Yes, I think so.

6  Q  Do you remember the last time before May 22 or
7     23 that you worked on IBO #2?

8  A  No, sir.

9  Q  Do you remember the last time a machinist
10    millwright worked on IBO #2 before the fire?

11 A  No, sir.

12 Q  Did you guys keep records as to the work that
13    you performed?

14 A  No.

15 Q  So if a machinist millwright performs some work
16    on IBO #2, no records are kept of the work that
17    was performed?

18 A  When we do air flows, there's records kept.

19 Q  Okay.

20 A  And for like maintenance issues, we don't keep a
21    data log.

22 Q  Are there any shop logs that you keep?

23 A  No.

24 Q  Would any repairs that you did on the IBO #2
25    kind of fall under the category of a floor call

---

**38**

1     or fixing equipment?

2  A  Yes.

3  Q  When you get that call, either over the PA or
4     your supervisor tells you to do something, is
5     there a work ticket or any kind of documentation
6     created of that call that was made or request
7     for work?

8  A  No.

9  Q  So is my understanding of your testimony
10    correct, that there would be no documents
11    maintained by the machinist millwright
12    department with respect to any repairs or
13    maintenance performed on IBO #2?

14 A  No, just air flows.

15 Q  But air flow, that's just testing, that's not
16    repair or maintenance; true?

17 A  Yes.

18 Q  So I am correct in saying that there are no
19    records for any repairs or maintenance of IBO #2
20    maintained by your department?

21    MR. SENAK:  Object to foundation.  Go
22    ahead.

23 Q  Is that true?

24    MR. SENAK:  Go ahead, you can answer.

25 A  Oh, yes.

---

**39**

1  Q  Do you recall the last time that you were around
2     IBO #2 before the fire?

3  A  No, sir.

4  Q  Aside from adjusting that conveyor belt that you
5     spoke of, do you recall any other work that you
6     ever did on IBO #2?

7  A  (Witness shakes head side to side.)

8  Q  You have got to answer out loud.

9  A  Just air flows.

10 Q  But, again, that's just reading it, you know,
11    that's just recording information; correct?

12 A  Yes.

13 Q  So you're not doing any maintenance or repair
14    incident to recording air flows; right?

15 A  Yes.

16 Q  Well, let's just talk about maintenance and
17    repair.

18    Do you recall any maintenance or repair
19    that you performed on IBO #2?

20 A  I do not remember.

21 Q  Was there a difference between IBO #2 and any
22    other IBO?

23 A  One, 2, and 3 are the same.

24 Q  Okay.

25 A  At the time, when we had line 4, it was a

---

**40**

1     different style.

2  Q  Was it the same manufacturer of the oven?

3  A  I'm not for sure.

4  Q  When you say "different style," explain that to
5     me.  What does that mean?

6  A  It was new and ran on a different conveyor
7     system instead of a stainless steel mat.  It
8     runs on a cavalier mat.

9  Q  Other than the different material of the mat,
10    was there any difference?

11 A  I am not for sure.

12 Q  What was that machine number?

13 A  What's that?

14 Q  The IBO that was different than the other three.

15 A  IBO 4.

16 Q  Four.  So 1, 2, and 3 were the same and 4 had a
17    different type of mat?

18 A  Yeah.

19 Q  But 1, 2, and 3 were identical; right?

20 A  Yes, sir.

21 Q  Would you have been involved in any cleaning of
22    the IBO ovens?

23 A  No, sir.

24 Q  Did you play any role in Ball Manufacturing's
25    decision to hire Air Tech?

---

---

**41**

1  A  No, sir.
2  Q  Do you know whether Air Tech was the outside
3      firm to do the cleaning services beginning in
4      August of '04 when you began being a machinist
5      millwright?
6  A  I don't know.
7  Q  When you were in production for that really
8      short three-month window, did you work on
9      IBO #2?
10 A  No.
11 Q  Where did you work in the plant at that time?
12 A  Just the front end.
13 Q  And what were your job functions on the front
14     end?
15 A  Do can checks and adjustments to keep the
16     machine making production.
17 Q  But in that role you had no involvement with
18     IBO #2?
19 A  No.
20 Q  Could you see IBO #2 from where you worked?
21 A  No.
22 Q  So do you have any knowledge of how long
23     Air Tech had provided services here at Ball?
24 A  No, sir.
25 Q  Do you have any knowledge of who decided to hire

---

**42**

1      Air Tech?
2  A  No, sir.
3  Q  Do you have any knowledge of any Air Tech
4      employees?
5  A  No, sir.
6  Q  Have you ever heard the name Paul Scholten
7      before?
8  A  No, sir.
9  Q  Did you ever have any conversations with anyone
10     that you knew was an Air Tech employee?
11 A  No, sir.
12 Q  Were you aware of when the IBOs were scheduled
13     to be cleaned?
14 A  No, sir.
15 Q  As a part of your job, were you aware of the
16     maintenance schedule or the cleaning schedules
17     for any of the ovens?
18 A  We did them on the maintenance days.
19 Q  Were you aware of the maintenance days before
20     they happened?
21 A  Yes, sir.
22 Q  Were you involved in scheduling those
23     maintenance days?
24 A  No, sir.
25 Q  Do you know who set the maintenance days?

---

**43**

1  A  No, sir.
2  Q  Do you know how it was determined when a
3      maintenance day was?
4  A  No, sir.
5  Q  Do you know how it was determined -- strike
6      that.
7      Do you know how the frequency of
8      maintenance days were scheduled?
9  A  No, sir.
10 Q  How many maintenance days would there be a
11     month?
12 A  Not for sure.
13 Q  How many maintenance days would there be a year?
14 A  Not for sure.
15 Q  Do you know who would have that information?
16 A  Freddy Spencer.
17 Q  And what is Freddy Spencer's role?
18 A  Plant engineer.
19 Q  Does the machinist millwright supervisor report
20     to Freddy Spencer?
21 A  Yes, sir.
22 Q  Is there anyone in between you or machinist
23     millwrights like you and Freddy Spencer other
24     than the supervisor machinist millwrights?
25 A  No.

---

**44**

1  Q  Do you know whether Freddy Spencer tells your
2      supervisor when a maintenance day is?
3  A  I'm not for sure.
4  Q  Do you know in advance that a maintenance day is
5      coming up?
6  A  Yes, sir.
7  Q  All right.  When you learn that there is a
8      maintenance day coming up, does that affect
9      anything about your job?
10 A  No.
11 Q  Why are you made aware that a maintenance day is
12     coming up?
13 A  So we can be here on that day.
14 Q  All of the machinist millwrights?
15 A  It depends.  It can be days or nights.
16 Q  But I think you earlier testified there was 14;
17     is that right?
18 A  Yes, sir.
19 Q  On a maintenance day would all 14 be on site for
20     the day?
21 A  It depends.
22 Q  What does it depend on?
23 A  What we are doing on that day.
24 Q  Are you notified that there is cleaning going to
25     be done on the ovens?

---

Randy Grume
March 07, 2018

45 to 48

45

1  A  If they post it and notify everybody.
2  Q  Where would that be posted?
3  A  They send an email and put it on the eight-day
4     board back in the break room.
5  Q  Who posts it?
6  A  I am not for sure.
7  Q  Is it always posted that there is going to be a
8     cleaning?
9  A  Yes.
10 Q  So I understand it, the IBOs are not all cleaned
11    on the same day; is that true?
12 A  On the day of the maintenance?
13 Q  Correct.
14 A  No, sir.
15 Q  So you may have maintenance or cleaning on one
16    IBO but the other three are functioning; true?
17 A  Yes, sir.
18 Q  Do you have any idea of how many times a year
19    each IBO is cleaned?
20 A  No, sir.
21 Q  When an IBO is being cleaned, are the machinist
22    millwrights involved in that process?
23 A  No, sir.
24 Q  Are the machinist millwrights involved in any
25    process that takes place before the IBOs are

46

1     cleaned?
2  A  I don't think so.
3  Q  So the machinist millwrights don't have to do
4     anything to get the machine ready to be cleaned;
5     true?
6  A  No, sir.
7  Q  Do the machinist millwrights do anything after
8     the machine has been cleaned?
9  A  No, sir.
10 Q  Is the conveyor, is that affected by the
11    cleaning process?
12 A  No.
13 Q  So the cleaning does not result in the conveyor
14    needing to be adjusted?
15 A  Not usually.
16 Q  Do you have any knowledge of the work that
17    Air Tech performed?
18 A  No, sir.
19 Q  Do you have any knowledge of the process that is
20    followed to clean an IBO?
21 A  No, sir.
22 Q  Did Ball Manufacturing provide you with any
23    training on the operation of an IBO?
24 A  No, sir.
25 Q  Has Ball Manufacturing provided you with any

47

1     training on the cleaning of an IBO?
2  A  No, sir.
3  Q  Has Ball Manufacturing provided you any training
4     as to the repair of an IBO?
5  A  No, sir.
6  Q  Has Ball Manufacturing provided you with any
7     training as to the maintenance of an IBO?
8  A  No, sir.
9  Q  Have you personally read the maintenance manual
10    for an IBO?
11 A  No, sir.
12 Q  Are you aware of where the maintenance manual is
13    located?
14 A  No, sir.
15 Q  Have you ever read the operator's manual for an
16    IBO?
17 A  No, sir.
18 Q  Are you aware of whether or not an operations
19    manual is even on site?
20 A  Not for sure.
21 Q  Are you aware of whether a maintenance manual
22    for the IBOs are even on site?
23 A  Not for sure.
24 Q  Are you aware of a repair manual for the IBOs?
25 A  I am not for sure.

48

1  Q  Have you ever read a repair manual for the IBOs?
2  A  No, sir.
3  Q  Do you know whether or not one is located on
4     site?
5  A  Not for sure.
6  Q  Have you ever seen a parts manual for the IBO?
7  A  I am not for sure.
8  Q  Have you ever read a parts manual for the IBO?
9  A  Not for sure.
10 Q  Do you even know whether a parts manual for the
11    IBO is located on site?
12 A  I am not for sure.
13 Q  Wouldn't a parts manual be important for a
14    machinist millwright?
15 A  Yes.
16 Q  Because if something breaks on the machine, you
17    need to know what broke, what it is called, so
18    you can order it or fabricate a new one;
19    correct?
20 A  Yes.
21 Q  But you have no knowledge of whether or not one
22    even exists on the site?
23 A  No, sir.
24 Q  In the machinist millwright office do you have
25    like an area that has like bookshelves where



49

1    parts manuals are?
2  A  Yes, sir.
3  Q  Is that accessible to all of the machinist
4     millwrights?
5  A  Yes, sir.
6  Q  But you never personally had to consult that and
7     look for --
8  A  No.
9  Q  -- anything for the IBOs?
10  A  No, sir.
11  Q  I think you testified that you have not received
12     any training while in Ball's employment as to
13     the operation, maintenance, or repair of IBOs;
14     correct?
15  A  No, sir.
16  Q  How do you know how to do your job without
17     having received any training?
18  A  Like for repairing?
19  Q  The IBO.  Like if something -- for instance, you
20     talked earlier about the adjustments that you
21     make.
22  A  Yeah.
23  Q  How did you figure out how to do that?
24  A  Change the bearing out, you mark where it is at
25     with a depth mic or calipers, take it off, put a

50

1     new bearing on, put it back to the same
2     location.  Make sure it spins freely and put it
3     back together.
4  Q  But is that something that, like a skill or a
5     knowledge that you acquired here or someplace
6     else?
7  A  Just put it back the same way we took it apart.
8  Q  But doesn't that require the guy who did it
9     before you to have known what they were doing?
10  A  Not for sure.
11  Q  Well, if you're putting it back together the way
12     that it was, don't you have to know whether or
13     not it was put together properly in the first
14     place?  Are you following my question?
15  A  We measure it, put it back in the same location
16     the way it comes off so we know it is right and
17     make sure it is free.
18  Q  But to do that, you don't consult any manuals,
19     books?
20  A  No, sir.
21  Q  Do you know anything about the history of the
22     IBO at issue in this lawsuit?
23  A  No, sir.
24  Q  Do you know how long it had been in operation?
25  A  No, sir.

51

1  Q  When you started working here, was it used to
2     process aluminum cans or some other product?
3  A  Since I have been here, aluminum.
4  Q  So from '04 through the current it has always
5     been used for aluminum?
6  A  Yes, sir.
7  Q  Do you have any knowledge of how frequently you
8     worked around IBO #2?
9  A  No, sir.
10  Q  Is there a machinist millwright that knows more
11     about IBOs than any other machinist millwright?
12  A  I don't know.
13  Q  Is it fair to say that because 75 percent of
14     your time is devoted to cartridge, trimmer
15     cartridge rebuilds, that there would be others
16     that would know more about IBO maintenance and
17     repair than you?
18  A  Yes, sir.
19  Q  Who would those individuals be?
20  A  Not for sure.
21  Q  Do you know how you got slotted to kind of the
22     specialty of trimmer cartridge rebuilds?
23  A  I asked for it.
24  Q  Has anybody else asked to be specifically like
25     the maintenance repair guy for IBOs or PIN ovens

52

1     or any other pieces, piece of equipment?
2  A  Not for sure.
3  Q  But you don't know anybody within your
4     department that kind of specializes on IBOs,
5     right?
6  A  No, sir.
7  Q  Do you have any knowledge on the maintenance of
8     repair, maintenance or repair of the burners on
9     top of the IBO ovens?
10  A  No, sir.
11  Q  Do you recall ever doing any maintenance or
12     repair of the burners on top of the ovens?
13  A  I am not for sure.
14  Q  Do you recall being involved in the maintenance
15     or repair on the combustion chambers?
16  A  Not for sure.
17  Q  If a burner needed replaced, would that be the
18     role of the machinist millwrights?
19  A  I am not for sure.
20  Q  Who would know that?
21  A  Freddy Spencer.
22  Q  So most of the time were the machinist
23     millwrights, the work that you guys did, was
24     that requested by Freddy Spencer or other
25     people?



53

1  A  Other people and supervisor.
2  Q  If there is a problem with the IBO that's going
3     to be addressed by your department, how would
4     you find out about that?
5  A  Through a page or through our supervisor.
6  Q  Who would page you?
7  A  Individuals on the floor.
8  Q  What individuals?
9  A  It could be chief maintainer, it could be
10    somebody around production, in that department.
11 Q  Who does the maintainer work for, what
12    department?
13 A  He could be a back end maintainer, which works
14    in the necker, or he could be an IC maintainer,
15    which works right in front of the --
16 Q  Is a maintainer, is that a maintenance position?
17 A  They just maintain equipment.  It is just a
18    maintainer's job.
19 Q  Yeah.  But is that like a position that
20    requires -- does it work under the machinist
21    millwright department?
22 A  No, sir.
23 Q  What department do they work under?
24 A  The ICs.
25 Q  What's an IC?

54

1  A  Internal spray.  They put the coating inside a
2     can.  And the necker would be the back, behind
3     the oven.  And then they would call if the head
4     can's falling over or whatever on the back end.
5  Q  But are those two positions, are those under
6     production?
7  A  Yes.
8  Q  So would it be accurate then to say that any
9     requests made of your department for work,
10    either maintenance or repair of the IBO, would
11    come from a production person?
12 A  Not all of them.
13 Q  Who else would it come from?
14 A  Freddy or my supervisor.
15 Q  How would your supervisor learn?
16 A  From --
17 Q  Production?
18 A  -- production, being a supervisor or a chief or
19    a maintainer.
20 Q  But the chief or the maintainer is under
21    production; right?
22 A  Yes.
23 Q  So your boss would be notified by someone in
24    production; true?
25 A  Yes.

55

1  Q  And would Freddy also be notified by someone in
2     production?
3  A  It depends.
4  Q  What would it depend on?
5  A  I mean, if they send out an email or if it was
6     just like mat tracking, like say they have been
7     having a problem, so they tell us to go look at
8     it.
9  Q  Do you know what would cause your boss to be
10    notified of an issue with an IBO as opposed to
11    Freddy Spencer being notified?
12 A  No.
13 Q  Are you aware of any fires involving IBOs at
14    Ball other than the one at issue in this case?
15 A  No, sir.
16 Q  Are you aware of any fires here at the plant
17    other than the one involved in this case?
18 A  No, sir.
19 Q  Do you recall what shift you worked on May 22,
20    2014?
21 A  No, sir.
22 Q  Were you in the plant when Air Tech was
23    performing the cleaning services on May 22, '14?
24 A  I am not sure.
25 Q  You have no memory of seeing them work or

56

1     cleaning the oven?
2  A  I was on night shift.
3  Q  You were on night shift on the 22nd?
4  A  Yes.
5  Q  Okay.  So on the 22nd, for that workday, when
6     would you have gone on and when would you have
7     gone off your shift?
8  A  Came in at seven p.m.
9  Q  So seven p.m. of the 21st?
10 A  When was the incident?
11 Q  The fire?
12 A  Yeah.
13 Q  That would have been either late the 24th or
14    early -- or the 22nd or early the 23rd.
15 A  So it would have been --
16 Q  So Air Tech was on site cleaning on May 22.
17    Okay?
18 A  Okay.
19 Q  Arrived somewhere around 7:30, left somewhere
20    around 6 or a little bit before.
21 A  Okay.  I would have been in there at seven that
22    night.
23 Q  But let's talk about the 22nd itself.  Okay?
24    You would have started your work shift that led
25    into the morning of the 22nd on the 21st, true,

**57**

1  at seven p.m.?
2  A  Seven p.m. on the 22nd, before the fire or after
3    the fire?
4  Q  Okay.  I just wanted to -- Air Tech was here,
5    say, 7:30 a.m. on the 22nd till 6 p.m. on the
6    22nd.
7  A  Okay.  I came in on the 22nd at seven p.m.
8  Q  Did you work on the 21st at seven p.m. till
9    seven a.m. on the 22nd?
10  A  I am not for sure.
11  Q  Why wouldn't you be sure?
12  A  We work a four on/four off schedule.
13  Q  If I tell you what day of the week that would
14    have been, would you be able to tell me whether
15    you worked on the 21st to the morning of the
16    22nd?
17  A  I would have to see a Ball schedule, because we
18    work a four on/four off rotating shift.
19  Q  So me telling you the 21st was a Wednesday, that
20    doesn't help you to know whether or not --
21  A  No.
22  Q  Because the four on can begin any day of the
23    week?
24  A  Yeah.
25  Q  So you can't tell me if you worked also the

**58**

1  morning of the 22nd, all you can tell me is you
2  started at seven p.m. on the 22nd?
3  A  Yes.
4  Q  So it was seven p.m. to seven a.m.?
5  A  Yes, sir.
6  Q  On the 23rd; true?  So that was your shift?
7  A  Yeah.  I got off that morning at seven a.m.
8  Q  If your shift starts at seven p.m., what time
9    would you get here?
10  A  6:50, 6:50, right around 6:50.
11  Q  6:50 pulling into the parking lot or 6:50
12    punching into the clock?
13  A  6:50 punching into the clock.
14  Q  To punch in at 6:50 means you arrive at what
15    point in time?
16  A  6:30.
17  Q  Okay.  So do you spend like 20 minutes out at
18    your truck smoking a cigarette and talking with
19    buddies or --
20  A  No.
21  Q  Do you just immediately come in?
22  A  I will sit in my vehicle.
23  Q  When you were punching in at 6:50, do you have
24    any recollection of whether Air Tech employees
25    were on site?

**59**

1  A  I can't remember.
2  Q  Do you have any recollection of seeing Air Tech
3    on site on May 22, 2014?
4  A  I can't remember.
5  Q  Do you have any recollection of what time
6    Air Tech -- or would you have any knowledge of
7    what time Air Tech left?
8  A  No, I am not familiar.
9  Q  Do you know whether production had resumed on
10    line when you arrived at work?
11  A  On?
12  Q  May 22 of '14.
13  A  Yeah, the last day or, yeah, whatever the day of
14    the fire.  I don't know if it was running when
15    we came in or not.
16  Q  So you don't know if production had resumed on
17    that line when you arrived?
18  A  Yeah.
19  Q  Do you know what time production resumed?
20  A  No, sir.
21  Q  Do you know what you did on May 22, when you
22    came in that night and punched in at 6:50, do
23    you know what you did?
24  A  No, I can't remember.
25  Q  But it would be more likely than not that you

**60**

1  were working in the machine shop; right?
2  A  Yeah.  It was more likely I was in the shop.
3  Q  And more likely than not, if you were in the
4    shop, you were working on rebuilding trimmer
5    cartridges; right?
6  A  It depends.  I mean, there was just two of us on
7    nights.
8  Q  Oh, okay.  Who else was working with you that
9    night?
10  A  Wes Krintz.
11  Q  So you were the night shift machinist
12    millwright?
13  A  Yes, sir.  Both of us.
14  Q  And your boss wasn't there at that time; right?
15  A  No.
16  Q  So who was supervising you?
17  A  Mike Rogers.
18  Q  And what was his position?
19  A  He is the production supervisor.
20  Q  Do you keep track of what you do for the 12-hour
21    shift that you're here?
22  A  No, sir.
23  Q  Does any machinist millwright keep track of what
24    they do in the 12 hours?
25  A  I am not for sure.

61

1  Q  Do the machinist millwrights keep any shop logs?
2  A  Not for sure.
3  Q  Well, have you personally kept any shop logs or
4     been involved in making any notations in shop
5     logs from August of '04 through the present
6     date?
7  A  Yes.
8  Q  On what occasions will you make shop log entries
9     in shop logs?
10 A  Oh, that was when I did my -- to keep track of
11    like cartridges, what came in, what ones went to
12    which machine, they used to keep a log on which
13    ones came in, which ones did I rebuild, which
14    ones came out.
15 Q  Was that for purposes of tracking how frequently
16    you had to maintain any one individual
17    cartridge?
18 A  No.  It was just something that they knew how
19    many were going out.
20 Q  Do you still do that?
21 A  No.
22 Q  Other than that period of time where you were
23    making log entries about the trimmer cartridges
24    that you were rebuilding, have you ever been
25    involved in any other type of entries?

62

1  A  I am not for sure.  That's the one I do all the
2     time, used to do all the time.
3  Q  But you don't remember doing any other entries
4     besides that; true?
5  A  I can't remember.
6  Q  Do you have any knowledge of how frequently the
7     duct system was cleaned at the plant?
8  A  No, sir.
9  Q  Has Ball provided you with reclassifiable
10    confined space training?
11 A  Yes.
12 Q  Is it your understanding an IBO is a
13    reclassifiable confined space?
14 A  Yes, sir.
15 Q  So you have the proper training and
16    certification to work inside an IBO oven if the
17    need arises; correct?
18 A  Yes, we have been trained.
19 Q  And have all machinist millwrights been trained
20    in reclassifiable confined spaces?
21 A  Not for sure.
22 Q  Do you have any knowledge regarding the normal
23    internal operating temperatures for an IBO?
24 A  No, sir.
25 Q  Do you have any knowledge of what the normal

63

1     temperature is of the IBO at the squirrel cage
2     fan?
3  A  No, sir.
4  Q  Do you have any knowledge of the normal
5     operating temperature of the ductwork
6     immediately above the squirrel cage fan?
7  A  No.
8     MR. SENAK:  Can we give him a drink of
9     water?  Do you want some water?
10 Q  Do you want some water?
11 A  I'm just dry mouth.
12 Q  We can get you water.  Let's take a break.
13    (A recess was taken between 2:33 p.m. and
14    2:34 p.m.)
15    BY MR. MILLER:
16 Q  Have you ever participated in any thermal
17    photography at the IBO or its ductwork?
18 A  Yes.
19 Q  And when did you do that?
20 A  The day of the fire.
21 Q  And how did you know to take that, those thermal
22    images?
23 A  ETs were doing it.
24 Q  Who was requested to do the thermal imaging?
25 A  Electricians do that.

64

1  Q  I thought you testified that you were involved
2     in thermal imaging, that you participated in the
3     thermal imaging?
4  A  I was over there the day of the fire when they
5     were doing it.
6  Q  Maybe my question was unclear.
7  A  Okay.
8  Q  Did you take any of the pictures?
9  A  No, sir.
10 Q  Did you hold the camera?
11 A  No, sir.
12 Q  Did you direct them where to take the pictures?
13 A  No, sir.
14 Q  So you were just standing next to somebody when
15    they were taking the pictures?
16 A  Yes, sir.
17 Q  So you didn't participate, other than being, you
18    know, like a spectator watching somebody else do
19    it?
20 A  Yes, sir.
21 Q  Did you provide any input as to where they may
22    want to take pictures?
23 A  Yes, sir.
24 Q  And where did you tell them to take pictures?
25 A  I pointed at the exhaust blower.



**65**

1  Q  And why did you point there?
2  A  Because the paint was starting to bubble.
3  Q  Had anyone noticed that prior to you?
4  A  No.
5  Q  And was the paint bubbling, was that above the
6     squirrel cage fan?
7  A  Right at it.
8  Q  Other than pointing to that one area, did you
9     tell them to take any other pictures?
10 A  They were taking additional pictures.
11 Q  But did you direct them to take pictures of any
12    other areas of the oven?
13 A  No.
14 Q  So the one and only area that you pointed them
15    to was the area above the squirrel cage fan?
16 A  Right at the squirrel cage, yes.
17 Q  Did you review the photographs that were being
18    taken?
19 A  We seen them.  We were standing there over them
20    before we got into a lift.
21 Q  Pardon me?
22 A  I was looking at them before we got into a lift.
23 Q  What kind of lift were you using?
24 A  A Genie scissor lift.  You go up there and see
25    vision-wise to see what was going on.

**66**

1  Q  Who brought the lift to the machine?
2  A  It was already over there.
3  Q  Do you know who brought it over?
4  A  I think an ET.
5  Q  Do you know where it was brought from?
6  A  Probably ICs.
7  Q  What's IC?
8  A  That's where we store them, right there by
9     IBO 1.
10 Q  Were you on the lift?
11 A  Yes.
12 Q  Who else was on the lift?
13 A  Wes Krintz.
14 Q  Anybody else?
15 A  It was Wes Krintz and me.
16 Q  Who was taking the pictures?
17 A  ETs.
18 Q  Do you know the name of the ET?
19 A  Bob Pellegrini and Justin Stout.
20 Q  Did you work with them frequently?
21 A  Yes.  They were our on-crew ETs.
22 Q  What does that mean?
23 A  They are on the same crew as us.
24 Q  Meaning that night, the night shift?
25 A  We have two night shift electricians, ETs, and

**67**

1     we have two night shift millwrights and they run
2     our two night shifts.
3  Q  And did you always work with them?
4  A  Yes.
5  Q  And how long a period of time was that?
6  A  Back then we did, the shop did eight months on
7     days, four months on nights.  So we could be
8     with them for eight months or it could be for
9     four months.  It just depended on what cycle you
10    were on.
11 Q  How closely did the ETs and the machinist
12    millwrights work?
13 A  That day?
14 Q  No.  Just as a general matter.
15 A  Oh.  When they need a motor, electrical motor
16    removed, that's usually when they will call us.
17 Q  The thermal imaging camera, do you know where
18    that is stored?
19 A  No, sir.
20 Q  Do machinist millwrights ever use that?
21 A  No.
22 Q  Do you know who uses it as a part of their job?
23 A  Electricians.
24 Q  So just electricians?
25 A  Yes.

**68**

1  Q  Where is the electricians' office located?
2  A  From here, turn out the door, go right, go to
3     the end of Sandy Mill's desk, turn left, and go
4     through that doorway.
5  Q  Is it close to the machinist millwright shop?
6  A  No, sir.
7  Q  Were any ETs on the scissor lift?
8  A  Not when we got there.
9  Q  Had they been on the scissor lift?
10 A  I think one of them brought it over.
11 Q  Did they use it or just bring it over?
12 A  I think they just brought it over.
13 Q  Did they give you the thermal imaging camera to
14    take up with you?
15 A  No, sir.
16 Q  So all of the thermal imaging photographs were
17    taken from standing on the ground; right?
18 A  I am sure, unless they took some before we got
19    there.  I am not --
20 Q  And then how did you and Wes decide to get on
21    the scissor lift?
22 A  We were trying to see where all the smoke was
23    coming from.
24 Q  Where was the smoke coming from?
25 A  At the blower.



69

1  Q   And was the smoke rising up?
2  A   Yeah.  There was a dark gray haze coming around
3      the blower itself.
4  Q   Was that when you arrived?
5  A   Yes.
6  Q   How long had that been going on?
7  A   When they paged the millwrights, we got there,
8      it was already smoking.  So I don't know how
9      long in advance before.
10 Q   What did that page tell you?
11 A   They just said they needed millwrights.  Usually
12     it is mat tracking, so we assumed that it was
13     mat tracking.
14 Q   So you received a page in the shop, the
15     machinist shop, saying, what, millwrights to
16     IBO #2?
17 A   Yes, sir.
18 Q   And so both of you went at the same time?
19 A   Yes, sir.
20 Q   How long did it take you from the time you left
21     the machinist department until arriving at
22     IBO #2?
23 A   A minute, two minutes.  Grab our tool bags and
24     go out there.
25 Q   Were you aware when you left your shop that

70

1      there was smoke coming from the area of IBO #2?
2  A   No, sir.
3  Q   When did you first notice that smoke?
4  A   When we got to the ICs.
5  Q   The --
6  A   Yeah, right in front of the ICs, internal spray.
7  Q   And that's when you noticed smoke?
8  A   Yes.
9  Q   Did you smell smoke or see smoke?
10 A   Seen it.  A very little gray haze.
11 Q   And then once you approached the IBO #2, what
12     did you see?
13 A   Gray smoke coming out of that blower.  The ETs
14     were taking imaging pictures.  And we got in the
15     lift to go up there and try to see what was
16     causing it.
17 Q   And did you find out what was causing it?
18 A   No.
19 Q   Were you and Wes getting on the scissor lift as
20     a part of trying to figure out what was causing
21     it?
22 A   Yes.
23 Q   Did you attempt to figure out what was causing
24     it from kind of standing on the floor area?
25 A   No.

71

1  Q   Did you see smoke coming from the IBO at any
2      place other than this area above the squirrel
3      cage fan?
4  A   No.
5  Q   So that the only place you saw smoke was the
6      area above the squirrel cage fan?
7      MR. SENAK:  Objection.  Misstates his
8      testimony.  Go ahead and answer.
9  A   It was coming out right there, around the
10     squirrel fan, along the blower.
11 Q   And you got on the scissor lift; right?
12 A   Yes, sir.
13 Q   What did you do once you and Wes got on the
14     scissor lift?
15 A   We went up there to see if there was a bad
16     bearing.
17 Q   How far up did you raise the scissor lift?
18 A   Fifteen feet, whatever, whatever we could do to
19     get to the blower itself.
20 Q   Well, I guess what I am asking is, were you eye
21     level with the squirrel cage fan?  Were you
22     above the squirrel cage fan?  Were you below the
23     squirrel cage fan?
24 A   Eye level.
25 Q   So you were eye level with the squirrel cage

72

1      fan?
2  A   Yeah.
3  Q   Did you exit the platform of the scissor lift
4      and get on top of the oven?
5  A   No.
6  Q   So the entire time you were on this scissor lift
7      platform; right?
8  A   Yes.
9  Q   And is there a gate that you can swing open on
10     the railing that surrounds that platform?
11 A   Yeah.  But we are not allowed to do that unless
12     you're tied off.
13 Q   Did you have any materials on you to tie
14     yourself off?
15 A   No.
16 Q   So you couldn't have got on the oven even if you
17     wanted to; right?
18 A   Yeah.
19 Q   Because you didn't have the appropriate
20     equipment?
21 A   At that time.
22 Q   Did you go back and get the equipment?
23 A   No.  It expired real fast after that.
24 Q   But nobody, no Ball employee notified you in
25     advance that you needed to bring with you



73

1  equipment to tie yourself off because there was
2  a lift there; true?
3  A  Yes.
4  Q  So as you're looking at the area where the smoke
5  is coming from the eye level position, what did
6  you see?
7  A  From the side view, let's see, which would be
8  the west side of the blower, the middle of the
9  radius, there was smoke coming around the cone.
10  There is a cone, and it was smoking from there,
11  and for, I don't know, maybe a couple minutes.
12  I don't know how long.  And then the ETs were
13  taking imaging pictures, because there are two
14  different exhaust blowers, one for each one,
15  trying to see if there was a fluctuation in
16  temperature.
17  Q  Was there?
18  A  No.  And then all of a sudden the paint started
19  bubbling and then they were checking it and the
20  next thing you know, just poof.
21  Q  So there was no fluctuation in temperature
22  between --
23  A  A little bit.  A couple degrees.
24  Q  But nothing significant --
25  A  No.

74

1  Q  -- between the two exhaust fans; true?
2  A  No.  Yes.
3  Q  Did you look at this area where the smoke was
4  coming from both sides of the oven?
5  A  No, sir.
6  Q  So the scissor lift was only on one side of the
7  oven; true?
8  A  Yes, sir.
9  Q  Which side would that have been?
10  A  Of the oven?
11  Q  Yes.
12  A  The north side.
13  Q  The north side.  Did you ever look at this area
14  from the south side?
15  A  No, sir.
16  Q  Was any thermal imaging taken, to your
17  knowledge, from the south side?
18  A  I am not for sure.
19  Q  Did you look at the area where the smoke was
20  emanating from either the east or west side?
21  A  The west side, the side we were on.  The west
22  side.
23  Q  So the only side that you looked at this area
24  where the smoke was emanating was from the west
25  side; true?

75

1  A  Yeah.  It was coming all the way around it, the
2  hole.  But we were visually looking at it just
3  on the west side, but it was smoke, like smoke
4  coming all the way around it.
5  Q  And how far away from it were you at that point?
6  A  From me to you, eight feet.
7  Q  And when you were up there, you saw smoke
8  emanating, but there was no temperature
9  differential at that time between the two
10  exhaust fans; true?
11  A  No, sir.
12  Q  And then you said there was a poof?
13  A  Yeah.  Kind of like it stopped for a split
14  second and then a fireball shot out from it.  It
15  came through the pipe.  There is a hole that we
16  do air flows, a flame shot out about two foot,
17  so only a half-inch hole.
18  Q  Now is that above the squirrel cage fan?
19  A  Yeah.
20  Q  So when you say there were the flames, the
21  flames were above the squirrel cage fan; true?
22      MR. SENAK:  Objection to foundation.  His
23      misstates his testimony.  Go ahead.
24  A  No.  It shot out of where the cone area was, on
25  the fan, and it came through the pipe, and

76

1  wherever there was a crack, it just flashed out.
2  Q  When you were ascending up the scissor lift to
3  take this closer visual look, did you have a
4  fire extinguisher with you?
5  A  Yes.  We had one in the lift and one on the
6  ground.
7  Q  What was the capacity of the one with you on the
8  lift?
9  A  I'm not for sure.
10  Q  When you said that you just saw smoke but before
11  this poof and the flame shot out, before seeing
12  the flame shoot out, did you attempt to
13  extinguish whatever it was causing this smoke?
14  A  No.
15  Q  Did you discharge the fire extinguisher before
16  seeing the flames shoot out?
17  A  No.
18  Q  Did you discharge the fire extinguisher after
19  seeing the flames shoot out?
20  A  Yes.
21  Q  Did you completely empty the fire extinguisher?
22  A  Yes.
23  Q  But it was only after seeing the flames that you
24  operated the fire extinguisher; true?
25  A  Yes.  We shot it into a half-inch hole for when



77

1   we do our tests.  That's the only place that we
2   could get into it.
3   Q   But before, when just seeing the smoke, you
4       didn't attempt to extinguish anything; true?
5   A   No, sir.
6   Q   Are you provided with any training by Ball in
7       responses to a suspected fire?
8   A   They have us do an annual fire extinguisher
9       class.
10  Q   Tell me about that.
11  A   It is on a computer.  You watch a video and you
12      take a test.  And it tells you about the PASS,
13      pull, aim, squeeze, and sweep.
14          Like Ball's protocols, like if it is bigger
15      than a trash can fire, evacuate.
16  Q   When had you received that training?
17  A   Probably every year since I have been here.
18  Q   And after those flames came out, what did you do
19      then?
20  A   We extinguished the fire extinguisher and a
21      little bit of another one and --
22  Q   How did you get that other one if you were
23      already up on the scissor lift?
24  A   We went down real quick and got it and tried to
25      go back up.

78

1   Q   Okay.
2   A   In a matter of seconds we extinguished it.  We
3       got more on the outside than we did on the
4       inside.  But Justin and me went to; Justin and
5       me went to the supervisor's office and told them
6       to hit the panic, evacuation alarm for a fire.
7   Q   Okay.
8   A   And everybody evacuated.
9   Q   Did you evacuate at that point?
10  A   Yes.
11  Q   Was there anyone left there attempting to
12      extinguish the flames?
13  A   No.
14  Q   So after you extinguished that -- or after that
15      second extinguisher --
16  A   We didn't have to do the second one.
17  Q   You did not?
18  A   No.
19  Q   So you emptied one and then partially --
20  A   Partial, three-quarters.  I don't think we
21      emptied it all.
22  Q   Who actually was using that extinguisher?
23  A   Me and Wes Krintz.
24  Q   Did you use one extinguisher and he used the
25      other?

79

1   A   Yeah, I think so.
2   Q   Do you know who initially tried to put it out?
3       Was it you or Wes?
4   A   It was me.
5   Q   And then you lowered and Wes got the second
6       extinguisher and used the second extinguisher?
7   A   Yeah.  I got it in my mouth and my face, and I
8       was hacking and gagging and trying to put it out
9       then.
10  Q   Okay.
11  A   We decided to go down and leave.
12  Q   Was there anyone else around IBO #2 when you
13      were leaving the area?
14  A   The only ones over there were me, Wes, ET Bob,
15      and Justin, ET Justin, and we all --
16  Q   Which Justin, Justin Stout?
17  A   Yeah.
18  Q   And Bob Pellegrini?
19  A   Bob Pellegrini.
20  Q   And who else?
21  A   Wes Krintz.
22  Q   Wes Krintz.
23  A   Us four, we all left and went to -- me and
24      Justin went to the supervisor's office, let them
25      know, and Wes and Bob and everybody else

80

1   evacuated and did our normal evacuation
2   procedure.
3   Q   Other than the four people that you have
4       identified that were standing there, was there
5       anyone else around IBO #2?
6   A   At the time of the fire, no.  Before the
7       supervisor come over there.
8   Q   And who was that?
9   A   Mike Rogers.
10  Q   Anyone else?
11  A   That would have been it.
12  Q   Was there any production guys around?
13  A   No.
14  Q   Do you know who paged you originally?
15  A   No, sir.
16  Q   From the time that you left that area, do you
17      know how long before the fire department came
18      in?
19  A   No, I don't, no.
20  Q   Do you know what time it was that you were
21      notified when you received that page?
22  A   I can't remember.
23  Q   From the time that you arrived at the IBO #2
24      until you ascended the scissor lift, how long
25      was it?



81

1   A   I can't remember.
2   Q   Do you know how long it was from the time that
3        you were looking eye level at the area where
4        smoke was emanating until the flame came out?
5   A   A couple minutes probably.
6   Q   So for a couple minutes you were looking at it
7        without using any fire extinguisher; true?
8   A   Yes.
9   Q   What were you doing during that two-minute
10       period of time?
11  A   Trying to look and see what was causing that,
12       see if there was a bearing, see what was going
13       on.  Just really trying to see where it was
14       coming from.
15  Q   How were you trying to see if it was a bearing?
16  A   Where the lift was, when we were up there,
17       trying to look on the rail to see if we could
18       see like a bad bearing.
19  Q   How would you see a bad bearing?
20  A   You could probably hear it.  A lot of times when
21       a bearing goes bad you can hear it squealing and
22       squalling.
23  Q   Okay.
24  A   And usually that means, as loud as it is in the
25       plant, you can hear bearings when they lock up.

82

1   Q   But at any point were you physically like
2        handling anything on the machine?
3   A   No.
4   Q   So it was all just kind of visual and audio kind
5        of troubleshooting?
6   A   Yes, sir.
7   Q   Do you know how long the oven had been running
8        before you guys got the page?
9   A   No, sir.
10  Q   Did you ask anybody?
11  A   No, sir.
12  Q   To your knowledge, were there any issues with
13       the operation of the oven after the cleaning but
14       before the fire?
15  A   I am not for sure.
16  Q   Did anyone tell you that there was any issues?
17  A   Not for sure.
18  Q   Well, do you remember, like what did you say
19       when you first arrived at the oven?
20  A   We seen the smoke, the light smoke.
21  Q   Did you ask anybody -- did you talk to anybody
22       once you got there?
23  A   Justin and Bob.
24  Q   What did Justin tell you?
25  A   They were looking at the infrared gun.

83

1   Q   But did they say anything?
2   A   They were trying to figure out why it was
3        smoking.  So we just grabbed the tool bag and
4        jumped in the lift and went up to see what the
5        problem was.
6   Q   Do you have any knowledge of what the
7        maintenance schedule is on the IBOs?
8   A   No, sir.
9   Q   Do you have any knowledge of what the
10       manufacturer recommended cleaning schedule is
11       for the IBOs?
12  A   No, sir.
13  Q   Do you have any knowledge of how it is decided
14       when it is time to clean each IBO?
15  A   No, sir.
16  Q   Do you have any knowledge of how Ball decides
17       when it is time to clean the ductwork?
18  A   No, sir.
19  Q   Do you have any knowledge of the material that
20       accumulates inside the oven as a part of the
21       production process?
22  A   No, sir.
23  Q   Do you have any knowledge of the material that
24       accumulates in the ductwork as a part of the
25       manufacturing process?

84

1   A   No, sir.
2   Q   Have you ever been asked to perform any repairs
3        that were discovered during a cleaning of an
4        IBO?
5   A   No, sir.
6   Q   Did you know IBO #2 was to be cleaned on May 22?
7   A   Yes.
8   Q   How did you find that out?
9   A   Our maintenance schedule.
10  Q   And who provides that maintenance schedule to
11       you?
12  A   That's sent through an email and it is posted on
13       the eight-day board.
14  Q   Did that require you to do anything differently
15       that day?
16  A   On nights, no.
17  Q   In the 30 days prior to the fire had there been
18       any operational problems with IBO #2?
19  A   I don't know.
20  Q   To your knowledge, had any repairs been
21       performed on IBO #2 or any of its components in
22       the time frame leading up to the fire?
23  A   I don't know.
24  Q   Who would know that?
25  A   Freddy Spencer or -- Freddy Spencer.



85

1  Q   Anyone other than Ball employees inspecting the
2      oven or the ductwork in the time frame leading
3      up to the fire?
4  A   Not for sure.
5  Q   So the only people that were around the oven
6      were Ball employees; true?
7  A   During the fire?
8  Q   Yep.
9  A   Yes.
10 Q   And anytime you were around the oven that night,
11     the only employees that were around it were Ball
12     employees; true?
13 A   At the time before the -- the time that I was
14     there, yes.
15 Q   And the only people around the ovens that were
16     diagnosing and determining what to do about the
17     smoke were Ball employees; true?
18 A   Yes.
19 Q   And the only individuals around the oven that
20     were deciding whether or not to call the fire
21     department were Ball employees; true?
22 A   Yes.
23 Q   And it was Ball employees who entirely
24     controlled when the fire department was
25     summoned; true?

86

1  A   Yes.
2  Q   Do you know how long Ball employees had been
3      witnessing smoke before deciding whether or not
4      to call the fire department?
5  A   Not for sure.
6  Q   How long were you there at the oven?  Ten
7      minutes?
8  A   Maybe.  I am not for sure.
9  Q   So you were standing around the oven watching
10     smoke for, perhaps, as long as ten minutes?
11 A   No.  We got there and then the ET went up and
12     was visually trying to figure out what was going
13     on.
14 Q   And how long were the ETs there before you were
15     called?
16 A   I am not for sure.
17 Q   Do you know how long it was that a production
18     person called the ETs saying, well, something is
19     wrong, I see smoke?
20 A   No, not for sure.
21 Q   Do you have any knowledge of what Air Tech did
22     on May 22?
23 A   No, sir.
24 Q   Do you have any knowledge of what Ball, the
25     inspections Ball employees performed after

87

1      Air Tech got done with its work?
2  A   No.
3  Q   To your knowledge, did any millwrights or
4      machinist millwrights perform any inspections
5      while Air Tech was performing its work?
6  A   I am not for sure.
7  Q   Do you have any knowledge of the liquid that
8      sprayed in the cans prior to entering the IBOs?
9  A   I know it sprayed in there.
10 Q   But do you know what is sprayed in there?
11 A   IC spray.
12 Q   Do you know anything about that IC spray?
13 A   Well, you have different kinds for different
14     lines.  There's different kinds for different
15     lines.  It depends on what kind of stuff we are
16     cleaning.
17 Q   Do you know what kind is used on line #2? `
18 A   Not at that time.
19 Q   Do you know anything Ball does to prepare an IBO
20     to be cleaned?
21 A   I don't know.
22 Q   Are you aware which Ball employees worked on IBO
23     line #2 in the 24 hours prior to the fire?
24 A   I don't know.
25 Q   Do you know who was working on that line when

88

1      the smoke was discovered?
2  A   I don't know.
3  Q   Do you know the identities of the Ball
4      Manufacturing employees who worked on this line
5      at the time of the fire?
6  A   I don't know.
7  Q   Do you know whether or not any employee that was
8      working on the line at the time smoke was
9      discovered, did you have any conversations with
10     anyone before contacting the ETs?
11 A   I don't know that.
12 Q   What training is provided to Ball employees as
13     to what to do if they see smoke?
14 A   That's in our fire extinguisher class on, you
15     know, who calls, how they come over and inspect
16     it and if there is a fire anything bigger than a
17     trash can.
18 Q   Walk me through the process.  What happens if an
19     employee sees --
20 A   Notify a supervisor.
21 Q   So a line employee would notify a supervisor?
22 A   Yeah, if there was a fire or smoke.
23 Q   How do they do that?
24 A   By paging over the intercom system.
25 Q   How do they page over the intercom system?

89

1    A   It is a phone you pick up and you dial a couple
2        numbers and say what you need to say, then it
3        will send a recording over the system throughout
4        the whole plant.
5    Q   Where is that phone located?  Where is the
6        closest phone located to IBO #2?
7    A   Right in the front of line 2 ICs.
8    Q   Okay.
9    A   Which is 40 feet, 50 feet maybe.
10   Q   Do you know who placed that page?
11   A   No, sir.
12   Q   Did you hear that page?
13   A   Yes, sir.
14   Q   And what was that page?
15   A   We need millwrights to line 2 IBO.
16   Q   Well, how did the ETs then show up to take
17       pictures?
18   A   Their department is close to line 2.
19   Q   How were they summoned?
20   A   I don't know.
21   Q   So the fire training that you get, employees are
22       instructed to call the millwrights first?
23   A   Supervisor.
24   Q   I guess what I am asking is, did you hear the
25       page to the supervisor of the line worker?

90

1    A   No.
2    Q   Do you have a speaker in your office where you
3        would hear that page?
4    A   Our department, yes.
5    Q   So was yours then at least the second page,
6        according to the fire protocol?
7    A   I don't know.
8    Q   Okay.
9    A   They just called and page millwrights.  And
10       whenever they page millwrights, I mean, we go.
11   Q   I think you confused me, because I was
12       talking -- I want you to walk me through the
13       fire protocol.
14   A   Yeah.
15   Q   So a production worker at IBO #2 sees smoke.
16   A   Yeah.
17   Q   And what's the first thing that he is instructed
18       to do?
19   A   You should call a supervisor.
20   Q   So a production worker, if he's following the
21       protocol, walks 40 or 50 feet, picks up the
22       phone and asks for his supervisor to come to
23       IBO #2?
24   A   Yeah.  Or if there is a fire, put it out
25       yourself.

91

1    Q   Pardon me?
2    A   If there is a fire, put it out yourself.  We are
3        all trained on how to use the fire extinguisher.
4    Q   So the employee that was working there was
5        trained on how to put out a fire?
6    A   Yeah.
7    Q   Was there a fire extinguisher close to that
8        area?
9    A   We have got fire extinguishers in different
10       parts of each department.  There's 300 of them,
11       I think, so.  And where they could be at, I
12       couldn't tell you, but --
13   Q   Okay.  So are employees trained at the sight of
14       smoke to try and put it out with a fire
15       extinguisher?
16   A   No.
17   Q   What are they trained at?
18   A   We are shown how to use a fire extinguisher,
19       what's the protocol for if there is smoke, fire.
20   Q   Tell me what that protocol is.  Walk me through
21       the steps.
22   A   I would have to have it in front of me.  But
23       they should be -- if there is smoke, contact
24       your supervisor.  If there is a fire right here,
25       there is a fire extinguisher and you can put it

92

1        out.  If it is the size of a trash can, put it
2        out.  If not, evacuate the plant.
3    Q   So in this circumstance, them seeing smoke, the
4        first thing that they should have done was call
5        their supervisor?
6    A   Yeah.
7    Q   And the production people aren't supervised by
8        the ETs; correct?
9    A   No.
10   Q   So the ETs to be there had to have been called
11       by someone; right?
12   A   They could have been called.  They could have
13       been waved down when they are walking by.
14   Q   Okay.
15   A   I mean, there's a bunch of different situations.
16   Q   Did the production person attempt to use a fire
17       extinguisher?
18   A   No.
19   Q   To your knowledge, did the production person
20       supervisor attempt to use a fire extinguisher?
21   A   Not to my knowledge.
22   Q   Did either of the ETs attempt to use a fire
23       extinguisher?
24   A   Not to my knowledge.
25   Q   So you're the first guy that tried to use a fire



93

1    extinguisher; right?
2  A  Yes; me and Wes.
3  Q  And that would have been ten minutes after you
4     arrived and saw smoke?
5  A  Yeah.  I don't know what the time frame was.
6  Q  After you left the area, whom did you go to
7     speak to?
8  A  Went into the production office, told them they
9     need to evacuate the plant.
10  Q  Who was that person that you talked to?
11  A  Mike Rogers, production supervisor, night shift.
12  Q  Did you tell him that or did Wes?
13  A  Me and Justin.
14  Q  You and Justin?
15  A  Yes.
16  Q  And Justin is an ET; right?
17  A  Yes.
18  Q  Where did Wes go?
19  A  They evacuated.  They left.
20  Q  As they were leaving, were they telling other
21     people to evacuate too?
22  A  I mean, all four us went towards the production
23     office.  They went -- the ET shop is this way,
24     production office is this way, we went to tell
25     them to evacuate, hit the evacuation button,

94

1     Mike Rogers did, and went straight, went in one
2     door, told them to evacuate, and we went up to
3     the top of the hill, which is protocol, for
4     everybody to meet.  And they do a head count and
5     do all that.
6  Q  When the evacuation button is hit, does that
7     immediately summon the fire department?
8  A  I don't think so.
9  Q  So somebody has to physically call the fire
10     department?
11  A  There is a lever in there.  There is a fire
12     lever and then I think there is a button, panic
13     button.
14  Q  Okay.
15  A  I don't know if we call it a panic button,
16     but --
17  Q  The evacuation button?
18  A  Yeah.  It might be tied in.  I am not for sure.
19  Q  Do you know who pulled that fire alarm?
20  A  Mike Rogers.
21  Q  Do you know anything about the procedure that's
22     followed after the cleaning is finished but
23     before production starts?
24  A  No, I am not aware of that.
25  Q  Do you have any understanding as to what Ball is

95

1     claiming in this lawsuit?
2  A  No, sir.
3  Q  Do you have any knowledge of what was on fire?
4  A  No, sir.
5  Q  Do you have any opinions as to what caused the
6     fire?
7  A  No, sir.
8  Q  Has anyone shared with you an opinion as to what
9     caused the fire?
10  A  No, sir.
11  Q  Has anyone ever talked to you about the fire?
12  A  Mark.
13  Q  Anyone other than Mark?
14  A  That was it.
15  Q  Have you ever met with any fire investigators?
16  A  No, sir.
17  Q  Did anyone with the Monticello Fire Department
18     ask you any questions?
19  A  The day of the fire, they asked for tools, but
20     that's about it.
21  Q  But did they ever ask you about what you saw?
22  A  No, sir.
23  Q  Have you ever had any conversations with a guy
24     by the name of Scott Howell?
25  A  No, sir.

96

1  Q  Have you ever had any conversations with a guy
2     by the name of Otto Soyk, S-O-Y-K?
3  A  No, sir.
4  Q  And have you ever had any conversations with a
5     Bill Soyk?
6  A  No, sir.
7  Q  So no fire investigators have ever talked to
8     you?
9  A  No, sir.
10  Q  Has anyone shared with you an opinion as to what
11     caused the fire?
12  A  No.
13     MR. SENAK:  You can answer the question.
14     Because the answer was no; right?
15     MR. MILLER:  He said no, right.
16  Q  Have you ever had any conversations with people
17     that you understand to be investigators hired by
18     Ball or its insurance company?
19  A  No, sir.
20  Q  Do you recall putting together a written
21     statement?
22  A  Yes.
23  Q  Who asked you to do that?
24  A  Mike Rogers before we left, for insurance
25     purposes.



97

1  Q  When you say before you left --
2  A  Before we went home, at seven a.m.
3  Q  Do you recall what time you were initially
4     called to the IBO?
5  A  Twelve, 12:30, 12:20, 12:25, 12:30, somewhere in
6     there.
7  Q  Do you recall what time you ended up evacuating
8     the plant?
9  A  Not off the top of my head, no.
10 Q  After you left the plant and evacuated, did you
11    ever come back into the plant that night?
12 A  After the fire was put out, opened up doors to
13    ventilate.  That was it.
14 Q  Do you remember when that was?
15 A  No, sir.
16 Q  Was it light out or was it still dark?
17 A  I think it was still dark.
18 Q  But you don't have any knowledge of what time
19    you went back in?
20 A  No, sir.
21 Q  What did you do when you were outside of the
22    plant?
23 A  Stand out front until the fire department left.
24    Then we went in after they said it was clear and
25    opened up doors so we could ventilate all the

98

1     smoke out of the warehouse and put fans to blow
2     the smoke out and then had us write a statement
3     and we went home.
4  Q  And Mike Rogers asked you to write a statement
5     out?
6  A  Yeah.
7  Q  Who else did he ask to write a statement up?
8  A  Like all four of us that was over there.
9  Q  And what did he say to you?
10 A  He told us we need to write a statement before
11    we left.
12 Q  What was your understanding as to why you were
13    asked to prepare the statement?
14 A  He said for insurance, so they can know.  That
15    was the last time we talked about it.
16 Q  Did he provide you with any instructions on how
17    to make that statement?
18 A  He just told us to write down what we
19    remembered.
20 Q  Had you ever written a statement like that
21    before?
22 A  No, sir.
23 Q  Were the four of you all together when you were
24    writing down those statements?
25 A  We was in the big office.

99

1  Q  What big office?
2  A  I think it was the Shafer room or the other room
3     up there, the big room.
4  Q  The conference room --
5  A  Yeah.
6  Q  -- that's down the hall?
7  A  Yeah.
8  Q  So all four of you were in the conference room
9     at the same time?
10 A  Yeah.  Gave us a piece of paper and told us to
11    write what we remembered and we can go home,
12    because it was after 7:00.
13 Q  How long did it take you to write that
14    statement?
15 A  I don't know.
16 Q  So it was after your shift ended but before you
17    could leave?
18 A  It was right before the shift was ended.
19 Q  Were any other instructions given to you?
20 A  No.  That was it.
21 Q  Once you had finished, what did you do with the
22    statement?
23 A  Gave it to Mike Rogers and went up to the shop
24    to get my belongings, my keys, lock my toolbox,
25    and then went home for four days or three days

100

1     or however many days it was.
2  Q  That the plant was shut down?
3  A  Huh?
4  Q  Was the plant shut down during that three or
5     four days or was your work --
6  A  It was my days off, yes.
7  Q  Okay.
8  A  Two days, three days.  I can't remember how many
9     days it was.  I think it was a holiday.  I can't
10    remember.
11 Q  So the time that you were off work, that was
12    scheduled time off for you personally?
13 A  Yes.
14 Q  Did you have any involvement in any kind of fire
15    remediation work here at the plant?
16 A  What do you mean?
17 Q  To get the plant to the point where you could
18    resume production.
19 A  Oh, yeah.  We came back on our days and did
20    stuff in the plant, I mean, rebuilds and all or
21    whatever they needed to do our job.
22 Q  Yeah.  So you weren't doing cartridge trimming
23    rebuilds at that time?
24 A  I can't remember.
25 Q  Since you completed that statement, have you



**101**

1  ever seen it again?
2  A  When Mark was here.
3  Q  Is that one of the documents that he showed you?
4  A  Yes.
5      MR. MILLER:  Can I get that marked, please.
6      (Crume Deposition Exhibit 1 was marked for
7  identification.)
8  Q  Randy, that's a two-page document that has been
9  marked as Crume 1.  It is actually two markings.
10  The first page says "EXHIBIT 25, Michael
11  Vergon," and then it has got "Crume 1" beneath
12  that.
13      Do you see that?
14  A  Yes.
15  Q  Did you prepare page 1 of Crume 1?
16  A  This one?
17  Q  Yes, sir.
18  A  No.
19  Q  Do you know who prepared page 1 of Crume 1?
20  A  No, sir.
21  Q  So you didn't have any involvement in preparing
22  page 1; true?
23  A  Yes.
24  Q  Flip to page 2.
25  A  Yes.

**102**

1  Q  Is that your handwriting?
2  A  Yes, sir.
3  Q  Have you ever seen page 1 of this document?
4  A  Just the day that Mark was here.
5  Q  So Mark gave you page 1 of Crume 1?
6  A  He gave me this page 2 first, then he handed me
7  page 2.
8      MR. SENAK:  Page 1.
9  A  Page 1, sorry.  He gave me page 2 and then he
10  showed me page 1.  I wanted to make sure that's
11  what I wrote.
12  Q  But you don't know who put together page 1?
13  A  No, sir.
14  Q  Did you compare it word for word.
15  A  I looked at it.
16  Q  Is it the same word for word?
17  A  I don't know.  Yes.
18  Q  But you don't have any idea who created page 1
19  of Crume 1 --
20  A  No, sir.
21  Q  -- the typewritten?
22      The first sentence says, "IBO exit exhaust
23  blower, blows smoking."
24      Do you see that?
25  A  Yes, sir.

**103**

1  Q  Was that the east or the west end of the oven?
2  A  It would be the east end.
3  Q  And what do you mean by when it says "exit
4  exhaust blow"?
5  A  The blower.
6  Q  So the west exhaust blower?
7  A  Exit east blower.
8  Q  Okay.
9  A  Smoke coming out of it.
10  Q  Now it says "Check air flow, air flow was good
11  .13."
12  A  Yeah.
13  Q  Who took the air flow measurements?
14  A  I did.
15  Q  Where did you take the air flow measurement?
16  A  It is right there by the pipe.  From me to
17  you there is a -- from the blower back to
18  the, wait a minute, west, there is a
19  little-bitty three-quarter inch hole that you do
20  your air flow.
21  Q  Do you insert something into that?
22  A  Yeah.  Just like an air flow gauge.
23  Q  Do you carry that with you?
24  A  No.
25  Q  How did you have it?

**104**

1  A  I must have went back and got it.
2  Q  So at some point after you arrived at the IBO #2
3  you then left to get an air flow gauge?
4  A  I can't remember.
5  Q  Where would you have got the air flow gauge
6  from?
7  A  It is in the shop.
8  Q  The machinist shop?
9  A  Yes, sir.
10  Q  Okay.  Then what does .13 mean?
11  A  The air flow, like 0.00, .01, .02 and on up.
12  Q  And what's a normal reading?
13  A  That's it.
14  Q  .13 is a normal reading?
15  A  Yeah.
16  Q  Is that an analog or digital?
17  A  Analog.
18  Q  And did you take that, once you elevated up --
19  were you on the scissor lift when you took that?
20  A  You don't need the scissor lift.  It is at the
21  pipe.
22  Q  So when you are eye level, that's when you
23  inserted --
24  A  (Witness nods head up and down.)
25  Q  So that was while it was smoking; right?

---

**105**

1  A  Yeah.

2  Q  Pardon me?

3  A  I said yeah.

4  Q  And how did you know that that was a good air

5     flow?

6  A  I have done air flows before.

7  Q  Is that a routine part of your job?

8  A  On Thursdays.

9  Q  So you had been doing those air flow readings

10    since '04, August of '04?

11 A  Yeah.  If it fits on your day, because we work a

12    rotating schedule.

13 Q  The .13 --

14 A  Yeah.

15 Q  -- what unit of measurement is that?

16 A  I am not for sure.  It is the flow gauge that we

17    have.  It goes from like 0 to like 5.0, I think,

18    .50, I think.

19 Q  So it is .5, not 5.0?

20 A  It goes from 0 to .50 on that chart, I think.

21 Q  And .13 is a normal reading?

22 A  Yeah.

23 Q  And is that measurement taken, is that above or

24    below the squirrel cage fan?

25 A  Above it, yeah, above it.

---

**106**

1  Q  Who trained you in how to take that reading?

2  A  One of the shop guys.

3  Q  You don't remember who?

4  A  No.

5  Q  When it says, the next sentence, "Heat gun temp

6     270 degrees + 280 degrees, then fire up to

7     700 degrees."

8        Do you see that?

9  A  Yes, sir.

10 Q  Did you have the heat gun with you --

11 A  No.

12 Q  -- on the scissor lift?

13 A  No.

14 Q  Who took the readings, this 270 + 280 degrees,

15    then fire up to 700 degrees?  Who is taking

16    those temperatures?

17 A  The ETs were taking all the temperature

18    readings.  We yelled down to them and we had

19    paint starting to bubble.  And they said it was

20    700.  Then that's when it went from 270 to 700

21    real quick.

22 Q  When were they providing this information to

23    you?

24 A  They had the heat gun yelling at us, yeah, the

25    infrared gun.

---

**107**

1  Q  Was that when you were taking the air flow

2     readings?

3  A  No.  This was after.

4  Q  That was after?

5  A  Yes.

6  Q  So after you had removed the gauge, they're

7     telling you what the temperatures were?

8  A  Yeah.  They were checking the temperatures back

9     and forth to see what was going on.

10 Q  And do you know which of the two ETs was taking

11    those readings?

12 A  They were both right there.

13 Q  Do you remember who was telling you this

14    information?

15 A  Both of them were standing closer than me and

16    Mark.

17 Q  No, I understand.  But do you know who was

18    talking?

19 A  They were both talking.

20 Q  And when you say "heat gun," are you talking

21    about the thermal imaging camera?

22 A  The camera, yeah.  I call it a heat gun.

23 Q  But you don't use the heat gun as a part of your

24    work; right?

25 A  No.  We got a little thermometer that they put

---

**108**

1     in there when we do our air flows.

2  Q  Did you put a thermometer in there that night?

3  A  No.  No.

4  Q  Why not?

5  A  We were doing, checking the flow to see if we

6     had air flow.

7  Q  Did you bring that thermometer with you when you

8     had gotten the air flow gauge?

9  A  I am not for sure.

10 Q  When it says "Check all exit blows temps were

11    the same" --

12 A  It was Bob and Justin were checking the air

13    flows, checking the temperatures with their heat

14    gun.

15 Q  When you mean the temperatures was the same, was

16    that the 270 to 280 degrees?

17 A  Yeah.  They were checking each blower.  I mean,

18    they were standing, I mean, in between them,

19    checking, coming back and forth and checking

20    them.

21 Q  Okay.

22 A  Because we were trying to figure out what was

23    going on when we seen paint bubble.

24 Q  When they got the 700, did they check the other

25    one too?

---

109

1  A  No.  As soon as we seen paint bubbling and yell
2     at them, they said it was 700, that's when the
3     fireball came out and hit with the extinguisher.
4  Q  So when you say the temps were the same, you're
5     talking about the 270 and 280 degree
6     temperatures; true?
7  A  Yes.  They were checking, yes, with the heat
8     gun, infrared gun.
9  Q  So the same doesn't refer to the 700 degrees,
10    just the 270 to 280?
11 A  270, 280.  They were running about the same
12    temperature with their infrared gun.
13 Q  And then it says, "Then fire was coming out."
14 A  Yes.
15 Q  You never saw flames until after checking the
16    air flow and measuring the temperatures; true?
17 A  This was -- yeah, this was after.
18 Q  Did you ever see flames at any other location?
19 A  After the poof?
20 Q  Yeah.  Other than at that exit hole I think you
21    called it, the access hole.
22    MR. SENAK:  Objection.  That misstates his
23    testimony.  Go ahead and answer.
24 A  Yeah.  As soon as the poof down there, we had
25    fire coming out exiting, like I said, anywhere

110

1     where it could exit.
2  Q  Were those areas above the squirrel cage fan?
3  A  Yeah, right at the squirrel cage fan, and that
4     way it pushed it towards us.
5  Q  Who shut the burners down?
6  A  I guess the ETs.
7  Q  Well, it says, "Shut burn down."  Do you know
8     who that -- how did you find out that the
9     burners were shut down?
10 A  When that fire went off?  What do you mean?
11 Q  I am just reading from your statement.  It says,
12    "Shut burn down."
13 A  Oh, when it came out, we quick got down out of
14    there.
15 Q  Okay.  And I see "fire was coming out."
16 A  Yeah.
17 Q  And then it says, "Shut burn down."
18    Do you see that?  That's the fourth line of
19    your statement.
20    MR. SENAK:  Right there.
21 A  The only thing, the burner was running at that
22    temperature.
23 Q  No.  But it says, "Shut burn down."
24    Do you see that?
25 A  Yeah.

111

1  Q  Who shut them down?
2  A  I don't know.  I don't think we did shut them
3     down.
4  Q  Then so what does this mean, "Shut burn down"?
5  A  I am guessing it was burning down.  I don't
6     know.
7  Q  Well, what I don't understand --
8  A  It is a big fireball, then it kind of like went
9     away.
10 Q  No, I understand.  But I guess I am confused,
11    because the typewritten statement, page 1 of
12    this, says --
13 A  Yeah.
14 Q  -- "Shut burners down."  But your handwritten
15    statement says "Shut burn down."  And I don't --
16    I mean, I don't understand the difference,
17    number one, between those two sentences, and I
18    am hoping you can solve that for me, and, number
19    two, I don't really understand what it means.
20    MR. SENAK:  Yeah.  Just object to the form
21    and the foundation as to the statement on
22    number 1.  You can answer as to 2, page 2.  Do
23    you understand?
24    THE WITNESS:  What's that?
25    MR. SENAK:  No.  Do you understand the

112

1     question?
2     THE WITNESS:  No.
3  A  We had a big fireball came out and then it kind
4     of like went down.
5  Q  I understand.  I understand.  And I just want to
6     focus on your words.  Okay?
7  A  Yeah.
8  Q  And the fourth line says, "Shut burn down."
9     Do you see that?
10 A  Yes, sir, I see that.
11 Q  But you go back to page 1 of this document --
12    MR. SENAK:  You see the problem.
13 Q  -- and it says, "Shut burners down."
14    MR. SENAK:  Yeah.  Still the objection is
15    to foundation as to page 1.
16 Q  Do you see that --
17 A  Yes, sir.
18 Q  -- the difference between page 1 and page 2?
19 A  Yeah.
20 Q  Do you know why your statement was changed from
21    "Shut burn down" to "Shut burners down"?
22 A  No.
23 Q  Did you shut the burners down?
24 A  No.  We have got a hidden fire extinguisher, got
25    down and left.

113

1  Q  So you never shut the burners down; true?
2  A  No, sir.  No.
3  Q  Are you aware of anyone shutting the burners
4     down?
5  A  No, sir.
6  Q  Do you know why, whomever prepared this
7     typewritten page, has indicated that you shut
8     the burners down when you never did?
9        MR. SENAK:  Object to foundation.
10  Q  You can answer.
11        MR. SENAK:  Go ahead.  You can answer the
12     question.
13  A  Typed it wrong, misunderstood my writing.
14  Q  Do you know, were you ever contacted about the
15     preparation of this typewritten page?
16  A  No.  I just showed up and we looked at this one
17     and then I looked at that one.
18  Q  Do you know whether Ball has a policy of when to
19     shut burners off in the event of a thought that
20     there is a fire?
21  A  I am not for sure.
22  Q  Do you know who has discretion to turn off the
23     burners of an oven?
24  A  Not for sure.
25  Q  Can just an hourly worker, a production worker

114

1     shut down a line?
2  A  Shut down a line.  He did an E-Stop?
3  Q  Pardon me?
4  A  He did an E-Stop.
5  Q  What's an E-Stop?
6  A  Emergency stop.
7  Q  Is there an emergency stop button near?
8  A  Yes.
9  Q  And if you hit that emergency stop button, will
10     that shut down the burners of an oven?
11  A  I am not for sure.
12  Q  Don't know.  When it says in your statement
13     fire extinguisher to put out fire out of 3/4"
14     assist -- access hole or assist hole, then
15     flame started to spread to the other pipe and
16     blower" --
17  A  Yeah.
18  Q  -- so did the fire spread from the east to the
19     west end?
20  A  Yeah.
21  Q  Okay.
22  A  Yeah, east to the west.
23  Q  And the fire department wasn't called until
24     after the fire had spread; true?
25  A  After the fire started.  We got a lift, went and

115

1     notified them.
2  Q  When you say that "then fire was coming out," do
3     you see that?  Fourth sentence, right at the end
4     of the line.
5  A  Yes.
6  Q  Was the fire coming out of this three-quarter
7     access hole that you referred to later in the
8     sentence?
9        MR. SENAK:  Object to form.  Misstates his
10     prior testimony.
11  Q  You can answer, sir.
12        MR. SENAK:  Yeah.
13  A  Okay.  When that fire came out of the fan, it
14     came out of that exhaust hole.  It came through
15     the pipe.
16  Q  So the fire was coming out of the --
17  A  Access hole.
18  Q  -- access hole?
19  A  And any other spot that they could find.
20  Q  And that was on the east blower?
21  A  Yes.
22  Q  I think that's all I have for you, sir.  Thank
23     you.
24  A  Thank you.
25

116

1     CROSS-EXAMINATION,
2        QUESTIONS BY MARK N. SENAK:
3  Q  I have got a few questions.
4        With respect to the second page of Crume
5     Exhibit Number 1, this is your handwriting;
6     true?
7  A  Yes, sir.
8  Q  And that's your signature on the bottom?
9  A  Yes, sir.
10  Q  And the date is shown as 5/22/14; correct?
11  A  Yes, sir.
12  Q  Was this statement, did you write this statement
13     after the fire was over?
14  A  Yes, sir.
15  Q  You would have started your shift at seven or
16     four p.m. on the 22nd?
17  A  7:00.
18  Q  7:00 on the 22nd?
19  A  P.m., on the 22nd.  I would have to look at the
20     calendar again.  The 22nd, I believe, before the
21     fire.
22  Q  By the time you wrote this statement it was
23     already the following day?
24  A  Yes, sir, the morning, the next morning.
25  Q  It would have been the morning of May 23rd.

117

1   A   Okay.
2   Q   So what I just want to make sure is, even though
3       the date here shows 5/22/14, in reality, you
4       gave this statement on the morning of 5/23/14?
5   A   Yes.
6   Q   Okay.  If you look at the upper left-hand
7       corner, you will see 12:20 a.m.?
8   A   Yes.
9   Q   Is that the time that you would have first been
10      notified of the fire?
11  A   Yes.
12  Q   So that 12:20 a.m. would have been on the
13      morning of May 23rd, 2014; true?
14  A   Yes, sir.
15  Q   And, again, going to the first line, right after
16      12:20 a.m., it says, "IBO exit," is the next
17      word east?
18  A   Yes.
19  Q   Will you just do me a favor and read this
20      statement into the record for the court
21      reporter.
22  A   "IBO -- 12:20" --
23  Q   No.  I was going to say start with the time.
24  A   "12:20 am.  IBO east" --
25  Q   I'm sorry, first of all, so take it one word at

118

1       a time.
2   A   Okay.  Sorry.  "12:20 am.  IBO exit east
3       blower."
4       MR. MILLER:  I'm going to object.  That's
5       not what's written.
6   A   Smoking.
7       MR. MILLER:  It is blow.  It is not blower.
8       MR. SENAK:  Right.
9   A   I didn't spell it right.
10  Q   So let's go back.  IBO, start with there and go
11      forward.
12  A   "IBO exit east below smoking.  Check air flow,
13      air flow was good .13, heat gun temp 270 degrees
14      + 280 degrees, then fired up to 70 degrees."
15  Q   Could you read back the last line?
16  A   Sorry.  700.
17  Q   Go ahead.
18  A   "700 degrees, checked all blowers."
19  Q   Whoa.  Could you read it back from "check"?  Do
20      you want to try again?
21  A   "Check all exit blows, temp were the same, then
22      fire was coming out.  Shut burner -- burn down,
23      blower were running to cool down, then big puff
24      of smoke and fire out of blower and used fire
25      extinguisher to put out fire out of 3/4 access

119

1       hole, then flames start spreading to other pipe
2       and blower and fire department got called.
3       5/22/14, Randy Crume."
4       MR. SENAK:  This will be Crume 2 and
5       Crume 3.
6       (Crume Deposition Exhibits 2 and 3 were
7       marked for identification.)
8   Q   Randy, I am going to show you what has been
9       marked as Crume Exhibit 2 and Crume Exhibit 3.
10      All right.  Do you know what these two pictures
11      show?
12  A   Exhaust blowers.
13  Q   Do you know if this is IBO #2?
14  A   Yes.
15  Q   Why do you know it is IBO #2?
16  A   Because of the fire.
17  Q   The fire damage shown in the photographs?
18  A   Yes.
19  Q   All right.  Now you, in your statement, you
20      talked about taking air flow measurements?
21  A   Yes.
22  Q   And you were mentioning that there was a hole in
23      which you put the air flow gauge --
24  A   Yes.
25  Q   -- right?

120

1       Is the location of that hole shown on
2       either Exhibit 2 or 3?
3   A   It looks like it is all Exhibit 2.
4   Q   If you could just put an X where that hole is
5       at.
6   A   On this spot?
7   Q   Yep.  And then put your initials, if you would.
8   A   (Witness complies.)
9   Q   The location where you took the air flow
10      measurements is on the horizontal piece of
11      ductwork above the squirrel cage; correct?
12  A   Yes, sir.
13  Q   And you indicated that the measurement at that
14      particular location showed normal air flow at
15      the time you took it; correct?
16  A   Yes.
17  Q   When you were on the lift, did you look inside
18      that hole?
19  A   In that hole there?
20  Q   Yeah.
21  A   No.  I had the gauge in there.
22  Q   You also indicated that you saw paint bubbling.
23      Is the area where you saw the paint bubbling
24      shown in either Exhibit 2 or 3?
25  A   It will be Exhibit 2.

121

1  Q  All right.
2  A  Right here on the radius.
3  Q  Would you mind circling the area where you saw
4     the paint bubbling on Exhibit 2?
5  A  (Witness complies.)
6  Q  And, again, if you could just put your initial
7     by that.
8  A  (Witness complies.)
9  Q  Now the area where you just circled and put your
10    initial where the paint was bubbling, is that
11    the east blower that you have been referring to?
12 A  Yes.
13 Q  When the reading of 700 degrees was conveyed to
14    you, was that reading of 700 degrees being taken
15    on the east blower?
16 A  Yes.
17 Q  You also indicated that you first observed
18    flames coming out of an area of -- is that area
19    shown?
20 A  It is right there, in that radius, there is like
21    a little cone, circle area.
22 Q  Can you just put a square around the area where
23    you first saw flames coming out and, again, put
24    your initials in that area?
25 A  That square is there and the circle is right

122

1     there, initials.
2  Q  So the square shows the area where the flames
3     were coming out but the circle shows where the
4     paint was bubbling?
5  A  Yes.  Right.
6  Q  In your statement you indicate there was a big
7     puff of smoke and fire out of the blower.  Is
8     the area that you have shown in the square the
9     area where the big puff of smoke and fire was
10    seen?
11 A  Yes.  Then all this area up here.
12 Q  And that's my next question, which is after you
13    see the flames initially in the area of the
14    square, where do the flames -- where do you next
15    see flames?
16 A  They traveled up the pipe, this way.
17 Q  And then you saw them come out of the hole where
18    you were measuring the air flow?
19 A  Yes.
20 Q  Which you have shown as an X on the exhibit?
21 A  Yes.
22 Q  When you were up on the lift, the purpose you
23    went up there was to check to see if there was
24    anything wrong with the bearings?
25 A  Yes.  See where the smoke was coming from.  If

123

1     it was the bearings on the blower, do an
2     inspection of it.
3  Q  And, again, the blower that you were looking at
4     is the one that is shown in Exhibit 2; correct?
5  A  Yes, sir.
6  Q  The east blower?
7  A  Yes, sir.
8  Q  Are you familiar with the sound that a bearing
9     makes when it is failing?
10 A  Yeah.
11 Q  And how is it that you're familiar with that?
12 A  We have had them fail before on different parts
13    of equipment.
14 Q  When you were up on the lift, how close were you
15    to the area where the bearings are on the blower
16    shown in Exhibit 2?
17 A  The yellow gas line.
18 Q  Do you have a estimate as to the distance you
19    would have been?
20 A  From the gas line to the blowers?
21 Q  From where you were on the lift to the bearings
22    in the blower.
23 A  In the blowers, five feet from the gas line.
24 Q  And I take it five feet, meaning five feet from
25    where the blower motor was at?

124

1  A  Yeah.
2  Q  When you were up there, did you hear anything
3     that would indicate to you that there was any
4     bearing failure that was occurring at that time?
5  A  No.
6        (Crume Deposition Exhibit 4 was marked for
7     identification.)
8        MR. SENAK:  That's going to be 5.
9        (Crume Deposition Exhibits 5 and 6 were
10    marked for identification.)
11       MR. MILLER:  So 2385 is Crume 6?
12       MR. SENAK:  Yes.
13 Q  Randy, I am going to show you Crume Exhibits 4,
14    5, and 6.  Can you identify these for me?
15 A  It looks like from the pictures a blower, one of
16    the blowers.
17 Q  Have you -- go ahead.
18 A  Exhibit 5 looks like one of the blowers.
19 Q  You mentioned that you were present at the time
20    infrared photographs were being taken on the day
21    of the fire; true?
22 A  Yes.
23 Q  Were you standing with Bob Pellegrini and
24    Justin Stout at the time those photographs were
25    taken?

125

1  A  Some of them, when we first got there.

2  Q  When you look at Exhibits 4, 5, and 6, do you

3     know whether these are infrared photographs that

4     were taken by either Stout or Pellegrini on the

5     day of the fire?

6  A  No.

7  Q  Did you ever see the photographs that were taken

8     by Stout or Pellegrini after the fire?

9  A  Just from you, when we had our meeting.

10 Q  Do you have any recollection as to whether these

11    were the photographs that you saw at the

12    meeting?

13 A  You showed them to me with the Ball letters.

14 Q  Okay.  Oh, you're talking about the meeting with

15    me?

16 A  Yeah.

17 Q  What I'm interested in is after these

18    photographs were taken, did you ever see copies

19    of them --

20 A  No.

21 Q  -- other than at the meeting?

22 A  No.

23 Q  Do you know whether Exhibits 4, 5, and 6

24    accurately reflects the temperatures of the

25    blower shown in those photographs at the time

126

1     these photographs were taken?

2  A  This one here the temperature was close on

3     Exhibit 6.

4  Q  So with respect to Exhibit 6, Exhibit 6

5     accurately, fairly and accurately reflects the

6     temperature of the east blower's squirrel cage

7     at the time of the fire?

8  A  Yes.

9  Q  Okay.  Do you know whether that's true for 5 and

10    4?

11 A  Not for sure.

12 Q  When you saw the area where the paint was

13    bubbling that you showed in I think it was

14    Exhibit 2, is that the first area where you saw

15    paint bubbling on the furnace around any of the

16    ductwork or the exhaust blowers?

17 A  Yes.

18    MR. SENAK:  That's all I have.

19    MR. MILLER:  All right.  I have nothing

20    further.

21    MR. SENAK:  Reserve.  You're done.

22    (Time Noted:  3:55 p.m.)

23

24

25

127

1  AND FURTHER DEPONENT SAITH NOT.

2

3

4  _____

   RANDY GENE CRUME

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

128

1  STATE OF INDIANA        )
                           )  SS:
2  COUNTY OF HAMILTON      )

3

4     I, Diane Zeyen, RPR, a Notary Public in and for

5  the County of Hamilton, State of Indiana, at large,

6  do hereby certify that RANDY GENE CRUME, the

7  deponent herein, was by me first duly sworn to tell

8  the truth, the whole truth, and nothing but the

9  truth in the aforementioned matter;

10    That the foregoing deposition was taken on

11 behalf of the Defendant, at Ball Metal Beverage

12 Packaging, 501 North 6th Street, Monticello,

13 White County, Indiana, on the 7th day of March,

14 2018, at 1:06 p.m., pursuant to the Federal Rules of

15 Trial Procedure;

16    That said deposition was taken down in

17 stenograph notes and afterwards reduced to

18 typewriting under my direction, and that the

19 typewritten transcript is a true record of the

20 testimony given by the said deponent; and that the

21 signature by said deponent to his deposition was not

22 waived;

23    That the parties were represented by their

24 counsel as aforementioned.

25    I do further certify that I am a disinterested

1    person in this cause of action, that I am not a
2    relative or attorney of either party or otherwise
3    interested in the event of this action, and that I
4    am not in the employ of the attorneys for any party.
5         IN WITNESS WHEREOF, I have hereunto set my hand
6    and affixed my notarial seal on this _____ day of
7    March, 2018.
8
9
10                N O T A R Y   P U B L I C
11
12   My Commission Expires:
13   September 2, 2024
14   County of Residence:
15   Hamilton County
16
17
18
19
20
21
22
23
24
25



---

**Exhibits**

**K CRUME_1** 3:11 101:6 116:5

**K CRUME_2** 3:12 119:9 120:2, 3,24,25 121:4 123:4,16 126:14

**K CRUME_3** 3:12 119:9

**K CRUME_4** 3:13 124:6

**K CRUME_5** 3:13 124:18

**K CRUME_6** 3:14 126:3,4

---

**#**

**#2** 29:25 30:6,8 33:18 34:2,11, 14 36:13,23,25 37:7,10,16,24 38:13,19 39:2,6,19,21 41:9,18, 20 51:8 69:16,22 70:1,11 79:12 80:5,23 84:6,18,21 87:17,23 89:6 90:15,23 104:2 119:13,15

---

**0**

**0** 105:17,20

**0.00** 104:11

**01** 10:20 104:11

**02** 104:11

**04** 8:2,5 9:10 10:20 11:3 12:14 15:5 23:21,22 28:14 32:23 41:4 51:4 61:5 105:10

---

**1**

**1** 40:16,19 66:9 101:6,9,11,15, 19,22 102:3,5,8,9,10,12,18,19 111:11,22 112:11,15,18 116:5

**12** 8:24 60:24

**12-hour** 60:20

**12:20** 97:5 117:7,12,16,22,24 118:2

**12:25** 97:5

**12:30** 97:5

**13** 103:11 104:10,14 105:13,21 118:13

**14** 19:25 20:1 25:13 26:13 44:16,19 55:23 59:12

**15** 32:8,17

**18** 7:15

**1999** 9:3

---

**2**

**2** 39:23 40:16,19 89:7,15,18 101:24 102:6,7,9 111:22 112:18 119:4,6,9 120:2,3,24,25 121:4 123:4,16 126:14

**20** 58:17

**2001** 9:20

**2004** 7:13,20 12:18 21:8 24:3

**2008** 28:12

**2010** 28:13

**2014** 25:1 37:3 55:20 59:3 117:13

**21st** 56:9,25 57:8,15,19

**22** 37:3,6 55:19,23 56:16 59:3, 12,21 84:6 86:22

**22nd** 56:3,5,14,23,25 57:2,5,6, 7,9,16 58:1,2 116:16,18,19,20

**23** 37:3,7

**2385** 124:11

**23rd** 56:14 58:6 116:25 117:13

**24** 12:14 87:23

**24th** 7:20 56:13

**25** 30:11 31:21,25 32:11 101:10

**270** 106:6,14,20 108:16 109:5, 10,11 118:13

**280** 106:6,14 108:16 109:5,10, 11 118:14

**2:33** 63:13

**2:34** 63:14

---

**3**

**3** 25:11 39:23 40:16,19 119:5,6, 9 120:2,24

**3/4** 114:13 118:25

**30** 84:17

**300** 91:10

**35** 32:11

---

**4**

**4** 25:13 39:25 40:15,16 124:6,13 125:2,23 126:10

**4-H** 8:16

**40** 89:9 90:21

---

**46947** 7:11

**49** 20:19 27:13,15

**4:30** 20:11,12,16 23:11

---

**5**

**5** 32:8,17 105:19 124:8,9,14,18 125:2,23 126:9

**5.0** 105:17,19

**5/04** 15:11

**5/22/14** 116:10 117:3 119:3

**5/23/14** 117:4

**50** 20:16 89:9 90:21 105:18,20

**5265** 7:10

---

**6**

**6** 20:12,15 23:11 56:20 57:5 124:9,11,14 125:2,23 126:3,4

**6:30** 58:16

**6:50** 58:10,11,13,14,23 59:22

---

**7**

**70** 118:14

**700** 106:7,15,20 108:24 109:2,9 118:16,18 121:13,14

**75** 27:18 28:20 51:13

**7:00** 99:12 116:17,18,19

**7:30** 56:19 57:5

---

**8**

**8** 25:12

**8/04** 15:8,11

---

**9**

**99** 9:10,20

---

**A**

**a.m.** 20:12,15 57:5,9 58:4,7 97:2 117:7,12,16

**academic** 16:3

**access** 109:21 114:14 115:7, 17,18 118:25

**accessible** 49:3

---

**accumulates** 83:20,24

**accurate** 28:18 32:13 54:8

**accurately** 125:24 126:5

**acquired** 50:5

**additional** 9:5 30:15 31:12,23 65:10

**address** 7:9,12,15

**addressed** 53:3

**adjust** 35:2,4,8 36:7,22

**adjusted** 35:10 46:14

**adjusting** 13:24 36:12 39:4

**adjustment** 35:13,20 36:3

**adjustments** 41:15 49:20

**adjusts** 14:11

**advance** 44:4 69:9 72:25

**affect** 35:11 44:8

**affected** 46:10

**afternoon** 4:9

**ahead** 38:22,24 71:8 75:23 109:23 113:11 118:17 124:17

**aim** 77:13

**air** 36:18,19 37:18 38:14,15 39:9,14 40:25 41:2,23 42:1,3,10 46:17 55:22 56:16 57:4 58:24 59:2,6,7 75:16 86:21 87:1,5 103:10,13,15,20,22 104:3,5,11 105:4,6,9 107:1 108:1,6,8,12 109:16 118:12,13 119:20,23 120:9,14 122:18

**alarm** 34:21 78:6 94:19

**Allen** 26:22,23,24 27:1

**allowed** 72:11

**aluminum** 25:7 51:2,3,5

**amount** 25:15

**analog** 104:16,17

**annual** 77:8

**answers** 5:1,18

**anytime** 85:10

**applied** 13:11

**approached** 70:11

**area** 25:25 28:21 29:5,7 30:9,20 31:18 48:25 65:8,14,15 70:1,24 71:2,6 73:4 74:3,13,19,23 75:24 79:13 80:16 81:3 91:8 93:6 120:23 121:3,9,18,21,22,24 122:2,8,9,11,13 123:15 126:12, 14

---



USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 221 of
1167
Randy Crume
2                          March 07, 2018                    Index: areas..cleaning

**areas** 65:12 110:2

**arises** 62:17

**arrive** 58:14

**arrived** 56:19 59:10,17 69:4 80:23 82:19 93:4 104:2

**arriving** 69:21

**ascended** 80:24

**ascending** 76:2

**asks** 90:22

**assignment** 33:9

**assist** 114:14

**assume** 35:15

**assumed** 69:12

**attempt** 70:23 76:12 77:4 92:16,20,22

**attempting** 78:11

**audibly** 5:19

**audio** 82:4

**August** 15:4,5 23:21 24:3 32:23 41:4 61:5 105:10

**average** 32:3

**aware** 21:18 42:12,15,19 44:11 47:12,18,21,24 55:13,16 69:25 87:22 94:24 113:3

**B**

**back** 6:2 9:18 15:19 16:16,23 23:21 24:3 26:5 28:16 31:9,10 35:18 45:4 50:1,3,7,11,15 53:13 54:2,4 67:6 72:22 77:25 97:11, 19 100:19 103:17 104:1 107:8 108:19 112:11 118:10,15,19

**background** 8:23

**backup** 28:3

**backwards** 35:21

**bad** 71:15 81:18,19,21

**bag** 83:3

**bags** 69:23

**Ball** 7:17,24 8:3,6 10:1,23 11:6 12:5,12 13:23 27:20 33:1,5,9, 12,16 34:10 40:24 41:23 46:22, 25 47:3,6 55:14 57:17 62:9 72:24 77:6 83:16 85:1,6,11,17, 21,23 86:2,24,25 87:19,22 88:3, 12 94:25 96:18 113:18 125:13

**Ball's** 49:12 77:14

**basis** 22:4

**bearing** 36:15 49:24 50:1 71:16 81:12,15,18,19,21 123:8 124:4

**bearings** 36:16,22 81:25 122:24 123:1,15,21

**Beef** 8:14,15

**began** 41:4

**begin** 57:22

**beginning** 41:3

**belongings** 99:24

**belt** 14:19 34:23 35:1 39:4

**beneath** 101:11

**benefits** 12:11

**beverage** 33:3

**big** 98:25 99:1,3 111:8 112:3 118:23 122:6,9

**bigger** 77:14 88:16

**Bill** 96:5

**bit** 56:20 73:23 77:21

**blow** 98:1 103:4 118:7

**blower** 64:25 68:25 69:3 70:13 71:10,19 73:8 102:23 103:5,6,7, 17 108:17 114:16 115:20 118:3, 7,23,24 119:2 121:11,15 122:7 123:1,3,6,15,22,25 124:15 125:25

**blower's** 126:6

**blowers** 36:18,20 73:14 118:18 119:12 123:20,23 124:16,18 126:16

**blows** 102:23 108:10 118:21

**board** 45:4 84:13

**Bob** 66:19 79:14,18,19,25 82:23 108:12 124:23

**bolt** 36:4,5

**books** 50:19

**bookshelves** 48:25

**boss** 54:23 55:9 60:14

**bottom** 116:8

**bought** 11:13

**break** 45:4 63:12

**breaks** 14:19 48:16

**bring** 26:14 31:9,10 68:11 72:25 108:7

**broader** 16:18

**broke** 48:17

**brought** 66:1,3,5 68:10,12

**bubble** 65:2 106:19 108:23

**bubbling** 65:5 73:19 109:1 120:22,23 121:4,10 122:4 126:13,15

**buddies** 58:19

**bunch** 92:15

**burn** 110:7,12,17,23 111:4,15 112:8,21 118:22

**burner** 52:17 110:21 118:22

**burners** 36:19 52:8,12 110:5,9 111:14 112:13,21,23 113:1,3,8, 19,23 114:10

**burning** 111:5

**business** 10:12,15 11:9

**businesses** 8:9

**button** 93:25 94:6,12,13,15,17 114:7,9

**buying** 8:18

**C**

**C-r-u-m-e** 4:11

**cage** 63:1,6 65:6,15,16 71:3,6, 21,22,23,25 75:18,21 105:24 110:2,3 120:11 126:6

**calculator** 25:10

**calendar** 116:20

**calipers** 69:25

**call** 37:25 38:3,6 54:3 67:16 85:20 86:4 89:22 90:19 92:4 94:9,15 107:22

**called** 36:14 48:17 86:15,18 90:9 92:10,12 97:4 109:21 114:23 119:2

**calls** 25:22 30:14,18,19,21 31:18,22 88:15

**camera** 18:4,5 64:10 67:17 68:13 107:21,22

**can's** 54:4

**cans** 12:21 51:2 87:8

**capacity** 76:7

**care** 19:15

**Career** 15:17

**carry** 103:23

**cartridge** 25:6 26:4,8,18,21 27:3,8,20 28:9,12 51:14,15,22 61:17 100:22

**cartridges** 23:17,24 25:4,8,16, 25 27:11,17 29:20 30:12 60:5 61:11,23

**case** 55:14,17

**category** 37:25

**Caterpillar** 12:4

**cattle** 8:13,14,15

**caught** 23:14,15 25:21

**caused** 95:5,9 96:11

**causing** 70:16,17,20,23 76:13 81:11

**cavalier** 40:8

**Center** 15:17

**Century** 15:17

**certificate** 17:4

**certificates** 16:7

**certification** 62:16

**certifications** 16:8

**chambers** 52:15

**change** 36:22 49:24

**changed** 24:5 112:20

**chart** 105:20

**check** 103:10 108:10,24 118:12,19,21 122:23

**checked** 118:18

**checking** 73:19 107:8 108:5, 12,13,17,23 109:7,15

**checks** 41:15

**chief** 27:6 53:9 54:18,20

**chose** 11:23

**cigarette** 58:18

**circle** 121:21,25 122:3

**circled** 121:9

**circling** 121:3

**circumstance** 92:3

**claiming** 95:1

**class** 77:9 88:14

**clean** 46:20 83:14,17

**cleaned** 42:13 45:10,19,21 46:1,4,8 62:7 84:6 87:20

**cleaning** 40:21 41:3 42:16 44:24 45:8,15 46:11,13 47:1 55:23 56:1,16 82:13 83:10 84:3 94:22



clear 97:24

clock 58:12,13

close 68:5 89:18 91:7 123:14 126:2

closed 11:9

closely 67:11

closer 12:10 76:3 107:15

closest 89:6

CNC 12:2,3

co-employees 19:5

coating 54:1

combustion 52:15

company 11:13 14:6 96:18

compare 102:14

complete 5:6,9

completed 16:11 100:25

completely 76:21

completion 17:4

complies 120:8 121:5,8

component 31:12,16

components 84:21

computer 77:11

conclusion 16:6

cone 73:9,10 75:24 121:21

conference 99:4,8

confined 62:10,13,20

confused 90:11 111:10

consistently 32:13

constant 25:14

consult 49:6 50:18

consumed 31:21

contact 30:8 91:23

contacted 113:14

contacting 88:10

continuously 7:21

contractor 34:8

controlled 35:24 85:24

convenient 23:12

conversations 42:9 88:9 95:23 96:1,4,16

conveyed 121:13

conveyor 14:19 34:23 35:1,16

36:10,12 39:4 40:6 46:10,13

cool 118:23

copies 125:18

corner 117:7

Corp 10:1 11:6 12:5,12 13:23

Corporation 8:3 33:16

correct 4:19 28:11 33:13 38:10, 18 39:11 45:13 48:19 49:14 62:17 92:8 116:10 120:11,15 123:4

correctly 14:7

count 94:4

couple 18:10 20:6 21:6 73:11, 23 81:5,6 89:1

courses 16:2,3

court 4:25 5:5,15,17,22 6:2 117:20

courtroom 4:21,24

crack 76:1

created 38:6 102:18

crew 66:23

CROSS-EXAMINATION 116:1

crume 4:11,12 101:6,9,11,15, 19 102:5,19 116:4 119:3,4,5,6,9 124:6,9,11,13

current 7:8,17 8:6 12:16 15:8 32:24 51:4

cycle 67:9

**D**

daily 22:4

damage 119:17

dark 69:2 97:16,17

data 37:21

date 7:19 12:16 32:21 61:6 116:10 117:3

day 4:17 16:1,3 17:9 18:3 20:4 22:9,12 23:1,7,11,25 24:22 44:3 44:2,4,8,11,13,19,20,23 45:11, 12 57:13,22 59:13 63:20 64:4 67:13 84:15 95:19 102:4 105:11 116:23 124:20 125:5

day/nights 24:23

days 15:19 20:6,8,9 24:4,12,23, 24 25:19 28:25 42:18,19,23,25 43:8,10,13 44:15 67:7 84:17 99:25 100:1,5,6,8,9,19

decide 68:20

decided 41:25 79:11 83:13

decides 83:16

deciding 85:20 86:3

decision 40:25

Deere 12:4

define 13:21

degree 109:5

degrees 73:23 106:6,7,14,15 108:16 109:9 118:13,14,18 121:13,14

deliver 26:10

department 38:12,20 52:4 53:3,10,12,21,23 54:9 69:21 80:17 85:21,24 86:4 89:18 90:4 91:10 94:7,10 95:17 97:23 114:23 119:2

depend 44:22 55:4

depended 67:9

depends 32:2 44:15,21 55:3 60:6 87:15

deposed 4:12 8:21 19:6,9

deposition 4:14,16 5:13 17:8 18:19 101:6 119:6 124:6,9

depth 49:25

desk 68:3

determined 43:2,5

determining 85:16

devoted 51:14

diagnosing 85:16

dial 89:1

difference 39:21 40:10 111:16 112:18

differential 75:9

differently 84:14

digital 104:16

dip 10:12

diploma 16:22 17:1

diplomas 16:24

direct 20:23 64:12 65:11

directs 22:3

disassemble 26:3

discharge 76:15,18

discourteous 5:14

discovered 84:3 88:1,9

discretion 113:22

distance 123:18

distinction 4:19

divided 20:2

document 101:8 102:3 112:11

documentation 38:5

documents 17:25 18:11,20,23 38:10 101:3

door 13:14 29:8,9 68:2 94:2

doors 29:17 97:12,25

doorway 68:4

downtime 26:15

drink 63:8

dropping 26:17

dry 63:11

duct 62:7

ductwork 63:5,17 83:17,24 85:2 120:11 126:16

duties 24:5

**E**

E-stop 114:2,4,5

earlier 44:16 49:20

early 36:14

east 74:20 103:1,2,7 114:18,22 115:20 117:17,24 118:2,12 121:11,15 123:6 126:6

easy 5:15

education 9:5 15:13

educational 8:23

eight-day 45:3 84:13

EI 15:18,19 16:2,8,12,16 17:5

electrical 67:15

electricians 63:25 66:25 67:23,24

electricians' 68:1

elevated 104:18

else's 29:23

email 45:3 55:5 84:12

emanating 74:20,24 75:8 81:4

emergency 114:6,7,9



**employee** 6:25 7:17 20:21 26:25 42:10 72:24 88:7,19,21 91:4

**employees** 11:22 42:4 58:24 85:1,6,11,12,17,21,23 86:2,25 87:22 88:4,12 89:21 91:13

**employer** 8:5

**employment** 12:8 33:12 34:10 49:12

**emptied** 78:19,21

**empty** 76:21

**end** 12:18,21 41:12,14 53:13 54:4 68:3 103:1,2 114:19 115:3

**ended** 97:7 99:16,18

**engineer** 43:18

**entering** 87:8

**entire** 25:15 29:3 32:18 72:6

**entirety** 36:7

**entrance** 29:9

**entries** 61:8,23,25 62:3

**environment** 6:9

**equipment** 13:25 14:1 30:14 31:6,7,19,22 33:25 38:1 52:1 53:17 72:20,22 73:1 123:13

**estimate** 27:15 123:18

**ETS** 63:23 66:17,21,25 67:11 68:7 70:13 73:12 86:14,18 88:10 89:16 92:8,10,22 106:17 107:10,110:6

**evacuate** 77:15 78:9 92:2 93:9, 21,25 94:2

**evacuated** 78:8 80:1 93:19 97:10

**evacuating** 97:7

**evacuation** 78:6 80:1 93:25 94:6,17

**event** 113:19

**exact** 4:23

**exhaust** 36:19 64:25 73:14 74:1 75:10 102:22 103:4,6 115:14 119:12 126:16

**exhibit** 101:6,10 116:5 119:9 120:2,3,24,25 121:4 122:20 123:4,16 124:6,18 126:3,4,14

**Exhibits** 119:6 124:9,13 125:2, 23

**existence** 11:10

**exists** 48:22

**exit** 72:3 102:22,103:3,7 108:10 109:20 110:1 117:16 118:2,12, 21

**exiting** 109:25

**experience** 13:18 33:3,6

**expired** 72:23

**explain** 40:4

**extended** 5:20,25

**extinguish** 76:13 77:4 78:12

**extinguished** 77:20 78:2,14

**extinguisher** 76:4,15,18,21,24 77:8,20 78:15,22,24 79:6 81:7 88:14 91:3,7,15,18,25 92:17,20, 23 93:1 109:3 112:24 114:13 118:25

**extinguishers** 91:9

**eye** 71:20,24,25 73:5 81:3 104:22

---

**F**

**fabricate** 48:18

**fabrication** 14:5,8 33:3

**face** 79:7

**facility** 29:12

**fact** 19:8

**fail** 123:12

**failing** 123:9

**failure** 36:15 124:4

**fair** 6:20 51:13

**fairly** 126:5

**fall** 37:25

**falling** 54:4

**familiar** 59:8 123:8,11

**family** 11:24

**fan** 63:2,6 65:6,15 71:3,6,10,21, 22,23 72:1 75:18,21,25 105:24 110:2,3 115:13

**fans** 36:19,22,23,25 74:1 75:10 98:1

**fast** 72:23

**favor** 117:19

**feel** 21:24

**feet** 36:11 71:18 75:6 89:9 90:21 123:23,24

**Fife** 35:22,25

**Fifteen** 71:18

**figure** 32:4 49:23 70:20,23 83:2 86:12 108:22

**figured** 19:14

**find** 53:4 70:17 84:8 110:8 115:19

**fine** 7:7

**finish** 13:2

**finished** 94:22 99:21

**fire** 33:18 37:2,10 39:2 56:11 57:2,3 59:14 63:20 64:4 76:4, 15,18,21,24 77:7,8,15,20 78:6 80:6,17 81:7 82:14 84:17,22 85:3,7,20,24 86:4 87:23 88:5, 14,16,22 89:21 90:6,13,24 91:2, 3,5,7,9,14,18,19,24,25 92:16, 20,22,25 94:7,9,11,19 95:3,6,9, 11,15,17,19 96:7,11 97:12,23 100:14 106:6,15 109:13,25 110:10,15 112:24 113:20 114:13,18,23,24,25 115:2,6,13, 16 116:13,21 117:10 118:22,24, 25 119:2,16,17 122:7,9 124:21 125:5,8 126:7

**fireball** 75:14 109:3 111:8 112:3

**fired** 118:14

**fires** 55:13,16

**firm** 41:3

**fits** 105:11

**fix** 31:11

**fixing** 30:14 31:6,7,19,22 38:1

**flame** 75:16 76:11,12 81:4 114:15

**flames** 75:20,21 76:16,19,23 77:18 78:12 109:15,18 119:1 121:18,23 122:2,13,14,15

**flashed** 76:1

**Flip** 101:24

**float** 20:5

**floater** 20:8

**floaters** 20:7

**floating** 24:10

**floor** 25:22,23 26:1 28:23 29:16 30:14,18,20,23 31:8,13,18,22 32:1,7,9,10,17 37:25 53:7 70:24

**Flora** 9:11,14,15

**flow** 36:18 38:15 103:10,13,15, 20,22 104:3,5,11 105:5,9,16 107:1 108:5,6,8 109:16 118:12, 13 119:20,23 120:9,14 122:18

**flows** 37:18 38:14 39:9,14 75:16 105:6 108:1,13

**fluctuation** 73:15,21

**focus** 112:6

**foot** 13:14 75:16

**forget** 5:11,12 13:5

**form** 6:23 21:15 111:20 115:9

**forward** 35:21 118:11

**foundation** 21:14,15 38:21 75:22 111:21 112:15 113:9

**fourth** 110:18 112:8 115:3

**fractures** 14:19

**frame** 84:22 85:2 93:5

**Freddy** 43:16,17,20,23 44:1 52:21,24 54:14 55:1,11 84:25

**free** 50:17

**freely** 50:2

**frequency** 43:7

**frequently** 51:7 61:15 62:6 66:20

**Friday** 20:9,15

**front** 12:18,21 41:12,13 53:15 70:6 89:7 91:22 97:23

**full** 4:9

**function** 19:21 25:3

**functioning** 45:16

**functions** 41:13

**funds** 10:14

**furnace** 126:15

---

**G**

**G-e-n-e** 4:11

**gagging** 79:8

**gas** 123:17,20,23

**gate** 72:9

**gauge** 103:22 104:3,5 105:16 107:6 108:8 119:23 120:21

**gave** 99:10,23 102:5,6,9 117:4

**Gene** 4:11

**general** 67:14

**Generally** 13:21

**Genie** 65:24

**gentleman** 28:2



**give** 7:4 25:11 26:17 32:3 63:8 68:13

**good** 4:9 30:4 103:10 105:4 118:13

**Grab** 69:23

**grabbed** 83:3

**graduate** 8:24 9:1

**graduation** 9:4,7

**Grand** 6:24,25 7:2

**gray** 69:2 70:10,13

**Greg** 21:4,5

**ground** 68:17 76:6

**guess** 71:20 89:24 110:6 111:10

**guessing** 111:5

**gun** 82:25 106:5,10,24,25 107:20,22,23 108:14 109:8,12 118:13

**guy** 28:1,9,19 50:8 51:25 92:25 95:23 96:1

**guys** 23:11 37:12 52:23 80:12 82:8 106:2

### H

**hacking** 79:8

**half** 16:1 29:3

**half-inch** 75:17 76:25

**hall** 99:6

**handed** 102:6

**handful** 11:20

**handling** 82:2

**handwriting** 102:1 116:5

**handwritten** 111:14

**happened** 4:17 18:3 42:20

**hat** 6:24

**haze** 69:2 70:10

**head** 5:21 6:15 39:7 54:3 94:4 97:9 104:24

**hear** 6:5 81:20,21,25 89:12,24 90:3 124:2

**heard** 6:19 42:6

**hearing** 6:10

**heat** 106:5,10,24 107:20,22,23 108:13 109:7 118:13

**height** 25:7

**held** 15:9

**hidden** 112:24

**high** 9:1,7 15:15,16 16:3,23 17:1

**hill** 94:3

**hire** 7:19 12:24 40:25 41:25

**hire-in** 12:16

**hire-on** 32:21

**hired** 8:2 11:18 12:14 13:6,13 28:14 96:17

**history** 50:21

**hit** 78:6 93:25 94:6 109:3 114:9

**hold** 64:10

**hole** 75:2,15,17 76:25 103:19 109:20,21 114:14 115:7,14,17, 18 119:1,22 120:1,4,18,19 122:17

**holiday** 100:9

**home** 8:8 12:10 97:2 98:3 99:11,25

**honors** 16:22

**hope** 20:14

**hoping** 111:18

**horizontal** 120:10

**hour** 17:18

**hourly** 20:21,22 113:25

**hours** 20:10 24:7,8 29:4 31:21 32:8,11,17 60:24 87:23

**Howell** 95:24

**huh-uh** 6:1

**hydraulic** 35:22 36:1

### I

**IBO** 29:25 30:6,8 33:6,18 34:2, 11,14 36:13,23,25 37:7,10,16, 24 38:13,19 39:2,6,19,21,22 40:14,15,22 41:9,18,20 45:16, 19,21 46:20,23 47:1,4,7,10,16 48:6,8,11 49:19 50:22 51:8,16 52:9 53:2 54:10 55:10 62:12,16, 23 63:1,17 66:9 69:16,22 70:1, 11 71:1 79:12 80:5,23 83:14 84:4,6,18,21 87:19,22 89:6,15 90:15,23 97:4 102:22 104:2 117:16,22,24 118:2,10,12 119:13,15

**IBOS** 33:11,15 42:12 45:10,25 47:22,24 48:1 49:9,13 51:11,25 52:4 55:13 83:7,11 87:8

**IC** 53:14,25 66:7 87:11,12

**ICS** 53:24 66:6 70:4,6 89:7

**idea** 27:7 45:18 102:18

**identical** 40:19

**identification** 101:7 119:7 124:7,10

**identified** 80:4

**identify** 124:14

**identities** 88:3

**images** 63:22

**imaging** 18:4,5,25 63:24 64:2,3 67:17 68:13,16 70:14 73:13 74:16 107:21

**immediately** 58:21 63:6 94:7

**important** 4:19 5:2,18 48:13

**inch** 103:19

**incident** 39:14 56:10

**incredibly** 6:8

**Indiana** 7:10 9:15

**individual** 22:13 27:24,25 61:16

**individuals** 51:19 53:7,8 85:19

**Industrial** 6:24

**information** 19:17 39:11 43:15 106:22 107:14

**infrared** 82:25 106:25 109:8,12 124:20 125:3

**initial** 121:6,10

**initially** 79:2 97:3 122:13

**initials** 120:7 121:24 122:1

**input** 64:21

**insert** 103:21

**inserted** 104:23

**inside** 54:1 62:16 78:4 83:20 120:17

**inspect** 88:15

**inspecting** 85:1

**inspection** 123:2

**inspections** 86:25 87:4

**instance** 49:19

**instructed** 89:22 90:17

**instructions** 98:16 99:19

**insurance** 96:18,24 98:14

**intent** 7:14

**intercom** 88:24,25

**interested** 125:17

**internal** 54:1 62:23 70:6

**investigators** 95:15 96:7,17

**involved** 17:19 33:18 34:2,5 40:21 42:22 45:22,24 52:14 55:17 61:4,25 64:1

**involvement** 41:17 100:14 101:21

**involving** 55:13

**issue** 50:22 55:10,14

**issues** 34:15 37:20 82:12,16

### J

**January** 18:12 23:2,4,18 24:9

**Jerry** 21:9

**job** 13:11,12 19:21,22 23:13,16, 23,25 24:2,4,5 25:3 31:17 33:24 41:13 42:15 44:9 49:16 53:18 67:22 100:21 105:7

**jobs** 8:8 11:20

**John** 12:4

**judgments** 5:22 6:3

**jumped** 83:4

**Junior** 15:25

**Justin** 66:19 78:4 79:15,16,24 82:23,24 93:13,14,16 108:12 124:24

### K

**keys** 99:24

**kids** 8:16

**kind** 8:12 12:22 14:15 16:14,19 19:20 23:12 26:1 27:19 29:22 32:3,20 37:25 38:5 51:21 52:4 65:23 70:24 75:13 82:4 87:15, 17 100:14 111:8 112:3

**kinds** 87:13,14

**Kirby** 10:24 11:7,25 12:6,9

**knew** 42:10 61:18

**knowledge** 41:22,25 42:3 46:16,19 48:21 50:5 51:7 52:7 59:6 62:6,22,25 63:4 74:17 82:12 83:6,9,13,16,19,23 84:20 86:21,24 87:3,7 92:19,21,24 95:3 97:18

**Krintz** 19:12 60:10 66:13,15 78:23 79:21,22



**Kyger** 21:4,5

---

**L**

**L-a-n-d-i-s** 9:23

**Lack** 10:14

**Lafayette** 10:24

**laid** 10:9

**Landis** 9:17,22 10:4,7,17,22 11:7,9,10,17 13:19

**lasts** 27:8

**late** 15:4 56:13

**lawsuit** 50:22 95:1

**leading** 84:22 85:2

**learn** 44:7 54:15

**leave** 11:24 12:8 79:11 99:17

**leaving** 79:13 93:20

**led** 56:24

**left** 28:3,4 35:17 56:19 59:7 68:3 69:20,25 78:11 79:23 80:16 93:6,19 96:24 97:1,10,23 98:11 104:3 112:25

**left-hand** 117:6

**legal** 4:10

**length** 9:19 36:7

**letters** 125:13

**level** 71:21,24,25 73:5 81:3 104:22

**lever** 94:11,12

**lift** 65:20,22,23,24 66:1,10,12 68:7,9,21 70:15,19 71:11,14,17 72:3,6 73:2 74:6 76:2,5,8 77:23 80:24 81:16 83:4 104:19,20 106:12 114:25 120:17 122:22 123:14,21

**light** 82:20 97:16

**limited** 16:17

**lines** 25:13 87:14,15

**liquid** 87:7

**list** 27:2

**little-bitty** 103:19

**lived** 7:12

**livestock** 8:11

**located** 29:7,11 47:13 48:3,11 68:1 89:5,6

**location** 50:2,15 109:18 120:1, 9,14

**locations** 7:24 11:21 33:9

**lock** 81:25 99:24

**log** 37:21 61:8,12,23

**Logansport** 7:10 8:24 9:1 17:1

**logs** 37:22 61:1,3,5,9

**long** 7:12 10:17 15:24 17:17 20:25 21:5,10 23:1 27:7 28:4 36:10 41:22 50:24 67:5 69:6,9, 20 73:12 80:17,24 81:2 82:7 86:2,6,10,14,17 99:13

**longer** 11:10 33:19

**looked** 18:22 74:23 102:15 113:16,17

**loss** 6:10

**lot** 21:12,24 58:11 81:20

**loud** 6:16 39:8 81:24

**lowered** 79:5

---

**M**

**machine** 25:10,11 26:3,15 29:10,11,14,15 30:5 31:8,14,15 32:6,11,14 36:8,17 40:12 41:16 46:4,8 48:16 60:1 61:12 66:1 82:2

**machinery** 13:25 14:16

**machines** 14:9,11,12 25:12

**machining** 14:4

**machinist** 9:17 10:5 12:13,17 13:17,18,22,23 14:3,8,18,22 15:5,9,14,21 16:13,17,20 19:20, 23 20:1 22:11,17,18 32:23 37:9, 15 38:11 41:4 43:19,22,24 44:14 45:21,24 46:3,7 48:14,24 49:3 51:10,11 52:18,22 53:20 60:11,23 61:1 62:19 67:11,20 68:5 69:15,21 87:4 104:8

**made** 12:4 38:6 44:11 54:9

**maintain** 53:17 61:18

**maintained** 38:11,20

**maintainer** 12:19 53:9,11,13, 14,16 54:19,20

**maintainer's** 53:18

**maintaining** 14:1

**maintains** 14:12

**maintenance** 14:15 37:20 38:13,16,19 39:13,16,18 42:16, 18,19,23,25 43:3,8,10,13 44:2, 4,8,11,19 45:12,15 47:7,9,21 49:13 51:16,25 52:7,8,11,14 53:16 54:10 83:7 84:9,10

**make** 5:14,22,23 6:2 12:21 14:20,21 49:21 50:2,17 61:8 98:17 102:10 117:2

**makes** 123:9

**making** 41:16 61:4,23

**manual** 47:9,12,15,19,21,24 48:1,6,8,10,13

**manuals** 49:1 50:18

**manufacturer** 40:2 83:10

**manufacturing** 8:3,6 11:14 12:3 33:2 46:22,25 47:3,6 83:25 88:4

**Manufacturing's** 40:24

**mark** 49:24 95:12,13 101:2 102:4,5 107:16 116:2

**marked** 101:5,6,9 119:7,9 124:6,10

**markings** 101:9

**mat** 34:15,17,18,19 35:24,25 36:10,12 40:7,8,9,17 55:6 69:12,13

**material** 40:9 83:19,23

**materials** 72:13

**math** 28:11

**matter** 13:16 67:14 78:2

**meaning** 66:24 123:24

**means** 58:14 81:24 111:19

**measure** 50:15

**measurement** 103:15 105:15, 23 120:13

**measurements** 103:13 119:20 120:10

**measuring** 109:16 122:18

**meet** 17:10 37:4 94:4

**meeting** 17:14,17,19,24 18:13, 15 125:9,12,14,21

**memory** 55:25

**mentioned** 33:24 124:19

**mentioning** 119:22

**met** 17:15 18:16 95:15

**metal** 14:4

**mic** 49:25

**Michael** 101:10

**middle** 73:8

**Mike** 60:17 80:9 93:11 94:1,20 96:24 98:4 99:23

**Mill's** 68:3

**Miller** 20:24,25 63:15 96:15 101:5 118:4,7 124:11 126:19

**millwright** 12:13,17 13:7,22, 23,24 14:11,14,23 15:6,9,14,21 16:13,18 19:20 22:17 30:21 32:23 33:25 37:10,15 38:11 41:5 43:19 48:14,24 51:10,11 53:21 60:12,23 68:5

**millwrights** 19:23 20:1 22:11, 18 34:5 43:23,24 44:14 45:22, 24 46:3,7 49:4 52:18,23 61:1 62:19 67:1,12,20 69:7,11,15 87:3,4 89:15,22 90:9,10

**mind** 121:3

**minute** 69:23 103:18

**minutes** 17:11,14 18:16 58:17 69:23 73:11 81:5,6 86:7,10 93:3

**misstates** 71:7 75:23 109:22 115:9

**misunderstood** 113:13

**Monday** 24:21

**month** 43:11

**months** 7:15 10:25 11:3 12:9, 18 15:2 17:16 18:10,21 21:6 67:6,7,8,9

**Monticello** 7:25 10:2 95:17

**Morgan** 21:9

**morning** 17:13 56:25 57:15 58:1,7 116:24,25 117:4,13

**motor** 67:15 123:25

**mounted** 26:12

**mouth** 63:11 79:7

**move** 10:7,22 11:7,23 13:10

**moved** 13:7 14:22

**moves** 14:11 34:23

**moving** 7:14 13:25 33:25 34:2

---

**N**

**necker** 53:14 54:2

**needed** 52:17 69:11 72:25 100:21

**needing** 46:14

**night** 22:12,15 56:2,3,22 59:22 60:9,11 66:24,25 67:1,2 85:10 93:11 97:11 108:2

**nights** 22:21,22,24 24:13 44:15 60:7 67:7 84:16



**nod** 5:21

**nods** 6:15 104:24

**noisy** 6:8

**normal** 62:22,25 63:4 80:1 104:12,14 105:21 120:14

**north** 36:1 74:12,13

**notations** 61:4

**notice** 70:3

**noticed** 65:3 70:7

**notified** 30:24 31:3 44:24 54:23 55:1,10,11 72:24 80:21 115:1 117:10

**notify** 45:1 88:20,21

**number** 25:16 40:12 111:17,18, 22 116:5

**numbers** 89:2

**O**

**oath** 4:20,23

**object** 6:23 21:14 38:21 111:20 113:9 115:9 118:4

**objection** 71:7 75:22 109:22 112:14

**observed** 121:17

**occasions** 61:8

**occurred** 37:2

**occurrence** 4:18

**occurring** 124:4

**offered** 11:20

**office** 48:24 68:1 78:5 79:24 90:2 93:8,23,24 98:25 99:1

**on-crew** 66:21

**on/four** 24:21 57:12,18

**one-hour** 18:13,15

**one-year** 23:8

**open** 72:9

**opened** 97:12,25

**operated** 76:24

**operating** 62:23 63:5

**operation** 46:23 49:13 50:24 82:13

**operational** 84:18

**operations** 47:18

**operator** 12:2

**operator's** 47:15

**opinion** 95:8 96:10

**opinions** 95:5

**opposed** 27:17 28:23 32:6 55:10

**order** 35:7 48:18

**originally** 80:14

**Otto** 96:2

**oven** 34:20,24 35:5,7,10 40:2 54:3 56:1 62:16 65:12 72:4,16 74:4,7,10 82:7,13,19 83:20 85:2,5,10,19 86:6,9 103:1 113:23 114:10

**ovens** 33:6 40:22 42:17 44:25 51:25 52:9,12 85:15

**overstaffed** 10:13

**owner** 11:18

**P**

**p.m.** 56:8,9 57:1,2,5,7,8 58:2,4, 8 63:13,14 116:16,19

**PA** 30:25 31:3 38:3

**paddle** 35:24,25

**paged** 69:7 80:14

**paging** 88:24

**paint** 65:2,5 73:18 106:19 108:23 109:1 120:22,23 121:4, 10 122:4 126:12,15

**panic** 78:6 94:12,15

**paper** 16:11 99:10

**Pardon** 65:21 91:1 105:2 114:3

**parking** 58:11

**part** 13:24 14:4,18,20 31:9 33:24 42:15 67:22 70:20 83:20, 24 105:7 107:23

**Partial** 78:20

**partially** 78:19

**participate** 64:17

**participated** 63:16 64:2

**parts** 12:4 14:8 22:3 27:2 48:6, 8,10,13 49:1 91:10 123:12

**PASS** 77:12

**past** 7:2 17:15

**Paul** 42:6

**Pellegrini** 66:19 79:18,19 124:23 125:4,8

**people** 5:6 11:20 17:19 21:24 26:6,7 52:25 53:1 80:3 85:5,15 92:7 93:21 96:16

**percent** 27:18 28:20 30:11 31:21,25 51:13

**percentage** 27:10 31:25

**percentages** 32:20

**perform** 36:13 84:2 87:4

**performed** 37:13,17 38:13 39:19 46:17 84:21 86:25

**performing** 55:23 87:5

**performs** 37:15

**period** 16:6 61:22 67:5 81:10

**permanent** 23:7

**person** 13:13 22:9 54:11 86:18 92:16,19 93:10

**personal** 26:24

**personally** 27:21 33:15 47:9 49:6 61:3 100:12

**phone** 89:1,5,6 90:22

**photographs** 18:7,25 19:1 65:17 68:16 119:17 124:20,24 125:3,7,11,18,25 126:1

**photography** 63:17

**photos** 18:11

**physically** 82:1 94:9

**pick** 89:1

**picks** 90:21

**pictures** 18:4 64:8,12,15,22,24 65:9,10,11 66:16 70:14 73:13 89:17 119:10 124:15

**piece** 14:3,15 16:11 52:1 99:10 120:10

**pieces** 52:1

**pig** 8:18

**pigs** 8:13,15

**PIN** 51:25

**pipe** 75:15,25 103:16 104:21 114:15 115:15 119:1 122:16

**place** 45:25 50:14 71:2,5 77:1

**plant** 7:25 8:3 14:2 17:22 19:24 25:9 32:18 33:20 34:3 41:11 43:18 55:16,22 62:7 81:25 89:4 92:2 93:9 97:8,10,11,22 100:2, 4,15,17,20

**plastic** 11:14

**Plastics** 9:17,22 10:4,8,18,22 11:7 13:19

**platform** 72:3,7,10

**play** 40:24

**point** 37:3 58:15 65:1 75:5 78:9 82:1 100:17 104:2

**pointed** 64:25 65:14

**pointing** 65:8

**policy** 113:18

**poof** 73:20 75:12 76:11 109:19, 24

**position** 11:25 12:12 13:7,10, 15 14:23 15:6 21:13 23:7,10 53:16,19 60:18 73:5

**positions** 14:24 54:5

**post** 45:1

**posted** 45:2,7 84:12

**posting** 13:11,12

**posts** 45:5

**preparation** 113:15

**prepare** 17:7 18:19 87:19 98:13 101:15

**prepared** 101:19 113:6

**preparing** 101:21

**present** 7:14 61:5 124:19

**presume** 6:19

**presumption** 6:21

**prevents** 30:2

**previously** 18:17

**primary** 23:25 25:3 28:9

**printer** 27:5

**prior** 13:18 17:14 33:1,2,6 65:3 84:17 87:8,23 115:10

**problem** 22:14 53:2 55:7 83:5 112:12

**problems** 84:18

**procedure** 80:2 94:21

**process** 11:15 25:14 45:22,25 46:11,19 51:2 83:21,25 88:18

**product** 34:24 51:2

**production** 12:23,25 13:6,13 14:1,5 15:1,11 22:15,19 26:1,6, 7,25 29:12,16 30:20 31:18 32:7, 16 41:7,16 53:10 54:6,11,17,18, 21,24 55:2 59:9,16,19 60:19 80:12 83:21 86:17 90:15,20 92:7,16,19 93:8,11,22,24 94:23 100:18 113:25

**program** 15:23,24 16:12



**proper** 62:15

**properly** 50:13

**protocol** 90:6,13,21 91:19,20 94:3

**protocols** 77:14

**provide** 46:22 64:21 98:16

**provided** 41:23 46:25 47:3,6 62:9 77:6 88:12

**providing** 106:22

**puff** 118:23 122:7,9

**pull** 77:13

**pulled** 94:19

**pulling** 58:11

**punch** 58:14

**punched** 59:22

**punching** 58:12,13,23

**purpose** 122:22

**purposes** 61:15 96:25

**pursue** 13:17

**pushed** 110:4

**put** 14:20 26:18 45:3 49:25 50:1,2,7,13,15 54:1 79:2,8 90:24 91:2,5,14,25 92:1 97:12 98:1 102:12 107:25 108:2 114:13 118:25 119:23 120:4,7 121:6,9,22,23

**putting** 50:11 96:20

---

**Q**

**Quality** 9:11,12,16,18 10:7,10 13:19

**question** 5:7,10 6:5,12,13,18, 20 50:14 64:6 96:13 112:1 113:12 122:12

**questions** 5:1 19:16 95:18 116:2,3

**quick** 77:24 106:21 110:13

---

**R**

**radius** 73:9 121:2,20

**rail** 81:17

**railing** 72:10

**raise** 8:12 71:17

**ran** 40:6

**Randy** 4:11 7:7,8 8:23 17:7 27:19 32:4 101:8 119:3,8

124:13

**Ray** 20:24,25

**read** 47:9,15 48:1,8 117:19 118:15,19

**reading** 39:10 104:12,14 105:21 106:1 110:11 121:13,14

**readings** 105:9 106:14,18 107:2,11

**readjust** 34:21

**ready** 46:4

**real** 72:23 77:24 106:21

**reality** 117:3

**rebuild** 23:17,23 25:3 28:9,12 61:13

**rebuilding** 25:18,24 27:10,16 29:19 30:12 60:4 61:24

**rebuilds** 30:15 31:13,23 51:15, 22 100:20,23

**rebuilt** 27:4,8

**recall** 11:1 16:10,21 18:2,7 21:7,10 24:25 34:13 36:21 39:1, 5,18 52:11,14 55:19 96:20 97:3, 7

**receive** 16:7,22

**received** 9:4,8 49:11,17 69:14 77:16 80:21

**recent** 23:5

**recess** 63:13

**reclassifiable** 62:9,13,20

**recollection** 37:4 58:24 59:2,5 125:10

**recommended** 83:10

**record** 4:10 117:20

**recording** 39:11,14 89:3

**records** 37:12,16,18 38:19

**refer** 7:6 109:9

**referred** 115:7

**referring** 121:11

**reflects** 125:24 126:5

**remain** 32:21

**remediation** 100:15

**remember** 5:8 17:17 37:6,9 39:20 59:1,4,24 62:3,5 80:22 81:1 82:18 97:14 100:8,10,24 104:4 106:3 107:13

**remembered** 98:19 99:11

**remind** 5:13

**remove** 26:4,7,14,20

**removed** 67:16 107:6

**repair** 14:8,21 30:23 38:16 39:13,17,18 47:4,24 48:1 49:13 51:17,25 52:8,12,15 54:10

**repaired** 26:14

**repairing** 25:24 49:18

**repairs** 25:22 37:24 38:12,19 84:2,20

**repeat** 6:6

**rephrase** 6:13

**replace** 26:21

**replaced** 52:17

**report** 43:19

**reporter** 4:25 5:5,15,17,22 6:2 117:21

**request** 38:6

**requested** 52:24 63:24

**requests** 54:9

**require** 50:8 84:14

**required** 26:20

**requires** 5:21 6:2 31:17 53:20

**Reserve** 126:21

**respect** 38:12 116:4 126:4

**responses** 77:7

**rest** 16:2 20:6

**result** 46:13

**resume** 100:18

**resumed** 59:9,16,19

**retired** 28:2,6,16,20

**review** 65:17

**reviewed** 19:1

**rising** 69:1

**Risk** 10:24 11:8,25 12:6,9

**River** 7:10

**road** 7:10 10:1

**Rogers** 60:17 80:9 93:11 94:1, 20 96:24 98:4 99:23

**role** 15:1 40:24 41:17 43:17 52:18

**room** 45:4 99:2,3,4,8

**rotating** 57:18 105:12

**rotation** 24:22

**routine** 105:7

**run** 67:1

**running** 59:14 82:7 87:16 109:11 110:21 118:23

**runs** 40:8

---

**S**

**S-o-y-k** 96:2

**salaried** 20:21

**Sandy** 68:3

**scattered** 32:18

**schedule** 42:16 57:12,17 83:7, 10 84:9,10 105:12

**scheduled** 42:12 43:8 100:12

**schedules** 42:16

**scheduling** 42:22

**Scholten** 42:6

**school** 9:2,7 15:15,16 16:3,23 17:2

**scissor** 65:24 68:7,9,21 70:19 71:11,14,17 72:3,6 74:6 76:2 77:23 80:24 104:19,20 106:12

**Scott** 95:24

**screw** 35:15

**screws** 35:13,20

**season** 8:18

**seconds** 78:2

**sees** 88:19 90:15

**Senak** 6:23 17:10 18:16 21:14 38:21,24 63:8 71:7 75:22 96:13 102:8 109:22 110:20 111:20,25 112:12,14 113:9,11 115:9,12 116:2 118:8 119:4 124:8,12 126:18,21

**send** 45:3 55:5 89:3

**senior** 15:25

**sentence** 102:22 106:5 115:3,8

**sentences** 111:17

**services** 41:3,23 55:23

**set** 9:11,12,16,18 10:7,10 13:19 14:13 42:25

**setting** 13:25

**settled** 19:15

**Shafer** 99:2



shake 5:21

shakes 39:7

shared 95:8 96:10

shelf 25:13

shift 20:4 22:5,9,12,15,19 23:1, 7,11 24:10,22,25 35:16,18 55:19 56:2,3,7,24 57:18 58:6,8 60:11,21 66:24,25 67:1 93:11 99:16,18 116:15

shifts 20:2 24:15,16,17,18,20 67:2

shoot 76:12,16,19

shop 23:20 25:23,25 26:2,5,10 28:21 29:1,5,7,10,11,14,15 30:4,5 31:8,10,14,15 32:6,11,14 37:22 60:1,2,4 61:1,3,4,8,9 67:6 68:5 69:14,15,25 93:23 99:23 104:7,8 106:2

short 41:8

shot 75:14,16,24 76:11,25

show 8:15 89:16 119:8,11 124:13

showed 101:3 102:10 113:16 120:14 125:13 126:13

shown 17:25 18:2,11 91:18 116:10 119:17 120:1,24 121:19 122:8,20 123:4,16 125:25

shows 117:3 122:2,3

shut 35:7 100:2,4 110:5,7,9,12, 17,23 111:1,2,4,14,15 112:8,13, 21,28 113:1,7,19 114:1,2,10 118:22

shutting 113:3

side 8:8 39:7 73:7,8 74:6,9,12, 13,14,17,20,21,22,23,25 75:3

sides 74:4

sight 91:13

signature 116:8

significant 73:24

sir 4:22 5:24 6:4,17 7:3,5,16,23 8:1,4,17,22 9:6,9 10:16 11:16 12:7,15 13:1,9,20 15:3,10 16:5 17:3,6 18:9,14,24 20:13 21:19, 21 22:25 23:6 26:19 28:10 29:21 35:14,19 37:8,11 39:3 40:20,23 41:1,24 42:2,5,8,11, 14,21,24 43:1,4,9,21 44:6,18 45:14,17,20,23 46:6,9,18,21,24 47:2,5,8,11,14,17 48:2,23 49:2, 5,10,15 50:20,23,25 51:6,9,18 52:6,10 53:22 55:15,18,21 58:5 59:20 60:13,22 62:8,14,24 63:3 64:9,11,13,16,20,23 67:19 68:6,

15 69:17,19 70:2 71:12 74:5,8, 15 75:11 77:5 80:15 82:6,9,11 83:8,12,15,18,22 84:1,5 86:23 89:11,13 95:2,4,7,10,16,22,25 96:3,6,9,19 97:15,20 98:22 101:17,20 102:2,13,20,25 104:9 106:9 112:10,17 113:2,5 115:11,22 116:7,9,11,14,24 117:14 120:12 123:5,7

sit 58:22

site 22:18 29:4 44:19 47:19,22 48:4,11,22 56:16 58:25 59:3

situation 22:15

situations 92:15

size 92:1

skill 50:4

skills 16:19

slide 9:18

slotted 51:21

smell 70:9

smoke 68:22,24 69:1 70:1,3,7, 9,13 71:1,5 73:4,9 74:3,19,24 75:3,7 76:10,13 77:3 81:4 82:20 85:17 86:3,10,19 88:1,8,13,22 90:15 91:14,19,23 92:3 93:4 98:1,2 103:9 118:24 122:7,9,25

smoking 58:18 69:8 73:10 83:3 102:23 104:25 118:6,12

sold 11:17

solely 28:15

solid 30:2

solve 111:18

someplace 50:5

sound 123:8

south 7:10 36:1 74:14,17

Soyk 96:2,5

space 62:10,13

spaces 62:20

spares 25:13 26:12,13

speak 93:7

speaker 90:2

speaking 13:21

specialist 27:20

specializes 52:4

specialty 51:22

specific 15:21 16:13 29:18

specifically 23:10 51:24

spectator 64:18

spell 118:9

Spencer 43:16,20,23 44:1 52:21,24 55:11 84:25

Spencer's 43:17

spend 16:1 32:1,5,14,16 58:17

spending 28:20

spent 27:10,16 29:4

spins 50:2

split 75:13

spoke 39:5

spot 115:19 120:6

spray 54:1 70:6 87:11,12

sprayed 87:8,9,10

spread 114:15,18,24

spreading 119:1

squalling 81:22

square 121:22,25 122:2,8,14

squealing 81:21

squeeze 77:13

squirrel 63:1,6 65:6,15,16 71:2, 6,10,21,22,23,25 75:18,21 105:24 110:2,3 120:11 126:6

staff 11:19

stainless 34:19 36:10 40:7

Stand 97:23

standard 14:15

standing 64:14 65:19 68:17 70:24 80:4 86:9 107:15 108:18 124:23

start 25:16 117:23 118:10 119:1

started 51:1 56:24 58:2 73:18 114:15,25 116:15

starting 65:2 106:19

starts 58:8 94:23

state 4:9

statement 18:3 96:21 98:2,4,7, 10,13,17,20 99:14,22 100:25 110:11,19 111:1,15,21 112:20 114:12 116:12,22 117:4,20 119:1 122:6

statements 98:24

steel 34:19 40:7

steps 91:21

stock 8:12

stop 114:6,7,9

stopped 75:13

store 66:8

stored 67:18

Stout 66:19 79:16 124:24 125:4,8

straight 94:1

stretches 24:2

strike 43:5

study 15:22 16:17

stuff 14:1 30:23 87:15 100:20

style 40:1,4

suck 36:18

sudden 73:18

suffered 6:9

summon 94:7

summoned 85:25 89:19

supervised 22:13,14,19 92:7

supervising 60:16

supervisor 20:23 21:1,3,5,7, 10,20,22 22:1,5,9,11,17,20 27:6 30:22 38:4 43:19,24 44:2 53:1,5 54:14,15,18 60:19 80:7 88:20, 21 89:23,25 90:19,22 91:24 92:5,20 93:11

supervisor's 21:12 78:5 79:24

supervisors 22:16

surrounds 72:10

suspected 77:7

sweep 77:13

swing 72:9

system 31:1 40:7 62:7 88:24,25 89:3

_____

T

takes 45:25

taking 14:3 64:15 65:10 66:16 70:14 73:13 106:15,17 107:1,10 119:20

talk 5:2 19:16 30:18 39:16 56:23 82:21

talked 19:3,5,8,14 49:20 93:10 95:11 96:7 98:15 119:20

talking 5:6 58:18 90:12 107:18, 19,20 109:5 125:14



**Tech** 40:25 41:2,23 42:1,3,10 46:17 55:22 56:16 57:4 58:24 59:2,6,7 86:21 87:1,5

**technical** 16:19,22

**telephoned** 31:3,5

**telling** 57:19 93:20 107:7,13

**tells** 30:22,25 31:2 36:1 38:4 44:1 77:12

**temp** 106:5 118:13,21

**temperature** 35:10 63:1,5 73:16,21 75:8 106:17 109:12 110:22 126:2,6

**temperatures** 62:23 106:16 107:7,8 108:13,15 109:6,16 125:24

**temporary** 23:8 33:8

**temps** 108:10 109:4

**ten** 28:5,6,8,19 86:6,10 93:3

**terminate** 11:17

**test** 77:12

**testified** 8:20 44:16 49:11 64:1

**testimony** 5:23 38:9 71:8 75:23 109:23 115:10

**testing** 38:15

**tests** 77:1

**thermal** 18:5,25 63:16,21,24 64:2,3 67:17 68:13,16 74:16 107:21

**thermometer** 107:25 108:2,7

**thing** 31:16 73:20 90:17 92:4 110:21

**things** 5:15

**thought** 24:1 64:1 113:19

**three-month** 41:8

**three-quarter** 103:19 115:6

**three-quarters** 78:20

**Thursdays** 105:8

**ticket** 38:5

**tie** 72:13 73:1

**tied** 72:12 94:18

**till** 57:5,8

**time** 5:2 7:22 8:6 9:19 15:8 16:21 18:22 20:14 25:21 27:10, 16,18 28:21,25 30:11 31:25 32:5,14,16,20,22,24 37:6,9 39:1,25 41:11 51:14 52:22 58:8, 15 59:5,7,19 60:14 61:22 62:2 67:5 69:18,20 72:6,21 75:9

**80**:6,16,20,23 81:2,10 83:14,17 84:22 85:2,13 87:18 88:5,8 93:5 97:3,7,18 98:15 99:9 100:11,12, 23 116:22 117:9,23 118:1 120:15 124:4,19,24 125:25 126:7

**times** 24:12 36:21 45:18 81:20

**Tip** 15:18,19 16:2,8,12,16 17:5

**title** 19:21,22

**today** 4:23 6:5,12 7:6 8:21 17:12,14 18:16 19:9

**today's** 5:12 17:7

**told** 78:5 93:8 94:2 98:10,18 99:10

**tool** 69:23 83:3

**toolbox** 99:24

**tools** 26:20 95:19

**top** 36:20 52:9,12 72:4 94:3 97:9

**topics** 19:17

**touches** 35:25

**track** 35:1 36:2 60:20,23 61:10

**tracking** 34:15,17,18 55:6 61:15 69:12,13

**trades** 15:14

**train** 28:2

**trained** 27:24 62:18,19 91:3,5, 13,17 106:1

**training** 9:8 15:13 27:25 46:23 47:1,3,7 49:12,17 62:10,15 77:6,16 88:12 89:21

**transcribe** 5:5

**transcribing** 4:25 5:17

**trash** 77:15 88:17 92:1

**traveled** 122:16

**trial** 23:9

**trimmer** 23:17,23 25:4,6,8,15, 25 26:4,7,21 27:3,7,11,17,19 28:9,12 29:20 30:12 51:14,22 60:4 61:23

**trimming** 100:22

**trims** 25:7

**troubleshooting** 82:5

**truck** 58:18

**true** 7:17 13:8 14:16 17:2 27:13 28:13 33:20,25 35:18 38:16,23 45:11,16 46:5 54:24 56:25 58:6 62:4 73:2 74:1,7,25 75:10,21

**76**:24 77:4 81:7 85:6,12,17,21, 25 101:22 109:6,16 113:1 114:24 116:6 117:13 124:21 126:9

**Tuesday** 20:9,15

**turn** 29:8 68:2,3 113:22

**turning** 35:15,17

**turnover** 21:12,18

**Twelve** 97:5

**two-minute** 81:9

**two-page** 101:8

**two-year** 16:6

**type** 40:17 61:25

**Typed** 113:13

**typewritten** 102:21 111:11 113:7,15

---

### U

**uh-huh** 6:1

**unclear** 64:6

**understand** 4:14 6:13 14:7 33:19 45:10 96:17 107:17 111:7,10,16,19,23,25 112:5

**understanding** 4:16 35:23 37:2 38:9 62:12 94:25 98:12

**understood** 6:20

**unit** 35:22,25 105:15

**upper** 117:6

---

### V

**vacation** 20:17,18

**variety** 16:19

**vehicle** 58:22

**ventilate** 97:13,25

**verbally** 5:19,25

**Vergon** 101:11

**vibrations** 36:14,16

**video** 77:11

**view** 13:14 73:7

**vision-wise** 65:25

**visual** 30:8 76:3 82:4

**visually** 75:2 86:12

**vocational** 9:8

---

### W

**WA** 15:18,19 16:2,8,12,16 17:5

**wait** 103:18

**walk** 88:18 90:12 91:20

**walking** 92:13

**walks** 90:21

**wall** 30:2

**wanted** 13:17 57:4 72:17 102:10

**warehouse** 98:1

**watch** 77:11

**watching** 64:18 86:9

**water** 63:9,10,12

**waved** 92:13

**ways** 30:4

**Wednesday** 57:19

**week** 25:19 27:9,12 32:8,17 57:13,23

**weeks** 20:16,19 27:13,15

**weeks'** 20:17,18

**welding** 14:6

**Wes** 19:12,13 60:10 66:13,15 68:20 70:19 71:13 78:23 79:3,5, 14,21,22,25 93:2,12,18

**west** 7:10 73:8 74:20,21,24 75:3 103:4,6,18 114:19,22

**whichever** 36:2

**Whoa** 118:19

**whomever** 113:6

**window** 41:8

**windows** 29:14,17

**witnesses** 19:3

**witnessing** 86:3

**word** 102:14,16 117:17,25

**words** 112:6

**work** 6:9 8:9 9:19 10:17 16:18 17:9 20:10,15,16,19 23:11 24:9, 16 25:17,20,24 27:13 29:19 30:9,23 31:21 32:5 33:1,5,8,11 34:10 36:13 37:12,15,16 38:5,7 39:5 41:8,11 46:16 53:11,15,11, 20,23 54:9 55:25 56:24 57:8,12, 18 59:10 62:16 66:20 67:3,12 87:1,5 100:5,11,15 105:11 107:24



**workbench** 29:18

**workday** 56:5

**worked** 7:2,21,24 9:11 22:24
33:15 34:13 37:7,10 41:20 51:8
55:19 57:15,25 87:22 88:4

**worker** 12:22,23,24 13:6 89:25
90:15,20 113:25

**working** 23:1 24:25 29:1 51:1
60:1,4,8 87:25 88:8 91:4

**works** 22:3,12 53:13,15

**workspace** 29:22,25

**wrench** 26:22,23,24 27:1

**write** 98:2,4,7,10,18 99:11,13
116:12

**writing** 98:24 113:13

**written** 18:3 96:20 98:20 118:5

**wrong** 86:19 113:13 122:24

**wrote** 102:11 116:22

---

### Y

---

**year** 7:15 15:25 20:16,19 21:2
23:3,4 24:9 27:13,16 43:13
45:18 77:17

**years** 10:19 21:11 27:9 28:5,6,
8,16,19

**yell** 109:1

**yelled** 106:18

**yelling** 106:24

**yellow** 123:17



**12:20AM**       IBO exit exhaust blower smoking. Check air flow, airflow good. .13, Heat gun temp 270* + 280* then fire up to 700*. Check all exit blowers. Temp were the same. Then fire was coming out. Shut burners down, blowers were running to cool down then big puff of smoke and fire out of blower on, and used fire extinguisher to put out fire out of ¾" access hole. Then flames started to spread to other pipe and blower and the fire department got called.

5-22-2014

Randy Crume

**EXHIBIT 25**

Michael Vergon

10/11/2017
Reported By
Tamara J. Brown
CRR, RMR, CSR

DEPOSITION EXHIBIT
Crume 1
8   3-7-18
PENGAD 800-631-6989

12:20AM    IBO Exit Etast blow smoking
Check air flow, Airflow was good .13, Heat Sun
Temp 270° + 280° then fire up to 700°, Ckeck all
Exit blows, temp were the same Iten fire was comy out,
Shut Burn Down, blower were Running to Cool Down then
B's puff of snokt and Fire out of Blower in and Use
Fire Extinguisher to put out fire out of
3/4" Astt hole then flame start spred to the other pipo & blower
and fire Department got Called.


5/22/14

Rony Cure





DEPOSITION
EXHIBIT
Crune 3
J 3-7-19

PENGAD 800-631-6989

PRIVILEDGED AND CONFIDENTIAL

PRIVILEDGED AND CONFIDENTIAL

DEPOSITION
EXHIBIT

PRIVILEDGED AND CONFIDENTIAL

# Exhibit 9

*In the Matter Of:*

BALL CORPORATION, ET AL.

-vs-

AIR TECH OF MICHIGAN, INC.

WESLEY KRINTZ

March 12, 2018



**CONNOR REPORTING**

111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

**1**

```
 1          UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF INDIANA
 2

            CAUSE NO. 4:16-CV-00042-PPS-APR
 3
    BALL CORPORATION, an Indiana      )
 4  Corporation, and FACTORY          )
    MUTUAL INSURANCE COMPANY, a       )
 5  Rhode Island Corporation, as      )
    Subrogee,                         )
 6                                    )
            Plaintiffs,               )
 7                                    )
            -vs-                      )
 8                                    )
    AIR TECH OF MICHIGAN, INC., a     )
 9  Michigan Corporation,             )
                                      )
10          Defendant.                )
11
12
13       DEPOSITION OF WESLEY MICHAEL KRINTZ
14
15       The deposition upon oral examination of
    WESLEY MICHAEL KRINTZ, a witness produced and sworn
16  before me, Diane Zeyen, RPR, a Notary Public in and
    for the County of Hamilton, State of Indiana, taken
17  on behalf of the Defendant, at Ball Metal Beverage
    Packaging, 501 North 6th Street, Monticello,
18  White County, Indiana, on the 12th day of March,
    2018, at 10:03 a.m., pursuant to the Federal Rules
19  of Civil Procedure with written notice as to time
    and place thereof.
20
21
22
23
24
25
```

**2**

```
 1        A P P E A R A N C E S
 2
 3  FOR THE PLAINTIFF(S):
 4     Mark N. Senak
       SENAK KEEGAN GLEASON SMITH & MICHAUD, LTD.
 5     566 West Adams Street, Suite 750
       Chicago, IL  60661
 6     312.214.1400
       msenak@skgsmlaw.com
 7
 8
 9  FOR THE DEFENDANT(S):
10     Andrew B. Miller
       STARR AUSTEN & MILLER, LLP
11     201 South 3rd Street
       Logansport, IN  46947
12     574.722.6676
       miller@starrausten.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1       I N D E X  O F  E X A M I N A T I O N
 2                                          PAGE
 3  DIRECT EXAMINATION .....................4
    Questions by Andrew B. Miller
 4  CROSS-EXAMINATION ....................125
    Questions by Mark N. Senak
 5
 6
 7       I N D E X  O F  E X H I B I T S
 8                                          PAGE
 9  Krintz Deposition Exhibit No.:
10  Exhibit 1 - Typewritten  . . . . . . . . . . .122
                Statement/Handwritten Statement by
11              Wes Krintz
    Exhibit 2 - Handwritten Statement by  . . . . . .125
12              Wes Krintz
    Exhibit 3 - Handwritten Statement by  . . . . . .137
13              Randy Crume
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1          WESLEY MICHAEL KRINTZ,
 2      Having been duly sworn to tell the truth,
 3  the whole truth, and nothing but the truth
 4  relating to said matter was examined and
 5  testified as follows:
 6
 7  DIRECT EXAMINATION,
 8      QUESTIONS BY ANDREW B. MILLER:
 9  Q  Good morning.  Can you please state your full
10     legal name for the record?
11  A  Wesley Michael Krintz.
12  Q  Mr. Krintz, my name is Andrew Miller.  I
13     represent the defendant, Air Tech, in a lawsuit
14     filed by Ball Corporation and its insurance
15     company.
16      Before we begin today, I want to set just a
17     few ground rules for the deposition.
18      First off, how would you like for me to
19     refer to you today?
20  A  Wes.
21  Q  Thank you, Wes.  Wes, have you ever been deposed
22     before?
23  A  No, sir.
24  Q  A few important ground rules to go over.  We
25     have got a court reporter transcribing both my
```



5

1    questions and your answers. So it is important
2    that you answer audibly, meaning, yes, no, or a
3    more extended answer rather than nodding your
4    head. Okay?
5 A  Yep.
6 Q  Also, answer verbally, meaning yes, no, or a
7    more extended answer rather than uh-huh or
8    huh-uh, as that requires our court reporter to
9    make judgments about what your testimony is.
10    Okay?
11 A  Okay.
12 Q  I want to make sure today that the testimony is
13    your own and not our guesses as to what your
14    testimony is. Okay?
15 A  Okay.
16 Q  If I ask you a question and you don't hear it,
17    ask for me to repeat it. Okay? I know how
18    noisy the factory floor is, and you have
19    probably worked here a few years, do you have
20    any hearing loss?
21 A  No, sir.
22 Q  If I ask you a question today and you don't
23    understand that question, ask for me to repeat
24    it. Okay?
25 A  Okay.

6

1 Q  If I ask you a question and you answer, I will
2    assume you both heard and understood my
3    question. Is that a fair presumption?
4      MR. SENAK: Object to the form of the
5    question.
6 Q  I didn't hear you, sir.
7      MR. SENAK: You can go ahead and answer.
8      THE WITNESS: Oh, I never said.
9      MR. SENAK: No, that's all right.
10 A  Fair.
11 Q  Thank you very much. Wes, what is your current
12    home address?
13 A  2559 West 100 South, Reynolds, Indiana, 47980.
14 Q  And how long have you been at that address?
15 A  Since February of 2000.
16 Q  Do you have any present intent to move from that
17    address in the next, say, year to 18 months?
18 A  No, sir.
19 Q  I forgot to give you another ground rule. Allow
20    me to complete my question before you answer,
21    because it is impossible for our court reporter
22    to transcribe two people talking at once. Okay?
23 A  Okay.
24 Q  Throughout the day, you're going to forget that
25    ground rule and so will I, because it kind of

7

1    runs counter to normal everyday conversation.
2    If I remind you of that rule, it is not to be
3    discourteous, it is just to try to make things
4    easier on our court reporter. Okay?
5 A  Okay.
6 Q  And your business address, sir?
7 A  6th Street. I am not sure what the number is.
8 Q  But your only business place is this plant;
9    correct?
10 A  Correct.
11 Q  Do you have any intent to change employers, move
12    positions in the next year to 18 months?
13 A  No.
14 Q  And how long have you been in Ball's employ?
15 A  Oh, '04 is the year, November. November of '04.
16 Q  And has your employment with Ball been
17    continuous from November 2004 through to today's
18    date?
19 A  Yes.
20 Q  Wes, what's your educational background?
21 A  Associate's degree, Vincennes University.
22 Q  Let's go back to high school for a second.
23    Where did you go to high school?
24 A  Twin Lakes, Monticello.
25 Q  And when did you graduate from Twin Lakes High

8

1    School?
2 A  1991.
3 Q  And when did you graduate from Vincennes?
4 A  '93.
5 Q  And you went, I assume you graduated from
6    Twin Lakes in May of '91; correct?
7 A  Uh-huh. Correct.
8 Q  And then did you enter Vincennes in August of
9    '91?
10 A  I assume. I believe. It has been a few years.
11 Q  But there was no gap --
12 A  Huh-uh.
13 Q  -- in education?
14 A  No.
15 Q  And what course of study did you have at
16    Vincennes?
17 A  Auto body technician.
18 Q  And you were a full-time student at Vincennes;
19    correct?
20 A  Correct.
21 Q  From '93 to 2004, that time period, did you work
22    in auto body tech?
23 A  No.
24 Q  No. Did you ever work in auto body tech after
25    graduating from Vincennes?

9

1　A　Yes.
2　Q　So tell me about the employment that you
3　　　received after graduation.
4　A　It would be Mike Raisor Ford in Lafayette.
5　Q　Now was that in their body shop, collision
6　　　repair?
7　A　Yes.
8　Q　And how long did you work for Mike Raisor Ford?
9　A　Under a year, just under.
10　Q　Would you have accepted that position in
11　　　August of '93, after your graduation from
12　　　Vincennes?
13　A　Directly after college, yes.
14　Q　And you would have worked there till probably
15　　　the summer of '94, would that be true?
16　A　It might have been spring.
17　Q　And where did you go after that?
18　A　Chester's in Brookston.
19　Q　Would that also be auto body?
20　A　Nope.
21　Q　What was that?
22　A　Farm, agriculture industry, fertilizer plant.
23　Q　And what did you do for Chester's?
24　A　Operator, weld fabricate, anything.
25　Q　Now when you say "operator," were you spreading

10

1　　　fertilizer --
2　A　Yes.  Yes.
3　Q　-- or pesticides?
4　A　Yes.
5　Q　And I assume you received some certifications to
6　　　be a insecticide pesticide applicator; correct?
7　A　Correct.
8　Q　After working at Chester's -- how long did you
9　　　work at Chester's?
10　A　I am going to say three and a half years.
11　Q　Where did you go after that?
12　A　Johnson's Machine Shop, Brookston also.
13　Q　What did you do there?
14　A　Weld fabricate, operator.  Primarily weld.
15　Q　And how long were you there?
16　A　I am going to say four years.
17　Q　Would that have been about up to 2002?
18　A　Probably a little earlier than that.
19　Q　So there was another employer that you had;
20　　　correct?
21　A　Yeah.
22　Q　And who was that?
23　A　Well, that would have been, for a spell I worked
24　　　for my father-in-law at another fertilizer plant
25　　　before going to another machine shop, so.

11

1　Q　What was that other fertilizer shop?
2　A　Round Grove Farm Center.
3　Q　And how long did you work there?
4　A　A year.
5　Q　Then you went to the machine shop?
6　A　Yeah.  Another one, Carter Manufacturing.
7　Q　And did you weld and fabricate there?
8　A　Yes.
9　Q　And how long were you there?
10　A　That's where I came from when I started here, so
11　　　a couple years.
12　Q　And then that brings us up to Ball
13　　　Manufacturing?
14　A　Right.  I believe it was the second week of
15　　　November in '04.
16　Q　Can you tell me the positions that you have held
17　　　while at Ball?
18　A　Started as an adjustor, two months, maintainer,
19　　　a total of roughly three years, and then I was
20　　　in the shop after that, put in for a shop job.
21　　　So I was on the floor for three years, the first
22　　　three years.
23　Q　So the positions that you have held were
24　　　adjustor --
25　A　Uh-huh.

12

1　Q　-- number one?
2　A　Uh-huh.
3　Q　Maintainer, number two?
4　A　Uh-huh.
5　Q　And the third position?
6　A　Machinist millwright.
7　Q　And can you tell me what an adjustor does?
8　A　At the time they ran the bagger, sliding ends,
9　　　we had an end line, sliding ends.  Mopping,
10　　　cleanup, threading up conversion presses, which
11　　　I was only an adjustor for two months, so, I
12　　　started doing and then I got moved in my
13　　　department to a different area.
14　Q　Was that a promotion?
15　A　More money, yes.
16　Q　And that was the position of maintainer?
17　A　Yes.
18　Q　And tell me what a maintainer does.
19　A　Maintains the equipment, runs the equipment,
20　　　works on the equipment, makes adjustments.
21　Q　Is that a production position?
22　A　Yes.
23　Q　Is the maintainer the individual that actually
24　　　operates the machinery?
25　A　Yes.



---

**13**

1  Q  Is there any other Ball employee that operates
2     the machinery that's not a maintainer?
3  A  Adjustors, adjustors thread up new coils at the
4     time.  Now we don't even have an adjustor
5     anymore.  So then, yes.  Now, there is no such
6     thing as an adjustor, so.
7  Q  So the maintainer is it?
8  A  The maintainer was the main operator.  The
9     adjustor was a janitor.  I mean, theoretically
10    that's kind of how it is.  I mean, you cleaned
11    up messes, I mean, you mopped, you wiped things
12    down and you cleaned them.  You just done it.
13  Q  And then you put a new spool of aluminum --
14  A  On the --
15  Q  You have got to let me finish.
16  A  I'm sorry.
17  Q  And then put the new spool of aluminum to
18    facilitate the production?
19  A  Correct.
20  Q  And that's what you began with, then you went to
21    maintainer, and the maintainer was the
22    individual that actually operated the machinery
23    to produce the aluminum cans and make any
24    adjustments to the machinery that's necessary to
25    continue production; true?

**14**

1  A  Correct.
2  Q  And then the machinist millwright position, what
3     does that individual do?
4  A  Oh, for me, primarily, it is fabrication.
5  Q  And fabrication of what?
6  A  Guards, anything necessary.
7  Q  Does it also entail repair of machinery?
8  A  Yes.
9  Q  So repair of machinery and fabrication of parts
10    for machinery; true?
11  A  True.
12  Q  Is there any other duties of a machinist
13    millwright?
14  A  Repair, the repair is pretty broad.  So, I mean,
15    mats, repairing mats.  That's about it.
16  Q  And by mats, do you mean the conveyor belt that
17    moves the product through the various machines?
18  A  Correct.
19  Q  Did your education at Vincennes provide you with
20    any background on the position that you perform
21    at Ball Manufacturing?
22  A  I took a welding class at Vincennes.  So, yes, I
23    am sure it helped.
24  Q  So other than the welding class, were there any
25    other courses that you took at Vincennes that

**15**

1     are transferable to the position that you hold
2     at Ball?
3  A  I am going to go with no.
4  Q  It sounds then as if, aside from the welding
5     class that you took at Vincennes, the majority
6     of the skills that you employ in your position
7     at Ball Manufacturing were obtained through just
8     on-the-job experience at prior employers; true?
9  A  True.
10  Q  And how long have you been a machinist
11    millwright?
12  A  Eleven years, 11.
13  Q  Do you recall when you began that position?
14  A  No, I do not.
15  Q  If we look at your employment history with Ball,
16    you began in November of '04, and it looks like
17    just a little over three years, would it have
18    been January of '07 that you began as a
19    machinist millwright?
20  A  Possibly.  I don't recall.
21  Q  As I understand it, you worked as an adjustor
22    for two months, a maintainer for three years,
23    and you began in November of '04, so that would
24    bring it to January of '07, for three years and
25    two months?

**16**

1  A  True.  The only reason I know the first date is
2     because hire date is an important date.
3  Q  Sure.
4  A  So after that, they kind of run together after
5     that.
6  Q  Because that controls your benefits; true?
7  A  True.
8  Q  Plus your retirement, presumably; true?
9  A  If I ever make it there.  A long way to go.
10  Q  As a machinist millwright, are you an hourly
11    employee?
12  A  Yes.
13  Q  Do you have any supervisory responsibilities?
14  A  No.
15  Q  Have you ever had supervisory responsibilities
16    as you have been an employee here at Ball?
17  A  No.
18  Q  Who is your boss?
19  A  Ray Miller.
20  Q  Ray Miller?
21  A  Correct.
22  Q  And what is his position?
23  A  Maintenance supervisor.
24  Q  Does Mr. Miller supervise any other category of
25    employees other than machinist millwrights?

**17**

1  A  No.
2  **Q  And how long has Roy Miller been your**
3  **supervisor?**
4  A  It is Ray.
5  **Q  Or I am sorry, Ray.**
6  A  It is all right.
7     He has not been here long.  I don't know.
8  But two years, if I were guessing.
9  **Q  Was he promoted into that position or was he**
10  **brought from another plant?**
11  A  Brought in from the outside.
12  **Q  Was Ray Miller your supervisor on the date of**
13  **this fire?**
14  A  No.
15  **Q  Who was your supervisor on the date of the fire?**
16  A  Jerry Morgan.
17  **Q  Is that J-E-R-R-Y?**
18  A  Yes.
19  **Q  Morgan?**
20  A  M-O-R-G-A-N.
21  **Q  And how long had Morgan been your supervisor?**
22  A  Since the machinist millwright position.
23  **Q  Did Mr. Morgan transfer to another position, to**
24  **your knowledge?**
25  A  Retired.

**18**

1  **Q  Do you recall when he retired?**
2  A  No, I do not.
3  **Q  Would it be about two years ago when Mr. Miller**
4  **assumed that position?**
5  A  It was longer than that.
6  **Q  Did you have somebody in the interim, in between**
7  **Mr. Morgan and Mr. Miller?**
8  A  We had a couple -- we had an associate that I
9  worked with that was temporary, a trial
10  supervisor for a short spell.  Then we had
11  Rick Nydegger, which he is retired, he was
12  probably a year, and Freddy Spencer filled in as
13  a manager.
14  **Q  Do you know how long after the fire Mr. Morgan**
15  **retired?**
16  A  I do not.
17  **Q  Was Mr. Morgan in the plant at the time of the**
18  **fire?**
19  A  No, sir.
20  **Q  At the time of the fire who was supervising you?**
21  A  Jerry Morgan.
22  **Q  Maybe I asked a poor question.**
23     I thought I understood your testimony was
24  that Mr. Morgan was not in the plant at the time
25  of the fire; true?

**19**

1  A  True.
2  **Q  So when Mr. Morgan was not in the plant, who was**
3  **your supervisor?**
4  A  So the production supervisor, which is who we
5  answer to, would have been Mike Rogers.
6  **Q  So the maintenance supervisor is under the**
7  **authority or direction and control of the**
8  **production supervisor?**
9  A  No.  The production supervisor is on a rotating
10  schedule.  The maintenance supervisor is not.
11  **Q  So when the maintenance supervisor is not at the**
12  **plant, the production supervisor stands in and**
13  **supervises those that the maintenance supervisor**
14  **typically directs and controls; true?**
15  A  That's correct.
16  **Q  Wes, I forgot to ask you, what did you do to**
17  **prepare for today's deposition?**
18  A  Absolutely nothing.
19  **Q  So you have never met with anybody to prepare**
20  **for today's deposition?**
21  A  Nope.
22  **Q  So not even two months ago or three months ago**
23  **you didn't meet with anybody to prep for your**
24  **deposition?**
25  A  I met with him.  That's it.

**20**

1  **Q  And when was that?**
2  A  Let's say a month ago.  I don't know a date.
3  **Q  But you believe it was approximately a month**
4  **ago?**
5  A  Sure.
6  **Q  And I don't want to hear anything about the**
7  **content of your discussions during that time**
8  **period, but how long did that meeting last?**
9  A  Thirty minutes.
10  **Q  Were there other individuals in the room aside**
11  **from you and Mr. Senak?**
12  A  Just us.
13  **Q  As a part of that meeting, did you review any**
14  **documents?**
15  A  Documents?  Yes.
16  **Q  Do you recall what you reviewed?**
17  A  Our testimony the night of the fire.
18  **Q  So your handwritten statement?**
19  A  Correct.
20  **Q  Did you read any other statements?**
21  A  Yes.
22  **Q  Whose statements did you read?**
23  A  Randy Crume, Bob Pellegrini.
24  **Q  Okay.**
25  A  I think that was the only two that I actually



**21**

1    read.
2    Q    Prior to that meeting with Mr. Senak, you hadn't
3        reviewed those statements?
4    A    No.
5    Q    Prior to that meeting, had you ever seen the
6        statements of Mr. Crume and Mr. Pellegrini?
7    A    When we wrote them.
8    Q    Were you, Mr. Crume, Mr. Pellegrini in the same
9        room when you wrote your statements?
10   A    I don't recall.
11   Q    You testified that you had reviewed Mr. Crume
12       and Mr. Pellegrini's statements when you wrote
13       them.  Do you recall how that review came about?
14   A    I did not actually read them.  We were -- in
15       passing, I think we wrote them in the guard
16       shack.
17            So as far as actually reading, we were
18       both -- we were all there the night of the fire,
19       so we were side by side.  So, I mean, I assumed
20       that their deposition or their testimony was the
21       same as mine so.
22   Q    Okay.  And in your reading --
23   A    As actual reading it, I did not read theirs, no.
24   Q    Did you discuss with them the content of their
25       statements before you wrote yours?

**22**

1    A    No, sir.
2    Q    In your review of those statements about a month
3        ago, did those provide you with any information
4        that you didn't otherwise have?
5    A    No, sir.
6    Q    Aside from reviewing those statements, did you
7        review any other documents to prepare you for
8        your deposition?
9    A    There were papers that showed heat gun or heat
10       in the equipment.
11   Q    And those would be the copies of thermal imaging
12       photographs?
13   A    Correct.
14   Q    Did you review any other photographs?
15   A    I don't think so.
16   Q    Do you recall how many thermal imaging
17       photographs you reviewed?
18   A    Four or five.
19   Q    And were those thermal imaging photographs that
20       you reviewed taken on the night of the fire or
21       some other date?
22   A    The night of the fire.
23   Q    So all four or five thermal imaging photographs
24       that you reviewed to prepare for today's
25       deposition were taken on the night of the fire?

**23**

1    A    To my knowledge.
2    Q    Did you learn anything from your review of those
3        photographs?
4    A    No.
5    Q    Did you speak with any witnesses to prepare for
6        your deposition?
7    A    Witnesses?  No.
8    Q    Have you spoken with any of the other Ball
9        employees that I have taken, recently taken
10       their depositions?
11   A    We work together.  So, yeah, I have talked to
12       them.
13   Q    Did you talk to them about their depositions?
14   A    Other than how long it took.
15   Q    Okay.  And who did you speak with?
16   A    Mike Russell and Randy Crume.
17   Q    And when did you speak with Mr. Russell?
18   A    A couple weeks ago.
19   Q    And when did you speak with Mr. Crume?
20   A    A couple days ago.  I don't know.  I don't know
21       when it was.
22   Q    And in your conversations with Mr. Russell and
23       Mr. Crume, did they share with you anything
24       about the deposition, other than the length of
25       time of my questioning?

**24**

1    A    No, sir.
2    Q    Other than the length of time, did you learn
3        anything about the depositions through those
4        conversations with Mr. Russell and Mr. Crume?
5    A    No, sir.
6    Q    How long did they tell you to expect for your
7        deposition?
8    A    Three hours.
9    Q    Okay.  Prior to working at Ball Manufacturing,
10       did you have any prior experience in beverage
11       can fabrication?
12   A    No, sir.
13   Q    When you began working at Ball Manufacturing in
14       November of '04, I think it was, what was the
15       product being produced?
16   A    I don't understand.
17   Q    Was Ball manufacturing aluminum beverage cans in
18       November of 2004?
19   A    Yes.
20   Q    Have you ever been employed by Ball, at this
21       Ball plant, when they manufactured steel
22       beverage cans?
23   A    Nope.  No, sir.
24   Q    So the entirety of your time at Ball
25       Manufacturing, this plant has been producing

25

1  aluminum beverage cans; true?
2  A  True.
3  Q  Are there any other products that are produced
4     by this plant other than aluminum beverage cans?
5  A  No.
6  Q  And what are the size ranges of the aluminum
7     beverage cans that are produced by this plant?
8  A  Twelve, 16, 24, 32, 750.
9  Q  And do those aluminum beverage cans, is the
10    manufacturing process identical for each of the
11    cans without respect to size?
12 A  Yes.
13 Q  Do you know whether the length of time those
14    cans travel through the ovens is dependent upon
15    their size?
16 A  Possibly, but I don't know.  I don't know the
17    difference in the time.
18 Q  But going back to your days in production, do
19    you recall whether or not there was any
20    difference in the length of time or volume of
21    cans produced per hour depending upon their
22    size?
23 A  I work on the in line first and then I went to
24    the bottle line.  From the bottle line, which is
25    shut down now, I came to the shop.  I never

26

1     worked on the can side of the production line.
2  Q  And when you say the "bottle line," is that
3     aluminum bottles or glass bottles?
4  A  Aluminum.  Alumi-tek, Alumi-tek line.
5  Q  What is the aluminum tech line?
6  A  Alumi-tek is a Alumi-tek bottle that our
7     facility produced.
8  Q  Is Alumi-tek, is that a description of the
9     material used to create the product?
10 A  Don't know.
11 Q  But the Alumi-tek line fabricated the aluminum
12    bottles?
13 A  Yeah.  With a removable cap.  Threaded, a
14    threaded cap.
15 Q  Was it intended to hold a beverage?
16 A  Correct.
17 Q  Do you know what type of beverage?
18 A  Oh, beer.  There was others.
19 Q  Were the aluminum bottles also processed through
20    PIN and IBO ovens?
21 A  Yes.
22 Q  Do you know whether the IBO oven at issue in
23    this case, which I believe is IBO #2, was used
24    to process the Alumi-tek bottle, aluminum bottle
25    beverage --

27

1  A  Absolutely not.
2  Q  -- containers?
3  A  Absolutely not.
4  Q  So, to your knowledge, IBO #2 was used
5     exclusively to process aluminum beverage cans?
6  A  Correct.
7  Q  And that was true on the date of the fire;
8     correct?
9  A  Correct.
10 Q  And that was true dating back as far as November
11    of 2004 when you began your employment at Ball?
12 A  Correct.
13 Q  Did IBO #2 process a single size of aluminum
14    beverage can?
15 A  Yes.
16 Q  And what size did IBO #2 process?
17 A  Twelve or 16, I forget.
18 Q  Did you ever work in production on IBO #2?
19 A  No, sir.
20 Q  So your only experience with IBO #2 is within
21    the context of your role as a machinist
22    millwright; true?
23 A  True.
24 Q  Is my assumption correct that you would not have
25    had daily interaction with IBO #2?

28

1  A  That's correct.
2  Q  Before working at Ball Manufacturing, did you
3     have any experience with IBO ovens?
4  A  No, sir.
5  Q  And your job as a machinist millwright requires
6     you to fabricate parts for an IBO and repair
7     IBOs; true?
8  A  Repair, yes.
9  Q  But not fabricating any parts?
10 A  True.  True.  Fabricating parts.
11 Q  So let me make sure that I understand your
12    testimony correctly.  As a machinist millwright,
13    you do not fabricate parts for the IBO oven;
14    correct?
15 A  I have worked on parts for the IBO.
16 Q  In working on parts, have you ever had to
17    fabricate a part for an IBO?
18 A  Guard.
19 Q  And a guard is what?
20 A  To guard a pulley on a blower.
21 Q  And that would be for the personal protection of
22    the operator of the IBO; true?
23 A  True.
24 Q  So other than fabricating a guard for a pulley
25    on an IBO, have you ever had to fabricate any



29

1    other parts?
2  A  Well, end shafts, mat, mat conveying shafts with
3    bearings, where is the groove in them, weld them
4    and turn those down.  I mean, prepared the
5    shaft.  So fabrication, not really, but prepare.
6  Q  So, as we sit here today, the only part that you
7    can recall fabricating for an IBO was a guard
8    for a pulley; true?
9  A  True.
10  Q  And you recall repairing a pulley shaft when a
11    bearing went out for an IBO?
12  A  It is a mat shaft, yes.
13  Q  I am sorry, a mat shaft.
14  A  For the IBO mat.  Discharge end, bearings, worn
15    groove, have worn grooves in the shaft before
16    you pull them out, weld, and turn them back
17    down, so it is a repair.
18  Q  Now was that on IBO #2 that you performed that
19    repair?
20  A  Possibly.
21  Q  Was guard for the pulley, was that fabricated
22    for IBO #2?
23  A  Possibly.
24  Q  Other than the repair of the mat shaft, can you
25    recall any other repairs that you have made to

30

1    an IBO?
2  A  Installing mats, just maintenance.
3  Q  And was that installation of the mat performed
4    on IBO #2?
5  A  At some point.
6  Q  Okay.
7  A  At some point I am sure we put a mat on IBO 2.
8  Q  Other than repairing the mat shaft and replacing
9    mats, can you remember any other maintenance
10    work that you have performed on an IBO?
11  A  Nope.
12  Q  Because you did not have any experience with
13    IBOs before coming to work at Ball
14    Manufacturing, what training did Ball provide to
15    you with respect to the maintenance of IBOs when
16    you began your position as a machinist
17    millwright?
18  A  Working with experienced fellow associates.
19  Q  Anything else?
20  A  No.
21  Q  Did those experienced fellow employees provide
22    you with kind of sit-down meeting to explain the
23    repair or maintenance work required by IBOs?
24  A  Yes.  We had a specific job we all talked about,
25    the direction or how we are going to go about

31

1    the repair job.
2  Q  And during those meetings, were you provided
3    with any written materials with respect to the
4    IBO?
5  A  No.
6  Q  So all of the information provided to you was
7    verbal; true?
8  A  True.
9  Q  And that information was provided by other
10    employees; true?
11  A  True.
12  Q  Was there ever an instance where you received
13    any information from a manufacturer's
14    representative that built the IBO?
15  A  Not to my knowledge.
16  Q  So all of the knowledge you have with respect to
17    IBOs was imparted to you by Ball employees;
18    true?
19  A  True.
20  Q  Have you ever worked at any other Ball facility
21    other than the Monticello plant?
22  A  No.
23  Q  So you have never gone on a temporary assignment
24    to any other plant?
25  A  No.

32

1  Q  I also forgot to mention, if you want to take a
2    break at any time, that's fine.  Just let me
3    know so we can call a break.
4  A  Yeah.
5  Q  All I would ask is if I have asked you a
6    question, answer the question before we proceed
7    to a break.  Okay?
8  A  Okay.
9  Q  Have you ever reviewed the maintenance manual
10    for an IBO oven?
11  A  No.
12  Q  Have you ever reviewed the parts manual for an
13    IBO oven?
14  A  No.
15  Q  Have you ever reviewed any manuals for an IBO?
16  A  PM sheet.
17  Q  What is a PM sheet, sir?
18  A  The preventative maintenance checks that we do,
19    which I haven't done for quite some time, and
20    mat tracking primarily, our PM was the function
21    of and the equipment that kept the mat straight.
22  Q  And mat tracking, does that mean to assure that
23    the mat is traveling appropriately through the
24    IBO and is not cocked or tilted one way or the
25    other?



33

1  A  Correct.
2  Q  The preventative maintenance check sheets that
3      you referenced, are those a Ball Manufacturing
4      document or a document created by the
5      manufacturer of the IBO?
6  A  Both, I believe.
7  Q  So the only written document that you have ever
8      reviewed or consulted concerning an IBO is the
9      internal Ball document for preventative
10     maintenance of that piece of machine; correct?
11 A  Correct.
12 Q  So you never reviewed a document created by the
13     manufacturer of the IBO; true?
14 A  True.
15 Q  Wes, did you play any role in Ball
16     Manufacturing's decision to hire Air Tech?
17 A  No, sir.
18 Q  Do you know whether Air Tech was the outside
19     contractor cleaning the IBO ovens when you
20     worked in production from November of 2004
21     through some point in 2007?
22 A  No.
23 Q  Do you know when Air Tech began providing
24     services to this Ball Manufacturing plant here
25     in Monticello, Indiana?

34

1  A  I do not know.
2  Q  Do you have any knowledge of Air Tech's
3      employees?
4  A  No.
5  Q  Did you have any interaction with Air Tech
6      employees through the course of your employment
7      as a machinist millwright?
8  A  No.
9  Q  Did Ball Manufacturing provide you with any
10     training on the operation of an IBO?
11 A  No.
12 Q  Do you know the history of the IBO at issue in
13     this litigation?
14 A  No.  Can you repeat that question?
15 Q  Yes.  Do you know the history of the IBO at
16     issue in this litigation?
17 A  No.
18 Q  Do you know how long it had been in operation
19     here at Ball Manufacturing?
20 A  No.
21 Q  Do you know whether it was purchased new or
22     used?
23 A  No.
24 Q  Do you know when it was installed?
25 A  No.

35

1  Q  Do you know the maintenance history of that IBO?
2  A  No.
3  Q  Do you know the repair history on that IBO?
4  A  No.
5  Q  Do you know historically what that IBO --
6      strike that.
7          Historically, do you know what product that
8      IBO has been used in the production?
9  A  No.
10 Q  Do you have any knowledge whether that IBO has
11     been used to process a product other than
12     aluminum beverage cans?
13 A  No.
14 Q  Do you know the frequency with which you would
15     work or perform any services related to the IBO
16     at issue in this litigation?
17 A  No.
18 Q  Prior to the date of the fire, do you recall the
19     last time that you worked on the IBO at issue in
20     this litigation?
21 A  No idea.
22 Q  Prior to the fire, do you know the last time
23     that you performed any services that would have
24     been related to the IBO at issue in this
25     litigation?

36

1  A  No.
2  Q  You had earlier testified that all of the
3      information that was necessary for you to
4      perform any job function on an IBO was provided
5      by fellow employees; true?
6  A  True.
7          MR. SENAK:  Object to form.  Go ahead.
8  Q  Can you identify those employees who trained you
9      with respect to any issue involving an IBO?
10 A  I am going to go with senior millwrights.  I
11     mean, one, two, which are mostly retired, which
12     was discussion on how to run or change a mat or
13     to that effect of repair.
14         I mean, it is who was going to do what and
15     who was going to get ready and prepare, you
16     know, to -- just the procedure of what it takes
17     of a job we were working on.
18 Q  Do you recall the individuals who provided you
19     with that information?
20 A  There is no way I could be specific.  I know the
21     senior operators, the senior millwrights that
22     obviously directed us on how to do the repair.
23 Q  But you can't identify them by name?
24 A  Don Curnutt, John Hayden.
25 Q  Wait.  Slow down.  Don what?



37

1 A  Curnutt.
2 Q  Do you know how to spell that name?
3 A  Curnut [sic], let's say.
4 Q  Is Mr. Curnutt still employed by Ball?
5 A  Retired.
6 Q  He's retired.  Who else?
7 A  John Hayden.
8 Q  And he is employed by --
9 A  Retired.
10 Q  Anyone else?
11 A  Freddy Spencer.
12 Q  Anyone else?
13 A  That's it.
14 Q  And Mr. Spencer is still --
15 A  Correct.
16 Q  -- employed at Ball; correct?
17 A  Correct.
18 Q  You had mentioned that you have occasion to
19    repair mat shafts.  Do you recall that
20    testimony?
21 A  Yes.
22 Q  When performing that repair, did you receive any
23    instruction from Ball employees as to how to
24    properly do that repair?
25 A  Most of the repairs are common sense.  I mean,

38

1'    you have four bolts to remove, two bearings, and
2'    the shaft has got to come out.  At that point I
3     am a welder, so I didn't need advice on how to
4     weld it.  Then turn the shaft down and
5     reinstall.
6 Q  So if I am understanding your testimony that it
7    was common sense and the fact that you're a
8    welder, do I understand that to mean that you
9    did not receive any instruction or training from
10    other employees as to how to perform the repair
11    on the IBO?
12 A  That specific repair, that's correct.
13 Q  And to perform that repair, you didn't consult
14    any IBO maintenance manuals; true?
15 A  True.
16 Q  The other repair that you mentioned was a mat
17    tracking issue; correct?
18 A  Correct.
19 Q  And you did receive verbal instructions from
20    senior Ball employees to perform that repair;
21    true?
22 A  True.
23 Q  But you didn't consult any written materials;
24    true?
25 A  I did not.

39

1 Q  Are there any other repairs that you recall
2    performing on the IBO other than those two that
3    you mentioned?
4 A  That's what I can remember.
5 Q  And flipping back to the fabrication that you
6    mentioned, fabricating the pulley guard, did you
7    consult any written materials to fabricate that
8    guard?
9 A  No.
10 Q  Was there existing guard that was removed and
11    you created a new one?
12 A  Yes.
13 Q  So you replicated what was in existence; true?
14 A  True.
15 Q  Did Ball Manufacturing provide you with any
16    training on the cleaning of an IBO?
17 A  No.
18 Q  As a part of your either present or past
19    positions with Ball Manufacturing, have you ever
20    been involved in the cleaning of an IBO?
21 A  No.
22 Q  Do you have knowledge as to how an IBO is
23    cleaned?
24 A  No.
25 Q  Have you ever watched an IBO be cleaned?

40

1 A  Yes.  Walking past, not standing there
2    observing the whole time.  Just when they hired
3    a crew to clean it, seeing the guys, you know,
4    clean it and get in there and digging it out.  I
5    mean, that's -- other than walking by, I mean,
6    that's it.  Try to stay out of their way.
7 Q  So your knowledge of the process of cleaning an
8    IBO is limited to what you would have observed
9    when walking past the IBO as it was being
10    cleaned; true?
11 A  True.
12 Q  In those instances where you walked past the IBO
13    when it was being cleaned, did you ever stop to
14    watch?
15 A  Possibly, not for any length of time.
16 Q  And the purpose of today in my questions is it's
17    not a guessing game.
18 A  Sure.
19 Q  As we sit here today, do you have any specific
20    memory of seeing the cleaning being performed
21    and stopping and watching it?
22 A  Yes.
23 Q  Do you recall when that would have been in
24    proximity to the fire?
25 A  No.



41

1  Q   Do you recall stopping and watching the IBO
2     being cleaned on the date of the fire?
3  A   No.
4  Q   Do you recall stopping and watching an IBO being
5     cleaned on multiple occasions or just one
6     occasion?
7  A   I have seen people cleaning ovens multiple
8     times.
9  Q   I think I understand your testimony, but I want
10    to make sure.  I just want to know whether
11    seeing them clean ovens, whether that was just
12    in the space of time it took you to walk past
13    the IBO or whether you stood for a dedicated
14    period of time to watch them clean.
15 A   I would say ten seconds.
16 Q   So your knowledge of an IBO cleaning is solely
17    the product of seeing them being cleaned as you
18    were walking past and standing for a ten-second
19    period of time on one or more occasions to
20    watch; true?
21 A   True.
22 Q   Do you have knowledge of how an IBO is cleaned
23    from start to finish?
24 A   No.
25 Q   Do you have knowledge of what tools are used to

42

1     clean an IBO?
2  A   No.
3  Q   Do you have knowledge of what process is used to
4     clean an IBO?
5  A   No.
6  Q   Have you been certified to work in
7     reclassifiable confined spaces?
8  A   No.
9  Q   Have you received any training or certifications
10    as a part of your positions at Ball
11    Manufacturing?
12 A   Ask again, please.
13    MR. MILLER:  Can you read it back?
14    (The requested text was read back by the
15    reporter.)
16 A   No.
17 Q   Do you receive safety training?
18 A   Yes.
19 Q   How frequently do you receive safety training?
20 A   Often, at least monthly.
21 Q   And do those trainings ever result in you
22    receiving certifications?
23 A   For truck operation, for truck operator.
24 Q   Any others that you recall?
25 A   No.

43

1  Q   As a part of your employment with Ball, have you
2     ever been involved in cleaning the air flow
3     tubes on an IBO?
4  A   No.
5  Q   As a part of your position with Ball, have you
6     ever been involved in a cleaning of the burner
7     chambers on an IBO?
8  A   No.
9  Q   As a part of your employment with Ball, have you
10    ever been on top of an IBO?
11 A   Yes.
12 Q   And what function or job were you performing
13    when you were on top of an IBO?
14 A   Belts, bearings, maintenance.
15 Q   When you say belts or bearings, do I take that
16    to mean replacing belts or bearings?
17 A   Check the belts, check the tension.  If the belt
18    is cracked, replace it, which requires you to
19    move a guard, replace the belt.  So, yeah,
20    that's it.
21 Q   Were those belts and/or bearings located on or
22    in connection with fans?
23 A   Yes.
24 Q   Were the belts or bearings located on or
25    incident to anything other than fans?

44

1  A   Not on top, no.
2  Q   So the only reason you would have been on top of
3     an IBO was to repair or replace a belt or a
4     bearing on one of the fans; correct?
5  A   Correct.
6  Q   How many fans are on top of the IBO?
7  A   I don't recall.
8  Q   Do you know where those fans are located?
9  A   Vicinity, yes.
10 Q   Can you please describe for me where they are
11    located?
12 A   There's entry, discharge.  I don't know what
13    they are called, but the main blowers that -- I
14    call them big blowers and little blowers.  I
15    know the end feed of a discharge, pull air out
16    of them.
17 Q   Okay.
18 A   Circulation blowers, I assume that's what they
19    are called.
20 Q   Let's stick for a moment with your description
21    of big blowers and little blowers.
22 A   Uh-huh.
23 Q   How many big blowers are there?
24 A   Two.
25 Q   And do the big blowers direct air flow into the



45

1    exhaust ducts?
2  A  I will say no.
3  Q  Where do the big blowers direct the air flow to?
4  A  Inside the oven.
5  Q  Are the big blowers the item that directs the
6     hot air down into the oven?
7  A  I believe so.
8  Q  And the little blowers, do they direct the air
9     flow into the ducting, the main duct system for
10    the plant?
11 A  Yes.
12 Q  So how many little blowers would there be?
13 A  One at the in-feed and one at the discharge.
14 Q  And other than work on the belts and the
15    bearings for those blowers, did you ever perform
16    any other task on those?
17 A  (Witness shakes head side to side.)
18 Q  These blowers are fans; correct?
19 A  Correct.
20 Q  They are like squirrel cage fans; true?
21 A  Correct.
22 Q  Squirrel cage fans are rated in CFM, cubic feet
23    per minute; true?
24 A  True.
25 Q  Do you know the size in CFMs for those fans?

46

1  A  I do not.
2  Q  Have you ever received any training on how to
3     service those exhaust fans?
4  A  Define service.
5  Q  Let's stick with the belts and the bearings.
6  A  I have to say common sense, inspect the belt.
7     If it is weather damaged, if it needs to be
8     replaced, replace it.
9  Q  And based upon that answer, I take it you have
10    not received any formalized training in --
11 A  Not formalized training, no.
12 Q  Can you recall performing any other repair or
13    maintenance on those squirrel cage fans other
14    than replacing or checking the tension of belts
15    or replacing bearings?
16 A  No.
17 Q  So you have never had to replace a fan in its
18    entirety?
19 A  No.
20 Q  Are those fans run by a separate electric motor?
21 A  Yes.
22 Q  So each of the fans has an electric motor?
23 A  To my knowledge.
24 Q  Are those fans powered by an electrical --
25    strike that.

47

1    The oven is gas fired; true?
2  A  True.
3  Q  Did you ever perform any work on the gas lines
4     to the IBO ovens?
5  A  No.
6  Q  Did you ever provide any maintenance or repair
7     of the burners on the ovens?
8  A  No.
9  Q  What department would be responsible for
10    maintaining or repairing the burners?
11 A  I am not sure.
12 Q  Do you have knowledge whether machinist
13    millwrights have ever performed maintenance on
14    the burners or the IBOs?
15 A  I do not.
16 Q  In maintaining or repairing the squirrel cage
17    fans, do you ever inspect the fans themselves?
18 A  I have not.
19 Q  In maintaining or repairing the fans, do you
20    ever check the cleanliness of the fans?
21 A  Not disassembling myself, not disassembling the
22    fan.  But just, you know, while you're working
23    on it, I mean, you can usually see if there
24    is -- well, not internally, no.
25 Q  Is there an access panel that you can remove to

48

1    look at the fan?
2  A  Yes.
3  Q  When maintaining the squirrel cage fans or
4     repairing the squirrel cage fans, have you ever
5     been instructed to remove that access panel to
6     check the condition of the fan itself?
7  A  I have not.
8  Q  In receiving the training from more experienced
9     millwrights, machinist millwrights, have you
10    ever been instructed to periodically look at the
11    fan to check its condition and cleanliness?
12 A  I have not.
13 Q  Do you know what the maintenance schedule is for
14    an IBO?
15 A  I do not.
16 Q  Do you know what the cleaning -- the
17    manufacturer's recommended cleaning frequency
18    for an IBO?
19 A  No, sir.
20 Q  Have you ever been trained by a more experienced
21    Ball employee as to the cleaning schedule
22    recommended by the manufacturer of an IBO?
23 A  No.
24 Q  Do you recall ever having any discussions during
25    the course of your employment with Ball as to



49

1    what the manufacturer's recommended cleaning
2    schedule is for an IBO?
3    A  I have heard it discussed, but I am not aware of
4    the time.
5    Q  Okay.
6    A  I don't know what the time span is.
7    Q  Who have you heard discussing that issue?
8    A  Freddy Spencer.
9    Q  What was the context of those discussions?
10   A  It was just mentioned during -- I don't recall
11   who he was talking to, but it was time for the
12   oven to be cleaned or words to that effect.
13   Q  And do you know how they determined that it was
14   time to be cleaned?
15   A  No.  Millwrights don't clean ovens, so.
16   Q  But when the oven is cleaned, it is shut down;
17   true?
18   A  True.
19   Q  And when the oven is shut down, that would
20   provide the machinist millwrights with
21   opportunities to perform any necessary
22   maintenance or repair on the ovens; true?
23   A  That's correct.
24   Q  And do you recall ever being involved in
25   performing maintenance or repairs of the IBO

50

1    while it was being cleaned?
2    A  No.
3    Q  Do you have any knowledge of what the
4    manufacturer's recommended cleaning schedule is?
5    A  No clue.
6    Q  Do you know whether that oven needs cleaned --
7    strike that.
8        Do you know whether the frequency of the
9    cleaning of an IBO has any relation to the
10   amount of hours per day that it is in operation?
11   A  I would assume that how much you use it
12   determines how dirty it will be.
13   Q  So if it is operated 24 hours a day, 7 days a
14   week, that oven would need to be cleaned more
15   frequently than if it were operated 8 hours a
16   day; true?
17       MR. SENAK:  Form and foundation.
18   A  True.
19   Q  Did you ever have any discussions while employed
20   by Ball discussing the cleanliness or condition
21   of the IBO at issue in this litigation?
22   A  No, sir.
23   Q  Are you aware of any fires involving IBOs at
24   Ball other than the one at issue in this
25   litigation?

51

1    A  No.
2    Q  Are you involved in any other fires involving
3    the IBO at issue in this litigation?
4    A  Please repeat the question.
5        MR. MILLER:  Can you repeat the question?
6        (The requested text was read back by the
7    reporter.)
8    Q  Are you aware of any fires involving the IBO
9    other than the fire at issue in this litigation?
10   A  No.
11   Q  Are you aware of any fires involving the
12   ductwork at this plant?
13   A  Repeat the question.
14       (The requested text was read back by the
15   reporter.)
16   A  IBO #2.
17   Q  But is that the fire at issue in this case or a
18   different fire?
19       MR. SENAK:  Do you understand the question?
20       THE WITNESS:  No, I don't.
21       MR. SENAK:  Maybe you can try it again.
22   Q  My understanding is that the ductwork was
23   involved in the fire at issue in this case, the
24   one that occurred in May 2014; true?
25       MR. SENAK:  Object to foundation.  Go

52

1    ahead.
2    A  True.
3    Q  Other than that fire, are you aware of any other
4    fires involving the ductwork at this plant?
5    A  No, sir.
6    Q  Other than the fire at issue in this case, are
7    you aware of any other fires at Ball
8    Manufacturing?
9    A  No, sir.
10   Q  Let me clarify that, at this Ball Manufacturing
11   facility.
12   A  No fires that I am aware of.
13   Q  I refer to the fire as being in May of 2014.  Is
14   it your understanding that the fire occurred on
15   May 22 of 2014?
16   A  I will believe you.  It has been a long time.
17   That's the vicinity, yes.
18   Q  As I understand it, the fire occurred somewhere
19   around midnight?
20   A  Yes.  Correct?
21   Q  So it would have been midnight leading from the
22   22nd to the 23rd; true?
23   A  True.
24   Q  You worked the night shift that day; true?
25   A  True.

53

1  Q   What time did you start your job that day?
2  A   7:00.
3  Q   So seven p.m., May 22, 2014, is when you began
4      your shift; true?
5  A   True.
6  Q   And your shift was scheduled to end at
7      seven a.m. on the 23rd; true?
8  A   True.
9  Q   Prior to coming to work at seven p.m., had you
10      also worked within the calendar day May 22?
11  A   No.
12  Q   So you did not work the prior evening into --
13  A   No.  I do not recall if that was -- what day
14      that was for me.  I was on nights.  So if I was
15      working, it would have been the night before.  I
16      don't know where that fit in my schedule.
17  Q   So if you were working the night before, you
18      would have gone on at seven p.m. on the 21st?
19  A   Right.
20  Q   And gone off at seven a.m. on the 22nd; true?
21  A   True.
22  Q   And then arrived again --
23  A   True.
24  Q   -- that evening at seven p.m. on the 22nd; true?
25  A   True.

54

1  Q   Do you have any recollection as to whether you
2      were on site when Air Tech arrived the morning
3      of the 22nd?
4  A   They leave at seven.  I don't recall anybody
5      being here when I left.
6  Q   My understanding is Air Tech arrived at
7      somewhere around 7:30 a.m. on May 22 of 2014.
8      Okay?
9  A   Okay.
10  Q   Do you have any recollection of seeing Air Tech
11      employees on site when you were leaving on the
12      morning of the 22nd?
13  A   I do not.
14  Q   Do you have any recollection as to whether the
15      IBO #2 was in the process of being cleaned when
16      you left on the morning of May 22?
17  A   We would have known that they had a maintenance
18      on that line when we left.
19  Q   Okay.
20  A   As far as if it was scheduled for Air Tech to be
21      here, the night shift probably didn't know what
22      the involvement was going to be on line 2, just
23      because of maintenance, because the maintenance
24      are done during the day.
25  Q   Do machinist millwrights have any involvement in

55

1      the cleaning process of IBOs?
2  A   I have never.  Not to my knowledge.
3  Q   Are machinist millwrights involved in any steps
4      to prepare the oven to be cleaned?
5  A   Taking the doors off the oven.
6  Q   Anything else?
7  A   Not to my knowledge.
8  Q   Are machinist millwrights involved in shutting
9      down an oven in preparation for it being
10      cleaned?
11  A   ETs will take care of that.
12  Q   Do you have any recollection of removing the
13      doors to the oven on either May 21 or 22?
14  A   I do not.
15  Q   Do you recall removing doors from the IBO oven
16      at any time?
17  A   Yes.
18  Q   And when you removed those doors, was it always
19      as a part of the cleaning of the IBOs?
20  A   They have us remove the doors before, before --
21      after the oven has cooled off, before -- they
22      have had us remove the doors after the oven has
23      cooled down before maintenance.
24  Q   When you say "they have had," are you speaking
25      of the outside contractor --

56

1  A   No.
2  Q   -- or your supervisor at Ball?
3  A   Freddy Spencer.
4  Q   And do you know why machinist millwrights were
5      asked by Freddy Spencer to remove the doors of
6      the IBOs?
7  A   I am going to say cut down on time.  Just to
8      access the inside of the ovens so it will be
9      cleaned.
10  Q   So to cut down on the time that the furnace
11      would be -- strike that.
12      To cut down on the time that it would take
13      for the outside contractor to perform the
14      cleaning services?
15      MR. SENAK:  Object to foundation.
16  A   Yes.
17  Q   Would machinist millwrights also be used to put
18      the doors back on after the ovens were cleaned?
19  A   Very possible.
20  Q   Do you recall any other tasks that you would
21      perform as a machinist millwright to participate
22      in the cleaning process other than removing and
23      rehanging the doors on the IBOs?
24  A   No, sir.
25  Q   In removing and rehanging the doors on the IBO,



57

1    would you be working with the outside
2    contractor?
3    A  Usually we have two millwrights.  If that task
4    was asked of us, there would just be two
5    millwrights that would put them back on.
6    Q  As the outside contractor was in the area
7    performing its work?
8    A  After, yes.
9    Q  Do you have any recollection of Air Tech
10    employees being on site on May 22?
11   A  No, sir.
12   Q  I saw you look at the clock.  Did you want to
13    take a brief break?
14   A  No.  I am good.  I was just curious.
15   Q  Okay.
16   A  Just wondering.
17   Q  Seeing how far you're into that three hours?
18   A  Yeah.  Exactly.
19   Q  You testified earlier that your shift began at
20    seven p.m. on the evening of May 22; true?
21   A  True.
22   Q  Do you recall what time you would have arrived
23    at the plant that evening?
24   A  I am always here early.  So around six.
25   Q  So your habit and practice is to arrive

58

1    approximately an hour before your shift begins?
2    A  Correct.
3    Q  And for that hour period of time, are you
4    spending that in the parking lot in your
5    personal vehicle or actually in the plant?
6    A  You can only clock in 15 minutes prior to your
7    shift time.  So 6:45 is the earliest I can clock
8    in.
9    Q  And so the 45-minute period between your typical
10    arrival time at 6 p.m., and your clock-in time
11    of 6:45, where would you spend that time?
12   A  In my truck.
13   Q  And what parking lot do you park in?
14   A  I have no idea.  It varies.
15   Q  Is the parking lot that you park in typically
16    also used by outside contractors that are
17    performing work here at the plant?
18   A  Yes.
19   Q  Your job as a machinist millwright, does that
20    require you to spend most of your time in the
21    machine shop?
22   A  It varies, but yes.  Depending on the jobs, I
23    mean.
24   Q  And the machine shop is not on the production
25    floor; true?

59

1    A  True.
2    Q  And from your position in the machine shop, do
3    you have visual access to IBO #2?
4    A  No, sir.
5    Q  When you leave the plant for the day, when your
6    shift is over, does your path from the machine
7    shop to your personal vehicle require you to
8    pass by IBO #2?
9    A  No.
10   Q  From when you clock in, from wherever you clock
11    in to the machine shop, does that require for
12    you to walk past IBO #2?
13   A  No.
14   Q  So do you have any knowledge of ever seeing
15    Air Tech employees either when you were clocking
16    out on the morning of the 22nd or arriving the
17    evening of the 22nd, do you have any knowledge
18    of seeing Air Tech employees at IBO #2?
19   A  No, sir.
20   Q  Do you recall whether Air Tech was done cleaning
21    the oven when you arrived on the evening of
22    May 22 of 2014?
23   A  I do not.
24   Q  Do you recall whether production had resumed on
25    the line that IBO #2 is a part of?

60

1    A  I do not remember.
2    Q  Do you recall whether any necessary safety
3    checks that are required before the IBO has been
4    put back into service had been completed when
5    you arrived?
6    A  No.
7    Q  Do you recall what you were scheduled to do on
8    May 22?
9    A  No.
10   Q  Before your shift starts, do you have an idea as
11    to how your time is going to be occupied for
12    that shift?
13   A  Depending on what the day consisted of.
14    Obviously maintenance.  There are times you have
15    to replace motors, help replace motors or
16    maintenance, they might have follow-up work that
17    needs done.
18      But on that specific day, I do not recall
19    anything that we had to do.
20   Q  So on May 22 you don't recall having a defined
21    set of tasks that you were going to be
22    completing that day?
23   A  No, sir.
24   Q  Have you ever received any training on the IBO's
25    structure or component parts?

61

1   A  No.
2   Q  Are you able to identify any Ball employees who
3       were responsible for maintenance of the IBOs?
4   A  I don't understand the question.
5   Q  As I understand it, there's a variety of
6       employment kind of categories at Ball; true?
7   A  True.
8   Q  One of them is machinist millwrights; true?
9   A  True.
10  Q  And there is another category called electronics
11      technicians, true?
12  A  ETs, yes.
13  Q  But ET stands for electrician technician; true?
14  A  Correct.
15  Q  And then you have got maintainers that work in
16      production; true?
17  A  True.
18  Q  And I have not stated all of the different
19      employee categories; true?
20  A  True.
21  Q  But I have used just those as examples.
22          Can you give me the employee categories
23      that would be involved in the maintenance of an
24      IBO?
25  A  ETs, millwrights, probably maintainers,

62

1       depending on what they consist of.
2   Q  Any others?
3   A  Outside contractors.
4   Q  Now going to repairs, give me the employee
5       classifications that would be involved in the
6       repair of IBOs.
7   A  ET, millwrights, and contractor.
8   Q  So for maintenance of IBOs, it would be
9       maintainers, ETs, millwrights, and outside
10      contractors; true?
11  A  True.
12  Q  And for repair, it would be ETs, millwrights,
13      and outside contractors; true?
14  A  True.
15  Q  So millwrights are involved in both maintenance
16      and repair of --
17  A  True.
18  Q  -- IBOs?
19  A  True.
20  Q  Describe for me any routine maintenance that is
21      performed on an IBO.
22  A  Inspection of belts, grease and bearings,
23      checking bearings to make sure they are not
24      going out or out, mat wear.  Mainly bearings,
25      bearings and belts.

63

1   Q  Earlier you had testified as to a PM or
2       preventative maintenance check sheet.
3           Do you recall that testimony?
4   A  Yes.
5   Q  Is that PM check sheet, was that specific to
6       IBOs?
7   A  Yes.
8   Q  And is it the millwright that does the
9       preventative maintenance check sheet?
10  A  Yes, it was.
11  Q  Do you recall when the last preventative
12      maintenance was performed on IBO #2 prior to
13      May 22 of 2014?
14  A  No, sir.
15  Q  What was the frequency of that PM check sheet?
16  A  I don't recall the frequency.
17  Q  How was the frequency determined?
18  A  Management, I assume.  Management.
19  Q  Do you know?
20  A  We were required -- our PMs have changed.
21  Q  When did they change?
22  A  A year ago.
23  Q  Why did they change?
24  A  Less paperwork.  Now it is mostly done on the
25      computer now.

64

1   Q  Has the substance of the PM changed?
2   A  I don't do -- I am not responsible for the PMs
3       like I used to be.  So since they have changed,
4       I know we used to have a PM book to fill out, PM
5       papers that we wrote it on, but now it is all in
6       the computer.
7   Q  I guess what I am asking, though, is the task --
8       I understand how the preventative maintenance is
9       recorded has changed, but the actual functions
10      or tasks performed as preventative maintenance,
11      has that changed in the last year?
12  A  I don't know.  It's probably changed.  It has
13      not been just a year.  It has probably been,
14      say, two years possibly.
15  Q  Would that have been after the fire at issue in
16      this case?
17  A  Yes.
18  Q  But, as we sit here today, you don't know
19      whether there have been any changes as to the
20      tasks performed in the PM, just how the PM is
21      recorded?
22  A  As far as the mat tracking goes, it is called a
23      FIFE unit, a FIFE unit that keeps the mat
24      straight.  I don't think we do part of the PM as
25      we did on -- we check the mat tracking.  I don't

65

1   believe we use the FIFE units anymore.
2  Q  Okay.
3  A  Therefore, I think that's why the PMs have
4     changed, because they automatically adjust the
5     mat, conveying the cans through, keeping it
6     straight.
7  Q  The FIFE unit does that?
8  A  Yes.
9  Q  So the FIFE unit is an automatic adjustor --
10 A  True.
11 Q  -- of the mat?
12 A  Correct.
13 Q  But are millwrights required to do any periodic
14    maintenance or adjustment on the FIFE unit?
15 A  If it is out of adjustment, it limits -- or it
16    hits a limit switch when the mat wanders, and we
17    have to adjust to make up for that, to keep the
18    mat straight.
19 Q  Do you have any knowledge of the frequency with
20    which the duct system was cleaned?
21 A  Frequency?
22 Q  Yeah.
23 A  I do not.
24 Q  Do machinist millwrights have any involvement in
25    the process of cleaning the duct system?

66

1  A  No.
2  Q  Are machinist millwrights used to perform any
3     disassembly that's necessary so that the ducts
4     can be accessed and cleaned?
5  A  It is possible.  It is possible that we might
6     have removed an inspection plate after the oven
7     was down.
8  Q  Do you recall --
9  A  I don't know the -- Air Tech was during the day
10    and I was sleeping.  So what happened that
11    specific day, I can't tell.
12 Q  No, I understand.  Did you always work the night
13    shift?
14 A  No.  It's rotating, rotating shifts.
15 Q  So you were there on some occasions during the
16    day when the IBOs were being cleaned; true?
17 A  True.
18 Q  And you earlier testified that on some of those
19    occasions you would remove and rehang the doors
20    as a part of the cleaning process; true?
21 A  True.
22 Q  Do you recall doing any related tasks to
23    facilitate the cleaning of ductwork by outside
24    contractors?
25 A  Not myself personally, no.

67

1  Q  Do you recall whether machinist millwrights
2     would perform tasks related to the duct
3     cleaning?
4  A  They might -- they might now.  No.
5  Q  Do you understand what reclassifiable confined
6     spaces are?
7  A  Roughly, yes.
8  Q  What is your understanding of a reclassifiable
9     confined space?
10 A  You have specific limitations that -- a
11    checklist, limitations that you have to go
12    through before you can enter a confined space.
13 Q  And is an IBO a reclassifiable confined space?
14 A  I don't believe so.
15 Q  As a part of your employment with Ball
16    Manufacturing, have you ever had to enter an
17    IBO?
18 A  No.
19 Q  So earlier you testified you had been on top of
20    an IBO, but you have never been inside of an
21    IBO; true?
22 A  True.
23 Q  And you have been next to an IBO; true?
24 A  True.
25 Q  Have you ever been under an IBO?

68

1  A  I wouldn't fit.
2  Q  IBO #2, have you been around all four sides of
3     it?
4  A  Yes.
5  Q  And you have been on top of it; true?
6  A  True.
7  Q  Do you remember when you were last in proximity
8     to IBO #2 before the fire?
9  A  No idea.
10 Q  Do you know what the normal internal operating
11    temperature for the IBO is?
12 A  Not specifically, I don't.
13 Q  Do you know generally?
14 A  400, four something, four -- around 400, I
15    think.
16 Q  And what is that knowledge based on?
17 A  Glancing at the number.  I don't remember.  I
18    don't recall exactly what the number is.  But I
19    believe at some point I have seen it around 400.
20 Q  Is that specific to IBO #2 or all IBOs?
21 A  All IBOs.
22 Q  So your belief that the internal operating
23    temperature of IBO #2 was 400 is based upon
24    glancing at a temperature gauge on the oven?
25 A  Yeah.  It is not really -- it is not really



69

1    anything that millwrights have anything to do
2    with, so.
3    Q    So the temperature of an IBO does not impact
4        your job; true?
5    A    No.  Correct.
6    Q    Do you know what the normal operating
7        temperature at the squirrel cage fan is?
8    A    No idea.
9    Q    Do you know what the normal operating
10       temperature above the squirrel cage fan is?
11   A    No.
12   Q    And I was speaking of the fan at the exhaust.
13       Okay?
14   A    Okay.
15   Q    Do you know what the operating temperature is at
16       the fan at the burner chamber?
17   A    I do not.
18   Q    Without knowing what the normal temperatures
19       were, what was the purpose of looking at those
20       thermal image photographs that we discussed
21       earlier?
22       MR. SENAK:  I guess I should object to
23       foundation.  But go ahead.
24   A    It was to see where there was more heat than in
25       other areas.

70

1    Q    But you had no ability to assess whether or not,
2        whatever the heat, was normal or abnormal; true?
3    A    The specific temperature, true.
4    Q    What about general temperature?
5    A    I don't understand the question.  I don't know.
6    Q    Well, you said specific temperature.
7    A    I have no idea what the temperature of that
8        ductwork is.
9        Back when I used to do the PM a hundred
10       years ago, possibly, but I don't know.  I don't
11       have -- I mean, it is -- I haven't done it for
12       so long.
13   Q    No.  I understand.  And I don't want to talk
14       about stuff that happened 100 years ago, because
15       that is not beneficial to this case.
16   A    True.  True.
17   Q    But let's talk about on May 22.
18   A    Okay.
19   Q    Did you at that time know what the normal
20       operating temperature below the squirrel cage
21       fan was?
22   A    Squirrel cage fan, no.
23   Q    And on the same date, May 22 of 2014, did you
24       know what the normal operating temperature was
25       above the squirrel cage fan?

71

1    A    No.
2    Q    And you said that the thermal imaging
3        photographs that you reviewed were taken on the
4        date of, on May 22, 2014; true?
5    A    True.
6    Q    If you did not know what the normal operating
7        temperature above and below the squirrel cage
8        fan was, what was the purpose of looking at the
9        thermal image photographs from that date?
10       MR. SENAK:  It has been asked and answered.
11       Go ahead and answer.
12   A    To see the difference.
13   Q    The difference of what?
14   A    Temperature.
15   Q    Okay.
16   A    But there is no specific degree that I can give.
17   Q    What was the difference in temperature?
18   A    The thermal imaging showed one area warmer than
19       another area.
20   Q    Was the area that was warmer within the normal
21       operating temperatures?
22   A    I don't recall the temperature that was on the
23       paper or the oven.  I just recall the imaging
24       showing excessive heat compared to lack of -- or
25       less heat.

72

1    Q    But what you said, the excessive heat, the
2        differential --
3    A    It is not excessive.
4    Q    Then what?
5    A    That's not what I mean.  The difference, the
6        difference in temperature is what the thermal
7        imaging showed.
8    Q    But were those temperature differences shown by
9        the thermal image photographs --
10   A    I don't recall.
11   Q    -- within the normal operating temperatures?
12   A    I don't recall what the temperature was on the
13       image.
14   Q    So you cannot say whether or not that thermal
15       imaging shows any deviation from the normal
16       operating temperatures; true?
17   A    True.
18   Q    The thermal imaging photographs that you
19       reviewed, did you take those?
20   A    I did not.
21   Q    Have you ever been trained as to how to take a
22       thermal imaging photograph?
23   A    I have not.
24   Q    Have you ever handled a thermal imaging camera?
25   A    No.



73

1  Q  Is a thermal imaging camera used within the job
2     function of a machinist millwright?
3  A  No.
4  Q  Were you in the area when those thermal imaging
5     photographs were taken?
6  A  Not a specific time that they were taken.
7  Q  Were you in the area at any time when thermal
8     image photographs were being taken?
9  A  Not to my knowledge.
10 Q  Do you know who took the thermal imaging
11    photographs on the evening of May 22, 2014?
12 A  I do not know who, because I wasn't there.
13 Q  So because you were not there, you didn't
14    participate in the decision-making process to
15    determine what was photographed and what was not
16    photographed; true?
17 A  True.
18 Q  Before your meeting to prepare for this
19    deposition, had you ever reviewed the thermal
20    image photographs?
21 A  No, sir.
22 Q  So that was the one and only time that you
23    reviewed the photographs; true?
24 A  Correct.
25 Q  And because you had no knowledge as to the

74

1     normal operating temperatures, did those thermal
2     imaged photographs mean anything to you?
3  A  No.
4  Q  Do you know at what time those thermal-imaged
5     photographs were taken?
6  A  No idea.
7  Q  Do you know who was in the area when the thermal
8     image photographs were taken?
9  A  I can only assume.
10 Q  And what is that assumption?
11 A  ETs.
12    MR. MILLER:  We have been going about two
13 hours.  Let's take a little break.
14    (A recess was taken between 11:58 a.m. to
15    1:10 p.m.)
16    BY MR. MILLER:
17 Q  Wes, we are back on the record.  Same oath that
18    you took before the break.  Okay?
19 A  Yes.
20 Q  Were you at the factory when the fire actually
21    began?
22 A  I believe so.
23 Q  And why do you believe so?
24 A  There was smoldering coming out of the blower.
25    They paged millwrights.  I was actually in the

75

1     break room.  It is an IBO, it is an oven, so not
2     uncommon for it to smell kind of hot.  People,
3     people said it smells hot, something don't seem
4     right.  We didn't get too crazy about it.  We
5     are just like, so.
6  Q  Do you recall what people said that?
7  A  The ETs, the ETs that were there, maybe
8     maintainers.  They could smell paint or
9     something burning.
10 Q  Do you recall what maintainer provided you with
11    that information?
12 A  I do not.
13 Q  Do you recall what ET provided you with that
14    information?
15 A  Pellegrini, Bob Pellegrini was there when I had
16    got there.  And when I asked him what was going
17    on, he says, you know, I am not sure, there
18    might be something going on in the blower.  And
19    you could see smoldering smoke coming out of the
20    pitot, pitot tube hole.  I call it a pitot
21    hole.  It is a hole in the pipe where you --
22    part of the PM was to check air flow.
23 Q  But Bob Pellegrini is a machinist millwright;
24    true?
25 A  Wrong.  He's an ET.

76

1  Q  He is an ET?
2  A  Uh-huh.
3  Q  So were there any other ETs other than
4     Bob Pellegrini who identified that there was
5     some problem?
6  A  Justin Stout.
7  Q  Anyone else?
8  A  Probably Mike Rogers, which was the supervisor
9     in charge that night.  I think he was there.  I
10    believe all three of them were there when I got
11    there.
12 Q  And how many machinist millwrights were working
13    that evening?
14 A  Two.
15 Q  And who were those?
16 A  Randy Crume and me.
17 Q  And you were in the break room when you were
18    paged?
19 A  Yes.
20 Q  And were you paged specifically or just by your
21    employment classification?
22 A  Employment.
23 Q  So they just had millwrights?
24 A  Millwright 2, IBO #2.
25 Q  So since you were in the break room, were you



77

1  with Randy Crume at that time?
2  A  I think Randy was with me.
3  Q  So you think both of you were on break at that
4     time in the break room?
5  A  If I were to guess, I would say yes.
6  Q  And do you have a recollection of you and Randy
7     walking from the break room to the IBO #2 --
8  A  Yes.
9  Q  -- together?
10  A  Within seconds.
11  Q  When you were paged, was any information
12     provided to you other than millwrights to
13     IBO #2?
14  A  Not over the PA system.
15  Q  So you received no information indicating that
16     there was concern regarding a fire; true?
17  A  Not over the PA system, that's true.
18  Q  So when you were walking from the break room to
19     IBO #2, you had no knowledge as to whether it
20     was a time-sensitive matter or not time
21     sensitive; true?
22  A  That's correct.
23  Q  Did you run from the break room to IBO #2?
24  A  I don't run nowhere.
25  Q  So you walked from the break room to IBO #2?

78

1  A  There was no -- running is not something we are
2     allowed to do.
3  Q  But there was no urgency conveyed to you?
4  A  No.
5  Q  Correct?
6  A  Correct.
7  Q  How long did it take you to get from the break
8     room to IBO #2?
9  A  Twenty seconds, 15, 20 seconds.
10  Q  And when you arrived at IBO #2, identify the
11     individuals that were already there.
12  A  Pellegrini, Justin Stout, and I think Rogers was
13     there.
14  Q  Anyone else?
15  A  Randy Crume was with me.  Or he was either ahead
16     of me, behind me.  We came at the same time, I
17     think.
18  Q  And of the five people that you identified,
19     three of them are ETs and two of them are
20     machinist millwrights; true?
21  A  Two ETs and two machinist millwrights, one
22     supervisor.
23  Q  Oh, I'm sorry.  And that was Mike Rogers; right?
24  A  Yes.
25  Q  Was there a maintainer that was in that area?

79

1  A  Before I got to the area, I think, because
2     somebody told me that they smelled something hot
3     back there in the passing, but I will never be
4     able to specify who that is.
5  Q  Okay.  So as you were walking from the break
6     room to IBO #2 but before you had arrived --
7  A  Correct.
8  Q  -- somebody passed you and stated they smelled
9     something hot there?
10  A  Yeah.
11  Q  But you don't know who that individual was?
12  A  No idea.
13  Q  Okay.
14  A  It is just a -- it has been so long, but --
15  Q  A vague recollection?
16  A  Yeah.  I feel that's how I knew a little bit
17     about what was going on before I got there.
18  Q  So before you arrived, you knew that something
19     smelled hot?
20  A  Yeah.
21  Q  But nothing more?
22  A  Correct.
23  Q  Earlier you testified that it took you
24     approximately 20 seconds to walk from the break
25     room to the IBO.  Do you remember that

80

1     testimony?
2  A  Yes.
3  Q  Where in the space of that 20-second block did
4     this individual pass you to tell you that they
5     had smelled something hot?
6  A  I was almost -- almost there.
7  Q  So you were just on the edge of the IBO when you
8     acquired this knowledge; true?
9  A  The discharge end, as I come around the
10     discharge end, one of the maintainers specified
11     that he thinks something don't smell right.
12  Q  So when you arrived there, the only individuals
13     in proximity to the oven were the two ETs, the
14     supervisor, Mike Rogers, and you and Randy
15     Crume, both of which are millwrights; true?
16  A  To the best of my knowledge.
17  Q  So there was no production people around at that
18     point in time?
19  A  Not to my knowledge.
20  Q  When you arrived, was IBO #2 still processing
21     beverage cans?
22  A  I knew the IBO was running.  I do not recall if
23     it was cans coming through or if they had
24     stopped or if they had stopped the in-feed of
25     the product.

81

1  Q   So, as we sit here today, you have no
2     recollection as to whether or not product was
3     moving through the oven when you arrived?
4  A   To me, at that time it was irrelevant, whether
5     those were coming through or not.
6  Q   No, I understand.
7  A   I mean --
8  Q   I just want to make sure that --
9  A   Yeah, I don't know.
10 Q   So you do know, though, that the oven was still
11    on?
12 A   Absolutely.
13 Q   But what you don't know is whether beverage cans
14    were moving through it; true?
15 A   Correct.
16 Q   So both the burners and all fans were
17    operational when you arrived?
18 A   Correct.
19 Q   In order to turn off either the burners or the
20    fans, who makes that decision?
21 A   ETs and supervisor.
22 Q   Okay.
23 A   We discussed it.  I am not sure whether the
24    supervisor or the ET suggested it.  But our
25    thought process was that if we shut the air off

82

1     to it, it might help.  Because with a blower
2     running, you automatically think that you're
3     feeding air to a flame.  So that's why I think
4     we all kind of talked about it and decided that
5     we would shut the blower off.
6  Q   The blower shut off before the burners were shut
7     off?
8  A   I don't recall if the burners were shut off
9     before or -- even with that, Bob Pellegrini
10    would shut them off.  If they were shut off,
11    Bob Pellegrini would have been the one to shut
12    them off.
13 Q   That would fit within his job?
14 A   Or Justin Stout, I'm sorry.
15 Q   That would fit within the job classification of
16    an ET; true?
17 A   Correct.
18 Q   But you don't know when either the decision was
19    made or the action was taken in relation to when
20    you arrived; true?
21 A   Short-term.  A minute or two.  I mean, there was
22    a heat gun involved.  They were checking
23    temperatures of the pipes, of the ductwork.
24 Q   But those temperatures didn't mean anything to
25    you; true?

83

1  A   No.  All I knew is Pellegrini checked that one
2     and IBO 1, I believe, I can't tell you which IBO
3     he went to.  I know he came back.  And I
4     specifically remember him saying I just checked
5     that one, now I don't know which one it is, but
6     he said they are not that far apart.  The
7     temperatures aren't that much different, I
8     remember that.
9  Q   So within a minute or two of your arrival, the
10    decision was made to shut off the fans?
11 A   Shut that blower off.  I don't know if all of
12    them or just that one.  I thought it was just
13    that one.
14 Q   And that was made within a minute or two of your
15    arrival?
16 A   Yes.
17 Q   And that decision would have been made by either
18    Mr. Pellegrini or Mr. Stout; true?
19 A   And Mike Rogers.
20 Q   And Mike Rogers?
21 A   Yeah.
22 Q   When you arrived, did you see any smoke?
23 A   Yes.
24 Q   When did you first see smoke?
25 A   As soon as I walked up there.

84

1  Q   How would you describe the smoke, heavy or
2     light?
3  A   I wasn't really concerned about it.  I mean, I
4     was like, yeah, I mean, they just cleaned it
5     today, so it can smell different, you know.  I
6     figured, I thought that as soon as they clean
7     it, they would expose metal, so now it is
8     freshly started, the smell was going to be
9     natural.  So a little bit of smolder here and
10    there might not be a big deal.
11 Q   Was that typical when ovens had been cleaned,
12    that there would be that smoldering or smell?
13        MR. SENAK:  Object to foundation.
14 A   In my mind, I just assumed that it would be.
15 Q   How did you know that the oven had been cleaned
16    that day?
17 A   Because we had a maintenance, and I have no idea
18    how I knew.
19 Q   I think when I got there, when I got there, they
20    stated that he just cleaned it.
21 A   
22 Q   When your shift started or --
23 A   Yes.
24 Q   -- or when you arrived?
25 A   No.  When my shift started.



85

1  Q  So we are not talking about when you arrived at
2     the IBO #2?
3  A  No.
4  Q  When you arrived at the IBO #2, was that your
5     first time that shift to be around that piece of
6     machinery?
7  A  Yes.
8  Q  And so let me go back to asking you how would
9     you describe the smoke.  Was it heavy or was it
10    light?
11 A  I am going to say light.
12 Q  And that smoke, did you see the source of the
13    smoke?
14 A  No.
15 Q  You didn't know where the smoke was coming from?
16 A  Through the hole in the ductwork.
17 Q  And is that hole above the squirrel cage fan or
18    below?
19 A  To the right of it.  It has all changed since
20    then.  Squirrel cage fan is here, ductwork went
21    this way, and the hole is right here with the
22    smoke coming out of it.
23 Q  Okay.
24 A  Not far from the blower, but just to the west of
25    the blower.

86

1  Q  But was that hole between the oven and the
2     squirrel cage fan or after the squirrel cage
3     fan?
4  A  Before.
5  Q  Okay.
6  A  Before.
7  Q  And you saw light smoke coming from that?
8  A  Uh-huh.  I am trying to remember this.  It has
9     been a long time.
10 Q  No, I understand.  Do you know how long the oven
11    had been in operation after the cleaning but
12    before you were called?
13 A  I don't know when they started it.
14 Q  To your knowledge, were there any issues with
15    the operation of the oven after the cleaning but
16    before the fire?
17 A  Not to my knowledge.
18 Q  To your knowledge, were there any issues with
19    that oven prior to the cleaning?
20 A  No.
21 Q  Do you know what area of the oven was cleaned by
22    Air Tech?
23 A  No idea.
24 Q  Do you know the operating schedule of that IBO?
25 A  Define operating schedule.

87

1  Q  Let me break it down.  Does the oven operate 24
2     hours a day?
3  A  Yes.
4  Q  Does the oven operate seven days a week?
5  A  Yes.
6  Q  So the only time in a calendar year when that
7     oven is shut down is when it is shut down for
8     cleaning or maintenance?
9  A  Correct.
10 Q  So other than any cleaning or maintenance shut
11    down, that IBO is processing cans 24 hours a
12    day, 7 days a week; true?
13 A  Christmas and -- or Christmas and Thanksgiving.
14 Q  Are there any other holidays other than
15    Christmas or Thanksgiving?
16 A  Not since I have been here.
17 Q  And that's Christmas Day, the 25th?
18 A  This year, before we used to get two days,
19    Christmas Eve Day and Christmas Day.  So we shut
20    down two days for Christmas and I believe two
21    days for Thanksgiving.
22 Q  But now you're down to shutting down just one
23    day?
24 A  Depending on our supply and demand.  I mean,
25    depending on if we need cans or not.

88

1  Q  Are maintenance or cleaning scheduled for those
2     two holiday shutdown periods?
3  A  Usually not.
4  Q  So the only shutdowns of IBO #2 in a calendar
5     year would be Christmas, Thanksgiving, and
6     whatever cleanings or maintenances are
7     scheduled?
8  A  Correct.
9  Q  Does the maintenance schedule align with the
10    cleaning schedules?
11 A  Yes.
12 Q  So the machine is shut down in short of a time
13    as possible; true?
14 A  Correct.
15 Q  And do you know how many times a year it is
16    cleaned?
17 A  I do not.
18 Q  Do you have any knowledge as to how long
19    Air Tech had been cleaning that oven?
20 A  No idea.
21 Q  Do you know who currently cleans it?
22 A  No idea.
23 Q  In the 30 days prior to the fire, had there been
24    any operational problems with the IBO #2?
25 A  Not to my knowledge.

**89**

1  Q  In the 30 days prior to the fire, had there been
2     any operational problems with any components of
3     IBO #2?
4  A  Not that I can remember.
5  Q  In the 30 days prior to the fire, had there
6     been any issues with the ductwork emanating from
7     IBO #2?
8  A  Not that I know of.
9  Q  In the 30 days prior to the fire, had you
10    performed any preventative maintenance on
11    IBO #2?
12  A  I don't think so.
13  Q  In the 30 days prior to the fire, had you done
14    anything to IBO #2?
15  A  Not that I remember.
16  Q  Do you have any recollection of even being
17    around IBO #2 in the 30 days prior to the fire?
18  A  Other than walking past it. I mean, it has been
19    a long time, a long time ago. Nobody told me to
20    take notes. And I'm not being a smartass. I am
21    just saying I just didn't.
22  Q  No, no, I understand.
23  A  Nothing, nothing out of the ordinary that we
24    done.
25  Q  No, I understand.

**90**

1  A  Other than just walking by it or, I mean, I have
2     been around it.
3        I'm afraid the next question you're going
4     to ask me is if I do anything. It sounds like
5     that's where you were going.
6  Q  No, sir.
7  A  Okay.
8  Q  And let me just back up and give you some
9     context. You are right, I am asking you some
10    very, very specific questions.
11  A  Right.
12  Q  And the purpose of that is I want to test what
13    your memory is so that I know.
14  A  Okay.
15  Q  So when we arrive at a jury trial and you are
16    sitting in the witness stand you don't testify
17    as to very detailed, specific memories.
18  A  Okay. I see. I get it.
19  Q  Okay?
20  A  Okay.
21  Q  Do you know whether there had been any repairs
22    performed at the IBO or any of its component
23    parts in the time frame leading up to the fire?
24  A  I don't.
25  Q  And any of those repairs would have been handled

**91**

1     by a machinist millwright; true?
2  A  Not so much. It could have been ETs, if there
3     were any. It could have been ETs. I mean, ETs
4     or machinist millwrights.
5  Q  Because I think you testified earlier that the
6     machinist millwrights would have been involved
7     in the mat tracking issues in any repair of
8     bearings?
9  A  Right.
10  Q  Replacement of belts; true?
11  A  Correct.
12  Q  Or on those occasions where a mat rod would need
13    repaired; correct?
14  A  Yeah.
15  Q  But as to any of the burners and that component,
16    that would be the ETs; true?
17  A  Absolutely.
18  Q  But you don't have any knowledge of any repairs
19    being performed by millwrights on IBO #2 in the
20    30 days prior to the fire?
21  A  No, sir.
22  Q  Do you have any knowledge of when the oven was
23    cleaned prior to May 22 of '14?
24  A  No, sir. No idea.
25  Q  And, as we sit here today, you don't recall

**92**

1     doing any maintenance -- strike that.
2        As we sit here today, you don't recall your
3     department, the machinist millwrights, as
4     performing any maintenance or preventative
5     maintenance on IBO #2 when it was shut down that
6     day for cleaning?
7  A  I do not. But I wouldn't have been involved
8     with it, because I wasn't scheduled to be there
9     till seven so, seven p.m.
10  Q  But as part of your shift change, you speak with
11    the individuals on day shift; true?
12  A  True.
13  Q  And they tell you what they did during their
14    shifts; true?
15  A  True.
16  Q  So you know whether there is any kind of
17    carryover work that you need to do on your
18    shift; true?
19  A  True.
20  Q  And, as we sit here today, you recall being told
21    nothing about the machinist millwrights being
22    involved with IBO #2 on May 22 of 2014; true?
23  A  That's correct.
24  Q  And, as we sit here today, you don't remember
25    the last time any preventative maintenance was

93

1    performed on IBO #2; true?
2  A  True.
3  Q  Do you have any knowledge of the accumulation of
4     materials in the oven that were being cleaned by
5     the outside contractor?
6  A  The outside.  I mean, other than just there is
7     buildup.  That's all I know.  As far as nothing
8     anything about it or how much there was or -- I
9     don't know anything about it.
10 Q  Yes.  You don't have any knowledge of the amount
11    of --
12 A  No.
13 Q  -- the buildup that was in the oven on May 22,
14    2014; true?
15 A  True.
16 Q  Do you know what that buildup is?
17 A  Specifically, no.
18 Q  Does your job require you to do anything because
19    of the buildup?
20 A  No.
21 Q  And you have no idea what Air Tech was supposed
22    to clean on May 22 of 2014; correct?
23 A  Correct.
24 Q  And you have no knowledge of what time the oven
25    was shut down for cleaning or turned back on for

94

1     production; true?
2  A  True.
3  Q  Do you have any knowledge of any inspections
4     that were performed on IBO #2 on May 22 by Ball
5     employees?
6  A  I do not.
7  Q  Have you had any conversations with any Ball
8     employees that were on site while Air Tech was
9     performing its cleaning job about that cleaning
10    job?
11 A  No, sir.
12 Q  Do you have any knowledge of the liquid that is
13    sprayed into the aluminum beverage cans before
14    those cans entered the IBO?
15 A  As far as the makeup, no.
16 Q  What does IBO stand for?
17 A  Internal bake oven.
18 Q  Do you understand what the purpose of the cans
19    going through the IBO is?
20 A  Yeah.
21 Q  What is that purpose?
22 A  To dry the spray that has just been installed in
23    the can.
24 Q  Do you know what is sprayed in the can?
25 A  I would have to say IC spray.  I don't actually

95

1     know what the Ball molecular structure is.  I
2     just know that it is IC spray.
3  Q  Okay.
4  A  Just a sealant that seals the product from the
5     can.
6  Q  But do you know like what the ignition point in
7     that is?
8  A  No, I do not.
9  Q  Do you know whether or not it is flammable?
10 A  I do not know.
11    MR. SENAK:  Can we take a short break?  I
12    just have to make a call.
13    MR. MILLER:  Yeah.  Sure.
14    (A recess was taken between 12:39 p.m. and
15    12:44 p.m.)
16    MR. MILLER:  What was my last question?
17    (The requested text was read back by the
18    reporter.)
19 Q  Do you have any knowledge of the procedures
20    Ball Manufacturing follows in preparation for
21    the IBO to be cleaned?
22 A  No.
23 Q  Do you have any knowledge of the Ball
24    Manufacturing employee who worked on IBO #2 line
25    in the 24 hours prior to the fire?

96

1  A  No.
2  Q  It is my understanding that as a byproduct of
3     the IC that is sprayed in the cans and then
4     baked or cured in the IBO oven that there is
5     accumulations that come off of that that collect
6     on the inside of the oven.  Is that your
7     understanding as well?
8  A  Yes.
9  Q  It is my understanding that occasionally those
10    accumulations are kind of a gooey consistency.
11    Does that meet with your knowledge or
12    recollection of the substance?
13 A  Yes.
14 Q  Do you know whether that gooey consistency
15    accumulated in the ductwork above the IBO #2?
16 A  I do not know.  I do not know.
17 Q  Did that gooey material collect on any component
18    parts that you were required to work on as a
19    machinist millwright?
20 A  No.
21 Q  Do you know the identity of the Ball
22    Manufacturing employee who was working on the
23    IBO #2 line at the time of the fire?
24 A  The question again.
25    MR. MILLER:  Could you read it back?

97

1        (The requested text was read back by the
2    reporter.)
3  A  That was working on or operating or the
4    maintainer or who was all there when I got
5    there.
6  Q  Okay.  Let me see if I can ask a better
7    question.
8  A  Yeah.
9  Q  Do you know who the operator of the IBO #2 was?
10 A  I do not.
11 Q  Do you know who the maintainer of the IBO #2
12    was?
13 A  I do not.
14 Q  Do you know the identity of any production
15    employee that would have been working on or
16    around IBO #2 prior to the fire?
17 A  I don't remember who was working -- who was
18    running the IBO.
19 Q  As a part of your job as a machinist millwright,
20    you're not working with production employees on
21    a routine basis; true?
22 A  True.
23 Q  Tell me what paperwork would your department,
24    the machinist millwrights, create when any
25    service or repair was done on an IBO?

98

1  A  We had a logbook.  We had a logbook that we used
2    to write, and that just wasn't IBOs, that was
3    anything, that we worked on to let the oncoming
4    shift, to communicate with the oncoming guys on
5    what we, you know, worked or had trouble with or
6    anything like that.
7  Q  I need for you to identify for me any documents,
8    paperwork, computer programs with data entry,
9    any written document or compilation of data that
10    you're aware of that would reflect maintenance
11    or repair or problems that had been identified
12    with an IBO?
13        MR. SENAK:  Could you read the question, if
14    you would?
15        (The requested text was read back by the
16    reporter.)
17        MR. SENAK:  Okay.  Go ahead and answer.
18 A  The air flow reports of the blower, the
19    ductworks.
20 Q  Okay.
21 A  The hole, which is where the smoke was coming
22    out of is -- I am going to call it a hole for
23    the pitot tube that we stick in there and check
24    the air flow for the meter.  And I know we used
25    to do it on Thursdays.  It is the first Thursday

99

1    of the month, second Thursday -- last Thursday,
2    last Thursday of the month, I believe.
3  Q  Okay.
4  A  And that's when we done checked air flows.  And
5    we had to do all the ovens, so in-feed and
6    discharge.  But other than -- I mean, the air
7    flow of the exhaust system is the only thing I
8    can -- because that was all documented.
9  Q  And the logbook?
10 A  Yeah, we had a logbook, but that wasn't specific
11    to IBO.  That was -- I mean, any repair in the
12    facility that we wanted to communicate with the
13    next oncoming shift, and they really, really
14    want us to communicate.  I mean, it was stressed
15    to make sure you fill out the logbook.  If you
16    do anything, fill out the logbook.  But that's
17    been awhile back.  We haven't had a logbook for
18    a long time.
19 Q  Did you have a logbook in 2014?
20 A  I can't answer that.
21 Q  Can you think of any other documentation that
22    would be created by your department?
23 A  I can't.
24 Q  So the only two documentations that your
25    department creates as a product of its work is

100

1    air flow reports and entries made in a logbook;
2    true?
3  A  True.
4  Q  Let's go back to an example you gave earlier
5    today.  Do you remember when you testified
6    that you had fabricated a pulley guard for the
7    IBO #2?
8  A  Yes, I do.
9  Q  And do you remember when you testified earlier
10    that you had to repair a mat shaft by doing some
11    welding and then grinding it down to fixing
12    imperfections?  Do you remember that?
13 A  I remember -- that was not specific to #2.
14    That's IBOs in general.
15 Q  Bad question on my part.  You had earlier
16    testified to fabricating a pulley guard for an
17    IBO.
18 A  Okay.  Correct.
19 Q  And you had earlier testified as to repairing a
20    mat shaft.  Do you remember that testimony?
21 A  Yep.  Yep.
22 Q  When you fabricated that pulley guard for an
23    IBO, did your department receive any type of
24    work ticket?
25 A  No.



101

1  Q  So the request that the machinist millwrights
2     received to fabricate a pulley guard was
3     verbally conveyed to it?
4  A  Yes.
5  Q  And no document would result from either the
6     request to perform the work or the fact that the
7     work was performed; true?
8  A  True.
9  Q  When you received the request to repair the mat
10    shaft, was that request verbal?
11 A  Yes.
12 Q  So no documentation would have resulted from
13    either the request made to perform the repair or
14    the fact that you had made the repair; true?
15 A  True.
16 Q  So absolutely the only documents that you can
17    recall creating for an IBO have been made on air
18    flow reports or on logbook entries; true?
19 A  For millwrights, yes.
20 Q  For millwrights?
21 A  Yes.
22 Q  So there is no documentation that's created for
23    any preventative maintenance that is made on an
24    IBO; true?
25 A  We have checklists.  There is a difference

102

1     between maintenance, actual maintenance and the
2     PM sheet.  The PM sheets, things we just check,
3     we go through and make sure everything is in
4     good working order.
5  Q  Okay.
6  A  So that PMs, you know, could be a document.  But
7     that doesn't necessarily mean we had to work on
8     them.
9  Q  I understand.  But that's why I specifically
10    referenced that to make sure --
11 A  Okay.  I'm trying to figure out what you were
12    asking, so.
13 Q  Because air flow reports don't indicate that you
14    need to do anything?
15 A  Absolutely.  Right.
16 Q  And check sheets or p.m. check sheets would be
17    the same type of issue; true?
18 A  Right.
19 Q  So I am just trying to make sure, sir, that I
20    understand the full range of documents that your
21    department would create that could have some
22    relation to the IBO.
23 A  Okay.
24 Q  That's what I am trying to dig down at.
25 A  Okay.

103

1  Q  So we got air flow reports, logbooks and PM
2     check sheets; true?
3  A  True.
4  Q  Is there any other document or data compilation,
5     even if it is just on computer as opposed to
6     paper, is there anything that you can think of
7     that would record any activity taken by your
8     department with respect to an IBO?
9  A  Not to my knowledge, no.
10 Q  Same question but with respect to the ductwork,
11    is there any documents or data compilations
12    created by the machinist millwright department
13    that would reflect information regarding the
14    ductwork of the plant?
15 A  No.
16 Q  Are you aware of Ball Manufacturing ever being
17    critical of the work that Air Tech performed?
18 A  Not to my knowledge.
19 Q  Are you familiar with an individual by the name
20    of Paul Scholten?
21 A  I know who he is.  I know what he looks like.
22 Q  And how do you know Paul Scholten?
23 A  I don't know -- I mean, I just know who that is.
24    If he walked by me today, I probably wouldn't
25    recognize him.

104

1  Q  But you had heard the name Paul Scholten
2     previously; true?
3  A  True.  Paul, Paul is all I have heard.  I just
4     knew that guy's name was Paul, so.
5  Q  And in what context would that guy Paul have
6     been pointed out to you?
7  A  I knew he was the manager, supervisor of the
8     cleaning crew.  That's all I knew.  I mean, I
9     don't know that I ever talked to the man, so.
10 Q  Okay.
11 A  I just knew who he was.
12 Q  But why would that information have been
13    provided to you?
14 A  It is general knowledge.  I mean, he
15    was -- anytime I was on days, the cleaning crew,
16    Air Tech would say, was there.  He seemed to be
17    the one that was in charge, let's put it that
18    way.
19       To me, he seemed to be the one that was in
20    charge of the group of people cleaning the IBO.
21 Q  So he seemed to be in charge of the Air Tech
22    employees that were doing the manual work; true?
23 A  Yep.  True.
24 Q  I guess what I am trying to understand is, as a
25    machinist millwright, did you have any



105

1   Q   involvement with Paul Scholten or the employees
2       as they were working?
3   A   I have not ever.
4   Q   Because earlier you testified that you would
5       remove the doors and rehang the doors at the
6       request of a Ball employee.  Do you recall that
7       testimony?
8   A   Yep.
9   Q   What I am trying to find out now is did
10      Paul Scholten or any other Air Tech employees
11      make requests of you that you then performed
12      tasks?
13  A   Not to me.
14  Q   Dale Spencer, do you recall that name?
15  A   Yes.
16  Q   What position did Dale have here at Ball?
17  A   Production supervisor, I believe.
18  Q   And my recollection of your earlier testimony
19      was that when the maintenance supervisor is not
20      on site that you, as a machinist millwright, is
21      supervised by the production supervisor; true?
22  A   Timeout.  That is not what I meant to say.
23      MR. SENAK:  Okay.  Well --
24      He's not a production supervisor, production
25      manager, sorry.

106

1   Q   Dale Spencer?
2   A   Yeah.
3   Q   Okay.
4   A   Supervisors were below Dale.  Production
5       supervisor was Mike Rogers.  That's production
6       supervisor.
7           I just want to make clear that I said
8       production supervisor and he was actually the
9       production manager.
10  Q   That's fantastic.  Thank you for that
11      clarification.
12  A   Okay.
13  Q   In that role as production manager, did the
14      production manager have any supervisory role or
15      responsibility for you as a machinist
16      millwright?
17  A   Can you say it again?
18  Q   Yeah.  And maybe this will be helpful.  Earlier
19      you testified that the machinist millwrights are
20      supervised by the maintenance supervisor;
21      correct?
22  A   Correct.
23  Q   But the maintenance supervisor is a daytime
24      position; correct?
25  A   True.

107

1   Q   And machinist millwrights all work 24 hours a
2       day so there is a night crew; correct?
3   A   Correct.
4   Q   You just held up two fingers indicating that
5       there's two?
6   A   There is two of us.
7   Q   Two of you on the night shift?
8   A   Correct.
9   Q   And earlier you testified that those night shift
10      machinist millwrights are supervised by a
11      production supervisor; correct?
12  A   Correct.
13  Q   And right now you testified that Dale Spencer
14      was a production manager; correct?
15  A   Correct.  Yes.
16  Q   So when the machinist millwrights are working
17      and their normal supervisor is not on premises,
18      is the only supervisor that they have the
19      production supervisor?
20  A   Production supervisor is the only member of
21      management that's here all night.
22  Q   So Dale Spencer, in his role as production
23      manager, isn't going to be on site at night?
24  A   No.  But they talk.  So phone calls, they -- I
25      mean, the production supervisor would have been

108

1       in contact with the production manager by phone.
2   Q   Okay.
3   A   The supervisor was the only one that done a
4       12-hour shift on nights.
5   Q   You need to take a break?
6   A   Restroom.
7   Q   Absolutely.
8   A   Thanks.
9       (A recess was taken between 1:05 p.m. and
10      1:08 p.m.)
11      MR. MILLER:  Back on record.
12      BY MR. MILLER:
13  Q   Do you have any knowledge of procedures that are
14      in place post-cleaning but before the oven
15      returns to production?
16  A   Flypaper.
17  Q   When you say "flypaper," what do you mean, sir?
18  A   They run the -- I don't know exactly the
19      procedure.  They run the oven, the blowers.  I
20      think the oven is on and they coat chipboard,
21      chipboard with IC spray and run it through the
22      oven.  So any debris that was blowing around
23      from cleaning sticks to the paper.  And they do
24      that for a specific amount of time to collect
25      all the dust that's in the oven.

109

1  Q   And how do you know of that procedure?
2  A   I have seen them do it.
3  Q   Do machinist millwrights have any involvement in
4     that --
5  A   No.
6  Q   -- post-cleaning/pre-production procedure that
7     Ball employees follow?
8  A   No.  That would be the maintainers.  Primarily
9     maintainers would take care of that.
10 Q   So your knowledge of that is simply visually
11    seeing it?
12 A   Correct.
13 Q   And is that similar to your knowledge of the
14    cleaning process that you would gather by
15    walking past the IBO or occasionally standing
16    for a ten-second period of time and witnessing
17    it?
18 A   That's the fact.
19 Q   Do you know whether that procedure was followed
20    on May 22, 2014?
21 A   I do not.
22 Q   Do you know whether any inspections are made of
23    those sheets that are run through to determine
24    whether or not --
25 A   Specifically, I don't, but I know they run --

110

1     but I believe they run them through, they run
2     them through until their clean ones come
3     through.  So as far as the specific amount, I
4     can't give that.  I don't know.
5  Q   Okay.
6  A   Obviously if there were still particles on the
7     sheets of cardboard they would keep doing it
8     until it was all collected and ran out.
9  Q   And who controls that procedure?  Who has that
10    final call?
11 A   Oh, I am going to say production manager.
12 Q   And that would have been Dale Spencer?
13 A   I think he was there.  He was here at that time.
14    I believe so, yes.
15 Q   So it would have been Dale Spencer who approved
16    the IBO to be put back in production service on
17    May 22, 2014, to the best of your knowledge?
18 A   Yes.  To the best of my knowledge, if he was
19    here, yes, it would have been him.
20 Q   Other than running those lacquered covered
21    sheets through the oven, are you aware of any
22    other actions Ball Manufacturing does to assure
23    itself that the IBO was appropriately cleaned
24    and ready to be put back in service?
25 A   There are oven curves that the ETs perform, but

111

1     I don't know when they do that.  I don't know
2     have any information about that.
3  Q   Do you have any knowledge of that procedure?
4  A   There is an imitation clump of cans with a bunch
5     of sensors that they run through, and it tells
6     different temperatures at different stages in
7     the oven.
8  Q   Okay.
9  A   I don't know any details, no numbers, no
10    temperatures, no nothing.  I just know that they
11    do that.  I don't even -- I am not even sure
12    when or why.  I think that's a check that the
13    ETs have to do.  I don't know if they do it
14    before they start up after a cleaning or -- I
15    don't know.
16    I have heard them, we work with ETs, and I
17    have heard them talk about having to run an oven
18    curve.  And just by talking with them I kind of
19    know what it is about.
20 Q   But you don't have any knowledge of the
21    procedure other than it's one of their job
22    responsibilities; true?
23 A   Correct.
24 Q   And does your knowledge of the equipment that
25    they use in the process consist, again, of you

112

1     kind of walking past the machine while it is
2     being performed?
3  A   I have seen them do it.  Yeah, I've seen them,
4     yeah.
5  Q   But it is the same thing, where you're just
6     walking past and casually stop for ten seconds?
7  A   Correct.  I don't have nothing to do with
8     running it through.
9  Q   Do you know whether Ball employs any quality
10    control inspectors?
11 A   Do we have any?
12 Q   Yes, sir.
13 A   Yes.
14 Q   To your knowledge, do the quality control
15    inspectors have a role in the
16    post-cleaning/pre-production inspection process
17    that Ball employees perform?
18 A   To my knowledge, if there was imperfections on
19    the inside of the can, they would have something
20    to say about it.
21 Q   But do you know whether Ball employed quality
22    control inspectors were actually involved in the
23    post-cleaning/pre-production procedures that
24    were used?
25 A   No, I don't.

113

1  Q  Have you ever discussed anything about the
2     May 22, 2014 cleaning or the May 23, 2014 fire
3     with an individual by the name of Scott Howell?
4  A  I have never heard of that name before.
5  Q  Have you ever had any discussion about the
6     cleaning or the fire with an individual by the
7     name of Otto Soyk, S-O-Y-K?
8  A  No.
9  Q  Have you ever been interviewed by any fire
10    investigators?
11 A  No.
12 Q  Have you ever been interviewed by anybody to
13    discuss the fire?
14 A  No.  They asked me to write the, whatever you
15    call it, my report --
16 Q  A statement?
17 A  -- report statement of what I witnessed.  Other
18    than that, that's all I heard.
19 Q  And you used the pronoun "they," can you
20    identify the individuals that asked you to make
21    that report?
22 A  I'm not sure if it was Freddy Spencer or Paula,
23    Chris Czarkowski, I'm not sure.
24 Q  Paula, who's Paula?
25 A  Paula Tennis.

114

1  Q  What role does Paula Tennis have?
2  A  HR manager.
3  Q  Okay.
4  A  And I don't recall who actually asked us to fill out
5     the statement.
6  Q  But you think it would have been either
7     Paula Thoennes or Chris Czarkowski?
8  A  Czarkowski.
9  Q  Or who else?
10 A  Freddy Spencer.
11 Q  Or Freddy Spencer.  Okay.  Now not to put too
12    fine a point on it, but earlier you used the
13    pronoun "they," which is a plural pronoun.
14 A  Uh-huh.
15 Q  Was it one individual or multiple individuals
16    that asked you to write this statement?
17 A  I have no idea.
18 Q  And you don't recall specifically who it was of
19    the three and whether it was more than one;
20    true?
21 A  I know that we did not just go write testimony,
22    a statement on our own.
23 Q  No, you were requested to do it; true?
24 A  Yes.  That's all I know.  I can't recall who it
25    was.  I mean, at that time it wasn't important,

115

1     so I forgot it, so.
2  Q  And the statement that you wrote, was it your
3     handwriting or --
4  A  Yes.
5  Q  Did you ever take that statement and type that
6     statement into a computer?
7  A  I did not.
8  Q  Have you ever created a typewritten draft of
9     that statement?
10 A  Not to my knowledge.
11 Q  The request to make that statement, was it made
12    by a Ball employee?
13 A  Yes.
14 Q  So you have never been asked to make a statement
15    by a non-Ball employee; true?
16 A  True.
17 Q  And you never met or had a telephone call or
18    exchanged any kind of text messages or e-mails
19    with any fire investigators?
20 A  Nope.
21 Q  Do you have any knowledge of what Ball or its
22    insurance company is claiming in this lawsuit?
23 A  Nope.  No, sir.
24 Q  Can you identify anything that Air Tech did
25    wrong on May 22 of 2014?

116

1     MR. SENAK:  Object to foundation.
2  A  I cannot.  Personally, I cannot.
3  Q  Do you have any knowledge of where the fire
4     originated?
5  A  The embers that I saw through the hole was by
6     the blower.  So all I can do is -- I couldn't
7     actually get in the pipe.  You know, I mean, I
8     couldn't see what was going on in there.
9  Q  But you saw embers?
10 A  The first thing that happened we seen smoke.  We
11    got up there, I saw embers going by, and then we
12    shut the blower off.  Temperature rose really,
13    really fast, because Pellegrini had said, no, it
14    is not much different than the other one.  And
15    we shut the blower off, and all of a sudden it
16    just went crazy.  The temperature just escalated
17    fast.
18 Q  So shutting the blower off was a bad idea?
19 A  We all thought about it and we thought, well, we
20    talked about it, putting air to a fire is not a
21    good thing, so let's shut the blowers off.  And
22    as soon as we shut the blowers off, the blower
23    turned orange.
24 Q  Okay.
25 A  The blower itself was glowing orange.



117

1  Q  So it appears, based upon that, that turning off
2     the blower was a poor decision; true?
3        MR. SENAK:  Object to foundation.  Go ahead
4     and answer.
5  A  It was the decision that fire loves oxygen, so
6     it has to have oxygen to burn.  So if we limit
7     the supply of oxygen, it could possibly rebound
8     the temperature, you know, going crazy.
9  Q  No, I understand.  I understand the basis of the
10    decision.
11       But in practice, it made the situation
12    worse, to turn off the blower; true?
13       MR. SENAK:  Object to foundation.
14  A  It allowed the fire to get worse.
15  Q  By turning off the blowers?
16  A  It allowed us to -- yes.  Yes, it got worse when
17    we shut the blowers off, correct.
18  Q  And I think earlier you testified that the
19    blowers were shut off within a short span of
20    time of your arrival; true?
21  A  True.
22  Q  And that decision was made by the ET and/or
23    their supervisor, Mike Rogers; true?
24  A  Uh-huh.  Yes.
25  Q  And the decision to turn off the blowers, that

118

1     was made when you were still standing on the
2     ground; correct?
3  A  Yes.
4  Q  And it was only after the burners or the blowers
5     were turned off before you and Randy Crume got
6     on the scissor lift and went up; true?
7  A  Correct.
8  Q  So by the time that you were on the scissor lift
9     eye level with the fan, the blowers weren't on
10    at that point in time; true?
11  A  That blower was turned off.
12  Q  That blower was turned off?
13  A  Uh-huh.
14  Q  And you saw red embers traveling past you as
15    you're looking in that --
16  A  The little -- it is not very big.
17  Q  That little porthole?
18  A  It's your finger size.  I mean, it is maybe a
19    half-inch hole.  I mean, if I remember
20    correctly, it is not very big.  So, I mean,
21    other than just going up in there and looking in
22    and seeing what we could see, we saw sparks and
23    embers screaming by and Pellegrini is yelling
24    that the temperature is going up, the
25    temperature -- I mean, it is getting hotter, it

119

1     is getting hotter.
2  Q  And all the while the fan was off; true?
3  A  (Witness nods head up and down.)  Yeah.
4  Q  Did anyone try and turn the fan on to see if
5     they could cool it down?
6  A  In a matter of seconds, it went from -- I don't
7     want to give you a temperature, because I don't
8     really know.  I just remember -- I remember Bob
9     having a temperature gauge on it, a thermal
10    imaging gun or a temperature laser, I don't
11    remember which one it was, but he was saying how
12    hot it was getting.
13       So that's when we decided to hurry up, jump
14    up there and see what we could see.  By the time
15    we get the lift situated and up there where we
16    can see in the hole, more smoke, and obviously
17    it is getting ugly, so.  And then when we look
18    over the -- we had a hand fire extinguisher, and
19    I stuck the fire extinguisher over that hole and
20    hit the button.  And when I done that, instantly
21    that blower turned a glowing orange.  So at that
22    point we are fighting a losing battle now.
23  Q  Okay.
24  A  So there wasn't much else we could do, because
25    it was all enclosed, so, I mean, we couldn't get

120

1     to it.
2  Q  So, as I understand your testimony today, you
3     were in the break room, you were summoned to
4     IBO #2, it took you 20 seconds to walk over
5     there.  As you're approaching getting ready to
6     turn the corner, an individual tells you it
7     smells hot?
8  A  (Witness nods head up and down.)
9  Q  Then you arrive and you're speaking with the two
10    ETs and Mike Rogers, you're there for a minute,
11    maybe two, there's light smoke, it didn't seem
12    that critical of a situation to you, and you
13    thought it was just kind of a normal kind of
14    issue due to the cleaning; correct?
15  A  Correct.
16  Q  And then Mike Rogers made the decision to turn
17    off the blower?
18  A  We discussed it.  And Mike Rogers being in
19    charge, I assume he was the one that specified
20    that we were going to shut it off, so.
21  Q  And after that decision was made to shut off the
22    blower, things rapidly escalated?
23  A  Yeah.
24  Q  Only then did you see the red embers and then
25    the fans started going red and things got out of



121

1    control; true?
2        MR. SENAK: Object to form and foundation.
3    A   True.
4    Q   So everything was fine and then the decision was
5        made to turn off the fan and everything then
6        just got horrible and out of control; true?
7        MR. SENAK: Object to form and foundation.
8        Misstates his statement?
9    A   Uh-huh.
10   Q   Is that true, sir?
11   A   True.
12   Q   Did I misstate your testimony?
13       MR. SENAK: Same objections.
14   Q   You can answer.
15   A   No.
16   Q   Do you have any training in fire? Like do you
17       have any training in firefighting?
18   A   No.
19   Q   Has anyone shared with you an opinion as to what
20       caused the May 23, 2014 fire?
21       MR. SENAK: You can answer the question to
22       the extent that it doesn't involve anything I
23       told you.
24   A   Yeah. Nobody has specified what caused it.
25   Q   Did you look inside the oven after Air Tech

122

1        completed its work?
2    A   It was running when I got there, so no.
3    Q   Do you have any opinion as to what caused the
4        fire?
5    A   I have assumptions.
6    Q   And what is that assumption?
7    A   Something inside the blower caught on fire.
8        What it was, I have no clue. Whether it was the
9        gunk or foreign object, I have no idea. I just
10       know that that right there is where it got the
11       hottest the fastest, only because it turned
12       orange.
13       MR. MILLER: Can I get that marked, please?
14       (Krintz Deposition Exhibit 1 was marked for
15       identification.)
16   Q   Mr. Krintz, Wes, I have handed you a two-page
17       document. It is marked as Krintz 1. The first
18       page is typewritten, the second page is
19       handwritten. You may be more familiar with the
20       second page, as you testified earlier.
21       Do you see that?
22   A   Yeah.
23   Q   Is the second page your handwritten statement?
24   A   Yes.
25   Q   Do you know who prepared the first page that's

123

1        the typewritten?
2    A   No idea.
3    Q   Have you seen this typewritten page before
4        today?
5    A   I don't recall. I don't remember.
6    Q   You earlier testified that you had reviewed your
7        statement a month or so ago. Do you remember
8        that?
9    A   Yeah.
10   Q   So you reviewed your handwritten statement a
11       month ago. Was the typewritten statement ever
12       provided to you?
13   A   I don't remember.
14   Q   But you don't remember reviewing the typewritten
15       statement a month ago, you remember reviewing
16       the handwritten statement?
17   A   I remember reading this one.
18   Q   And this one you're pointing to --
19   A   Yeah.
20   Q   -- the handwritten page --
21   A   Handwritten.
22   Q   -- page 2 of Exhibit 1?
23   A   Yes.
24   Q   And this was what one of three Ball employees
25       asked you to prepare after the fire?

124

1    A   Yes.
2    Q   And this was the one that was done in the guard
3        shack?
4    A   Yes.
5    Q   And was that done on either the night or early
6        morning hours of May 23?
7    A   I was very tired. I am looking at my writing.
8        It was -- I am trying to think. I am thinking
9        around 9:00 before I got out of here. Shift was
10       over at seven, I am thinking it was -- because
11       it was total chaos, so.
12   Q   And nine a.m. you're referring to; right --
13   A   Correct.
14   Q   -- on the 23rd?
15   A   Nine or 9:30, I believe, when I finally got in
16       my truck and went home.
17   Q   Okay.
18   A   I wrote this. They asked me to write what I
19       witnessed and what happened, my version of it,
20       before I left.
21   Q   Okay.
22   A   I was in a hurry.
23   Q   Because you wanted to leave?
24   A   I was ready to go home.
25   Q   Did you have any involvement then in plant



---

**Page 125**

1   cleanup and returning the plant to production?
2  A  Oh, maybe water damage, but primarily it was
3    contracted, if I remember right.
4  **Q  All right.**
5  A  I don't think we had a lot to do with the
6    cleanup.
7  **Q  Thank you for your time, Wes. That's all I have**
8    **got.**
9  A  Yep.
10
11  CROSS-EXAMINATION,
12    QUESTIONS BY MARK N. SENAK:
13  **Q  I have got some questions for you.**
14  A  Okay.
15  **Q  First of all, I just want to mark this one.**
16    **That is Krintz 2.**
17    (Krintz Deposition Exhibit 2 was marked for
18    identification.)
19  **Q  What is Krintz 2?**
20    MR. SENAK: I gave you one; right?
21    MR. MILLER: Yes.
22  **Q  I just want to make sure that Krintz 2, which is**
23    **Bates labeled Ball 001127, is the same**
24    **handwritten statement that was part of -- that**
25    **is page 2 of Krintz Exhibit 1; is that true?**

**Page 126**

1  A  That's correct.
2  **Q  Can you just read into the record what you wrote**
3    **on Krintz Exhibit 2?**
4  A  Called out to line 2 IBO for light smoke from
5    discharge blower at, well, 12:20, I guess.
6    Inspected blower, seemed normal. ETs got heat
7    camera and was same as other blower. Close
8    within 20 degrees of other one. Shut down
9    burners, temperature lowered some. It shows
10    what I remember. With burners off and blower on
11    white smoke began to discharge from blower. Got
12    scissor lift and fire extinguisher and attempted
13    to put fire out, which made it worse. Discharge
14    blower fully engulfed inside. I don't know what
15    that means right there. Didn't help. Called
16    911.
17  **Q  Yeah, let's go to the last line. There is a**
18    **section, the last line begins with what. Do**
19    **you know what that word is or is it a word or is**
20    **an abbreviation?**
21  A  Except didn't help is what I would -- I leave
22    out letters, I guess.
23  **Q  That's okay. The letters are E-X-T?**
24  A  Yeah. That's not how you spell it. I don't
25    know what it is, to be honest with you.

**Page 127**

1  **Q  Is it an abbreviation for extinguisher?**
2    MR. MILLER: I'm going to object to asked
3    and answered. He said he doesn't know what it
4    is.
5  A  Extinguisher didn't help. That's exactly what
6    it is.
7  **Q  Okay.**
8  A  Extinguisher didn't help. Called 911.
9  **Q  And then the date that you have written there is**
10    **5/22/14?**
11  A  Yes.
12  **Q  And that's your signature?**
13  A  Correct.
14  **Q  You mentioned that you gave this statement or**
15    **you wrote this statement out after the fire?**
16  A  Correct.
17  **Q  The date of the fire was May 23rd of 2014.**
18  A  Not for me it wasn't.
19  **Q  Explain to me what you mean not by you.**
20  A  My work shift started on the 22nd.
21  **Q  So that's why you dated this document May 22nd,**
22    **2014?**
23  A  When we fill out PMs or do anything, the day,
24    previous date is our work date.
25  **Q  All right. But you actually would have written**

**Page 128**

1    **this statement the following morning on the**
2    **23rd; correct?**
3  A  But to us working nights, to us working nights,
4    we go by, everything we write, the whole night,
5    the whole 12 hours is written on the previous
6    day.
7  **Q  On the date that you start your shift?**
8  A  This is the night of my night shift of the 22nd.
9    The morning of the 23rd after midnight. Well,
10    if I guess the fire was 12:20, so it would have
11    been the next day.
12  **Q  So let's just take a look at this statement.**
13    **Your first line says, "Called out to line 2 IBO**
14    **for light smoke from discharge blower."**
15    **The discharge blower, can you describe or**
16    **tell us where that's located on the oven.**
17  A  The blower that discharges the smoke to the
18    atmosphere.
19  **Q  Does that sit on top of the oven?**
20  A  Yes.
21  **Q  And there are two blowers that sit on top of the**
22    **oven; correct?**
23  A  Correct.
24  **Q  One is to the west side of the oven, one is to**
25    **the east side of the oven?**



129

1   A   Correct.
2   Q   Is the discharge blower you're referring to
3       here, which of those two?
4   A   The discharge blower of the fumes of the smoke,
5       the discharge and of the oven would be the other
6       end, the discharge end.
7   Q   So this one is the east side blower?
8   A   Yes.  Yes.  Wait a minute.  Huh-huh.
9   Q   Let's say this is the blower where you observed
10      the smoke and the fire.
11  A   That's the blower, yes.
12  Q   You make a notation that it was at 12:20?
13  A   Roughly.  I mean, it was --
14  Q   That's your best recollection at the time you
15      wrote this statement?
16  A   Uh-huh.
17  Q   The time when you would have been called when
18      you received the call?
19  A   Correct.
20  Q   It says you inspect blower, seemed normal.
21         Did you get up on top of the oven and take
22      a look at the blower to see if it was operating?
23  A   Yeah, it was running.  The normal part was that
24      it wasn't orange, it wasn't.
25  Q   At that point?

130

1   A   Yeah, at that point.  It seemed, everything
2       seemed normal when I walked up there.
3   Q   And by normal, meaning the blower was running?
4   A   Yes.
5   Q   You didn't hear or see anything to suggest that
6       there was a bearing problem with the blower?
7   A   No.
8   Q   When you got up on top of the oven in the
9       scissor lift, at that point you didn't hear
10      anything or see anything that suggested to you
11      that there was any problem with the bearing of
12      the motor for that blower?
13  A   No.
14  Q   You're familiar with what a bearing failure
15      would look like or sound like?
16  A   Scream.  It is loud.
17  Q   And you didn't hear anything that would suggest
18      that was true in this case?
19  A   No.
20  Q   Your next line says the "ETs got heat cam and
21      was same as the other blower."
22         Do you see that?
23  A   I remember Pellegrini, I don't know what blower
24      he went to.  I don't know if it was the oven
25      beside us or the other blower on the oven.  But

131

1       he came back and said, no, he said that the
2       temperatures are close to the same, as far as
3       the one he checked.
4   Q   Was that conversation after you observed the
5       light smoke at the discharge blower?
6   A   Yes.
7   Q   So the first thing that you see is the smoke is
8       already coming out of the blower when you are
9       walking up to the machine?
10  A   That little hole, right.  Just down from the
11      blower there was smoke coming out of it.  And
12      around the blower, there was light smoke that
13      was -- it didn't seem crazy at the time.  I
14      mean, they had just cleaned it, I thought, so.
15  Q   But the smoke is already coming out of the
16      blower and the hole you are referring to before
17      Mr. Pellegrini takes his temperature readings?
18  A   That's why he took them, temperature readings,
19      because nobody could understand why it was
20      smelling so bad and why it was smoking so much.
21      So that was just an attempt to figure out if
22      there was a problem.
23  Q   Again, the reason the temperature readings were
24      taken was because of the visible smoke coming
25      out of the blower in the hole?

132

1   A   Correct.
2   Q   And that's the discharge blower?
3   A   It is the blower that was smoking.
4   Q   Understood.
5   A   I mean, the discharge to me was discharging,
6       though.
7   Q   So you then say in your statement, "With burners
8       off and blower on white smoke began to discharge
9       from blower."
10         Do you see that?
11  A   Uh-huh.
12  Q   Do you know whether you would have turned the
13      burners off before the blower was turned off?
14  A   The ETs would have taken care of shutting the
15      burners off.  And it was probably just the best
16      explanation of the order that I could give at
17      the time.
18  Q   So this statement isn't necessarily in sequence
19      of events, these are just observation that were
20      made at different times while you were --
21  A   True.
22  Q   -- there at the scene?
23  A   True.  But I am not sure if the burners were off
24      before or after.  I just know that was talked
25      about by Mike Rogers and Bob Pellegrini and



**133**

1      Justin Stout.
2    Q   You then go on, "With burners off and blower on
3       white smoke began to discharge from blower." I
4       take it that's the same blower --
5    A   Yes.
6    Q   -- that you referred to earlier?
7    A   Right.
8    Q   And that would have been the discharge blower?
9    A   Correct.
10   Q   Where do you see smoke coming from the discharge
11      blower, do you recall?
12   A   Shaft, the opening where the shaft comes
13      through.  Inspection plate.  I mean, it was
14      smoking.  I mean, I can't --
15   Q   You had to get a scissor lift and the fire
16      extinguisher and that's when you go up on top of
17      the oven to see if you can put out the fire;
18      true?
19   A   True.
20   Q   At that point, based on your observations --
21   A   At that point we didn't really -- I mean, the
22      temperature was escalating fast.  So we jump in
23      it, we spinned around, go up, extend it out,
24      Randy hands me the fire extinguisher, and I look
25      in there and I could see embers going by, stick

**134**

1      it in the hole and blast it.
2    Q   At that point, based on your sort of
3       observations, do you believe the fire has
4       already started?
5    A   Absolutely.
6    Q   And by the time you turn off the blower or the
7       blower's turned off or the burner's turned off,
8       is it your observation that the fire has already
9       started?
10   A   The fire was started before the blower was
11      turned off.
12   Q   Because there was smoke present?
13   A   (Witness nods head up and down.)
14   Q   You mentioned that you observed embers going
15      through the ductwork?
16   A   I seen embers inside the ductwork, yes.
17   Q   And that's because you looked in the hole where
18      you would take air flow readings; correct?
19   A   Not very big.  But you could see orange sparks,
20      embers, something going past.
21   Q   In the air flow that was going through there?
22   A   Uh-huh.
23   Q   Do you know whether that was before or after the
24      blower had been turned off?
25   A   After.

**135**

1    Q   But there was still enough air --
2    A   Correct.
3    Q   -- to blow the embers through the ductwork?
4    A   Correct.
5    Q   Is that because the blower on the other side was
6       still on?
7    A   Possibly.
8    Q   You then note here, "Discharge blower fully
9       engulfed inside."
10   A   By fully engulfed, it was glowing orange.  I
11      cannot say that it was fully engulfed in flames,
12      because there was none on the outside.
13   Q   You couldn't see inside?
14   A   Correct.  It was all enclosed, so.
15   Q   Were you able to see from where you are, and I
16      take it at this point you're standing on the
17      lift, above the furnace?
18   A   Uh-huh.
19   Q   You're looking at the discharge blower?
20   A   (Witness nods head up and down.)
21   Q   You see smoke at that point coming from the area
22      of the blower, from the seams of the blower?
23   A   When we first walked up there, there was smoke
24      coming out of the hole.  And then as the blower
25      was shut off, the smoke started to come out

**136**

1      around -- the blower itself started smoking.
2       You can see paint turning black or the aluminum
3       paint.
4    Q   Go ahead.
5    A   You could see the aluminum paint bubbling and
6       starting to smoke.  And then at some point it
7       got hot enough.  And before it was over with, I
8       believe there was flames coming out of the
9       blower.  I mean, there was actually flames
10      coming out of the blower of the holes.  And by
11      that time fire department is on its way and we
12      were told to go.
13   Q   So your observation of the blower is you see
14      smoke coming out of the blower, the exhaust
15      blower; true?
16   A   After it was shut off.  While it was running,
17      and I don't know if it was forcing it on out the
18      pipe or once we shut it off, then it --
19   Q   I just want to make sure we get the sequence
20      correct.
21         The first thing you see is smoke coming
22      from the exhaust blower?
23   A   Uh-huh.
24   Q   You have to answer out loud.
25   A   Oh, yes.  Sorry.

---

137

1   Q   After that, do you then see the paint on the
2       blower housing start to bubble?
3   A   This is after the blowers shut off, correct.
4   Q   And then do you see a change in the color of the
5       metal of the discharge blower?
6   A   It started to glow.
7   Q   By glow, what color?
8   A   Orange.
9   Q   And then at some point you see actual flames in
10      the discharge blower?
11  A   If I remember right, that little hole had flames
12      coming out of it then.  There was flames coming
13      out from around the shaft.
14  Q   Of the discharge blower?
15  A   Of the blower.  It turned -- because this all
16      happened in seconds after -- I mean, after the
17      fire was upset, it was fast.
18          MR. SENAK:  Mark this as the next exhibit.
19          (Krintz Deposition Exhibit 3 was marked for
20          identification.)
21  Q   Mr. Krintz, I am showing you Exhibit Number 3,
22      which is the handwritten statement of
23      Randy Crume.  Was Mr. Crume with you at the
24      time?
25  A   Yes.

---

138

1   Q   He would not have been up on the lift with you;
2       true?
3   A   Yes, he would have.
4   Q   He was on the lift with you?
5   A   Yes.
6   Q   You will see that you were talking about some
7       temperature readings that were being taken.
8           Do you recall what the temperature readings
9       that you were told were being taken of the areas
10      of the oven?
11  A   I remember, without looking at this, I remember
12      Pellegrini pointing a gun up there and saying it
13      wasn't that much different.
14          When the blowers were shut off, he
15      specified, well, 400, well, hell, there's 500,
16      no, there is 600.  He said there has got to be a
17      fire.  There has got to be something in there.
18      There has got to be a problem.
19  Q   Without referencing Mr. Crume's statement you
20      recall --
21  A   I just remember him saying, well, there is 500,
22      there is 600, so then we are like we better get
23      up there.
24  Q   You're talking about Mr. Pellegrini making these
25      statements?

---

139

1   A   He was on the ground, pointing the gun at the
2       blower.
3   Q   And as he was doing that, he was reading to you
4       or making statements to you --
5   A   Saying out loud what the reading was.  The first
6       reading was that, you know, it is not too bad
7       and then after we shut the blower off it
8       escalated.
9   Q   And do you have a recollection of what those
10      readings were that you were being told?
11  A   I remember him going from each hundred degree
12      increments.  There is 400, there is 500.  He
13      said there is a problem.  He said you better go
14      check, so we jumped in the lift.
15  Q   How high did he get in terms of the readings
16      that he conveyed to you?
17  A   I thought it was 600.  But it was pretty
18      intimidating, so, I mean --
19  Q   Understood.
20  A   It wasn't all calm and collected.  So I didn't
21      really -- I just know he just kept counting up
22      and it was seconds that he was counting.  And
23      that's how fast it was getting hot, so.
24  Q   When you were up on the lift with Mr. Crume, did
25      you take air flow readings through the hole in

---

140

1       the ductwork?
2   A   No.
3   Q   If you look at Mr. Crume's statement, do you
4       recall him taking air flow readings?
5   A   I do not.
6   Q   Looking at Mr. Crume's statement, does that at
7       all refresh your recollection as to whether he
8       would have taken any air flow readings?
9   A   Can I read it?
10  Q   Sure.
11  A   I didn't read it.  Something puff of smoke.
12  Q   I think it is big.
13  A   Oh, big puff of smoke and fire out of blower.
14      Used fire extinguisher to put out fire of
15      three-quarter inch hole, a hole that big or
16      whatever, and the flame started to spread to
17      other pipe and blower and fire department got
18      called.  Where do you see temperatures?
19  Q   In the second line.
20  A   He didn't do it.  Pellegrini was yelling.
21  Q   No.  No.  I am talking about air flow readings.
22          And my question is, do you recall you
23      checking air flow readings?
24          MR. MILLER:  Objection.  Asked and
25      answered.

---

141 to 144

141

1  A  I don't recall anybody checking air flow
2     readings.
3        Temperature readings is the only thing I
4     recall.  That's the only thing I recall being
5     checked was the temperature.  Whether it was
6     with an imaging gun or a laser that was --
7  Q  Do you specifically recall Mr. Crume not taking
8     any air flow readings or you just can't
9     remember?
10 A  I am going to say I can't remember.  I don't
11    remember him taking any air flow readings.
12 Q  Meaning he could have taken them, you just don't
13    recall?
14    MR. MILLER:  Objection.  Asked and
15    answered.
16 Q  You have to answer the question.
17 A  It could have happened.
18 Q  You just don't recall it happening?
19 A  I do not.
20 Q  I am sorry, I didn't hear your answer.
21 A  I do not.
22    MR. MILLER:  And I'm going to object.
23    You're trying to testify, Mark.  He has
24    answered.
25    MR. SENAK:  You already have.  So just make

142

1     your objection, and as you should.
2  A  I am not saying it didn't happen.  But, to my
3     knowledge, I don't recall him checking air flow.
4  Q  That's all I have.
5  A  Good.
6     MR. MILLER:  Thank you.  Nothing further.
7     MR. SENAK:  Signature is reserved.
8     (Time Noted: 1:56 p.m.)
9
10
11       AND FURTHER DEPONENT SAITH NOT.
12
13
14    _____
      WESLEY MICHAEL KRINTZ
15
16
17
18
19
20
21
22
23
24
25

143

1  STATE OF INDIANA          )
                             )  SS:
2  COUNTY OF HAMILTON        )
3
4     I, Diane Zeyen, RPR, a Notary Public in and for
5  the County of Hamilton, State of Indiana, at large,
6  do hereby certify that WESLEY MICHAEL KRINTZ, the
7  deponent herein, was by me first duly sworn to tell
8  the truth, the whole truth, and nothing but the
9  truth in the aforementioned matter;
10    That the foregoing deposition was taken on
11 behalf of the Defendant, at Ball Metal Beverage
12 Packaging, 501 North 6th Street, Monticello,
13 White County, Indiana, on the 12th day of March,
14 2018, at 10:03 a.m., pursuant to the Federal Rules
15 of Trial Procedure;
16    That said deposition was taken down in
17 stenograph notes and afterwards reduced to
18 typewriting under my direction, and that the
19 typewritten transcript is a true record of the
20 testimony given by the said deponent; and that the
21 signature by said deponent to his deposition was not
22 waived;
23    That the parties were represented by their
24 counsel as aforementioned.
25    I do further certify that I am a disinterested

144

1  person in this cause of action, that I am not a
2  relative or attorney of either party or otherwise
3  interested in the event of this action, and that I
4  am not in the employ of the attorneys for any party.
5     IN WITNESS WHEREOF, I have hereunto set my hand
6  and affixed my notarial seal on this _____ day of
7  March, 2018.
8
9
10              N O T A R Y   P U B L I C
11
12 My Commission Expires:
13 September 2, 2024
14 County of Residence:
15 Hamilton County
16
17
18
19
20
21
22
23
24
25



**Exhibits**

**W KRINTZ_1** 3:10 122:14
123:22 125:25

**W KRINTZ_2** 3:11 125:17
126:3

**W KRINTZ_3** 3:12 137:19,21

---

**#**

**#2** 26:23 27:4,13,16,18,20,25
29:18,22 30:4 51:16 54:15 59:3,
8,12,18,25 63:12 68:2,8,20,23
76:24 77:7,13,19,23,25 78:8,10
79:6 80:20 85:2,4 88:4,24 89:3,
7,11,14,17 91:19 92:5,22 93:1
94:4 95:24 96:15,23 97:9,11,16
100:7,13 120:4

---

**0**

**001127** 125:23

**04** 7:15 11:15 15:16,23 24:14

**07** 15:18,24

---

**1**

**1** 83:2 122:14,17 123:22 125:25

**100** 6:13 70:14

**11** 15:12

**11:58** 74:14

**12** 128:5

**12-hour** 108:4

**12:20** 126:5 128:10 129:12

**12:39** 95:14

**12:44** 95:15

**14** 91:23

**15** 58:6 78:9

**16** 25:8 27:17

**18** 6:17 7:12

**1991** 8:2

**1:05** 108:9

**1:08** 108:10

**1:10** 74:15

---

**2**

**2** 30:7 54:22 76:24 123:22
125:16,17,19,22,25 126:3,4

---

128:13

**20** 78:9 79:24 120:4 126:8

**20-second** 80:3

**2000** 6:15

**2002** 10:17

**2004** 7:17 8:21 24:18 27:11
33:20

**2007** 33:21

**2014** 51:24 52:13,15 53:3 54:7
59:22 63:13 70:23 71:4 73:11
92:22 93:14,22 99:19 109:20
110:17 113:2 115:25 121:20
127:17,22

**21** 55:13

**21st** 53:18

**22** 52:15 53:3,10 54:7,16 55:13
57:10,20 59:22 60:8,20 63:13
70:17,23 71:4 73:11 91:23
92:22 93:13,22 94:4 109:20
110:17 113:2 115:25

**22nd** 52:22 53:20,24 54:3,12
59:16,17 127:20,21 128:8

**23** 113:2 121:20 124:6

**23rd** 52:22 53:7 124:14 127:17
128:2,9

**24** 25:8 50:13 87:1,11 95:25
107:1

**2559** 6:13

**25th** 87:17

---

**3**

**3** 137:19,21

**30** 88:23 89:1,5,9,13,17 91:20

**32** 25:8

---

**4**

**400** 68:14,19,23 138:15 139:12

**45-minute** 58:9

**47980** 6:13

---

**5**

**5/22/14** 127:10

**500** 138:15,21 139:12

---

**6**

**6** 58:10

**600** 138:16,22 139:17

**6:45** 58:7,11

**6th** 7:7

---

**7**

**7** 50:13 87:12

**750** 25:8

**7:00** 53:2

**7:30** 54:7

---

**8**

**8** 50:15

---

**9**

**91** 8:6,9

**911** 126:16 127:8

**93** 8:4,21 9:11

**94** 9:15

**9:00** 124:9

**9:30** 124:15

---

**A**

**a.m.** 53:7,20 54:7 74:14 124:12

**abbreviation** 126:20 127:1

**ability** 70:1

**abnormal** 70:2

**absolutely** 19:18 27:1,3 81:12
91:17 101:16 102:15 108:7
134:5

**accepted** 9:10

**access** 47:25 48:5 56:8 59:3

**accessed** 66:4

**accumulated** 96:15

**accumulation** 93:3

**accumulations** 96:5,10

**acquired** 80:8

**action** 82:19

**actions** 110:22

---

**activity** 103:7

**actual** 21:23 64:9 102:1 137:9

**address** 6:12,14,17 7:6

**adjust** 65:4,17

**adjustment** 65:14,15

**adjustments** 12:20 13:24

**adjustor** 11:18,24 12:7,11 13:4,
6,9 15:21 65:9

**adjustors** 13:3

**advice** 38:3

**afraid** 90:3

**agriculture** 9:22

**ahead** 6:7 36:7 52:1 69:23
71:11 78:15 98:17 117:3 136:4

**air** 4:13 33:16,18,23 34:2,5 43:2
44:15,25 45:3,6,8 54:2,6,10,20
57:9 59:15,18,20 66:9 75:22
81:25 82:3 86:22 88:19 93:21
94:8 98:18,24 99:4,6 100:1
101:17 102:13 103:1,17 104:16,
21 105:10 115:24 116:20
121:25 134:18,21 135:1 139:25
140:4,8,21,23 141:1,8,11 142:3

**align** 88:9

**allowed** 78:2 117:14,16

**Alumi-tek** 26:4,6,8,11,24

**aluminum** 13:13,17,23 24:17
25:1,4,6,9 26:3,4,5,11,19,24
27:5,13,35:12 94:13 136:2,5

**amount** 50:10 93:10 108:24
110:3

**and/or** 43:21 117:22

**Andrew** 4:12

**answers** 5:1

**anymore** 13:5 65:1

**anytime** 104:15

**appears** 117:1

**applicator** 10:6

**approaching** 120:5

**appropriately** 32:23 110:23

**approved** 110:15

**approximately** 20:3 58:1
79:24

**area** 12:13 57:6 71:18,19,20
73:4,7 74:7 78:25 79:1 86:21
135:21

**areas** 69:25 138:9



**arrival** 58:10 83:9,15 117:20

**arrive** 57:25 90:15 120:9

**arrived** 53:22 54:2,6 57:22 59:21 60:5 78:10 79:6,18 80:12, 20 81:3,17 82:20 83:22 84:24 85:1,4

**arriving** 59:16

**assess** 70:1

**assignment** 31:23

**associate** 18:8

**Associate's** 7:21

**associates** 30:18

**assume** 6:2 8:5,10 10:5 44:18 50:11 63:18 74:9 120:19

**assumed** 18:4 21:19 84:14

**assumption** 27:24 74:10 122:6

**assumptions** 122:5

**assure** 32:22 110:22

**atmosphere** 128:18

**attempt** 131:21

**attempted** 126:12

**audibly** 5:2

**August** 8:8 9:11

**authority** 19:7

**auto** 8:17,22,24 9:19

**automatic** 65:9

**automatically** 65:4 82:2

**aware** 49:3 50:23 51:8,11 52:3, 7,12 98:10 103:16 110:21

**awhile** 99:17

---

**B**

**back** 7:22 25:18 27:10 29:16 39:5 42:13,14 51:6,14 56:18 57:5 60:4 70:9 74:17 79:3 83:3 85:8 90:8 93:25 95:17 96:25 97:1 98:15 99:17 100:4 108:11 110:16,24 131:1

**background** 7:20 14:20

**bad** 100:15 116:18 131:20 139:6

**bagger** 12:8

**bake** 94:17

**baked** 96:4

**Ball** 4:14 7:16 11:12,17 13:1 14:21 15:2,7,15 16:16 23:8

24:9,13,17,20,21,24 27:11 28:2 30:13,14 31:17,20 33:3,9,15,24 34:9,19 37:4,16,23 38:20 39:15, 19 42:10 43:1,5,9 48:21,25 50:20,24 52:7,10 56:2 61:2,6 67:15 94:4,7 95:1,20,23 96:21 103:16 105:6,16 109:7 110:22 112:9,17,21 115:12,21 123:24 125:23

**Ball's** 7:14

**based** 46:9 68:16,23 117:1 133:20 134:2

**basis** 97:21 117:9

**Bates** 125:23

**battle** 119:22

**bearing** 29:11 44:4 130:6,11,14

**bearings** 29:3,14 38:1 43:14, 15,16,21,24 45:15 46:5,15 62:22,23,24,25 91:8

**beer** 26:18

**began** 13:20 15:13,16,18,23 24:13 27:11 30:16 33:23 53:3 57:19 74:21 126:11 132:8 133:3

**begin** 4:16

**begins** 58:1 126:18

**belief** 68:22

**belt** 14:16 43:17,19 44:3 46:6

**belts** 43:14,15,16,17,21,24 45:14 46:5,14 62:22,25 91:10

**beneficial** 70:15

**benefits** 16:6

**beverage** 24:10,17,22 25:1,4,7, 9 26:15,17,25 27:5,14 35:12 80:21 81:13 94:13

**big** 44:14,21,23,25 45:3,5 84:10 118:16,20 134:19 140:12,13,15

**bit** 79:16 84:9

**black** 136:2

**blast** 134:1

**block** 80:3

**blow** 135:3

**blower** 28:20 74:24 75:18 82:1, 5,6 83:11 85:24,25 98:18 116:6, 12,15,18,22,25 117:2,12 118:11,12 119:21 120:17,22 122:7 126:5,6,7,10,11,14 128:14,15,17 129:2,4,7,9,11,20, 22 130:3,6,12,21,23,25 131:5,8, 11,12,16,25 132:2,3,8,9,13 133:2,3,4,8,11 134:6,10,24 135:5,8,19,22,24 136:1,9,10,13,

14,15,22 137:2,5,10,14,15 139:2,7 140:13,17

**blower's** 134:7

**blowers** 44:13,14,18,21,23,25 45:3,5,8,12,15,18 108:19 116:21,22 117:15,17,19,25 118:4,9 128:21 137:3 138:14

**blowing** 108:22

**Bob** 20:23 75:15,23 76:4 82:9, 11 119:8 132:25

**body** 8:17,22,24 9:5,19

**bolts** 38:1

**book** 64:4

**boss** 16:18

**bottle** 25:24 26:2,6,24

**bottles** 26:3,12,19

**break** 32:2,3,7 57:13 74:13,18 75:1 76:17,25 77:3,4,7,18,23,25 78:7 79:5,24 87:1 95:11 108:5 120:3

**bring** 15:24

**brings** 11:12

**broad** 14:14

**Brookston** 9:18 10:12

**brought** 17:10,11

**bubble** 137:2

**bubbling** 136:5

**buildup** 93:7,13,16,19

**built** 31:14

**bunch** 111:4

**burn** 117:6

**burner** 43:6 69:16

**burner's** 134:7

**burners** 47:7,10,14 81:16,19 82:6,8 91:15 118:4 126:9,10 132:7,13,15,23 133:2

**burning** 75:9

**business** 7:6,8

**button** 119:20

**byproduct** 96:2

---

**C**

**cage** 45:20,22 46:13 47:16 48:3,4 69:7,10 70:20,22,25 71:7 85:17,20 86:2

14,15,22 137:2,5,10,14,15 139:2,7 140:13,17

**calendar** 53:10 87:6 88:4

**call** 32:3 44:14 75:20 95:12 98:22 110:10 113:15 115:17 129:18

**called** 44:13,19 61:10 64:22 86:12 126:4,15 127:8 128:13 129:17 140:18

**calls** 107:24

**calm** 139:20

**cam** 130:20

**camera** 72:24 73:1 126:7

**cans** 13:23 24:17,22 25:1,4,7,9, 11,14,21 27:5 35:12 65:5 80:21, 23 81:13 87:11,25 94:13,14,18 96:3 111:4

**cap** 26:13,14

**cardboard** 110:7

**care** 55:11 109:9 132:14

**carryover** 92:17

**Carter** 11:6

**case** 26:23 51:17,23 52:6 64:16 70:15 130:18

**casually** 112:6

**categories** 61:6,19,22

**category** 16:24 61:10

**caught** 122:7

**caused** 121:20,24 122:3

**Center** 11:2

**certifications** 10:5 42:9,22

**certified** 42:6

**CFM** 45:22

**CFMS** 45:25

**chamber** 69:16

**chambers** 43:7

**change** 7:11 36:12 63:21,23 92:10 137:4

**changed** 63:20 64:1,3,9,11,12 65:4 85:19

**chaos** 124:11

**charge** 76:9 104:17,20,21 120:19

**check** 33:2 43:17 47:20 48:6,11 63:2,5,9,15 64:25 75:22 98:23 102:2,16 103:2 111:12 139:14

**checked** 83:1,4 99:4 131:3 141:5



checking 46:14 62:23 82:22 140:23 141:1 142:3

checklist 67:11

checklists 101:25

checks 32:18 60:3

Chester's 9:18,23 10:8,9

chipboard 108:20,21

Chris 113:23 114:7

Christmas 87:13,15,17,19,20 88:5

Circulation 44:18

claiming 115:22

clarification 106:11

clarify 52:10

class 14:22,24 15:5

classification 76:21 82:15

classifications 62:5

clean 40:3,4 41:11,14 42:1,4 49:15 84:6 93:22 110:2

cleaned 13:10,12 39:23,25 40:10,13 41:2,5,17,22 49:12,14, 16 50:1,6,14 54:15 55:4,10 56:9,18 65:20 66:4,16 84:4,11, 15,21 86:21 88:16 91:23 93:4 95:21 110:23 131:14

cleaning 33:19 39:16,20 40:7, 20 41:7,16 43:2,6 48:16,17,21 49:1 50:4,9 55:1,19 56:14,22 59:20 65:25 66:20,23 67:3 86:11,15,19 87:8,10 88:1,10,19 92:6 93:25 94:9 104:8,15,20 108:23 109:14 111:14 113:2,6 120:14

cleanings 88:6

cleanliness 47:20 48:11 50:20

cleans 88:21

cleanup 12:10 125:1,6

clear 106:7

clock 57:12 58:6,7 59:10

clock-in 58:10

clocking 59:15

close 126:7 131:2

clue 50:5 122:8

clump 111:4

coat 108:20

cocked 32:24

coils 13:3

collect 96:5,17 108:24

collected 110:8 139:20

college 9:13

collision 9:5

color 137:4,7

common 37:25 38:7 46:6

communicate 98:4 99:12,14

company 4:15 115:22

compared 71:24

compilation 98:9 103:4

compilations 103:11

complete 6:20

completed 60:4 122:1

completing 60:22

component 60:25 90:2 91:15 96:17

components 89:2

computer 63:25 64:6 98:8 103:5 115:6

concern 77:16

concerned 84:3

condition 48:6,11 50:20

confined 42:7 67:5,9,12,13

connection 43:22

consist 62:1 111:25

consisted 60:13

consistency 96:10,14

consult 38:13,23 39:7

consulted 33:8

contact 108:1

containers 27:2

content 20:7 21:24

context 27:21 49:9 90:9 104:5

continue 13:25

continuous 7:17

contracted 125:3

contractor 33:19 55:25 56:13 57:2,6 62:7 93:5

contractors 58:16 62:3,10,13 66:24

control 19:7 112:10,14,22 121:1,6

controls 16:6 19:14 110:9

conversation 7:1 131:4

conversations 23:22 24:4 94:7

conversion 12:10

conveyed 78:3 101:3 139:16

conveying 29:2 65:5

conveyor 14:16

cool 119:5

cooled 55:21,23

copies 22:11

corner 120:6

Corporation 4:14

correct 7:9,10 8:6,7,19,20 10:6, 7,20 13:19 14:1,18 16:21 19:15 20:19 22:13 26:16 27:6,8,9,12, 24 28:1,14 33:1,10,11 37:15,16, 17 38:12,17,18 44:4,5 45:18,19, 21 49:23 52:20 58:2 61:14 65:12 69:5 73:24 77:22 78:5,6 79:7,22 81:15,18 82:17 87:9 88:8,14 91:11,13 92:23 93:22, 23 100:18 106:21,22,24 107:2, 3,8,11,12,14,15 109:12 111:23 112:7 117:17 118:2,7 120:14,15 124:13 126:1 127:13,16 128:2, 22,23 129:1,19 132:1 133:9 134:18 135:2,4,14 136:20 137:3

correctly 28:12 118:20

counter 7:1

counting 139:21,22

couple 11:11 18:8 23:18,20

courses 14:25

court 4:25 5:8 6:21 7:4

covered 110:20

cracked 43:18

crazy 75:4 116:16 117:8 131:13

create 26:9 97:24 102:21

created 33:4,12 39:11 99:22 101:22 103:12 115:8

creates 99:25

creating 101:17

crew 40:3 104:8,15 107:2

critical 103:17 120:12

CROSS-EXAMINATION 125:11

Crume 20:23 21:6,8,11 23:16, 19,23 24:4 76:16 77:1 78:15 80:15 118:5 137:23 139:24 141:7

Crume's 138:19 140:3,6

cubic 45:22

cured 96:4

curious 57:14

Curnut 37:3

Curnutt 36:24 37:1,4

current 6:11

curve 111:18

curves 110:25

cut 56:7,10,12

Czarkowski 113:23 114:7,8

### D

daily 27:25

Dale 105:14,16 106:1,4 107:13, 22 110:12,15

damage 125:2

damaged 46:7

data 98:8,9 103:4,11

date 7:18 16:1,2 17:12,15 20:2 22:21 27:7 35:18 41:2 70:23 71:4,9 127:9,17,24 128:7

dated 127:21

dating 27:10

day 6:24 50:10,13,16 52:24 53:1,10,13 54:24 59:5 60:13,18, 22 66:9,11,16 84:16 87:2,12,17, 19,23 92:6,11 107:2 127:23 128:6,11

days 23:20 25:18 50:13 87:4, 12,18,20,21 88:23 89:1,5,9,13, 17 91:20 104:15

daytime 106:23

deal 84:10

debris 108:22

decided 82:4 119:13

decision 33:16 81:20 82:18 83:10,17 117:2,5,10,22,25 120:16,21 121:4

decision-making 73:14

dedicated 41:13

defendant 4:13

Define 46:4 86:25

defined 60:20

degree 7:21 71:16 139:11



degrees 126:8

demand 87:24

department 12:13 47:9 92:3 97:23 99:22,25 100:23 102:21 103:8,12 136:11 140:7

dependent 25:14

depending 25:21 58:22 60:13 62:1 87:24,25

deposed 4:21

deposition 4:17 19:17,20,24 21:20 22:8,25 23:6,24 24:7 73:19 122:14 125:17 137:19

depositions 23:10,13 24:3

describe 44:10 62:20 84:1 85:9 128:15

description 26:8 44:20

detailed 90:17

details 111:9

determine 73:15 109:23

determined 49:13 63:17

determines 50:12

deviation 72:15

difference 25:17,20 71:12,13, 17 72:5,6 101:25

differences 72:8

differential 72:2

dig 102:24

digging 40:4

direct 44:25 45:3,8

directed 36:22

direction 19:7 30:25

Directly 9:13

directs 19:14 45:5

dirty 50:12

disassembling 47:21

disassembly 66:3

discharge 29:14 44:12,15 45:13 80:9,10 99:6 126:5,11,13 128:14,15 129:2,4,5,6 131:5 132:2,5,8 133:3,8,10 135:8,19 137:5,10,14

discharges 128:17

discharging 132:5

discourteous 7:3

discuss 21:24 113:13

discussed 49:3 69:20 81:23 113:1 120:18

discussing 49:7 50:20

discussion 36:12 113:5

discussions 20:7 48:24 49:9 50:19

document 33:4,7,9,12 98:9 101:5 102:6 103:4 122:17 127:21

documentation 99:21 101:12, 22

documentations 99:24

documented 99:8

documents 20:14,15 22:7 98:7 101:16 102:20 103:11

Don 36:24,25

doors 55:5,13,15,18,20,22 56:5,18,23,25 66:19 105:5

draft 115:8

dry 94:22

duct 45:9 65:20,25 67:2

ducting 45:9

ducts 45:1 66:3

ductwork 51:12,22 52:4 66:23 70:8 82:23 85:16,20 89:6 96:15 103:10,14 134:15,16 135:3 140:1

ductworks 98:19

due 120:14

dust 108:25

duties 14:12

**E**

e-mails 115:18

E-x-t 126:23

earlier 10:18 36:2 57:19 63:1 66:18 67:19 69:21 79:23 91:5 100:4,9,15,19 105:4,18 106:18 107:9 114:12 117:18 122:20 123:6 133:6

earliest 58:7

early 57:24 124:5

easier 7:4

east 128:25 129:7

edge 80:7

education 8:13 14:19

educational 7:20

effect 36:13 49:12

electric 46:20,22

electrical 46:24

electrician 61:13

electronics 61:10

Eleven 15:12

emanating 89:6

embers 116:5,9,11 118:14,23 120:24 133:25 134:14,16,20 135:3

employ 7:14 15:6

employed 24:20 37:4,8,16 50:19 112:21

employee 13:1 16:11,16 48:21 61:19,22 62:4 95:24 96:22 97:15 105:6 115:12,15

employees 16:25 23:9 30:21 31:10,17 34:3,6 36:5,8 37:23 38:10,20 54:11 57:10 59:15,18 61:2 94:5,8 97:20 104:22 105:1, 10 109:7 112:17 123:24

employer 10:19

employers 7:11 15:8

employment 7:16 9:2 15:15 27:11 34:6 43:1,9 48:25 61:6 67:15 76:21,22

employs 112:9

enclosed 119:25 135:14

end 12:9 29:2,14 44:15 53:6 80:9,10 129:6

ends 12:8,9

engulfed 126:14 135:9,10,11

entail 14:7

enter 8:8 67:12,16

entered 94:14

entirety 24:24 46:18

entries 100:1 101:18

entry 44:12 98:8

equipment 12:19,20 22:10 32:21 111:24

escalated 116:16 120:22 139:8

escalating 133:22

ETS 55:11 61:12,25 62:9,12 74:11 75:7 76:3 78:19,21 80:13 81:21 91:2,3,16 110:25 111:13, 16 120:10 126:6 130:20 132:14

Eve 87:19

evening 53:12,24 57:20,23 59:17,21 73:11 76:13

events 132:19

everyday 7:1

examples 61:21

excessive 71:24 72:1,3

exchanged 115:18

exclusively 27:5

exhaust 45:1 46:3 69:12 99:7 136:14,22

exhibit 122:14 123:22 125:17, 25 126:3 137:18,19,21

existence 39:13

existing 39:10

expect 24:6

experience 15:8 24:10 27:20 28:3 30:12

experienced 30:18,21 48:8,20

explain 30:22 127:19

explanation 132:16

expose 84:7

extend 133:23

extended 5:3,7

extent 121:22

extinguisher 119:18,19 126:12, 127:1,5,8 133:16,24 140:14

eye 118:9

**F**

fabricate 9:24 10:14 11:7 28:6, 13,17,25 39:7 101:2

fabricated 26:11 29:21 100:6, 22

fabricating 28:9,10,24 29:7 39:6 100:16

fabrication 14:4,5,9 24:11 29:5 39:5

facilitate 13:18 66:23

facility 26:7 31:20 52:11 99:12

fact 38:7 101:6,14 109:18

factory 5:18 74:20

failure 130:14

fair 6:3,10



5                                                                              Index: familiar..hole

**familiar** 103:19 122:19 130:14

**fan** 46:17 47:22 48:1,6,11 69:7, 10,12,16 70:21,22,25 71:8 85:17,20 86:2,3 118:9 119:2,4 121:5

**fans** 43:22,25 44:4,6,8 45:18, 20,22,25 46:3,13,20,22,24 47:17,19,20 48:3,4 81:16,20 83:10 120:25

**fantastic** 106:10

**Farm** 9:22 11:2

**fast** 116:13,17 133:22 137:17 139:23

**fastest** 122:11

**father-in-law** 10:24

**February** 6:15

**feed** 44:15

**feeding** 82:3

**feel** 79:16

**feet** 45:22

**fellow** 30:18,21 36:5

**fertilizer** 9:22 10:1,24 11:1

**FIFE** 64:23 65:1,7,9,14

**fighting** 119:22

**figure** 102:11 131:21

**figured** 84:6

**filed** 4:14

**fill** 64:4 99:15,16 114:4 127:23

**filled** 18:12

**final** 110:10

**finally** 124:15

**find** 105:9

**fine** 32:2 114:12 121:4

**finger** 118:18

**fingers** 107:4

**finish** 13:15 41:23

**fire** 17:13,15 18:14,18,20,25 20:17 21:18 22:20,22,25 27:7 35:18,22 40:24 41:2 51:9,17,18, 23 52:3,6,13,14,18 64:15 68:8 74:20 77:16 86:16 88:23 89:1,5, 9,13,17 90:23 91:20 95:25 96:23 97:16 113:2,6,9,13 115:19 116:3,20 117:5,14 119:18,19 121:16,20 122:4,7 123:25 126:12,13 127:15,17 128:10 129:10 133:15,17,24 134:3,8,10 136:11 137:17

138:17 140:13,14,17

**fired** 47:1

**firefighting** 121:17

**fires** 50:23 51:2,8,11 52:4,7,12

**fit** 53:16 68:1 82:13,15

**fixing** 100:11

**flame** 82:3 140:16

**flames** 135:11 136:8,9 137:9, 11,12

**flammable** 95:9

**flipping** 39:5

**floor** 5:18 11:21 58:25

**flow** 43:2 44:25 45:3,9 75:22 98:18,24 99:7 100:1 101:18 102:13 103:1 134:18,21 139:25 140:4,8,21,23 141:1,8,11 142:3

**flows** 99:4

**flypaper** 108:16,17

**follow** 109:7

**follow-up** 60:16

**forcing** 136:17

**Ford** 9:4,8

**foreign** 122:9

**forget** 6:24 27:17

**forgot** 6:19 19:16 32:1 115:1

**form** 6:4 36:7 50:17 121:2,7

**formalized** 46:10,11

**foundation** 50:17 51:25 56:15 69:23 84:13 116:1 117:3,13 121:2,7

**frame** 90:23

**Freddy** 18:12 37:11 49:8 56:3,5 113:22 114:10,11

**frequency** 35:14 48:17 50:8 63:15,16,17 65:19,21

**frequently** 42:19 50:15

**freshly** 84:8

**full** 4:9 102:20

**full-time** 8:18

**fully** 126:14 135:8,10,11

**fumes** 129:4

**function** 32:20 36:4 43:12 73:2

**functions** 64:9

**furnace** 56:10 135:17

**game** 40:17

**gap** 8:11

**gas** 47:1,3

**gather** 109:14

**gauge** 68:24 119:9

**gave** 100:4 125:20 127:14

**general** 70:4 100:14 104:14

**generally** 68:13

**give** 6:19 61:22 62:4 71:16 90:8 110:4 119:7 132:16

**glancing** 68:17,24

**glass** 26:3

**glow** 137:6,7

**glowing** 116:25 119:21 135:10

**good** 4:9 57:14 102:4 116:21 142:5

**gooey** 96:10,14,17

**graduate** 7:25 8:3

**graduated** 8:5

**graduating** 8:25

**graduation** 9:3,11

**grease** 62:22

**grinding** 100:11

**groove** 29:3,15

**grooves** 29:15

**ground** 4:17,24 6:19,25 118:2 139:1

**group** 104:20

**Grove** 11:2

**guard** 21:15 28:18,19,20,24 29:7,21 39:6,8,10 43:19 100:6, 16,22 101:2 124:2

**Guards** 14:6

**guess** 64:7 69:22 77:5 104:24 126:5,22 128:10

**guesses** 5:13

**guessing** 17:8 40:17

**gun** 22:9 82:22 119:10 138:12 139:1 141:6

**gunk** 122:9

**guy** 104:5

**guy's** 104:4

**guys** 40:3 98:4

**habit** 57:25

**half** 10:10

**half-inch** 118:19

**hand** 119:18

**handed** 122:16

**handled** 72:24 90:25

**hands** 133:24

**handwriting** 115:3

**handwritten** 20:18 122:19,23 123:10,16,20,21 125:24 137:22

**happen** 142:2

**happened** 66:10 70:14 116:10 124:19 137:16 141:17

**happening** 141:18

**Hayden** 36:24 37:7

**head** 5:4 45:17 119:3 120:8 134:13 135:20

**hear** 5:16 6:6 20:6 130:5,9,17 141:20

**heard** 6:2 49:3,7 104:1,3 111:16,17 113:4,18

**hearing** 5:20

**heat** 22:9 69:24 70:2 71:24,25 72:1 82:22 126:6 130:20

**heavy** 84:1 85:9

**held** 11:16,23 107:4

**hell** 138:15

**helped** 14:23

**helpful** 106:18

**high** 7:22,23,25 139:15

**hire** 16:2 33:16

**hired** 40:2

**historically** 35:5,7

**history** 15:15 34:12,15 35:1,3

**hit** 119:20

**hits** 65:16

**hold** 15:1 26:15

**hole** 75:20,21 85:16,17,21 86:1 98:21,22 116:5 118:19 119:16, 19 131:10,16,25 134:1,17 135:24 137:11 139:25 140:15



**holes** 136:10

**holiday** 88:2

**holidays** 87:14

**home** 6:12 124:16,24

**honest** 126:25

**horrible** 121:6

**hot** 45:6 75:2,3 79:2,9,19 80:5 119:12 120:7 136:7 139:23

**hotter** 118:25 119:1

**hottest** 122:11

**hour** 25:21 58:1,3

**hourly** 16:10

**hours** 24:8 50:10,13,15 57:17 74:13 87:2,11 95:25 107:1 124:6 128:5

**housing** 137:2

**Howell** 113:3

**HR** 114:2

**Huh-huh** 129:8

**huh-uh** 5:8 8:12

**hundred** 70:9 139:11

**hurry** 119:13 124:22

**I**

**IBO** 26:20,22,23 27:4,13,16,18, 20,25 28:3,6,13,15,17,22,25 29:7,11,14,18,22 30:1,4,7,10 31:4,14 32:10,13,15,24 33:5,8, 13,19 34:10,12,15 35:1,3,5,8, 10,15,19,24 36:4,9 38:11,14 39:2,16,20,22,25 40:8,9,12 41:1,4,13,16,22 42:1,4 43:3,7, 10,13 44:3,6 47:4 48:14,18,22 49:2,25 50:9,21 51:3,8,16 54:15 55:15 56:25 59:3,8,12,18,25 60:3 61:24 62:21 63:12 67:13, 17,20,21,23,25 68:2,8,11,20,23 69:3 75:1 76:24 77:7,13,19,23, 25 78:8,10 79:6,25 80:7,20,22 83:2 85:2,4 86:24 87:11 88:4,24 89:3,7,11,14,17 90:22 91:19 92:5,22 93:1 94:4,14,16,19 95:21,24 96:4,15,23 97:9,11,16, 18,25 98:12 99:11 100:7,17,23 101:17,24 102:22 103:8 104:20 109:15 110:16,23 120:4 126:4 128:13

**IBO'S** 60:24

**IBOS** 28:7 30:13,15,23 31:17 47:14 50:23 55:1,19 56:6,23 61:3 62:6,8,18 63:6 66:16 68:20,21 98:2 100:14

**IC** 94:25 95:2 96:3 108:21

**idea** 35:21 58:14 60:10 68:9 69:8 70:7 74:6 79:12 84:17 86:23 88:20,22 91:24 93:21 114:17 116:18 122:9 123:2

**identical** 25:10

**identification** 122:15 125:18 137:20

**identified** 76:4 78:18 98:11

**identify** 36:8,23 61:2 78:10 98:7 113:20 115:24

**identity** 96:21 97:14

**ignition** 95:6

**image** 69:20 71:9 72:9,13 73:8, 20 74:8

**imaged** 74:2,4

**imaging** 22:11,16,19,23 71:2, 18,23 72:7,15,18,22,24 73:1,4, 10 119:10 141:6

**imitation** 111:4

**impact** 69:3

**imparted** 31:17

**imperfections** 100:12 112:18

**important** 4:24 5:1 16:2 114:25

**impossible** 6:21

**in-feed** 45:13 80:24 99:5

**inch** 140:15

**incident** 133:25

**increments** 139:12

**Indiana** 6:13 133:25

**indicating** 77:15 107:4

**individual** 12:23 13:22 14:3 79:11 80:4 103:19 113:3,6 114:15 120:6

**individuals** 20:10 36:18 78:11 80:12 92:11 113:20 114:15

**industry** 9:22

**information** 22:3 31:6,9,13 36:3,19 75:11,14 77:11,15 103:13 104:12 111:2

**insecticide** 10:6

**inside** 45:4 56:8 67:20 96:6 112:19 121:25 122:7 126:14 134:16 135:9,13

**inspect** 46:6 47:17 129:20

**Inspected** 126:6

**inspection** 62:22 66:6 112:16

133:13

**inspections** 94:3 109:22

**inspectors** 112:10,15,22

**installation** 30:3

**installed** 34:24 94:22

**Installing** 30:2

**instance** 31:12

**instances** 40:12

**instantly** 119:20

**instructed** 48:5,10

**instruction** 37:23 38:9

**instructions** 38:19

**insurance** 4:14 115:22

**intended** 26:15

**intent** 6:16 7:11

**interaction** 27:25 34:5

**interim** 18:6

**internal** 33:9 68:10,22 94:17

**internally** 47:24

**interviewed** 113:9,11

**intimidating** 139:18

**investigators** 113:10 115:19

**involve** 121:22

**involved** 39:20 43:2,6 49:24 51:2,23 55:3,8 61:23 62:5,15 82:22 91:6 92:7,22 112:22

**involvement** 54:22,25 65:24 105:1 109:3 124:25

**involving** 36:9 50:23 51:2,8,11 52:4

**irrelevant** 81:4

**issue** 26:22 34:12,16 35:16,19, 24 36:9 38:17 49:7 50:21,24 51:3,9,17,23 52:6 64:15 102:17 120:14

**issues** 86:14,18 89:6 91:7

**item** 45:5

**J**

**J-e-r-r-y** 17:17

**janitor** 13:9

**January** 15:18,24

**Jerry** 17:16 18:21

**job** 11:20 28:5 30:24 31:1 36:4,

17:43:12 53:1 58:19 69:4 73:1 82:13,15 93:18 94:9,10 97:19 111:21

**jobs** 58:22

**John** 36:24 37:7

**Johnson's** 10:12

**judgments** 5:9

**jump** 119:13 133:22

**jumped** 139:14

**jury** 90:15

**Justin** 76:6 78:12 82:14 133:1

**K**

**keeping** 65:5

**kind** 6:25 13:10 16:4 30:22 61:6 75:2 82:4 92:16 96:10 111:18 112:1 115:18 120:13

**knew** 79:16,18 80:22 83:1 84:18 104:4,7,8,11

**knowing** 69:18

**knowledge** 17:24 23:1 27:4 31:15,16 34:2 35:10 39:22 40:7 41:16,22,25 42:3 46:23 47:12 50:3 55:2,7 59:14,17 65:19 68:16 73:9,25 77:19 80:8,16,19 86:14,17,18 88:18,25 91:18,22 93:3,10,24 94:3,12 95:19,23 96:11 103:9,18 104:14 108:13 109:10,13 110:17,18 111:3,20, 24 112:14,18 115:10,21,16:3 142:3

**krintz** 4:11,12 122:14,16,17 125:16,17,19,22,25 126:3 137:19,21

**L**

**labeled** 125:23

**lack** 71:24

**lacquered** 110:20

**Lafayette** 9:4

**Lakes** 7:24,25 8:6

**laser** 119:10 141:6

**lawsuit** 4:13 115:22

**leading** 52:21 90:23

**learn** 23:2 24:2

**leave** 54:4 59:5 124:23 126:21

**leaving** 54:11



**left** 54:5,16,18.124:20

**legal** 4:10

**length** 23:24 24:2 25:13,20 40:15

**letters** 126:22,23

**level** 118:9

**lift** 118:6,8 119:15 126:12 130:9 133:15 135:17 138:1,4 139:14, 24

**light** 84:2 85:10,11 86:7 120:11 126:4 128:14 131:5,12

**limit** 65:16 117:6

**limitations** 67:10,11

**limited** 40:8

**limits** 65:15

**lines** 47:3

**liquid** 94:12

**litigation** 34:13,16 35:16,20,25 50:21,25 51:3,9

**located** 43:21,24 44:8,11 128:16

**logbook** 98:1 99:9,10,15,16,17, 19 100:1 101:18

**logbooks** 103:1

**long** 6:14 7:14 9:8 10:8,15 11:3, 9 15:10 16:9 17:2,7,21 18:14 20:8 23:14 24:6 34:18 52:16 70:12 78:7 79:14 86:9,10 88:18 89:19 99:18.

**longer** 18:5

**looked** 134:17

**losing** 119:22

**loss** 5:20

**lot** 58:4,13,15 125:5

**loud** 130:16 136:24 139:5

**loves** 117:5

**lowered** 126:9

---

**M**

**M-o-r-g-a-n** 17:20

**machine** 10:12,25 11:5 33:10 58:21,24 59:2,6,11 88:12 112:1 131:9

**machinery** 12:24 13:2,22,24 14:7,9,10 85:6

**machines** 14:17

**machinist** 12:6 14:2,12 15:10, 19 16:10,25 17:22 27:21 28:5, 12 30:16 34:7 47:12 48:9 49:20 54:25 55:3,8 56:4,17,21 58:19 61:8 65:24 66:2 67:1 73:2 75:23 76:12 78:20,21 91:1,4,6 92:3,21 96:19 97:19,24 101:1 103:12 104:25 105:20 106:15,19 107:1, 10,16 109:3

**made** 29:25 82:19 83:10,14,17 100:1 101:13,14,17,23 109:22 115:11 117:11,22 118:1 120:16, 21 121:5 126:13 132:20

**main** 13:8 44:13 45:9

**maintainer** 11:18 12:3,16,18, 23 13:2,7,8,21 15:22 75:10 78:25 97:4,11

**maintainers** 61:15,25 62:9 75:8 80:10 109:8,9

**maintaining** 47:10,16,19 48:3

**Maintains** 12:19

**maintenance** 16:23 19:6,10, 11,13 30:2,9,15,23 32:9,18 33:2,10 35:1 38:14 43:14 46:13 47:6,13 48:13 49:22,25 54:17, 23 55:23 60:14,16 61:3,23 62:8, 15,20 63:2,9,12 64:8,10 65:14 84:17 87:8,10 88:1,9 89:10 92:1,4,5,25 98:10 101:23 102:1 105:19 106:20,23

**maintenances** 88:6 .

**majority** 15:5

**make** 5:9,12,7,3 13:23,16:9. 28:11 41:10 62:23 65:17 81:8 95:12 99:15 102:3,10,19 105:11 106:7 113:20 115:11,14 125:22 129:12 136:19 141:25

**makes** 12:20 81:20

**makeup** 94:15

**making** 138:24 139:4

**man** 104:9

**management** 63:18 107:21

**manager** 18:13 104:7 105:25 106:9,13,14 107:14,23 108:1 110:11 114:2

**manual** 32:9,12 104:22

**manuals** 32:15 38:14

**manufactured** 24:21

**manufacturer** 33:5,13 48:22

**manufacturer's** 31:13 48:17 49:1 50:4 .

**manufacturing** 11:6,13 14:21

---

.15:7.24:9,13,17,25.25:10.28:2 30:14 33:3,24 34:9,19 39:15,19 42:11 52:8,10 67:16 95:20,24 96:22 103:16 110:22

**Manufacturing's** 33:16

**mark** 125:12,15 137:18 141:23

**marked** 122:13,14,17 125:17 137:19

**mat** 29:2,12,13,14,24 30:3,7,8 32:20,21,22,23 36:12 37:19 38:16 62:24 64:22,23,25 65:5, 11,16,18 91:7,12 100:10,20 101:9

**material** 26:9 96:17

**materials** 31:3 38:23 39:7 93:4

**mats** 14:15,16 30:2,9

**matter** 77:20 119:6

**meaning** 5:2,6 130:3 141:12

**means** 126:15

**meant** 105:22

**meet** 19:23 96:11

**meeting** 20:8,13 21:2,5 30:22 73:18

**meetings** 31:2

**member** 107:20

**memories** 90:17

**memory** 40:20 90:13

**mention** 32:1.

**mentioned** 37:18 38:16 39:3,6 49:10 127:14 134:14

**messages** 115:18

**messes** 13:11

**met** 19:19,25 115:17

**metal** 84:7 137:5

**meter** 98:24

**Michael** 4:11

**midnight** 52:19,21 128:9

**Mike** 9:4,8 19:5 23:16 76:8 78:23 80:14 83:19,20 106:5 117:23 120:10,16,18 132:25

**Miller** 4:12 16:19,20,24 17:2,12 18:3,7 42:13 51:5 74:12,16 95:13,16 96:25 108:11,12 122:13 125:21 127:2 140:24 141:14,22 142:6

**millwright** 12:6 14:2,13 15:11, 19 16:10 17:22 27:22 28:5,12 30:17 34:7 56:21 58:19 63:8

---

73:2 75:23 76:24 91:1.96:19. 97:19 103:12 104:25 105:20 106:16

**millwrights** 16:25 36:10,21 47:13 48:9 49:15,20 54:25 55:3, 8 56:4,17 57:3,5 61:8,25 62:7,9, 12,15 65:13,24 66:2 67:1 69:1 74:25 76:12,23 77:12 78:20,21 80:15 91:4,6,19 92:3,21 97:24 101:1,19,20 106:19 107:1,10,16 109:3

**mind** 84:14

**mine** 21:21

**minute** 45:23 82:21 83:9,14 120:10 129:8

**minutes** 20:9 58:6

**misstate** 121:12

**Misstates** 121:8

**molecular** 95:1

**moment** 44:20

**money** 12:15

**month** 20:2,3 22:2 99:1,2 123:7,11,15

**monthly** 42:20

**months** 6:17 7:12 11:18 12:11 15:22,25 19:22

**Monticello** 7:24 31:21 33:25

**mopped** 13:11

**Mopping** 12:9.

**Morgan** 17:16,19,21,23 18:7, 14,17,21,24 19:2

**morning** 4:9 54:2,12,16 59:16 124:6 128:1,9

**motor** 46:20,22 130:12

**motors** 60:15

**move** 6:16 7:11 43:19

**moved** 12:12

**moves** 14:17

**moving** 81:3,14

**multiple** 41:5,7 114:15

---

**N**

**natural** 84:9

**necessarily** 102:7 132:18

**night** 20:17 21:18 22:20,22,25 52:24 53:15,17 54:21 66:12 76:9 107:2,7,9,21,23 124:5 128:4,8



**nights** 53:14 108:4 128:3

**nodding** 5:3

**nods** 119:3 120:8 134:13 135:20

**noisy** 5:18

**non-ball** 115:15

**normal** 7:1 68:10 69:6,9,18 70:2,19,24 71:6,20 72:11,15 74:1 107:17 120:13 126:6 129:20,23 130:2,3

**notation** 129:12

**note** 135:8

**notes** 89:20

**November** 7:15,17 11:15 15:16,23 24:14,18 27:10 33:20

**number** 7:7 12:1,3 68:17,18 137:21

**numbers** 111:9

**Nydegger** 18:11

---

**O**

**oath** 74:17

**object** 6:4 36:7 51:25 56:15 69:22 84:13 116:1 117:3,13 121:2,7 122:9 127:2 141:22

**objection** 140:24 141:14 142:1

**objections** 121:13

**observation** 132:19 134:8 136:13

**observations** 133:20 134:3

**observed** 40:8 129:9 131:4 134:14

**observing** 40:2

**obtained** 15:7

**occasion** 37:18 41:6

**occasionally** 96:9 109:15

**occasions** 41:5,19 66:15,19 91:12

**occupied** 60:11

**occurred** 51:24 52:14,18

**on-the-job** 15:8

**oncoming** 98:3,4 99:13

**opening** 133:12

**operate** 87:1,4

**operated** 13:22 50:13,15

**operates** 12:24 13:1

**operating** 68:10,22 69:6,9,15 70:20,24 71:6,21 72:11,16 74:1 86:24,25 97:3 129:22

**operation** 34:10,18 42:23 50:10 86:11,15

**operational** 81:17 88:24 89:2

**operator** 9:24,25 10:14 13:8 28:22 42:23 97:9

**operators** 36:21

**opinion** 121:19 122:3

**opportunities** 49:21

**opposed** 103:5

**orange** 116:23,25 119:21 122:12 129:24 134:19 135:10 137:8

**order** 81:19 102:4 132:16

**ordinary** 89:23

**originated** 116:4

**Otto** 113:7

**oven** 26:22 28:13 32:10,13 45:4,6 47:1 49:12,16,19 50:6,14 55:4,5,9,13,15,21,22 59:21 66:6 68:24 71:23 75:1 80:13 81:3,10 84:15 86:1,10,15,19,21 87:1,4,7 88:19 91:22 93:4,13,24 94:17 96:4,6 108:14,19,20,22,25 110:21,25 111:7,17 121:25 128:16,19,22,24,25 129:5,21 130:8,24,25 133:17 138:10

**ovens** 25:14 26:20 28:3 33:19 41:7,11 47:4,7 49:15,22 56:8,18 84:11 99:5

**oxygen** 117:5,6,7

---

**P**

**p.m.** 53:3,9,18,24 57:20 58:10 74:15 92:9 95:14,15 102:16 108:9,10

**PA** 77:14,17

**paged** 74:25 76:18,20 77:11

**paint** 75:8 136:2,3,5 137:1

**panel** 47:25 48:5

**paper** 71:23 103:6 108:23

**papers** 22:9 64:5

**paperwork** 63:24 97:23 98:8

**park** 58:13,15

**parking** 58:4,13,15

**part** 20:13 28:17 29:6 39:18 42:10 43:1,5,9 55:19 59:25 64:24 66:20 67:15 75:22 92:10 97:19 100:15 125:24 129:23

**participate** 56:21 73:14

**particles** 110:6

**parts** 14:9 28:6,9,10,13,15,16 29:1 32:12 60:25 90:23 96:18

**pass** 59:8 80:4

**passed** 79:8

**passing** 21:15 79:3

**past** 39:18 40:1,9,12 41:12,18 59:12 89:18 109:15 112:1,6 118:14 134:20

**path** 59:6

**Paul** 103:20,22 104:1,3,4,5 105:1,10

**Paula** 113:22,24,25 114:1,7

**Pellegrini** 20:23 21:6,8 75:15, 23 76:4 78:12 82:9,11 83:11,18 116:13 118:23 130:23 131:17 132:25 138:12,24 140:20

**Pellegrini's** 21:12

**people** 6:22 41:7 75:2,3,6 78:18 80:17 104:20

**perform** 14:20 35:15 36:4 38:10,13,20 45:15 47:3 49:21 56:13,21 66:2 67:2 101:6,13 110:25 112:17

**performed** 29:18 30:3,10 35:23 40:20 47:13 62:21 63:12 64:10, 20 89:10 90:22 91:19 93:1 94:4 101:7 103:17 105:11 112:2

**performing** 37:22 39:2 43:12 46:12 49:25 57:7 58:17 92:4 94:9

**period** 8:21 20:8 41:14,19 58:3, 9 109:16

**periodic** 65:13

**periodically** 48:10

**periods** 88:2

**personal** 28:21 58:5 59:7

**personally** 66:25 116:2

**pesticide** 10:6

**pesticides** 10:3

**phone** 107:24 108:1

**photograph** 72:22

**photographed** 73:15,16

**photographs** 22:12,14,17,19, 23 23:3 69:20 71:3,9 72:9,18 73:5,8,11,20,23 74:2,5,8

**piece** 33:10 85:5

**PIN** 26:20

**pipe** 75:21 116:7 136:18 140:17

**pipes** 82:23

**pitot** 75:20 98:23

**place** 7:8 108:14

**plant** 7:8 9:22 10:24 17:10 18:17,24 19:2,12 24:21,25 25:4, 7 31:21,24 33:24 45:10 51:12 52:4 57:23 58:5,17 59:5 103:14 124:25 125:1

**plate** 66:6 133:13

**play** 33:15

**plural** 114:13

**PM** 32:16,17,20 63:1,5,15 64:1, 4,20,24 70:9 75:22 102:2 103:1

**PMS** 63:20 64:2 65:3 102:6 127:23

**point** 30:5,7 33:21 38:2 68:19 80:18 95:6 114:12 118:10 119:22 129:25 130:1,9 133:20, 21 134:2 135:16,21 136:6 137:9

**pointed** 104:6

**pointing** 123:18 138:12 139:1

**poor** 18:22 117:2

**porthole** 118:17

**position** 9:10 12:5,16,21 14:2, 20 15:1,6,13 16:22 17:9,22,23 18:4 30:16 43:5 59:2 105:16 106:24

**positions** 7:12 11:16,23 39:19 42:10

**possibly** 15:20 25:16 29:20,23 40:15 64:14 70:10 117:7 135:7

**post-cleaning** 108:14

**post-cleaning/pre- production** 109:6 112:16,23

**powered** 46:24

**practice** 57:25 117:11

**premises** 107:17

**prep** 19:23

**preparation** 55:9 95:20

**prepare** 19:17,19 22:7,24 23:5 29:5 36:15 55:4 73:18 123:25

**prepared** 29:4 122:25



**present** 6:16 39:18 134:12

**presses** 12:10

**presumption** 6:3

**pretty** 14:14 139:17

**preventative** 32:18 33:2,9 63:2,9,11 64:8,10 89:10 92:4,25 101:23

**previous** 127:24 128:5

**previously** 104:2

**primarily** 10:14 14:4 32:20 109:8 125:2

**prior** 15:8 21:2,5 24:9,10 35:18, 22 53:9,12 58:6 63:12 86:19 88:23 89:1,5,9,13,17 91:20,23 95:25 97:16

**problem** 76:5 130:6,11 131:22 138:18 139:13

**problems** 88:24 89:2 98:11

**procedure** 36:16 108:19 109:1, 6,19 110:9 111:3,21

**procedures** 95:19 108:13 112:23

**proceed** 32:6

**process** 25:10 26:24 27:5,13, 16 35:11 40:7 42:3 54:15 55:1 56:22 65:25 66:20 73:14 81:25 109:14 111:25 112:16

**processed** 26:19

**processing** 80:20 87:11

**produce** 13:23

**produced** 24:15 25:3,7,21 26:7

**producing** 24:25

**product** 14:17 24:15 26:9 35:7, 11 41:17 80:25 81:2 95:4 99:25

**production** 12:21 13:18,25 19:4,8,9,12 25:18 26:1 27:18 33:20 35:8 58:24 59:24 61:16 80:17 94:1 97:14,20 105:17,21, 24 106:4,5,8,9,13,14 107:11,14, 19,20,22,25 108:1,15 110:11,16 125:1

**products** 25:3

**programs** 98:8

**promoted** 17:9

**promotion** 12:14

**pronoun** 113:19 114:13

**properly** 37:24

**protection** 28:21

**provide** 14:19 22:3 30:14,21 34:9 39:15 47:6 49:20

**provided** 31:2,6,9 36:4,18 75:10,13 77:12 104:13 123:12

**providing** 33:23

**proximity** 40:24 68:7 80:13

**puff** 140:11,13

**pull** 29:16 44:15

**pulley** 28:20,24 29:8,10,21 39:6 100:6,16,22 101:2

**purchased** 34:21

**purpose** 40:16 69:19 71:8 90:12 94:18,21

**put** 11:20 13:13,17 30:7 56:17 57:5 60:4 104:17 110:16,24 114:11 126:13 133:17 140:14

**putting** 116:20

**Q**

**quality** 112:9,14,21

**question** 5:16,22,23 6:1,3,5,20 18:22 32:6 34:14 51:4,5,13,19 61:4 70:5 90:3 95:16 96:24 97:7 98:13 100:15 103:10 121:21 140:22 141:16

**questioning** 23:25

**questions** 5:1 40:16 90:10 125:12,13

**R**

**Raisor** 9:4,8

**ran** 12:8 110:8

**Randy** 20:23 23:16 76:16 77:1, 2,6 78:15 80:14 118:5 133:24 137:23

**range** 102:20

**ranges** 25:6

**rapidly** 120:22

**rated** 45:22

**Ray** 16:19,20 17:4,5,12

**read** 20:20,22 21:1,14,23 42:13, 14 51:6,14 95:17 96:25 97:1 98:13,15 126:2 140:9,11

**reading** 21:17,22,23 123:17 139:3,5,6

**readings** 131:17,18,23 134:18 138:7,8 139:10,15,25 140:4,8, 21,23 141:2,3,8,11

**ready** 36:15 110:24 120:5 124:24

**reason** 16:1 44:2 131:23

**rebound** 117:7

**recall** 15:13,20 18:1 20:16 21:10,13 22:16 25:19 29:7,10, 25 35:18 36:18 37:19 39:1 40:23 41:1,4 42:24 44:7 46:12 48:24 49:10,24 53:13 54:4 55:15 56:20 57:22 59:20,24 60:2,7,18,20 63:3,11,16 66:8,22 67:1 68:18 71:22,23 72:10,12 75:6,10,13 80:22 82:8 91:25 92:2,20 101:17 105:6,14 114:4, 18,24 123:5 133:11 138:8,20 140:4,22 141:1,4,7,13,18 142:3

**receive** 37:22 38:9,19 42:17,19 100:23

**received** 9:3 10:5 31:12 42:9 46:2,10 60:24 77:15 101:2,9 129:18

**receiving** 42:22 48:8

**recently** 23:9

**recess** 74:14 95:14 108:9

**reclassifiable** 42:7 67:5,8,13

**recognize** 103:25

**recollection** 54:1,10,14 55:12 57:9 77:6 79:15 81:2 89:16 96:12 105:18 129:14 139:9 140:7

**recommended** 48:17,22 49:1 50:4,6

**record** 4:10 74:17 103:7 108:11 126:2

**recorded** 64:9,21

**red** 118:14 120:24,25

**refer** 4:19 52:13

**referenced** 33:3 102:10

**referencing** 138:19

**referred** 133:6

**referring** 124:12 129:2 131:16

**reflect** 98:10 103:13

**refresh** 140:7

**rehang** 66:19 105:5

**rehanging** 56:23,25

**reinstall** 38:5

**related** 35:15,24 66:22 67:2

**relation** 50:9 82:19 102:22

**ready** / **remember** 30:9 39:4 60:1 68:7, 17 79:25 83:4,8 86:8 89:4,15 92:24 97:17 100:5,9,12,13,20 118:19 119:8,11 123:5,7,13,14, 15,17 125:3 126:10 130:23 137:11 138:11,21 139:11 141:9, 10,11

**remind** 7:2

**removable** 26:13

**remove** 38:1 47:25 48:5 55:20, 22 56:5 66:19 105:5

**removed** 39:10 55:18 66:6

**removing** 55:12,15 56:22,25

**repair** 9:6 14:7,9,14 28:6,8 29:17,19,24 30:23 31:1 35:3 36:13,22 37:19,22,24 38:10,12, 13,16,20 44:3 46:12 47:6 49:22 62:6,12,16 91:7 97:25 98:11 99:11 100:10 101:9,13,14

**repaired** 91:13

**repairing** 14:15 29:10 30:8 47:10,16,19 48:4 100:19

**repairs** 29:25 37:25 39:1 49:25 62:4 90:21,25 91:18

**repeat** 5:17,23 34:14 51:4,5,13

**replace** 43:18,19 44:3 46:8,17 60:15

**replaced** 46:8

**Replacement** 91:10

**replacing** 30:8 43:16 46:14,15

**replicated** 39:13

**report** 113:15,17,21

**reporter** 4:25 5:8 6:21 7:4 42:15 51:7,15 95:18 97:2 98:16

**reports** 98:18 100:1 101:18 102:13 103:1

**represent** 4:13

**representative** 31:14

**request** 101:1,6,9,10,13 105:6 115:11

**requested** 42:14 51:6,14 95:17 97:1 98:15 114:23

**requests** 105:11

**require** 58:20 59:7,11 93:18

**required** 30:23 60:3 63:20 65:13 96:18

**requires** 5:8 28:5 43:18

**reserved** 142:7



**respect** 25:11 30:15 31:3,16 36:9 103:8,10

**responsibilities** 16:13,15 111:22

**responsibility** 106:15

**responsible** 47:9 61:3 64:2

**Restroom** 108:6

**result** 42:21 101:5

**resulted** 101:12

**resumed** 59:24

**retired** 17:25 18:1,11,15 36:11 37:5,6,9

**retirement** 16:8

**returning** 125:1

**returns** 108:15

**review** 20:13 21:13 22:2,7,14 23:2

**reviewed** 20:16 21:3,11 22:17, 20,24 32:9,12,15 33:8,12 71:3 72:19 73:19,23 123:6,10

**reviewing** 22:6 123:14,15

**Reynolds** 6:13

**Rick** 18:11

**rod** 91:12

**Rogers** 19:5 76:8 78:12,23 80:14 83:19,20 106:5 117:23 120:10,16,18 132:25

**role** 27:21 33:15 106:13,14 107:22 112:15 114:1

**room** 20:10 21:9 75:1 76:17,25 77:4,7,18,23,25 78:8 79:6,25 120:3

**rose** 116:12

**rotating** 19:9 66:14

**roughly** 11:19 67:7 129:13

**Round** 11:2

**routine** 62:20 97:21

**Roy** 17:2

**rule** 6:19,25 7:2

**rules** 4:17,24

**run** 16:4 36:12 46:20 77:23,24 108:18,19,21 109:23,25 110:1 111:5,17

**running** 78:1 80:22 82:2 97:18 110:20 112:8 122:2 129:23 130:3 136:16

**runs** 12:19

**Russell** 23:16,17,22 24:4

---

**S**

**S-o-y-k** 113:7

**safety** 42:17,19 60:2

**scene** 132:22

**schedule** 19:10 48:13,21 49:2 50:4 53:16 86:24,25 88:9

**scheduled** 53:6 54:20 60:7 88:1,7 92:8

**schedules** 88:10

**Scholten** 103:20,22 104:1 105:1,10

**school** 7:22,23 8:1

**scissor** 118:6,8 126:12 130:9 133:15

**Scott** 113:3

**Scream** 130:16

**screaming** 118:23

**sealant** 95:4

**seals** 95:4

**seams** 135:22

**seconds** 41:15 77:10 78:9 79:24 112:6 119:6 120:4 137:16 139:22

**section** 126:18

**Senak** 6:4,7,9,20:11 21:2 36:7 50:17 51:19,21,25 56:15 69:22 71:10 84:13 95:11 98:13,17 105:23 116:1 117:3,13 121:2,7, 13,21 125:12,20 137:18 141:25 142:7

**senior** 36:10,21 38:20

**sense** 37:25 38:7 46:6

**sensitive** 77:21

**sensors** 111:5

**separate** 46:20

**sequence** 132:18 136:19

**service** 46:3,4 60:4 97:25 110:16,24

**services** 33:24 35:15,23 56:14

**set** 4:16 60:21

**shack** 21:16 124:3

**shaft** 29:5,10,12,13,15,24 30:8 38:2,4 100:10,20 101:10 133:12 137:13

**shafts** 29:2 37:19

**shakes** 45:17

**share** 23:23

**shared** 121:19

**sheet** 32:16,17 63:2,5,9,15 102:2

**sheets** 33:2 102:2,16 103:2 109:23 110:7,21

**shift** 52:24 53:4,6 54:21 57:19 58:1,7 59:6 60:10,12 66:13 84:22,25 85:5 92:10,11,18 98:4 99:13 107:7,9 108:4 124:9 127:20 128:7,8

**shifts** 66:14 92:14

**shop** 9:5 10:12,25 11:1,5,20 25:25 58:21,24 59:2,7,11

**short** 18:10 88:12 95:11 117:19

**Short-term** 82:21

**showed** 22:9 71:18 72:7

**showing** 71:24 137:21

**shown** 72:8

**shows** 72:15 126:9

**shut** 25:25 49:16,19 81:25 82:5, 6,8,10,11 83:10,11 87:7,10,19 88:12 92:5 93:25 116:12,15,21, 22 117:17,19 120:20,21 126:8 135:25 136:16,18 137:3 138:14 139:7

**shutdown** 88:2

**shutdowns** 88:4

**shutting** 55:8 87:22 116:18 132:14

**sic** 37:3

**side** 21:19 26:1 45:17 128:24,25 129:7 135:5

**sides** 68:2

**signature** 127:12 142:7

**similar** 109:13

**simply** 109:10

**single** 27:13

**sir** 4:23 5:21 6:6,18 7:6 18:19 22:1,5 24:1,5,12,23 27:19 28:4 32:17 33:17 48:19 50:22 52:5,9 56:24 57:11 59:4,19 60:23 63:14 73:21 90:6 91:21,24 94:11 102:19 108:17 112:12 115:23 121:10

**sit** 29:6 40:19 64:18 81:1 91:25 92:2,20,24 128:19,21

**sit-down** 30:22

**site** 54:2,11 57:10 94:8 105:20 107:23

**sitting** 90:16

**situated** 119:15

**situation** 117:11 120:12

**size** 25:6,11,15,22 27:13,16 45:25 118:18

**skills** 15:6

**sleeping** 66:10

**sliding** 12:8,9

**Slow** 36:25

**smartass** 89:20

**smell** 75:2,8 80:11 84:5,8,12

**smelled** 79:2,8,19 80:5

**smelling** 131:20

**smells** 75:3 120:7

**smoke** 75:19 83:22,24 84:1 85:9,12,13,15,22 86:7 98:21 116:10 119:16 120:11 126:4,11 128:14,17 129:4 131:5,7,11, 12,15,24 132:8 133:3,10 134:12 135:21,23,25 136:6,14,21 140:11,13

**smoking** 131:20 132:3 133:14 136:1

**smolder** 84:9

**smoldering** 74:24 75:19 84:12

**solely** 41:16

**sort** 134:2

**sound** 130:15

**sounds** 15:4 90:4

**source** 85:12

**South** 6:13

**Soyk** 113:7

**space** 41:12 67:9,12,13 80:3

**spaces** 42:7 67:6

**span** 49:6 117:19

**sparks** 118:22 134:19

**speak** 23:5,15,17,19 92:10

**speaking** 55:24 69:12 120:9

**specific** 30:24 36:20 38:12 40:19 60:18 63:5 66:11 67:10 68:20 70:3,6 71:16 73:6 90:10, 17 99:10 100:13 108:24 110:3



**specifically** 68:12 76:20 83:4,
9 93:17 102:9 109:25 114:18
141:7

**spell** 10:23 18:10 37:2 126:24

**Spencer** 18:12 37:11,14 49:8
56:3,5 105:14 106:1 107:13,22
110:12,15 113:22 114:10,11

**spend** 58:11,20

**spending** 58:4

**spinned** 133:23

**spoken** 23:8

**spool** 13:13,17

**spray** 94:22,25 95:2 108:21

**sprayed** 94:13,24 96:3

**spread** 140:16

**spreading** 9:25

**spring** 9:16

**squirrel** 45:20,22 46:13 47:16
48:3,4 69:7,10 70:20,22,25 71:7
85:17,20 86:2

**stages** 111:6

**stand** 90:16 94:16

**standing** 40:1 41:18 109:15
118:1 135:16

**stands** 19:12 61:13

**start** 41:23 53:1 111:14 128:7
137:2

**started** 11:10,18 12:12 84:6,22,
25 86:13 120:25 127:20 134:4,
9,10 135:25 136:1 137:6 140:16

**starting** 136:6

**starts** 60:10

**state** 4:9

**stated** 61:18 79:8 84:21

**statement** 20:18 113:16,17
114:5,16,22 115:2,5,6,9,11,14
121:8 122:23 123:7,10,11,15,16
125:24 127:14,15 128:1,12
129:15 132:7,18 137:22 138:19
140:3,6

**statements** 20:20,22 21:3,6,9,
12,25 22:2,6 138:25 139:4

**stay** 40:6

**steel** 24:21

**steps** 55:3

**stick** 44:20 46:5 98:23 133:25

**sticks** 108:23

**stood** 41:13

**stop** 40:13 112:6

**stopped** 80:24

**stopping** 40:21 41:1,4

**Stout** 76:6 78:12 82:14 83:18
133:1

**straight** 32:21 64:24 65:6,18

**Street** 7:7

**stressed** 99:14

**strike** 35:6 46:25 50:7 56:11
92:1

**structure** 60:25 95:1

**stuck** 119:19

**student** 8:18

**study** 8:15

**stuff** 70:14

**substance** 64:1 96:12

**sudden** 116:15

**suggest** 130:5,17

**suggested** 81:24 130:10

**summer** 9:15

**summoned** 120:3

**supervise** 16:24

**supervised** 105:21 106:20
107:10

**supervises** 19:13

**supervising** 18:20

**supervisor** 16:23 17:3,12,15,
21 18:10 19:3,4,6,8,9,10,11,12,
13 56:2 76:8 78:22 80:14 81:21,
24 104:7 105:17,19,21,24
106:5,6,8,20,23 107:11,17,18,
19,20,25 108:3 117:23

**Supervisors** 106:4

**supervisory** 16:13,15 106:14

**supply** 87:24 117:7

**supposed** 93:21

**switch** 65:16

**system** 45:9 65:20,25 77:14,17
99:7

─────────────

**T**

**takes** 36:16 131:17

**taking** 55:5 140:4 141:7,11

**talk** 23:13 70:13,17 107:24
111:17

**talked** 23:11 30:24 82:4 104:9
116:20 132:24

**talking** 6:22 49:11 85:1 111:18
138:6,24 140:21

**task** 45:16 57:3 64:7

**tasks** 56:20 60:21 64:10,20
66:22 67:2 105:12

**tech** 4:13 8:22,24 26:5 33:16,
18,23 34:5 54:2,6,10,20 57:9
59:15,18,20 66:9 86:22 88:19
93:21 94:8 103:17 104:16,21
105:10 115:24 121:25

**Tech's** 34:2

**technician** 8:17 61:13

**technicians** 61:11

**telephone** 115:17

**tells** 111:5 120:6

**temperature** 68:11,23,24 69:3,
7,10,15 70:3,4,6,7,20,24 71:7,
14,17,22 72:6,8,12 116:12,16
117:8 118:24,25 119:7,9,10
126:9 131:17,18,23 133:22
138:7,8 141:3,5

**temperatures** 69:18 71:21
72:11,16 74:1 82:23,24 83:7
111:6,10 131:2 140:18

**temporary** 18:9 31:23

**ten** 41:15 112:6

**ten-second** 41:18 109:16

**Tennis** 113:25 114:1

**tension** 43:17 46:14

**terms** 139:15

**test** 90:12

**testified** 21:11 36:2 57:19 63:1
66:18 67:19 79:23 91:5 100:5,9,
16,19 105:4 106:19 107:9,13
117:18 122:20 123:6

**testify** 90:16 141:23

**testimony** 5:9,12,14 18:23
20:17 21:20 28:12 37:20 38:6
41:9 63:3 80:1 100:20 105:7,18
114:21 120:2 121:12

**text** 42:14 51:6,14 95:17 97:1
98:15 115:18

**Thanksgiving** 87:13,15,21
88:5

**theoretically** 13:9

**thermal** 22:11,16,19,23 69:20

**71**:2,9,18 72:6,9,14,18,22,24
73:1,4,7,10,19 74:1,4,7 119:9

**thing** 13:6 99:7 112:5 116:10,21
131:7 136:21 141:3,4

**things** 7:3 13:11 102:2 120:22,
25

**thinking** 124:8,10

**thinks** 80:11

**Thirty** 20:9

**Thoennes** 114:7

**thought** 18:23 81:25 83:12 84:6
116:19 120:13 131:14 139:17

**thread** 13:3

**threaded** 26:13,14

**threading** 12:10

**three-quarter** 140:15

**Thursday** 98:25 99:1,2

**Thursdays** 98:25

**ticket** 100:24

**till** 9:14 92:9

**tilted** 32:24

**time** 8:21 12:8 13:4 18:17,20,24
20:7 23:25 24:2,24 25:13,17,20
32:2,19 35:19,22 40:2,15 41:12,
14,19 49:4,6,11,14 52:16 53:1
55:16 56:7,10,12 57:22 58:3,7,
10,11,20 60:11 70:19 73:6,7,22
74:4 77:1,4,20 78:16 80:18 81:4
85:5 86:9 87:6,16,12,89:19,
90:23 92:25 93:24 96:23 99:18
108:24 109:16 110:13 114:25
117:20 118:8,10 119:14 125:7
129:14,17 131:13 132:17 134:6
136:11 137:24

**time-sensitive** 77:20

**Timeout** 105:22

**times** 41:8 60:14 88:15 132:20

**tired** 124:7

**today** 4:16,19 5:12,22 29:6
40:16,19 64:18 81:1 84:5 91:25
92:2,20,24 100:5 103:24 120:2
123:4

**today's** 7:17 19:17,20 22:24

**told** 79:2 89:19 92:20 121:23
136:12 138:9 139:10

**tools** 41:25

**top** 43:10,13 44:1,2,6 67:19
68:5 128:19,21 129:21 130:8
133:16



12

Index: total..yelling

**total** 11:19 124:11

**tracking** 32:20,22 38:17 64:22, 25 91:7

**trained** 36:8 48:20 72:21

**training** 30:14 34:10 38:9 39:16 42:9,17,19 46:2,10,11 48:8 60:24 121:16,17

**trainings** 42:21

**transcribe** 6:22

**transcribing** 4:25

**transfer** 17:23

**transferable** 15:1

**travel** 25:14

**traveling** 32:23 118:14

**trial** 18:9 90:15

**trouble** 98:5

**truck** 42:23 58:12 124:16

**true** 9:15 13:25 14:10,11 15:8,9 16:1,6,7,8 18:25 19:1,14 25:1,2 27:7,10,22,23 28:7,10,22,23 29:8,9 31:7,8,10,11,18,19 33:13,14 36:5,6 38:14,15,21,22, 24 39:13,14 40:10,11 41:20,21 45:20,23,24 47:1,2 49:17,18,22 50:16,18 51:24 52:2,22,23,24, 25 53:4,5,7,8,20,21,23,24,25 57:20,21 58:25 59:1 61:6,7,8,9, 11,13,16,17,19,20 62:10,11,13, 14,17,19 65:10 66:16,17,20,21 67:21,22,23,24 68:5,6 69:4 70:2,3,18 71:4,5 72:18,17 73:16,17,23 75:24 77:16,17,21 78:20 80:8,15 81:14 82:16,20, 25 83:18 87:12 88:13 91:1,10, 16 92:11,12,14,15,18,19,22 93:1,2,14,15 94:1,2 97:21,22 100:2,3 101:7,8,14,15,18,24 102:17 103:2,3 104:2,3,22,23 105:21 106:25 111:22 114:20, 23 115:15,16 117:2,12,20,21,23 118:6,10 119:2 121:1,3,6,10,11 125:25 130:18 132:21,23 133:18,19 136:15 138:2

**tube** 75:20 98:23

**tubes** 43:3

**turn** 29:4,16 38:4 81:19 117:12, 25 119:4 120:6,16 121:5 134:6

**turned** 93:25 116:23 118:5,11, 12 119:21 122:11 132:12,13 134:7,11,24 137:15

**turning** 117:1,15 136:2

**Twelve** 25:8 27:17

**Twenty** 78:9

**Twin** 7:24,25 8:6

**two-page** 122:16

**type** 26:17 100:23 102:17 115:5

**typewritten** 115:8 122:18 123:1,3,11,14

**typical** 58:9 84:11

**typically** 19:14 58:15

---

U

**ugly** 119:17

**uh-huh** 5:7 8:7 11:25 12:2,4 44:22 76:2 86:8 114:14 117:24 118:13 121:9 129:16 132:11 134:22 135:18 136:23

**uncommon** 75:2

**understand** 5:23 15:21 24:16 28:11 38:8 41:9 51:19 52:18 61:4,5 64:8 66:12 67:5 70:5,13 81:6 86:10 89:22,25 94:18 102:9,20 104:24 117:9 120:2 131:19

**understanding** 38:6 51:22 52:14 54:6 67:8 96:2,7,9

**understood** 6:2 18:23 132:4 139:19

**unit** 64:23 65:7,9,14

**units** 65:1

**University** 7:21

**upset** 137:17

**urgency** 78:3

---

V

**vague** 79:15

**varies** 58:14,22

**variety** 61:5

**vehicle** 58:5 59:7

**verbal** 31:7 38:19 101:10

**verbally** 5:6 101:3

**version** 124:19

**vicinity** 44:9 52:17

**Vincennes** 7:21 8:3,8,16,18,25 9:12 14:19,22,25 15:5

**visible** 131:24

**visual** 59:3

**visually** 109:10

**volume** 25:20

---

W

**Wait** 36:25 129:8

**walk** 41:12 59:12 79:24 120:4

**walked** 40:12 77:25 83:25 103:24 130:2 135:23

**walking** 40:1,5,9 41:18 77:7,18 79:5 89:18 90:1 109:15 112:1,6 131:9

**wanders** 65:16

**wanted** 99:12 124:23

**warmer** 71:18,20

**watch** 40:14 41:14,20

**watched** 39:25

**watching** 40:21 41:1,4

**water** 125:2

**wear** 62:24

**weather** 46:7

**week** 11:14 50:14 87:4,12

**weeks** 23:18

**weld** 9:24 10:14 11:7 29:3,16 38:4

**welder** 38:3,8

**welding** 14:22,24 15:4 100:11

**Wes** 4:20,21 6:11 7:20 19:16 33:15 74:17 122:16 125:7

**Wesley** 4:11

**west** 6:13 85:24 128:24

**white** 126:11 132:8 133:3

**wiped** 13:11

**witnessed** 113:17 124:19

**witnesses** 23:5,7

**witnessing** 109:16

**wondering** 57:16

**word** 126:18,19

**words** 49:12

**work** 8:21,24 9:8 10:9 11:3 23:11 25:23 27:18 30:10,13,23 35:15 42:6 45:14 47:3 53:9,12 57:7 58:17 60:16 61:15 66:12 92:17 96:18 99:25 100:24 101:6,7 102:7 103:17 104:22 107:1 111:16 122:1 127:20,24

**worked** 5:19 9:14 10:23 15:21 18:9 26:1 28:15 31:20 33:20 35:19 52:24 53:10 95:24 98:3,5

**working** 10:8 24:9,13 28:2,16 30:18 36:17 47:22 53:15,17 57:1 76:12 96:22 97:3,15,17,20 102:4 105:2 107:16 128:3

**works** 12:20

**worn** 29:14,15

**worse** 117:12,14,16 126:13

**write** 98:2 113:14 114:16,21 124:18 128:4

**writing** 124:7

**written** 31:3 33:7 38:23 39:7 98:9 127:9,25 128:5

**wrong** 75:25 115:25

**wrote** 21:7,9,12,15,25 64:5 115:2 124:18 126:2 127:15 129:15

---

Y

**year** 6:17 7:12,15 9:9 11:4 18:12 63:22 64:11,13 87:6,18 88:5,15

**years** 5:19 8:10 10:10,16 11:11, 19,21,22 15:12,17,22,24 17:8 18:3 64:14 70:10,14

**yelling** 118:23 140:20

Called out to line 2 IBO for light smoke from discharge blower @ 12:20. Inspected blower seemed normal. Et's got heat cam and was same as other blower. Close between 20° of other. Shut down burners temp lowered some. With burners off and blowers on white smoke began to discharge from the blower. Got scissor lift and fire extinguishers and attempted to put fire out which made it worse. Discharge blower fully engulfed inside. Extinguisher didn't help. Supervisor called 911.

5-22-2014

Wes Krintz

**EXHIBIT 23**

Michael Vergon

10/11/2017

Reported By
Tamara J. Brown
CRR, RMR, CSR



Called out to line 2 IOO for light smoke from discharge blower. @ 12:20 inspct Blower seemed Normal. ETS got Heat Cam and was same as other Blower. close within 20 deg of other. shut down barners temp lowered some. With barners off ad Blower on white smoke Began to discharge from Blower. got sisor lift and fire extinguishers and attempted To put fire out, which made it worse. Discharge Blower fully ingulfed inside. Ext didnt help. called 911. supervisor

5/22/14

Wen

Called out to line 2 ISO for light smoke from discharge blower. @12:20 Inspect Blower seemed Normal. Its got Head Cam and was same as other blower. Close within 20 deg of other. Shut down burners temp lowered some. With burners off and Blower on white smoke began to discharge from Blower. Got sisor lift and Fire extinguishers and Attempted To put fire out, which made it worse. Discharge Blower fully ingulfed inside. Ext didn't help. called 911.

Superisor

5/22/14



DEPOSITION
EXHIBIT
Printed
8 3-12-18

PRIVILEGE AND CONFIDENTIAL          BALL 001127

<u>12:20AM</u>   IBO Exit E east blow smoking
Check air flow, Airflow was good .13, Heat gun
Temp 270° + 280° then fire up to 700°, Cknk all
Exit blows temp were the same then fire was comy out.
Shut Burn Down, blower were Running to Cool Down then
Big puff of snoke and Fire out of Blower in and Use
Fire ~~extinguisher~~ Extinguisher to put out fire out of
3/4" Asut hole then flame start spread to the other pipe & blower
and fire Department got Called.

5/22/14

Rony Ann



DEPOSITION
EXHIBIT
Keintz 3
JS 3-12-18
PENGAD 800-631-6989

**PRIVILEGE AND CONFIDENTIAL**

**BALL 001125**

# Exhibit 10

*In the Matter Of:*

# BALL CORPORATION, ET AL.

## -vs-

# AIR TECH OF MICHIGAN, INC.

# ROBERT PELLEGRINI

# March 12, 2018



**CONNOR REPORTING**

111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF INDIANA
 2
               CAUSE NO. 4:16-CV-00042-PPS-APR
 3
     BALL CORPORATION, an Indiana      )
 4   Corporation, and FACTORY          )
     MUTUAL INSURANCE COMPANY, a       )
 5   Rhode Island Corporation, as      )
     Subrogee,                         )
 6                                     )
            Plaintiffs,                )
 7                                     )
            -vs-                       )
 8                                     )
     AIR TECH OF MICHIGAN, INC., a     )
 9   Michigan Corporation,             )
                                       )
10          Defendant.                 )
11
12
13        DEPOSITION OF ROBERT JOHN PELLEGRINI
14
15       The deposition upon oral examination of
     ROBERT JOHN PELLEGRINI, a witness produced and sworn
16   before me, Diane Zeyen, RPR, a Notary Public in and
     for the County of Hamilton, State of Indiana, taken
17   on behalf of the Defendant, at Ball Metal Beverage
     Packaging, 501 North 6th Street, Monticello,
18   White County, Indiana, on the 12th day of March,
     2018, at 2:00 p.m., pursuant to the Federal Rules of
19   Civil Procedure with written notice as to time and
     place thereof.
20
21
22
23
24
25
```

**Page 2**

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF(S):
 4        Mark N. Senak
          SENAK KEEGAN GLEASON SMITH & MICHAUD, LTD.
 5        566 West Adams Street, Suite 750
          Chicago, IL  60661
 6        312.214.1400
          msenak@skgsmlaw.com
 7
 8
 9   FOR THE DEFENDANT(S):
10        Andrew B. Miller
          STARR AUSTEN & MILLER, LLP
11        201 South 3rd Street
          Logansport, IN  46947
12        574.722.6676
          miller@starrausten.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1        I N D E X   O F   E X A M I N A T I O N
 2                                              PAGE
 3   DIRECT EXAMINATION ...........................4
     Questions by Andrew B. Miller
 4   CROSS-EXAMINATION ...........................98
     Questions by Mark N. Senak
 5
 6
 7
 8        I N D E X   O F   E X H I B I T S
 9                                              PAGE
10   Pellegrini Deposition Exhibit No.:
11   Exhibit 1 - Typewritten  . . . . . . . . . . . 97
                  Statement/Handwritten Statement by
12                Robert Pellegrini
13
14   Previously Marked Exhibit No.:
15   Exhibit 2 - Handwritten Statement of  . . . . . .106
                  Wes Krintz
16   Exhibit 3 - Handwritten Statement of  . . . . . .106
                  Randy Crume
17
18
19
20
21
22
23
24
25
```

**Page 4**

1        ROBERT JOHN PELLEGRINI,
2    Having been duly sworn to tell the truth,
3    the whole truth, and nothing but the truth
4    relating to said matter was examined and
5    testified as follows:
6
7 DIRECT EXAMINATION,
8    QUESTIONS BY ANDREW B. MILLER:
9  Q  Good afternoon.  Can you please state your full
10    legal name for the record?
11 A  Robert John Pellegrini.
12 Q  Mr. Pellegrini, how would you like for me to
13    refer to you today?
14 A  Just Bob is fine.
15 Q  Thank you, Bob.  Bob, my name is Andrew Miller.
16    I represent Air Tech in a lawsuit filed by
17    Ball Corporation and its insurer against it.
18        Have you ever been deposed before?
19 A  I don't believe so.
20 Q  Let me give you just a few ground rules for a
21    deposition.
22        You have been sworn in just as if you were
23    in court.
24 A  Uh-huh.
25 Q  It is a less formal setting being in a



Page 5

1  conference room here at Ball's factory here in
2  Monticello, but it is the same oath you take.
3  A  Okay.
4  Q  We have got a court reporter transcribing both
5  my questions and your answers.  Because she is
6  making a transcription of everything, it is
7  important that we not speak at the same time.
8  Okay?
9     So if occasionally we forget and I remind
10  you of that ground rule, it is not to be
11  discourteous.  It is just to try and make things
12  easier on our court reporter.  Okay?
13  A  Okay.
14  Q  And because we are having a transcription, it is
15  important that you answer both audibly and
16  verbally.  By audibly I mean yes, no, or a more
17  extended answer rather than nods of the head or
18  shakes of the head.  Okay?
19  A  Okay.
20  Q  I just want to make sure that the testimony is
21  your own and our court reporter doesn't have to
22  make judgments about that testimony.
23     By verbally I mean yes, no, or a more
24  extended answer rather than uh-huh or huh-uhs as
25  that, again, requires our court to make

Page 6

1  judgments.  Okay?
2  A  Okay.
3  Q  If I ask you a question and you don't hear it,
4  ask for me to repeat it.  All right?
5  A  Okay.
6  Q  I know that it is an incredibly noisy
7  environment out on the factory floor.  Do you
8  have any hearing loss?
9  A  No.
10  Q  If I ask you a question and you don't understand
11  it, ask for me to rephrase it.  Okay?
12  A  Yes.
13  Q  If I ask you a question and you answer, I am
14  going to presume you both heard and understood
15  my question.  Is that a fair presumption?
16     MR. SENAK:  Object to form.  Go ahead and
17  answer.
18  A  Okay.  I suppose, yes.
19  Q  What's your current address, Bob?
20  A  601 West Washington, Monticello, Indiana.
21  Q  Do you have any intent of moving from that
22  address in the next, say, year to 18 months?
23  A  I don't believe so.
24  Q  And your business address is the Ball plant here
25  in Monticello; correct?

Page 7

1  A  Yes.
2  Q  Have you ever been deposed before today, sir?
3  A  You asked that question, but no.
4  Q  Did I?
5  A  Yeah.
6  Q  I'm sorry.
7  A  I don't believe so was my answer.
8  Q  Okay.  Bob, how long have you been a Ball
9  employee?
10  A  I believe it is 16 years now, possibly 17.  I
11  would have to count that out.
12  Q  Do you remember your hire-in date?
13  A  It was 2001, in, oh, September or -- November, I
14  believe.
15  Q  So November of 2001?
16  A  I believe that's when it was, yes.
17  Q  Through the current date?
18  A  Yes.
19  Q  Have there been any lapses in your employment
20  status with Ball from November of 2001 through
21  the current time?
22  A  I was off sick for approximately three months.
23  But other than that, I was actually still
24  working here, just --
25  Q  But you have not resigned your position --

Page 8

1  A  No.
2  Q  -- and accept others and then come back?
3  A  No, I have not.
4  Q  Do you have any intent in the next year to
5  18 months to change positions and leave Ball's
6  employ?
7  A  Hope not, but I would have to say no.
8  Q  Bob, what's your educational background?
9  A  I have a bachelor's degree in electronics
10  engineering from DeVry.
11  Q  So since you have a bachelor's degree, I assume
12  you also have a high school degree; correct?
13  A  I have that also.
14  Q  And you graduated from what high school?
15  A  Hillcrest High School, in Illinois, Hazel Crest.
16  Q  And what year did you graduate from high school?
17  A  It was '82.
18  Q  And you said you had a bachelor's of science
19  degree from DeVry?
20  A  Yes.
21  Q  Is that DeVry Institute?
22  A  I believe it is now university.  So institute,
23  university, whichever.
24  Q  Which of the campuses or locations?
25  A  I was in Chicago on -- oh, what was that?  I

**9**

1  can't remember the name of the road.
2  Q  That's okay.  But it was the --
3  A  In Chicago.
4  Q  In Chicago.  Okay.  And what year did you
5     graduate from the DeVry?
6  A  '86.
7  Q  And your bachelor's degree was in what?
8  A  Electronics engineering.
9  Q  Is that the same degree as an electrical
10     engineer?
11  A  I don't believe so.
12  Q  Now the bachelor of science in electronics
13     engineering, does that allow you to sit for the
14     professional engineering license or designation
15     that's granted by the State of Indiana?
16  A  I could not tell you that.
17  Q  Are you a licensed engineer?
18  A  No, I am not.
19  Q  Have you ever sought to sit for the professional
20     engineering licensure?
21  A  No, I have not.
22  Q  Have you ever worked as an engineer?
23  A  No, I have not.
24  Q  The electronics engineer degree from DeVry, was
25     it explained to you the career track for that --

**10**

1     was that an engineering career track or was it
2     something different?
3  A  Pretty much kind of getting into what I am doing
4     now, I suppose.
5  Q  Okay.
6  A  Or just to be able to get into companies having
7     that education, troubleshooting, work on
8     equipment.
9  Q  So you graduated from DeVry in '86 and you began
10     work at Ball in 2001?
11  A  Yes.
12  Q  Prior to taking employment with Ball
13     Manufacturing, have you had any prior experience
14     in aluminum beverage can manufacturing?
15  A  No, I have not.
16  Q  Prior to accepting your position with Ball, did
17     you have any experience with internal bake
18     ovens, IBOs?
19  A  No, I have not.
20  Q  November 2001, did you hire in to this plant
21     here in Monticello?
22  A  Yes.
23  Q  Did you move to Monticello in order to take this
24     position?
25  A  I started the position and then moved up here.

**11**

1  Q  And how did you learn of this position?
2  A  My wife's sister somehow, I don't know how they
3     know each other or knew each other, but they
4     were looking for someone here.  I talked to
5     Paula and I turned my resume in to her.
6  Q  Where were you working prior to accepting
7     employment with Ball?
8  A  Acme Steel.
9  Q  Acme Steel?
10  A  Uh-huh.
11  Q  Where was that at?
12  A  Chicago.  On the south side, off Torrence
13     Avenue.
14  Q  And what years did you work for Acme Steel?
15  A  It was 13 years there.  So we would have to
16     count back from 2001, I suppose.
17  Q  Did you have employment after DeVry but before
18     Acme?
19  A  Yes.
20  Q  Where did you work?
21  A  A photo finishing plant, Guardian Photo.  And
22     that was in, I think that it was Homewood,
23     Illinois.  I am not 100 percent sure of the
24     actual --
25  Q  So the three positions, beginning with

**12**

1     Guardian Photo, then Acme Steel, and now Ball,
2     does that encompass the entirety of your work
3     positions --
4  A  As far as electronics --
5  Q  You have got to let me finish, sir.
6  A  Okay.
7  Q  -- the entirety of your post-DeVry and to
8     current jobs?
9  A  Yes.
10  Q  Bob, what did you do to prepare for today's
11     deposition?
12  A  Not really anything, I suppose.
13  Q  Well, did you review any documents?
14  A  No.  I was under the assumption that you have
15     documents, so I didn't have no documents to
16     actually go over.
17  Q  Did you review any photographs?
18  A  No.
19  Q  Did you meet with anybody?
20  A  Not met with anybody, per se.  Anybody who may
21     have gone through, said they have already been
22     through it, but other than that.
23  Q  Okay.  Who have you spoken with that I have
24     taken -- and I assume gone through it, you're
25     talking about that I have taken their

13

1   deposition; correct?
2   A   Right.
3   Q   Who have you talked to?
4   A   Mike, he's in my department.  He said he's
5       already gone through it.
6   Q   Mike who?
7   A   Russell.
8   Q   Who else?
9   A   That's it so far.
10  Q   Did Mr. Russell tell you anything about the
11      deposition?
12  A   No.  He just said that you asked a whole bunch
13      of questions.
14  Q   Did he talk about the topics of my questions or
15      any of the actual questions?
16  A   Just he said you had asked about the actual
17      ovens, fans were about the only thing that he
18      had mentioned, so.
19  Q   Anything else?
20  A   No.
21  Q   So other than speaking with Mr. Russell, have
22      you done anything to prepare for today's
23      deposition?
24  A   No, I have not.
25  Q   Haven't met with Mr. Senak?

14

1   A   I was supposed to, but I never had the chance.
2   Q   Bob, let's go through your positions with
3       Ball Manufacturing.
4   A   Okay.
5   Q   What was the position that you hired in for?
6   A   Electrical technician.
7   Q   And you began that in November of '01?
8   A   Correct.
9   Q   And you have held that position until when?
10  A   Today so far.
11  Q   So since beginning employment you have always
12      been an electronic technician?
13  A   Uh-huh.
14  Q   Is electrical technician, is that the same as an
15      electronic technician?
16  A   I don't know how they compare it or, I mean,
17      they have never explained.  As far as I
18      understand here, it is anything electrical.
19  Q   Okay.
20  A   So I don't know.
21  Q   I ask for this reason, some of the individuals
22      have identified their position as electronics
23      technician.
24  A   Okay.
25  Q   And you just testified that your position is

15

1       electrical technician.
2   A   It could be electrical, electronic.  I am not
3       sure how they all -- I know when you look at it
4       it is electrical tech.  So I am not sure how
5       they break it down, so I couldn't tell you,
6       honestly.  I couldn't tell you how they worded
7       it then.
8   Q   When you say "they worded it," who are you
9       speaking of?
10  A   The company.
11  Q   Okay.
12  A   If you look at the document, it is electrical
13      tech.  So I just broke it down electrical on my
14      part, because that's how I figure it.  But it is
15      anything electrical, electronics, electrical,
16      motors, so.
17  Q   Is your position called an ET?
18  A   Yes.
19  Q   Is that the most frequent or commonly used term,
20      ET?
21  A   Yes.
22  Q   And as an ET, can you describe your job function
23      for me?
24  A   Repairs, troubleshooting basically, repairs,
25      installation.

16

1   Q   Anything else?
2   A   Pretty much anything they come up with, so.
3   Q   Okay.
4   A   Just about everything, too.
5   Q   Let's break this down a little bit so I can
6       better understand your position.
7           When you say "troubleshooting," what are
8       you troubleshooting?
9   A   If a machine is not running and they don't know
10      what's going on, they call us to figure out what
11      the problem is.
12  Q   Okay.
13  A   So it could be anything.  I couldn't tell you
14      specifically, because every one is usually
15      different, so.
16  Q   So it would be troubleshooting any machine in
17      this plant?
18  A   Yeah.  Except for lift machines, apparently, we
19      are not allowed to touch those.
20  Q   Okay.
21  A   That's outside contractors who are qualified and
22      have licenses to work on.
23  Q   And when you say "repair," what are you
24      repairing?
25  A   It depends on the situation.  It could be



17

1  anything.  If a wire broke, I repair it.  I will
2  have to re-strip it and land it back into a
3  terminal strip, if that happens to be what the
4  problem is.  If the motor is bad, we will repair
5  it or remove it and replace it with a new.  It
6  depends on the situation.
7  Q  So is the repair component of your job the same
8     as troubleshooting, that you will repair any
9     machine in this plant with the exception of a
10    lift truck?
11  A  I believe that's -- within our capabilities, I
12    guess, yeah.  If it is too large or something,
13    then we would have to get a contractor to work
14    on it.
15  Q  Who determines whether it is in your
16    capabilities?
17  A  It is kind of broke down, I guess, to -- I don't
18    know how that would be.  Such as, say, the fan
19    that just has to be replaced for the oxidizer,
20    that's being done outside, because it is a large
21    job.  We could replace the motor.  We would
22    probably do that, if need be.  But because it is
23    an entire rebuild, I am sure we won't be
24    rebuilding that.  So I am not sure how they
25    determine, if it comes down to an individual

18

1  project, I guess.
2  Q  And when you say "installation," is that the
3     same as the other categories, that you will
4     install any machine in this plant but you won't
5     be involved in lift trucks?
6  A  Right.  I suppose.  If we were putting a new
7     line in, they would bring all the equipment in.
8     They might have outside contractors landing
9     everything and then we would come in and either
10    get it running afterwards, so.
11  Q  Okay.
12  A  And, again, it is individual things.  It depends
13    on what happens.  So I think it is hard to give
14    you an exact, because everything is different
15    usually.  So I'm not sure what you want from
16    that question, so.
17  Q  Who makes the determination as to whether a
18    repair needs to be done by an ET or a machinist
19    millwright?
20  A  That would be, if it is mechanical, it would be
21    a machinist millwright.  If it is a large motor
22    that needs to be broke loose, they might install
23    the motor into place and then we will finish
24    with the wiring up.  So I don't know if it is
25    anybody in particular.  It is just per job, I

19

1  guess.
2     If it is, again, mechanically, the pump,
3  half of it, if there is nothing wrong with the
4  motor, they would take care of that.  And you
5  don't -- it is pretty much a given, I guess,
6  that I don't know who would make that decision
7  other than you kind of know that's who does it,
8  so.
9  Q  Bob, do you have any supervisory
10    responsibilities in your job?
11  A  I do not believe so.
12  Q  Have you ever been in a supervisory position --
13  A  Yes, I have.
14  Q  -- here at Ball?
15  A  No, I have not.
16  Q  Have you ever worked at a Ball facility other
17    than the one here at Monticello?
18  A  No, I have not.
19  Q  The entirety of your tenure at this plant, has
20    it been under the ownership of Ball
21    Manufacturing?
22  A  Yes.
23  Q  Do you work one static shift or do you work a
24    variety of shifts?
25  A  It is a rotating shift.  So it goes from days to

20

1  nights and back and forth.  So I am on the same
2  crew, so it has not changed.
3  Q  In May of 2014, my understanding is the fire
4     occurred in either the late evening hours or
5     early morning hours of May 22-23, somewhere in
6     there.
7  A  Okay.
8  Q  Is that your understanding as well?
9  A  I couldn't tell you what day it was anymore.  I
10    know we signed papers the day it happened and
11    stuff.  I would have to look at that to remember
12    when it happened.
13  Q  Do you know what shift you were working that
14    day?
15  A  I was on night shift then.
16  Q  Did you have the same responsibilities in
17    May 2014 as you have now?
18  A  I would think so, other than newer equipment and
19    more stuff than before.
20  Q  Did your job require that you work on or around
21    the IBO involved in this fire?
22  A  I didn't on that day, I don't believe, I was on
23    nights, so everything was done by the time we
24    got in.  I did checks.  We would go around and
25    check our papers, chart papers and stuff,

**21**

1  temperatures.
2  **Q  But in the past had you worked on -- my**
3  **understanding this was called IBO #2.  Is that**
4  **your understanding?**
5  A  Yes.
6  **Q  Had you worked as an ET on IBO #2 in the past?**
7  A  Yes.
8  **Q  Do you recall what specific tasks you performed**
9  **on IBO #2?**
10  A  Not all of them, I suppose.  It is anytime
11  during the entire time, I mean.
12  **Q  Yeah.**
13  A  It has been -- I couldn't tell you exactly on
14  that particular machine without going -- I would
15  have to look at notes or anything, if there was
16  any notes.
17  **Q  Do you keep notes when you work on specific**
18  **machines?**
19  A  The last time we just did our logbook, which I
20  know you guys have a copy of all that, so.
21  **Q  How do you know that?**
22  A  Because they were in there printing it out for
23  you.
24  **Q  Okay.**
25  A  I was sitting there when they were doing it.

**22**

1  **Q  When you say "they," who are you referring to?**
2  A  I think Scott was getting it for you.
3  **Q  Scott who?**
4  A  Possibly LaFond.
5  **Q  Okay.**
6  A  And I am not sure if Freddy had anything to do
7  with that too.  I can't remember who came in to
8  get it all.  So I'm not 100 percent sure.
9  **Q  And when was that?**
10  A  A week, a week or so ago.
11  **Q  So other than making notes that you are**
12  **referring to, is that just in the logbook or --**
13  A  Yeah.
14  **Q  -- is there another source?**
15  A  No.  If it is something major or something,
16  that's usually when it would get put there.  If
17  it is not, it usually doesn't get broke down.
18  Because like lightbulbs and things, that's an
19  everyday occurrence.  It is usually for if there
20  is something to follow or keep track of.
21  **Q  No, I understand.  But there's no lightbulbs on**
22  **an IBO; true?**
23  A  Indicator lights.
24  **Q  So if an indicator light would go bad, there**
25  **would be no documentation, no notation under a**

**23**

1  work log?
2  A  No, I don't believe so.
3  **Q  What makes it to a work log then?**
4  A  I don't know.  If you notice noise on the
5  machine, that would be on a log.  Or that's
6  usually done on -- you would know, somebody
7  would bring it to your attention if you had to
8  change it out, then we would change it out and
9  you log it up that that was changed, because
10  either a noise, broken belt, something like
11  that, then you would log something like that up.
12  I would think that's kind of major.
13  **Q  So a lightbulb doesn't make it but a broken belt**
14  **does?**
15  A  I don't think we would put the belt down.  I am
16  not sure if anybody else would.  But, say, a bad
17  motor, that would get put on there.  I don't
18  think a belt would be.
19  **Q  I am confused, because you just gave that as an**
20  **example.**
21  A  As what?
22  **Q  Something that would get logged, a broken belt.**
23  A  No.  I retracted, because I wouldn't put
24  something like that on, because it is not
25  something electrical.

**24**

1  **Q  Okay.**
2  A  A motor would be.
3  **Q  So for you to log something it needs to be**
4  **electrical in nature?**
5  A  Yes, for me.
6  **Q  Who provided you with that guidance as to what**
7  **to log?**
8  A  I would have to say me, I guess, vaguely.  I
9  don't think it's been anybody in particular.  We
10  just figured major items of what we would put on
11  there.
12  **Q  But when you began your employment here in**
13  **November of 2001, were you provided any guidance**
14  **as to how to properly log tasks that you**
15  **performed?**
16  MR. SENAK:  Object to foundation.  I am
17  sorry, to form.  Go ahead.
18  A  Just work with people, whoever, the other ETs at
19  the time, just kind of go over things as they
20  come up.
21  There is not really, as far as I know, just
22  any big logbook of what to go through or -- I
23  don't know how to answer that exactly.  Other
24  than went with other ETs at the time.  When I
25  started, you didn't just get put on a shift.



**25**

1  You just worked with all the ETs, whoever was on
2  at the time. That's how you kind of learn the
3  job.
4  **Q  Okay.**
5  A  You get a feel for what to do.
6  **Q  You had mentioned that prior to accepting your**
7  **position with Ball Manufacturing that you had no**
8  **prior experience with IBOs. Do you remember**
9  **that testimony?**
10 A  Uh-huh.
11 **Q  Once you accepted your position, what training**
12 **did Ball Manufacturing provide you as to the**
13 **operation of an IBO?**
14 A  Basically on the job.
15 **Q  Once you began your position at Ball, what**
16 **training did Ball provide you on the maintenance**
17 **of an IBO?**
18 A  Again, it would be on the job. If a machine was
19 down and we were working on it, you would be
20 working with another ET at the time.
21 **Q  Okay.**
22 A  And, as I said, I would be working with -- when
23 I started it was a couple different ones until I
24 got put on a specific crew.
25 **Q  Now I have asked you about the training you**

**26**

1  received on operation and maintenance and now I
2  want to ask you about repair.
3  A  Uh-huh.
4  **Q  What training has Ball provided you on how to**
5  **repair an IBO?**
6  A  Up to the point, I never had to repair one yet
7  really. So I haven't had that kind of training.
8  **Q  So from November of 2001 through the current**
9  **date you never had to repair an IBO; true?**
10 A  Okay. Let me have you rephrase that.
11 As being repair, what do you want, as far
12 as a repair? Taking just pieces off of it or
13 something for a repair or an entire breakdown of
14 the entire machine? What do you mean repair?
15 **Q  You would know better than I, sir. Repair to me**
16 **would indicate that if the machine is not**
17 **working that you fix it. Maintenance would be**
18 **items that are performed to assure the**
19 **continued, proper operation of the machine.**
20 A  Kind of both the same, isn't it? If a part is
21 not working properly, you would repair it or
22 replace it.
23 We don't repair any of the actual items on
24 it. It just gets replaced. Because it would be
25 already tested and -- how would you put that?

**27**

1  They're sealed units usually. You can't make
2  repair on parts of it basically. In other
3  words, if you had a gas pressure switch, we
4  don't try to fix the switch itself. We just
5  replace it with a new one. If it does not work,
6  you just replace it.
7  **Q  Okay.**
8  A  So burners, if you had to do anything, it is
9  just cleaning them out. You go by the booklet
10 that comes with it and it just gets put back in.
11 We haven't really done anything to it but clean
12 and maintenance, so.
13 **Q  The booklet that comes with what, sir?**
14 A  With one of the ovens, or burners. Whatever
15 burner it is has a book, installation, whatever,
16 book.
17 **Q  And does that booklet that comes with the**
18 **burner, it comes specifically with the burner**
19 **when it is purchased?**
20 A  For that type model, whatever, it is the model
21 booklet that goes with the model of burner, so
22 yes.
23 **Q  And, for instance, on an IBO, who is the**
24 **manufacturer of that burner?**
25 A  I don't know what the name of it is.

**28**

1  **Q  Is the manufacturer of the burner different from**
2  **the manufacturer of the oven?**
3  A  Probably, yes.
4  **Q  Well, let's go back to the repair issue.**
5  A  Okay.
6  **Q  What training has Ball provided you in the**
7  **repair of IBOs?**
8  A  Again, it is basically on the job, as something
9  breaks.
10 **Q  So for the operation of IBOs, for the**
11 **maintenance of IBOs, and for the repair of the**
12 **IBOs, the only training you have received is**
13 **on-the-job training; true?**
14 A  Yes; not left and need to go somewhere for it.
15 **Q  And the on-the-job training that you received on**
16 **the operation, maintenance, and repair of an**
17 **IBO, that has simply been provided by**
18 **co-employees; true?**
19 A  Yes.
20 **Q  Have you ever received any written materials on**
21 **the operation, maintenance, or repair of an IBO?**
22 A  Just that booklet, I suppose.
23 **Q  But that booklet concerned a burner; true?**
24 A  Right.
25 **Q  Not the oven itself; true?**



29

1  A  How the whole thing operates?
2  Q  Correct.
3  A  I don't have one.
4  Q  Have you ever consulted a operations manual for
5     the IBO?
6  A  If it is part of fixing something, yes.
7  Q  Would that be a maintenance manual or a repair
8     manual?
9  A  I don't know.  I haven't -- I would have to look
10    at the manual again to see.
11        But if I am working on something that has
12    come apart, I need to see what I am doing before
13    I can do it, with either a book on that subject
14    or --
15 Q  Tell me how many volumes the manual --
16 A  I do not --
17 Q  -- for this oven consists of?
18 A  I have no idea.
19 Q  Is it a multi-volume set or a single volume?
20 A  I still can't answer that question.  I don't
21    know.
22 Q  Do you know where that manual is located?
23 A  If it is not with Scott, it would be with
24    Freddy.
25 Q  When was the last time that you had to consult a

30

1     manual for an IBO?
2  A  I couldn't say.  I don't know.
3  Q  Do you recall what task you were performing that
4     required you to consult the manual?
5  A  Cleaning a burner maybe, I would think, would be
6     the last thing I can remember, but I couldn't
7     say when.
8  Q  Okay.  Do you recall when you had to clean the
9     burner?
10 A  I just said I can't recall when, so I don't
11    know.  I can't remember when the last time was I
12    had to clean one.  It was on a PIN oven.
13 Q  Let's talk just about IBOs for a second, because
14    a PIN oven is a different oven than an IBO;
15    correct?
16 A  That's the only one I have ever worked on as far
17    as having to clean up an oven burner.
18 Q  Throughout your course of employment as an ET,
19    have you ever cleaned a burner on an IBO?
20 A  No.
21 Q  Throughout the course of your employment with
22    Ball, have you ever cleaned a flow tube on an
23    IBO?
24 A  Yes.
25 Q  Did you need to consult a manual to clean the

31

1     flow tube?
2  A  No.
3  Q  How did you learn how to clean the flow tube?
4  A  Through working with other ETs when we do our
5     checks.
6  Q  Do you recall any instances in consulting a
7     manual specifically for an IBO?  I don't want to
8     talk about PIN ovens right now, just IBOs.
9  A  No.
10 Q  I didn't hear you.
11 A  No.  No.
12 Q  Do you know who the manufacturer of the IBO is?
13 A  I still don't recall.
14 Q  I want to make sure that I understand your
15    testimony.  Do you know whether there is a
16    manual, there actually is a manual on site for
17    the IBO at issue in this fire?
18 A  I haven't taken it out myself, so, no, I can't
19    answer that.
20 Q  Perfect.  That's what I want to establish.
21        As we sit here today, as you testify, you
22    have no recollection of ever consulting a manual
23    for an IBO; true?
24 A  I have not.
25 Q  Bob, did you play any decision in Ball's

32

1     decision to hire Air Tech?
2  A  No.
3  Q  Do you have any idea when Air Tech began
4     providing services at Ball Manufacturing?
5  A  No.
6  Q  Do you have any knowledge as to who made the
7     decision to hire Air Tech?
8  A  I'm not sure who makes that decision, but no.
9  Q  Do you have any knowledge as to whether Air Tech
10    was providing services when you began your
11    employment at Ball?
12 A  I couldn't say, no.
13 Q  Do you have any knowledge of Air Tech?
14 A  Other than they clean ovens.  That's about all I
15    know.
16 Q  And how do you know they clean ovens?
17 A  Because they have been here before.
18 Q  So when they're here, how are they identified?
19    How do you know, oh, that's Air Tech?
20 A  They are the people inside the ovens, I guess.
21    We just know.  I mean, it is said that they, the
22    cleaning people come, and I know it is Air Tech,
23    because that's what we are here for right now.
24    But other than that, I mean, I don't pay any
25    attention.  It does not --



33

1  Q  That's what I am trying to establish, sir. I am
2     not --
3  A  I know.
4  Q  So until you arrived today, you were not aware
5     and --
6  A  No. I mean --
7  Q  You have got to let me finish.
8  A  I know. I'm sorry, sir. Go ahead.
9  Q  So were you unaware of Air Tech's identity until
10    you received the Notice of Deposition which
11    clearly says Air Tech at the top of it or did
12    you know of Air Tech's identity prior to?
13 A  Okay. I have to put it this way. I don't know,
14    didn't -- never paid attention to what the name
15    of any crew is that would come in because it is
16    not in my department. So I just know they come
17    in to clean the ovens, whatever crew, whether it
18    is Air Tech or if there was somebody else, I
19    don't know.
20       I know it is Air Tech, because, again, we
21    are here for Air Tech. So that would be the
22    only reason I would even have paid attention to
23    the name of the cleaning crew, per se.
24 Q  Okay.
25 A  So I am not sure if others have done it or not.

34

1     I just know Air Tech is the one we are dealing
2     with now, so.
3  Q  So from that, do I understand you have no
4     recollection of seeing a truck that says
5     Air Tech on it?
6  A  It could have been there, but I paid no
7     attention to it, so I couldn't say yes.
8  Q  I understand that. I am just asking as to what
9     your recollection is --
10 A  Right.
11 Q  -- as we sit here.
12 A  Right.
13 Q  Do you have any recollection of seeing Air Tech
14    on the truck?
15 A  No.
16 Q  Do you have any recollection of seeing Air Tech
17    on a name badge on a shirt?
18 A  No.
19 Q  So do you have any specific recollection of
20    being aware of Air Tech as an entity before
21    receiving the Notice of Deposition that says
22    Air Tech?
23 A  If I did, I would not have remembered. So, no,
24    I paid no attention to it.
25 Q  So as of May 22 of 2014, you couldn't identify

35

1     the name of the company that was hired to
2     perform the work; true?
3  A  Probably. Yeah, I would say that's true.
4  Q  You were simply aware that an outside contractor
5     was hired to do the cleaning; true?
6  A  Right.
7  Q  But the name of the contractor you didn't know
8     and it didn't matter to you; true?
9  A  Yeah. I wasn't even here until the evening, so
10    I didn't see them that day at all.
11 Q  Bob, do you know the history of the IBO at issue
12    in this litigation?
13 A  I don't believe so. As far as problems with it
14    or anything? Is that what you mean by history
15    then?
16 Q  Well, let's start with the most basic question.
17    Do you know when it was manufactured?
18 A  No.
19 Q  Do you know when it was purchased by Ball
20    Manufacturing?
21 A  It was here when I started, so no.
22 Q  So that IBO was installed in the plant by
23    November of 2001; true?
24 A  I believe it was -- yeah, it was here before I
25    had started, so it was here when I came.

36

1  Q  But you had no idea when --
2  A  It --
3  Q  You have got to let me finish, sir.
4  A  All right.
5  Q  You have no idea when it was originally
6     installed; true?
7  A  True.
8  Q  Do you have any knowledge as to whether that was
9     a new or used machine when it was bought?
10 A  Do not know.
11 Q  Do you know what products that machine was used
12    to process throughout its lifespan?
13 A  While it was here, it was just cans.
14 Q  But you can only speak to as of November of
15    2001; true?
16 A  True.
17 Q  So from November of 2001 through the current
18    time or when the machine was taken out of
19    service, it only processed beverage cans; true?
20 A  Yes.
21 Q  And what was the material those beverage cans
22    were made out of?
23 A  Aluminum.
24 Q  Do you have any knowledge of that machine having
25    been used to process steel cans?



37

1  A  I suppose it could have, because I think they
2     had said it was a steel plant beforehand or made
3     steel cans prior to aluminum.  Again, that was
4     before my time, I don't know if that was there
5     or not.
6  Q  Do you have any knowledge of modifications made
7     to the IBO when it was transitioned from
8     processing steel cans to aluminum cans?
9  A  I would not know that, because, again, I said I
10    wasn't here before that and I didn't know if it
11    was here during that time either, so.
12 Q  Do you know whether there are any component
13    parts of that IBO that had to be changed to
14    process a new product?
15 A  I couldn't answer that.
16 Q  Is there any written history, like a maintenance
17    history on that IBO?
18 A  I am not sure.
19 Q  I think earlier you testified that you had
20    cleaned the air flow tubes; correct?
21 A  Yes.
22 Q  But you had not changed any burners; correct?
23 A  No, I haven't changed burners, no.
24 Q  So other than cleaning the air flow tube, do you
25    have any recollection of any other work that you

38

1     may have performed on an IBO?
2  A  Motor changes when they burnt out.
3  Q  Anything else?
4  A  Not that I can recall.
5  Q  And the motors that you have changed out for an
6     IBO, what were those motors power?
7  A  180 volts.
8  Q  No.  What would they power?
9  A  A fan.
10 Q  And is that sometimes called a squirrel cage
11    fan?
12 A  Yes.
13 Q  Okay.  How many squirrel cage fans are on an
14    IBO?
15 A  That particular IBO or any IBO?  Because they
16    are different.
17 Q  Let's start with that IBO.
18 A  Okay.  Thirteen.
19 Q  So would there be 13 motors on an IBO?
20 A  Yes.
21 Q  And what is different about IBO #2 as opposed to
22    other IBOs?
23 A  The one that is there now or the one that was
24    there before?
25 Q  I think you're thinking too deeply about this

39

1     question, Bob.
2        You testified earlier that there is a
3     difference between IBO #2 and other IBOs;
4     correct?
5  A  There is now.  The one that's there now is a
6     different one.  There's less zones in it.
7  Q  No, I understand, that IBO #2 that was involved
8     in this fire is no longer in existence.
9  A  So you want the original IBO that was there?
10 Q  Yeah.
11 A  Okay.  Compared to 1, which is the same.
12 Q  Sir, you testified that IBO #2 was different
13    than other IBOs.  Do you remember that?
14 A  Well, you're going to have to explain where I
15    said that line.
16       MR. MILLER:  Can you please read back his
17    testimony?
18 A  Different how?
19 Q  That's the word you used, sir.  We are going to
20    read back your testimony.
21       (The requested text was read back by the
22    reporter.)
23 A  And I just was saying it is different because
24    they are now, the one that is there now is
25    different than the one that was there

40

1     originally.
2  Q  Stop right there.
3  A  Okay.
4  Q  So between of lay of 2014 were all of the IBOs at
5     this plant identical?
6  A  No.
7  Q  Tell me the difference between the IBOs in 2014
8     that were here on site.
9  A  IBO 5 was different than IBO 1, 2, and 3, and 4
10    is also different than 1, 2, and 3.  Or was that
11    even there then?
12       I can't remember if we had all the lines
13    going then.
14 Q  So from your testimony, IBOs #1, 2, and 3 were
15    identical; true?
16 A  Same style.  Identical, I don't know if they
17    would be totally identical or not.  But I think
18    in design I think they are similar.
19 Q  But IBO #4 was different than IBOs #1, 2, and 3;
20    true?
21 A  Yes.
22 Q  And IBO #5, if it existed, was different from 1,
23    2, 3, and 4; true?
24 A  Uh-huh.
25 Q  You have got to answer out loud, sir.



41

1  A  Yes.
2  Q  So tell me what was different between IBOs #1,
3     2, and 3 as opposed to IBO #4.
4  A  The zones.
5  Q  How many zones did 1, 2, and 3 have?
6  A  There are four -- here, let's see.  Four zones
7     on 1, 2, and 3.
8  Q  How many zones are in --
9  A  Three.
10  Q  -- IBO #4?
11     You have got to let me finish, sir.
12  A  Three.
13  Q  There's three on #4 and --
14  A  I believe so.
15  Q  -- at least four on --
16     MR. SENAK:  Why don't you just ask the
17  questions and you just need to let him finish.
18     THE WITNESS:  Okay.  Sorry.
19     MR. SENAK:  He will let you finish and then
20  we can someday come to the end of this.
21     MR. MILLER:  Mark, just stop, please.
22  That's not an objection.
23     MR. SENAK:  Well, Andrew, you're not
24  dealing well with him, if you can't tell from
25  the record, so I am actually trying to help the

42

1  deposition move forward.
2  Q  Bob, listen, you can't talk over me.
3  A  Sorry.
4  Q  While I am talking, you have to just listen.
5     Okay?
6  A  Uh-huh.
7  Q  Because we are having a tremendous problem with
8     cross-talk and you are interjecting and you
9     start answering questions when I am still
10     formulating the question.  Okay?
11     MR. SENAK:  Great.  You have instructed the
12  witness now three times.  I understand the
13  problem.  Why don't you ask the question.
14     MR. MILLER:  Mark, just stop.
15     MR. SENAK:  No.  I'm not going to let you
16  badger the witness by continuing to instruct
17  him.  He understands.  You can ask the question.
18  He will answer it.
19     MR. MILLER:  He doesn't understand, Mark,
20  because he is continually doing it.
21     MR. SENAK:  Do you not understand?
22     THE WITNESS:  I understand.
23     MR. SENAK:  He understands.
24  BY MR. MILLER:
25  Q  One, 2, and 3 have four zones; true?

43

1  A  Yes.
2  Q  Four has three zones; true?
3  A  Can I have just one moment?  I have to think.
4     No.  Two zones.
5  Q  And how many zones does 5 have?
6  A  Three zones, I believe.  Yes, three zones.
7  Q  One, 2, and 3 were four zones, and 4 with three
8     zones?
9  A  No.  Two zones.
10  Q  Two zones.  So do IBOs #1, 2, and 3 have twice
11     as many fans as IBO #4 because twice as many
12     zones?
13  A  I would have to think about that a second.  No.
14  Q  How many fan does IBO #4 have?
15  A  I believe, and I would have to verify, but I am
16     pretty sure there is one -- I am not 100 percent
17     sure.  I think there are six maybe.  I am not
18     100 percent sure without looking again.
19  Q  What effect does the number of zones have on the
20     component parts of an IBO?
21  A  I know the first zone is to get the gassing out
22     of the inside spray and then after that it is
23     curing.
24  Q  And are the purposes of each zone the same for
25     all of the ovens?

44

1  A  I believe.
2  Q  So why does, if all of the ovens have the
3     removal of the gas as being the function of
4     Zone 1, why do some cans require more zones to
5     cure?
6  A  I can't answer that.  I don't -- I didn't design
7     it.
8  Q  Does the additional zones have any effect on
9     your job as an ET?
10  A  I don't think so.
11  Q  Are there any additional maintenance or repair
12     responsibilities dependent upon the number of
13     zones?
14  A  I don't think so.
15  Q  Do each of the zones function in the same way?
16  A  I don't know.  I mean, again, I didn't design
17     it.  I didn't know what the whole design plan
18     was to get it.
19  Q  My understanding of the role of ETs is they take
20     certain heat curve readings.  Are you familiar
21     with those?
22  A  Uh-huh.
23  Q  Are the same heat curve tests performed on all
24     of the IBO ovens?
25  A  Uh-huh.

45

1      MR. SENAK:  You have to answer out loud.
2  **Q  You have to say yes or --**
3      MR. SENAK:  It's okay.
4      MR. MILLER:  Mark, you have got to let --
5      MR. SENAK:  Andrew, believe me, I will be
6  glad to help him answer the questions, out loud.
7  A  It was yes.
8      MR. MILLER:  I understand that you try and
9  help the witnesses answer the questions, Mark.
10  That's not appropriate.
11      MR. SENAK:  Andrew, ask the questions, he
12  will answer them.  Let's move forward,
13  because --
14      MR. MILLER:  But I don't want you to help
15  him answer the questions.  That's the point,
16  Mark.
17      MR. SENAK:  I am just reminding him to
18  answer the questions out loud, and you know
19  that.  So don't try to misstate the record.
20  **Q  Bob, without Mark's help --**
21      MR. SENAK:  You see what I mean?
22  **Q  -- can you please tell me, is the heat curve**
23  **test, is this the same performed on all the**
24  **IBOs?**
25  A  Yes.

46

1  **Q  And through that heat curve test you know what**
2  **the heat for each of the zones is; true?**
3  A  It gives that temperature reading.
4  **Q  Are you able to tell me what are the heat zones**
5  **for each -- or the heat curves for each of the**
6  **zones on the four zone ovens, 1, 2, or 3?**
7  A  I don't understand your question.  What do you
8  want to know.
9  **Q  You do a heat curve test; true?**
10  A  Right.
11  **Q  And that heat curve test tells you what the**
12  **temperatures of the zones are; true?**
13  A  Right.
14  **Q  What are the temperatures for the four zones**
15  **contained in IBOs #1, 2, or 3?**
16  A  Whatever they are set for.
17  **Q  What are they set for?**
18  A  I don't know what that is off the top of my
19  head.
20  **Q  Do you have any knowledge of the settings for**
21  **the heat zones on IBO #4, which has three zones?**
22  A  It would be the same thing.  I would have to see
23  what they are set to.
24  **Q  As we sit here today, you don't know what they are set**
25  **for; true?**

47

1  A  No.
2  **Q  As we sit here today, you do not know the normal**
3  **operating temperatures for an IBO; true?**
4  A  No, they are at the machine themselves and on a
5  piece of paper.
6      Off the top of my head, no, I can't tell
7  them to you.  I don't know.
8  **Q  So, as we sit here, you do not know what the**
9  **normal operating temperatures for each zone in**
10  **an IBO is; true?**
11  A  Sure.  True.
12  **Q  As we sit here today, do you have any knowledge**
13  **of the normal operating temperature below the**
14  **squirrel cage fan?**
15  A  I don't understand that question.  What do you
16  mean?
17  **Q  When the IBO is operating normally, what is the**
18  **temperature reading below in the ductwork,**
19  **immediately below the squirrel cage fan on the**
20  **exhaust?**
21      MR. SENAK:  Object to the form.  Go ahead.
22  A  I am going to have to say whatever is on the
23  display.  There is a set point on the machine.
24  And that is what it would be set to.  And as it
25  goes -- whatever, there is a set point and then

48

1  actual temperature, whatever the actual
2  temperature is.
3  **Q  Tell me what that is.**
4  A  I just told you I don't know off the top of my
5  head.
6      MR. SENAK:  Okay.  You're asking the same
7  questions over and over again.
8      MR. MILLER:  Thanks, Mark.
9      MR. SENAK:  So at some point it becomes
10  badgering the witness.
11      MR. MILLER:  Okay.  Thanks, Mark.
12  **Q  What is the temperature, the normal operating**
13  **temperature above the squirrel cage fan?**
14  A  I couldn't -- whatever is on the probe.  I don't
15  know what that would be.
16  **Q  You use an infrared heat gun occasionally as**
17  **part of your job as an ET; true?**
18      MR. SENAK:  Infrared?
19  A  Infrared are you talking about?
20      MR. SENAK:  Infrared heat?
21  **Q  Yeah.**
22  A  Okay.  Yes, there is one.  I have used it.
23  **Q  And what is the purpose of using that, sir?**
24  A  See surface temperature.
25  **Q  And what are you comparing that surface**



49

1    temperature to?
2    A  I don't understand that question.
3    Q  Are you looking for a deviation from a norm,
4        sir?
5    A  I suppose if I were asked to do so, yeah.
6    Q  And how do you know what the normal is so that
7        you can determine whether it is deviating from
8        it?
9    A  I don't know.  You would have to let me know
10        what I am checking.
11   Q  Let's go to May 22 of 2014.
12   A  Okay.
13   Q  Did you use that heat gun?
14   A  I used a heat gun, yes.  It was a camera heat
15        gun.
16   Q  And that camera heat gun revealed certain
17        temperatures; true?
18   A  Yes.
19   Q  Were those temperatures a deviation from the
20        norm?
21   A  I did not have a norm for it.
22   Q  Okay.  So what was the purpose of using that
23        heat gun?
24   A  I compared it to a different machine to see if
25        they were similar.

50

1    Q  And were they?
2    A  Actually it was cooler than the other one.
3    Q  So IBO #2 was cooler than the other IBO?
4    A  By a couple degrees.
5    Q  Okay.
6    A  But that's, I don't know how to explain that.
7    Q  What IBO were you using as a comparison?
8    A  I believe it was 1.
9    Q  Were you actually the individual using that heat
10        gun, sir?
11   A  Yes.
12   Q  Did anyone else use the heat gun?
13   A  No.
14   Q  How were you selected or determined to be the
15        guy using the heat gun?
16   A  I just chose to do it.
17   Q  Did you have to go back to your workshop area to
18        get it or --
19   A  Yes.
20   Q  -- did you have it with you?
21   A  Sorry.  Yes, I went back to my workshop to get
22        it.
23   Q  Bob, are you aware of any other fires involving
24        IBO #2 except the May 2014 fire?
25   A  No.

51

1    Q  Are you aware of any fires involving any other
2        IBO ovens?
3    A  Yes.
4    Q  When did that fire occur?
5    A  I do not know.  Before the other one, though.
6    Q  So sometime after November of 2001 but before
7        May of 2014; true?
8    A  I believe so, yes.
9    Q  Was it closer to 2014 or closer to 2001?
10   A  I do not know.  I cannot recall.  I was not
11        there for that one.
12   Q  Do you know what oven that involved?
13   A  I believe it was oven #3.
14   Q  And do you recall what caught fire on that oven?
15   A  No.
16   Q  Are you aware of any fires in ductwork at the
17        Ball plant other than the May 2014 one?
18   A  In the ductwork, no.  That was on the oxidizer
19        outside.
20   Q  When was that?
21   A  I don't recall but before also.  And it was not
22        in the ductwork.  It just caught the insulation
23        on fire outside.
24   Q  Outside of the oxidizer or outside of the plant?
25   A  Outside of the oxidizer and the plant.  It would

52

1    be outside.
2    Q  What time did you arrive for work on May 22 of
3        2014?
4    A  I don't know.  Before work.  Within 15 minutes I
5        would, because you're not allowed to come to
6        work any earlier than that.
7    Q  And May 22 of 2014, were you working the
8        seven p.m. to seven a.m. shift?
9    A  If it was -- yeah.  I don't remember when they
10        changed the times from the 6:30 to 7.  I don't
11        remember.
12        At one time we were at 6:30 to 6:30, but I
13        don't remember when we changed that.
14   Q  Would you have been in the plant at six p.m.?
15   A  Nope.
16   Q  I understand that you can only clock in 15
17        minutes prior to your shift.
18   A  Uh-huh.
19   Q  Okay.  So if your clock-in time is 6:45 p.m. at
20        the earliest, what time would you have arrived
21        on site?
22   A  If I were here before that, I would be sitting
23        out in the parking lot, so.  And I can't
24        remember how much earlier.
25   Q  Do you recall when you arrived for work whether



53

1  or not the cleaning crew was done cleaning the
2  oven?
3  A  I believe they were done, there was nobody here
4     other than our crew.  They were packed and gone,
5     I believe.  But I couldn't say for sure.  But I
6     don't recall seeing anybody.
7  Q  Had production resumed?
8  A  Yes.  They were already running.
9  Q  Are you aware of any specific tasks that are
10    performed by Ball employees post-cleaning and
11    pre-production?
12 A  Like running a flypaper.
13 Q  Okay.  Anything else?
14 A  Oven checks and things.
15 Q  Anything else?
16 A  I am not sure.
17 Q  So you have identified two different things that
18    are done post-cleaning/pre-production, running
19    flypaper and oven checks.  Let's start with --
20 A  It would be -- or wait, oven checks are before
21    your flypapers, because it would be before you
22    started.
23 Q  Anything else?
24 A  No.
25 Q  Oven checks, tell me what those are and who

54

1  performs them.
2  A  ETs perform them.  We check to make sure
3     everything is working safety-wise.  I would have
4     to have the list to kind of go over step by
5     step.  We have a list that we go through.
6  Q  So you can't recall the specific tasks that are
7     performed, as we sit here today; true?
8  A  True.
9  Q  Are the oven checks done after the cleaning crew
10    has totally completed his job and left the area?
11 A  Yes.
12 Q  Have you performed these oven checks on IBO #2
13    in the past?
14 A  Yes.
15 Q  And on those occasions where you have done the
16    oven checks, the oven has been totally cleaned
17    and the cleaning crew is gone; correct?
18 A  Correct.
19 Q  How were you notified that the cleaning is done
20    and now the time for the oven checks has begun?
21 A  Sometimes by a supervisor or we would be
22    watching it ourselves to see when they have
23    finished.
24 Q  Okay.
25 A  And they have to remove locks, because you can't

55

1  do anything till then.
2  Q  So you have watched an oven being cleaned;
3     correct?
4  A  Not watched it being cleaned, just watch when
5     they have gotten out and closed it up.  I have
6     seen them in it.
7  Q  And when you have seen them in it, is it because
8     you have been walking past or actually standing
9     stationary to watch and learn what they are
10    doing?
11 A  It would be just walking past.  I don't go in
12    the area if I don't have to.
13 Q  So you learn that it is time to perform the oven
14    check by either standing and watching and seeing
15    them finish their job or being noticed by your
16    supervisor that the time has come to perform the
17    job; true?
18 A  Right.
19 Q  And how long does the oven check process take?
20 A  I am not 100 percent sure.  I'm not sure of the
21    total length of time.
22 Q  And I recognize that you don't have the
23    checklist here to consult with.  But as a
24    general matter, can you tell me what an oven
25    check consists of?

56

1  A  Making sure the air flow is shut down.  When you
2     shut it down, it loses air flow.  We shut it
3     down and make sure that if you lost gas that it
4     shuts down.  Loss of flame will shut down.
5  Q  Anything else?
6  A  Not 100 percent sure, but I think that pretty
7     much is all of them.
8  Q  The second step in this post-cleaning
9     pre-production work, you called it running
10    flypaper.
11 A  Yes.
12 Q  Tell me what that is.
13 A  The ovens are lit.  They are brought down to a
14    low temperature to just get stuff moving around,
15    any of the particles that may be left, and then
16    they run paper through with IC on it, I believe.
17    And that will collect and get any particles so
18    it doesn't get into the cans.
19 Q  And who performs the running flypaper task that
20    you identified?
21 A  The people on the floor doing the other cleaning
22    and stuff, I guess, IC operators maybe.
23 Q  Are ETs involved in the running flypaper portion
24    of the post-cleaning/pre-production steps?
25 A  Setting the temperature.  That's about it.



57

1  Q  Is setting the temperature, that's not a part of
2     the oven checks?
3  A  No.  That's to lower the temperature.
4  Q  And do you recall what the temperature, what it
5     would be set at?
6  A  Around 200, I think.
7  Q  Is that information provided to you on your oven
8     check sheet or is it --
9  A  That's just what we always set it to that I can
10    remember.
11 Q  After the running flypaper task, are ETs
12    involved in any other activities to get back to
13    production mode?
14 A  After the flypaper's run, the temperature goes
15    back to whatever the set point is for that oven.
16 Q  Is it the ET that sets that temperature?
17 A  Puts it back to whatever it's been set to, prior
18    to it.
19 Q  How do you know that the time has come to reset
20    the temperature to production temperatures?
21 A  They will say they are done running flypaper.
22 Q  Okay.
23 A  Someone.  It could be anybody.  I don't know.
24 Q  And how are you notified of that?
25 A  They will find us.  Either we get a call on a PA

58

1     or if we are working on something and they know
2     where we are at, they will come get us.
3  Q  So this isn't a situation where you're standing
4     watching them --
5  A  No.
6  Q  -- run the flypaper?
7  A  (Witness shakes head side to side.)  No.
8  Q  They have to summon you to come back to the
9     machine?
10 A  Yes.
11 Q  Do you know how long it takes for them to
12    complete the running the flypaper step?
13 A  Nope.
14 Q  After you set the temperatures to return to
15    production temp, are ETs involved in any other
16    aspect?
17 A  After they begun running product, then we will
18    do another curve.
19 Q  How long do they run product before you do the
20    oven curve?
21 A  It doesn't really matter, I suppose, as long as
22    the oven is full.  Once you got product coming
23    out the other end, it could be done anytime
24    after that.
25 Q  Do you, as an ET, after you have adjusted the

59

1     temperature upward to begin production, do you
2     stay there and wait until it is time for the
3     oven curve or do you leave and then come back?
4  A  It all depends what's happening at the time.  If
5     we are busy, then I will come back.
6  Q  And if you are not busy, you will just stay and
7     wait?
8  A  I might wait to see -- I usually won't wait
9     there, because it may take awhile before they
10    get product through it.
11 Q  And do you have a check sheet when you perform
12    that oven curve check so that you know whether
13    or not the temperatures are within the accepted
14    parameters?
15 A  It gets put into the oven curve program.  We
16    call it up and look to make sure all the numbers
17    are correct or within -- temperature ranges has
18    to be over a certain temperature or a certain
19    amount of time.
20 Q  Okay.  And is that, I think you said you call it
21    up or pull it up.  Is that on a computer?
22 A  Yes.
23 Q  Is that a laptop computer that you bring with
24    you or a computer that is isolated to that oven?
25 A  It is in the office.  In Scott's office there is

60

1     a computer with that software on it.
2  Q  So the ET has to return to the electronics
3     workshop to run the oven curve test?
4  A  Yes.
5  Q  Does the tool that you had referenced earlier
6     that's run through the oven, what is that tool
7     called?
8  A  The data pack.
9  Q  The data pack.  Does the data pack wirelessly
10    transmit the information to the computer in the
11    electronics workshop or do you have to manually
12    download that information?
13 A  Manually.
14 Q  And how is that done?
15 A  It's plugged in to a jack on the computer and
16    then it is unloaded into the computer.
17 Q  And have you performed all facets of that test?
18 A  I don't understand what you mean by all facets
19    of that test.
20 Q  Well, have you taken the data pack from your
21    electronics workshop to the IBO?
22 A  Okay.  Yes.
23 Q  And then have you put it in the IBO to run it
24    through?
25 A  Yes.



61

1  Q  And then you take that back and have you
2      personally download it into the computer?
3  A  Yes.
4  Q  And have you run the program to see whether or
5      not it is within the normal parameters?
6  A  Yes.
7  Q  To your knowledge, has IBO #2 not been within
8      the accepted parameters?
9         MR. SENAK:  Object to form.  Answer, if you
10     can.
11 Q  You can answer.
12 A  I don't recall it ever.  I couldn't say.
13 Q  Who taught you how to do the oven curve test?
14 A  Other ETs.
15 Q  Is there a written protocol for how to do it?
16 A  I don't think so, but I am not sure.
17 Q  So the only instruction that you received has
18     been verbal from other employees?
19 A  Watch and learn, yeah.
20 Q  I guess the point is, you never seen a written
21     protocol for that testing; correct?
22 A  No, I don't believe so.
23 Q  Have you seen any written protocols for any job
24     functions performed by an ET?
25 A  I have seen a list of things we are supposed to

62

1      do but not a detailed list.
2         There is, let me think, programming on some
3      of our machines, like a small cog or something.
4  Q  Is your testimony that you have seen list of
5      the tasks that you are supposed to perform but
6      not how to perform those tasks?
7  A  I am not sure how to answer that question, so.
8      Can you rephrase what you want to know on that
9      one?
10 Q  I think your testimony was you have seen a list
11     of the tasks that ETs are to perform; true?
12        MR. SENAK:  Object to form.
13 A  There is a job --
14        MR. SENAK:  Go ahead.
15 A  There is a job, I don't know, what they have
16     here at Ball saying what an ET is supposed to
17     do.  That's what I have seen before.  But I
18     couldn't even tell you what all is on it.  It is
19     just basically anything electrical type.
20 Q  The tasks that are identified on that list, are
21     there any documents that you have ever seen
22     since you began employment in November of 2001
23     that explain to ETs how to perform those tasks?
24 A  I would have to say what we write up as we go.
25     I mean, in our computer, when we learn how to do

63

1      something, whoever is the one who figures it out
2      first will have that, usually write out how to
3      do it.
4         I mean, troubleshooting is figuring it out.
5      So there is not going to be a document on
6      troubleshooting.
7  Q  Are there any documents that have been created,
8      as you just testified, that concern any facet of
9      an IBO #2?
10 A  I would have to go look, but I don't know.
11 Q  Where would you go to look to find that
12     information?
13 A  On our computer.
14 Q  And the computer is located in the electronics?
15 A  In the electrical shop.
16 Q  Do you have any knowledge of the frequency that
17     the IBO was cleaned?
18 A  Not really.
19 Q  Are ETs involved in determining the frequency at
20     which the IBOs should be cleaned?
21 A  No.
22 Q  Are ETs involved in determining the frequency
23     with which the duct system are cleaned?
24 A  No.
25 Q  Do you have any knowledge as to what the

64

1      manufacturer's recommended cleaning schedule is
2      for this IBO?
3  A  No.
4  Q  Who is responsible for determining when the IBOs
5      were cleaned?
6  A  I am not sure.
7  Q  Were ETs told when IBOs were scheduled to be
8      cleaned?
9  A  We will know usually before they are cleaned.
10 Q  So the answer is yes?
11 A  Yeah.
12 Q  Who tells you?
13 A  It would be Scott probably, LaFond.
14 Q  And is that your boss?
15 A  Yes.
16 Q  Do you know whether he makes the determination
17     that it is time to be cleaned?
18 A  I do not know that.
19 Q  Do you recall how you learned that there was
20     some question or concern regarding IBO #2 on
21     May 22?
22 A  I believe they called us over there.
23 Q  When you say "they," the pronoun "they," are you
24     referring to one individual or multiple?
25 A  There were several people standing around there



---

**65**

1  that I can recall, but I can't recall exactly
2  who. But I am trying to remember who our
3  supervisor was at the time. I think it was
4  Mike Rogers at the time.
5  **Q  Mike Rogers, what was his position?**
6  A  He was supervisor, floor supervisor, I believe,
7  or -- he was on the supervisor at nights. He
8  would be back end, and I don't know if they
9  called them general then. They keep changing
10  names, what positions they are. So I couldn't
11  tell you exactly what his actual title was, but
12  he was supervisor for the floor.
13  **Q  How did he contact you?**
14  A  They called us on PA.
15  **Q  And when you say "they," do you know who it was**
16  **that called you?**
17  A  I can't remember who it was on the PA at the
18  time.
19  **Q  And then an individual, a production worker is**
20  **able from the floor to page someone; true?**
21  A  Uh-huh. Yes.
22  **Q  So it could have been a production worker that**
23  **paged?**
24  A  Yes.
25  **Q  But you don't know who it was?**

**66**

1  A  I can't remember who it was.
2  **Q  What was the actual content of the page that you**
3  **received?**
4  A  To go to IBO 2.
5  **Q  Did they identify you individually by name or**
6  **just a job category?**
7  A  Just an ET.
8  **Q  And how many ETs were working that night?**
9  A  Myself and one other.
10  **Q  And the one other was who?**
11  A  Justin Stout.
12  **Q  So you and Justin Stout were the only ETs**
13  **working that evening; true?**
14  A  Yes.
15  **Q  When you received the page, were you and Justin**
16  **together or were you individually working on**
17  **tasks?**
18  A  I don't recall if we were together at the
19  moment. I know we showed up basically at the
20  same time, so we were both there when we went.
21  I can't remember what we were doing at the time
22  prior to that.
23  **Q  So you received a page and you walked to the**
24  **machine. When you were walking to the machine,**
25  **did you have any knowledge as to why you were**

**67**

1  being paged?
2  A  No.
3  **Q  When did you acquire the knowledge as to why you**
4  **were paged?**
5  A  When we got there.
6  **Q  And when you got there, identify for me all of**
7  **the individuals that were there.**
8  A  I can't recall.
9  **Q  You don't recall --**
10  A  Everybody that was there. Just two of them I do
11  remember was Mike, because he was the
12  supervisor, and Justin was with me. I can't
13  remember the other people that were there at the
14  time, right at that time.
15  **Q  Do you remember how many people?**
16  A  When we first got there, no.
17  **Q  Were there a lot of people?**
18      MR. SENAK: Object to form.
19  A  Three, four, five. I don't know.
20  **Q  Do you know what job classifications those**
21  **individuals were in?**
22  A  If they are there, they're -- I don't know. It
23  could be -- I am not sure. One of them would
24  have been an IC operator probably. I am not
25  sure.

**68**

1  **Q  Were these production workers as opposed to like**
2  **machinist millwrights?**
3  A  Production workers most likely, yeah.
4  **Q  But when you arrived, Mike Rogers was already**
5  **there; true?**
6  A  Yes.
7  **Q  And the information that was provided to you,**
8  **was it by Mike Rogers or these production**
9  **individuals that were milling around?**
10  A  I don't remember who actually said anything. It
11  was when we got there.
12  **Q  And what were you told?**
13  A  That they smelled something.
14  **Q  And what did you do?**
15  A  I could smell it also. I could see a little
16  whiff of smoke coming out of the exhaust.
17  **Q  So what actions did you take in response to**
18  **smelling the smoke and seeing the whiff of**
19  **exhaust?**
20  A  Other than -- we looked, I didn't notice
21  anything on the display that looked different.
22  And then I went and got that camera to take a
23  look to see if we could see anything, other than
24  that.
25  **Q  Let's break that down. Where did you look?**

---



69

1  A  Where do you mean where did I look?  At the
2     displays, on the panel.
3  Q  Where is the display on the panel located?
4  A  Right next to it.
5  Q  Right next to what?
6  A  IBO 2.  They are at the end of the IBO, at the
7     discharge, the panel sits right there.
8  Q  And when you say a panel, is that just a
9     computer terminal?
10 A  No.
11 Q  What is it?
12 A  That is the control panel for the IBO.
13 Q  And what information is imparted by that control
14    panel?
15 A  You have your temperature displays.
16 Q  And is that the temperature display for each of
17    the four zones?
18 A  Yes.
19 Q  Are there any temperature gauges for any other
20    component or part of the IBO?
21 A  No.  I believe they are just giving you your
22    zone temperatures.
23 Q  So for IBO #2 there would be four temperature
24    gauges; true?
25 A  There are multiple gauges on there.  There is

70

1     the four temperature gauges and then there is
2     another set above it, which give you a separate
3     but they are the same.  They are just redundant
4     systems.
5  Q  Other than temperature gauges, are any other
6     gauges on this control panel?
7  A  No, I don't believe so.
8  Q  So the control panel consists only of
9     temperature gauges and there's two sets, one of
10    which is redundant of the other; true?
11 A  As far as the gauges go, yeah.
12 Q  What other items are on the control panel other
13    than the gauges?
14 A  Indicator lights.
15 Q  What are the lights indicating?
16 A  Whether or not you have lost air pressure -- or
17    the air flows.
18 Q  Is that one light for each of the 13 fans that
19    you earlier testified to?
20 A  No.  For each one of the fans you have a flow
21    switch to let you know they are circulating.
22    You have one for the blower fans for the burner.
23    You have one for the exhaust fan.  There is one
24    in each one of the squirrel cages where the
25    circulation goes.  And those are all indicated

71

1     there.  So if the light is on, it just meant
2     there is a trip for that.
3  Q  When you looked at the control panel, did you
4     receive any information to indicate why you were
5     smelling smoke?
6  A  No.
7  Q  When you looked at the control panel, did they
8     give you any indication that there was a
9     problem?
10 A  No.
11 Q  So after looking at the control panel, did
12    you -- strike that.
13    Was anyone with you when you were looking
14    at the control panel?
15 A  Everybody was standing there.  I don't know if
16    they would know to look at the control panel for
17    any reason, but --
18 Q  Okay.  Did you see the smoke from the control
19    panel?
20 A  It wasn't -- I don't understand what you want
21    from that.  Did I see what smoke from the
22    control panel?
23 Q  You had earlier testified that you saw kind of a
24    whiff of smoke --
25 A  Out of the --

72

1  Q  -- and you smelled it when you arrived; true?
2     MR. SENAK:  Object to form.
3  A  True.
4     MR. SENAK:  Go ahead.
5  Q  So I am just asking about that testimony.  Where
6     did you see what you testified to was a whiff of
7     smoke?
8  A  The rear exhaust coming out of the fan housing.
9  Q  And when you were standing at the control panel,
10    is that in close proximity to that area where
11    you saw the whiff of smoke?
12 A  Yes.
13 Q  So after consulting the control panel, you told
14    the others in that assembled area that you
15    didn't see anything to indicate why there was a
16    problem; true?
17 A  I did not say that.
18 Q  What did you say?
19 A  I didn't say anything.  I mean, I went to look
20    at it and just make sure that's what it was.
21 Q  Okay.
22 A  But I didn't say anything.  I didn't speak to
23    anybody for -- they are all standing there.  I
24    was just trying to assess the situation.
25 Q  So after you had looked at the control panel,



**73**

1  did you say anything to Mike Rogers and the
2  people that were standing there?
3  A  Well, I might have said to him, I couldn't --
4  again, it is a long time ago.  I don't remember
5  what I said to anybody exactly.  I don't know
6  what I said to him.
7  Q  But can you remember the content of the
8  information that you provided or whether or not
9  you provided any information to them?
10  A  I am not 100 percent sure.  It has been a long
11  time.
12  Q  So you think it may be possible that you looked
13  at the control panel, didn't say anything to
14  anybody and just walked away back to your
15  office --
16  A  Oh, no.
17  Q  -- to get the heat gun?
18  A  No.  I believe when I looked at it and didn't
19  see anything, I might have mentioned that I'm
20  going to get that heat gun or I may not have
21  even said because I was just trying to get an
22  idea of what was going on still.  So I went and
23  got the heat gun because I wanted to see if I
24  could see anything that was odd.
25  Q  So you got the heat gun?

**74**

1  A  Uh-huh.
2  Q  And came back --
3  A  Yes.
4  Q  -- true?
5      How long in time was it between when you
6  first arrived to when you consulted the control
7  panel?
8  A  I couldn't say for sure.
9  Q  Do you know how long it was that you were gone
10  from the machine when you walked away to get the
11  heat gun?
12  A  No.  Just however long it takes to get from
13  there to the shop, get the gun out and go back
14  in.
15  Q  And how long does it take to get from IBO #2 to
16  your shop?
17  A  I couldn't tell you without actually walking it
18  and timing it.
19  Q  Would you have been gone from the machine for
20  five minutes?
21  A  I do not know.
22  Q  Is it possible?
23      MR. SENAK:  Object to form.
24  A  I suppose anything is possible, yeah.
25  Q  Do you remember what time you were originally

**75**

1  called and paged?
2  A  Nope.
3  Q  When you went from the IBO #2 to get the heat
4  gun, did anyone come with you?
5  A  No, I don't believe so.
6  Q  So when you came back to IBO #2, were there the
7  same amount of people there or had some left or
8  had some additional individuals arrived?
9  A  I couldn't say for sure.
10  Q  Do you recall who was standing there when you
11  arrived with the heat gun?
12  A  I can't remember everybody who was there or not.
13  Accurately, I couldn't say.
14  Q  Were any machinist millwrights there at that
15  time?
16  A  I know they showed up at some time, but I
17  couldn't say when, at what point they were.
18  Q  Who summoned or paged the machinist millwrights?
19  A  I don't recall.
20  Q  Did you play any role in having the machinist
21  millwrights paged?
22  A  I don't recall.
23  Q  Do you recall whether Justin had any role in
24  paging the machinist millwrights?
25  A  Again, don't recall.

**76**

1  Q  Do you know why the machinist millwrights were
2  paged?
3  A  I don't recall if they were paged, so I don't
4  know.
5  Q  So do you have any knowledge of Wes Krintz being
6  at the machine?
7  A  Yes.  Again, I don't recall when or whatever, I
8  don't.
9  Q  Do you understand Wes Krintz to be a machinist
10  millwright?
11  A  Yes.
12  Q  And Randy Crume was at the IBO #2; true?
13  A  I believe so.
14  Q  And do you understand Randy Crume to be a
15  machinist millwright?
16  A  Yes.
17  Q  But you have no knowledge of when Randy Crume
18  and Wes Krintz arrived at IBO #2?
19  A  I don't remember that long ago, so.  I can't
20  remember.
21  Q  But you don't have any recollection of you
22  personally paging for machinist millwrights?
23  A  No, I don't believe I did.
24  Q  In that situation, what would have a machinist
25  millwright, what would be the purpose of calling

77

1    a machinist millwright when ETs were there?
2        MR. SENAK: Object to foundation.
3    A  I don't know why.
4    Q  So other than checking the control panel and
5        getting the heat gun, did you do anything to
6        attempt to address the smell or the smoke that
7        you saw?
8    A  Other than checking to see if any temperatures
9        in that area seemed different than another
10       machine, which would have been one. At that
11       point everything looked the same. There was no
12       indications other than smoke coming out and the
13       smell of anything going wrong. So I think we
14       decided we were just going to let it cool off,
15       shut it down and let it cool off and see what
16       we was up with it.
17   Q  You said we made the decision to shut it down.
18   A  It would have to be from Mike, because he was --
19       you know, just asking him if that would be -- he
20       just said, yeah, try it, so.
21   Q  When you say "Mike," you are referring to
22       Mike Rogers; true?
23   A  Rogers.
24   Q  So is it your testimony that the idea to shut
25       the oven down originated with Mike and then he

78

1    questioned you as to whether that was
2    appropriate?
3    A  I don't recall exactly how the conversation went
4    back and forth. But we concurred, I guess,
5        between us that that would be what we should
6        try.
7    Q  And when you say shut it down, what are you
8        shutting down?
9    A  Sorry. Burners.
10   Q  Did you shut the fans down as well?
11   A  No. It has to cool off.
12   Q  Wes Krintz has testified that the blowers -- the
13       fans were also shut down?
14       MR. SENAK: Object to form.
15   Q  Do you agree or disagree with that testimony?
16   A  I don't know what his testimony was. But I
17       don't recall. We shut -- the only fans that
18       would go down would be the burner blowers.
19   Q  Did you shut down the fans on the burner
20       blowers?
21   A  No. When you hit the burner stops, those will
22       go off.
23   Q  And then after you shut off the burners and the
24       blower, burner blowers, what did you do?
25   A  We were just waiting for it to cool off so that

79

1    they could see what was going on.
2    Q  Did you walk away from the IBO or did you stay
3        there?
4    A  No. Stayed right there.
5    Q  And then what happened next?
6    A  A lot more smoke starting coming out a few
7        minutes later.
8    Q  So after you turned the burners and the burner
9        blowers off, there was additional smoke?
10   A  Not right away.
11   Q  How long was that interim period between turning
12       those, the burners and the blowers off and the
13       heavy smoke?
14   A  Not sure exactly.
15   Q  But would you agree that the situation got worse
16       after the burners and blowers were turned off?
17       MR. SENAK: Object to form.
18   A  I couldn't say. I don't know what was going on
19       in there.
20   Q  Well, it went from a situation of light smoke to
21       heavy smoke; true?
22       MR. SENAK: Same objection.
23   A  It definitely went from a light smoke to a
24       heavier.
25   Q  And did that indicate to you that things were

80

1    getting worse?
2    A  I suppose it could be, yeah.
3    Q  And as that situation was getting worse, what
4        actions did you take in response?
5    A  I didn't do anything exactly because not much I
6        could do.
7    Q  So you were just standing watching; true?
8    A  Not much more I could do at that point.
9    Q  Do you know, what was Mike doing at this point?
10   A  Mike?
11   Q  Rogers.
12   A  Rogers. I believe he went back to the office.
13   Q  So he just left?
14   A  No. He went to call.
15   Q  Who did he call?
16   A  I'm not sure who he was calling exactly, but
17       whether it was -- I don't know who he went to
18       call to inform of the situation.
19   Q  What was Justin Stout doing?
20   A  We were there, Justin went back over when the
21       smoke got bad, I believe. I think he went to
22       the office and to tell them just go ahead and --
23       actually, yeah. I am not 100 percent sure how
24       that went, because I am not sure if Mike even
25       saw that or not, whether he saw that smoke

**81**

1    started at that point to the extent it was or
2    after.
3  Q  Well, in response to the smoke getting worse,
4    was anybody doing anything to address that --
5  A  Yes.  Sorry.
6  Q  -- the magnification of the situation?
7  A  Millwrights opened, tried to open up a duct to
8    get some CO2 into it with an extinguisher.
9  Q  And that would have been Randy Crume and
10    Wes Krintz; true?
11  A  Yes.
12  Q  Who asked them to do that?
13  A  Again, I can't recall how that went, as far as
14    who asked or --
15  Q  And what were you doing during that period of
16    time?
17  A  Pretty much just there kind of.  I am not sure.
18    I couldn't -- maybe assisting in handing stuff
19    to them or something, but other than that.
20  Q  Well, they were on a scissor lift; right?
21  A  Correct.
22  Q  So you couldn't hand anything to them when they
23    were in an elevated platform; true?
24  A  Not when they are up in the air, no.
25  Q  So were you just standing down on the ground

**82**

1    looking up?
2  A  Uh-huh.
3  Q  Do you recall doing anything else?
4  A  Nope.
5  Q  Since you had the heat gun, how did you
6    determine which areas of the oven to point it
7    at?
8  A  Just looked for anything close to the area,
9    where the smoke was coming from.
10  Q  So the smoke guided what you were, the areas as
11    to you were going to thermal image; right?
12  A  Uh-huh.
13      MR. SENAK:  Out loud.
14  A  I am sorry, yes.
15  Q  Did you receive any kind of input as to other
16    areas to check by any of the other individuals
17    that were standing around?
18  A  I don't believe so.
19  Q  And what do you recall next?
20  A  When they did try to put the CO2 in, it just
21    blew flames everywhere.  So at that point I am
22    pretty sure we decided that's way bigger than a
23    trash can fire.
24  Q  And that is the guidance that you are provided
25    through safety training here at Ball; true?

**83**

1  A  Correct.
2  Q  And at that point what did you do?
3  A  I believe Justin may have went to the office.
4    And I don't know if he actually pulled it or
5    somebody pulled the fire alarm to get people
6    out.
7  Q  And what did you do at that point?
8  A  We all went out.
9  Q  So you went directly from IBO #2 outside of the
10    plant to the point where you're --
11  A  Waiting.
12  Q  -- supposed to assemble; true?
13  A  Correct.
14  Q  Do you remember what time that was?
15  A  Nope.
16  Q  So the only individuals that attempted to put
17    out the fire were the two millwrights; true?
18  A  I believe so, before the fire department.
19  Q  Do you know how long the oven had been operating
20    that night before the fire?
21  A  Nope.
22  Q  Do you have any knowledge of the procedures used
23    to clean that oven?
24  A  Nope.
25  Q  Are ETs involved in taking air flow readings?

**84**

1  A  No.
2  Q  Is that done only by machinist millwrights?
3  A  I believe so.  We don't take the readings when
4    they do that.  I am not sure how they
5    documented, if they document, or I am not sure
6    what they do with it.
7  Q  Are you aware whether the IBO #2 had any
8    operational problems within 30 days prior to the
9    fire?
10  A  No, I am not.
11  Q  Do you recall performing any work on that oven
12    in the 30 days prior to the fire?
13  A  I could not say.
14  Q  Have you received confined space training?
15  A  We are not supposed to do confined space here.
16    We are not supposed to --
17  Q  That's helpful, but that wasn't an answer.
18      MR. SENAK:  You have to let him answer the
19    question, though.
20  Q  Have you received confined space training, sir?
21    Yes or no.
22  A  We have had -- what do you call it? -- safety
23    training, but we are not allowed, so we don't
24    get it.
25  Q  Your safety director has stated that all Ball



85

1   employees receive confined space training.
2       Do you agree or disagree with that
3   testimony?
4       MR. SENAK:  Object to form and foundation:
5   Go ahead and answer.
6   A  I am not 100 percent sure.  If you count his
7   watching the training class stuff, then, yeah, I
8   guess that would be.
9   Q  Are you familiar with the term "reclassifiable
10  confined space"?
11  A  Yes.
12  Q  What is a reclassifiable confined space?
13  A  I believe that's a space that has been
14  determined to be clear of any hazards, I
15  suppose.
16  Q  Did you play any role in shutting down IBO #2 in
17  preparation for it to be cleaned?
18  A  No.
19  Q  Are ETs involved in that process?
20  A  I believe they will shut down the burners and
21  let it start cooling prior to them shutting it
22  all the way off.
23  Q  Do you know who, which ETs participated in that
24  shutdown procedure in preparation for it to be
25  cleaned on May 22 of 2014?

86

1   A  No, I don't recall.
2   Q  Do you recall whether or not you worked on the
3   evening of May 21 bleeding into May 22?
4   A  Is this the night of the fire?
5   Q  No.  The fire occurred either late, very late in
6   the night on May 22 or early in the morning on
7   May 23.
8   A  Okay.  Your question was?
9   Q  And you went to work that night at seven p.m. on
10  the 22nd and were to get off at seven a.m. on
11  the 23rd; true?
12  A  Okay.
13  Q  What I am asking you is, did you work seven p.m.
14  on the 21st to seven a.m. on the 22nd?
15  A  I can't remember if that was a workday I was
16  supposed to be on or not.
17  Q  Would it have been the night shift ETs that
18  would have shut down the oven to prepare for
19  cleaning on the 22nd?
20  A  It depends on what time they do their shutdown.
21  Sometimes they -- the time could be anytime when
22  they decide to cut the coil.  So I don't know
23  when it would have been.  It could have been the
24  morning.  It could have been that evening or
25  early, early morning the night before, so I

87

1   don't know.
2   Q  So that would have been whoever was on the night
3   shift?
4   A  It depends on what time they actually cut the
5   coil and it gets through the ovens.  When the
6   final product goes through, that's when that
7   would be shut down.
8   Q  Tell me the processes that ETs follow in the
9   shutdown procedure.
10  A  Once we are notified that it is okay to shut it
11  down, we will just hit burner stop and it will
12  begin to cool.
13      Sometimes we may shut it down or sometimes
14  they will go ahead and shut it the rest of the
15  way down.  By just killing the power, they are
16  going to block it out.  They just wait for the
17  temperatures to get low enough, usually below
18  200, or hopefully more than that because people
19  are going to be in it, so.
20  Q  When you say shut the burners off, is that a
21  button on the control panel that you referenced
22  earlier?
23  A  Yes.  One for each zone.
24  Q  So there would be four buttons to push to power
25  down or to shut off each of the four zones on

88

1   IBO #2; true?
2   A  True.
3   Q  And you said that there is an alternative way by
4   shutting down all of the power to the
5   A  That's not alternative, I guess.  I mean, for
6   some reason you want to shut the whole thing
7   down.  That's not the way we do it.  That
8   doesn't give any zones a chance to cool off.
9   Q  Because the fans aren't running?
10  A  Correct.
11  Q  I guess I am confused then.  Why did you mention
12  that possibility when my question was asking you
13  for the procedure that's followed to shut down
14  an oven to prepare for cleaning.
15  A  I don't understand your question as how I said
16  that that way.
17      After it cools off, they will shut it down,
18  whether they just shut the switch off or shut
19  the rest of the blowers off individually.
20  Q  ETs are involved in shutting an IBO down for
21  cleaning; correct?
22  A  Most of the time, yes.
23  Q  Tell me the process that you personally have
24  done in shutting down an IBO oven to prepare for
25  cleaning.



89

1  A  Okay.  Hit the stop buttons for burner stops on
2     all four zones and then let it cool off.
3        When the temperature drops or whenever the
4     crews may show up or whenever they say they are
5     ready, if I am the one going over there to shut
6     it the rest of the way off, I will shut the
7     rest, there's stops on everything, and then just
8     shut the power off.
9        It is usually ran till the last minute, to
10    give it enough time to cool as much as possible.
11    So sometimes we don't shut that off the rest of
12    the way.  When the crew gets in, they will shut
13    it down.  They will just pull the disconnect.
14  Q  To terminate all power to the machine, to the
15    IBO?
16  A  Correct.
17  Q  Is that button also on the control panel?
18  A  It is a lever.
19  Q  Is that lever on the control panel?
20  A  Yes.
21  Q  Do you know whether Ball employees performed any
22    required maintenance or service on the IBO #2
23    when it was shut down that day?
24  A  I don't know.  I can't recall.
25  Q  When there is a shift change, does the prior

90

1     shift tell you what they have done that day?
2  A  As far as our stuff goes, it would be just the
3     checklist that we would have.
4        As far as other departments go, I don't
5     know what their procedures are.
6  Q  Other than shutting the oven down for cleaning
7     and then turning the oven back on, what role do
8     ETs play in cleaning an IBO?
9  A  Other than what we talked about before, that's
10    about it.
11  Q  And before that was cleaning the air flow tubes?
12  A  Right.
13  Q  And cleaning the burner chambers?
14  A  We would only, like I said, on the PIN oven, if
15    it is not working properly, that's when we take
16    something like that apart.  I have never done
17    it.
18  Q  Let's just talk about the IBO oven, sir.
19  A  It would just be the burner tubes and then their
20    tests.
21  Q  Are you aware of Ball Manufacturing ever being
22    critical of the work that Air Tech performed?
23  A  I don't know.
24  Q  Do you have any knowledge of Paul Scholten?
25  A  No.

91

1  Q  Have you ever spoken with Air Tech employees?
2  A  Other than maybe saying hello or something, not
3     really.
4  Q  But you have never spoken with them incident to
5     the work they were performing?
6  A  No.
7  Q  When you arrived at work on the
8     evening of the 22nd, were all of the
9     post-cleaning/pre-production tasks completed?
10  A  I could tell you it was running at the time I
11    came in, so I don't know.
12  Q  Was it running in production?
13  A  There were cans going through the oven.
14  Q  So even the heat curve test had been performed;
15    true?
16  A  I believe so.
17  Q  Because you didn't personally perform any heat
18    curve --
19  A  I did not.
20  Q  You have got to let me finish, sir.
21  A  Sorry.
22  Q  You didn't perform any of the heat curve tests;
23    true?
24  A  I did not.
25  Q  Have you discussed anything about the May 22,

92

1     2014 cleaning or the May 23, 2014 fire with an
2     individual named Scott Howell?
3  A  I am not 100 percent who Scott Howell is, so.
4  Q  So if you are not 100 percent, there is some
5     percentage of you that believes that you know
6     who Scott Howell is; true?
7  A  Only if you are going to tell me I met him
8     before, but I don't know him.  I don't know.
9  Q  Okay.
10  A  I don't know.  The name is not familiar to me.
11  Q  So you don't recall having a conversation with a
12    gentleman by the name of Scott Howell; true?
13  A  There were some lawyers or somebody was in the
14    front office, I don't know how long afterwards,
15    that I had gone up to talk with, but I cannot
16    remember who they are.
17  Q  When was that?
18  A  I do not remember.
19  Q  And you don't recall the names of any
20    individuals?
21  A  No.
22  Q  Do you recall how many individuals?
23  A  I believe there might have been two of them.
24  Q  Do you recall what they looked like?
25  A  No.



93

1  Q  Do you recall what they were wearing?
2  A  Clothes.  I don't know.  I don't know what
3     they --
4  Q  Was it clothes like I am wearing, sir, or was it
5     clothes like you're wearing?
6  A  They were not in work clothes.  But then that
7     would be your work clothes.  So, yes, they would
8     be in some type of clothes.  I don't know.  I
9     did not pay attention to what they were wearing.
10    I don't know what they had on.
11 Q  How long did the conversation last?
12 A  I don't believe it was that very long.
13 Q  Do you recall what you were asked?
14 A  No.  Not 100 percent, nope.
15 Q  Do you recall anything regarding the content of
16    that conversation?
17 A  No.
18 Q  And where did that conversation occur?
19 A  I believe it was in the room down the hall.
20 Q  So the other conference room?
21 A  Yes.
22 Q  Do you recall any of your other co-employees
23    that were in the room?
24 A  The only one I can somewhat remember, I think
25    Freddy was with me, Freddy Spencer.

94

1  Q  Have you ever heard of the name Otto Soyk,
2     S-O-Y-K?
3  A  It doesn't sound familiar, but --
4  Q  Do you recall ever providing any information to
5     a fire investigator?
6  A  I don't think so, but I am not sure.
7  Q  Do you recall providing any statements
8     concerning the fire?
9  A  A written one that we did right after it
10    happened, in the little room out there at the
11    guard shack.
12 Q  And who requested that you provide that
13    statement?
14 A  I believe that was Nick Trejo.
15 Q  And what position does Nick Trejo hold?
16 A  Supervisor.
17 Q  Supervisor of what?
18 A  I don't think he's here anymore.  I'm not sure
19    how they rank them up in there.  Just I think at
20    the time was just supervisor.
21 Q  And who else was requested to provide
22    statements?
23 A  I believe it was Randy, Wes, myself, and Justin.
24    And I am not sure if anyone else was.  There may
25    have been, but I think that was it.

95

1  Q  Did you have any conversations with the other
2     individuals who were providing written
3     statements before writing your own?
4  A  No.  We all just went and did it right away, so.
5  Q  And have you ever seen that document?
6  A  No, not since I turned it in.  I can't remember
7     even what I put on it.
8  Q  And was your document in handwriting or did you
9     type it up?
10 A  Handwriting.
11 Q  Do you have any understanding about what Ball is
12    claiming in this lawsuit?
13 A  No, I do not.
14 Q  Do you have any understanding as to Ball or its
15    insurance company's allegations of wrongdoing by
16    Air Tech?
17 A  Just other than the lawsuit, I suppose, so no.
18 Q  Do you know what Ball is contending my client
19    did that caused or contributed to cause the
20    fire?
21    MR. SENAK:  Object to foundation.  Go ahead
22    and answer.
23 A  No.
24 Q  Do you have any opinions as to what caused the
25    May 23, 2014 fire?

96

1  A  Nope.
2  Q  Do you have any opinions as to the quality of
3     the work performed by Air Tech?
4  A  Nope.
5  Q  Have you been involved at all in any
6     investigation as to what caused the fire?
7  A  No, I don't believe so.
8  Q  Has anyone asked for your assistance in
9     performing any tasks related to cause and origin
10    investigation of the fire?
11 A  No.
12 Q  Has anyone shared with you an opinion as to what
13    caused the fire?
14 A  I don't believe so.
15 Q  The burners on the IBO are on top of the oven;
16    correct?
17 A  Yes, I think so.
18 Q  So the burners are not located within the oven
19    itself; true?
20 A  I am not 100 percent sure how you want me to
21    answer that.  It is within, because it is part
22    of the oven, isn't it?
23 Q  It is not in the chamber where the cans are
24    traveling --
25 A  No.


CONNOR REPORTING

Connor Reporting
www.connorreporting.com

317.236.6022

97

1  Q  -- through; true?
2  A  True.
3  Q  Bob, do you recall typing up a typewritten
4     statement that you provided?
5        MR. MILLER:  Will you mark that?
6  A  I don't know.  I don't think so.  I can't
7     remember.  I thought it was just written out.
8        (Pellegrini Deposition Exhibit 1 was marked
9     for identification.)
10  Q  Bob, I am going to hand you a two-page document
11     marked as Pellegrini 1.  Take a look at that
12     document.
13  A  All right.
14  Q  Have you had an opportunity to look at that
15     two-page document, sir?
16  A  I am looking at it now.
17  Q  The second page of Exhibit Number 1, is that
18     your handwritten statement?
19  A  I believe it is.
20  Q  And that's what you wrote out on the morning of
21     the 23rd; correct?
22  A  Yes.
23  Q  The typed --
24  A  When you say -- sorry.
25  Q  We have had other witnesses testify that when

98

1     you work night shift --
2  A  It is the day before that you put down.
3  Q  Correct.
4  A  Yeah.
5  Q  So it would have been written out after the fire
6     presumably; true?
7  A  Uh-huh.
8        MR. SENAK:  Out loud.
9  Q  You have to say yes.
10  A  I'm sorry, yes.  Sorry.
11  Q  Page 1 of this, of Exhibit 1, Pellegrini
12     Exhibit 1, the typewritten version --
13  A  Okay.
14  Q  -- have you ever seen this before?
15  A  I don't know.  I don't think so.
16  Q  Do you know who created the typewritten version?
17  A  It could have been me.  I don't remember.  I
18     remember writing this down, but I am not 100
19     percent sure about going back over and redoing
20     that.
21  Q  Thank you.  I don't have anything further.
22
23  CROSS-EXAMINATION,
24     QUESTIONS BY MARK N. SENAK:
25  Q  Bob, I just have a few questions for you.

99

1        First of all, if you would just take a look
2     at the second page of Pellegrini Exhibit 1,
3     that's your handwritten statement?
4  A  Uh-huh.
5  Q  Will you just read into the record what you
6     wrote?
7  A  Approximately 12:20 a.m. just asked for a --
8     Justin asked for a heat gun.  Smoke was seen or
9     seen coming from there.  Rear exhaust, fans,
10     housing.  Look at temp, 275 as compared to
11     line 1, 255.  We shut down burners.  Temp went
12     down to 70 within 3 to 5 minutes.  Large amount
13     of smoke came out.  The housing temp on gun
14     shows 480 to 520.  Insulation started on fire.
15     Shut exhaust fans down.  Millwrights used 2 fire
16     extinguishers at same time.  Flames started at
17     inlet exhaust.  Called for them to come down and
18     get out.  We went to the evacuation area.  After
19     roll call went with Mike Rogers to assist fire
20     department, if needed.  We were asked to go back
21     in, go in, Randy, Wes, and myself.  I was to
22     actually shut down panel, and we three stood by
23     IC a few minutes and then told fire department
24     we were going outside.  We stood outside in
25     front of cooling towers.

100

1  Q  And we already established that this was written
2     on May 23rd, not May 22nd, as shown on the
3     document?
4  A  Yes.
5  Q  Is this your handwriting?
6  A  Yes.
7  Q  And is that your signature at the bottom?
8  A  Yes.
9  Q  And is this the statement that you prepared,
10     handwrote after the fire?
11  A  Yes.
12  Q  If we take a look at the second line on the top,
13     it begins, "Smoke was see coming from rear
14     exhaust fan housing."
15        Do you see that?
16  A  Yes.
17  Q  Now the IBO is divided into four zones?
18  A  Uh-huh.  I am sorry, yes.  Sorry.
19  Q  And is the rear fan housing located above
20     Zone 4?
21  A  Yes.
22  Q  And is that where you observed smoke first when
23     you came to the scene?
24  A  Coming from that, yes.
25  Q  Is that an area that you know is referred to as

101

1    the squirrel cage?
2    A   I don't -- yeah, the housing is a squirrel cage
3        housing, yeah, for the exhaust.
4    Q   You then continue on, "Large amount of smoke
5        came out of the housing."
6            Is that the same housing that you referred
7        to previously?
8    A   Yes.
9    Q   That housing is located above Zone 4?
10   A   Yes.
11   Q   And, again, that's the squirrel cage, as it is
12       known?
13   A   Yes.
14   Q   Continuing on, you note that "Flames started at
15       the inlet exhaust."
16   A   When they shot it with the fire extinguisher, it
17       came out the other end, at the inlet also.
18   Q   That's not the same area as referred to before?
19   A   No.
20   Q   In your statement you referred to Randy and Wes?
21   A   Yes.
22   Q   I take it that's Randy Crume and Wes Krintz?
23   A   Yes.
24   Q   Does this refresh your recollection that they
25       were there with you?

102

1    A   Yes.
2    Q   And is it your understanding that people who
3        were there would have been Randy Crume, Wes
4        Krintz, yourself, Justin Stout, and Mike Rogers?
5    A   Yes.
6    Q   Do you have any recollection of anyone else
7        being there?
8    A   Not really.
9    Q   In the third line, you indicate in your
10       handwritten statement, I think it is -- I am
11       sorry, "Looked at temperature 275 as compared to
12       Line 1 255."
13   A   Correct.
14   Q   Explain to us how you came to get that
15       information.
16   A   With the camera, it actually gives you actual
17       temperatures on the spot.
18           The housing on Zone 4 of I am guessing
19       IBO 2 was 275, Line 1 was 255, in that exact
20       same spot approximately of that housing.
21   Q   And you're just comparing the same area of
22       Line 1 with the same area of Line 2?
23   A   Correct.
24   Q   You then indicate you shut down the burners, or
25       the burners were shut down.  I don't know if you

103

1    did it, but --
2    A   Right.
3    Q   You talked about the idea that there are burners
4        and burner blowers?
5    A   When the burners -- yeah.  When the burners,
6        when you go to light -- when you start the
7        burners, the first thing that happens is the
8        burner blower comes on, help evacuate any gases
9        that is trapped in there before it actual
10       lights.  That will run prior to it igniting.
11   Q   Are there blowers on the oven other than the
12       burner blowers?
13   A   There are squirrel -- there's circulation fans
14       that take and move the heat around the product.
15       There is the burner fans and then there is
16       exhaust fans.
17   Q   On that day when the blowers were shut down,
18       were all the blowers shut down or just the
19       burner blowers?
20   A   Just the burner blowers.
21   Q   Were the other blowers continuing to operate?
22   A   They were on to help cool down the zones, yes, I
23       believe, I think.  I am pretty sure we did not
24       shut down anything but the burners.
25   Q   You then go on that we shut down burner, temp

104

1    went down 270 within 3 to 5 minutes; is that --
2    A   We shut down burners, temp went down to 270
3        within 3 to 5 minutes, a large amount of smoke
4        came out.  And I can't remember if that was
5        from -- I don't know.  I can't remember what
6        temperature I got that from, whether it was the
7        heat gun or -- I don't know where I saw that
8        temperature.
9    Q   Let's start with just the statement before.
10       When you make the statement, "We shut down
11       burners temp went down to 270," there should be
12       a period there?
13   A   Okay.  Well --
14           MR. MILLER:  Oh, Mark, you can't change his
15       testimony.
16           MR. SENAK:  Andrew, Andrew, if you have an
17       objection, make it and be done.  Okay?  But you
18       criticize me for speaking.  Why don't you abide
19       by your own instructions?
20           MR. MILLER:  Mark, earlier you said that
21       you were helping the witness, now you're telling
22       him what to say.
23           MR. SENAK:  Why don't you abide by your own
24       instructions and make your objection.  All
25       right?



105

1    MR. MILLER: You're going to be sworn in.
2       MR. SENAK: Again, Mark, please refrain
3    from making comments. Make your objection and
4    move on. All right?
5  Q  So my question is, when you say within 3 to 5
6    minutes a large amount of smoke came out of the
7    housing, does the smoke come out after the
8    burners are turned down, turned off?
9  A  Yeah.
10  Q  So we shut down the burners and the temp went
11    down to 270; true?
12  A  True.
13  Q  So following shutting the burners and the burner
14    blower off actually reduce the temperature that
15    you were observing?
16  A  True. For a moment.
17  Q  Right. And then you continue on, within 3 to 5
18    minutes a large amount of smoke came out of the
19    housing.
20  A  Correct.
21  Q  Is that 3 to 5 minutes after you had shut down
22    the burners and the burner blower?
23  A  I believe so, yes.
24  Q  Now you go on to say, "Temp gun shown 480 to
25    520."

106

1  A  Yes.
2  Q  Do you see that?
3       How long after you took the reading of 275
4    shown above in your statement did you get the
5    reading of 480 to 520?
6  A  I am going to say it was 3 to 5 minutes after.
7  Q  Now, did the temperature continue to escalate
8    above the 480 to 520?
9  A  I couldn't tell you after that, because I
10    believe I didn't shoot a temp after that again.
11    I don't think I did, so.
12  Q  Okay. Let me show you what was Krintz
13    Exhibit 2.
14  A  Okay.
15  Q  Which is the handwritten statement of
16    Wes Krintz.
17       (Previously marked Krintz Exhibit 2 was
18    shown to the witness.)
19  Q  And if you could take a look at his handwritten
20    statement.
21  A  Okay. Ready.
22  Q  And I am going to show you Exhibit Number 3,
23    which is the handwritten statement of
24    Randy Crume.
25       (Previously marked Krintz Exhibit 3 was

107

1    shown to the witness.)
2  A  Okay.
3  Q  Do you recall telling Mr. Crume or Mr. Krintz
4    what the temperature readings were that you were
5    observing on the heat gun?
6  A  I may have shown it to them. I am not sure,
7    because it has got just a display on it.
8  Q  You would have been on the ground looking at the
9    display?
10  A  Right.
11  Q  They would have been up in the lift?
12  A  No. Yeah. See, this would have been before,
13    because that's before I think they were on the
14    lift, weren't they? I am not --
15  Q  Understood. You're pointing to Mr. Crume's
16    statement?
17  A  Well, either one of them. But, I mean, when the
18    temperature was up, I don't know at what point
19    they were on lift compared to that.
20  Q  What was the highest reading that you recall
21    receiving or observing on the temperature gun?
22  A  I am going to have to say the 520, because I
23    can't remember.
24  Q  You were talking a little bit about confined
25    space training or your ability to operate in

108

1    confined space.
2       What is your understanding of the policy at
3    Ball regarding the Ball employees going into
4    confined spaces?
5  A  We are just not supposed to. Any confined
6    space, outside contractors usually get called in
7    for that.
8  Q  Do you know why that's true?
9  A  Not really.
10  Q  How do you find out about that information?
11  A  In our safety meetings.
12  Q  And that's what you were told during your safety
13    meetings?
14  A  Yes.
15  Q  Who conducts the safety meetings?
16  A  It has been Matt and then for awhile it has
17    been -- you can get on-line ones also, where we
18    just go through the -- as far as I think those
19    go, that's Matt, sometimes Freddy has done it,
20    maybe. I can't remember. Matt is always
21    usually the one who gives it to us, or Matt was
22    -- I can't remember who did the training.
23       MR. SENAK: All right. That's all I have.
24       MR. MILLER: Nothing further.
25       MR. SENAK: Signature is reserved.



109

```
 1   (Time Noted:  4:23 p.m.)

 2

 3

 4          AND FURTHER DEPONENT SAITH NOT.

 5

 6

 7   _____

     ROBERT JOHN PELLEGRINI

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

111

```
 1   person in this cause of action, that I am not a

 2   relative or attorney of either party or otherwise

 3   interested in the event of this action, and that I

 4   am not in the employ of the attorneys for any party.

 5       IN WITNESS WHEREOF, I have hereunto set my hand

 6   and affixed my notarial seal on this _____ day of

 7   March, 2018.

 8

 9

10         N O T A R Y   P U B L I C

11

12   My Commission Expires:

13   September 2, 2024

14   County of Residence:

15   Hamilton County

16

17

18

19

20

21

22

23

24

25
```

110

```
 1   STATE OF INDIANA         )
                              )  SS:
 2   COUNTY OF HAMILTON       )

 3

 4       I, Diane Zeyen, RPR, a Notary Public in and for

 5   the County of Hamilton, State of Indiana, at large,

 6   do hereby certify that ROBERT JOHN PELLEGRINI, the

 7   deponent herein, was by me first duly sworn to tell

 8   the truth, the whole truth, and nothing but the

 9   truth in the aforementioned matter;

10       That the foregoing deposition was taken on

11   behalf of the Defendant, at Ball Metal Beverage

12   Packaging, 501 North 6th Street, Monticello,

13   White County, Indiana, on the 12th day of March,

14   2018, at 2:00 p.m., pursuant to the Federal Rules of

15   Trial Procedure;

16       That said deposition was taken down in

17   stenograph notes and afterwards reduced to

18   typewriting under my direction, and that the

19   typewritten transcript is a true record of the

20   testimony given by the said deponent; and that the

21   signature by said deponent to his deposition was not

22   waived;

23       That the parties were represented by their

24   counsel as aforementioned.

25       I do further certify that I am a disinterested
```



**Exhibits**

R PELLEGRINI_1  3:11 97:8, 17 98:11,12 99:2

---

**#**

**#1**  40:14,19 41:2 43:10 46:15

**#2**  21:3,6,9 38:21 39:3,7,12 50:3,24 54:12 61:7 63:9 64:20 69:23 74:15 75:3,6 76:12,18 83:9 84:7 85:16 88:1 89:22

**#3**  51:13

**#4**  40:19 41:3,10,13 43:11,14 46:21

**#5**  40:22

---

**0**

**01**  14:7

---

**1**

**1**  39:11 40:9,10,22 41:5,7 44:4 46:6 50:8 97:8,11,17 98:11,12 99:2,11 102:12,19,22

**100**  11:23 22:8 43:16,18 55:20 56:6 73:10 80:23 85:6 92:3,4 93:14 96:20 98:18

**12:20**  99:7

**13**  14:25 38:19 70:18

**15**  52:4,16

**16**  7:10

**17**  7:10

**18**  6:22 8:5

**180**  38:7

---

**2**

**2**  40:9,10,14,19,23 41:3,5,7 42:25 43:7,10 46:6,15 66:4 69:6 99:15 102:19,22 106:13,17

**200**  57:6 87:18

**2001**  7:13,15,20 10:10,20 11:16 24:13 26:8 35:23 36:15,17 51:6, 9 62:22

**2014**  20:3,17 34:25 40:4,7 49:11 50:24 51:7,9,17 52:3,7 85:25 92:1 95:25

**21**  86:3

---

**21st**  86:14

**22**  34:25 49:11 52:2,7 64:21 85:25 86:3,6 91:25

**22-23**  20:5

**22nd**  86:10,14,19 91:8 100:2

**23**  86:7 92:1 95:25

**23rd**  86:11 97:21 100:2

**255**  99:11 102:12,19

**270**  104:1,2,11 105:11

**275**  99:10 102:11,19 106:3

---

**3**

**3**  40:9,10,14,19,23 41:3,5,7 42:25 43:7,10 46:6,15 99:12 104:1,3 105:5,17,21 106:6,22, 25

**30**  84:8,12

---

**4**

**4**  40:9,23 43:7 100:20 101:9 102:18

**480**  99:14 105:24 106:5,8

---

**5**

**5**  40:9 43:5 99:12 104:1,3 105:5, 17,21 106:6

**520**  99:14 105:25 106:5,8 107:22

---

**6**

**601**  6:20

**6:30**  52:10,12

**6:45**  52:19

---

**7**

**7**  52:10

**70**  99:12

---

**8**

**82**  8:17

**86**  9:6 10:9

---

**A**

**a.m.**  52:8 86:10,14 99:7

**abide**  104:18,23

**ability**  107:25

**accept**  8:2

**accepted**  25:11 59:13 61:8

**accepting**  10:16 11:6 25:6

**Accurately**  75:13

**Acme**  11:8,9,14,18 12:1

**acquire**  67:3

**actions**  68:17 80:4

**activities**  57:12

**actual**  11:24 13:15,16 26:23 48:1 65:11 66:2 102:16 103:9

**additional**  44:8,11 75:8 79:9

**address**  6:19,22,24 77:6 81:4

**adjusted**  58:25

**afternoon**  4:9

**agree**  78:15 79:15 85:2

**ahead**  6:16 24:17 33:8 47:21 62:14 72:4 80:22 85:5 87:14 95:21

**air**  4:16 32:1,3,7,9,13,19,22 33:9,11,12,18,20,21 34:1,5,13, 16,20,22 37:20,24 56:1,2 70:16, 17,81:24 83:25 90:11,22 91:1 95:15 96:3

**alarm**  83:5

**allegations**  95:15

**allowed**  16:19 52:5 84:23

**alternative**  88:3,5

**aluminum**  10:14 36:23 37:3,8

**amount**  59:19 75:7 99:12 101:4 104:3 105:6,18

**Andrew**  4:15 41:23 45:5,11 104:16

**answering**  42:9

**answers**  5:5

**anymore**  20:9 94:18

**anytime**  21:10 58:23 86:21

**apparently**  16:18

**approximately**  7:22 99:7 102:20

**area**  50:17 54:10 55:12 72:10,

---

14 77:9,82:8 98:18 100:25 101:18 102:21,22

**areas**  82:6,10,16

**arrive**  52:2

**arrived**  33:4 52:20,25 68:4 72:1 74:6 75:8,11 76:18 91:7

**aspect**  58:16

**assemble**  83:12

**assembled**  72:14

**assess**  72:24

**assist**  99:19

**assistance**  96:8

**assisting**  81:18

**assume**  8:11 12:24

**assumption**  12:14

**assure**  26:18

**attempt**  77:6

**attempted**  83:16

**attention**  23:7 32:25 33:14,22 34:7,24 93:14

**audibly**  5:15,16

**Avenue**  11:13

**aware**  33:4 34:20 35:4 50:23 51:1,16 53:9 84:7 90:21

**awhile**  59:9 108:16

---

**B**

**bachelor**  9:12

**bachelor's**  8:9,11,18 9:7

**back**  8:2 11:16 17:2 20:1 27:10 28:4 39:16,20,21 50:17,21 57:12,15,17 58:8 59:3,5 61:1 65:8 73:14 74:2,13 75:6 78:4 80:12,20 90:7 98:19 99:20

**background**  8:8

**bad**  17:4 22:24 23:16 80:21

**badge**  34:17

**badger**  42:16

**badgering**  48:10

**bake**  10:17

**Ball**  4:17 6:24 7:8,20 10:10,12, 16 11:7 12:1 14:3 19:14,16,20 25:7,12,15,16 26:4 28:6 30:22 32:4,11 35:19 51:17 53:10 62:16 82:25 84:25 89:21 90:21 95:11,14,18 108:3



**Ball's** 5:1.8:5 31:25

**basic** 35:16

**basically** 15:24 25:14 27:2 28:8 62:19 66:19

**began** 10:9 14:7 24:12 25:15 32:3,10 62:22

**begin** 59:1 87:12

**beginning** 11:25 14:11

**begins** 100:13

**begun** 54:20 58:17

**believes** 92:5

**belt** 23:10,13,15,18,22

**beverage** 10:14 36:19,21

**big** 24:22

**bigger** 82:22

**bit** 16:5 107:24

**bleeding** 86:3

**blew** 82:21

**block** 87:16

**blower** 70:22 78:24 103:8 105:14,22

**blowers** 78:12,18,20,24 79:9, 12,16 88:19 103:4,11,12,17,18, 19,20,21

**Bob** 4:14,15 6:19 7:8 8:8 12:10 14:2 19:9 31:25 35:11 39:1 42:2 45:20 50:23 97:3,10 98:25

**book** 27:15,16 29:13

**booklet** 27:9,13,17,21 28:22,23

**boss** 64:14

**bottom** 100:7

**bought** 36:9

**break** 15:5 16:5 68:25

**breakdown** 26:13

**breaks** 28:9

**bring** 18:7 23:7 59:23

**broke** 15:13 17:1,17 18:22 22:17

**broken** 23:10,13,22

**brought** 56:13

**bunch** 13:12

**burner** 27:15,18,21,24 28:1,23 30:5,9,17,19 70:22 78:18,19,21, 24 79:8 87:11 89:1 90:13,19 103:4,8,12,15,19,20,25 105:13, 22

**burners** 27:8,14 37:22,23 78:9, 23 79:8,12,16 85:20 87:20 96:15,18 99:11 102:24,25 103:3,5,7,24 104:2,11 105:8,10, 13,22

**burnt** 38:2

**business** 6:24

**busy** 59:5,6

**button** 87:21 89:17

**buttons** 87:24 89:1

---

**C**

**cage** 38:10,13 47:14,19 48:13 101:1,2,11

**cages** 70:24

**call** 16:10 57:25 59:16,20 80:14, 15,18 84:22 99:19

**called** 15:17 21:3 38:10 56:9 60:7 64:22 65:9,14,16 75:1 99:17 108:6

**calling** 76:25 80:16

**camera** 49:14,16 68:22 102:16

**campuses** 8:24

**cans** 36:13,19,21,25 37:3,8 44:4 56:18 91:13 96:23

**capabilities** 17:11,16

**care** 19:4

**career** 9:25 10:1

**categories** 18:3

**category** 66:6

**caught** 51:14,22

**caused** 95:19,24 96:6,13

**chamber** 96:23

**chambers** 90:13

**chance** 14:1 88:8

**change** 8:5 23:8 89:25 104:14

**changed** 20:2 23:9 37:13,22,23 38:5 52:10,13

**changing** 65:9

**chart** 20:25

**check** 20:25 54:2 55:14,19,25 57:8 59:11,12 82:16

**checking** 49:10 77:4,8

**checklist** 55:23 90:3

**checks** 20:24 31:5 53:14,19,20, 25 54:9,12,16,20 57:2

**Chicago** 8:25 9:3,4 11:12

**chose** 50:16

**circulating** 70:21

**circulation** 70:25 103:13

**claiming** 95:12

**class** 85:7

**classifications** 67:20

**clean** 27:11 30:8,12,17,25 31:3 32:14,16 33:17 83:23

**cleaned** 30:19,22 37:20 54:16 55:2,4 63:17,20,23 64:5,8,9,17 85:17,25

**cleaning** 27:9 30:5 32:22 33:23 35:5 37:24 53:1 54:9,17,19 56:21 64:1 86:19 88:14,21,25 90:6,8,11,13 92:1

**clear** 85:14

**client** 95:18

**clock** 52:16

**clock-in** 52:19

**close** 72:10 82:8

**closed** 55:5

**closer** 51:9

**clothes** 93:2,4,5,6,7,8

**co-employees** 28:18 93:22

**CO2** 81:8 82:20

**cog** 62:3

**coil** 86:22 87:5

**collect** 56:17

**comments** 105:3

**commonly** 15:19

**companies** 10:6

**company** 15:10 35:1

**company's** 95:15

**compare** 14:16

**compared** 39:11 49:24 99:10 102:11 107:19

**comparing** 48:25 102:21

**comparison** 50:7

**complete** 58:12

**completed** 54:10 91:9

**component** 17:7 37:12 43:20 69:20

**computer** 59:21,23,24 60:1,10, 15,16 61:2 62:25 63:13,14 69:9

**concern** 63:8 64:20

**concerned** 28:23

**concurred** 78:4

**conducts** 108:15

**conference** 5:1 93:20

**confined** 84:14,15,20 85:1,10, 12 107:24 108:1,4,5

**confused** 23:19 88:11

**consists** 29:17 55:25 70:8

**consult** 29:25 30:4,25 55:23

**consulted** 29:4 74:6

**consulting** 31:6,22 72:13

**contact** 65:13

**contained** 46:15

**contending** 95:18

**content** 66:2 73:7 93:15

**continually** 42:20

**continue** 101:4 105:17 106:7

**continued** 26:19

**continuing** 42:16 101:14 103:21

**contractor** 17:13 35:4,7

**contractors** 16:21 18:8 108:6

**contributed** 95:19

**control** 69:12,13 70:6,8,12 71:3,7,11,14,16,18,22 72:9,13, 25 73:13 74:6 77:4 87:21 89:17, 19

**conversation** 78:3 92:11 93:11,16,18

**conversations** 95:1

**cool** 77:14,15 78:11,25 87:12 88:8 89:2,10 103:22

**cooler** 50:2,3

**cooling** 85:21 99:25

**cools** 88:17

**copy** 21:20

**Corporation** 4:17

**correct** 6:25 8:12 13:1 14:8 29:2 30:15 37:20,22 39:4 54:17, 18 55:3 59:17 61:21 81:21 83:1, 13 88:10,21 89:16 96:16 97:21 98:3 102:23 105:20

**count** 7:11 11:16 85:6

**couple** 25:23 50:4



court 4:23 5:4,12,21,25

created 63:7 98:16

Crest 8:15

crew 20:2 25:24 33:15,17,23 53:1,4 54:9,17 89:12

crews 89:4

critical 90:22

criticize 104:18

CROSS-EXAMINATION 98:23

cross-talk 42:8

Crume 76:12,14,17 81:9 101:22 102:3 106:24 107:3

Crume's 107:15

cure 44:5

curing 43:23

current 6:19 7:17,21 12:8 26:8 36:17

curve 44:20,23 45:22 46:1,9,11 58:18,20 59:3,12,15 60:3 61:13 91:14,18,22

curves 46:5

cut 86:22 87:4

**D**

data 60:8,9,20

date 7:12,17 26:9

day 20:9,10,14,22 35:10 89:23 90:1 98:2 103:17

days 19:25 84:8,12

dealing 34:1 41:24

decide 86:22

decided 77:14 82:22

decision 19:6 31:25 32:1,7,8 77:17

deeply 38:25

degree 8:9,11,12,19 9:7,9,24

degrees 50:4

department 13:4 33:16 83:18 99:20,23

departments 90:4

dependent 44:12

depends 16:25 17:6 18:12 59:4 86:20 87:4

deposed 4:18 7:2

deposition 4:21 12:11 13:1,11, 23 33:10 34:21 42:1 97:8

describe 15:22

design 40:18 44:6,16,17

designation 9:14

detailed 62:1

determination 18:17 64:16

determine 17:25 49:7 82:6

determined 50:14 85:14

determines 17:15

determining 63:19,22 64:4

deviating 49:7

deviation 49:3,19

Devry 8:10,19,21 9:5,24 10:9 11:17

difference 39:3 40:7

directly 83:9

director 84:25

disagree 78:15 85:2

discharge 69:7

disconnect 89:13

discourteous 5:11

discussed 91:25

display 47:23 68:21 69:3,16 107:7,9

displays 69:2,15

divided 100:17

document 15:12 63:5 84:5 95:5,8 97:10,12,15 100:3

documentation 22:25

documented 84:5

documents 12:13,15 62:21 63:7

download 60:12 61:2

drops 89:3

duct 63:23 81:7

ductwork 47:18 51:16,18,22

**E**

earlier 37:19 39:2 52:6,24 60:5 70:19 71:23 87:22 104:20

earliest 52:20

early 20:5 86:6,25

easier 5:12

education 10:7

educational 8:8

effect 43:19 44:8

electrical 9:9 14:6,14,18 15:1, 2,4,12,13,15 23:25 24:4 62:19 63:15

electronic 14:12,15 15:2

electronics 8:9 9:8,12,24 12:4 14:22 15:15 60:2,11,21 63:14

elevated 81:23

employ 8:6

employee 7:9

employees 53:10 61:18 85:1 89:21 91:1 108:3

employment 7:19 10:12 11:7, 17 14:11 24:12 30:18,21 32:11 62:22

encompass 12:2

end 41:20 58:23 65:8 69:6 101:17

engineer 9:10,17,22,24

engineering 8:10 9:8,13,14,20 10:1

entire 17:23 21:11 26:13,14

entirety 12:2,7 19:19

entity 34:20

environment 6:7

equipment 10:8 18:7 20:18

escalate 106:7

establish 31:20 33:1

established 100:1

ETS 24:18,24 25:1 31:4 44:19 54:2 56:23 57:11 58:15 61:14 62:11,23 63:19,22 64:7 66:8,12 77:1 83:25 85:19,23 86:17 87:8 88:20 90:8

evacuate 103:8

evacuation 99:18

evening 20:4 35:9 66:13 86:3, 24 91:8

everyday 22:19

exact 18:14 102:19

exception 17:9

exhaust 47:20 68:16,19 70:23 72:8 99:9,15,17 100:14 101:3, 15 103:16

Exhibit 97:8,17 98:11,12 99:2 106:13,17,22,25

existed 40:22

existence 39:8

experience 10:13,17 25:8

explain 39:14 50:6 62:23 102:14

explained 9:25 14:17

extended 5:17,24

extent 81:1

extinguisher 81:8 101:16

extinguishers 99:16

**F**

facet 63:8

facets 60:17,18

facility 19:16

factory 5:1 6:7

fair 6:15

familiar 44:20 85:9 92:10 94:3

fan 17:18 38:9,11 43:14 47:14, 19 48:13 70:23 72:8 100:14,19

fans 13:17 38:13 43:11 70:18, 20,22 78:10,13,17,19 88:9 99:9, 15 103:13,15,16

feel 25:5

figure 15:14 16:10

figured 24:10

figures 63:1

figuring 63:4

filed 4:16

final 87:6

find 57:25 63:11 108:10

fine 4:14

finish 12:5 18:23 33:7 36:3 41:11,17,19 55:15 91:20

finished 54:23

finishing 11:21

fire 20:3,21 31:17 39:8 50:24 51:4,14,23 82:23 83:5,17,18,20 84:9,12 86:4,5 92:1 94:5,8 95:20,25 96:6,10,13 98:5 99:14, 15,19,23 100:10 101:16

fires 50:23 51:1,16

fix 26:17 27:4



**fixing** 29:6

**flame** 56:4

**flames** 82:21 99:16 101:14

**floor** 6:7 56:21 65:6,12,20

**flow** 30:22 31:1,3 37:20,24 56:1,2 70:20 83:25 90:11

**flows** 70:17

**flypaper** 53:12,19 56:10,19,23 57:11,21 58:6,12

**flypaper's** 57:14

**flypapers** 53:21

**follow** 22:20 87:8

**forget** 5:9

**form** 6:16 24:17 47:21 61:9 62:12 67:18 72:2 74:23 78:14 79:17 85:4

**formal** 4:25

**formulating** 42:10

**forward** 42:1 45:12

**foundation** 24:16 77:2 85:4 95:21

**Freddy** 22:6 29:24 93:25 108:19

**frequency** 63:16,19,22

**frequent** 15:19

**front** 92:14 99:25

**full** 4:9 58:22

**function** 15:22 44:3,15

**functions** 61:24

**G**

**gas** 27:3 44:3 56:3

**gases** 103:8

**gassing** 43:21

**gauges** 69:19,24,25 70:1,5,6,9,11,13

**gave** 23:19

**general** 55:24 65:9

**gentleman** 92:12

**give** 4:20 18:13 70:2 71:8 88:8 89:10

**giving** 69:21

**glad** 45:6

**Good** 4:9

**graduate** 8:16 9:5

**graduated** 8:14 10:9

**granted** 9:15

**Great** 42:11

**ground** 4:20 5:10 81:25 107:8

**guard** 94:11

**Guardian** 11:21 12:1

**guess** 17:12,17 18:1 19:1,5 24:8 32:20 56:22 61:20 78:4 85:8 88:5,11

**guessing** 102:18

**guidance** 24:6,13 82:24

**guided** 82:10

**gun** 48:16 49:13,14,15,16,23 50:10,12,15 73:17,20,23,25 74:11,13 75:4,11 77:5 82:5 99:8,13 104:7 105:24 107:5,21

**guy** 50:15

**guys** 21:20

**H**

**half** 19:3

**hall** 93:19

**hand** 81:22 97:10

**handing** 81:18

**handwriting** 95:8,10 100:5

**handwritten** 97:18 99:3 102:10 106:15,19,23

**handwrote** 100:10

**happened** 20:10,12 79:5 94:10

**happening** 59:4

**hard** 18:13

**hazards** 85:14

**Hazel** 8:15

**head** 5:17,18 46:19 47:6 48:5 58:7

**hear** 6:3 31:10

**heard** 6:14 94:1

**hearing** 6:8

**heat** 44:20,23 45:22 46:1,2,4,5,9,11,21 48:16,20 49:13,14,16,23 50:9,12,15 73:17,20,23,25 74:11 75:3,11 77:5 82:5 91:14,17,22 99:8 103:14 104:7 107:5

**heavier** 79:24

**heavy** 79:13,21

**held** 14:9

**helpful** 84:17

**helping** 104:21

**high** 8:12,14,15,16

**highest** 107:20

**Hillcrest** 8:15

**hire** 10:20 32:1,7

**hire-in** 7:12

**hired** 14:5 35:1,5

**history** 35:11,14 37:16,17

**hit** 78:21 87:11 89:1

**hold** 94:15

**Homewood** 11:22

**honestly** 15:6

**Hope** 8:7

**hours** 20:4,5

**housing** 72:8 99:10,13 100:14,19 101:2,3,5,6,9 102:18,20 105:7,19

**Howell** 92:2,3,6,12

**huh-uhs** 5:24

**I**

**IBO** 20:21 21:3,6,9 22:22 25:13,14 26:5,9 27:23 28:17,24 29:5,30:1,14,19,23 31:7,12,17,23 35:11,22 37:7,13,17 38:1,6,14,15,17,19,21 39:3,7,9,12 40:9,19,22 41:3,10 43:11,14,20 44:24 46:21 47:3,10,17 50:3,7,24 51:2 54:12 60:21,23 61:7 63:9,17 64:2,20 66:4 69:6,12,20,23 74:15 75:3,6 76:12,18 79:2 83:9 84:7 85:16 88:1,20,24 89:15,22 90:8,18 96:15 100:17 102:19

**IBOS** 10:18 25:8 28:7,10,11,12 30:13 31:8 38:22 39:3,13 40:4,7,14,19 41:2 43:10 45:24 46:15 63:20 64:4,7

**IC** 56:16,22 67:24 99:23

**idea** 29:18 32:3 36:1,5 73:22 77:24 103:3

**identical** 40:5,15,16,17

**identification** 97:9

**identified** 14:22 32:18 53:17 56:20 62:20

**identify** 34:25 66:5,6,7,6

**identity** 33:9,12

**igniting** 103:10

**Illinois** 8:15 11:23

**image** 82:11

**immediately** 47:19

**imparted** 69:13

**important** 5:7,15

**incident** 91:4

**incredibly** 6:6

**Indiana** 6:20 9:15

**indicating** 70:15

**indication** 71:8

**indications** 77:12

**indicator** 22:23,24 70:14

**individual** 17:25 18:12 50:9 64:24 65:19 92:2

**individually** 66:5,16 88:19

**individuals** 14:21 67:7,21 68:9 75:8 82:16 83:16 92:20,22 95:2

**inform** 80:18

**information** 57:7 60:10,12 63:12 68:7 69:13 71:4 73:8,9 94:4 102:15 108:10

**infrared** 48:16,18,19,20

**inlet** 99:17 101:15

**inlet also** 101:17

**input** 82:15

**inside** 32:20 43:22

**install** 18:4,22

**installation** 15:25 18:2 27:15

**installed** 35:22 36:6

**instance** 27:23

**instances** 31:6

**institute** 8:21,22

**instruct** 42:16

**instructed** 42:11

**instruction** 61:17

**instructions** 104:19,24

**insulation** 51:22 99:14

**insurance** 95:15

**insurer** 4:17

**intent** 6:21 8:4



interim 79:11

interjecting 42:8

internal 10:17

investigation 96:6,10

investigator 94:5

involved 18:5 20:21 39:7 51:12 56:23 57:12 58:15 63:19,22 83:25 85:19 88:20 96:5

involving 50:23 51:1

isolated 59:24

issue 28:4 31:17 35:11

items 24:10 26:18,23 70:12

**J**

jack 60:15

job 15:22 17:7,21 18:25 19:10 20:20 25:3,14,18 28:8 44:9 48:17 54:10 55:15,17 61:23 62:13,15 66:6 67:20

jobs 12:8

John 4:11

judgments 5:22 6:1

Justin 66:11,12,15 67:12 75:23 80:19,20 83:3 94:23 99:8 102:4

**K**

killing 87:15

kind 10:3 17:17 19:7 23:12 24:19 25:2 26:7,20 54:4 71:23 81:17 82:15

knew 11:3

knowledge 32:6,9,13 36:8,24 37:6 46:20 47:12 61:7 63:16,25 66:25 67:3 76:5,17 83:22 90:24

Krintz 76:5,9,18 78:12 81:10 101:22 102:4 106:12,16,17,25 107:3

**L**

Lafond 22:4 64:13

land 17:2

landing 18:8

lapses 7:19

laptop 59:23

large 17:12,20 18:21 99:12 101:4 104:3 105:6,18

late 20:4 86:5

lawsuit 4:16 95:12,17

lawyers 92:13

learn 11:1 25:2 31:3 55:9,13 61:19 62:25

learned 64:19

leave 8:5 59:3

left 28:14 54:10 56:15 75:7 80:13

legal 4:10

length 55:21

lever 89:18,19

license 9:14

licensed 9:17

licenses 16:22

licensure 9:20

lifespan 36:12

lift 16:18 17:10 18:5 81:20 107:11,14,19

light 22:24 70:18 71:1 79:20,23 103:6

lightbulb 23:13

lightbulbs 22:18,21

lights 22:23 70:14,15 103:10

lines 40:12

list 54:4,5 61:25 62:1,10,20

listen 42:2,4

lists 62:4

lit 56:13

litigation 35:12

located 29:22 63:14 69:3 96:18 100:19 101:9

locations 8:24

locks 54:25

log 23:1,3,5,9,11 24:3,7,14

logbook 21:19 22:12 24:22

logged 23:22

long 7:8 55:19 58:11,19,21 73:4,10 74:5,9,12,15 76:19 79:11 83:19 92:14 93:11,12 106:3

longer 39:8

looked 68:20,21 71:3,7 72:25 73:12,18 77:11 82:8 92:24 102:11

loose 18:22

loses 56:2

loss 6:8 56:4

lost 56:3 70:16

lot 52:23 67:17 79:6

loud 40:25 45:1,6,18 82:13 98:8

low 56:14 87:17

lower 57:3

**M**

machine 16:9,16 17:9 18:4 21:14 23:5 25:18 26:14,16,19 36:9,11,18,24 47:4,23 49:24 58:9 66:24 74:10,19 76:6 77:10 89:14

machines 16:18 21:18 62:3

machinist 18:18,21 68:2 75:14,18,20,24 76:1,9,15,22,24 77:1 84:2

made 32:6 36:22 37:2,6 77:17

magnification 81:6

maintenance 25:16 26:1,17 27:12 28:11,16,21 29:7 37:16 44:11 89:22

major 22:15 23:12 24:10

make 5:11,20,22,25 19:6 23:13 27:1 31:14 54:2 56:3 59:16 72:20 104:10,17,24 105:3

makes 18:17 23:3 32:8 64:16

making 5:6 22:11 56:1 105:3

manual 29:4,7,8,10,15,22 30:1, 4,25 31:7,16,22

manually 60:11,13

manufactured 35:17

manufacturer 27:24 28:1,2 31:12

manufacturer's 64:1

manufacturing 10:13,14 14:3 19:21 25:7,12 32:4 35:20 90:21

mark 41:21 42:14,19 45:4,9,16 48:8,11 97:5 98:24 104:14,20 105:2

Mark's 45:20

marked 97:8,11 106:17,25

material 36:21

materials 28:20

Matt 108:16,19,20,21

matter 35:8 55:24 58:21

meant 71:1

mechanical 18:20

mechanically 19:2

meet 12:19

meetings 108:11,13,15

mention 88:11

mentioned 13:18 25:6 73:19

met 12:20 13:25 92:7

Mike 13:4,6 65:4,5 67:11 68:4,8 73:7 17:18,21,22,25 80:9,10,24 99:19 102:4

Miller 4:15 39:16 41:21 42:14, 19,24 45:4,8,14 48:8,11 97:5 104:14,20 105:1 108:24

milling 68:9

millwright 18:19,21 76:10,15, 25 77:1

millwrights 68:2 75:14,18,21, 24 76:1,22 81:7 83:17 84:2 99:15

minute 89:9

minutes 52:4,17 74:20 79:7 99:12,23 104:1,3 105:6,18,21 106:6

misstate 45:19

mode 57:13

model 27:20,21

modifications 37:6

moment 43:3 66:19 105:16

months 6:22 7:22 8:5

Monticello 5:2 6:20,25 10:21, 23 19:17

morning 20:5 86:6,24,25 97:20

motor 17:4,21 18:21,23 19:4 23:17 24:2 38:2

motors 15:16 38:5,6,19

move 10:23 42:1 45:12 103:14 105:4

moved 10:25

moving 6:21 56:14

multi-volume 29:19

multiple 64:24 69:25



**N**

named 92:2

names 65:10 92:19

nature 24:4

needed 99:20

newer 20:18

Nick 94:14,15

night 20:15 66:8 83:20 86:4,6,9, 17,25 87:2 98:1

nights 20:1,23 65:7

nods 5:17

noise 23:4,10

noisy 6:6

norm 49:3,20,21

normal 47:2,9,13 48:12 49:6 61:5

notation 22:25

note 101:14

notes 21:15,16,17 22:11

notice 23:4 33:10 34:21 68:20

noticed 55:15

notified 54:19 57:24 87:10

November 7:13,15,20 10:20 14:7 24:13 26:8 35:23 36:14,17 51:6 62:22

number 43:19 44:12 97:17 106:22

numbers 59:16

**O**

oath 5:2

Object 6:16 24:16 47:21 61:9 62:12 67:18 72:2 74:23 77:2 78:14 79:17 85:4 95:21

objection 41:22 79:22 104:17, 24 105:3

observed 100:22

observing 105:15 107:5,21

occasionally 5:9 48:16

occasions 54:15

occur 51:4 93:18

occurred 20:4 86:5

occurrence 22:19

odd 73:24

office 59:25 73:15 80:12,22 83:3 92:14

on-line 108:17

on-the-job 28:13,15

open 81:7

opened 81:7

operate 103:21 107:25

operates 29:1

operating 47:3,9,13,17 48:12 83:19

operation 25:13 26:1,19 28:10, 16,21

operational 84:8

operations 29:4

operator 67:24

operators 56:22

opinion 96:12

opinions 95:24 96:2

opportunity 97:14

opposed 38:21 41:3 68:1

order 10:23

origin 96:9

original 39:9

originally 36:5 40:1 74:25

originated 77:25

Otto 94:1

oven 28:2,25 29:17 30:12,14,17 51:12,13,14 53:2,14,19,20,25 54:9,12,16,20 55:2,13,19,24 57:2,7,15 58:20,22 59:3,12,15, 24 60:3,6 61:13 77:25 82:6 83:19,23 84:11 86:18 88:14,24 90:6,7,14,18 91:13 96:15,18,22 103:11

ovens 10:18 13:17 27:14 31:8 32:14,16,20 33:17 43:25 44:2, 24 46:6 51:2 56:13 87:5

ownership 19:20

oxidizer 17:19 51:18,24,25

**P**

p.m. 52:8,14,19 86:9,13

PA 57:25 65:14,17

pack 60:8,9,20

packed 53:4

paged 65:23 67:1,4 75:1,18,21 76:2,3

paging 75:24 76:22

paid 33:14,22 34:6,24

panel 69:2,3,7,8,12,14 70:6,8, 12 71:3,7,11,14,16,19,22 72:9, 13,25 73:13 74:7 77:4 87:21 89:17,19 99:22

paper 47:5 56:16

papers 20:10,25

parameters 59:14 61:5,8

parking 52:23

part 15:14 26:20 29:6 48:17 57:1 69:20 96:21

participated 85:23

particles 56:15,17

parts 27:2 37:13 43:20

past 21:2,6 54:13 55:8,11

Paul 90:24

Paula 11:5

pay 32:24 93:9

pellegrini 4:11,12 97:8,11 98:11 99:2

people 24:18 32:20,22 56:21 64:25 67:13,15,17 73:2 75:7 83:5 87:18 102:2

percent 11:23 22:8 43:16,18 55:20 56:6 73:10 80:23 85:6 92:3,4 93:14 96:20 98:19

percentage 92:5

Perfect 31:20

perform 35:2 54:2 55:13,16 59:11 62:5,6,11,23 91:17,22

performed 21:8 24:15 26:18 38:1 44:23 45:23 53:10 54:7,12 60:17 61:24 89:21 90:22 91:14 96:3

performing 30:3 84:11 91:5 96:9

performs 54:1 56:19

period 79:11 81:15 104:12

personally 61:2 76:22 88:23 91:17

photo 11:21 12:1

photographs 12:17

piece 47:5

pieces 26:12

PIN 30:12,14 31:8 90:14

place 18:23

plan 44:17

plant 6:24 10:20 11:21 16:17 17:9 18:4 19:19 35:22 37:2 40:5 51:17,24,25 52:14 83:10

platform 81:23

play 31:25 75:20 85:16 90:8

plugged 60:15

point 26:6 45:15 47:23,25 48:9 57:15 61:20 75:17 77:11 80:8,9 81:1 82:6,21 83:2,7,10 107:18

pointing 107:15

policy 108:2

portion 56:23

position 7:25 10:16,24,25 11:1 14:5,9,22,25 15:17 16:6 19:12 25:7,11,15 65:5 94:15

positions 8:5 11:25 12:3 14:2 65:10

possibility 88:12

possibly 7:10 22:4

post-cleaning 53:10 56:8

post-cleaning/pre-production 53:18 56:24 91:9

post-devry 12:7

power 38:6,8 87:15,24 88:4 89:8,14

pre-production 53:11 56:9

preparation 85:17,24

prepare 12:10 13:22 86:18 88:14,24

prepared 100:9

pressure 27:3 70:16

presume 6:14

presumption 6:15

pretty 10:3 16:2 19:5 43:16 56:6 81:17 82:22 103:23

previously 101:7 106:17,25

printing 21:22

prior 10:12,13,16 11:6 25:6,8 33:12 37:3 52:17 57:17 66:22 84:8,12 85:21 89:25 103:10

probe 48:14

problem 16:11 17:4 42:7,13



.71:9 72:16

**problems** 35:13 84:8

**procedure** 85:24 87:9 88:13

**procedures** 83:22 90:5

**process** 36:12,25 37:14 55:19 85:19 88:23

**processed** 36:19

**processes** 87:8

**processing** 37:8

**product** 37:14 58:17,19,22 59:10 87:6 103:14

**production** 53:7 57:13,20 58:15 59:1 65:19,22 68:1,3,8 91:12

**products** 36:11

**professional** 9:14,19

**program** 59:15 61:4

**programming** 62:2

**project** 18:1

**pronoun** 64:23

**proper** 26:19

**properly** 24:14 26:21 90:15

**protocol** 61:15,21

**protocols** 61:23

**provide** 25:12,16 94:12,21

**provided** 24:6,13 26:4 28:6,17 57:7 68:7 73:8,9 82:24 94:4

**providing** 32:4,10 94:4,7 95:2

**proximity** 72:10

**pull** 59:21 89:13

**pulled** 83:4,5

**pump** 19:2

**purchased** 27:19 35:19

**purpose** 48:23 49:22 76:25

**purposes** 43:24

**push** 87:24

**put** 22:16 23:15,17,23 24:10,25 25:24 26:25 27:10 33:13 59:15 60:23 82:20 83:16 95:7 98:2

**Puts** 57:17

**putting** 18:6

---

**Q**

**qualified** 16:21

**quality** 96:2

**question** 6:3,10,13,15 7:3 18:16 29:20 35:16 39:1 42:10, 13,17 46:7 47:15 49:2 62:7 64:20 84:19 86:8 88:12,15 105:5

**questioned** 78:1

**questions** 5:5 13:13,14,15 41:17 42:9 45:6,9,11,15,18 48:7 98:24,25

---

**R**

**ran** 89:9

**Randy** 76:12,14,17 81:9 94:23 99:21 101:20,22 102:3 106:24

**ranges** 59:17

**rank** 94:19

**re-trip** 17:2

**read** 39:16,20,21 99:5

**reading** 46:3 47:18 106:3,5 107:20

**readings** 44:20 83:25 84:3 107:4

**ready** 89:5 106:21

**rear** 72:8 99:9 100:13,19

**reason** 14:21 33:22 71:17 88:6

**rebuild** 17:23

**rebuilding** 17:24

**recall** 21:8 30:3,8,10 31:6,13 38:4 51:10,14,21 52:25 53:6 54:6 57:4 61:12 64:19 65:1 66:18 67:8,9 75:10,19,22,23,25 76:3,7 78:3,17 81:13 82:3,19 84:11 86:1,2 89:24 92:11,19,22, 24 93:1,13,15,22 94:4,7 97:3 107:3,20

**receive** 71:4 82:15 85:1

**received** 26:1 28:12,15,20 33:10 61:17 66:3,15,23 84:14, 20

**receiving** 34:21 107:21

**reclassifiable** 85:9,12

**recognize** 55:22

**recollection** 31:22 34:4,9,13, 16,19 37:25 76:21 101:24 102:6

**recommended** 64:1

**record** 4:10 41:25 45:19 99:5

**redoing** 98:19

**reduce** 105:14

**redundant** 70:3,10

**refer** 4:13

**referenced** 60:5 87:21

**referred** 100:25 101:6,18,20

**referring** 22:1,12 64:24 77:21

**refrain** 105:2

**refresh** 101:24

**related** 96:9

**remember** 7:12 9:1 20:11 22:7 25:8 30:6,11 39:13 40:12 52:9, 11,13,24 57:10 65:2,17 66:1,21 67:11,13,15 68:10 73:4,7 74:25 75:12 76:19,20 83:14 86:15 92:16,18 93:24 95:6 97:7 98:17, 18 104:4,5 107:23 108:20,22

**remembered** 34:23

**remind** 5:9

**reminding** 45:17

**removal** 44:3

**remove** 17:5 54:25

**repair** 16:23 17:1,4,7,8 18:18 26:2,5,6,9,11,12,13,14,15,21,23 27:2 28:4,7,11,16,21 29:7 44:11

**repairing** 16:24

**repairs** 15:24

**repeat** 6:4

**rephrase** 6:11 26:10 62:8

**replace** 17:5,21 26:22 27:5,6

**replaced** 17:19 26:24

**reporter** 5:4,12,21 39:22

**represent** 4:16

**requested** 39:21 94:12,21

**require** 20:20 44:4

**required** 30:4 89:22

**requires** 5:25

**reserved** 108:25

**reset** 57:19

**resigned** 7:25

**response** 68:17 80:4 81:3

**responsibilities** 19:10 20:16 44:12

**responsible** 64:4

**rest** 87:14 88:19 89:6,7,11

**resume** 11:5

**resumed** 53:7

**retracted** 23:23

**return** 58:14 60:2

**revealed** 49:16

**review** 12:13,17

**road** 9:1

**Robert** 4:11

**Rogers** 65:4,5 68:4,8 73:1 77:22,23 80:11,12 99:19 102:4

**role** 44:19 75:20,23 85:16 90:7

**roll** 99:19

**room** 5:1 93:19,20,23 94:10

**rotating** 19:25

**rule** 5:10

**rules** 4:20

**run** 56:16 57:14 58:6,19 60:3,6, 23 61:4 103:10

**running** 16:9 18:10 53:8,12,18 56:9,19,23 57:11,21 58:12,17 88:9 91:10,12

**Russell** 13:7,10,21

---

**S**

**S-o-y-k** 94:2

**safety** 82:25 84:22,25 108:11, 12,15

**safety-wise** 54:3

**scene** 100:23

**schedule** 64:1

**scheduled** 64:7

**Scholten** 90:24

**school** 8:12,14,15,16

**science** 8:18 9:12

**scissor** 81:20

**Scott** 22:2,3 29:23 64:13 92:2, 3,6,12

**Scott's** 59:25

**sealed** 27:1

**selected** 50:14

**Senak** 6:16 13:25 24:16 41:16, 19,23 42:11,15,21,23 45:1,3,5, 11,17,21 47:21 48:6,9,18,20 61:9 62:12,14 67:18 72:2,4 74:23 77:2 78:14 79:17,22



82:13,84:18 85:4 95:21 98:8,24
104:16,23 105:2 108:23,25

**separate** 70:2

**September** 7:13

**service** 36:19 89:22

**services** 32:4,10

**set** 29:19 46:16,17,23,24 47:23,
24,25 57:5,9,15,17 58:14 70:2

**sets** 57:16 70:9

**setting** 4:25 56:25 57:1

**settings** 46:20

**shack** 94:11

**shakes** 5:18 58:7

**shared** 96:12

**sheet** 57:8 59:11

**shift** 19:23,25 20:13,15 24:25
52:8,17 86:17 87:3 89:25 90:1
98:1

**shifts** 19:24

**shirt** 34:17

**shoot** 106:10

**shop** 63:15 74:13,16

**shot** 101:16

**show** 89:4 106:12,22

**showed** 66:19 75:16

**shown** 100:2 105:24 106:4,18
107:16

**shows** 99:14

**shut** 56:1,2,4 77:15,17,24 78:7,
10,13,17,19,23 85:20 86:18
87:7,10,13,14,20,25 88:6,13,17,
18 89:5,6,8,11,12,23 99:11,15,
22 102:24,25 103:17,18,24,25
104:2,10 105:10,21

**shutdown** 85:24 86:20 87:9

**shuts** 56:4

**shutting** 78:8 85:16,21 88:4,20,
24 90:6 105:13

**sick** 7:22

**side** 11:12 58:7

**signature** 100:7 108:25

**signed** 20:10

**similar** 40:18 49:25

**simply** 28:17 35:4

**single** 29:19

**sir** 7:2 12:5 26:15 27:13,33:1,8
36:3 39:12,19 40:25 41:11
48:23 49:4 50:10 84:20 90:18
91:20 93:4 97:15

**sister** 11:2

**sit** 9:13,19 31:21 34:11 46:24
47:2,8,12 54:7

**site** 31:16 40:8 52:21

**sits** 69:7

**sitting** 21:25 52:22

**situation** 16:25 17:6 58:3 72:24
76:24 79:15,20 80:3,18 81:6

**small** 62:3

**smell** 16:15 77:6,13

**smelled** 68:13 72:1

**smelling** 68:18 71:5

**smoke** 68:16,18 71:5,18,21,24
72:7,11 77:6,12 79:6,9,13,20,
21,23 80:21,25 81:3 82:9,10
99:8,13 100:13,22 101:4 104:3
105:6,7,18

**software** 60:1

**someday** 41:20

**sought** 9:19

**sound** 94:3

**source** 22:14

**south** 11:12

**Soyk** 94:1

**space** 84:14,15,20 85:1,10,12,
13 107:25 108:1,6

**spaces** 108:4

**speak** 5:7 36:14 72:22

**speaking** 13:21 15:9 104:18

**specific** 28:1,17 25:24 34:19
53:9 54:6

**specifically** 16:14 27:18 31:7

**Spencer** 93:25

**spoken** 12:23 91:1,4

**spot** 102:17,20

**spray** 43:22

**squirrel** 38:10,13 47:14,19
48:13 70:24 101:1,2,11 103:13

**standing** 55:8,14 58:3 64:25
71:15 72:9,23 73:2 75:10 80:7
81:25 82:17

**start** 35:16 38:17 42:9 53:19
85:21 103:6 104:9

**started** 10:25 24:25 25:23
35:21,25 53:22 81:1 99:14,16
101:14

**starting** 79:6

**state** 4:9 9:15

**stated** 84:25

**statement** 94:13 97:4,18 99:3
100:9 101:20 102:10 104:9,10
106:4,15,20,23 107:16

**statements** 94:7,22 95:3

**static** 19:23

**stationary** 55:9

**status** 7:20

**stay** 59:2,6 79:2

**Stayed** 79:4

**steel** 11:8,9,14 12:1 36:25 37:2,
3,8

**step** 54:4,5 56:8 58:12

**steps** 56:24

**stood** 99:22,24

**stop** 40:2 41:21 42:14 87:11
89:1

**stops** 78:21 89:1,7

**Stout** 66:11,12 80:19 102:4

**strike** 71:12

**strip** 17:3

**stuff** 20:11,19,25 56:14,22
81:18 85:7 90:2

**style** 40:16

**subject** 29:13

**summon** 58:8

**summoned** 75:18

**supervisor** 54:21 55:16 65:3,6,
7,12 67:12 94:16,17,20

**supervisory** 19:9,12

**suppose** 6:18 10:4 11:16 12:12
18:6 21:10 28:22 37:1 49:5
58:21 74:24 80:2 85:15 95:17

**supposed** 14:1 61:25 62:5,16
83:12 84:15,16 86:16 108:5

**surface** 48:24,25

**switch** 27:3,4 70:21 88:18

**sworn** 4:22 105:1

**system** 63:23

**systems** 70:4

### T

**takes** 58:11 74:12

**taking** 10:12 26:12 83:25

**talk** 13:14 30:13 31:8 42:2 90:18
92:15

**talked** 11:4 13:3 90:9 103:3

**talking** 12:25 42:4 48:19 107:24

**task** 30:3 56:19 57:11

**tasks** 21:8 24:14 53:9 54:6
62:5,6,11,20,23 66:17 91:9 96:9

**taught** 61:13

**tech** 4:16 15:4,13 32:1,3,7,9,13,
19,22 33:11,18,20,21 34:1,5,13,
16,20,22 90:22 91:1 95:16 96:3

**Tech's** 33:9,12

**technician** 14:6,12,14,15,23
15:1

**telling** 104:21 107:3

**tells** 46:11 64:12

**temp** 58:15 99:10,11,13 103:25
104:2,11 105:10,24 106:10

**temperature** 46:3 47:13,18
48:1,2,12,13,24 49:1 56:14,25
57:1,3,4,14,16,20 59:1,17,18
69:15,16,19,23 70:1,5,9 89:3
102:11 104:6,8 105:14 106:7
107:4,18,21

**temperatures** 21:1 46:13,14
47:3,9 49:17,19 57:20 58:14
59:13 69:22 77:8 87:17 102:17

**tenure** 19:19

**term** 15:19 85:9

**terminal** 17:3 69:9

**terminate** 89:14

**test** 45:23 46:1,9,11 60:3,17,19
61:13 91:14

**tested** 26:25

**testified** 14:25 37:19 39:2,12
63:8 70:19 71:23 72:6 78:12

**testify** 31:21 97:25

**testimony** 5:20,22 25:9 31:15
39:17,20 40:14 62:4,10 72:5
77:24 78:15,16 85:3 104:15

**testing** 61:21

**tests** 44:23 90:20 91:22

**text** 39:21



thermal 82:11

thing 13:17 29:1 30:6 46:22
88:6 103:7

things 5:11 18:12 22:18 24:19
53:14,17 61:25 79:25

thinking 38:25

Thirteen 38:18

thought 97:7

till 55:1 89:9

time 5:7 7:21 20:23 21:11,19
24:19,24 25:2,20 29:25 30:11
36:18 37:4,11 52:2,12,19,20
54:20 55:13,16,21 57:19 59:2,4,
19 64:17 65:3,4,18 66:20,21
67:14 73:4,11 74:5,25 75:15,16
81:16 83:14 86:20,21 87:4
88:22 89:10 91:10 94:20 99:16

times 42:12 52:10

timing 74:18

title 65:11

today 4:13 7:2 14:10 31:21 33:4
47:2,12 54:7

today's 12:10 13:22

told 48:4 64:7 68:12 72:13
99:23 108:12

tool 60:5,6

top .33:11 46:18 47:6 48:4 96:15
100:12

topics 13:14

Torrence 11:12

total 55:21

totally 40:17 54:10,16

touch 16:19

towers 99:25

track 9:25 10:1 22:20

training 25:11,16,25 26:4,7
28:6,12,13,15 82:25 84:14,20,
23 85:1,7 107:25 108:22

transcribing 5:4

transcription 5:6,14

transitioned 37:7

transmit 60:10

trapped 103:9

trash 82:23

traveling 96:24

Trejo 94:14,15

tremendous 42:7

trip 71:2

troubleshooting 10:7 15:24
16:7,8,16 17:8 63:4,6

truck 17:10 34:4,14

trucks 18:5

true 22:22 26:9 28:13,18,23,25
31:23 35:2,3,5,8,23 36:6,7,15,
16,19 40:15,20,23 42:25 43:2
46:2,9,12,25 47:3,10,11 48:17
49:17 51:7 54:7,8 55:17 62:11
65:20 66:13 68:5 69:24 70:10
72:1,3,16 74:4 76:12 77:22
79:21 80:7 81:10,23 82:25
83:12,17 86:11 88:1,2 91:15,23
92:6,12 96:19 97:1,2 98:6
105:11,12,16 108:8

tube 30:22 31:1,3 37:24

tubes 37:20 90:11,19

turned 11:5 79:8,16 95:6 105:8

turning 79:11 90:7

two-page 97:10,15

type 27:20 62:19 93:8 95:9

typed 97:23

typewritten .97:3 98:12,16

typing 97:3

---

## U

uh-huh .4:24 5:24 11:10 14:13,
25:10 26:3 40:24 42:6 44:22,25
52:18 65:21 74:1 82:2,12 98:7
99:4 100:18

unaware 33:9

understand 6:10 14:18 16:6
22:21 31:14 34:3,8 39:7 42:12,
19,21,22 45:8 46:7 47:15 49:2
52:16 60:18 71:20 76:9,14
88:15

understanding 20:3,8 21:3,4
44:19 95:11,14 102:2 108:2

understands 42:17,23

understood 6:14 107:15

units 27:1

university 8:22,23

unloaded 60:16

upward 59:1

---

## V

vaguely 24:8

variety 19:24

verbal 61:18

verbally 5:16,23

verify 43:15

version 98:12,16

volts 38:7

volume 29:19

volumes 29:15

---

## W

wait 53:20 59:2,7,8 87:16

waiting 78:25 83:11

walk 79:2

walked 66:23 73:14 74:10

walking 55:8,11 66:24 74:17

wanted 73:23

Washington 6:20

watch 55:4,9 61:19

watched 55:2,4

watching 54:22 55:14 58:4
80:7 85:7

wearing 93:1,4,5,9

week 22:10

Wes 76:5,9,18 78:12 81:10
94:23 99:21 101:20,22 102:3
106:16

West 6:20

whichever 8:23

whiff 68:16,18 71:24 72:6,11

wife's 11:2

wire 17:1

wirelessly 60:9

wiring 18:24

witnesses 45:9 97:25

word 39:19

worded 15:6,8

words 27:3

work 10:7,10 11:14,20 12:2
16:22 17:13 19:23 20:20 21:17
23:1,3 24:18 27:5 35:2 37:25

52:2,4,6,25 56:9 84:11 86:9,13
90:22 91:5,7 93:6,7 96:3 98:1

workday 86:15

worked 9:22 19:16 21:2,6 25:1
30:16 86:2

worker 65:19,22

workers 68:1,3

working 7:24 11:6 20:13 25:19,
20,22 26:17,21 29:11 31:4 52:7
54:3 58:1 66:8,13,16 90:15

workshop 50:17,21 60:3,11,21

worse 79:15 80:1,3 81:3

write 62:24 63:2

writing 95:3 98:18

written 28:20 37:16 61:15,20,
23 94:9 95:2 97:7 98:5 100:1

wrong 19:3 77:13

wrongdoing 95:15

wrote 97:20 99:6

---

## Y

year 6:22 8:4,16 9:4

years 7:10 11:14,15

---

## Z

zone 43:21,24 44:4 46:6 47:9
69:22,87:23 100:20 101:9
102:18

zones 39:6 41:4,5,6,8 42:25
43:2,4,5,6,7,8,9,10,12,19 44:4,
8,13,15 46:2,4,6,12,14,21 69:17
87:25 88:8 89:2 100:17 103:22



# Exhibit 11

CONFIDENTIAL







RIMKUS000258

# Exhibit 12

9-4-15  Bull Longs ovll ats

oven 2 east Blowr

seal moistr Arr Hsstj̄

seal moistr
spm ~19
LXV

seal moistr Arr
itnsk
smp 19
LXV
~1-3)/6



condenser Blowr wheel
3-4 histand
Beanngs ok
shft to rotatup
100 of

Lidy Through inspection plate — charred dect residas
@ top of temp view abuv
probably not cleaned before Fire

CONFIDENTIAL

RIMKUS000006

West Blower oven 2
shelf does not turn
(workplace Blower wheel on shaft

Sticky material Had dripped from above - sample

Blower wheel sluggish to move Due to sticky
material.

sticky material Had migrated to Base of Blower
Housing

**CONFIDENTIAL**

**RIMKUS000007**

CONFIDENTIAL

RIMKUS000022



**RIMKUS**
CONSULTING GROUP, INC.

CLIENT: 50901985

SUBJECT: 48" CTC 42" opening X14

JOB NO:

SHEET:        OF

BY:

DATE:

CKD:

REV:

Aluminum Beverage Containers    350,000 SF

5 Lines    24/7

Roll of Aluminum To Cans - Open Top

Line 1&2 *12oz Cans   2000 cans Min

3 16oz   1650 PM

4 24/32/75mL - 1600/1400 P.M.

5 Bottle Line 16/12oz   500 P.M.

Built 1964 - 1978 Can Plant

Smelled Fire - Smoldering, Smokey 12:20 A.M. 5/23/14

Called Supervisor - Could not locate - Saw

✗ Smoke Evacuation Port

Shut down to Investigate (oven)

Used heat gun - Pipes changed color (Thermal changes)

Use F.E. No Inspection Port

FD 12:45 AM - Sealed ducts -

Nothing difficult -

Line 2 oven - Maintenance dept - own cleaned -

outside Contract - AirTech -

6:00 PM Started back up - Shut down 7:00 AM.

Required Safety checks - Plant Electrician

Lines & Air Gun Switch - use of Air Pressure Lines

If flame.

Exhaust air flow had pollen - Prevents fire -

Bleed

Just own cleaned -

**CONFIDENTIAL**                    RIMKUS000023

Time line    11/29 - ave 7th           Air Ten -
                                        Michigan
Any other fire
Any problems
Diagram of area -


open door  Take out Parts, Wire break, Vacuum
Inlet to Exhaust Clean - clean fan & Exhaust line.
no other chemicals, all use Bowls.


Inspection Part is clean past week.
no problem
Prior fire - Insulation fire - 1 - 1½ yr. ago.


Aunt  7:30 am.  5/22/14
       6:00 pm.  5/22/14


water & Smoke damage - Electric Supply -
Parts of Smoke -
Spill after Shut down burn.
Temp Records 12 hrs. prior to
Banded Varnish
No. 29 Part work Clean. no Cunide
Btu - 400°F


Need ME

CONFIDENTIAL
RIMKUS000024



**RIMKUS**
Consulting Group, Inc.

CLIENT_____ JOB NO._____ SHEET_____ OF_____
SUBJECT_____ BY_____ DATE _____
_____ CKD._____ REV._____

Wiring diagram incl. Thermo couples.
Cleaning records Reg Vents.
Complete plant diagram w/ Vents

PNJD
Wiring diagram for Control System
Plant Engineer Available

blower

vent to oven

vent to oven

blower

OVEN

South Side Drain (#4)

SS 1' 0' Long
10' 6" Wide
7' Tall
28' 2" Deep?

Drying Oven?



**RIMKUS**
Consulting Group, Inc.

CONFIDENTIAL

RIMKUS000050



**RIMKUS**
CONSULTING GROUP, INC.

| | | | | | |
|---|---|---|---|---|---|
| CLIENT | | | JOB NO. | SHEET | OF |
| SUBJECT | | | BY | DATE | |
| | | | CKD. | REV. | |



**CONFIDENTIAL**

**RIMKUS000051**

Robert   Pellegrini - Electrical Tech. - 12 yrs.
doing oxyche - After 12:00 him IBO all
Gas & Thums came - Smoke coming by - Coupled to
line 1 - Maybe 10" differ - Sat differ Angl.
Smoke from Exhaust blower -

First Foyes could Fin Shut burners down
Smoke down,
Insulation on outside of duct was burning
270+ - big Puff n Smoke 200-400 immeditly
Randy Crumle
Was Kinty Krinty
520 hyst reading
           Burner           Bun
390° exit      190° Inlet

RIMKUS000054

A,1-3 - From E of oven 2
B,C - West vent oven 2
D,E - E vent oven 2
F - Roof vent
G, - Roof F vent
H = Vacuum end oven 2

CONFIDENTIAL

# RIMKUS
CONSULTING GROUP, INC.

CLIENT_____    JOB No._____    SHEET_____OF_____

SUBJECT_____    BY_____    DATE_____

_____    CKD._____    REV._____

Phoenix Industrial — Chicago
Internal
Boiler
Over

CONFIDENTIAL

RIMKUS000070

4 Zones

1 - Heat off 2600!

2 - Flush off

3 - Heat to 390°

4 - Heat Furth to 850°

1 Exhaust blower Case 2 Zones

Charles Ogden

Thursday 10am

CONFIDENTIAL

RIMKUS000075

CLIENT_____    JOB NO._____   SHEET_____OF_____

SUBJECT_____    BY_____   DATE_____

_____    CKD._____   REV._____

Need From plat
over operating records for last months Before the
process parameters & time startup
instrument testing schedule & calibration

CONFIDENTIAL

RIMKUS000076

# Exhibit 13

























# Exhibit 14

# RIMKUS CONSULTING GROUP, INC.

## EVIDENCE CUSTODY FORM

RCG File No.: 509019 *5*  Date of Loss: 5/23/14  Date Collected: 6/2-4/14

Client: FM Global  Contact: Paul Anderson  Phone: 202 282-4739

Claim No.:  Collected By: _AC_

Location of Loss: 501 N. 6 St. Monticello, IN.

Collected From: Oven #2 And Associated duct work

| Exhibit Letter | Qnty | Description of Evidence |
|---|---|---|
| B | 1 | Glass Jar Scraping w/end oven #2 Duct |
| C | 1 | Glass Jar Scraping 2nd w/end oven #2 Duct |
| D | 1 | Glass Jar Scraping 2nd E/end over #2 Duct |
| E | 1 | Glass Jar Scraping E/end oven #2 Duct |
| F | 1 | Glass Jar Scraping E End Roof Duct |
| G | 1 | Glass Jar Scraping E End Roof Duct |
| H | 1 | Glass Jar Scrap Vacuum E End Exit oven #2 |
| I | 1 | Glass Jar Scrap Vacuum E End exit oven #2 |
| J | 32 | Caps From End of 2nd oven #2 |
| K | 1 | Glass Jar w/Scrap Fire East Exhaust west Vent |
| L | 1 | Glass Jar 4 Gram Fire East Exhaust East Vent |
| M | 1 | Plastic Bag w/debris Fire Blower over 2 East side |

## Change of Evidence Custodian

| Date | Exhibit Letter | Reason | Signature | Location |
|---|---|---|---|---|
| 6/4/14 | B-M | Placed In Storage | OWS & AC | Floor |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Transfer

Date: _____  Company: _____

Name: _____  Signature: _____

## Disposal

Date: _____

Verifying Manager: _____  Evidence Technician: _____

Print: _____  Print: _____

(Attach Authorization Letter)

RCG - 501

FILE COPY

**CONFIDENTIAL**

RIMKUS000103

*Internal*

# RIMKUS

**Engineering** › **Evidence Home** › **View Evidence** › **Evidence Search** | **Add New Evidence** | **Evidence Report**

| **Assignment No.** | | **Evidence Name:** | | **Evidence Location:** |
|---|---|---|---|---|
| 🔍 50901985 | | burned material, scrapings from ducts, vacuum and vents, debris from blower and multiple cans | | Chicago |

## Exhibit Items

**Generate Documents:** 📄 📄 📑 📑 📑

| ☐ Select | View | Exhibit | Location | Description | Last Activity |
|---|---|---|---|---|---|
| ☐ | 🔍 | A | F3 | Three Glass Jars containing Burned Material | Check Out |
| ☐ | 🔍 | B | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | C | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | D | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | E | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | F | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | G | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | H | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | I | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | J | F3 | QTY 32 - Cans from End of Run Oven #2 | Check In |
| ☐ | 🔍 | K | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | L | F3 | Glass Jar Scraping | Check In |
| ☐ | 🔍 | M | F3 | Plastic Bag with Debris from Blower Oven #2 East Side | Check In |
| ☐ | 🔍 | N | F3 | QTY 4 Boxes of Cans | Check In |
| ☐ | 🔍 | O | F3 | Gallon Metal Can containing Debris from East Blower | Check In |
| ☐ | 🔍 | P | F3 | Gallon Metal Can containing Debris from East Blower | Check In |
| ☐ | 🔍 | Q | F3 | Plastic Bag containing Debris from East Blower | Check In |

**CONFIDENTIAL**

RIMKUS000126

| | | | | | |
|---|---|---|---|---|---|
| ☐ | 🔑 | R | F3 | Plastic Bag containing Debris from West Blower | Check In |
| ☐ | 🔑 | S | F3 | Glass Jar containing Debris from West Blower | Check In |
| ☐ | 🔑 | T | F3 | Plastic Bag containing Debris from West Blower | Check In |
| ☐ | 🔑 | U | F3 | Glass Jar containing Debris from West Blower | Check Out |
| ☐ | 🔑 | V | F3 | Glass Jar of Scrapings from Blower | Check Out |

**Add Activity to All Selected Exhibits** ⬇

**Add New Exhibit Item**

**Exhibit Letter:**   **Location:**   **Date Collected:**
W   [          ]   [          ] 📅

**Description:**   **Comments:**

[                    ] ⬍   [                    ] ⬍

**Images**

**Image:**   **Name:**

[                    Browse..]   [                    ]
[                    Browse..]   [                    ]
[                    Browse..]   [                    ]

⬇

[ Insert New Exhibit >> ]

**CONFIDENTIAL**

# Rimkus Consulting Group, Inc.

## EVIDENCE CUSTODY FORM

RCG File No.: 5090 1985  Date of Loss: 5/23/14    Date Collected: 9/1/15

Client: FM Global    Contact: Paul    Phone: 212 282-4779

Claim No.: _____    Collected By: _____

Location of Loss: 501 N. 6th St. Monticello, In.

Collected From: Blower From Furnace #2

| Exhibit Letter | Qnty | Description of Evidence |
|---|---|---|
| O | 1 | Gallon Metal Can w/debris from E Blower |
| P | 1 | Gallon metal Can w/debris from E Blower |
| Q | 1 | Clear plastic Bag w/debris from E Blower |
| R | 1 | Plastic Bag w/debris from W Blower |
| S | 1 | Glass Jar w/debris from w/Blower |
| T | 1 | Ziploc Bag w/debris from w/Blower |
| U | 1 | Glass Jar w/ debris from w/Blower |
| | | |
| | | |
| | | |
| | | |

## Change of Evidence Custodian

| Date | Exhibit Letter | Reason | Signature | Location |
|---|---|---|---|---|
| 9/1/15 | O-U | Storage | [signature] | |
| 9/1/15 | O-U | Placed in storage | N. Preisler | E3 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Transfer

Date: _____  Company: _____

Name: _____    Signature: _____

## Disposal

Date: _____

Verifying Manager: _____    Evidence Technician: _____

Print: _____    Print: _____

(Attach Authorization Letter)

RCG- 501                    FILE COPY

CONFIDENTIAL                    RIMKUS000107

RIMKUS000108






CONFIDENTIAL

RIMKUS000109






CONFIDENTIAL

RIMKUS000110




CONFIDENTIAL

# RIMKUS CONSULTING GROUP, INC.

## EVIDENCE CUSTODY FORM

RCG File No.: 5890/985    Date of Loss: 5/23/14    Date Collected: 6/2 - 4/14

Client: FM Global    Contact: Paul Anderson    Phone: 212 247-4235

Claim No.: _____    Collected By: _____

Location of Loss: 501 N. 6th St. Monticello, IN.

Collected From: oven #2 And Associated duct work

| Exhibit Letter | Qnty | Description of Evidence |
|---|---|---|
| N | 4 | Boxes of Cars    4 Boxes - Qty 40 in each Box    160 total |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## Change of Evidence Custodian

| Date | Exhibit Letter | Reason | Signature | Location |
|---|---|---|---|---|
| 6/5/14 | N | Storage | | Floor |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Transfer

Date: _____    Company: _____

Name: _____    Signature: _____

## Disposal

Date: _____

Verifying Manager: _____    Evidence Technician: _____

Print: _____    Print: _____

(Attach Authorization Letter)

RCG - 501    FILE COPY

**CONFIDENTIAL**    **RIMKUS000104**

RIMKUS000105









CONFIDENTIAL

RIMKUS000106






CONFIDENTIAL

# RIMKUS CONSULTING GROUP, INC.

## EVIDENCE CUSTODY FORM

#1

RCG File No.: _50901985_    Date of Loss: _05/23/14_    Date Collected: _5/31/14_

Client: _FM Global_    Contact: _Paul Anderson_    Phone: _262 287-4733_

Claim No.: _____    Collected By: _____

Location of Loss: _501 N. 6º St.  Monticello, In._

Collected From: _E End Blower motor #2 oven._

1 BOX

| Exhibit Letter | Qnty | Description of Evidence |
|---|---|---|
| 1A-C | 3 | Glass Jars of Burned material |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

### Change of Evidence Custodian

| Date | Exhibit Letter | Reason | Signature | Location |
|---|---|---|---|---|
| 5/31/14 | 1A-C | Storage | _/s/_ | Floor |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

### Transfer

Date: _____    Company: _____

Name: _____    Signature: _____

### Disposal

Date: _____

Verifying Manager: _____    Evidence Technician: _____

Print: _____    Print: _____

(Attach Authorization Letter)

RCG - 501

FILE COPY

**CONFIDENTIAL**

RIMKUS000101



CONFIDENTIAL

RIMKUS000100

RIMKUS000102







CONFIDENTIAL

# RIMKUS CONSULTING GROUP, INC.

## EVIDENCE CUSTODY FORM

RCG File No.: 5091985   Date of Loss: 5-23-14   Date Collected: 4-23-15

Client: FM Global   Contact: Mark Senek   Phone: 312-214-4415

Claim No.: ___   Collected By: SMF

Location of Loss: 501 N. 6TH Street Monticello In

Collected From: Blower

| Exhibit Letter | Qnty | Description of Evidence |
|---|---|---|
| V | 1 | 1oz of Scrapings from Blower |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

### Change of Evidence Custodian

| Date | Exhibit Letter | Reason | Signature | Location |
|---|---|---|---|---|
| 9-23-15 | V | Placed into Storage w/ other artifacts | N. Preisler | F3 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### Transfer

Date: _____   Company: _____

Name: _____   Signature: _____

### Disposal

Date: _____

Verifying Manager: _____   Evidence Technician: _____

Print: _____   Print: _____

(Attach Authorization Letter)

RCG - 501                    FILE COPY

CONFIDENTIAL                    RIMKUS000111



CONFIDENTIAL

RIMKUS000112

# Exhibit 15



| Company | Ball Corp | Process | IBO#2 225/350/400/390/ 16.5FPI | Printed | 04/06/2017 |
| Site | Monticello | Product | CANS | Line Speed | 16.5 (ft/min) |

### Data Collection Details

Operator:
Cycle Time:
Number of Probes: 6
Sampling Interval: 0:01.0 (MM:SS.T)
Trigger Mode: None
Data Loaded: 12:01:00 03/04/2014
Collection Started: 12:08:00 03/04/2014
File Name: R:\PAQ\FILES\2014\MARCH\D144C001C.PAQ
Logger Id: A911-462-00

### Notes

DATAPAQ © 1990-2017, Oven Tracker for Windows v3.04

LINE SPEED : 16.5 FT/MIN
FILM WEIGHTS :

| ZONE | 1 | 2 | 3 | 4 |
| SET | 225 | 350 | 400 | 390 |
| ACT | 225 | 350 | 400 | 390 |

EXHAUST READINGS:    SCFM
WAS 90% FULL

### Probe Map

Dimension: 0.4 x 0.2 ft

|  | Min 380.0 | Max 395.0 |
| LEFT AIR TEMP | | 146 | 0.7  0.8 |
| LEFT DOME TEMP | | 101 | 0.7  2.8 |
| CENTER AIR TEMP | | 151 | 1.6  0.9 |
| CENTER DOME TEMP | | 116 | 1.7  2.9 |
| RIGHT AIR TEMP | | 149 | 2.5  0.9 |
| RIGHT DOME TEMP | | 109 | 2.6  2.9 |

* Probe data realigned *

| Speed 16.5 (ft/min) | | | | | | |
|---|---|---|---|---|---|---|
| Zone | #1 | #2 | #3 | #4 | | |
| Upper | 225 | 350 | 400 | 390 | | |
| Lower | 0 | 0 | 0 | 0 | | |

DATAPAQ © 1990-2017, OTWIN v3.04

|  |  | | Datapaq Value | | |
|---|---|---|---|---|---|
|  |  | High | Mid | Low | |
| Temp | | 395.0 | 387.0 | 380.0 | |
| Time | | 1:00.0 | 1:00.0 | 1:00.0 | |

### Max and Min Temperatures in °F

| Probe Label | Max Temp | Max Time | Min Temp | Time Above 380.0°F | Reached 380.0°F |
|---|---|---|---|---|---|
| #1  LEFT AIR TEMP | 402.8 | 2:34.0 | 69.8 | 1:28.0 | 1:53.0 |
| #2  LEFT DOME TEMP | 390.2 | 2:38.0 | 69.8 | 1:01.0 | 2:20.0 |
| #3  CENTER AIR TEMP | 404.6 | 2:37.0 | 71.6 | 1:31.0 | 1:50.0 |
| #4  CENTER DOME TEMP | 397.4 | 2:41.0 | 71.6 | 1:10.0 | 2:11.0 |
| #5  RIGHT AIR TEMP | 404.6 | 2:40.0 | 71.6 | 1:30.0 | 1:51.0 |
| #6  RIGHT DOME TEMP | 397.4 | 2:38.0 | 71.6 | 1:06.0 | 2:15.0 |

IBO #2 weekly 3-2-14

PRIVILEGE AND CONFIDENTIAL

BALL 001068



| Company | Ball Corp | Process | IBO#2 225/350/400/2Bo/ 15FPM | Printed | 04/06/2017 |
|---|---|---|---|---|---|
| Site | Monticello | Product | CANS | Line Speed | 15.0 (ft/min) |

IBO #2 weekly 3-17-14

**Data Collection Details**

Operator: Weekly JS
Cycle Time:
Number of Probes: 6
Sampling Interval: 0:01.0 (MM/M:SS.T)
Trigger Mode: None
Data Loaded: 7:57:00 03/17/2014
Collection Started: 7:35:00 03/17/2014
File Name: R:\PAQFILES\2014\MARCHD14H7670J.PAQ
Logger Id: A611-482-00

DATAPAQ © 1990-2017, Oven Tracker for Windows v3.04

LINE SPEED : 16.5 FT/MIN
FILM WEIGHTS :

| ZONE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| SET | 225 | 350 | 400 | 390 |
| ACT | 225 | 350 | 400 | 390 |

EXHAUST READINGS:   SCFM
WAS 90% FULL

**Notes**

**Probe Map**

Dimension: 0.4 x 0.2 ft

| | |
|---|---|
| LEFT AIR TEMP | 0.7  0.8 |
| LEFT DOME TEMP | 0.7  2.8 |
| CENTER AIR TEMP | 1.6  0.9 |
| CENTER DOME TEMP | 1.7  2.9 |
| RIGHT AIR TEMP | 2.5  0.9 |
| RIGHT DOME TEMP | 2.8  2.9 |
*Probe data realigned *

DATAPAQ © 1990-2017, OTWIN v3.04

| | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| Temp | High | | 400 | Mid | Low |
| Time | 1:00.0 | | 0 | 1:00.0 | 1:00.0 |

Datapaq Value
| | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| Temp | | | High 395.0 | Mid 387.0 | Low 380.0 |
| Time | | | 1:00.0 | 1:00.0 | 1:00.0 |

Max and Min Temperatures in °F

| Zone | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| Upper | 225 | 350 | 400 | 390 |
| Lower | 0 | 0 | 0 | 0 |

| Speed 15.0 (ft/min) | | | | | Min 380.0 | Max 395.0 | Time Above 380.0°F | Reached 380.0°F |
|---|---|---|---|---|---|---|---|---|

| Probe Label | Max Temp | Max Time | Min Temp | Min Time | Min | Max | Time Above 380.0°F | Reached 380.0°F |
|---|---|---|---|---|---|---|---|---|
| #1  LEFT AIR TEMP | 399.2 | 2:25.0 | 66.2 | | | 169 | 1:42.0 | 1:53.0 |
| #2  LEFT DOME TEMP | 388.4 | 2:28.0 | 68.0 | | | 123 | 1:14.0 | 2:15.0 |
| #3  CENTER AIR TEMP | 402.8 | 2:28.0 | 68.0 | | | 178 | 1:47.0 | 1:48.0 |
| #4  CENTER DOME TEMP | 393.8 | 2:22.0 | 68.0 | | | 141 | 1:25.0 | 2:04.0 |
| #5  RIGHT AIR TEMP | 402.8 | 2:27.0 | 68.0 | | | 176 | 1:46.0 | 1:50.0 |
| #6  RIGHT DOME TEMP | 395.6 | 2:26.0 | 68.0 | | | 134 | 1:21.0 | 2:08.0 |

PRIVILEGE AND CONFIDENTIAL

BALL 001069



| Company | Ball Corp | Process | IBO#2 225/350/400/360/ 16.5FPI | Printed | 04/06/2017 |
| Site | Monticello | Product | CANS | Line Speed | 13.5 (ft/min) |

**Data Collection Details**

| Operator: | R.P. |
| Cycle Time: | |
| Number of Probes: | 6 |
| Sampling Interval: | 0:01.0 (MM/4:SS.T) |
| Trigger Mode: | None |
| Data Loaded: | 14:10:00 03/28/2014 |
| Collection Started: | 13:58:00 03/28/2014 |
| File Name: | R3PAQFILES\2014\MARCH\D14\QE10F.PAQ |
| Logger Id: | A811-40200 |

DATAPAQ ©1990-2017, Oven Tracker for Windows v3.04

LINE SPEED : 16.5 FT/MIN
FILM WEIGHTS :

**Notes**

| ZONE | 1 | 2 | 3 | 4 |
| SET | 225 | 350 | 400 | 390 |
| ACT | 225 | 350 | 400 | 390 |

EXHAUST READINGS: SCFM
WAS 80% FULL

**Probe Map**

Dimension: 0.4 x 0.2 ft

| | 0.7 | 0.8 |
| LEFT AIR TEMP | 0.7 | 2.8 |
| LEFT DOME TEMP | 1.6 | 0.9 |
| CENTER AIR TEMP | 1.7 | 2.9 |
| CENTER DOME TEMP | 2.5 | 0.9 |
| RIGHT AIR TEMP | 2.6 | 2.9 |
| RIGHT DOME TEMP | |
| * Probe data realigned * | |

IBO #2 weekly 3-26-14

Max and Min Temperatures in °F

| Zone | #1 | #2 | #3 | #4 |
| Upper | 225 | 350 | 400 | 390 |
| Lower | 0 | 0 | 0 | 0 |

Datapaq Value

| | High | Mid | Low |
| Temp | 395.0 | 387.0 | 380.0 |
| Time | 1:00.0 | 1:00.0 | 1:00.0 |

| Probe Label | Max Temp | Max Time | Min Temp | Min | Max | Time Above 380.0°F | Reached 380.0°F |
|---|---|---|---|---|---|---|---|
| #1  LEFT AIR TEMP | 404.6 | 3:21.0 | 78.8 | 380.0 | 395.0 | | |
| #2  LEFT DOME TEMP | 399.2 | 3:24.0 | 78.8 | | 268 | 2:41.0 | 1:51.0 |
| #3  CENTER AIR TEMP | 404.6 | 3:21.0 | 78.8 | | 178 | 1:47.0 | 2:40.0 |
| #4  CENTER DOME TEMP | 399.2 | 3:20.0 | 78.8 | | 266 | 2:40.0 | 1:52.0 |
| #5  RIGHT AIR TEMP | 404.6 | 3:18.0 | 78.8 | | 194 | 1:57.0 | 2:27.0 |
| #6  RIGHT DOME TEMP | 399.2 | 3:14.0 | 78.8 | | 258 | 2:35.0 | 1:57.0 |
| | | | | | 206 | 2:04.0 | 2:21.0 |

Speed 13.5 (ft/min)

PRIVILEGE AND CONFIDENTIAL

BALL 001070



| Company | Ball Corp | Process | IBOM2 225/350/400/390/ 16.5FPT | Printed | 04/06/2017 |
| Site | Monticello | Product | CANS | Line Speed | 16.5 (ft/min) |

**Data Collection Details**

Operator: rar
Cycle Time:
Number of Probes: 6
Sampling Interval: 0:01.0 (MM:SS.T)
Trigger Mode: None
Data Loaded: 12:55:00 03/31/2014
Collection Started: 12:48:00 03/31/2014
File Name: R:\PACIFILES\2014\MARCH\D14\C55B.PAQ
Logger Id: A611-482-00

DATAPAQ © 1980-2017, Oven Tracker for Windows v3.04

LINE SPEED : 16.5 FT/MIN
FILM WEIGHTS :

| ZONE | 1 | 2 | 3 | 4 |
| SET | 225 | 350 | 400 | 390 |
| ACT | 225 | 350 | 400 | 390 |

EXHAUST READINGS: SCFM
WAS 90% FULL

**Notes**

**Probe Map**

Dimension: 0.4 x 0.2 ft

| | |
| LEFT AIR TEMP | 0.7   0.8 |
| LEFT DOME TEMP | 0.7   2.8 |
| CENTER AIR TEMP | 1.6   0.9 |
| CENTER DOME TEMP | 1.7   2.9 |
| RIGHT AIR TEMP | 2.6   2.9 |
| RIGHT DOME TEMP | 2.8   2.9 |
| * Probe data realigned * | ▲ |

| Zone | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| Upper | 225 | 350 | 400 | 390 |
| Lower | 0 | 0 | 0 | 0 |

**Datapaq Value**

| | High | Mid | Low |
|---|---|---|---|
| Temp | 395.0 | 387.0 | 380.0 |
| Time | 1:00.0 | 1:00.0 | 1:00.0 |

**Max and Min Temperatures in °F**

| Probe Label | Max Temp | Max Time | Min Temp | Min | Max | Time Above 380.0°F | Reached 380.0°F |
|---|---|---|---|---|---|---|---|
| #1 LEFT AIR TEMP | 401.0 | 2:27.0 | 82.4 | 380.0 | 395.0 | | |
| #2 LEFT DOME TEMP | 388.4 | 2:29.0 | 82.4 | | 173 | 1:44.0 | 1:52.0 |
| #3 CENTER AIR TEMP | 401.0 | 2:28.0 | 82.4 | | 121 | 1:13.0 | 2:18.0 |
| #4 CENTER DOME TEMP | 390.2 | 2:26.0 | 82.4 | | 168 | 1:41.0 | 1:57.0 |
| #5 RIGHT AIR TEMP | 401.0 | 2:26.0 | | | 131 | 1:19.0 | 2:13.0 |
| #6 RIGHT DOME TEMP | 393.8 | 2:28.0 | 84.2 | | 176 | 1:46.0 | 1:52.0 |
| | | | | | 141 | 1:25.0 | 2:07.0 |

Q3/31/2014 IBOM2 WEEKLY

**PRIVILEGE AND CONFIDENTIAL**

BALL 001071



| Company | Ball Corp | Process | IBOM2 225/350/400/390/ 16.5FPI | Printed | 04/06/2017 |
|---|---|---|---|---|---|
| Site | Monticello | Product | CANS | Line Speed | 16.5 (ft/min) |

04/07/2014 IBO #2 WEEKLY

**Data Collection Details**

Operator: rar
Cycle Time:
Number of Probes: 6
Sampling Interval: 0:01.0 (MMM:SS.T)
Trigger Mode: None
Date Loaded: 12/28/00 04/07/2014
Collection Started: 12/17/00 04/07/2014
File Name: R3PAQFILES\2014\APRILIE\147C28D.PAQ
Logger Id: A611-462-00

DATAPAQ © 1990-2017, Oven Tracker for Windows v3.04

**Notes**

LINE SPEED : 16.5 FT/MIN
FILM WEIGHTS :

| ZONE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| SET | 225 | 350 | 400 | 390 |
| ACT | 225 | 350 | 400 | 390 |

EXHAUST READINGS: SCFM
WAS 90% FULL

**Probe Map**

Dimension: 0.4 x 0.2 ft

| | |
|---|---|
| LEFT AIR TEMP | 0.7  0.8 |
| LEFT DOME TEMP | 0.7  2.8 |
| CENTER AIR TEMP | 1.6  0.9 |
| CENTER DOME TEMP | 1.7  2.9 |
| RIGHT AIR TEMP | 2.5  0.9 |
| RIGHT DOME TEMP | 2.6  2.9 |
| * Probe data realigned * | |

DATAPAQ © 1990-2017, OTWIN v3.04

**Datapaq Value**

| | #1 | #2 | #3 | #4 | | High | Mid | Low |
|---|---|---|---|---|---|---|---|---|
| Temp | 225 | 350 | 400 | 390 | | 395.0 | 387.0 | 380.0 |
| Time | 0 | 0 | 0 | | | 1:00.0 | 1:00.0 | 1:00.0 |

| Zone | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| Upper | 225 | 350 | 400 | 390 |
| Lower | | | | |

**Max and Min Temperatures in °F**

| Probe Label | Max Temp | Max Time | Min Temp | Min | Max | Time Above 380.0°F | Reached 380.0°F |
|---|---|---|---|---|---|---|---|
| #1 LEFT AIR TEMP | 402.8 | 3:02.0 | 87.8 | 380.0 | 281 | 2:49.0 | 1:55.0 |
| #2 LEFT DOME TEMP | 393.8 | 3:00.0 | 96.8 | | 208 | 2:05.0 | 2:35.0 |
| #3 CENTER AIR TEMP | 402.8 | 3:02.0 | 89.6 | | 279 | 2:48.0 | 1:57.0 |
| #4 CENTER DOME TEMP | 395.6 | 3:04.0 | 98.6 | | 213 | 2:08.0 | 2:32.0 |
| #5 RIGHT AIR TEMP | 402.8 | 3:01.0 | 93.2 | | 284 | 2:51.0 | 1:55.0 |
| #6 RIGHT DOME TEMP | 397.4 | 2:56.0 | 98.6 | | 234 | 2:21.0 | 2:19.0 |

**PRIVILEGE AND CONFIDENTIAL**

BALL 001072



| Company | Ball Corp | Process | IBO#2 225/335/400/390/ 12FPM | Printed | 04/06/2017 |
| Site | Monticello | Product | CANS | Line Speed | 12.0 (ft/min) |

**Data Collection Details**

Operator: cgc
Cycle Time:
Number of Probes: 6
Sampling Interval: 0:01.0 (MM:SS.T)
Trigger Mode: None
Data Loaded: 7:58:00 04/14/2014
Collection Started: 7:49:00 04/14/2014
File Name: R:\PAQFILES\2014\PRILLE'14E7S8.PAQ
Logger Id: A611-482-00

DATAPAQ © 1990-2017, Oven Tracker for Windows v3.04

**Notes**

IBO #2 weekly 4-13-14

LINE SPEED :   12 FT/MIN
FILM WEIGHTS :

| ZONE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| SET | 225 | 350 | 400 | 390 |
| ACT | 225 | 350 | 400 | 390 |

EXHAUST READINGS:   SCFM
WAS 90% FULL

**Probe Map**

Dimension: 0.4 x 0.2 ft

| | |
|---|---|
| LEFT AIR TEMP | 0.7  0.8 |
| LEFT DOME TEMP | 0.7  2.8 |
| CENTER AIR TEMP | 1.8  0.9 |
| CENTER DOME TEMP | 1.7  2.9 |
| RIGHT AIR TEMP | 2.5  0.9 |
| RIGHT DOME TEMP | 2.6  2.9 |

* Probe data realigned *

| Zone | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| Upper | 225 | 350 | 400 | 390 |
| Lower | 0 | 0 | 0 | 0 |

**Datapaq Value**

| | High | Mid | Low |
|---|---|---|---|
| Temp | 395.0 | 387.0 | 380.0 |
| Time | 1:00.0 | 1:00.0 | 1:00.0 |

DATAPAQ © 1990-2017, OTWIN v3.04

**Max and Min Temperatures in °F**

| Probe Label | Max Temp | Max Time | Min Temp | Min | Max | Time Above 380.0°F | Reached 380.0°F |
|---|---|---|---|---|---|---|---|
| #1  LEFT AIR TEMP | 401.0 | 2:58.0 | 86.0 | 380.0 | 395.0 | | |
| #2  LEFT DOME TEMP | 395.6 | 3:07.0 | 87.8 | | 273 | 2:44.0 | 1:57.0 |
| #3  CENTER AIR TEMP | 404.6 | 3:10.0 | 86.0 | | 211 | 2:07.0 | 2:29.0 |
| #4  CENTER DOME TEMP | 399.2 | 3:04.0 | 87.8 | | 274 | 2:45.0 | 1:56.0 |
| #5  RIGHT AIR TEMP | 406.4 | 3:10.0 | 86.0 | | 224 | 2:15.0 | 2:18.0 |
| #6  RIGHT DOME TEMP | 402.8 | 3:03.0 | 87.8 | | 278 | 2:47.0 | 1:54.0 |
| | | | | | 241 | 2:25.0 | 2:09.0 |

PRIVILEGE AND CONFIDENTIAL

BALL 001073



| Company | Ball Corp | Process | IBO#2 225/350/400/390/ 16.5FPI | Printed | 04/06/2017 |
| Site | Monticello | Product | CANS | Line Speed | 16.5 (ft/min) |

**Data Collection Details**

Operator:                                      rwr
Cycle Time:
Number of Probes:              6
Sampling Interval:             0:01.0 (MM:SS.T)
Trigger Mode:                  None
Data Loaded:                   11:10:00 04/21/2014
Collection Started:            11:10:00 04/21/2014
File Name:                     R:\PAQ\FILES\2014\APRIL\E14LB10D.PAQ
Logger Id:                     A911-482:00

DATAPAQ © 1980-2017, Oven Tracker for Windows v3.04

**Notes**

LINE SPEED :        16.5 FT/MIN
FILM WEIGHTS :

| ZONE | 1 | 2 | 3 | 4 |
| SET | 225 | 350 | 400 | 390 |
| ACT | 225 | 350 | 400 | 390 |

EXHAUST READINGS:                    SCFM
WAS 90% FULL

**Probe Map**

Dimension: 0.4 x 0.2 ft

| | | |
| LEFT AIR TEMP | 0.7 | 0.6 |
| LEFT DOME TEMP | 0.7 | 2.6 |
| CENTER AIR TEMP | 1.6 | 0.9 |
| CENTER DOME TEMP | 1.7 | 2.9 |
| RIGHT AIR TEMP | 2.5 | 0.9 |
| RIGHT DOME TEMP | 2.6 | 2.9 |
| *Probe data realigned * | | |

| Zone | #1 | #2 | #3 | #4 |
| | 225 | 350 | 400 | 390 |
| Upper | 0 | 0 | 0 | 0 |
| Lower | | | | |

DATAPAQ © 1980-2017, OTWIN v3.04

| | Datapaq Value | | |
| | High | Mid | Low |
| | 395.0 | 387.0 | 380.0 |
| Temp | 1:00.0 | 1:00.0 | 1:00.0 |
| Time | | | |

**Max and Min Temperatures in °F**

| Probe Label | Max Temp | Max Time | Min Temp | Min | Max | Time Above 380.0°F | Reached 380.0°F |
| | | | | 380.0 | 395.0 | | |
| #1  LEFT AIR TEMP | 401.0 | 2:26.0 | 89.6 | 174 | | 1:45.0 | 1:49.0 |
| #2  LEFT DOME TEMP | 390.2 | 2:26.0 | 95.0 | 128 | | 1:17.0 | 2:13.0 |
| #3  CENTER AIR TEMP | 402.8 | 2:30.0 | 89.6 | 178 | | 1:47.0 | 1:49.0 |
| #4  CENTER DOME TEMP | 390.2 | 2:26.0 | 96.8 | 131 | | 1:19.0 | 2:11.0 |
| #5  RIGHT AIR TEMP | 401.0 | 2:24.0 | 95.0 | 178 | | 1:47.0 | 1:49.0 |
| #6  RIGHT DOME TEMP | 393.8 | 2:24.0 | 96.8 | 141 | | 1:25.0 | 2:05.0 |

**PRIVILEGE AND CONFIDENTIAL**

**BALL 001074**



PRIVILEGE AND CONFIDENTIAL

BALL 001075



PRIVILEGE AND CONFIDENTIAL



| Company | Ball Corp | Process | IBOM2 225/350/400/390/ 16.5FPI | Printed | 04/06/2017 |
|---------|-----------|---------|-------------------------------|---------|------------|
| Site | Monticello | Product | CANS | Line Speed | 15.5 (ft/min) |

**Data Collection Details**

Operator:
Cycle Time:
Number of Probes: 6
Sampling Interval: 0:01.0 (MMM.SS.T)
Trigger Mode: None
Data Loaded: 12:42:00 05/20/2014
Collection Started: 12:27:00 05/20/2014
File Name: R\PAQFILES\2014\MAY\F14KC42F.PAQ
Logger Id: A611-483-00

DATAPAQ © 1990-2017, Oven Tracker for Windows v3.04

LINE SPEED : 16.5 FT/MIN
FILM WEIGHTS :

| ZONE | 1 | 2 | 3 | 4 |
|------|---|---|---|---|
| SET | 225 | 350 | 400 | 390 |
| ACT | 225 | 350 | 400 | 390 |

EXHAUST READINGS: SCFM
WAS 90% FULL

**Notes**

**Probe Map**

Dimension: 0.4 x 0.2 ft

| | | |
|---|---|---|
| LEFT AIR TEMP | 0.7 | 0.8 |
| LEFT DOME TEMP | 0.7 | 2.8 |
| CENTER AIR TEMP | 1.6 | 0.9 |
| CENTER DOME TEMP | 1.7 | 2.9 |
| RIGHT AIR TEMP | 2.5 | 2.9 |
| RIGHT DOME TEMP | 2.9 | 2.9 |
| * Probe data realigned * | | |

IBO #2 weekly 5-20-14

| | Zone | #1 | #2 | #3 | #4 |
|---|------|-----|-----|-----|-----|
| | Upper | 225 | 350 | 400 | 390 |
| | Lower | 0 | 0 | 0 | Low 380.0 |

Datapaq Value

| | High | Mid | Low |
|---|------|-----|-----|
| Temp | 395.0 | 387.0 | 380.0 |
| Time | 1:00.0 | 1:00.0 | 1:00.0 |

DATAPAQ © 1990-2017, OTWIN v3.04

Max and Min Temperatures in °F

| Probe Label | Max Temp | Max Time | Min Temp | Min | Max | Time Above 380.0°F | Reached 380.0°F |
|-------------|----------|----------|----------|-----|-----|--------------------|-----------------|
| #1 LEFT AIR TEMP | 402.8 | 2:18.0 | 127.4 | 380.0 | 395.0 | 194 | 1:57.0 | 1:35.0 |
| #2 LEFT DOME TEMP | 392.0 | 3:19.0 | 159.8 | | | 131 | 1:19.0 | 2:09.0 |
| #3 CENTER AIR TEMP | 402.8 | 2:24.0 | 132.8 | | | 196 | 1:58.0 | 1:36.0 |
| #4 CENTER DOME TEMP | 393.8 | 2:19.0 | 159.8 | | | 149 | 1:30.0 | 1:58.0 |
| #5 RIGHT AIR TEMP | 402.8 | 2:18.0 | 138.2 | | | 198 | 1:59.0 | 1:34.0 |
| #6 RIGHT DOME TEMP | 397.4 | 2:20.0 | 161.6 | | | 161 | 1:37.0 | 1:50.0 |

| Speed | |
|-------|---|
| 15.5 (ft/min) | |

**PRIVILEGE AND CONFIDENTIAL**

BALL 001077

| Company | Bell Corp | Process | IBO#2 225/350/400/400 of 16.5FPf | Printed | 09/23/2015 |
|---|---|---|---|---|---|
| Site | Monticello | Product | CANS | Line Speed | 13.5 (ft/min) |

**Data Collection Details**

| | |
|---|---|
| Operator: | R.P. |
| Cycle Time: | |
| Number of Probes: | 5 |
| Sampling Interval: | 0:01.0 (MM:SS.T) |
| Trigger Mode: | None |
| Data Logout: | 20:37:00 05/22/2014 |
| Collection Started: | 20:28:00 05/22/2014 |
| File Name: | F:\P\C\FILES\001\4\MA\YF1\AIK\370.PAQ |
| Logger Id: | A811-482-00 |

DATAPAQ © 1993-2015, Oven Tracker for Windows v3.04

**Notes**

LINE SPEED : 16.5 FT/MIN
FILM WEIGHTS :

| ZONE | 1 | 2 | 3 | 4 |
|---|---|---|---|---|
| SET | 225 | 350 | 400 | 390 |
| ACT | 225 | 350 | 400 | 390 |

EXHAUST READINGS:    SCFM
WAS 90% FULL

**Probe Map**

Dimension: 0.4 x 0.2 ft

| | |
|---|---|
| LEFT AIR TEMP | 0.7  0.8 |
| LEFT DOME TEMP | 0.7  2.8 |
| CENTER AIR TEMP | 1.6  0.9 |
| CENTER DOME TEMP | 1.7  2.9 |
| RIGHT AIR TEMP | 2.8  0.9 |
| RIGHT DOME TEMP | 2.6  2.8 |

* Probe data realigned *

IBO #2: Start Up: 5-22-14



Speed
13.5 (ft/min)

| Zone | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| | 225 | 350 | 400 | 390 |
| Upper | 225 | 350 | 400 | 390 |
| Lower | 0 | 0 | 0 | 0 |

DATAPAQ © 1993-2015, OTWIN v3.04

**Datapaq Value**

| | High | Mid | Low | Min | Max |
|---|---|---|---|---|---|
| Temp | 395.0 | 397.0 | 380.0 | 380.0 | 395.0 |
| Time | 1:00.0 | 1:00.0 | 1:00.0 | | |

**Max and Min Temperatures in °F**

| Probe Label | Max Temp | Max Time | Min | Max | Time Above 380.0°F | Reached 380.0°F |
|---|---|---|---|---|---|---|
| #1  LEFT AIR TEMP | 404.6 | 2:55.0 | | 288 | 2:54.0 | 1:50.0 |
| #2  LEFT DOME TEMP | 399.2 | 3:02.0 | | 231 | 2:19.0 | 2:19.0 |
| #3  CENTER AIR TEMP | 404.6 | 2:55.0 | | 288 | 2:53.0 | 1:52.0 |
| #4  CENTER DOME TEMP | 399.2 | 3:00.0 | | 234 | 2:21.0 | 2:17.0 |
| #5  RIGHT AIR TEMP | 406.4 | 2:54.0 | | 284 | 2:57.0 | 1:49.0 |
| #6  RIGHT DOME TEMP | 402.8 | 2:50.0 | | 271 | 2:43.0 | 1:55.0 |

CONFIDENTIAL

RIMKUS000010

# Exhibit 16

PRIVILEGE AND CONFIDENTIAL          BALL 001138



PRIVILEGE AND CONFIDENTIAL     BALL 001139



PRIVILEGE AND CONFIDENTIAL

BALL 001140



PRIVILEGE AND CONFIDENTIAL

BALL 001141





PRIVILEGE AND CONFIDENTIAL

BALL 001143

PRIVILEGE AND CONFIDENTIAL

BALL 001144



PRIVILEGE AND CONFIDENTIAL

BALL 001145



PRIVILEGE AND CONFIDENTIAL          BALL 001146



PRIVILEGE AND CONFIDENTIAL

BALL 001147



PRIVILEGE AND CONFIDENTIAL          BALL 001148

PRIVILEGE AND CONFIDENTIAL

BALL 001149



PRIVILEGE AND CONFIDENTIAL          BALL 001150



PRIVILEGE AND CONFIDENTIAL            BALL 001151



**PRIVILEGE AND CONFIDENTIAL**

BALL 001152

PRIVILEGE AND CONFIDENTIAL

BALL 001153

PRIVILEGE AND CONFIDENTIAL

BALL 001154



**PRIVILEGE AND CONFIDENTIAL**   **BALL 001155**

PRIVILEGE AND CONFIDENTIAL

BALL 001156



**PRIVILEGE AND CONFIDENTIAL**

**BALL 001157**

PRIVILEGE AND CONFIDENTIAL

BALL 001158

PRIVILEGE AND CONFIDENTIAL        BALL 001159

PRIVILEGE AND CONFIDENTIAL

BALL 001160

PRIVILEGE AND CONFIDENTIAL        BALL 001161



**PRIVILEGE AND CONFIDENTIAL**

**BALL 001162**



PRIVILEGE AND CONFIDENTIAL          BALL 001163

PRIVILEGE AND CONFIDENTIAL

BALL 001164



PRIVILEGE AND CONFIDENTIAL

BALL 001165

PRIVILEGE AND CONFIDENTIAL

BALL 001166

PRIVILEGE AND CONFIDENTIAL

BALL 001167

PRIVILEGE AND CONFIDENTIAL     BALL 001168



PRIVILEGE AND CONFIDENTIAL
BALL 001169

PRIVILEGE AND CONFIDENTIAL

BALL 001170

PRIVILEGE AND CONFIDENTIAL

BALL 001171

PRIVILEGE AND CONFIDENTIAL

BALL 001172

PRIVILEGE AND CONFIDENTIAL

BALL 001173



PRIVILEGE AND CONFIDENTIAL        BALL 001174

PRIVILEGE AND CONFIDENTIAL          BALL 001175

PRIVILEGE AND CONFIDENTIAL

BALL 001176



PRIVILEGE AND CONFIDENTIAL          BALL 001177

PRIVILEGE AND CONFIDENTIAL

BALL 001178

PRIVILEGE AND CONFIDENTIAL

BALL 001179

PRIVILEGE AND CONFIDENTIAL

BALL 001181

PRIVILEGE AND CONFIDENTIAL          BALL 001182

PRIVILEGE AND CONFIDENTIAL

BALL 001183

PRIVILEGE AND CONFIDENTIAL

BALL 001184

PRIVILEGE AND CONFIDENTIAL

BALL 001185

PRIVILEGE AND CONFIDENTIAL

BALL 001186



PRIVILEGE AND CONFIDENTIAL

BALL 001187

PRIVILEGE AND CONFIDENTIAL

BALL 001188

PRIVILEGE AND CONFIDENTIAL          BALL 001189

PRIVILEGE AND CONFIDENTIAL

BALL 001190

**PRIVILEGE AND CONFIDENTIAL**

**BALL 001191**

PRIVILEGE AND CONFIDENTIAL

BALL 001192

**PRIVILEGE AND CONFIDENTIAL**

**BALL 001193**

PRIVILEGE AND CONFIDENTIAL

BALL 001194

PRIVILEGE AND CONFIDENTIAL

BALL 001195

# Exhibit 17

# Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/22/2013 | Crew | A | Total Line Down | 0.18 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 13 <br> 8:00 <br> Day 13 | 106,197 | | | | |
| Hr 14 <br> 9:00 <br> Day 27 | 220,563 <br> 1,323,378 | | | | |
| Hr 9 <br> 10:00 <br> Day 36 | 294,084 <br> 1,176,336 | IBO mat tracking faults. <br> c/o printer blankets | | | |
| Hr 14 <br> 11:00 <br> Day 50 | 408,450 <br> 1,225,350 | | | | |
| Hr 12 <br> 12:00 <br> Day 62 | 506,478 <br> 1,215,547 | | | | |
| Hr 12 <br> 1:00 <br> Day 74 | 604,506 <br> 1,209,012 | shrink wrapper down.  Backed up all lines | 5 | | |
| Hr 16 <br> 2:00 <br> Day 90 | 735,210 <br> 1,260,371 | | | | |
| Hr 14 <br> 3:00 <br> Day 104 | 849,576 <br> 1,274,364 | | | | |
| Hr 15 <br> 4:00 <br> Day 119 | 972,111 <br> 1,296,116 | | | | |
| Hr 12 <br> 5:00 <br> Day 131 | 1,070,139 <br> 1,284,167 | | | | |
| Hr 13 <br> 6:00 <br> Day 144 | 1,176,336 <br> 1,283,265 | LOC cupper down with scrap duct work jam above cupper | 6 | | |
| Hr 14 <br> 7:00 <br> Day 158 | 1,290,702 <br> 1,290,702 | | | | |
| | | | | Total HFI's | 0 |

L/C's        0

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00208**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/22/2013 | Crew | B | Total Line Down | 1.72 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 11<br>8:00<br>Day | 89,859<br>1,078,308 | | | | |
| Hr 3<br>9:00<br>Day 14 | 114,366<br>686,196 | L/C to Coke Summer Car/Bike<br>Had to put light grey over gold, took a while to clean out. | 35 | Beer to Bev | 1 |
| Hr 16<br>10:00<br>Day 30 | 245,070<br>980,280 | | | | |
| Hr 10<br>11:00<br>Day 40 | 326,760<br>980,280 | Palletizer backed line up, motor overload, ET reset. | 9 | Washer Stain<br>Off Color | 1<br>2 |
| Hr 13<br>12:00<br>Day 53 | 432,957<br>1,039,097 | | | | |
| Hr 14<br>1:00<br>Day 67 | 547,323<br>1,094,646 | | | | |
| Hr 15<br>2:00<br>Day 82 | 669,858<br>1,148,338 | Washer down at 1:50 for oven flow fault. C/O belts on zone 1 blower and had to wait till oven came back to temp and then dumped 7 hoppers from washer. | 47 | | |
| Hr 2<br>3:00<br>Day 84 | 686,196<br>1,029,294 | | | Washer Stain | 1 |
| Hr 8<br>4:00<br>Day 92 | 751,548<br>1,002,039 | | | | |
| Hr 10<br>5:00<br>Day 102 | 833,238<br>999,886 | Necker jammed up and sent dents to tester and tester jammed up also. Made a big mess.<br>Had to pull a piece of tooling to get jam out, ko did not look good so changed out. | 12 | Creases | 1 |
| Hr 13<br>6:00<br>Day 115 | 939,435<br>1,024,830 | | | | |
| Hr 12<br>7:00<br>Day 127 | 1,037,463<br>1,037,463 | | | | |
| | | | | Total HFI's | 6 |
| | | | | L/C's | 1 |

**PRIVILEGE AND CONFIDENTIAL**

BALL 00209

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/23/2013 | Crew | A | Total Line Down | 1.70 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 8<br>8:00<br>Day 8 | 65,352 | Washer jam stage 5 blow off<br>c/o small form roll inker 2 and c/o date code. | 22 | | |
| Hr 15<br>9:00<br>Day 23 | 187,887<br>1,127,322 | | | | |
| Hr 13<br>10:00<br>Day 36 | 294,084<br>1,176,336 | | | | |
| Hr 15<br>11:00<br>Day 51 | 416,619<br>1,249,857 | | | | |
| Hr 10<br>12:00<br>Day 61 | 498,309<br>1,195,942 | cleaned tunnel track and doubling box on printer infeed for gapping out.  Also increase air assist on air table feeding to IC for cans sticking on air table. | 10 | | |
| Hr 14<br>1:00<br>Day 75 | 612,675<br>1,225,350 | | | | |
| Hr 12<br>2:00<br>Day 87 | 710,703<br>1,218,358 | | | | |
| Hr 14<br>3:00<br>Day 101 | 825,069<br>1,237,604 | | | | |
| Hr 8<br>4:00<br>Day 109 | 890,421<br>1,187,198 | | | | |
| Hr 8<br>5:00<br>Day 117 | 955,773<br>1,146,928 | Label change Coke Summer Coaster<br><br>c/o ov roll for cut | 15 | smear | 1 |
| Hr 9<br>6:00<br>Day 126 | 1,029,294<br>1,122,857 | OV unit locked up.  OV roll installed to tight on back side | 55 | | |
| Hr 2<br>7:00<br>Day 128 | 1,045,632<br>1,045,632 | | | | |
| | | | | Total HFI's | 1 |

L/C's     1

**PRIVILEGE AND CONFIDENTIAL**

BALL 00210

# Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/23/2013 | Crew | B | Total Line Down | 0.25 | Pallet Count | 8169 |
|----------|------|-----------|------|---|-----------------|------|--------------|------|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 11 8:00 Day | 89,859 1,078,308 | | | | |
| Hr 13 9:00 Day 24 | 196,056 1,176,336 | | | | |
| Hr 14 10:00 Day 38 | 310,422 1,241,688 | | | | |
| Hr 13 11:00 Day 51 | 416,619 1,249,857 | | | | |
| Hr 12 12:00 Day 63 | 514,647 1,235,153 | | | | |
| Hr 13 1:00 Day 76 | 620,844 1,241,688 | | | Heel Dents | 1 |
| Hr 13 2:00 Day 89 | 727,041 1,246,366 | | | Off Color | 1 |
| Hr 11 3:00 Day 100 | 816,900 1,225,350 | Infeed jams and gapping out. Cleaned dueblin box and single filer into printer. | 15 | | |
| Hr 11 4:00 Day 111 | 906,759 1,208,982 | | | | |
| Hr 14 5:00 Day 125 | 1,021,125 1,225,350 | | | | |
| Hr 15 6:00 Day 140 | 1,143,660 1,247,619 | | | | |
| Hr 11 7:00 Day 151 | 1,233,519 1,233,519 | | | | |
| | | | | Total HFI's | 2 |
| | | | | L/C's | 0 |

**PRIVILEGE AND CONFIDENTIAL**

# Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/24/2013 | Crew | C | Total Line Down | 1.75 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 6<br>8:00<br>Day 6 | 49,014 | 2100cpm<br>Wavy flanges start of shift. | 30 | wavy flanges | 2 |
| Hr 6<br>9:00<br>Day 12 | 98,028<br>588,168 | Removed 2 turns of clamp off of reformer--lost flange<br>Added clamp to flanger to get width and FFCH | 30 | wavy flanges | 5 |
| Hr 2<br>10:00<br>Day 14 | 114,366<br>457,464 | Shutdown to clean plates-red into white and dark ink drip | 25 | | |
| Hr 12<br>11:00<br>Day 26 | 212,394<br>637,182 | | | | |
| Hr 11<br>12:00<br>Day 37 | 302,253<br>725,407 | | | | |
| Hr 13<br>1:00<br>Day 50 | 408,450<br>816,900 | | | | |
| Hr 12<br>2:00<br>Day 62 | 506,478<br>868,255 | | | | |
| Hr 12<br>3:00<br>Day 74 | 604,506<br>906,759 | IBO discharge deadplate knocking cans over, millwrights adjusted. IBO overtemp on restart. | 20 | | |
| Hr 11<br>4:00<br>Day 85 | 694,365<br>925,797 | | | | |
| Hr 11<br>5:00<br>Day 96 | 784,224<br>941,069 | | | | |
| Hr 10<br>6:00<br>Day 106 | 865,914<br>944,626 | | | | |
| Hr 14<br>7:00<br>Day 120 | 980,280<br>980,280 | | | | |
| | | | | Total HFI's | 7 |

L/C's          0

**PRIVILEGE AND CONFIDENTIAL**

**BALL 00212**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/24/2013 | Crew | D | Total Line Down | 0.00 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 13<br>8:00<br>Day | 106,197<br>1,274,364 | | | | |
| Hr 10<br>9:00<br>Day 23 | 187,887<br>1,127,322 | | | | |
| Hr 14<br>10:00<br>Day 37 | 302,253<br>1,209,012 | | | | |
| Hr 14<br>11:00<br>Day 51 | 416,619<br>1,249,857 | | | | |
| Hr 15<br>12:00<br>Day 66 | 539,154<br>1,293,970 | | | | |
| Hr 13<br>1:00<br>Day 79 | 645,351<br>1,290,702 | | | | |
| Hr 15<br>2:00<br>Day 94 | 767,886<br>1,316,387 | | | | |
| Hr 15<br>3:00<br>Day 109 | 890,421<br>1,335,632 | | | | |
| Hr 6<br>4:00<br>Day 115 | 939,435<br>1,252,549 | L/C to Sprite | | | |
| Hr 14<br>5:00<br>Day 129 | 1,053,801<br>1,264,561 | | | Off Color | 1 |
| Hr 13<br>6:00<br>Day 142 | 1,159,998<br>1,265,442 | | | | |
| Hr 15<br>7:00<br>Day 157 | 1,282,533<br>1,282,533 | | | | |
| | | | | Total HFI's | 1 |

L/C's    1

**PRIVILEGE AND CONFIDENTIAL**    **BALL 00213**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/25/2013 | Crew | C | Total Line Down | 1.82 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 10<br>8:00<br>Day 10 | 81,690 | 2100cpm | | Off Color | 2 |
| Hr 10<br>9:00<br>Day 20 | 163,380<br>980,280 | Picture frames down | 12 | | |
| Hr 11<br>10:00<br>Day 31 | 253,239<br>1,012,956 | *Z creases found in final. Found low clamp pressure pkt 5 Adjustments made. | 28 | | |
| Hr 10<br>11:00<br>Day 41 | 334,929<br>1,004,787 | | | ink spot | 3 |
| Hr 12<br>12:00<br>Day 53 | 432,957<br>1,039,097 | | | | |
| Hr 13<br>1:00<br>Day 66 | 539,154<br>1,078,308 | | | | |
| Hr 13<br>2:00<br>Day 79 | 645,351<br>1,106,325 | Brite can jammed above printer<br>Brite can jammed above printer | 19<br>30 | | |
| Hr 6<br>3:00<br>Day 85 | 694,365<br>1,041,548 | | | | |
| Hr 11<br>4:00<br>Day 96 | 784,224<br>1,045,606 | | | | |
| Hr 10<br>5:00<br>Day 106 | 865,914<br>1,039,097 | Brite can jammed above printer | 20 | | |
| Hr 12<br>6:00<br>Day 118 | 963,942<br>1,051,564 | Brite can jammed above printer 5pm | | | |
| Hr 13<br>7:00<br>Day 131 | 1,070,139<br>1,070,139 | | | | |
| | | | | Total HFI's | 5 |

L/C's    0

**PRIVILEGE AND CONFIDENTIAL**    **BALL 00214**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/25/2013 | Crew | D | Total Line Down | 1.50 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 14<br>8:00<br>Day | 114,366<br>1,372,392 | | | | |
| Hr 13<br>9:00<br>Day 27 | 220,563<br>1,323,378 | | | | |
| Hr 2<br>10:00<br>Day 29 | 236,901<br>947,604 | L/C to Ale 8 1.<br>Forms on inker 6 were set backwards. Would not kick on.<br>reset. | 30<br>20 | | |
| Hr 11<br>11:00<br>Day 40 | 326,760<br>980,280 | | | Smear | 1 |
| Hr 14<br>12:00<br>Day 54 | 441,126<br>1,058,702 | | | | |
| Hr 15<br>1:00<br>Day 69 | 563,661<br>1,127,322 | | | | |
| Hr 11<br>2:00<br>Day 80 | 653,520<br>1,120,329 | | | | |
| Hr 8<br>3:00<br>Day 88 | 718,872<br>1,078,308 | L/C to Minute Maid Lemonade Cold Fill | 20 | | |
| Hr 13<br>4:00<br>Day 101 | 825,069<br>1,100,064 | | | | |
| Hr 14<br>5:00<br>Day 115 | 939,435<br>1,127,322 | | | | |
| Hr 13<br>6:00<br>Day 128 | 1,045,632<br>1,140,680 | | | | |
| Hr 9<br>7:00<br>Day 137 | 1,119,153<br>1,119,153 | L/C to Minute Maid LT Lemonade | 20 | | |
| | | | | Total HFI's | 1 |
| | | | | L/C's | 3 |

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00215**

# Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | | Date | 5/26/2013 | Crew | C | Total Line Down | 1.67 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|---|
| | | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 7<br>8:00<br>Day 7 | 57,183 | 2100cpm      Coming up from L/C<br>Cupper 1 down for bad bearing in cup chute blower<br>LOC FE washer jam | | | |
| Hr 11<br>9:00<br>Day 18 | 147,042<br>882,252 | | | | |
| Hr 13<br>10:00<br>Day 31 | 253,239<br>1,012,956 | | | | |
| Hr 10<br>11:00<br>Day 41 | 334,929<br>1,004,787 | | | Creases | 2 |
| Hr 12<br>12:00<br>Day 53 | 432,957<br>1,039,097 | Cupper 1 running<br>L/C to Coke CF DT | 35 | | |
| Hr 10<br>1:00<br>Day 63 | 514,647<br>1,029,294 | | | | |
| Hr 14<br>2:00<br>Day 77 | 629,013<br>1,078,317 | | | | |
| Hr 12<br>3:00<br>Day 89 | 727,041<br>1,090,562 | ME audit yellow dot | | | |
| Hr 15<br>4:00<br>Day 104 | 849,576<br>1,132,740 | | | | |
| Hr 8<br>5:00<br>Day 112 | 914,928<br>1,097,914 | wavy flanges on palletizer--flipping pocket 5&9 pads<br>Shutdown reformer to work on wavy flanges | 5<br>60 | | |
| Hr 1<br>6:00<br>Day 113 | 923,097<br>1,007,007 | LOC FE | | Damage<br>Creases | 1<br>5 |
| Hr 4<br>7:00<br>Day 117 | 955,773<br>955,773 | Changed blade in inker #6 during downtime | | Crease | 1 |
| | | | | Total HFI's | 9 |

L/C's      2

PRIVILEGE AND CONFIDENTIAL          BALL 00216

# Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/26/2013 | Crew | D | Total Line Down | 2.08 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 13<br>8:00<br>Day | 106,197<br>1,274,364 | | | | |
| Hr 11<br>9:00<br>Day 24 | 196,056<br>1,176,336 | Working on reformer station 1 for crease. | 15 | | |
| Hr 11<br>10:00<br>Day 35 | 285,915<br>1,143,660 | | | | |
| Hr 8<br>11:00<br>Day 43 | 351,267<br>1,053,801 | working on reformer crease.<br>Checked all reformer tooling for locked up tooling. | 30 | | |
| Hr 2<br>12:00<br>Day 45 | 367,605<br>882,252 | Changed Reformer tooling ram. | 20 | Crease | 9 |
| Hr 0<br>1:00<br>Day 45 | 367,605<br>735,210 | Re-built pusher ram for reformer pocket 1.<br>set the clamp and checking dome reversal. | 60 | Crease | 1 |
| Hr 8<br>2:00<br>Day 53 | 432,957<br>742,218 | | | Crease | 2 |
| Hr 13<br>3:00<br>Day 66 | 539,154<br>808,731 | | | | |
| Hr 15<br>4:00<br>Day 81 | 661,689<br>882,230 | | | | |
| Hr 14<br>5:00<br>Day 95 | 776,055<br>931,266 | | | | |
| Hr 14<br>6:00<br>Day 109 | 890,421<br>971,360 | | | | |
| Hr 12<br>7:00<br>Day 121 | 988,449<br>988,449 | | | | |
| | | | | Total HFI's | 12 |

L/C's          1

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00217**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/27/2013 | Crew | C | Total Line Down | 3.12 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 10<br>8:00<br>Day 10 | 81,690 | 2100cpm<br>necker down start of shift. ET's working on jam gate sensor | 30 | | |
| Hr 7<br>9:00<br>Day 17 | 138,873<br>833,238 | L/C to Coke Dt | 30 | | |
| Hr 0<br>10:00<br>Day 17 | 138,873<br>555,492 | Changed OV roll<br>Working on creases from necker | 12<br>65 | necker crease | 5 |
| Hr 0<br>11:00<br>Day 17 | 138,873<br>416,619 | | | creases | 1 |
| Hr 10<br>12:00<br>Day 27 | 220,563<br>529,351 | | | creases | 1 |
| Hr 8<br>1:00<br>Day 35 | 285,915<br>571,830 | 12:09 C/O rams pkt 5 reformer. | 20 | | |
| Hr 7<br>2:00<br>Day 42 | 343,098<br>588,173 | checking all reformer pockets for twist--Parrish | | creases | 5 |
| Hr 4<br>3:00<br>Day 46 | 375,774<br>563,661 | Reset PPL on reformers | 30 | creases | 4 |
| Hr 15<br>4:00<br>Day 61 | 498,309<br>664,395 | | | | |
| Hr 10<br>5:00<br>Day 71 | 579,999<br>695,999 | | | | |
| Hr 16<br>6:00<br>Day 87 | 710,703<br>775,306 | | | | |
| Hr 4<br>7:00<br>Day 91 | 743,379<br>743,379 | Necker creases are back | | creases | 6 |
| | | | | Total HFI's | 22 |

L/C's  1

**PRIVILEGE AND CONFIDENTIAL**               **BALL 00218**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | | Date | 5/27/2013 | Crew | D | Total Line Down | | 3.00 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|---|---|
| L-2 | | | Budget | 1,225,000 | | | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr  1  8:00  Day | 8,169  98,028 | Lightning crease from pocket 5 at 650. looking for pocket that was creating crease, #5 reformer the pusher had been replaced on day shift, so the pusher | 60 | N/F Crease | 4 |
| Hr  1  9:00  Day  2 | 16,338  98,028 | ram was replaced, the crease was gone but the flange witdh was on the low side, an adjustment to the flange was made and the crease was back, clamp was then added to the reformer | 60 | N/F Crease | 3 |
| Hr  0  10:00  Day  2 | 16,338  65,352 | and the crease was gone but now had a shallow dome, the flange was set to low side of spec and the buckle was on the low side also, dome depth in spec and crease was gone | 60 | N/F Crease | 1 |
| Hr  11  11:00  Day  13 | 106,197  318,591 | up and running | | | |
| Hr  16  12:00  Day  29 | 236,901  568,562 | | | | |
| Hr  14  1:00  Day  43 | 351,267  702,534 | | | N/F Crease | 1 |
| Hr  11  2:00  Day  54 | 441,126  756,222 | | | | |
| Hr  4  3:00  Day  58 | 473,802  710,703 | started getting lightening bolt creases, tracked them to #9, replaced the tooling ram and set flange and buckle to low just like pocket #5, still had creases, slowed down to 1900 cpm | | N/F Crease | 8 |
| Hr  6  4:00  Day  64 | 522,816  697,071 | and added clamp to reformer, issue resolved for this pocket | | | |
| Hr  14  5:00  Day  78 | 637,182  764,618 | | | | |
| Hr  14  6:00  Day  92 | 751,548  819,864 | | | | |
| Hr  7  7:00  Day  99 | 808,731  808,731 | | | | |
| | | | | Total HFI's | 17 |
| | | | | L/C's | 0 |

**PRIVILEGE AND CONFIDENTIAL**        **BALL 00219**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/28/2013 | Crew | A | Total Line Down | 2.48 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| L-2 | | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 15<br>8:00<br>Day 15 | 122,535 | Necker running 1900 cpm for creases | | | |
| Hr 8<br>9:00<br>Day 23 | 187,887<br>1,127,322 | shut down necker.  Reset protrusion back .040"<br>Reset all flanges, clamp, etc. | | | |
| Hr 0<br>10:00<br>Day 23 | 187,887<br>751,548 | Necker down | 60 | | |
| Hr 0<br>11:00<br>Day 23 | 187,887<br>563,661 | Necker down | 60 | | |
| Hr 7<br>12:00<br>Day 30 | 245,070<br>588,168 | Resetting flanges and buckles | | creases | 1 |
| Hr 9<br>1:00<br>Day 39 | 318,591<br>637,182 | Deco conveying fault.  ET reset in panel | 6 | | |
| Hr 10<br>2:00<br>Day 49 | 400,281<br>686,202 | Down cans feeding to printer | 5 | | |
| Hr 10<br>3:00<br>Day 59 | 481,971<br>722,957 | Resetting flanges and buckles<br>c/o reformer ram #2 | 15 | | |
| Hr 11<br>4:00<br>Day 70 | 571,830<br>762,421 | Resetting flanges and buckles<br>Clean pin chain for minor ME activity lower sidewall | 3 | | |
| Hr 12<br>5:00<br>Day 82 | 669,858<br>803,830 | | | | |
| Hr 15<br>6:00<br>Day 97 | 792,393<br>864,422 | | | | |
| Hr 14<br>7:00<br>Day 111 | 906,759<br>906,759 | | | | |
| | | | | Total HFI's | 1 |

L/C's    0

**PRIVILEGE AND CONFIDENTIAL**              **BALL 00220**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | | Date | 5/28/2013 | Crew | B | Total Line Down | 1.67 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|---|
| | | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 14 8:00 Day | 114,366 1,372,392 | L/C to Coke Summer Baseball | 21 | | |
| Hr 4 9:00 Day 18 | 147,042 882,252 | Had to c/o OV roll. | 12 | Void | 2 |
| Hr 0 10:00 Day 18 | 147,042 588,168 | Getting voids, c/o linear bearing on #1 spindle. | 67 | Void | 7 |
| Hr 1 11:00 Day 19 | 155,211 465,633 | | | | |
| Hr 13 12:00 Day 32 | 261,408 627,379 | | | | |
| Hr 14 1:00 Day 46 | 375,774 751,548 | | | | |
| Hr 14 2:00 Day 60 | 490,140 840,247 | | | | |
| Hr 14 3:00 Day 74 | 604,506 906,759 | | | | |
| Hr 12 4:00 Day 86 | 702,534 936,689 | | | | |
| Hr 14 5:00 Day 100 | 816,900 980,280 | | | | |
| Hr 14 6:00 Day 114 | 931,266 1,015,918 | | | | |
| Hr 15 7:00 Day 129 | 1,053,801 1,053,801 | | | | |
| | | | | Total HFI's | 9 |

L/C's          1

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00221**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/29/2013 | Crew | A | Total Line Down | 2.08 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 13 8:00 Day 13 | 106,197 | | | | |
| Hr 14 9:00 Day 27 | 220,563 1,323,378 | | | | |
| Hr 13 10:00 Day 40 | 326,760 1,307,040 | | | | |
| Hr 9 11:00 Day 49 | 400,281 1,200,843 | Shut down necker for wavy flanges.  Cleaned reformer | | | |
| Hr 6 12:00 Day 55 | 449,295 1,078,308 | rollers pockets 3, 5 & 9.  Remove clamp for high buckles | | | |
| Hr 10 1:00 Day 65 | 530,985 1,061,970 | change out OV roll printer Measure protrusion on reformer | | | |
| Hr 7 2:00 Day 72 | 588,168 1,008,296 | c/o reformer rams 2,3,7 7 10 | | | |
| Hr 12 3:00 Day 84 | 686,196 1,029,294 | | | | |
| Hr 9 4:00 Day 93 | 759,717 1,012,931 | | | | |
| Hr 6 5:00 Day 99 | 808,731 970,477 | | | | |
| Hr 12 6:00 Day 111 | 906,759 989,183 | Downtime for shift total with necker down | 125 | | |
| Hr 12 7:00 Day 123 | 1,004,787 1,004,787 | | | | |
| | | | | Total HFI's | 0 |

L/C's          0

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00222**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/29/2013 | Crew | B | Total Line Down | 1.08 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 8<br>8:00<br>Day | 65,352<br>784,224 | Getting wavy flanges at necker. Set all PPL to zero and still had wavy flanges. C/O #3 flanger ram and had to take .006 off | | | |
| Hr 9<br>9:00<br>Day 17 | 138,873<br>833,238 | of it to get out of wavy flanges. IBO down had to have ET reset on start up. Then had to wait for the pin oven to come back up to temp. | 43 | | |
| Hr 10<br>10:00<br>Day 27 | 220,563<br>882,252 | | | | |
| Hr 12<br>11:00<br>Day 39 | 318,591<br>955,773 | | | | |
| Hr 11<br>12:00<br>Day 50 | 408,450<br>980,280 | Down cans at infeed, popped up and moved top covers, millwrights put top covers back in place. | 17 | | |
| Hr 13<br>1:00<br>Day 63 | 514,647<br>1,029,294 | | | | |
| Hr 14<br>2:00<br>Day 77 | 629,013<br>1,078,317 | | | | |
| Hr 13<br>3:00<br>Day 90 | 735,210<br>1,102,815 | | | | |
| Hr 12<br>4:00<br>Day 102 | 833,238<br>1,110,956 | Shut down to check zero on printer. | 5 | | |
| Hr 13<br>5:00<br>Day 115 | 939,435<br>1,127,322 | | | | |
| Hr 12<br>6:00<br>Day 127 | 1,037,463<br>1,131,768 | Line 2 trimmers down, all vacuum chutes plugged up, shop checking belts and blower. | | | |
| Hr 5<br>7:00<br>Day 132 | 1,078,308<br>1,078,308 | Line still down end of shift. | | | |
| | | | | Total HFI's | 0 |
| | | | | L/C's | 0 |

**PRIVILEGE AND CONFIDENTIAL**                    **BALL 00223**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | | Date | 5/30/2013 | Crew | A | Total Line Down | 1.38 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|---|
| | | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 8<br>8:00<br>Day 8 | 65,352 | Low on cans line 2 bodymakers down w/ scrap system blower down with electrical short. | 2 | | |
| Hr 13<br>9:00<br>Day 21 | 171,549<br>1,029,294 | | | | |
| Hr 16<br>10:00<br>Day 37 | 302,253<br>1,209,012 | | | | |
| Hr 12<br>11:00<br>Day 49 | 400,281<br>1,200,843 | | | | |
| Hr 9<br>12:00<br>Day 58 | 473,802<br>1,137,125 | Removed .005" clamp all pockets at reformer. | 25 | | |
| Hr 13<br>1:00<br>Day 71 | 579,999<br>1,159,998 | | | | |
| Hr 12<br>2:00<br>Day 83 | 678,027<br>1,162,342 | | | | |
| Hr 7<br>3:00<br>Day 90 | 735,210<br>1,102,815 | Remove .005" clamp to all pockets again. Flange widths changed to short flanges .072". Audit pallets. Reset | 30 | | |
| Hr 7<br>4:00<br>Day 97 | 792,393<br>1,056,498 | flanges | 26 | | |
| Hr 12<br>5:00<br>Day 109 | 890,421<br>1,068,505 | | | | |
| Hr 13<br>6:00<br>Day 122 | 996,618<br>1,087,211 | | | | |
| Hr 13<br>7:00<br>Day 135 | 1,102,815<br>1,102,815 | | | | |
| | | | | Total HFI's | 0 |

L/C's    0

PRIVILEGE AND CONFIDENTIAL          BALL 00224

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 5/30/2013 | Crew | B | Total Line Down | 3.57 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 13<br>8:00<br>Day | 106,197<br>1,274,364 | | | | |
| Hr 14<br>9:00<br>Day 27 | 220,563<br>1,323,378 | | | | |
| Hr 12<br>10:00<br>Day 39 | 318,591<br>1,274,364 | | | | |
| Hr 12<br>11:00<br>Day 51 | 416,619<br>1,249,857 | | | | |
| Hr 14<br>12:00<br>Day 65 | 530,985<br>1,274,364 | M96A motor and gearbox being changed out, line down. | | | |
| Hr 8<br>1:00<br>Day 73 | 596,337<br>1,192,674 | | | | |
| Hr 0<br>2:00<br>Day 73 | 596,337<br>1,022,301 | Line back up at 2 AM, lost 2 hours. | 120 | | |
| Hr 5<br>3:00<br>Day 78 | 637,182<br>955,773 | Transfer jumped time, reset. | 19 | | |
| Hr 10<br>4:00<br>Day 88 | 718,872<br>958,472 | Can went through transfer drive belt, found can with teeth marks on it. | | | |
| Hr 12<br>5:00<br>Day 100 | 816,900<br>980,280 | | | | |
| Hr 10<br>6:00<br>Day 110 | 898,590<br>980,272 | Palletizer down, flight bar broken. 5:45 | | | |
| Hr 0<br>7:00<br>Day 110 | 898,590<br>898,590 | Palletizer still down at shift end... | 75 | | |
| | | | | Total HFI's | 0 |
| | | | | L/C's | 0 |

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00225**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | | Date | 5/31/2013 | Crew | A | Total Line Down | 10.37 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|---|
| L-2 | | | Budget | 1,225,000 | | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 0<br>8:00<br>Day 0 | 0 | Palletizer down at 5:50 AM for flight bar bolts broke. | 300 | | |
| Hr 0<br>9:00<br>Day 0 | 0 | Changed north east corner chain guide several sections broke out. | | | |
| Hr 0<br>10:00<br>Day 0 | 0 | Both east side flight bar bolts broke. Changed north east chain guide again and chain. Shop removed broken bolts from flight bars--none left in stock. Retimed flight bars and | 280 | | |
| Hr 0<br>11:00<br>Day 0 | 0 | installed. | | | |
| Hr 0<br>12:00<br>Day 0 | 0 | Printer up at 11: 40<br>Backed off bottom coater roll buried into can causing football | | | |
| Hr 9<br>1:00<br>Day 9 | 73,521<br>147,042 | cans.<br><br>North IC debulin box belt motor burnt up. Running 1/2 IC's | 30 | | |
| Hr 5<br>2:00<br>Day 14 | 114,366<br>196,058 | while shop/ET's change out motor.<br><br>C/O LMI bottom coater pump for low flow. | 12 | | |
| Hr 16<br>3:00<br>Day 30 | 245,070<br>367,605 | | | | |
| Hr 12<br>4:00<br>Day 42 | 343,098<br>457,453 | | | | |
| Hr 12<br>5:00<br>Day 54 | 441,126<br>529,351 | | | | |
| Hr 16<br>6:00<br>Day 70 | 571,830<br>623,809 | | | | |
| Hr 15<br>7:00<br>Day 85 | 694,365<br>694,365 | | | Total HFI's | 0 |

L/C's            0

**PRIVILEGE AND CONFIDENTIAL**            **BALL 00226**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | | Date | 5/31/2013 | Crew | B | Total Line Down | | 0.10 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | L-2 | | Budget | 1,225,000 | | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 13<br>8:00<br>Day | 106,197<br>1,274,364 | | | | |
| Hr 11<br>9:00<br>Day 24 | 196,056<br>1,176,336 | | | | |
| Hr 13<br>10:00<br>Day 37 | 302,253<br>1,209,012 | | | | |
| Hr 13<br>11:00<br>Day 50 | 408,450<br>1,225,350 | | | | |
| Hr 12<br>12:00<br>Day 62 | 506,478<br>1,215,547 | ME spikes, cleaned pin chain. | 6 | | |
| Hr 13<br>1:00<br>Day 75 | 612,675<br>1,225,350 | | | | |
| Hr 14<br>2:00<br>Day 89 | 727,041<br>1,246,366 | | | | |
| Hr 12<br>3:00<br>Day 101 | 825,069<br>1,237,604 | | | | |
| Hr 14<br>4:00<br>Day 115 | 939,435<br>1,252,549 | | | | |
| Hr 14<br>5:00<br>Day 129 | 1,053,801<br>1,264,561 | | | | |
| Hr 13<br>6:00<br>Day 142 | 1,159,998<br>1,265,442 | | | | |
| Hr 12<br>7:00<br>Day 154 | 1,258,026<br>1,258,026 | | | | |
| | | | | Total HFI's | 0 |
| | | | | L/C's | 0 |

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00227**

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 6/1/2013 | Crew | C | Total Line Down | 0.33 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 11<br>8:00<br>Day 11 | 89,859 | 2100cpm | | | |
| Hr 13<br>9:00<br>Day 24 | 196,056<br>1,176,336 | Necker down called ET.<br>Cupper 2 jammed | 20 | | |
| Hr 10<br>10:00<br>Day 34 | 277,746<br>1,110,984 | | | | |
| Hr 12<br>11:00<br>Day 46 | 375,774<br>1,127,322 | | | | |
| Hr 17<br>12:00<br>Day 63 | 514,647<br>1,235,153 | | | | |
| Hr 11<br>1:00<br>Day 74 | 604,506<br>1,209,012 | | | | |
| Hr 13<br>2:00<br>Day 87 | 710,703<br>1,218,358 | | | | |
| Hr 15<br>3:00<br>Day 102 | 833,238<br>1,249,857 | | | | |
| Hr 14<br>4:00<br>Day 116 | 947,604<br>1,263,440 | | | | |
| Hr 13<br>5:00<br>Day 129 | 1,053,801<br>1,264,561 | | | | |
| Hr 6<br>6:00<br>Day 135 | 1,102,815<br>1,203,061 | L/C Coca-Cola Zero | | | |
| Hr 11<br>7:00<br>Day 146 | 1,192,674<br>1,192,674 | | | | |
| | | | | Total HFI's | 0 |

L/C's          1

PRIVILEGE AND CONFIDENTIAL          BALL 00228

## Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | Date | 6/1/2013 | Crew | D | Total Line Down | 1.42 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|
| | L-2 | | Budget | 1,225,000 | | | | |

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 10<br>8:00<br>Day | 81,690<br>980,280 | Lost Test Can at neckers. Shut necker down, could not find the test can. Cleared line from Necker to Palletizer. Held 1 pallet plus 2 layers for Lost test can. | 15 | Lost Test Can | 1 |
| Hr 12<br>9:00<br>Day 22 | 179,718<br>1,078,308 | | | | |
| Hr 8<br>10:00<br>Day 30 | 245,070<br>980,280 | Printer went down at 9:15. Spline coupling on OV unit stripped. Pulled unit to inspect and replace coupling. Could not find an obvious issue with unit. Replaced coupling and re-installed | 45 | | |
| Hr 1<br>11:00<br>Day 31 | 253,239<br>759,717 | Printer back in auto at 10:25 | 25 | | |
| Hr 15<br>12:00<br>Day 46 | 375,774<br>901,858 | | | | |
| Hr 14<br>1:00<br>Day 60 | 490,140<br>980,280 | | | | |
| Hr 12<br>2:00<br>Day 72 | 588,168<br>1,008,296 | | | | |
| Hr 15<br>3:00<br>Day 87 | 710,703<br>1,066,055 | | | | |
| Hr 12<br>4:00<br>Day 99 | 808,731<br>1,078,281 | | | Washer Stain | 1 |
| Hr 13<br>5:00<br>Day 112 | 914,928<br>1,097,914 | | | | |
| Hr 15<br>6:00<br>Day 127 | 1,037,463<br>1,131,768 | | | | |
| Hr 12<br>7:00<br>Day 139 | 1,135,491<br>1,135,491 | HFI'd 10 previous pallets to sort for creases. | | | |
| | | | | Total HFI's | 2 |
| | | | | L/C's | 0 |

**PRIVILEGE AND CONFIDENTIAL**           **BALL 00229**

# Ball metal Corporation - MONTICELLO Plant - DAILY REPORT

| Line - 2 | | Date | 6/2/2013 | Crew | C | Total Line Down | 0.62 | Pallet Count | 8169 |
|---|---|---|---|---|---|---|---|---|---|

| Pallets Hour | Actual Potential | Down time and Comments | Time Down Minutes | Defect | Number of HFI's |
|---|---|---|---|---|---|
| Hr 12<br>8:00<br>Day 12 | 98,028 | 2100cpm<br><br>L/C Barq's Root Beer 4PK | 25 | | |
| Hr 7<br>9:00<br>Day 19 | 155,211<br>931,266 | printer maintainer shut off ductor instead of blowoff<br>sent silver bullets down line | 12 | | |
| Hr 15<br>10:00<br>Day 34 | 277,746<br>1,110,984 | | | | |
| Hr 14<br>11:00<br>Day 48 | 392,112<br>1,176,336 | | | | |
| Hr 14<br>12:00<br>Day 62 | 506,478<br>1,215,547 | | | | |
| Hr 10<br>1:00<br>Day 72 | 588,168<br>1,176,336 | L/C Coke CF DT | | | |
| Hr 9<br>2:00<br>Day 81 | 661,689<br>1,134,333 | | | | |
| Hr 14<br>3:00<br>Day 95 | 776,055<br>1,164,083 | | | | |
| Hr 14<br>4:00<br>Day 109 | 890,421<br>1,187,198 | | | | |
| Hr 12<br>5:00<br>Day 121 | 988,449<br>1,186,139 | | | | |
| Hr 14<br>6:00<br>Day 135 | 1,102,815<br>1,203,061 | | | | |
| Hr 12<br>7:00<br>Day 147 | 1,200,843<br>1,200,843 | | | | |
| | | | | Total HFI's | 0 |

L-2     Budget     1,225,000

L/C's    2

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00230**

# Exhibit 18

# SAFETY CHECK LIST

LINE  2                                    DATE    5/22/2014

## INTERNAL BAKE OVEN

### SAFETY CHECK OUT     (ITEMS WHICH CAUSE SHUT DOWN)

| ****DISABLE BLIP DETECTION**** | INITIAL: |
|---|---|
| DEPRESS RESET P.B. NEXT TO MICROLOGIX UNTIL OUTPUT (XXX) STARTS FLASHING | |

| | | | | PASSED | FAILED |
|---|---|---|---|---|---|
| LOSS OF EXTRACT AIR FLOW | FRONT | FSL 1 | CB 12 | ✓ | |
| LOSS OF EXTRACT AIR FLOW | REAR | FSL 2 | CB 13 | ✓ | |
| LOSS OF RECIRC AIR | FAN 1 | PSL 1-1 | CB 1 | ✓ | |
| LOSS OF RECIRC AIR | FAN 2-1 | PSL 2-1 | CB 2 | ✓ | |
| LOSS OF RECIRC AIR | FAN 2-2 | PSL 2-2 | CB 3 | ✓ | |
| LOSS OF RECIRC AIR | FAN 3-1 | PSL 3-1 | CB 4 | ✓ | |
| LOSS OF RECIRC AIR | FAN 3-2 | PSL 3-2 | CB 5 | ✓ | |
| LOSS OF RECIRC AIR | FAN 4-1 | PSL 4-1 | CB 6 | ✓ | |
| LOSS OF RECIRC AIR | FAN 4-2 | PSL 4-2 | CB 7 | ✓ | |
| LOSS OF BURNER BLOWER AIR PRESSURE IN ZONE 1 | | | CB 8 | ✓ | |
| SS OF BURNER BLOWER AIR PRESSURE IN ZONE 2 | | | CB 9 | ✓ | |
| LOSS OF BURNER BLOWER AIR PRESSURE IN ZONE 3 | | | CB 10 | ✓ | |
| LOSS OF BURNER BLOWER AIR PRESSURE IN ZONE 4 | | | CB 11 | ✓ | |
| LOSS OF FLAME  (SHOULD ALSO STOP MAT)  CHECK ALL BURNERS | | | | ✓ | |
| HIGH TEMPERATURE ALARM    CHECK ALL ZONES | | | | ✓ | |
| LOSS OF GAS PRESSURE IN ALL ZONES | | | | ✓ | |

| RECORD MICROAMPS FROM FLAME MODULES | ZONE 1 | ZONE 2 | ZONE 3 | ZONE 4 |
|---|---|---|---|---|
| WHILE IN LOW FIRE (SHOULD BE 1.5 OR HIGHER) | | | | |

| ****ENABLE BLIP DETECTION**** | INITIAL: |
|---|---|
| DEPRESS RESET P.B. NEXT TO MICROLOGIX UNTIL OUTPUT (XXX) STOPS FLASHING | |

### RUN MODE  (FAULTS WHICH STOP THE MAIN MAT )

| | | |
|---|---|---|
| LOW TEMPERATURE ALARM | | |
| SHEAR PIN SENSOR | | |
| MAT WONDER SENSORS | | |

COMMENTS:

ET: _____

Prepared by Monticello ET Shop

CONFIDENTIAL                                    RIMKUS000012

# Exhibit 19

**AIR TECH, INC.**

# Invoice

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

| Date | Invoice # |
|------|-----------|
| 11/30/2009 | 13223 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 92016821OC | Due on receipt | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF LINE 1 PIN OVEN ON 11/27/09 | 6,766.25 | 6,766.25 |
| | CLEANING COMPLETION OF LINE 1 IBO OVEN ON 11/27/09 | 7,733.75 | 7,733.75 |
| | | | |
| | THANK YOU | | |

0035

| | | |
|---|---|---|
| Please remit to the address above within 30 days. A 2% monthly interest fee will be charged over 30 | **Total** | $14,500.00 |

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/5/2010 | 13239 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 92017291OC | Due on receipt | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF LINE 3 PIN OVEN | 6,766.25 | 6,766.25 |
| | CLEANING COMPLETION OF LINE 3 IBO OVEN | 7,733.75 | 7,733.75 |
| | INSPECTION/CLEANING COMPLETION OF LINE 5 | 4,000.00 | 4,000.00 |
| | THANK YOU | | |

0036

| Please remit to the address above within 30 days. A 2% monthly interest fee will be charged over 30 | **Total** | $18,500.00 |
|---|---|---|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/15/2010 | 13324 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 92018340 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF PIN OVEN 2 ON 04/13/10. | 6,766.25 | 6,766.25 |
| | CLEANING COMPLETION OF IBO #2 ON 04/13/10 | 7,733.75 | 7,733.75 |
| | CLEANING COMPLETION OF BRIQUETTER CYCLONE ON 04/13/10 | 6,900.00 | 6,900.00 |
| | THANK YOU | | |

0037

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $21,400.00 |
|-----------|------------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/26/2010 | 13466 |

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 92018909 | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE OXIDIZER DUCTS EXHAUST AND FIRE BOXES ON 08/10/10. <br><br> THANK YOU | 7,625.00 | 7,625.00 |

0038

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $7,625.00 |
|-----------|-----------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/4/2010 | 13535 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 92020947 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF PIN OVEN 3 ON 11/03/10. | 6,766.25 | 6,766.25 |
| | CLEANING COMPLETION OF IBO OVEN 3 ON 11/03/10 | 7,733.75 | 7,733.75 |
| | THANK YOU | | |

0039

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| Total | $14,500.00 |
|-------|-----------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 12/2/2010 | 13572 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 92021264 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF LINE 2 PIN OVEN, LINE ON PIN OVEN AND LINE ON IBO ON 12/02/10.<br><br>THANK YOU | 23,300.00 | 23,300.00 |

0040

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | **$23,300.00** |
|-----------|----------------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/3/2011 | 13650 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 92022379 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE LINE 3 IBO'S AND PIN OVENS ON 03/02/11.<br><br>THANK YOU | 14,500.00 | 14,500.00 |

0041

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | **$14,500.00** |
|-----------|----------------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/8/2011 | 13787 |

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 92024343 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE RTO DURING THE ANNUAL MAINTENANCE ON 08/02/11 AT THE 501 NORTH SIXTH STREET MONTICELLO, IN 47960 FACILITY.<br><br>THANK YOU | 7,725.00 | 7,725.00 |

0042

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | **$7,725.00** |
|-----------|---------------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/13/2011 | 13819 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10008465OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF LINE 4 AT THE MONTICELLO FACILITY ON 09/06/11.<br><br>THANK YOU | 12,350.00 | 12,350.00 |

0043

| | | |
|---|---|---|
| Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days | **Total** | $12,350.00 |

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/20/2011 | 13832 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10009869 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF LINE 1 PIN OVEN ON 09/20/11 | 6,766.25 | 6,766.25 |
| | CLEANING COMPLETION OF LINE 1 IBO ON 09/20/11 | 7,733.75 | 7,733.75 |
| | THANK YOU | | |

0044

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| Total | $14,500.00 |
|-------|-----------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 10/24/2011 | 13868 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10014399 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF PIN OVEN #2 AT THE MONTICELLO FACILITY ON 10/03/11. | 6,766.25 | 6,766.25 |
| | CLEANING COMPLETION OF IBO OVEN #2 AT THE MONTICELLO FACILITY ON 10/03/11. | 7,733.75 | 7,733.75 |
| | THANK YOU | | |

0045

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| Total | $14,500.00 |
|-------|------------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/28/2011 | 13897 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10018691 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE RTO ON 11/25/11. | 21,425.00 | 21,425.00 |
| | CLEANING COMPLETION OF PARTIAL CYCLONE ON 11/25/11. | 3,200.00 | 3,200.00 |
| | THANK YOU | | |

0046

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | **$24,625.00** |

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/23/2012 | 14057 |

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10037485 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF L3 PIN OVEN ZONE 1 AT THE MONTICELLO FACILITY ON 04/19/12 | 3,300.00 | 3,300.00 |
| | CLEANING COMPLETION OF IBO3 ZONE 1 AND 2 AT THE MONTICELLO FACILITY ON 04/19/12. | 4,500.00 | 4,500.00 |
| | THANK YOU | | |

0047

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | **$7,800.00** |
|-----------|---------------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 5/11/2012 | 14070 |

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10040055 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE PIN OVEN AT THE MONTICELLO FACILITY ON 05/09/12 | 4,900.00 | 4,900.00 |
| | CLEANING COMPLETION OF THE IBO OVEN AT THE MONTICELLO FACILITY ON 05/09/12. | 4,400.00 | 4,400.00 |
| | THANK YOU | | |

0048

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| Total | $9,300.00 |
|-------|-----------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 6/25/2012 | 14104 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10046577 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF PIN OVEN #2 AT THE MONTICELLO FACILITY ON 06/21/12 | 7,140.00 | 7,140.00 |
| | CLEANING COMPLETION OF IBO 2, ZONE 1 & 2 AT THE MONTICELLO FACILITY ON 06/21/21 | 5,700.00 | 5,700.00 |

0049

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| Total | $12,840.00 |
|-------|-----------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/7/2012 | 14170 |

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10052744 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE LINE 5 PIN OVEN AT THE MONTICELLO FACILITY ON 09/06/12<br><br>THANK YOU | 4,250.00 | 4,250.00 |

0050

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $4,250.00 |
|-----------|-----------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 9/7/2012 | 14171 |

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10057590 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE OXIDIZER DUCT AT THE MONTICELLO FACILITY ON 09/06/12.  THANK YOU | 8,250.00 | 8,250.00 |

0051

| Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days | **Total** | $8,250.00 |
|---|---|---|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 10/8/2012 | 14203 |

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10057898 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE L-3 IBO OVEN AT THE MONTICELLO FACILITY ON 10/03/12. | 7,950.00 | 7,950.00 |
| | CLEANING COMPLETION OF THE L-3 PIN OVEN AT THE MONTICELLO FACILITY ON 10/03/12. | 6,950.00 | 6,950.00 |
| | THANK YOU | | |

0052

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $14,900.00 |

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/5/2012 | 14249 |

**PAID**
**01/15/2013**

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10062148 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE L-2 PIN OVEN AT THE MONTICELLO, INDIANA FACILITY ON 11/05/12.<br><br>THANK YOU | 6,950.00 | 6,950.00 |

0053

| Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days | **Total** | $6,950.00 |
|---|---|---|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/16/2013 | 14313 |

**PAID**
**04/01/2013**

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10069001 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF LINE 4 IBO AT THE MONTICELLO FACILITY ON 01/07/13.<br>THANK YOU | 7,900.00 | 7,900.00 |

0054

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $7,900.00 |
|-----------|-----------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/7/2013 | 14345 |

**PAID**
**05/15/2013**

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10073288 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF IBO # 3 AT THE MONTICELLO FACILITY ON 03/05/13 | 7,950.00 | 7,950.00 |
| | THANK YOU | | |

0055

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | **$7,950.00** |
|-----------|---------------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/5/2013 | 14366 |

**PAID**
06/17/2013

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10079873 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | EMERGENCY CLEANING COMPLETION OF THE RTO INLET DAMPERS AT THE MONTICELLO FACILITY ON 04/03/13.<br><br>THANK YOU | 2,000.00 | 2,000.00 |

0056

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $2,000.00 |
|-----------|-----------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/26/2013 | 14393 |

**PAID 07/01/2013**

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10082358 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION (2) BAGHOUSES STARCH COLLECTORS AT THE MONTICELLO FACILITY ON 04/25/13.<br><br>THANK YOU | 4,000.00 | 4,000.00 |

0057

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | **$4,000.00** |
|-----------|---------------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 5/2/2013 | 14402 |

**PAID**
**07/15/2013**

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10082784 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF PIN OVENS 1 & 2 AT THE MONTICELLO INDIANA FACILITY ON 04/30/13.<br><br>THANK YOU | 12,900.00 | 12,900.00 |

0058

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $12,900.00 |
|-----------|------------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 8/7/2013 | 14511 |

**PAID**
**10/15/2013**

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10092199 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE OXIDIZER AT THE MONTICELLO FACILITY ON 08/07/13.  THANK YOU | 7,225.00 | 7,225.00 |

0059

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $7,225.00 |
|-----------|-----------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 11/30/2013 | 14638 |

**PAID**
01/31/2014

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10104479 | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF IBO #3 AT THE BALL MONTICELLO FACILITY ON 11/30/13. | 8,100.00 | 8,100.00 |
| | CLEANING COMPLETION OF THE #3 OVEN EXHAUST AT THE BALL MONTICELLO FACILITY ON 11/30/13. | 21,400.00 | 21,400.00 |
| | THANK YOU | | |

0060

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $29,500.00 |
|-----------|-----------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 12/16/2013 | 14662 |

**PAID**
**02/26/2014**

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10107003 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE 41/42 PIN OVEN AT THE MONTICELLO FACILITY ON 12/10/13. | 9,900.00 | 9,900.00 |
| | CLEANING COMPLETION OF LINE 4 IBO AT THE MONTICELLO FACILITY ON 12/10/13 | 6,950.00 | 6,950.00 |
| | THANK YOU | | |

0061

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $16,850.00 |
|-----------|-----------|

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 12/18/2013 | 14669 |

**PAID**
02/28/2014

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10108098 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF THE LINE 3 PIN OVEN AT THE MONTICELLO FACILITY ON 13/18/13.<br><br>THANK YOU | 7,250.00 | 7,250.00 |

0062

| | |
|---|---|
| Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days | **Total** $7,250.00 |

**AIR TECH, INC.**

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/29/2014 | 14694 |

PAID
03/31/2014

| Bill To |
|---------|
| BALL METAL BEVERAGE CONTAINER CORP.<br>ATTN: ACCOUNTS PAYABLE<br>P O BOX 589<br>BROOMFIELD, CO 80038-0589 |

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10110927 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF LINE 1 AND 2 PIN OVEN AT THE MONTICELLO FACILITY ON 01/27/14 & 01/28/14.<br><br>THANK YOU | 13,750.00 | 13,750.00 |

0063

| Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days | **Total** | **$13,750.00** |
|---|---|---|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 1/29/2014 | 14695 |

**PAID**
**03/31/2014**

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10111020 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF LINE 1 AND 2 IBO AT THE MONTICELLO FACILITY ON 01/27/14 & 01/28/14.<br><br>THANK YOU | 16,200.00 | 16,200.00 |

0064

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| Total | $16,200.00 |
|-------|-----------|

AIR TECH, INC.

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/7/2014 | 14739 |

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10118807 | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF (1) STARCH SILO AT THE MONTICELLO FACILITY ON 03/28/14. | 2,500.00 | 2,500.00 |
| | THANK YOU | | |

0065

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| Total | $2,500.00 |
|-------|-----------|

AIR TECH, INC.

# Invoice

4152 FILLMORE RD.
HOLLAND, MI 49423
616-396-0244

| Date | Invoice # |
|------|-----------|
| 5/22/2014 | 14791 |

**Bill To**

BALL METAL BEVERAGE CONTAINER CORP.
ATTN: ACCOUNTS PAYABLE
P O BOX 589
BROOMFIELD, CO 80038-0589

| P.O. No. | Terms | Project |
|----------|-------|---------|
| 10124913 OC | Net 60 | |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | CLEANING COMPLETION OF LINE 2 IBO AND PIN AT THE MONTICELLO FACILITY ON 05/22/14.  THANK YOU | 15,300.00 | 15,300.00 |

0066

Please remit to above address within 60 days. A 1.5% monthly service fee will be charged over 60 days

| **Total** | $15,300.00 |
|-----------|-----------|

**\*\*\* CHANGE ORDER - OPEN ITEMS ONLY \*\*\***

**Ball Corporation**
BALL METAL BEVERAGE CONTAINER CORP .

| | |
|---|---|
| Page: | Page 1 of 4 |
| Date: | 5/27/2014 |
| Order No.: | 10104479 OC |
| Revision: | 1 |
| Brn/Plt: | 192 |

9047775

Phone: (800) 968-0247
Fax:  (616) 396-2847

SHIP TO   **BALL METAL BEVERAGE CONTAINER CORP**
501 North Sixth Street
Monticello INDIANA 47960

Attn CUSTOMER SERVICE
**AIR TECH INC**
4152 FILLMORE ROAD
HOLLAND MICHIGAN 49423-8538

Direct Pay Permit # 0101041306-001 Effective 4/4/2011

REMIT INVOICE TO   **BALL METAL BEVERAGE CONTAINER CORP**
ATTN ACCOUNTS PAYABLE
PO BOX 589
BROOMFIELD CO 80038-0589

OR FAX INVOICE TO (303) 736-4212
OR email inv pkgapmonticello@ball.com

---

Ordered:  **11/14/2013** Freight:  NOT APPLICABLE TO THIS ORDER

Due on Site: 11/29/2013 Taken By:

Delivery: SERVICE ORDER

Buyer:  GEORGETTE I KRINTZ

Buyer Email  GKRINTZ@BALL.COM

Exchange Rate:

Buyer's Phone: (574) 583-9418

Buyer's Fax:  (574) 583-7734

Purchase Order Currency:  USD

DRAFT/COPY
_____
Buyer's Signature

CERTIFICATE OF INSURANCE: DATE OF EXPIRATION _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CONFIRMING ORDER ONLY!!

DO NOT DUPLICATE THIS ORDER!

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

   NOTE: INVOICES WILL NOT BE PAID WITHOUT REFERENCE TO BALL'S PURCHASE ORDER NUMBER!

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

USE: OVEN & DUCT CLEANINGS FOR 11/29/2013

REQUESTOR: FREDDY

CC:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

   CONSIDERATION AND PAYMENT:

   NOTE: ALL PROGRESSIVE AND/OR PARTIAL PAYMENT INVOICES SHALL BE DONE BY PURCHASE ORDER LINE ITEM.

   LUMP-SUM INVOICES FOR MULTIPLE LINE ITEM PURCHASE ORDERS WILL NOT BE ACCEPTED.

   COSTS FOR ADDITIONAL WORK OR OUT OF SCOPE WORK ARE SUBJECT TO BALL'S REVIEW AND APPROVAL.

   ALL ADDITIONAL CHANGES TO THIS ORDER MUST BE APPROVED BY A WRITTEN CHANGE ORDER TO THIS ORDER.

---

THE COMPLETE PURCHASE ORDER NUMBER, INCLUDING ALPHA CHARACTERS, AND BALL PART NUMBERS MUST APPEAR ON ALL INVOICES, BILLS OF LADING, PACKING SLIPS, AND RELATED CORRESPONDENCE.

SUBJECT TO BALL'S TERMS AND CONDITIONS WHICH APPEAR AS AN ATTACHMENT TO THIS DOCUMENT.
SELLER'S COMMENCEMENT OF WORK ON THE GOODS SUBJECT TO THIS PURCHASE ORDER OR THE SHIPMENT OF GOODS, WHICHEVER OCCURS FIRST, OR THE COMMENCEMENT OF PERFORMANCE OF THE SERVICES REQUESTED BY THIS ORDER, SHALL BE DEEMED AN EFFECTIVE MODE OF ACCEPTANCE OF BUYER'S OFFER CONTAINED IN THIS ORDER.

This order, including the attached T&Cs, may be changed or amended only by a written document signed by the Buyer whose name and signature appear above. Ball Corporation and Ball Packaging, LLC act from time to time as purchasing agents for Ball Corporation and its affiliates; Ball Metal Beverage Container Corp., Ball Metal Food Container LLC, Ball Metal Food Container (Oakdale), LLC, Ball Packaging Products Canada, Inc., and Ball Aerosol and Specialty Container Inc.

**PRIVILEGE AND CONFIDENTIAL**   **BALL 00139**

Seller: _____   Seller acknowledges and accepts this order including terms attached, and will ship as indicated above.



*** CHANGE ORDER - OPEN ITEMS ONLY ***

**Ball Corporation**
**BALL METAL BEVERAGE CONTAINER CORP**

| | |
|---|---|
| Page: | Page 2 of 4 |
| Date: | 5/27/2014 |
| Order No.: | 10104479 OC |
| Revision: | 1 |
| Brn/Plt: | 192 |

*******************************************

LAWFUL WORK STATUS:

CONTRACTOR REPRESENTS AND WARRANTS TO BALL THAT ALL INDIVIDUALS WHO CONTRACTOR ASSIGNS TO PERFORM WORK ON THE PROJECT WILL BE EITHER UNITED STATES CITIZENS OR ALIENS WHO MAY LAWFULLY BE EMPLOYED IN THE UNITED STATES. CONTRACTOR FURTHER REPRESENTS AND WARRANTS THAT IT SHALL FULLY COMPLY WITH ALL RELEVANT REQUIREMENTS OF STATE AND FEDERAL LAW REGARDING LAWFUL EMPLOYMENT IN THE UNITED STATES, INCLUDING BUT NOT LIMITED TO, THE U.S. IMMIGRATION REFORM AND CONTROL ACT, AS AMENDED, AND REGULATIONS PROMULGATED THEREUNDER. CONTRACTOR SHALL COMPLY WITH ALL REQUIREMENTS REGARDING VERIFICATION OF THE IDENTITY AND WORK AUTHORIZATION OF ALL INDIVIDUALS ASSIGNED TO THIS PROJECT, COMPLETION OF APPROPRIATE FORM I-9 DOCUMENTATION, AND COMPLIANCE WITH RECORD KEEPING REQUIREMENTS. CONTRACTOR SHALL INCLUDE THIS PROVISION IN ALL AGREEMENTS BETWEEN CONTRACTOR AND ANY SUBCONTRACTOR OR COMPANY PERFORMING WORK FOR CONTRACTOR ON THE PROJECT. UPON REQUEST CONTRACTOR SHALL PROVIDE BALL WITH COPIES OF ALL RECORDS DOCUMENTING ITS COMPLIANCE WITH THIS PARAGRAPH AND SHALL FULLY INDEMNIFY BALL FROM AND AGAINST ALL LIABILITIES, DAMAGES, FINES AND OTHERS LOSSES, INCLUDING, BUT NOT LIMITED TO, COSTS AND ATTORNEYS' FEES, THAT BALL MAY INCUR AS A RESULT OF CONTRACTOR'S BREACH OF THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS PARAGRAPH.

*******************************************

CERTIFICATES OF INSURANCE:

CONTRACTOR SHALL MAINTAIN INSURANCE COVERAGE NAMING "BALL CORPORATION AND ALL SUBSIDIARIES OF THE CORPORATION" AS ADDITIONAL INSUREDS AND CERTIFICATE HOLDER TO THE GENERAL LIABILITY POLICY AS DESCRIBED IN PARAGRAPH 6.0 OF BALL'S GENERAL PROVISIONS (COPY ATTACHED). A CURRENT INSURANCE CERTIFICATE SHALL BE DELIVERED TO BALL CORPORATION VIA FAX (303) 460-5170, PRIOR TO START OF WORK.

*******************************************

BALL'S TECHNICAL REPRESENTATIVE IS: FREDDY SPENCER

*******************************************

THE REPRESENTATIVE MUST BE CONTACTED PRIOR TO STARTING THIS WORK AND DURING THE PROJECT FOR ALLTECHNICAL DIRECTION REQUIRED. THE REPRESENTATIVE WILL BE REQUIRED TO MAKE A FINAL INSPECTION PRIOR TO PROCESSING OF THE FINAL PAYMENT. ALL CORRESPONDENCE AND TECHNICAL DATA SHOULD BE DIRECTED TO THE BUYER, WHO IS THE CONTRACT ADMINISTRATOR FOR THIS ORDER.

*******************************************

NOTE: SUPPLIER'S INVOICE MUST SHOW LABOR AND MATERIAL AS SEPARATE LINE ITEMS FOR TAX PURPOSES. TAXES ARE NOT INCLUDED IN THIS PURCHASE ORDER.

*******************************************

INVOICES TO BE APPROVED BY: FREDDY SPENCER

*******************************************

ATTACHMENTS: THESE ATTACHMENTS BECOME PART OF THIS ORDER BY THIS REFERENCE.
* BALL'S GENERAL PROVISIONS DATED 07/29/2008
* BALL'S GENERAL WORK RULES (REV. 8), DATED OCTOBER 18, 2012

*******************************************

SPECIAL NOTICE:

SUBJECT TO BALL'S TERMS AND CONDITIONS WHICH APPEAR AS AN ATTACHMENT TO THIS DOCUMENT.

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00140**



**Ball Corporation**
**BALL METAL BEVERAGE CONTAINER CORP**

*** CHANGE ORDER - OPEN ITEMS ONLY ***

| Page: | Page 3 of 4 |
|---|---|
| Date: | 5/27/2014 |
| Order No.: | 10104479 OC |
| Revision: | 1 |
| Brn/Plt: | 192 |

BALL CORPORATION MAY AT ANY TIME DURING THIS ORDER OFFER TO THE CONTRACTOR ADDITIONAL WORK WHICH IS OUT OF THE SCOPE OF THE ORIGINAL WORK. THIS ADDITIONAL WORK SHALL NOT BE MANDATORY, AND MAY BE ACCEPTED OR REFUSED BY THE CONTRACTOR.

IF ACCEPTED, THIS ADDITIONAL WORK WILL BE COVERED BY A WRITTEN WORK ORDER, WHICH WILL REFERENCE THIS PURCHASE ORDER AND BECOME A REVISION TO THIS ORDER. IT IS UNDERSTOOD BY THE CONTRACTOR THAT THIS ADDITIONAL WORK, IF ACCEPTED, WILL NOT ADVERSELY IMPACT THE SCHEDULE NOR THE COST OF THE ORIGINAL SCOPE OF WORK. FURTHERMORE, THE ADDITIONAL WORK SHALL NOT BE GROUNDS FOR ADDITIONAL CHARGES OF ANY TYPE TO THE ORIGINAL SCOPE OF WORK BEYOND THE FEE AGREED UPON FOR THE INDIVIDUAL WORK ORDERS.

*************************************************

AIR POLLUTION REGULATIONS:
IT IS THE CONTRACTOR'S RESPONSIBILITY TO COMPLY WITH ALL FEDERAL, STATE, AND LOCAL REQUIREMENTS WHEN USING ARCHITECTURAL COATINGS (I.e. PAINTS, CLEANERS, SOAPS, ETC.) ON BALL PROPERTIES. COMPLIANCE CONSIDERATIONS INCLUDE VOLATILE ORGANIC COMPOUND CONTENT LIMITATIONS, VOLUME/ QUANTITY LIMITATIONS, AND APPLICATION METHODOLOGY RESTRICTIONS, NOT ALL INCLUSIVE.

*************************************************

BEFORE STARTING WORK:
THE FACILITY MANAGER, ENGINEERING MANAGER, OR DELEGATE MUST PROVIDE CONTRACTOR ORIENTATION BEFORE ANY WORK CAN BEGIN AT THE FACILITY. ALL SUBCONTRACTORS ARE REQUIRED TO RECEIVE ORIENTATION FROM THE CONTRACTOR PRIOR TO STARTING ANY WORK AND WRITTEN DOCUMENTATION OF THIS ORIENTATION MUST BE SUBMITTED TO BALL BY CONTRACTOR PRIOR TO WORK BEGINNING.

*************************************************

CONFIRMING ORDER ONLY!!
DO NOT DUPLICATE THIS ORDER!!

*************************************************

NOTE: INVOICES WILL NOT BE PAID WITHOUT REFERENCE TO BALL'S PURCHASE ORDER NUMBER!

*************************************************

REQUISITION NAME: Oven & duct cleanings for 11/29/13

*************************************************

REQUESTOR: Freddy

CC:

*************************************************

SUPPLIER CONTACT NAME : Paul Sholten

SUPPLIER CONTACT INFORMATION:

*************************************************

INVOICES APPROVAL:Freddy

DELIVER TO:

Cleaning of oven ducting, L-3 IBO & baler cyclone (Per quote)

SUBJECT TO BALL'S TERMS AND CONDITIONS WHICH APPEAR AS AN ATTACHMENT TO THIS DOCUMENT.

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00141**

*** CHANGE ORDER - OPEN ITEMS ONLY ***

**Ball Corporation**
BALL METAL BEVERAGE CONTAINER CORP

| | |
|---|---|
| Page: | Page 4 of 4 |
| Date: | 5/27/2014 |
| Order No.: | 10104479 OC |
| Revision: | 1 |
| Brn/Plt: | 192 |

Scheduled for 11/29/13

See Freddy for start times

closed order on 12/31/2013 this service was cancelled

| Line | Description | Qty Ordered | UOM | Unit Price | Extended Price | Due on Site | Rev | Tax |
|---|---|---|---|---|---|---|---|---|
| **1.** | | | EA | .0000 | 21,400.00 | 11/29/2013 | 0 | |
| Duct cleanings | | | | | | | | |
| ACCT# | 192100.617310.305 | | | | | | | |
| **3.** | | | EA | .0000 | 8,100.00 | 11/29/2013 | 0 | |
| Clean L3 IBO | | | | | | | | |
| ACCT# | 192100.617310.120 | | | | | | | |

| | | Sales Tax | Total Order |
|---|---|---|---|
| Terms: 1-15 Due15/16-31 Due 31 2nd Mo | Tax Rate: *NA* | .00 | 29,500.00 |

SUBJECT TO BALL'S TERMS AND CONDITIONS WHICH APPEAR AS AN ATTACHMENT TO THIS DOCUMENT.

## PRIVILEGE AND CONFIDENTIAL                    BALL 00142

**Ball Corporation**
**BALL METAL BEVERAGE CONTAINER CORP**

*** CHANGE ORDER - OPEN ITEMS ONLY ***

| | |
|---|---|
| Page: | Page 1 of 4 |
| Date: | 5/27/2014 |
| Order No.: | 10111020 OC |
| Revision: | 1 |
| Brn/Plt: | 192 |

9047775

Phone: (800) 968-0247
Fax: (616) 396-2847

SHIP TO
BALL METAL BEVERAGE CONTAINER CORP
501 North Sixth Street
Monticello INDIANA 47960

Attn CUSTOMER SERVICE
AIR TECH INC
4152 FILLMORE ROAD
HOLLAND MICHIGAN 49423-8538

Direct Pay Permit # 0101041306-001  Effective 4/4/2011

REMIT INVOICE TO
BALL METAL BEVERAGE CONTAINER CORP
ATTN ACCOUNTS PAYABLE
PO BOX 589
BROOMFIELD CO 80038-0589

OR FAX INVOICE TO (303) 736-4212
OR email inv pkgapmonticello@ball.com

Ordered: 1/17/2014  Freight:  NOT APPLICABLE TO THIS ORDER        Purchase Order Currency:  USD
Due on Site: 1/27/2014  Taken By:             Exchange Rate:
Delivery:  SERVICE ORDER
Buyer:  GEORGETTE I KRINTZ       Buyer's Phone: (574) 583-9418        DRAFT/COPY
Buyer Email  GKRINTZ@BALL.COM    Buyer's Fax:   (574) 583-7734      _____
                                                                     Buyer's Signature

CERTIFICATE OF INSURANCE: DATE OF EXPIRATION _____

*********************************************

CONFIRMING ORDER ONLY!!

DO NOT DUPLICATE THIS ORDER!

*********************************************

NOTE: INVOICES WILL NOT BE PAID WITHOUT REFERENCE TO BALL'S PURCHASE ORDER NUMBER!

*********************************************

USE: LINE 1 & 2 IBO CLEANING

REQUESTOR: DALE SPENCER

CC:

*********************************************

CONSIDERATION AND PAYMENT:

NOTE: ALL PROGRESSIVE AND/OR PARTIAL PAYMENT INVOICES SHALL BE DONE BY PURCHASE ORDER LINE ITEM.

LUMP-SUM INVOICES FOR MULTIPLE LINE ITEM PURCHASE ORDERS WILL NOT BE ACCEPTED.

COSTS FOR ADDITIONAL WORK OR OUT OF SCOPE WORK ARE SUBJECT TO BALL'S REVIEW AND APPROVAL.

ALL ADDITIONAL CHANGES TO THIS ORDER MUST BE APPROVED BY A WRITTEN CHANGE ORDER TO THIS ORDER.

THE COMPLETE PURCHASE ORDER NUMBER, INCLUDING ALPHA CHARACTERS, AND BALL PART NUMBERS MUST APPEAR ON ALL INVOICES, BILLS OF LADING, PACKING SLIPS, AND RELATED CORRESPONDENCE.

SUBJECT TO BALL'S TERMS AND CONDITIONS WHICH APPEAR AS AN ATTACHMENT TO THIS DOCUMENT. SELLER'S COMMENCEMENT OF WORK ON THE GOODS SUBJECT TO THIS PURCHASE ORDER OR THE SHIPMENT OF GOODS, WHICHEVER OCCURS FIRST, OR THE COMMENCEMENT OF PERFORMANCE OF THE SERVICES REQUESTED BY THIS ORDER, SHALL BE DEEMED AN EFFECTIVE MODE OF ACCEPTANCE OF BUYER'S OFFER CONTAINED IN THIS ORDER.

This order, including the attached T&Cs, may be changed or amended only by a written document signed by the Buyer whose name and signature appear above. Ball Corporation and Ball Packaging, LLC act from time to time as purchasing agents for Ball Corporation and its affiliates; Ball Metal Beverage Container Corp., Ball Metal Food Container LLC, Ball Metal Food Container (Oakdale), LLC, Ball Packaging Products Canada, Inc., and Ball Aerosol and Specialty Container Inc.

Seller:

**PRIVILEGE AND CONFIDENTIAL**    **BALL 00136**
Seller acknowledges and accepts this Order including terms attached, and will ship as indicated above.

*** CHANGE ORDER - OPEN ITEMS ONLY ***

**Ball Corporation**
**BALL METAL BEVERAGE CONTAINER CORP**

| | |
|---|---|
| Page: | Page 2 of 4 |
| Date: | 5/27/2014 |
| Order No.: | 10111020 OC |
| Revision: | 1 |
| Brn/Plt: | 192 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LAWFUL WORK STATUS:

CONTRACTOR REPRESENTS AND WARRANTS TO BALL THAT ALL INDIVIDUALS WHO CONTRACTOR ASSIGNS TO PERFORM WORK ON THE PROJECT WILL BE EITHER UNITED STATES CITIZENS OR ALIENS WHO MAY LAWFULLY BE EMPLOYED IN THE UNITED STATES. CONTRACTOR FURTHER REPRESENTS AND WARRANTS THAT IT SHALL FULLY COMPLY WITH ALL RELEVANT REQUIREMENTS OF STATE AND FEDERAL LAW REGARDING LAWFUL EMPLOYMENT IN THE UNITED STATES, INCLUDING BUT NOT LIMITED TO, THE U.S. IMMIGRATION REFORM AND CONTROL ACT, AS AMENDED, AND REGULATIONS PROMULGATED THEREUNDER. CONTRACTOR SHALL COMPLY WITH ALL REQUIREMENTS REGARDING VERIFICATION OF THE IDENTITY AND WORK AUTHORIZATION OF ALL INDIVIDUALS ASSIGNED TO THIS PROJECT, COMPLETION OF APPROPRIATE FORM I-9 DOCUMENTATION, AND COMPLIANCE WITH RECORD KEEPING REQUIREMENTS. CONTRACTOR SHALL INCLUDE THIS PROVISION IN ALL AGREEMENTS BETWEEN CONTRACTOR AND ANY SUBCONTRACTOR OR COMPANY PERFORMING WORK FOR CONTRACTOR ON THE PROJECT. UPON REQUEST CONTRACTOR SHALL PROVIDE BALL WITH COPIES OF ALL RECORDS DOCUMENTING ITS COMPLIANCE WITH THIS PARAGRAPH AND SHALL FULLY INDEMNIFY BALL FROM AND AGAINST ALL LIABILITIES, DAMAGES, FINES AND OTHERS LOSSES, INCLUDING, BUT NOT LIMITED TO, COSTS AND ATTORNEYS' FEES, THAT BALL MAY INCUR AS A RESULT OF CONTRACTOR'S BREACH OF THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS PARAGRAPH.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

CERTIFICATES OF INSURANCE:

CONTRACTOR SHALL MAINTAIN INSURANCE COVERAGE NAMING "BALL CORPORATION AND ALL SUBSIDIARIES OF THE CORPORATION" AS ADDITIONAL INSUREDS AND CERTIFICATE HOLDER TO THE GENERAL LIABILITY POLICY AS DESCRIBED IN PARAGRAPH 6.0 OF BALL'S GENERAL PROVISIONS (COPY ATTACHED). A CURRENT INSURANCE CERTIFICATE SHALL BE DELIVERED TO BALL CORPORATION VIA FAX (303) 460-5170, PRIOR TO START OF WORK.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BALL'S TECHNICAL REPRESENTATIVE IS: FREDDY SPENCER

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THE REPRESENTATIVE MUST BE CONTACTED PRIOR TO STARTING THIS WORK AND DURING THE PROJECT FOR ALL TECHNICAL DIRECTION REQUIRED. THE REPRESENTATIVE WILL BE REQUIRED TO MAKE A FINAL INSPECTION PRIOR TO PROCESSING OF THE FINAL PAYMENT. ALL CORRESPONDENCE AND TECHNICAL DATA SHOULD BE DIRECTED TO THE BUYER, WHO IS THE CONTRACT ADMINISTRATOR FOR THIS ORDER.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

NOTE: SUPPLIER'S INVOICE MUST SHOW LABOR AND MATERIAL AS SEPARATE LINE ITEMS FOR TAX PURPOSES. TAXES ARE NOT INCLUDED IN THIS PURCHASE ORDER.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INVOICES TO BE APPROVED BY: FREDDY SPENCER

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ATTACHMENTS: THESE ATTACHMENTS BECOME PART OF THIS ORDER BY THIS REFERENCE.

* BALL'S GENERAL PROVISIONS DATED 07/29/2008
* BALL'S GENERAL WORK RULES (REV. 8), DATED OCTOBER 18, 2012

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SPECIAL NOTICE:

---

SUBJECT TO BALL'S TERMS AND CONDITIONS WHICH APPEAR AS AN ATTACHMENT TO THIS DOCUMENT.

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00137**



**Ball Corporation**
**BALL METAL BEVERAGE CONTAINER CORP**

*** CHANGE ORDER - OPEN ITEMS ONLY ***

| Page: | Page 3 of 4 |
| Date: | 5/27/2014 |
| **Order No.:** | **10111020 OC** |
| Revision: | 1 |
| Brn/Plt: | 192 |

BALL CORPORATION MAY AT ANY TIME DURING THIS ORDER OFFER TO THE CONTRACTOR ADDITIONAL
WORK WHICH IS OUT OF THE SCOPE OF THE ORIGINAL WORK. THIS ADDITIONAL WORK SHALL NOT BE
MANDATORY, AND MAY BE ACCEPTED OR REFUSED BY THE CONTRACTOR.

IF ACCEPTED, THIS ADDITIONAL WORK WILL BE COVERED BY A WRITTEN WORK ORDER, WHICH WILL
REFERENCE THIS PURCHASE ORDER AND BECOME A REVISION TO THIS ORDER. IT IS UNDERSTOOD BY
THE CONTRACTOR THAT THIS ADDITIONAL WORK, IF ACCEPTED, WILL NOT ADVERSELY IMPACT THE SCHEDULE
NOR THE COST OF THE ORIGINAL SCOPE OF WORK. FURTHERMORE, THE ADDITIONAL WORK SHALL NOT
BE GROUNDS FOR ADDITIONAL CHARGES OF ANY TYPE TO THE ORIGINAL SCOPE OF WORK BEYOND THE
FEE AGREED UPON FOR THE INDIVIDUAL WORK ORDERS.

*******************************************

AIR POLLUTION REGULATIONS:

IT IS THE CONTRACTOR'S RESPONSIBILITY TO COMPLY WITH ALL FEDERAL, STATE, AND LOCAL REQUIREMENTS
WHEN USING ARCHITECTURAL COATINGS (i.e. PAINTS, CLEANERS, SOAPS, ETC.) ON BALL PROPERTIES.
COMPLIANCE CONSIDERATIONS INCLUDE VOLATILE ORGANIC COMPOUND CONTENT LIMITATIONS,
VOLUME/ QUANTITY LIMITATIONS, AND APPLICATION METHODOLOGY RESTRICTIONS, NOT ALL INCLUSIVE.

*******************************************

BEFORE STARTING WORK:

THE FACILITY MANAGER, ENGINEERING MANAGER, OR DELEGATE MUST PROVIDE CONTRACTOR ORIENTATION
BEFORE ANY WORK CAN BEGIN AT THE FACILITY. ALL SUBCONTRACTORS ARE REQUIRED TO RECEIVE
ORIENTATION FROM THE CONTRACTOR PRIOR TO STARTING ANY WORK AND WRITTEN DOCUMENTATION
OF THIS ORIENTATION MUST BE SUBMITTED TO BALL BY CONTRACTOR PRIOR TO WORK BEGINNING.

*******************************************

CONFIRMING ORDER ONLY!!

DO NOT DUPLICATE THIS ORDER!

*******************************************

NOTE:  INVOICES WILL NOT BE PAID WITHOUT REFERENCE TO BALL'S PURCHASE ORDER NUMBER!

*******************************************

REQUISITION NAME:   Line 1 and 2 IBO cleaning

*******************************************

REQUESTOR:   Dale Spencer

CC:

*******************************************

SUPPLIER CONTACT NAME :

SUPPLIER CONTACT INFORMATION: AirTech

*******************************************

INVOICES APPROVAL:

DELIVER TO: Dale Spencer - Line 1 and 2 IBO cleaning

| Line | Description | Qty Ordered | UOM | Unit Price | Extended Price | Due on Site | Rev | Tax |
|------|-------------|-------------|-----|------------|----------------|-------------|-----|-----|
| | | | EA | .0000 | 16,200.00 | 1/27/2014 | 1 | |

**PRIVILEGE AND CONFIDENTIAL**          **BALL 00138**

# Exhibit 20

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2               FOR THE NORTHERN DISTRICT OF INDIANA

 3   BALL CORPORATION, an Indiana    )
     Corporation, and FACTORY        )
 4   MUTUAL INSURANCE COMPANY, a     )
     Rhode Island corporation, as    )   Case No. 16 cv 42
 5   subrogee,                       )
                                     )
 6                 Plaintiffs,       )
                                     )
     v.                              )
 7                                   )
     AIR TECH OF MICHIGAN, INC.,     )
 8   a Michigan corporation,         )
                                     )
 9                 Defendant.        )

10

11                 DEPOSITION OF PAUL SCHOLTEN

12   taken by the Plaintiff on Friday, September 1, 2017, at the

13   office of O'Brien & Bails Court Reporting and Video, 625 Kenmoor

14   Avenue, SE, Suite 301, Grand Rapids, Michigan, at 9:25 a.m.

15

     APPEARANCES:
16
     For the Plaintiffs:       MR. MARK N. SENAK
17                             Senak Keegan Gleason
                               Smith & Michaud, LTD.
18                             621 S. Plymouth Court
                               Suite 100
19                             Chicago, Illinois 60605
                               (312) 214-1400
20                             msenak@skgsmlaw.com

21   For the Defendant:        MR. ANDREW B. MILLER
                               Starr Austen & Miller, LLP
22                             201 South Third Street
                               Logansport, Indiana 46947
23                             (574) 722-6676
                               miller@starrausten.com
24
     REPORTED BY:              Ms. Diane Murray, CSR-4019, RPR
25
```

1                           TABLE OF CONTENTS

2    EXAMINATIONS                                        PAGE

3    WITNESS:   PAUL SCHOLTEN

4    Examination by Mr. Senak                              3
     * Certified Question                                 80
5

6                             EXHIBITS

7                       (Attached hereto.)

8    NUMBER                  DESCRIPTION               PAGE

9      Number 14      Interrogatories                   17
       Number 15      Letter to Randall Russell from    35
10                    Paul Scholten
       Number 16      General Work Rules for            40
11                    Contractors and Subcontractors
       Number 17      Emails                            47
12     Number 18      Photograph                        51
       Number 19      Report of Findings (partial)      62
13     Number 20      Commercial General Liability      85
                      insurance

14

15

16

17

18

19

20

21

22

23

24

25

```
1              Grand Rapids, Michigan
2              Friday, September 1, 2017 - 9:25 a.m.
3                    PAUL SCHOLTEN,
4              HAVING BEEN CALLED AND DULY SWORN:
5                    EXAMINATION
6    BY MR. SENAK:
7    Q.   Just state your name and spell your first and last name
8         for the court reporter.
9    A.   It's Paul Scholten.  Paul, P-a-u-l; Scholten, S-c-h-o-l-t-e-n.
10   Q.   Mr. Scholten, you've been here for the depositions, so you
11        know the two things that I tell everyone --
12   A.   Yep.
13   Q.   -- so I can skip that.
14             Would you just give us a summary of your
15        educational background?
16   A.   A four-year degree.
17   Q.   In what?
18   A.   Criminal justice.
19   Q.   And where did you get it?
20   A.   Oh, from Grand Valley.
21   Q.   And what year?
22   A.   Oh, I have -- early '80's.
23   Q.   Good enough.
24   A.   So --
25   Q.   You're either an owner or an employee of Air Tech?
```

1   A.   Yes.

2   Q.   What did you do before you became involved with Air Tech?

3   A.   I worked at Herman Miller, in supervision.

4   Q.   When did you begin with Air Tech?

5   A.   '91.

6   Q.   So prior to 1991, you would have worked with -- I'm sorry

7        -- Herman --

8   A.   Herman Miller.

9   Q.   What is Herman Miller?

10  A.   They're a furniture company.  They make office furniture,

11       petitions and stuff like that.

12  Q.   And what did you do for them?

13  A.   I was in supervision, ran one of the day shift crews.

14  Q.   How long did you work there?

15  A.   About sixteen years.

16  Q.   Did you work there right after you got out of school?

17  A.   Yeah, pretty much.  Yes.  As I went through college, I

18       then worked there.

19  Q.   How did you get involved with Air Tech?

20  A.   Just had an opportunity to start our own business and went

21       that route.

22  Q.   Who did you start it with?

23  A.   Kevin Brouwer.

24  Q.   How did you know Kevin?

25  A.   He actually was an employee of mine.  He was my scheduler

```
 1        at Herman Miller and we had an opportunity to take over a

 2        duct cleaning company.

 3   Q.   How did that opportunity come to be?

 4   A.   It was a friend of Kevin's.

 5   Q.   Did you buy the company from Kevin's friend?

 6   A.   Yes.

 7   Q.   Had Air Tech existed before you and Kevin bought it?

 8   A.   Yes.

 9   Q.   When did you and Kevin acquire your interest in it?

10             MR. MILLER:  Objection.  Asked and answered.

11   A.   Yeah.  Early '90's.

12   BY MR. SENAK:

13   Q.   That would have been 1991 --

14   A.   Right.

15   Q.   -- is when you started?

16             And when you started, you bought the company?

17   A.   Yeah, basically.  Yeah.

18   Q.   Meaning you didn't work for the company and then buy it;

19        you bought it and then started working?

20   A.   Correct.  Correct.

21   Q.   Had you ever done any duct cleaning or oven cleaning

22        before that?

23   A.   No.

24   Q.   Was it just you and Mr. Brouwer who purchased the company?

25   A.   Yes.
```

```
 1   Q.    I take it you would have been the original owners of the
 2         company or -- at that time -- let me try that again.
 3                   MR. MILLER:  Objection.  Misstates the record.
 4   BY MR. SENAK:
 5   Q.    When you and Kevin bought the company, it was just you and
 6         he owned the company, in its entirety?
 7   A.    Correct.
 8                   MR. MILLER:  Objection.  Asked and answered.
 9   BY MR. SENAK:
10   Q.    The prior owner had no continuing interest in the company?
11   A.    That's correct.
12   Q.    Do you and Kevin own the company in equal shares?
13   A.    Yes.
14   Q.    I take it it's fifty percent each?
15   A.    Correct.
16   Q.    Are you familiar with the term closely held company?
17   A.    No.
18   Q.    Let's say this.  Air Tech is not a publicly traded
19         company?
20   A.    No.
21   Q.    Are you and Mr. Brouwer the only officers or directors of
22         the company?
23   A.    Yes.
24   Q.    How many current employees do you have?
25   A.    Ranges from, well, we've got about nine right now,
```

```
 1        full-time -- well, full part.
 2   Q.   I'm sorry?
 3   A.   Full part-time.
 4   Q.   Explain to me what you mean by full part-time.
 5   A.   Well, we have some gals in the office, receptionists in
 6        the office, and they work on a part-time basis.  They
 7        share hours.
 8   Q.   So you've got -- do you hire temporary workers?
 9   A.   Occasionally.
10   Q.   And are those workers hired as employees?
11   A.   Yes.
12   Q.   What's the largest number of employees you've had?
13   A.   We've had at one time, between part and full, we've had up
14        to eighteen.
15   Q.   What does Air Tech do?
16   A.   Residential duct cleaning, and that's how we started,
17        still do that, and then industrial cleaning.
18   Q.   What percentage of your work is residential?
19   A.   You know, probably eight percent.
20   Q.   I'm sorry?
21   A.   Eight percent.
22   Q.   I take it the other ninety-two would be industrial?
23   A.   Correct.
24   Q.   What type of industrial cleaning do you do?
25   A.   All kinds.  From, you know, you know, oven cleaning to
```

```
 1        vacuuming walls and ceilings.
 2   Q.   Is there a type of industrial cleaning that you would not
 3        do?
 4   A.   Yes.
 5   Q.   What is that?
 6   A.   I evaluate, if anybody calls me, if there's too much
 7        danger involved with it, I just don't, don't take it.  I
 8        don't even quote it.
 9   Q.   Is the criteria that you use to decide not to take work,
10        whether it's too dangerous, given your kind of skillset
11        and tools and things of that nature?
12   A.   Yeah.  And I look at if I don't wanna -- if it's something
13        I don't wanna do, I don't want my people doing it either.
14   Q.   Anything other than something that's too dangerous in
15        terms of cleaning, you would take?
16   A.   Yes.
17   Q.   Air Tech was hired to clean Internal Bake Ovens at the
18        Ball plant in Monticello, Indiana?
19   A.   That's correct.
20   Q.   Do you consider Air Tech to be qualified to do that job?
21   A.   Oh, yes.
22   Q.   Had you cleaned Internal Bake Ovens for other companies
23        prior to the time you started working at Ball?
24   A.   Yes, we have.
25   Q.   How long, prior to the time you started working for Ball,
```

1        had you been cleaning Internal Bake Ovens?

2   A.   When you say Ball, are you referring to Monticello?

3   Q.   Or any other Ball facility.

4   A.   Oh, yes.

5   Q.   All right.  Who else have you cleaned IBO's for?

6   A.   Crown.  Sylvan.

7   Q.   Anyone else?

8   A.   Edison.  But they have since -- well --

9   Q.   They're no longer Edison; right?

10  A.   Right.  Companies buy and sell all the time.

11  Q.   Oh, yeah.

12  A.   It's hard to keep up with it.

13  Q.   When's the first time Air Tech started cleaning IBO's?

14  A.   Late '90's.

15  Q.   There are a number of Ball facilities that you have

16       cleaned ovens for; true?

17  A.   That's correct.

18  Q.   Tell me what they are.

19  A.   Milwaukee.

20  Q.   When did you start cleaning a Ball plant in Milwaukee?

21  A.   Around that same period.

22  Q.   So that would have been --

23  A.   Late '90's.  I don't know a specific date.

24  Q.   Yeah.  I understand.  I mean -- you know.

25  A.   Yeah.

1  Q.  Other than Milwaukee?

2  A.  Findlay, Ohio.

3  Q.  Again, in the late '90's is when you started cleaning?

4  A.  Yeah.  Yeah.  Late '90's, early 2000's.  Yeah.

5  Q.  Any others?

6  A.  Fort Atkinson, Wisconsin.

7  Q.  Same time period, late '90's, when you started at Fort

8      Atkinson?

9  A.  Yeah.

10  Q.  Any others?

11  A.  Fort Atkinson might've been a little later because they

12      were bought -- they were not Ball Corporate.  Ball Corp

13      bought them.  So the exact date, I'm not sure.

14  Q.  Understood.

15  A.  Excuse me?  What was the question?

16  Q.  No.  I'm just trying to get the other Ball facilities that

17      you've done work at.

18  A.  That's it.

19  Q.  Those three?

20  A.  Yes.

21  Q.  What do they do at Milwaukee?

22  A.  Basically, the same thing, more food cans versus

23      beverages, like baby food and so forth.

24  Q.  Do they have IBO's in Milwaukee?

25  A.  They have an IBO in Milwaukee.

```
 1    Q.   And I take it Air Tech would have cleaned that?

 2    A.   Yes.

 3    Q.   Do you continue to clean that?

 4    A.   Yes.

 5    Q.   Findlay, Ohio?

 6    A.   Yes.

 7    Q.   What do they do there?

 8    A.   Same thing; they have beverage and also do food cans.

 9    Q.   Do you continue -- do they have an IBO there?

10    A.   Correct.

11    Q.   And do you continue to do work there?

12    A.   Yes.

13    Q.   Fort Atkinson, Wisconsin?

14    A.   Same thing.

15    Q.   Food and beverage?

16    A.   Just, just beverage.

17    Q.   Aluminum cans?

18    A.   Yes.

19    Q.   I take it they have an IBO?

20    A.   Correct.

21    Q.   And do you continue to do work there?

22    A.   Yes.

23    Q.   I take it, given the amount of time that you've been doing

24         this, you consider yourself sort of an expert in oven

25         cleaning?
```

```
 1   A.   Well, yeah.  I've done a lot of IBO ovens.  Yes.

 2   Q.   So you know how to do this work?

 3   A.   Yes.

 4   Q.   You have personally done this work?

 5   A.   Yes.

 6   Q.   When Ball picked Air Tech to clean the IBO's in

 7        Monticello, they picked a company that was qualified and

 8        had expertise in cleaning IBO's; true?

 9   A.   True.

10   Q.   Have you been cleaning IBO ovens since the late '90's?

11   A.   Yes.

12   Q.   Was that the first time that you would have started

13        cleaning IBO's?

14   A.   Correct.  Yeah.

15   Q.   How many of these ovens have you cleaned over the course

16        of your career?

17   A.   Oh, I mean involved in cleaning?

18   Q.   That you personally --

19   A.   That I personally?

20   Q.   -- would have put your hands on and done work on the oven.

21             MR. MILLER:  Objection.  Calls for speculation.

22   BY MR. SENAK:

23   Q.   Give me your best estimate.

24   A.   A lot.

25   Q.   More than a hundred?
```

```
 1   A.   I would say at least that.

 2   Q.   Less than a thousand?

 3   A.   Yes.

 4   Q.   Less than five hundred?

 5              MR. MILLER:  Objection.  Calls for speculation.

 6   A.   I, I don't know.

 7   BY MR. SENAK:

 8   Q.   You tell me then.

 9   A.   Yeah.  Yeah.  It's, you know, it's close.  I never really

10        actually counted it up in my head, you know, but --

11   Q.   Would you agree that you have sort of a greater knowledge

12        about oven cleaning than the average person?

13   A.   Well, yes.

14   Q.   Does Air Tech advertise that it has expertise in oven

15        cleaning?

16   A.   No.

17   Q.   Does Air Tech represent to customers, like Ball, that it

18        has expertise in oven cleaning?

19   A.   What do you mean by that?

20   Q.   When you go and you tell Ball that, like, we're gonna

21        clean your oven, do you tell them we know how to do it, we

22        have an expertise in doing this?

23              MR. MILLER:  Objection.  In those words?

24              MR. SENAK:  No.

25   A.   Yeah.  You know, initially Ball called us, you know.  And
```

```
 1        when we initially come into an oven, a new company, they

 2        go through the whole oven with us and how to, how to clean

 3        it, because every oven is a little different.

 4   BY MR. SENAK:

 5   Q.   I understand.

 6   A.   They're not all the same --

 7   Q.   Right.

 8   A.   -- you know.

 9   Q.   Do you tell them that we can clean your oven?

10   A.   We can clean your oven.

11   Q.   And we know how do it?

12   A.   Yeah.

13   Q.   You've heard us talk about confined space training?

14   A.   Correct.

15   Q.   Do you need to have confined space training to clean an

16        oven?

17   A.   Yes.

18   Q.   Just tell me why.

19   A.   Well, because any, any enclosed space if it has a limited

20        amount of exits becomes a confined space, you know.  So

21        when it comes to an actual IBO, by the time you take the

22        doors off, technically you don't need it but we always

23        make sure we have it.

24   Q.   Is it a requirement for purposes of cleaning IBO's at

25        Ball?
```

1    A.    Yes.

2    Q.    And your employees go through that confined space training

3          so they can do that work?

4    A.    That's correct.

5    Q.    Without that certification, is it true that you can't

6          clean the oven?

7                    MR. MILLER:  Objection.  Calls for speculation.

8    A.    Without that certification, yes.  Every, every IBO has

9          signs right on it, confined space cleaning, you know,

10          right on the oven, so yes, you need to have that to work

11          there.

12   BY MR. SENAK:

13   Q.    All right.  You mentioned that your degree is in criminal

14          justice; true?

15   A.    Uh-huh.  Correct.

16   Q.    I take it you don't have any education or experience in

17          engineering?

18   A.    No.

19   Q.    No education or experience in chemistry?

20   A.    No.

21   Q.    No education or experience in cause and origin

22          investigation regarding fires?

23   A.    No.

24   Q.    Do you have any knowledge or experience in designing

25          IBO's?

```
 1   A.   No.

 2   Q.   So you'd have no expertise in designing IBO's?

 3   A.   No.

 4   Q.   Do you have any expertise in operating IBO's?

 5   A.   No.  And I'm assuming you mean fire them up, turn them on?

 6   Q.   Right.  You know, run them so they perform the function

 7        for which they're intended.

 8   A.   No.  We allow the Ball employees to do that.

 9   Q.   Right.

10   A.   We never do that part.

11   Q.   Other than cleaning an IBO, do you have any expertise in

12        maintaining them?

13   A.   No.

14   Q.   Ever perform any repairs on an IBO?

15   A.   No.  If we see a problem, we let maintenance know.

16   Q.   Right.  That would be the right thing to do?

17   A.   Right.  You know, we don't touch that part.

18   Q.   So, for instance, in the course of your cleaning the oven

19        and you see a condition that needs to be repaired, you go

20        tell whoever owns the oven?

21   A.   Correct.

22   Q.   And that would be true if you saw some condition that you

23        considered to be hazardous?

24   A.   That is right.

25   Q.   You would inform the owner of the oven that there's a
```

```
 1        condition with respect to the operation of the oven that's

 2        hazardous and needs to be corrected?

 3   A.   Correct.

 4   Q.   So is it true that if you saw some hazardous condition at

 5        the Ball Monticello plant with respect to the IBO, you

 6        would tell Ball about it?

 7   A.   Yes.  Yes.  Just like we mentioned that some of those

 8        areas were awful greasy, several times.

 9   Q.   Yeah.  We'll get there.

10             MR. SENAK:  This is going to be 13.  Oh, hold

11        on.  Let me make sure.  14.

12                  (At 9:43 a.m., Deposition Exhibit Number 14 was

13                  marked.)

14   BY MR. SENAK:

15   Q.   Mr. Scholten, showing you Exhibit 14.

16        Do you recognize this document?

17   A.   Yes.

18   Q.   All right.  If you go to the end of it?  It's actually the

19        second to the last page right there.

20   A.   Right there.  Okay.

21   Q.   Is that your signature on it?

22   A.   Yes.

23   Q.   Did you review this document before you signed it?

24   A.   Yes.

25   Q.   Do you understand what this document is?
```

```
 1   A.    I've seen several documents.

 2                 MR. MILLER:  Do you need your glasses?

 3                 THE WITNESS:  I wonder if I should get them.  Do

 4         you mind if I go get my glasses, because --

 5                 MR. SENAK:  No.  No.  Go right ahead.

 6                 (At 9:44 to 9:51 a.m. recess taken.)

 7   BY MR. SENAK:

 8   Q.    So, Mr. Scholten, did you review any documents to prepare

 9         for the deposition?

10   A.    No.

11   Q.    Did you meet with Mr. Miller to prepare for the

12         deposition?

13   A.    Outside here.

14   Q.    I guess when, would be the answer?

15   A.    This morning.

16   Q.    Okay.  Other than that, did you ever talk with him about

17         the deposition?

18   A.    Not about the deposition; just the schedule and so forth.

19   Q.    Okay.  Did you talk to anyone else at Air Tech about the

20         deposition?

21   A.    Just the people that were scheduled to be here Wednesday

22         and today.

23   Q.    Those would have been the either current or former Air

24         Tech employees?

25   A.    Correct.
```

```
 1   Q.   And when did you contact them?

 2   A.   When I knew what the schedule was.

 3   Q.   All right.  Did you talk to them about what the cause of

 4        the fire was?

 5   A.   No.

 6   Q.   Have you ever talked to them about what the cause of the

 7        fire was?

 8   A.   No.

 9   Q.   All right.  Did they ever tell you what they thought the

10        cause of the fire was?

11   A.   No.

12   Q.   Did anyone ever tell you what they thought the cause of

13        the fire was?

14   A.   No.

15             MR. MILLER:  I'm gonna, I'm gonna object.  That

16        invades the attorney/client privilege.

17   BY MR. SENAK:

18   Q.   Oh, other than your attorney, did anyone ever tell you

19        what the cause of the fire was?

20             MR. SENAK:  How's that?  I think that cures the

21        problem; right?

22   A.   No.

23   BY MR. SENAK:

24   Q.   Okay.

25   A.   Yep.
```

```
 1   Q.   I'm showing you Exhibit 14 again.

 2             Do you know what these documents are?

 3   A.   Yeah.  These were something that were done way in the

 4        beginning; correct?

 5   Q.   That's true, I believe.

 6   A.   Yeah.

 7   Q.   You signed these on the second to the last page?

 8   A.   Correct.

 9   Q.   Was it your understanding, when you signed these, that you

10        were signing this document under oath?

11   A.   I don't know.

12   Q.   Do you --

13   A.   But I did sign it thinking, you know, feeling that --

14             MR. MILLER:  I'm gonna object.  That assumes

15        facts not in evidence.

16             MR. SENAK:  Yeah.  Well, that may be true

17        because there is no affirmation that the document is

18        signed under oath.

19   BY MR. SENAK:

20   Q.   I just want to know, when you read through this document,

21        was it your understanding, when you were signing it, you

22        were affirming under oath that the answers that you were

23        giving were correct?

24             MR. MILLER:  I'm gonna, I'm gonna object.  That

25        calls for speculation.  It also calls for a legal
```

```
 1        conclusion.
 2                 MR. SENAK:  I don't think so.
 3   BY MR. SENAK:
 4   Q.   You can answer the question.
 5   A.   At the time, I felt that.  Yeah.
 6   Q.   Yeah.  All right.  If you would just look through these
 7        and just tell me whether the answers are correct that were
 8        given?
 9   A.   The whole thing?
10   Q.   Yeah.  Why don't you do that?
11                 So while you're doing that, Mr. Scholten, let me
12        just tell you this:  I have no reason to believe that
13        they're not.  I just need to make sure that they are.
14   A.   Well, it's been a while.
15   Q.   So there's no, you know, ulterior or nefarious motive
16        here.  I just want to know whether
17                 MR. MILLER:  Well, I'm gonna object.  That --
18                 MR. SENAK:  That remains to be seen?  Yes.
19                 MR. MILLER:  -- assumes facts not in evidence.
20                 MR. SENAK:  I just want to -- there wasn't a
21        verification attached to this and I just want to make sure
22        that the answers are correct.
23                 MR. MILLER:  Just let him review the document.
24   BY MR. SENAK:
25   Q.   While you're doing it, one other point.  If you see
```

```
 1        something that's incorrect or that needs to be updated,

 2        just let me know.

 3   A.   Completes approximately 2:00.  It could've been a little

 4        longer that than that.  I'm not a hundred percent sure on

 5        that.

 6   Q.   Just let me make sure that we know what you're talking

 7        about on the record.

 8   A.   Oh.

 9   Q.   Can you just identify the interrogatory number you're

10        referring to and then tell us what you believe needs to be

11        revised?

12   A.   We'll leave it.

13             MR. SENAK:  While you finish that, I'm going to

14        take a short break.

15             THE WITNESS:  Okay.

16             (At 9:57 to 10:03 a.m. recess taken.)

17   BY MR. SENAK:

18   Q.   Okay.  You're all done?

19   A.   I'm not a speed reader, but I think I got it.

20   Q.   I get it.  Look, I just want to make sure --

21   A.   Yeah.  Yeah.

22   Q.   -- that the interrogatory answers are true and correct and

23        there's been no changes to them.

24   A.   (Shaking head negatively.)

25   Q.   Okay.  Interrogatory Number 4, it indicates that there
```

```
 1        were communications with Dale Spencer, Jerry Morgan and
 2        Randy Russell?
 3   A.   Uh-huh.
 4   Q.   Can you just tell me, okay, Dale Spencer, what were the
 5        communications with him?
 6   A.   Okay.  Let me, let me read the question.  Dale Spencer is
 7        a person who's kinda the, he's the go-to guy, you know,
 8        for --
 9   Q.   At the time --
10   A.   -- checking out the oven.
11   Q.   -- he was a Ball employee?
12   A.   Yes.  Yep.
13   Q.   All right.  And you mentioned he's sort of the go-to guy
14        to check out the oven?
15   A.   Correct.
16   Q.   Did you have conversations with him?
17   A.   Not on the job.
18   Q.   Okay.
19   A.   But, you know, afterwards.
20   Q.   All right.  So just tell me when you talked to him.
21             MR. MILLER:  Objection.  Are you speaking of May
22        of 2014 or to the origin of Air Tech's work at Ball
23        Monticello?
24             MR. SENAK:  Well, yeah.  That's actually a good
25        point, you know.
```

```
 1   BY MR. SENAK:

 2   Q.   Let's start -- let's use May of 2014 --

 3   A.   Okay.

 4   Q.   -- as sort of the dividing line.

 5             Did you have conversations with Mr. Spencer

 6        before that?

 7   A.   Before May?

 8   Q.   May of 2014.

 9   A.   Sure.

10   Q.   All right.  About what?

11   A.   Okay.  Are we talking about previously as far back as --

12   Q.   Yeah.  Again, thinking of May of 2014 as sort of the

13        dividing line, you had conversations with Mr. Spencer

14        before that, what were they about?

15   A.   You know, oven cleaning, what we had to do, what line we

16        had to do.

17   Q.   Let me try this.  Would Mr. Spencer have been your, Air

18        Tech's point of contact at Ball with respect to oven

19        cleaning?

20   A.   At that point.  At that time.

21   Q.   Prior to May of 2014?

22   A.   To May of 2014, there was several different ones that took

23        that responsibility, and these are the names that are

24        listed right here.

25   Q.   Are all the people that are listed in Interrogatory Number
```

```
 1        4 people that you would have talked with prior to May of
 2        2014 about cleaning ovens at the Ball Monticello plant?
 3   A.   Yes.
 4   Q.   And would the substance of those conversations all been
 5        about the scope of work that Air Tech would perform
 6        relative to either cleaning ovens or ductwork or any type
 7        of work for the Ball Monticello plant?
 8   A.   Yes.
 9   Q.   All right.  Is it true that the people that are listed in
10        Interrogatory Number 4, you would have had multiple
11        conversations with prior to May of 2014?
12   A.   Yes.
13   Q.   Other than conversations about cleaning different aspects
14        of the Ball Monticello plant, did you have conversations
15        with them about anything else --
16   A.   I mean
17   Q.   -- regarding Air Tech's scope of work?
18   A.   Oh, no.
19   Q.   All right.  I know that you might have talked about a lot
20        of different things.
21   A.   Yeah.
22   Q.   I get that.
23   A.   Yeah.
24   Q.   Okay.  May of 2014, did you have conversations with either
25        Mr. Spencer, Mr. Morgan or Mr. Russell about what the
```

```
 1        scope of work Ball would be performing relative to IBO

 2        Number 2?

 3   A.   No.

 4   Q.   You didn't talk to any of those three about cleaning IBO

 5        Number 2 in May of 2014?

 6   A.   Just the email scheduling it.  That's it.

 7   Q.   Interrogatory Number 5, it says that the work was

 8        completed on May 22, 2014 at about 2:00 p.m.?

 9   A.   (Nodding head affirmatively.)

10   Q.   Yes?

11   A.   Yes.  I'm sorry.

12   Q.   How do you know it was 2:00 p.m.?

13   A.   Covered it with the guys and it was around that time.

14        That's all.

15   Q.   Were you there when they finished?

16   A.   No.

17   Q.   The way you found out the information about Number 5 or

18        that was responsive to Number 5 is you asked the people on

19        the crew when they finished?

20   A.   I asked Ken.

21   Q.   And Ken said 2:00?

22   A.   Approximately.

23   Q.   Approximately.

24             Number 6, it talks about Mr. Spencer inspected

25        the work that was done.
```

```
 1               And just so we understand, we're talking about
 2        the work here as the work on IBO Number 2 that was done on
 3        May 22nd, 2014; correct?
 4   A.   Correct.
 5   Q.   All right.  Were you present when Mr. Spencer inspected or
 6        accepted the work, as you characterize it?
 7   A.   No.
 8   Q.   Again, how do you know he did it?
 9   A.   Because Ken told me he did.
10   Q.   Other than Ken, did anyone else tell you that Mr. Spencer
11        had accepted or inspected the work?
12   A.   The person in charge of the PIN oven did, yes.
13   Q.   Do you know who that was?
14   A.   Yeah.
15   Q.   Who?
16   A.   Nick.
17   Q.   Your son?
18   A.   Correct.
19   Q.   Okay.  Your son was working on the PIN oven?
20   A.   That's correct.
21   Q.   Let's say this:  Nick Scholten was working on the PIN
22        oven?
23   A.   That's correct.
24   Q.   So your son would've told you that Mr. Spencer inspected
25        the PIN oven?
```

1    A.    That's correct.

2    Q.    Did he tell you that he inspected the IBO?

3    A.    No.

4    Q.    All right.  Is it true that the only person who told you

5          he inspected the IBO would've been Ken Wall?

6    A.    That's correct.

7    Q.    Did anyone else on the crew that worked on the IBO tell

8          you that Mr. Spencer inspected the IBO?

9    A.    I can't recall that.

10   Q.    Did Mr. Wall tell you specifically what sections of the

11         IBO Mr. Spencer inspected?

12   A.    No.

13   Q.    Did Mr. Wall tell you that Mr. Spencer inspected the

14         squirrel cage?

15   A.    I don't know that.

16   Q.    Did Mr. Wall tell you that Mr. Spencer inspected the

17         ductwork?

18   A.    He inspected the oven.

19   Q.    Okay.  And that's really what I'm trying to kind of

20         understand.

21   A.    You know, that's all part of the oven, but --

22   Q.    Did you inspect any part of the squirrel cage, the

23         ductwork or the oven of IBO Number 2 after the work was

24         done on May 22nd of 2014?

25   A.    No.

```
 1                    MR. MILLER:  Objection.  Asked and answered.

 2   A.   No.

 3   BY MR. SENAK:

 4   Q.   Okay.  Interrogatory Number 7 says that respondent, Air

 5        Tech, had some communications with Mr. Spencer regarding

 6        the occurrence.

 7                    Do you see that?

 8   A.   Yes.

 9   Q.   The occurrence, I believe, was defined as the fire that

10        occurred in IBO Number 2?

11   A.   Yes.

12   Q.   And so do you recall what communications you would have

13        had with Mr. Spencer?

14   A.   Yeah.  The first thing, he had called at the end of the

15        day.

16   Q.   When you said the end of the day, do you mean the 22nd?

17   A.   The 22nd.

18   Q.   Okay.

19   A.   And expressed what an excellent job was done, I mean that

20        was on the phone call conversation, and then scheduled to

21        have another oven cleaned the following week.

22   Q.   When you say the end of the day, I take it this was before

23        the fire?

24   A.   Yes.

25   Q.   Okay.  So at least the first communication you had with
```

```
 1        Mr. Spencer would have been somewhere at the end of the

 2        day on May 22nd and that was for purposes of sort of

 3        scheduling the next job?

 4   A.   Correct.

 5   Q.   And that was on the phone?

 6   A.   Correct.

 7   Q.   And I take it it would have lasted a few minutes?

 8             MR. MILLER:  Objection.  Assumes facts not in

 9        evidence.

10   A.   I don't know.

11   BY MR. SENAK:

12   Q.   Well, I can ask you how long it would have lasted but you

13        would probably give me the same answer then?

14   A.   Yeah.

15   Q.   Did you have any other conversations with him about the

16        occurrence?

17   A.   Later, I think, the next day.

18   Q.   And that would have been May 23rd?

19   A.   Uh-huh.

20   Q.   Just tell me --

21   A.   Yes.  I'm sorry.

22   Q.   -- what you talked about.

23   A.   Basically he told me there was a fire.

24   Q.   Anything else that you recall from that conversation?

25   A.   You know, not really.
```

```
 1   Q.   Were there any other conversations with Mr. Spencer about
 2        the occurrence?
 3   A.   No.
 4   Q.   Other than yourself, do you know if anyone at Air Tech
 5        spoke to anyone at Ball about the occurrence?
 6   A.   No.
 7   Q.   Meaning you don't know of anyone who did?
 8   A.   I don't know of anyone.
 9   Q.   To your knowledge, you were the only one who had
10        communications with anyone at Ball about the fire?
11   A.   Correct.
12   Q.   All right.  Number 19.  I think you kind of alluded to
13        this answer a bit earlier.  It talks about concerns that
14        were expressed to Ball about the oven may have been
15        especially dirty.
16        Do you see that?
17   A.   Okay.  Yes.
18   Q.   All right.  So, first of all, who made the communication
19        to Ball?
20   A.   This is -- this here isn't necessarily from that day.
21   Q.   And, you know, that's what I'm trying to kind of figure
22        out is what happened here.
23             So let's start with when did this communication
24        take place?
25   A.   Throughout, throughout different cleanings.  We always
```

```
 1        express, if we see any area that's a concern, we

 2        communicate it verbally.

 3   Q.   When you say we, do you mean you or someone else?

 4   A.   Either myself or Ken or he comes to me and expresses it

 5        and I go from there.

 6   Q.   Would you be the one who would communicate that to Ball?

 7   A.   Yes.

 8   Q.   Now, you say throughout the different cleanings.

 9             Do you have any specific recollection of the

10        dates when those --

11   A.   Oh, no.

12   Q.   -- communications would have been made?

13   A.   I don't.

14   Q.   If you look back, you'll see that, in the interrogatory

15        answers, I think you provide a list of dates when

16        cleanings were done?

17   A.   Correct.

18   Q.   Do any of those dates sort of refresh your recollection as

19        to when you would have had these --

20   A.   No, they don't.

21   Q.   -- communications?

22   A.   No, they don't.

23   Q.   Were you the only one who would have expressed those

24        concerns to Ball or would Mr. Wall have done it, also?

25   A.   No.   Pretty much myself.
```

```
 1   Q.   All right.  So, to your knowledge, you would be the only
 2        one who would have expressed concerns to Ball Corporation
 3        about the oven may have been especially dirty?
 4                  MR. MILLER:  Objection.  Calls for speculation.
 5   BY MR. SENAK:
 6   Q.   Again, to your knowledge.
 7   A.   Yes.
 8   Q.   Who at Ball did you tell?
 9   A.   You know, the names you see listed earlier in Number --
10   Q.   Go ahead.  Tell me so I know.
11   A.   Over the years, Jonathan or Dale, Jerry Morgan and Randy
12        Russell.  They were in charge at different times
13        throughout those years.
14   Q.   And what would you have told them?
15                  MR. MILLER:  Objection.  Asked and answered.
16   A.   If I saw a problem, if I thought it was a potential
17        problem or --
18   BY MR. SENAK:
19   Q.   Well, and I say this only because what you say here is
20        that the oven may have been especially dirty.
21                  Is that what you would have told them?
22   A.   Yeah, especially dirty, or if there was a certain point
23        that I would point out, but yeah.
24   Q.   Okay.  Other than that, did you tell them anything else?
25   A.   No.
```

```
 1   Q.   You mentioned these would have been verbal communication?

 2   A.   Correct.

 3   Q.   Do you recall whether you would have ever communicated

 4        those concerns in writing?

 5   A.   No.

 6   Q.   Would those communications have been made over the phone

 7        or in person at the Ball plant, if you can remember?

 8   A.   In person.

 9   Q.   And why or what purpose was it for you in making those

10        communications?

11   A.   Well, a couple reasons, you know.  One is that, you know,

12        it's a possibility it should be cleaned more often because

13        there's quite a buildup, and just so they're aware of it

14        so that there's no potential problems.

15   Q.   And did it affect Air Tech's ability to clean the oven?

16   A.   No.

17   Q.   Did it affect the operation of the oven at all, to your

18        knowledge?

19             MR. MILLER:  Objection.  Calls for speculation.

20   A.   I don't know.  I've never had any complaints.

21   BY MR. SENAK:

22   Q.   Just Number 20 now, Interrogatory Number 20.  We sort of

23        touched upon this.

24             You indicate that Mr. Spencer, I think it's Dale

25        Spencer, was the one who, after Air Tech completed, he
```

1    went through and he looked to make sure the work was done?

2  A.    Yes.

3  Q.    Other than Mr. Spencer, anyone else at Ball do that?

4  A.    Typically -- well, no.  Dale would be the one.

5  Q.    He would have been the only one?

6  A.    That particular date.

7  Q.    Let's say this.  For the May 22nd, 2014 cleaning,

8    Mr. Spencer would have been the only one?

9  A.    Yes.

10         MR. MILLER:  Objection.  Calls for speculation.

11         (At 10:20 a.m., Deposition Exhibit Number 15 was

12         marked.)

13  BY MR. SENAK:

14  Q.    Mr. Scholten, I'm showing you Exhibit 15.

15  A.    Uh-huh.

16  Q.    Can you just identify this document?

17  A.    This is a quote given to Randy Russell.  It looks like

18    4-15-2005.

19  Q.    And, you know, that's really one of the questions I was

20    gonna ask is if you go to the second page, again, is this

21    your signature on the document?

22  A.    Yes.

23  Q.    Okay.  Did you prepare the document?

24  A.    Yes.

25  Q.    Did you send it to Mr. Russell?

```
 1   A.   Yes.

 2   Q.   What was the purpose of that?

 3   A.   Basically for a quote on what we -- basically a breakdown

 4        of what we do and a price to do it.

 5   Q.   You alluded to the idea that up in the right-hand corner,

 6        a date of 04-15-2005 is written on the document.

 7             There's no date on the document that's typed on

 8        the document; correct?

 9   A.   Correct.

10   Q.   Is it your recollection that you sent this document to him

11        on or about April 15th of 2005?

12   A.   You know, I know it was 2005.  So --

13   Q.   And was this the first proposal that Air Tech sent to Ball

14        to clean IBO ovens, and I guess PIN ovens are also on this

15        list?

16   A.   Correct, to Monticello.  Yes.

17   Q.   Right.  Up until this time, Air Tech had not done work for

18        the Monticello plant?

19   A.   That's correct.

20   Q.   The purpose of this document was to submit a proposal to

21        Monticello, to do work for cleaning IBO's and PIN ovens;

22        true?

23   A.   Correct.

24   Q.   And this document describes kind of the scope of work that

25        Air Tech would perform?
```

```
 1   A.   That's correct.

 2   Q.   It has a cost that's written on the bottom, or I mean not

 3        on the bottom, but it shows a cost for cleaning the IBO's

 4        and the PIN ovens?

 5   A.   Uh-huh.  Yes.

 6   Q.   I take it from -- you continued to do work at the Ball

 7        Monticello plant, you meaning Air Tech, from 2005 up

 8        through 2014; right?

 9   A.   Correct.

10   Q.   I take it this document sort of continued to be the scope

11        of work for the cleaning of the IBO's and the PIN ovens

12        during that time?

13             MR. MILLER:  Objection.  Assumes facts not in

14        evidence.

15   BY MR. SENAK:

16   Q.   Is that true?

17   A.   Yeah.  Pretty much.

18   Q.   All right.  The one thing that may have changed here might

19        have been the price; is that true?

20   A.   Yes.

21   Q.   All right.  The price changed but the scope of work was

22        the same?

23   A.   There may have been some changes on ovens that we had

24        taken care of and just never updated.

25   Q.   Meaning you would have cleaned like IBO 2, 3 or PIN Oven 2
```

```
 1        or 3?  I think in the interrogatories it shows --
 2   A.   Yeah.  Yes.
 3   Q.   -- a list of the different things?
 4   A.   That's correct.
 5   Q.   But with respect to at least the IBO and the PIN ovens,
 6        you never made another proposal?
 7   A.   That's correct.
 8   Q.   All right.  On this document, in the first paragraph, it
 9        mentions, on the one, two, three, fourth line down, "You
10        always need one line of ovens taken care of in a
11        twelve-hour time frame."
12             Do you see that note?
13   A.   Uh-huh.  I'm sorry.  Yes.
14   Q.   I do it, too, so don't worry about it.
15             Is it accurate to say that throughout the time
16        you cleaned the IBO's, that Air Tech cleaned the IBO's,
17        that it was always understood that the work would need to
18        be done within a twelve-hour time period?
19   A.   That's what it initially was set up.  Yes.
20   Q.   And that's because they run a production facility and they
21        can only take the line down for a finite amount of time?
22   A.   That's correct.
23             MR. MILLER:  Objection.  Assumes facts not in
24        evidence.  Calls for his speculation.
25   BY MR. SENAK:
```

```
 1  Q.   Go ahead.

 2  A.   That's correct.

 3  Q.   At the very bottom of the page, it goes, it reads, "From

 4       what I gathered, you would also like the stacks cleaned

 5       during shutdown, which is once a year on the Christmas

 6       holiday"?

 7  A.   That was true at that time, yes.

 8  Q.   All right.  Did that change?

 9  A.   Yes.

10  Q.   Okay.  First of all, when you call it the stacks, is that

11       essentially the exhaust?

12  A.   That's the exhaust, yes.

13  Q.   Okay.  The ductwork?

14  A.   That runs along the ceiling, yeah.

15  Q.   All right.  So, originally, this was gonna be once a year

16       around Christmas, and you indicated that somehow that had

17       changed.

18            How did it change?

19  A.   They just changed the times, you know.  It wasn't always

20       around Christmas and it wasn't always once a year.

21  Q.   All right.  The next paragraph on Page 2, it says, "We

22       will also follow all your required safety rules."

23            Do you see that?

24  A.   Yes.

25            MR. SENAK:  And I think this will be 16.
```

```
 1                    (At 10:25 a.m., Deposition Exhibit Number 16 was
 2               marked.)
 3   BY MR. SENAK:
 4   Q.   So, Mr. Scholten, I'm showing you Exhibit 16.
 5               Do you know what those are?
 6   A.   Yeah.  It's Ball's Rules for Contractors and
 7        Subcontractors.
 8   Q.   Are those the safety rules that are referred to in Exhibit
 9        15?
10               MR. MILLER:  Objection.  Calls for speculation.
11   A.   I would say no.
12   BY MR. SENAK:
13   Q.   Okay.  Did you follow -- let me try this.
14               With respect to sort of the contract by which
15        Air Tech would do the work, does the contract consist of
16        your proposal and the safety rules?
17               MR. MILLER:  Objection.  Calls --
18   BY MR. SENAK:
19   Q.   Exhibit 16.
20               MR. MILLER:  Objection.  Misstates prior
21        testimony, calls for speculation, lack of foundation.
22   BY MR. SENAK:
23   Q.   You tell me.
24   A.   No.  This was done before this (pointing).
25   Q.   Yeah.  And, look, all I'm trying to figure out is what was
```

1          the contract that sort of defined what you guys would do.

2          And, you know, I take it the proposal is part of it.

3                    Is there anything else?

4     A.   No.

5     Q.   All right.  So these, Exhibit 16, to your understanding,

6          were not part of the contract?

7     A.   No.

8     Q.   Well, that's sort of a double negative --

9     A.   I know it.

10    Q.   -- so I've got to try to get it straight.

11                   You tell me.  Exhibit 15 was the contract?

12    A.   Correct.

13    Q.   Was there anything else, other than Exhibit 15, that was

14         part of the contract?

15                   MR. MILLER:  Objection.  Asked and answered.

16                   THE WITNESS:  No.

17    BY MR. SENAK:

18    Q.   All right.  Good enough.  I think I got it that time.

19    A.   Okay.

20    Q.   Even though Exhibit 16 was not part of the contract, when

21         you say -- let me strike that.

22                   It says you will follow the -- Exhibit 15 says,

23         "We will also follow all the required safety rules."

24                   What rules were you referring to?

25    A.   Confined space, you know, wearing glasses.

```
 1   Q.   Were you provided any safety rules, other than Exhibit 16,

 2        for doing work at the Ball plant?

 3              MR. MILLER:  Objection.  Lack of foundation.

 4        Also calls for speculation.

 5   A.   No.

 6   BY MR. SENAK:

 7   Q.   All right.  I know this is -- you guys produced Exhibit

 8        16.

 9   A.   Correct.

10   Q.   Right?

11   A.   Correct.

12   Q.   What is Exhibit 16, from your perspective?

13   A.   This is, this is all done previous to, to this.  This is

14        given to us once we first started on, you know, rules and

15        regulations and making sure, you know, like the horseplay

16        and the

17   Q.   Right.

18   A.   This is something they give to all contractors.

19   Q.   Did you agree to comply with Exhibit 16 when you were

20        doing the work?

21              MR. MILLER:  Objection.  Lack of foundation.

22        Calls for speculation.

23   A.   Basically -- you know, I, I don't know.  I really don't

24        know, you know.

25   BY MR. SENAK:
```

```
 1   Q.   Fair enough.

 2   A.   Yeah.

 3   Q.   You then issued invoices for the work that you did?

 4   A.   Correct.

 5   Q.   Am I correct to say that Exhibit 15, along with the

 6        invoice for the cleaning of IBO Number 2 in May of 2014,

 7        would be all the contract documents for that work?

 8   A.   The invoice?

 9   Q.   Right.

10   A.   Yeah.  It lists the oven, the line that was cleaned, the --

11   Q.   Right.  I just want to make sure, you know, the idea of

12        what is the contract, I want to make sure we understand

13        what that is --

14   A.   Uh-huh.

15   Q.   -- and it's, as I understand it, Exhibit 15 and your

16        invoice that shows the amount of the cost of that?

17   A.   Correct.

18   Q.   That cost is different than what's shown in Exhibit 15?

19   A.   No.

20             MR. MILLER:  Objection.  Assumes facts not in

21        evidence.

22   BY MR. SENAK:

23   Q.   The same cost --

24   A.   As what's in Exhibit 15, yes.

25   Q.   Okay.  So the invoice just simply is the bill for the work
```

1      that was done in May, on May 22nd, 2014?

2  A.   That's correct.

3  Q.   All right.  Did Ball perform all of its obligations under

4      the contract for cleaning IBO Number 2 in May of 2014?

5  A.   I don't know.

6  Q.   I mean is there -- you're Air Tech; okay?

7  A.   I know.

8  Q.   Is there something that they didn't do, from your

9      perspective as Air Tech, that they should have done under

10     the contract?

11  A.   To clean the oven?  To do normal cleaning?  Is that the

12     question you're asking?

13  Q.   Right.  Is there something that Ball didn't do that they

14     should have done?

15  A.   They did, they did everything they had to do --

16  Q.   Okay.  For instance, they paid you?

17  A.   -- for, for cleaning.  Oh, yes.

18  Q.   To use a legal --

19  A.   I'm assuming they paid me.

20  Q.   To use a legal term, there's nothing that you're aware of

21     that shows that Ball breached any of the terms of the

22     agreement to clean IBO Number 2 in May of 2014?

23         MR. MILLER:  I'm gonna object.  That calls for a

24     legal conclusion, it asks him to speculate and it's beyond

25     the scope of this layman's knowledge.

```
 1  BY MR. SENAK:

 2  Q.   You can answer, if you can.

 3  A.   You know, for the oven cleaning, for us to clean what we

 4       say we're going to on the oven cleaning, they did what

 5       they -- I mean they gave us the oven.

 6  Q.   They did what they were supposed to do; right?

 7  A.   Right.

 8  Q.   They paid you for --

 9  A.   For a, for a normal oven cleaning, they did what they're

10       supposed to do.

11  Q.   Okay.  You either individually or as Air Tech worked at

12       the Ball plant since 2005; true?

13  A.   True.

14  Q.   And you would have cleaned the IBO's, including IBO Number

15       2, during that period of time?

16                 MR. MILLER:  Objection.

17  A.   That is correct.

18                 MR. MILLER:  Asked and answered.

19  BY MR. SENAK:

20  Q.   Are you familiar with what the IBO's look like at the Ball

21       plant in Monticello?

22  A.   Yes.

23  Q.   All right.  Exhibit Number 1, is that a photograph of IBO

24       Number 2?

25                 MR. MILLER:  Objection.  Lack of foundation.
```

```
 1   A.    That's an example of an IBO.

 2   BY MR. SENAK:

 3   Q.    Do you know whether that's IBO Number 2?

 4   A.    It could be 1, 2 or 3.

 5   Q.    All right.  But let's say this:  It's a fair and accurate

 6         representation of what an IBO oven looks like at the Ball

 7         plant in Monticello?

 8   A.    Yes.

 9   Q.    You were present after the fire?

10   A.    Several days later.

11   Q.    Right.

12   A.    Yes.

13   Q.    I think you and I were both there and Andrew was there and --

14   A.    Yes.

15   Q.    -- everybody was there.

16   A.    Yes.

17   Q.    Do you know whether Exhibit Number 1 shows the condition

18         of IBO Number 2 after the fire?

19               MR. MILLER:  Objection.  Calls for speculation.

20   A.    Boy, I don't -- yeah.  I, I don't remember that, Mark.

21   BY MR. SENAK:

22   Q.    Fair enough.

23   A.    I mean it's --

24   Q.    Exhibit Number 1 does show sort of the layout or

25         configuration of an IBO?
```

```
 1   A.    Yes.

 2   Q.    All right.  Is that also true for Exhibit Number 2 in

 3         terms of the ductwork that connects to the IBO?

 4                    MR. MILLER:  Objection.  Lack of foundation.

 5   A.    Yeah, it looks like.

 6   BY MR. SENAK:

 7   Q.    All right.  You just don't know whether Exhibit Number 2

 8         shows IBO Number 2?

 9   A.    Correct.

10   Q.    All right.  Are all the IBO's, the ductwork that attaches

11         to them that goes to the main ductwork, are they all

12         configured approximately the same way?

13                    MR. MILLER:  Objection.  Calls for speculation.

14   A.    You're referencing, you're referencing Monticello?

15   BY MR. SENAK:

16   Q.    Yes.

17   A.    Yes.

18                    (At 10:35 a.m., Deposition Exhibit Number 17 was

19                    marked.)

20   BY MR. SENAK:

21   Q.    I'm showing you Exhibit 17.  Exhibit 17, would you just

22         identify it for me?

23   A.    That is an email.  I believe Rodney -- I'm trying to think

24         of Rodney --

25   Q.    Rod Marler is, for lack of a better term, kind of the risk
```

```
 1        manager --
 2   A.   Oh, okay.  Okay.
 3   Q.   -- for Ball Corporation and he's in Colorado.
 4   A.   Oh, okay.
 5   Q.   That's just by way of a little bit of background.
 6               And, so, look, Exhibit 17 are two emails that
 7        you sent?
 8   A.   Correct.
 9   Q.   The bottom one you would've sent to Dale Spencer; I think
10        the top one you sent to Rod Marler?
11   A.   Right.
12   Q.   Is that true?
13   A.   That's true.  Yep.
14   Q.   At the bottom, let's start with the one on May 27, 2014,
15        at 2:47 p.m., from you to Dale Spencer, it says, "Dale, I
16        had a meeting with the guys to go over the cleaning for
17        Line 2."
18               And this is after the fire?
19   A.   Uh-huh.  Yes.
20   Q.   And am I wrong to assume that after you got notice of the
21        fire, you went and talked to the people who did the work
22        and said, "What happened?  I mean did you do the work?
23        What did you do?"
24               You wanted to find out some information; right?
25               MR. MILLER:  Objection.  Lack of foundation.
```

```
 1  BY MR. SENAK:

 2  Q.   Is that true?

 3  A.   Yes.

 4  Q.   When you say "the guys", quote, in Exhibit 17, if you look

 5       at Exhibit 14 -- oh, sorry.  You can't look at it because

 6       I have it -- the guys you would have met with are the guys

 7       who did the work; correct?

 8  A.   Correct.  It, it meant mostly the guys in charge.

 9  Q.   Hold on here.  I'm sorry.  It will take me just a minute

10       here to figure out where they're at.

11            Oh.  Exhibit Number or -- I'm sorry --

12       Interrogatory Answer Number 3 on Exhibit 14.

13            So in Exhibit 17, when you say, "had a meeting

14       with the guys", are you talking about the people who are

15       identified in answer to Interrogatory Number 3?

16  A.   No, not all of them.

17  Q.   All right.  Just tell me who, then, you know, who you met

18       with sometime from the 24th to the 27th, to talk about or

19       to go over the oven cleaning.

20  A.   Ken Wall.

21  Q.   Okay.  And I ask that because you say "guys", suggesting

22       it was plural, but --

23  A.   I know.

24  Q.   -- I want to just make sure you only met with Ken?

25  A.   Yeah.  Right.
```

```
 1   Q.   You didn't meet with Gonsalo, Oscar Woody, Rubin Jimenez,

 2        Valentino Romero or David Woody?

 3   A.   No.

 4   Q.   Those were the other people that did the cleaning of IBO

 5        Number 2 on May 22nd of 2014?

 6   A.   Correct.

 7   Q.   There would have been nobody else?

 8   A.   No.

 9   Q.   All right.  Now, if we go back to 17.  That's this one.

10   A.   Oh, I'm sorry.

11   Q.   Not Answer 17, but Exhibit 17.  That's my mistake.

12             It says, "Everything in the two fan housings was

13        cleaned as normal and all the debris was vacuumed out."

14             Do you see that?

15   A.   Correct.

16   Q.   Is the fan housing shown in Exhibit Number 2?

17             MR. MILLER:  Objection.  Lack of foundation.

18        Calls for speculation.

19   A.   Back side of it.

20   BY MR. SENAK:

21   Q.   All right.  Let's try this.  Let me give you a fresh one.

22             MR. MILLER:  Do you have a copy for me?

23             MR. SENAK:  It's the same as -- I'll give you

24        another one.

25             THE WITNESS:  Can I get a glass of water?
```

1          MR. SENAK:  Oh, go right ahead.

2          And, here, you can have a colored one.

3          MR. MILLER:  Thank you.  This will be 18?

4          MR. SENAK:  This will be 18.  Let me get that

5     marked.

6          (At 10:40 a.m., Deposition Exhibit Number 18 was

7          marked.)

8  BY MR. SENAK:

9  Q.   All right.  Mr. Scholten, showing you Exhibit 18, which is

10      just kind of a clean copy of Exhibit Number 2, I actually

11      have a Sharpie this time, but when you say you cleaned the

12      fan housings, can you just circle on Exhibit Number 2 what

13      you believe to be the fan housings or what you meant by

14      the fan housings?

15 A.   Right there.

16 Q.   And if you could just put the date and your initials to

17      the side somewhere?

18 A.   What is the date today?

19 Q.   The 30th?

20          MR. MILLER:  It's the 1st.

21 BY MR. SENAK:

22 Q.   The 1st.  Sorry.

23 A.   09.

24 Q.   How about that.

25 A.   Going too fast.

1   Q.   So on Exhibit Number 18, you have circled the fan housings

2        and that would have been one of the things you cleaned or

3        Air Tech cleaned --

4   A.   Yes.

5   Q.   -- on May 22nd in 2014?

6   A.   Yes.

7   Q.   If you go up to the email, the first email on Exhibit 17,

8        this is the one dated May 27, 2014 at 4:04; all right?

9   A.   Uh-huh.

10  Q.   You indicate that, "There are two fan housings that we

11       clean on top of the IBO ovens that lead to the main

12       exhaust."

13            Do you see that?

14  A.   Yes.

15  Q.   The one that you circled on Exhibit 18, is that one of the

16       two fan housings?

17  A.   It looks like a fan housing, yeah, of one of the IBO's.

18  Q.   There is another one, and if you look at Exhibit Number 1,

19       does it show the other fan housing?

20  A.   Yes.

21  Q.   All right.  If you could take your marker that I gave you

22       and circle the two fan housings on Exhibit 1 and then put

23       your initials and again the date?  Thanks.

24            And in Exhibit 17 you go on, "The cleaning

25       requires us to open the access panel to the fan and clean

```
 1    out the fan and the fan housing."  I'm sorry.  Let me go
 2    back one sentence.
 3              The prior sentence reads, "There are two fan
 4    housings that we clean on top of the IBO oven that lead to
 5    the main exhaust."
 6              Do you see that?
 7  A.  Up here or see the exhaust?
 8  Q.  I'm sorry.  I'm on 17 here.
 9  A.  Okay.
10  Q.  You say that, "There are two fan housings we clean on top
11    of the IBO ovens lead to the main exhaust."
12              So if you look at Exhibit 18, I take it -- well,
13    let's start with does Exhibit 18 show the ductwork that
14    leads to the main exhaust?
15  A.  Yes.
16  Q.  All right.  There is a point where Air Tech would have
17    cleaned up to and then no further?
18  A.  Correct.
19  Q.  All right.  Is that shown on Exhibit 18?
20  A.  Yes.  It's a little hard because of the insulation here.
21  Q.  All right.  Can you just draw a line where Air Tech would
22    have stopped its cleaning?
23  A.  Let's see.  The fan is in the housing right here.  So the
24    fan is at this level --
25  Q.  Okay.
```

```
 1   A.   -- and you can't get much past that.

 2   Q.   All right.  So you've drawn a line on Exhibit 18, which

 3        shows where Air Tech would have stopped cleaning.

 4             Can you just put a Number 2 where the line is,

 5        the date and, again, your initials?

 6             Now, above that, there is some ductwork, there's

 7        an elbow.  Do you see that?

 8   A.   Uh-huh.  Yes.

 9   Q.   Is that like the first elbow that leads to the ductwork?

10   A.   Right here's the first, right here's the first elbow, yes.

11   Q.   Would you just draw a circle around the first elbow, if

12        you would, and, again, put the Number 3 and your initials

13        and the date to show the location of the first elbow?

14             And then you go on to say that, "We clean on top

15        of the IBO ovens that lead to the main exhaust."  You've

16        already showed where you stopped

17             Is the main exhaust that you're referring to

18        shown in Exhibit Number 2?

19   A.   Yes.

20   Q.   All right.  Can you just draw a circle around the entire

21        main exhaust?  Okay.  And, again, off to the side of that

22        larger circle, the Number 4 and your initials and the

23        date.

24   A.   Let's see.  9-1.

25   Q.   That main exhaust, then, leads, if I'm not mistaken, to
```

1    like a T.

2         I don't know that it's shown in any of the other

3    ones that we have, but is it your recollection that it

4    leads to a T and then that leads to some additional

5    ductwork up above?

6  A.  That's correct.

7  Q.  So the two blower motors each go up to a first elbow that

8    goes to the main exhaust to the T, the T goes up to the

9    main exhaust or the other ductwork; true?

10  A.  Correct.

11  Q.  Do you know where that ductwork goes?

12  A.  Back to the oxidizer.

13  Q.  Okay.  Part of your cleaning would have been to remove any

14    of the debris below the line that you've shown in Exhibit

15    18 and then vacuum out those areas; right?

16  A.  Correct.

17  Q.  Can we go back to Exhibit 14?  This is really kind of, the

18    terminology here is a little unique, so I want to try to

19    make sure we're all set.

20         In Exhibit Number -- or in Interrogatory Answer

21    Number 2 on Page 2, you'll see at the top it says you

22    describe sort of the process for cleaning; all right?

23  A.  Uh-huh.

24  Q.  And you go through all this, but the one I'm really

25    interested in says, "Cleaning the exhaust to the squirrel

```
 1        cage fan."

 2                   On Exhibit 18 we've reflected sort of the

 3        exhaust.

 4                   The squirrel cage, is the squirrel cage shown on

 5        Exhibit 18 -- or -- yeah, on Exhibit 18?

 6   A.   The what now?

 7   Q.   The squirrel cage.

 8   A.   I cannot see the squirrel cage in Exhibit 18.

 9   Q.   What is the difference between the squirrel cage and I

10        think you labeled it as the main exhaust?

11                   MR. MILLER:  I'm gonna object.  Misstatement of

12        prior testimony.

13   BY MR. SENAK:

14   Q.   I mean I'm trying to figure out what's the difference

15        between the exhaust, the main exhaust, and the squirrel

16        cage?

17                   Can you explain that to me?

18   A.   The main exhaust is what comes (pointing).

19   Q.   Yeah.  You make a good point.  Hold on.

20   A.   The squirrel cage is --

21   Q.   Let me, let me strike it and start over --

22   A.   Sure.

23   Q.   -- because I'm wrong and you're right.

24                   The fan housing, I'm trying to get a sense

25        between the difference between the fan housing and the
```

```
 1        squirrel cage.

 2   A.   This is the fan housing.

 3   Q.   Okay.

 4   A.   Okay?

 5   Q.   You're pointing to Exhibit 18 and I think that's the

 6        circle that -- I don't think we put a number there, but

 7        let's put that as a 1.  Okay.  So go ahead.  I'm sorry.

 8   A.   Yeah.  The squirrel cage is inside, the squirrel cage fan

 9        is inside the housing, otherwise it would be ineffective.

10   Q.   And so let's look at Exhibit Number 3; all right?

11             Does Exhibit 3 show the squirrel cage?

12   A.   Exhibit Number 3 shows the housing.  It shows the -- this

13        is the housing.

14   Q.   You're referring to the black area in the center of the

15        picture?

16   A.   No.  The edges.  That's the housing (pointing).  The

17        squirrel cage is inside the housing.

18   Q.   Look at Exhibit Number 4; all right?

19             Is Exhibit Number 4 the squirrel cage?

20   A.   That's the squirrel cage.

21   Q.   Okay.  I think I've got it now.

22             So when you say the fan housing, you're

23        referring to the metal box in which, inside that, is the

24        squirrel cage?

25   A.   Correct.
```

```
 1   Q.   And the squirrel cage is really the fan blades that are
 2        inside the fan housing?
 3   A.   That's correct.
 4   Q.   All right.  As I understand it, within the scope of work
 5        for Air Tech in May of 2014 would have been to clean the
 6        fan housing and the fan or the squirrel cage, including
 7        the fan blades?
 8   A.   That's correct.
 9   Q.   All right.  I think I got it.  I understand the
10        difference.
11             You were here for the other depositions; right?
12   A.   Uh-huh.
13   Q.   So I asked people about how they were paid.
14   A.   Sure.
15   Q.   And were they paid 325 a day?
16   A.   Yeah, he was.  There's different wages, depending on their
17        experience.
18   Q.   Okay.  But are they all paid a flat fee or flat amount per
19        day?
20   A.   That is correct.
21   Q.   Do they get overtime?
22   A.   No.
23   Q.   So they're paid that flat amount no matter how much time
24        it takes them to work?
25   A.   That is correct.
```

1   Q.   It's somewhere here, but I'm gonna just sort of ask you

2        this question.

3                 I had a note that Air Tech did cleaning at four

4        Ball facilities?

5   A.   (Nodding head affirmatively.)

6   Q.   You gave me Milwaukee, Findlay, Fort -- is it Atkin --

7   A.   Fort Atkinson.

8   Q.   -- Atkinson and then the fourth would have been

9        Monticello?

10  A.   Correct.

11  Q.   Other than those four, you don't do any cleaning at any

12       other Ball facility?

13  A.   That's correct.

14  Q.   You were here when they talked about the tools that are

15       used?

16  A.   (Nodding head affirmatively.)

17  Q.   And I think --

18  A.   Yes.  Sorry.

19  Q.   -- it comes down to a scraper, a wire brush, an electric

20       grinder or wire brush, an air chisel.

21                 Anything else that I missed?

22  A.   No.  You pretty much got it.  And the vacuums, of course.

23  Q.   And the vacuum?

24  A.   Yeah.

25  Q.   Those are all the tools; true?

```
 1  A.   Yes.

 2  Q.   Anything else?  Rags?

 3  A.   And rags are just for when you find a wet spot, you know.

 4  Q.   Right.   Obviously I'm interested in dust.

 5            So these tools create dust when you're cleaning

 6       the oven; true?

 7  A.   True.

 8  Q.   And you give your workers masks so that they don't inhale

 9       the dust?

10  A.   Correct.

11  Q.   I've asked them, you know, are those the masks that just

12       cover your mouth and nose or are those like the full face

13       mask with the discs, and they said it's just the mask and --

14  A.   The nose with the disc, filtered disc.

15  Q.   And I just want to make sure that I kind of understand.

16            The ones you're talking about have -- the

17       filters are discs?

18  A.   Yeah.   They're round.

19  Q.   And you replace or you unscrew them from the mask and put

20       those back in?

21  A.   Correct.

22  Q.   There are some that are just like cloth that go around the

23       mouth.

24            Those aren't the ones we're talking about?

25  A.   No.
```

```
 1  Q.   When the work is done, the dust that is created by, for
 2       instance, cleaning the squirrel cage would settle at the
 3       base of the squirrel cage, which if you look at Exhibit 3,
 4       I think it was Mr. Woody who drew a circle around the base
 5       of the squirrel cage; is that true?
 6            MR. MILLER:  Objection.  Calls for speculation.
 7       Also lack of foundation.
 8  BY MR. SENAK:
 9  Q.   Go ahead.
10  A.   Yeah.  It always lands in the bottom here and that's all --
11  Q.   And then you would, or someone, an Air Tech employee,
12       would take the vacuum and vacuum out the base of the
13       squirrel cage, to get all that dust and debris out of
14       there?
15  A.   Correct.
16  Q.   Similarly, when the work is done inside the oven, dust or
17       pieces of the residue would fall to the bottom of the
18       oven; true?
19  A.   Correct.
20  Q.   And your employees, at the end, would either sweep up or
21       vacuum up that debris, to get it out of the oven?
22  A.   It's always vacuumed up.
23  Q.   I take it it's vacuumed because that's how small it is, I
24       mean right?
25            MR. MILLER:  Objection.  Calls for speculation.
```

```
 1        Assumes facts not in evidence.
 2   A.   You have different size pieces of debris.
 3   BY MR. SENAK:
 4   Q.   Either they could pick it up with their hands, pull it
 5        out, or they could vacuum it up?
 6   A.   Yeah, because we want to get it out of there thoroughly.
 7        So --
 8   Q.   Yep.  Had Air Tech cleaned the ductwork at the Monticello
 9        plant?
10   A.   What do you mean by that?
11   Q.   Let me go back to --
12   A.   Oh, duct?  Yeah.  It's --
13   Q.   Let me try this.
14            MR. SENAK:  Andrew, I'm sorry, but I have but
15        one copy of this.  It's the Vergon & Associate fire
16        report.
17            MR. MILLER:  And that's gonna be Exhibit 19?
18            MR. SENAK:  That's gonna be 19.
19            (At 10:55 a.m., Deposition Exhibit Number 19 was
20            marked.)
21   BY MR. SENAK:
22   Q.   I'm gonna show you Exhibit 19, which is part of the Vergon
23        & Associates fire report.  And by that, I mean it's the
24        first three pages.  Oh, that's really not where or what I
25        thought it was going to be.  Hold on.
```

```
 1                    Let me just ask you the question and see if you
 2         can answer it.
 3                    Do you know whether the ductwork was cleaned in
 4         2013?
 5    A.   Yes.
 6    Q.   Okay.  Did Air Tech do that work?
 7    A.   Yes.
 8    Q.   And if you look at Exhibit 14, which is the interrogatory
 9         answers, and I think you were already looking because I
10         think you knew, maybe you knew what I was looking for.
11    A.   Uh-huh.
12    Q.   Does it show the date in 2013 when the ductwork was
13         cleaned?
14    A.   Yes.
15    Q.   What was the date?
16    A.   11-30-2013.
17    Q.   Would that ductwork have included the ductwork above IBO
18         Number 2?
19    A.   Yes.
20    Q.   All right.  So is it accurate to say that the ductwork
21         that's shown in Exhibits 1, 2, 18, that would have been
22         cleaned by Air Tech in November of 2013?
23    A.   Correct.
24    Q.   Okay.  Air Tech cleans IBO's at three other Ball
25         facilities; true?
```

1   A.   True.

2   Q.   And the frequency with which Air Tech cleans those, is it

3        the same frequency that it cleans at Monticello, the

4        IBO's?

5   A.   The frequency at the other Ball facilities is much more

6        often.

7   Q.   Okay.  Can you just tell me what you mean by "more often"?

8   A.   With the other facilities, we get a yearly schedule that

9        we have to clean their ovens, and it's usually we'll clean

10       the oven probably about every three to four months, the

11       same oven.  Monticello started out that way and it got

12       eventually stretched out to about a year.

13  Q.   The frequency with which you cleaned IBO's at Monticello,

14       is that every year?

15  A.   Each, each oven they tried to have it done every year,

16       yeah, each line.

17  Q.   And if we look at --

18  A.   And you can see the schedule.

19  Q.   Right.  I was just gonna say if you look at Exhibit 14 and

20       then you look at Exhibit or Interrogatory Number 8, it

21       looks like, at least here, when you say, like, 10-24-2011,

22       it says line to PIN, line to IBO?

23  A.   Uh-huh.

24  Q.   So that would have been a cleaning of IBO Number 2; true?

25  A.   Correct.  Correct.

```
 1   Q.   Then if you go down, it says 6-25-12, Line 2 IBO, Zone 1

 2        and 2, also PIN 2, that would have been, like, the next

 3        year?

 4   A.   Uh-huh.

 5   Q.   It's just about, well, you know, eight months later, they

 6        cleaned IBO 2 again?

 7   A.   Yep.

 8   Q.   Now, in 2013, do you recall cleaning IBO Number 2?

 9   A.   2013?

10   Q.   And let me just --

11   A.   It looks like, it looks like May; right?  Line 2.

12   Q.   Okay.  I missed that one.  Sorry.

13   A.   Yep.

14   Q.   Then the next IBO 2 cleaning appears to be January 29th of

15        2014?

16   A.   Yes.

17   Q.   And then the May 22nd, 2014 cleaning; true?

18   A.   Correct.

19   Q.   Okay.

20   A.   I'm sure these are pretty accurate.

21   Q.   Yeah.  I think these are the same dates as the invoices

22        that you produced, so I think they're, as you say, they're

23        kind of, they're pretty accurate.

24             When you cleaned the ductwork, do you do it

25        differently than when you do, like, the ovens?
```

```
 1   A.   No.   Same.

 2   Q.   The same tools, same approach, same material on the inside

 3        of the ductwork that's in the ovens?

 4   A.   Correct.

 5   Q.   If the oven in the ductwork is cleaned properly, is it

 6        accurate that there shouldn't be any residue on the inside

 7        of the oven after it's cleaned?

 8   A.   On the inside of the, of the oven?

 9   Q.   Right.

10   A.   Right.

11   Q.   And that's also true there shouldn't be any, like,

12        creosote or residue on the inside of the squirrel cage or

13        the exhaust, if it's cleaned properly?

14   A.   Yes.

15   Q.   All right.  If there is residue there, that would suggest

16        it was not cleaned properly?

17   A.   It would depend.  It, it would depend, but --

18   Q.   Generally, that would be a true statement?

19   A.   Yeah.

20   Q.   All right.  Interrogatory Number 19, which is Exhibit 14.

21   A.   14, you said?

22   Q.   Right.  Well, I'm sorry.  Answer 19, Exhibit 14.

23   A.   Oh.

24   Q.   You talked about that you had told Ball Corporation that

25        there were occasions when the ovens may have been
```

```
 1      especially dirty?

 2  A.  Correct.

 3  Q.  Do you see that?

 4  A.  Yes.

 5  Q.  Did you ever tell them that they needed to be cleaned more

 6      frequently?

 7  A.  Yes.

 8  Q.  I note that Exhibit 19 does not contain that statement.

 9  A.  It was all verbal.  Yeah.  But --

10  Q.  When you say you told them verbally you should clean it

11      more frequently, just tell me when that statement was

12      made.

13  A.  I don't have the date.  You know, if an oven was really

14      dirty, I would just say, you know.

15  Q.  That you should clean it more frequently?

16  A.  Yeah, clean them more frequently.  Airflow --

17  Q.  Who would you tell?

18  A.  One of those three guys.

19  Q.  By the three, you mean the three --

20  A.  Whoever was in charge at that time -- Dale Spencer, Jerry

21      Morgan or Randy Russell.

22  Q.  Thank you.  Did you ever tell anyone at Ball that the

23      ductwork should be cleaned more frequently?

24  A.  Yes.

25  Q.  I note that wasn't included in Exhibit -- or in your
```

```
 1       response to Exhibit -- or Interrogatory 19 either.

 2   A.  The question was really we were dealing more in the ovens,

 3       so I just didn't even --

 4   Q.  And that's why I'm -- you know, one of the parts of this

 5       is I just want to make sure I get everything complete.

 6   A.  Right.

 7   Q.  So, you know, I want to know whether you told them to

 8       clean it more frequently and, by that, I mean the ductwork

 9       and the oven, who you told, when you told them, how you

10       told them, all of that; all right?

11           Those statements would have been made verbally

12       to one of the three people that you've identified; true?

13   A.  True.

14   Q.  Did you ever include that in any written communication you

15       had with Ball?

16   A.  No.

17   Q.  All right.  Now we can go to the Vergon fire report, which

18       is this one here.

19           THE WITNESS:  I got an awful loud chair here.

20           MR. SENAK:  Do you want to take a break?

21           THE WITNESS:  No.  But I've got a loud chair.

22       Every time I move, it's like --

23           MR. SENAK:  That's true.

24   BY MR. SENAK:

25   Q.  I just want to make sure that some of what's in here is
```

```
 1        true, you know.

 2   A.   Uh-huh.

 3   Q.   Now, Mr. Vergon interviewed you and Mr. Wall?  That's

 4        shown on Exhibit -- or Page 2?

 5   A.   2.

 6   Q.   It says, "Witness information provided.  Ken Wall, Paul

 7        Scholten, Air Tech of Michigan."

 8             Do you recall talking to Mr. Vergon?

 9   A.   Yes.

10   Q.   All right.  Now, he goes on and he says, "On May 22, 2014

11        the cleaning of IBO was commenced at 7:00 a.m. at the end

12        of a twelve-hour Ball Corporation plant shift"; is that

13        true?

14   A.   I don't know that.

15   Q.   Okay.  That may have been from, say, Mr. Wall?

16   A.   Yes.

17             MR. MILLER:  I'm gonna -- it calls for

18        speculation.

19             THE WITNESS:  Yeah.

20   BY MR. SENAK:

21   Q.   No.  I just want to -- you don't know whether that

22        statement is true or not?

23   A.   I don't, no.

24   Q.   Okay.  It says, "The oven operates at approximately 400

25        degrees Fahrenheit."
```

```
 1              Do you know whether that's true or not?
 2   A.   Usually it would go by the --
 3   Q.   You tell me.
 4   A.   I don't because of the --
 5   Q.   Okay.  "And the ovens were still hot when the Air Tech
 6        crew arrived".
 7              Do you know whether that is true or not?
 8   A.   I don't.
 9   Q.   Have you ever cleaned an oven where you came to do the job
10        and the oven had just been taken out of production and was
11        still hot?
12   A.   Yes.
13   Q.   You can't work in that oven at that point; can you?
14   A.   No, sir.
15   Q.   And 400 degrees is way beyond what is a working -- you
16        can't get inside a 400 degree oven.  Let's put it that
17        way.
18   A.   No.  No.
19   Q.   You have to wait for the oven to cool down?
20   A.   Yes.
21   Q.   How long does it take?
22   A.   Depends on the oven, you know.  It can take an hour.  I
23        mean --
24   Q.   All right.  So if this, if this information that's
25        reflected in Mr. Vergon's report is accurate, it's 7:00
```

```
 1        a.m. when Air Tech gets there, the oven's just taken out
 2        of production, they have to wait at least an hour before
 3        they can start their work; is that true?
 4                  MR. MILLER:  Objection.  Calls for speculation.
 5   A.   Approximately.  Like I say, it depends on the oven, how
 6        quick it cools down.
 7   BY MR. SENAK:
 8   Q.   Right.  Let's say this:  They couldn't start at exactly
 9        7:00 if that oven was at 400 degrees?
10   A.   That's correct.
11   Q.   You were here for Mr. Wall's testimony?
12   A.   Yes.
13   Q.   He said he was the supervisor; is that true?
14   A.   Yes.
15   Q.   Okay.  What is his function as the supervisor?
16   A.   He just makes sure -- you know, one of things he takes
17        care of is helps on the top of the IBO and makes sure that
18        everything is cleaned properly there, but he's in charge
19        of the whole oven, so he's going around and checking and
20        making sure everything is done properly.
21   Q.   You know, I was there after the fire, as, I think, you
22        were --
23   A.   Uh-huh.
24   Q.   -- when they were taking this whole thing apart.
25   A.   Correct.
```

1   Q.   When you get up on top of that IBO, do you wear, like, a

2        lanyard or a harness, to make sure you don't fall or if

3        you do, so that you don't --

4   A.   That is a rule they started just recently before that.

5   Q.   I mean would your employees wear that same kind of device

6        to protect themselves?

7   A.   Yes.

8   Q.   Am I wrong that under, I think, the Ball rules, anybody

9        who gets up there has to wear that device?

10  A.   Correct.

11  Q.   So have there been occasions where you've gone up on top

12       of the oven to either clean it or inspect it?

13  A.   Yes.

14  Q.   And you have worn that same device?

15  A.   Correct.

16  Q.   All right.  If you look at Mr. Vergon's report, it goes

17       on, it says, "It is also" -- and this is referring to the

18       scale or the residue that's on the inside of the ovens or

19       the ductwork or the squirrel cage.

20  A.   Where are we at?

21  Q.   I'm kind of right in the center --

22  A.   Okay.

23  Q.   -- of the first paragraph.  It says, "It is also generally

24       described as a creosote type residue that adheres to the

25       surface of the oven and ductwork over time similar to

1    creosote that builds up on the fireplace chimney flue

2    pipe."

3            Do you see that?

4    A.    Uh-huh.

5    Q.    That's an accurate description of what is on the inside of

6    the oven and the ductwork?

7    A.    Yes.  Correct.

8    Q.    It says, "They also clean the exhaust blower."

9            I think we covered that.  That's true?

10   A.    Yes.

11   Q.    And then it goes on and it says, "Mr. Scholten advised

12   that the goo would always drop down into the blower from

13   the ductwork above so they would clean above the blower as

14   far as they could reach"?

15   A.    Correct.

16   Q.    Is that true?

17   A.    That's true.

18   Q.    So if we look at -- and maybe this is a good one.

19            Is it accurate that Number 1 is the blower?

20   A.    That's correct, the, the housing.

21   Q.    The blower housing?

22   A.    Yep.

23   Q.    And then what you're saying here is that -- and I think

24   Mr. Woody talked about it, too -- that he would reach up

25   as far as he could and clean the inside of that ductwork

```
 1        or housing.
 2                 Is there a photograph that kind of shows what
 3        would happen?
 4   A.   Yeah.  Right here's the housing.
 5   Q.   And we're talking Exhibit Number 4?
 6   A.   Right.  And inside is the squirrel cage fan.  Well, you
 7        can't get much past that because you can see the gap is
 8        not that big.
 9   Q.   You're referring to the top of the photograph of Exhibit
10        Number 4, the distance between the fan blade and the
11        housing?
12   A.   Right.
13   Q.   Okay.
14   A.   Right.
15   Q.   Okay.  So when you say they would clean above the blower,
16        you're talking above the fan blade shown in Exhibit Number
17        4?
18   A.   That is correct, as far as they can reach, which is not
19        very far.
20   Q.   So they would stick their hand in that gap and try to get
21        as far as they could?
22   A.   Right.
23   Q.   All right.  Going back to Mr. Wall and the supervisor.
24   A.   Uh-huh.
25   Q.   Again, his function, I take it, is to supervise the Air
```

```
 1        Tech employees?

 2   A.   Correct.

 3   Q.   Mr. Wall is not responsible for supervision of the Ball

 4        employees; true?

 5   A.   True.

 6   Q.   And I take it you don't believe that it is Ball's duty to

 7        supervise the Air Tech employees?

 8             MR. MILLER:  I'm gonna object.  Lack of

 9        foundation.

10   A.   You know, if they've got -- supervise, no -- but, you

11        know, if they've got something they want done in

12        particular, they let us know.

13   BY MR. SENAK:

14   Q.   Right.  They would tell you or they'd tell Mr. Wall --

15   A.   Exactly.

16   Q.   -- to direct the Air Tech employees?

17   A.   Yep.

18   Q.   The Ball people couldn't tell your employees what to do?

19   A.   No.

20   Q.   I take it one of the Air Tech supervisor's duties is to

21        make sure the Air Tech employees do their job?

22   A.   Correct.

23   Q.   And Air Tech's job was to clean the oven?

24   A.   Correct.

25   Q.   That's what Air Tech was hired and paid to do; true?
```

```
 1  A.   True.

 2  Q.   So it was Air Tech's supervisor, Mr. Wall, his duty to

 3       make sure the oven was clean?

 4  A.   Correct.

 5  Q.   It wasn't --

 6  A.   Well, it's everybody's duty, but yeah.

 7  Q.   Yeah.  I mean that's what you guys get paid for?

 8  A.   Uh-huh.  Yes.

 9  Q.   Ball doesn't do that work; they don't clean the oven?

10  A.   No.

11  Q.   So I take it it's not their job to make sure the oven's

12       clean?

13                  MR. MILLER:  Objection.  Lack of foundation.  It

14       also calls for a legal conclusion.

15  BY MR. SENAK:

16  Q.   You can answer.

17  A.   Well, they wanna make sure it's clean.

18  Q.   They don't do that work though?

19  A.   No.

20  Q.   All right.  And so when they don't do the work, obviously

21       they can't actually clean the oven?

22  A.   No.

23                  MR. MILLER:  Objection.

24  BY MR. SENAK:

25  Q.   So they wouldn't have the ability to make sure the oven
```

```
 1         was clean, because they don't do the work; true?
 2                   MR. MILLER:  Objection.  Calls for speculation.
 3    A.   They'd inspect the oven.
 4    BY MR. SENAK:
 5    Q.   Oh, we'll get to that, but I mean in terms of --
 6                   MR. SENAK:  I'm sorry.
 7                   MR. MILLER:  Lack of foundation.  Calls for a
 8         legal conclusion.
 9    BY MR. SENAK:
10    Q.   Actually doing the work to make sure the work is done,
11         Ball doesn't do that?
12    A.   No.
13    Q.   Air Tech does that?
14    A.   Yes.
15    Q.   To make sure that the Air Tech employees do their job, the
16         Air Tech supervisor inspects their work; true?
17    A.   Correct.
18    Q.   I take it it's not the Air Tech supervisor's duty to
19         inspect the work of Ball employees?
20    A.   No.
21    Q.   Ball employees are hired to make cans; right?
22                   MR. MILLER:  I'm gonna object.  It calls for
23         speculation and beyond the scope of his knowledge.  He
24         doesn't know that, Mark.
25    BY MR. SENAK:
```

```
1   Q.   Right?

2   A.   Yeah.

3                MR. SENAK:  I mean he's been in the plant for

4        twenty years.  I don't know how you could not know it, but --

5                MR. MILLER:  Mark, is the risk manager that is

6        the author of one of these emails --

7                MR. SENAK:  Okay.  It's okay.  It's okay.

8                MR. MILLER:  -- is he hired by Ball to make a

9        can?

10               MR. SENAK:  Calm down.  Calm down.

11               MR. MILLER:  No, Mark.  You're making -- you're

12       editorializing and --

13               MR. SENAK:  Yeah, but you're making speaking

14       objections, too.  And, really, I'm trying to finish this

15       off and I'm not too far, you know.

16               MR. MILLER:  Mark, no.  It's improper and you

17       know it.

18               MR. SENAK:  Oh, no.  It's not improper.  It

19       absolutely isn't.

20               MR. MILLER:  So you're telling me --

21               MR. SENAK:  What's improper is the speaking

22       objection you're making right now.

23               MR. MILLER:  No.  You're telling me --

24               MR. SENAK:  We know that's improper; okay?

25               MR. MILLER:  You're telling me --
```

1           MR. SENAK:  My questions, if they are improper,

2     you simply object to them, you make your record and we

3     move on, or you instruct him not to answer the question.

4     You know that, Andrew.  I mean we've done this enough.

5           MR. MILLER:  The risk manager that is identified

6     on Exhibit Number --

7           MR. SENAK:  Andrew, I don't know what you're

8     doing here other than disrupting the deposition; okay?

9           MR. MILLER:  -- 17 is not hired to make cans.

10    It's a misstatement of the factual --

11          MR. SENAK:  I mean I really would ask that --

12          MR. MILLER:  -- record by counsel for Plaintiff.

13          MR. SENAK:  -- you just make your objection.  I

14    understand your objection.  You understand your objection;

15    okay?  You understand my question.  He can either answer

16    it, he cannot answer it, you can tell him not to answer

17    it.  All those are well within reason.  But, you know, the

18    speech is wrong and you know that; okay?

19          MR. MILLER:  So Defendant stands on its

20    objection.

21          MR. SENAK:  Can you go back and read the last

22    question before all of this started?  You know what, I can

23    pick up; okay?

24    BY MR. SENAK:

25    Q.  One thing we know for sure is Air Tech is not hired to

```
 1      make aluminum cans at the Monticello plant?

 2  A.  Right.

 3  Q.  And so since Air Tech's not hired to make cans, it would

 4      have no duty to supervise or make sure the Ball employees

 5      make the cans properly?

 6  A.  That would be a good conclusion.

 7  Q.  All right.  You would agree with that?

 8  A.  Yes.

 9  Q.  Air Tech is hired to clean ovens; true?

10  A.  True.

11  Q.  And Ball is not hired to clean ovens?

12          MR. MILLER:  I'm gonna object.  Calls for

13      speculation.

14  A.  True.

15  BY MR. SENAK:

16  Q.  So is it true that since Air Tech has no duty to inspect

17      Ball's work, Ball would have no duty to inspect Air Tech's

18      work?

19          MR. MILLER:  I'm gonna instruct -- that calls

20      for a legal conclusion -- I'm gonna instruct the witness

21      not to answer.

22          MR. SENAK:  Really?

23          MR. MILLER:  Uh-huh.

24          MR. SENAK:  Wow.  Okay.  I guess, then, for what

25      it's worth, I'd like the question certified so that we can
```

```
 1       have the judge rule on that one.
 2  BY MR. SENAK:
 3  Q.   My apologies if I've asked this one.  I think I may.
 4            You personally didn't inspect either the fan
 5       housing or the squirrel cage after the work was done on
 6       May 22nd of 2014?
 7            MR. MILLER:  Objection.  Asked and answered.
 8  A.   No.
 9  BY MR. SENAK:
10  Q.   All right.  That's what I thought.
11            There's -- there have been -- do you know
12       whether there have been prior fires in the ductwork at the
13       Ball plant?
14  A.   I do not know that.
15  Q.   All right.  We talked about the confined space training?
16  A.   Uh-huh.
17  Q.   OSHA regulation, as I understand it?
18  A.   I believe so.
19  Q.   All right.  Are you aware of any codes, rules, regulations
20       regarding oven cleaning, other than that confined space
21       training?
22  A.   No.  I'm not aware of.
23  Q.   Aware of any codes, rules, regulations or instructions
24       regarding how frequently IBO's should be cleaned?
25  A.   No.
```

```
 1   Q.   How about any codes, rules, regulations regarding how
 2        frequently ductwork attached to IBO's should be cleaned?
 3   A.   Not aware of any.
 4   Q.   All right.  Mr. Vergon's report, Page 3, first full
 5        paragraph begins with "Mr. Scholten".  I'm interested in
 6        the last sentence:  "And it is his opinion that this
 7        particular plant has an issue with exhaust airflow."
 8                  Do you see that?
 9   A.   Uh-huh.
10   Q.   Other than that, do you have any other opinions about this
11        case?
12   A.   No.
13   Q.   Do you have any opinion on the cause of the fire?
14                  MR. MILLER:  Objection.  Exceeds -- he doesn't
15        have the expertise, he's testified to that, and it --
16   A.   No.
17                  MR. MILLER:  -- calls for speculation.
18   BY MR. SENAK:
19   Q.   I just need to make sure, you know.
20                  MR. MILLER:  May I please finish my objection?
21                  MR. SENAK:  I'm sorry.  I didn't -- are you
22        done?
23                  MR. MILLER:  Yes, but you spoke over me when I
24        was trying to, and it's impossible for our court reporter
25        to transcribe two people talking at one time.
```

```
 1              MR. SENAK:  I'm usually -- I always -- I try my
 2         best; all right?
 3  BY MR. SENAK:
 4  Q.   I'm interested in this opinion about the adequacy of the
 5         airflow.  Tell me what it is.
 6              And, you know, I mean do you have an opinion
 7         about the adequacy of the airflow?  I mean it's shown in
 8         Mr. Vergon's report that apparently you told him that.
 9         I'm just curious as to what it is.
10  A.   Anytime, anytime there's a baking situation and your
11         airflow is diminished, you get condensation.
12  Q.   Okay.
13  A.   It condensates, where you get the liquid, the goo.
14  Q.   You're talking on the inside of the duct and really on the
15         inside of the oven; right?
16  A.   Correct, where, when you get the goo; otherwise, it's dry,
17         you know.  And so that's why I mentioned that, that that
18         should be looked into.
19  Q.   Do you know what the different methods are for measuring
20         airflow?
21  A.   No.
22  Q.   Do you know that there are different methods for measuring
23         airflow?
24  A.   Oh, I'm sure there are.
25  Q.   Do you know that there are tools that measure airflow?
```

```
 1   A.   Gauges, yeah.  I'm sure.

 2   Q.   I take it you've never used any of those to measure the

 3        airflow either in the oven or in the ductwork or in the

 4        squirrel cage or in the exhaust housing at the Ball plant

 5        on any of the IBO's?

 6   A.   No.

 7   Q.   All right.  Is it true that you would not know the correct

 8        unit of measure to determine if the airflow was adequate?

 9   A.   That would be true.

10   Q.   And you would not know what is the correct amount of

11        airflow for an IBO?

12   A.   No.

13   Q.   You've never taken any measurements of airflow at the IBO

14        at the Monticello plant?

15   A.   No.

16   Q.   You have not?

17   A.   No.

18   Q.   And so you don't really know what the airflow is in the

19        IBO's at the Monticello plant?

20   A.   No.

21   Q.   Or what it should be?

22   A.   No.

23   Q.   We talked about operating temperature and do you know what

24        the proper operating temperature of an IBO is during

25        normal operation?
```

```
 1   A.    No.

 2   Q.    Do you know the temperature of the ductwork during normal

 3         operating conditions?

 4   A.    No.

 5   Q.    Do you know the temperature of the squirrel cage during

 6         normal operating conditions?

 7   A.    No.

 8   Q.    Do you know the temperature of the housing that contains

 9         the squirrel cage during normal operating conditions?

10   A.    No.

11               MR. SENAK:  Let's take just like five minutes

12         because I'm very close to being done and then we can wrap

13         it up.

14               (At 11:23 to 11:25 a.m. recess taken.)

15               (At 11:25 a.m., Deposition Exhibit Number 20 was

16         marked.)

17   BY MR. SENAK:

18   Q.    We talked about Exhibit 1.  We talked about Exhibit 2.

19               Exhibit 3, can you just tell me what Exhibit 3

20         shows?

21               MR. MILLER:  Objection.  Lack of foundation.

22   A.    It shows a fan housing.

23   BY MR. SENAK:

24   Q.    Is this a fan housing on an IBO?

25   A.    It looks like an IBO.  Yeah.
```

```
 1   Q.   Do you know whether this is IBO Number 2 at the Ball
 2        plant?
 3   A.   I don't know which, which one it is, but it definitely
 4        looks like an IBO.
 5   Q.   Sure.  Exhibit Number 3 and Exhibit Number 5?
 6   A.   Uh-huh.
 7   Q.   In Exhibit Number 3, there's a circle drawn around what I
 8        believe is the fan housing?
 9   A.   Right here.  Yeah.
10   Q.   The fan housing, as you're facing the photograph to the
11        right of the fan housing, there's kind of a rectangular
12        box with a 45-degree piece that comes off of it.
13             What is that?
14   A.   That's, that's ductwork.
15   Q.   Okay.  That's just referred to as ductwork?
16   A.   Yes.
17   Q.   Is that something that Air Tech would clean?
18   A.   Yes.
19   Q.   All right.  And if you look at Exhibit Number 5, there's
20        an access panel, it appears, on that piece of ductwork?
21   A.   Uh-huh.  Yes.  I'm sorry.  Gosh.
22   Q.   I take it when that piece of ductwork is cleaned, the
23        access panel is removed and Air Tech then cleans out the
24        inside of that ductwork; true?
25   A.   That's correct.
```

```
 1   Q.   Okay.  We talked about Exhibit 4 is a picture of the
 2        squirrel cage; is that true?
 3   A.   Yes.
 4   Q.   Let's see.  Exhibit 6 would, again, be a picture inside
 5        the squirrel cage; true?
 6             MR. MILLER:  Objection.  Lack of foundation.
 7   A.   That's the squirrel cage.  Yes.
 8   BY MR. SENAK:
 9   Q.   All right.  And it shows the fan blades?
10   A.   Yep.
11   Q.   That would have been something that Air Tech -- or let me
12        try that again.
13             That would have been within the scope of work of
14        the cleaning done by Air Tech on IBO Number 2 in May of
15        2014?
16   A.   Yes.
17   Q.   Exhibit 7, do you know what it shows?
18   A.   It looks like an IBO with the doors off.
19   Q.   That's inside the IBO; true?
20             MR. MILLER:  Objection.  Lack of foundation.
21        What part are you referring to?
22   BY MR. SENAK:
23   Q.   Let me try it again.  Does that show the inside of an IBO
24        before or after it's cleaned?
25   A.   Oh, I don't know that.  I can't tell.
```

```
 1   Q.   Exhibit Number 8, again, do you know whether that shows an
 2        IBO before or after it was cleaned?
 3   A.   I can't tell that.
 4   Q.   Exhibit Number 9, does that show an IBO before or after it
 5        was cleaned?
 6   A.   I can't tell that.  Looks like somebody scraped it.
 7   Q.   Yeah.  And that's what I -- it shows, I think in Exhibit
 8        9, that the metal parts inside of the oven have been
 9        scraped; is that true?
10              MR. MILLER:  Objection.  Lack of foundation.
11        Calls for speculation.
12   A.   In some areas it does.
13   BY MR. SENAK:
14   Q.   Are those areas shown by circular sort of rotational
15        scratches on the metal?
16   A.   I can't tell that.  I'm sorry.
17   Q.   No.  I understand.
18              You know, you've cleaned these ovens, so when
19        they are clean, do they show rotational scratches where
20        either the grinder or the wire, the electric wire brush,
21        where the surface metal has been, has been cleaned?
22   A.   Where it needs to be, yes.  The circular grinder, it does
23        show it, but not all areas need it.
24   Q.   Good point.  You clean the areas where there's actually
25        residue?
```

1  A.    Exactly.

2  Q.    Right.  And those areas would show the type of grind marks

3        shown in Exhibit 9?

4              MR. MILLER:  Objection.  Misstates his prior

5        testimony, calls for speculation, lack of foundation.

6  A.    This surface here looks like it was ground.  Yes.

7  BY MR. SENAK:

8  Q.    Can you just take your marker there, draw a circle around

9        the area you're referring to and your initials and the

10       date?

11 A.    Okay.

12 Q.    And help me out here.  What you do is you circled an area

13       on Exhibit Number 9 that reflects where the metal internal

14       structures of the oven had been cleaned by a grinder?

15 A.    That is a spot that was cleaned by a grinder.

16 Q.    All right.  Exhibit Number 10 shows a person using what I

17       believe is a grinder or a electric wire brush to clean the

18       oven or to clean a piece of metal; is that true?

19 A.    It looks like it.

20             MR. MILLER:  Lack of foundation.  Calls for

21       speculation.

22 BY MR. SENAK:

23 Q.    Is this the type of work that's done when an IBO is

24       cleaned?

25 A.    You mean using the grinder?

1  Q.   Yes.

2  A.   Yes.

3  Q.   I mean does Exhibit 10 show a reasonable depiction of how

4      the internal metal portions of an oven, an IBO, are

5      cleaned?

6           MR. MILLER:  I'm gonna object.  It calls for

7      speculation.

8  A.   This looks like the outside door panel.

9  BY MR. SENAK:

10  Q.   All right.  Of an IBO oven?

11  A.   Of an IBO oven.

12  Q.   But this is how you clean it with a grinder; true?

13  A.   If it needs it, yeah.

14  Q.   And, again, Exhibit Number 11, I take it, shows a piece of

15      an IBO oven, some of which has been cleaned with a grinder

16      and some of which still contains the residue that is the

17      reason why you clean it?

18  A.   I really can't tell what, you know, what, what this is.

19  Q.   Sure.  Exhibit Number 12, does that show ductwork that has

20      been cleaned?

21  A.   That has been cleaned?  I can't tell.

22           MR. MILLER:  Objection.  Calls for speculation.

23      Lack of foundation.

24  A.   I really can't tell on that.

25  BY MR. SENAK:

```
1   Q.   When ductwork is cleaned, does it -- do you -- does it --
2        is it cleaned to the metal, to the bare metal, I guess is
3        a better way of putting it?
4   A.   Not always because a lot of times it's just discolored
5        from the heat.  It's not dirty but it's just -- so no.
6   Q.   Let's say this:  When you do clean it, do you clean it
7        down to the metal?
8   A.   When we clean it down to the metal?
9   Q.   Yeah.  When Air Tech cleans either parts of the oven or
10       parts of the ductwork, when you do clean it, do you clean
11       it down to the metal?
12  A.   We try, yes.
13  Q.   And is that shown at all in Exhibit Number 12?
14            MR. MILLER:  Objection.  Calls for speculation.
15       Lack of foundation.
16  A.   Yeah.  I don't know what that is.
17  BY MR. SENAK:
18  Q.   Do you know what Exhibit 13 is?
19  A.   Looks like the back of a IBO.
20  Q.   All right.  I'm showing you Exhibit 20.
21            Do you know what Exhibit 20 is?
22            MR. MILLER:  I'm gonna object.  Lack of
23       foundation, calls for speculation, also it's not relevant.
24  BY MR. SENAK:
25  Q.   Do you know what Exhibit 20 is?
```

```
 1   A.    It looks like an insurance policy.

 2   Q.    Air Tech's?

 3              Well, all I can tell you is if you look at the

 4         bottom, you can see there are numbers attached to it, this

 5         is something that Air Tech produced in the course of

 6         discovery.

 7   A.    Must be insurance produced it.  I, I can't --

 8   Q.    Here's my simple question.

 9   A.    Okay.

10   Q.    Do you know whether you have insurance for this claim?

11   A.    Yes.

12              MR. MILLER:  Objection.  Calls for speculation.

13   BY MR. SENAK:

14   Q.    Do you know how much?

15   A.    How much?

16   Q.    Yeah.

17              MR. MILLER:  I'm gonna object.  Calls for

18         speculation, beyond the scope of his personal knowledge

19         and calls for a legal conclusion.

20   A.    I don't know.  I'd have to read through it.

21   BY MR. SENAK:

22   Q.    All right.  Do you know how much insurance Air Tech has

23         that applies to this claim?

24              MR. MILLER:  Again, objection.  Calls for a --

25   A.    No, I don't.
```

```
 1                    MR. MILLER: -- legal conclusion.
 2   BY MR. SENAK:
 3   Q.    No one has told you --
 4                    MR. MILLER:  Paul, again, you've got to allow me
 5         to finish.
 6                    THE WITNESS:  Oh, I'm sorry.
 7                    MR. SENAK:  Go ahead.
 8                    MR. MILLER:  Calls for a legal conclusion.
 9   BY MR. SENAK:
10   Q.    Has anyone told you how much insurance coverage Air Tech
11         has for this claim?
12   A.    If I did, it was from --
13                    MR. MILLER:  Probably protected by the
14         attorney/client privilege.
15                    MR. SENAK:  Well, assuming that you would
16         conclude it, that's not factual information and somehow
17         reflects advice of counsel or work product, but I can't
18         see how that could be true, but, you know, reasonable
19         minds may differ on this.
20   BY MR. SENAK:
21   Q.    I'm just trying to figure out how much insurance coverage
22         you have; all right?  That's all I want to know.  I asked
23         the question in the interrogatories, you know, and it was
24         objected to and I understand that, but, you know, I'm
25         obviously curious as to how much insurance Air Tech has
```

```
 1        that's applicable to this case.

 2                    And so do you know how much insurance Air Tech

 3        has, generally?

 4                    MR. MILLER:  Objection.  Calls for speculation,

 5        calls for a legal conclusion, attorney/client privilege

 6        and lack of foundation and --

 7   BY MR. SENAK:

 8   Q.   You can go ahead and answer.

 9                    MR. MILLER:  -- asked and answered.

10   A.   I don't know.  It, it, it --

11   BY MR. SENAK:

12   Q.   That's all right.

13   A.   Insurance companies -- I don't know.

14   Q.   When you were -- when you received the Summons and

15        Complaint in this case, did you notify your insurance

16        company?

17   A.   Yes.

18   Q.   Okay.  And did your insurance company send you back a

19        letter acknowledging that the claim was covered?

20                    MR. MILLER:  I'm gonna object.  It calls for

21        speculation.

22   A.   I don't believe so.

23   BY MR. SENAK:

24   Q.   All right.  Do you recall receiving any communication from

25        your insurance company telling you the claim was not
```

```
 1      covered?

 2  A.  No.

 3  Q.  Is it your understanding that whatever claim is made in

 4      this case, it is covered by your insurance?

 5              MR. MILLER:  Again, I'm gonna object.  It calls

 6      for speculation, calls for a legal conclusion and --

 7  A.  I really don't have --

 8              MR. MILLER:  -- also potentially violates the

 9      attorney/client privilege.

10  BY MR. SENAK:

11  Q.  Go ahead.

12  A.  Okay.  I don't have an answer for that, Mark.  I really

13      don't.

14  Q.  I understand.  As I understand Exhibit 20, okay, Exhibit

15      20 shows that there is 2 million dollars in insurance

16      coverage per occurrence under what is termed a commercial

17      general liability coverage.

18              Do you see what I'm referring to?

19  A.  Right on the top here?

20  Q.  Yeah.  It says limits of insurance, each occurrence, limit

21      2 million.  Above that, it talks about commercial

22      generally liability coverage.

23              Do you see that?

24  A.  Uh-huh.

25  Q.  You have to answer out loud.
```

```
 1  A.   Oh, I'm sorry.  Yes.

 2  Q.   That's all right.  Air Tech, to your knowledge, has

 3       commercial general liability coverage; true?

 4                 MR. MILLER:  I'm gonna object.  Calls for a --

 5  A.   Yes.

 6                 MR. MILLER:  -- legal conclusion and asks him to

 7       speculate.

 8  BY MR. SENAK:

 9  Q.   Do you know whether you have commercial --

10  A.   Yes.

11  Q.   You do?

12  A.   Yeah.  I would -- every company needs -- you know.

13  Q.   Absolutely.

14  A.   You've gotta have it.

15  Q.   It's a good thing.

16                 If you go to the second page, you'll see the

17       title is Commercial Umbrella Liability Coverage.  If you

18       go down, it says limits of insurance, 3 million dollars,

19       each occurrence limit?

20  A.   Right here?

21  Q.   Yes.  I think it's -- where am I?  I'm right in here.

22  A.   Right here?

23  Q.   Yeah.

24  A.   I see 3 million.

25  Q.   Okay.  Do you know whether Air Tech has commercial
```

1     umbrella liability coverage that applies to this case or

2     to this claim?

3                 MR. MILLER:  Objection.  Calls for speculation,

4     calls for a legal conclusion and potentially breaches the

5     attorney/client communication.

6  A.  You know, I don't know.  I see the paper here, but I don't

7     know.

8  BY MR. SENAK:

9  Q.  I'm, I'm -- you know.

10                Do you know the amount of damages that's claimed

11    in this case?

12 A.  I have not, I have not heard recently.  No.

13 Q.  Okay.  Do you know the amount of damages claimed is 12

14    million dollars?

15                MR. MILLER:  Objection.  Asked and answered.

16 BY MR. SENAK:

17 Q.  Do you know that is the claim?

18 A.  You just told me.

19 Q.  Okay.  And if I calculate this right, you have 5 million

20    dollars in insurance coverage, which the amount of the

21    claim is substantially higher than the amount of coverage

22    that Air Tech has.

23                Has anyone told you that?

24                MR. MILLER:  I'm gonna object.  It potentially

25    breaches the attorney/client privilege.

```
 1   BY MR. SENAK:

 2   Q.   It's a simple yes or no question.

 3              MR. MILLER:  Well, no, it's not, because it gets

 4        into the content of attorney/client communications.  So --

 5              MR. SENAK:  I would disagree.

 6   BY MR. SENAK:

 7   Q.   You can either answer or -- I mean has anyone told you

 8        that the amount of claim or that's been claimed in damages

 9        exceeds the amount of insurance that you have?

10              MR. MILLER:  Same objection.

11   A.   Well --

12              MR. MILLER:  Well, come here.

13              MR. SENAK:  Yeah, if you want to.  I mean let me

14        just note my objection, you conferring with the witness

15        while the question is pending, but I can't stop you.

16              MR. MILLER:  Mark, it's the nature of the

17        attorney/client privilege.

18              MR. SENAK:  I understand that.  I think the

19        proper approach is to instruct him not to answer, not to

20        confer with him, but I will say this much --

21              MR. MILLER:  I'll tell you what.  Then I'll

22        instruct him.  I was trying to get an answer for you but I

23        instruct him not to answer.

24   BY MR. SENAK:

25   Q.   I'm just trying to figure out whether you've been told
```

```
 1        that through some source other than your attorney.
 2                    MR. MILLER:  That's a different question.
 3   A.   Okay.  Yes.
 4   BY MR. SENAK:
 5   Q.   You have been told that?
 6   A.   Yeah.
 7   Q.   All right.  Has there ever been a valuation done of Air
 8        Tech, a value of the company, to your knowledge?
 9   A.   No.  I'll tell you this -- we're a service.
10   Q.   The assets of Air Tech consist of the equipment that it
11        owns?
12   A.   Uh-huh.
13   Q.   True?
14   A.   True.
15   Q.   Does it own any real property?
16   A.   No.
17                    MR. SENAK:  Okay.  That's all I have.
18                    THE WITNESS:  All right.
19                    MR. MILLER:  No questions.  We'll reserve
20        signature.
21                    Mark, can you, before we go off the record, can
22        you identify the Bates Stamp numbers of the photographs
23        that you have used as exhibits?  Because I only received
24        black and white photographs, which are exceptionally poor
25        quality; and the quality of the color photographs that
```

1    have been entered into evidence is not very good either.

2         So can you identify the Bates Stamp numbers so I

3    can go back and collect those?

4         MR. SENAK:  Yes.  I would have to go back to the

5    witness production, and there were numbers that were

6    assigned to these that were on the electronic production

7    of documents, and those numbers I can probably identify

8    for you.

9         MR. MILLER:  Yeah.  If you can get me those.

10   Are you able to do it now or --

11        MR. SENAK:  Well, there's like 400 Rimkus

12   photographs and that's the only problem that I'd have is

13   going through all of them now, but I mean I can go back

14   and tell you which ones I picked out of that list and get

15   them to you.

16        MR. MILLER:  Yes.  I just want an identification

17   by Bates Stamp number that corresponds to the exhibit

18   number so that I can get those.

19        MR. SENAK:  Yes.  I'll sort through them and

20   figure out which ones I used.  We're going to make sure of

21   that.  We're off the record.

22        (At 11:44 a.m., deposition concluded.)

23

24

25

```
1   STATE OF MICHIGAN        )
                             )    SS
2   COUNTY OF LIVINGSTON     )

3

4

5            I certify that this transcript, consisting of 101 pages,

6   is a complete, true and correct record of the testimony of said

7   witness held in this case on Friday, September 1, 2017.

8            I also certify that prior to taking this deposition, the

9   witness was duly sworn to tell the truth.

10

11       Date:  09-10-2017

12

13

14

15

16

17                          Diane Murray, CSR-4019, RPR

18                          County of Livingston, State of Michigan

19                          My Commission expires:  10-12-2018

20

21

22

23

24

25
```

**Exhibits**

**Scholten dep Exhibits**

---

**0**

---

**04-15-2005** 36:6

**09** 51:23

---

**1**

---

**1** 3:2 45:23 46:4,17,24 52:18,22 57:7 63:21 65:1 73:19 85:18

**10** 89:16 90:3

**10-24-2011** 64:21

**10:03** 22:16

**10:20 a.m** 35:11

**10:25 a.m** 40:1

**10:35 a.m** 47:18

**10:40 a.m** 51:6

**10:55 a.m** 62:19

**11** 90:14

**11-30-2013** 63:16

**11:23** 85:14

**11:25** 85:14

**11:25 a.m** 85:15

**11:44 a.m** 100:22

**12** 90:19 91:13 97:13

**13** 17:10 91:18

**14** 17:11,12,15 20:1 49:5,12 55:17 63:8 64:19 66:20, 21,22

**15** 35:11,14 40:9 41:11,13, 22 43:5,15,18, 24

**15th** 36:11

**16** 39:25 40:1, 4,19 41:5,20 42:1,8,12,19

**17** 47:18,21 48:6 49:4,13 50:9,11 52:7, 24 53:8 79:9

**18** 51:3,4,6,9 52:1,15 53:12, 13,19 54:2 55:15 56:2,5,8 57:5 63:21

**19** 31:12 62:17,18,19, 22 66:20,22 67:8 68:1

**1991** 4:6 5:13

**1st** 51:20,22

---

**2**

---

**2** 26:2,5 27:2 28:23 29:10 37:25 39:21 43:6 44:4,22 45:15,24 46:3, 4,18 47:2,7,8 48:17 50:5,16 51:10,12 54:4, 18 55:21 63:18,21 64:24 65:1,2, 6,8,11,14 69:4,5 85:18 86:1 87:14 95:15,21

**20** 34:22 85:15 91:20,21,25 95:14,15

**2000's** 10:4

**2005** 36:11,12 37:7 45:12

**2013** 63:4,12, 22 65:8,9

**2014** 23:22 24:2,8,12,21, 22 25:2,11,24 26:5,8 27:3 28:24 35:7 37:8 43:6 44:1,4,22 48:14 50:5 52:5,8 58:5 65:15,17 69:10 81:6 87:15

**2017** 3:2

**22** 26:8 69:10

**22nd** 27:3 28:24 29:16, 17 30:2 35:7 44:1 50:5 52:5 65:17 81:6

**23rd** 30:18

**24th** 49:18

**27** 48:14 52:8

**27th** 49:18

**29th** 65:14

**2:00** 22:3 26:8,12,21

**2:47** 48:15

---

**3**

---

**3** 37:25 38:1 46:4 49:12,15 54:12 57:10, 11,12 61:3 82:4 85:19 86:5,7 96:18, 24

**30th** 51:19

**325** 58:15

---

**4**

---

**4** 22:25 25:1, 10 54:22 57:18,19 74:5, 10,17 87:1

**4-15-2005** 35:18

**400** 69:24 70:15,16 71:9 100:11

**45-degree** 86:12

**4:04** 52:8

---

**5**

---

**5** 26:7,17,18 86:5,19 97:19

---

**6**

---

**6** 26:24 87:4

**6-25-12** 65:1

---

**7**

---

**7** 29:4 87:17

**7:00** 69:11 70:25 71:9

---

**8**

---

**8** 64:20 88:1

**80's** 3:22

---

**9**

---

**9** 88:4,8 89:3, 13

**9-1** 54:24

**90's** 5:11 9:14, 23 10:3,4,7 12:10

**91** 4:5

**9:25** 3:2

**9:43 a.m** 17:12

**9:44** 18:6

**9:51** 18:6

**9:57** 22:16

---

**A**

---

**a.m.** 3:2 18:6 22:16 69:11 71:1 85:14

**ability** 34:15 76:25

**absolutely** 78:19 96:13

**accepted** 27:6,11

**access** 52:25 86:20,23

**accurate** 38:15 46:5 63:20 65:20, 23 66:6 70:25 73:5,19

**acknowledging** 94:19

**acquire** 5:9

**actual** 14:21

**additional** 55:4

**adequacy** 83:4,7

**adequate** 84:8

**adheres** 72:24

**advertise** 13:14

**advice** 93:17

**advised** 73:11

**affect** 34:15, 17

**affirmation** 20:17

**affirmatively** 26:9 59:5,16

**affirming** 20:22

**agree** 13:11 42:19 80:7

**agreement** 44:22

**ahead** 18:5 33:10 39:1 51:1 57:7 61:9 93:7 94:8 95:11

**air** 3:25 4:2,4, 19 5:7 6:18 7:15 8:17,20 9:13 11:1 12:6 13:14,17 18:19,23 23:22 24:17 25:5,17 29:4 31:4 34:15,25 36:13,17,25 37:7 38:16 40:15 44:6,9 45:11 52:3 53:16,21 54:3 58:5 59:3,20 61:11 62:8 63:6,22,24 64:2 69:7 70:5 71:1 74:25 75:7,16,20,21, 23,25 76:2 77:13,15,16, 18 79:25 80:3, 9,16,17 86:17, 23 87:11,14 91:9 92:2,5,22 93:10,25 94:2 96:2,25 97:22 99:7,10

**airflow** 67:16 82:7 83:5,7, 11,20,23,25 84:3,8,11,13, 18

**alluded** 31:12 36:5

**aluminum** 11:17 80:1

**amount** 11:23 14:20 38:21 43:16 58:18, 23 84:10 97:10,13,20, 21 98:8,9

**Andrew** 46:13 62:14 79:4,7

**answers** 20:22 21:7,22 22:22 32:15 63:9

**anytime** 83:10

**apologies** 81:3

**apparently** 83:8

**appears** 65:14 86:20

**applicable** 94:1

**applies** 92:23 97:1

**approach** 66:2 98:19

**approximatel y** 22:3 26:22, 23 47:12 69:24 71:5

**April** 36:11

**area** 32:1 57:14 89:9,12

**areas** 17:8 55:15 88:12, 14,23,24 89:2

**arrived** 70:6

**asks** 44:24 96:6

**aspects** 25:13

**assets** 99:10

**assigned** 100:6

**Associate** 62:15

**Associates** 62:23

**assume** 48:20

**assumes** 20:14 21:19 30:8 37:13 38:23 43:20 62:1

**assuming** 16:5 44:19 93:15

**Atkin** 59:6

**Atkinson** 10:6,8,11 11:13 59:7,8

**attached** 21:21 82:2 92:4

**attaches** 47:10

**attorney** 19:18 99:1

**attorney/ client** 19:16 93:14 94:5 95:9 97:5,25 98:3,17

**author** 78:6

**average** 13:12

**aware** 34:13 44:20 81:19, 22,23 82:3

**awful** 17:8 68:19

---

**B**

**baby** 10:23

**back** 24:11 32:14 50:9,19 53:2 55:12,17 60:20 62:11 74:23 79:21

**91:19 94:18 100:3,4,13**

**background** 3:15 48:5

**Bake** 8:17,22 9:1

**baking** 83:10

**Ball** 8:18,23, 25 9:2,3,15,20 10:12,16 12:6 13:17,20,25 14:25 16:8 17:5,6 23:11, 22 24:18 25:2, 7,14 26:1 31:5,10,14,19 32:6,24 33:2,8 34:7 35:3 36:13 37:6 42:2 44:3,13, 21 45:12,20 46:6 48:3 59:4,12 63:24 64:5 66:24 67:22 68:15 69:12 72:8 75:3,18 76:9 77:11,19,21 78:8 80:4,11, 17 81:13 84:4 86:1

**Ball's** 40:6 75:6 80:17

**bare** 91:2

**base** 61:3,4, 12

**basically** 5:17 10:22 30:23 36:3 42:23

**basis** 7:6

**Bates** 99:22 100:2,17

**begin** 4:4

**beginning** 20:4

**begins** 82:5

**beverage**

**11:8,15,16**

**beverages** 10:23

**big** 74:8

**bill** 43:25

**bit** 31:13 48:5

**black** 57:14 99:24

**blade** 74:10, 16

**blades** 58:1,7 87:9

**blower** 55:7 73:8,12,13,19, 21 74:15

**bottom** 37:2,3 39:3 48:9,14 61:10,17 92:4

**bought** 5:7, 16,19 6:5 10:12,13

**box** 57:23 86:12

**Boy** 46:20

**breached** 44:21

**breaches** 97:4,25

**break** 22:14 68:20

**breakdown** 36:3

**Brouwer** 4:23 5:24 6:21

**brush** 59:19, 20 88:20 89:17

**builds** 73:1

**buildup** 34:13

**business** 4:20

**buy** 5:5,18 9:10

**C**

cage 28:14,22 56:1,4,7,8,9, 16,20 57:1,8, 11,17,19,20, 24 58:1,6 61:2,3,5,13 66:12 72:19 74:6 81:5 84:4 85:5,9 87:2,5, 7

calculate 97:19

call 29:20 39:10

called 3:4 13:25 29:14

calls 8:6 12:21 13:5 15:7 20:25 33:4 34:19 35:10 38:24 40:10,17,21 42:4,22 44:23 46:19 47:13 50:18 61:6,25 69:17 71:4 76:14 77:2,7, 22 80:12,19 82:17,88:11 89:5,20 90:6, 22 91:14,23 92:12,17,19, 24 93:8 94:4, 5,20 95:5,6 96:4 97:3,4

Calm 78:10

cans 10:22 11:8,17 77:21 79:9 80:1,3,5

care 37:24 38:10 71:17

career 12:16

case 82:11 94:1,15 95:4 97:1,11

ceiling 39:14

ceilings 8:1

center 57:14 72:21

certification 15:5,8

certified 80:25

chair 68:19,21

change 39:8, 18

changed 37:18,21 39:17,19

characterize 27:6

charge 27:12 33:12 49:8 67:20 71:18

check 23:14

checking 23:10 71:19

chemistry 15:19

chimney 73:1

chisel 59:20

Christmas 39:5,16,20

circle 51:12 52:22 54:11, 20,22 57:6 61:4 86:7 89:8

circled 52:1, 15 89:12

circular 88:14,22

claim 92:10, 23 93:11 94:19,25 95:3 97:2,17,21 98:8

claimed 97:10,13 98:8

clean 8:17 11:3 12:6 13:21 14:2,9,

10,15 15:6 34:15 36:14 44:11,22 45:3 51:10 52:11, 25 53:4,10 54:14 58:5 64:9 67:10,15, 16 68:8 72:12 73:8,13,25 74:15 75:23 76:3,9,12,17, 21 77:1 80:9, 11 86:17 88:19,24 89:17,18 90:12,17 91:6, 8,10

cleaned 8:22 9:5,16 11:1 12:15 29:21 34:12 37:25 38:16 39:4 43:10 45:14 50:13 51:11 52:2,3 53:17 62:8 63:3,13, 22 64:13 65:6, 24 66:5,7,13, 16 67:5,23 70:9 71:18 81:24 82:2 86:22 87:24 88:2,5,18,21 89:14,15,24 90:5,15,20,21 91:1,2

cleaning 5:2, 21 7:16,17,24, 25 8:2,15 9:1, 13,20 10:3 11:25 12:8,10, 13,17 13:12, 15,18 14:24 15:9 16:11,18 24:15,19 25:2, 6,13 26:4 35:7 36:21 37:3,11 43:6 44:4,11, 17 45:3,4,9 48:16 49:19 50:4 52:24 53:22 54:3 55:13,22,25 59:3,11 60:5 61:2 64:24

65:8,14,17 69:11 81:20 87:14

cleanings 31:25 32:8,16

cleans 63:24 64:2,3 86:23 91:9

close 13:9 85:12

closely 6:16

cloth 60:22

codes 81:19, 23 82:1

collect 100:3

college 4:17

color 99:25

Colorado 48:3

colored 51:2

commenced 69:11

commercial 95:16,21 96:3, 9,17,25

communicate 32:2,6

communicated 34:3

communication 29:25 31:18,23 34:1 68:14 94:24 97:5

communications 23:1,5 29:5,12 31:10 32:12,21 34:6, 10 98:4

companies 8:22 9:10 94:13

company 4:10 5:2,5,16, 18,24 6:2,5,6,

10,12,16,19, 22 12:7 14:1 94:16,18,25 96:12 99:8

Complaint 94:15

complaints 34:20

complete 68:5

completed 26:8 34:25

Completes 22:3

comply 42:19

concern 32:1

concerns 31:13 32:24 33:2 34:4

conclude 93:16

concluded 100:22

conclusion 21:1 44:24 76:14 77:8 80:6,20 92:19 93:1,8 94:5 95:6 96:6 97:4

condensates 83:13

condensation 83:11

condition 16:19,22 17:1, 4 46:17

conditions 85:3,6,9

confer 98:20

conferring 98:14

configuration 46:25

configured 47:12

**confined** 14:13,15,20 15:2,9 41:25 81:15,20

**connects** 47:3

**considered** 16:23

**consist** 40:15 99:10

**contact** 19:1 24:18

**content** 98:4

**continue** 11:3,9,11,21

**continued** 37:6,10

**continuing** 6:10

**contract** 40:14,15 41:1, 6,11,14,20 43:7,12 44:4, 10

**contractors** 40:6 42:18

**conversation** 29:20 30:24

**conversations** 23:16 24:5, 13 25:4,11,13, 14,24 30:15 31:1

**cool** 70:19

**cools** 71:6

**copy** 50:22 51:10 62:15

**corner** 36:5

**Corp** 10:12

**Corporate** 10:12

**Corporation** 33:2 48:3 66:24 69:12

**correct** 5:20

6:7,11,15 7:23 8:19 9:17 11:10,20 12:14 14:14 15:4,15 16:21 17:3 18:25 20:4,8,23 21:7,22 22:22 23:15 27:3,4, 18,20,23 28:1, 6 30:4,6 31:11 32:17 34:2 36:8,9,16,19, 23 37:1,9 38:4,7,22 39:2 41:12 42:9,11 43:4,5,17 44:2 45:17 47:9 48:8 49:7,8 50:6,15 53:18 55:6,10,16 57:25 58:3,8, 20,25 59:10, 13 60:10,21 61:15,19 63:23 64:25 65:18 66:4 67:2 71:10,25 72:10,15 73:7, 15,20 74:18 75:2,22,24 76:4 77:17 83:16 84:7,10 86:25

**corrected** 17:2

**corresponds** 100:17

**cost** 37:2,3 43:16,18,23

**could've** 22:3

**counsel** 79:12 93:17

**counted** 13:10

**couple** 34:11

**court** 3:8 82:24

**cover** 60:12

**coverage**

93:10,21 95:16,17,22 96:3,17 97:1, 20,21

**covered** 26:13 73:9 94:19 95:1,4

**create** 60:5

**created** 61:1

**creosote** 66:12 72:24 73:1

**crew** 26:19 28:7 70:6

**crews** 4:13

**criminal** 3:18 15:13

**criteria** 8:9

**Crown** 9:6

**cures** 19:20

**curious** 83:9 93:25

**current** 6:24 18:23

**customers** 13:17

─────────

**D**

**Dale** 23:1,4,6 33:11 34:24 35:4 48:9,15 67:20

**damages** 97:10,13 98:8

**danger** 8:7

**dangerous** 8:10,14

**date** 9:23 10:13 35:6 36:6,7 51:16, 18 52:23 54:5, 13,23 63:12, 15 67:13 89:10

**dated** 52:8

**dates** 32:10, 15,18 65:21

**David** 50:2

**day** 4:13 29:15,16,22 30:2,17 31:20 58:15,19

**days** 46:10

**dealing** 68:2

**debris** 50:13 55:14 61:13, 21 62:2

**decide** 8:9

**Defendant** 79:19

**defined** 29:9 41:1

**degree** 3:16 15:13 70:16

**degrees** 69:25 70:15 71:9

**depend** 66:17

**depending** 58:16

**depends** 70:22 71:5

**depiction** 90:3

**deposition** 17:12 18:9,12, 17,18,20 35:11 40:1 47:18 51:6 62:19 79:8 85:15 100:22

**depositions** 3:10 58:11

**describe** 55:22

**describes** 36:24

**description** 73:5

**designing** 15:24 16:2

**determine** 84:8

**device** 72:5,9, 14

**differ** 93:19

**difference** 56:9,14,25 58:10

**differently** 65:25

**diminished** 83:11

**direct** 75:16

**directors** 6:21

**dirty** 31:15 33:3,20,22 67:1,14 91:5

**disagree** 98:5

**disc** 60:14

**discolored** 91:4

**discovery** 92:6

**discs** 60:13, 17

**disrupting** 79:8

**distance** 74:10

**dividing** 24:4, 13

**document** 17:16,23,25 20:10,17,20 21:23 35:16, 21,23 36:6,7, 8,10,20,24 37:10 38:8

**documents** 18:1,8 20:2 43:7 100:7

**dollars** 95:15

96:18 97:14, 20

**door** 90:8

**doors** 14:22 87:18

**double** 41:8

**draw** 53:21 54:11,20 89:8

**drawn** 54:2 86:7

**drew** 61:4

**drop** 73:12

**dry** 83:16

**duct** 5:2,21 7:16 62:12 83:14

**ductwork** 25:6 28:17,23 39:13 47:3,10, 11 53:13 54:6, 9 55:5,9,11 62:8 63:3,12, 17,20 65:24 66:3,5 67:23 68:8 72:19,25 73:6,13,25 81:12 82:2 84:3 85:2 86:14,15,20, 22,24 90:19 91:1,10

**DULY** 3:4

**dust** 60:4,5,9 61:1,13,16

**duties** 75:20

**duty** 75:6 76:2,6 77:18 80:4,16,17

———————

**E**

**earlier** 31:13 33:9

**early** 3:22 5:11 10:4

**edges** 57:16

**Edison** 9:8,9

**editorializing** 78:12

**education** 15:16,19,21

**educational** 3:15

**eighteen** 7:14

**elbow** 54:7,9, 10,11,13 55:7

**electric** 59:19 88:20 89:17

**electronic** 100:6

**email** 26:6 47:23 52:7

**emails** 48:6 78:6

**employee** 3:25 4:25 23:11 61:11

**employees** 6:24 7:10,12 15:2 16:8 18:24 61:20 72:5 75:1,4,7, 16,18,21 77:15,19,21 80:4

**enclosed** 14:19

**end** 17:18 29:14,16,22 30:1 61:20 69:11

**engineering** 15:17

**entered** 100:1

**entire** 54:20

**entirety** 6:6

**equal** 6:12

**equipment** 99:10

**essentially** 39:11

**estimate** 12:23

**evaluate** 8:6

**eventually** 64:12

**everybody's** 76:6

**evidence** 20:15 21:19 30:9 37:14 38:24 43:21 62:1 100:1

**exact** 10:13

**EXAMINATIO N** 3:5

**exceeds** 82:14 98:9

**excellent** 29:19

**exceptionally** 99:24

**Excuse** 10:15

**exhaust** 39:11,12 52:12 53:5,7, 11,14 54:15, 17,21,25 55:8, 9,25 56:3,10, 15,18 66:13 73:8 82:7 84:4

**exhibit** 17:12, 15 20:1 35:11, 14 40:1,4,8,19 41:5,11,13,20, 22 42:1,7,12, 19 43:5,15,18, 24 45:23 46:17,24 47:2, 7,18,21 48:6 49:4,5,11,12, 13 50:11,16 51:6,9,10,12 52:1,7,15,18, 22,24 53:12, 13,19 54:2,18 55:14,17,20 56:2,5,8 57:5, 10,11,12,18, 19 61:3 62:17,

19,22 63:8 64:19,20 66:20,22 67:8, 25 68:1 69:4 74:5,9,16 79:6 85:15,18,19 86:5,7,19 87:1,4,17 88:1,4,7 89:3, 13,16 90:3,14, 19 91:13,18, 20,21,25 95:14 100:17

**exhibits** 63:21 99:23

**existed** 5:7

**exits** 14:20

**experience** 15:16,19,21, 24 58:17

**expert** 11:24

**expertise** 12:8 13:14,18, 22 16:2,4,11 82:15

**explain** 7:4 56:17

**express** 32:1

**expressed** 29:19 31:14 32:23 33:2

**expresses** 32:4

———————

**F**

**face** 60:12

**facilities** 9:15 10:16 59:4 63:25 64:5,8

**facility** 9:3 38:20 59:12

**facing** 86:10

**facts** 20:15 21:19 30:8 37:13 38:23 43:20 62:1

**factual** 79:10 93:16

**Fahrenheit** 69:25

**fair** 43:1 46:5, 22

**fall** 61:17 72:2

**familiar** 6:16 45:20

**fan** 50:12,16 51:12,13,14 52:1,10,16,17, 19,22,25 53:1, 3,10,23,24 56:1,24,25 57:2,8,22 58:1,2,6,7 74:6,10,16 81:4 85:22,24 86:8,10,11 87:9

**fast** 51:25

**fee** 58:18

**feeling** 20:13

**felt** 21:5

**fifty** 6:14

**figure** 31:21 40:25 49:10 56:14 93:21 98:25 100:20

**filtered** 60:14

**filters** 60:17

**find** 48:24 60:3

**Findlay** 10:2 11:5 59:6

**finish** 22:13 78:14 82:20 93:5

**finished** 26:15,19

**finite** 38:21

**fire** 16:5 19:4, 7,10,13,19 29:9,23 30:23 31:10 46:9,18

48:18,21
62:15,23
68:17 71:21
82:13

**fireplace** 73:1

**fires** 15:22
81:12

**flat** 58:18,23

**flue** 73:1

**follow** 39:22
40:13 41:22,
23

**food** 10:22,23
11:8,15

**Fort** 10:6,7,11
11:13 59:6,7

**found** 26:17

**foundation**
40:21 42:3,21
45:25 47:4
48:25 50:17
61:7 75:9
76:13 77:7
85:21 87:6,20
88:10 89:5,20
90:23 91:15,
23 94:6

**four-year**
3:16

**fourth** 38:9
59:8

**frame** 38:11

**frequency**
64:2,3,5,13

**frequently**
67:6,11,15,16,
23 68:8 81:24
82:2

**fresh** 50:21

**Friday** 3:2

**friend** 5:4,5

**full** 7:1,3,4,13
60:12 82:4

**full-time** 7:1

**function** 16:6

**71:15 74:25**

**furniture** 4:10

———————

**G**

**gals** 7:5

**gap** 74:7,20

**gathered**
39:4

**Gauges** 84:1

**gave** 45:5
52:21 59:6

**general** 95:17
96:3

**generally**
66:18 72:23
94:3 95:22

**get all** 61:13

**give** 3:14
12:23 30:13
42:18 50:21,
23 60:8

**giving** 20:23

**glass** 50:25

**glasses** 18:2,
4 41:25

**go-to** 23:7,13

**Gonsalo** 50:1

**goo** 73:12
83:13,16

**good** 3:23
23:24 41:18
56:19 73:18
80:6 88:24
96:15 100:1

**Gosh** 86:21

**gotta** 96:14

**Grand** 3:1,20

**greasy** 17:8

**greater** 13:11

**grind** 89:2

**grinder** 59:20
88:20,22

**89:14,15,17,
25 90:12,15**

**ground** 89:6

**guess** 18:14
36:14 80:24
91:2

**guy** 23:7,13

**guys** 26:13
41:1 42:7
48:16 49:4,6,
8,14,21 67:18
76:7

———————

**H**

**hand** 74:20

**hands** 12:20
62:4

**happen** 74:3

**happened**
31:22 48:22

**hard** 9:12
53:20

**harness** 72:2

**hazardous**
16:23 17:2,4

**head** 13:10
22:24 26:9
59:5,16

**heard** 14:13
97:12

**heat** 91:5

**held** 6:16

**helps** 71:17

**Herman** 4:3,
7,8,9 5:1

**higher** 97:21

**hire** 7:8

**hired** 7:10
8:17 75:25
77:21 78:8
79:9,25 80:3,
9,11

**hold** 17:10

**49:9 56:19
62:25**

**holiday** 39:6

**horseplay**
42:15

**hot** 70:5,11

**hour** 70:22
71:2

**hours** 7:7

**housing**
50:16 52:17,
19 53:1,23
56:24,25 57:2,
9,12,13,16,17,
22 58:2,6
73:20,21 74:1,
4,11 81:5 84:4
85:8,22,24
86:8,10,11

**housings**
50:12 51:12,
13,14 52:1,10,
16,22 53:4,10

**How's** 19:20

**hundred**
12:25 13:4
22:4

———————

**I**

**IBO** 10:25
11:9,19 12:1,
10 14:21 15:8
16:11,14 17:5
26:1,4 27:2
28:2,5,7,8,11,
23 29:10
36:14 37:25
38:5 43:6
44:4,22 45:14,
23 46:1,3,6,
18,25 47:3,8
50:4 52:11
53:4,11 54:15
63:17 64:22,
24 65:1,6,8,14
69:11 71:17
72:1 84:11,13,
24 85:24,25
86:1,4 87:14,

**18,19,23 88:2,
4 89:23 90:4,
10,11,15
91:19**

**IBO'S** 9:5,13
10:24 12:6,8,
13 14:24
15:25 16:2,4
36:21 37:3,11
38:16 45:14,
20 47:10
52:17 63:24
64:4,13 81:24
82:2 84:5,19

**idea** 36:5
43:11

**identification**
100:16

**identified**
49:15 68:12
79:5

**identify** 22:9
35:16 47:22
99:22 100:2,7

**impossible**
82:24

**improper**
78:16,18,21,
24 79:1

**include** 68:14

**included**
63:17 67:25

**including**
45:14 58:6

**incorrect**
22:1

**Indiana** 8:18

**individually**
45:11

**industrial**
7:17,22,24 8:2

**ineffective**
57:9

**inform** 16:25

**information**
26:17 48:24
69:6 70:24

93:16

inhale 60:8

initially 13:25
14:1 38:19

initials 51:16
52:23 54:5,12,
22 89:9

inside 57:8,9,
17,23 58:2
61:16 66:2,6,
8,12 70:16
72:18 73:5,25
74:6 83:14,15
86:24 87:4,19,
23 88:8

inspect 28:22
72:12 77:3,19
80:16,17 81:4

inspected
26:24 27:5,11,
24 28:2,5,8,
11,13,16,18

inspects
77:16

instance
16:18 44:16
61:2

instruct 79:3
80:19,20
93:19,22,23

instructions
81:23

insulation
53:20

insurance
92:1,7,10,22
93:10,21,25
94:2,13,15,18,
25 95:4,15,20
96:18 97:20
98:9

intended 16:7

interest 5:9
6:10

interested
55:25 60:4
82:5 83:4

internal 8:17,
22 9:1 89:13
90:4

interrogatori
es 38:1 93:23

interrogatory
22:9,22,25
24:25 25:10
26:7 29:4
32:14 34:22
49:12,15
55:20 63:8
64:20 66:20
68:1

interviewed
69:3

invades
19:16

investigation
15:22

invoice 43:6,
8,16,25

invoices 43:3
65:21

involved 4:2,
19 8:7 12:17

issue 82:7

issued 43:3

**J**

January
65:14

Jerry 23:1
33:11 67:20

Jimenez 50:1

job 8:20 23:17
29:19 30:3
70:9 75:21,23
76:11 77:15

Jonathan
33:11

judge 81:1

justice 3:18
15:14

**K**

Ken 26:20,21
27:9,10 28:5
32:4 49:20,24
69:6

Kevin 4:23,24
5:7,9 6:5,12

Kevin's 5:4,5

kind 8:10
28:19 31:12,
21 36:24
47:25 51:10
55:17 60:15
65:23 72:5,21
74:2 86:11

kinda 23:7

kinds 7:25

knew 19:2
63:10

knowledge
13:11 15:24
31:9 33:1,6
34:18 44:25
77:23 92:18
96:2 99:8

**L**

labeled 56:10

lack 40:21
42:3,21 45:25
47:4,25 48:25
50:17 61:7
75:8 76:13
77:7 85:21
87:6,20 88:10
89:5,20 90:23
91:15,22 94:6

lands 61:10

lanyard 72:2

larger 54:22

largest 7:12

lasted 30:7,12

late 9:14,23
10:3,4,7 12:10

layman's
44:25

layout 46:24

lead 52:11
53:4,11 54:15

leads 53:14
54:9,25 55:4

leave 22:12

legal 20:25
44:18,20,24
76:14 77:8
80:20 92:19
93:1,8 94:5
95:6 96:6 97:4

letter 94:19

level 53:24

liability 95:17,
22 96:3,17
97:1

limit 95:20
96:19

limited 14:19

limits 95:20
96:18

liquid 83:13

list 32:15
36:15 38:3
100:14

listed 24:24,
25 25:9 33:9

lists 43:10

location
54:13

long 4:14 8:25
30:12 70:21

longer 9:9
22:4

looked 35:1
83:18

lot 12:1,24
25:19 91:4

loud 68:19,21
95:25

**M**

made 31:18
32:12 34:6
38:6 67:12
68:11 95:3

main 47:11
52:11 53:5,11,
14 54:15,17,
21,25 55:8,9
56:10,15,18

maintaining
16:12

maintenance
16:15

make 4:10
14:23 17:11
21:13,21 22:6,
20 35:1 43:11,
12 49:24
55:19 56:19
60:15 68:5,25
72:2 75:21
76:3,11,17,25
77:10,15,21
78:8 79:2,9,15
80:1,3,4,5
82:19 100:20

makes 71:16,
17

making 34:9
42:15 71:20
78:11,13,22

manager 48:1
78:5 79:5

Mark 46:20
77:24 78:5,11,
16 95:12
98:16 99:21

marked 17:13
35:12 40:2
47:19 51:5,7
62:20 85:16

marker 52:21
89:8

marks 89:2

Marler 47:25
48:10

mask 60:13, 19

masks 60:8, 11

material 66:2

matter 58:23

meaning 5:18 31:7 37:7,25

meant 49:8 51:13

measure 83:25 84:2,8

measurements 84:13

measuring 83:19,22

meet 18:11 50:1

meeting 48:16 49:13

mentioned 15:13 17:7 23:13 34:1 83:17

mentions 38:9

met 49:6,17, 24

metal 57:23 88:8,15,21 89:13,18 90:4 91:2,7,8,11

methods 83:19,22

Michigan 3:1 69:7

might've 10:11

Miller 4:3,8,9 5:1,10 6:3,8 12:21 13:5,23 15:7 18:2,11 19:15 20:14, 24 21:17,19, 23 23:21 29:1 30:8 33:4,15

34:19 35:10 37:13 38:23 40:10,17,20 41:15 42:3,21 43:20 44:23 45:16,18,25 46:19 47:4,13 48:25 50:17, 22 51:3,20 56:11 61:6,25 62:17 69:17 71:4 75:8 76:13,23 77:2, 7,22 78:5,8, 11,16,20,23, 25 79:5,9,12, 19 80:12,19, 23 81:7 82:14, 17,20,23 85:21 87:6,20 88:10 89:4,20 90:6,22 91:14, 22 92:12,17, 24 93:1,4,8,13 94:4,9,20 95:5,8 96:4,6 97:3,15,24 98:3,10,12,16, 21 99:2,19 100:9,16

million 95:15, 21 96:18,24 97:14,19

Milwaukee 9:19,20 10:1, 21,24,25 59:6

mind 18:4

minds 93:19

mine 4:25

minute 49:9

minutes 30:7 85:11

missed 59:21 65:12

misstatement 56:11 79:10

Misstates 6:3 40:20 89:4

mistake 50:11

mistaken 54:25

months 64:10 65:5

Monticello 8:18 9:2 12:7 17:5 23:23 25:2,7,14 36:16,18,21 37:7 45:21 46:7 47:14 59:9 62:8 64:3,11,13 80:1 84:14,19

Morgan 23:1 25:25 33:11 67:21

morning 18:15

motive 21:15

motors 55:7

mouth 60:12, 23

move 68:22 79:3

multiple 25:10

---

**N**

names 24:23 33:9

nature 8:11 98:16

necessarily 31:20

needed 67:5

nefarious 21:15

negative 41:8

negatively 22:24

Nick 27:16,21

ninety-two 7:22

nodding 26:9 59:5,16

normal 44:11 45:9 50:13 84:25 85:2,6,9

nose 60:12,14

note 38:12 59:3 67:8,25 98:14

notice 48:20

notify 94:15

November 63:22

number 7:12 9:15 17:12 22:9,25 24:25 25:10 26:2,5, 7,17,18,24 27:2 28:23 29:4,10 31:12 33:9 34:22 35:11 40:1 43:6 44:4,22 45:14,23,24 46:3,17,18,24 47:2,7,8,18 49:11,12,15 50:5,16 51:6, 10,12 52:1,18 54:4,12,18,22 55:20,21 57:6, 10,12,18,19 62:19 63:18 64:20,24 65:8 66:20 73:19 74:5,10,16 79:6 85:15 86:1,5,7,19 87:14 88:1,4 89:13,16 90:14,19 91:13 100:17, 18

numbers 92:4 99:22 100:2,5,7

---

**O**

oath 20:10,18, 22

object 19:15 20:14,24 21:17 44:23 56:11 75:8 77:22 79:2 80:12 90:6 91:22 92:17 94:20 95:5 96:4 97:24

objected 93:24

objection 5:10 6:3,8 12:21 13:5,23 15:7 23:21 29:1 30:8 33:4,15 34:19 35:10 37:13 38:23 40:10, 17,20 41:15 42:3,21 43:20 45:16,25 46:19 47:4,13 48:25 50:17 61:6,25 71:4 76:13,23 77:2 78:22 79:13, 14,20 81:7 82:14,20 85:21 87:6,20 88:10 89:4 90:22 91:14 92:12,24 94:4 97:3,15 98:10, 14

objections 78:14

obligations 44:3

Occasionally 7:9

occasions 66:25 72:11

occurred 29:10

occurrence 29:6,9 30:16 31:2,5 95:16, 20 96:19

office 4:10 7:5,6

**officers** 6:21

**Ohio** 10:2
11:5

**open** 52:25

**operates**
69:24

**operating**
16:4 84:23,24
85:3,6,9

**operation**
17:1 34:17
84:25

**opinion** 82:6,
13 83:4,6

**opinions**
82:10

**opportunity**
4:20 5:1,3

**origin** 15:21
23:22

**original** 6:1

**originally**
39:15

**Oscar** 50:1

**OSHA** 81:17

**oven** 5:21
7:25 11:24
12:20 13:12,
14,18,21 14:1,
2,3,9,10,16
15:6,10 16:18,
20,25 17:1
23:10,14
24:15,18
27:12,19,22,
25 28:18,21,
23 29:21
31:14 33:3,20
34:15,17
37:25 43:10
44:11 45:3,4,
5,9 46:6 49:19
53:4 60:6
61:16,18,21
64:10,11,15
66:5,7,8 67:13
68:9 69:24
70:9,10,13,16,

19,22 71:5,9,
19 72:12,25
73:6 75:23
76:3,9,21,25
77:3 81:20
83:15 84:3
88:8 89:14,18
90:4,10,11,15
91:9

**oven's** 71:1
76:11

**ovens** 8:17,22
9:1,16 12:1,
10,15 25:2,6
36:14,21 37:4,
11,23 38:5,10
52:11 53:11
54:15 64:9
65:25 66:3,25
68:2 70:5
72:18 80:9,11
88:18

**overtime**
58:21

**owned** 6:6

**owner** 3:25
6:10 16:25

**owners** 6:1

**owns** 16:20
99:11

**oxidizer**
55:12

— — — — — —
**P**
— — — — — —

**P-a-u-l** 3:9

**p.m.** 26:8,12
48:15

**pages** 62:24

**paid** 44:16,19
45:8 58:13,15,
18,23 75:25
76:7

**panel** 52:25
86:20,23 90:8

**paper** 97:6

**paragraph**
38:8 39:21

**72:23 82:5

**part** 7:1,13
16:10,17
28:21,22 41:2,
6,14,20 55:13
62:22 87:21

**part-time** 7:3,
4,6

**parts** 68:4
88:8 91:9,10

**past** 54:1 74:7

**Paul** 3:3,9
69:6 93:4

**pending**
98:15

**people** 8:13
18:21 24:25
25:1,9 26:18
48:21 49:14
50:4 58:13
68:12 75:18
82:25

**percent** 6:14
7:19,21 22:4

**percentage**
7:18

**perform** 16:6,
14 25:5 36:25
44:3

**performing**
26:1

**period** 9:21
10:7 38:18
45:15

**person** 13:12
23:7 27:12
28:4 34:7,8
89:16

**personal**
92:18

**personally**
12:4,18,19
81:4

**perspective**
42:12 44:9

**petitions** 4:11

**phone** 29:20
30:5 34:6

**photograph**
45:23 74:2,9
86:10

**photographs**
99:22,24,25
100:12

**pick** 62:4
79:23

**picked** 12:6,7
100:14

**picture** 57:15
87:1,4

**piece** 86:12,
20,22 89:18
90:14

**pieces** 61:17
62:2

**PIN** 27:12,19,
21,25 36:14,
21 37:4,11,25
38:5 64:22
65:2

**pipe** 73:2

**place** 31:24

**Plaintiff** 79:12

**plant** 8:18
9:20 17:5
25:2,7,14 34:7
36:18 37:7
42:2 45:12,21
46:7 62:9
69:12 78:3
80:1 81:13
82:7 84:4,14,
19 86:2

**plural** 49:22

**point** 21:25
23:25 24:18,
20 33:22,23
53:16 56:19
70:13 88:24

**pointing**
40:24 56:18
57:5,16

**policy** 92:1

**poor** 99:24

**portions** 90:4

**possibility**
34:12

**potential**
33:16 34:14

**potentially**
95:8 97:4,24

**prepare** 18:8,
11 35:23

**present** 27:5
46:9

**pretty** 4:17
32:25 37:17
59:22 65:20,
23

**previous**
42:13

**previously**
24:11

**price** 36:4
37:19,21

**prior** 4:6 6:10
8:23,25 24:21
25:1,11 40:20
53:3 56:12
81:12 89:4

**privilege**
19:16 93:11
94:5 95:9
97:25 98:17

**problem**
16:15 19:21
33:16,17
100:12

**problems**
34:14

**process**
55:22

**produced**
42:7 65:22
92:5,7

**product**
93:17

**production**
38:20 70:10

71:2 100:5,6

**proper** 84:24
98:19

**properly**
66:5,13,16
71:18,20 80:5

**property**
99:15

**proposal**
36:13,20 38:6
40:16 41:2

**protect** 72:6

**protected**
93:13

**provide** 32:15

**provided**
42:1 69:6

**publicly** 6:18

**pull** 62:4

**purchased**
5:24

**purpose** 34:9
36:2,20

**purposes**
14:24 30:2

**put** 12:20
51:16 52:22
54:4,12 57:6,7
60:19 70:16

**putting** 91:3

---

**Q**

**qualified** 8:20
12:7

**quality** 99:25

**question**
10:15 21:4
23:6 44:12
59:2 63:1 68:2
79:3,15,22
80:25 92:8
93:23 98:2,15
99:2

**questions**

---

35:19 79:1
99:19

**quick** 71:6

**quote** 8:8
35:17 36:3
49:4

---

**R**

**rags** 60:2,3

**ran** 4:13

**Randy** 23:2
33:11 35:17
67:21

**Ranges** 6:25

**Rapids** 3:1

**reach** 73:14,
24 74:18

**read** 20:20
23:6 79:21
92:20

**reader** 22:19

**reads** 39:3
53:3

**real** 99:15

**reason** 21:12
79:17 90:17

**reasonable**
90:3 93:18

**reasons**
34:11

**recall** 28:9
29:12 30:24
34:3 65:8 69:8
94:24

**received**
94:14 99:23

**receiving**
94:24

**recently** 72:4
97:12

**receptionists**
7:5

**recess** 18:6

---

22:16 85:14

**recognize**
17:16

**recollection**
32:9,18 36:10
55:3

**record** 6:3
22:7 79:2,12
99:21 100:21

**rectangular**
86:11

**referencing**
47:14

**referred** 40:8
86:15

**referring** 9:2
22:10 41:24
54:17 57:14,
23 72:17 74:9
87:21 89:9
95:18

**reflected** 56:2
70:25

**reflects** 89:13
93:17

**refresh** 32:18

**regulation**
81:17

**regulations**
42:15 81:19,
23 82:1

**relative** 25:6
26:1

**relevant**
91:23

**remains**
21:18

**remember**
34:7 46:20

**remove** 55:13

**removed**
86:23

**repaired**
16:19

**repairs** 16:14

---

**replace** 60:19

**report** 62:16,
23 68:17
70:25 72:16
82:4 83:8

**reporter** 3:8
82:24

**represent**
13:17

**representatio
n** 46:6

**required**
39:22 41:23

**requirement**
14:24

**requires**
52:25

**reserve** 99:19

**residential**
7:16,18

**residue** 61:17
66:6,12,15
72:18,24
88:25 90:16

**respect** 17:1,
5 24:18 38:5
40:14

**respondent**
29:4

**response**
68:1

**responsibilit
y** 24:23

**responsible**
75:3

**responsive**
26:18

**review** 17:23
18:8 21:23

**revised** 22:11

**right-hand**
36:5

**Rimkus**
100:11

---

**risk** 47:25
78:5 79:5

**Rod** 47:25
48:10

**Rodney**
47:23,24

**Romero** 50:2

**rotational**
88:14,19

**round** 60:18

**route** 4:21

**Rubin** 50:1

**rule** 72:4 81:1

**rules** 39:22
40:6,8,16
41:23,24 42:1,
14 72:8 81:19,
23 82:1

**run** 16:6 38:20

**runs** 39:14

**Russell** 23:2
25:25 33:12
35:17,25
67:21

---

**S**

**S-c-h-o-l-t-e-
n** 3:9

**safety** 39:22
40:8,16 41:23
42:1

**scale** 72:18

**schedule**
18:18 19:2
64:8,18

**scheduled**
18:21 29:20

**scheduler**
4:25

**scheduling**
26:6 30:3

**Scholten** 3:3,
9,10 17:15
18:8 21:11

27:21 35:14 40:4 51:9 69:7 73:11 82:5

**school** 4:16

**scope** 25:5,17 26:1 36:24 37:10,21 44:25 58:4 77:23 87:13 92:18

**scraped** 88:6, 9

**scraper** 59:19

**scratches** 88:15,19

**sections** 28:10

**sell** 9:10

**SENAK** 3:6 5:12 6:4,9 12:22 13:7,24 14:4 15:12 17:10,14 18:5, 7 19:17,20,23 20:16,19 21:2, 3,18,20,24 22:13,17 23:24 24:1 29:3 30:11 33:5,18 34:21 35:13 37:15 38:25 39:25 40:3,12,18,22 41:17 42:6,25 43:22 45:1,19 46:2,21 47:6, 15,20 49:1 50:20,23 51:1, 4,8,21 56:13 61:8 62:3,14, 18,21 68:20, 23,24 69:20 71:7 75:13 76:15,24 77:4, 6,9,25 78:3,7, 10,13,18,21, 24 79:1,7,11, 13,21,24 80:15,22,24 81:2,9 82:18, 21 83:1,3

85:11,17,23 87:8,22 88:13 89:7,22 90:9, 25 91:17,24 92:13,21 93:2, 7,9,15,20 94:7,11,23 95:10 96:8 97:8,16 98:1, 5,6,13,18,24 99:4,17 100:4, 11,19

**send** 35:25 94:18

**sense** 56:24

**sentence** 53:2,3 82:6

**September** 3:2

**service** 99:9

**set** 38:19 55:19

**settle** 61:2

**shaking** 22:24

**share** 7:7

**shares** 6:12

**Sharpie** 51:11

**shift** 4:13 69:12

**short** 22:14

**show** 46:24 52:19 53:13 54:13 57:11 62:22 63:12 87:23 88:4,19, 23 89:2 90:3, 19

**showed** 54:16

**showing** 17:15 20:1 35:14 40:4 47:21 51:9 91:20

**shown** 43:18 50:16 53:19

54:18 55:2,14 56:4 63:21 69:4 74:16 83:7 88:14 89:3 91:13

**shows** 37:3 38:1 43:16 44:21 46:17 47:8 54:3 57:12 74:2 85:20,22 87:9, 17 88:1,7 89:16 90:14 95:15

**shutdown** 39:5

**side** 50:19 51:17 54:21

**sign** 20:13

**signature** 17:21 35:21 99:20

**signed** 17:23 20:7,9,18

**signing** 20:10,21

**signs** 15:9

**similar** 72:25

**Similarly** 81:19

**simple** 92:8 98:2

**simply** 43:25 79:2

**sir** 70:14

**situation** 83:10

**sixteen** 4:15

**size** 62:2

**skillset** 8:10

**skip** 3:13

**small** 61:23

**son** 27:17,19, 24

**sort** 11:24 13:11 23:13 24:4,12 30:2 32:18 34:22 37:10 40:14 41:1,8 46:24 55:22 56:2 59:1 88:14 100:19

**source** 99:1

**space** 14:13, 15,19,20 15:2, 9 41:25 81:15, 20

**speaking** 23:21 78:13, 21

**specific** 9:23 32:9

**specifically** 28:10

**speculate** 44:24 96:7

**speculation** 12:21 13:5 15:7 20:25 33:4 34:19 35:10 38:24 40:10,21 42:4, 22 46:19 47:13 50:18 67:6,25 69:18 71:4 77:2,23 80:13 82:17 88:11 89:5,21 90:7,22 91:14, 23 92:12,18 94:4,21 95:6 97:3

**speech** 79:18

**speed** 22:19

**spell** 3:7

**Spencer** 23:1, 4,6 24:5,13,17 25:25 26:24 27:5,10,24 28:8,11,13,16 29:5,13 30:1 31:1 34:24,25 35:3,8 48:9,15

67:20

**spoke** 31:5 82:23

**spot** 60:3 89:15

**squirrel** 28:14,22 55:25 56:4,7, 8,9,15,20 57:1,8,11,17, 19,20,24 58:1, 6 61:2,3,5,13 66:12 72:19 74:6 81:5 84:4 85:5,9 87:2,5, 7

**stacks** 39:4, 10

**Stamp** 99:22 100:2,17

**stands** 79:19

**start** 4:20,22 9:20 24:2 31:23 48:14 53:13 56:21 71:3,8

**started** 5:15, 16,19 7:16 8:23,25 9:13 10:3,7 12:12 42:14 64:11 72:4 79:22

**state** 3:7

**statement** 66:18 67:8,11 69:22

**statements** 68:11

**stick** 74:20

**stop** 98:15

**stopped** 53:22 54:3,16

**straight** 41:10

**stretched** 64:12

**strike** 41:21 56:21

**structures**
89:14

**stuff** 4:11

**Subcontracto
rs** 40:7

**submit** 36:20

**substance**
25:4

**substantially**
97:21

**suggest**
66:15

**suggesting**
49:21

**summary**
3:14

**Summons**
94:14

**supervise**
74:25 75:7,10
80:4

**supervision**
4:3,13 75:3

**supervisor**
71:13,15
74:23 76:2
77:16

**supervisor's**
75:20 77:18

**supposed**
45:6,10

**surface** 72:25
88:21 89:6

**sweep** 61:20

**SWORN** 3:4

**Sylvan** 9:6

—————

**T**

**takes** 58:24
71:16

**taking** 71:24

**talk** 14:13
18:16,19 19:3

26:4 49:18

**talked** 19:6
23:20 25:1,19
30:22 48:21
59:14 66:24
73:24 81:15
84:23 85:18
87:1

**talking** 22:6
24:11 27:1
49:14 60:16,
24 69:8 74:5,
16 82:25
83:14

**talks** 26:24
31:13 95:21

**Tech** 3:25 4:2,
4,19 5:7 6:18
7:15 8:17,20
9:13 11:1 12:6
13:14,17
18:19,24 25:5
29:5 31:4
34:25 36:13,
17,25 37:7
38:16 40:15
44:6,9 45:11
52:3 53:16,21
54:3 58:5 59:3
61:11 62:8
63:6,22,24
64:2 69:7 70:5
71:1 75:1,7,
16,20,21,25
77:13,15,16,
18 79:25 80:9,
16 86:17,23
87:11,14 91:9
92:5,22 93:10,
25 94:2 96:2,
25 97:22 99:8,
10

**Tech's** 23:22
24:18 25:17
34:15 75:23
76:2 80:3,17
92:2

**technically**
14:22

**telling** 78:20,
23,25 94:25

**temperature**
84:23,24 85:2,
5,8

**temporary**
7:8

**term** 6:16
44:20 47:25

**termed** 95:16

**terminology**
55:18

**terms** 8:15
44:21 47:3
77:5

**testified**
82:15

**testimony**
40:21 56:12
71:11 89:5

**thing** 10:22
11:8,14 16:16
21:9 29:14
37:18 71:24
79:25 96:15

**things** 3:11
8:11 25:20
38:3 52:2
71:16

**thinking**
20:13 24:12

**thought** 19:9,
12 33:16
62:25 81:10

**thousand**
13:2

**time** 6:2 7:13
8:23,25 9:10,
13 10:7 11:23
12:12 14:21
21:5 23:9
24:20 26:13
36:17 37:12
38:11,15,18,
21 39:7 41:18
45:15 51:11
58:23 67:20
68:22 72:25
82:25

**times** 17:8

33:12 39:19
91:4

**title** 96:17

**today** 18:22
51:18

**told** 27:9,24
28:4 30:23
33:14,21
66:24 67:10
68:7,9,10 83:8
93:3,10 97:18,
23 98:7,25
99:5

**tools** 8:11
59:14,25 60:5
66:2 83:25

**top** 48:10
52:11 53:4,10
54:14 55:21
71:17 72:1,11
74:9 95:19

**touch** 16:17

**touched**
34:23

**traded** 6:18

**training**
14:13,15 15:2
81:15,21

**transcribe**
92:25

**true** 9:16 12:8,
9 15:5,14
16:22 17:4
20:5,16 22:22
25:9 28:4
36:22 37:16,
19 39:7 45:12,
13 47:2 48:12,
13 49:2 55:9
59:25 60:6,7
61:5,18 63:25
64:1,24 65:17
66:11,18
68:12,13,23
69:1,13,22
70:1,7 71:3,13
73:9,16,17
75:4,5,25 76:1
77:1,16 80:9,
10,14,16 84:7,

9 86:24 87:2,
5,19 88:9
89:18 90:12
93:18 96:3
99:13,14

**turn** 16:5

**twelve-hour**
38:11,18
69:12

**twenty** 78:4

**type** 7:24 8:2
25:6 72:24
89:2,23

**typed** 36:7

**Typically**
35:4

—————

**U**

**Uh-huh** 15:15
23:3 30:19
35:15 37:5
38:13 43:14
48:19 52:9
54:8 55:23
58:12 63:11
64:23 65:4
69:2 71:23
73:4 74:24
76:8 80:23
81:16 82:9
86:6,21 95:24
99:12

**ulterior** 21:15

**umbrella**
96:17 97:1

**understand**
9:24 14:5
17:25 27:1
28:20 43:12,
15 58:4,9
60:15 79:14,
15 81:17
88:17 93:24
95:14 98:18

**understandin
g** 20:9,21 41:5
95:3

**understood**

10:14 38:17

**unique** 55:18

**unit** 84:8

**unscrew** 60:19

**updated** 22:1 37:24

———————

**V**

———————

**vacuum** 55:15 59:23 61:12,21 62:5

**vacuumed** 50:13 61:22, 23

**vacuuming** 8:1

**vacuums** 59:22

**Valentino** 50:2

**Valley** 3:20

**valuation** 99:7

**verbal** 34:1 67:9

**verbally** 32:3, 67:10 68:11

**Vergon** 62:15, 22 68:17 69:3, 8

**Vergon's** 70:25 72:16 82:4 83:8

**verification** 21:21

**versus** 10:22

**violates** 95:8

———————

**W**

———————

**wages** 58:16

**wait** 70:19 71:2

**Wall** 28:5,10, 13,16 32:24 49:20 69:3,6, 15 74:23 75:3, 14 76:2

**Wall's** 71:11

**walls** 8:1

**wanna** 8:12, 13 76:17

**wanted** 48:24

**water** 50:25

**wear** 72:1,5,9

**wearing** 41:25

**Wednesday** 18:21

**week** 29:21

**wet** 60:3

**When's** 9:13

**white** 99:24

**wire** 59:19,20 88:20 89:17

**Wisconsin** 10:6 11:13

**Woody** 50:1,2 61:4 73:24

**words** 13:23

**work** 4:14,16 5:18 7:6,18 8:9 10:17 11:11,21 12:2, 4,20 15:3,10 23:22 25:5,7, 17 26:1,7,25 27:2,6,11 28:23 35:1 36:17,21,24 37:6,11,21 38:17 40:15 42:2,20 43:3, 7,25 48:21,22 49:7 58:4,24 61:1,16 63:6 70:13 71:3 76:9,18,20 77:1,10,16,19 80:17,18 81:5

87:13 89:23 93:17

**worked** 4:3,6, 18 28:7 45:11

**workers** 7:8, 10 60:8

**working** 5:19 8:23,25 27:19, 21 70:15

**worn** 72:14

**worry** 38:14

**worth** 80:25

**would've** 27:24 28:5 48:9

**Wow** 80:24

**wrap** 85:12

**writing** 34:4

**written** 36:6 37:2 68:14

**wrong** 48:20 56:23 72:8 79:18

———————

**Y**

———————

**year** 3:21 39:5,15,20 64:12,14,15 65:3

**yearly** 64:8

**years** 4:15 33:11,13 78:4

———————

**Z**

———————

**Zone** 65:1

# Exhibit 21

*In the Matter Of:*

BALL CORPORATION

-vs-

AIR TECH OF MICHIGAN, INC.

FREDDY SPENCER

January 23, 2018



**CONNOR REPORTING**
111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

3

```
 1    UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF INDIANA
 2
 3        CAUSE NO. 4:16-CV-00042-PPS-APR

 4   BALL CORPORATION, an Indiana    )
     Corporation, and FACTORY        )
     MUTUAL INSURANCE COMPANY, a     )
 5   Rhode Island Corporation, as    )
     Subrogee,                       )
 6                                   )
          Plaintiffs,                )
 7                                   )
          -vs-                       )
 8                                   )
     AIR TECH OF MICHIGAN, INC., a   )
 9   Michigan Corporation,           )
                                     )
10        Defendant.                 )
11
12
13        DEPOSITION OF FREDDY SPENCER
14
15        The deposition upon oral examination of
     FREDDY SPENCER, a witness produced and sworn before
16   me, Diane Zeyen, RPR, a Notary Public in and for the
     County of Hamilton, State of Indiana, taken on
17   behalf of the Defendant, at the White County
     Courthouse, 110 North Main Street, Monticello,
18   White County, Indiana, on the 23rd day of January,
     2018, at 9:56 a.m., pursuant to the Federal Rules of
19   Civil Procedure with written notice as to time and
     place thereof.
20
21
22
23
24
25
```

```
 1    I N D E X   O F   E X A M I N A T I O N
 2                                        PAGE
 3   DIRECT EXAMINATION ........................4
     Questions by Andrew B. Miller
 4   CROSS-EXAMINATION .......................161
     Questions by Mark N. Senak
 5   REDIRECT EXAMINATION ....................175
     Questions by Andrew B. Miller
 6
 7
 8      I N D E X   O F   E X H I B I T S
 9                                        PAGE
10   Deposition Exhibit No.:
11   Exhibit A - Thermal Imaging Photograph . . . . .168
     Exhibit B - Thermal Imaging Photograph . . . . .168
12   Exhibit C - Thermal Imaging Photograph . . . . .168
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2

```
 1           A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF(S):
 4        Mark N. Senak
          SENAK KEEGAN GLEASON SMITH & MICHAUD, LTD.
 5        566 West Adams Street, Suite 750
          Chicago, IL  60661
 6        312.214.1400
          msenak@skgsmlaw.com
 7
 8
 9   FOR THE DEFENDANT(S):
10        Andrew B. Miller
          STARR AUSTEN & MILLER, LLP
11        201 South 3rd Street
          Logansport, IN  46947
12        574.722.6676
          miller@starrausten.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1        FREDDY SPENCER,
 2     Having been duly sworn to tell the truth,
 3   the whole truth, and nothing but the truth
 4   relating to said matter was examined and
 5   testified as follows:
 6
 7   DIRECT EXAMINATION,
 8     QUESTIONS BY ANDREW B. MILLER:
 9   Q  Could you please state your full legal name for
10      the record?
11   A  Okay.  It is Freddy Lynn, L-Y-N-N, Spencer.
12   Q  And could you spell your first name?
13   A  F-R-E-D-D-Y.
14   Q  Okay.  Thank you.  Mr. Spencer, my name is
15      Andrew Miller.  I represent the defendant,
16      Air Tech, in the lawsuit that's been filed by
17      it, against it by Ball and its insurance
18      company.
19        How would you like for me to refer to you
20      today?
21   A  Freddy.
22   Q  Thank you, Freddy.
23        Freddy, before we went on the record you
24      mentioned that you have a slight hearing
25      impairment; correct?
```



5

A Yes.
Q I am going to be asking you a number of questions today. If I ask you a question and you don't hear it, ask that I repeat it. Okay?
A I will.
Q And I will be, as I stated, asking you several questions. Throughout the course of my questioning, if you don't understand my question ask that I rephrase it. Okay?
A Okay.
Q And if I ask you a question and you answer, I am going to presume that you both heard and understood my question. Is that a fair presumption?
A Yes.
MR. SENAK: Object to the form of the question. Go ahead.
Q Freddy, have you ever been deposed before?
A No.
Q Do you understand what a deposition is?
A Yes.
Q Can you explain to me your understanding of a deposition?
A It is my account of events that happen that you're going to be questioning.

6

Q Correct. But it has the important kind of distinction of being testimony under oath, meaning the court reporter placed you under oath, the same oath under the penalties of perjury as you would take in a courtroom. Okay?
A Yes.
Q So the testimony that you will provide today, there will be a written record of that all under oath and it will follow us through the balance of the lawsuit. Okay?
A Yes.
Q It is very important today that we have a clean record. And by that I mean not a confusing, jumbled up record. Okay? We want to know what questions were asked and what answers were given.
It will be a great help if you answer all of my questions verbally, yes, no, or more extended answer rather than simply audibly, being uh-huh or huh-uh or a nod of the head or a shake of the head. Okay?
A Got it. Uh-huh.
Q Audible or nonverbal responses require our court reporter to make judgments, and we want to make sure the testimony is your own. Okay?

7

A Yes.
Q Another important ground rule is this, allow me to complete my question before you answer. I will try to extend you the same courtesy, because our court reporter can't transcribe two people talking at once. All right?
A Yes.
Q So there's going to be occasions today where I will start speaking before you have answered or you will start answering before I am done speaking. Mistakes will happen. But if I remind you, it is not to be discourteous. It is just to try and be respectful of our court reporter. Okay?
A Yes.
Q Freddy, what is your current home address?
A 6911 East Maple Bend, two words, Drive, and that's Monticello, Indiana, 47960.
Q Do you have any intention of moving, say, in the next 18 months from that home?
A Yes.
Q Where do you anticipate moving to?
A We are looking to retire and move to southern Missouri.
Q When is your projected retirement date?

8

A I am still working with my financial advisor but maybe July.
Q So July of --
A '18.
Q -- 2018?
But you don't know the exact date?
A I don't know if I am 100 percent going to retire, but that's the plan.
Q Do you have an idea of when you will make a firm decision as to whether you will be retiring?
A Probably within the next couple of months.
Q Do you have an address in Missouri?
A No.
Q Do you know a town in Missouri that you will be near to?
A Probably near Branson.
Q Do you have family located in southern Missouri?
A No.
Q So do you have any contacts whatsoever in Missouri?
A Not actually in Missouri, but geographically closer to other family members.
Q What's your cell phone number?
A 574-870-2764.
Q 2764?



9

1  A  Uh-huh.
2  Q  And what's your Social Security number?
3     And the reason that I ask is this, if
4     you're not in the geographic location when this
5     case goes to trial, I may need to hunt you down.
6     And it is a whole lot easier to find you with a
7     Social Security number.
8  A  Well, I would like to add -- ask Mark about
9     that.
10 Q  Sure.
11    MR. SENAK:  Yeah.  So I just object.  I
12    don't think you need it.
13    If you do need to find him, we will be glad
14    to locate him for you.  So unless he wants to
15    provide you his Social Security number, I am
16    going to instruct him not to.
17    MR. MILLER:  Okay.
18    MR. SENAK:  But we will gladly work with
19    you should you want him for purposes of trial.
20    We will provide you with the information at that
21    time to locate him.
22    MR. MILLER:  So you're making a
23    representation as the attorney and agent for
24    Ball and the insurance company that you will
25    assume the obligation to find Freddy Spencer and

10

1     produce him as a trial witness?
2     MR. SENAK:  Yes.
3     MR. MILLER:  Thank you.
4  Q  And, Freddy, what's your business address?
5  A  501 North 6th Street, Monticello, Indiana,
6     47960.
7  Q  And that is the Ball Manufacturing facility here
8     in town; correct?
9  A  Yes.  Yes.
10 Q  And what is your email address?
11 A  It is fspencer@ball.com.
12 Q  And your business phone number?
13 A  574-583-1823.  That's my direct line.
14 Q  You have never been deposed before; correct?
15 A  Pardon me?
16 Q  You have never had your deposition taken before;
17    correct?
18 A  No.
19 Q  What's your educational background, Freddy?
20 A  Well, obviously finished high school, then I did
21    a four-year apprenticeship for a tool and die
22    maker.
23 Q  Where did you go to high school and when did you
24    graduate?
25 A  Paris, Illinois, 1974.

11

1  Q  And your tool and die apprenticeship, was that
2     through a union?
3  A  It was through a union, yes.
4  Q  Which union, please?
5  A  It was ACTWU.
6  Q  ACTWU?
7  A  Yeah.
8  Q  And what does that stand for?
9  A  Amalgamated Clothing and Textile Workers Union.
10 Q  And what was the local that your certification
11    came from?
12 A  I don't remember.
13 Q  Do you recall when you received that
14    apprenticeship?
15 A  Yeah; 1982.
16 Q  And how long did that apprenticeship last?
17 A  Four years.
18 Q  So was it from '82 to '86 or was it --
19 A  No.  '78 to '82.
20 Q  Okay.  And then you became a card-carrying
21    member of the union?
22 A  I did.
23 Q  And how long were you a member of that union?
24 A  Till 1989.
25 Q  So from '82 to '89 you were a journeyman?

12

1  A  Yes.
2  Q  Do you have any other education aside from your
3     high school degree as well as --
4  A  No.
5  Q  -- the tool and die apprenticeship?
6  A  No.
7  Q  You have got to let me finish my question before
8     you answer.
9  A  Okay.
10    MR. SENAK:  That's all right.
11 Q  Any college coursework?
12 A  I did take some college courses, but they were
13    business courses.
14 Q  And how many college courses?
15 A  I think it was four.
16 Q  And where was that?
17 A  Pardon me?
18 Q  What institution did you take those courses
19    through?
20 A  That was through Lakeland College out of
21    Charleston, Illinois.
22 Q  Do you recall when that was?
23 A  No.  I think it was probably '84, '85, somewhere
24    around in there.
25 Q  And you said those were in business?



Freddy Spencer
January 23, 2018

13 to 16

---

**13**

1  A  Yes.  I don't remember the exact course name.
2  Q  But there were four separate business courses
3     that you took?
4  A  Yeah.  It was a business management.  It was
5     basically retail business.
6  Q  Freddy, what did you do to prepare for today's
7     deposition?
8  A  Talked with Mark.
9  Q  Anything else?
10  A  Pardon me?
11  Q  Anything else?
12  A  No.
13  Q  When did you talk to Mark?
14  A  Last week.
15  Q  Was it one conversation or multiple
16     conversations?
17  A  We just talked one day.
18  Q  Was that in person or over the phone?
19  A  In person.
20  Q  And where did that meeting occur?
21  A  Ball Corporation.
22  Q  Were there other individuals present?
23  A  Yes.
24  Q  Who was present?
25  A  Chris Czajkowski and Matt Saul.

---

**14**

1  Q  And how long did that conversation last?
2  A  I think it was close to two hours.
3  Q  During the course of that meeting, were any
4     documents provided to you?
5  A  As far as paper document?
6  Q  Either paper or electronic.
7  A  Okay.  I think we did review one electronic
8     drawing or document.
9  Q  Was that electronic document that you reviewed,
10     was it one page or multiple pages?
11  A  It was more than one page.
12  Q  Do you recall how many pages?
13  A  No, I do not.
14  Q  Was there text on the document or diagrams or
15     drawings that you mentioned before?
16  A  Text.
17  Q  Were there any drawings?
18  A  No.
19  Q  Okay.
20  A  Or, yes, there was.
21  Q  Do you recall what that document was called?
22  A  No.
23  Q  Do you recall what information was on that
24     document?
25  A  Yes.

---

**15**

1  Q  What was the information?
2  A  It was my account of the previous events.
3  Q  Was that a statement that you had provided?
4  A  Yes.
5  Q  Do you recall who the statement was made to?
6  A  No.
7  Q  Was the statement made to a lawyer, to your
8     knowledge?
9  A  It was a document that I had -- a declaration is
10     what it was.  I don't know all the legal garb.
11  Q  Sure.  You said that there was a drawing on it
12     as well?
13  A  Yeah, it was a drawing of the ovens.
14  Q  What evidence?
15  A  Ovens.
16  Q  Oh, of the ovens?
17  A  Yes.
18  Q  Was it a hand drawing or a photograph?
19  A  Photograph.
20  Q  Do you know what oven was depicted?
21  A  It was both the PIN oven and the IBO oven.
22  Q  Was it a photograph that was taken after the
23     fire or before the fire?
24  A  No.  This was a -- this wasn't a photograph.
25     This was out of a, looked like out of a manual.

---

**16**

1  Q  And what part of the oven was depicted?
2  A  It actually showed a picture of the whole oven.
3  Q  How many pictures?
4  A  Two, I believe.
5  Q  Did you learn anything from your review of that
6     document in the photographs?
7  A  No.  It was a document that I had already signed
8     before.
9  Q  Did you review any other documents in
10     preparation --
11  A  No.
12  Q  -- for today's deposition?
13  A  Nope.
14  Q  And I assume that Mark Senak provided you with
15     that document?
16  A  Yes.
17  Q  Was any text or information on the documents
18     highlighted or otherwise brought to your
19     attention?
20  A  No.
21  Q  Did you speak with any witnesses to prepare for
22     today's deposition?
23  A  I worked with them.
24  Q  Okay.
25  A  So yes.

---

17

1  Q  Did you speak specifically about the deposition
2     or anything concerning the fire or this
3     litigation or was it just normal --
4  A  No.  The conversation was about the time line of
5     the deposition.
6  Q  And time line being scheduling?
7  A  Scheduling.
8  Q  What date, who was being deposed, and what time?
9  A  Yeah; because three of those guys work for me,
10    or four of them.
11 Q  And which are those guys?
12 A  Wes Krintz, Randy Crume, Bob Pellegrini, oh,
13    Mike Russell.  I think that's all.
14 Q  And you are currently employed by Ball
15    Manufacturing; true?
16 A  Yes.
17 Q  And how long have you been a Ball employee?
18 A  Twenty-eight and a half years.
19 Q  Do you recall the start date?
20 A  May 25th, '89.
21 Q  And that coincides with the end of your --
22    strike that.
23    Your start date with Ball coincides with
24    the end date of your employment through as a
25    union tool and die maker; true?

18

1  A  Yes.
2  Q  Did you begin your employment at Ball's
3     Monticello facility?
4  A  Pardon me?
5  Q  Did you begin your employment with Ball at the
6     Monticello facility?
7  A  It was not Ball at the time, but I started
8     there.  It was actually Bev-Pak was the name of
9     the company.
10 Q  So your employment that began 5/25 of '89 was
11    not with Ball but Ball's predecessor; true?
12 A  True.
13 Q  Okay.  So it was Bev-Pak, is that B-E-V-P-A-C?
14 A  P-A-K.
15 Q  P-A-K.  And is that two different words?
16 A  It is, with a hyphen in between them.
17 Q  And you were employed with Bev-Pak from 5/25 of
18    '89 through when?
19 A  I don't remember the exact month.  But it was
20    '93 and then we got bought by Reynolds Metals
21    Company.
22 Q  And how long were you a Reynolds Metal Company
23    employee?
24 A  Till August 10th of '98.  That's when we became
25    Ball.

19

1     MR. SENAK:  When did Bev-Pak buy the plant?
2     THE WITNESS:  When did Bev-Pak buy the
3     plant?
4     MR. SENAK:  Yeah.
5     THE WITNESS:  It was August of '88.
6     MR. SENAK:  Sorry.
7  Q  So you have been at the facility that is now
8     known as Ball Manufacturing from May 25 of 1989
9     through the current date?
10 A  Yes.
11 Q  But throughout that time it has been owned by
12    three separate entities?
13 A  Yes.
14 Q  And those three are Bev-Pak, Reynolds Metals
15    Company, and then Ball Manufacturing?
16 A  Exactly.
17 Q  And can you provide me a time line of the
18    positions that you have held through your entire
19    length of employment at the manufacturing plant
20    now known as Ball?
21    So, in other words, I want to know the
22    positions you have held with Bev-Pak, Reynolds
23    Metals Company, and Ball.
24 A  Okay.  This is going to be a little bit of a
25    lengthy answer.

20

1     THE WITNESS:  Are you good with that?
2     MR. SENAK:  Absolutely.
3  Q  Well, I am the guy asking questions.
4  A  I know.
5     1989, started as a machinist millwright for
6     Bev-Pak.  I was still a machinist at Bev-Pak
7     when Reynolds bought the company in '93.  And
8     then in 1995 I was promoted to maintenance
9     supervisor and held that position under Reynolds
10    for ten years.
11    And then in 2005, under Ball Corporation, I
12    was promoted to engineering manager, which is my
13    current position.
14 Q  So from '89 through '95, you were a machinist
15    millwright, from '95 through 2005 you were the
16    maintenance supervisor, and from 2005 through
17    the current date you have been the engineering
18    manager; true?
19 A  True.
20 Q  When you began your employment at Bev-Pak on
21    5/25 of 1989, was the IBO #2 oven at the plant?
22 A  Yes.
23 Q  And it is my understanding that the IBO #2 oven
24    is the one at issue in this case; correct?
25 A  Yes.  Now just to clarify, that may have been at

21

1    that time IBO #3.
2 Q  So it is numbering may have changed?
3 A  Yes.
4 Q  But the oven that's at issue in this case was at
5    the -- what is now known as the Ball
6    Manufacturing facility, then known as Bev-Pak,
7    on 5/25/1989, when you began your employment?
8 A  Yes.
9 Q  Do you know when that oven was originally
10    installed at the plant?
11 A  I do not.
12 Q  But it has been there your entire length of
13    employment?
14 A  Yes.
15 Q  As the engineering manager, how many employees
16    do you supervise?
17 A  Direct supervision, two.
18 Q  How are you defining direct supervision?
19 A  I am the manager.  I have two supervisors and
20    then each supervisor has so many team members
21    under each one.
22 Q  So do you indirectly supervise those team
23    members?
24 A  I am responsible for them.
25 Q  So you supervise two, but you're responsible for

22

1    how many employees?
2 A  Let's see.  Twenty-six.
3 Q  Prior to working at -- strike that.
4    If I refer today to your employment at
5    Ball, I am speaking of the entirety of your
6    employment history at the current facility
7    that's now known as Ball.  Okay?
8 A  Okay.
9 Q  So if I ask you about kind of employment history
10    issues, I want to stretch all the way back to
11    5/25 of '89 with Bev-Pak moving forward.  Okay?
12 A  Okay.
13 Q  Prior to working at the Ball facility, now known
14    as Ball, did you have any prior experience in
15    beverage can fabrication?
16 A  No.
17 Q  Prior to working at the Ball facility, did you
18    have any prior experience in metal can
19    fabrication?
20 A  No.
21 Q  Prior to working at the Ball facility, did you
22    have any prior experience with IBO ovens?
23 A  No.
24 Q  Has all of your experience in metal can
25    fabrication or beverage can fabrication been

23

1    since your employment with Bev-Pak in May of
2    1989?
3 A  Yes.
4 Q  Have you ever worked at any facilities other
5    than the Monticello facility?
6 A  Yes; for a short time.
7 Q  Were those always under the ownership of Ball or
8    were some of those instances when Reynolds
9    Metals or Bev-Pak owned it?
10 A  It was under Ball Corporation.
11 Q  And were those just on a project-by-project
12    basis?
13 A  Yes.  It was to train an individual and to help
14    get their toolroom straightened up.
15 Q  And what facilities were those at?
16 A  That was the Ball beverage facility in
17    California.  They closed it.
18 Q  Do you recall when that was?
19 A  No, I don't recall the exact dates.  It was
20    after 9/11, I do know that, right after 9/11.
21 Q  Do you recall the length of time that you spent
22    at that Ball --
23 A  It was six months.
24 Q  You got to let me finish my question.
25 A  Okay.

24

1 Q  Six months --
2 A  Yeah.
3 Q  -- you were at the Ball facility in California?
4 A  It was not six months continuous, but three
5    months and then I came home for awhile and went
6    back for three months.
7 Q  And did the training that you provide, did that
8    concern IBO ovens?
9 A  No.
10 Q  Was there an IBO oven located at the California
11    plant?
12 A  Yes.
13 Q  Did you have any involvement with the IBO oven
14    at the Ball plant in California?
15 A  No.
16 Q  Freddy, can you tell me, what are the duties and
17    responsibilities of an engineering manager?
18 A  It's pretty vague, but basically maintain the
19    engineering functions of the plant, all
20    engineering functions.
21 Q  What are the engineering functions of the plant?
22 A  Maintain the building, grounds, supervise my
23    maintenance supervisor, electrical supervisor,
24    and take care of contract labor.  That's the
25    basics.  Projects.

25

1  Q  Did you say supervise the outside contractors?
2  A  Yes.
3  Q  Did you select the outside contractors?
4  A  Yes. Not all of them, but --
5  Q  Did the supervision of outside contractors --
6     strike that. Is Air Tech one of the outside
7     contractors that you supervised?
8  A  I did supervise them, yes.
9  Q  And when did you begin supervising Air Tech?
10 A  I don't remember the exact date that we actually
11    brought them on board.
12 Q  Do you recall when -- you don't recall when
13    Air Tech was brought on board?
14 A  No, I don't.
15 Q  Did you play a role in selecting Air Tech as an
16    outside contractor?
17 A  Yes.
18 Q  Who else played a role in selecting Air Tech?
19 A  I believe his name was John Cummins.
20 Q  Anyone else?
21 A  No.
22 Q  And how do you spell Cummins? Is it like the --
23 A  C-U-M-M-I-N-S.
24 Q  Just like the diesel?
25 A  Yeah.

26

1  Q  And what was Mr. Cummins' position?
2  A  At that time I believe he was the director of
3     engineering.
4  Q  And were you the engineering manager at that
5     time?
6  A  No.
7  Q  What position did you hold at that time?
8  A  Maintenance supervisor.
9  Q  Did John Cummins occupy the position that you
10    now hold?
11 A  No.
12 Q  So the director of engineering is different than
13    the engineering manager?
14 A  Yes.
15 Q  Do you report now to a director of engineering?
16 A  No. That position is no longer there.
17 Q  Do you know, was John Cummins the last
18    individual to occupy the position of director of
19    engineering?
20 A  As far as I know, yes.
21 Q  And do you know when his -- strike that.
22    When the director of engineering was phased
23    out, was John Cummins let go?
24 A  No.
25 Q  Was he moved to a different position?

27

1  A  He was moved to a different -- I think he went
2     to corporate.
3  Q  And do you know when he made that move?
4  A  No.
5  Q  Do you have a general time frame?
6  A  No, I do not.
7  Q  And the reason I was asking those questions and
8     trying to isolate when you believe Air Tech
9     first began providing services.
10 A  Right.
11 Q  So is there anything that could refresh your
12    recollection as to, perhaps, when Air Tech first
13    began?
14 A  I would have to go look at my records.
15 Q  And when you and John selected Air Tech, were
16    there multiple outside contractors that you were
17    looking at for this work?
18 A  They replaced an existing contractor.
19 Q  And who was that contractor that they replaced?
20 A  Phoenix Industrial.
21 Q  And how do you spell Phoenix Industrial?
22 A  P-H-O-E-N-I-X, I think.
23 Q  So like the city in --
24 A  Yes.
25 Q  -- Arizona?

28

1     Was Phoenix Industrial located in Arizona?
2  A  No.
3  Q  Do you know where they were located?
4  A  I believe -- I don't know the exact address.
5  Q  How long did Phoenix Industrial provide services
6     to Ball or its predecessors?
7  A  I don't know.
8  Q  If we look back at the time line of your
9     positions, you were the maintenance supervisor
10    from 1995 through 2005; correct?
11 A  True.
12 Q  And you believe that Air Tech was hired to
13    replace Phoenix Industrial while you were the
14    maintenance supervisor; true?
15 A  True.
16 Q  So Air Tech would have begun providing services
17    to the Ball facility sometime between 1995 and
18    2005; correct?
19 A  Correct.
20 Q  Do you know whether Air Tech began providing
21    services when it was under Reynolds Metals
22    Company ownership?
23 A  I don't know.
24 Q  How long had Phoenix Industrial provided
25    services as an outside contractor to Ball?

29

1  A  I don't know.

2  Q  Was Phoenix Industrial providing IBO cleaning
3     when you began your employment with Ball or its
4     predecessors?

5  A  Not when I started with Ball.

6  Q  Do you recall what company was cleaning the IBO
7     when you started with Ball?

8  A  No.

9  Q  So you have no idea how long Phoenix Industrial
10     provided services?

11  A  No. I don't have exact dates.

12  Q  Do you recall what services Phoenix Industrial
13     provided to Ball or the predecessor company?

14  A  Yes; same service as Air Tech.

15  Q  And please define those services.

16  A  PIN oven cleaning, IBO cleaning, and duct
17     cleaning.

18  Q  And why did Ball or its predecessor stop using
19     Phoenix Industrial?

20  A  I don't recall the exact reason.

21  Q  Did you make the decision to transition away
22     from Phoenix Industrial to Air Tech?

23  A  No.

24  Q  Who made that decision?

25  A  I believe that was John.

30

1  Q  And that was John Cummins; correct?

2  A  Yes.

3  Q  Do you recall how you and John became familiar
4     with Air Tech as a company?

5  A  I do not.

6  Q  Do you know whether Air Tech was providing
7     services to other Ball plants prior to beginning
8     at the Monticello facility?

9  A  Prior to?

10  Q  Yes, sir.

11  A  I don't have any -- I don't recall that.

12  Q  Do you know whether or not Air Tech was referred
13     to John Cummins by a colleague that worked at
14     another Ball plant?

15  A  I don't know.

16  Q  Do you recall being dissatisfied with Phoenix
17     Industrial's services?

18  A  Yes.

19  Q  And what do you recall regarding your
20     dissatisfaction with those services?

21  A  I believe it was their inability to put the oven
22     back together correctly.

23  Q  Was there a dissatisfaction with the actual
24     cleaning that was done?

25  A  Not that I recall.

31

1  Q  So the dissatisfaction was in their reassembly
2     of the oven?

3  A  Yes.

4  Q  Do you know who would have been in charge of
5     supervising Phoenix Industrial?

6     MR. SENAK:  Object to form.  Go ahead and
7     answer the question.

8  A  It would have been me.

9  Q  Okay.  Did you provide any training to
10     Phoenix Industrial as to how to reassemble that
11     oven?

12  A  No.  They told us that they knew how to take
13     them apart and put them back together, so.

14  Q  How many cleaning events did Phoenix perform for
15     Ball?

16  A  I have no clue.

17  Q  How many times did you notice defects or
18     deficiencies in the manner in which they
19     reassembled the oven?

20  A  I don't have an exact amount of times.

21  Q  Was it more than one?

22  A  Yes.

23  Q  Would it have been more than two?

24  A  I don't recall.

25  Q  And was it that they had an inability to

32

1     reassemble the oven or the manner in which that
2     they reassembled it was not correct and
3     appropriate for operating?

4  A  I believe it was the manner.

5  Q  Did you ever provide Phoenix Industrial with any
6     maintenance manuals for the IBO oven?

7  A  I don't recall.

8  Q  Do you recall whether or not you provided
9     Phoenix Industrial with any user manuals for the
10     oven?

11  A  I don't recall.

12  Q  Do you recall whether or not you provided
13     Phoenix Industrial with any manuals that would
14     explain the assembly and disassembly of the IBO?

15  A  I don't recall.

16  Q  Was the inability of Phoenix Industrial to
17     properly reassemble the ovens limited to the IBO
18     or was it also the PIN ovens?

19  A  I believe it was just the IBOs.

20  Q  To your knowledge, how many Ball Manufacturing
21     facilities did Air Tech perform services?

22  A  I don't have a clue.

23  Q  Have you ever experienced any problems with
24     Air Tech's ability to properly reassemble the
25     IBOs?



33

1  A  I believe we did in the beginning.
2  Q  And were those problems remedied?
3  A  Yes.
4  Q  Do you remember how many occasions when Air Tech
5     began providing services that they had
6     difficulty properly reassembling the IBO?
7  A  No, I do not.
8  Q  Did they have any difficulty assembling,
9     reassembling the PIN ovens?
10 A  Not that I recall.
11 Q  So it was exclusively confined to the IBO?
12 A  Yes.
13 Q  Is there something about the IBO that makes it
14    difficult to reassemble for outside contractors?
15 A  I would say yes.
16 Q  What is that characteristic or feature of the
17    IBO ovens that makes it difficult to reassemble?
18 A  We call it the shingling of the oven doors when
19    they put them back in, when they bolt them in.
20 Q  Can you describe the shingling that you are
21    referring to?
22 A  Yeah.  The shingling is the position of each
23    panel, how it overlaps, and they have to be
24    proper in order for the cans not to get hung up
25    on them.

34

1  Q  And is that the external access doors?
2  A  No.
3  Q  What doors are you referring to?
4  A  These are the internal doors that bolt on.
5  Q  So the internal doors, they are within the IBO
6     oven itself; true?
7  A  True.
8  Q  How many interior doors are there?
9  A  I have no -- I don't know.
10 Q  And in order to assemble, reassemble these
11    interior doors, an individual needs to enter the
12    oven; true?
13 A  It actually -- yes.
14 Q  So when Phoenix improperly reassembled those
15    interior doors, who fixed the problem?
16 A  We did.
17 Q  And on that occasion that Air Tech improperly
18    reassembled the interior doors, who fixed the
19    problem?
20 A  We did.  But we explained to them what they had
21    done wrong.
22 Q  Did you make that explanation to Air Tech while
23    Air Tech was still at the facility?
24 A  I don't recall.
25 Q  Was the problem discovered when Ball started up

35

1     the oven to resume production during the testing
2     phase?
3  A  I believe it was found during the inspection.
4  Q  And did those inspections occur while Air Tech
5     was still on site?
6  A  Yes.
7  Q  So when those problems were found, did Air Tech
8     fix the problem or did Ball employees fix the
9     problem?
10 A  I don't recall exactly who fixed the problem.  I
11    wasn't in charge of the oven that day.
12 Q  Do you recall who would have been?
13 A  No.
14 Q  All right.  And after that incident with Air
15    Tech not assembling the interior doors
16    correctly, did they ever experience that problem
17    again?
18 A  Not that I am aware of.
19 Q  And just to clarify, it was the same problem
20    that Phoenix had?
21 A  Similar.
22 Q  So it was a little different?
23 A  A little different.
24 Q  What problems did Phoenix have in reassembling?
25 A  It was shingling as well.

36

CONFIDENTIAL
1  Q  Do you recall the distinction between the
2     problems that you experienced with Phoenix and
3     Air Tech?
4  A  No.  That was quite a span of years.
5  Q  How many IBOs are on site at the Monticello
6     plant?
7  A  I just need to clarify, active IBOs or actual
8     ovens?
9  Q  Let's start with active.
10 A  Four.
11 Q  And are there inactive IBOs?
12 A  One.
13 Q  When did that IBO become inactive?
14 A  July of last year.
15 Q  So 7 of '17?
16 A  Yes.
17 Q  So if we go back to the time period of this
18    fire, which was May of 2014 is my understanding,
19    is that understanding correct?
20 A  Yes.
21 Q  If we go back to 2014, how many active IBOs were
22    at the Monticello facility?
23 A  Five.
24 Q  The one IBO that's inactive, was that removed
25    from service for -- strike that.



**37**

CONFIDENTIAL

1 What reason was the IBO removed from
2 service?
3 A  That line has been shut down.
4 Q  And what line are you referring to?
5 A  Line 5.
6 Q  And what did line 5 produce?
7 A  Alumni-Tek bottles.
8 Q  What is an Alumni-Tek bottle?
9 A  It is a specialty product, specialty bottle for
10 Ball Corporation.
11 Q  Who was the customer for this -- did you call it
12 Alumni-Tek?
13 A  Alumni-Tek.  That's a trademark.
14 Q  Who is Ball's customer for this Alumni-Tek
15 bottle?
16 A  The primary customer was MillerCoors.
17 Q  Were there secondary customers?
18 A  We had several customers for that.
19 Q  Does the Ball Manufacturing facility produce any
20 Alumni-Tek bottles?
21 A  Yes.
22 Q  But not on line 5?
23 A  Not in Monticello.
24 Q  So Monticello ceased producing Alumni-Tek
25 bottles?

**38**

CONFIDENTIAL

1 A  Yes.
2 Q  Does the cessation of production of Alumni-Tek
3 bottles have anything to do with the May 2014
4 fire?
5 A  No.
6 Q  So the fact that there is one inactive IBO, that
7 has no relationship to the fire; correct?
8 A  No.
9   MR. SENAK:  I just need to designate the
10 portion of the transcript about Ball Corporation
11 customers as confidential.
12   MR. MILLER:  That's fine.
13   MR. SENAK:  Under the protective order.
14 Q  The four active IBOs at Monticello, are those
15 IBOs the same IBOs that were in use in May of
16 2014?
17 A  No.
18 Q  How many are new IBOs?  And by new I mean new to
19 Monticello from May of 2014.
20 A  IBO, which is now 2 and 3 are new.
21 Q  Is the IBO oven that is at issue in this case
22 still in use at the Monticello plant?
23 A  No.
24 Q  Is the IBO that's at issue in this fire, is that
25 the one inactive IBO?

**39**

1 A  I am sorry, can you repeat that?
2 Q  Sure.  You mentioned that there is one inactive
3 IBO at the Monticello plant; correct?
4 A  Yes.
5 Q  And that became inactive in July of '17;
6 correct?
7 A  Yes.
8 Q  Is that inactive IBO the IBO that's at issue in
9 this case where the fire occurred?
10 A  No.
11 Q  Okay.  Where is the IBO that's at issue in this
12 case?
13 A  It was taken out.  It was removed.
14 Q  Where was it taken to?
15 A  Scrap.
16 Q  So it was sold as scrap?
17 A  Yes.
18 Q  And when was it sold as scrap?
19 A  I don't recall the exact date.  I don't recall
20 the exact date.
21 Q  Was it taken out of use and sold as scrap as a
22 result of this fire?
23 A  No.
24 Q  My understanding is the IBO after the fire was
25 refurbished and put back in service; true?

**40**

1 A  True.
2 Q  Do you know how long it functioned in service?
3 A  I don't have exact dates.
4 Q  Did it function capably once it was placed back
5 in service?
6 A  Yes.
7 Q  Was the IBO at issue in this case replaced by a
8 newer model?
9 A  Yes.
10 Q  And the replacement of the IBO at issue in this
11 case has nothing to do with the fire; true?
12 A  True.
13 Q  Who is the IBO at issue in this case
14 manufactured by?
15 A  It is actually two companies; Smith Engineering
16 and Metal Box Corporation.
17 Q  And the current IBOs that are in use at
18 Monticello, who are they manufactured by?
19 A  A company called HeatTek.
20 Q  Are all of the IBOs that are functioning at
21 Monticello now manufactured by HeatTek?
22 A  No.
23 Q  How many are?
24 A  Let's see.  Three.
25 Q  And the remaining one, who is it manufactured

41

1  by?
2  A  That's the -- it is an original Metal Box,
3     Smith Engineering.
4  Q  What are the differences between the new IBOs
5     manufactured by HeatTek and the old IBOs
6     manufactured by Smith Engineering and Metal Box
7     Corp.?
8  A  I am not an oven engineer, so I don't know the
9     answer to that.
10 Q  Did Ball Manufacturing, again, or any of the
11    predecessor companies that you worked for in
12    Monticello provide you with training on the
13    operation of an IBO?
14 A  No.
15 Q  Have you ever worked on the line manufacturing
16    cans?
17 A  No.
18 Q  You had testified that Ball Manufacturing had
19    never provided you with any training on the
20    IBOs; correct?
21 A  Correct.
22 Q  Did you do any self-study to train yourself on
23    the operation of IBOs?
24 A  Yes.
25 Q  Tell me the self-study that you did.

42

1  A  Pardon me?
2  Q  Tell me the extent of the self-study you did.
3  A  I read the manual.
4  Q  Do you recall when you read that manual?
5  A  Probably '90, '91.
6  Q  Do you recall how many times you read the
7     manual?
8  A  No, I do not.
9  Q  Okay.  Do you recall whether it was multiple
10    times?
11 A  Well, I probably referenced the manual.
12 Q  And that's a good distinction.
13    Did you read the manual in its entirety one
14    time?
15 A  I don't recall if I read the entire manual.
16 Q  The self-study, was that a product of there was
17    a problem and you had to research what was going
18    on?
19 A  Yes.
20 Q  So it wasn't an instance where you just read the
21    manual to familiarize yourself with the piece of
22    machinery prior to having any problems?
23 A  No.  I did read the manual so I could understand
24    the theory of operation.
25 Q  So from your testimony is my understanding

43

1  correct, you read the manual one time to
2  understand the theory of operation and then on
3  subsequent occasions you would go back and
4  research specific issues, problems, or
5  components as needed to fix a problem?
6  A  Yes.
7  Q  Okay.  Did you ever contact Smith Engineering
8     and Metal Box Corporation for technical support
9     on the IBOs?
10 A  Yes.
11 Q  Do you recall when that was?
12 A  No, I don't recall the exact date.
13 Q  Was it multiple times or a single instance?
14 A  Multiple times.
15 Q  And do you recall what the issue you were trying
16    to address?
17 A  Not definitively.  I can't recall just exactly
18    what the problems were.
19 Q  Do you recall the time period that you would
20    have made these inquiries of the manufacturer?
21 A  No, I do not.
22 Q  Did you make any inquiries of the manufacturer
23    regarding the reassembly difficulties you were
24    experiencing with Phoenix Industrial?
25 A  No, I did not.

44

1  Q  Did you make any inquiries of the manufacturer
2     regarding the one instance of reassembly
3     difficulties you experienced with Air Tech?
4  A  No, I did not.  They weren't in business.
5  Q  Who wasn't in business?
6  A  When Air Tech took over, Metal Box Engineering
7     had went out of business.
8  Q  Was Smith Engineering still in business?
9  A  No.
10 Q  So both Smith Engineering and Metal Box
11    Corporation were out of business by the time
12    Air Tech came on board?
13 A  Right.  Right.
14 Q  After Smith Engineering and Metal Box
15    Corporation were no longer in existence, who did
16    you go to for technical support?
17 A  I don't recall exactly.  I don't recall.
18 Q  Did you provide Phoenix Industrial with the
19    telephone number or any contact information for
20    Smith Engineering or Metal Box Corp. should they
21    experience any problems with the -- or encounter
22    any difficulties in performing their job?
23 A  I don't recall.
24 Q  Do you recall whether or not you provided
25    Air Tech with any technical support numbers or



45

1    contact information for the oven?
2  A  I do not.  I don't recall.
3  Q  Do you recall providing the manual that you read
4      and you would consult to Phoenix Industrial?
5  A  I don't recall.
6  Q  Do you recall providing a manual to Air Tech?
7  A  I don't recall that.
8  Q  If Air Tech testifies that they were never
9      provided with a manual on the IBO, would you
10     have any reason to disagree with that?
11        MR. SENAK:  I will object to form and
12     foundation.  Go ahead and answer.
13 A  If they said that I didn't provide them one, I
14     would say yes.
15 Q  That, yes, that was accurate testimony?
16 A  Right.
17 Q  Okay.  And if Air Tech testifies that no one at
18     Ball Corporation provided them with a manual,
19     would you have any reason to disagree with that?
20        MR. SENAK:  Same objections.  Go ahead and
21     answer.
22 A  Yeah.  I don't have any way to know that.
23 Q  So nobody at Ball has told you that they
24     provided Air Tech with a manual; true?
25 A  True.

46

1        MR. SENAK:  Same objections.  Go ahead and
2      answer.
3  Q  I want to drop back and ask you a couple of
4      questions about the history of the IBO at issue
5      in this litigation.
6        Throughout the course of this case I have
7      been referring to it as IBO #2.
8  A  Correct.
9  Q  I understand that that number changed at some
10     point after the fire; correct?
11 A  No.  The oven went away after the fire.  The
12     oven is no longer there.  We still have IBO 2.
13 Q  But the oven that's at issue in this case was in
14     use until 2017; true?
15 A  True.
16 Q  And it got scrapped for reasons —
17 A  Right.
18 Q  — that have nothing to do with this case; true?
19 A  True.
20 Q  So throughout the time that that IBO was in use
21     at Ball Manufacturing, dating to the beginning
22     of your employment in May of 1989 through the
23     time it was scrapped in 2017, was it always
24     referred to as IBO #2?
25 A  Not always.

47

1  Q  Okay.
2  A  I stated earlier that that may have been IBO 3.
3  Q  What period of time was it called IBO #2?
4  A  From 1993 on.
5  Q  So from '93 until 2017 it was IBO #2?
6  A  Yes.
7  Q  And when it says #2, is that referring to the #2
8      line?
9  A  Yes.
10 Q  Okay.  So let's talk about IBO #2.
11        Do you have any idea how long it had been
12     in operation at the Monticello facility?
13 A  IBO 2?
14 Q  Yes, sir.
15 A  Since '89.
16 Q  Okay.
17 A  Or '88.
18 Q  So you know that it has been in use from May 25
19     of 1989, your start date, through the date that
20     it was scrapped in July of 2017; true?
21 A  True.
22 Q  Prior to May of 1989, do you know when it was in
23     use?
24 A  Not exactly, no.
25 Q  Okay.  Who would know?

48

1  A  Well, it was there when I started.
2  Q  Okay.
3  A  The plant went in in '88, September of '88.  So
4      that's only like a six-month time span there.
5  Q  So the Ball Manufacturing -- the plant now known
6      as Ball in Monticello was constructed in August
7      of 1988?
8  A  Yes.
9  Q  And is it your belief that the IBO #2 was in use
10     at the Monticello facility from August of 1988
11     through 2017?
12 A  As far as I know, yes.
13 Q  Do you know whether that oven, that IBO was
14     purchased new in August of 1988?
15 A  All of the ovens were purchased new, so yes.
16 Q  Do you know when it was purchased?
17 A  No.
18 Q  Did the plant begin operation in August of 1988?
19 A  I believe it was actually September.
20 Q  But you don't know the date of purchase?
21 A  No.
22 Q  Throughout your course of employment at Ball,
23     have you ever gone back to look at the purchase
24     documents for that IBO?
25 A  No.



49

1  Q  Would you even -- strike that.
2      Do you know whether Ball has retained
3  documentation concerning the purchase of that
4  IBO oven at issue in this case?
5  A  I don't know whether they retained the
6  information.
7  Q  Do you know who would have that information?
8  A  I do not.
9  Q  To your knowledge, had the IBO at issue in this
10  case ever been used to process steel cans?
11  A  Yes.
12  Q  Okay.  Did it begin processing steel cans in
13  September of 1988, to your knowledge?
14  A  Yes.
15  Q  What period of time did the IBO at issue in this
16  case -- strike that.
17      What was the period of time that the IBO at
18  issue in this case was used in the process or
19  manufacture of steel cans?
20  A  I believe it was from '88 to '93.
21  Q  Do you remember in 1993 when that was?
22  A  I do not.  It could have been late '92.
23  Q  Was the IBO oven used for the same purpose in
24  the manufacturing process of steel cans as
25  aluminum cans?

50

1  A  Yes.
2  Q  And my understanding is the IBO, its function is
3  to cure a liquid that is sprayed into the
4  interior of the cans and then cures through as
5  it travels through the oven?
6  A  True.
7  Q  And the purpose of that spray is to coat the
8  interior of the can; true?
9  A  True.
10  Q  And the coating's function is -- strike that.
11      What is the coating's function?
12  A  To protect the contents from getting metal,
13  metal flavor.
14  Q  What substance is sprayed in the interior of
15  those cans?
16  A  It is called internal coating.
17  Q  Who is the manufacturer?
18  A  We have various manufacturers.
19  Q  Did the various manufacturers -- is the product
20  that is purchased from the various manufacturers
21  identical?
22  A  I don't know.  I don't know the answer to that.
23  Q  Is the internal coating that was sprayed into
24  steel cans the same substance as is sprayed into
25  aluminum cans?

51

1  A  I don't have the answer to that.
2  Q  Who would?
3  A  Whoever orders that material.
4  Q  After late 1992 or 1993, what product was the
5  IBO used to process?
6  A  Aluminum beverage cans, beverage and beer cans.
7  Q  And what period of time was that?
8  A  From late '92 or early '93 until present.
9  Q  Well, actually through July of 2017 when it was
10  taken --
11  A  Right.
12  Q  -- taken offline; correct?
13  A  Yes.
14  Q  And you were at the facility now known as Ball
15  in late 1992 when it made the transition from
16  steel to aluminum; correct?
17  A  Correct.
18  Q  Did you assist in transitioning that line from
19  steel cans to aluminum beverage cans?
20  A  Yes.
21  Q  What did you do to transition that oven from
22  processing steel cans to aluminum cans?
23  A  I don't recall exactly what we did to the oven.
24  Q  Was that done by Ball or a predecessor company
25  employees or an outside contractor?

52

1  A  I don't recall.
2  Q  Who would have that knowledge at Ball?
3  A  Today, I don't think there is anybody there
4  left.
5  Q  Because that dates to the era of Reynolds Metal
6  Company; correct?
7  A  Correct.  Actually, we did the conversion just
8  prior to Reynolds buying us.  It all happened at
9  the same time.
10  Q  So that would have been Bev-Pak?
11  A  Bev-Pak to Reynolds.  The conversion and the
12  purchase was at the same time.
13  Q  Was the conversion as a result of the purchase?
14  A  I don't know.
15  Q  Do you recall anything that you did to
16  transition the oven from processing steel cans
17  to aluminum cans?
18      MR. SENAK:  Asked and answered.  Go ahead
19  and answer.
20  A  I don't recall exactly what -- if I had anything
21  to do with it, that was a long time ago.  I was
22  an hourly then.
23  Q  What was the operational temperature for the IBO
24  when it was being used to process steel cans?
25  A  I don't know.

53

1  Q  What is the operational temperature of the IBO
2     when used to process aluminum beverage cans?
3  A  I don't have the answer to that.
4  Q  Freddy, I neglected to mention, we have been
5     going an hour and ten minutes or so. You can
6     take a break anytime that you need to, if you
7     need to stretch your legs, use the restroom, go
8     out and have a cigarette, whatever. All I would
9     ask is allow me to, if I have asked you a
10    question, to complete your answer to the
11    question before we take a break. Okay?
12 A  Okay.
13 Q  Would you like to take a break?
14 A  No, I am good.
15    MR. SENAK: Do you want to keep going?
16    THE WITNESS: I'm good.
17    MR. SENAK: Okay. Let's go.
18 Q  Do you recall whether steel cans are processed
19    at a higher rate of speed than aluminum beverage
20    cans?
21 A  From my recollection, I think they were slower.
22 Q  So you think that the IBO processes more
23    aluminum cans per hour than it was able to
24    process steel cans per hour?
25 A  I would believe so, yes.

54

1  Q  And that belief is based upon what?
2  A  Experience.
3  Q  Do you recall how many steel cans were processed
4     per hour by the IBO at issue in this case?
5  A  I do not.
6  Q  Do you recall how many aluminum beverage cans
7     were processed per hour by the IBO at issue in
8     this case?
9  A  Unfortunately, we don't do it per hour, we do it
10    by minute.
11 Q  Okay.
12 A  So I can probably give a better answer by
13    minute.
14 Q  Okay.
15 A  With aluminum cans, depending on the size.
16 Q  I guess the initial question I have to ask is
17    tell me all the sizes that it processed.
18 A  Twelve ounce, 16 ounce, 24 ounce, 32 ounce,
19    750 milliliter.
20 Q  And tell me how many cans per minute of each are
21    processed by the IBO at issue in this case.
22 A  I can't give you an exact. I can give you
23    close.
24 Q  Okay.
25 A  Okay. So I think it is 1,950 cans a minute for

55

1     12 ounce, about 1800 cans a minute for 16 ounce.
2     Combined with two decorators, 24 ounce is about
3     1600 a minute, 32 is about 1500 a minute, and
4     750 is about 1500 a minute.
5  Q  So as the size of the can increases, the speed
6     of the IBO decreases; true?
7  A  True.
8  Q  And what is necessary -- strike that.
9     Tell me the steps that you have to take to
10    adjust the speed of the IBO to process the
11    variety of products that go through it.
12 A  The steps, as I know, are the line speed, we
13    would adjust the line speed, because the
14    temperature doesn't change.
15 Q  And how is the line speed adjusted?
16 A  Through a line control, by computer.
17 Q  What is line control?
18 A  Line control is a computer program that's set up
19    to control the speed of the line.
20 Q  And is line control, is that, to your knowledge,
21    a proprietary computer program for Ball Corp. or
22    is it an outside vendor?
23 A  I would say Ball Corporation.
24 Q  Does the operator of the oven have the ability
25    to control the line speed from a computer

56

1     terminal next to the oven?
2  A  No.
3  Q  Where is that change made?
4  A  In our electrical shop.
5  Q  Who makes that change?
6  A  Only the electricians.
7  Q  And do you know what size product was being run
8     through the IBO on May 22 and into May 23 of
9     2014?
10 A  IBO 2?
11 Q  Yes, sir.
12 A  12 ounce.
13 Q  So 12-ounce cans were being processed on the
14    date of this fire; correct?
15 A  Yes.
16 Q  And what is the speed of the line to process
17    12-ounce cans?
18 A  It is between 1900 and 2,000.
19 Q  So the speed is only referenced by the number of
20    cans, not an actual feet per second or any
21    other --
22 A  In a breakdown of the line, yes. But when we
23    reference a line, we talk about line control, we
24    talk about cans per minute or CPM.
25 Q  And cans per minute, what does that translate



**57**

1    into cans per day?
2    A   It is just the totals.
3    Q   So my understanding is the Ball Manufacturing
4        plant operated 24 hours a day, 7 days a week;
5        true?
6    A   True.
7    Q   So that IBO was in constant use; true?
8    A   True.
9    Q   So it would produce 1900 to 2,000 12-ounce cans
10       per minute for the entirety of 7, 24 hour a day
11       increments per week?
12   A   True.
13   Q   Prior to Air Tech cleaning the oven on May 22 of
14       2014, what cans were being processed?
15   A   12 ounce.
16   Q   Do you know how long 12-ounce cans had been
17       being processed by the oven?
18   A   Line 2 oven?
19   Q   Yes.
20   A   Since '88.
21   Q   So IBO oven #2 was used exclusively for 12-ounce
22       beverage cans?
23   A   Yes; or beer, beer or beverage.
24   Q   Okay.
25   A   12-ounce cans.

**58**

1    Q   But I guess I am getting confused by your
2        distinction of beer and beverage.
3        Is the same process, manufacturing process
4        used --
5    A   Yes.
6    Q   -- for -- you got to let me finish. -- used for
7        a beer or what you're calling a beverage can?
8    A   Yes.
9    Q   So it is the same amount of internal coating
10       that's sprayed into each can without respect to
11       the ultimate beverage that is being placed in
12       the can?
13   A   No. It is not the same amount of spray. That's
14       the distinction.
15   Q   Tell me about that.
16   A   One requires more spray than the other.
17   Q   What requires more spray?
18   A   The can.
19   Q   What content of the can requires more spray?
20   A   I don't recall. It is beverage or beer, one or
21       the other.
22   Q   When you say "beverage," what are you referring
23       to?
24   A   Soda cans.
25   Q   So beverage is soda, beer is beer?

**59**

1    A   Right.
2    Q   And either soda or beer requires more internal
3        coating in the can --
4    A   Yes.
5    Q   -- true?
6    A   True.
7    Q   Who would know which requires more?
8    A   The quality department.
9    Q   The more coating that is sprayed in the can,
10       does that require a longer time in the oven to
11       cure?
12   A   No.
13   Q   Why?
14       MR. SENAK:  Object to foundation.  Go ahead
15       and answer, if you can.
16   A   To my knowledge, it is the time and temperature
17       of the coating and whether it is the spray for
18       beverage or spray for beer.  Our oven curve
19       still falls within that window.
20   Q   Okay.  Do you know whether the oven was
21       processing beverage or beer cans at the time of
22       the fire?
23   A   I do not recall.
24   Q   Do you know whether the oven was processing
25       beverage or beer cans prior to Air Tech's

**60**

1    cleaning on May 22 of 2014?
2    A   Sorry, but the question is, is do I know what we
3        were running prior to them cleaning?
4    Q   Yeah.
5    A   No, I do not.
6    Q   So despite the amount of internal coating that's
7        being sprayed into the can, Ball does not adjust
8        anything on as to the speed or temperature at
9        which the IBO oven is functioning?
10   A   Yeah.  I am not sure if they adjust.  I know we
11       don't adjust the speed.  I am not sure about the
12       temperature.
13   Q   Do you have any knowledge as to whether the IBO
14       was being used to process beer or soda cans in
15       the 30 days prior to Air Tech's cleaning?
16   A   No, I do not.
17   Q   How frequently do you switch over between soda
18       cans and beer cans?
19   A   I don't know how often that is.  It is all
20       dependent on our customer requirements.
21   Q   Who adjusts the amount of spray, the internal
22       coating that is being sprayed into the cans?
23   A   Operators.
24   Q   And is that adjustment done at the IBO?
25   A   No.

**61**

1  Q   Where is that adjustment made?

2  A   For the spray controllers for the sprays.

3  Q   And where is that located?

4  A   In the spray area, spray room area.

5  Q   Where is the spray room area in relation to the

6      IBO?

7  A   Prior to the in-feed.

8  Q   How much prior?

9  A   Fifteen, 20 feet.

10 Q   So it is a matter of feet; correct?

11 A   True.

12 Q   What protections are in place to make sure the

13     appropriate amount of internal coating is being

14     sprayed in each can?

15 A   There are quality checks, weight checks.

16 Q   Are those done before the cans enter the IBO or

17     after they exit?

18 A   I am not sure.

19 Q   If I am understanding your testimony correctly,

20     Freddy, your position required you to work in

21     and around the IBO; true?

22 A   I'm sorry?

23 Q   Your position at Ball required you to work

24     around or with the IBO, in part; correct?

25 A   Yes.

**62**

1  Q   What were your responsibilities with respect to

2      the IBO?

3  A   Prior responsibilities or current

4      responsibilities?

5  Q   Well, I am not really concerned about current,

6      because this IBO was taken offline in '17.

7  A   So you're still referencing IBO 2?

8  Q   Well, let me ask a question and see if we can

9      clarify.

10     Has the work that you perform with IBOs

11     changed currently as opposed to what it was in

12     2014?

13 A   Yes, a little.

14 Q   And what are those changes?

15 A   Well, prior to 2005, I was directly responsible

16     for them. But after we started the process

17     superintendent model, then the process

18     superintendent was in charge of the IBO,

19     directly in charge of it.

20 Q   Who was the process superintendent that was in

21     charge of the IBO in May of 2014?

22 A   I believe it was Dale Spencer.

23 Q   So prior to 2005 you were in charge of the IBO;

24     true?

25 A   I was responsible for them, yes.

**63**

1  Q   And what did that responsibility entail?

2  A   Just overseeing the contractor, make sure that

3      they -- you know, get all the safety thing, the

4      lockout-tagout, the confined space entry, made

5      sure they cleaned the oven, kind of did a basic

6      inspection of it, tried to see if they put it

7      back together right.

8  Q   Okay.  And what did that basic inspection

9      consist of?

10 A   Pardon me?

11 Q   What did the basic inspection that you just

12     referred to consist of?

13 A   Well, you know, we are not oven cleaners, so I

14     would just take a flashlight and look in there

15     and made sure there wasn't, you know, piles of

16     residue in there where they had scraped and

17     cleaned.

18 Q   When the IBO was under your responsibility prior

19     to 2005, did you supervise Air Tech's work?

20 A   Yes.

21     MR. SENAK:  Object to foundation and to

22 form.  Go ahead.

23     THE WITNESS:  Sorry.

24     MR. SENAK:  That's all right.

25 Q   In the inspections that you did after Air Tech's

**64**

1      work, do you have any instances where they did

2      not meet your satisfaction?

3      MR. SENAK:  Same objection.

4  A   Yes.

5      MR. SENAK:  Go ahead.

6  Q   Okay.  Do you recall when that was?

7  A   I believe that was -- I don't recall when.

8  Q   But it would have had to have been 2005 or

9      prior; true?

10 A   Right.

11 Q   Were there any checklists or documents that Ball

12     employees made reference to in performing the

13     inspections after the cleanings were done?

14 A   No.

15 Q   And I know you focused specifically on your

16     supervision of outside contractors cleaning the

17     IBOs, but I want to ask you a broader question.

18     And that is, what other work did you do with or

19     around the IBOs in your position?

20 A   I don't understand.

21 Q   Okay.  Did you perform any repairs on the IBOs?

22 A   Oh, yes.

23 Q   Did you perform periodic maintenance on the

24     IBOs?

25 A   Yes.  Not me personally, but yes.

**65**

1  Q   Your department?
2  A   Yes.
3  Q   Did you personally ever perform repairs on the
4      IBOs?
5  A   Years ago, yeah.
6  Q   Do you have personal experience, as well as
7      supervisory experience, in supervising employees
8      or outside contractors making repairs for
9      cleaning the IBOs?
10  A   Yes.
11  Q   What else did your position require you to do
12      with respect to the IBOs?
13  A   Just to make sure they get cleaned and
14      maintained.
15  Q   And what training did Ball provide to you to
16      make sure that they got properly cleaned and
17      maintained?
18  A   None.
19  Q   How did you know that the machine -- that the
20      IBOs were being properly cleaned and maintained
21      without having received any training?
22  A   Just based on my experience with it.
23  Q   And that experience was exclusively at Ball or
24      its predecessor companies?
25  A   True.

**66**

1  Q   But nobody had provided you with any training on
2      the IBOs, be it all or any of the predecessor
3      companies?
4  A   No.
5  Q   Did Ball Manufacturing provide you with any
6      training on the maintenance of the IBO?
7  A   No.
8  Q   Had any of the predecessors provided you with
9      any training on the maintenance of the IBO?
10  A   No.
11  Q   Had Ball or any of the predecessors provided you
12      with any training on the repair of an IBO?
13  A   No.
14  Q   Had Ball or any of its predecessors provided you
15      with any training on the cleaning of an IBO?
16  A   No.
17  Q   Do you mind if we take a five-minute break?
18  A   If you will make it ten, so I can go smoke a
19      cigarette.
20  Q   Yeah. Absolutely. Sure.
21      MR. SENAK: Ready to go. It seems like a
22      deal.
23      (A recess was taken between 11:31 a.m. and
24      11:40 a.m.)
25      BY MR. MILLER:

**67**

1  Q   Freddy, we are back on the record after a short
2      break.
3      Are you aware of any fires involving IBOs
4      at Ball other than the one at issue in this
5      case?
6  A   Yes.
7  Q   When was that other fire?
8  A   I don't recall the dates.
9  Q   Were there more than one prior fire?
10  A   To an IBO, I don't think so.
11  Q   What IBO was involved?
12  A   I believe it was 3.
13  Q   And is IBO #3 that was involved in the other
14      fire, is that different from IBO #2 that was
15      involved in the fire that's at issue in this
16      case?
17  A   From what I can recall, yes.
18  Q   Because I think earlier you testified that at
19      some points in time IBO #2 that was involved in
20      this fire was referred to as IBO #3; correct?
21  A   Right. This was after that.
22  Q   Was the other fire after the fire at issue in
23      this case or before the fire at issue?
24  A   Prior.
25  Q   Do you recall how long prior?

**68**

1  A   No, I don't.
2  Q   And that other fire with the ductwork involved
3      in the fire as well?
4  A   No.
5  Q   So it was just the fire was contained to the
6      oven?
7  A   From what I can recall, yes.
8  Q   And what was the damage sustained?
9  A   I don't recall exactly.
10  Q   Do you recall what caused that fire?
11  A   No, I do not.
12  Q   Do you recall whether any litigation resulted
13      from that fire?
14  A   No.
15  Q   No, there was no litigation or you don't recall?
16  A   I don't believe there was any litigation.
17  Q   Was the fire department called?
18  A   Yes.
19  Q   What fire department?
20  A   Monticello.
21  Q   Ball Manufacturing doesn't have its own fire
22      department; correct?
23  A   No.
24  Q   So any fires are responded to by Monticello City
25      Fire Department?

69

1  A  Yes.
2  Q  Are you aware of any fires involving the same
3     IBO that we have been referring to as IBO #2,
4     the one that's at issue in this case?
5  A  No.
6  Q  With the other fire involving the IBO #3, do you
7     recall where the fire started?
8  A  I don't recall exactly.
9  Q  Do you recall whether there was any disruptions
10    or interferences to Ball's manufacturing as a
11    result of that fire?
12 A  I believe it was a slight disruption.
13 Q  Do you know how long that disruption lasted?
14 A  A few hours.
15 Q  Do you recall whether any changes were made in
16    the plant procedures as a result of that prior
17    fire?
18 A  No, I do not.
19 Q  Do you recall what shift you worked on May 22 of
20    2014?
21 A  I'm sorry?
22 Q  Do you recall what shift you would have been
23    working on May 22 of 2014?
24 A  I don't work shift work, day shift.
25 Q  Do you recall what hours you worked on May 22 of

70

1     2014?
2  A  I don't recall exactly how many hours because it
3     was a maintenance day.
4  Q  Well, do you recall what time you would have
5     started?
6  A  6:30 a.m.
7  Q  And my notes are correct that Air Tech performed
8     its work on May 22 of 2014; correct?
9  A  I believe that was the day.
10 Q  So you began work at 6:30 a.m.?
11 A  I did, yes.
12 Q  Do you recall what time Air Tech arrived?
13 A  I do not.
14 Q  Do you recall what time you would have left the
15    plant on May 22 of 2014?
16 A  I don't recall the exact time I left.
17 Q  Was there a typical time that you would leave
18    the plant?
19 A  Normally I would leave at 4:30.
20 Q  On maintenance days would that have been
21    different?
22 A  Yes.
23 Q  And was there a typical time you would leave the
24    plant on a maintenance day?
25 A  Depending on how the lines started up.

71

1  Q  And what was the norm?
2  A  Probably 14 hours would have been a norm, 12,
3     14 hours.
4  Q  So you would begin work at 6:30 a.m. and
5     complete between, sometime between 6:30 p.m. and
6     8:30 p.m. --
7  A  Probably, yes.
8  Q  -- on a maintenance day?
9     And do you recall what time the fire
10    occurred?
11 A  I don't recall exactly what time. I know what
12    time they called me.
13 Q  Were you on the plant premises when the fire
14    occurred?
15 A  No.
16 Q  Where were you physically located when you --
17 A  At home.
18 Q  So you were at home and received a call --
19 A  Yes.
20 Q  -- that there was a fire?
21 A  Yes.
22 Q  Do you recall what time you received that call?
23 A  I don't recall exactly. I believe it was around
24    11:30.
25 Q  Do you recall, were you awakened by the call or

72

1     were you still awake?
2  A  No, I was awakened.
3  Q  And do you recall who called you?
4  A  I believe it was Mike Rogers. I am not sure.
5  Q  And what was Mike Rogers' position?
6  A  Supervisor.
7  Q  A supervisor of what?
8  A  Production.
9  Q  So he was the production supervisor?
10 A  Yes. I may not be right on the name. I'm not
11    sure if it was Mike, but I think it was.
12 Q  Was Mike Rogers in the same position as
13    Dale Spencer?
14 A  No.
15 Q  What was Dale Spencer's position?
16 A  He was a process superintendent.
17 Q  Okay. If the records reflect that Air Tech
18    arrived at Ball Manufacturing at approximately
19    7:30 a.m., would you have any reason to dispute
20    that?
21 A  I personally would not.
22 Q  Does that seem like a typical arrival time for
23    an outside contractor to clean the ovens?
24 A  No. It normally would have been sooner than
25    that.



**73**

1  Q  So your memory is that Air Tech would have
2     arrived typically earlier than 7:30 p.m. -- or
3     7:30 a.m.?
4  A  Yes.
5  Q  Do you recall what time production resumed on
6     May 22 of 2014?
7  A  I don't remember the exact time.  They were
8     running when I left, I know that.
9  Q  So production had resumed before you left the
10    plant?
11 A  Yes.
12 Q  And who was the supervisor in charge of the IBO
13    when production resumed?
14 A  I believe it was Mike Rogers.  And that's just
15    to the best of my recollection.
16 Q  Did Mike Rogers normally work the night shift?
17 A  We are on a rotating shift, and he was on nights
18    at that time.
19 Q  Okay.  And so Dale Spencer would have been on
20    days?
21 A  Yes.
22 Q  But Dale Spencer was there on May 22, 2014,
23    notwithstanding the fact that they weren't doing
24    any production that day; correct?
25 A  Yes.

**74**

1  Q  So the production supervisor's job on a
2     maintenance day, like May 22, 2014, would be
3     supervising the cleaning rather than supervising
4     the production?
5     MR. SENAK:  Object to form and foundation.
6     Go ahead and answer, if you can.
7  A  No.  His responsibility would be for production.
8  Q  Okay.  Do you recall what you did on May 22 of
9     2014?
10 A  No, I do not.
11 Q  Do you recall whether other IBOs were being
12    cleaned that day?
13 A  No.  Just IBO 2.
14 Q  So it was only line #2 that was shut down that
15    day?
16 A  Yes.
17 Q  Did Dale Spencer supervise other production
18    lines?
19    MR. SENAK:  Objection to form and
20    foundation.  Go ahead and answer.
21 A  No, he did not.
22 Q  So he supervised only one line?
23 A  He is the process superintendent.  He was over
24    the maintenance of that line.
25 Q  Okay.  Do you have five different process

**75**

1     superintendents?
2  A  I'm sorry?
3  Q  Are there multiple supervisor process
4     superintendents to --
5  A  Yes.
6  Q  So you have a process superintendent over each
7     line?
8  A  Over each section of the line.
9  Q  And how many sections are on each line?
10 A  Basically three.
11 Q  What are those sections?
12 A  The front end, the midline, and back end.
13 Q  And what section is IBO #2 on?
14 A  It is in the midline.
15 Q  And what's the front line?
16 A  The body makers.
17 Q  And is that the actual fabrication of the can?
18 A  Yes.
19 Q  And then what composes the front line aside from
20    the fabrication of the can?
21 A  The front line goes from the rolled steel till
22    the decorator infeed.
23 Q  Okay.  And let me -- you just testified to
24    rolled steel.
25 A  Aluminum.

**76**

1  Q  Because this line concerned only aluminum cans
2     at that time?
3  A  Yes.
4  Q  So the front end goes from the rolled aluminum
5     until the can fabrication and then the
6     decoration of the can?
7  A  The front part is from the rolled aluminum to
8     the infeed of the decorators before the can is
9     decorated.
10 Q  Okay.
11 A  And that becomes midline.
12 Q  Midline is from the decoration or painting of
13    the can; correct?
14 A  (Witness nods head up and down.)
15 Q  Through what point?
16 A  Through the IBO oven.
17 Q  And then end line?
18 A  That's the necking process to the palletizer.
19 Q  What's necking mean?
20 A  It is the necking, where they neck the can, put
21    the flange on it for the lid.
22 Q  And is the lid installed at any time at the Ball
23    plant or is that when the can is actually
24    filled?
25 A  At the filler.

77

1　Q　And when production resumed on May 22 of 2014,
2　　were there any difficulties?
3　A　No.
4　Q　Did anything seem wrong with the IBO?
5　A　No.
6　Q　Did anyone make any complaints to you about the
7　　IBO on the evening of May 22, 2014?
8　A　No.
9　Q　Earlier you had talked about you did some
10　　self-study by reviewing the manuals of the IBO.
11　　Do you recall that testimony?
12　A　Yes.
13　Q　Was that IBO manual provided to you or was it
14　　just located somewhere in the plant and you had
15　　to search it out?
16　A　It was located in the maintenance office.
17　Q　And is the maintenance office your office or was
18　　it your office?
19　A　Well, it was my office.
20　Q　How many manuals were there?
21　A　I believe we had three sets of manuals for those
22　　IBOs.
23　Q　And were the three sets, were they three sets of
24　　identical manuals?
25　A　Yes.

78

1　Q　And did the three sets come with each of the --
2　　did a set of manuals come with each IBO?
3　A　I believe so, yes.
4　Q　But all of the IBOs were the same; true?
5　A　True.
6　Q　So the manuals would have been the same?
7　A　Yes.
8　Q　How many manuals were in a set?
9　A　I don't have an exact number, because manual,
10　　parts book, drawings, they were all together.
11　Q　In different volumes or one volume?
12　A　Different volumes.
13　Q　Identify for me all of the manuals or all of the
14　　volumes in a set of manuals for the IBO.
15　A　Okay.  Operation manual.  Parts manual.
16　Q　Let's go slow.  Operations manual.  Okay.
17　A　Parts manual.
18　Q　Okay.
19　A　And then the drawings, mechanical and
20　　electrical.
21　Q　Anything else?
22　A　No.
23　Q　So this set of manuals for each of the IBOs was
24　　in three volumes, an operations manual, a parts
25　　manual, and a drawings manual, which contained

79

1　　both the mechanical and electrical drawings;
2　　true?
3　A　Yes.
4　Q　And the drawings manual for the mechanical and
5　　electrical, what use would you put -- strike
6　　that.
7　　　On what occasions or for what purposes
8　　would you consult the drawings volume?
9　A　I would say if you had parts that you couldn't
10　　get from the manufacturer you could figure out
11　　what they were and have them fabricated.
12　　　And then on the electrical, it is a
13　　reference for the electrical, the original
14　　electrical drawings.
15　Q　Now when you specify the original electrical
16　　drawings, do I take that to mean that there was
17　　subsequent revisions to the electrical system?
18　A　I would assume.
19　Q　And when revisions to the electrical system were
20　　made, a new drawing created so that it could
21　　be placed in the electrical drawing manual so
22　　that you could know what the current state of
23　　the electrical was?
24　A　I believe they were.  I am not an electrician,
25　　so.

80

1　Q　Were mechanical drawings updated to reflect any
2　　changes that were made?
3　A　We didn't make any mechanical changes to the
4　　ovens.
5　Q　When you say "mechanical," how are you defining
6　　that?
7　A　Any of the build -- all the parts to the oven,
8　　we never changed those, so.
9　Q　Do you recall ever providing the drawings volume
10　　to any outside contractors?
11　A　No.
12　Q　What use would the parts manual be?
13　A　For spare parts.
14　Q　So if you had to order a part, you would consult
15　　that manual?
16　A　Yes.
17　Q　And were those parts available through the
18　　manufacturer?
19　A　Not necessarily the oven manufacturer, but we
20　　could find somebody that manufactured them or
21　　the manufacturer that made them for the oven
22　　builders.
23　Q　And was that parts manual ever given to an
24　　outside contractor?
25　A　No.



**Page 81**

1  Q  And the operations manual, what use would you
2     have for that?
3  A  I'm sorry?
4  Q  The operations manual, on what occasions, for
5     what use would you consult that volume?
6  A  I don't know.  I read it, and that was it.
7     That's all I recall.
8  Q  Did Ball provide its employees who were actually
9     operating the IBO with a copy of the operations
10    manual?
11 A  They were available.  I don't understand what
12    you mean by provide.
13 Q  Well, when somebody was hired or transferred on
14    to operating that IBO, were they provided with a
15    copy of the operations manual?
16 A  Okay.  Well, that's a little bit confusing,
17    because the IBO does not take an operator.
18 Q  Okay.  Well, for instance, Dale Spencer was in
19    charge of the operation of the IBO; correct?
20 A  Dale Spencer was in charge of the maintenance of
21    the IBO.
22 Q  Was Dale Spencer provided with a copy of the
23    operations manual?
24 A  I don't know.
25 Q  Did you ever provide it to him?

**Page 82**

1  A  I did not.
2  Q  Did you ever provide Dale Spencer with a copy of
3     the parts manual?
4  A  No.
5  Q  Did you ever provide Dale Spencer with a copy of
6     the drawings manual?
7  A  No.
8  Q  Okay.  During your time when the manuals were
9     under your control in your office, do you recall
10    providing the operations manual for the IBO to
11    anyone?
12 A  No.
13 Q  During the time that the manuals were under your
14    control in your office, do you recall providing
15    the parts manual to anyone?
16 A  No.  Yes.  Yes.
17 Q  Who?
18 A  My maintenance guys.
19 Q  And was that because the oven had broke?
20 A  I believe we were looking for some parts for
21    something.
22 Q  Was that for IBO #2 or some other?
23 A  IBO.  Well, IBO 1, 2, and 3 were the same, so.
24 Q  Do you recall, when you gave the parts manual to
25    that employee, which of the IBOs they were

**Page 83**

1     trying to fix?
2  A  No.
3  Q  When the manuals were under your control in your
4     office, do you recall giving the drawing manual
5     to anyone?
6  A  No.
7  Q  Did Ball ever provide you with information or
8     training on the IBO's structure or component
9     parts?
10 A  No.
11 Q  What is the heat source of the IBO?
12 A  Pardon me?
13 Q  What is the heat source of the IBO?
14 A  Gas burner.
15 Q  And that burner is located in a kind of a box;
16    correct?
17 A  True.
18 Q  Where is that burner box located?
19 A  There's four of them.
20 Q  Where are the four burner boxes located?
21 A  On top of the oven.
22 Q  And all four are located on top of the oven;
23    correct?
24 A  Correct.
25 Q  And is there a separate burner box for each zone

**Page 84**

1     within the IBO?
2  A  Yes.
3  Q  So there are four zones in the IBO; true?
4  A  Yes.
5  Q  There is no open flame in the actual IBO;
6     correct?
7  A  Correct.
8  Q  The open flame is just in each of the four
9     burner boxes on top of the IBO; correct?
10 A  Correct.
11 Q  And is my understanding correct that heat enters
12    the IBO from a fan on the bottom of the burner
13    box that forces the hot air down into the oven?
14 A  It is not exactly on the bottom, but it is on
15    the side of the burner box.
16 Q  But there is a fan on the side of the burner box
17    that forces hot air that's been heated by the
18    open flame down into the IBO?
19 A  Correct.
20 Q  But there is no open flame in the IBO?
21 A  No.
22 Q  So on May 22 of 2014 Dale Spencer was the
23    employee responsible for the IBO's maintenance;
24    true?
25 A  True.

**85**

1  Q  And do you recall what period of time he was in
2      the position that he was responsible for IBO
3      #2's maintenance?
4  A  I don't recall.
5  Q  Can you describe for me the routine maintenance
6      that was performed on an IBO?
7  A  Routine maintenance?
8  Q  Yes.
9        THE WITNESS:  Are you okay with that?
10       MR. SENAK:  Unless you tell me otherwise.
11  A  Basically it is, you know, we hire a contractor
12      to come in.  They disassemble the oven.  They
13      pull the -- are you talking about their
14      responsibility as far as cleaning the IBO?
15  Q  Well, let me ask you this question, because it
16      sounded like you're beginning to testify
17      regarding the cleaning process; true?
18  A  Right.
19  Q  Is your understanding that the only maintenance
20      that the IBO requires is cleaning?
21  A  No.
22  Q  What maintenance does the IBO require?
23  A  It is to check the bearings on all the shafts,
24      on top of the IBO, check the belts for all the
25      blowers.  And then we, my electrical group does

**86**

1      a safety check after the clean.
2  Q  It sounds like the maintenance then is checking
3      the bearings and checking the belts on the fans?
4  A  Yes.
5  Q  How many belts does that IBO use?
6  A  Four zones, I am not sure.
7  Q  How frequently are the belts checked?
8  A  It would be at minimum three times a year.
9  Q  And what do those three times correspond with?
10  A  Our maintenance schedule frequency.
11  Q  And is that maintenance schedule consistent with
12      the cleaning schedule?
13  A  Yes.
14  Q  So as the IBO is being cleaned, the belts are
15      also being checked?
16  A  Yes.
17  Q  And the bearings are being checked?
18  A  Yes.
19  Q  And who changes the belts and checks the
20      bearings?
21  A  Whatever maintenance person is assigned to it.
22  Q  But those are Ball employees; correct?
23  A  Yes.
24  Q  So at the same time that Air Tech was providing
25      services, cleaning services on May 22 of 2014, a

**87**

1      Ball employee was providing maintenance services
2      on the IBO?
3  A  Yes.
4  Q  And, as we sit here today, do you know who that
5      Ball employee would have been?
6  A  No.
7  Q  And would Dale Spencer have been the individual
8      supervising that Ball employee that was doing
9      the maintenance activities on the IBO of May 22
10      of 2014?
11  A  I would say yes.
12  Q  How many of the belts were changed on May 22 of
13      2014?
14  A  I don't know.
15  Q  Would they change all of the belts or only if
16      necessary?
17  A  I am not certain on that.
18  Q  Do you know whether any bearings needed
19      replaced?
20  A  I don't recall bearings being replaced.
21  Q  Would there be any documentation created if a
22      bearing was replaced?
23  A  I would say yes.
24  Q  And who would have that documentation?
25  A  I'm not sure.  I am not sure who would have it.

**88**

1  Q  Would that documentation exist today if the work
2      was performed on May 22 of 2014?
3  A  I am not sure.  But I would assume so, but I am
4      not sure.
5  Q  Are you aware of any other maintenance that Ball
6      performed on those IBOs other than changing
7      belts on the fans and checking the bearings?
8  A  No.
9  Q  Did Ball always use its own employees as opposed
10      to outside contractors to do that maintenance
11      activity that you just testified to?
12  A  As far as I can recall, yes.
13  Q  Yes, all maintenance was performed by Ball
14      employees?
15  A  The basic maintenance, yes.
16  Q  Okay.  Now how are you defining basic
17      maintenance?
18  A  Belts and bearings.  That's basic.
19  Q  If there was any maintenance that was required
20      for the IBO beyond that basic maintenance, who
21      would perform that work?
22  A  I would say probably my maintenance shop.
23  Q  And is the maintenance shop, are those Ball
24      employees?
25  A  Yes.



---

**89**

1  Q  So whether it be basic maintenance or something
2     more than basic maintenance, it was always
3     performed by Ball employees; true?
4  A  True.
5  Q  Are you aware of any instances where an outside
6     contractor was hired to perform any maintenance
7     services on the IBOs?
8  A  The only outside maintenance services we have
9     are vibration infrared.
10 Q  What is that?
11 A  That's where they come in with the equipment to
12    check vibration on fans and bearings and any
13    infrared where they heat check all the
14    electrical components.
15 Q  Okay.  When was that last done prior to May 22
16    of 2014?
17 A  I don't have an exact date.
18 Q  Do you have a range?
19 A  During that time it was performed quarterly.
20 Q  And were those activities able to be performed
21    while the oven was in operation or did they need
22    to be performed during one of these maintenance
23    days?
24 A  Actually, the oven has to be in operation for
25    him to do his testing.

---

**90**

1  Q  Do you know, though, whether that was
2     coordinated with the maintenance day, that those
3     testings, that testing be done either before it
4     shuts down for maintenance or --
5  A  Before.
6  Q  So is it your testimony that the outside
7     contractor maintenance that I think you called
8     it, to test the electrical system, as well as
9     the vibration?
10 A  Yes.
11 Q  Was that done on May 21 or 22, right before
12    Air Tech started performing its work?
13 A  I don't have an exact date.
14 Q  Do you recall whether any problems were
15    discovered when that was performed?
16 A  I do not recall any problems.
17 Q  Freddy, what was the frequency that the duct
18    system was cleaned?
19 A  The ducting was cleaned on an annual basis.
20 Q  And was there a specific time each year that it
21    was done?
22 A  Normally around Thanksgiving.
23 Q  And who made the decision that the duct was
24    cleaned annually?
25 A  I don't know who made that decision.

---

**91**

1  Q  Who is in charge of the duct system and getting
2     it cleaned?
3  A  Well, I was in charge of it while I was
4     maintenance supervisor.
5  Q  Okay.  So the duct cleaning, that was the
6     maintenance supervisor's responsibility?
7  A  Yes.
8  Q  And the IBO cleaning was the production
9     manager's responsibility?
10 A  It started out as maintenance supervisor, then
11    during that time it was the process
12    superintendent.
13 Q  So in 2014, calendar year 2014, the duct
14    cleaning was the responsibility of the
15    maintenance supervisor and the IBO cleaning was
16    the responsibility of the process
17    superintendent?
18 A  Correct.  Actually, maintenance
19    supervisor/engineering manager.  It was in my
20    department.
21 Q  And before May of 2014, when was the last time
22    the ducts were cleaned?
23 A  I don't have an exact day.
24 Q  Would it have been around Thanksgiving of 2014?
25 A  No.  It would have had to have been the previous

---

**92**

1     year.  So it would have been 2013.
2  Q  So prior to the fire, ducts were last cleaned in
3     November of 2013?
4  A  As far as I can -- I don't remember the exact
5     day.
6  Q  And who decided that the ducts were to be
7     cleaned annually?
8  A  I don't know.
9  Q  Do you know how long the manufacturing plant
10    followed the annual cleaning cycle for ducts?
11 A  No, I don't.
12 Q  Do you know why it was decided that the ducts
13    were only to be cleaned annually?
14 A  No, I don't.
15 Q  So you don't know who made the decision or the
16    facts that were the basis for the decision;
17    true?
18 A  No.  When I got maintenance supervisor, it was
19    handed to me, you clean them annual.
20 Q  Was there a list provided to you of --
21 A  No.
22 Q  -- what needed done?
23 A  No.
24 Q  So how did you find out the ducts needed cleaned
25    annually?

---

93

1   A  It was just--
2   Q  Or strike that.  How did you find out that Ball
3      was in the habit or practice of having the ducts
4      cleaned annually?
5   A  I just knew that they did it.  And when I got
6      maintenance supervisor, I just kept doing it
7      every year, so.
8   Q  Did you have a system in place to remind you to
9      schedule the duct cleaning?
10  A  Yes.
11  Q  Explain to me that system.
12  A  I put it on my Outlook calendar.
13  Q  Who put it on your Outlook?
14  A  I did.
15  Q  Okay.  And when would you call to arrange the
16     cleaning?
17  A  I usually called Air Tech about maybe a month
18     ahead of time.
19  Q  And who decided the frequency of the IBO
20     cleaning?
21  A  I don't know.
22  Q  Do you recall -- well, strike that.
23       Did you ever play a role in determining the
24     frequency of the IBO cleaning?
25  A  No.

94

1   Q  How frequently did the operations manual
2     recommend the IBO be cleaned?
3   A  I don't recall.
4   Q  Do you recall reading that in the operations
5     manual when you --
6   A  I don't recall reading the frequency.
7   Q  When Air Tech cleaned the ducts, would you ever
8     go up to kind of individually inspect the ducts
9     to see what they looked like?
10  A  I would, yes.
11      MR. SENAK:  Object to form and foundation.
12     Go ahead.
13  A  Yes.
14  Q  And do you recall when the last time was that
15     you visually inspected the ductwork?
16  A  No.
17  Q  Do you recall what you saw in the ductwork?
18  A  No.
19  Q  Do you recall taking photographs of the interior
20     of the ductwork?
21  A  No.
22  Q  Do you recall making any measurements of any
23     accumulated creosote or soot or any substance
24     inside the ductwork?
25  A  No.

95

1   Q  Did Ball provide you with any confined space
2     training?
3   A  Me personally?
4   Q  Yes.
5   A  Basic confined space, yes.
6   Q  So you were certified to work in confined
7     spaces?
8   A  No.  No.
9   Q  Is anyone at Ball trained to work in confined
10     spaces?
11  A  Not totally confined, no.
12  Q  How do you define totally confined?
13  A  Well, because there's two phases to that.
14  Q  Explain to me the two phases.
15  A  One is reclassifiable confined space and then
16     confined space contractor only.
17  Q  Did you call it reclassifiable?
18  A  Yes.
19  Q  What's a reclassifiable confined space?
20  A  Certain places where you can access and they
21     don't have to have lifesaving equipment to
22     rescue you.
23  Q  What is your understanding of the -- strike
24     that.
25      Is an IBO oven a confined space?

96

1   A  Reclassifiable confined space, yes.
2   Q  And you're trained in reclassifiable confined
3     spaces; true?
4   A  True.
5   Q  And were you so trained on May 22 of 2014?
6   A  I am not sure of that.  I don't know if I had
7     expired or not.
8   Q  But had you been trained --
9   A  Prior.
10  Q  -- in reclassifiable confined spaces prior to
11     May 22 of 2014?
12  A  Yes.
13  Q  How many Ball employees were trained in
14     reclassifiable confined spaces?
15  A  I am not sure how many.
16  Q  Do you know whether Dale Spencer was trained in
17     reclassifiable confined spaces as of May of
18     2014?
19  A  I believe he was trained being in that position.
20  Q  And that allows you to enter the IBO to inspect
21     it; true?
22  A  True.
23  Q  Do you know the normal operating temperature for
24     the IBO?
25  A  I do not.



97

1  Q  Do you know the normal operating temperature at
2     the squirrel cage fan?
3  A  I do not.
4  Q  Do you know the normal temperature at the duct
5     immediately above the squirrel cage fan?
6  A  I do not.
7  Q  Do you know the normal operating temperature of
8     the duct immediately below the squirrel cage
9     fan?
10 A  I do not.
11 Q  Did you participate in any thermal photography
12    of the IBO or its ductwork at any time?
13 A  Yes.
14 Q  When?
15 A  After the fire.
16 Q  When after the fire?
17 A  I believe it was the next day.
18 Q  Did you participate in any thermal photography
19    of the IBO or its ductwork on the date of the
20    fire?
21 A  No.
22 Q  What was the purpose of thermal photography
23    after the fire?
24 A  I seen the results after the fire.
25 Q  Okay.  The question that I asked was

98

1     participate, not view.
2  A  Okay.
3  Q  Did you participate in taking thermal pictures
4     or being with an individual taking thermal
5     pictures at any time?
6  A  No.
7  Q  So you have never participated or been in
8     proximity to someone taking thermal pictures of
9     the IBO?
10 A  No.
11 Q  But you viewed thermal photography of the IBO on
12    the day after the fire?
13 A  Yes.
14 Q  Who showed you those pictures?
15 A  I believe it was Bob Pellegrini.
16 Q  Why did Bob Pellegrini show you those pictures?
17    MR. SENAK:  Objection to foundation.
18    Answer, if you can.
19 A  Just to give me an idea of where the hotspots
20    were.
21 Q  And what was your understanding as to when those
22    photographs were taken?
23 A  I'm sorry?
24 Q  What was your understanding as to when those
25    photographs were taken?

99

1  A  As to when?
2  Q  Yes, sir.  Date and time.
3  A  They were taken on the 22nd, when the fire
4     started.
5  Q  But at what time?
6  A  I don't have an exact time.
7  Q  And what did those thermal photographs depict?
8  A  In my opinion?  I mean, it just showed the
9     hotspots.
10 Q  But what were the -- how are you defining
11    hotspots?
12 A  Difference in temperatures.
13 Q  What difference in temperatures?
14 A  I don't know how to answer that.
15 Q  Because my understanding is the IBO has four
16    zones that function at different temperatures;
17    true?
18 A  True.
19 Q  So did these photographs show something out of
20    the ordinary?
21 A  From what I seen, yes.
22 Q  How did you know that they saw -- that they
23    depicted something out of the ordinary without
24    having knowledge of what the normal operating
25    temperatures were?

100

1  A  I don't.
2  Q  So you didn't know whether or not the
3     photographs showed anything out of the ordinary;
4     true?
5  A  No, that's not true.
6  Q  Why is it not true?
7  A  Well, I mean, the photographs showed a load
8     temperature here and a very, very high
9     temperature here that would have exceeded what I
10    would consider normal.
11 Q  I am confused.
12 A  So am I.
13 Q  What is the normal temperatures?
14 A  I don't know what the normal temperature is.
15 Q  How did you know that those photographs were
16    depicting temperatures then above normal if you
17    didn't know the normal?
18 A  Comparatively speaking, looking at one area and
19    then right beside it, looking at another area,
20    it wasn't normal, in my opinion.
21 Q  Had you ever seen thermal imaging of that oven
22    during its normal operation?
23 A  No.
24 Q  I guess I am still confused.  I don't understand
25    how, if you had never seen what the normal

101

1  photographs were, how were you able to define
2  the photographs you saw as being abnormal.
3      MR. SENAK: I think he has answered the
4  question now a couple times. He can continue to
5  do that. But I am not going to let you ask him
6  like five times the same question.
7  Q  You can answer. He is just trying to pitch you
8  his own answer.
9      MR. SENAK: No, he has already given an
10  answer, twice.
11  Q  What is it?
12  A  My answer is simple. If you are holding a match
13  here and an ice cube here and you see that
14  difference, something is wrong.
15  Q  Tell me then where these temperature
16  differentials were within the oven.
17  A  On the ductwork.
18  Q  Where on the ductwork?
19  A  I don't recall exactly.
20  Q  Was it above or below the squirrel cage fan?
21  A  Above.
22  Q  How far above the squirrel cage fan?
23  A  I am not real sure.
24  Q  Did you view any other of these what you thought
25  were abnormal hotspots at any place other than

102

1  above the squirrel cage fan?
2  A  Yes.
3  Q  Where?
4  A  The other blower.
5  Q  What other --
6  A  Exhaust blower.
7  Q  Okay. Was that also above the squirrel cage
8  fan?
9  A  Yes.
10  Q  So you saw two hotspots and both were above the
11  squirrel --
12  A  No. I seen the hotspot on one and then the
13  other fan does not show it.
14  Q  Okay. So there was only one hotspot?
15  A  Yes.
16  Q  And the one hotspot that you saw was above the
17  squirrel cage fan?
18  A  Yes.
19  Q  And what is your understanding of the area that
20  Air Tech cleaned?
21  A  I don't understand.
22  Q  What area did Air Tech clean on the IBO on
23  May 22 of 2014?
24  A  I am not sure. I wasn't in charge of it.
25  Q  Do you know who took the thermal photography?

103

1  A  Yes.
2  Q  Who?
3  A  Bob Pellegrini.
4  Q  Was Bob Pellegrini alone when he took the
5  thermal photography?
6  A  I don't have a clue.
7  Q  But it is your understanding that Bob Pellegrini
8  was the individual actually operating the
9  camera?
10  A  No. I am not sure if it was him or Justin. I
11  can't think of what Justin's name was. I
12  believe it was Bob Pellegrini.
13  Q  And you don't know whether he was alone or with
14  other individuals?
15  A  I personally don't know.
16  Q  And do you recall what the temperature readings
17  were on that thermal?
18  A  No.
19  Q  Do you know how Bob Pellegrini determined what
20  areas of the IBO and/or ductwork were thermal
21  imaged?
22  A  Just from -- I only know what I was told.
23  Q  What did he tell you?
24  A  They just told me that they seen smoke come out
25  of it, and evidently he went to get the thermal

104

1  imager while the other guys were trying to
2  extinguish the fire.
3  Q  When you say smoke coming out of it, what is the
4  "it" that you are referring to?
5  A  Out of the -- again, these are events that I was
6  told, you know, I wasn't there.
7  Q  No, I understand. But when you are using the
8  word, when the smoke was coming out of it --
9  A  Out of the -- oh, the whatchamacallit, test
10  port.
11  Q  What is a test port?
12  A  Where we check for oven flow.
13  Q  What is oven flow?
14  A  Where we measure the amount of air flow through
15  the duct.
16  Q  And where is the test port located?
17  A  In the ductwork.
18  Q  Above or below the squirrel cage fan?
19  A  Above.
20  Q  So the smoke and the hotspot were both above the
21  squirrel cage fan?
22  A  From what I understand.
23  Q  And the squirrel cage fan that we are referring
24  to, that's the exhaust duct; right?
25  A  Yes.

105

1  Q  Do you know how long the oven had been back up
2     and running before the first -- there was any
3     first indication that there was a fire or a
4     problem or smoke?
5  A  I don't have the exact time, just what I was
6     told.
7  Q  What were you told?
8  A  About six hours.
9  Q  And in that six-hour period of time, how many
10    cans were run through?
11 A  I don't know.
12 Q  Would it be the same 1900 to 2,000 a minute?
13 A  If the line was up to full speed, yes, but I
14    don't know.
15 Q  How long does it take to get the line up to full
16    speed?
17 A  Depends on how well the oven is cleaned.
18 Q  What does that mean?
19 A  Well, if there is contamination blowing around
20    in there, if they didn't get it cleaned good
21    enough, then, well, it takes a little bit longer
22    to get the line up to full speed.
23 Q  Okay.  And from that are you referring to the
24    lacquered covered sheets that are run through
25    the oven?

106

1  A  Yes.
2  Q  And that is prior to production beginning;
3     right?
4  A  Yes.
5  Q  So that is the quality control process that goes
6     on after cleaning but before production?
7  A  Yes.
8  Q  So the six hours that you reference that was in
9     production, was that inclusive of the kind of
10    the quality control work that was done before
11    actual production cans were --
12 A  Yes.  It was five or six hours, I believe.
13 Q  Okay.
14 A  It may have been five hours, closer to five
15    hours.
16 Q  But how long was actual production cans for
17    customers being run through the oven prior to
18    the fire?
19 A  I don't know that.
20 Q  To your knowledge, were there any issues with
21    the operation of the oven after the May 22, 2014
22    cleaning but before the fire?
23 A  Not to my knowledge.
24 Q  Was anything reported to you, that it took
25    longer than normal to -- the quality control

107

1     process after cleaning?
2  A  Not to me, no.
3  Q  And who was in control of that post-cleaning
4     quality control process?
5  A  I don't know.  I would assume it was the
6     supervisor.
7  Q  Which would have been Dale Spencer?
8  A  Dale or Mike.
9  Q  Rogers?
10 A  Yeah.
11 Q  And do you know what that post-cleaning
12    pre-production quality control process consists
13    of?
14 A  I do.
15 Q  Tell me what that consists of.
16 A  It consists of putting varnish on sheets of
17    metal and running the sheets of metal, the wet
18    sheets of metal through the oven.  We reduce the
19    oven temperature to 200 degrees, and they run
20    these sheets through, so whatever contamination
21    is in the air flow of the oven will stick to the
22    contaminants.  And we keep doing that until it
23    is clear.
24 Q  When you were discussing the lacquer covered
25    sheets, you made a hand gesture, as if somebody

108

1     was using a paint brush to paint?
2  A  A roller.
3  Q  So somebody physically takes a roller of lacquer
4     and rolls it on sheets of aluminum?
5  A  Uh-huh.
6  Q  How big are these sheets of aluminum?
7  A  Oh, they are -- I would guess, they are maybe
8     five foot wide, five, six, seven feet long.
9  Q  And what is the lacquer that is used?
10 A  The same spray that goes on the inside.
11 Q  So it is just the internal coating I think you
12    called it?
13 A  Yes.
14 Q  So it is the same thing that's sprayed inside
15    the can as what's being applied on the aluminum
16    sheets?
17 A  Yes.
18 Q  How many sheets typically need to be run through
19    to pick up any airborne contaminants?
20 A  Again, it depends on how well the oven is
21    cleaned, how well it is vacuumed out.  I don't
22    have an exact number, 50, 60.
23 Q  Okay.
24 A  Something like that.
25 Q  So, in your experience, 50 or 60 sheets need run



**109**

1   through the oven?
2   A   Would normally clean it up, yeah.
3   Q   Do you have any knowledge as to how many were
4       run through on May 22 of 2014?
5   A   No, I do not.
6   Q   Who would have that knowledge?
7   A   Probably Dale Spencer or Mike Rogers.
8   Q   And is that process done while Air Tech is still
9       physically on the premises or after they have
10      left?
11  A   They're normally, they are cleaning up or -- if
12      they are not gone, they are in the process of
13      lugging up all their equipment when we start it.
14  Q   And who physically performs that task?
15  A   It is a variety of people.
16  Q   Who would they be?
17  A   They would be the operators, the spray room
18      operators, some other mechanics in the plant or
19      operators.
20  Q   Are all of the individuals responsible for that
21      post-cleaning pre-production quality control,
22      consisting of running the lacquered sheets of
23      aluminum, are those all Ball employees?
24  A   Yes.
25  Q   So no outside contractors participate in those

**110**

1       actions; correct?
2   A   No.
3   Q   Air Tech was not responsible for that quality
4       control process; true?
5   A   True.
6   Q   And who ultimately makes the determination that
7       the oven can be put back in service?
8   A   It is either the production supervisor or it
9       could be the process superintendent.
10  Q   And those are both Ball employees; true?
11  A   True.
12  Q   And if those Ball employees determined that it
13      was not sufficiently cleaned, did they have the
14      authority to call Air Tech back to have them
15      come and remedy --
16  A   That would be rare, yes.
17  Q   But they had that authority; true?
18  A   Yes.
19  Q   Do you recall that ever happening?
20  A   No.
21  Q   Describe for me your understanding of the
22      procedure Air Tech used to clean the IBO on
23      May 22 of 2014.
24  A   This is where I started a little while ago;
25      right?

**111**

1       They come in and they take a -- they take
2       the doors off.  They open the oven up, take all
3       the panels off.  They pull all of the screens
4       out.  And then they go in and they wire brush
5       the screens.  They go in and they clean the
6       nozzles, vacuum.  They clean the exhaust
7       blowers, the squirrel cage, the fan housing,
8       that they go up into the ductworks as far as
9       they can reach.  They clean the transition going
10      from the oven to the squirrel cage blower and
11      clean and vacuum, put it all back together.
12  Q   Did any of Air Tech's cleaning activities on
13      May 22, 2014, deviate from what they had done in
14      the past cleaning?
15          MR. SENAK:  Object to foundation.  Answer,
16      if you can.
17  A   I wasn't around the oven, so I don't know.
18  Q   Have you become aware of whether Air Tech
19      deviated in any way from its normal procedure on
20      May 22, 2014, as opposed to prior cleanings?
21          MR. SENAK:  Same objection.
22  A   Nobody said anything to me.
23  Q   To your knowledge, did Ball Manufacturing ever
24      complain about the procedure that Air Tech used?
25          MR. SENAK:  Object to foundation.

**112**

1   A   Can you repeat that?
2   Q   Yes.  To your knowledge, did Ball Manufacturing
3       ever complain about the procedure Air Tech used
4       to clean the IBO?
5          MR. SENAK:  Same objection.
6          THE WITNESS:  Do you want me to answer?
7          MR. SENAK:  Yeah.  Oh, yes.
8          THE WITNESS:  All right.
9   A   Probably complaints as -- we always complain
10      about contractors, so I am sure there were some
11      complaints where they didn't get it cleaned
12      properly and they had to go back in and do some
13      more work or get it vacuumed properly.
14  Q   Would there be any documentation of those
15      complaints?
16  A   I don't believe so.
17  Q   Were the complaints ever of significant concern
18      that Ball Manufacturing questioned the abilities
19      of Air Tech?
20          MR. SENAK:  Object to form and foundation.
21      Go ahead and answer.
22  A   No.
23  Q   Did Air Tech's procedure differ from, I think
24      was Phoenix?
25  A   Phoenix, yes.

113

1 Q Was it Phoenix, Incorporated, or Phoenix --
2 A Phoenix Industrial.
3 Q Phoenix Industrial, I am sorry.
4    MR. SENAK: Object to foundation. Go ahead
5 and answer.
6 A Their procedures are very similar.
7 Q Are you aware of any differences in the
8 procedures?
9    MR. SENAK: Same objection.
10 A No.
11 Q Who cleans the IBO currently?
12 A Premier Maintenance.
13 Q And where are they located?
14 A Ohio.
15 Q And what procedure does Premier Maintenance
16 follow to clean the IBOs?
17 A Same. Same.
18 Q Do they use --
19 A Same as Air Tech.
20 Q Pardon me?
21 A Same as Air Tech.
22 Q What tools do they use?
23 A I am not sure what tools they use.
24 Q What tools did Air Tech use?
25 A They all use similar tools, scrapers and wire

114

1 brushes.
2 Q To your knowledge, does Premier Maintenance
3 perform any functions of the job any differently
4 than Air Tech?
5 A Not that I am aware of.
6 Q Have complaints been made with respect to
7 Premier Maintenance's work?
8 A Not that I'm aware of.
9 Q Did Ball ever use in-house employees to clean
10 the IBO?
11 A We did.
12 Q When was that?
13 A When I first started there.
14 Q Was that before Phoenix --
15 A Yes.
16 Q -- Industrial?
17 A Yes.
18 Q And that was before you started?
19 A It was before I -- no, I worked there then.
20 Q Did you ever personally participate in
21 cleaning --
22 A No.
23 Q -- the IBO?
24    Do you know who did?
25 A No.

115

1 Q Are any of those employees still employed by
2 Ball?
3 A I don't know.
4 Q What procedure did Ball's employees follow in
5 cleaning the IBO?
6 A I don't know. I wasn't involved with it.
7 Q Do you know why Ball changed from using in-house
8 employees to outside contractors --
9 A No.
10 Q -- with the IBO cleaning?
11 A I do not.
12 Q Do you know who made that decision?
13 A I do not.
14 Q How does Ball Manufacturing decide when it is
15 time to clean the IBO?
16 A It is based on our historic maintenance
17 schedule.
18 Q And who developed the historical maintenance
19 schedule?
20 A I don't know.
21 Q Do you know what factors were considered in
22 developing that historical maintenance schedule?
23 A Only one that I can recall.
24 Q And what is that?
25 A That was the flow measurements. If we had

116

1 trouble with flow measurements, we would know
2 that the IBO needed -- we would assume that the
3 IBO needed cleaned.
4 Q Do you know why Ball decided to deviate from the
5 maintenance schedule specified in the operations
6 manual?
7    MR. SENAK: Object to form and foundation.
8 A I didn't understand the question.
9    MR. MILLER: Can you read it back, please.
10    (The requested text was read back by the
11 reporter.)
12 A I don't know that we did.
13 Q But you don't know who made that decision?
14 A No.
15    MR. SENAK: Object to form and foundation.
16 Q And what is Ball's historical maintenance
17 schedule?
18    MR. SENAK: We are starting to go over the
19 same stuff again. But I will let him continue
20 to answer the question, but he has answered
21 these before.
22 A Can you repeat it?
23 Q Yeah.
24    MR. MILLER: Can you read it back?
25    (The requested text was read back by the



117

1    reporter.)
2    A   To me, it is just what we developed over
3         29 years.
4    Q   I just want to know the frequency, sir.
5    A   The frequency?
6    Q   Yes.
7    A   So that's your question?
8    Q   Yes.
9    A   What is the frequency of the IBO's schedule?
10   Q   Yes.
11   A   It was quarterly.
12   Q   Has that changed?
13   A   Yes.
14   Q   What is it now?
15   A   Every four months.
16   Q   So it was every three months, now it is every
17        four months?
18   A   Right.
19   Q   When was that change made?
20   A   I don't know exactly.
21   Q   What was the frequency that it was cleaned in
22        the 2014 era?
23   A   Quarterly.
24   Q   Okay.  And do you have any estimation as to how
25        long you have been on the every four-month

118

1         cycle?
2    A   I don't know exactly.
3    Q   But it was after the fire?
4    A   Yes.
5    Q   Do you know who decided to switch from every
6         three-month to every four-month cleaning cycle?
7    A   No.
8    Q   How did you receive notice of that change?
9    A   I don't even know how I got that.
10   Q   And you don't know why?
11   A   I don't know why, no.
12   Q   The IBO, it is owned by Ball Manufacturing;
13        correct?
14   A   Yes.
15   Q   So back in 2014, the IBO was cleaned four times
16        a year and that required it to be down for one
17        shift for a cleaning; true?
18   A   True.
19   Q   So 12 hours?
20   A   True.
21   Q   So in a 365 day year, the IBO is not in
22        production for two 24-hour increments; true?
23   A   True.
24   Q   So it operates 363 days a year?
25   A   Minus holidays.

119

1    Q   How many holidays?
2    A   I believe we are usually down three days, the
3         plant is actually down.
4    Q   So the IBO is in production for 360 of 365 days?
5    A   Close to, yeah.
6    Q   And on those 360 days it is operating 24 hours a
7         day?
8    A   Yes.
9    Q   Processing 2,000 cans a minute?
10   A   Yes.
11   Q   And the shutdowns for cleaning the IBOs, all
12        IBOs are not on the same quarterly schedule;
13        true?
14   A   True.
15   Q   And you testified that the ductwork is cleaned
16        annually?
17   A   Yes.
18   Q   And how long does it take to clean the ductwork?
19   A   That's a long day.  That's usually, I would say
20        up to 16 hours.
21   Q   But it can be completed within one calendar
22        year?
23   A   Yes.
24   Q   Or calendar date?
25   A   Yes.

120

1    Q   When the ductwork is being cleaned, does Ball
2         also have -- does it coordinate the ductwork
3         cleaning with the cleaning of all of the IBOs?
4    A   No.
5    Q   So the plant is able to operate even though the
6         ductwork is being cleaned?
7    A   No.
8    Q   So no production occurs on that day?
9    A   I'm sorry?
10   Q   So no production occurs on the day that ductwork
11        is being cleaned?
12   A   Right.
13   Q   But it doesn't coordinate cleaning of the IBOs
14        to coincide with that day?
15   A   Now it can coordinate the cleaning of one IBO
16        and one PIN oven possibly during the duct
17        cleaning.
18   Q   Okay.
19   A   But never more than one.
20   Q   Does that happen, do you know?
21   A   It has happened in the past, but I don't think
22        it is very often.
23   Q   In 2014 was Dale Spencer responsible for
24        scheduling the cleaning with Air Tech?
25   A   I don't know if he was responsible alone.  It is



121

1    a collective decision.

2    Q   The four times a year that it was cleaned, was
3        that scheduled in advance or was each cleaning
4        independently scheduled?

5    A   I would say each cleaning was independently
6        scheduled.

7    Q   And do you know how far in advance of the
8        cleanings it was scheduled?

9    A   I would estimate two -- at least a month or two.

10   Q   And were those efforts to schedule the cleaning,
11       were those a product of like an Outlook calendar
12       reminder like you talked about for scheduling
13       the ductwork?

14   A   No.  It is a little bit different when we
15       schedule a whole line to be down.

16   Q   And how is that scheduled?

17   A   Well, that's put on our main calendar, on our
18       portal that everybody can see.

19   Q   Who does that?

20   A   Because a lot of events happen during an oven
21       cleaning.

22   Q   What other events?

23   A   The whole line is down for maintenance.

24   Q   And does that require other outside contractors
25       to come in?

122

1    A   Not normally.

2    Q   So it is Ball employees performing all of those
3        maintenance functions?

4    A   Uh-huh.

5    Q   Is there any effort to inspect the oven to see
6        how dirty it is before scheduling the quarterly
7        cleaning back in 2014?

8    A   Not that I'm aware of.

9    Q   Do you know whether any inspection was performed
10       by Ball of the IBO 2 ductwork to determine
11       whether it may also need cleaned during the May
12       2014 cleaning cycle?

13   A   Not that I'm aware of.

14   Q   In the 30 days prior to the fire, are you aware
15       of any operational problems with IBO #2 or any
16       of its components?

17   A   No.

18   Q   Are you aware whether any repairs were performed
19       on the IBO #2 or any of its component parts in
20       the months preceding the fire?

21   A   Not that I'm aware of.

22   Q   Who would be most knowledgeable at Ball
23       regarding any repair or maintenance on the IBO
24       in the six months prior to the fire?

25   A   Probably Dale Spencer.

123

1    Q   What about who would be most knowledgeable
2        regarding any maintenance or issues with respect
3        to the ductwork?

4    A   That probably would have been me.

5    Q   Do you recall any work being undertaken, any
6        work or maintenance or cleaning of the ductwork
7        being undertaken between the November,
8        approximately, 2013 ductwork cleaning and the
9        date of the fire?

10   A   No.

11   Q   Had there been any inspections performed of the
12       ductwork at any time from the date it was
13       cleaned through the date of the fire?

14   A   No.

15   Q   Do you recall the last time the oven was cleaned
16       prior to May 22, 2014?

17   A   I don't have that date.

18   Q   Do you have any knowledge of any accumulations
19       of foreign matter from the baking process in the
20       IBO #2 leading up to May 22?

21   A   You will have to --

22   Q   Okay.  My understanding is that when that
23       interior coating is sprayed in the fan -- in the
24       can and the can goes through the oven, some
25       materials off-gas off of that interior coating;

124

1        correct?

2    A   Uh-huh.  Yes.

3    Q   And as a part of that kind of off-gassing,
4        there's certain buildups on the sides of the
5        IBO; correct?

6    A   Correct.

7    Q   And on the screens and on the fans and just
8        generally it gets all over everything; right?

9    A   Correct.

10   Q   Did Ball ever monitor the accumulations in the
11       IBOs?

12   A   Not that I'm aware of.

13   Q   Would anyone at Ball be able to determine
14       whether or not any accumulations in the IBO were
15       thicker than normal or normal or less than
16       normal on May 22 of 2014?

17   A   I don't believe so.

18   Q   What about, same question with respect to any
19       buildup in the ductwork.

20   A   The ductwork, I would just look at it from one
21       year to the next, see if there was more or less,
22       you know.

23   Q   So you performed that function with respect to
24       the ductwork?

25   A   Yeah.



125

1  Q  Do you recall what the ductwork was like in
2     November of 2013?
3  A  I do not.
4  Q  How do you keep track year to year so that you
5     can remember to determine whether it is more
6     than normal or normal?
7  A  It is a little bit different now, because you
8     have got a cell phone with a camera on it, so
9     you just take a few pictures and see. But prior
10    to was just from memory.
11 Q  Do you save those pictures now?
12 A  Yes.
13 Q  So you have a file at work where you have a
14    picture of the interior ductwork in November of
15    2017?
16 A  Yes.
17 Q  And you have a picture of the ductwork in
18    November of 2016?
19 A  If it was in November, yes.
20 Q  Let me make the question a little bit broader
21    then.
22 A  Okay.
23 Q  Do you have photographs of the interior of the
24    ductwork during the cleaning process in 2017?
25 A  Yes.

126

1  Q  Same question for 2016.
2  A  Yes.
3  Q  Same question for 2015 cleaning.
4  A  2015, I'm not sure.
5  Q  But you definitely know that you have got
6     photographs of the interior of the ducts as they
7     were being cleaned in 2016 and 2017?
8  A  Yes.
9  Q  And those are in your possession?
10 A  Yes.
11 Q  Are they at your office or on a physical, like a
12    device?
13 A  No, they are in my office, on my computer.
14 Q  Do you recall what file they are saved in?
15 A  No.
16 Q  To your knowledge, did Air Tech ever clean the
17    inside of the burner boxes?
18 A  No.
19 Q  That was beyond -- they were never hired to
20    clean the burner boxes?
21 A  No.
22 Q  Who cleaned the inside of the burner boxes?
23 A  Nobody cleaned them. You shouldn't have to.
24 Q  Did anyone from Ball access the interior of the
25    burner boxes?

127

1  A  Yes.
2  Q  Who accessed?
3  A  I have accessed the interior.
4  Q  When did you access the interior of the burner
5     boxes?
6  A  I don't remember what year it was.
7  Q  Was it before 2014, May of 2014?
8  A  I am not sure. I am not sure.
9  Q  Why would you have accessed the burner box?
10 A  I believe -- that was a long time ago. I don't
11    remember the exact reason.
12 Q  Was it for maintenance or cleaning?
13 A  I think it was for inspection.
14 Q  Do you know what caused you to want to inspect
15    the interior of the burner box?
16 A  I think it was one of those that I didn't ever
17    recall anybody doing it. So I thought it might
18    be a good idea to see if there was any buildup
19    in there.
20 Q  Do you recall whether it required any repair?
21 A  No.
22 Q  Do you recall whether it required any
23    maintenance activities?
24 A  None.
25 Q  And you don't have any recollection of when that

128

1     was?
2  A  No, I really don't.
3  Q  Do you recall how many times you did it?
4  A  How many times?
5  Q  Yes.
6  A  Maybe two or three times.
7  Q  Were all of those two or three times before the
8     fire or were some after the fire?
9  A  I don't recall after the fire.
10 Q  Was Air Tech required to clean anything beyond
11    the squirrel cage fan on May 22, 2014?
12 A  You have got to say that again.
13 Q  Was Air Tech required to clean anything beyond
14    the squirrel cage fan on May 22 of --
15 A  Beyond, you mean further down line or --
16 Q  Yeah.
17 A  Oh, okay. No. Just as far as they could reach
18    up in the ductwork.
19 Q  When did Ball shut down IBO #2 in anticipation
20    of Air Tech cleaning on May 22 of 2014?
21 A  I don't know what time it was.
22 Q  Do you have an estimate based upon your
23    knowledge?
24 A  I think it was down before I got to work, so.
25 Q  So sometime before 6:30?

129

1 A  Prior to 6:30.

2 Q  How long does it take for that oven to cool
3    down?

4 A  Normally an hour.

5 Q  As part of that cooling down process, did Ball
6    employees open the side doors of the oven?

7 A  We do or Air Tech, yes.

8 Q  Did you physically walk around the IBO #2 oven
9    on May 22, 2014, when it was being cleaned?

10 A  Yeah, I think I was over in that area.

11 Q  Do you recall anything that seemed out of the
12   norm to you?

13 A  No.

14 Q  Did you talk with any Air Tech employees?

15 A  Yeah.  Normally Paul Scholten and I always shake
16   hands whenever I am there and a couple of his
17   guys, so it would have been, you know, long-time
18   guys.  So I don't think we had any conversation.

19 Q  You don't recall any interactions with them on
20   May 22 of '14?

21 A  No.

22 Q  Do you recall whether that interaction was
23   before Air Tech started its work, during its
24   work, or after completion?

25 A  During.

130

1 Q  During.  Did you observe Air Tech's employees
2    actually performing the work?

3 A  Yeah, they were working when I got there.

4 Q  Did anything seem out of the ordinary about the
5    work they were performing?

6 A  No.

7 Q  Did anything seem out of the ordinary with
8    respect to the ovens as you looked at them?

9 A  No.

10 Q  Do you recall making any requests or providing
11   any instructions to Air Tech employees on May 22
12   of 2014?

13 A  No.

14 Q  Is there anything at all that sticks out in your
15   mind about the cleaning that Air Tech performed
16   on May 22 of 2014?

17 A  No.

18 Q  Who do you believe would be the most
19   knowledgeable person with respect -- the most
20   knowledgeable Ball employee as to Air Tech's
21   work on May 22 of 2014?

22 A  Dale Spencer.

23 Q  The interior coating, have you ever read the
24   MSDS?

25 A  No.

131

1 Q  Do you know whether that liquid is flammable?

2 A  I don't know.

3 Q  Is there any procedures that Ball follows to
4    prepare the oven for Air Tech's work, cleaning
5    work?

6 A  Just the shutdown procedure.

7 Q  What is the --

8 A  And to make sure that they do their confined
9    space.

10 Q  What is the shutdown procedure?

11 A  Shut the burners off and leave the fans running
12   till it cools down.

13 Q  Are the fans shut off during the actual cleaning
14   process?

15 A  Yes.

16 Q  Who shuts those fans off?

17 A  Probably Ball employees, probably our electrical
18   group.

19 Q  Where is the shutoff for the fan, for the fans?

20 A  For the fans, on the main control panel.

21 Q  Where is the main control panel?

22 A  Right at the end of the IBO, toward the
23   discharge.

24 Q  Is it where the product enters the IBO or exits
25   the IBO --

132

1 A  Exits.

2 Q  -- is the main panel?

3    So the main panel is on the exit side?

4 A  Yes.

5 Q  And I think you also mentioned something about
6    confined space; right?

7 A  Yes.

8 Q  What procedure is that?

9 A  Actually, it is the contractor's responsibility
10   to fill out all the forms and do the air testing
11   prior to their people entering the oven.

12 Q  Okay.

13 A  They have to show us all the documents.  They
14   have to post the document.  They have to
15   lockout-tagout the machine, which is basically
16   opening the disconnect and -- or closing the
17   disconnect and putting the locks on it.

18 Q  And that was all performed?

19 A  Yes.

20 Q  But the lockout procedure -- the confined space
21   procedure is performed by Air Tech?

22 A  Yes.

23 Q  So the only thing that Ball does to prepare for
24   cleaning is the shutdown procedure?

25 A  Yes.



133

1  Q  Do you know, when Air Tech first began
2     performing its work, who provided them with
3     their instructions as to how the oven was to be
4     cleaned?
5  A  We didn't give them instructions on how to clean
6     the oven. That's what they are supposed to do.
7  Q  But I think you earlier testified you weren't
8     the one to hire them, it was you in consultation
9     with Tom Cummins; right?
10 A  Right.
11 Q  But who was the person that actually made the
12    call? Would it have been --
13 A  That would have been me.
14 Q  That would have been you?
15 A  Yes. To schedule them.
16 Q  So were you the initial point of contact?
17 A  On that date?
18 Q  When they were first hired, Air Tech.
19 A  Yes.
20 Q  So you were their contact person at the
21    Monticello plant; true?
22 A  Yes.
23 Q  And you didn't provide them with any
24    instructions on cleaning --
25 A  No.

134

1  Q  -- true?
2     And they weren't provided with any user or
3     maintenance manuals; true?
4  A  True.
5  Q  During the production process with the IBO, are
6     there any Ball employees that are actually kind
7     of working in physical proximity to that
8     machine?
9     MR. SENAK: I will object to form.
10 A  No. There wouldn't really be anybody. I mean,
11    just the people in the spray room and then
12    people in the neckers. So you're on either side
13    of the machine, either at the entrance or the
14    exit.
15 Q  And do you know who were those people working in
16    the area of the entrance and exit at the time of
17    the fire?
18 A  I do not.
19 Q  Who would know that at Ball?
20 A  Production supervisor.
21 Q  I want to flip back. Earlier we talked about
22    the off-gassing, you know, the interior coating,
23    when it is heated up, substance comes off that
24    collects. And what's the consistency of that
25    material once it off-gases and returns to, you

135

1     know, its original state, what results?
2  A  I don't know.
3  Q  Is it like a gooey substance?
4  A  Not necessarily. It can be hard. Depends on
5     whether it is cured or not.
6  Q  Pardon me?
7  A  Whether it is cured.
8  Q  And where would it be cured at, in the oven?
9  A  Yes.
10 Q  So it is more likely to be hard on the sides of
11    the oven and gooey, what, farther away?
12 A  I don't know.
13 Q  Since you were Ball's main contact person
14    at -- or, I'm sorry, since you were Air Tech's
15    main contact person at Ball, would all of the
16    communication flow through you to Air Tech or
17    were there any other Ball employees involved in
18    the communications with Air Tech?
19 A  Are you talking about the day of the event or --
20 Q  Let's just say generally and then we will work
21    down to the specific.
22 A  Okay. Generally, yeah, I was the main contact.
23    But once the process superintendents got
24    involved, then they kind of took it over and
25    then I just kind of stepped back.

136

1  Q  And what was the time period where you kind of
2     stepped back?
3  A  I don't remember the exact dates of -- I don't.
4     I couldn't answer that earlier, so I don't
5     remember.
6  Q  But when you stepped back, were you still the
7     individual scheduling their cleaning?
8  A  No.
9  Q  So then it was handled by Dale Spencer, the
10    scheduling?
11 A  True.
12 Q  After you stepped back?
13 A  Right.
14 Q  But despite the fact that you really weren't
15    involved in the scheduling or responsibility for
16    the IBO cleaning, you would still occasionally
17    stop by to say hello to Air Tech --
18 A  Oh, yeah.
19 Q  -- when they were on the premises?
20 A  Yeah.
21 Q  But you were still the guy, the main contact for
22    purposes of duct cleaning?
23 A  Yes.
24 Q  So even though you weren't the main point of
25    contact for one area of Air Tech services, you

137

1    were for another?
2    A    True.
3    Q    Did Air Tech provide any other services to Ball
4        other than cleaning the IBOs and cleaning the
5        ductwork?
6    A    I don't believe so.  I'm not sure.
7    Q    Did Air Tech clean the PIN ovens?
8    A    Yes.
9    Q    So they cleaned the PIN ovens, the IBOs, and the
10       ductwork?
11   A    Yes.
12   Q    Did they clean all of the PINs and all of the
13       IBOs and all of the ductwork at Ball Monticello?
14   A    Yes.
15   Q    Do you recall speaking with Paul Scholten of
16       Air Tech following their completion of the work?
17   A    On that night?
18   Q    Yeah.  On May 22, 2014.
19   A    No, I did not.
20   Q    So you just recall chatting with him sometime
21       during the day?
22   A    Yeah, it was sometime during the day.
23   Q    To your knowledge, did Ball have the authority
24       if it believed the oven had not been cleaned
25       sufficiently to request Air Tech to perform

138

1    additional work?
2        MR. SENAK:  Objection to form and
3    foundation.
4    A    I didn't understand the question.
5    Q    Ball hired Air Tech; true?
6    A    True.
7    Q    And Air Tech was a outside contractor; true?
8    A    True.
9    Q    If Ball didn't like the work that Air Tech had
10       performed or didn't believe it was done
11       sufficiently, could it have required Air Tech to
12       perform additional work?
13       MR. SENAK:  Same objection.
14   A    I would say yes.
15   Q    Are you getting a call?
16   A    No, go ahead.
17   Q    Do you want to take a break?
18   A    I am digging it out.
19   Q    Oh, I thought you were looking for your phone.
20       And if you are ready for a break, just let
21   me know.
22       You had talked about the process of running
23   the lacquered sheets, is there a written
24   protocol that Ball has for post-cleaning
25   pre-production quality control work?

139

1    A    Not that I am aware of.
2    Q    Are there any checklists to document the
3        completed steps of that process?
4    A    Of the sheet stocking process?
5    Q    Yeah.
6    A    No.
7    Q    Are any photographs taken of that sheet stock
8        that's run through with lacquer --
9    A    No.
10   Q    -- to document the contaminants that were
11       collected?
12   A    No.
13   Q    Who would be most knowledgeable -- strike that.
14       How many employees are involved in that
15       process of running the lacquer covered aluminum
16       through the IBOs?
17   A    Normally I would say four to six.
18   Q    And who are those employees?  What department do
19       they come from?
20   A    I believe I answered that already.  It is the
21       operators and people from different areas come
22       up to help out.
23   Q    Who do I talk to to figure out who the four to
24       six employees that undertook that process on
25       May 22?

140

1    A    I would guess the maintenance supervisor, or not
2        maintenance, production supervisor.
3    Q    And that would be Dale Spencer?
4    A    No.  That would be Mike Rogers.
5    Q    Mike Rogers.  Okay.  Do you know if Mike Rogers
6        participated in it?
7    A    I do not know.
8    Q    What happens to the aluminum sheets once that
9        process is completed?
10   A    They are scrapped.
11   Q    But they are not retained to document condition?
12   A    No.
13   Q    Is there one person that makes the final
14       decision to say, yes, those sheets are coming
15       out clean, it is time to start production?
16   A    Yes.
17   Q    Who is that?
18   A    It is usually, normally the production
19       supervisor.
20   Q    And who --
21   A    Or it could be a quality supervisor.
22   Q    Okay.  And who was in that role on May 22 of
23       2014?
24   A    Again, Mike Rogers.  I just want to say again, I
25       am pretty sure that Mike Rogers was the guy.

141

1  Q   Okay.
2  A   So all of these Mike Rogers we have been talking
3      about could be somebody else.
4  Q   So you believe that it was Mike Rogers that
5      approved the IBO to be put back in production
6      service on May 22, 2014?
7  A   I don't know who approved it.
8  Q   But you think, as you sit here today, you think
9      that that would be the person?
10     MR. SENAK:  Object to form.
11  A  It could have been him.  I don't know.
12  Q   Well, this isn't a trick question.  I am just
13      trying to --
14  A   Yeah, I know.
15  Q   Give me the --
16  A   I don't know.
17  Q   I know.  But you're the guy at the Ball plant
18      that I am deposing right now.
19  A   I know that.
20  Q   So tell me in your experience, your estimation,
21      who would be the universe of people that would
22      have made that decision.
23  A   Production supervisor.
24  Q   And that was Mike Rogers?
25  A   Yes.

142

1  Q   And is Mike Rogers in an equivalent position as
2      Dale Spencer?
3  A   No.
4  Q   Is Mike Rogers above Dale Spencer?
5  A   Below.
6  Q   Below.  Does Mike Rogers report or did
7      Mike Rogers report to Dale Spencer?
8  A   No.
9  Q   Who did Mike Rogers report to?
10  A  Production manager.
11  Q   Who was that?
12  A   I believe it was Harry Monroe at the time.  I am
13      not even going to say, because I don't know.  I
14      don't remember.
15     MR. SENAK:  Whenever you would like to take
16     a break, let me know, because I would.
17     MR. MILLER:  Okay.  Let's take a break now.
18     (A recess was taken between 1:30 p.m. to
19     1:38 p.m.)
20  BY MR. MILLER:
21  Q   Freddy, you're back on the record, still under
22      oath.  Okay?
23  A   Yes.
24  Q   Is there a separate quality control department
25      at Ball Monticello?

143

1  A   What do you mean by separate?
2  Q   Well, is there a quality control department?
3  A   Yes.
4  Q   Who heads the quality control department?
5  A   Scott Lane.
6  Q   Lane?
7  A   L-A-N-E.
8  Q   And is his title quality control manager?
9  A   Yes.
10  Q   Is the quality control department involved in
11      the post-cleaning, pre-production testing that's
12      done of the oven?
13  A   Not the testing.  But they are the ones that
14      determine whether the product is good enough to
15      release.
16  Q   And where is that determination made?
17  A   Probably at the palletizer.
18  Q   So it is at the palletizing stage?
19  A   Right.
20  Q   Is there a quality control person that was at
21      the palletizer station on May 22, 2014, after
22      production had begun?
23  A   I don't know that, but I would assume so.
24  Q   How many people -- I assume -- strike that.
25      How many people are in Scott Lane's quality

144

1      control department?
2  A   Well, he's like me.  He has supervisors and then
3      they supervise people under them.
4  Q   Do you know how many people that Scott Lane
5      directly supervises?
6  A   Currently, two.
7  Q   What about 2014?
8  A   I am not sure.
9  Q   Who does he supervise?
10  A  The QA supervisors.
11  Q   And who are they?
12  A   Gary Stone and Diana Hickman.
13  Q   And then how many people are underneath the
14      quality control supervisors?
15  A   I am not sure.
16  Q   Is there any way to determine -- how do I figure
17      out who did any quality control inspections of
18      the cans at the palletizer phase on May 22,
19      2014, after the oven was cleaned?
20  A   I would say you have to get with Scott.
21  Q   Do you know how long after production resumes
22      before that quality control inspection is done?
23  A   I know that they will not release a pallet to
24      the customer until they're good.
25  Q   But I would -- well, tell me if I'm wrong, it is

145

1   my assumption that they are not going to want to
2   run, you know, a million cans through this
3   thing --
4   A   No.
5   Q   -- without having them inspected because then --
6         MR. SENAK:  Object to form and foundation.
7   Go ahead.
8   Q   -- they can't sell them; true?
9   A   True.
10  Q   And if 1900 cans a minute are being run through
11     this thing, it doesn't take very long before you
12     have run a lot of cans; true?
13  A   True.
14  Q   So based upon just your knowledge of the
15     production cycle, do you have any understanding
16     as to what the window of opportunity was for the
17     quality control people who looked at the cans?
18        MR. SENAK:  Form and foundation.
19  A   It is within minutes.
20  Q   Okay.  That's what I am looking for.
21  A   Yeah.
22  Q   So there is somebody in quality control that is
23     in the area of the IBO within minutes of
24     production resuming?
25  A   To discharge the IBO, yes.

146

1   Q   Are you aware whether there were any quality
2      control issues noted with the cans on the
3      evening of May 22, 2014, after Air Tech had
4      completed its work?
5   A   I am not aware.
6   Q   Do you know who Scott Howell is?
7   A   The name is familiar, but I am not sure.
8   Q   A couple years ago when there was all these
9      inspections going on of the IBO and the retained
10     fire artifacts, you and I met; correct?
11  A   Yes.
12  Q   And during that process, I noted that you
13     chatted some, had some conversations with some
14     of the experts that Ball had hired for the fire
15     investigation; true?
16  A   True.
17  Q   How many conversations did you have with those
18     individuals?
19  A   I don't recall.  There was a lot of people
20     involved with that.
21  Q   Do you recall what role you played in that?
22  A   Played in what?
23  Q   In the inspections.
24  A   Prior to or after?
25  Q   Prior to what?

147

1   A   The fire.
2   Q   No.  Did you --
3   A   I don't understand your question.
4   Q   Did some of the experts that Ball and its
5      insurance company hire to inspect the fire, were
6      they there before the fire?
7   A   No.
8   Q   So it was all after the fire; correct?
9   A   Correct.
10  Q   Did they ask you any questions?
11  A   I don't recall.
12  Q   You don't recall any questions that may have
13     been asked of you?
14  A   There may have been, but I don't recall any
15     specific questions.
16  Q   Do you recall any kind of interactions that you
17     would have had with them?
18  A   I know that I was there, helping them get into
19     position to take pictures and whatever.
20  Q   After they completed their inspections, did they
21     ever call you?
22  A   No.
23  Q   Did you ever have any contact with them after
24     they did their inspections?
25  A   I don't recall any contact after that.

148

1   Q   Obviously, you know, Ball sued my client,
2      otherwise we wouldn't be sitting here today;
3      true?
4   A   (Witness nods head up and down.)
5   Q   Do you have any understanding about what Ball is
6      claiming in this lawsuit?
7   A   I don't have a definitive -- I don't know
8      exactly what it is about.
9   Q   Do you know generally?
10  A   Yeah.  It is general as I can know, yeah.
11  Q   And what is that?
12  A   It is just that Ball claims that Air Tech
13     started the fire and just trying to recover from
14     the damages from what I understand.
15  Q   And what is it your understanding as to Ball's
16     claim as to what my client did wrong?
17  A   I don't know.
18  Q   Do you know anything that my client did wrong?
19  A   Not aware of.
20  Q   Do you have any knowledge as to what Ball is
21     contending my client did wrong?
22  A   No, I don't.
23  Q   Do you have any knowledge of anything that
24     Air Tech did that may have caused this fire?
25        MR. SENAK:  Object to foundation.  Go



149

1   ahead.
2   A   Yeah, I am not an investigator.  I don't know.
3   Q   Are you aware of anything that my client did
4       that you're critical of?
5           MR. SENAK:  Same objection.
6   A   I didn't understand the question.
7   Q   Are you aware of anything that my client did on
8       May 22, 2014, that you think was wrong or
9       inappropriate?
10          MR. SENAK:  Same objection.
11  A   I don't know.
12  Q   I am just trying to make sure that we don't show
13      up at trial and you will say a bunch of critical
14      things about my client.
15  A   I understand.
16  Q   So, as we sit here today, you're not aware of
17      anything that you would be critical of my
18      client's actions on May 22, 2014?
19          MR. SENAK:  Object to foundation.  And I
20      think it has been asked and answered.
21  Q   And your answer was, sir?
22  A   No, I don't know.
23  Q   Did you provide any information to the fire
24      investigators?
25          MR. SENAK:  Object to foundation.

150

1   A   Yeah, I don't -- I don't recall.  That was --
2       no, I don't recall.
3   Q   Did anyone request that you provide them with
4       documents.
5           MR. SENAK:  Same objection.
6   A   Yes.
7   Q   Who requested that you provide them with
8       documents?
9   A   Well, actually Mark requested documents for you.
10  Q   And that was part of just responding to requests
11      for production?
12  A   Yes.
13  Q   Aside from your assistance in responding to
14      requests for production, have you provided
15      documents to anyone?
16  A   No.
17  Q   Has anyone shared with you an opinion as to what
18      caused the fire?
19          MR. SENAK:  I need to object.  To the
20      extent that that answer would require you to
21      rely upon information that I provided to you,
22      then I instruct you not to answer the question.
23          THE WITNESS:  Okay.
24          MR. SENAK:  But if it does not, then you
25      should answer the question.

151

1   A   You're going to have to repeat it.
2   Q   Has anyone shared with you an opinion as to what
3       caused the fire?
4   A   Okay.  Then based on that, I would rather not
5       answer the question.
6   Q   Has anyone other than -- and is the individual
7       that shared that information with you as to the
8       cause of the fire Mark Senak?
9   A   Say that again.
10  Q   Is the individual that shared with you any
11      opinions as to the cause of the fire Mark Senak?
12  A   No.
13  Q   Who shared with you an opinion as to what caused
14      the fire?
15  A   Well, I have to tell you there's a lot of people
16      that had opinions.  So, I mean, a lot of people
17      had opinions.
18  Q   Like, for instance, who?  Identify some of those
19      people.
20  A   I mean, it could be, you know, somebody out on
21      the floor or somebody I was having a
22      conversation with.  You know, I mean, you just
23      don't realize how many people said, well, I
24      think I know what caused it, I think I know what
25      caused it, well, I think I know what caused it.

152

1   You know, I don't know.
2   Q   So you don't personally know what caused the
3       fire; true?
4   A   I do not.
5   Q   Has any -- and I understand how everybody --
6   A   It is a wide open question.
7   Q   I know.  And there's a lot of people that work
8       at Ball.
9   A   Right.
10  Q   And a lot of production guys, and I'm sure they
11      are experts about a whole range of things.
12  A   Right.
13  Q   And I am not really talking about, you know,
14      John Smith that works in the maintenance
15      department, you know, second shift, whether he
16      shared with you an opinion.
17  A   Right.
18  Q   I am talking about, has any expert witnesses
19      shared an opinion with you?
20  A   No.
21          MR. SENAK:  I object to foundation.  Go
22      ahead.
23  A   Yeah.  No.
24  Q   Okay.
25          MR. SENAK:  As long as it is not me.

153

1　Q　Have any persons in Ball Manufacturing
2　　　management shared an opinion with you as to what
3　　　caused the fire?
4　A　No.
5　Q　Have any fire investigators shared an opinion
6　　　with you as to the cause of the fire?
7　A　No.
8　Q　Have you been interviewed by any fire
9　　　investigators?
10　　　　MR. SENAK: Object to foundation. Go
11　　ahead.
12　A　No.
13　Q　Have you been interviewed by the fire
14　　　department?
15　A　No.
16　Q　Have you had any conversations at all with fire
17　　　department members?
18　A　No.
19　Q　Do you know any of the firemen?
20　A　Yeah.
21　Q　Monticello is a small town like Logansport is.
22　A　Yeah, it is. Yeah.
23　Q　So you know some of the firemen?
24　A　Well, I don't know them personally.
25　Q　Okay.

154

1　A　But I met them and seen them at a few functions.
2　Q　But you don't have any personal friends that are
3　　　on the department?
4　A　No.
5　Q　Have you had any conversations with any fire
6　　　people, fire personnel about the fire?
7　A　No.
8　Q　The cans that were run after production resumed
9　　　on May 22, okay, after cleaning, after the
10　　　quality control work with the sheets of
11　　　lacquered covered aluminum and it was placed
12　　　back in production, those cans that were run
13　　　during that period between 7 p.m. or whatever
14　　　and 11 p.m. at the time of the fire, were any of
15　　　those cans maintained after the fire?
16　A　Were they what.
17　Q　Maintained. Saved.
18　A　I don't believe so.
19　Q　Do you have any knowledge of that quality
20　　　control process where the cans are inspected?
21　A　No. Just my basic knowledge of can making.
22　Q　Have you ever been in proximity when that work
23　　　has been performed?
24　A　Yeah.
25　Q　As you saw it, what does that quality control

155

1　　　process consist of?
2　A　Are you talking about qualifying the cans after
3　　　an oven cleaning?
4　Q　Yeah. Yeah. Yeah.
5　A　It is mostly visual. And, you know, if there's
6　　　contamination inside the can, then they are not
7　　　going to pass, so.
8　Q　How is that contamination checked for?
9　A　Visual.
10　Q　So you had kind of made a hand gesture as if you
11　　　are touching the inside of the can. Is that
12　　　part of it?
13　A　Well, yeah, you can see it, touch it.
14　Q　The image that comes to mind, there used to be
15　　　an old commercial, maybe you remember it, for
16　　　like Endust or something.
17　A　Yeah. Yeah.
18　Q　And somebody had the white gloves on and they
19　　　would -- is that process used for the inside of
20　　　the can is like a white cloth or a dark cloth
21　　　used?
22　A　I believe it is mostly visual.
23　Q　So there is no swabs or clothes used --
24　A　No.
25　Q　-- to see whether any residue comes out on it?

156

1　A　Right.
2　Q　Does anyone at quality control document the
3　　　condition through like photographs?
4　A　No.
5　Q　Are there, to your knowledge, are there any
6　　　check sheets to make sure that all components of
7　　　the quality control process have been completed?
8　A　I am sure there is.
9　Q　But you're not knowledgeable of that?
10　A　No, I'm not knowledgeable of it.
11　Q　But Scott Lane may be?
12　A　Scott Lane will be.
13　Q　Okay.
14　　　　MR. SENAK: L-A-N-G?
15　　　　THE WITNESS: L-A-N-E, E.
16　　　　MR. SENAK: Sorry.
17　　　　MR. MILLER: Give me just a few minutes to
18　　look at my notes and I can figure out whether I
19　　have got anything else. We can go off.
20　　　　MR. SENAK: Okay.
21　　　　(A recess was taken between 1:57 p.m. and
22　　1:58 p.m.)
23　　　　MR. MILLER: We can go on briefly. I can
24　　go on and go off, if you don't mind.
25　　　　MR. SENAK: Sure.



157

BY MR. MILLER:

2 Q John Cummins you testified earlier was the
3 director of engineering, he is no longer a Ball
4 employee; true?
5 A He is no longer alive.
6 Q So he passed away?
7 A Yes.
8 Q When did he pass away?
9 A I don't recall. It has been quite awhile.
10 MR. MILLER: Okay. We can go off again.
11 (A recess was taken between 1:59 p.m. and
12 2:00 p.m.)
13 MR. MILLER: We can go back on.
14 BY MR. MILLER:
15 Q Do you know who purchased the scrap, the IBO #2
16 scrap from you folks?
17 A I do not.
18 Q Who would have arranged that?
19 A It was during the project, and I am just not
20 sure.
21 Q When you say "during the project," what project
22 are you referring to?
23 A Yeah, you're talking about when we scrapped the
24 IBO?
25 Q Yes, sir.

158

1 A We did a line upgrade project, that's when we
2 replaced it.
3 Q Replaced it with the new IBOs?
4 A Yeah.
5 Q Do you know whether that IBO was truly scrapped,
6 meaning, you know, melted down and recycled or
7 was that bought by another can manufacturer?
8 A No, it was scrapped.
9 Q Was there something wrong with it?
10 A Yeah, it was out of date.
11 Q Okay.
12 A Technology was gone.
13 Q So it was just obsolete?
14 A Right.
15 Q Technologically obsolete?
16 A Exactly.
17 Q Okay. Do you know, what is the lifespan of
18 those IBOs?
19 A I do not.
20 Q When was the decision made to replace that IBO?
21 A When we did a upgrade project.
22 Q And when was that?
23 A It was either '15, '16, right in there.
24 Q So 2015 or 2016?
25 A Yes.

159

1 Q And that upgrade was entirely independent of the
2 fire; true?
3 A Pardon me?
4 Q The upgrades that were performed, that had
5 nothing to do with the fire; correct?
6 A Yeah, absolutely nothing.
7 MR. MILLER: We can go back off.
8 (A recess was taken between 2:01 p.m. and
9 2:02 p.m.)
10 MR. MILLER: We can go back on.
11 BY MR. MILLER:
12 Q Did Ball use any outside contractors when the
13 IBO #2 transitioned from steel cans to aluminum
14 cans?
15 A I don't recall.
16 Q Do you know whether any modifications were made
17 to the IBO to transition from the two different
18 materials?
19 A I don't recall that.
20 MR. MILLER: We can go off.
21 (A recess was taken between 2:02 p.m. and
22 2:03 p.m.)
23 MR. MILLER: Go back on.
24 BY MR. MILLER:
25 Q The change in the cleaning schedule from every

160

1 three months to every four months, was that done
2 after the new IBOs were installed?
3 A I don't recall. I think -- I don't recall.
4 Q Are the new IBOs natural gas fired?
5 A Yes.
6 Q Same fuel as used on the old IBOs?
7 A Yes.
8 Q Are you aware of any differences between the new
9 IBOs and the old IBOs?
10 A Yes.
11 Q What differences?
12 A Well, one, the new ones only have -- they have
13 less burners.
14 Q Okay.
15 A And the exhaust ducting is down the center
16 instead of on the side like what was on line 2.
17 A lot more energy efficient.
18 Q Did Ball Corporation install those or did you
19 have an outside contractor?
20 A Outside contractor.
21 Q Who was that?
22 A I can't remember the name of the contractor.
23 Q Would it have been Grand Industrial?
24 A Grand did not install the ovens.
25 Q I think that's all I have. Thank you very much



161

1    for your patience.  I know it has been a long
2    day.
3  A  Okay.
4
5  CROSS-EXAMINATION,
6    QUESTIONS BY MARK N. SENAK:
7  Q  Freddy, I just have a few questions.
8      So was Air Tech an independent contractor?
9  A  Yes.
10  Q  And Air Tech is in the business of cleaning
11    ovens like IBO #2?
12  A  Yes.
13      MR. MILLER:  Objection.  It exceeds the
14    scope of his personal knowledge.
15  Q  Ball is not in the business of cleaning ovens
16    like IBO #2?
17  A  No.
18  Q  As part of the written agreement to clean the
19    oven, did you or anyone at Ball agree to
20    supervise Air Tech employees?
21  A  No.
22  Q  As part of that agreement, did you or anyone at
23    Ball agree to inspect the work that was done by
24    Air Tech?
25  A  No.

162

1  Q  As part of that agreement, did you or anyone at
2    Ball agree to verify that Air Tech had properly
3    performed the services it was hired to perform?
4  A  No.
5  Q  Did Air Tech provide all the tools that were
6    needed to clean IBO #2?
7  A  Yes.
8  Q  Did Air Tech provide all the personnel to
9    perform the cleaning services of IBO #2?
10  A  Yes.
11  Q  The Air Tech employees would come to the plant,
12    perform their cleaning and then would they leave
13    the plant?
14  A  Yes.
15  Q  They did not stay at the plant after the oven
16    cleaning was completed?
17  A  No.
18  Q  Other than cleaning the oven, did Air Tech have
19    access to the plant on other days?
20  A  No.
21  Q  Other than cleaning the IBO, did Air Tech
22    personnel do any other work at the plant?
23  A  No.
24  Q  Do you know whether Air Tech was paid a lump sum
25    to perform the task, the cleaning of IBO #2?

163

1      MR. MILLER:  Objection.  Exceeds the scope
2    of his personal knowledge.
3  A  They were issued a PO to do it, yeah.
4  Q  Do you know whether they were paid a set amount?
5  A  Yes.
6  Q  All right.  They were not paid by the hour?
7  A  No.
8  Q  Did Ball pay Air Tech or did they pay the
9    Air Tech employees or personnel?
10  A  Ball paid the company Air Tech.
11  Q  All right.  Did you have the ability or anyone
12    at Ball, to your knowledge, have the ability to
13    terminate or fire any of the Air Tech employees?
14  A  No.
15  Q  Did Air Tech have the ability to terminate or
16    fire any Ball employees?
17  A  No.
18  Q  Did you have the ability to direct how Air Tech
19    employees would clean the oven?
20  A  No.
21  Q  Did you have the ability to tell Air Tech which
22    individuals Air Tech would use to clean the
23    ovens?
24  A  No.
25  Q  Did any Ball employees do any of the actual

164

1    cleaning of the ovens?
2  A  No.
3  Q  Did you have the ability to tell Air Tech which
4    tools to use and how to clean the oven?
5  A  No.
6  Q  Did you or anyone at Ball have the ability to
7    tell Air Tech which Air Tech employees they
8    would select to perform the cleaning of IBO #2?
9  A  No.
10      MR. MILLER:  What time period are you
11    talking about?
12      MR. SENAK:  The cleaning of IBO #2, which
13    is the subject of this case.
14      MR. MILLER:  On May 22, 2014?
15      MR. SENAK:  Correct.
16      MR. MILLER:  Then I'm going to object.  It
17    exceeds the scope of his personal knowledge,
18    because he testified that he wasn't in any
19    supervisory capacity on that date over the IBO.
20      MR. SENAK:  If I made that speaking
21    objection, I am sure you would be critical of
22    me.  So if you would like to make the objection,
23    you know how to make it.  But I would ask that
24    you confine it to what is proper under the
25    rules.

---

**165**

1    MR. MILLER: Mark, you interposed and made
2  a speech to him during the course of my
3  questioning.
4    MR. SENAK: I think the record will reflect
5  to the contrary.
6  Q  But do you have any training in cleaning
7     internal bake ovens?
8  A  No.
9  Q  Do you have any experience in cleaning IBOs?
10 A  Me personally cleaning them?
11 Q  Right.
12 A  No.
13 Q  Have you ever actually cleaned an IBO?
14 A  No.
15 Q  When you said earlier in your deposition you
16    supervised Air Tech, did you mean that you were
17    inspecting or supervising their work for the
18    purpose of ensuring that the job was done
19    properly or that the work was completed?
20    MR. MILLER: Objection. Form.
21 Q  Go ahead.
22    MR. SENAK: Did you get the answer?
23    THE REPORTER: I did not.
24 A  I was inspecting that the work was completed.
25 Q  You did not personally examine or inspect IBO #2

---

**166**

1    prior to the fire?
2  A  No.
3  Q  Was the purpose of having the oven inspected
4     after Air Tech completed its work to confirm
5     that the work had been completed and that the
6     oven had been put back together?
7    MR. MILLER: Objection. Form. Lack of
8  foundation.
9  A  Yes.
10 Q  Were there parts of the area that were cleaned
11    that could not be examined by any Ball employee
12    after the oven had been reassembled?
13 A  Yes.
14 Q  Could a Ball employee inspect the blower area
15    where the squirrel cage was located after
16    Air Tech completed its cleaning?
17    MR. MILLER: Objection. Lacks personal
18  knowledge. Calls for speculation.
19 A  Before it was assembled?
20 Q  After Air Tech finished.
21 A  Oh, no.
22 Q  All right. And why is that?
23 A  Because it is put back together.
24 Q  You were asked some questions about where the
25    hotspots were that you observed in the

---

**167**

1  photographs; correct?
2  A  Yes.
3    MR. SENAK: All right. Why don't you mark
4  these 1, 2, and 3.
5    MR. MILLER: Do you have copies for me?
6    MR. SENAK: I don't.
7    MR. MILLER: Pardon me?
8    MR. SENAK: I don't.
9    MR. MILLER: Can you identify the Bates
10 stamped number of those documents for the --
11    MR. SENAK: These don't have Bates stamps
12 on them.
13    MR. MILLER: Do those correspond to
14 documents that have been produced?
15    MR. SENAK: It is my understanding the
16 question is yes.
17    MR. MILLER: And do you know what the Bates
18 stamped numbers are?
19    MR. SENAK: Not without going through the
20 thousands of documents that have been produced.
21    I can tell you, I mean, these documents
22 have -- and I will identify them, they have date
23 and time stamps on them.
24    MR. MILLER: Okay.
25    MR. SENAK: And if I'm not mistaken, these

---

**168**

1  are the documents referenced by the witness
2  during your examination of him.
3    (Deposition Exhibits A - C were marked for
4    identification.)
5  Q  Mr. Spencer, I am going to show you Exhibits A,
6     B and C. Have you seen these photographs
7     before?
8  A  Yes.
9  Q  Can you just identify what they are?
10 A  Yeah. They are the thermal imaging.
11 Q  Do you know who took these?
12 A  Yep. Bob Pellegrini.
13 Q  You will see on the bottom of the photographs
14    they are dated 5/23/2014. And then there is a
15    time of 12:37:56, 12- -- well, let's say this.
16    On Exhibit A it is 12:37:56, on Exhibit B it is
17    12:32:58, and on Exhibit C 12:32:34.
18    Do you see those?
19 A  Yes.
20 Q  You were asked earlier about your observation of
21    where the hotspots were in these photographs,
22    okay, and what you consider to be irregular
23    temperatures.
24    Looking at these photographs, what
25    temperatures do you consider to be abnormal as

---



169

1  shown in the photographs?
2  A  Well, the 200 degrees, 274.
3  Q  You're referring to Exhibit Number A, 274.2
4    that's shown in Exhibit Number A; correct?
5  A  Yes.
6  Q  Do you know whether that area that's shown in
7    Exhibit A is above or below the area where
8    Air Tech was contractually obligated to clean?
9  A  It was below.
10      MR. MILLER:  And I'm going to object.  Form
11    and function.  Plus, he lacks personal knowledge
12    of the contractual functions.
13  Q  Go ahead.  Go ahead.
14  A  Oh, below.
15  Q  So Exhibit A shows the area that is within the
16    scope of work that Air Tech was performing when
17    they were cleaning IBO #2?
18  A  Yes.
19  Q  When you were asked earlier about whether the
20    hotspot you were referring to were above or
21    below the squirrel cage, does Exhibit A, B, and
22    C reflect the area of the squirrel cage?
23  A  Yes.
24  Q  All right.
25  A  But it is below it.

170

1  Q  Does the hotspots that are shown in these
2    photographs, are they above or below the
3    squirrel cage?
4  A  Below.
5  Q  And earlier in your testimony you had indicated
6    that you believe they were above; true?
7  A  That's what I said, but that's not -- the
8    photographs that we had were below.
9  Q  All right.  And these are the photographs that
10    you were referring to earlier?
11  A  Yes, it is.  That's the only ones that I am
12    aware of.
13  Q  And so do these photographs refresh your
14    recollection of the area, the hotspots that you
15    were referring to were below the squirrel cage?
16  A  Yes.
17  Q  Does Ball Corporation take flow measurements of
18    the ductwork on IBO #2?
19  A  Yes.
20  Q  What's the purpose of taking the flow
21    measurements?
22  A  The flow measurements are taken to determine if
23    the oven needs cleaned and/or the ductwork,
24    there is problem with the ductwork.
25  Q  So is one method by which Ball Corporation

171

1    determines whether the ductwork should be
2    cleaned the results of the flow measurements?
3  A  Yes.
4  Q  Are you familiar how flow measurements are
5    taken?
6  A  Yes.
7  Q  Would you just describe how that's done?
8  A  Yeah.  You take a Pitot tube with a magnehelic,
9    insert the Pitot tube in.  You take ten
10    measurements across the duct and then traverse
11    up and take ten measurements vertical on the
12    duct and then we have a formula that calculates
13    the flow.
14  Q  Have you actually done that yourself or --
15  A  I have.
16  Q  And you're familiar with the formula?
17  A  I'm familiar with the formula, yes.
18  Q  And is the purpose of taking the measurements is
19    that when you apply the results of your test to
20    the formula, it will give you a value that
21    reflects air flow in the ductwork?
22  A  Yes.
23  Q  And once you complete that calculation, do you
24    use that to determine whether there is
25    sufficient air flow?

172

1  A  Yes.
2  Q  And if the duct is in need of cleaning, meaning
3    if the residue on the inside of the duct has
4    accumulated to a greater degree, that will be
5    reflected in the air flow measurements?
6  A  Yes.
7  Q  And that is one method by which Ball Corporation
8    determines whether the ductwork should be
9    cleaned or needs to be cleaned?
10  A  Yeah.  Yes.
11  Q  That's also done in the ovens; true?
12  A  No.
13  Q  Just in the ductwork above the ovens?
14  A  Yes.
15  Q  All right.  In determining how to -- in
16    determining whether the ovens need to be
17    cleaned, does Ball Corporation rely upon the air
18    flow measurements that are taken in the ductwork
19    above the ovens?
20  A  Not solely.
21  Q  Is that one of the factors?
22  A  That is one of the factors.
23  Q  Are there other factors?
24  A  It is just, like I said earlier, on a quarterly
25    cleaning schedule.



173

1  Q  So would one of the factors be just duration,
2     amount of time since the last cleaning?
3  A  Yes.
4  Q  Another factor would be the flow measurements
5     taken in the ductwork above the oven?
6  A  Yes.
7  Q  Are there any others?
8  A  No.
9  Q  You were asked questions about whether you had
10    any conversations with Scott Howell or cause and
11    origin investigators for Ball.
12       Do you know who Scott Howell is?
13 A  I don't remember exactly who he is.
14 Q  Do you know who Bill Soyk is?
15 A  No.
16 Q  All right.  Do you recall two gentlemen who were
17    present at the time of the cleaning, the recent
18    cleaning of IBO #2 or IBO #1?
19 A  Yes.
20 Q  Had you spoken to those two people before?
21 A  If they were there before, I probably did.
22 Q  Do you recall being present at the time the
23    ductwork was inspected in the parking lot --
24 A  Yes.
25 Q  -- behind the Ball plant?

174

1  A  Yes.
2  Q  Do you know whether Mr. Holland and Mr. Soyk
3     were there at that time?
4  A  I don't remember.
5  Q  If they were there, do you recall speaking with
6     both the cause and origin investigators at that
7     time?
8  A  Yes.
9  Q  You would have spoke with all of those cause and
10    origin investigators who were present during
11    that inspection; true?
12 A  I just don't remember the names.
13 Q  So it is your recollection you have had
14    conversations with cause and origin
15    investigators employed on behalf of Ball
16    Corporation, you just can't remember what their
17    names were?
18 A  Exactly.
19 Q  Do you recall being on telephone conversations
20    with cause and origin investigators employed by
21    Ball?
22 A  I don't recall the telephone conversations.
23 Q  But you do recall physically speaking with them
24    during the inspection after the fire and during
25    the inspection of the ductwork?

175

1  A  Yeah.
2  Q  Okay.
3  A  When we had all the ductwork laid out in the
4     parking lot, yes.
5     MR. SENAK:  That's all I have.
6
7  REDIRECT EXAMINATION,
8     QUESTIONS BY ANDREW B. MILLER:
9  Q  You had testified right now on cross about, you
10    testified that the ductwork was cleaned
11    quarterly, whereas earlier you testified it
12    was annually.
13 A  Yeah, IBOs are annually.
14 Q  Correct.  But you in reference to Mr. Senak's
15    questions regarding the ductwork you referenced
16    quarterly cleaning.
17 A  Oh, I misunderstood then.
18    MR. SENAK:  If that's -- my apologies.  I
19 had intended the question to be annual for the
20 ductwork.
21 Q  Okay.  When was the last time this air flow
22    testing was done on the ductwork prior to the
23    fire?
24 A  That testing is done monthly.
25 Q  Okay.

176

1  A  Or weekly.  No, it is the third Thursday of the
2     month or something.
3  Q  When was that done then prior to the fire?
4  A  It would have been that previous month.
5  Q  Okay.
6  A  Or it could have been in May.
7  Q  Do you retain that air flow testing data?
8  A  I think they do, yeah.
9  Q  Who maintains that?
10 A  I think Scott Lane.
11 Q  Scott Lane?
12 A  Yeah.  Or it could be Matt Saul.
13 Q  So it is monthly testing and it is performed per
14    each IBO?
15 A  Just on the metal box IBOs.
16 Q  And that would have been done by Scott Lane, by
17    his department?
18 A  No.  It would have been done by the maintenance
19    department and then the results would have been
20    communicated to Scott.
21 Q  And he is the quality control manager?
22 A  Yes.
23 Q  And the results, who maintains the data from the
24    results?  Would it be Scott Lane's department or
25    maintenance?



177

1  A  I know it is on a spreadsheet somewhere.  I just
2     can't remember where that spreadsheet is.
3  Q  And that air flow testing, do you know how long
4     that is maintained by Ball?
5  A  No, I do not.  Huh-uh.
6  Q  Do you think that that testing data still exists
7     for 2014?
8  A  We are pretty good at retaining records, so I
9     would say yes.
10 Q  Is testing, that air flow testing was only on
11    the, I think it was Smith -- was it Smith --
12    yeah, Smith Engineering and Metal Box Corp., the
13    IBOs?
14 A  Right.
15 Q  But that's not done on the new IBOs?
16 A  No.
17 Q  That's all I have got.  Thank you.
18 A  Yeah.
19    MR. SENAK:  Signature is reserved.  You're
20    done.
21    THE WITNESS:  Thank you.
22    (Time Noted: 2:23 p.m.)
23
24
25

178

1     AND FURTHER DEPONENT SAITH NOT.
2
3
4     _____
      FREDDY SPENCER
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

179

1     STATE OF INDIANA        )
                              )  SS:
2     COUNTY OF HAMILTON      )
3
4        I, Diane Zeyen, RPR, a Notary Public in and for
5     the County of Hamilton, State of Indiana, at large,
6     do hereby certify that FREDDY SPENCER, the deponent
7     herein, was by me first duly sworn to tell the
8     truth, the whole truth, and nothing but the truth in
9     the aforementioned matter;
10       That the foregoing deposition was taken on
11    behalf of the Defendant, at the White County
12    Courthouse, 110 North Main Street, Monticello,
13    White County, Indiana, on the 23rd day of January,
14    2018, at 9:56 a.m., pursuant to the Federal Rules of
15    Trial Procedure;
16       That said deposition was taken down in
17    stenograph notes and afterwards reduced to
18    typewriting under my direction, and that the
19    typewritten transcript is a true record of the
20    testimony given by the said deponent; and that the
21    signature by said deponent to his deposition was not
22    waived;
23       That the parties were represented by their
24    counsel as aforementioned.
25       I do further certify that I am a disinterested

180

1     person in this cause of action, that I am not a
2     relative or attorney of either party or otherwise
3     interested in the event of this action, and that I
4     am not in the employ of the attorneys for any party.
5        IN WITNESS WHEREOF, I have hereunto set my hand
6     and affixed my notarial seal on this _____ day of
7     January, 2018.
8
9
10             N O T A R Y    P U B L I C
11
12    My Commission Expires:
13    September 2, 2024
14    County of Residence:
15    Hamilton County
16
17
18
19
20
21
22
23
24
25



**Exhibits**

**F SPENCER_A** 3:11 168:16 169:3,4,7,15,21

**F SPENCER_B** 3:11 168:16

**F SPENCER_C** 3:12 168:17

---

**#**

**#1** 173:18

**#2** 20:21,23 46:7,24 47:3,5,7,10 48:9 57:21 67:14,19 69:3 74:14 75:13 82:22 122:15,19 123:20 128:19 129:8 157:15 159:13 161:11,16 162:6,9,25 164:8,12 165:25 169:17 170:18 173:18

**#2's** 85:3

**#3** 21:1 67:13,20 69:6

---

**1**

**1** 82:23 167:4

**1,950** 54:25

**100** 8:7

**10th** 18:24

**11** 154:14

**11:30** 71:24

**11:31** 66:23

**11:40** 66:24

**12** 55:1 56:12 57:15 71:2 118:19

**12-** 168:15

**12-ounce** 56:13,17 57:9,16,21, 25

**12:32:34** 168:17

**12:32:58** 168:17

**12:37:56** 168:15,16

**14** 71:2,3 129:20

**15** 158:23

**1500** 55:3,4

**16** 54:18 55:1 119:20 158:23

**1600** 55:3

**17** 36:15 39:5 62:6

**18** 7:20 8:4

**1800** 55:1

**1900** 56:18 57:9 105:12 145:10

---

**1974** 10:25

**1982** 11:15

**1988** 48:7,10,14,18 49:13

**1989** 11:24 19:8 20:5,21 23:2 46:22 47:19,22

**1992** 51:4,15

**1993** 47:4 49:21 51:4

**1995** 20:8 28:10,17

**1:30** 142:18

**1:38** 142:19

**1:57** 156:21

**1:58** 156:22

**1:59** 157:11

---

**2**

**2** 38:20 46:12 47:13 56:10 57:18 62:7 74:13 82:23 122:10 160:16 167:4

**2,000** 56:18 57:9 105:12 119:9

**20** 61:9

**200** 107:19 169:2

**2005** 20:11,15,16 28:10,18 62:15,23 63:19 64:8

**2013** 92:1,3 123:8 125:2

**2014** 36:18,21 38:3,16,19 56:9 57:14 60:1 62:12,21 69:20,23 70:1,8,15 73:6,22 74:2,9 77:1,7 84:22 86:25 87:10,13 88:2 89:16 91:13,21,24 96:5,11,18 102:23 106:21 109:4 110:23 111:13,20 117:22 118:15 120:23 122:7,12 123:16 124:16 127:7 128:11,20 129:9 130:12, 16,21 137:18 140:23 141:6 143:21 144:7,19 146:3 149:8,18 164:14 177:7

**2015** 126:3,4 158:24

**2016** 125:18 126:1,7 158:24

**2017** 46:14,23 47:5,20 48:11 51:9 125:15,24 126:7

**2018** 8:5

**21** 90:11

**22** 56:8 57:13 60:1 69:19,23,25 70:8,15 73:6,22 74:2,8 77:1,7 84:22 86:25 87:9,12 88:2 89:15 90:11 96:5,11 102:23 106:21 109:4 110:23 111:13,20 123:16, 20 124:16 128:11,14,20 129:9, 20 130:11,16,21 137:18 139:25 140:22 141:6 143:21 144:18

---

146:3 149:8,18 154:9 164:14

**22nd** 99:3

**23** 56:8

**24** 54:18 55:2 57:4,10 119:6

**24-hour** 118:22

**25** 19:8 47:18

**25th** 17:20

**274** 169:2

**274.2** 169:3

**2764** 8:25

**29** 117:3

**2:00** 157:12

**2:01** 159:8

**2:02** 159:9,21

**2:03** 159:22

---

**3**

**3** 38:20 47:2 67:12 82:23 167:4

**30** 60:15 122:14

**32** 54:18 55:3

**360** 119:4,6

**363** 118:24

**365** 118:21 119:4

---

**4**

**47960** 7:18 10:6

**4:30** 70:19

---

**5**

**5** 37:5,6,22

**5/23/2014** 168:14

**5/25** 18:10,17 20:21 22:11

**5/25/1989** 21:7

**50** 108:22,25

**501** 10:5

**574-583-1823** 10:13

**574-870-2764** 8:24

---

**6**

**60** 108:22,25

**6911** 7:17

---

**6:30** 70:6,10 71:4,5 128:25 129:1

**6th** 10:5

---

**7**

**7** 36:15 57:4,10 154:13

**750** 54:19 55:4

**78** 11:19

**7:30** 72:19 73:2,3

---

**8**

**82** 11:18,19,25

**84** 12:23

**85** 12:23

**86** 11:18

**88** 19:5 47:17 48:3 49:20 57:20

**89** 11:25 17:20 18:10,18 20:14 22:11 47:15

**8:30** 71:6

---

**9**

**9/11** 23:20

**90** 42:5

**91** 42:5

**92** 49:22 51:8

**93** 18:20 20:7 47:5 49:20 51:8

**95** 20:14,15

**98** 18:24

---

**A**

**a.m.** 66:23,24 70:6,10 71:4 72:19 73:3

**abilities** 112:18

**ability** 32:24 55:24 163:11,12, 15,18,21 164:3,6

**abnormal** 101:2,25 168:25

**absolutely** 20:2 66:20 159:6

**access** 34:1 95:20 126:24 127:4 162:19

**accessed** 127:2,3,9

**account** 5:24 15:2

**accumulated** 94:23 172:4

**accumulations** 123:18

---



**accurate** 45:15

**actions** 110:1 149:18

**active** 36:7,9,21 38:14

**activities** 87:9 89:20 111:12 127:23

**activity** 88:11

**actual** 30:23 36:7 56:20 75:17 84:5 106:11,16 131:13 163:25

**ACTWU** 11:5,6

**add** 9:8

**additional** 138:1,12

**address** 7:16 8:12 10:4,10 28:4 43:16

**adjust** 55:10,13 60:7,10,11

**adjusted** 55:15

**adjustment** 60:24 61:1

**adjusts** 60:21

**advance** 121:3,7

**advisor** 8:1

**agent** 9:23

**agree** 161:19,23 162:2

**agreement** 161:18,22 162:1

**ahead** 5:17 31:6 45:12,20 46:1 52:18 59:14 63:22 64:5 74:6,20 93:18 94:12 112:21 113:4 138:16 145:7 149:1 152:22 153:11 165:21 169:13

**air** 4:16 25:6,9,13,15,18 27:8,12, 15 28:12,16,20 29:14,22 30:4,6, 12 32:21,24 33:4 34:17,22,23 35:4,7,14 36:3 44:3,6,12,25 45:6,8,17,24 57:13 59:25 60:15 63:19,25 70:7,12 72:17 73:1 84:13,17 86:24 90:12 93:17 94:7 102:20,22 104:14 107:21 109:8 110:3,14,22 111:12,18,24 112:3,19,23 113:19,21,24 114:4 120:24 126:16 128:10,13,20 129:7,14,23 130:1,11,15,20 131:4 132:10,21 133:1,18 135:14,16,18 136:17,25 137:3, 7,16,25 138:5,7,9,11 146:3 148:12,24 161:8,10,20,24 162:2,5,8,11,18,21,24 163:8,9, 10,13,15,18,21,22 164:3,7 165:16 166:4,16,20 169:8,16 171:21,25 172:5,17 175:21 176:7 177:3,10

**airborne** 108:19

**alive** 157:5

**aluminum** 49:25 50:25 51:6, 16,19,22 52:17 53:2,19,23 54:6, 15 75:25 76:1,4,7 108:4,6,15 109:23 139:15 140:8 154:11 159:13

**Alumni-tek** 37:7,8,12,13,14,20, 24 38:2

**Amalgamated** 11:9

**amount** 31:20 58:9,13 60:6,21 61:13 104:14 163:4 173:2

**and/or** 103:20 170:23

**Andrew** 4:15 175:8

**annual** 90:19 92:10,19 175:19

**annually** 90:24 92:7,13,25 93:4 119:16 175:12,13

**answering** 7:10

**answers** 6:15

**anticipate** 7:22

**anticipation** 128:19

**anytime** 53:6

**apologies** 175:18

**applied** 108:15

**apply** 171:19

**apprenticeship** 10:21 11:1,14, 16 12:5

**approved** 141:5,7

**approximately** 72:18 123:8

**area** 61:4,5 100:18,19 102:19, 22 129:10 134:16 136:25 145:23 166:10,14 169:6,7,15,22 170:14

**areas** 103:20 139:21

**Arizona** 27:25 28:1

**arrange** 93:15

**arranged** 157:18

**arrival** 72:22

**arrived** 70:12 72:18 73:2

**artifacts** 146:10

**assemble** 34:10

**assembled** 166:19

**assembling** 33:8 35:15

**assembly** 32:14

**assigned** 86:21

**assist** 51:18

**assistance** 150:13

**assume** 9:25 16:14 79:18 88:3 107:5 116:2 143:23,24

**assumption** 145:1

**attention** 16:19

**attorney** 9:23

**Audible** 6:23

**audibly** 6:19

**August** 18:24 19:5 48:6,10,14, 18

**authority** 110:14,17 137:23

**awake** 72:1

**awakened** 71:25 72:2

**aware** 35:18 67:3 69:2 88:5 89:5 111:18 113:7 114:5,8 122:8,13,14,18,21 124:12 139:1 146:1,5 148:19 149:3,7,16 160:8 170:12

**awhile** 24:5 157:9

## B

**B-e-v-p-a-c** 18:13

**back** 22:10 24:6 28:8 30:22 31:13 33:19 36:17,21 39:25 40:4 43:3 46:3 48:23 63:7 67:1 75:12 105:1 110:7,14 111:11 112:12 116:9,10,24,25 118:15 122:7 134:21 135:25 136:2,6,12 141:5 142:21 154:12 157:13 159:7,10,23 166:6,23

**background** 10:19

**bake** 165:7

**baking** 123:19

**balance** 6:9

**Ball** 4:17 9:24 10:7 13:21 17:14, 17,23 18:5,7,11,25 19:8,15,20, 23 20:11 21:5 22:5,7,13,14,17, 21 23:7,10,16,22 24:3,14 28:6, 17,25 29:3,5,7,13,18 30:7,14 31:15 32:20 34:25 35:8 37:10, 19 38:10 41:10,18 45:18,23 46:21 48:5,6,22 49:7 51:14,24 52:2 55:21,23 57:3 60:7 61:23 64:11 65:15,23 66:5,11,14 67:4 68:21 72:18 76:22 81:8 83:7 86:22 87:1,5,8 88:5,9,13,23 89:3 93:2 95:1,9 96:13 109:23 110:10,12 111:23 112:2,18 114:9 115:2,7,14 116:4 118:12 120:1 122:2,10,22 124:10,13 126:24 128:19 129:5 130:20 131:3,17 132:23 134:6,19 135:15,17 137:3,13,23 138:5,9, 24 141:17 142:25 146:14 147:4

148:1,5,12,20 152:8 153:1 157:3 159:12 160:18 161:15,19, 23 162:2 163:8,10,12,16,25 164:6 166:11,14 170:17,25 172:7,17 173:11,25 174:15,21 177:4

**Ball's** 18:2,11 37:14 69:10 115:4 116:16 135:13 148:15

**based** 54:1 65:22 115:16 128:22 145:14 151:4

**basic** 63:5,8,11 88:15,16,18,20 89:1,2 95:5 154:21

**basically** 13:5 24:18 75:10 85:11 132:15

**basics** 24:25

**basis** 23:12 90:19 92:16

**Bates** 167:9,11,17

**bearing** 87:22

**bearings** 85:23 86:3,17,20 87:18,20 88:7,18 89:12

**beer** 51:6 57:23 58:2,7,20,25 59:2,18,21,25 60:14,18

**began** 18:10 20:20 21:7 27:9,13 28:20 29:3 33:5 70:10 133:1

**begin** 18:2,5 25:9 48:18 49:12 71:4

**beginning** 30:7 33:1 46:21 85:16 106:2

**begun** 28:16 143:22

**behalf** 174:15

**belief** 48:9 54:1

**believed** 137:24

**belts** 85:24 86:3,5,7,14,19 87:12,15 88:7,18

**Bend** 7:17

**Bev-pak** 18:8,13,17 19:1,2,14, 22 20:6,20 21:6 22:11 23:1,9 52:10,11

**beverage** 22:15,25 23:16 51:6, 19 53:2,19 54:6 57:22,23 58:2, 7,11,20,22,25 59:18,21,25

**big** 108:6

**Bill** 173:14

**bit** 19:24 81:16 105:21 121:14 125:7,20

**blower** 102:4,6 111:10 166:14

**blowers** 85:25 111:7

**blowing** 105:19



**board** 25:11,13 44:12

**Bob** 17:12 98:15,16 103:3,4,7, 12,19 168:12

**body** 75:16

**bolt** 33:19 34:4

**book** 78:10

**bottle** 37:8,9,15

**bottles** 37:7,20,25 38:3

**bottom** 84:12,14 168:13

**bought** 18:20 20:7 158:7

**box** 40:16 41:2,6 43:8 44:6,10, 14,20 83:15,18,25 84:13,15,16 127:9,15 176:15 177:12

**boxes** 83:20 84:9 126:17,20,22, 25 127:5

**Branson** 8:16

**break** 53:6,11,13 66:17 67:2 138:17,20 142:16,17

**breakdown** 56:22

**briefly** 156:23

**broader** 64:17 125:20

**broke** 82:19

**brought** 16:18 25:11,13

**brush** 108:1 111:4

**brushes** 114:1

**build** 80:7

**builders** 80:22

**building** 24:22

**buildup** 124:19 127:18

**buildups** 124:4

**bunch** 149:13

**burner** 83:14,15,18,20,25 84:9, 12,15,16 126:17,20,22,25 127:4,9,15

**burners** 131:11 160:13

**business** 10:4,12 12:13,25 13:2,4,5 44:4,5,7,8,11 161:10, 15

**buy** 19:1,2

**buying** 52:8

**C**

**C-u-m-m-i-n-s** 25:23

**cage** 97:2,5,8 101:20,22 102:1, 7,17 104:18,21,23 111:7,10

**128**:11,14 166:15 169:21,22 170:3,15

**calculates** 171:12

**calculation** 171:23

**calendar** 91:13 93:12 119:21, 24 121:11,17

**California** 23:17 24:3,10,14

**call** 33:18 37:11 71:18,22,25 93:15 95:17 110:14 133:12 138:15 147:21

**called** 14:21 40:19 47:3 50:16 68:17 71:12 72:3 90:7 93:17 108:12

**calling** 58:7

**Calls** 166:18

**camera** 103:9 125:8

**cans** 33:24 41:16 49:10,12,19, 24,25 50:4,15,24,25 51:6,19,22 52:16,17,24 53:2,18,20,23,24 54:3,6,15,20,25 55:1 56:13,17, 20,24,25 57:1,9,14,16,22,25 58:24 59:21,25 60:14,18,22 61:16 76:1 105:10 106:11,16 119:9 144:18 145:2,10,12,17 146:2 154:8,12,15,20 155:2 159:13,14

**capably** 40:4

**capacity** 164:19

**card-carrying** 11:20

**care** 24:24

**case** 9:5 20:24 21:4 38:21 39:9, 12 40:7,11,13 46:6,13,18 49:4, 10,16,18 54:4,8,21 67:5,16,23 69:4 164:13

**caused** 68:10 127:14 148:24 150:18 151:3,13,24,25 152:2 153:3

**ceased** 37:24

**cell** 8:23 125:8

**center** 160:15

**certification** 11:10

**certified** 95:6

**cessation** 38:2

**change** 55:14 56:3,5 87:15 117:19 118:8 159:25

**changed** 21:2 46:9 62:11 80:8 87:12 115:7 117:12

**changing** 88:6

**characteristic** 33:16

**charge** 31:4 35:11 62:18,19,21, 23 73:12 81:19,20 91:1,3 102:24

**Charleston** 12:21

**chatted** 146:13

**chatting** 137:20

**check** 85:23,24 86:1 89:12,13 104:12 156:6

**checked** 86:7,15,17 155:8

**checking** 86:2,3 88:7

**checklists** 64:11 139:2

**checks** 61:15 86:19

**Chris** 13:25

**cigarette** 53:8 66:19

**city** 27:23 68:24

**claim** 148:16

**claiming** 148:6

**claims** 148:12

**clarify** 20:25 35:19 36:7 62:9

**clean** 6:12 72:23 86:1 92:19 102:22 109:2 110:22 111:5,6,9, 11 112:4 113:16 114:9 115:15 119:18 126:16,20 128:10,13 133:5 137:7,12 140:15 161:18 162:6 163:19,22 164:4 169:8

**cleaned** 63:5,17 65:13,16,20 74:12 86:14 90:18,19,24 91:2, 22 92:2,7,13,24 93:4 94:2,7 102:20 105:17,20 108:21 110:13 112:11 116:3 117:21 118:15 119:15 120:1,6,11 121:2 122:11 123:13,15 126:7,22,23 129:9 133:4 137:9,24 144:19 165:13 166:10 170:23 171:2 172:9,17 175:10

**cleaners** 63:13

**cleaning** 29:2,6,16,17 30:24 31:14 57:13 60:1,3,15 64:16 65:9 66:15 74:3 85:14,17,20 86:12,25 91:5,8,14,15 92:10 93:9,16,20,24 106:6,22 107:1 109:11 111:12,14 114:21 115:5, 10 118:6,17 119:11 120:3,13, 15,17,24 121:3,5,10,21 122:7, 12 123:6,8 125:24 126:3 127:12 128:20 130:15 131:4,13 132:24 133:24 136:7,16,22 137:4 154:9 155:3 159:25 161:10,15 162:9, 12,16,18,21,25 164:1,8,12 165:6,9,10 166:16 169:17 172:2,25 173:2,17,18 175:16

**cleanings** 64:13 111:20 121:8

**cleans** 113:11

**clear** 107:23

**client** 148:1,16,18,21 149:3,7, 14

**client's** 149:18

**close** 14:2 54:23 119:5

**closed** 23:17

**closer** 8:22 106:14

**closing** 132:16

**cloth** 155:20

**clothes** 155:23

**Clothing** 11:9

**clue** 31:16 32:22 103:6

**coat** 50:7

**coating** 50:16,23 58:9 59:3,9, 17 60:6,22 61:13 108:11 123:23,25 130:23 134:22

**coating's** 50:10,11

**coincide** 120:14

**coincides** 17:21,23

**colleague** 30:13

**collected** 139:11

**collective** 121:1

**collects** 134:24

**college** 12:11,12,14,20

**Combined** 55:2

**commercial** 155:15

**communicated** 176:20

**communication** 135:16

**communications** 135:18

**companies** 40:15 41:11 65:24 66:3

**company** 4:18 9:24 18:9,21,22 19:15,23 20:7 28:22 29:6,13 30:4 40:19 51:24 52:6 147:5 163:10

**Comparatively** 100:18

**complain** 111:24 112:3,9

**complaints** 77:6 112:9,11,15, 17 114:6

**complete** 7:3 53:10 71:5 171:23

**completed** 119:21 139:3 140:9 146:4 147:20 156:7 162:16 165:19,24 166:4,5,16



**completion** 129:24 137:16

**component** 83:8 122:19

**components** 43:5 89:14 122:16 156:6

**composes** 75:19

**computer** 55:16,18,21,25 126:13

**concern** 24:8 112:17

**concerned** 62:5 76:1

**condition** 140:11 156:3

**confidential** 38:11

**confine** 164:24

**confined** 33:11 63:4 95:1,5,6,9, 11,12,15,16,19,25 96:1,2,10,14, 17 131:8 132:6,20

**confirm** 166:4

**confused** 58:1 100:11,24

**confusing** 6:13 81:16

**considered** 115:21

**consist** 63:9,12 155:1

**consistency** 134:24

**consistent** 86:11

**consisting** 109:22

**consists** 107:12,15,16

**constant** 57:7

**constructed** 48:6

**consult** 45:4 79:8 80:14 81:5

**consultation** 133:8

**contact** 43:7 44:19 45:1 133:16,20 135:13,15,22 136:21, 25 147:23,25

**contacts** 8:19

**contained** 68:5 78:25

**contaminants** 107:22 108:19 139:10

**contamination** 105:19 107:20 155:6,8

**contending** 148:21

**content** 58:19

**contents** 50:12

**continue** 101:4 116:19

**continuous** 24:4

**contract** 24:24

**contractor** 25:16 27:18,19 28:25 51:25 63:2 72:23 80:24

85:11 89:6 90:7 95:16 138:7 160:19,20,22 161:8

**contractor's** 132:9

**contractors** 25:1,3,5,7 27:16 33:14 64:16 65:8 80:10 88:10 109:25 112:10 115:8 121:24 159:12

**contractual** 169:12

**contractually** 169:8

**contrary** 165:5

**control** 55:16,17,18,19,20,25 56:23 82:9,14 83:3 106:5,10,25 107:3,4,12 109:21 110:4 131:20,21 138:25 142:24 143:2, 4,8,10,20 144:1,14,17,22 145:17,22 146:2 154:10,20,25 156:2,7 176:21

**controllers** 61:2

**conversation** 13:15 14:1 17:4 129:18 151:22

**conversations** 13:16 146:13, 17 153:16 154:5 173:10 174:14, 19,22

**conversion** 52:7,11,13

**cool** 129:2

**cooling** 129:5

**cools** 131:12

**coordinate** 120:2,13,15

**coordinated** 90:2

**copies** 167:5

**copy** 81:9,15,22 82:2,5

**Corp** 41:7 44:20 55:21 177:12

**corporate** 27:2

**Corporation** 13:21 20:11 23:10 37:10 38:10 40:16 43:8 44:11,15 45:18 55:23 160:18 170:17,25 172:7,17 174:16

**correct** 4:25 6:1 10:8,14,17 20:24 28:10,18,19 30:1 32:2 36:19 38:7 39:3,6 41:20,21 43:1 46:8,10 51:12,16,17 52:6,7 56:14 61:10,24 67:20 68:22 70:7,8 73:24 76:13 81:19 83:16, 23,24 84:6,7,9,10,11,19 86:22 91:18 110:1 118:13 124:1,5,6,9 146:10 147:8,9 159:5 164:15 167:1 169:4 175:14

**correctly** 30:22 35:16 61:19

**correspond** 86:9 167:13

**couple** 8:11 46:3 101:4 129:16 146:8

**courses** 12:12,13,14,18 13:2

**coursework** 12:11

**court** 6:3,24 7:5,13

**courtesy** 7:4

**courtroom** 6:5

**covered** 105:24 107:24 139:15 154:11

**CPM** 56:24

**created** 79:20 87:21

**creosote** 94:23

**critical** 149:4,13,17 164:21

**cross** 175:9

**CROSS-EXAMINATION** 161:5

**Crume** 17:12

**cube** 101:13

**Cummins** 25:19,22 26:9,17,23 30:1,13 133:9 157:2

**Cummins'** 26:1

**cure** 50:3 59:11

**cured** 50:4 135:5,7,8

**current** 7:16 19:9 20:13,17 22:6 40:17 62:3,5 79:22

**curve** 59:18

**customer** 37:11,14,16 60:20 144:24

**customers** 37:17,18 38:11 106:17

**cycle** 92:10 118:1,6 122:12 145:15

**Czajkowski** 13:25

---

**D**

**Dale** 62:22 72:13,15 73:19,22 74:17 81:18,20,22 82:2,5 84:22 87:7 96:16 107:7,8 109:7 120:23 122:25 130:22 136:9 140:3 142:2,4,7

**damage** 68:8

**damages** 148:14

**dark** 155:20

**data** 176:7,23 177:6

**date** 7:25 8:6 17:8,19,23,24 19:9 20:17 25:10 39:19,20 43:12 47:19 48:20 56:14 89:17 90:13 97:19 99:2 119:24 123:9, 12,13,17 133:17 158:10 164:19

167:22

**dated** 168:14

**dates** 23:19 29:11 40:3 52:5 67:8 136:3

**dating** 46:21

**day** 13:17 35:11 57:1,4,10 69:24 70:3,9,24 71:8 73:24 74:2,12,15 90:2 91:23 92:5 97:17 98:12 118:21 119:7,19 120:8,10,14 135:19 137:21,22 161:2

**days** 57:4 60:15 70:20 73:20 89:23 118:24 119:2,4,6 122:14 162:19

**deal** 66:22

**decide** 115:14

**decided** 92:6,12 93:19 116:4 118:5

**decision** 8:10 29:21,24 90:23, 25 92:15,16 115:12 116:13 121:1 140:14 141:22 158:20

**declaration** 15:9

**decorated** 76:9

**decoration** 76:6,12

**decorator** 75:22

**decorators** 55:2 76:8

**decreases** 55:6

**defects** 31:17

**defendant** 4:15

**deficiencies** 31:18

**define** 29:15 95:12 101:1

**defining** 21:18 80:5 88:16 99:10

**definitive** 148:7

**definitively** 43:17

**degree** 12:3 172:4

**degrees** 107:19 169:2

**department** 59:8 65:1 68:17, 19,22,25 91:20 139:18 142:24 143:2,4,10 144:1 152:15 153:14,17 154:3 176:17,19,24

**dependent** 60:20

**depending** 54:15 70:25

**depends** 105:17 108:20 135:4

**depict** 99:7

**depicted** 15:20 16:1 99:23

**depicting** 100:16



**deposed** 5:18 10:14 17:8

**deposing** 141:18

**deposition** 5:20,23 10:16 13:7 16:12,22 17:1,5 165:15 168:3

**describe** 33:20 85:5 110:21 171:7

**designate** 38:9

**determination** 110:6 143:16

**determine** 122:10 124:13 125:5 143:14 144:16 170:22 171:24

**determined** 103:19 110:12

**determines** 171:1 172:8

**determining** 93:23 172:15,16

**developed** 115:18 117:2

**developing** 115:22

**deviate** 111:13 116:4

**deviated** 111:19

**device** 126:12

**diagrams** 14:14

**Diana** 144:12

**die** 10:21 11:1 12:5 17:25

**diesel** 25:24

**differ** 112:23

**difference** 99:12,13 101:14

**differences** 41:4 113:7 160:8, 11

**differentials** 101:16

**differently** 114:3

**difficult** 33:14,17

**difficulties** 43:23 44:3,22 77:2

**difficulty** 33:6,8

**digging** 138:18

**direct** 10:13 21:17,18 163:18

**directly** 62:15,19 144:5

**director** 26:2,12,15,18,22 157:3

**dirty** 122:6

**disagree** 45:10,19

**disassemble** 85:12

**disassembly** 32:14

**discharge** 131:23 145:25

**disconnect** 132:16,17

**discourteous** 7:12

**discovered** 34:25 90:15

**discussing** 107:24

**dispute** 72:19

**disruption** 69:12,13

**disruptions** 69:9

**dissatisfaction** 30:20,23 31:1

**dissatisfied** 30:16

**distinction** 6:2 36:1 42:12 58:2,14

**document** 14:5,8,9,14,21,24 15:9 16:6,7,15 132:14 139:2,10 140:11 156:2

**documentation** 49:3 87:21,24 88:1 112:14

**documents** 14:4 16:9,17 48:24 64:11 132:13 150:4,8,9,15 167:10,14,20,21 168:1

**doors** 33:18 34:1,3,4,5,8,11,15, 18 35:15 111:2 129:6

**drawing** 14:8 15:11,13,18 79:20,21 83:4

**drawings** 14:15,17 78:10,19,25 79:1,4,8,14,16 80:1,9 82:6

**Drive** 7:17

**drop** 46:3

**duct** 29:16 90:17,23 91:1,5,13 93:9 97:4,8 104:15,24 120:16 136:22 171:10,12 172:2,3

**ducting** 90:19 160:15

**ducts** 91:22 92:2,6,10,12,24 93:3 94:7,8 126:6

**ductwork** 68:2 94:15,17,20,24 97:12,19 101:17,18 103:20 104:17 119:15,18 120:1,2,6,10 121:13 122:10 123:3,6,8,12 124:19,20,24 125:1,14,17,24 128:18 137:5,10,13 170:18,23, 24 171:1,21 172:8,13,18 173:5, 23 174:25 175:3,10,15,20,22

**ductworks** 111:8

**duration** 173:1

**duties** 24:16

---

## E

**earlier** 47:2 67:18 73:2 77:9 133:7 134:21 136:4 157:2 165:15 168:20 169:19 170:5,10 172:24 175:11

**early** 51:8

**easier** 9:6

**East** 7:17

**education** 12:2

**educational** 10:19

**efficient** 160:17

**effort** 122:5

**efforts** 121:10

**electrical** 24:23 56:4 78:20 79:1,5,12,13,14,15,17,19,21,23 85:25 89:14 90:8 131:17

**electrician** 79:24

**electricians** 56:6

**electronic** 14:6,7,9

**email** 10:10

**employed** 17:14 18:17 115:1 174:15,20

**employee** 17:17 18:23 82:25 84:23 87:1,5,8 130:20 157:4 166:11,14

**employees** 21:15 22:1 35:8 51:25 64:12 65:7 81:8 86:22 88:9,14,24 89:3 96:13 109:23 110:10,12 114:9 115:1,4,8 122:2 129:6,14 130:1,11 131:17 134:6 135:17 139:14,18,24 161:20 162:11 163:9,13,16,19, 25 164:7

**employment** 17:24 18:2,5,10 19:19 20:20 21:7,13 22:4,6,9 23:1 29:3 46:22 48:22

**encounter** 44:21

**end** 17:21,24 75:12 76:4,17 131:22

**Endust** 155:16

**energy** 160:17

**engineer** 41:8

**engineering** 20:12,17 21:15 24:17,19,20,21 26:3,4,12,13,15, 19,22 40:15 41:3,6 43:7 44:6,8, 10,14,20 157:3 177:12

**ensuring** 165:18

**entail** 63:1

**enter** 34:11 61:16 96:20

**entering** 132:11

**enters** 84:11 131:24

**entire** 19:18 21:12 42:15

**entirety** 22:5 42:13 57:10

**entities** 19:12

**entrance** 134:13,16

**entry** 63:4

**equipment** 89:11 95:21 109:13

**equivalent** 142:1

**era** 52:5 117:22

**estimate** 121:9 128:22

**estimation** 117:24 141:20

**evening** 77:7 146:3

**event** 135:19

**events** 5:24 15:2 31:14 104:5 121:20,22

**evidence** 15:14

**evidently** 103:25

**exact** 8:6 13:1 18:19 23:19 25:10 28:4 29:11,20 31:20 39:19,20 40:3 43:12 54:22 70:16 73:7 78:9 89:17 90:13 91:23 92:4 99:6 105:5 108:22 127:11 136:3

**examination** 168:2 175:7

**examine** 165:25

**examined** 166:11

**exceeded** 100:9

**exceeds** 161:13 163:1 164:17

**exclusively** 33:11 57:21 65:23

**exhaust** 102:6 104:24 111:6 160:15

**Exhibit** 168:16,17 169:3,4,7,15, 21

**Exhibits** 168:3,5

**exist** 88:1

**existence** 44:15

**existing** 27:18

**exists** 177:6

**exit** 61:17 132:3 134:14,16

**exits** 131:24 132:1

**experience** 22:14,18,22,24 35:16 44:21 54:2 65:6,7,22,23 108:25 141:20 165:9

**experienced** 32:23 36:2 44:3

**experiencing** 43:24

**expert** 152:18

**experts** 146:14 147:4 152:11

**expired** 96:7

**explain** 5:22 32:14 93:11 95:14



explained 34:20

explanation 34:22

extend 7:4

extended 6:19

extent 42:2 150:20

external 34:1

extinguish 104:2

**F**

F-r-e-d-d-y 4:13

fabricated 79:11

fabrication 22:15,19,25 75:17, 20 76:5

facilities 23:4,15 32:21

facility 10:7 18:3,6 19:7 21:6 22:6,13,17,21 23:5,16 24:3 28:17 30:8 34:23 36:22 37:19 47:12 48:10 51:14

fact 38:6 73:23 136:14

factor 173:4

factors 115:21 172:21,22,23 173:1

facts 92:16

fair 5:13

falls 59:19

familiar 30:3 146:7 171:4,16,17

familiarize 42:21

family 8:17,22

fan 84:12,16 97:2,5,9 101:20,22 102:1,8,13,17 104:18,21,23 111:7 123:23 128:11,14 131:19

fans 86:3 88:7 89:12 124:7 131:11,13,16,19,20

farther 135:11

feature 33:16

feet 56:20 61:9,10 108:8

Fifteen 61:9

figure 79:10 139:23 144:16 156:18

file 125:13 126:14

filed 4:16

fill 132:10

filled 76:24

filler 76:25

final 140:13

financial 8:1

find 9:6,13,25 80:20 92:24 93:2

fine 38:12

finish 12:7 23:24 58:6

finished 10:20 166:20

fire 15:23 17:2 36:18 38:4,7,24 39:9,22,24 40:11 46:10,11 56:14 59:22 67:7,9,14,15,20,22, 23 68:2,3,5,10,13,17,19,21,25 69:6,7,11,17 71:9,13,20 92:2 97:15,16,20,23,24 98:12 99:3 104:2 105:3 106:18,22 118:3 122:14,20,24 123:9,13 128:8,9 134:17 146:10,14 147:1,5,6,8 148:13,24 149:23 150:18 151:3, 8,11,14 152:3 153:3,5,6,8,13,16 154:5,6,14,15 159:2,5 163:13, 16 166:1 174:24 175:23 176:3

fired 160:4

firemen 153:19,23

fires 67:3 68:24 69:2

firm 8:9

five-minute 66:17

fix 35:8 43:5 83:1

fixed 34:15,18 35:10

flame 84:5,8,18,20

flammable 131:1

flange 76:21

flashlight 63:14

flavor 50:13

flip 134:21

floor 151:21

flow 104:12,13,14 107:21 115:25 116:1 135:16 170:17,20, 22 171:2,4,13,21,25 172:5,18 173:4 175:21 176:7 177:3,10

focused 64:15

folks 157:16

follow 6:9 113:16 115:4

foot 108:8

forces 84:13,17

foreign 123:19

form 5:16 31:6 45:11 63:22 74:5,19 94:11 112:20 116:7,15 134:9 138:2 141:10 145:6,18 165:20 166:7 169:10

forms 132:10

formula 171:12,16,17,20

forward 22:11

found 35:3,7

foundation 45:12 59:14 63:21 74:5,20 94:11 98:17 111:15,25 112:20 113:4 116:7,15 138:3 145:6,18 148:25 149:19,25 152:21 153:10 166:8

four-month 117:25 118:6

four-year 10:21

frame 27:5

Freddy 4:11,21,22,23 5:18 7:16 9:25 10:4,19 13:6 24:16 53:4 61:20 67:1 90:17 142:21 161:7

frequency 86:10 90:17 93:19, 24 94:6 117:4,5,9,21

frequently 60:17 86:7 94:1

friends 154:2

front 75:12,15,19,21 76:4,7

fspencer@ball.com. 10:11

fuel 160:6

full 4:9 105:13,15,22

function 40:4 50:2,10,11 99:16 124:23 169:11

functioned 40:2

functioning 40:20 60:9

functions 24:19,20,21 114:3 122:3 154:1 169:12

**G**

garb 15:10

Gary 144:12

gas 83:14 160:4

gave 82:24

general 27:5 148:10

generally 124:8 135:20,22 148:9

gentlemen 173:16

geographic 9:4

geographically 8:21

gesture 107:25 155:10

get all 63:3

give 54:12,22 98:19 133:5 141:15 156:17 171:20

giving 83:4

glad 9:13

gladly 9:18

gloves 155:18

good 20:1 42:12 53:14,16 105:20 127:18 143:14 144:24 177:8

gooey 135:3,11

graduate 10:24

Grand 160:23,24

great 6:17

greater 172:4

ground 7:2

grounds 24:22

group 85:25 131:18

guess 54:16 58:1 100:24 108:7 140:1

guy 20:3 136:21 140:25 141:17

guys 17:9,11 82:18 104:1 129:17,18 152:10

**H**

habit 93:3

half 17:18

hand 15:18 107:25 155:10

handed 92:19

handled 136:9

hands 129:16

happen 5:24 7:11 120:20 121:20

happened 52:8 120:21

happening 110:19

hard 135:4,10

Harry 142:12

head 6:20,21 76:14 148:4

heads 143:4

hear 5:4

heard 5:12

hearing 4:24

heat 83:11,13 84:11 89:13

heated 84:17 134:23

Heattek 40:19,21 41:5

held 19:18,22 20:9

helping 147:18



**Hickman** 144:12

**high** 10:20,23 12:3 100:8

**higher** 53:19

**highlighted** 16:18

**hire** 85:11 133:8 147:5

**hired** 28:12 81:13 89:6 126:19
133:18 138:5 146:14 162:3

**historic** 115:16

**historical** 115:18,22 116:16

**history** 22:6,9 46:4

**hold** 26:7,10

**holding** 101:12

**holidays** 118:25 119:1

**Holland** 174:2

**home** 7:16,20 24:5 71:17,18

**hot** 84:13,17

**hotspot** 102:12,14,16 104:20
169:20

**hotspots** 98:19 99:9,11 101:25
102:10 166:25 168:21 170:1,14

**hour** 53:5,23,24 54:4,7,9 57:10
129:4 163:6

**hourly** 52:22

**hours** 14:2 57:4 69:14,25 70:2
71:2,3 105:8 106:8,12,14,15
118:19 119:6,20

**housing** 111:7

**Howell** 146:6 173:10,12

**huh-uh** 6:20 177:5

**hung** 33:24

**hunt** 9:5

**hyphen** 18:16

---

**I**

**IBO** 15:21 20:21,23 21:1 22:22
24:8,10,13 29:2,6,16 32:6,14,17
33:6,11,13,17 34:5 36:13,24
37:1 38:6,20,21,24,25 39:3,8,
11,24 40:7,10,13 41:13 45:9
46:4,7,12,20,24 47:2,3,5,10,13
48:9,13,24 49:4,9,15,17,23 50:2
51:5 52:23 53:1,22 54:4,7,21
55:6,10 56:8,10 57:7,21 60:9,
13,24 61:6,16,21,24 62:2,6,7,
18,21,23 63:18 66:6,9,12,15
67:10,11,13,14,19,20 69:3,6
73:12 74:13 75:13 76:16 77:4,7,
10,13 78:2,14 81:9,14,17,19,21
82:10,22,23 83:11,13 84:1,3,5,

9,12,18,20 85:2,6,14,20,22,24
86:5,14 87:2,9 88:20 91:8,15
93:19,24 94:2 95:25 96:20,24
97:12,19 98:9,11 99:15 102:22
103:20 110:22 112:4 113:11
114:10,23 115:5,10,15 116:2,3
118:12,15,21 119:4 120:15
122:10,15,19,23 123:20 124:5,
14 128:19 129:8 131:22,24,25
134:5 136:16 141:5 145:23,25
146:9 157:15,24 158:5,20
159:13,17 161:11,16 162:6,9,
21,25 164:8,12,19 165:13,25
169:17 170:18 173:18 176:14

**IBO'S** 83:8 84:23 117:9

**IBOS** 32:19,25 36:5,7,11,21
38:14,15,18 40:17,20 41:4,5,20,
23 43:9 62:10 64:17,19,21,24
65:4,9,12,20 66:2 67:3 74:11
77:22 78:4,23 82:25 88:6 89:7
113:16 119:11,12 120:3,13
124:11 137:4,9,13 139:16
158:3,18 160:2,4,6,9 165:9
175:13 176:15 177:13,15

**ice** 101:13

**idea** 8:9 29:9 47:11 98:19
127:18

**identical** 50:21 77:24

**identification** 168:4

**identify** 78:13 151:18 167:9,22
168:9

**Illinois** 10:25 12:21

**image** 155:14

**imaged** 103:21

**imager** 104:1

**imaging** 100:21 168:10

**immediately** 97:5,8

**impairment** 4:25

**important** 6:1,12 7:2

**improperly** 34:14,17

**in-feed** 61:7

**in-house** 114:9 115:7

**inability** 30:21 31:25 32:16

**inactive** 36:11,13,24 38:6,25
39:2,5,8

**inappropriate** 149:9

**incident** 35:14

**inclusive** 106:9

**Incorporated** 113:1

**increases** 55:5

**increments** 57:11 118:22

**independent** 159:1 161:8

**independently** 121:4,5

**Indiana** 7:18 10:5

**indication** 105:3

**indirectly** 21:22

**individual** 23:13 26:18 34:11
87:7 98:4 103:8 136:7 151:6,10

**individually** 94:8

**individuals** 13:22 103:14
109:20 146:18 163:22

**Industrial** 27:20,21 28:1,5,13,
24 29:2,9,12,19,22 31:5,10
32:5,9,13,16 43:24 44:18 45:4
113:2,3 114:16 160:23

**Industrial's** 30:17

**infeed** 75:22 76:8

**information** 9:20 14:23 15:1
16:17 44:19 45:1 49:6,7 83:7
149:23 150:21 151:7

**infrared** 89:9,13

**initial** 54:16 133:16

**inquiries** 43:20,22 44:1

**insert** 171:9

**inside** 94:24 108:10,14 126:17,
22 155:6,11,19 172:3

**inspect** 94:8 96:20 122:5
127:14 147:5 161:23 165:25
166:14

**inspected** 94:15 145:5 154:20
166:3 173:23

**inspecting** 165:17,24

**inspection** 35:3 63:6,8,11
122:9 127:13 144:22 174:11,24,
25

**inspections** 35:4 63:25 64:13
123:11 144:17 146:9,23 147:20,
24

**install** 160:18,24

**installed** 21:10 76:22 160:2

**instance** 42:20 43:13 44:2
81:18 151:18

**instances** 23:8 64:1 89:5

**institution** 12:18

**instruct** 9:16 150:22

**instructions** 130:11 133:3,5,
24

**insurance** 4:17 9:24 147:5

**intended** 175:19

**intention** 7:19

**interaction** 129:22

**interactions** 129:19 147:16

**interferences** 69:10

**interior** 34:8,11,15,18 35:15
50:4,8,14 94:19 123:23,25
125:14,23 126:6,24 127:3,4,15
130:23 134:22

**internal** 34:4,5 50:16,23 58:9
59:2 60:6,21 61:13 108:11
165:7

**interposed** 165:1

**interviewed** 153:8,13

**investigation** 146:15

**investigator** 149:2

**investigators** 149:24 153:5,9
173:11 174:6,10,15,20

**involved** 67:11,13,15,19 68:2
115:6 135:17,24 136:15 139:14
143:10 146:20

**involvement** 24:13

**involving** 67:3 69:2,6

**irregular** 168:22

**isolate** 27:8

**issue** 20:24 21:4 38:21,24 39:8,
10 40:7,10,13 43:15 46:4,13
49:4,9,15,18 54:4,7,21 67:4,15,
22,23 69:4

**issued** 163:3

**issues** 22:10 43:4 106:20 123:2
146:2

---

**J**

**job** 44:22 74:1 114:3 165:18

**John** 25:19 26:9,17,23 27:15
29:25 30:1,3,13 152:14 157:2

**journeyman** 11:25

**judgments** 6:24

**July** 8:2,3 36:14 39:5 47:20 51:9

**jumbled** 6:14

**Justin** 103:10

**Justin's** 103:11



**K**

**kind** 6:1 22:9 63:5 83:15 94:8 106:9 124:3 134:6 135:24,25 136:1 147:16 155:10

**knew** 31:12 93:5

**knowledge** 15:8 32:20 49:9,13 52:2 55:20 59:16 60:13 99:24 106:20,23 109:3,6 111:23 112:2 114:2 123:18 126:16 128:23 137:23 145:14 148:20,23 154:19,21 156:5 161:14 163:2, 12 164:17 166:18 169:11

**knowledgeable** 122:22 123:1 130:19,20 139:13 156:9,10

**Krintz** 17:12

**L**

**L-a-n-e** 143:7 156:15

**L-a-n-g** 156:14

**L-y-n-n** 4:11

**labor** 24:24

**Lack** 166:7

**lacks** 166:17 169:11

**lacquer** 107:24 108:3,9 139:8, 15

**lacquered** 105:24 109:22 138:23 154:11

**laid** 175:3

**Lakeland** 12:20

**Lane** 143:5,6 144:4 156:11,12 176:10,11,16

**Lane's** 143:25 176:24

**lasted** 69:13

**late** 49:22 51:4,8,15

**lawsuit** 4:16 6:10 148:6

**lawyer** 15:7

**leading** 123:20

**learn** 16:5

**leave** 70:17,19,23 131:11 162:12

**left** 52:4 70:14,16 73:8,9 109:10

**legal** 4:9 15:10

**legs** 53:7

**length** 19:19 21:12 23:21

**lengthy** 19:25

**lid** 76:21,22

**lifesaving** 95:21

**lifespan** 158:17

**limited** 32:17

**lines** 70:25 74:18

**liquid** 50:3 131:1

**list** 92:20

**litigation** 17:3 46:5 68:12,15,16

**load** 100:7

**local** 11:10

**locate** 9:14,21

**located** 8:17 24:10 28:1,3 61:3 71:16 77:14,16 83:15,18,20,22 104:16 113:13 166:15

**location** 9:4

**lockout** 132:20

**lockout-tagout** 63:4 132:15

**locks** 132:17

**Logansport** 153:21

**long** 11:16,23 14:1 17:17 18:22 28:5,24 29:9 40:2 47:11 52:21 57:16 67:25 69:13 92:9 105:1, 15 106:16 108:8 117:25 119:18, 19 127:10 129:2 144:21 145:11 152:25 161:1 177:3

**long-time** 129:17

**longer** 26:16 44:15 46:12 59:10 105:21 106:25 157:3,5

**looked** 15:25 94:9 130:8 145:17

**lot** 9:6 121:20 145:12 146:19 151:15,16 152:7,10 160:17 173:23 175:4

**lugging** 109:13

**lump** 162:24

**Lynn** 4:11

**M**

**machine** 65:19 132:15 134:8, 13

**machinery** 42:22

**machinist** 20:5,6,14

**made** 15:5,7 27:3 29:24 43:20 51:15 56:3 61:1 63:4,15 64:12 69:15 79:20 80:2,21 90:23,25 92:15 107:25 114:6 115:12 116:13 117:19 133:11 141:22 143:16 155:10 158:20 159:16 164:20 165:1

**magnehelic** 171:8

**main** 12:17 131:20,21 132:2,3 135:13,15,22 136:21,24

**maintain** 24:18,22

**maintained** 65:14,17,20 154:15,17 177:4

**maintains** 176:9,23

**maintenance** 20:8,16 24:23 26:8 28:9,14 32:6 64:23 66:6,9 70:3,20,24 71:8 74:2,24 77:16, 17 81:20 82:18 84:23 85:3,5,7, 19,22 86:2,10,11,21 87:1,9 88:5,10,13,15,17,19,20,22,23 89:1,2,6,8,22 90:2,4,7 91:4,6, 10,15,18 92:18 93:6 113:12,15 114:2 115:16,18,22 116:5,16 121:23 122:3,23 123:2,6 127:12,23 134:3 140:1,2 152:14 176:18,25

**Maintenance's** 114:7

**make** 6:24,25 8:9 29:21 34:22 43:22 44:1 61:12 63:6 65:13,16 66:18 77:6 80:3 125:20 131:8 149:12 156:6 164:22,23

**maker** 10:22 17:25

**makers** 75:16

**makes** 33:13,17 56:5 110:6 140:13

**making** 9:22 65:8 94:22 130:10 154:21

**management** 13:4 153:2

**manager** 20:12,18 21:15,19 24:17 26:4,13 91:19 142:10 143:8 176:21

**manager's** 91:9

**manner** 31:18 32:1,4

**manual** 15:25 42:3,4,7,11,13, 15,21,23 43:1 45:3,6,9,18,24 77:13 78:9,15,16,17,24,25 79:4, 21 80:12,15,23 81:1,4,10,15,23 82:3,6,10,15,24 83:4 94:1,5 116:6

**manuals** 32:6,9,13 77:10,20, 21,24 78:2,6,8,13,14,23 82:8,13 83:3 134:3

**manufacture** 49:19

**manufactured** 40:14,18,21,25 41:5,6 80:20

**manufacturer** 43:20,22 44:1 50:17 79:10 80:18,19,21 158:7

**manufacturers** 50:18,19,20

**manufacturing** 10:7 17:15

19:8,15,19 21:6 32:20 37:19 41:10,15,18 46:21 48:5 49:24 57:3 58:3 66:5 68:21 69:10 72:18 92:9 111:23 112:2,18 115:14 118:12 153:1

**Maple** 7:17

**mark** 9:8 13:8,13 16:14 150:9 151:8,11 161:6 165:1 167:3

**marked** 168:3

**match** 101:12

**material** 51:3 134:25

**materials** 123:25 159:18

**Matt** 13:25 176:12

**matter** 61:10 123:19

**meaning** 6:3 158:6 172:2

**measure** 104:14

**measurements** 94:22 115:25 116:1 170:17,21,22 171:2,4,10, 11,18 172:5,18 173:4

**mechanical** 78:19 79:1,4 80:1, 3,5

**mechanics** 109:18

**meet** 64:2

**meeting** 13:20 14:3

**melted** 158:6

**member** 11:21,23

**members** 8:22 21:20,23 153:17

**memory** 73:1 125:10

**mention** 53:4

**mentioned** 4:24 14:15 39:2 132:5

**met** 146:10 154:1

**metal** 18:22 22:18,24 40:16 41:2,6 43:8 44:6,10,14,20 50:12,13 52:5 107:17,18 176:15 177:12

**Metals** 18:20 19:14,23 23:9 28:21

**method** 170:25 172:7

**midline** 75:12,14 76:11,12

**Mike** 17:13 72:4,5,11,12 73:14, 16 107:8 109:7 140:4,5,24,25 141:2,4,24 142:1,4,6,7,9

**Miller** 4:15 9:17,22 10:3 38:12 66:25 116:9,24 142:17,20 156:17,23 157:1,10,13,14 159:7,10,11,20,23,24 161:13 163:1 164:10,14,16 165:1,20 166:7,17 167:5,7,9,13,17,24



169:10 175:8

**Millercoors** 37:16

**milliliter** 54:19

**million** 145:2

**millwright** 20:5,15

**mind** 66:17 130:15 155:14 156:24

**minimum** 86:8

**Minus** 118:25

**minute** 54:10,13,20,25 55:1,3,4 56:24,25 57:10 105:12 119:9 145:10

**minutes** 53:5 145:19,23 156:17

**Missouri** 7:24 8:12,14,17,20,21

**mistaken** 167:25

**Mistakes** 7:11

**misunderstood** 175:17

**model** 40:8 62:17

**modifications** 159:16

**monitor** 124:10

**Monroe** 142:12

**month** 18:19 93:17 121:9 176:2,4

**monthly** 175:24 176:13

**months** 7:20 8:11 23:23 24:1,4, 5,6 117:15,16,17 122:20,24 160:11

**Monticello** 7:18 10:5 18:3,6 23:5 30:8 36:5,22 37:23,24 38:14,19,22 39:3 40:18,21 41:12 47:12 48:6,10 68:20,24 133:21 137:13 142:25 153:21

**move** 7:23 27:3

**moved** 26:25 27:1

**moving** 7:19,22 22:11

**MSDS** 130:24

**multiple** 13:15 14:10 27:16 42:9 43:13,14 75:3

---

**N**

**names** 174:12,17

**natural** 160:4

**necessarily** 80:19 135:4

**neck** 76:20

**neckers** 134:12

**necking** 76:18,19,20

**needed** 43:5 87:18 92:22,24 116:2,3 162:6

**neglected** 53:4

**newer** 40:8

**night** 73:16 137:17

**nights** 73:17

**nod** 6:20

**nods** 76:14 148:4

**nonverbal** 6:23

**norm** 71:1,2 129:12

**normal** 17:3 96:23 97:1,4,7 99:24 100:10,13,14,16,17,20, 22,25 106:25 111:19 124:15,16 125:6

**North** 10:5

**noted** 146:2,12

**notes** 70:7 156:18

**notice** 31:17 118:8

**notwithstanding** 73:23

**November** 92:3 123:7 125:2, 14,18,19

**nozzles** 111:6

**number** 5:2 8:23 9:2,7,15 10:12 44:19 46:9 56:19 78:9 108:22 167:10 169:3,4

**numbering** 21:2

**numbers** 44:25 167:18

---

**O**

**oath** 6:2,4,9 142:22

**object** 5:16 9:11 31:6 45:11 59:14 63:21 74:5 94:11 111:15, 25 112:20 113:4 116:7,15 134:9 141:10 145:6 148:25 149:19,25 150:19 152:21 153:10 164:16 169:10

**objection** 64:3 74:19 98:17 111:21 112:5 113:9 138:2,13 149:5,10 150:5 161:13 163:1 164:21,22 165:20 166:7,17

**objections** 45:20 46:1

**obligated** 169:8

**obligation** 9:25

**observation** 168:20

**observe** 130:1

**observed** 166:25

**obsolete** 158:13,15

**occasion** 34:17

**occasionally** 136:16

**occasions** 7:8 33:4 43:3 79:7 81:4

**occupy** 26:9,18

**occur** 13:20 35:4

**occurred** 39:9 71:10,14

**occurs** 120:8,10

**off-gas** 123:25

**off-gases** 134:25

**off-gassing** 124:3 134:22

**office** 77:16,17,18,19 82:9,14 83:4 126:11,13

**offline** 51:12 62:6

**Ohio** 113:14

**open** 84:5,8,18,20 111:2 129:6 152:6

**opening** 132:16

**operate** 120:5

**operated** 57:4

**operates** 118:24

**operating** 32:3 81:9,14 96:23 97:1,7 99:24 103:8 119:6

**operation** 41:13,23 42:24 43:2 47:12 48:18 78:15 81:19 89:21, 24 100:22 106:21

**operational** 52:23 53:1 122:15

**operations** 78:16,24 81:1,4,9, 15,23 82:10 94:1,4 116:5

**operator** 55:24 81:17

**operators** 60:23 109:17,18,19 139:21

**opinion** 99:8 100:20 150:17 151:2,13 152:16,19 153:2,5

**opinions** 151:11,16,17

**opportunity** 145:16

**opposed** 62:11 88:9 111:20

**order** 33:24 34:10 38:13 80:14

**orders** 51:3

**ordinary** 99:20,23 100:3 130:4, 7

**origin** 173:11 174:6,10,14,20

**original** 41:2 79:13,15 135:1

**originally** 21:9

**ounce** 54:18 55:1,2 56:12 57:15

**Outlook** 93:12,13 121:11

**oven** 15:20,21 16:1,2 20:21,23 21:4,9 24:10,13 29:16 30:21 31:2,11,19 32:1,6,10 33:18 34:6,12 35:1,11 38:21 41:8 45:1 46:11,12,13 48:13 49:4,23 50:5 51:21,23 52:16 55:24 56:1 57:13,17,18,21 59:10,18,20,24 60:9 63:5,13 68:6 76:16 80:7, 19,21 82:19 83:21,22 84:13 85:12 89:21,24 95:25 100:21 101:16 104:12,13 105:1,17,25 106:17,21 107:18,19,21 108:20 109:1 110:7 111:2,10,17 120:16 121:20 122:5 123:15,24 129:2, 6,8 131:4 132:11 133:3,6 135:8, 11 137:24 143:12 144:19 155:3 161:19 162:15,18 163:19 164:4 166:3,6,12 170:23 173:5

**ovens** 15:13,15,16 22:22 24:8 32:17,18 33:9,17 36:8 48:15 72:23 80:4 130:8 137:7,9 160:24 161:11,15 163:23 164:1 165:7 172:11,13,16,19

**overlaps** 33:23

**overseeing** 63:2

**owned** 19:11 23:9 118:12

**ownership** 23:7 28:22

---

**P**

**P-a-k** 16:14,15

**P-h-o-e-n-i-x** 27:22

**p.m.** 71:5,6 73:2 142:18,19 154:13,14 156:21,22 157:11,12 159:8,9,21,22

**pages** 14:10,12

**paid** 162:24 163:4,6,10

**paint** 108:1

**painting** 76:12

**pallet** 144:23

**palletizer** 76:18 143:17,21 144:18

**palletizing** 143:18

**panel** 33:23 131:20,21 132:2,3

**panels** 111:3

**paper** 14:5,6

**Pardon** 10:15 12:17 13:10 18:4 42:1 63:10 83:12 113:20 135:6 159:3 167:7



**Paris** 10:25

**parking** 173:23 175:4

**part** 16:1 61:24 76:7 80:14
124:3 129:5 150:10 155:12
161:18,22 162:1

**participate** 97:11,18 98:1,3
109:25 114:20

**participated** 98:7 140:6

**parts** 78:10,15,17,24 79:9 80:7,
12,13,17,23 82:3,15,20,24 83:9
122:19 166:10

**pass** 155:7 157:8

**passed** 157:6

**past** 111:14 120:21

**patience** 161:1

**Paul** 129:15 137:15

**pay** 163:8

**Pellegrini** 17:12 98:15,16
103:3,4,7,12,19 168:12

**penalties** 6:4

**people** 7:6 109:15 132:11
134:11,12,15 139:21 141:21
143:24,25 144:3,4,13 145:17
146:19 151:15,16,19,23 152:7
154:6 173:20

**percent** 8:7

**perform** 31:14 32:21 62:10
64:21,23 65:3 88:21 89:6 114:3
137:25 138:12 162:3,9,12,25,
164:8

**performed** 70:7 85:6 88:2,6,13
89:3,19,20,22 90:15 122:18
123:11 124:23 130:15 132:18,
21 138:10 154:23 159:4 162:3
176:13

**performing** 44:22 64:12 90:12
122:2 130:2,5 133:2 169:16

**performs** 109:14

**period** 36:17 43:19 47:3 49:15,
17 51:7 85:1 105:9 136:1
154:13 164:10

**periodic** 64:23

**perjury** 6:5

**person** 13:18,19 86:21 130:19
133:11,20 135:13,15 140:13
141:9 143:20

**personal** 65:6 154:2 161:14
163:2 164:17 166:17 169:11

**personally** 64:25 65:3 72:21
95:3 103:15 114:20 152:2
153:24 165:10,25

**personnel** 154:6 162:8,22
163:9

**persons** 153:1

**phase** 35:2 144:18

**phased** 26:22

**phases** 95:13,14

**Phoenix** 27:20,21 28:1,5,13,24
29:2,9,12,19,22 30:16 31:5,10,
14 32:5,9,13,16 34:14 35:20,24
36:2 43:24 44:18 45:4 112:24,
25 113:1,2,3 114:14

**phone** 8:23 10:12 13:18 125:8
138:19

**photograph** 15:18,19,22,24

**photographs** 16:6 94:19
98:22,25 99:7,19 100:3,7,15
101:1,2 125:23 126:6 139:7
156:3 167:1 168:6,13,21,24
169:1 170:2,8,9,13

**photography** 97:11,18,22
98:11 102:25 103:5

**physical** 126:11 134:7

**physically** 71:16 108:3 109:9,
14 129:8 174:23

**pick** 108:19

**picture** 16:2 125:14,17

**pictures** 16:3 98:3,5,8,14,16
125:9,11 147:19

**piece** 42:21

**piles** 83:15

**PIN** 15:21 29:16 32:18 33:9
120:16 137:7,9

**PINS** 137:12

**pitch** 101:7

**Pitot** 171:8,9

**place** 61:12 93:8 101:25

**places** 95:20

**plan** 8:8

**plant** 19:1,3,19 20:21 21:10
24:11,14,19,21 30:14 36:6
38:22 39:3 48:3,5,18 57:4 69:16
70:15,18,24 71:13 73:10 76:23
77:14 92:9 109:18 119:3 120:5
133:21 141:17 162:11,13,15,19,
22 173:25

**plants** 30:7

**play** 25:15 93:23

**played** 25:18 146:21,22

**PO.** 163:3

**point** 46:10 76:15 133:16
136:24

**points** 67:19

**port** 104:10,11,16

**portal** 121:18

**portion** 38:10

**position** 20:9,13 26:1,7,9,16,
18,25 33:22 61:20,23 64:19
65:11 72:5,12,15 85:2 96:19
142:1 147:19

**positions** 19:18,22 28:9

**possession** 126:9

**possibly** 120:16

**post** 132:14

**post-cleaning** 107:3,11
109:21 138:24 143:11

**practice** 93:3

**pre-production** 107:12 109:21
138:25 143:11

**preceding** 122:20

**predecessor** 18:11 29:13,18
41:11 51:24 65:24 66:2

**predecessors** 28:6 29:4 66:8,
11,14

**Premier** 113:12,15 114:2,7

**premises** 71:13 109:9 136:19

**preparation** 16:10

**prepare** 13:6 16:21 131:4
132:23

**present** 13:22,24 51:8 173:17,
22 174:10

**presume** 5:12

**presumption** 5:14

**pretty** 24:18 140:25 177:8

**previous** 15:2 91:25 176:4

**primary** 37:16

**prior** 22:3,13,14,17,18,21,22
30:7,9 42:22 52:8 57:13
59:25 60:3,15 61:7,8 62:3,15,23
63:18 64:9 67:9,24,25 69:16
89:15 92:2 96:9,10 106:2,17
111:20 122:14,24 123:16 125:9
129:1 132:11 146:24,25 166:1
175:22 176:3

**problem** 34:15,19,25 35:8,9,10,
16,19 42:17 43:5 105:4 170:24

**problems** 32:23 33:2 35:7,24

36:2 42:22:24 43:4,18 44:21 90:14,
16 122:15

**procedure** 110:22 111:19,24
112:3,23 113:15 115:4 131:6,10
132:8,20,21,24

**procedures** 69:16 113:6,8
131:3

**process** 49:10,18,24 51:5
52:24 53:2,24 55:10 56:16 58:3
60:14 62:16,17,20 72:16 74:23,
25 75:3,6 76:18 85:17 91:11,16
106:5 107:1,4,12 109:8,12
110:4,9 123:19 125:24 129:5
131:14 134:5 135:23 138:22
139:3,4,15,24 140:9 146:12
154:20 155:1,19 156:7

**processed** 53:18 54:3,7,17,21
56:13 57:14,17

**processes** 53:22

**processing** 49:12 51:22 52:16
59:21,24 119:9

**produce** 10:1 37:6,19 57:9

**produced** 167:14,20

**producing** 37:24

**product** 37:9 42:16 50:19 51:4
56:7 121:11 131:24 143:14

**production** 35:1 38:2 72:8,9
73:5,9,13,24 74:1,4,7,17 77:1
91:8 106:2,6,9,11,16 110:8
118:22 119:4 120:8,10 134:5,20
140:2,15,18 141:5,23 142:10
143:22 144:21 145:15,24
150:11,14 152:10 154:8,12

**products** 55:11

**program** 55:18,21

**project** 157:19,21 158:1,21

**project-by-project** 23:11

**projected** 7:25

**Projects** 24:25

**promoted** 20:8,12

**proper** 33:24 164:24

**properly** 32:17,24 33:6 65:16,
20 112:12,13 162:2 165:19

**proprietary** 55:21

**protect** 50:12

**protections** 61:12

**protective** 38:13

**protocol** 138:24

**provide** 6:7 9:15,20 19:17 24:7
28:5 31:9 32:5 41:12 44:18



USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 686 of 1167
Freddy Spencer
January 23, 2018
11                                                                    Index: provided..resumed

45:13 65:15 66:5 81:8,12,25 82:2,5 83:7 95:1 133:23 137:3 149:23 150:3,7 162:5,8

**provided** 14:4 15:3 16:14 28:24 29:10,13 32:8,12 41:19 44:24 45:9,18,24 66:1,8,11,14 77:13 81:14,22 92:20 133:2 134:2 150:14,21

**providing** 27:9 28:16,20 29:2 30:6 33:5 45:3,6 80:9 82:10,14 86:24 87:1 130:10

**proximity** 98:8 134:7 154:22

**pull** 85:13 111:3

**purchase** 48:20,23 49:3 52:12, 13

**purchased** 48:14,15,16 50:20 157:15

**purpose** 49:23 50:7 97:22 165:18 166:3 170:20 171:18

**purposes** 9:19 79:7 136:22

**put** 30:21 31:13 33:19 39:25 63:6 76:20 79:5 93:12,13 110:7 111:11 121:17 141:5 166:6,23

**putting** 107:16 132:17

---

### Q

**QA** 144:10

**qualifying** 155:2

**quality** 59:8 61:15 106:5,10,25 107:4,12 109:21 110:3 138:25 140:21 142:24 143:2,4,8,10,20, 25 144:14,17,22 145:17,22 146:1 154:10,19,25 156:2,7 176:21

**quarterly** 89:19 117:11,23 119:12 122:6 172:24 175:11,16

**question** 5:3,8,11,13,17 7:3 12:7 23:24 31:7 53:10,11 54:16 60:2 62:8 64:17 85:15 97:25 101:4,6 116:8,20 117:7 124:18 125:20 126:1,3 138:4 141:12 147:3 149:6 150:22,25 151:5 152:6 167:16 175:19

**questioned** 112:18

**questioning** 5:8,25 165:3

**questions** 5:3,7 6:15,18 20:3 27:7 46:4 147:10,12,15 161:6,7 166:24 173:9 175:8,15

---

### R

**Randy** 17:12

**range** 89:18 152:11

**rare** 110:16

**rate** 53:19

**reach** 111:9 128:17

**read** 42:3,4,6,13,15,20,23 43:1 45:3 81:6 116:9,10,24,25 130:23

**reading** 94:4,6

**readings** 103:16

**ready** 66:21 138:20

**real** 101:23

**realize** 151:23

**reason** 9:3 27:7 29:20 37:1 45:10,19 72:19 127:11

**reasons** 46:16

**reassemble** 31:10 32:1,17,24 33:14,17 34:10

**reassembled** 31:19 32:2 34:14,18 166:12

**reassembling** 33:6,9 35:24

**reassembly** 31:1 43:23 44:2

**recall** 11:13 12:22 14:12,21,23 15:5 17:19 23:18,19,21 25:12 29:6,12,20 30:3,11,16,19,25 31:24 32:7,8,11,12,15 33:10 34:24 35:10,12 36:1 39:19 42:4, 6,9,15 43:11 44:4,14,17, 23,24 45:2,3,5,6,7 51:23 52:1, 15,20 53:18 54:3,6,58:20 59:23 64:6,7 67:8,17,25 68:7,9,10,12, 15 69:7,8,9,15,19,22,25 70:2,4, 12,14,16 71:9,11,22,23,25 72:3 73:5 74:8,11 77:11 80:9 81:7 82:9,14,24 83:4 85:1,4 87:20 88:12 90:14,16 93:22 94:3,4,6, 14,17,19,22 101:19 103:16 110:19 115:23 123:5,15 125:1 126:14 127:17,20,22 128:3,9 129:11,19,22 130:10 137:15,20 146:19,21 147:11,12,14,16,25 150:1,2 157:9 159:15,19 160:3 173:16,22 174:5,19,22,23

**receive** 118:8

**received** 11:13 65:21 71:18,22

**recent** 173:17

**recess** 66:23 142:18 156:21 157:11 159:8,21

**reclassifiable** 95:15,17,19 96:1,2,10,14,17

**recollection** 27:12 53:21 73:15 127:25 170:14 174:13

**recommend** 94:2

**record** 4:10,23 6:8,13,14 67:1 142:21 165:4

**records** 27:14 72:17 177:8

**recover** 148:13

**recycled** 158:6

**REDIRECT** 175:7

**reduce** 107:18

**refer** 4:19 22:4

**reference** 56:23 64:12 79:13 106:8 175:14

**referenced** 42:11 56:19 168:1 175:15

**referencing** 62:7

**referred** 30:12 46:24 63:12 67:20

**referring** 33:21 34:3 37:4 46:7 47:7 58:22 69:3 104:4,23 105:23 157:22 169:3,20 170:10, 24

**reflect** 72:17 80:1 165:4 169:22

**reflected** 172:5

**reflects** 171:21

**refresh** 27:11 170:13

**refurbished** 39:25

**relation** 61:5

**relationship** 38:7

**release** 143:15 144:23

**rely** 150:21 172:17

**remaining** 40:25

**remedied** 33:2

**remedy** 110:15

**remember** 11:12 13:1 18:19 25:10 33:4 49:21 73:7 92:4 125:5 127:6,11 136:3,5 142:14 155:15 160:22 173:13 174:4,12, 16 177:2

**remind** 7:12 93:8

**reminder** 121:12

**removed** 36:24 37:1 39:13

**repair** 66:12 122:23 127:20

**repairs** 64:21 65:3,8 122:18

**repeat** 5:4 39:1 112:1 116:22 151:1

**rephrase** 5:9

**replace** 28:13 158:20

**replaced** 27:18,19 40:7 87:19, 20,22 158:2,3

**replacement** 40:10

**report** 26:15 142:6,7,9

**reported** 106:24

**reporter** 6:3,24 7:5,14 116:11 117:1 165:23

**represent** 4:15

**representation** 9:23

**request** 137:25 150:3

**requested** 116:10,25 150:7,9

**requests** 130:10 150:10,14

**require** 6:23 59:10 65:11 85:22 121:24 150:20

**required** 61:20,23 88:19 118:16 127:20,22 128:10,13 138:11

**requirements** 60:20

**requires** 58:16,17,19 59:2,7 85:20

**rescue** 95:22

**research** 42:17 43:4

**reserved** 177:19

**residue** 63:16 155:25 172:3

**respect** 58:10 62:1 65:12 114:6 123:2 124:18,23 130:8,19

**respectful** 7:13

**responded** 68:24

**responding** 150:10,13

**responses** 6:23

**responsibilities** 24:17 62:1,3, 4

**responsibility** 63:1,18 74:7 85:14 91:6,9,14,16 132:9 136:15

**responsible** 21:24,25 62:15,25 84:23 85:2 109:20 110:3 120:23,25

**restroom** 53:7

**result** 39:22 52:13 69:11,16

**resulted** 68:12

**results** 97:24 135:1 171:2,19 176:19,23,24

**resume** 35:1

**resumed** 73:5,9,13 77:1 154:8



**resumes** 144:21

**resuming** 145:24

**retail** 13:5

**retain** 176:7

**retained** 49:2,5 140:11 146:9

**retaining** 177:8

**retire** 7:23 8:8

**retirement** 7:25

**retiring** 8:10

**returns** 134:25

**review** 14:7 16:5,9

**reviewed** 14:9

**reviewing** 77:10

**revisions** 79:17,19

**Reynolds** 18:20,22 19:14,22 20:7,9 23:8 28:21 52:5,8,11

**Rogers** 72:4,12 73:14,16 107:9 109:7 140:4,5,24,25 141:2,4,24 142:1,4,6,7,9

**Rogers'** 72:5

**role** 25:15,18 93:23 140:22 146:21

**rolled** 75:21,24 76:4,7

**roller** 108:2,3

**rolls** 108:4

**room** 61:4,5 109:17 134:11

**rotating** 73:17

**routine** 85:5,7

**rule** 7:2

**rules** 164:25

**run** 56:7 105:10,24 106:17 107:19 108:18,25 109:4 139:8 145:2,10,12 154:8,12

**running** 60:3 73:8 105:2 107:17 109:22 131:11 138:22 139:15

**Russell** 17:13

**S**

**safety** 63:3 86:1

**satisfaction** 64:2

**Saul** 13:25 176:12

**save** 125:11

**saved** 126:14 154:17

**schedule** 86:10,11,12 93:9

115:17,19,22 116:5,17 117:9 119:12 121:10,15 133:15 159:25 172:25

**scheduled** 121:3,4,6,8,16

**scheduling** 17:6,7 120:24 121:12 122:6 136:7,10,15

**Scholten** 129:15 137:15

**school** 10:20,23 12:3

**scope** 161:14 163:1 164:17 169:16

**Scott** 143:5,25 144:4,20 146:6 156:11,12 173:10,12 176:10,11, 16,20,24

**scrap** 39:15,16,18,21 157:15,16

**scraped** 63:16

**scrapers** 113:25

**scrapped** 46:16,23 47:20 140:10 157:23 158:5,8

**screens** 111:3,5 124:7

**search** 77:15

**secondary** 37:17

**section** 75:8,13

**sections** 75:9,11

**Security** 9:2,7,15

**select** 25:3 164:8

**selected** 27:15

**selecting** 25:15,18

**self-study** 41:22,25 42:2,16 77:10

**sell** 145:8

**Senak** 5:16 9:11,18 10:2 12:10 16:14 19:1,4,6 20:2 31:6 38:9, 13 45:11,20 46:1 52:18 53:15, 17 59:14 63:21,24 64:3,5 66:21 74:5,19 85:10 94:11 98:17 101:3,9 111:15,21,25 112:5,7, 20 113:4,9 116:7,15,18 134:9 138:2,13 141:10 142:15 145:6, 18 148:25 149:5,10,19,25 150:5,19,24 151:8,11 152:21,25 153:10 156:14,16,20,25 161:6 164:12,15,20 165:4,22 167:3,6, 8,11,15,19,25 175:15,18 177:19

**Senak's** 175:14

**separate** 13:2 19:12 83:25 142:24 143:1

**September** 48:3,19 49:13

**service** 29:14 36:25 37:2 39:25 40:2,5 110:7 141:6

**services** 27:9 28:5,16,21,25 29:10,12,15 30:7,17,20 32:21 33:5 86:25 87:1 89:7,8 136:25 137:3 162:3,9

**set** 55:18 78:2,8,14,23 163:4

**sets** 77:21,23 78:1

**shafts** 85:23

**shake** 6:21 129:15

**shared** 150:17 151:2,7,10,13 152:16,19 153:2,5

**sheet** 139:4,7

**sheets** 105:24 107:16,17,18,20, 25 108:4,6,16,18,25 109:22 138:23 140:8,14 154:10 156:6

**shift** 69:19,22,24 73:16,17 118:17 152:15

**shingling** 33:18,20,22 35:25

**shop** 56:4 88:22,23

**short** 23:6 67:1

**show** 98:16 99:19 102:13 132:13 149:12 168:5

**showed** 16:2 98:14 99:8 100:3, 7

**shown** 169:1,4,6 170:1

**shows** 169:15

**shut** 37:3 74:14 128:19 131:11, 13

**shutdown** 131:6,10 132:24

**shutdowns** 119:11

**shutoff** 131:19

**shuts** 90:4 131:16

**side** 84:15,16 129:6 132:3 134:12 160:16

**sides** 124:4 135:10

**Signature** 177:19

**signed** 16:7

**significant** 112:17

**similar** 35:21 113:6,25

**simple** 101:12

**simply** 6:19

**single** 43:13

**sir** 30:10 47:14 56:11 99:2 117:4 149:21 157:25

**sit** 87:4 141:8 149:16

**site** 35:5 36:5

**sitting** 148:2

**six-hour** 105:9

**six-month** 48:4

**size** 54:15 55:5 56:7

**sizes** 54:17

**slight** 4:24 69:12

**slow** 78:16

**slower** 53:21

**small** 153:21

**Smith** 40:15 41:3,6 43:7 44:8, 10,14,20 152:14 177:11,12

**smoke** 66:18 103:24 104:3,8,20 105:4

**Social** 9:2,7,15

**soda** 58:24,25 59:2 60:14,17

**sold** 39:16,18,21

**solely** 172:20

**sooner** 72:24

**soot** 94:23

**sounded** 85:16

**sounds** 86:2

**source** 83:11,13

**southern** 7:23 8:17

**Soyk** 173:14 174:2

**space** 63:4 95:1,5,15,16,19,25 96:1 131:9 132:6,20

**spaces** 95:7,10 96:3,10,14,17

**span** 36:4 48:4

**spare** 80:13

**speak** 16:21 17:1

**speaking** 7:9,11 22:5 100:18 137:15 164:20 174:5,23

**specialty** 37:9

**specific** 43:4 90:20 135:21 147:15

**specifically** 17:1 64:15

**speculation** 166:18

**speech** 165:2

**speed** 53:19 55:5,10,12,13,15, 19,25 56:16,19 60:8,11 105:13, 16,22

**spell** 4:12 25:22 27:21

**Spencer** 4:11,14 9:25 62:22 72:13 73:19,22 74:17 81:18,20, 22 82:2,5 84:22 87:7 96:16



107:7 109:7 120:23 122:25
130:22 136:9 140:3 142:2,4,7
168:5

**Spencer's** 72:15

**spent** 23:21

**spoke** 174:9

**spoken** 173:20

**spray** 50:7 58:13,16,17,19
59:17,18 60:21 61:2,4,5 108:10
109:17 134:11

**sprayed** 50:3,14,23,24 58:10
59:9 60:7,22 61:14 108:14
123:23

**sprays** 61:2

**spreadsheet** 177:1,2

**squirrel** 97:2,5,8 101:20,22
102:1,7,11,17 104:18,21,23
111:7,10 128:11,14 166:15
169:21,22 170:3,15

**stage** 143:18

**stamped** 167:10,18

**stamps** 167:11,23

**stand** 11:8

**start** 7:9,10 17:19,23 36:9 47:19
109:13 140:15

**started** 18:7 20:5 29:5,7 34:25
48:1 62:16 69:7 70:5,25 90:12
91:10 99:4 110:24 114:13,18
129:23 148:13

**starting** 116:18

**state** 4:9 79:22 135:1

**stated** 5:6 47:2

**statement** 15:3,5,7

**station** 143:21

**stay** 162:15

**steel** 49:10,12,19,24 50:24
51:16,19,22 52:16,24 53:18,24
54:3 75:21,24 159:13

**stepped** 135:25 136:2,6,12

**steps** 55:9,12 139:3

**stick** 107:21

**sticks** 130:14

**stock** 139:7

**stocking** 139:4

**Stone** 144:12

**stop** 29:18 136:17

**straightened** 23:14

**Street** 10:5

**stretch** 22:10 53:7

**strike** 17:22 22:3 25:6 26:21
36:25 49:1,16 50:10 55:8 79:5
93:2,22 95:23 139:13 143:24

**structure** 83:8

**stuff** 116:19

**subject** 164:13

**subsequent** 43:3 79:17

**substance** 50:14,24 94:23
134:23 135:3

**sued** 148:1

**sufficient** 171:25

**sufficiently** 110:13 137:25
138:11

**sum** 162:24

**superintendent** 62:17,18,20
72:16 74:23 75:6 91:12,17
110:9

**superintendents** 75:1,4
135:23

**supervise** 21:16,22,25 24:22
25:1,8 63:19 74:17 144:3,9
161:20

**supervised** 25:7 74:22 165:16

**supervises** 144:5

**supervising** 25:9 31:5 65:7
74:3 87:8 165:17

**supervision** 21:17,18 25:5
64:16

**supervisor** 20:9,16 21:20
24:23 26:8 28:9,14 72:6,7,9
73:12 75:3 91:4,10,15 92:18
93:6 107:6 110:8 134:20 140:1,
2,19,21 141:23

**supervisor's** 74:1 91:6

**supervisor/engineering**
91:19

**supervisors** 21:19 144:2,10,14

**supervisory** 65:7 164:19

**support** 43:8 44:16,25

**supposed** 133:6

**sustained** 68:8

**swabs** 155:23

**switch** 60:17 118:5

**system** 79:17,19 90:8,18 91:1
93:8,11

---

                        **T**

**takes** 105:21 108:3

**taking** 94:19 98:3,4,8 170:20
171:18

**talk** 13:13 47:10 56:23,24
129:14 139:23

**talked** 13:8,17 77:9 121:12
134:21 138:22

**talking** 7:6 85:13 135:19 141:2
152:13,18 155:2 157:23 164:11

**task** 109:14 162:25

**team** 21:20,22

**Tech** 4:16 25:6,9,13,15,18 27:8,
12,15 28:12,16,20 29:14,22
30:4,6,12 32:21 33:4 34:17,22,
23 35:4,7,15 36:3 44:3,6,12,25
45:6,8,17,24 57:13 70:7,12
72:17 73:1 86:24 90:12 93:17
94:7 100:22,22 109:8 110:3,14,
22 111:18,24 112:3,19 113:19,
21,24 114:4 120:24 126:16
128:10,13,20 129:7,14,23
130:11,15 132:21 133:1,18
135:16,18 136:17,25 137:3,7,
16,25 138:5,7,9,11 146:3
148:12,24 161:8,10,20,24
162:2,5,8,11,18,21,24 163:8,9,
10,13,15,18,21,22 164:3,7
165:16 166:4,16,20 169:8,16

**Tech's** 32:24 59:25 60:15
63:19,25 111:12 112:23 130:1,
20 131:4 135:14

**technical** 43:8 44:16,25

**Technologically** 158:15

**Technology** 158:12

**telephone** 44:19 174:19,22

**temperature** 52:23 53:1 55:14
59:16 60:8,12 96:23 97:1,4,7
100:8,9,14 101:15 103:16
107:19

**temperatures** 99:12,13,16,25
100:13,16 168:23,25

**ten** 20:10 53:5 66:18 171:9,11

**terminal** 56:1

**terminate** 163:13,15

**test** 90:8 104:9,11,16 171:19

**testified** 41:18 67:18 75:23
88:11 119:15 133:7 157:2
164:18 175:9,10,11

**testifies** 45:8,17

**testify** 85:16

**testimony** 6:2,7,25 42:25
45:15 61:19 77:11 90:6 170:5

**testing** 35:1 89:25 90:3 132:10
143:11,13 175:22,24 176:7,13
177:3,6,10

**testings** 90:3

**text** 14:14,16 16:17 116:10,25

**Textile** 11:9

**Thanksgiving** 90:22 91:24

**theory** 42:24 43:2

**thermal** 97:11,18,22 98:3,4,8,
11 99:7 100:21 102:25 103:5,
17,20,25 168:10

**thicker** 124:15

**thing** 63:3 108:14 132:23 145:3,
11

**things** 149:14 152:11

**thought** 101:24 127:17 138:19

**thousands** 167:20

**three-month** 118:6

**Thursday** 176:1

**till** 11:24 18:24 75:21 131:12

**time** 9:21 17:4,6,8 18:7 19:11,
17 21:1 23:6,21 26:2,5,7 27:5
28:8 36:17 42:14 43:1,19 44:11
46:20,23 47:3 48:4 49:15,17
51:7 52:9,12,21 59:10,16,21
67:19 70:4,12,14,16,17,23 71:9,
11,12,22 72:22 73:5,7,18 76:2,
22 82:8,13 85:1 86:24 89:19
90:20 91:11,21 93:18 94:14
97:12 98:5 99:2,5,6 105:5,9
115:15 123:12,15 127:10
128:21 134:16 136:1 140:15
142:12 154:14 164:10 167:23
168:15 173:2,17,22 174:3,7
175:21

**times** 31:17,20 42:6,10 43:13,
14 86:8,9 101:4,6 118:15 121:2
128:3,4,6,7

**title** 143:8

**today** 4:20 5:3 6:7,12 7:8 22:4
52:3 87:4 88:1 141:8 148:2
149:16

**today's** 13:6 16:12,22

**told** 31:12 45:23 103:22,24
104:6 105:6,7

**Tom** 133:9

**tool** 10:21 11:1 12:5 17:25



Freddy Spencer
January 23, 2018

14

**toolroom** 23:14

**tools** 113:22,23,24,25 162:5 164:4

**top** 83:21,22 84:9 85:24

**totally** 95:11,12

**totals** 57:2

**touch** 155:13

**touching** 155:11

**town** 8:14 10:8 153:21

**track** 125:4

**trademark** 37:13

**train** 23:13 41:22

**trained** 95:9 96:2,5,8,13,16,19

**training** 24:7 31:9 41:12,19 65:15,21 66:1,6,9,12,15 83:8 95:2 165:6

**transcribe** 7:5

**transcript** 38:10

**transferred** 81:13

**transition** 29:21 51:15,21 52:16 111:9 159:17

**transitioned** 159:13

**transitioning** 51:18

**translate** 56:25

**travels** 50:5

**traverse** 171:10

**trial** 9:5,19 10:1 149:13

**trick** 141:12

**trouble** 116:1

**true** 17:15,25 18:11,12 20:18,19 28:11,14,15 34:6,7,12 39:25 40:1,11,12 45:24,25 46:14,15, 18,19 47:20,21 50:6,8,9 55:6,7 57:5,6,7,8,12 59:5,6 61:11,21 62:24 64:9 65:25 78:4,5 79:2 83:17 84:3,24,25 85:17 89:3,4 92:17 96:3,4,21,22 99:17,18 100:4,5,6 110:4,5,10,11,17 118:17,18,20,22,23 119:13,14 133:21 134:1,3,4 136:11 137:2 138:5,6,7,8 145:8,9,12,13 146:15,16 148:3 152:3 157:4 159:2 170:6 172:11 174:11

**tube** 171:8,9

**Twelve** 54:18

**Twenty-eight** 17:18

**Twenty-six** 22:2

**typical** 70:17,23 72:22.

**typically** 73:2 108:18

## U

**uh-huh** 6:20,22 9:1 108:5 122:4 124:2

**ultimate** 58:11

**ultimately** 110:6

**underneath** 144:13

**understand** 5:8,20 42:23 43:2 46:9 64:20 81:11 100:24 102:21 104:7,22 116:8 138:4 147:3 148:14 149:6,15 152:5

**understanding** 5:22 20:23 36:18,19 39:24 42:25 50:2 57:3 61:19 84:11 85:19 95:23 98:21, 24 99:15 102:19 103:7 110:21 123:22 145:15 148:5,15 167:15

**understood** 5:13

**undertaken** 123:5,7

**undertook** 139:24

**union** 11:2,3,4,9,21,23 17:25

**universe** 141:21

**updated** 80:1

**upgrade** 158:1,21 159:1

**upgrades** 159:4

**user** 32:9 134:2

## V

**vacuum** 111:6,11

**vacuumed** 108:21 112:13

**vague** 24:18

**variety** 55:11 109:15

**varnish** 107:16

**vendor** 55:22

**verbally** 6:18

**verify** 162:2

**vertical** 171:11

**vibration** 89:9,12 90:9

**view** 98:1 101:24

**viewed** 98:11

**visual** 155:5,9,22

**visually** 94:15

**volume** 78:11 79:8 80:9 81:5

**volumes** 78:11,12,14,24

## W

**walk** 129:8

**week** 13:14 57:4,11

**weekly** 176:1

**weight** 61:15

**Wes** 17:12

**wet** 107:17

**whatchamacallit** 104:9

**whatsoever** 8:19

**white** 155:18,20

**wide** 108:8 152:6

**window** 59:19 145:16

**wire** 111:4 113:25

**witnesses** 16:21 152:18

**word** 104:8

**words** 7:17 18:15 19:21

**work** 9:18 17:9 27:17 61:20,23 62:10 63:19 64:1,18 69:24 70:8, 10 71:4 73:16 88:1,21 90:12 95:6,9 106:10 112:13 114:7 123:5,6 125:13 128:24 129:23, 24 130:2,5,21 131:4,5 133:2 135:20 137:16 138:1,9,12,25 146:4 152:7 154:10,22 161:23 162:22 165:17,19,24 166:4,5 169:16

**worked** 16:23 23:4 30:13 41:11,15 69:19,25 114:19

**Workers** 11:9

**working** 8:1 22:3,13,17,21 69:23 130:3 134:7,15

**works** 152:14

**written** 6:8 138:23 161:18

**wrong** 34:21 77:4 101:14 144:25 148:16,18,21 149:8 158:9

## Y

**year** 36:14 86:8 90:20 91:13 92:1 93:7 118:16,21,24 119:22 121:2 124:21 125:4 127:6

**years** 11:17 17:18 20:10 36:4 65:5 117:3 146:8

## Z

**zone** 83:25

**zones** 84:3 86:6 99:16





IR000 453

DEPOSITION
EXHIBIT
13

PENGAD 800-631-6989

5/23/2014 12:32:58 AM

JR 000453

# Exhibit 22

\IN THE UNITES STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| BALL CORPORATION, an Indiana corporation and FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island corporation, as subrogee, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No: 4:16-cv-42 |
| v. | ) ) ) | |
| AIR TECH OF MICHIGAN, INC., a Michigan corporation, | ) ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF FREDDY SPENCER

I, FREDDY SPENCER, after having been duly sworn on oath, deposes and states that the information set forth in this Declaration is based on personal knowledge, and if called as a witness I would competently testify to the following:

1. I am currently employed as the Plant Engineering Manager for Ball Beverage Packaging North & Central America, formerly known as Ball Corporation, Metal Beverage Packaging Division ("Ball"), in Monticello, Indiana. I have been employed in this capacity for 12 years, and have been employee by Ball Corporation for 28 years.

2. In I am familiar with the manufacturing process for aluminum beverage cans utilized at the Ball Monticello plant.

3. Internal Bake Ovens (IBO) are used to cure a liquid spay liner applied to the interior of aluminum beverage cans manufactured at the plant.

4. Below is a true and accurate photograph depicting an Internal Bake Oven of the type used at the Monticello plant.



5.    Pin Ovens are used to cure the exterior coatings on aluminum beverage cans manufactured at the Monticello plant.  Exterior coatings consist of paint used to imprint the label on the can and a varnish used to create a durable protective coating over the label.

6.    Below is a true and accurate picture of a Pin Oven of the type used at the Monticello plant.



7. The fire that occurred on May 23, 2014, involved the start-up of an Internal Bake Oven, not a Pin Oven. The fire was first observed in the ductwork above the oven, not in the oven itself.

**OCTOBER 9, 2011**

8. I am familiar with the facts and circumstances relating to a fire at the plant on October 9, 2011.

9. A flame was observed at the metal seam of the near the top of the oven wall. The fire did not originate in the ventilation ductwork.

10. The incident was presumably caused by restricted air flow inside Zone 1 of Internal Bake Oven No. 3, resulting in the oven overheating.

11. Although the fire department came to the plant, the fire was extinguished by plant personnel with a handheld fire extinguishers present onsite.

**JULY 7, 2013**

12. I am familiar with the facts and circumstances relating to a fire at the plant on July 7, 2013.

13. A fire originated in Pin Oven No. 41, not an Internal Bake Oven.

14. The fire originated inside the Pin Oven, not in the ventilation ductwork. No fire was ever reported or observed in the ductwork.

15. The fire was extinguished by plant personnel using a hand-held fire extinguisher that is kept at the plant.

16. The incident was presumably caused by inadequate venting of the oven, which caused the ignition of vapors from the paint and varnish that is applied to the exterior of the cans.

**APRIL 3, 2013**

17. I am familiar with the facts and circumstances relating to a fire at the plant on July 7, 2013.

18. The fire originated outside the plant in the regenerative thermal oxidizer (RTO), which is used to treat the exhaust air from the inside plant's ventilation system.

19.   The RTO oxidizes volatile organic compounds used in the production of aluminum beverage cans before venting the air into the atmosphere.

20.   Below is a true and accurate photograph of the RTO at the Monticello plant.



21.   The incident was presumably caused by a loose wire connection, which reduced the speed of the exhaust fan and allowed the unit to overheat.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746(2), the undersigned declares under penalty of perjury that the foregoing statements are true and correct.

Executed on:

Date: __11/14/17__                          By __[signature]__
                                                Freddy Spencer

4

# Exhibit 23

**16.8M INTERNAL BAKE OVEN**

for

**BEV-PAK, INCORPORATED**
**MONTICELLO, INDIANA**

Designed by

METAL BOX ENGINEERING

Manufactured by

SMITH ENGINEERING COMPANY

SMITH JOB NO. EIB688-1687

**PRIVILEGE AND CONFIDENTIAL**          **BALL 001197**

## TABLE OF CONTENTS

**VOLUME I:**

**CHAPTER 1   -   INTRODUCTION**

1.  General

2.  Oven

3.  Cooler

4.  Conveyor

5.  Specification

6.  Performance

7.  Gas

**CHAPTER 2   -   INSTALLATION**

1.  Inspection for Transit Damage

2.  Installation on the Foundation

3.  Connections

**CHAPTER 3   -   SETTINGS**

**CHAPTER 4   -   OPERATING INFORMATION**

1.  Introduction

2.  Description of Control System

    2.1  Mat Conveyor
    2.2  Fans
    2.3  Gas Systems
    2.4  Temperature Control

3.  Start Up/Shut Down Sequence

    3.1  Starting Up the Oven
    3.2  Shutting Down the Oven

- i -

**PRIVILEGE AND CONFIDENTIAL**                    **BALL 001198**

**TABLE OF CONTENTS - continued**

**CHAPTER 5   -   MAINTENANCE**

1.  Introduction

    1.1  General
    1.2  Lubrication
    1.3  Oven Cleaning

2.  Safety

3.  Routine Maintenance Procedures

    3.1  Weekly
    3.2  Monthly
    3.3  Three Monthly
    3.4  Six Monthly
    3.5  Annually
    3.6  Two Yearly

4.  Oven Cleaning

    4.1  Introduction
    4.2  Fire Hazard
    4.3  Effect on Correct Air Flow Balancing
    4.4  Safety Points
    4.5  General Oven Interior Cleaning Recommendations
    4.6  Inspecting the Oven Interior
    4.7  Oven Exhaust System
    4.8  Oven Dismantling

5.  Conveyor Belt and Pinch Roller Compression Springs

    5.1  Conveyor Belt
    5.2  Pinch Roller Compression Springs

6.  Lubrication Schedule


**CHAPTER 6     -     VENDOR BULLETINS**


**CHAPTER 7     -     FAN DATA**


**CHAPTER 8     -     SPARE PARTS**

1.  Mechanical Spares

2.  Electrical Spares

-ii-

**PRIVILEGE AND CONFIDENTIAL          BALL 001199**

# Exhibit 24



LEGEND:

BALL 001260



PRIVILEGE AND CONFIDENTIAL

BALL 001261



BALL 001262



PRIVILEGE AND CONFIDENTIAL

BALL 001263



PRIVILEGE AND CONFIDENTIAL

BALL 001264



BALL 001265



PRIVILEGE AND CONFIDENTIAL

BALL 001266



PRIVILEGE AND CONFIDENTIAL

BALL 001267



PRIVILEGE AND CONFIDENTIAL

BALL 001268



PRIVILEGE AND CONFIDENTIAL

BALL 001269



PRIVILEGE AND CONFIDENTIAL

BALL 001270



PRIVILEGE AND CONFIDENTIAL

BALL 001271



PRIVILEGE AND CONFIDENTIAL



PRIVILEGE AND CONFIDENTIAL

BALL 001273

PRIVILEGE AND CONFIDENTIAL

MATERIAL LIST
CONTAINER SYSTEMS INTERNATIONAL, INC.
MONTICELLO, IN.

1667-D-0115

MATERIAL LIST

CONTAINER SYSTEMS INTERNATIONAL, INC.
INDIANAPOLIS, IN

DRAWING NUMBER: 1687-D-0116

PRIVILEGE AND CONFIDENTIAL



PRIVILEGE AND CONFIDENTIAL

BALL 001276



PRIVILEGE AND CONFIDENTIAL

BALL 001277



ZONE 1

ZONE 2

GAS PIPING SCHEMATIC
CONTAINER SYSTEMS INTERNATIONAL, INC
Huntsville, TN.
1687-D-0801

PRIVILEGE AND CONFIDENTIAL

BALL 001278



PRIVILEGE AND CONFIDENTIAL

BALL 001279



PRIVILEGE AND CONFIDENTIAL

BALL 001280



PRIVILEGE AND CONFIDENTIAL

BALL 001281

# Exhibit 25

```
 1
 2                 IN THE UNITED STATES DISTRICT COURT
 3                FOR THE NORTHERN DISTRICT OF INDIANA
 4
 5   _____
 6   BALL CORPORATION, an Indiana
 7   Corporation and FACTORY MUTUAL
 8   INSURANCE COMPANY, a Rhode Island
 9   corporation, as subrogee,
10            Plaintiff,                    Case No.: 16 cv 42
11   v
12   AIR TECH OF MICHIGAN, INC.,
13   a Michigan corporation,
14            Defendant.
15   _____
16
17
18                    DEPOSITION OF OSCAR WOODY
19
20   DATE:       August 30, 2017
21   TIME:       9:53 a.m.
22   LOCATION:   O'Brien & Bails
23               625 Kenmoor Avenue, SE, Suite 301
24               Grand Rapids, Michigan
25   REPORTER:   Rebecca S. Renzema, CSR-1435
```

```
 1   APPEARANCES:

 2

 3       SENAK KEEGAN GLEASON SMITH & MICHAUD, LTD.

 4       BY:  Mark N. Senak

 5            621 S. Plymouth Ct., Suite 100

 6            Chicago, Illinois 60605

 7            (312) 214-1400

 8            msenak@skgsmlaw.com

 9                On behalf of Plaintiffs

10

11       STARR AUSTEN & MILLER, LLP

12       BY:  Andrew B. Miller

13            201 South 3rd Street

14            Logansport, Indiana 46947

15            (574) 722-6676

16            miller@starrausten.com

17                On behalf of Defendant

18

19       ALSO PRESENT:  Paul Scholten

20

21

22

23

24

25
```

```
1                                    INDEX

2    WITNESS:                                              PAGE

3         OSCAR WOODY

4    Examination by Mr. Senak                                 4

5

6

7                                  EXHIBITS

8    NUMBER            IDENTIFICATION                      PAGE

9    Ex. No. 1         Photograph                           20

10   Ex. No. 2         Photograph                           21

11   Ex. No. 3         Photograph                           31

12   Ex. No. 4         Photograph                           31

13   Ex. No. 5         Photograph                           40

14   Ex. No. 6         Photograph                           42

15   Ex. No. 7         Photograph                           48

16   Ex. No. 8         Photograph                           48

17   Ex. No. 9         Photograph                           50

18   Ex. No. 10        Photograph                           52

19   Ex. No. 11        Photograph                           53

20   Ex. No. 12        Photograph                           54

21                     (Original exhibits retained.   Copies attached.)

22

23

24

25
```

```
 1                      Grand Rapids, Michigan

 2                      August 30, 2017; 9:53 a.m.

 3                              ***

 4                         OSCAR WOODY,

 5          after having been duly sworn, was examined and

 6          testified as follows:

 7                          EXAMINATION

 8  BY MR. SENAK:

 9  Q.    Would you state your name and just spell your name for the

10        court reporter?

11  A.    Oscar Woody.  O-s-c-a-r W-o-o-d-y.

12  Q.    Mr. Woody, have you ever been deposed before?

13  A.    No.

14  Q.    All right.  I give you this sort of advice, if you will,

15        primarily for our court reporter.  So two things.  One is, as

16        you can see, she's taking down the answers and the questions.

17        So if you would answer out loud instead of maybe nodding your

18        head or shrugging your shoulders --

19  A.    Yeah.

20  Q.    -- it will help her.  And secondly, I will try to let you

21        finish your answer before I ask the next question and if you

22        do the same for me, it will again help her because it's hard

23        for her to take down something when we're both talking at the

24        same time.  Finally, if you need to take a break, just let me

25        know.
```

```
 1   A.   Okay.

 2   Q.   I'm not trying to keep you here kind of against your will.

 3        Would you just tell us your address?

 4   A.   7044 32nd Avenue, Covert, Michigan.

 5   Q.   It's Covert?

 6   A.   Covert, Michigan, yeah.  49043.

 7   Q.   How long have you lived there?

 8   A.   Fifty years.

 9   Q.   Any plans on moving?

10   A.   No.

11   Q.   Do you know Dave Woody?

12   A.   Yeah.  That's my uncle.

13   Q.   Okay.  Do you know where he's at?

14   A.   Probably at home now.

15   Q.   Do you know his address?

16   A.   Which -- there's three Daves.  I've got an uncle, a cousin,

17        and I've got another cousin.

18   Q.   Well, one of them worked for Air Tech, right?

19   A.   Yeah.

20   Q.   Which one is that?

21   A.   That would be my cousin.

22   Q.   All right.  Do you know where your cousin is at?

23   A.   He's in Grand Junction.

24   Q.   Do you know his address?

25   A.   No, I don't know.
```

```
 1    Q.    Do you have his phone number?

 2    A.    No, I don't.

 3    Q.    Did you review any documents to prepare for the deposition

 4          today?

 5    A.    No.

 6    Q.    Did you meet with Mr. Miller?

 7    A.    Mr. Miller?  Oh, yeah, earlier.

 8    Q.    When did that occur?

 9    A.    When he came in.  He introduced me to him.

10    Q.    Today?

11    A.    Yeah.

12    Q.    Anytime before today?

13    A.    No.

14    Q.    Would you just give us a summary of your educational

15          background?

16    A.    My who?

17    Q.    Educational background.  Like, how much school have you gone

18          to?

19    A.    I went to the 12th grade.  I didn't graduate, though, and I

20          worked all my life.

21    Q.    You currently work for Air Tech?

22    A.    Yeah.

23    Q.    How long have you worked for them?

24    A.    About 12 years.

25    Q.    So you would have started in 2002 or thereabouts?
```

```
 1   A.   Yeah, somewhere around there.

 2   Q.   Before working at Air Tech, can you just tell us what you

 3        did?

 4   A.   I used to pour metal at a die cast place, Duwell's.  It's in

 5        Bangor, Michigan.

 6   Q.   How long had you worked for them?

 7   A.   Ten years.

 8   Q.   How about before that?

 9   A.   I went right to the other Duwell's in Dowagiac and I was there

10        five years.  It's a die cast place that made car parts.

11   Q.   And then before that what did you do?

12   A.   Worked at a school, Covert school.

13   Q.   What did you do at the school?

14   A.   Bus mechanic.

15   Q.   When you started at Air Tech, what was your job title?

16   A.   Cleaning furnaces.

17   Q.   Has your job duties or job title changed at all during the

18        time you worked at Air Tech?

19   A.   No, not really.

20   Q.   You mentioned you started cleaning furnaces.  Do you clean

21        anything else other than furnaces?

22   A.   Yeah.  We vacuum houses out.  I mean the ducts and stuff like

23        that.

24   Q.   The furnaces that you clean, are they residential furnaces?

25        You know, people's homes?
```

```
 1   A.   No.  Huh-uh.

 2   Q.   Are they industrial or commercial furnaces?

 3   A.   You mean at a house?

 4   Q.   Yeah.

 5   A.   Yeah, that's furnaces at a house.  Yeah.

 6   Q.   In terms of, like, the amount or percentage of furnaces

 7        that you clean, how many would be residential versus

 8        industrial or commercial?

 9   A.   Residential, like maybe two a day or something like that.

10   Q.   Is the work you do primarily residential?

11   A.   No.

12   Q.   It's primarily commercial?

13   A.   I don't know what you're talking about.

14   Q.   You know, in terms of, like, you clean furnaces in homes of

15        people.

16   A.   Yeah, yeah, yeah.

17   Q.   Is that primarily the type of furnace you clean or -- you

18        know, at the Ball Corporation you cleaned an internal bake

19        oven, right?

20   A.   Yeah.

21   Q.   Do you do more residential work or do you do more commercial

22        work or for businesses?

23   A.   Back then it's probably more commercial work, you know.

24   Q.   When you started working or since you have been working at

25        Air Tech, did you receive any training in how to do the job
```

```
 1        you do?

 2   A.   Yeah.

 3   Q.   Explain to me what type of training you received.

 4   A.   Well, when you -- I clean squirrel cages, you know, the

 5        grease and stuff.  I clean that out and go through the whole

 6        thing, whole process.

 7   Q.   How did you learn how to do that?

 8   A.   My boss showed me how to do it first and then after that I

 9        knew how to do it all the time.

10   Q.   When you first started with Air Tech, who was your boss?

11   A.   Paul.

12   Q.   Mr. Scholten?

13   A.   Uh-huh.

14   Q.   Is he the one who taught you how to clean --

15   A.   Yeah.

16   Q.   -- ovens or furnaces?

17   A.   Yeah.

18   Q.   How did he do it?

19   A.   What do you mean?

20   Q.   How did he teach you?

21   A.   Well, you go in there and you open up -- take this big thing

22        off, a piece of pan or whatever, the screws that's on there,

23        you take that off and you look in there and if it's dirty,

24        you've got to clean it.  You go in there with an air hammer

25        and chisel all that stuff out of there and then whatever's in
```

```
 1        there you've got to clean it out, you know.

 2   Q.   Let me say this.  Is the type of training you received

 3        on-the-job training?  Do you know what that means?

 4   A.   What did you say?

 5   Q.   Did you receive sort of on-the-job training?

 6   A.   Yeah, yeah, yeah.

 7   Q.   Okay.  And whenever there was a job, you'd be showed how to do

 8        it --

 9   A.   Yeah.

10   Q.   -- and then you would do it the way you were shown to do it?

11   A.   Yeah.

12   Q.   Did you receive any, like, formal training other than that?

13   A.   Like cleaning anything else or something like that or what?

14   Q.   Were you sent to any classes or training seminars or anything

15        on how to do it?

16   A.   Yeah.

17   Q.   You were?

18   A.   Yeah.

19   Q.   Can you tell me what they were?

20   A.   Oh, man.  It's been a while.  You've got to go through a test,

21        you know, and then you call and they ask you a whole bunch of

22        questions and that's about it.  It was on the phone.  I mean

23        on computer.

24   Q.   The test that you took on the phone, was that for --

25   A.   It was on computer.
```

```
1   Q.  Or on computer.  I'm sorry.

2   A.  Yeah.

3   Q.  What was the purpose of that?  What was it for?

4   A.  So you have your permit, your license so you can clean, I

5       guess.

6   Q.  Do you know what type of permit or license you had or you

7       received?

8   A.  I think I've still got it.  Hold on.

9   Q.  And that's what I was going to ask you, oddly enough.  Is

10      the training you received essentially confined space entry

11      training?

12  A.  Yeah.  Uh-huh.

13  Q.  And what does that allow you to do?

14  A.  Clean.

15  Q.  All right.  Do you have any other permits, licenses --

16  A.  No.

17  Q.  -- of any nature other than the confined space training?

18  A.  That's it.

19  Q.  I'll give you that back.  Do you have to have confined space

20      training to do the work you do?

21  A.  Yeah.

22  Q.  Do you know whether you need it to be licensed to work in

23      confined spaces to work at the Ball plant?

24  A.  I don't know really -- I don't know if you do or not.  I'm not

25      for sure.
```

```
 1   Q.   All right.  Do you know of any other rules or regulations that

 2        apply to cleaning ovens like at the Ball plant?

 3   A.   No.

 4   Q.   When you receive a job assignment, who assigns you the work?

 5   A.   My boss.

 6   Q.   And would that be Paul Scholten?

 7   A.   Yep.

 8   Q.   Other than Paul, does anyone else assign you work?

 9   A.   No.

10   Q.   Explain to me how you come to know what you're supposed to do

11        in terms of a job assignment.

12   A.   Well, when I get there, the first thing I do is I got to clean

13        the squirrel cage.  Do you know what a squirrel cage is?

14   Q.   Yeah.

15   A.   Okay.  That's what I -- then I just take and dip all the oil

16        out of it in a bucket.  Then I take a rag and wipe all of it

17        out and then go to the next one.  Some of them don't have oil

18        and some of them do.

19   Q.   What I'm interested in is finding out how you know, like,

20        where you're going to work and what you're going to do on a

21        given day.  Like, how you receive your job assignment.  I take

22        it it comes from Paul?

23   A.   Yeah.

24   Q.   How does he tell you what to do?  I mean, what does he say?

25   A.   I already know what to do when I get there.
```

```
 1   Q.   All right.  How do you know what to do when you get there?

 2   A.   That's my average job.  That's what I always do.

 3   Q.   Does Mr. Scholten tell you, for instance, "Today we're going

 4        to be working at a specific location and we're going to do

 5        this specific job"?

 6   A.   Yeah.

 7   Q.   Does he tell you that the day before?

 8   A.   Yeah.  Maybe a couple weeks before, a week before that.

 9              MR. MILLER:  Oscar, you need to allow him to

10        complete his question before you answer.

11              THE WITNESS:  Oh, okay.

12   BY MR. SENAK:

13   Q.   Again --

14   A.   Yeah, she's typing.

15   Q.   When you're given a job, are you told how long it's going to

16        take to complete the job or how much time you have?

17   A.   No.

18   Q.   So, for instance, like at the Ball plant if you're told,

19        "We're going to go down and work at the Ball plant, we're

20        going to clean the IBO" --

21   A.   Uh-huh.

22   Q.   -- "and that job is going to be Tuesday and Wednesday," or are

23        you just told, "We're going to clean it until we get done"?

24              MR. MILLER:  I'll object, form.  You can answer.

25        You can answer.
```

```
1   BY MR. SENAK:

2   Q.   Do you understand the question?

3   A.   Yeah, I understand it.  Whenever we get done, that's when we

4        leave.

5   Q.   So there is not a specific amount of time that you have to

6        clean the oven.  You can take as much time as you want?

7   A.   Yeah.  There's no race to get it done or cleaned.

8   Q.   You realize this incident occurred at the Ball plant in

9        Monticello, Indiana?

10  A.   Uh-huh.  Yes.

11  Q.   Had you worked there before?

12  A.   Yeah.

13  Q.   How many times had you worked there before this particular

14       incident?

15  A.   Oh, man.  At least seven or eight times.

16  Q.   On those seven, eight times, do you recall the first time you

17       would have worked there?

18  A.   No, I don't.

19  Q.   Of those seven or eight times, just tell me what you did.

20  A.   Same thing.  Clean the squirrel cage.

21  Q.   On those seven or eight times, did you always clean an oven?

22  A.   Do I clean an oven, too?

23  Q.   Yeah.

24  A.   Sometimes when I get done, I help the other guys out.

25  Q.   Are you aware there's, like, two types of ovens down at the
```

```
 1        Ball plant?

 2   A.   Two types?

 3                  MR. SENAK:  Right.

 4                  MR. MILLER:  Objection, form.  Assumes facts not in

 5        evidence.

 6                  THE WITNESS:  There's two different types, yeah.

 7   BY MR. SENAK:

 8   Q.   What are the two types that you're aware of?

 9   A.   IBO and -- oh, man.  What's the other furnace?

10   Q.   Are you familiar with a term called a pin oven?

11   A.   Yeah, pin oven.  There you go.

12   Q.   On these seven or eight occasions prior to 2014, did you clean

13        IBOs or pin ovens or both?

14   A.   Both.

15   Q.   On those seven or eight times, had you cleaned an IBO before

16        2014?

17   A.   Yep.

18   Q.   Of those seven or eight times, how many times did you clean an

19        IBO versus a pin oven, if you can remember?

20   A.   Oh, man.  I don't know.  Probably about four or five times.

21   Q.   When you first cleaned a pin oven, did Mr. Scholten show you

22        how to do it?

23   A.   Yeah.

24   Q.   And I take it you cleaned it the way you were told to do it on

25        each of the occasions after that?
```

```
 1   A.   Yeah.

 2   Q.   Is there any difference in cleaning an IBO versus a pin

 3        oven?

 4   A.   Yeah.

 5   Q.   Explain to me what your understanding of the difference is.

 6   A.   One of them you've got to get down and scrape the wall with a

 7        brush as far as you can reach and then go from the bottom and

 8        scrape the rest up, you know, with a brush.

 9   Q.   Is that for an IBO or a pin oven?

10   A.   Pin oven.

11   Q.   How many people worked on, like, a crew when you cleaned an

12        IBO?

13   A.   It varies.  Sometimes people don't show up.

14   Q.   Just give me a sense of what the range is of the number of

15        people.

16   A.   Sometimes ten.  Sometimes maybe nine.

17   Q.   So there are usually nine or ten people that would be involved

18        in cleaning the IBO?

19   A.   Yeah.

20   Q.   If there were nine or ten people involved, how long would it

21        take?

22   A.   To clean one furnace?

23   Q.   Yeah, to clean one IBO.

24   A.   Probably close to eight hours.

25   Q.   Would that change or would it take more or less time to clean
```

```
 1        a pin oven?
 2   A.   Both of them about the same.
 3   Q.   This incident happened in 2014, do you recall?
 4   A.   Yeah, I heard about it.
 5   Q.   When did you first find out that you were going to be working
 6        at the Ball plant in 2014?
 7   A.   What now?
 8   Q.   Let me try it again.  This incident happened in May of 2014,
 9        do you recall?
10   A.   I don't know when it happened.  I know it happened, but I
11        don't know what day and all that.
12   Q.   How long before you went to the Ball plant to clean the IBO
13        were you told that that was going to be your job assignment?
14   A.   It's been years ago.  I can't remember.
15   Q.   Explain for me just how you went about doing the work.
16            MR. MILLER:  Objection, asked and answered.
17            THE WITNESS:  Just about cleaning the furnace.
18   BY MR. SENAK:
19   Q.   Let me try again.  It may not have been the best question.
20        When you first get to the site, what do you do?
21   A.   What do I do?
22   Q.   Yeah.
23   A.   The first thing I do is grab me a ladder and go up on top of
24        the furnace and put my harness on and open up the doors and
25        see what I've got to clean in there.
```

```
 1    Q.   You were one of nine or ten people who were working on the

 2         furnace at that time?

 3    A.   Yeah.

 4    Q.   I take it you all arrive at the plant at about the same

 5         time?

 6    A.   Yeah.

 7    Q.   And they show you what oven you're going to clean?

 8    A.   Yep.

 9    Q.   And then you start the cleaning process?

10    A.   Yeah.

11    Q.   Does anyone from Ball Corporation tell you how to clean the

12         oven?

13    A.   No, not really.

14    Q.   Does anyone from Ball Corporation provide you any tools?

15    A.   No.

16    Q.   Does anyone from Ball supervise your work?

17    A.   Yeah.

18    Q.   Who is that?

19    A.   I don't know.  I don't know his name.

20    Q.   Tell me what the person you're referring to does.

21    A.   Well, when he goes in there, he checks my work out and see if

22         anything's in there, see if it's cleaned right, and if it's

23         cleaned right, I just bolt it back up.

24    Q.   In this eight-hour period it takes you to do the work, how

25         often does the person from Ball come and take a look at what
```

```
 1          you're doing?
 2   A.     I don't know.  They walk around there all the time, but -- I
 3          don't know.  They just walk around there and look and see if
 4          we're doing anything that we're supposed to be doing.
 5   Q.     Is there a supervisor that you report to at Air Tech?
 6   A.     Supervisor?  Yeah, Paul.
 7   Q.     Was Mr. Scholten, Paul Scholten, the supervisor for the
 8          cleaning of the IBO at the Ball plant in 2014?
 9   A.     Yeah, I think so.
10   Q.     Is he on-site all the time during the cleaning?
11   A.     Yeah.
12   Q.     What does he do?
13   A.     Well, he helps out, too.
14   Q.     So he helps with some cleaning?
15   A.     Yeah.
16   Q.     Does he check to make sure that the work is done?
17   A.     Yep.
18   Q.     Who do you report to when you're working at the Ball plant?
19   A.     Who do I report to?  What do you mean?
20   Q.     Yeah.  I mean, who is your -- you mentioned Mr. Scholten is
21          your supervisor?
22   A.     Yeah.
23   Q.     Do you report to him?
24   A.     Yeah, if something happens.  If something's wrong, yeah.
25   Q.     Does he tell you what to do?
```

```
 1   A.    Yeah.

 2   Q.    Does anyone from Ball tell you what to do?

 3               MR. MILLER:  Objection, asked and answered.

 4               THE WITNESS:  I don't never ask nobody nothing over

 5         there.

 6   BY MR. SENAK:

 7   Q.    So when you arrive you are told, "We're going to clean the

 8         IBO."  And then you mentioned you get a ladder and a harness

 9         and you go on top of the oven?

10   A.    Yeah.

11   Q.    You indicated that you clean the squirrel cage?

12   A.    Yeah.

13   Q.    Is that what you do for all the ovens?

14   A.    All of them, yeah.  Yep.  All the IBOs.

15   Q.    I know this is an odd question.  Is that kind of your

16         specialty is to clean the squirrel cage?

17   A.    Yep.

18               (Exhibit No. 1 marked for identification.)

19   BY MR. SENAK:

20   Q.    Mr. Woody, I'm going to show you what's been marked as

21         Exhibit Number 1, Ball Exhibit Number 1.

22   A.    Uh-huh.

23   Q.    Do you recognize this picture?

24   A.    Yeah.

25   Q.    What is it?
```

```
 1   A.    IBO.

 2   Q.    Is this the IBO that you were involved in cleaning in May of

 3         2014?

 4   A.    Maybe.

 5   Q.    All right.  Exhibit Number 1 shows an IBO, though, correct?

 6   A.    Yeah.

 7   Q.    Do you know whether this is an IBO at the Ball plant?

 8   A.    Yeah, it looks like it.

 9   Q.    Do you know if there are multiple IBOs at the Ball plant?

10   A.    Yeah.

11   Q.    And they all have a specific number?

12   A.    Yes.

13   Q.    Do you know which IBO you cleaned in May of 2014?

14   A.    No, I don't.

15               (Exhibit No. 2 marked for identification.)

16   BY MR. SENAK:

17   Q.    Okay.  I'm going to show you Exhibit Number 2.

18   A.    Uh-huh.

19   Q.    Do you recognize Exhibit Number 2?

20   A.    No, I don't recognize that one.

21   Q.    If you look at Exhibit Number 1, you said Exhibit Number 1 is

22         an IBO at the Ball plant?

23   A.    Uh-huh.

24   Q.    Okay.  Do you know if Exhibit Number 2 is a picture of the

25         same IBO?
```

1          MR. MILLER:  Objection, calls for speculation, also

2     asked and answered.

3          THE WITNESS:  I can't tell.

4  BY MR. SENAK:

5  Q.   All right.  For instance, when you look at Exhibit Number 1,

6      you'll see that there is a blue column?

7  A.   Yeah.

8  Q.   Do you see the same blue column in Exhibit Number 2?

9  A.   Yeah.

10          MR. MILLER:  I'm going to object.  You're asking him

11     to speculate as to whether it's the same column and he said he

12     can't --

13          MR. SENAK:  I know, but you have to just make the

14     objection and move on.

15          MR. MILLER:  Well, Mark, I'm going to object because

16     he said he can't identify what number 2 is and now you're

17     trying to lead him.

18          MR. SENAK:  Well, I'm asking him questions about the

19     similarities between 1 and 2, which is completely proper.

20          MR. MILLER:  But Mark --

21          MR. SENAK:  Andrew, you've made your objection.

22          MR. MILLER:  I'm not going to let you lead him when

23     he's testified --

24          MR. SENAK:  You have to instruct him not to answer

25     the question, okay?

1          MR. MILLER:  -- when he's testified that he can't

2     identify number 2.

3          MR. SENAK:  But you can't make speaking objections.

4          MR. MILLER:  And I'm not going to have him guess.

5          MR. SENAK:  You can't make speaking objections.  If

6     you don't want him to answer the question, instruct him not to

7     answer the question.

8          MR. MILLER:  I'm not going to allow him to guess,

9     Mark.

10         MR. SENAK:  I understand that and I think that your

11    objection is noted, well noted in the record at this point,

12    all right?

13   BY MR. SENAK:

14   Q.   Now, Mr. Woody, you have taken a look at Exhibits 1 and 2,

15        all right?  You'll see there's a blue column in both of them.

16        There's duct work that's in both of them, true?

17   A.   Yeah.

18   Q.   And the duct work in both of them both shows some fire

19        damage?

20              MR. MILLER:  Objection, calls for speculation.  He's

21        not a fire expert.

22   BY MR. SENAK:

23   Q.   Do you see that?  Let's say this.  The duct work in both shows

24        some damage, correct?

25              MR. MILLER:  Objection, calls for speculation,

```
 1        beyond the scope of his expertise.
 2   BY MR. SENAK:
 3   Q.    Do you see the duct work, the damage to the duct work in both
 4         photographs?
 5   A.    Yeah, I see the damage.
 6              MR. MILLER:  Same objection.
 7   BY MR. SENAK:
 8   Q.    Does that in any way help you to determine whether the
 9         photograph in Exhibit Number 2 is a picture of the same IBO
10         that's shown in Exhibit Number 1?
11              MR. MILLER:  Objection, calls for speculation and
12         also asked and answered.
13              THE WITNESS:  I really can't tell.
14   BY MR. SENAK:
15   Q.    Let's stay with Exhibit Number 1, all right, which is -- you
16         recognize this --
17   A.    Yeah.
18   Q.    -- as the Ball plant, the IBO at the Ball plant?
19   A.    The back of it, yeah.
20   Q.    And this is the one that you cleaned in May of 2014?
21              MR. MILLER:  Objection, asked and answered, calls
22         for speculation.
23              THE WITNESS:  I'm not sure.
24   BY MR. SENAK:
25   Q.    Is this similar to IBOs that you have cleaned at the Ball
```

```
 1        plant?

 2   A.   Yeah.

 3   Q.   Does Exhibit Number 1 show the squirrel cage that you referred

 4        to?

 5   A.   This one?

 6   Q.   Yeah.

 7   A.   It's right in here.

 8   Q.   Is there another squirrel cage shown in the exhibit?

 9   A.   No.

10   Q.   Can you take a look at this area down here?

11   A.   Uh-huh.

12   Q.   Does that show a squirrel cage, too?

13   A.   Yeah, I think so.  There's one in there.

14   Q.   When you were at the Ball plant, did you clean the squirrel

15        cage that is shown in Exhibit Number 1?

16   A.   Yeah.  Uh-huh.

17   Q.   I'm going to give you this pen and I want you to circle the

18        area --

19   A.   That I cleaned?

20   Q.   -- where you cleaned.  Okay.  Mr. Woody, I'm sorry, but that

21        pen didn't really work so well.  So if you can just take a

22        marker and if you can just circle the area.

23   A.   Right there and right there.

24   Q.   And then if you would, just put your initials and today's date

25        somewhere next to the two circles that you made.  If you do it
```

```
 1          with the pen, you'll be better this time.

 2    A.    What's the date today?

 3    Q.    Today is the 30th.

 4    A.    And initial it?

 5    Q.    Yeah.  And then one more in the other area, too.  Now, in the

 6          two areas that you've shown where you cleaned, you refer to

 7          that as the squirrel cage?

 8    A.    Yeah.

 9    Q.    Inside the squirrel cage, is there a blower?

10    A.    A blower?

11    Q.    Yeah.

12    A.    The squirrel cage, not a blower in there.  Just the cage.

13    Q.    Is there a fan?

14    A.    No.

15    Q.    Describe for me what the squirrel cage does then.

16    A.    I guess it keeps the furnace cool.

17    Q.    Does air blow through it?

18    A.    Yeah.

19    Q.    Now, the two areas that you've circled, you cleaned the

20          squirrel cage, but then there is another piece of the

21          furnace that the squirrel cage is attached to, correct?

22    A.    Yeah.

23    Q.    What do you call this particular spot?

24    A.    Part of the squirrel cage of the furnace.

25    Q.    Do you consider that to be part of the squirrel cage?
```

```
 1   A.   No.  This is just a part of the furnace here that's goes into
 2        the squirrel cage.
 3   Q.   Okay.  So the squirrel cage connects to a piece of duct
 4        work?
 5   A.   Yep.
 6   Q.   And that piece of duct work goes then down into the furnace?
 7   A.   Into the furnace, yep.
 8   Q.   All right.  That piece of duct work I'm going to mark on this
 9        as number 2 on Exhibit 1, okay?
10   A.   Uh-huh.
11   Q.   That piece of duct work is attached to the squirrel cage on
12        both locations that you've shown on Exhibit Number 1?
13   A.   Yeah.  Yes.
14   Q.   So there's a squirrel cage on the east side of the furnace and
15        on the west side?
16   A.   Yep.
17   Q.   Do you know which of the two is east and west in photograph
18        number 1?
19   A.   Yeah.  This is west and that's the east.
20   Q.   Okay.  I'm going to draw a line and I'll mark one east, okay,
21        and then another line and I'll call that one west.  Okay?
22   A.   Yeah.
23   Q.   So the piece of duct work that connects to the squirrel cage
24        marked as number 2 in Exhibit Number 1, did you clean that?
25   A.   Yeah.
```

```
 1   Q.   And then you would have cleaned this squirrel cage which is

 2        connected to it?

 3   A.   Yeah.

 4   Q.   That would have been both for the east and west squirrel

 5        cages?

 6   A.   Yep.  Uh-huh.

 7   Q.   How far up did you clean past the squirrel cage?

 8   A.   As far as I can reach.  Arm's length.

 9   Q.   When you say as far as you can reach, you mean inside the

10        squirrel cage?

11   A.   Yeah.  Up the side type, yeah.

12   Q.   Would you have cleaned up to where the squirrel cage connects

13        to the duct work above the squirrel cage?

14   A.   You can't reach way up in there.

15   Q.   Meaning there's a portion of the squirrel cage that you did

16        not clean?

17             MR. MILLER:  Objection.  That's a mischaracter-

18        ization of his testimony.

19   BY MR. SENAK:

20   Q.   You tell me.

21   A.   I cleaned just the squirrel cage.

22   Q.   I understand.  The squirrel cage connects to duct work, does

23        it not?

24   A.   Yes.

25   Q.   And is that reflected in Exhibit 1?
```

1    A.    This pipe that's going up right here?

2    Q.    Yeah.

3    A.    I can't reach way up there.

4    Q.    No.  I'm just saying the squirrel cage connects to a piece of

5          duct work, right?

6    A.    Yeah.

7    Q.    And is that piece of duct work shown in Exhibit 1?

8    A.    Yeah.

9    Q.    All right.  Can you just draw a line where the duct work

10         connects to the squirrel cage?

11   A.    Right here.  Do you see where it's connected?

12   Q.    Well, do you see the line I've drawn?

13   A.    Yeah.  That's as far as I can reach right there.

14   Q.    Oh, I understand.  We'll get to that.  I just want to make

15         sure I understand the pieces of the oven.

16   A.    Oh, yeah.

17   Q.    Or at least you and I understand what we're talking about

18         here.

19   A.    Uh-huh.

20   Q.    There's a line that I drew.  Is that where the duct work

21         connects to the squirrel cage?

22   A.    Yeah.

23   Q.    All right.  I'm going to mark that line as number 3.  Just so

24         we're clear, the line drawn and marked as number 3 is the

25         location where the duct work connects to the squirrel cage,

```
 1        right?

 2   A.   Right.

 3   Q.   Now, you clean the squirrel cage?

 4   A.   Yeah.

 5   Q.   You do not clean, I take it, any of the duct work above the

 6        line shown in number 3?

 7   A.   No.

 8   Q.   That was not part of the scope of work that you were told to

 9        do in May of 2014 at the Ball plant?

10   A.   No.  I wasn't supposed to do that.  As far as I can reach.

11   Q.   And I take it you couldn't reach up into that duct work --

12   A.   No.

13   Q.   -- above the line in number 3?

14   A.   No.

15   Q.   Your job was just to clean the squirrel cage?

16   A.   Yep.

17   Q.   Now, explain to me how you do that.

18            MR. MILLER:  Objection, asked and answered.

19            THE WITNESS:  Explain how I clean the cage again,

20        the squirrel cage?

21   BY MR. SENAK:

22   Q.   Yeah.

23   A.   Well, I take the top off of it.  The cage has got a door on

24        it.  You take the door off.  And I go in there and look and

25        see if I see anything in there big.  Like something hard or
```

1      something, I'll take an air hammer and go in there and chisel

2      it out.  Then I'll get to the bottom and there'll be like a

3      half -- about that much oil in it, about a good half a foot of

4      oil in there.  And I'll take a bucket, a can, one of those

5      cans and dip all the oil out into a bucket.  Then I'll take a

6      rag and wipe it out and go to the next one.

7    Q.    Anything else?

8    A.    That's it.  There ain't nothing else to do in there really.

9                (Exhibit No. 3 marked for identification.)

10   BY MR. SENAK:

11   Q.    Mr. Woody, showing you Exhibit Number 3.

12   A.    Uh-huh.

13   Q.    Is that a picture of the squirrel cage?

14   A.    Yeah, right there.

15              MR. SENAK:  All right.  Would you do me a favor?

16   Draw a circle around the squirrel cage on Exhibit Number 3

17   and just your initials and today's date.

18              (Exhibit No. 4 marked for identification.)

19   BY MR. SENAK:

20   Q.    Now let's just look at Exhibit 3 for the time being.

21   A.    Uh-huh.

22   Q.    You circled the squirrel cage?

23   A.    Yeah.

24   Q.    And, again, that's attached to another piece of duct work.  Do

25   you see that?

```
 1   A.   That went down, yeah.

 2   Q.   Right.  Is the piece of duct work that's shown in Exhibit

 3        Number 3 also shown in Exhibit Number 1?

 4                 MR. MILLER:  Objection, calls for speculation.

 5                 THE WITNESS:  It's a little different.

 6   BY MR. SENAK:

 7   Q.   Do you see the piece of duct work marked as number 2 in

 8        Exhibit 1?

 9   A.   Uh-huh.

10   Q.   Is that also shown in Exhibit 3?

11                 MR. MILLER:  Objection, calls for speculation.

12                 THE WITNESS:  That might be a different one.

13   BY MR. SENAK:

14   Q.   No, I'm just talking about is it -- it may be on a different

15        oven.  I'm just saying is it the same type of duct work?

16   A.   Yeah.

17                 MR. MILLER:  Objection, calls for speculation.

18   BY MR. SENAK:

19   Q.   So the one that's marked as number 2 in Exhibit Number 1, is

20        that this piece of duct work in Exhibit Number 3?

21                 MR. MILLER:  Objection, lacks foundation.  You just

22        acknowledged, Mark, that they may be from different ovens, so

23        they can't be the same.

24                 MR. SENAK:  Andrew, come in.

25                 MR. MILLER:  It's a mischaracterization on the
```

```
 1        record.

 2               MR. SENAK:  I know, but you know -- I mean, you

 3        can't make speaking objections.  You criticized me for that.

 4        I try to abide by that.  I'd ask you to do the same.

 5               MR. MILLER:  I have.

 6               MR. SENAK:  Well, we'll let the record deal with

 7        that.

 8   BY MR. SENAK:

 9   Q.   You cleaned the squirrel cage which is shown in Exhibit

10        Number 3.  Do you also clean the piece of duct work that it's

11        attached to in Exhibit Number 3?

12               MR. MILLER:  Objection, mischaracterization of the

13        evidence and record.

14               THE WITNESS:  No.  I just clean the squirrel cage

15        and this part that's going down in here.

16   BY MR. SENAK:

17   Q.   Will you just circle the other portions of the duct work that

18        you clean in Exhibit Number 3?

19   A.   Right there.

20   Q.   All right.  On the piece of duct work that you've shown in

21        Exhibit Number 3, you indicated an area that you cleaned.

22   A.   Uh-huh.

23   Q.   Can you just draw a line that shows where you stopped

24        cleaning?

25   A.   Where I stopped at?
```

1    Q.    Yeah.

2    A.    From here to this part right here opens up, that door here.    I

3          cleaned this part here.

4    Q.    Okay.  You've drawn a square around the area that you

5          cleaned --

6    A.    Yeah.

7    Q.    -- on Exhibit Number 3?

8    A.    Yeah.

9    Q.    I take it you don't clean anything up above the square that

10         you've marked?

11   A.    No.  I clean this part here that opens up here.

12   Q.    Now, in Exhibit Number 3 in the area that you've indicated is

13         the squirrel cage there is an opening.  Do you see that?

14   A.    Yeah.

15   Q.    Is that how you accessed the squirrel cage to clean it?

16   A.    Yeah.

17   Q.    So when you get to the plant and you get up on top of the

18         oven, you mentioned that you open the squirrel cage, right?

19   A.    Yeah.  Uh-huh.

20   Q.    Is it true that there's a piece of metal that is over the

21         opening that is shown in Exhibit Number 3?

22   A.    Yep.

23   Q.    You take that piece of metal off?

24   A.    Uh-huh.

25   Q.    And then what do you do?

```
 1   A.   I go in there and --
 2              MR. MILLER:  Objection, asked and answered.
 3              THE WITNESS:  -- see if there's anything in there
 4        and stuff be in there all the time.  So I go in there with an
 5        air hammer and chisel it all out and take and wipe it all out
 6        and go to the next one.
 7   BY MR. SENAK:
 8   Q.   If you can look at Exhibit Number 4.
 9   A.   Yeah.
10   Q.   Do you know if Exhibit Number 4 is a closeup of the opening
11        shown in Exhibit Number 3?
12              MR. MILLER:  Objection, calls for speculation.
13              THE WITNESS:  No, it's different.
14   BY MR. SENAK:
15   Q.   Do you know if Exhibit Number 4 shows the opening to a
16        squirrel cage?
17              MR. MILLER:  Objection, calls for speculation.
18              THE WITNESS:  This right here opens up, yeah.
19        Uh-huh.
20   BY MR. SENAK:
21   Q.   I'm sorry, but you do have to answer out loud because she's
22        trying to take down what you're saying.
23   A.   Yeah, there's a door on here, too.
24   Q.   Is that sort of the access panel to the squirrel cage?
25              MR. MILLER:  Objection, calls for speculation.
```

```
 1                    THE WITNESS:  No.

 2                    MR. MILLER:  Form.

 3    BY MR. SENAK:

 4    Q.   Do you know what it is?

 5    A.   This?

 6                    MR. SENAK:  Yeah.

 7                    MR. MILLER:  Objection, calls for speculation, form.

 8                    THE WITNESS:  It's supposed to be like a -- what do

 9         they call that?  Almost like a fan, you know what I mean?

10         More like a blower.

11    BY MR. SENAK:

12    Q.   That's what's shown on Exhibit Number 4?

13    A.   Uh-huh.

14    Q.   Do you know whether the fan or the blower shown in Exhibit

15         Number 4 is part of the squirrel cage?

16                    MR. MILLER:  Objection, calls for speculation.

17                    THE WITNESS:  Part of the squirrel cage?

18    BY MR. SENAK:

19    Q.   Right.

20    A.   Yes.

21    Q.   And this shows that the access panel has been removed and I

22         take it you would clean inside this particular area?

23    A.   Uh-huh.

24                    MR. MILLER:  I'm going to object to form of the

25         question.
```

1  BY MR. SENAK:

2  Q.   You have to answer out loud.

3  A.   Clean this?

4  Q.   Yeah.

5  A.   Yes, yes, yes.

6  Q.   All right.  When you clean that, you use a rag and an air

7       chisel you mentioned?

8  A.   Yeah.

9  Q.   Explain to me what you use the air chisel for.

10 A.   All this stuff right here.  You see all that?  All on the

11      outside of that?  You got to chisel all of that out of there.

12      You can't do it by hand, you know what I mean?  It's too hard

13      to do it by hand because it cakes up there.  It's like coal,

14      you know what I mean?  So you can't get it out of there with

15      nothing else but a chisel.

16 Q.   You can't wipe it off?

17 A.   No.

18 Q.   And so you have to chisel it off?

19 A.   Yeah.

20 Q.   That tool that you use for that, is that something that is

21      given to you by Air Tech to do the job?

22 A.   Yep.

23 Q.   Explain to me how you then use that to work around the -- to

24      clean the squirrel cage.

25 A.   How do I use it?  To knock all that stuff out of there.

```
 1        Chisel it out.
 2   Q.   When you chisel it out, do you break it up into pieces?
 3   A.   Yeah, little pieces?  Yeah.  Uh-huh.
 4   Q.   The pieces that you break it up into then, I take it, fall
 5        down into the oven?
 6   A.   No, it don't fall down in the oven.  It falls down in the
 7        squirrel cage.
 8   Q.   All right.  The size of these pieces, how big are they?
 9   A.   Some of them are like this big around.  Some of them probably
10        that size.  Some of them smaller.  It depends how they break
11        up.
12   Q.   Other than the air chisel, do you use anything else to try to
13        remove the residue that is shown in Exhibit Number 3?  Or 4.
14        I'm sorry.
15   A.   Yeah, just the air chisel.
16   Q.   What other tools are you given when you
17   A.   Anything I need to use to get it out of there.  Wire brush,
18        whatever you need to use.
19   Q.   Do you use a wire brush to remove the residue that's shown in
20        Exhibit Number 4?
21   A.   Some of it.
22   Q.   And I take it you scrape that area where the residue is shown
23        in Exhibit Number 4 --
24   A.   Yeah.
25   Q.   -- with the wire brush?
```

```
 1   A.   That, too, and a scraper.

 2   Q.   And when you say a scraper, are you talking, like, a hand

 3        scraper?

 4   A.   Yeah.

 5   Q.   Like a paint scraper --

 6   A.   Yeah.

 7   Q.   -- that you'd use to remove paint?

 8   A.   Yeah.  Uh-huh.

 9   Q.   Are you given a grinder?

10   A.   Yeah.

11   Q.   Do you use the grinder, too?

12   A.   Sometimes.  It depends.

13   Q.   So an air chisel, wire brush, scraper and a grinder are the

14        tools that you use to remove --

15   A.   Yeah.

16   Q.   -- the residue that's shown in Exhibit Number 4?

17   A.   Yeah.

18   Q.   That residue then, again, can be large in the sense that it's

19        a chunk of --

20   A.   Yeah.

21   Q.   -- what's there and it can be very small, too?

22   A.   Yeah.

23   Q.   Some of that residue that you scrape off with a wire brush,

24        does that become like a powder?

25   A.   No.
```

```
 1   Q.   How about like a dust?

 2   A.   Not really.  It's just flakes.

 3   Q.   Little flakes?

 4   A.   Yeah.

 5   Q.   All right.  And that falls down inside the squirrel cage?

 6   A.   Yeah.

 7   Q.   How do you get it out of there?

 8   A.   Vacuum.

 9   Q.   Is this like an industrial shop vac that you're given?

10   A.   Yeah.

11   Q.   After you do that, you take it and you go in there and you

12        vacuum up what's left?

13   A.   Yeah.

14   Q.   Do you wipe it out then?

15   A.   No.  If it's dry, I don't need to wipe it out.

16   Q.   You just vacuum it?

17   A.   Yeah.

18   Q.   How do you make sure you get all the dust out?

19   A.   How do I make sure?

20   Q.   Yeah.

21   A.   When I look in there, there ain't nothing left.

22   Q.   So you just visually look to see that you've got everything

23        out of there?

24   A.   Yeah.  Uh-huh.

25             (Exhibit No. 5 marked for identification.)
```

1    BY MR. SENAK:

2    Q.   Mr. Woody, I'm going to show you Exhibit Number 5.

3    A.   Uh-huh.

4    Q.   If you look back at Exhibit Number 1 you'll see the area that

5         I marked with a number 2, which is that piece of duct work

6         that connects to the squirrel cage?

7    A.   Yeah.

8    Q.   Do you know whether that's shown in Exhibit Number 5?

9             MR. MILLER:  Objection, calls for speculation.

10           THE WITNESS:  This shows the number 5?

11   BY MR. SENAK:

12   Q.   Yeah.  What I want to know is, the piece of duct work that's

13       marked with a number 2 in Exhibit 1, is that the piece of duct

14       work that's shown in Exhibit Number 5?

15           MR. MILLER:  Objection, calls for speculation.

16           THE WITNESS:  They look the same.

17   BY MR. SENAK:

18   Q.   All right.  You'll see -- do you recall cleaning this type of

19       duct work at the Ball plant?

20   A.   Yeah.  You've got to take this door off right here.

21   Q.   Yeah.  That's why I brought it, oddly enough.

22   A.   Yeah.  You've got to take this door off and clean inside of

23       here, too, the walls and the bottom and all that.

24   Q.   If you look at number 3, you marked with a square the area

25       that you cleaned?

1  A.  Number 3, yeah.

2  Q.  Right there?

3  A.  Uh-huh.

4  Q.  Is that piece of duct work shown in Exhibit Number 5?

5  A.  Yeah, same thing.

6  Q.  Can you just do the same thing you did on Exhibit Number 3

7      which is show me what areas of the duct work --

8  A.  That I cleaned?

9  Q.  Yeah.  Draw a square around it.  Let me try again.  Use one of

10     those and see if it works any better.  All right.  Is that all

11     you cleaned in Exhibit Number 5 or do you reach inside and

12     clean up --

13 A.  Inside and clean that all out.

14 Q.  All right.  Well, if you could just draw a circle around all

15     the area that you cleaned.

16 A.  This whole area.

17              MR. SENAK:  And, again, your initials and the date.

18              (Exhibit No. 6 marked for identification.)

19 BY MR. SENAK:

20 Q.  Mr. Woody, I'm going to show you Exhibit Number 6.  Do you

21     know what that shows?

22 A.  Same thing as that one.  Right there.

23 Q.  So Exhibit 6 shows the same piece of duct work as Exhibit

24     Number 4 --

25 A.  Uh-huh.

```
 1   Q.   -- true?  Do you know whether Exhibit 6 shows the inside of

 2        the squirrel cage?

 3   A.   No, it don't.

 4   Q.   Does Exhibit 6 show the debris or the residue that you removed

 5        from inside the squirrel cage?

 6   A.   Right down in the bottom.

 7   Q.   On Exhibit Number 6 there's an area around the perimeter of

 8        the hole that shows kind of the black residue that you were

 9        talking about?

10   A.   Uh-huh.

11   Q.   Is that the stuff that you clean out?

12   A.   Yeah.

13   Q.   And again, you used the air chisel, the brush, the grinder and

14        the -- I'm sorry.

15   A.   Scraper.

16   Q.   -- scraper to do that?

17   A.   Uh-huh.

18   Q.   Does Exhibit 6 show the area of the duct work or squirrel cage

19        before or after you finish cleaning it?

20              MR. MILLER:  Objection, calls for speculation.

21              THE WITNESS:  What now?

22   BY MR. SENAK:

23   Q.   Do you know whether what's shown in Exhibit Number 6, does

24        that show before or after you've cleaned it?

25   A.   Does it show before or after I cleaned it?
```

```
1    Q.   Right.

2    A.   Before or after?  I'm trying to figure out what he's talking

3         about.

4    Q.   Okay.  I can try again.  Exhibit Number 6 shows a variety of

5         residue around the perimeter involved.

6    A.   Yeah.

7    Q.   As part of your cleaning, would you remove that residue?

8    A.   Yeah.  I'd get all of this out of here.

9    Q.   So this photograph would reflect the condition of the squirrel

10        cage before you cleaned it?

11   A.   Yeah.

12   Q.   After you cleaned it, that wouldn't be there?

13   A.   No.  None of this here.  This is all clean and shiny.  Yep.

14        You can eat down in there if you want to.

15   Q.   Now, as you do your work, you mentioned that the residue you

16        show in Exhibit Number 6 would fall down into the base of the

17        squirrel cage.

18   A.   Yeah.

19   Q.   Are any of the photographs that you've seen show the base of

20        the squirrel cage?

21   A.   The base?

22   Q.   Yeah.

23   A.   Right here.

24   Q.   All right.  You're showing Exhibit Number 3?

25   A.   Yeah.
```

1    Q.    All right. And can you just take a marker and draw -- you've

2          drawn a circle around the squirrel cage here in Exhibit

3          Number 3. Can you just draw a square around the area where

4          the debris would fall after you removed it?

5    A.    Down here. Right down in here.

6    Q.    I'm going to -- I'm going to have to get you something better.

7          Try that one. Sorry.

8    A.    Right here. It falls down in this part here.

9    Q.    All right. Can you again just put your initials and the date?

10         And that square that you've drawn, I'll draw an arrow to it.

11         What I would like you to do is again put the number 2 at that

12         location.

13   A.    Where? Here?

14   Q.    Yeah. To show where the debris falls. And your initials and

15         the date again by the number 2. All right. Once the debris

16         falls there, you then take a vacuum and remove it?

17   A.    Yeah.

18   Q.    Do you then check to make sure you have removed all the debris

19         out of there?

20   A.    Yeah.

21              MR. MILLER: Objection, asked and answered.

22   BY MR. SENAK:

23   Q.    And you do that by visually looking in to see if there's any

24         debris left?

25              MR. MILLER: Objection, asked and answered.

1              THE WITNESS:  Yes.

2    BY MR. SENAK:

3    Q.    You mentioned that some of the pieces that fall into the area

4          shown by the number 2 on Exhibit 3 are big pieces?

5              MR. MILLER:  Objection, asked and answered and

6          that's a mischaracterization of his testimony.

7    BY MR. SENAK:

8    Q.    Is that true?

9    A.    True.  They're big pieces.

10   Q.    And for those, I take it you reach in and just pull those out

11         with your hand?

12   A.    Yeah.  Uh-huh.

13   Q.    The other pieces are too small to pick up with your hand?

14   A.    Right.

15   Q.    And that's why you use a vacuum?

16   A.    Right.

17   Q.    Because those pieces are so fine that you can't pick them up

18         with your hand?

19   A.    No.

20   Q.    Is the squirrel cage the first thing you clean when you go to

21         the oven?

22             MR. MILLER:  Objection, asked and answered.

23             THE WITNESS:  When I first go there?  Yeah, that's

24         the first thing.  I open up the door.

25

1    BY MR. SENAK:

2    Q.    Other people do other parts of the oven --

3    A.    Yeah.

4    Q.    -- but your first thing is to go clean the squirrel cage?

5    A.    Yep.  Uh-huh.

6    Q.    After you get done cleaning the squirrel cage, do you then go

7          help the other workers clean the rest of the oven?

8               MR. MILLER:  Objection, asked and answered.

9               THE WITNESS:  Take me a break first.

10   BY MR. SENAK:

11   Q.    That's all right.

12   A.    Yeah, I do.

13   Q.    So you're familiar with the process of cleaning the rest of

14         the oven, not just the squirrel cage?

15   A.    Yeah.  Uh-huh.

16   Q.    Do you use the same tools to clean the rest of the oven that

17         you used to clean the squirrel cage?

18   A.    Sometimes.

19   Q.    And that's the air chisel, the wire brush, the grinder, the

20         scraper and the -- was there anything else?  I don't think

21         there was anything else.

22   A.    Yeah, that's it.

23   Q.    So those are tools that you basically use to clean the entire

24         oven, not just the squirrel cage?

25   A.    Yeah.

```
 1   Q.   And do you use those for the same purpose that you use them to

 2        clean the squirrel cage?

 3   A.   Yeah.

 4   Q.   And I take it you're doing the same thing.  You're trying to

 5        remove the residue from inside the oven?

 6   A.   Yeah.

 7   Q.   If we look back at Exhibit Number 1, when you clean the rest

 8        of the oven, you'll see that there are some doors that are

 9        shown on the bottom of Exhibit Number 1?

10   A.   Yeah.

11   Q.   Do you take those doors off?

12   A.   Yeah.

13   Q.   What do you do -- I mean, how do you clean in there?

14                MR. MILLER:  Objection, asked and answered.

15                THE WITNESS:  Take those doors off and take a wire

16        brush and brush the walls down and all that and suck it all

17        out with a vacuum.

18                (Exhibit Nos. 7 and 8 marked for identification.)

19   BY MR. SENAK:

20   Q.   Mr. Woody, I'm going to show you what's been marked as

21        Exhibits 7 and 8, all right?

22   A.   Uh-huh.

23   Q.   If you look back at Exhibit Number 1, we were looking at the

24        doors on the oven shown in Exhibit Number 1.  Does 7 and 8

25        show the doors of the oven removed?
```

1        MR. MILLER:  Objection, calls for speculation.

2        THE WITNESS:  Is it showing they're removed?

3   BY MR. SENAK:

4   Q.   Yeah.  If you look at Exhibit Number 1 --

5   A.   Yeah, they're off there.

6   Q.   -- you'll see the doors, right?

7   A.   Yeah, they're off there.

8   Q.   Exhibit 7 and 8 just show the portion --

9   A.   The doors --

10  Q.   Exhibit 7 and 8 just show the portion of the oven with the

11       doors removed?

12       MR. MILLER:  You've got to allow him to complete his

13       question before you answer.

14       THE WITNESS:  Okay.

15       MR. MILLER:  It's impossible for the court reporter

16       to transcribe two people talking at once, okay?

17  BY MR. SENAK:

18  Q.   Again, those two pictures show the inside of the oven?

19       MR. MILLER:  Objection, calls for speculation.

20       THE WITNESS:  Part of it, yeah.

21  BY MR. SENAK:

22  Q.   Right.  We talked about the idea that --

23  A.   Yes.

24  Q.   -- once the doors are taken off, this is what the inside of

25       the oven looks like.  Is this what the inside of the oven

```
 1        looks like before or after it's cleaned?

 2   A.   That's before.

 3   Q.   Okay.  How do you clean the areas of the oven shown in

 4        Exhibits 7 and 8?

 5   A.   Same way you clean the rest of it.

 6   Q.   All right.  Just tell me what that is.

 7   A.   You take the wire wheel brush and brush it all down and

 8        whatever you see in there scrape it off.

 9   Q.   That wire wheel brush that you referred to --

10   A.   Uh-huh.

11   Q.   -- is that electric?

12   A.   Yeah.

13   Q.   So that's a brush that's attached to, like, an electric drill

14        that spins the brush around?

15   A.   Yeah.

16   Q.   That's not just -- you have just a hand-held wire brush?

17   A.   Yeah.

18   Q.   But you also have an electric wire brush?

19   A.   Yeah.

20   Q.   All right.  Do you take some pieces out of the oven to clean

21        them?

22   A.   No.

23               (Exhibit No. 9 marked for identification.)

24   BY MR. SENAK:

25   Q.   Showing you Exhibit Number 9, Mr. Woody.
```

```
 1    A.    That's 9?

 2    Q.    Yes, this is 9.  Does this show -- yeah, that's 9.  Does this

 3          show what's reflected in Exhibits 7 and 8, but after it's been

 4          cleaned?

 5                    MR. MILLER:  Objection, calls for speculation.

 6                    THE WITNESS:  This shows what?  After being cleaned?

 7    BY MR. SENAK:

 8    Q.    Yeah.

 9    A.    I'm not for sure.  Maybe.  I'm not sure.

10    Q.    Does Exhibit 8 show the inside of the oven?

11                    MR. MILLER:  Objection, calls for speculation.

12          That's 9.

13    BY MR. SENAK:

14    Q.    Oh, I'm sorry.  Does Exhibit 9 show the inside of the oven?

15    A.    No.

16    Q.    Do you know what Exhibit 9 shows?

17    A.    Just the outside of the oven.  A little part of the inside,

18          but it's not the whole oven.

19    Q.    No, no.  I understand that.  But if you look at Exhibit

20          Number 1 again, you'll see the doors that have been removed?

21    A.    Uh-huh.

22    Q.    Does Exhibit 9 show the inside of the oven after the doors

23          have been removed?

24                    MR. MILLER:  Objection, calls for speculation.

25                    THE WITNESS:  Yeah.
```

1    BY MR. SENAK:

2    Q.    And if you look at Exhibit 7, you indicated that Exhibit 7 and

3          Exhibit 8 show the oven before it was cleaned.  And am I

4          wrong, that just shows the residue on the inside of the oven,

5          right?

6    A.    Uh-huh.

7    Q.    You have to answer out loud.

8    A.    Yes.

9    Q.    Now, if you look at Exhibit 9, it appears that that residue

10         has been removed, is that true?

11   A.    It looks like a little bit has.

12   Q.    All right.  Does Exhibit 9 show the residue that has been

13         removed with the tools that you described?

14               MR. MILLER:  I'm going to object, calls for

15         speculation.

16               THE WITNESS:  Probably a brush or something like.  I

17         think a grinder.

18               (Exhibit No. 10 marked for identification.)

19   BY MR. SENAK:

20   Q.    I'm going to show you Exhibit Number 10.  Do you know what

21         Exhibit Number 10 shows?

22   A.    Ten?

23   Q.    Yeah.

24   A.    Somebody grinding something it looks like.

25   Q.    Do you know whether that's the type of grinder you'd use to

```
 1        clean the oven?

 2    A.  Yeah, that's the kind I used.

 3    Q.  When you use that, does it leave marks on the metal?

 4    A.  Sometimes.

 5              (Exhibit No. 11 marked for identification.)

 6    BY MR. SENAK:

 7    Q.  I'm going to show you Exhibit Number 11.

 8    A.  What's that?  Right there's a little bit of grinding right

 9        there.  Right there and right there.

10    Q.  Does Exhibit Number 11 show the piece of the oven where some

11        of the residue has been removed and some has not?

12              MR. MILLER:  Objection, calls for speculation.

13              THE WITNESS:  It looks like a little bit has.

14    BY MR. SENAK:

15    Q.  In the area where the residue has been removed, does it show

16        marks on the metal?

17    A.  On 8?

18    Q.  On 11.

19    A.  Yeah, that shows marks.

20    Q.  All right.  So 11 shows a grinder being used and some of the

21        residue has been removed and some of it has not, true?

22    A.  Yeah.

23    Q.  And in the areas where it has been removed, the grinder leaves

24        marks on the metal?

25    A.  Sometimes, yeah.
```

```
 1   Q.   If you look back at Number 9, am I wrong, but those same marks
 2        are shown on the inside of the oven as reflective of work
 3        that's been done on the inside of the oven?
 4             MR. MILLER:  Objection, form, calls for speculation.
 5   BY MR. SENAK:
 6   Q.   You just have to answer out loud.
 7   A.   Yes, it looks like it.
 8   Q.   All right.  So when we look at Exhibits 8 and 7, that shows
 9        the oven before it's been cleaned because there's residue on
10        the inside and there are no grind marks, true?
11             MR. MILLER:  Objection, form.
12             THE WITNESS:  True.
13   BY MR. SENAK:
14   Q.   When we look at Exhibit 9, we know that that oven has been
15        cleaned because there are grind marks where the residue has
16        been removed, right?
17   A.   True.
18   Q.   That's because you use a grinder to clean the insides of the
19        oven, right?
20   A.   Uh-huh.
21             (Exhibit No. 12 marked for identification.)
22   BY MR. SENAK:
23   Q.   Mr. Woody, showing you Exhibit 12.  Does that show the same
24        cleaning or grind marks on the inside of the duct work?
25             MR. MILLER:  Objection, calls for speculation.
```

1               THE WITNESS:  I'm not for sure.

2   BY MR. SENAK:

3   Q.   Do you know what Exhibit 12 shows?

4   A.   Twelve?

5   Q.   Yeah.

6   A.   I don't know what that is.

7   Q.   When you got done cleaning the squirrel cage, do you recall

8        whether Mr. Scholten went up and looked to see if it was

9        clean?

10  A.   I'm not for sure.

11  Q.   Okay.  Do you recall who else you worked with when you cleaned

12       IBO number 2 at the Ball plant in May of 2014?

13  A.   Who else what?

14  Q.   Who else you worked with.  Who else was on the crew?

15  A.   That worked with me?

16  Q.   Yeah.

17  A.   Let me see.  There was me.  Ken worked with me, too.

18  Q.   I take it that's Ken Wall?

19  A.   Yeah.

20  Q.   Anyone else that you can remember?

21  A.   Not with me up there, no.  Nobody else.

22  Q.   Anyone else who worked on the oven as a whole, not just on the

23       squirrel cage?

24  A.   I can't remember everybody, but -- I couldn't name everybody.

25       I just worry about myself.

```
 1   Q.   Did Mr. Wall help you clean the squirrel cage or were you the

 2        only one?

 3   A.   I'm the only one that cleaned the squirrel cage.  He cleans

 4        right around the squirrel cage on the other side.

 5   Q.   When you got done, did anyone from Ball Corporation get up on

 6        top of the oven to look inside the squirrel cage?

 7   A.   Yeah.

 8             MR. MILLER:  Objection, asked and answered.

 9   BY MR. SENAK:

10   Q.   All right.  Do you know who it was?

11   A.   No, I don't.

12   Q.   Did that person inspect the entire oven?

13   A.   He inspected -- yeah.  And the squirrel cage, yep.

14   Q.   When they inspected the squirrel cage, when did they do it?

15   A.   Right after I got through cleaning it.

16   Q.   How long did it take you to clean it?

17   A.   Both of them?  About eight hours.

18   Q.   So it would have taken you effectively kind of four hours to

19        clean each squirrel cage?

20   A.   Each one.  Uh-huh.

21   Q.   When you get up on the oven to clean the squirrel cage, you

22        mentioned -- you have to wear a lanyard?

23   A.   Yeah.

24   Q.   I take it that's so you don't fall?

25   A.   Yeah.
```

```
 1   Q.   The lanyard is connected to the --

 2   A.   Beams or whatever.

 3   Q.   -- beams above the squirrel cage?

 4   A.   Yeah.

 5   Q.   Did anyone from Ball Corporation, to your knowledge, go inside

 6        the oven?

 7   A.   Yeah, I think so.  Sometimes I guess they do.

 8   Q.   You just don't know who it is?

 9   A.   No, I don't.

10   Q.   Had you seen that person before?

11   A.   In Ball Corp.?

12   Q.   Yeah.

13   A.   Yeah.

14   Q.   Do you know where they worked at the plant?

15             MR. MILLER:  You've got to say yes or no.

16             THE WITNESS:  Big boss.  I don't know.  This is a

17        big boss.  I don't know.

18   BY MR. SENAK:

19   Q.   When people on your crew or you clean the oven, do you go

20        inside of it?

21   A.   Do I go inside the oven?

22   Q.   Yeah.

23   A.   It depends if everything is clean, you know.  I've got to go

24        in there to clean it, get everything clean.

25   Q.   So there are occasions where you actually go inside the oven?
```

```
 1   A.   Sometimes, yeah.

 2   Q.   I take it that's why you need confined space training?

 3   A.   Yeah.

 4   Q.   All right.  When you looked inside the squirrel cage when you

 5        first got there, did you see anything in there?

 6   A.   Did I see anything in there?

 7   Q.   Yeah.

 8   A.   Yeah, a lot of oil and grease.

 9   Q.   And I take it you would have removed that?

10   A.   Yeah.

11   Q.   Did you see anything out of the ordinary in there?

12   A.   Huh-uh.

13   Q.   You have to answer out loud.

14   A.   No.

15   Q.   Okay.  When did you first find out about the fire?

16   A.   That's been a long time.  I can't remember.

17   Q.   Did you ever discuss the fire with anyone?

18   A.   No.

19   Q.   Anyone ever tell you what caused the fire?

20   A.   No.

21   Q.   Do you have any opinion as to what caused the fire?

22             MR. MILLER:  Objection, beyond the scope of the

23        witness's expertise.

24             THE WITNESS:  Not really.

25             MR. SENAK:  All right.  That's all I have.  Thank
```

1  you.

2          THE WITNESS:  Okay.

3          MR. MILLER:  No questions.  And we're going to have

4  to reserve signature.

5          (Deposition concluded at 11:10 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              CERTIFICATE

 2

 3   STATE OF MICHIGAN      )

 4                          )

 5   COUNTY OF KENT         )

 6

 7            I, REBECCA S. RENZEMA, Certified Shorthand Reporter

 8       and Notary Public, do hereby certify that the foregoing matter

 9       was taken before me at the time and place hereinbefore set

10       forth.

11            I FURTHER CERTIFY that this matter was taken in

12       shorthand and thereafter transcribed by me and that it is a

13       true and accurate transcript.

14            IN WITNESS WHEREOF, I have hereunto set my hand this

15       1st day of September of 2017 at Caledonia, Michigan.

16

17                              _____

18                              REBECCA S. RENZEMA, CSR-1435

19                              Notary Public for Kent County

20                              My Commission Expires: 12-31-2022

21

22

23

24

25
```

1                   CERTIFICATE OF WITNESS

2

3          I, OSCAR WOODY, the witness in the fore-

4     going deposition, do hereby certify that I have read

5     the deposition transcript of my testimony taken on the

6     30th day of August, 2017, and that, subject to the

7     corrections indicated on the attached errata sheet, it

8     is a true and correct transcript of my testimony as

9     given.

10

11

12          _____

13                   OSCAR WOODY

14

15

16          _____

17                   Dated

18

19

20

21

22

23

24

25

**Exhibits**

**Ball Exhibit 1** 20:18,21 21:5, 21 22:5 24:10, 15 25:3,15 27:9,12,18,24 28:25 29:7 32:3,8,19 41:4,13 48:7, 9,23,24 49:4 51:19,20

**Ball Exhibit 2** 21:15,17,19, 24 22:8,16 23:2 24:9 27:9,24 32:7, 19 41:5,13 45:11,15 46:4 55:12

**Ball Exhibit 3** 29:23,24 30:6, 13 31:9,11,16, 20 32:2,3,10, 20 33:9,10,11, 18,21 34:7,12, 21 35:11 38:13 41:24 42:1,6 44:24 45:2,3 46:4

**Ball Exhibit 4** 31:18 35:8,10, 15 36:12,14, 15 38:20,23 39:16 42:23, 24

**Ball Exhibit 5** 40:25 41:2,8, 10,14 42:4,11

**Ball Exhibit 6** 42:18,20,23 43:1,4,7,18,23 44:4,16

**Ball Exhibit 7** 49:8,10 52:2

**Ball Exhibit 8** 51:10 52:3

**Ball Exhibit 9** 50:23,25 51:14,16,22

52:9,12 54:1, 14

**Ball Exhibit 10** 52:18,20,21

**Ball Exhibit 11** 53:5,7,10

**Ball Exhibit 12** 54:21,23 55:3

___

**1**

**1** 20:18,21 21:5,21 22:5, 19 23:14 24:10,15 25:3, 15 27:9,12,18, 24 28:25 29:7 32:3,8,19 41:4,13 48:7, 9,23,24 49:4 51:20

**10** 52:18,20,21

**11** 53:5,7,10, 18,20

**11:10** 59:5

**12** 6:24 54:21, 23 55:3

**12th** 6:19

___

**2**

**2** 21:15,17,19, 24 22:8,16,19 23:2,14 24:9 27:9,24 32:7, 19 41:5,13 45:11,15 46:4 55:12

**2002** 6:25

**2014** 15:12,16 17:3,6,8 19:8 21:3,13 24:20 30:9 55:12

**2017** 4:2

___

**3**

**3** 29:23,24 30:6,13 31:9, 11,16,20 32:3, 10,20 33:10, 11,18,21 34:7, 12,21 35:11 38:13 41:24 42:1,6 44:24 45:3 46:4

**30** 4:2

**30th** 26:3

**32nd** 5:4

___

**4**

**4** 31:18 35:8, 10,15 36:12, 15 38:13,20, 23 39:16 42:24

**49043** 5:6

___

**5**

**5** 40:25 41:2,8, 10,14 42:4,11

___

**6**

**6** 42:18,20,23 43:1,4,7,18,23 44:4,16

___

**7**

**7** 48:18,21,24 49:8,10 50:4 51:3 52:2 54:8

**7044** 5:4

___

**8**

**8** 48:18,21,24 49:8,10 50:4 51:3,10 52:3 53:17 54:8

___

**9**

**9** 50:23,25 51:1,2,12,14, 16,22 52:9,12 54:1,14

**9:53** 4:2

___

**A**

**a.m.** 4:2 59:5

**abide** 33:4

**access** 35:24 36:21

**accessed** 34:15

**acknowledged** 32:22

**address** 5:3, 15,24

**advice** 4:14

**air** 5:18 6:21 7:2,15,18 8:25 9:10,24 19:5 26:17 31:1 35:5 37:6,9,21 38:12,15 39:13 43:13 47:19

**amount** 8:6 14:5

**Andrew** 22:21 32:24

**answers** 4:16

**anything's** 18:22

**Anytime** 6:12

**appears** 52:9

**apply** 12:2

**area** 25:10,18, 22 26:5 33:21 34:4,12 36:22 38:22 41:4,24 42:15,16 43:7, 18 45:3 46:3

53:15

**areas** 26:6,19 42:7 50:3 53:23

**Arm's** 28:8

**arrive** 18:4 20:7

**arrow** 45:10

**assign** 12:8

**assignment** 12:4,11,21 17:13

**assigns** 12:4

**Assumes** 15:4

**attached** 26:21 27:11 31:24 33:11 50:13

**August** 4:2

**Avenue** 5:4

**average** 13:2

**aware** 14:25 15:8

___

**B**

**back** 8:23 11:19 18:23 24:19 41:4 48:7,23 54:1

**background** 6:15,17

**bake** 8:18

**Ball** 8:18 11:23 12:2 13:18,19 14:8 15:1 17:6,12 18:11,14,16, 25 19:8,18 20:2,21 21:7, 9,22 24:18,25 25:14 30:9 41:19 55:12 56:5 57:5,11

**Bangor** 7:5

**base** 44:16, 19,21

**basically** 47:23

**beams** 57:2,3

**big** 9:21 30:25 38:8,9 46:4,9 57:16,17

**bit** 52:11 53:8, 13

**black** 43:8

**blow** 26:17

**blower** 26:9, 10,12 36:10, 14

**blue** 22:6,8 23:15

**bolt** 18:23

**boss** 9:8,10 12:5 57:16,17

**bottom** 16:7 31:2 41:23 43:6 48:9

**break** 4:24 38:2,4,10 47:9

**brought** 41:21

**brush** 16:7,8 38:17,19,25 39:13,23 43:13 47:19 48:16 50:7,9, 13,14,16,18 52:16

**bucket** 12:16 31:4,5

**bunch** 10:21

**Bus** 7:14

**businesses** 8:22

_____ C _____

**cage** 12:13

14:20 20:11, 16 25:3,8,12, 15 26:7,9,12, 15,20,21,24, 25 27:2,3,11, 14,23 28:1,7, 10,12,13,15, 21,22 29:4,10, 21,25 30:3,15, 19,20,23 31:13,16,22 33:9,14 34:13, 15,18 35:16, 24 36:15,17 37:24 38:7 40:5 41:6 43:2,5,18 44:10,17,20 45:2 46:20 47:4,6,14,17, 24 48:2 55:7, 23 56:1,3,4,6, 13,14,19,21 57:3 58:4

**cages** 9:4 28:5

**cakes** 37:13

**call** 10:21 26:23 27:21 36:9

**called** 15:10

**calls** 22:1, 23:20,25 24:11,21 32:4, 11,17 35:12, 17,25 36:7,16 41:9,15 43:20 49:1,19 51:5, 11,24 52:14 53:12 54:4,25

**cans** 31:5

**car** 7:10

**cast** 7:4,10

**caused** 58:19, 21

**change** 16:25

**changed** 7:17

**check** 19:16 45:18

**checks** 18:21

**chisel** 9:25 31:1 35:5 37:7,9,11,15, 18 38:1,2,12, 15 39:13 43:13 47:19

**chunk** 39:19

**circle** 25:17, 22 31:16 33:17 42:14 45:2

**circled** 26:19 31:22

**circles** 25:25

**classes** 10:14

**clean** 7:20,24 8:7,14,17 9:4, 5,14,24 10:1 11:4,14 12:12 13:20,23 14:6, 20,21,22 15:12,18 16:22,23,25 17:12,25 18:7, 11 20:7,11,16 25:14 27:24 28:7,16 30:3, 5,15,19 33:10, 14,18 34:9,11, 15 36:22 37:3, 6,24 41:22 42:12,13 43:11 44:13 46:20 47:4,7, 16,17,23 48:2, 7,13 50:3,5,20 53:1 54:18 55:9 56:1,16, 19,21 57:19, 23,24

**cleaned** 8:18 14:7 15:15,21, 24 16:11 18:22,23 21:13 24:20, 25 25:19,20 26:6,19 28:1, 12,21 33:9,21 34:3,5 41:25 42:8,11,15

**checks** 18:21

43:24,25 44:10,12 50:1 51:4,6 52:3 54:9,15 55:11 56:3

**cleaning** 7:16,20 10:13 12:2 16:2,18 17:17 18:9 19:8,10,14 21:2 33:24 41:18 43:19 44:7 47:6,13 54:24 55:7 56:15

**cleans** 56:3

**clear** 29:24

**close** 16:24

**closeup** 35:10

**coal** 37:13

**column** 22:6, 8,11 23:15

**commercial** 8:2,8,12,21,23

**complete** 13:10,16 49:12

**completely** 22:19

**computer** 10:23,25 11:1

**concluded** 59:5

**condition** 44:9

**confined** 11:10,17,19, 23 58:2

**connected** 28:2 29:11 57:1

**connects** 27:3,23 28:12, 22 29:4,10,21, 25 41:6

**cool** 26:16

**Corp** 57:11

**Corporation** 8:18 18:11,14 56:5 57:5

**correct** 21:5 23:24 26:21

**couple** 13:8

**court** 4:10,15 49:15

**cousin** 5:16, 17,21,22

**Covert** 5:4,5,6 7:12

**crew** 16:11 55:14 57:19

**criticized** 33:3

_____ D _____

**damage** 23:19,24 24:3, 5

**date** 25:24 26:2 31:17 42:17 45:9,15

**Dave** 5:11

**Daves** 5:16

**day** 8:9 12:21 13:7 17:11

**deal** 33:6

**debris** 43:4 45:4,14,15,18, 24

**depends** 38:10 39:12 57:23

**deposed** 4:12

**deposition** 6:3 59:5

**Describe** 26:15

**determine**

24:8

**die** 7:4,10

**difference** 16:2,5

**dip** 12:15 31:5

**dirty** 9:23

**discuss** 58:17

**documents** 6:3

**door** 30:23,24 34:2 35:23 41:20,22 46:24

**doors** 17:24 48:8,11,15,24, 25 49:6,9,11, 24 51:20,22

**Dowagiac** 7:9

**draw** 27:20 29:9 31:16 33:23 42:9,14 45:1,3,10

**drawn** 29:12, 24 34:4 45:2, 10

**drew** 29:20

**drill** 50:13

**dry** 40:15

**duct** 23:16,18, 23 24:3 27:3, 6,8,11,23 28:13,22 29:5, 7,9,20,25 30:5,11 31:24 32:2,7,15,20 33:10,17,20 41:5,12,13,19 42:4,7,23 43:18 54:24

**ducts** 7:22

**duly** 4:5

**dust** 40:1,18

**duties** 7:17

**Duwell's** 7:4,

---

9

---

**E**

**earlier** 6:7

**east** 27:14,17, 19,20 28:4

**eat** 44:14

**educational** 6:14,17

**effectively** 56:18

**eight-hour** 18:24

**electric** 50:11,13,18

**entire** 47:23 56:12

**entry** 11:10

**essentially** 11:10

**evidence** 15:5 33:13

**EXAMINATION** 4:7

**examined** 4:5

**exhibit** 20:18, 21 21:5,15,17, 19,21,24 22:5, 8 24:9,10,15 25:3,8,15 27:9,12,24 28:25 29:7 31:9,11,16,18, 20 32:2,3,8, 10,19,20 33:9, 11,18,21 34:7, 12,21 35:8,10, 11,15 36:12, 14 38:13,20, 23 39:16 40:25 41:2,4, 8,13,14 42:4, 6,11,18,20,23 43:1,4,7,18,23 44:4,16,24 45:2 46:4 48:7,9,18,23,

---

24 49:4,8,10 50:23,25 51:10,14,16, 19,22 52:2,3, 9,12,18,20,21 53:5,7,10 54:14,21,23 55:3

**Exhibits** 23:14 48:21 50:4 51:3 54:8

**expert** 23:21

**expertise** 24:1 58:23

**explain** 9:3 12:10 16:5 17:15 30:17, 19 37:9,23

---

**F**

**facts** 15:4

**fall** 38:4,6 44:16 45:4 46:3 56:24

**falls** 38:6 40:5 45:8,14,16

**familiar** 15:10 47:13

**fan** 26:43 36:9,14

**favor** 31:15

**Fifty** 5:8

**figure** 44:2

**Finally** 4:24

**find** 17:5 58:15

**finding** 12:19

**fine** 46:17

**finish** 4:21 43:19

**fire** 23:18,21 58:15,17,19, 21

**flakes** 40:2,3

---

**foot** 31:3

**form** 13:24 15:4 36:2,7,24 54:4,11

**formal** 10:12

**foundation** 32:21

**furnace** 8:17 15:9 16:22 17:17,24 18:2 26:16,21,24 27:1,6,7,14

**furnaces** 7:16,20,21,24 8:2,5,6,14 9:16

---

**G**

**get all** 40:18 44:8

**give** 4:14 6:14 11:19 16:14 25:17

**good** 31:3

**grab** 17:23

**grade** 6:19

**graduate** 6:19

**Grand** 4:1 5:23

**grease** 9:5 58:8

**grind** 54:10, 15,24

**grinder** 39:9, 11,13 43:13 47:19 52:17, 25 53:20,23 54:18

**grinding** 52:24 53:8

**guess** 11:5 23:4,8 26:16 57:7

---

**guys** 14:24

---

**H**

**half** 31:3

**hammer** 9:24 31:1 35:5

**hand** 37:12,13 39:2 46:11,13, 18

**hand-held** 50:16

**happened** 17:3,8,10

**hard** 4:22 30:25 37:12

**harness** 17:24 20:8

**head** 4:18

**heard** 17:4

**helps** 19:13, 14

**Hold** 11:8

**hole** 43:8

**home** 5:14

**homes** 7:25 8:14

**hours** 16:24 56:17,18

**house** 8:3,5

**houses** 7:22

**Huh-uh** 8:1 58:12

---

**I**

**IBO** 13:20 15:9,15,19 16:2,9,12,18, 23 17:12 19:8 20:8 21:1,2,5, 7,13,22,25 24:9,18 55:12

**IBOS** 15:13 20:14 21:9

24:25

**idea** 49:22

**identification**
20:18 21:15
31:9,18 40:25
42:18 48:18
50:23 52:18
53:5 54:21

**identify** 22:16
23:2

**impossible**
49:15

**incident** 14:8,
14 17:3,8

**Indiana** 14:9

**industrial**
8:2,8 40:9

**initial** 26:4

**initials** 25:24
31:17 42:17
45:9,14

**inside** 26:9
28:9 36:22
40:5 41:22
42:11,13 43:1,
5 48:5 49:18,
24,25 51:10,
14,17,22 52:4
54:2,3,10,24
56:6 57:5,20,
21,25 58:4

**insides** 54:18

**inspect** 56:12

**inspected**
56:13,14

**instance**
13:3,18 22:5

**instruct** 22:24
23:6

**interested**
12:19

**internal** 8:18

**introduced**
6:9

**involved**
16:17,20 21:2

44:5

**ization** 28:18

———————

**J**

**job** 7:15,17
8:25 10:7
12:4,11,21
13:2,5,15,16,
22 17:13
30:15 37:21

**Junction** 5:23

———————

**K**

**Ken** 55:17,18

**kind** 5:2 20:15
43:8 53:2
56:18

**knew** 9:9

**knock** 37:25

**knowledge**
57:5

———————

**L**

**lacks** 32:21

**ladder** 17:23
20:3

**lanyard** 56:22
57:1

**large** 39:18

**lead** 22:17,22

**learn** 9:7

**leave** 14:4
53:3

**leaves** 53:23

**left** 40:12,21
45:24

**length** 28:8

**license** 11:4,6

**licensed**
11:22

**licenses**
11:15

**life** 6:20

**lived** 5:7

**location** 13:4
29:25 45:12

**locations**
27:12

**long** 5:7 6:23
7:6 13:15
16:20 17:12
56:16 58:16

**looked** 55:8
58:4

**lot** 58:8

**loud** 4:17
35:21 37:2
52:7 54:6
58:13

———————

**M**

**made** 7:10
22:21 25:25

**make** 19:16
22:13 23:3,5
29:14 33:3
40:18,19
45:18

**man** 10:20
14:15 15:9,20

**mark** 22:15,20
23:9 27:8,20
29:23 32:22

**marked**
20:18,20
21:15 27:24
29:24 31:9,18
32:7,19 34:10
40:25 41:5,13,
24 42:18
48:18,20
50:23 52:18
53:5 54:21

**marker** 25:22
45:1

**marks** 53:3,
16,19,24 54:1,

10,15,24

**Meaning**
28:15

**means** 10:3

**mechanic**
7:14

**meet** 6:6

**mentioned**
7:20 19:20
20:8 34:18
37:7 44:15
46:3 56:22

**metal** 7:4
34:20,23 53:3,
16,24

**Michigan** 4:1
5:4,6 7:5

**Miller** 6:6,7
13:9,24 15:4
17:16 20:3
22:1,10,15,20,
22 23:1,4,8,
20,25 24:6,11,
21 28:17
30:18 32:4,11,
17,21,25 33:5,
12 35:2,12,17,
25 36:2,7,16,
24 41:9,15
43:20 45:21,
25 46:5,22
47:8 48:14
49:1,12,15,19
51:5,11,24
52:14 53:12
54:4,11,25
56:8 57:15
58:22 59:3

**mischaracter
-** 28:17

**mischaracter
ization** 32:25
33:12 46:6

**Monticello**
14:9

**move** 22:14

**moving** 5:9

**multiple** 21:9

10,15,24

———————

**N**

**nature** 11:17

**nodding** 4:17

**Nos** 48:18

**noted** 23:11

**number** 6:1
16:14 20:21
21:5,11,17,19,
21,24 22:5,8,
16 23:2 24:9,
10,15 25:3,15
27:9,12,18,24
29:23,24 30:6,
13 31:11,16
32:3,7,19,20
33:10,11,18,
21 34:7,12,21
35:8,10,11,15
36:12,15
38:13,20,23
39:16 41:2,4,
5,8,10,13,14,
24 42:1,4,6,
11,20,24 43:7,
23 44:4,16,24
45:3,11,15
46:4 48:7,9,
23,24 49:4
50:25 51:20
52:20,21 53:7,
10 54:1 55:12

———————

**O**

**O-s-c-a-r** 4:11

**object** 13:24
22:10,15
36:24 52:14

**objection**
15:4 17:16
20:3 22:1,14,
21 23:11,20,
25 24:6,11,21
28:17 30:18
32:4,11,17,21
33:12 35:2,12,
17,25 36:7,16
41:9,15 43:20
45:21,25 46:5,
22 47:8 48:14

49:1,19 51:5,
11,24 53:12
54:4,11,25
56:8 58:22

**objections**
23:3,5 33:3

**occasions**
15:12,25
57:25

**occur** 6:8

**occurred**
14:8

**odd** 20:15

**oddly** 11:9
41:21

**oil** 12:15,17
31:3,4,5 58:8

**on-site** 19:10

**on-the-job**
10:3,5

**open** 9:21
17:24 34:18
46:24

**opening**
34:13,21
35:10,15

**opens** 34:2,11
35:18

**opinion** 58:21

**ordinary**
58:11

**Oscar** 4:4,11
13:9

**oven** 8:19
14:6,21,22
15:10,11,19,
21 16:3,9,10
17:1 18:7,12
20:9 29:15
32:15 34:18
38:5,6 46:21
47:2,7,14,16,
24 48:5,8,24,
25 49:10,18,
25 50:3,20
51:10,14,17,
18,22 52:3,4

53:1,10 54:2,
3,9,14,19
55:22 56:6,12,
21 57:6,19,21,
25

**ovens** 9:16
12:2 14:25
15:13 20:13
32:22

---

**P**

**paint** 39:5,7

**pan** 9:22

**panel** 35:24
36:21

**part** 26:24,25
27:1 30:8
33:15 34:2,3,
11 36:15,17
44:7 45:8
49:20 51:17

**parts** 7:10
47:2

**past** 28:7

**Paul** 9:11
12:6,8,22
19:6,7

**pen** 25:17,21
26:1

**people** 8:15
16:11,13,15,
17,20 18:1
47:2 49:16
57:19

**people's** 7:25

**percentage**
8:6

**perimeter**
43:7 44:5

**period** 18:24

**permit** 11:4,6

**permits** 11:15

**person** 18:20,
25 56:12
57:10

**phone** 6:1
10:22,24

**photograph**
24:9 27:17
44:9

**photographs**
24:4 44:19

**pick** 46:13,17

**picture** 20:23
21:24 24:9
31:13

**pictures**
49:18

**piece** 9:22
26:20 27:3,6,
8,11,23 29:4,7
31:24 32:2,7,
20 33:10,20
34:20,23 41:5,
12,13 42:4,23
53:10

**pieces** 29:15
38:2,3,4,8
46:3,4,9,13,17
50:20

**pin** 15:10,11,
13,19,21 16:2,
9,10 17:1

**pipe** 29:1

**place** 7:4,10

**plans** 5:9

**plant** 11:23
12:2 13:18,19
14:8 15:1
17:6,12 18:4
19:8,18 21:7,
9,22 24:18
25:1,14 30:9
34:17 41:19
55:12 57:14

**point** 23:11

**portion** 28:15
49:8,10

**portions**
33:17

**pour** 7:4

**powder** 39:24

**prepare** 6:3

**primarily**
4:15 8:10,12,
17

**prior** 15:12

**process** 9:6
18:9 47:13

**proper** 22:19

**provide** 18:14

**pull** 46:10

**purpose** 11:3
48:1

**put** 17:24
25:24 45:9,11

---

**Q**

**question** 4:21
13:10 14:2
17:19 20:15
22:25 23:6,7
36:25 49:13

**questions**
4:16 10:22
22:18 59:3

---

**R**

**race** 14:7

**rag** 12:16 31:6
37:6

**range** 16:14

**Rapids** 4:1

**reach** 16:7
28:8,9,14
29:3,13 30:10,
11 42:11
46:10

**realize** 14:8

**recall** 14:16
17:3,9 41:18
55:7,11

**receive** 8:25
10:5,12 12:4,

21

**received** 9:3
10:2 11:7,10

**recognize**
20:23 21:19,
20 24:16

**record** 23:11
33:1,6,13

**refer** 26:6

**referred** 25:3
50:9

**referring**
18:20

**reflect** 44:9

**reflected**
28:25 51:3

**reflective**
54:2

**regulations**
12:1

**remember**
15:19 17:14
55:20,24
58:16

**remove**
38:13,19 39:7,
14 44:7 45:16
48:5

**removed**
36:21 43:4
45:4,18 48:25
49:2,11 51:20,
23 52:10,13
53:11,15,21,
23 54:16 58:9

**report** 19:5,
18,19,23

**reporter** 4:10,
15 49:15

**reserve** 59:4

**residential**
7:24 8:7,9,10,
21

**residue**
38:13,19,22
39:16,18,23

43:4,8 44:5,7,
15 48:5 52:4,
9,12 53:11,15,
21 54:9,15

**rest** 16:8 47:7,
13,16 48:7
50:5

**review** 6:3

**rules** 12:1

_____
**S**

**Scholten**
9:12 12:6 13:3
15:21 19:7,20
55:8

**school** 6:17
7:12,13

**scope** 24:1
30:8 58:22

**scrape** 16:6,8
38:22 39:23
50:8

**scraper** 39:1,
2,3,5,13
43:15,16
47:20

**screws** 9:22

**seminars**
10:14

**SENAK** 4:8
13:12 14:1
15:3,7 17:18
20:6,19 21:16
22:4,13,18,21,
24 23:3,5,10,
13,22 24:2,7,
14,24 28:19
30:21 31:10,
15,19 32:6,13,
18,24 33:2,6,
8,16 35:7,14,
20 36:3,6,11,
18 37:1 41:1,
11,17 42:17,
19 43:22
45:22 46:2,7
47:1,10 48:19
49:3,17,21
50:24 51:7,13

52:1,19 53:6,
14 54:5,13,22
55:2 56:9
57:18 58:25

**sense** 16:14
39:18

**shiny** 44:13

**shop** 40:9

**shoulders**
4:18

**show** 15:21
16:13 18:7
20:20 21:17
25:3,12 41:2
42:7,20 43:4,
18,24,25
44:16,19
45:14 48:20,
25 49:8,10,18
51:2,3,10,14,
22 52:3,12,20
53:7,10,15
54:23

**showed** 9:8
10:7

**showing**
31:11 44:24
49:2 50:25
54:23

**shown** 10:10
24:10 25:3,15
26:6 27:12
29:7 30:6
32:2,3,10
33:9,20 34:21
35:11 36:12,
14 38:13,19,
22 39:16 41:8,
14 42:4 43:23
46:4 48:9,24
50:3 54:2

**shows** 21:5
23:18,23
33:23 35:15
36:21 41:10
42:21,23 43:1,
8 44:4 51:6,16
52:4,21 53:19,
20 54:8 55:3

**shrugging**

4:18

**side** 27:14,15
28:11 56:4

**signature**
59:4

**similar** 24:25

**similarities**
22:19

**site** 17:20

**size** 38:8,10

**small** 39:21
46:13

**smaller** 38:10

**something's**
19:24

**sort** 4:14 10:5
35:24

**space** 11:10,
17,19 58:2

**spaces** 11:23

**speaking**
23:3,5 33:3

**specialty**
20:16

**specific** 13:4,
5 14:5 21:11

**speculate**
22:11

**speculation**
22:1 23:20,25
24:11,22 32:4,
11,17 35:12,
17,25 36:7,16
41:9,15 43:20
49:1,19 51:5,
11,24 52:15
53:12 54:4,25

**spell** 4:9

**spins** 50:14

**spot** 26:23

**square** 34:4,9
41:24 42:9
45:3,10

**squirrel** 9:4

4:18

12:13 14:20
20:11,16 25:3,
8,12,14 26:7,
9,12,15,20,21,
24,25 27:2,3,
11,14,23 28:1,
4,7,10,12,13,
15,21,22 29:4,
10,21,25 30:3,
15,20 31:13,
16,22 33:9,14
34:13,15,18
35:16,24
36:15,17
37:24 38:7
40:5 41:6
43:2,5,18
44:9,17,20
45:2 46:20
47:4,6,14,17,
24 48:2 55:7,
23 56:1,3,4,6,
13,14,19,21
57:3 58:4

**start** 18:9

**started** 6:25
7:15,20 8:24
9:10

**state** 4:9

**stay** 24:15

**stopped**
33:23,25

**stuff** 7:22 9:5,
25 35:4 37:10,
25 43:11

**suck** 48:16

**summary**
6:14

**supervise**
18:16

**supervisor**
19:5,6,7,21

**supposed**
12:10 19:4
30:10 36:8

**sworn** 4:5

_____
**T**

**takes** 18:24

**taking** 4:16

**talked** 49:22

**talking** 4:23
8:13 29:17
32:14 39:2
43:9 44:2
49:16

**taught** 9:14

**teach** 9:20

**Tech** 5:18
6:21 7:2,15,18
8:25 9:10 19:5
37:21

**ten** 7:7 16:16,
17,20 18:1
52:22

**term** 15:10

**terms** 8:6,14
12:11

**test** 10:20,24

**testified** 4:6
22:23 23:1

**testimony**
28:18 46:6

**there'll** 31:2

**thereabouts**
6:25

**thing** 9:6,21
12:12 14:20
17:23 42:5,6,
22 46:20,24
47:4 48:9

**things** 4:15

**time** 4:24 7:18
9:9 13:16
14:5,6,16
16:25 18:2,5
19:2,10 26:1
31:20 35:4
58:16

**times** 14:13,
15,16,19,21

15:15,18,20

**title** 7:15,17

**today** 6:4,10, 12 13:3 26:2,3

**today's** 25:24 31:17

**told** 13:15,18, 23 15:24 17:13 20:7 30:8

**tool** 37:20

**tools** 18:14 38:16 39:14 47:16,23 52:13

**top** 17:23 20:9 30:23 34:17 56:6

**training** 8:25 9:3 10:2,3,5, 12,14 11:10, 11,17,20 58:2

**transcribe** 49:16

**true** 23:16 34:20 43:1 46:8,9 52:10 53:21 54:10, 12,17

**Tuesday** 13:22

**Twelve** 55:4

**type** 8:17 9:3 10:2 11:6 28:11 32:15 41:18 52:25

**types** 14:25 15:2,6,8

**typing** 13:14

---

**U**

**Uh-huh** 9:13 11:12 13:21 14:10 20:22 21:18,23 25:11,16

27:10 28:6 29:19 31:12, 21 32:9 33:22 34:19,24 35:19 36:13, 23 38:3 39:8 40:24 41:3 42:3,25 43:10, 17 46:12 47:5, 15 48:22 50:10 51:21 52:6 54:20 56:20

**uncle** 5:12,16

**understand** 14:2,3 23:10 28:22 29:14, 15,17 51:19

**understanding** 16:5

---

**V**

**vac** 40:9

**vacuum** 7:22 40:8,12,16 45:16 46:15 48:17

**varies** 16:13

**variety** 44:4

**versus** 8:7 15:19 16:2

**visually** 40:22 45:23

---

**W**

**W-o-o-d-y** 4:11

**walk** 19:2,3

**wall** 16:6 55:18 56:1

**walls** 41:23 48:16

**wear** 56:22

**Wednesday** 13:22

**week** 13:8

**weeks** 13:8

**west** 27:15, 17,19,21 28:4

**whatever's** 9:25

**wheel** 50:7,9

**wipe** 12:16 31:6 35:5 37:16 40:14, 15

**wire** 38:17,19, 25 39:13,23 47:19 48:15 50:7,9,16,18

**witness's** 58:23

**Woody** 4:4, 11,12 5:11 20:20 23:14 25:20 31:11 41:2 42:20 48:20 50:25 54:23

**work** 6:21 8:10,21,22,23 11:20,22,23 12:4,8,20 13:19 17:15 18:16,21,24 19:16 23:16, 18,23 24:3 25:21 27:4,6, 8,11,23 28:13, 22 29:5,7,9, 20,25 30:5,8, 11 31:24 32:2, 7,15,20 33:10, 17,20 37:23 41:5,12,14,19 42:4,7,23 43:18 44:15 54:2,24

**worked** 5:18 6:20,23 7:6, 12,18 14:11, 13,17 16:11 55:11,14,15, 17,22 57:14

**workers** 47:7

**working** 7:2 8:24 13:4 17:5 18:1 19:18

**works** 42:10

**worry** 55:25

**wrong** 19:24 52:4 54:1

---

**Y**

**years** 5:8 6:24 7:7,10 17:14

# Exhibit 26

```
 1              IN THE UNITED STATES DISTRICT COURT.

 2           FOR THE NORTHERN DISTRICT OF INDIANA

 3   BALL CORPORATION, an Indiana    )
     Corporation, and FACTORY        )
 4   MUTUAL INSURANCE COMPANY, a     )
     Rhode Island corporation, as    )   Case No. 16 cv 42
 5   subrogee,                       )
                        Plaintiffs,  )
 6   v.                              )
                                     )
 7   AIR TECH OF MICHIGAN, INC.,     )
     a Michigan corporation,         )
 8                                   )
                        Defendant.   )
 9

10

11                  DEPOSITION OF GONSALO SILVA

12   taken by the Plaintiff on Friday, September 1, 2017, at the

13   office of O'Brien & Bails Court Reporting and Video, 625 Kenmoor

14   Avenue, SE, Suite 301, Grand Rapids, Michigan, at 9:02 a.m.

15

16   APPEARANCES

17   For the Plaintiffs:       MR. MARK N. SENAK
                               Senak Keegan Gleason
18                             Smith & Michaud, LTD.
                               621 S. Plymouth Court
19                             Suite 100
                               Chicago, Illinois 60605
20                             (312) 214-1400
                               msenak@skgsmlaw.com
21

22   For the Defendant:        MR. ANDREW B. MILLER
                               Starr Austen & Miller, LLP
23                             201 South Third Street
                               Logansport, Indiana 46947
24                             (574) 722-6676
                               miller@starrausten.com
25
```

```
 1   REPORTED BY:              Ms. Diane Murray, CSR-4019, RPR

 2   ALSO PRESENT:             Mr. Paul Scholten

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      TABLE OF CONTENTS

 2    EXAMINATIONS                                  PAGE

 3    WITNESS:  GONSALO SILVA

 4    Examination by Mr. Senak                        4

 5

 6                        EXHIBITS

 7                     (None marked.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    Grand Rapids, Michigan
 2              Friday, September 1, 2017 - 9:02 a.m.
 3                         GONSALO SILVA,
 4               HAVING BEEN CALLED AND DULY SWORN:
 5                          EXAMINATION
 6   BY MR. SENAK:
 7   Q.   Would you state your name and spell your first and last
 8        name for the court reporter?
 9   A.   Okay.  It's Gonsalo Silva.  G-o-n-s-a-l-o.  Last name is
10        S-i-l-v-a.
11   Q.   Mr. Silva, have you ever given a deposition before?
12   A.   No.
13   Q.   Two things I tell people, and it's primarily for the court
14        reporter.  One is you have to answer out loud because
15        you'll note she's taking down what you say, and if you
16        don't answer out loud, she can't take down --
17   A.   All right.
18   Q.   -- what you say.
19             The second one is if you would wait till I
20        finish my question before you answer and I'll try to wait
21        to finish your answer before I ask my next question --
22   A.   Okay.
23   Q.   -- because, again, if we talk at the same time it makes it
24        tough for her.
25             Finally, if you'd like to take a break, just let
```

```
 1        me know.  We can take a break whenever you like.

 2   A.   Okay.

 3   Q.   Where do you live?

 4   A.   In South Haven.

 5   Q.   Can you give me your address?

 6   A.   68287 County Road 380.

 7   Q.   And that's in South Haven?

 8   A.   Yep.

 9   Q.   How long have you lived there?

10   A.   About twenty years.

11   Q.   Just summarize for us your educational background.

12   A.   Just, basically just graduated from high school.

13   Q.   At some point you worked for Air Tech?

14   A.   Yep.

15   Q.   When did you begin working there?

16   A.   Not sure.  Probably like late '90's, 1999.

17   Q.   And when did you stop working there?

18   A.   Oh, about three years ago.

19   Q.   So about 2014?

20   A.   Yep.

21   Q.   Why did you leave the company?

22   A.   Well, going out of town and stuff, I got kids and stuff.

23   Q.   Before you worked for Air Tech, can you just give us a

24        summary of what your work experience was?

25   A.   Just basic factory work, general labor stuff.
```

```
 1   Q.   And since leaving Air Tech, what have you done?

 2   A.   I work for another company, supervisor, second shift

 3        supervisor.

 4   Q.   What's the name of the company?

 5   A.   East Jordan Plastics.

 6   Q.   When you worked at Air Tech, did you receive any kind of

 7        training?

 8   A.   It was kinda like on-the-job training.

 9   Q.   In terms of how to clean ovens --

10   A.   Yep.  Yep.

11   Q.   -- you were trained on the job?

12   A.   Yep.

13   Q.   Did you receive confined space training?

14   A.   Yep.

15   Q.   Explain to me how that training was given to you.

16   A.   It was an online course.

17   Q.   And why did you have to have that training?

18   A.   Because we entered confined space.

19   Q.   Did you receive a certification after you completed that

20        training?

21   A.   Yep.

22   Q.   Did you need that training to clean ovens?

23             MR. MILLER:  Objection.  Calls for speculation.

24   BY MR. SENAK:

25   Q.   You can answer, if you know.
```

```
 1   A.   I'm pretty sure.   Yeah.

 2   Q.   Tell me how you were compensated when you worked at Air

 3        Tech.

 4   A.   What you mean?

 5   Q.   How were you paid?

 6   A.   Oh, by check.

 7   Q.   Okay.   How did they determine how much to pay you?

 8   A.   It was pretty much the same pay every day.

 9   Q.   Were you paid a set amount every day?

10   A.   Yeah.

11   Q.   Did that -- was that determined by the amount of hours

12        that you worked or was it the same regardless of the

13        number of the hours you worked?

14   A.   It was about the same.

15   Q.   So no matter how long you worked, you received the same

16        amount?

17   A.   Yeah.   Some days were short, some days were long, but it's

18        all the same.

19   Q.   So even on the short days, you still received the same

20        amount?

21   A.   Yep.

22   Q.   Did you receive any kind of incentive or bonus?

23   A.   Yeah, on Christmas, you know, Christmas bonus.

24   Q.   Anything other than that?

25   A.   No.
```

```
 1   Q.   How did you know what to do?  How did you receive your job
 2        assignments?
 3   A.   When I first started, you know, Paul was there, showed us
 4        what we had to do, you know.  It was on-the-job training.
 5   Q.   Other than Paul, did anyone else give you your job
 6        assignments?
 7   A.   Yeah.  Ken.
 8   Q.   Ken Wall?
 9   A.   Yep.
10   Q.   Other than those two, anyone else?
11   A.   No.
12   Q.   Was Mr. Wall your supervisor?
13   A.   Him and Paul.
14   Q.   All right.  Anyone else supervise you during your time at
15        Air Tech?
16   A.   No.
17   Q.   Do you recall working at the Ball plant?
18   A.   Yeah.
19   Q.   Do you recall working, cleaning an IBO there in May of
20        2014?
21   A.   I don't know the exact day but I do remember working.
22   Q.   Do you remember that, after you cleaned the IBO, there was
23        a fire at the plant?
24   A.   I don't remember about a fire.
25   Q.   Were you ever told that, after cleaning that IBO, there
```

```
 1       was a fire?

 2   A.  Yeah.  I heard.

 3   Q.  Okay.  Do you know what IBO number that was?

 4   A.  No.

 5   Q.  When you were at the Ball plant, did anyone at Ball

 6       supervise your work?

 7   A.  Yeah.

 8   Q.  Who was it?

 9   A.  I'm not sure of the guy.  It's been a while.

10   Q.  What do you mean when you say he supervised your work?

11       Tell me what you mean by that.

12   A.  Well, he'll come on, you know, check once in a while, look

13       in there with a flashlight and stuff, show which areas he

14       wanted us to clean.

15   Q.  You didn't work for Ball at the time; right?

16   A.  Not for the company, Ball.

17   Q.  Right.  You were employed by Air Tech?

18   A.  Yeah.

19   Q.  And as you pointed out, Mr. Wall would have been the

20       supervisor of your crew?

21   A.  Yeah.

22               MR. MILLER:  Objection.  Misstates his prior

23       testimony.

24   BY MR. SENAK:

25   Q.  Well, when you were cleaning the oven at the Monticello
```

```
 1        plant, Mr. Wall was your supervisor?
 2                   MR. MILLER:  Objection.  Misstates his prior
 3        testimony.
 4   BY MR. SENAK:
 5   Q.   Was he?
 6   A.   Him and Paul, yeah.
 7   Q.   Okay.  Thank you.
 8                   Do you recall who else was on the crew, other
 9        than you and Mr. Wall?
10   A.   No.
11   Q.   Had you cleaned IBO ovens before?
12   A.   Yeah.
13   Q.   How long would it take you to clean one?
14   A.   All depends.
15   Q.   On what?
16   A.   Just like gotta take out the screens and, you know, clean
17        'em.  Some are different than others.  All depends.
18   Q.   Generally, how long would it take?
19   A.   Like ten hours.
20   Q.   How many people would be on the crew that would clean an
21        IBO?
22   A.   It's all -- you know.  I don't know how many people.  It's
23        however many people Paul brought.
24   Q.   What's the most you've ever seen in terms of the number of
25        people on a crew that cleaned an IBO?
```

```
 1              MR. MILLER:  Objection.  Calls for speculation.
 2  A.   Probably -- I don't know.
 3  BY MR. SENAK:
 4  Q.   How many times had you cleaned an IBO, before Monticello
 5       in 2014?
 6  A.   A lot of times.
 7  Q.   So in those times, what's the most people that have worked
 8       on an IBO that you can recall?
 9              MR. MILLER:  Objection.  Asked and answered.
10  A.   Eight or twelve guys.
11  BY MR. SENAK:
12  Q.   What's the least amount of people who's worked to clean an
13       IBO?
14  A.   Probably about eight.
15  Q.   The more people that are on the crew, the less time it
16       takes, is that true?
17              MR. MILLER:  Objection.  Calls for speculation.
18       Also object as to form.
19  A.   I guess.  I don't know.
20  BY MR. SENAK:
21  Q.   Well, you've cleaned a number of IBO's?
22  A.   Yeah.  Yeah.
23  Q.   So I mean the more people you have, does it generally take
24       less time?
25              MR. MILLER:  Objection.  Calls for speculation.
```

```
 1        Object also as to form and asked and answered.
 2   A.   I don't know.  I don't know how to -- yeah, I guess.
 3   BY MR. SENAK:
 4   Q.   Okay.  Who determined what hours you worked at the Ball
 5        plant?
 6                  MR. MILLER:  Objection.  Calls for speculation.
 7   A.   When the job was done.
 8   BY MR. SENAK:
 9   Q.   No.  I mean who told you how much time you would be able
10        to work there?
11   A.   I don't know.  They never, they never told us that, I
12        don't think.
13   Q.   Did Air Tech determine the amount of hours that you
14        worked?
15                  MR. MILLER:  Objection.  Calls for speculation.
16   A.   No.  It was till the job got done.
17   BY MR. SENAK:
18   Q.   You worked for Air Tech; right?
19   A.   Yeah.
20   Q.   So when you were told to go work at the Ball plant, did
21        Air Tech tell you how much time you had to work there?
22   A.   No.
23   Q.   Who did?
24                  MR. MILLER:  Objection.  Asked and answered.
25   A.   It was, like I said, it was till the job was done.
```

```
 1   BY MR. SENAK:

 2   Q.   So did you have a certain amount of time to do the job?

 3                 MR. MILLER:  Objection.  Asked and answered.

 4   A.   No.  I don't think we did.

 5   BY MR. SENAK:

 6   Q.   What part of the IBO did you clean?

 7   A.   I cleaned the bottom, the bottom first three zones.

 8   Q.   After you got done cleaning it, did someone from Air Tech

 9        come to check to make sure it was clean?

10   A.   Yeah.

11   Q.   Who was it?

12   A.   Paul.

13   Q.   What did he do?

14   A.   He would go in there and he would, like, check and make

15        sure my areas were cleaned.

16   Q.   Do you know whether he checked the rest of the IBO?

17   A.   I'm not sure.  I just remember him, you know, checking my

18        zones.

19   Q.   Explain to me how you clean it.

20   A.   Well, we go inside, take some screens out, go inside and

21        use grinders, scrapers, vacuum cleaners.

22   Q.   Are you given a mask to use?

23   A.   Yep.

24   Q.   What kind of mask is it?

25   A.   A respirator, you know, for dust.
```

```
 1   Q.    Is it the kind that covers your nose and mouth or does it

 2         cover your entire face?

 3   A.    It covers your nose and mouth.

 4   Q.    And do you know why you're given that?

 5   A.    For our safety.

 6   Q.    And why is that needed for your safety?

 7   A.    Breathing in dust and stuff.

 8   Q.    Does the cleaning process create a dust?

 9   A.    Sometimes and sometimes not.

10   Q.    When you say sometimes it does, what creates the dust?

11               MR. MILLER:  Objection.  Calls for speculation.

12   A.    Just when we grind outside the doors.

13   BY MR. SENAK:

14   Q.    I'm sorry?

15   A.    When we grind the doors outside.

16   Q.    Do you also use the grinder inside the oven?

17   A.    Sometimes.

18   Q.    And I take it whenever you use the grinder, it creates a

19         dust?

20               MR. MILLER:  Objection.  It calls for

21         speculation.  Object also as to form.

22   A.    Yeah.

23   BY MR. SENAK:

24   Q.    And that's why you're given the mask is to make sure that

25         you don't breathe in the dust?
```

```
 1   A.   Yep.

 2   Q.   Okay.  Apart from the dust, when you scrape off the

 3        residue from inside the oven, does it create pieces of

 4        particulate matter that fall into the oven, of different

 5        sizes?

 6   A.   Yeah.

 7   Q.   How big or small are those pieces?

 8   A.   Different size every time.

 9   Q.   Are some of them very large?

10   A.   Not too big.

11   Q.   At the end, do you sweep them up or vacuum them up?

12   A.   We vacuum them up.

13   Q.   Do you wipe down the inside of the oven?

14   A.   Just, you know, with our hands and gloves and get it

15        vacuumed up.  It has a brush on it.

16   Q.   Okay.  Do you take a rag and wipe the inside of the oven?

17   A.   No.  The vacuum has a brush on it.

18   Q.   So is it true that the only way you get the dust up is you

19        vacuum it?

20   A.   Yeah.

21   Q.   When you began cleaning the IBO at the Monticello plant,

22        what were you told to do, what were you told to clean?

23   A.   It was just everything that, you know, that we could see,

24        you know, when we get inside.

25   Q.   Okay.  I'm going to show you Exhibit Number 1.
```

```
 1                 Do you know what that is?

 2   A.   It's the oven.  Well, the whole picture?

 3   Q.   Yes.

 4   A.   Yeah.  The oven.

 5   Q.   This is the oven at the Ball plant; right?

 6   A.   Yeah.

 7                 MR. MILLER:  I'm gonna object.  Calls for

 8        speculation, lack of foundation.

 9   BY MR. SENAK:

10   Q.   When you were told to clean the oven, did they tell you

11        how much of the oven you were supposed to clean?

12   A.   No.  They had the doors open, you know, and we cleaned it.

13   Q.   How did you know how much to clean?

14   A.   Well, you can go all the way through it, the bottom, the

15        bottom.  You can go all the way through it.

16   Q.   If you look at Exhibit Number 2, do you know whether you

17        were told to clean up to the area where there's a black

18        line on Exhibit Number 2?

19                 MR. MILLER:  Objection.  Lack of foundation.

20   A.   I never cleaned those zones -- so -- I was always in the

21        bottom.

22   BY MR. SENAK:

23   Q.   Okay.  Were you told that you would clean the bottom part

24        of the oven?

25   A.   Yeah.  That's what I've always done.
```

```
 1   Q.   All right.  Were you told anything about how far you would
 2        clean up into the ductwork?
 3                 MR. MILLER:  Objection.  Lack of foundation.
 4        Assumes --
 5   A.   I've never done ductwork.
 6                 MR. MILLER:  -- facts not in evidence.  You've
 7        got to let me finish my objection.  You need to let me
 8        finish my question or --
 9                 THE WITNESS:  Oh, okay.
10                 MR. MILLER:  -- my objection --
11                 MR. SENAK:  Yeah.  I should've said that.
12                 MR. MILLER:  -- before you answer.
13                 THE WITNESS:  Okay.
14                 MR. MILLER:  And, also, avoid speaking at the
15        same time as either Mr. Senak or myself --
16                 THE WITNESS:  Okay.
17                 MR. MILLER:  -- because it's impossible for our
18        court reporter to transcribe two people talking.  So allow
19        him to finish --
20                 MR. SENAK:  And can you --
21                 MR. MILLER:  -- his question before you answer.
22                 MR. SENAK:  Why don't you read the question back
23        and then I think she's got your objection.
24                 (At 9:18 a.m., record repeated by reporter as
25                 follows:  "Q.  Were you told anything about how
```

```
 1              far you would clean up into the ductwork?")
 2              MR. MILLER:  Same objections.
 3  A.   So answer now?
 4  BY MR. SENAK:
 5  Q.   Yeah.  You can answer now.
 6  A.   I never cleaned the ductwork.  I never cleaned that area.
 7  Q.   So no one told you, at least, how far up into the ductwork
 8       Air Tech would clean?
 9              MR. MILLER:  Objection.  Asked and answered.
10  A.   I never cleaned those.
11  BY MR. SENAK:
12  Q.   Okay.  Other than Mr. Schoulten, did anyone else inspect
13       your work?
14              MR. MILLER:  Objection.  Asked and answered.
15  BY MR. SENAK:
16  Q.   For Air Tech.  I'm sorry.
17  A.   Just Paul and Ken.
18  Q.   Mr. Wall also inspected the work, too?
19              MR. MILLER:  Objection.  Asked and answered.
20  A.   Yeah.
21  BY MR. SENAK:
22  Q.   Did you ever see either of them get up on top of the oven
23       and inspect the areas shown in Exhibit Number 2 that has
24       the circle drawn around it or below the black line?
25  A.   No.  That's not my job.
```

```
 1  Q.   So you don't recall seeing them get up and inspect those

 2       areas?

 3                 MR. MILLER:  Objection.  Asked and answered.

 4  A.   Not -- like I said, I was doing my, my work.

 5  BY MR. SENAK:

 6  Q.   Do you recall there being a fire in the oven after Air

 7       Tech finished cleaning it?

 8                 MR. MILLER:  Objection.  Asked and answered.

 9  A.   No.

10  BY MR. SENAK:

11  Q.   Did anyone ever tell you there was a fire?

12                 MR. MILLER:  Objection.  Asked and answered.

13  A.   No.

14  BY MR. SENAK:

15  Q.   Did anyone ever tell you what may have caused a fire in

16       the oven?

17  A.   No.

18                 MR. SENAK:  Okay.  That's all I have.  You're

19       done.

20                 MR. MILLER:  No questions.

21                 MR. SENAK:  Told you I'd get you out of here

22       quick.

23                 MR. MILLER:  You're done.  We're going to

24       reserve the right to review and sign.

25                 (At 9:21 a.m., deposition concluded.)
```

```
 1  STATE OF MICHIGAN        )
                             )   SS
 2  COUNTY OF LIVINGSTON     )

 3

 4

 5          I certify that this transcript, consisting of 20 pages,

 6  is a complete, true and correct record of the testimony of said

 7  witness held in this case on Friday, September 1, 2017.

 8          I also certify that prior to taking this deposition, the

 9  witness was duly sworn to tell the truth.

10

11      Date:   09-10-2017

12

13

14

15

16  _____

17                      Diane Murray, CSR-4019, RPR

18                      County of Livingston, State of Michigan

19                      My Commission expires:   10-12-2018

20

21

22

23

24

25
```

**1**

**1** 4:2 15:25
**1999** 5:16

**2**

**2** 16:16,18 18:23
**2014** 5:19 8:20 11:5
**2017** 4:2

**3**

**380** 5:6

**6**

**68287** 5:6

**9**

**90's** 5:16
**9:02** 4:2
**9:18** 17:24
**9:21** 19:25

**A**

**a.m.** 4:2 17:24 19:25
**address** 5:5
**Air** 5:13,23 6:1,6 7:2 8:15 9:17 12:13,18, 21 13:8 18:8, 16 19:6
**amount** 7:9, 11,16,20 11:12 12:13 13:2
**area** 16:17 18:6

**areas** 9:13 13:15 18:23 19:2
**assignments** 8:2,6
**Assumes** 17:4
**avoid** 17:14

**B**

**back** 17:22
**background** 5:11
**Ball** 8:17 9:5, 15,16 12:4,20 16:5
**basic** 5:25
**basically** 5:12
**began** 15:21
**begin** 5:15
**big** 15:7,10
**black** 16:17 18:24
**bonus** 7:22, 23
**bottom** 13:7 16:14,15,21, 23
**break** 4:25 5:1
**breathe** 14:25
**Breathing** 14:7
**brought** 10:23
**brush** 15:15, 17

**C**

**CALLED** 4:4
**calls** 6:23 11:1,17,25

12:6,15 14:11, 20 16:7
**caused** 19:15
**certification** 6:19
**check** 7:6 9:12 13:9,14
**checked** 13:16
**checking** 13:17
**Christmas** 7:23
**circle** 18:24
**clean** 6:9,22 9:14 10:13,16, 20 11:12 13:6, 9,19 15:22 16:10,11,13, 17,23 17:2 18:1,8
**cleaned** 8:22 10:11,25 11:4, 21 13:7,15 16:12,20 18:6, 10
**cleaners** 13:21
**cleaning** 8:19,25 9:25 13:8 14:8 15:21 19:7
**company** 5:21 6:2,4 9:16
**compensated** 7:2
**completed** 6:19
**concluded** 19:25
**confined** 6:13,18
**County** 5:6
**court** 4:8,13 17:18

**cover** 14:2
**covers** 14:1,3
**create** 14:8 15:3
**creates** 14:10,18
**crew** 9:20 10:8,20,25 11:15

**D**

**day** 7:8,9 8:21
**days** 7:17,19
**depends** 10:14,17
**deposition** 4:11 19:25
**determine** 7:7 12:13
**determined** 7:11 12:4
**doors** 14:12, 15 16:12
**drawn** 18:24
**ductwork** 17:2,5 18:1,6, 7
**DULY** 4:4
**dust** 13:25 14:7,8,10,19, 25 15:2,18

**E**

**East** 6:5
**educational** 5:11
**em** 10:17
**employed** 9:17
**end** 15:11
**entered** 6:18

**entire** 14:2
**evidence** 17:6
**exact** 8:21
**EXAMINATION** 4:5
**Exhibit** 15:25 16:16,18 18:23
**experience** 5:24
**Explain** 6:15 13:19

**F**

**face** 14:2
**factory** 5:25
**facts** 17:6
**fall** 15:4
**Finally** 4:25
**finish** 4:20,21 17:7,8,19
**finished** 19:7
**fire** 8:23,24 9:1 19:6,11,15
**flashlight** 9:13
**form** 11:18 12:1 14:21
**foundation** 16:8,19 17:3
**Friday** 4:2

**G**

**G-o-n-s-a-l-o** 4:9
**general** 5:25
**generally** 10:18 11:23
**give** 5:5,23 8:5

gloves 15:14

Gonsalo 4:3, 9

gotta 10:16

graduated 5:12

Grand 4:1

grind 14:12, 15

grinder 14:16, 18

grinders 13:21

guess 11:19 12:2

guy 9:9

guys 11:10

**H**

hands 15:14

Haven 5:4,7

he'll 9:12

heard 9:2

high 5:12

hours 7:11,13 10:19 12:4,13

**I**

IBO 8:19,22, 25 9:3 10:11, 21,25 11:4,8, 13 13:6,16 15:21

IBO'S 11:21

impossible 17:17

incentive 7:22

inside 13:20 14:16 15:3,13, 16,24

inspect 18:12,23 19:1

inspected 18:18

**J**

job 6:11 8:1,5 12:7,16,25 13:2 18:25

Jordan 6:5

**K**

Ken 8:7,8 18:17

kids 5:22

kind 6:6 7:22 13:24 14:1

kinda 6:8

**L**

labor 5:25

lack 16:8,19 17:3

large 15:9

late 5:16

leave 5:21

leaving 6:1

live 5:3

lived 5:9

long 5:9 7:15, 17 10:13,18

lot 11:6

loud 4:14,16

**M**

make 13:9,14 14:24

makes 4:23

mask 13:22, 24 14:24

matter 7:15 15:4

Michigan 4:1

MILLER 6:23 9:22 10:2 11:1,9,17,25 12:6,15,24 13:3 14:11,20 16:7,19 17:3, 6,10,12,14,17, 21 18:2,9,14, 19 19:3,8,12, 20,23

Misstates 9:22 10:2

Monticello 9:25 11:4 15:21

mouth 14:1,3

**N**

needed 14:6

nose 14:1,3

note 4:15

number 7:13 9:3 10:24 11:21 15:25 16:16,18 18:23

**O**

object 11:18 12:1 14:21 16:7

objection 6:23 9:22 10:2 11:1,9,17,25 12:6,15,24 13:3 14:11,20 16:19 17:3,7, 10,23 18:9,14, 19 19:3,8,12

objections 18:2

on-the-job 6:8 8:4

online 6:16

open 16:12

oven 9:25 14:16 15:3,4, 13,16 16:2,4, 5,10,11,24 18:22 19:6,16

ovens 6:9,22 10:11

**P**

paid 7:5,9

part 13:6 16:23

particulate 15:4

Paul 8:3,5,13 10:6,23 13:12 18:17

pay 7:7,8

people 4:13 10:20,22,23, 25 11:7,12,15, 23 17:18

picture 16:2

pieces 15:3,7

plant 8:17,23 9:5 10:1 12:5, 20 15:21 16:5

Plastics 6:5

point 5:13

pointed 9:19

pretty 7:1,8

primarily 4:13

prior 9:22 10:2

process 14:8

**Q**

question 4:20,21 17:8, 21,22

questions 19:20

quick 19:22

**R**

rag 15:16

Rapids 4:1

read 17:22

recall 8:17,19 10:8 11:8 19:1,6

receive 6:6, 13,19 7:22 8:1

received 7:15,19

record 17:24

remember 8:21,22,24 13:17

repeated 17:24

reporter 4:8, 14 17:18,24

reserve 19:24

residue 15:3

respirator 13:25

rest 13:16

review 19:24

Road 5:6

**S**

S-i-l-v-a 4:10

safety 14:5,6

school 5:12

Schoulten 18:12

scrape 15:2

scrapers 13:21

screens 10:16 13:20

Senak 4:6
6:24 9:24 10:4
11:3,11,20
12:3,8,17
13:1,5 14:13,
23 16:9,22
17:11,15,20,
22 18:4,11,15,
21 19:5,10,14,
18,21

September 4:2

set 7:9

shift 6:2

short 7:17,19

should've 17:11

show 9:13 15:25

showed 8:3

shown 18:23

sign 19:24

Silva 4:3,9,11

size 15:8

sizes 15:5

small 15:7

South 5:4,7

space 6:13,18

speaking 17:14

speculation
6:23 11:1,17,
25 12:6,15
14:11,21 16:8

spell 4:7

started 8:3

state 4:7

stop 5:17

stuff 5:22,25
9:13 14:7

summarize

5:11

summary 5:24

supervise 8:14 9:6

supervised 9:10

supervisor
6:2,3 8:12
9:20 10:1

supposed 16:11

sweep 15:11

SWORN 4:4

---

**T**

takes 11:16

taking 4:15

talk 4:23

talking 17:18

Tech 5:13,23
6:1,6 7:3 8:15
9:17 12:13,18,
21 13:8 18:8,
16 19:7

ten 10:19

terms 6:9 10:24

testimony 9:23 10:3

things 4:13

till 4:19 12:16, 25

time 4:23 8:14
9:15 11:15,24
12:9,21 13:2
15:8 17:15

times 11:4,6,7

told 8:25 12:9,
11,20 15:22
16:10,17,23
17:1,25 18:7
19:21

top 18:22

tough 4:24

town 5:22

trained 6:11

training 6:7,8,
13,15,17,20,
22 8:4

transcribe 17:18

true 11:16 15:18

twelve 11:10

twenty 5:10

---

**V**

vacuum
13:21 15:11,
12,17,19

vacuumed 15:15

---

**W**

wait 4:19,20

Wall 8:8,12
9:19 10:1,9
18:18

wanted 9:14

wipe 15:13,16

work 5:24,25
6:2 9:6,10,15
12:10,20,21
18:13,18 19:4

worked 5:13,
23 6:6 7:2,12,
13,15 11:7,12
12:4,14,18

working 5:15,
17 8:17,19,21

---

**Y**

years 5:10,18

---

**Z**

zones 13:7,18 16:20

# Exhibit 27

1

2           IN THE UNITED STATES DISTRICT COURT

3           FOR THE NORTHERN DISTRICT OF INDIANA

4

5    _____

6    BALL CORPORATION, an Indiana

7    Corporation and FACTORY MUTUAL

8    INSURANCE COMPANY, a Rhode Island

9    corporation, as subrogee,

10            Plaintiff,                Case No.: 16 cv 42

11   v

12   AIR TECH OF MICHIGAN, INC.,

13   a Michigan corporation,

14            Defendant.

15   _____

16

17

18                DEPOSITION OF KEN WALL

19

20   DATE:      August 30, 2017

21   TIME:      12:15 p.m.

22   LOCATION:  O'Brien & Bails

23              625 Kenmoor Avenue, SE, Suite 301

24              Grand Rapids, Michigan

25   REPORTER:  Rebecca S. Renzema, CSR-1435

```
 1   APPEARANCES:

 2

 3       SENAK KEEGAN GLEASON SMITH & MICHAUD, LTD.

 4       BY:  Mark N. Senak

 5            621 S. Plymouth Ct., Suite 100

 6            Chicago, Illinois 60605

 7            (312) 214-1400

 8            msenak@skgsmlaw.com

 9                On behalf of Plaintiffs

10

11       STARR AUSTEN & MILLER, LLP

12       BY:  Andrew B. Miller

13            201 South 3rd Street

14            Logansport, Indiana 46947

15            (574) 722-6676

16            miller@starrausten.com

17                On behalf of Defendant

18

19       ALSO PRESENT:  Paul Scholten

20

21

22

23

24

25
```

```
1                           INDEX

2    WITNESS:                                    PAGE

3        KEN WALL

4    Examination by Mr. Senak                       4

5

6

7                         EXHIBITS

8    NUMBER          IDENTIFICATION              PAGE

9    Ex. No. 13      Photograph                    30

10                   (Original exhibit retained.   Copy attached.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        Grand Rapids, Michigan

 2                        August 30, 2017; 12:15 p.m.

 3                                ***

 4                             KEN WALL,

 5           after having been duly sworn, was examined and

 6           testified as follows:

 7                             EXAMINATION

 8   BY MR. SENAK:

 9   Q.   Would you state your name and spell it for the court

10        reporter?

11   A.   Ken Wall.  K-e-n W-a-l-l.

12   Q.   Mr. Wall, have you ever given a deposition?

13   A.   No.

14   Q.   All right.  You may have been told this, but I do it really

15        for the court reporter.  Two things to keep in mind.  One, you

16        need to answer out loud because she can't take down anything

17        but a verbal response.  And two, if you would wait for me to

18        finish my question before you answer, I'll try to wait until

19        you finish your answer before I ask my next question.  Again,

20        when we talk at the same time it makes it difficult for her.

21   A.   Okay.

22   Q.   Thirdly, if you want to take a break, you let me know, all

23        right?

24   A.   Okay.

25   Q.   What's your address?
```

```
 1    A.    131 West 19th, Holland, Michigan.

 2    Q.    How long have you lived there?

 3    A.    Fifteen years.

 4    Q.    Any plans of moving?

 5    A.    Not right now.

 6    Q.    Would you just summarize your educational background?

 7    A.    High school.

 8    Q.    Did you take any, like, training courses, technical courses,

 9          seminars since that?

10    A.    No.

11    Q.    Are you familiar with a term called confined space training?

12    A.    Yes.

13    Q.    Have you taken that training?

14    A.    Yes.

15    Q.    Do you need to have confined space training to clean ovens?

16    A.    Yes.

17    Q.    Do you know why?

18    A.    Because it's a confined space.

19    Q.    Good answer.  If you don't have confined space training, are

20          you permitted to get inside the oven?

21    A.    No.

22    Q.    You work for Air Tech?

23    A.    Yes.

24    Q.    How long have you worked there?

25    A.    Twenty-one years.
```

```
 1    Q.    Do you have a job title?

 2    A.    No.

 3    Q.    All right.  Describe for me what your job duties are.

 4    A.    Clean ovens.

 5    Q.    When you say ovens, are these industrial ovens?

 6    A.    Industrial ovens, can ovens.

 7    Q.    I take it you're familiar with the Ball Corporation?

 8    A.    Yes.

 9    Q.    And I assume you've cleaned ovens at the Ball Monticello plant

10          on prior occasions?

11    A.    Yes.

12    Q.    Do you know how many times you've done that?

13    A.    Probably four to five -- four times a year maybe we would be

14          in the Monticello plant.

15    Q.    Four to five times a year you go down there to clean various

16          ovens?

17    A.    Correct.

18    Q.    And how long have you done that in terms of the number of

19          years?

20    A.    Ten.

21    Q.    In addition to cleaning ovens, do you clean duct work?

22    A.    Yes.

23    Q.    How often do you clean duct work?

24    A.    In ovens?

25    Q.    Or otherwise.
```

1  A.  I believe it was once a year, but I could be wrong.  I mean,

2      I'm sure you could look that up.

3  Q.  Cleaning the duct work, do you do it any differently than

4      cleaning the oven?

5  A.  It's basically the same thing.  Scrape everything out, vacuum

6      it out.

7  Q.  How are you paid by Air Tech?

8  A.  On the ovens we get paid by the day.

9  Q.  Do you get paid the same amount no matter how long it takes?

10 A.  Yes.

11 Q.  Do you have a specific amount of time that is allocated for

12     cleaning the oven?

13 A.  No.

14 Q.  So for instance at the Ball plant, you're not told, "The

15     oven's going to be down for a day, you have a day to clean

16     it"?

17 A.  Well, yeah, yeah.  They shut it down.

18 Q.  When they shut it down, do they tell you how long it's going

19     to be shut down?

20 A.  Me personally, no.

21 Q.  Do you know that from some source like Mr. Scholten or

22     otherwise?

23 A.  Well, they shut it down and then we clean it out.  I mean --

24 Q.  I'm just trying to figure out whether, you know, when you go

25     there they tell you, "Look, we're shutting production down for

1     a day so you can clean the oven, you've got one day to clean
2     it."
3  A.  Okay.
4  Q.  Is that true?
5  A.  Yeah.
6  Q.  So there's a finite amount of time you have to finish the
7     job?
8  A.  Yeah.
9  Q.  How long does it take you to clean it?
10 A.  Maybe eight hours.
11 Q.  How many people are on the crew that cleans it?
12 A.  For that particular oven, maybe five guys.
13 Q.  Other than confined space training, did you receive any other
14    kind of training while at Air Tech?
15 A.  Yeah.  Maybe a scissor lift training, aerial lift training,
16    something like that.
17 Q.  How did you learn how to clean an oven?
18 A.  On-the-job training.
19 Q.  Who showed you?
20 A.  Paul Scholten.
21 Q.  How long did that training last?
22 A.  Well, several jobs before you really know what's going on.
23 Q.  When you're working at the Ball plant, who supervises your
24    work?
25 A.  Ball employees.

```
1    Q.   Does anyone from Air Tech?

2    A.   I'm the supervisor.

3    Q.   All right.  As the supervisor, do you tell everyone what to

4         do?

5    A.   Yes.

6    Q.   So at the beginning of the job, explain to me what happens.

7    A.   Well, we get to the job and we lock out the oven and open all

8         the doors and start cleaning it out.

9    Q.   Does anyone from Ball tell you how to clean the oven?

10   A.   No.

11   Q.   That's up to you to decide how to do it?

12   A.   Well, yeah, we know how to clean ovens, but, I mean, there

13        might be some particular things that they will mention to you

14        or something.

15   Q.   Can you give me an example?

16   A.   Maybe if they want certain screens pulled out or something

17        like that or --

18   Q.   Does Ball have any control over how you clean the oven?

19   A.   Any control on how we clean the oven?  Yeah, it's their oven.

20        They have total control.

21   Q.   When you say they have total control, what do you mean by

22        that?

23   A.   It's their oven.  If they don't like what we're doing, I'm

24        sure they'll tell us.

25   Q.   I bet they will.  Who determines when you're done?
```

```
 1   A.   I do.

 2   Q.   So you would determine, like, when you start and when you

 3        finish?

 4   A.   I would, but then it also gets inspected by a Ball employee.

 5   Q.   Understood.  But before you tell Ball that you're done, you

 6        decide the job is done?

 7   A.   I do, yes.

 8   Q.   Do you direct your employees how to clean the oven?

 9   A.   Yes.

10   Q.   Does anyone at Ball direct your employees how to clean the

11        oven?

12   A.   No.

13   Q.   When you get done, do you inspect the work?

14   A.   Yes.

15   Q.   Does Mr. Scholten then inspect the work?

16   A.   If he's present.

17   Q.   Tell me what you do when you, like, inspect the work.

18   A.   I look through all the doors, all the openings with a

19        flashlight and make sure there's no dirt or debris or anything

20        in there.  Make sure everything is back together the way it

21        should be.

22   Q.   Once you do that is that -- do you then go tell someone at

23        Ball that the job's done?

24   A.   Yes.

25   Q.   Who do you tell?
```

```
 1   A.   I don't recall his name.

 2   Q.   There's one person, though, that you go to at Ball and you

 3        tell them, "We're done"?

 4   A.   Yes.

 5   Q.   They then come out and look at the job?

 6   A.   Yes.

 7   Q.   What do they do?

 8   A.   Same thing.  Inspect with a flashlight, look in all the

 9        openings and --

10   Q.   I know this may seem like an odd -- they do the same thing you

11        do?

12   A.   Yes.

13   Q.   Do they ever go inside the oven?

14   A.   No.

15   Q.   I take it you would need confined space training to go into

16        the oven, right?

17             MR. MILLER:  Objection, calls for speculation and

18        you haven't laid a foundation as to his expertise.

19   BY MR. SENAK:

20   Q.   You can answer the question.

21   A.   What was the question?

22   Q.   You do need confined space training to go inside the oven?

23             MR. MILLER:  Same objections.

24             THE WITNESS:  Yes.

25
```

1    BY MR. SENAK:

2    Q.    If someone from Ball didn't have that training, they shouldn't

3          be going in the oven?

4                    MR. MILLER:  Objection, calls for speculation.

5    BY MR. SENAK:

6    Q.    True?

7    A.    That's up to them, I mean.

8    Q.    What happens if you violate the confined space requirement?

9                    MR. MILLER:  Objection, calls for speculation, lack

10         of foundation as to expertise.

11   BY MR. SENAK:

12   Q.    You can still answer.

13   A.    I don't know.

14   Q.    Have you ever had an occasion where someone's violated -- like

15         gone into the oven who doesn't have confined space training?

16   A.    No.

17   Q.    Do you know whether that's an OSHA violation?

18                   MR. MILLER:  Objection, calls for speculation.

19                   THE WITNESS:  Don't know.

20   BY MR. SENAK:

21   Q.    When you're working, do you get breaks or do you take breaks

22         or does your crew take breaks?

23   A.    Yes.

24   Q.    Who decides when you get a break?

25   A.    The individual person.

1   Q.   Does anyone at Ball decide when you take breaks?

2   A.   No.

3   Q.   You've worked at the Ball Monticello plant on a number of

4        occasions, correct?

5   A.   Yes.

6   Q.   On each of those occasions you've cleaned ovens, true?

7   A.   Yes.

8   Q.   Do you know if there are different types of ovens at the

9        plant?

10  A.   Yes, there are.

11  Q.   What are they?

12  A.   They have pin ovens and IBO ovens.

13  Q.   Do you know what each of them does?

14  A.   Yes.

15  Q.   What's the IBO do versus the pin oven?

16  A.   They just run different cans.

17  Q.   Do you know if there's a different function for the IBO and

18       the pin oven?

19            MR. MILLER:   Objection, calls for speculation.

20            THE WITNESS:   I'm not an engineer.  I just clean

21       them.

22  BY MR. SENAK:

23  Q.   How do you find out that you're going to be working in the

24       Ball plant?

25  A.   Paul will let us know.

```
 1    Q.   How long in advance do you find out?

 2    A.   Maybe a week.

 3    Q.   He just comes to you and says, "We're working at the Ball

 4         plant next Tuesday" and that's how you know what you're going

 5         to be doing?

 6    A.   Correct.

 7    Q.   "And we're cleaning ovens"?

 8    A.   Correct.

 9    Q.   Can you tell me what tools you use to clean the ovens?

10    A.   Scrapers, wire brushes, vacuums.

11    Q.   Do you use any mechanized tools?

12    A.   Air chisel.

13    Q.   Any others?

14    A.   Maybe a grinder, electric grinder.  That's really about it.

15    Q.   Anything else?

16    A.   No.

17    Q.   Do you use rags?

18    A.   Yes.

19    Q.   Describe for me how you use these tools to clean the oven.

20    A.   You scrape the soot off the walls of the oven and then you

21         vacuum it up.

22    Q.   And by soot you're talking about, like, the residue that

23         accumulates on the inside of the oven or the duct work, I take

24         it?

25    A.   Correct.
```

```
 1   Q.   Does your crew use respirators or some kind of breathing
 2        apparatus?
 3   A.   Yes.
 4   Q.   Do you know what kind they are?
 5   A.   No.
 6   Q.   Are they a full mask or are they just the kind that go over
 7        your mouth and nose?
 8   A.   The style that go over your mouth and nose.
 9   Q.   Do you know why they're issued those?
10   A.   So you don't breathe the dust in.
11   Q.   And by dust, you're talking about what is generated when
12        you're removing the soot from the side of the oven?
13   A.   Right.
14   Q.   You know there was a fire at the Ball plant in 2014?
15   A.   Yes.
16   Q.   And do you know that fire occurred right after Air Tech got
17        done cleaning the oven?
18   A.   Yes.
19   Q.   Do you know the oven that you were cleaning that caught on
20        fire or where the fire originated?
21   A.   Yeah.
22   Q.   Do you know that to be IBO number 2?
23   A.   No.
24   Q.   You just know it's an IBO?
25   A.   I just know it's an IBO.
```

```
1   Q.    Do you know what an IBO looks like?

2   A.    Yes.

3   Q.    Can you take a look at Exhibit Number 1 and tell me if that's

4         a picture of an IBO?

5   A.    That's an IBO.

6               MR. MILLER:  Objection, lack of foundation, calls

7         for speculation.

8   BY MR. SENAK:

9   Q.    Do you know whether what's shown in Exhibit Number 1 is

10        IBO number 2 at the Ball plant?

11              MR. MILLER:  Objection, calls for speculation and

12        lack of foundation.

13              THE WITNESS:  No.

14  BY MR. SENAK:

15  Q.    If you look at Exhibit Number 1 and Exhibit Number 2, when

16        you clean an IBO, can you tell me what parts of the oven you

17        clean?

18  A.    The whole thing.

19  Q.    Let's say this.  You clean the inside of the oven, correct?

20  A.    Yeah.  Correct.

21  Q.    You'll note that there are portions of Exhibit Number 1 that

22        are marked and in particular there's a line with a number 3.

23        Do you see that?

24  A.    I see it.

25  Q.    Do you clean the part of the oven that sits on top of it up to
```

1          the line that's shown as number 3 on Exhibit 1?

2     A.   Yes.

3     Q.   Are you familiar with the term squirrel cage?

4     A.   Yes.

5     Q.   Do you clean the squirrel cage?

6     A.   Yes.

7     Q.   Who cleans the squirrel cage?

8     A.   Oscar.

9     Q.   Is that Oscar Woody?

10    A.   Oscar Woody, yes.

11    Q.   Do you know whether Mr. Woody cleaned the squirrel cage on

12         IBO number 2 in May of 2014?

13    A.   I don't recall.  If he didn't, I would have.

14    Q.   Is there something unique about cleaning the squirrel cage

15         that only two of you will do it?

16    A.   No.

17    Q.   Why is it that you or Mr. Woody are kind of the two that clean

18         the squirrel cage?

19    A.   Because everybody's got their own job to do.  So we get there.

20         You know what you've got to do and you get it done.

21    Q.   Right.  You kind of tell everybody or they know based on what

22         they've done before the job they have to do and they go do it,

23         right?

24    A.   Right.

25    Q.   Is the squirrel cage shown either in Exhibit Number 1 or

```
 1        Number 2?

 2                MR. MILLER:  Objection, lack of foundation.

 3                THE WITNESS:  No.

 4  BY MR. SENAK:

 5  Q.   If you look at -- let's see here.  If you look at the circle

 6       shown on Exhibit Number 1 or the circle shown on Exhibit

 7       Number 2 -- do you see those black circles?

 8  A.   Yes, I do.

 9  Q.   Do you know whether that shows the area known as the squirrel

10       cage?

11  A.   Yeah.

12  Q.   Do you know whether that area is shown in Exhibit Number 2?

13  A.   The squirrel cage?

14  Q.   Yeah.

15  A.   Yeah, the squirrel cage.

16  Q.   Would you do me a favor and circle the squirrel cage on

17       Exhibit Number 2?  And if you could just put your initials and

18       today's date next to the circle.  It's the 30th.  Thanks.  The

19       squirrel cage connects to another piece of duct work that is

20       shaped in sort of a 45-degree angle.  Do you see that?

21  A.   Yes.

22  Q.   What is that called or do you have a name for that?

23  A.   No.

24  Q.   That's just the duct work next to the squirrel cage?

25  A.   Yes.
```

```
 1   Q.   That connects to the oven, true?

 2   A.   True.

 3   Q.   As part of the scope of work for the Ball plant in May of

 4        2014, did that include cleaning the squirrel cage?

 5   A.   Yes.

 6   Q.   Looking at Exhibit 2, how far above the squirrel cage did you

 7        clean IBO number 2 in May of 2014?

 8   A.   To the squirrel cage.  That's as far as you can get.

 9   Q.   Let's try this.  You'll see that there's a piece of duct work

10        that connects to an area shown in the exhibit.  Do you see

11        that?

12            MR. MILLER:  I'm going to object.  Lack of

13        foundation and vague.

14   BY MR. SENAK:

15   Q.   All right.  Let's try this.  Do you see in Exhibit Number 1

16        there's a line and it's drawn to a particular spot?  I'm

17        sorry.  And it has a number 3 on it.  Do you see that?

18   A.   I see it.

19   Q.   Did you clean up to that line in May of 2014 on IBO number

20        2?

21   A.   Yes.

22   Q.   Okay.  On Exhibit Number 2, can you draw a line that shows

23        where you would have stopped cleaning?  And by you, I mean

24        Air Tech, on IBO number 2.  And just again, your initials and

25        the date by the line.  So is it accurate that you would have
```

1     been responsible for cleaning everything below the line that

2     you've shown on Exhibit Number 2?

3  A.   Yes.

4  Q.   You've actually cleaned the squirrel cage, so you know how to

5     do it, right?

6  A.   Yes.

7  Q.   If you look at Exhibit Number 3, does that show the squirrel

8     cage?

9          MR. MILLER:  Objection, lack of foundation.

10         THE WITNESS:  No, you can't see the squirrel cage on

11    that picture.

12  BY MR. SENAK:

13  Q.   What does it show?

14  A.   It just shows an opening.  It's all black.

15  Q.   Is the squirrel cage inside there?

16  A.   Yes.

17  Q.   And the squirrel cage is a blower?

18  A.   Yes.

19  Q.   The term squirrel cage, I think I understand it, but can you

20     tell me what you understand the term to mean?

21  A.   It's a fan.

22  Q.   Does it include the fan and the housing around it?

23  A.   I don't know.

24  Q.   I want to make sure you and I are talking about the same

25     thing.  So when I think of the squirrel cage, I think of

```
 1        what's shown as being circled on Exhibit Number 3.  Do you

 2        agree or disagree?

 3   A.   That's the housing for the squirrel cage.

 4   Q.   Is the squirrel cage in your understanding just the fan, like

 5        the fan blades?

 6   A.   Yes.

 7   Q.   Let's try Exhibit 4.  Does that show the squirrel cage?

 8             MR. MILLER:  Objection, lack of foundation.

 9             THE WITNESS:  Yes.

10   BY MR. SENAK:

11   Q.   And Exhibit 4 shows the fan blades inside the squirrel cage or

12        that are the squirrel cage?

13   A.   Yes.

14   Q.   You tell me.  Is the squirrel cage just the fan blades or does

15        it include the housing around the fan blades?

16   A.   I don't know.

17   Q.   What do you consider it to be?

18   A.   The fan.

19   Q.   Just the blades?

20   A.   When we clean the squirrel cage, we clean everything inside

21        there.

22   Q.   All right.  If you look at Exhibit Number 4, you'll see that

23        there's, like, soot or residue around the perimeter of the

24        opening?

25   A.   Yes.
```

1    Q.    When you clean the squirrel cage, I take it you open -- you

2          take the access panel off?

3    A.    Yes.

4    Q.    That allows you to clean inside?

5    A.    Yes.

6    Q.    How do you clean inside the squirrel cage?  What do you do in

7          there?

8    A.    You scrape it out with a putty knife.

9    Q.    Would you remove the residue that's shown around the perimeter

10         of the hole in Exhibit Number 4?

11   A.    What you're looking at is insulation.

12   Q.    Okay.  So you wouldn't -- I mean, you're not going to remove

13         the insulation, right?

14   A.    No.

15   Q.    What you're trying to do is just remove the residue or the

16         soot?

17   A.    From the inside.

18   Q.    From the inside.  When you do that, you use a putty knife?

19   A.    Yes.

20   Q.    Do you use a wire brush to scrape it, too?

21   A.    Yes.

22   Q.    You mentioned you also have an air chisel and a grinder.  Do

23         you use those if you need to to clean the inside of the

24         squirrel cage?

25   A.    Yes.

```
 1   Q.   When all that gets done, I take it all that residue sort of

 2        drops down?

 3              MR. MILLER:  Objection, lack of foundation.

 4   BY MR. SENAK:

 5   Q.   I can ask it another way if you want me to.

 6   A.   It's all clean.

 7   Q.   Yeah, I know.  You clean it off the inside.  That then falls

 8        down from inside the squirrel cage?

 9              MR. MILLER:  Objection, assumes facts not in

10        evidence.

11   BY MR. SENAK:

12   Q.   Do you understand the question?

13   A.   And everything is vacuumed up, yes.

14   Q.   No.  I'll get to that.  I just want to -- that stuff goes

15        straight down to the base of the squirrel cage?

16   A.   Yes.

17   Q.   Okay.  If you look at Exhibit Number 3, there is an area below

18        the opening that is -- I think that's supposed to be a square.

19        It's labeled number 2.  Do you see that area?

20   A.   It's a pretty poor picture.

21   Q.   I didn't take it, so --

22   A.   I see the area circled, yes.

23   Q.   Okay.  There's a circle.  And then there's an area within the

24        circle, it's kind of a square, but it does have the number 2

25        and an arrow pointing to it.  Do you see that?  It's the next
```

```
 1         question he's going to object to.
 2    A.   Do I see the square?  Yeah, I see the square.
 3    Q.   All right.  When you clean the squirrel cage, does the soot or
 4         the residue drop down into the area shown in the square with
 5         the number 2 in Exhibit Number 3?
 6              MR. MILLER:  Objection, lack of foundation.
 7              THE WITNESS:  Yes.
 8    BY MR. SENAK:
 9    Q.   Now, when it gets there, what do you do?
10    A.   Vacuum it up.
11    Q.   After you vacuum it up, do you go in and then wipe it up?
12    A.   If necessary.
13    Q.   Sometimes yes, sometimes no, right?
14    A.   Correct.
15    Q.   When you're cleaning the squirrel cage, you remove the access
16         panel?
17    A.   Yes.
18    Q.   Do you have any problem or difficulty cleaning the squirrel
19         cage given the amount of space that's available through the
20         access panel?
21    A.   No.
22    Q.   So the access panel provides you with all the space or room
23         that you need to clean the entire squirrel cage?
24    A.   Yes.
25    Q.   Through that panel you can -- I take it you reach your arm in
```

 1        and you do what you described in terms of scraping things

 2        off?

 3   A.   Yes.

 4   Q.   Can you reach all the areas inside the squirrel cage when you

 5        reach in to do that?

 6   A.   Yes.

 7   Q.   You don't need any more, if you will, access to thoroughly

 8        clean the squirrel cage?

 9   A.   No.

10   Q.   Looking at Exhibit Number 5, do you know what Exhibit Number 5

11        shows?

12             MR. MILLER:  I'm going to object, lack of

13        foundation.

14             THE WITNESS:  No.

15   BY MR. SENAK:

16   Q.   If you look back at Exhibit Number 1, you'll see that Exhibit

17        number 1 was the IBO, right?

18   A.   Okay.

19   Q.   I mean, you tell me.  I'm just going -- I think you testified

20        that Exhibit Number 1 is a picture of an IBO, correct?

21   A.   It's a picture of an IBO, yes.

22             MR. MILLER:  Objection, lack of foundation.

23   BY MR. SENAK:

24   Q.   Do you see the part that is shown on Exhibit Number 5 on

25        Exhibit Number 1?

```
 1                    MR. MILLER:  Objection, lack of foundation.

 2                    THE WITNESS:  No.

 3   BY MR. SENAK:

 4   Q.   Do you see on Exhibit Number 1 there's a 2 marked on a

 5        particular part of the oven or duct work?

 6   A.   I do.

 7   Q.   Do you know whether that is also shown in Exhibit Number 5?

 8   A.   I don't know if that's the same part.

 9   Q.   It may not be the exact same part of the oven, but is it a

10        part that is on an IBO?

11                    MR. MILLER:  Objection, asked and answered and calls

12        for speculation.

13                    THE WITNESS:  I don't know.

14   BY MR. SENAK:

15   Q.   Do you know whether -- you were pointing out that the circles

16        on Exhibit Number 1 show the squirrel cage.  Do you recall

17        that?

18   A.   Yes.

19   Q.   And they connect to what's shown on Exhibit Number 1 as being

20        labeled with a 2?

21   A.   Yes.

22   Q.   That's part of the oven that you would clean as part -- let me

23        just start over.  That was included within the scope of work

24        for cleaning the oven at the Ball plant in May of 2014,

25        true?
```

1  A.  Yes.

2  Q.  If you look at Exhibit Number 5, there's a panel that's shown

3      on Exhibit Number 5.  I would term it an access panel,

4      correct?

5              MR. MILLER:  Objection, lack of foundation.

6  BY MR. SENAK:

7  Q.  If you know.

8  A.  I'm not sure what this picture is.  I mean, it could be

9      anything.

10 Q.  All right.  If you look back at Exhibit Number 1, the

11     section -- the number marked 2, do you know whether you --

12     whether there's an access panel on number 2 that allows you to

13     get in and clean that?

14 A.  Yes.

15 Q.  Do you know whether the access panel is shown in Exhibit

16     Number 5?

17             MR. MILLER:  Objection, lack of foundation.

18             THE WITNESS:  I don't know.

19 BY MR. SENAK:

20 Q.  When you clean the portion of the oven or duct work shown as

21     number 2 on this Exhibit 1, how do you do it?

22 A.  Scrape it out and vacuum it out.

23 Q.  I take it you have to find some way to access the inside of

24     the duct work labeled as number 2, true?

25             MR. MILLER:  Objection, asked and answered.

1          THE WITNESS:  True.

2     BY MR. SENAK:

3     Q.    And do you do it the same way as you do it with the squirrel

4           cage, which is there's an access panel that you take off, you

5           reach in, you scrape it off and then you vacuum out the debris

6           that's in the bottom?

7     A.    Yes.

8     Q.    Okay.  If you can take a look at Exhibit Number 6.  Is that

9           again a picture of the squirrel cage?

10    A.    Yes.

11    Q.    Is what's shown in Exhibit 6 a fair and accurate, you know,

12          depiction of the squirrel cage that would have been on IBO

13          number 2?

14          MR. MILLER:  Again, I object, lack of foundation,

15          calls for speculation.

16          THE WITNESS:  I don't know.

17    BY MR. SENAK:

18    Q.    Did you clean the squirrel cage on IBO number 2?  My apologies

19          if I've asked you this before.

20          MR. MILLER:  Objection, asked and answered.

21          THE WITNESS:  I don't recall.

22    BY MR. SENAK:

23    Q.    You don't recall.  Take a look at Exhibit Number 7.  Do you

24          know what that shows?

25          MR. MILLER:  Objection, lack of foundation.

```
 1                    THE WITNESS:  No.

 2   BY MR. SENAK:

 3   Q.   Do you know whether what's shown in Exhibit Number 7 is part

 4        of the IBO that's shown in Exhibit Number 1?

 5                    MR. MILLER:  Objection, lack of foundation.

 6                    THE WITNESS:  No.

 7   BY MR. SENAK:

 8   Q.   How many times have you cleaned an IBO?

 9   A.   A lot of times.

10   Q.   And you don't know whether number 7 shows the inside of an

11        IBO?

12   A.   Well, the picture is kind of hard to see exactly what's going

13        on there.

14   Q.   I get it.  If you refer to --

15   A.   It could be.

16   Q.   Exhibit Number 1 and then Exhibit Number 7, does that

17        in any way provide you with some reference as to whether

18        Exhibit 7 shows the inside of an IBO?

19                    MR. MILLER:  Objection, lack of foundation.

20                    THE WITNESS:  Yeah, I don't know.

21                    MR. MILLER:  Who took those pictures?

22                    MR. SENAK:  To my understanding, these are all the

23        Ramkus photos.  So these were part of what should have been

24        in the Ramkus production.  I mean, they were in what I got.

25                    MR. MILLER:  You'd think experts would take better
```

```
1       pictures.

2                  MR. SENAK:  You know, oddly, for as many as they

3       took, you'd think you would be right, but, you know.

4                  (Exhibit No. 13 marked for identification.)

5    BY MR. SENAK:

6    Q.    I'm going to show you Exhibit 13.  And look at Exhibit

7          Number 1 and tell me if the doors that are shown on

8          Exhibit 13 are the doors from Exhibit Number 1, if you can.

9                  MR. MILLER:  Objection, lack of foundation.

10                 THE WITNESS:  No.

11                 MR. MILLER:  Calls for speculation.

12   BY MR. SENAK:

13   Q.    Do you know whether the doors in Exhibit Number 13 are part of

14         an IBO?

15   A.    No.

16   Q.    When you clean the inside of an IBO, does it leave marks on

17         the metal?

18   A.    Yes.

19   Q.    If you look at Exhibit Number 9, are those the kind of marks

20         that are left inside the IBO after you clean it?

21   A.    Yes.

22   Q.    When you clean the squirrel cage and you scrape the inside of

23         it with a scraper or with a brush or the grinder or whatever,

24         does it leave marks on the metal that shows that it was

25         cleaned?
```

```
 1   A.    Yes.

 2   Q.    And if you look at Exhibit Number 10, you'll see there's a guy

 3         using a grinder.  Is that the type of tool that you used

 4         cleaning the IBO?

 5               MR. MILLER:  Objection, lack of foundation.

 6               THE WITNESS:  Yes.

 7   BY MR. SENAK:

 8   Q.    Do you know what he's using?

 9   A.    A grinder.

10   Q.    When you clean the IBO, do you take parts of the oven out?

11   A.    Yes.

12   Q.    Do you know what those parts are called?

13   A.    Screens.

14   Q.    You take those out, you grind them off, then you put them back

15         in?

16   A.    Yes.

17   Q.    And part of what you do at the end is to make sure the oven is

18         put back together?

19   A.    Yes.

20   Q.    And that it's clean?

21   A.    Yes.

22   Q.    If you'd look at Exhibit Number 11.  Are those the types of

23         marks that are left after you finish cleaning with the

24         grinder?

25               MR. MILLER:  Objection, foundation.
```

```
 1                   THE WITNESS:  I don't know what that picture is

 2          showing.

 3   BY MR. SENAK:

 4   Q.     Okay.  If you'd look at Exhibit Number 12.  Does that show the

 5          type of marks that are left after you clean the duct work of

 6          an IBO?

 7                   MR. MILLER:  Objection, lack of foundation.

 8                   THE WITNESS:  I don't know what that picture is

 9          showing there, either.

10   BY MR. SENAK:

11   Q.     You don't know whether this shows part of an IBO?

12   A.     That could be anything.

13   Q.     I get it.  I'm just --

14   A.     It's a square piece of metal.

15   Q.     I just want to see if you know.  You mentioned that you use

16          rags as part of this process?

17   A.     Sometimes, yes.

18   Q.     Do you use rags inside the furnace?

19   A.     If it's real greasy, yes.

20   Q.     And you use the rags to wipe up the grease?

21   A.     Yes.

22   Q.     When you clean the squirrel cage, do you use a rag?

23   A.     If it's greasy, yes.

24   Q.     When you say if it's greasy, correct me if I'm wrong, you're

25          just wiping down the inside of the squirrel cage with a rag,
```

```
 1        right?

 2   A.   Yes.

 3   Q.   Is the rag used to pick up the dust and debris that's created

 4        by the chisel or the wire brush or the scraper?

 5   A.   No.

 6   Q.   That you use the vacuum for?

 7   A.   Correct.

 8   Q.   Do you recall this particular job that resulted -- that came

 9        before the fire?

10   A.   No.

11   Q.   Do you know anyone else who worked on that job?

12   A.   No.

13   Q.   Did you know that the fire occurred after Air Tech finished

14        its work?

15   A.   Yes.

16   Q.   Did you talk to anyone about that incident?

17   A.   No.

18   Q.   Did you hear anyone ever discuss what caused the fire?

19   A.   No.

20   Q.   Do you have any opinions on what caused the fire?

21             MR. MILLER:  Objection, calls for speculation.

22             THE WITNESS:  No.

23             MR. MILLER:  No foundation for expertise.

24             MR. SENAK:  That's all I have.  We're done.

25             THE WITNESS:  Oh, that's it?  Okay.
```

1          MR. MILLER:  No questions.  We'll reserve the right

2    to sign.

3          MR. SENAK:   Okay.  Thanks very much for coming in.

4          (Deposition concluded at 12:57 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              CERTIFICATE

 2

 3    STATE OF MICHIGAN      )

 4                           )

 5    COUNTY OF KENT         )

 6

 7              I, REBECCA S. RENZEMA, Certified Shorthand Reporter

 8         and Notary Public, do hereby certify that the foregoing matter

 9         was taken before me at the time and place hereinbefore set

10         forth.

11              I FURTHER CERTIFY that this matter was taken in

12         shorthand and thereafter transcribed by me and that it is a

13         true and accurate transcript.

14              IN WITNESS WHEREOF, I have hereunto set my hand this

15         1st day of September of 2017 at Caledonia, Michigan.

16

17                              _____

18                              REBECCA S. RENZEMA, CSR-1435

19                              Notary Public for Kent County

20                              My Commission Expires: 12-31-2022

21

22

23

24

25
```

1                    CERTIFICATE OF WITNESS

2

3         I, KEN WALL, the witness in the foregoing

4    deposition, do hereby certify that I have read

5    the deposition transcript of my testimony taken on

6    the 30th day of August, 2017, and that, subject to the

7    corrections indicated on the attached errata sheet, it

8    is a true and correct transcript of my testimony as

9    given.

10

11

12              _____

13              KEN WALL

14

15

16              _____

17              Dated

18

19

20

21

22

23

24

25

**Exhibits**

**Ball Exhibit 1**
**3** 30:4,6,8,13

**1**

**1** 16:3,9,15,21
17:1,25 18:6
19:15 25:16,
17,20,25 26:4,
16,19 27:10,
21 29:4,16
30:7,8

**10** 31:2

**11** 31:22

**12** 32:4

**12:15** 4:2

**12:57** 34:4

**13** 30:4,6,8,13

**131** 5:1

**19th** 5:1

**2**

**2** 15:22 16:10,
15 17:12 18:1,
7,12,17 19:6,
7,20,22,24
20:2 23:19,24
24:5 26:4,20
27:11,12,21,
24 28:13,18

**2014** 15:14
17:12 19:4,7,
19 26:24

**2017** 4:2

**3**

**3** 16:22 17:1
19:17 20:7
21:1 23:17
24:5

**30** 4:2

**30th** 18:18

**4**

**4** 21:7,11,22
22:10

**45-degree**
18:20

**5**

**5** 25:10,24
26:7 27:2,3,16

**6**

**6** 28:8,11

**7**

**7** 28:23 29:3,
10,16,18

**9**

**9** 30:19

**A**

**access** 22:2
24:15,20,22
25:7 27:3,12,
15,23 28:4

**accumulates**
14:23

**accurate**
19:25 28:11

**addition** 6:21

**address** 4:25

**advance** 14:1

**aerial** 8:15

**agree** 21:2

**air** 5:22 7:7
8:14 9:1 14:12
15:16 19:24
22:22 33:13

**allocated**
7:11

**amount** 7:9,
11 8:6 24:19

**angle** 18:20

**apologies**
28:18

**apparatus**
15:2

**area** 18:9,12
19:10 23:17,
19,22,23 24:4

**areas** 25:4

**arm** 24:25

**arrow** 23:25

**assume** 6:9

**assumes**
23:9

**August** 4:2

**B**

**back** 10:20
25:16 27:10
31:14,18

**background**
5:6

**Ball** 6:7,9 7:14
8:23,25 9:9,18
10:4,5,10,23
11:2 12:2
13:1,3,24 14:3
15:14 16:10
19:3 26:24

**base** 23:15

**based** 17:21

**basically** 7:5

**beginning**
9:6

**bet** 9:25

**black** 18:7
20:14

**blades** 21:5,
11,14,15,19

**blower** 20:17

**bottom** 28:6

**break** 4:22
12:24

**breaks** 12:21,
22 13:1

**breathe** 15:10

**breathing**
15:1

**brush** 22:20
30:23 33:4

**brushes**
14:10

**C**

**cage** 17:3,5,7,
11,14,18,25
18:10,13,15,
16,19,24 19:4,
6,8 20:4,8,10,
15,17,19,25
21:3,4,7,11,
12,14,20 22:1,
6,24 23:8,15
24:3,15,19,23
25:4,8 26:16
28:4,9,12,18
30:22 32:22,
25

**called** 5:11
18:22 31:12

**calls** 11:17
12:4,9,18
13:19 16:6,11
26:11 28:15
30:11 33:21

**cans** 13:16

**caught** 15:19

**caused** 33:18,
20

**chisel** 14:12
22:22 33:4

**circle** 18:5,6,
16,18 23:23,
24

**circled** 21:1

23:22

**circles** 18:7
26:15

**clean** 5:15
6:4,15,21,23
7:15,23 8:1,9,
17 9:9,12,18,
19 10:8,10
13:20 14:9,19
16:16,17,19,
25 17:5,17
19:7,19 21:20
22:1,4,6,23
23:6,7 24:3,23
25:8 26:22
27:13,20
28:18 30:16,
20,22 31:10,
20 32:5,22

**cleaned** 6:9
13:6 17:11
20:4 29:8
30:25

**cleaning** 6:21
7:3,4,12 9:8
14:7 15:17,19
17:14 19:4,23
20:1 24:15,18
26:24 31:4,23

**cleans** 8:11
17:7

**concluded**
34:4

**confined**
5:11,15,18,19
8:13 11:15,22
12:8,15

**connect**
26:19

**connects**
18:19 19:1,10

**control** 9:18,
19,20,21

**Corporation**
6:7

**correct** 6:17
13:4 14:6,8,25
16:19,20
24:14 25:20

27:4 32:24 33:7

courses 5:8

court 4:9,15

created 33:3

crew 8:11 12:22 15:1

_____

**D**

date 18:18 19:25

day 7:8,15 8:1

debris 10:19 28:5 33:3

decide 9:11 10:6 13:1

decides 12:24

depiction 28:12

deposition 4:12 34:4

Describe 6:3 14:19

determine 10:2

determines 9:25

differently 7:3

difficult 4:20

difficulty 24:18

direct 10:8,10

dirt 10:19

disagree 21:2

discuss 33:18

doors 9:8 10:18 30:7,8,13

draw 19:22

drawn 19:16

drop 24:4

drops 23:2

duct 6:21,23 7:3 14:23 18:19,24 19:9 26:5 27:20,24 32:5

duly 4:5

dust 15:10,11 33:3

duties 6:3

_____

**E**

educational 5:6

electric 14:14

employee 10:4

employees 8:25 10:8,10

end 31:17

engineer 13:20

entire 24:23

everybody's 17:19

evidence 23:10

exact 26:9

EXAMINATION 4:7

examined 4:5

exhibit 16:3, 9,15,21 17:1, 25 18:6,12,17 19:6,10,15,22 20:2,7 21:1,7, 11,22 22:10 23:17 24:5 25:10,16,20, 24,25 26:4,7, 16,19 27:2,3, 10,15,21 28:8,

11,23 29:3,4, 16,18 30:4,6, 8,13,19 31:2, 22 32:4

expertise 11:18 12:10 33:23

experts 29:25

explain 9:6

_____

**F**

facts 23:9

fair 28:11

falls 23:7

familiar 5:11 6:7 17:3

fan 20:21,22 21:4,5,11,14, 15,18

favor 18:16

Fifteen 5:3

figure 7:24

find 13:23 14:1 27:23

finish 4:18,19 8:6 10:3 31:23

finished 33:13

finite 8:6

fire 15:14,16, 20 33:9,13,18, 20

flashlight 10:19 11:8

foundation 11:18 12:10 16:6,12 18:2 19:13 20:9 21:8 23:3 24:6 25:13,22 26:1 27:5,17 28:14, 25 29:5,19 30:9 31:5,25 32:7 33:23

full 15:6

function 13:17

furnace 32:18

_____

**G**

generated 15:11

give 9:15

Good 5:19

Grand 4:1

grease 32:20

greasy 32:19, 23,24

grind 31:14

grinder 14:14 22:22 30:23 31:3,9,24

guy 31:2

guys 8:12

_____

**H**

hard 29:12

hear 33:18

High 5:7

hole 22:10

Holland 5:1

hours 8:10

housing 20:22 21:3,15

_____

**I**

IBO 13:12,15, 17 15:22,24, 25 16:1,4,5, 10,16 17:12 19:7,19,24 25:17,20,21 26:10 28:12, 18 29:4,8,11, 18 30:14,16,

20 31:4,10 32:6,11

identification 30:4

incident 33:16

include 19:4 20:22 21:15

included 26:23

individual 12:25

industrial 6:5,6

initials 18:17 19:24

inside 5:20 11:13,22 14:23 16:19 20:15 21:11, 20 22:4,6,17, 18,23 23:7,8 25:4 27:23 29:10,18 30:16,20,22 32:18,25

inspect 10:13,15,17 11:8

inspected 10:4

instance 7:14

insulation 22:11,13

issued 15:9

_____

**J**

job 6:1,3 8:7 9:6,7 10:6 11:5 17:19,22 33:8,11

job's 10:23

jobs 8:22

**K**

K-e-n 4:11

Ken 4:4,11

kind 8:14
15:1,4,6
17:17,21
23:24 29:12
30:19

knife 22:8,18

**L**

labeled 23:19
26:20 27:24

lack 12:9 16:6,
12 18:2 19:12
20:9 21:8 23:3
24:6 25:12,22
26:1 27:5,17
28:14,25 29:5,
19 30:9 31:5
32:7

laid 11:18

learn 8:17

leave 30:16,
24

left 30:20
31:23 32:5

lift 8:15

lived 5:2

lock 9:7

long 5:2,24
6:18 7:9,18
8:9,21 14:1

lot 29:9

loud 4:16

**M**

make 10:19,
20 20:24
31:17

makes 4:20

marked 16:22
26:4 27:11
30:4

marks 30:16,
19,24 31:23
32:5

mask 15:6

matter 7:9

mechanized
14:11

mention 9:13

mentioned
22:22 32:15

metal 30:17,
24 32:14

Michigan 4:1
5:1

MILLER
11:17,23 12:4,
9,18 13:19
16:6,11 18:2
19:12 20:9
21:8 23:3,9
24:6 25:12,22
26:1,11 27:5,
17,25 28:14,
20,25 29:5,19,
21,25 30:9,11
31:5,25 32:7
33:21,23 34:1

mind 4:15

Monticello
6:9,14 13:3

mouth 15:7,8

moving 5:4

**N**

nose 15:7,8

note 16:21

number 6:18
13:3 15:22
16:3,9,10,15,
21,22 17:1,12,
25 18:1,6,7,
12,17 19:7,15,
17,19,22,24

20:2,7 21:1,22
22:10 23:17,
19,24 24:5
25:10,16,17,
20,24,25 26:4,
7,16,19 27:2,
3,10,11,12,16,
21,24 28:8,13,
18,23 29:3,4,
10,16 30:7,8,
13,19 31:2,22
32:4

**O**

object 19:12
24:1 25:12
28:14

Objection
11:17 12:4,9,
18 13:19 16:6,
11 18:2 20:9
21:8 23:3,9
24:6 25:22
26:1,11 27:5,
17,25 28:20,
25 29:5,19
30:9 31:5,25
32:7 33:21

objections
11:23

occasion
12:14

occasions
6:10 13:4,6

occurred
15:16 33:13

odd 11:10

oddly 30:2

On-the-job
8:18

open 9:7 22:1

opening
20:14 21:24
23:18

openings
10:18 11:9

opinions
33:20

originated
15:20

Oscar 17:8,9,
10

OSHA 12:17

oven 5:20 7:4,
12 8:1,12,17
9:7,9,18,19,23
10:8,11 11:13,
16,22 12:3,15
13:15,18
14:19,20,23
15:12,17,19
16:16,19,25
19:1 26:5,9,
22,24 27:20
31:10,17

oven's 7:15

ovens 5:15
6:4,5,6,9,16,
21,24 7:8 9:12
13:6,8,12
14:7,9

**P**

p.m. 4:2 34:4

paid 7:7,8,9

panel 22:2
24:16,20,22,
25 27:2,3,12,
15 28:4

part 16:25
19:3 25:24
26:5,8,9,10,22
29:3,23 30:13
31:17 32:11,
16

parts 16:16
31:10,12

Paul 8:20
13:25

people 8:11

perimeter
21:23 22:9

permitted
5:20

person 11:2
12:25

personally
7:20

photos 29:23

pick 33:3

picture 16:4
20:11 23:20
25:20,21 27:8
28:9 29:12
32:1,8

pictures
29:21 30:1

piece 18:19
19:9 32:14

pin 13:12,15,
18

plans 5:4

plant 6:9,14
7:14 8:23
13:3,9,24 14:4
15:14 16:10
19:3 26:24

pointing
23:25 26:15

poor 23:20

portion 27:20

portions
16:21

present 10:16

pretty 23:20

prior 6:10

problem
24:18

process
32:16

production
7:25 29:24

provide 29:17

pulled 9:16

put 18:17
31:14,18

putty 22:8,18

**Q**

**question** 4:18,19 11:20, 21 23:12 24:1

**questions** 34:1

**R**

**rag** 32:22,25 33:3

**rags** 14:17 32:16,18,20

**Ramkus** 29:23,24

**Rapids** 4:1

**reach** 24:25 25:4,5 28:5

**real** 32:19

**recall** 11:1 17:13 26:16 28:21,23 33:8

**receive** 8:13

**refer** 29:14

**reference** 29:17

**remove** 22:9, 12,15 24:15

**removing** 15:12

**reporter** 4:10, 15

**requirement** 12:8

**reserve** 34:1

**residue** 14:22 21:23 22:9,15 23:1 24:4

**respirators** 15:1

**response** 4:17

**responsible** 20:1

**resulted** 33:8

**room** 24:22

**run** 13:16

**S**

**Scholten** 7:21 8:20 10:15

**school** 5:7

**scissor** 8:15

**scope** 19:3 26:23

**scrape** 7:5 14:20 22:8,20 27:22 28:5 30:22

**scraper** 30:23 33:4

**Scrapers** 14:10

**scraping** 25:1

**screens** 9:16 31:13

**section** 27:11

**seminars** 5:9

**SENAK** 4:8 11:19 12:1,5, 11,20 13:22 16:8,14 18:4 19:14 20:12 21:10 23:4,11 24:8 25:15,23 26:3,14 27:6, 19 28:2,17,22 29:2,7,22 30:2,5,12 31:7 32:3,10 33:24 34:3

**shaped** 18:20

**show** 20:7,13 21:7 26:16 30:6 32:4

**showed** 8:19

**showing** 32:2,9

**shown** 16:9 17:1,25 18:6, 12 19:10 20:2 21:1 22:9 24:4 25:24 26:7,19 27:2,15,20 28:11 29:3,4 30:7

**shows** 18:9 19:22 20:14 21:11 25:11 28:24 29:10, 18 30:24 32:11

**shut** 7:17,18, 19,23

**shutting** 7:25

**side** 15:12

**sign** 34:2

**sits** 16:25

**someone's** 12:14

**soot** 14:20,22 15:12 21:23 22:16 24:3

**sort** 18:20 23:1

**source** 7:21

**space** 5:11, 15,18,19 8:13 11:15,22 12:8, 15 24:19,22

**specific** 7:11

**speculation** 11:17 12:4,9, 18 13:19 16:7, 11 26:12 28:15 30:11 33:21

**spell** 4:9

**spot** 19:16

**square** 23:18, 24 24:2,4

32:14

**squirrel** 17:3, 5,7,11,14,18, 25 18:9,13,15, 16,19,24 19:4, 6,8 20:4,7,10, 15,17,19,25 21:3,4,7,11, 12,14,20 22:1, 6,24 23:8,15 24:3,15,18,23 25:4,8 26:16 28:3,9,12,18 30:22 32:22, 25

**start** 9:8 10:2 26:23

**state** 4:9

**stopped** 19:23

**straight** 23:15

**stuff** 23:14

**style** 15:8

**summarize** 5:6

**supervises** 8:23

**supervisor** 9:2,3

**supposed** 23:18

**sworn** 4:5

**T**

**takes** 7:9

**talk** 4:20 33:16

**talking** 14:22 15:11 20:24

**Tech** 5:22 7:7 8:14 9:1 15:16 19:24 33:13

**technical** 5:8

**Ten** 6:20

**term** 5:11 17:3 20:19,20 27:3

**terms** 6:18 25:1

**testified** 4:6 25:19

**thing** 7:5 11:8, 10 16:18 20:25

**things** 4:15 9:13 25:1

**Thirdly** 4:22

**time** 4:20 7:11 8:6

**times** 6:12,13, 15 29:8,9

**title** 6:1

**today's** 18:18

**told** 4:14 7:14

**tool** 31:3

**tools** 14:9,11, 19

**top** 16:25

**total** 9:20,21

**training** 5:8, 11,13,15,19 8:13,14,15,19 21 11:15,22 12:2,15

**true** 8:4 12:6 13:6 19:1,2 26:25 27:24 28:1

**Tuesday** 14:4

**Twenty-one** 5:25

**type** 31:3 32:5

**types** 13:8 31:22

**U**

**understand** 20:19,20

23:12

**understanding** 21:4 29:22

**Understood** 10:5

**unique** 17:14

---

**V**

**vacuum** 7:5 14:21 24:10, 11 27:22 28:5 33:6

**vacuumed** 23:13

**vacuums** 14:10

**vague** 19:13

**verbal** 4:17

**versus** 13:15

**violate** 12:8

**violated** 12:14

**violation** 12:17

---

**W**

**W-a-l-l** 4:11

**wait** 4:17,18

**Wall** 4:4,11,12

**walls** 14:20

**week** 14:2

**West** 5:1

**wipe** 24:11 32:20

**wiping** 32:25

**wire** 14:10 22:20 33:4

**Woody** 17:9, 10,11,17

**work** 5:22 6:21,23 7:3

8:24 10:13,15, 17 14:23 18:19,24 19:3, 9 26:5,23 27:20,24 32:5 33:14

**worked** 5:24 13:3 33:11

**working** 8:23 12:21 13:23 14:3

**wrong** 7:1 32:24

---

**Y**

**year** 6:13,15 7:1

**years** 5:3,25 6:19

# Exhibit 28

1

2                    IN THE UNITED STATES DISTRICT COURT

3                    FOR THE NORTHERN DISTRICT OF INDIANA

4

5    _____

6    BALL CORPORATION, an Indiana

7    Corporation and FACTORY MUTUAL

8    INSURANCE COMPANY, a Rhode Island

9    corporation, as subrogee,

10            Plaintiff,                    Case No.: 16 cv 42

11   v

12   AIR TECH OF MICHIGAN, INC.,

13   a Michigan corporation,

14            Defendant.

15   _____

16

17

18                    DEPOSITION OF RUBEN JIMENEZ

19

20   DATE:      August 30, 2017

21   TIME:      11:30 a.m.

22   LOCATION:  O'Brien & Bails

23              625 Kenmoor Avenue, SE, Suite 301

24              Grand Rapids, Michigan

25   REPORTER:  Rebecca S. Renzema, CSR-1435

```
1   APPEARANCES:

2

3       SENAK KEEGAN GLEASON SMITH & MICHAUD, LTD.

4       BY:  Mark N. Senak

5            621 S. Plymouth Ct., Suite 100

6            Chicago, Illinois 60605

7            (312) 214-1400

8            msenak@skgsmlaw.com

9                On behalf of Plaintiffs

10

11      STARR AUSTEN & MILLER, LLP

12      BY:  Andrew B. Miller

13           201 South 3rd Street

14           Logansport, Indiana 46947

15           (574) 722-6676

16           miller@starrausten.com

17                On behalf of Defendant

18

19      ALSO PRESENT:  Donna Bos, Interpreter

20                     Paul Scholten

21

22

23

24

25
```

```
 1                            INDEX

 2  WITNESS:                                      PAGE

 3      RUBEN JIMENEZ

 4  Examination by Mr. Senak                         4

 5

 6

 7                          EXHIBITS

 8  NUMBER        IDENTIFICATION                  PAGE

 9  None submitted

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          Grand Rapids, Michigan

 2                          August 30, 2017; 11:30 a.m.

 3                                  ***

 4                      (Interpreter sworn in.)

 5                          RUBEN JIMENEZ,

 6           after having been duly sworn, was examined and

 7           testified as follows:

 8                              EXAMINATION

 9   BY MR. SENAK:

10   Q.    Please state your name and spell your name, your first and

11         last name for the record.

12   A.    Ruben Jimenez.  R-u-b-e-n J-i-m-e-n-e-z.

13   Q.    Mr. Jimenez, do you understand English?

14   A.    No.   Very little.

15   Q.    What is your current address?

16   A.    304 Alexander Street, Bangor, Michigan.

17   Q.    Are you currently employed?

18   A.    Yes.  Do you want me to say the name?

19   Q.    Yes.

20   A.    My boss Paul.

21   Q.    Do you know the name of the company you work for?

22   A.    Yes.

23   Q.    What is it?

24   A.    Air Tech.

25   Q.    What is your job title with Air Tech?
```

1    A.    Can you repeat the question?

2    Q.    What is your job title with Air Tech?

3    A.    My title?

4    Q.    Do you have a job title at Air Tech?

5    A.    No.

6    Q.    What do you do at Air Tech?

7    A.    Cleaning ovens.

8    Q.    What are the names of some of the companies you have cleaned

9          ovens for?

10   A.    The truth is I don't remember.

11   Q.    Do you recall ever cleaning ovens at the Ball plant in

12         Monticello, Indiana?

13   A.    No, I don't remember.

14   Q.    Before the deposition today, did you meet with either

15         Mr. Miller or Mr. Scholten?

16   A.    No.

17   Q.    Who at Air Tech gives you your job assignments?

18   A.    Paul.

19   Q.    Does Mr. Scholten speak Spanish?

20   A.    Mr. Who?

21   Q.    Scholten?

22   A.    No.

23   Q.    How is it that he communicates with you?

24   A.    I know a little bit.  I understand what he tells me.

25   Q.    What is your highest level of education?

```
1   A.   Four [sic].

2   Q.   Did you attend school in the United States or in Mexico?

3   A.   In Mexico.

4   Q.   Have you ever attended any school in the United States?

5   A.   No.

6   Q.   Are you originally from Mexico?

7   A.   Yes.

8   Q.   How long have you been in the United States?

9   A.   Three years.  No, thirteen.

10  Q.   What type of ovens do you clean for Air Tech?

11  A.   The companies where they make the cans.

12  Q.   Any others?

13  A.   No.

14  Q.   Do you know the name of the company where they make the

15       cans?

16  A.   It's something like Both(ph).

17  Q.   Is it Ball, B-a-l-l?

18  A.   I think so.

19  Q.   On how many occasions have you cleaned ovens at the Ball

20       plant?

21  A.   Many times.

22  Q.   Can you tell me a specific number?

23  A.   No, I can't.  I don't have any idea.

24  Q.   On the occasions where you've cleaned ovens, how many people

25       are on the crew with you cleaning the ovens?
```

```
 1   A.   Eight or ten.

 2   Q.   How long does it take the crew to clean the oven?

 3   A.   From eight to nine hours.

 4   Q.   Do you recall cleaning an oven at the Ball plant in May of

 5        2014?

 6             MR. MILLER:  Objection, asked and answered.

 7             THE WITNESS:  What?

 8   BY MR. SENAK:

 9   Q.   Do you recall cleaning an oven at the Ball plant in May of

10        2014?

11             MR. MILLER:  Objection, asked and answered.

12             THE WITNESS:  I answered already.

13   BY MR. SENAK:

14   Q.   I don't recall what the answer was.  Would you please answer

15        again?

16             MR. MILLER:  Same objection.

17             THE WITNESS:  I don't remember well.

18   BY MR. SENAK:

19   Q.   Can you describe how you clean the oven?

20   A.   With what or how or --

21   Q.   What tools do you use?

22   A.   A brush with a -- a steel brush and a scraper.  Sometimes

23        a --

24             INTERPRETER:  The interpreter did not understand his

25        last word.
```

```
 1   BY MR. SENAK:

 2   Q.   Grinder?

 3   A.   Yeah, sometimes if it needs it.

 4   Q.   What other tools?

 5   A.   Vacuum.

 6   Q.   Do you use an air chisel?

 7   A.   When it's necessary.

 8   Q.   Other than what you've already identified, do you use any

 9        other tools?

10   A.   No.

11   Q.   Do you use any rags?

12   A.   No.

13   Q.   Explain to me how you use a wire brush to clean the oven.

14   A.   Washing or wiping the walls.

15   Q.   Anything else?

16   A.   Scrape the metal.

17   Q.   Is this inside the oven?

18   A.   Inside the oven.

19   Q.   When you scrape the inside of the oven, do you scrape off the

20        residue from inside the oven?

21   A.   Inside?

22   Q.   Yes.

23   A.   Yes.

24   Q.   And when you scrape off the residue inside the oven, where

25        does it fall?
```

```
 1   A.   On the floor.

 2   Q.   What does it look like when it's on the floor?

 3   A.   Black.

 4   Q.   What is the consistency of the residue after you scrape it

 5        off?

 6   A.   Hard.  Hard, sometimes hard.  Sometimes dust or powder.

 7   Q.   How do you remove the dust or powder from inside the oven?

 8   A.   I vacuum it with a vacuum.

 9   Q.   After you vacuum it with a vacuum, do you wipe the inside of

10        the oven?

11   A.   No.

12   Q.   Explain how you use the electric grinder to clean the oven.

13   A.   How?  In what way?

14   Q.   Yes.

15   A.   I scrape the walls and that's it.

16   Q.   Showing you Exhibit Number 9, is that what the walls look like

17        inside the oven after you get done using the electric grinder?

18             MR. MILLER:  Objection, lack of foundation, calls

19        for speculation.

20   BY MR. SENAK:

21   Q.   You can answer the question.

22   A.   Can you ask it again, please?

23   Q.   Sure.  Is what is shown in Exhibit Number 9 what the walls

24        look like inside the oven after you finish using the grinder?

25             MR. MILLER:  Objection, lack of foundation, calls
```

```
 1        for speculation.
 2   BY MR. SENAK:
 3   Q.    You can answer the question.
 4   A.    Answer the question or --
 5   Q.    Yes.
 6   A.    No.
 7   Q.    Look at Exhibit 10.  Is that the type of grinder you used to
 8         clean the oven?
 9              MR. MILLER:  Objection, lack of foundation, calls
10         for speculation.
11   BY MR. SENAK:
12   Q.    You can answer the question.
13   A.    I need to ask it or what?
14   Q.    I just want to know whether the type of grinder that is shown
15         in Exhibit Number 10 is the type of grinder that you used to
16         clean the inside of the oven.
17   A.    No.
18              MR. MILLER:  Objection, lack of foundation, calls
19         for speculation.
20   BY MR. SENAK:
21   Q.    You can answer the question.
22              MR. MILLER:  He did.
23              MR. SENAK:  Oh, sorry.  What did he say?
24              MR. MILLER:  He said no.
25              MR. SENAK:  All right.  Sorry.
```

1    BY MR. SENAK:

2    Q.    Showing you Exhibit Number 1, do you know whether that is the

3          oven that you cleaned at the Ball plant?

4                  MR. MILLER:  Objection, lack of foundation, calls

5          for speculation.

6                  THE WITNESS:  No.

7    BY MR. SENAK:

8    Q.    What parts of the oven do you recall cleaning at the Ball

9          plant?

10   A.    Just the walls.

11   Q.    Did you ever clean anything above the oven?

12   A.    No.

13   Q.    If you look at Exhibit Number 1, did you clean the duct work

14         shown as -- marked as Exhibit Number 2?

15   A.    No.

16                 MR. MILLER:  Objection, lack of foundation.  If you

17         put my hand on you, I'm going to make an objection and allow

18         me to complete my objection before you answer.

19                 THE WITNESS:  Oh.

20   BY MR. SENAK:

21   Q.    Showing you Exhibit Number 3, did you clean the parts of the

22         oven shown in Exhibit Number 3?

23                 MR. MILLER:  Objection, lack of foundation.

24   BY MR. SENAK:

25   Q.    You can answer.

```
 1   A.   No.

 2   Q.   Do you know who did?

 3   A.   No.

 4   Q.   Showing you Exhibit Number 4, did you clean this part of the

 5        oven at the Ball plant?

 6               MR. MILLER:  Objection, lack of foundation.

 7               THE WITNESS:  No.

 8   BY MR. SENAK:

 9   Q.   Showing you Exhibit Number 5, did you clean that part of the

10        oven or duct work at the Ball plant?

11               MR. MILLER:  Objection, lack of foundation.

12               THE WITNESS:  No.

13   BY MR. SENAK:

14   Q.   Do you know who did?

15   A.   No.

16   Q.   Do you know who cleaned the part of the oven or duct work

17        shown in Exhibit Number 4 at the Ball plant?

18               MR. MILLER:  Objection, lack of foundation, calls

19        for speculation.

20               THE WITNESS:  No.

21   BY MR. SENAK:

22   Q.   Do you get inside the oven to clean it?

23   A.   Yes.

24   Q.   When you are inside the oven, are you given any type of device

25        to protect you from inhaling the residue on the inside of the
```

1    oven?

2    A.    A mask.

3    Q.    Can you describe for me the type of mask that you're given?

4    A.    One of those that has these -- I put it here on my head.    It

5    has one of those -- in front.    I can't describe it.    I can't

6    name it.

7    Q.    Does it have circular disks or filters on it?

8    A.    Yes, filters.

9    Q.    And do you replace the filters?

10    A.    The boss or owner does it.

11    Q.    During the eight hours or nine hours that you're cleaning the

12    oven, do you have to replace the filter?

13    A.    I?

14    Q.    Yes.

15    A.    No.

16    Q.    Do you know why you're given a mask?

17    A.    Yes, because the dust that you can inhale can cause damage.

18    Q.    Is the dust that you're referring to the dust that is

19    generated from you cleaning the inside of the oven?

20        MR. MILLER:  Objection, calls for speculation.

21        THE WITNESS:  I don't know.

22    BY MR. SENAK:

23    Q.    Is there dust inside the oven before you start cleaning it?

24    A.    Yes.

25    Q.    Who is your supervisor when you're on the job?

```
 1    A.    My boss, Paul.

 2    Q.    Does anyone from Ball Corporation supervise your work?

 3    A.    Yes, when we finish.

 4    Q.    Who is it?

 5    A.    I don't know.

 6    Q.    The person who supervises your work at Ball, do they examine

 7          the work only when it's done or while it is in process of

 8          being done?

 9    A.    During the process and when we finish.

10    Q.    Have you gone through confined space training?

11    A.    What?

12    Q.    Have you gone through any training while at Air Tech?

13    A.    Paul would teach me.

14    Q.    Would he teach you how to clean the oven?

15    A.    Yes.

16    Q.    Do you know whether you have a permit to do confined space

17          work?

18    A.    If I have a permit?

19    Q.    Yes.

20    A.    I don't know.

21    Q.    Or a license?

22    A.    I don't know.

23    Q.    Do you recall ever going through any type of training on a

24          computer or otherwise?

25    A.    Paul would teach me and another person that he had there who
```

```
 1        had experience.

 2   Q.   Would you explain how you use an air chisel to clean the

 3        oven?

 4   A.   When things are really stuck on and thick, you have to keep

 5        cleaning it until it comes off.

 6   Q.   But I take it you use the air chisel to chip those pieces off

 7        the inside of the oven?

 8   A.   Sometimes the striker, the spatula, and the brush we use.

 9   Q.   Do you know whether there's any duct work connected to the

10        oven?

11   A.   No, I don't know.

12   Q.   Do you know whether there's a blower attached to the oven?

13   A.   Yes.

14   Q.   If you would take a look at Exhibit Number 2.  Is the blower

15        that's attached to the oven shown in Exhibit Number 2?

16   A.   No.

17             MR. MILLER:  Objection, lack of foundation, calls

18        for speculation.  He already answered.  Please wait until I

19        complete my objection before you answer.

20   BY MR. SENAK:

21   Q.   Are you familiar with part of the oven called the squirrel

22        cage?

23   A.   No.

24   Q.   After you get done with your work, does anyone from Air Tech

25        inspect it?
```

```
 1                    MR. MILLER:  Objection, asked and answered.

 2                    THE WITNESS:  I answered the question already.

 3   BY MR. SENAK:

 4   Q.   I understand that, but would you tell me who it is?

 5                    MR. MILLER:  Objection, asked and answered.

 6   BY MR. SENAK:

 7   Q.   Would you answer again, please?

 8                    MR. MILLER:  Objection, asked and answered.

 9                    THE WITNESS:  I answered it already.

10   BY MR. SENAK:

11   Q.   I understand that, but I forgot who you said.  So rather than

12        go back and try and find the answer, I just want to make sure

13        that I recall who it is.

14                    MR. MILLER:  Objection, asked and answered.  Perhaps

15        we need to look at the record.

16                    THE WITNESS:  Yeah, I already answered.

17   BY MR. SENAK:

18   Q.   Okay.  Does Paul Scholten inspect your work after you get

19        done?

20   A.   Yes.

21   Q.   Other than Paul Scholten, does anyone else from Air Tech

22        inspect the work to make sure it is done properly?

23   A.   From Air Tech?

24   Q.   Yes.

25   A.   Yes.
```

```
 1   Q.   Who?

 2   A.   His son.

 3   Q.   What is his son's name?

 4   A.   What's his name?

 5              MR. SCHOLTEN:   Nick.

 6   BY MR. SENAK:

 7   Q.   Other than Paul Scholten and Nick Scholten, does anyone else

 8        inspect the work?

 9   A.   No.

10   Q.   Are you there when they do the inspection?

11   A.   Yes.

12   Q.   Describe for me what they do.

13   A.   They check to see if everything is clean and they ask if we're

14        done already.  I ask them if we're done already and he says to

15        me yes or no.

16   Q.   When you clean the oven, does it leave marks on the inside of

17        the oven?

18   A.   No.

19   Q.   Are you paid by the hour by Air Tech or are you paid a

20        salary?

21   A.   Salary.

22   Q.   What is your salary?

23   A.   325.

24   Q.   Is that per hour?

25   A.   A day.
```

1   Q.  Do you receive any type of incentive or bonus?

2   A.  No.

3   Q.  How long do you work every day to be paid $325?

4   A.  It depends on the ovens, if they're big.  There are some big

5       ovens and some small ovens and when you finish them, I don't

6       remember exactly the hours that one works.

7   Q.  How many hours do you work a day?

8   A.  From eight to ten.  When we work in big ovens, it's eight or

9       ten hours that we finish them.  When they're smaller, it's a

10      few hours.

11  Q.  So you get paid the same amount no matter how many hours a day

12      you work?

13  A.  Yes.

14              MR. SENAK:  That's all I have.

15              MR. MILLER:  No questions.  We reserve the right to

16      sign.

17              (Deposition concluded at 12:03 p.m.)

18

19

20

21

22

23

24

25

```
 1                          CERTIFICATE

 2

 3   STATE OF MICHIGAN     )

 4                         )

 5   COUNTY OF KENT        )

 6

 7            I, REBECCA S. RENZEMA, Certified Shorthand Reporter

 8        and Notary Public, do hereby certify that the foregoing matter

 9        was taken before me at the time and place hereinbefore set

10        forth.

11            I FURTHER CERTIFY that this matter was taken in

12        shorthand and thereafter transcribed by me and that it is a

13        true and accurate transcript.

14            IN WITNESS WHEREOF, I have hereunto set my hand this

15        1st day of September of 2017 at Caledonia, Michigan.

16

17

18                         REBECCA S. RENZEMA, CSR-1435

19                         Notary Public for Kent County

20                         My Commission Expires: 12-31-2022

21

22

23

24

25
```

```
 1

 2                    CERTIFICATE OF WITNESS

 3

 4        I, RUBEN JIMENEZ, the witness in the fore-

 5   going deposition, do hereby certify that I have read

 6   the deposition transcript of my testimony taken on the

 7   30th day of August, 2017, and that, subject to the

 8   corrections indicated on the attached errata sheet, it

 9   is a true and correct transcript of my testimony as

10   given.

11

12

13        _____

14            RUBEN JIMENEZ

15

16

17        _____

18            Dated

19

20

21

22

23

24

25
```

**$**

**$325** 18:3

**1**

**1** 11:2,13
**10** 10:7,15
**11:30** 4:2
**12:03** 18:17

**2**

**2** 11:14 15:14, 15
**2014** 7:5,10
**2017** 4:2

**3**

**3** 11:21,22
**30** 4:2
**304** 4:16
**325** 17:23

**4**

**4** 12:4,17

**5**

**5** 12:9

**9**

**9** 9:16,23

**A**

**a.m.** 4:2
**address** 4:15
**air** 4:24,25 5:2,4,6,17 6:10 8:6 14:12
15:2,6,24 16:21,23 17:19
**Alexander** 4:16
**amount** 18:11
**assignments** 5:17
**attached** 15:12,15
**attend** 6:2
**attended** 6:4
**August** 4:2

**B**

**B-a-l-l** 6:17
**back** 16:12
**Ball** 5:11 6:17, 19 7:4,9 11:3, 8 12:5,10,17 14:2,6
**Bangor** 4:16
**big** 18:4,8
**bit** 5:24
**Black** 9:3
**blower** 15:12, 14
**bonus** 18:1
**boss** 4:20 13:10 14:1
**Both(ph)** 6:16
**brush** 7:22 8:13 15:8

**C**

**cage** 15:22
**called** 15:21
**calls** 9:18,25 10:9,18 11:4 12:18 13:20 15:17

**cans** 6:11,15
**check** 17:13
**chip** 15:6
**chisel** 8:6 15:2,6
**circular** 13:7
**clean** 6:10 7:2,19 8:13 9:12 10:8,16 11:11,13,21 12:4,9,22 14:14 15:2 17:13,16
**cleaned** 5:8 6:19,24 11:3 12:16
**cleaning** 5:7, 11 6:25 7:4,9 11:8 13:11,19, 23 15:5
**communicate s** 5:23
**companies** 5:8 6:11
**company** 4:21 6:14
**complete** 11:18 15:19
**computer** 14:24
**concluded** 18:17
**confined** 14:10,16
**connected** 15:9
**consistency** 9:4
**Corporation** 14:2
**crew** 6:25 7:2
**current** 4:15

**D**

**damage** 13:17
**day** 17:25 18:3,7,11
**depends** 18:4
**deposition** 5:14 18:17
**describe** 7:19 13:3,5 17:12
**device** 12:24
**disks** 13:7
**duct** 11:13 12:10,16 15:9
**duly** 4:6
**dust** 9:6,7 13:17,18,23

**E**

**education** 5:25
**electric** 9:12, 17
**employed** 4:17
**English** 4:13
**EXAMINATIO N** 4:8
**examine** 14:6
**examined** 4:6
**Exhibit** 9:16, 23 10:7,15 11:2,13,14,21, 22 12:4,9,17 15:14,15
**experience** 15:1
**explain** 8:13 9:12 15:2

**F**

**fall** 8:25
**familiar** 15:21
**filter** 13:12
**filters** 13:7,8, 9
**find** 16:12
**finish** 9:24 14:3,9 18:5,9
**floor** 9:1,2
**forgot** 16:11
**foundation** 9:18,25 10:9, 18 11:4,16,23 12:6,11,18 15:17
**front** 13:5

**G**

**generated** 13:19
**Grand** 4:1
**grinder** 8:2 9:12,17,24 10:7,14,15

**H**

**hand** 11:17
**hard** 9:6
**head** 13:4
**highest** 5:25
**hour** 17:19,24
**hours** 7:3 13:11 18:6,7, 9,10,11

**I**

**idea** 6:23
**identified** 8:8

**incentive** 18:1

**Indiana** 5:12

**inhale** 13:17

**inhaling** 12:25

**inside** 8:17, 18,19,20,21, 24 9:7,9,17,24 10:16 12:22, 24,25 13:19, 23 15:7 17:16

**inspect** 15:25 16:18,22 17:8

**inspection** 17:10

**interpreter** 4:4 7:24

---

**J**

**J-i-m-e-n-e-z** 4:12

**Jimenez** 4:5, 12,13

**job** 4:25 5:2,4, 17 13:25

---

**L**

**lack** 9:18,25 10:9,18 11:4, 16,23 12:6,11, 18 15:17

**leave** 17:16

**level** 5:25

**license** 14:21

**long** 6:8 7:2 18:3

---

**M**

**make** 6:11,14 11:17 16:12, 22

**marked** 11:14

**marks** 17:16

**mask** 13:2,3, 16

**matter** 18:11

**meet** 5:14

**metal** 8:16

**Mexico** 6:2,3, 6

**Michigan** 4:1, 16

**Miller** 5:15 7:6,11,16 9:18,25 10:9, 18,22,24 11:4, 16,23 12:6,11, 18 13:20 15:17 16:1,5, 8,14 18:15

**Monticello** 5:12

---

**N**

**names** 5:8

**Nick** 17:5,7

**number** 6:22 9:16,23 10:15 11:2,13,14,21, 22 12:4,9,17 15:14,15

---

**O**

**objection** 7:6, 11,16 9:18,25 10:9,18 11:4, 16,17,18,23 12:6,11,18 13:20 15:17, 19 16:1,5,8,14

**occasions** 6:19,24

**originally** 6:6

**oven** 7:2,4,9, 19 8:13,17,18, 19,20,24 9:7, 10,12,17,24

**-10:8;16 11:3, 8,11,22 12:5, 10,16,22,24 13:1,12,19,23 14:14 15:3,7, 10,12,15,21 17:16,17

**ovens** 5:7,9, 11 6:10,19,24, 25 18:4,5,8

**owner** 13:10

---

**P**

**p.m.** 18:17

**paid** 17:19 18:3,11

**part** 12:4,9,16 15:21

**parts** 11:8,21

**Paul** 4:20 5:18 14:1,13,25 16:18,21 17:7

**people** 6:24

**permit** 14:16, 18

**person** 14:6, 25

**pieces** 15:6

**plant** 5:11 6:20 7:4,9 11:3,9 12:5, 10,17

**powder** 9:6,7

**process** 14:7, 9

**properly** 16:22

**protect** 12:25

**put** 11:17 13:4

---

**Q**

**question** 5:1 9:21 10:3,4, 12,21 16:2

**questions** 18:15

---

**R**

**R-u-b-e-n** 4:12

**rags** 8:11

**Rapids** 4:1

**recall** 5:11 7:4,9,14 11:8 14:23 16:13

**receive** 18:1

**record** 4:11 16:15

**referring** 13:18

**remember** 5:10,13 7:17 18:6

**remove** 9:7

**repeat** 5:1

**replace** 13:9, 12

**reserve** 18:15

**residue** 8:20, 24 9:4 12:25

**Ruben** 4:5,12

---

**S**

**salary** 17:20, 21,22

**Scholten** 5:15,19,21 16:18,21 17:5, 7

**school** 6:2,4

**scrape** 8:16, 19,24 9:4,15

**scraper** 7:22

**SENAK** 4:9 7:8,13,18 8:1 9:20 10:2,11, 20,23,25 11:1,

**7,20,24 12:8, 13,21 13:22 15:20 16:3,6, 10,17 17:6 18:14

**Showing** 9:16 11:2,21 12:4,9

**shown** 9:23 10:14 11:14, 22 12:17 15:15

**sic** 6:1

**sign** 18:16

**small** 18:5

**smaller** 18:9

**son** 17:2

**son's** 17:3

**space** 14:10, 16

**Spanish** 5:19

**spatula** 15:8

**speak** 5:19

**specific** 6:22

**speculation** 9:19 10:1,10, 19 11:5 12:19 13:20 15:18

**spell** 4:10

**squirrel** 15:21

**start** 13:23

**state** 4:10

**States** 6:2,4,8

**steel** 7:22

**Street** 4:16

**striker** 15:8

**stuck** 15:4

**supervise** 14:2

**supervises** 14:6

**supervisor** 13:25

sworn 4:4,6

---

**T**

---

teach 14:13, 14,25

Tech 4:24,25 5:2,4,6,17 6:10 14:12 15:24 16:21, 23 17:19

tells 5:24

ten 7:1 18:8,9

testified 4:7

thick 15:4

things 15:4

thirteen 6:9

times 6:21

title 4:25 5:2, 3,4

today 5:14

tools 7:21 8:4, 9

training 14:10,12,23

truth 5:10

type 6:10 10:7,14,15 12:24 13:3 14:23 18:1

---

**U**

---

understand 4:13 5:24 7:24 16:4,11

United 6:2,4,8

---

**V**

---

vacuum 8:5 9:8,9

---

**W**

---

wait 15:18

walls 8:14 9:15,16,23 11:10

Washing 8:14

wipe 9:9

wiping 8:14

wire 8:13

word 7:25

work 4:21 11:13 12:10, 16 14:2,6,7,17 15:9,24 16:18, 22 17:8 18:3, 7,8,12

works 18:6

---

**Y**

---

years 6:9

# Exhibit 29

*In the Matter Of:*

BALL CORPORATION

-vs-

AIR TECH OF MICHIGAN, INC.

DALE SPENCER

November 03, 2017



**CONNOR REPORTING**
111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

3

                                        UNITED STATES DISTRICT COURT
                                        NORTHERN DISTRICT OF INDIANA

CAUSE NO. 4:16-CV-00042-PPS-APR

BALL CORPORATION, an Indiana          )
Corporation, and FACTORY              )
MUTUAL INSURANCE COMPANY, a           )
Rhode Island Corporation, as          )
Subrogee,                             )
                                      )
          Plaintiffs,                 )
                                      )
          -vs-                        )
                                      )
AIR TECH OF MICHIGAN, INC., a         )
Michigan Corporation,                 )
                                      )
          Defendant.                  )

                DEPOSITION OF DALE SPENCER

     The deposition upon oral examination of
DALE SPENCER, a witness produced and sworn before
me, Diane Zeyen, RPR, a Notary Public in and for the
County of Hamilton, State of Indiana, taken on
behalf of the Defendant, at the Monticello Public
Library, 321 West Broadway Street, Monticello,
White County, Indiana, on the 3rd day of November,
2017, at 9:56 a.m., pursuant to the Federal Rules of
Civil Procedure with written notice as to time and
place thereof.

                     I N D E X   O F   E X A M I N A T I O N

                                                         PAGE

DIRECT EXAMINATION ......................................4
Questions by Jacob O'Brien
CROSS-EXAMINATION ....................................204
Questions by Mark N. Senak
REDIRECT EXAMINATION .................................215
Questions by Jacob O'Brien
RECROSS-EXAMINATION ..................................218
Questions by Mark N. Senak
FURTHER REDIRECT EXAMINATION .........................219
Questions by Jacob O'Brien
FURTHER RECROSS-EXAMINATION ..........................225
Questions by Mark N. Senak


                     I N D E X   O F   E X H I B I T S

                                                         PAGE
Defendant's Deposition Exhibit No.:
Exhibit 1 - Email Chain Beginning with a . . . . .161
             May 27, 2014 Email to
             rmarler@ball.com from Paul Scholten
Exhibit 2 - May 24, 2014 Letter to Air Tech . . .179
             of Michigan from Rodney Marler
Exhibit 3 - Photograph . . . . . . . . . . . .202

2

                     A P P E A R A N C E S

FOR THE PLAINTIFF(S):
          Mark N. Senak
          SENAK KEEGAN GLEASON SMITH & MICHAUD, LTD.
          566 West Adams Street, Suite 750
          Chicago, IL  60661
          312.214.1400
          msenak@skgsmlaw.com


FOR THE DEFENDANT(S):
          Jacob O'Brien
          STARR AUSTEN & MILLER, LLP
          201 South 3rd Street
          Logansport, IN  46947
          574.722.6676
          obrien@starrausten.com

4

                    DALE SPENCER,
          Having been duly sworn to tell the truth,
     the whole truth, and nothing but the truth
     relating to said matter was examined and
     testified as follows:

DIRECT EXAMINATION,
     QUESTIONS BY JACOB O'BRIEN:
Q   Good morning.
A   Morning.
Q   Can you state your name for the record?
A   Jonathan Dale Spencer.
Q   You go by Dale; right?
A   Yeah.
Q   Is it okay if I call you Dale today?
A   That's fine.
Q   Well, Dale, thank you for being here today.  My
     name is Jacob O'Brien.  I am one of the
     attorneys for Air Tech who's been sued by
     Ball Corporation and Factory Mutual Insurance
     Company in relation to a May 23rd, 2014 fire --
A   Uh-huh.
Q   -- at the Ball Corporation plant here in
     Monticello.
          Dale, have you ever given a deposition



**5**

1    before?
2  A  I don't think so, no.
3  Q  Well, I am just going to give you some of the
4     basic ground rules.  I am not going to spend too
5     much time on it, just so you're kind of familiar
6     with the process.
7        I am asking you questions.  She's going to
8     take down all the questions and your answers to
9     the questions.
10  A  Uh-huh.
11  Q  If you don't understand a question, please stop
12     me, you know, ask me to clarify, I will try to
13     rephrase, or she can repeat it to you if it is
14     immediately -- the question I immediately just
15     asked.
16  A  Uh-huh.
17  Q  You know, if you need a break, let me know, we
18     will take a break.
19        As far as anything else, you know, if you
20     have questions as we are going throughout, I
21     will do my best to be helpful with you.  But,
22     understand, that I am not here to answer your
23     substantive questions.
24  A  Right.
25  Q  You said you didn't think you gave a deposition

**6**

1     before; correct?
2  A  I don't think so, no.  Right.
3  Q  Have you retained a lawyer to represent you here
4     today?
5  A  Just -- I have not retained one, but Mark is
6     here from --
7        MR. SENAK:  From Ball Corporation.
8  A  Ball.
9  Q  But you are not currently a Ball employee?
10  A  No.
11  Q  So you have not specifically retained Mark; is
12     that correct?
13  A  No, I have not specifically retained him.
14  Q  Thank you.  Did you ask Mark to represent you at
15     the deposition today?
16  A  Yes.
17  Q  Okay.  Are you paying him to represent you
18     today?
19  A  No.
20  Q  Dale, what's your current address?
21  A  7107 Northeast Shafer Drive, Monticello.
22  Q  How long have you lived there?
23  A  Since 2011.
24  Q  Do you got any plans to move here in the near
25     future?

**7**

1  A  Not in the near future, no.
2  Q  Do you have a home phone number?
3  A  Yeah.  You want it?
4  Q  Yeah.  Sure.
5  A  I don't use it.
6  Q  That's okay.
7  A  I don't keep up with it.  I usually just use my
8     cell number.  574-278-7202.
9  Q  Okay.  And you have a cell phone, do you want to
10     give me that number as well?
11  A  Yeah.  It is 574-870-7883.
12  Q  Thanks, Dale.  Give me an idea of your
13     educational, just kind of describe for me your
14     educational background.
15  A  Well, high school diploma, associate's degrees,
16     on-line, business management.
17  Q  Let's start, where did you go to high school?
18  A  Williston High School.
19  Q  Where is that?
20  A  Florida.  Williston, Florida.
21  Q  Williston, Florida.  Thank you.
22  A  Uh-huh.
23  Q  One thing I neglected to mention, and I should
24     have mentioned is let's do our best not to speak
25     over each other.

**8**

1  A  Yes.
2  Q  And it's mainly for the benefit of the court --
3  A  Yeah.
4  Q  -- reporter.
5  A  Yeah.
6  Q  It is very difficult for her.  So we are kind of
7     doing it right now, you're kind of answering me
8     as I am talking.
9  A  Uh-huh.
10  Q  Do your best to avoid that, and I'm going to do
11     the same.  Okay?  Just wait till I finish the
12     question --
13  A  Uh-huh.
14  Q  -- then you answer, and that will just make it
15     easier for her.  Okay?
16  A  (Witness nods head.)
17  Q  Thanks.  So you said Williston, Florida, is
18     where you went to high school?
19  A  Correct.
20  Q  And you got your high school diploma and then
21     you said you got an associate's degree?
22  A  Correct.
23  Q  Where was that from?
24  A  Ashworth University.
25  Q  Where is that?

9

1  A  Georgia.
2  Q  Okay.  So a two-year program?
3  A  Uh-huh.
4  Q  Okay.
5  A  Yes.
6  Q  Anything else as far as education?
7  A  Just leadership training throughout my career.
8     I did various things.
9  Q  Would some of that have been through Ball, Ball
10    Corporation?
11  A  Most of it was through Metal Container.
12  Q  Okay.
13  A  Anheuser-Busch.
14  Q  And, by the way, I just referred to Ball, and
15    I'm probably going to refer to Ball Corp. as
16    just Ball today, if that's --
17  A  Correct.
18  Q  -- okay with you.
19  A  That's fine.
20  Q  Are you currently employed?
21  A  Yes.
22  Q  Where do you work?
23  A  I work for Constellium Aluminum.
24  Q  Where is that?
25  A  Muscle Shoals, Alabama.

10

1  Q  How long have you worked there?
2  A  Since August of 2016.
3  Q  What is your title with -- Constellium, is
4     that -- can you spell that for the --
5  A  C-O-N-S-T-E-L-L-I-U-M.
6  Q  Thank you.
7  A  Uh-huh.
8  Q  And what's your title with Constellium?
9  A  Quality, quality rep, customer quality rep.
10  Q  I don't really know what Constellium does.  Can
11    you just kind of give me a basic idea of what
12    Constellium, what the business of Constellium
13    is?
14  A  Well, Ball makes cans.  Constellium supplies the
15    aluminum to the plants that make the cans in
16    automotive.  So we are also in automotive.
17  Q  So it is an aluminum employer?
18  A  Correct.
19  Q  And you said you're a quality rep.  What does
20    that entail?
21  A  Well, I pretty much give technical support, and
22    I have seven accounts that I represent, that I
23    go to the plants, different plants, whatever
24    issue they are having, or just routine customer
25    visits, depending on the circumstances.  But I

11

1     pretty much represent the plants.  I'm the
2     liaison between the plant and the mill.
3  Q  So any concerns they have got about the aluminum
4     they come to you?
5  A  Correct.
6  Q  You said you started there on August 16th.  Has
7     your title changed at all since then --
8  A  No.
9  Q  -- from then to present?
10  A  No.
11  Q  So you have always been a quality rep with
12    Constellium?
13  A  Correct.
14  Q  You said it was in Alabama.  Do you have a
15    business address?
16  A  4805 2nd Street, Muscle Shoals, Alabama.
17  Q  Can you spell that city name?
18  A  M-U-S-C-L-E, S-H-O-A-L-S.
19  Q  Thank you.  Do you have a work email?
20  A  Yes.
21  Q  Can you give that to me?
22  A  It is dale.spencer@constellium.com.
23  Q  And a business phone number?
24  A  My cell phone is my business number.
25  Q  Thank you.  All right.  Was it the case that you

12

1     left your employment with Ball to go work for
2     Constellium?
3  A  Yes.
4  Q  Okay.  We will come back to that.
5  A  Uh-huh.
6  Q  I want to get an idea of kind of an overarching
7     summary of your work history, starting out after
8     you get your associate's degree.  Just kind of
9     walk me through your employment history.
10  A  After I get my associate's degree or --
11  Q  Well, that's a good point.  Any work history you
12    have got.
13  A  Yeah.
14  Q  Okay.
15  A  Yeah.  Well, I was in the Marines from 1984 to
16    1988.  I got out of the Marines in 1988, went to
17    work for Metal Container Corporation in
18    Gainesville, which is part of AB Packaging.  It
19    is an end plant.
20     I worked there for nine years and
21    transferred to Metal Container in Newburgh,
22    New York, which is a can plant, similar to the
23    Ball plant here in Monticello.
24     I worked there for 16 years.  Opportunities
25    came up with Ball, so I left Metal Container

---

13

1   Corporation. And so I worked for Metal
2   Container for 24 years and then I went over to
3   Ball in 2011.
4   Q   Okay. So Ball in 2011?
5   A   Correct.
6   Q   Before that, you worked for Metal Container
7       Corp. for 24 years --
8   A   Correct.
9   Q   -- at two different locations?
10  A   Correct.
11  Q   What was your title when you left Metal
12      Container for Ball Corp.?
13  A   Process superintendent.
14  Q   Okay. Tell me a little bit about what, you
15      know, your job responsibilities were.
16  A   As a process superintendent, I was responsible
17      for the department. It is department manager,
18      similar to what I was doing with Ball during the
19      incident. I was a back end process
20      superintendent, in charge of the decorators.
21      Pretty much oversaw all the maintenance,
22      scheduled the maintenance. The maintenance team
23      worked for me. They reported to me. So I was
24      pretty much in charge of the equipment.
25  Q   You say "maintenance" and then you said

---

14

1   "equipment." What specific equipment? Was it
2   everything or --
3   A   It is everything from the printers to the
4       palletizers.
5   Q   Okay.
6   A   Which consisted of printers, IC spray, ovens,
7       neckers, flangers.
8   Q   Ductwork?
9   A   No.
10  Q   Okay. IC spray, what does IC spray?
11  A   Inside coating.
12  Q   So you go to Ball in 2011. I think you said it
13      was a similar position to what you had been
14      doing for Metal Container; right?
15  A   Correct.
16  Q   Was it the same title?
17  A   Eventually. Ball did not have the process
18      superintendent role at the time that I went
19      there. And, actually, I was on the front end
20      when I went to work for Ball, which is the body
21      makers. It is on the other end of the plant.
22      They did not have that position. They -- I
23      think it was maybe a year later they went over
24      to the process superintendent model, like Metal
25      Container, and then I became a process

---

15

1   superintendent, yes.
2   Q   I tell you what, I am going to ask him to stop.
3       Okay. Let's take a quick break for a second.
4       (A recess was taken been 10:08 a.m. and
5       10:09 a.m.)
6       BY MR. O'BRIEN:
7   Q   Okay. So we are talking about how Ball kind of
8       didn't have this role that you previously
9       occupied with Metal Container. And eventually
10      it sounds like they did kind of develop that
11      role?
12  A   Correct.
13  Q   Okay. And when did that happen, approximately?
14  A   2012.
15  Q   Okay.
16  A   I would say it was 2012, yes.
17  Q   So you have been there, estimating, about a
18      year?
19  A   Correct.
20  Q   Did anything, when they created this new title,
21      did anything change about what you were asked to
22      do or what your job responsibilities at Ball
23      were?
24  A   Actually, I was on the front end. I originally
25      came to Ball Monticello to help with the front

---

16

1   end process, getting it where it needed to be.
2       Once we went over to the process
3   superintendent model, they actually moved me to
4   the back end, because the front end seemed to be
5   stable at the time. So I went to the back end
6   and worked in the decorator area, the area I was
7   working in when the fire occurred.
8   Q   Okay. And did anything -- so let me back up.
9       So 2012 you start this kind of back end
10      role that you are talking about?
11  A   Uh-huh.
12  Q   Did anything change from then until you left at
13      Ball?
14  A   As far as what, my role?
15  Q   Yes, I'm sorry, your role with Ball.
16  A   Yes. I got promoted to department manager a
17      year later.
18  Q   Okay.
19  A   And then a year later, after that, up until I
20      left, I was the production manager.
21  Q   So I want to make sure I understand you. So in
22      2013 you were promoted to department manager?
23  A   2013, I was still in the back end.
24  Q   Okay.
25  A   It was 2014 or 2015, somewhere thereabout, I was

---



---

**17**

1 promoted to a department manager.

2 Q I think what happened was you were referencing a

3 year after the fire; is that right?

4 A Yes.

5 Q Okay. So a year after the fire you get

6 promoted?

7 A Well, it was less than that, because I had

8 already been on the back end quite awhile, so it

9 was less than a year I was promoted to

10 department manager.

11 Q Let me ask it this way. The position that you

12 occupied in 2012 was the same position you held

13 at the time of the May 23rd, 2014 fire?

14 A Correct.

15 Q Okay. Just want to make sure I had that clear.

16 Okay. And on the back end I think we

17 talked about what your responsibilities were at

18 Metal Container --

19 A Uh-huh.

20 Q -- when you take this back end, as you referred

21 to it role with Ball in 2012, did that entail

22 kind of overseeing the maintenance of the IBO

23 ovens?

24 A Yes.

25 Q And all of the components related to the IBO

---

**18**

1 ovens?

2 A Correct.

3 Q And with Metal Container that did not include

4 ductwork, is that the same?

5 A Correct.

6 Q So your role with Ball that you occupied in

7 2012, at least through the date of the fire, did

8 not require you to oversee the maintenance of

9 the ductwork?

10 A Correct.

11 Q Dale, what did you do to prepare for your

12 deposition today?

13 A Really nothing.

14 Q Did you speak with Mr. Senek?

15 A We spoke yesterday.

16 Q Okay.

17 A Briefly.

18 Q How long was your conversation?

19 A Five minutes.

20 MR. SENAK: Maybe.

21 A If that, maybe.

22 Q Did you review any documents in preparation for

23 your deposition?

24 A No.

25 Q Were you provided any instructions on how you

---

**19**

1 were supposed to testify today?

2 A No.

3 Q Can you give me an idea how many times you have

4 spoken to Mr. Senek about the case?

5 A Just I would say once. I mean, we went back and

6 forth about the scheduling of the meeting, of

7 the deposition, on when it was going to be and

8 the fact that it got delayed. It got pushed out

9 because of other issues. But speaking about the

10 case, I would say we haven't.

11 Q Were these conversations taking place over the

12 phone, in person?

13 A Over the phone.

14 Q Did I ask you if you reviewed any documents? I

15 think I did.

16 A Yes.

17 Q And you said you did not?

18 A No.

19 Q Thank you. Did you speak with any Ball

20 employees or representatives, not Mr. Senek,

21 anybody from Ball about your deposition today?

22 A Just I have talked to Chris and let him know

23 that I was giving a deposition but nothing in

24 detail about a deposition.

25 Q Who is Chris?

---

**20**

1 A The plant manager.

2 Q What's his last name?

3 A Czajkowski.

4 MR. SENAK: Can you spell that?

5 MR. O'BRIEN: Thank you, Mark. I was going

6 to ask him to do that.

7 MR. SENAK: I don't think anybody can spell

8 that but Chris, to tell you the truth.

9 THE WITNESS: I could spell it, but it has

10 been awhile since I wrote it down, but I got it

11 right here.

12 MR. SENAK: So I have it as

13 C-Z-A-J-K-O-W-S-K-I.

14 THE WITNESS: Sounds right.

15 MR. O'BRIEN: I was way off.

16 MR. SENAK: It is just like it sounds.

17 Q All right. So you spoke with, I am going to

18 call him Chris, you spoke with Chris about the

19 fact that a deposition was happening?

20 A Correct.

21 Q And, as I am understanding it, you didn't talk

22 to anybody else from Ball about this deposition?

23 A No.

24 Q Not about this case at all?

25 A No. Well, Freddie, Freddie Spencer, who's the

---

21

1  engineering manager, he knew I was giving a
2  deposition.
3  Q  Did you talk to Freddie about the deposition?
4  A  No.  Just the fact that there was going to be
5  one.
6  Q  So did you talk substantively about anything to
7  do with the fire, the May 23rd, 2014 fire?
8  A  Not to my knowledge, no.
9  Q  So you don't recall seeing anything?
10 A  No.
11 Q  All right.  Why was it that you were letting
12    them, just curious, why were you letting them
13    know about the deposition?
14 A  Just that I had been contacted by your attorney,
15    your office --
16 Q  Yeah, okay.
17 A  -- about the deposition.  And I believe Mark had
18    already been working with the insurance company
19    stuff.  And that they were aware of the
20    deposition, so they knew that it was coming, so.
21    And I, you know --
22 Q  Since you left your employment with Ball, have
23    you had any conversations with anybody from
24    Factory Mutual about the May 23rd, 2014 fire?
25 A  Factory Mutual?

22

1  Q  It is the other plaintiff in this case,
2    Factory Mutual Insurance Company.
3  A  No.
4  Q  You mentioned Freddie Spencer.  Are you related
5    to Mr. Spencer?
6  A  No.
7  Q  Just coincidence you have the same last name?
8  A  No.
9  Q  All right.  We talked about this.  One thing I
10    didn't ask you, and I think I know the answer,
11    but when you started working for Ball, was it
12    always at the Monticello facility?
13 A  Yes.
14 Q  With Metal Container Corp., are they kind of in
15    the same business as Ball?  Are they producing
16    the same sorts of products or is it different?
17    Just give me an idea.
18 A  It is the same.
19 Q  Aluminum cans?
20 A  It is the same thing, yes.
21 Q  And I think I kind of implicitly know the answer
22    to this based on what you said so far.  You left
23    Ball to pursue this other opportunity with your
24    current employer, Constellium?
25 A  Correct.

23

1  Q  Did you receive any sort of training from Ball,
2    during your tenure from 2011 forward, regarding
3    the operation of the IBOs?
4  A  No.
5  Q  Of the --
6  A  Well, I will rephrase that.
7  Q  Okay.
8  A  You know, I got a background in industrial
9    mechanics and process experience with the IBOs.
10    IBOs are different.  I mean, you have got
11    different brands, like anything else.
12       There has been a -- as far as training,
13    there was no formal training.  But there was --
14    you know, you know, taking over the department
15    and just being around the plant, the difference
16    is in the ovens that, you know, I question and
17    been approached with, you know, the side panels
18    and just different zones.  I mean, they are just
19    some differences.
20       It is the same theory of operation, but it
21    is a different oven, so.
22 Q  To make sure I got that all, so you have
23    experience with ovens?
24 A  Correct.
25 Q  But when you come to Ball?

24

1  A  Correct.
2  Q  With that being said, all ovens are a little bit
3    nuance, a little bit different?
4  A  Correct.
5  Q  And there is no specific training by Ball of you
6    with respect to the ovens that are in the
7    Monticello facility, but you're kind of learning
8    hands-on?
9  A  Correct.
10 Q  All right.  I am going to ask you the same
11    question about the maintenance of the IBOs.
12 A  Uh-huh.
13 Q  Did you receive specific training from Ball
14    regarding what they required as far as
15    maintenance of the IBOs?
16 A  Just the preventive maintenance program that was
17    already in place.  I mean, and it's pretty much
18    the same as any oven.  I mean, like I said, the
19    theory of operation of these ovens are all
20    pretty much the same.  So, I mean, just lay out
21    the mechanics of them might be a little
22    different, but the theory of operation is the
23    same.
24 Q  So I think what you said is that they had a
25    procedure, kind of a maintenance procedure



25

1  already in place?
2  A  Yes.
3  Q  And you were instructed as to what that was?
4  A  Correct.
5  Q  I guess my question was, would you consider that
6     training?
7  A  Well, based on my experience and background, I
8     pretty much already knew looking at the PM what
9     the -- I didn't need anyone to tell me where to
10    grease a bearing or where a blower was or
11    anything like that.  I already -- based on my
12    background, I already knew that.
13 Q  Sure.
14 A  Could figure that out on my own.
15 Q  So basically all that happens when you come in
16    with respect to the maintenance, in preparing
17    yourself to oversee the maintenance, because
18    that was part of your responsibility there?
19 A  Correct.
20 Q  So part of that is just basically bringing you
21    up to speed on how Ball has maintained these
22    things and what their procedure is?
23 A  Yes.
24 Q  Up until you get there; correct?
25 A  And my role as a process superintendent isn't

26

1  always to know everything but have people in
2  place that do.
3  Q  Okay.
4  A  You know, I had a maintenance team that worked
5  for me that was familiar with the operation,
6  familiar with the ovens.  You know, it was their
7  responsibility and expectation that they take
8  care of the maintenance.  It is my role to make
9  sure that they're meeting the expectations, so.
10 Q  So you have -- all right.  I am sorry, not you,
11    but Ball has kind of a maintenance team already
12    in place that you can kind of instruct?
13 A  Correct.
14 Q  And we need to address this or that?
15 A  Correct.
16 Q  And it would also be the case, I assume, that
17    sometimes you got to hire outside contractors to
18    kind of help with the maintenance?
19 A  Correct.
20 Q  Was that your decision when to make those hires
21    of the outside contractors?
22 A  As far as what?
23 Q  As far as maintenance, sorry.
24 A  Was it my responsibility?
25 Q  Yeah.  Let me say it again.  Sorry.  I will ask

27

1  it again.
2     Was it your responsibility to kind of make
3  these hiring decisions?  You said that there is
4  maintenance at Ball, Ball's employees perform,
5  and then there is also instances where Ball has
6  to hire an outside contractor to come in and
7  help with the maintenance.
8     Was that your decision to make those hires?
9  A  It was already in place.
10 Q  Okay.  So Ball had already -- my understanding
11    of what you said, Ball had relationships in
12    place?
13 A  Correct.
14 Q  With outside contractors?
15 A  Correct.
16 Q  And so you didn't have to form new relationships
17    with these outside contractors?
18 A  Correct.
19 Q  But I guess my question is a little bit
20    different.  Was it your decision when to call
21    these people and bring them in?
22 A  Yes.
23 Q  So you had kind of a discretion to determine,
24    okay, this is issue requires an outside
25    contractor?

28

1  A  Correct.
2  Q  All right.  Was cleaning of the ovens one of
3  those things that you had discretion to contact
4  these outside contractors?
5  A  Yes.
6  Q  And what about ductwork, I think you said maybe
7  no; is that --
8  A  That was usually scheduled by the engineering
9  group.  And that was done during most of the
10 time during holiday shutdowns.
11 Q  So ovens and ductwork cleanings did not
12    necessarily occur at the same time?
13 A  No.
14 Q  During your tenure with Ball, are you aware of
15    that ever happening, where the ovens and the
16    ductwork were cleaned kind of in one, I guess
17    one event?
18 A  No.  Not to my knowledge, no.
19 Q  Did you also oversee, in your role with Ball,
20    any necessary repairs for the IBOs?
21 A  Yes.
22 Q  Okay.  And was that the same kind of situation
23    where Ball has employees that can do some
24    repairs and you also have to hire at times
25    outside contractors?



29

1  A  Correct.
2  Q  And was that, again, you had some discretion in
3     when you could hire these outside contractors to
4     do this?
5  A  Yes.
6  Q  I guess the other component I am thinking of is
7     inspections of the IBOs. I am assuming Ball
8     kind of performs its own inspections of the IBOs
9     from time to time. Was that correct during your
10    tenure?
11 A  Inspections like routinely?
12 Q  Sure.
13 A  We did maintenance inspections of grease
14    bearings, looked at bearings, made sure there
15    was no vibrations. That was pretty much done on
16    a weekly basis.
17 Q  We will circle back to some of this kind of
18    routine stuff. Right now just kind of general
19    themes.
20 A  Uh-huh.
21 Q  Did Ball perform inspection of the oven for
22    purposes of determining whether cleanings were
23    necessary?
24 A  There was times where it was done based on the
25    performance of the equipment or if things were

30

1     going on, but it was -- it was basically
2     scheduled. It was a scheduled maintenance.
3  Q  So what I am hearing is, is if you're seeing
4     poor performance of the oven, you might,
5     somebody might go in there and look around?
6  A  Correct.
7  Q  But other than that, it is kind of already just
8     scheduled as far as cleaning goes?
9  A  Correct.
10 Q  When Ball would do these inspections, when an
11    oven is acting up, for example, who performed
12    those inspections?
13 A  Well, it really wasn't an inspection. It was
14    kind of the knowledge of knowing what was going
15    on and the inspection would be, you know, we
16    would go out, either we would get millwrights or
17    we would get the maintenance guys to take a look
18    inside, just what they could see.
19       It is a confined space. So Ball employees
20    are not allowed to -- they are not certified for
21    confined space, so we can't physically get in an
22    oven. It is just an idea of, okay, this is the
23    issue we are having, this is just based on
24    experience, you know, this is what we need to do
25    to resolve it.

31

1  Q  Something you said there, confined space
2     training, did any Ball Corporation employees at
3     the Monticello plant have confined space
4     training, to your knowledge?
5  A  No.
6  Q  So you couldn't actually get physically inside
7     of the ovens?
8  A  No.
9  Q  I have a general understanding, and we are going
10    to talk about this a little bit more later, but
11    there's panels, right, that can be removed on
12    the sides of the ovens?
13 A  Yes.
14 Q  As part of any of these inspections, when you
15    got an oven acting up, can you remove the panels
16    and at least look in there?
17 A  Yes.
18 Q  Did Ball do that?
19 A  Yes.
20 Q  And who performed those types of inspections?
21 A  It depended. I mean, a millwright could do it,
22    a maintenance guy could do it, engineering could
23    do it, I could look at them.
24       Most of the time we would get the
25    millwrights out there with the maintenance guys.

32

1     They would pull panels off and they would shine
2     the light in there and see what they could see
3     from where they were at to see if anything was
4     going on.
5  Q  So it sounds like you did it sometimes?
6  A  I have, yes.
7  Q  I mean, it sounds like there's a lot of
8     different people that might have done this?
9  A  Uh-huh.
10 Q  Are there any names of any Ball employees that
11    you know, that you have a memory that they
12    performed these types of inspections during your
13    tenure?
14 A  It has been a year since I left. I am trying to
15    think of names.
16 Q  Just to the best you can recall.
17 A  I would say Craig Grandstaff has looked at them.
18 Q  Do you have any idea whether Mr. Grandstaff is
19    still employed by Ball?
20 A  He is.
21 Q  Anybody else you can remember?
22 A  Millwrights. I mean, there has been Ron Kidney,
23    I would say, he has looked at them before.
24 Q  Ron Kidney?
25 A  Yeah.



33

1  Q  Spelled just like it --
2  A  K- -- yeah.
3  Q  And do you know if he still works for Ball?
4  A  He does.
5  Q  Anybody else that you can think of?
6  A  No, I have looked at them. I mean, Freddie has
7     looked at them.
8  Q  Freddie Spencer is who you're referring to?
9  A  Yes.
10 Q  Anybody else you can --
11 A  Not that I can think of, no.
12 Q  Did Ball provide any sort of training on what
13    you're supposed to look for in these kind of
14    inspections that we have been talking about just
15    now?
16 A  It was just based on experience.
17 Q  Okay.
18 A  I mean, it was --
19 Q  So Ball didn't, for example, give you a specific
20    set of items to be looking for in there?
21 A  No. We just -- most of the guys just knew what
22    to look at.
23 Q  And what would they be looking for?
24 A  They would just be looking for if there's, you
25    know, mechanical issues, you know, if there

34

1     was -- a lot of times you would start getting a
2     bunch of tip-overs or damage coming out of the
3     oven.
4        You know, you would look in there and see
5     if there is anything hung in the rail or if
6     there is anything broken, look for what you
7     could see.
8        And most of the time, if you just look
9     inside the oven, there is nothing really there,
10    as far as the oven, except a mat and perf
11    plates, and you got side rails. So they would
12    look at panels, make sure the panels were put on
13    properly.
14 Q  Nothing cracked, for example?
15 A  Correct. So, you know, they would just -- most
16    of the time with that. If it was an issue where
17    it was a performance issue of the oven you know,
18    they would take a look at perf plates, which is
19    right above the mat, to make sure they weren't
20    plugged or anything like that.
21 Q  Okay.
22 A  From where they could see. And usually if they
23    are plugged, they are going to be plugged on the
24    outside. They're plugged all the way across.
25 Q  Is one of the things that they are looking for,

35

1     the Ball employees or you previously,
2     accumulation of any particular debris or
3     anything like that?
4  A  Not typically. You know, if there's a -- most
5     of the time they are looking for, you know,
6     buildup on the perf plates, which is where the
7     air flow goes through, looking in there and
8     making sure that wasn't plugged up.
9        Other than that, then most of the -- I
10    would say 90 percent of the time during
11    production, if they are looking at an oven, they
12    are looking at it for mechanical reasons.
13 Q  Like I said, are you aware of any instance
14    where, for example, any Ball employee is kind of
15    looking in the oven and kind of trying to get an
16    idea of how thick any accumulation of
17    particulate or debris is in there, in the oven?
18 A  On the perf plates.
19 Q  Okay.
20 A  Yeah, if it is a cure issue.
21 Q  So tell me about that. What does that process
22    look like?
23 A  Well, they just take a flashlight and look up
24    top and make sure that -- perf plates are just
25    plates that go in the oven. And they have holes

36

1     in them, it is for air flow, to secure the IC.
2     They are just looking in there and making sure
3     they are not plugged up or there is not a lot of
4     buildup on them.
5  Q  So the place they are looking for buildup is the
6     perf plates --
7  A  Uh-huh.
8  Q  -- on these general inspections --
9  A  Correct.
10 Q  -- that we're talking about?
11       Anywhere else they look at?
12 A  No, not --
13 Q  When they look at the perf plates and the
14    accumulations, did they actually measure them,
15    measure the accumulation?
16 A  It is official. It is official.
17 Q  So they are not in there with like a ruler or
18    anything?
19 A  No.
20 Q  All right. Through your role with Ball, were
21    you required to be familiar with the user manual
22    of the IBOs?
23 A  No.
24 Q  Have you ever seen -- well, during your tenure,
25    did you ever see the user manual of the IBO?

---

**37**

1   A   No.  Just preventive maintenance documents.
2   Q   So you never really reviewed anything?
3   A   Right.
4   Q   And you said earlier you didn't review any
5        documents.  But just to close the gap, you
6        didn't review any user manual in preparation for
7        today?
8   A   No.
9   Q   And I should be more specific.  User manual for
10       the IBOs at the Ball facility in Monticello?
11  A   No.
12  Q   During your tenure with Ball, if you needed to
13       see the or needed to reference the user manual,
14       would you have known where to find it for the
15       IBOs?
16  A   Yes.
17  Q   Where was that?
18  A   We had some in our office, in the maintenance
19       office.
20  Q   Okay.
21  A   There was some over in the shop.  They had
22       manuals in the shop as well.
23  Q   So you knew where the manuals were generally
24       kept?
25  A   Yes.

**38**

1   Q   Do you know specifically which location the IBO
2        manual was?
3   A   As far as what office?
4   Q   Right.
5   A   All right.
6   Q   I guess the question is --
7   A   Well, we -- we -- we had --
8   Q   Sorry, let me just ask the question again, so
9        maybe I can make it clear.
10           Did you know specifically where the IBO
11       manual or user manual was during your employment
12       with Ball?
13  A   Specifically, I knew where to go get it.  But I
14       would have to look through the main books on the
15       shelf to find it.
16  Q   All right.  Did you ever do that during your
17       employment?
18  A   No.
19  Q   Are you aware of whether kind of the employees
20       that you oversaw and I think you said you could
21       have people do repairs, do maintenance, you
22       know, some do kind of these inspections, to your
23       knowledge, did any of these people have to be --
24       were they required to be familiar with the user
25       manual of the IBO?

**39**

1   A   No.
2   Q   Dale, could you describe for me your
3        understanding of what the function of the oven,
4        the purpose of the oven is or was during your
5        tenure, I guess, to Ball's overall manufacturing
6        process?
7   A   The oven we call an IC oven.  The purpose of the
8        oven is to cure the inside spray.  You have IC
9        spray machines prior to the oven.  It is called
10       an IBO, which is an inside bake oven.  And the
11       purpose of the IBO is to cure the spray.
12           There is a curve that has -- there's
13       specifications for that, as far as that curve of
14       where the spray is actually cured.  But there is
15       aluminum cans by themselves.  You can't put
16       product in them.  It would corrode.  So it has
17       to have a lining in it.
18           The IC is pretty much a lining that goes
19       inside the can.  It goes in wet and then it goes
20       through the oven to cure it.
21  Q   Okay.  So there is a lining inside the can.  I
22       think I understood, is there also some kind of a
23       lacquer outside the can?
24  A   Yeah; varnish.
25  Q   Varnish.  Does the oven play any role with

**40**

1        respect to that as well?
2   A   There is an oven prior to that.
3   Q   Okay.
4   A   It is called a PIN oven.
5   Q   All right.
6   A   But after the printer, that cures the ink and
7        the varnish on the can.
8   Q   Does it go through the PIN oven first to cure
9        the varnish?  Is that correct?
10  A   And ink.
11  Q   And ink.  Is that right?
12  A   Correct.
13  Q   And then after that, it gets the IC spray?
14  A   Correct.
15  Q   And then it goes through the IC oven?
16  A   Correct.
17  Q   Which is also referred to as the IBO?
18  A   Correct.
19  Q   And you raise a good point.  So I have always
20       been referring to this, and I think everyone
21       kind of in this litigation has been referring to
22       it as the IBO #2.  But it sounds like the Ball
23       employees might call it the IC oven?
24  A   We call it, most all call it the IBO.
25  Q   Okay.



**41**

1    A    But either one is not -- neither one is wrong.
2    Q    Got you.  So it is either/or.  All right.  Dale,
3         what was the normal internal operating
4         temperature for the IBOs?
5    A    Well, to be specific --
6    Q    To the best you can recall.
7    A    -- I would say between 350 and 400 degrees.
8    Q    Okay.
9    A    The oven has four zones in it.
10   Q    Okay.
11   A    So each zone is a different temperature.  So I
12        would say between 350 and 400.
13   Q    What's the purpose of these four zones?
14   A    Cure.  You got the first zone that pretty much
15        flashes off all the solvents and then it goes
16        through the curing process throughout the other
17        zones.  It is a curve.  It is an oven curve.
18   Q    If I refer to a squirrel cage, do you know what
19        I am talking about?
20   A    Uh-huh.
21   Q    Describe for me what that is.
22   A    It's part of a blower.  It's actually the fan
23        inside a blower.
24   Q    So the squirrel cage is the fan itself?
25   A    Yes.

**42**

1    Q    And do you know what the normal temperature
2         inside the squirrel cage was or in the squirrel
3         cage was during operations?
4    A    I had no idea.
5    Q    Is there somebody that, during your tenure with
6         Ball, that would have been knowledgeable about
7         that, to your knowledge?
8    A    To my knowledge, no.
9    Q    And then I think based on what you said
10        previously, I know the answer to this, do you
11        know what the normal temperature was for the
12        ductwork above the IBOs?  And I guess we need to
13        talk about that a little bit further, and we
14        will.  But I understand there is ductwork kind
15        of connected to the IBOs; right?
16   A    Correct.
17   Q    Right.  So the question now is, do you have any
18        knowledge of what the normal operating
19        temperature -- or, I'm sorry, the normal
20        temperature of the ductwork during operations
21        was?
22   A    No.
23   Q    Do you have any knowledge of who at Ball would
24        have had knowledge of that?
25   A    I don't know if it was something that was even

**43**

1         checked.  I don't know.
2    Q    I believe -- well, I will just ask the question.
3         Do the IBOs on any typical day, they run for
4         three shifts; right?
5    A    Twenty-four hours.
6    Q    Right.  So 24 hours a day.  I call that 3
7         shifts, 24 hours.
8    A    Four.  Four shifts.
9    Q    Four shifts.  Okay.  So how long are those
10        shifts then?
11   A    Twelve hours.
12   Q    Okay.
13   A    Actually, I'm sorry, two shifts.  We got two
14        crews on each end of the week, so it is two
15        shifts.
16   Q    Got you.
17   A    12-hour shifts.
18   Q    But it is 24 hours a day?
19   A    Correct.
20   Q    See, I guess I am glad we clarified that,
21        because when I say "3 shifts," I am assuming
22        8-hour shifts.
23   A    Right.
24   Q    So you got two 12-hour shifts?
25   A    Correct.

**44**

1    Q    Which you agree with me would be the equivalent
2         of three 8-hour shifts; right?
3    A    It would -- 24 hours is equivalent to three
4         8-hours, yes.
5    Q    It is not a trick question, sir.
6    A    Yeah.
7    Q    And, as a general matter, the ovens are used
8         every day; right?
9    A    Yes.
10   Q    Seven days a week?
11   A    Yes.
12   Q    Can you give me an idea during your tenure of
13        approximately how many days any given IBO would
14        be down in a month, in any given month?
15        You know, what is the average number of
16        days the IBO is not in operation?
17   A    It is always in operation.
18   Q    Okay.  I understand they have to shut it down
19        sometimes, though?
20   A    Correct.
21   Q    So that's what I am trying to get at.
22   A    Right.
23   Q    So how often is it, just generally, I'm not
24        trying to look for anything too terribly
25        specific, unless you're able to do that.  Just

---

**45**

1   trying to get a general understanding of, you
2   know, how many days in a given month might an
3   IBO be shut down, for example, for maintenance?
4   A   In a month? It wouldn't be.
5   Q   Okay. Well, then why don't you kind of explain
6   to me how often a given IBO would be shut down.
7   A   It would be -- I believe the scheduled
8   maintenance was every six months.
9   Q   Okay.
10  A   For cleaning.
11  Q   So cleaning every six months?
12  A   But it would get maintenance regularly, like
13  weekly. We had weekly maintenance that we did
14  on them.
15  Q   Let's circle back to that. So you said, I think
16  what you said is cleaning once every six months?
17  A   Correct.
18  Q   And when you do a cleaning -- or not -- Ball
19  doesn't do the cleanings; right?
20  A   No.
21  Q   So when Ball arranges the cleaning, how long is
22  the oven typically down in a typical cleaning?
23  A   Average, around 10 to 12 hours.
24  Q   So maybe a shift?
25  A   Uh-huh. Yes.

---

**46**

1   Q   And for these other kind of weekly maintenance,
2   does that require the oven to be shut down?
3   A   No.
4   Q   So the only time the oven gets shut down is for
5   a cleaning; is that --
6   A   Correct.
7   Q   And that's once every six months?
8   A   Yes.
9   Q   Do you have any idea of how many cans are
10  running through or were running through the IBO
11  in a typical day of operation during your
12  tenure?
13  A   Budget was two million six hundred, about two
14  million six. But I would say average --
15  Q   Two million six hundred you said?
16  A   Yes.
17  Q   Okay.
18  A   I would say on the average, probably two four,
19  two three.
20  Q   Okay. Now I want to make sure that I
21  understand.
22       Your quota -- is that a fair term?
23  A   Correct.
24  Q   -- is two million six hundred cans?
25  A   Correct.

---

**47**

1   Q   And then you said average, I think you said was
2   two four, are you still saying two million four
3   hundred or are you saying 2.4 million?
4   A   Two million four hundred thousand. It depends,
5   though.
6   Q   Okay.
7   A   It is really kind of depending on how that line
8   is running. I mean, the line doesn't run
9   perfect.
10      I mean, if you come in and you got six
11  label changes on the line, I mean, you're not
12  even going to make a million cans that shift.
13  Q   Okay.
14  A   You know, it depends on how the line is
15  performing, upstream.
16  Q   Sure. But this is just an average day, typical
17  day?
18  A   Typical day, over a year's time, I would say, I
19  don't know, yeah, about that, about two --
20  between two hundred, two hundred and six
21  thousand, two hundred.
22  Q   Okay.
23  A   Two six.
24  Q   We have kind of talked about some of its
25  aspects, but I would like for you to describe

---

**48**

1   for me kind of the basic structure and kind of
2   the layout of an IBO oven and kind of its
3   components.
4   A   Well, it is actually a pretty simple piece of
5   equipment. You have the mat that the cans ride
6   on. You have the recirc blowers, which provides
7   the air flow inside the oven to cure the can.
8   So you have to have the recirc, I would say a
9   vortex in there, to make sure you're getting hot
10  air down inside the can to cure it.
11  Q   Recirc, recirculation?
12  A   Yes.
13  Q   Okay.
14  A   Then you have the exhaust blowers, of course,
15  that draw the heat out. So you have a
16  temperature set in the oven based on an oven
17  curve that's run through the oven to make sure
18  you're reaching the peak oven, peak metal
19  temperature to cure the can, so.
20      And pretty much it is just air -- it is air
21  flow, hot air flow down inside the can through
22  the perf plates to make sure you're getting
23  proper cure.
24  Q   So the recirculation fan, and that's what you
25  called it; right?

---

49

1  A  Uh-huh.
2  Q  Is that a component of the burner box?
3  A  Yes.
4  Q  I want to talk about the burner box.  Is the
5     burner box on top of the oven?
6  A  Yes.
7  Q  And does it kind of have its own housing?
8  A  Yes.
9  Q  All right.  So it is separated from the oven?
10  A  Correct.
11  Q  It is kind of sitting on top?
12  A  Sitting on top, yes.
13  Q  And then the recirculation fan, does it have its
14     own housing?
15  A  Yes.
16  Q  So there is an IBO burner box and then there is
17     a circulation, recirculation fan underneath the
18     burner box?
19  A  It is all on top.
20  Q  Okay.
21  A  The recirc blower, burner box is all on top.
22  Q  But the recirc blower is between, I guess what
23     I'm getting at is the recirc blower is between
24     the body of the oven and the burner box?
25  A  Correct.

50

1  Q  And it has its own housing?
2  A  Correct.
3  Q  And the recirc fan forces hot air from the
4     burner box down into the ovens?
5  A  Yes.
6  Q  That's what you were referring to?
7  A  Yes.
8  Q  And to take the hot air away so it doesn't get
9     too hot in there, we have the exhaust fans;
10     right?
11  A  Correct.
12  Q  During operations is the recirc fan always kind
13     of forcing the hot air down or does it shut off
14     at any time?
15  A  No.  It runs continuous.
16  Q  What about the exhaust fan?
17  A  It runs continuous.
18  Q  It runs continuous.  Okay.  So based on this
19     structure we just talking about, where the
20     burner box sits on top and then there is a
21     recirc fan and then the oven, the burner box is
22     where the heat source actually comes from;
23     right?
24  A  Yes.
25  Q  Is there any other heat source for that oven?

51

1  A  No.
2  Q  And the burner box houses, is there an open
3     flame in there?
4  A  Inside, yes.
5  Q  Inside the burner box?
6  A  Yes.
7  Q  And is there any other open flame, I think I can
8     surmise that the answer is no, based on that
9     being the only heat source, but just to confirm,
10     there is no other open flame inside the oven?
11  A  No.
12  Q  The burner box is the only flame that heats this
13     oven?
14  A  Correct.  The only thing inside this oven is
15     heat.
16  Q  So this exhaust fan then, that's the squirrel
17     cage; right?
18  A  Yes.  Well, they are both squirrel cages.
19  Q  So even the burner box?
20  A  The recirc blower is the squirrel cage.
21  Q  Got you.  And then that connects, the exhaust
22     squirrel cage fan connects to ductwork; correct?
23  A  Correct.
24  Q  And the other squirrel cage fan, the recirc fan
25     is just to the burner box?

52

1  A  Correct.
2  Q  And that's the end of the system?
3  A  Correct.
4  Q  Give me an idea of what the ductwork that
5     attaches to this exhaust squirrel cage, just how
6     it was configured.
7  A  Well, it comes off each zone where the recirc
8     blower, the exhaust blowers are.  And that
9     ductwork actually runs through the plant to the
10     thermal oxidizer, the RTO outside, which burns
11     all the emissions.
12  Q  So the oxidizer kind of takes care of the fumes?
13  A  Correct.
14  Q  And the heat just kind of escapes?
15  A  Correct.
16  Q  How many squirrel cage exhaust fans were on
17     IBO #2?
18  A  Oh, let me think about that.  I believe there
19     were two.
20  Q  So the ductwork that is attached to those
21     squirrel cages, did it have like insulation?
22  A  Yes.
23  Q  Describe for me that insulation.  What was that
24     material?
25  A  It is just a foam insulation, high temp

53

1    insulation that wraps around the ductwork.
2  Q  What is the ductwork itself actually made of, do
3     you know?
4  A  I believe it is galvanized.
5  Q  Okay.  And then it is wrapped with this
6     insulation?
7  A  Correct.  It is galvanized or aluminum.  It
8     is --
9  Q  This insulation, did you -- were part of your
10    duties making sure that that insulation is, you
11    know, up to snuff, you know, doing its job?
12 A  No.
13 Q  No.  To your knowledge, who was responsible for
14    making sure the insulation on the ductwork was
15    in good repair?
16 A  I would say engineering would be.  But it never
17    wasn't in good repair.
18 Q  Sure.
19 A  It is one of those things that's there, it is
20    there.
21 Q  Do you have any name from engineering that you
22    could give me?
23 A  Freddie, Freddie Spencer was in engineering.
24 Q  Freddie was in engineering?
25 A  Yeah.

54

1  Q  So he would be the guy to talk to, to your
2     knowledge, he would be the guy to talk to about
3     any insulation --
4  A  Correct.
5  Q  -- on the ductwork?
6  A  But, I mean, it's one of those things that we
7     all -- you know, it was the plant's
8     responsibility to make sure the insulation, if
9     you're just talking about the insulation, it
10    would be the plant's responsibility to make sure
11    the insulation, if I looked up and seen that --
12 Q  It is hanging off?
13 A  -- it is hanging off, I would go say, hey,
14    Freddie, we need to get the millwrights out here
15    to take a look at the insulation on the
16    ductwork.  But it was never to that -- never
17    seen it to that point.
18 Q  So, as far as you know, it sounds like there is
19    not like, for example, a schedule where it is
20    like this insulation is X years old, we got to
21    replace it?
22 A  No.
23 Q  It is just kind of if you see --
24 A  Yeah.
25 Q  -- a problem?

55

1  A  Yeah.
2  Q  -- we address it?
3  A  And it doesn't go bad, so no need to replace it.
4  Q  Got you.  The IC liquid, do you know what
5     that -- did that have a specific name that you
6     used or did you just refer to it as IC liquid?
7  A  It was inside spray.  I mean, it was different
8     brands.  It was Akzo Nobel brand of IC.  But
9     there was different -- I mean, we used 640, we
10    used 2504, depending on what product we was
11    running.
12 Q  So it sounds like you used different sprays for
13    different cans?
14 A  Correct.
15 Q  And the spray I think you said prevents the
16    liquids, what's actually going to be in the can,
17    from corroding the can over time?
18 A  Correct.
19 Q  Do you have a manufacturer that -- well, I guess
20    you said there are different manufacturers for
21    these sprays?
22 A  Our manufacturer was Akzo Nobel.
23 Q  Okay.  Can you spell that for me?  If you can't,
24    that's okay.
25 A  A-Z-K-O [sic] N-O-B-E-L.

56

1  Q  Did you, as part of your employment with Ball,
2     receive any training regarding the safe handling
3     or precautionary measures with respect to the
4     handling of these liquids?
5  A  Yes.
6  Q  Describe for me what that was.
7  A  It was a hazardous material.  We did a
8     computer-based training every year.  It was an
9     annual EHS training that all employees were
10    required to do.
11 Q  Okay.
12 A  It was not just over this liquid, but it was
13    over any kind of chemical that was in the plant.
14 Q  Okay.  And these IC liquids, they are flammable
15    liquids; correct?
16 A  I know at one time they were.  I don't know so
17    much anymore.
18 Q  Okay.  So you say "at one time."  At one time
19    during your employment with Ball did you
20    understand they were flammable liquids?
21 A  Yes.
22 Q  Okay.
23 A  But I don't believe so now.  I think that's all
24    changed.
25 Q  As part of your training for the handling of



57

1    these liquids, did that include kind of fire
2    prevention training?
3  A  Containment, yes.
4  Q  Describe for me what that kind of looks like.
5  A  It was just, as far as containment, if there was
6    a spill, if there was an issue with a liquid,
7    say a line broke and there is a how to handle it
8    as a hazardous waste, you know, getting the
9    right people in place, contacting supervisors,
10    if it was a big spill.
11      If there was just a spill in the plant, we
12    contained it, and with the proper PPE, we would
13    take care of it.
14  Q  Do you know what the ignition points of these IC
15    liquids were?  Did they vary?
16      Let me ask you that first.  Did the
17    different liquids you're applying in different
18    cans have varying ignition points, to your
19    knowledge?
20  A  No.  Not to my knowledge, no.
21  Q  All had the same ignition point?
22  A  Yeah.
23  Q  Do you know what that was?
24  A  No.
25  Q  Who at Ball during your tenure would have been

58

1    knowledgeable about that?
2  A  I would say EHS manager.
3  Q  EHS, what does EHS stand for?
4  A  Environment health and safety.
5  Q  And who would that have been?
6  A  Matt Saul.
7  Q  Can you spell his last name for me?
8  A  S-A-U-L.
9  Q  Thank you.  All right.  Understanding that you
10    came to work for Ball in 2011, I am assuming
11    that the oven -- well, let's talk specifically
12    about IBO #2.  It was already there when you
13    arrived?
14  A  Correct.
15  Q  It is not like they purchased IBO #2 during your
16    tenure; right?
17  A  No.
18  Q  So understanding that you came there in 2011,
19    that the IBO was already there when you got
20    there, I want to get an idea of kind of the
21    history of the IBO #2, to the extent that you
22    have the knowledge.  Okay?
23      And I understand you may not know the
24    answer to a lot of these questions.  As a
25    threshold matter, is it your understanding Ball

59

1    owns the IBO #2; right?
2  A  Correct.
3  Q  It is not leased?
4  A  No.
5  Q  All right.  Do you know how long the IBO #2 had
6    been in operation as of the time you started
7    your employment with Ball?
8  A  The plant started in 1988, and I believe it was
9    the original oven.
10  Q  So it is the first oven that ever went in there
11    and it's still the same one to this day; is
12    that --
13  A  No.
14  Q  No, it is not?
15  A  No.  They have a new one now.
16  Q  Do you know when it was replaced?
17  A  It was a project that was put in place for, I
18    would say it was 2016.  2016 it was replaced.
19  Q  But up till the May 23rd, 2014 fire, it is the
20    same oven that had been installed in 1998 or
21    thereabouts?
22  A  Correct.
23  Q  Was it new at the time it was installed, to your
24    knowledge?
25  A  I would say so.  I mean, not to my knowledge.  I

60

1    don't know if it was new or not.
2  Q  You don't know for sure?
3  A  But I would say, yes, I would assume it was,
4    yes.
5  Q  Was the IBO #2 itself ever used to produce
6    anything other than aluminum cans, to your
7    knowledge?
8  A  Yes.
9  Q  Okay.
10  A  Steel.
11  Q  Steel cans?
12  A  Yes.
13  Q  Did you have an understanding of what the time
14    frame, how long it produced steel cans?
15  A  I wasn't there.
16  Q  Right.
17  A  So I know it was early '90s that they switched
18    over to aluminum.
19  Q  Do you know, did that switch, did it require any
20    kind of alterations to the IBO -- well, let's
21    start there, to the IBO itself?
22      MR. SENAK:  Object to foundation.  Go ahead
23    and answer that.
24  Q  To the extent that you know.
25  A  I wasn't there during that time, but it was -- I

---

**61**

1    don't know.
2  Q  Okay.
3  A  I wasn't there during that time, when they
4     converted over to aluminum. So I don't know
5     what engineering changes were made to the oven.
6  Q  Okay.
7  A  If any.
8  Q  Sure. And, again, I understand you weren't
9     there. I am just -- if you don't know, that's
10    fair.
11 A  Correct.
12 Q  I am just trying to figure out what you do know.
13    To your knowledge, did anything have to be
14    changed with respect to the ductwork when we
15    make this -- when Ball makes this switch from
16    steel cans to aluminum cans?
17    MR. SENAK: Object to foundation. Go
18    ahead.
19 A  Again, I wasn't there. So I don't know if they
20    changed that work or not.
21 Q  You just don't know?
22 A  I don't know.
23 Q  So we said, to your knowledge, it is steel cans
24    and aluminum cans, anything else that the IBOs
25    have ever been --

**62**

1  A  Not to my knowledge, no.
2  Q  So those are the only products that have ever
3     been produced using the IBO?
4  A  Correct.
5  Q  Prior to May 23rd, 2014, to your knowledge, have
6     there ever been any fires in the IBO #2?
7  A  No. Not to my knowledge, no.
8  Q  So none during your tenure?
9  A  No.
10 Q  And you're not aware of any prior to your
11    employment?
12 A  No.
13 Q  What about in the IBO #2 ductwork?
14 A  No.
15 Q  None to your knowledge?
16 A  None to my knowledge.
17 Q  Any fires -- well, let me strike that and back
18    up.
19    Are you aware of any fires occurring at the
20    Ball facility during your tenure?
21 A  Yes.
22 Q  Describe for me first, where was the fire?
23 A  The RTO, thermal oxidizer.
24 Q  The thermal oxidizer. And that's what we were
25    referring to earlier, I think?

**63**

1    What you said is that's the end of the
2    ductwork, it gets rid of the fumes and lets the
3    heat exhaust?
4  A  Correct.
5  Q  Is that the only one that you are aware of?
6  A  That's the only one I am aware of, yes.
7  Q  During your employment?
8  A  Yes.
9  Q  Were you aware when you arrived of any previous
10    fires that had occurred at the Ball Monticello
11    facility?
12 A  No.
13 Q  With respect to this RTO fire, can you give
14    me -- I know you may not know exactly the date,
15    but a general time frame of when this fire
16    occurred?
17 A  Well, I wasn't there very long, so it was early
18    on, so I don't have a specific date or time.
19 Q  Sure. Within the first one or two years?
20 A  Yes.
21 Q  So 2011, 2012?
22 A  Correct.
23 Q  Tell me what you can recall about that fire.
24 A  I can't recall anything. I don't even know
25    the -- you know, the extent of it or what caused

**64**

1    it. I don't recall that at all.
2  Q  Do you recall if the fire department was called
3    or came -- let's say not called, did they come
4    to the facility?
5  A  I'm not sure if they did or not. I would think
6    so, but I am not sure.
7  Q  Did you actually see the fire yourself?
8  A  I wasn't there.
9  Q  Okay.
10 A  I wasn't there when it happened.
11 Q  You were employed, but --
12 A  Correct.
13 Q  -- you weren't working at the time?
14 A  Correct.
15 Q  Did you ever have any knowledge of what any
16    determination was as to what caused that fire?
17 A  No.
18 Q  Okay. Are you able to provide any kind of
19    explanation as to what Ball did in response to
20    the RTO fire?
21 A  Huh-uh. No.
22 Q  Okay. To your knowledge, did Ball file any sort
23    of a lawsuit in relation to that fire?
24 A  Not to my knowledge, no.
25 Q  Okay.

65

1  A  I don't know. I don't know the answer to that.
2  Q  I got you. Earlier you kind of made reference
3     to some routine maintenance, things that were
4     being done weekly, things like that.
5        What I want to do now is just kind of get
6     an idea of what some of those were. Okay?
7        So were there any kind of maintenance
8     measures that had to be done on a daily basis?
9  A  I don't think so, no.
10 Q  Fair to say, then, as far as you're concerned or
11    as far as you're aware, Ball is not maintaining
12    the ovens on a daily basis?
13 A  Correct.
14       MR. SENAK:  Object to form.
15 A  Unless there's -- unless there's an issue. If
16    there is something that we see that we need to
17    take care of, we will.
18 Q  Sure. Okay. Assuming there is no performance
19    issue with the oven, assuming operations are
20    going smoothly, there are no tasks, to your
21    knowledge, that Ball was performing during your
22    tenure, as far as maintenance goes, on a daily
23    basis?
24 A  No.
25       MR. SENAK:  Same objection.

66

1  Q  You said the answer?
2  A  Not to my knowledge, I don't.
3  Q  Okay.
4  A  Like I said, unless there's a maintenance issue
5     at that time. There's weekly maintenances that
6     we take care of to do our inspections.
7  Q  And that's my next question.
8  A  Yeah.
9  Q  What is the weekly kind of maintenance that was
10    being done on the ovens?
11 A  Just an inspection of the oven, on the outside,
12    nothing inside. It was more of looking at
13    bearings, looking at shafts, making sure we
14    don't have any bearings failing, greasing,
15    greasing the bearings, and just overall
16    inspection of bearings and shafts.
17 Q  And then taking it a step out further, were
18    there the monthly tasks that were being done
19    every month by Ball?
20 A  Well, it was done every week. So there was
21    nothing where we shut the oven down or did
22    anything monthly, no.
23 Q  Sure. So I understand there's these weekly
24    tasks, and those happen every week?
25 A  Correct.

67

1  Q  I guess maybe I asked it poorly, what I want to
2     know is, were there things that, okay, we don't
3     do these on a weekly maintenance, but we do them
4     once a month?
5  A  Not that I recall.
6  Q  Okay.
7  A  Now I know at one point there was some
8     maintenance that the shop would do, the
9     millwrights. But I don't think that there was
10    anything routine that was being taken care of.
11 Q  What about on a quarterly basis, every three
12    months?
13 A  Same thing. The maintenance on the ovens is
14    just redundant. It just happens every week, so.
15 Q  Okay.
16 A  There is really not much to the oven, looking at
17    it on the outside, you got shafts and bearings.
18    You know, we do those on a weekly basis. You
19    know, make sure there is no noise or anything
20    going on in the blowers or anything like that.
21    But it is more or less a redundant maintenance
22    that gets done weekly. There is not much to it
23    other than that.
24 Q  And then you said, I think once every six months
25    the cleanings, that's when the cleanings occur;

68

1     right?
2  A  Correct.
3  Q  And that's something you hire out, Ball hires
4     outside contractors for; right?
5  A  Correct.
6  Q  Was there anything else that's kind of done
7     every six months on the same schedule but aside
8     from the cleanings?
9  A  Plant maintenance. I mean, we are doing, at
10    that time we are doing the -- you have got the
11    entire line down, we are doing printer
12    maintenance, we are doing maintenance on the
13    front end. The PIN ovens would probably, would
14    usually get cleaned at the -- at times it would
15    get cleaned at the same time as the IBO.
16 Q  So there are times when, for example, Air Tech
17    comes in, they are going to clean line 2, for
18    example, which is what IBO #2 was on?
19 A  Correct.
20 Q  They are going to clean IBO #2, the PIN oven,
21    and kind of whatever else?
22 A  At times, yes.
23 Q  Okay. We will circle back to that.
24       And then annually, were there any things
25    that are done only on an annual basis, as far as



69

1  maintaining the oven?
2  A  I know the ductwork was an annual, was done
3     annually.  To the extent of, I wasn't really
4     involved in that, so I can't really speak to it.
5  Q  So, you know, the ductwork you said done, you
6     mean cleaning?
7  A  Correct.
8  Q  So the ductwork is cleaned annually?
9  A  Correct.
10 Q  And you are aware that that's the schedule?
11 A  Correct.
12 Q  But that's the extent of your kind of knowledge?
13 A  Right.  I wasn't usually involved in that.  The
14    engineering group took care of the ductwork.
15 Q  During your tenure, would you be the most
16    knowledgeable person from Ball about these kind
17    of daily, weekly, you know, periodic maintenance
18    that we have been talking about or would there
19    be somebody else?
20       MR. SENAK:  Object to form and foundation.
21    Go ahead and answer.
22 A  I mean, I have knowledge of it.  But everybody
23    that's involved in maintenance has knowledge of
24    it.
25 Q  And I guess what my question is, from that time

70

1     frame during your tenure, did you understand
2     that there was somebody more knowledgeable than
3     you about those topics?
4  A  There is always somebody more knowledgeable.
5  Q  Who would that person be?
6  A  As far as the maintenance of the ovens?
7  Q  Right.  Well, the daily, weekly kind of these
8     periodic maintenance measures that we have been
9     talking about.
10 A  Yeah.  Well, I was responsible for them.  I
11    mean, it was my department, so I was the person
12    that led that.
13 Q  Okay.
14 A  And made sure it was getting done.
15 Q  And so I guess that's the question.  So most
16    knowledgeable about Ball's carrying out these
17    periodic --
18 A  Correct.
19 Q  -- maintenance measures was you during that
20    tenure?
21 A  Correct.
22 Q  I think you said earlier that Ball would
23    sometimes look inside of the ovens, but they are
24    not really looking for accumulations; is that
25    right?

71

1  A  Not all the time, no.
2  Q  And so if I'm understanding what you just said
3     about this periodic maintenance, Ball is not
4     kind of every month, for example, looking in the
5     ovens to see, hey, we got too much accumulation
6     here; is that right?
7       MR. SENAK:  Object to foundation.  Go
8     ahead.
9  A  No, they are not.
10 Q  To your knowledge they are not doing that?
11 A  No.
12 Q  Do the burner boxes require cleaning?
13 A  Not to my knowledge.  I have never went inside
14    one.
15 Q  Okay.
16 A  They are actually closed.  I mean, they are -- I
17    don't know how else to say it.  You pretty much
18    have to tear them apart to get at them.
19 Q  Let me ask it this way, when Ball hires a
20    contractor, Air Tech, for example, is Air Tech
21    being asked to clean the burner box or is that
22    something separate?
23       MR. SENAK:  Object to foundation.  Go ahead
24    and answer.
25 Q  To your knowledge.

72

1  A  They can get from what they can get to inside
2     the oven.  I have never been in the oven, to
3     look up to see how far they can see up inside
4     the burner boxes.  There is a -- I am thinking
5     there is -- there is, up inside there, there's
6     areas to clean from the inside of the oven.  But
7     from the outside, no, you cannot get to it from
8     the outside.
9  Q  Okay.  And there is this recirc fan I think is
10    what you said?
11 A  Uh-huh.
12 Q  Between the oven and the burner; right?
13 A  Correct.  But it is all together in the same
14    unit.
15 Q  Sure.  And so I think what you're saying is, to
16    the extent that there may be something in there
17    are cleaning in there, you just don't know?
18 A  Yeah.  Well, yes, there is something they are
19    cleaning in there.
20 Q  What is it?
21 A  There is an area to get up to in there.  I don't
22    know what it looks like, I haven't been in
23    there.
24       MR. SENAK:  When you say "they," can you
25    just clarify who you mean by they?

73

1    THE WITNESS:  Air Tech.
2       MR. SENAK:  Okay.  Sorry.
3    THE WITNESS:  Oven cleaners.
4   Q  All right.  But you just don't know how far up
5      into the burner box they are getting; right?
6   A  Correct.
7   Q  And, I guess, it sounds like you understand that
8      they probably can't get all the way into the
9      burner box; right?
10      MR. SENAK:  Lack of foundation.
11  A  I don't know.  I don't know how they can get
12     inside.
13  Q  Sure.  To the extent that you are aware what
14     they are doing in there, you don't know one way
15     or the other?
16  A  Correct.
17  Q  So you said Ball put a range for the ductwork to
18     be cleaned on an annual basis, once a year?
19  A  Correct.
20  Q  Was there ever any instances where Ball, you
21     know, strayed from that annual cleaning during
22     your tenure?
23  A  Not to my knowledge.
24  Q  Okay.
25  A  I don't know.

74

1   Q  As far as you're aware, it was once a year?
2   A  Correct.
3   Q  So, for example, there wasn't an instance where
4      it has been six months, Ball looks inside the
5      ductwork or becomes aware that there's some kind
6      of big accumulation in there and says, hey, we
7      need to clean the ductwork, to your knowledge,
8      that never happened?
9   A  No.
10  Q  Okay.  To your knowledge, was there ever a
11     problem at the Ball Monticello facility with
12     respect to condensation in the ductwork or on
13     the outside of the ductwork?
14  A  I have never -- was there a problem with the
15     condensation you're asking?
16  Q  Well, let me just ask it this way, were you ever
17     aware of condensation occurring on the outside
18     or the inside of the ductwork at the Ball
19     Monticello plant?
20  A  Condensation does occur, yes.
21  Q  Tell me about that.
22  A  As far as what?
23  Q  As far as what -- I mean, what does the
24     condensation tell Ball?  Does it mean anything
25     to you?

75

1   A  It doesn't.  It doesn't.  It is just part of
2      the -- to me, it is part of the process.
3   Q  Okay.
4   A  I mean, condensate is going to build up.  And
5      that's the reason for the cleaning, is to get
6      that condensate out, but it is going to build
7      up.
8   Q  Okay.
9   A  On the outside you really can't see, because of
10     the -- it doesn't really get on the outside.
11  Q  The insulation also?
12  A  Right.
13  Q  Okay.  I think what you said earlier was that
14     when you came -- or when you were hired by Ball,
15     was it the case that Air Tech was already kind
16     of the scheduled cleaner?
17  A  To my knowledge, yes.
18  Q  Okay.
19  A  I am not -- I believe they were, yes.
20  Q  Okay.  Did you have any kind of aware -- well, I
21     guess you're not sure that they were, but I
22     guess the answer then, I presume I know the
23     answer to this, is that you don't know how long
24     they would have been cleaning the ovens, for
25     example, at the time you arrived?

76

1   A  No.
2   Q  Okay.
3   A  They were in place when I got there, so.
4   Q  All right.  And so you didn't play any role --
5      in -- just closing the loop.  You didn't play
6      any role in Ball's decision to hire Air Tech,
7      you know, from the outset of that relationship?
8   A  I wasn't there when they hired them, so no.
9   Q  Okay.  Thank you.  To your knowledge,
10     understanding you don't know when they were
11     hired, to your knowledge, for the first time, to
12     your knowledge, after Air Tech is hired for this
13     first time, did anybody, did any other
14     contractor ever come in to clean the ovens?
15  A  Prior to Air Tech?
16  Q  Right.  Oh, no, I am sorry, after Air Tech is
17     hired for the first time.
18  A  Not to my knowledge.
19  Q  Do you need to get that?  We can take a break.
20      MR. O'BRIEN:  Let's go off the record.
21      (A recess was taken between 11:09 a.m. and
22     11:22 a.m.)
23  BY MR. O'BRIEN:
24  Q  Dale, we took a break, and we were talking about
25     kind of the first time Air Tech was hired to do



77

1    the cleaning.
2       I understand you weren't a Ball employee at
3    that time?
4  A  Right.
5  Q  Couple questions then.  And understanding that
6    you weren't there, do you have any knowledge of
7    who at Ball kind of made the decision to hire
8    Air Tech for the first time?
9  A  No.
10  Q  And so you don't know how Ball learned about
11    Air Tech's company --
12  A  No.
13  Q  -- fair?
14       All right.  During your tenure, so after
15    you started, 2011 through 2016, well, let's say
16    up to the fire, did anybody aside from Air Tech
17    clean the ovens at the Monticello Ball facility?
18  A  Not to my knowledge.
19  Q  And then after the fire, was it the case that
20    Ball hired somebody else to perform these
21    cleanings?
22  A  Yes.
23  Q  Who was that?
24  A  I can't recall the name of the company.  I will
25    think about it as we go.  I am sure it will pop

78

1    up.
2  Q  We can circle back.  All right.  When you arrive
3    at Ball, did you understand it to be within your
4    discretion or your responsibilities that you had
5    the ability to hire somebody other than Ball to
6    do these cleanings, or I am sorry, other than
7    Air Tech?
8  A  There was -- I could have, yes.
9  Q  Okay.  And so when you arrived, you didn't do
10    that, obviously?
11  A  No.
12  Q  And at not time during your tenure did you do
13    that?
14  A  No.
15  Q  But you could have made the decision yourself to
16    hire another company other than Air Tech to
17    perform the IBO cleanings?
18  A  I could have, yes.
19  Q  Okay.  Dale, describe for me -- well, first of
20    all, let me back up.
21       With respect to these Air Tech cleanings,
22    were you kind of Ball's contact person, kind of
23    the liaison between Ball and Air Tech with
24    respect to coordinating these?
25  A  Yes.

79

1  Q  And so you would discuss then with Air Tech,
2    hey, we need you to come clean X, whatever
3    component of Ball's manufacturing process?
4  A  Yes.
5  Q  As a general matter, describe for me what your
6    understanding of what Air Tech was hired to do
7    by Ball.
8  A  As far as the cleaning?
9  Q  Yes, the cleaning.
10  A  Well, the expectation was that they clean the
11    oven, remove all the buildup on the inside of
12    the oven, in the exhaust blowers, and get all
13    the buildup out of the oven and vacuum it out
14    and --
15  Q  You said exhaust blowers -- sorry, go ahead, I
16    didn't mean to cut you off.
17  A  And the housekeeping after, making sure the area
18    was clean when they left.
19  Q  When you say the exhaust blower, are you
20    referring to the squirrel cage?
21  A  Yes.
22  Q  So that was part of their responsibility?
23  A  Yes.
24  Q  Did you, I guess as part of your employment, did
25    you have knowledge of what tools Air Tech was

80

1    using to do these cleanings?
2  A  The expectation was that all the tools were to
3    be nonferrous I guess you would say,
4    spark-resistant tools while they were cleaning.
5    But I know they used grinders, scrapers, vacuum
6    cleaners, of that nature.
7  Q  So you knew what tools they were using?
8  A  I knew what tools, yeah.  I seen the tools they
9    were using, yes, most of the time, what they
10    were using.  I wasn't there.  I mean, I would
11    probably spend very little time back there when
12    they were cleaning the ovens.
13  Q  Okay.
14  A  So I'd kind of stay out of their way.  It was
15    roped off and just kind of stayed out of the
16    area while they were doing their job.
17  Q  So you got a general awareness?
18  A  General awareness, yeah.
19  Q  All right.
20  A  But I didn't inspect their tools every time they
21    came in to clean an oven, no.
22  Q  Did you, at any point during your tenure with
23    Ball, when Air Tech is doing these cleanings,
24    did you ever have concerns that the tools that
25    Air Tech was using were inappropriate for the

81

1  job?
2  A  I never approached them about any inappropriate
3     tools, no.
4  Q  I think that's a little different.
5  A  Okay.
6  Q  You never approached them?
7  A  Right.
8  Q  Did you personally ever have any concerns about
9     it?
10 A  No.
11 Q  As far as you were concerned, there was nothing
12    inappropriate about the tools that Air Tech was
13    using to perform this work --
14 A  No.
15 Q  -- correct?
16 A  Correct.
17 Q  To your knowledge, did anyone from Ball ever
18    communicate to Air Tech that he or she believed
19    that the tools being used for these cleanings
20    was inappropriate?
21 A  I don't know.  Not to my knowledge.
22 Q  And I think earlier you said you were the main
23    point of contact?
24 A  Correct.
25 Q  Okay.

82

1  A  But we have to say that I was only in that
2     department for a year.  So the amount of time
3     that Air Tech cleaned ovens to where I was
4     actually involved with them was right around a
5     year, so.
6  Q  Before the fire you mean?
7  A  No, a year altogether I was in the department.
8  Q  All right.  So Air Tech comes in, they scrape or
9     grind the residue off, they vacuum it up.  Is
10    that basically it, as far as you're aware?
11 A  Yes.
12 Q  Okay.
13 A  Yeah.
14 Q  Based on --
15 A  The expectation was they would remove the
16    buildup in the oven, so that's what their job
17    was.
18 Q  And so if they are hired to clean IBO #2, for
19    example, cleaning the IBO #2 ductwork is a
20    separate task; is that right?
21 A  Right.
22    MR. SENAK:  Object to form and foundation
23    as to what constitutes ductwork.  But go ahead.
24 Q  Okay.  Earlier I think you said that there was
25    an expectation that Air Tech would clean the

83

1     exhaust fan, the squirrel cage fan; right?
2  A  Yes.
3  Q  Was there any expectation, as far as you were
4     aware during your employment, that Air Tech
5     cleaned behind the squirrel cage fan in an oven
6     cleaning?
7  A  No.  Let me -- I will rephrase, there were
8     areas, if you look on the exhaust blower, which
9     the air duct is hooked to, a part of that, that
10    exhaust blower goes into the ductwork, so they
11    would clean what they could see or could get to.
12    But as far as going up inside, no, they did not
13    do that.
14       But there is ductwork that is attached to
15    the exhaust blower that they can see.  I mean,
16    physically can clean that.  But anything beyond
17    that, no.
18 Q  So I want to make sure I understand what you're
19    saying.  Your understanding of what Air Tech was
20    hired to do during your tenure, including at the
21    time of the fire, leading up to the fire, was
22    clean to that squirrel cage fan, they would get
23    there, and then they would clean as far as they
24    can reach and nothing else?
25    MR. SENAK:  Form and foundation.  Go ahead

84

1     and answer.
2  A  Yes.  Correct.
3  Q  Air Tech -- well, and I understand that you had
4     said earlier, I think that the ductwork was
5     something that -- you weren't arranging for the
6     cleaning or maintenance of the ductwork; right?
7  A  Right.
8  Q  Were you aware, did Air Tech also clean the
9     ductwork at the Ball Monticello facility, to
10    your knowledge?
11 A  Yes.
12    MR. SENAK:  Let me just object to
13    foundation.
14       And my concern is just the use of the term
15    "ductwork" is a bit ambiguous.  So to the degree
16    that you can be as specific as you can --
17    MR. O'BRIEN:  Mark, I don't think he has
18    had any trouble understanding what I'm talking
19    about when I am saying ductwork.  So your
20    objection is noted, but --
21    MR. SENAK:  Understood.  To the degree you
22    can do that, it would be better.  I won't have
23    to keep objecting every time.
24    MR. O'BRIEN:  You're free to object as much
25    as you want.

85

1  Q  All right.  I kind of lost my train of thought
2     here.
3        Based on your understanding of the work
4     that Air Tech is performing in cleaning the
5     ovens, did that require them to have a knowledge
6     of how to operate the IBO itself?
7  A  No.
8  Q  Can you think of any reason why they would
9     require knowledge of how to operate the IBO in
10    order to perform the cleanings of the ovens?
11 A  No.  They just need to have the knowledge of the
12    layout of the oven and where to clean.
13 Q  Okay.  Oh, I know what I was asking you.  To
14    your knowledge, was Air Tech also ever hired by
15    Ball to clean ductwork at the Monticello
16    facility?
17 A  Yes.
18 Q  And I think, as we were talking about, when they
19    clean an oven, that doesn't mean they are going
20    to clean all the associated ductwork at the same
21    time; correct?
22 A  Correct.
23 Q  During your tenure, was anybody, other than
24    Air Tech, to your knowledge, and I understand
25    this was kind of outside of your department,

86

1     but, to your knowledge, was anybody else other
2     than Air Tech ever hired to clean ductwork?
3  A  Not to my knowledge.
4  Q  Did Ball provide any instructions or require
5     Air Tech to observe certain procedures in its
6     cleaning of the oven?
7  A  I don't know what the arrangement was with Ball
8     when Air Tech, when they first came on site.
9  Q  Good point.  And let me limit it to your tenure.
10 A  No.
11 Q  So, for example, you wouldn't give them any
12    documents that say, hey, do this, this, and this
13    during your cleaning?
14 A  No.
15 Q  If they were going to receive something like
16    that, would it have come from you?
17 A  Yes.
18 Q  So if Air Tech was going to receive instructions
19    about how to perform their work, during your
20    employment with Ball, it would have come from
21    you?
22 A  Yes.
23 Q  All right.  To your knowledge, did anybody from
24    Ball ever provide Air Tech with a copy or any
25    portion of the user's manual for the IBO?

87

1  A  Not to my knowledge.
2  Q  And understanding you came on in 2011.  So
3     during your tenure that didn't happen; right?
4  A  No.
5  Q  And, as far as you're aware, it didn't happen
6     before that either --
7  A  No.
8  Q  -- is that fair?
9  A  Not to my knowledge.
10 Q  Okay.
11 A  No.
12 Q  I think I know the answer to this based on your
13    previous testimony, but I want to make sure.
14    Was there ever any instance where any Ball
15    employees or anybody from Ball in-house would
16    perform a cleaning of the oven?
17 A  Not to that extent.
18 Q  Explain what you mean by that.  So it sounds
19    like maybe there is some cleaning?
20 A  Well, if there was somewhere they could reach,
21    we were down for maintenance, and we were just
22    going to open up the oven and take a look at it,
23    do an inspection mechanically of it.  If there
24    was areas on the ledge or on the perf plates, if
25    they could reach with a vacuum without breaking,

88

1     getting inside the oven, we would vacuum and
2     clean that, yes.
3  Q  Okay.
4  A  But we wouldn't get inside the oven and scrape
5     and go to the extent of what our contractors
6     did.  Again, we weren't certified for confined
7     entry, so.
8  Q  I want to make sure I understand.  You use the
9     vacuum.  Did you use any -- or not necessarily
10    you, but did Ball use any scrapers for what it
11    could reach without getting in or was it
12    strictly the vacuum?
13 A  No.  Just vacuum.
14 Q  So if it is not loose, it is not getting
15    cleaned?
16 A  Right.
17 Q  Are you aware of Ball, during your tenure, ever
18    hiring an outside company, an outside contractor
19    to perform an inspection of the IBO #2
20    specifically?
21       And I'm not talking about Air Tech, I know
22    they are coming in and doing the cleanings, but
23    any kind of inspection?
24 A  Not to my knowledge, no.
25 Q  Earlier you said there was this time frame in

89

1  place I think when you arrived about cleaning
2  the ovens, I think it was once every six months?
3  A  Uh-huh.
4  Q  Did you have any understanding of where that
5  came from, where that kind of schedule came
6  from?
7  A  No.  It was in place when I got there.
8  Q  When you arrived, did you have the ability to
9  say, hey, we need a different schedule?
10  A  I didn't see a need to.
11  Q  Can you elaborate on why?  I mean, I guess you
12  were satisfied with the every six month, that
13  that was sufficient?
14  A  Based on the performance of the ovens and it
15  doing the job it was supposed to do, yes.
16  Q  So, for example, you're not seeing dented cans
17  and things like that?
18  A  Correct.
19  Q  And making sure I understand, the only reason
20  that you would have maybe decided to stray is if
21  you're seeing physical damage to the cans?
22  A  Correct.
23  Q  Okay.
24  A  And there was times we did adjust based on
25  maintenance issues or mechanical failures.

90

1  Q  So we have been kind of dancing around it, we
2  haven't really talked about it head-on.  So I
3  understand that this IC spray that goes on the
4  cans, as it bakes, it creates the fumes; right?
5  A  Correct.
6  Q  And the fumes get exhausted?
7  A  Correct.
8  Q  But I also understand that these fumes create,
9  as a byproduct, some kind of accumulation;
10  right?
11  A  Correct.
12  Q  And is that the condensation we were talking
13  about earlier related to that?
14  A  Dust, it would create a dust and build up,
15  correct.
16  Q  And is that dust, is that on the inside of the
17  oven itself?
18  A  It gets -- it gets exhausted.  It gets
19  exhausted, because that's part of what goes to
20  the thermal oxidizer.  But it can accumulate
21  inside, yes.
22  Q  That was going to be my question.
23  A  Yeah.
24  Q  So when Air Tech is coming in, the reason they
25  are hired, right, is to get rid of this

91

1  accumulation; right?
2  A  Correct.
3  Q  And it is the accumulation that results from
4  this liquid being baked off in the ovens?
5  A  Yes.
6  Q  So there's actually an accumulation in the oven
7  itself?
8  A  Correct.
9  Q  And in the squirrel cage fan, for example, and
10  the exhaust?
11  A  Correct.
12  Q  Can you describe what that accumulation kind of
13  looks like, feels like?  Just describe it for
14  me, as best you can.
15  A  It can be anywhere from dust to where it can be
16  like a hard, flaky material.
17  Q  Is it ever like a gooey-type consistency, to
18  your knowledge?
19  A  Not inside the oven, no, I never seen it gooey
20  inside the oven.
21  Q  And I take it you don't know one way or the
22  other what that accumulation might look like
23  inside the ductwork?
24  A  At most times it is hard.  It can be gooey at
25  times, but most times it is baked and hard.

92

1  Q  And you're referring to inside the ductwork?
2  A  Correct.
3  Q  When it has that gooey consistency, does it drop
4  down?  Does it ever drop down into the oven?
5      MR. SENAK:  Object to foundation.
6  A  Not inside the oven.  We have seen it accumulate
7  on the in-feed of -- prior to the oven where it
8  runs out to where it is hitting the fresh air,
9  and it can be gooey.  And then it can -- it does
10  not drop.
11      If you look inside the oven on the mat and
12  stuff like that, you don't see a huge buildup of
13  gooey buildup on the mat or anything like that.
14  Q  So on the inside of the actual body of the oven?
15  A  Correct.
16  Q  You don't see that?
17  A  No.
18  Q  All right.  To your knowledge, was there
19  anything different about the way that Ball, and
20  I understand it is hiring Air Tech, so I guess
21  Air Tech is handling the accumulations in the
22  ductwork as compared to inside the oven?
23  A  Are they handling it differently?
24  Q  Right.  To your knowledge.
25  A  To my knowledge, I don't know.  I have never

Dale Spencer
November 03, 2017

93 to 96

**93**

1    been there when they have cleaned the ductwork.

2 Q   Okay.

3 A   That's usually done during the shutdown and most

4      of the time there is no one in the plant but a

5      few people that is running the jobs.

6 Q   So the extent of your knowledge is what they do

7      in the oven --

8 A   Correct.

9 Q   -- fair?

10 A   Correct.

11 Q   Whenever Ball would arrange for one of these

12      cleanings to occur on an oven, walk me through

13      the process. Is it -- and let me start at the

14      very beginning, so you say it happens once every

15      six months?

16 A   Uh-huh.

17 Q   Is it you reaching out or Ball reaching out to

18      Air Tech?

19 A   I would -- when I was running the department, I

20      would reach out to Air Tech and check their

21      availability and schedule it.

22 Q   So it is not as if Air Tech just shows up every

23      six months and says, hey, we are here to clean

24      the --

25 A   No.

**94**

1 Q   You have to actually schedule it?

2 A   Correct.

3 Q   And during your tenure, were there ever times

4      where you kind of missed this six-month kind of

5      window?

6 A   Yes.

7 Q   And tell me about that.

8 A   Just based on scheduling. Either we -- looking

9      at demand or we had something else coming up,

10      say, okay, well, we are doing a shutdown in

11      another month or two months, let's just push it

12      out until that point.

13      You know, based on the performance that we

14      were seeing in the oven, there was nothing

15      pressing to say, hey, we need to get this done

16      right now because of the quality of the cans.

17      And basically you would see it in your cure

18      of the product. And if that's still good and

19      you are not seeing any decline in quality, then,

20      you know, we would push it out based on that.

21      But if it was something that, say, hey, we can't

22      wait, we need to do this now, then we would make

23      sure we did it.

24 Q   Okay.

25 A   Regardless of what else was coming up.

**95**

1 Q   All right. During your tenure, was there an

2      instance where that happened, you know, we need

3      to do this cleaning right now that you can

4      remember?

5 A   Not specifically, no.

6 Q   And I understand that you may not be able to

7      give me a specific time frame, but, as a general

8      matter, what was the longest you kind of strayed

9      from the six-month window during your tenure

10      that you can recall?

11 A   I don't -- I can't recall.

12 Q   Would there have been instances during your

13      tenure, to your memory, where the ductwork was

14      cleaned, for example, only once in a year?

15 A   The ductwork?

16 Q   I'm sorry. I misspoke. Thank you. The oven.

17 A   It could possibly have been, yes.

18 Q   Okay.

19 A   I don't have the records, so I don't --

20 Q   That's fair. I am assuming there were kind of

21      some procedures that Ball had to observe and put

22      in place to get the oven ready for the cleaning;

23      right?

24 A   No.

25 Q   Not really?

**96**

1 A   No procedure. We scheduled it. We shut it

2      down.

3      The biggest part of it was shutting it

4      down. That was getting it prepared because we

5      had to shut it down. We had to cool it off

6      before the cleaners could get inside.

7 Q   Sure. And so I think you said earlier the

8      cleaning itself takes 10 to 12 hours?

9 A   Correct.

10 Q   So before that, though, you got to shut it down

11      and get it cool; right?

12 A   Correct.

13 Q   So that's not part of this 10 to 12?

14 A   No. No. Well, not always. No.

15 Q   All right. Can you give me an idea of how long

16      it would take an oven to be prepared for Air

17      Tech to come in?

18 A   I would say it would have to cool down at least

19      an hour.

20 Q   And to get the oven prepared for a cleaning,

21      that's all Ball does, is shut it down and let it

22      cool?

23 A   Correct.

24 Q   Air Tech comes in, they do the work?

25 A   Correct.

97

1  Q  All right.  Several Air -- well, a couple
2     Air Tech employees have been deposed in this
3     case, and they have said that somebody from
4     Ball, that they couldn't identify, would kind of
5     check in with them during the progress of their
6     work, somebody from Ball, was that you?
7  A  Uh-huh.
8  Q  That would have been you?
9        MR. SENAK:  (Indicating.)
10 A  Yes.
11       MR. SENAK:  That stands for out loud.
12       MR. O'BRIEN:  Thank you.
13 Q  You would have been checking in with them during
14    their work?
15 A  Correct.
16 Q  When Air Tech arrives at the -- or would arrive
17    at the Ball facility, they check in with you?
18 A  Sometimes.  Sometimes they would check.  I would
19    know they were coming.  I would know they were
20    on site.  But I wouldn't always, depending on
21    what else was going on in the plant, I wouldn't
22    always go right to them.  I knew they were here,
23    which was the big thing, making sure they are on
24    the site to do the cleaning, and they would just
25    start the task.

98

1  Q  So they didn't always check in with you?
2  A  Not always.  Not when they arrived, no.
3  Q  But you would have known they were there?
4  A  I would have known they were there, yes.
5  Q  And was it always the case during their
6     cleanings that you would check in with them
7     during work?
8  A  Yes.
9  Q  All right.  Tell me about what you're doing when
10    you are checking in with them mid work.
11 A  Well, I would always go back to make sure, you
12    know, they pulled the perf plates out and those
13    are getting cleaned.  And mainly just checking
14    up on the progress and making sure we are
15    staying on task.  Because typically, the IBO is
16    the longest, when we clean an IBO, that's the
17    longest part of the maintenance.  So that's the
18    bottleneck when we are doing maintenance.
19       So it is more or less checking on where are
20    we at, how much longer do you have, what do you
21    got left to do.
22       And of course then I would go through,
23    whenever they -- he says, okay, we are done
24    cleaning, I would go through and inspect what I
25    could see.  Like I said, I can't crawl inside an

99

1     oven and completely inspect it, but mainly just
2     make sure the perf plates were on.  If they said
3     we are ready to go, we are done, the big thing
4     was making sure the side panels were put on
5     properly and they were installed, making sure
6     the housekeeping was done, they cleaned up the
7     area, the way it was before they got there.  So
8     I would go back there and check on those things.
9        But more or less, more or less I would
10    check in with them on the progress of the work,
11    where are we at and what's your time frame of
12    finishing up.
13 Q  So they are more progress checks than they are
14    substantive inspection of the work?
15 A  Yes.
16 Q  For example, you come to check in on the
17    progress check and you see that they are working
18    past, did you ever point out, hey, it looks like
19    you missed a spot or, hey, there is a dust pile
20    over here or anything like that?
21 A  If I could see that, yes, I would.
22 Q  So you would point things out like that?
23 A  Yeah.
24 Q  But only strictly what was visible?
25 A  Correct.

100

1  Q  During those kind of mid-work inspections, were
2     you ever able to see the progress in the
3     squirrel cage exhaust fan?
4  A  Typically, you know, I would have to tie off and
5     get up there to do it.  But, typically, I would
6     just talk to Paul and ask Paul, say, hey, are we
7     getting the exhaust blowers clean.  And he says,
8     yeah, they are working on them now.  And I would
9     see the guys up there doing it.  But, typically,
10    it was more questioning of where we are at on
11    that and is it getting done.
12 Q  I mean, I guess you said you would have to tie
13    off to go up there?
14 A  Correct.
15 Q  And you are talking kind of fall protection;
16    right?
17 A  Correct.
18 Q  Did that ever happen in these kind of progress
19    checks, where you got up there and actually
20    looked at what they are doing?
21 A  Not really.  No.  I mean, no.  I mean, I
22    have -- well, let me rephrase that.
23       I have gone up, I have gone up there for
24    other things and just kind of looked at what
25    they are -- you know, if we were changing a

**101**

1   bearing or something up there, I would be up
2   there looking around and I would look and see to
3   make sure they were cleaning it.
4       And a lot of times they keep the panels off
5   of it and you could see it. But other than
6   that, no, I didn't go up there into a in-depth
7   inspection on what they were doing.
8   Q   And I was referring to the progress checks, and
9       you also referenced that you would kind of do a
10      final check after they are done; right?
11  A   Yes.
12  Q   Is that the same for that as well, the same, you
13      didn't go check the squirrel cage at that time
14      either?
15  A   No. It was more of a -- you know, and I would
16      question Paul, because they have done it so
17      much. They knew the expectations of -- I mean,
18      they are the experts at it.
19      If I have got to go and look at an oven at
20      100 percent of what they are doing, then I got
21      the wrong people doing the job.
22  Q   Okay.
23  A   Because I don't have that time to do that. And
24      my main thing was make sure, okay, did we get
25      these things cleaned up, yes, you know, yes or

**102**

1   no, is the panels installed properly, is the
2   housekeeping done. It was more of make sure
3   we are getting the oven back the same way we
4   gave it to them.
5   Q   Based on what you said, so I think I know the
6       answer, so if Air Tech runs into problems, for
7       example, while they are doing their work, if
8       they have questions, they come to you; right?
9   A   Correct.
10  Q   Before they leave the facility, they come and
11      check in with you to initiate this kind of final
12      check; right?
13  A   Correct.
14  Q   So, to some extent, you're supervising
15      Air Tech's work while they are at the Monticello
16      facility?
17      MR. SENAK: Object to form and foundation.
18      Go ahead.
19  A   Not really. I mean, Paul is supervising the
20      work.
21  Q   Sure.
22  A   Paul is just checking in with me, and he in
23      there under my direction. And if he has an
24      issue, he can get with me. But it is more of me
25      just checking on their progress, making sure

**103**

1   that we are on task.
2   Q   Okay.
3   A   Because we have an entire line down and we are
4       having meetings throughout the day, updating the
5       plant manager on the progress of the
6       maintenance, and we need to know, okay, where is
7       each area at.
8       It is no different than me checking in with
9   the other guys on the other equipment or the
10  other contractors in there working, okay, where
11  are we at on the progress here.
12  Q   But, for example, I think you said if you are on
13      a progress check, you see something that you are
14      not happy with, you point it out and they
15      address it?
16  A   Correct.
17  Q   The same true on a final inspection?
18  A   The final inspection is more or less buttoned
19      up.
20  Q   Okay.
21  A   It has got the side panels on it. And I am just
22      going through and making sure everything is on
23      there, because we have side panels that go down
24      the side of the oven that they have to take off,
25      they are really small. If those aren't shingled

**104**

1   right and they are not put on properly, you're
2   going to have problems when we start the oven
3   up.
4       So it is more or less going through, okay,
5   those are installed properly, the housecleaning
6   is done, everything is buttoned up the way it
7   needs to be buttoned up.
8   Q   So it is the progress checks where you would
9       actually see if they are, for example, missing a
10      spot?
11  A   Not --
12  Q   To the extent you can see.
13  A   To the extent I could see. If I happen to walk
14      by something and see it, you know, I would point
15      it out, yeah.
16  Q   Okay.
17  A   But the progress is more of a touch bases on
18      where we are at in the completion of the oven.
19  Q   I think you said that you weren't usually there.
20      But do you have any knowledge of how long --
21      well, let me ask you this first, I guess. Did
22      Ball, to your knowledge, have to shut down
23      operations to clean ductwork?
24  A   It was done during shutdown.
25  Q   So it was already shut down?

105

1  A  Uh-huh.
2  Q  All right.  And I think you may have already
3     answered this, just to make sure, you're not
4     aware of there ever being an instance where the
5     IBO and the ductwork is cleaned at the same
6     time?
7  A  Not to my knowledge.  I mean, it could have
8     been, but not that I can remember if it ever
9     happened.
10 Q  Air Tech employees have, when they are
11    describing the Ball representative, who I think
12    was you --
13 A  Uh-huh.
14 Q  -- based on their testimony, based on your
15    testimony today, said that you used a flashlight
16    or something?
17 A  Uh-huh.
18 Q  What are you looking for when you --
19 A  Just if I'm walking by the oven, when I go back
20    there I can look inside it.
21 Q  Okay.
22 A  Because they have the doors open and you can see
23    inside the mat and whatever was in there.
24 Q  Did you use anything other than a flashlight to
25    kind of check in with them?

106

1  A  No.
2  Q  Can that --
3  A  And I mentioned, when we were going by there,
4     you can't look at every inch of the oven.  I
5     mean, there is just no way we can do that.
6  Q  Can you recall an instance during your tenure
7     when you ever provided any specific instructions
8     to Air Tech as a result of one of these progress
9     checks?
10 A  Well, if there was times where I didn't think
11    they were as far as they should be, I would
12    question why.
13 Q  Speed it up?
14 A  Well, that, and if they got hung up in an area,
15    you know, where it was excessive buildup, you
16    know, it kind of gave me some idea that when I
17    had a meeting with -- one of our meetings
18    throughout the day, I could kind of update the
19    team on it, on why we are not where we need to
20    be; yep.
21 Q  And during your tenure, it sounds like you have
22    recollection of some times where maybe they did
23    encounter some excessive buildup and were
24    delayed a little bit in their time frame; is
25    that right?

107

1  A  It could have been that.  It could have been,
2     you know, getting some panels off.  It could
3     have been on getting the guys going, I mean,
4     because they have to set up and stuff too.  So
5     it varied.
6  Q  When looking at this kind of final inspection,
7     after Ball -- or, I am sorry, Air Tech has told
8     you, hey, we think we are done, did Air Tech
9     remain at the facility while you do that?
10 A  There was some guys there.  Some guys were
11    packing.  Some guys would be outside packing.
12    But, Air Tech, as a company, yes, they were
13    still on site.
14 Q  They are on site?
15 A  Correct.
16 Q  So if you see something, for example, that, hey,
17    that's not right, that's clearly not right, you
18    guys need to come, they would still be there?
19 A  Correct.
20 Q  Did that ever happen during your tenure, where
21    you're doing this final inspection and Air Tech
22    has got to address some issue that you can
23    recall?
24 A  Not that I recall.
25 Q  All right.

108

1  A  Well, let me -- I will rephrase.  Most of the
2     time it is the housekeeping.
3  Q  Okay.
4  A  The cleanup around the oven, you know.  And they
5     wouldn't always have it as clean as what I would
6     expect them to have it, so I would say, hey, we
7     need to sweep this up and do some more mopping.
8  Q  Outside of the oven?
9  A  Yeah.
10 Q  Got you.  After you have done this inspection,
11    this final inspection, after Air Tech completed
12    its work, everything goes fine, I understand
13    that there is a process where some sheets would
14    get run through the oven that were covered with
15    like a lacquer, to kind of -- what was the
16    purpose of that?
17 A  To get all the -- well, when they are cleaning
18    the oven, they upset everything in there, and it
19    creates a dust.  We can't have that dust on the
20    cans, in the cans or outside the cans.  The cans
21    would be real gritty.  So we would actually take
22    that and put a varnish on it and just run that
23    through the oven, no heat.  Well, yeah, very
24    light, I think the oven would probably be about
25    200 degrees.  And we would run that through the

109

1    oven to collect all the dust that was
2    accumulated during the cleaning.
3  Q  So that happens after every cleaning?
4  A  Every time.
5  Q  And so I guess it is the case then, would you
6    agree with me that it is the case that, when Air
7    Tech does its work, Ball Corp. knows there is
8    still going to be stuff in that oven that didn't
9    get vacuumed up?
10 A  In the air.
11 Q  Sure.
12 A  In the air. Well, the thing is, once they break
13   everything loose, of course, they vacuum. It is
14   like if you get a accumulation on here, you're
15   going to vacuum and there can still be dust
16   unless you wipe it off.
17       Well, what happens in an IBO, is once you
18   hit the recirc blower, them blowers is going to
19   move everything around. So while them blowers
20   are moving everything around and the exhaust
21   blowers are trying to pull it out, we run that
22   in there, so it just collects it on that sheet
23   rather than collect it on the cans.
24 Q  So some of this dust, it sounds like, is pretty
25   fine particulates?

110

1  A  It is.
2  Q  And that gets kicked up by the fans when you
3    kick the system back on?
4  A  Yes.
5  Q  And so that's the purpose of these sheets is to
6    just clean up the rest of the stuff we can't get
7    otherwise?
8  A  Correct.
9  Q  Does Air Tech -- I'm sorry, did Air Tech -- let
10   me back up.
11       Air Tech didn't run the sheets through,
12   correct, the oven?
13 A  No.
14 Q  That's Ball's task; right?
15 A  Yes.
16 Q  Was that something you would oversee?
17 A  I would oversee it. The maintenance guys would
18   oversee it. Most of the time we all went back
19   there just so we could all help out. So it was
20   like a group effort.
21 Q  Who makes the final decision -- well, let me
22   back up.
23       What are you looking for in the sheets
24   after they run through?
25 A  What am I looking for on the sheets?

111

1  Q  Yeah.
2  A  The accumulation of particles.
3  Q  Right. So how do you know when it is time to,
4    okay, we're good, let's start the cans back up?
5  A  We look at the sheets. And if the sheets start
6    coming out clean, then we know -- or are fairly
7    clean, we know that it is clean enough to run
8    cans through.
9  Q  What I am hearing is, after you run these sheets
10   through, they don't have to be absolutely
11   spotless, there may be a little bit, but it is
12   basically an acceptable level of particulate in
13   the oven?
14 A  Correct.
15 Q  And was that your determination to make, as far
16   as when the cans would start being run through?
17 A  Not always. I mean, it could be the hourly guys
18   that could be back there running it. There have
19   been times I wasn't even back there when they
20   did it.
21       You know, it was just an expectation, when
22   we bring an oven up from a maintenance, that's
23   what we did. So the guys knew to go back there,
24   and they would get a whole group, because it
25   took more than -- you would have guys on the

112

1    infeed and guys on the discharge pulling them
2    out and bringing them around, so it was whoever
3    was there.
4  Q  So they didn't have to check in with you?
5  A  No. No.
6  Q  I mean, was there a certain kind of rank that
7    they had to have to make this decision or is it
8    just basically anybody can decide that's
9    familiar with this process can decide, hey,
10   these sheets are clean enough, let's start up?
11 A  Well, it would have to be somebody that was
12   comfortable enough making the decision. Most of
13   the time it was a maintenance guy or a
14   supervisor or an hourly guy that's done it
15   numbers of times to be able to say, hey, they
16   look fine, let's go.
17 Q  I think we have touched on everything as far as
18   kind of general.
19       I just want to ask you, during your tenure,
20   was there ever a time that you had concerns
21   about Air Tech's -- the way Air Tech was
22   performing these cleanings?
23       And let me -- I am sorry, let me back that
24   up.
25       Understanding that Air Tech did not work at

113

1   the facility from May 22nd, 2014, I believe it
2   was, through the end of your tenure, so up until
3   that May 23rd fire of 2014, did you ever have
4   concerns about Air Tech's cleanings and their
5   performance of that task?
6  A  No.  But with that said, you know, it is one of
7   the things, I have always -- you notice that the
8   oven cleaners -- and I will just say it, I have
9   seen two oven fires, bad oven fires in my
10  career, you know, not here, but at another
11  facility.  And when I say "bad," it is where a
12  fire department had to take over your plant.
13      The first one I was at it wasn't to the
14  degree where we had to shut the whole plant
15  down.  It wasn't as bad as what was here.  And
16  both of these fires followed an oven cleaning.
17      You can be the very best at what you're
18  doing.  But when it comes to these oven
19  cleanings, it is one of these things where you
20  got to hit a home run every time.  You
21  understand what I am saying?
22      It takes one spark, and I have seen it,
23  even -- you know, at times when we start, if we
24  have to do any kind of cutting, any kind of
25  drilling or anything around these ovens, there's

114

1   fire watch, there's fire extinguishers, there's
2   people watching to make sure that, you know, we
3   don't create a spark that's going to smolder.
4      And the problem in these ovens, if you
5   create one spark, and it can sit and smolder for
6   hours.  And once you turn the recirc blowers on,
7   it is like throwing gas on it.  I mean, that's
8   just how bad it can get.
9      So, yes, up to this point, I did not have
10  an issue on how they were cleaning the ovens.  I
11  think they did an acceptable job, but you have
12  to hit a home run every time.  There is no room
13  for error.
14 Q  Sure.  Is this other fire, was that with
15  Metal Container?
16 A  Yes.
17 Q  Just curious, where did that fire occur?
18 A  That was in a plant in New York.
19 Q  You said it occurred after a cleaning.  Was
20  there ever, in that case, a determination of
21  what caused the fire?
22 A  I don't recall what the outcome of that was, no.
23 Q  When you say they have to hit a home run every
24  time, what do you mean by that?
25 A  Meaning that they have to make sure that what

115

1   they are using doesn't create sparks, there is
2   nothing left in the oven, all the bolts are in
3   place, all the screws are in place, you don't
4   leave something laying around.
5      In the blowers, you know, you have to take
6   fasteners off when you are cleaning that and
7   wiping it out, you don't leave any kind of
8   debris behind, anything that can create a spark,
9   anything that could catch fire easily.  You
10  really have to be -- you have to really watch it
11  hard when you are cleaning those.  You can't
12  leave anything behind.
13 Q  Okay.
14 A  Not saying that's the case here.  Don't know
15  what happened.  But, like I said, it just takes
16  one spark in those ovens, and it will cause a
17  fire.
18 Q  And you anticipated my question, and that was, I
19  guess, using the way you put it, do you know
20  that Air Tech failed to hit a home run leading
21  up to this fire?
22 A  I would say, yes, they failed to hit a home run,
23  because following the oven cleaning the oven
24  caught on fire.
25 Q  I guess what I am asking you is, do you have any

116

1   specific knowledge or awareness of in what
2   respect they failed on this specific thing other
3   than the fact that a fire happened?
4  A  No.
5  Q  Do you know whether Air Tech -- well, let's just
6   leave it to your tenure and keep it simple.
7      Was Air Tech only, to your knowledge, only
8   performing cleanings at Ball's Monticello
9   facility or were they also performing cleanings
10  for Ball at other facilities, do you know?
11 A  They were at other facilities.
12 Q  And after the fire in May of 2014, do you know
13  whether Ball continued to clean other -- I'm
14  sorry, I said Ball, Air Tech continued to clean
15  other Ball facilities aside from the Monticello
16  facility?
17 A  They did.
18 Q  Did that have any significance to you?  I guess
19  why would Ball continue to hire Air Tech if they
20  had concerns about their ability to perform this
21  work?
22      MR. SENAK:  Object to form and foundation.
23 A  I don't know -- I don't know the specifics
24  around that.  But it did surprise me that they
25  were still cleaning ovens within Ball.

---

**117**

1    The only thing I can come up is with the
2 plant itself. I am sure they had knowledge of
3 the fire but not an extensive knowledge of what
4 we were going through here in Monticello.
5 Q  And I think you also didn't actually yourself
6    know what Air Tech may have done to even cause
7    the fire; fair?
8 A  Correct.
9 Q  So it is not like you know that Ball has some
10    piece of information, like, hey, they did this
11    and we know this caused the fire; right?
12 A  Right.
13 Q  After Ball -- I am sorry, after the fire, May of
14    2014, Air Tech no longer performs cleanings at
15    the Monticello facility; correct?
16 A  Correct.
17 Q  And you said you couldn't recall the company
18    previously. Are you still unable to recall?
19    And that's okay if you can't.
20 A  I can probably bring them up on my phone. When
21    I get a break I will.
22 Q  Maybe at a break I will ask you to look at it.
23 A  Yep.
24    MR. SENAK: May I interrupt? You're
25    talking about the current one; right?

---

**118**

1    THE WITNESS: Correct.
2    MR. SENAK: Okay.
3 Q  Okay. We can address it later.
4    Is there anything, to your knowledge,
5    anything different -- well, let's keep it to
6    your tenure, just to keep it nice and clean.
7    Anything different during your tenure that the
8    second company did, the replacement company did,
9    as far as oven cleanings, as compared to Air
10    Tech?
11 A  Anything different?
12 Q  Right.
13 A  To my knowledge, as far as the procedure of
14    cleaning the oven, no.
15 Q  So, as far as you know, they used the same basic
16    kind of tools?
17 A  I don't know if they used the same tools. They
18    could have used something different. I'm not
19    aware of all the tools they use. I didn't
20    inspect their tools.
21 Q  Sure. Let's just keep it general. They used
22    scrapers also?
23 A  Yes.
24 Q  Maybe some grinders?
25 A  They used grinders but don't know what they were

---

**119**

1    using as far as what they were grinding with; so
2    I don't know.
3 Q  So maybe the way to say it is, you're not aware
4    specifically what exact tools they are using,
5    but generally they are of the same nature that
6    Air Tech was using?
7 A  I would say yes.
8    MR. SENAK: Object to form and foundation.
9 Q  Fair?
10    MR. SENAK: Same.
11 Q  You have to answer it out loud, audibly.
12 A  Yes.
13 Q  Thank you. During your tenure, are you ever or
14    are you aware of any instance in which you or
15    Ball were critical of the work Air Tech
16    performed aside from the one preceding the fire?
17 A  No.
18 Q  Okay. Do you recall or are you aware of
19    yourself or anyone from Ball complimenting
20    Air Tech on its work during your tenure, its
21    cleaning work?
22 A  Not that I recall, no.
23 Q  Not saying it didn't happen, you just don't
24    recall?
25 A  Right, don't recall.

---

**120**

1 Q  I have seen some reference, and maybe you won't
2    recall it and I will just ask it, following the
3    May 22nd, 2014 cleaning, you agree that's the
4    day before the fire?
5 A  Right.
6 Q  And Air Tech was cleaning the IBO on that day;
7    right?
8 A  Correct.
9 Q  Follow that cleaning, do you recall scheduling
10    an additional cleaning by Air Tech at that time?
11 A  No.
12 Q  I have seen reference to it, and I am not going
13    to make any representation to you, I am just
14    trying to find out if you remember it, I think
15    what I have seen reference to is that there was
16    an additional cleaning scheduled for the
17    following week.
18    And if I understand you, you don't remember
19    that?
20 A  I don't recall that, no.
21 Q  You wouldn't be able to confirm or deny it one
22    way or the other?
23 A  No. An additional cleaning for IBO 2?
24 Q  No, I don't think so. I think it was just for
25    some other component.

---

121

1  A  Okay.
2  Q  So let me ask it this way.  If you had concerns
3     about the work that Air Tech did perform on
4     May 22nd, 2014, would you have scheduled another
5     cleaning for the next week?
6        MR. SENAK:  Object to form and foundation.
7  A  I'm sorry.  Repeat that.
8  Q  Sure.  Understanding that you don't remember
9     whether you did it or not, okay, let's assume
10    that you did go ahead and schedule Air Tech to
11    perform another, let's just say another oven
12    cleaning on a different oven, all right, for the
13    next week.  If you had concerns, as of May 22nd,
14    2014, would you have done that, would you have
15    scheduled that cleaning?
16       MR. SENAK:  Same objections.
17 A  Meaning after the fire would I have scheduled?
18 Q  Okay.  Good point.
19 A  Take the fire out of it?
20 Q  Fire hasn't happened yet.
21 A  Okay.
22 Q  It is May 22nd.
23 A  Okay.
24 Q  You're scheduling an additional cleaning.  Okay?
25    If you had any concerns as of May 22nd with the

122

1     work that Air Tech just performed at Ball's
2     Monticello facility, would you have scheduled
3     another cleaning for the next week?
4        MR. SENAK:  Same objections.
5  A  If I had concerns about the work that they had
6     already done?
7  Q  Exactly.
8  A  Would I have rescheduled them?  Well, we would
9     address the concerns, but I probably would have,
10    yes.
11 Q  We talked about some of these maintenance
12    schedules and some of the things that Ball did
13    with respect to the IBOs.
14       Was there a written policy regarding, to
15    your knowledge, the cleaning or any maintenance
16    measures that Ball was performing with respect
17    to the IBOs?
18 A  For the cleaning?
19 Q  Either one.  Any maintenance measure that Ball
20    is handling with respect to the IBOs.  Is there
21    any written policy, as far as that goes?
22 A  Not -- I don't know.
23 Q  Okay.
24 A  I mean, there's PMs, written PMs.
25 Q  PM, what is that?

123

1  A  Preventative maintenance.
2  Q  So there is a writing that shows those things?
3  A  Yes.
4  Q  And then there is some document that shows
5     Ball's schedule, as far as the things we were
6     talking about earlier, weekly, monthly, those
7     types of things, is that written?
8  A  Yes.
9  Q  Did Ball have any sort of like checklist that
10    they used for the same tasks, you know, keeping
11    track of their maintenance, their periodic
12    maintenance?
13 A  Yes.
14 Q  Okay.  Can you describe that to me?  Just give
15    me a little bit of an idea.
16 A  Well, right now it is electronic.  So it is an
17    electronic PM maintenance program.
18 Q  And it is, as far you know, like a checklist
19    basically, they mark it when it is done?
20 A  Yes.
21 Q  And was that the same -- it sounds like you said
22    they do that now.  I am asking, during your
23    tenure, that was the case?
24 A  It happened during my tenure.
25 Q  Okay.

124

1  A  Not sure if that was in place during this time
2     or not.  But I can't remember when we went live
3     with the electronic PM program.
4  Q  So we mainly have been talking generally about
5     Ball's kind of procedures, policies, and then
6     generally about what Air Tech did.
7        I want to try to focus in, if we can, on,
8     you know, May 22nd, May 23rd, and kind of the
9     circumstances leading up to that.  Okay?
10       So switching gears here, just kind of
11    filling you in on that.
12       You started in 2011 and the fire occurs on
13    May 23rd, 2014.  Approximately how many
14    cleanings had Air Tech performed of IBO #2 in
15    that time frame?
16 A  I don't have no idea.
17 Q  All right.  Do you know who at Ball would have
18    that information?
19 A  I don't know who would have that.
20 Q  Currently?
21 A  Yeah.  I don't currently know who would have
22    that record.
23 Q  During your tenure, is there anyone you can
24    think of that would have that information?
25 A  Well, I would have had it.



125

1  Q  So is it possible then that your predecessor
2     would have that information?
3  A  He could possibly have it.
4  Q  And do you know would your predecessor -- I am
5     sorry, not your predecessor, the person who
6     replaced you?
7        MR. SENAK:  Successor.
8  Q  Successor.
9        MR. O'BRIEN:  Thank you.
10  A  It would be Nick Trejo.
11  Q  Nick Trejo?
12  A  Uh-huh.
13  Q  And how do you spell his last name?
14  A  T-R-E-J-O.
15  Q  All right.  So he may have access to that
16     information?
17  A  He could possibly have that, yes.
18  Q  Do you recall, the May 22nd cleaning, was this
19     pursuant to the schedule that Ball had in place,
20     this every six months?
21  A  Yes.
22  Q  So this wasn't a situation where Ball has said,
23     hey, we got a problem with this oven, we got to
24     get it cleaned right now?
25  A  No.

126

1  Q  This was just a purely scheduled every six-month
2     cleaning?
3  A  Correct.
4  Q  Based on what you told me earlier, I assume that
5     you reached out to Air Tech?
6  A  Yes.
7  Q  To schedule the cleaning on May 22nd, 2014?
8  A  Yes, I would have done that.
9  Q  Do you have a specific memory of it?
10  A  No.
11  Q  So you don't know exactly when it would have
12     been?
13  A  No.
14  Q  Do you know whether Ball had performed any kind
15     of these kind of -- and understanding that they
16     are not getting in the ovens, but these
17     inspections that we were talking about earlier
18     of the oven, of IBO #2 specifically, in advance
19     of Air Tech's cleaning?
20  A  I don't believe they did.  I don't believe we
21     did that, no.
22  Q  So to the best that you can recall, in the 30
23     days leading up to the fire -- or leading up to
24     the cleaning, I should say, were there any
25     operational problems with IBO number 2?

127

1  A  Not to my knowledge, no.
2  Q  Was there ever any problems with, you know,
3     temperatures getting too high in the ovens, for
4     example?
5  A  No.
6  Q  And same for the ductwork, as far as you know,
7     that wasn't an issue?
8  A  No.  It would shut down.
9  Q  Okay.
10  A  It wouldn't run.  It has got fail safes in it
11     for temperature deviation.
12  Q  So if it gets too hot, it is shutting down?
13  A  If it gets too hot, it will shut down.  If it
14     gets too cool, it will shut down.
15  Q  In the same time period, that 30 days kind of
16     prior, do you recall there being any repairs
17     performed on IBO #2?
18  A  Not to my knowledge.
19  Q  And when I say "IBO 2," I am kind of referring
20     to all of its components.  So just to clarify,
21     is the answer the same?
22  A  Not to my knowledge, no.  I don't know.  I mean,
23     as far back, but not to my knowledge.
24  Q  Understood.  You can't recall here today?
25  A  Right.

128

1  Q  Same question, within the 30 days prior, had
2     there been any other maintenance performed that
3     you can recall to IBO #2?
4  A  Other than the weekly greasing and shaft
5     inspection, no.
6  Q  Okay.
7  A  There was no maintenance where we actually had
8     to go inside the oven and take it apart.
9  Q  Do you know how long it had been, as of
10     May 22nd, 2013, since IBO 2 was last cleaned?
11  A  I don't have specifics on that.
12  Q  Would that be something that Nick Trejo would
13     have?
14  A  He would.
15  Q  Would Nick Trejo also have the same information
16     with respect to -- or, I am sorry, have that
17     information with respect to kind of the
18     maintenance repairs and things we were just
19     talking about?
20  A  I don't know if that's documented or not.
21  Q  Okay.
22  A  I don't know.
23  Q  Would he be the place to start, I guess, if we
24     were looking for that information?
25  A  I would say so, yeah.



129

1  Q  We kind of walked through all that with respect
2     to the IBO.
3  A  Uh-huh.
4  Q  To your knowledge, had there been any
5     operational problems as far as the ductwork was
6     concerned?
7  A  No.
8  Q  Any repairs performed in that 30-day period
9     leading up May 22nd in the ductwork?
10  A  Not to my knowledge.
11  Q  Same question for maintenance.
12  A  No.
13  Q  Not to your knowledge?
14  A  (Witness shakes head side to side.)
15  Q  All right.  I told you we were going to stick to
16     this kind of more narrow time frame, but I did
17     neglect to ask you in kind of our general
18     discussion, was there ever a time that anyone
19     suggested to Ball that it might, or to you, that
20     you're aware of, that cleanings of the oven
21     might need to take place more frequently?
22  A  Not to my knowledge, no.
23  Q  And same question for ductwork, understanding
24     that it wasn't necessarily all your
25     responsibility, but would that be the same, you

130

1     just don't know?
2  A  No.
3  Q  All right.
4  A  No.
5  Q  You said that the ductwork was typically cleaned
6     once a year during holiday shutdown, is that
7     what you said?
8  A  Usually during shutdown, yes.
9  Q  In what time frame would that be?
10  A  That would probably be around holidays.
11  Q  So around Christmastime?
12  A  Yes.
13  Q  Late December?
14  A  Thanksgiving.
15  Q  Okay.
16  A  Yeah.
17  Q  So anytime between late November and kind of
18     January 1?
19  A  Correct.
20  Q  That window would be when the ductwork gets
21     cleaned?
22  A  Uh-huh.
23  Q  So that would put us in the holiday season of
24     2013.  Do you know whether a ductwork cleaning
25     occurred in that time frame?

131

1  A  I don't know.
2  Q  Okay.
3  A  I don't.
4  Q  Do you know who at Ball would have that
5     information?
6  A  That would be Freddie.
7  Q  Freddie Spencer?
8  A  Uh-huh.
9     MR. O'BRIEN:  I tell you what, I need to go
10  to the restroom, so we can take a break.
11     MR. SENAK:  Sure.
12     (A recess was taken between 12:19 p.m. and
13     12:23 p.m.)
14     BY MR. O'BRIEN:
15  Q  Dale, I understand that you have been able to
16     identify the successor company to Air Tech.
17  A  Uh-huh.
18  Q  Is that right?
19  A  Correct.
20  Q  Can you provide that to me?
21  A  Premier Maintenance.
22  Q  Premier Maintenance.  Do you know where they are
23     out of?
24  A  I am not sure where they are from.
25  Q  That's okay.  And they would have started

132

1     sometime after May 23rd, 2014?
2  A  Correct.
3     MR. SENAK:  May I?  I think they are in
4     Ohio.
5     THE WITNESS:  Okay.
6     MR. O'BRIEN:  Okay.
7     MR. SENAK:  I don't know for sure, but I --
8     THE WITNESS:  Yeah.
9     MR. SENAK:  -- have some recollection
10     somewhere someone saying to that effect.
11  Q  Well, thank you for figuring that out.  I
12     appreciate it.
13     Dale, were you present, were you at work on
14     May 22nd when Air Tech arrived?
15  A  Yes.
16  Q  And did they check in with you that particular
17     day?
18  A  I am sure they did at some point, yes.
19  Q  And how many people from Air Tech were there,
20     can you recall?
21  A  I can't recall.
22  Q  Generally was it more than five?
23  A  Typically more than five, yes.
24  Q  What was the typical number of people that they
25     had there with them?



133

1  A  Well, it depended if they were doing an oven, an
2     IBO and a PIN oven. I'm not sure if we did the
3     PIN oven that day or not. But I would typically
4     say there would be around 10, 12 guys.
5  Q  Was Paul Scholten there that day?
6  A  Yes.
7  Q  Was he your main point of contact with Air Tech?
8  A  Yes.
9  Q  And was he the one that actually checked in with
10    you on May 22nd?
11 A  Yes, he would have been the one checking in with
12    me.
13 Q  Anything stick out in your mind, as far as
14    anything that came up when he checked in on
15    May 22nd, 2014?
16 A  No.
17 Q  Do you recall around, I don't need an exact
18    time, but, you know, when Air Tech would have
19    showed up on May 22nd?
20 A  They would have -- probably around six.
21 Q  And I assume that they show up basically to
22    correspond with a change of shift; is that
23    right?
24 A  Correct. And I am saying six, but that's
25    typically when they show up, around six. And

134

1     then they -- you know, we have had the oven down
2     cooling off and they start around seven.
3  Q  So they show up while the oven is cooling?
4  A  Correct. In most cases. It depends if they
5     were early or late.
6  Q  Was Paul the individual you spoke with that day
7     when they checked in on May 22nd?
8  A  I'm not sure.
9  Q  Don't remember. And I take it you don't
10    remember anything from the substance of that
11    conversation?
12 A  No.
13 Q  During the work on May 22nd, was there anything,
14    did anyone from Air Tech have any questions for
15    you that arose during their work?
16 A  Not to my knowledge.
17 Q  Are you aware of any issues that kind of
18    Air Tech encountered during the performance of
19    its work on May 22nd?
20 A  Not that I can recall.
21 Q  Okay. Do you recall performing these kind of
22    progress checks that we talked about earlier on
23    May 22nd?
24 A  I would have. I don't know the frequency of it.
25    It could have been I touched base with them that

135

1     morning and then later on that day prior to a
2     meeting. It could have been I went back there
3     several times. I don't recall.
4  Q  All right.
5  A  I am out in the plant. Usually, when we got an
6     oven down, we are doing maintenance throughout
7     the entire plant. So I am not just focused on
8     an oven, you know, I got other areas of the
9     plant that I am focusing on on top of other job
10    responsibilities.
11       So, you know, in my role, I couldn't spend
12    my entire time back there with the oven
13    cleaning, and nor should I have to. I mean,
14    that's their responsibility. They are the
15    experts.
16       So it varied in how many times I contacted
17    them. I mean, there were times that I didn't
18    contact them at all. There were times I could
19    go through the day and not -- I would get with
20    my maintenance guy and say, hey, any idea where
21    we are at on the oven.
22 Q  This is the second time you have referred to
23    Air Tech as experts. What do you mean by that?
24 A  Well, they are the ones that we have hired to
25    clean the oven, I mean, the expectation. And

136

1     that's their job responsibility. That's what
2     they do. I am an expert at can manufacturing.
3  Q  So when you --
4  A  But does that mean I -- you know, that's my
5     profession, that's what I do.
6  Q  Sure.
7  A  You know, that's their profession.
8  Q  So when you say "they're experts," what you mean
9     is they scrape the oven, they know how to scrape
10    the oven?
11 A  Yeah, they know, they know the expectations of
12    cleaning the oven.
13 Q  You're not making any kind of statement about
14    their qualifications or anything like that?
15 A  No.
16 Q  And you don't know what the qualifications of
17    Air Tech's employees are, do you?
18 A  No.
19 Q  Do you recall yourself having any questions for
20    Air Tech on May 22 about any issues related to
21    the cleaning?
22 A  No, that I don't recall.
23 Q  On May 22nd, 2014, Air Tech is cleaning IBO 2;
24    correct?
25 A  Correct.

137

1  Q  Is there anything else that they are cleaning
2     that day?
3  A  I'm not sure if they did the PIN oven or not.
4  Q  Okay.
5  A  Sometimes they do.  Sometimes they do the PIN
6     oven and the IBO.  Sometimes they just do an IBO
7     and the next time they will do a PIN oven.  I
8     don't think they did the PIN oven but --
9  Q  Don't remember?
10 A  -- don't remember.
11 Q  They didn't clean any other IBOs that day?
12 A  No.  No.
13 Q  They didn't clean the ductwork that day?
14 A  No.
15 Q  All right.  I think, I don't know if I actually
16    asked you this previously, we are talking about
17    the general time frame that the ductwork
18    cleaning would occur.  And you said it was kind
19    of between Thanksgiving and New Year's of any
20    given year; right?
21 A  Correct.
22 Q  You said you didn't know for sure if that
23    happened in 2013?
24 A  I wouldn't have known.  I wouldn't have
25    typically been there.

138

1  Q  Somebody else would --
2  A  Yeah.
3  Q  Sorry.  Somebody else would have known whether
4     that happened?
5  A  Correct.
6  Q  And that was Freddie Spencer?
7  A  Correct.
8  Q  So on May 22nd, 2014, they're cleaning IBO #2.
9     And earlier you said when they clean an IBO,
10    they clean to the squirrel cage fan and as far
11    as they can reach from there?
12 A  In the duct, yes.
13 Q  And that's the extent of what they are cleaning
14    on May 22nd, 2014?
15 A  Correct.
16 Q  All right.  So you said they arrived at six a.m.
17    They would have began cleaning at around seven
18    you said?
19 A  I am speculating.  But that's typically the time
20    frame.
21 Q  Do you recall when you got to work on May 22nd,
22    2014?
23 A  I am usually there at that time, 6:00.
24 Q  6:00 when you get there?
25 A  Correct.

139

1  Q  And then do you work the whole 12 hours?
2  A  Yes.
3  Q  So you --
4  A  I work until the line is running.
5  Q  So on a cleaning day, and I should have asked
6     you this previously, on a cleaning day, you're
7     there from the time Air Tech gets there until
8     operations resume?
9  A  Correct.
10 Q  Okay.
11 A  On the entire line.  Not just the oven.
12 Q  So by the time you leave, Air Tech is gone?
13 A  Yes.
14 Q  All right.  Is there anything you recall being
15    different or unique or any synonym of those
16    words about the May 22nd, 2014 cleaning that
17    Air Tech performed?
18 A  No.
19 Q  As far as you're concerned, it went as planned?
20 A  Correct.
21 Q  Did it take them, do you recall it taking them
22    longer than normal?
23 A  I don't recall.
24 Q  Okay.
25 A  I mean, sometimes they can do it in eight hours.

140

1     Sometimes they can -- depending on the extent of
2     it.  I don't recall the time frame.
3  Q  And there was nothing during your mid-work
4     inspections, those kind of progress checks that
5     sticks out about May 22nd?
6  A  Not that I heard, no.
7  Q  As far as you can recall, everything was
8     progressing at the appropriate rate and as you
9     anticipated?
10 A  Yes.
11 Q  Do you recall, we talked about earlier sometimes
12    during your progress checks you might request
13    Air Tech to, you know, hey, look at this or
14    something like that?
15 A  Well, I would ask them have they -- you know,
16    knowing what part of the ovens are critical and
17    what need to be cleaned, I would typically ask,
18    hey, have we gotten this, have we done this, you
19    know, have we cleaned the blowers and just, you
20    know, get an answer from him.
21 Q  Do you recall anything like that coming up on
22    May 22nd?
23 A  Yeah.  Not sure, not sure.
24 Q  Aside from you, is there anyone from Ball that
25    you think might be more knowledgeable concerning

141

1  the work that Air Tech performed on May 22nd,
2  2014?
3  A  Probably not.
4  Q  Do you recall approximately when Air Tech would
5  have notified you that, hey, we think we are
6  done?
7  A  I am not sure.  Typically it is around 5 or
8  6:00.
9  Q  Okay.
10  A  Typically, but I'm not sure on this day.
11  Q  Okay.
12  A  It varies, depending.  It varies maintenance to
13  maintenance.
14  Q  And earlier we talked about the kind of post
15  work, kind of housekeeping inspection.  Did you
16  do that on May 22nd?
17  A  I would have done that, yes.
18  Q  It sounds like you don't have a specific memory
19  of it, but you just know you always did?
20  A  Yeah.
21  Q  And so I take it you don't recall any problems
22  that came up as a result of that?
23  A  No.
24  Q  Do you recall, we talked about earlier, as a
25  general matter, Air Tech is still there while

142

1  that's going on.  On May 22nd, were they still
2  there?
3  A  When what was going on?
4  Q  I'm sorry.  The post work inspection.
5  A  Yeah.  They would have been.
6  Q  Okay.
7  A  Yeah.  Usually Paul would come and get -- he
8  would come find me or someone would say Paul is
9  looking for you.  So I typically knew what he
10  wanted.  You know, I would walk back there and
11  look around.  That's what he would usually want
12  me, just look around the IBO and make sure
13  everything is okay.
14  Q  You know, I don't know if I asked you this
15  earlier, I can't remember, and I should have, if
16  I didn't.  We talked about running the sheets
17  through?
18  A  Uh-huh.
19  Q  Understanding that Air Tech doesn't actually run
20  the sheets through, are they still there while
21  the sheets are run through?
22  A  No, not usually.
23  Q  So once the sheets start running through, that's
24  Air Tech's kind of cue, you can leave?
25  A  Well, they are usually gone before that, because

143

1  it is a process to start the oven up.  So, you
2  know, it could take us anywhere from an hour to
3  two hours just to get it back up on-line.
4      MR. SENAK:  Are you good?
5      THE WITNESS:  Yeah, I am good.
6  Q  Just close the loop, Air Tech has nothing to do
7  with running the sheets through?
8  A  No.
9  Q  Ball runs the sheets through and Ball determines
10  when they're of satisfactory kind of appearance
11  that we can start running the cans through?
12  A  Correct.
13  Q  On May 22nd, I assume that you were still there
14  while the sheets are run through.  Is that the
15  case?
16  A  I would have been, yes.
17  Q  Did you stay there until the sheets were kind of
18  satisfactory?
19  A  Yes.
20  Q  And would you have left after that point?
21  A  I would have left after the line was running.
22  Q  Okay.
23  A  So depending on what time the entire line came
24  up and we were back in production is when I
25  would have left.

144

1  Q  So once the cans started running through again,
2  your shift is over?
3  A  No.  The IBO doesn't determine when I leave.
4  The rest of the line, I mean, you get the
5  printer, you got the washer, you got the front
6  end, you got all areas, necker, palletizer, the
7  entire line from back to front.
8  Q  Okay.
9  A  Once the palletizer is dropping pallets of cans,
10  that means the line is running.
11      So at that time we will either have a
12  hand-off meeting, we usually have a hand-off
13  meeting from days to nights during a
14  maintenance.  You know, we would talk and give
15  an update and make sure everything is okay and
16  then we would leave.
17  Q  Let me ask it this way.  On May 22nd, do you
18  recall how long it was after the sheets were run
19  through and approved, found to be satisfactory,
20  how long it was between then and when you left?
21  A  I do not.
22  Q  Okay.
23  A  Don't know.
24  Q  Do you have any recollection of what time you
25  left?



145

1  A  No.
2  Q  Would you have been there by like 9:00, let's
3     say?
4  A  I possibly could have been there by nine.
5  Q  Just don't remember from May 22nd?
6  A  No.
7  Q  Do you specifically recall the running of the
8     sheets through the oven on May 22nd?
9  A  No.
10  Q  Don't recall whether you were the one that
11     approved them or somebody else?
12  A  No.  Just to clarify it, just because Air Tech
13     leaves and we run the sheets through the oven
14     doesn't mean the oven is running at that point.
15     You know, the electrician still has safety
16     checks.  That could take them anywhere from an
17     hour to three hours to do the safety checks.
18        So even though the oven is ready from
19     Air Tech, say, hypothetically speaking, 6:00, it
20     could be 10, 11:00 before it is even running,
21     based on, you know, the other items that we have
22     to take care of.
23  Q  And those items are kind of outside of anything
24     Air Tech would be involved in --
25  A  Correct.

146

1  Q  -- right?
2  A  But just trying to clarify the startup of the
3     oven, when Air Tech leaves, it doesn't mean the
4     oven starts up and we are running.
5  Q  Yeah, that's a good clarification.  I just
6     wanted to make sure I understood.
7  A  Yeah.
8  Q  The other things that you are talking about are
9     not things that --
10  A  Right.
11  Q  -- Air Tech is -- for example, there is not some
12     other component down the line that Air Tech is
13     also responsible for, for doing the IBO #2, and
14     then you have to make sure all these other
15     maintenance issues are addressed after IBO #2 is
16     ready?
17  A  Correct; even within the IBO itself.
18  Q  Okay.  I didn't ask you this either.  I should
19     have.  After a typical cleaning, I guess how
20     many sheets do you have to run through before
21     you're normally satisfied?
22  A  It varies.
23  Q  Okay.
24  A  I mean, it could be -- we could run sheets
25     through and the first one comes out and it is

147

1     okay and there is no build- -- there is none on
2     it or we could run it for 20 minutes, 30 minutes
3     before it cleans up.  It varies.
4  Q  Does Ball retain the aluminum sheets that it
5     runs through or does it just dispose of them?
6  A  Dispose of them.
7  Q  So they're not like kept for records or anything
8     like that?
9  A  No.
10  Q  Is there any record that documents -- and I
11     don't even know what it would look like, but I
12     am just trying to make sure I close the loop
13     here.  Is there any document that would show,
14     hey, we inspected this sheet, this is what we
15     found, we think we are good to go, is there any
16     document produced as a result of that?
17  A  No.
18  Q  As it relates to IBO #2, and I understand that
19     you said there's other components that are part
20     of the line, do you recall having any concerns
21     on May 22nd about resuming production?
22  A  No.
23  Q  To your knowledge, were you aware of anyone from
24     Ball having such concerns as they would relate
25     to IBO #2?

148

1  A  No.
2  Q  From what you told me, I think I know the
3     answer, but you were not present at the Ball
4     facility when the fire was discovered; is that
5     right?
6  A  Correct.
7  Q  Did somebody call you that night?
8  A  Yes.
9  Q  And tell me about that.
10  A  I got a call that night that there was a fire at
11     the plant.  So I hung up, immediately got in my
12     car and went and drove to the plant.
13  Q  Do you recall what time you were contacted?
14  A  I would say it was around 12, 1:00.
15  Q  And I think the fire occurred sometime after
16     midnight, I'm not sure exactly when.
17  A  Yeah.
18  Q  But we have said May 23rd, but you agree it is
19     kind of the night between May 22nd and May 23rd?
20  A  Yeah.  Yeah.  I think it was closer to 1:00
21     probably, 1.
22  Q  It was closer to one?
23  A  I would say it was around one.
24  Q  Do you recall who contacted you?
25  A  I do not.  I would believe that -- I don't know

149

1   if it was my boss or if it was one of the
2   supervisors. I don't know who made the contact.
3   Q   Who was your boss, quote, unquote, boss at the
4       time?
5   A   Harry Monroe.
6   Q   And what type of things did you report to him
7       on?
8   A   I run the back end, so I reported to him on the
9       maintenance and the operational, day-to-day
10      operations on the back end.
11  Q   Did he oversee others?
12  A   He oversaw the whole plant.
13  Q   Okay.
14  A   He was the production manager at the time.
15  Q   Do you know -- well, I think you already said
16      it. You stay at the facility until the
17      production resumes?
18  A   Correct.
19  Q   And you confirm that everything is going
20      smoothly and then you leave?
21  A   Correct.
22  Q   So you're aware then that the production had
23      been resumed for at least a couple hours before
24      the fire starts; right?
25  A   Correct.

150

1   Q   Understanding that you don't recall that phone
2       call when they tell you the fire happened, do
3       you recall any conversations you had with anyone
4       that night about the fire?
5   A   No. I think everybody was just sitting there
6       and happening -- I mean, it was a pretty bad
7       situation, so I don't think there was a lot of
8       conversation about the fire or anything that
9       went on.
10  Q   Okay. Were you there until the fire was put
11      out?
12  A   Yes.
13  Q   And how long did that take?
14  A   I don't know how long it took, because they were
15      there when I got there. So I was probably --
16      couple hours there and then they had to be
17      recalled because it reignited.
18  Q   Were you there when they were recalled?
19  A   Yes.
20  Q   Let me ask you this. Were you there through the
21      night?
22  A   Yes.
23  Q   May 23rd, what time do you get home?
24  A   I don't know. It was -- I don't know if I went
25      home for the whole summer, but it was --

151

1   Q   Fair enough.
2   A   No. That was -- that's not a correct answer.
3   Q   No, I understood.
4   A   It was late the next day.
5   Q   Were you scheduled to work your regular shift on
6       May 23rd? I think it was a Saturday if that
7       will help you at all.
8   A   No. No.
9   Q   You didn't normally work Saturdays?
10  A   No.
11  Q   So you would have had the next day off?
12  A   Correct.
13  Q   Do you recall any conversations, not from the
14      night of, but kind of maybe the weekend or early
15      the next week with anyone from Ball about the
16      fire?
17  A   No. Our biggest -- our main focus was getting
18      our corporate engineering team in the plant and
19      coming up with a plan on what we were going to
20      do to recover.
21  Q   Who was that corporate engineer?
22  A   I don't remember. It is a whole entire group,
23      engineering group.
24  Q   But they are in house with Ball?
25  A   No. They are out of corporate office, in

152

1       Colorado.
2   Q   That's what I mean, so they are employed by
3       Ball?
4   A   Correct.
5   Q   Maybe not in Monticello?
6   A   Correct.
7   Q   So you said they are out of corporate, out of
8       Colorado?
9   A   Yeah.
10  Q   Okay. All right.
11  A   So basically the whole next day was coming up
12      with a plan on recovery, getting the plant back
13      up and running.
14          It is critical that we get it back running,
15      because we had customers that were counting on
16      us.
17  Q   Sure. Do you know how long the oven was down as
18      a result of the fire? Let me back that up, the
19      production was down.
20  A   I believe that the 12-ounce lines, which would
21      include line 2, I think it was down almost a
22      month or maybe longer.
23  Q   Was there anything significant in your mind or
24      did it tell you anything or did you have any
25      opinions about what might have caused the fire,



153

1  given that it had been running for several hours
2  after production resumed?
3  A  I don't know how many hours, I don't know how
4  many hours it ran before the fire ignited. I
5  mean, I don't know when the fire started, just
6  when it was detected.
7  Q  Fair.
8  A  There were issues. I don't know. I don't know
9  the --
10 Q  So what I'm hearing is it wasn't really that
11  significant to you at that time?
12 A  As far as what?
13 Q  As far as the fact that production had resumed
14  and at least there's no discovery of the fire
15  for several hours after production resumes.
16 A  Yeah. And it would have been hard to detect it
17  up there, anyway, because it would not have
18  created any issues with the operation of the
19  equipment. Actually, the IBO was running.
20  There was no issues in the IBO itself.
21 Q  Okay.
22 A  It continued to run until -- I don't know what
23  prompted us to look, but I don't think we even
24  knew there was a fire in the ductwork until -- I
25  can't recall how -- what drove going up there

154

1  and looking for something. Don't know if the
2  oven went down or what had happened. But I
3  don't know the circumstances leading up to the
4  point where we actually noticed it was on fire
5  in the ductwork.
6  Q  You said the oven continued to operate. So,
7  based on your understanding, the fire was in the
8  ductwork, not the oven?
9  A  Correct.
10 Q  What was the basis for that understanding?
11 A  What do you --
12 Q  I guess how was it that you came to understand,
13  hey, the fire is in the ductwork, it is not in
14  the oven?
15 A  Well, I wasn't there when we found it, so, but
16  there was nothing -- where the fire was at was
17  above the exhaust blower, from what I am
18  understanding, from the millwrights. And it was
19  at the oven when they noticed it, when they
20  found it. That's where they were at, at the
21  oven, but there was no fire inside the oven
22  itself.
23 Q  Had there been an active fire inside the oven,
24  you earlier talked about how if the temperature
25  gets too hot, it shuts down, if there is an

155

1  active fire inside the oven, I guess based on
2  your experience, you know, in the industry and
3  your knowledge of how things work in there,
4  would you have expected that the oven would have
5  shut down because the temperature gets too high?
6     MR. SENAK: Form and foundation. Go ahead.
7  A  Yeah. If it was bad enough, I would think so.
8  Q  Okay.
9  A  It would have to be a pretty significant fire in
10  there to -- I mean, you're already running
11  400 degrees in some areas of that oven.
12 Q  Okay.
13 A  So that would be pretty significant.
14 Q  All right. Production resumes before you leave,
15  and we know it is running for a time before the
16  fire is discovered?
17 A  Correct.
18 Q  Are you aware of any issues that were noted or
19  any problems or concerns by anyone at Ball about
20  the production in the production on May 22nd,
21  2014, into the evening I guess I should say?
22 A  Well, I know the millwrights discovered the
23  fire. Why they were out there, I don't know, if
24  something happened or something occurred that
25  would lead them to go out there.

156

1     It is not something they typically --
2  unless they were just doing their routine air
3  flow checks that they do in the ductwork and
4  noticed it. And I don't know if it is their
5  procedure that after we come up from a oven
6  cleaning, I don't know the procedure, if they
7  actually go out and do an air flow check on the
8  ductwork. But I don't know if that's what drove
9  it. But, no, I did not. Other than that, I do
10  not know of any operational issues.
11 Q  But it sounds like the only thing that would
12  stick out or either that would cause you to ask
13  a question is why are the guys out there?
14 A  Correct.
15 Q  And you don't know the answer to that?
16 A  No. That was before I got to the plant.
17 Q  Okay.
18 A  But the millwrights are actually the ones that
19  discovered the fire. So I don't know if they
20  were called out there for something or what they
21  were doing, I don't know.
22 Q  So cans are actually being run through the oven
23  at the time the fire is discovered; right?
24 A  Correct.
25 Q  All right. Did you ever get to see those cans

157

1    that were running through or that were on the
2    other end of the line?
3  A  No, not really.
4  Q  Never saw any?
5  A  No.
6  Q  To your knowledge, did anybody ever, I guess,
7    mention to you, hey, the cans have fire damage
8    or anything like that?
9  A  They were so -- everything in that area was just
10    so destroyed by the fire department, with
11    washing -- you know, they had a firehose above
12    that oven into the ductwork.  You know, it just
13    rained down there and all the buildup and
14    everything that was in an oven or anything was
15    all over the cans, I am sure it was -- it was
16    pretty bad, pretty messy over there.
17  Q  So once the fire department comes in and puts
18    the fire out and the ductwork is a mess?
19  A  Oh, the whole plant, yeah.
20  Q  Tell me, what's contributing to the mess?  Are
21    they spraying stuff loose?  I mean, I am just
22    trying to get an idea of --
23  A  Just from the heat of the fire, dropping stuff
24    down, them ripping stuff apart, cutting into the
25    ductwork, the back blast of the fire through the

158

1    ductwork, blowing panels off.  They got a high
2    pressure water hose in there just blasting
3    the -- I mean, the whole plant was like four
4    inches deep in water, so.
5  Q  And, I assume, that would pretty much rip
6    through the insulation on the ductwork?
7  A  I actually think they ripped the insulation
8    loose on the ductwork.
9  Q  So in part of putting the fire out, the fire
10    department is kicking up a lot of stuff into the
11    air, there is particulate, there is dust, it is
12    just a mess; right?
13  A  Correct.
14  Q  I guess what you're saying is, that may have
15    been on the cans afterwards, but is that what
16    you're saying?
17  A  It could have been, yes.
18  Q  Let me put it this way.  If you would have
19    looked at the cans and seen, you know, dust and
20    stuff on the cans, would it have been, you know,
21    significant in your mind in light of that?
22    MR. SENAK:  Form and foundation.
23  A  After the fire?
24  Q  After the fire.
25  A  No.  I mean, at the point of looking at cans or

159

1    looking at any kind of product was the farthest
2    things from our mind after this.  I mean, we had
3    the entire plant down, with all kinds of damage.
4    I mean, every oven was just, I mean, messed up
5    from the back blast.  I mean, we had to actually
6    go through and clean every oven and every PIN
7    oven in the entire plant.  So, I mean, looking
8    at the cans, sitting on the end of the IBO, was
9    the least of my concern at that time.
10  Q  Sure.  And I understand that.  So I guess, if
11    you would have looked at the cans, understanding
12    it wasn't a priority, and you saw particulate on
13    the cans, you saw some dust, would that have
14    been significant to you in any way in relation
15    to the fire?
16    MR. SENAK:  Form and foundation.
17  A  I don't know.  I mean, it --
18  Q  Let me ask you this.
19  A  It wouldn't have been significant, no.  It would
20    have been expected, I guess, based on the
21    situation.
22  Q  You said it would have been expected?
23  A  Well, based on the situation.
24  Q  Sure.
25  A  Yeah.  I mean, if you look in our plant, you

160

1    know, you got the ceiling, you know, that we
2    never get to, you got the conveying up there and
3    it has stuff on the bottom.  I mean, it was a
4    total mess in the plant, so it was hard to tell
5    what was what or what caused anything, you know.
6  Q  So that's a good point.  I mean, even if you
7    would have seen dust on the can, you wouldn't
8    have been able to say, oh, that's this, you
9    know, it came from this, because there is stuff
10    everywhere?
11    MR. SENAK:  Form and foundation.
12  A  Yeah.  I don't know.  I mean, I'm not an expert
13    on what the --
14  Q  Sure.  I understand.
15  A  -- what that would have been.  But, like I said,
16    it wasn't nothing that ever crossed my mind to
17    look at the cans.
18  Q  You said earlier Paul Scholten was kind of your
19    main point of contact.  Do you understand what
20    his role is with Air Tech?
21  A  Yes.
22  Q  And what is that?
23  A  He is the owner of the company, yes.
24  Q  Had you known Paul since the time you started
25    working?  I guess is there an introduction in



161

1    2011 that occurs?
2    A  Well, I didn't know him.  Like I said, I only
3       worked in that department for, the department
4       where I would have had contact with Paul, for
5       maybe a year before I got promoted.  So, yes, I
6       met him during that time.  And he was the person
7       that -- I mean, he was the one that had been
8       coming and cleaning the ovens.
9    Q  Do you recall having any conversations with
10      Paul Scholten on May 22nd, the day that Air Tech
11      was there performing the work?
12   A  I don't recall having any conversation with him,
13      but I am sure we did.
14   Q  And I meant to ask you, after the work was
15      completed.
16   A  Other than him coming and letting me know he was
17      complete to do the inspect, no extensive
18      conversation.
19          MR. O'BRIEN:  All right.  Will you mark
20      this?
21          (Defendant's Deposition Exhibit 1 was
22      marked for identification.)
23   Q  Dale, I am going to hand you what's been marked
24      as Defendant's Exhibit 1.
25   A  Okay.

162

1    Q  And I am looking first here at that bottom
2       email.  You see there's two messages here?
3    A  Uh-huh.
4    Q  I am looking at the bottom one.
5    A  Uh-huh.
6    Q  That's you, correct, that's in the "To" line?
7    A  What do you mean it is me?
8          MR. SENAK:  This.
9    Q  This email was sent to you.
10   A  Oh, correct.  Correct.  Correct.  Yes.
11   Q  Sorry.  And it was from Paul Scholten.  Do you
12      see that?
13   A  Yeah.
14   Q  Do you recall -- first of all, do you have any
15      memory, absent me showing this to you, of this
16      email?
17   A  Let me read this.
18   Q  Sure.  Absolutely.
19   A  Okay.
20   Q  Okay.  You can keep that in front of you for a
21      minute.
22   A  Okay.
23   Q  Do you recall that email, absent me just showing
24      it to you?
25   A  No.

163

1    Q  Okay.
2    A  No.  I am sure that after this happened I did
3       contact -- I would say I would have contacted
4       Paul, to let him know and discuss with him the
5       incident.
6    Q  So after the fire happens, you would have
7       contacted Paul?
8    A  Yeah.  Probably not right that day or the day
9       after, but, yes, I would have contacted him.
10   Q  Would that have been a phone call, you think?
11   A  It possibly would have been a phone call.  I'm
12      sure it was a phone call.
13   Q  Okay.
14   A  On this, it would have been a phone call.  I
15      don't believe I would have emailed something.
16   Q  I guess what I want to know first is, it doesn't
17      show here, did you have a Ball Corporation email
18      address?
19   A  Yes.
20   Q  And it doesn't show it here, but do you suspect
21      that that's what he's sending it to here?
22          In other words, would Paul Scholten have a
23      personal email address for you?
24   A  No, I don't think so.
25   Q  So, as far as you can tell, he sent this to your

164

1       Ball email address?
2    A  Correct.
3    Q  Aside from this, and understanding you may not
4       remember this specifically at the exact time,
5       but were there other instances that you and Paul
6       communicated via email, either before or after
7       the fire?
8    A  I am not sure.
9    Q  It is possible that there may have been?
10   A  There could have been, yes.
11   Q  So what I am hearing you say, it wasn't a
12      regular, it is not like you and Paul were
13      regularly emailing each other at least?
14   A  No; not unless it relates to oven cleaning.
15   Q  Most of your contacts are by the phone, is that
16      fair?
17   A  Both.
18   Q  Okay.
19   A  I mean, I would call him.
20   Q  Okay.
21   A  Most of it, I would usually give him a call,
22      though.
23   Q  Do you recall any instance in which you used
24      your email to schedule a cleaning, for example?
25   A  I would usually try to get ahold of him by phone

165

1    first to get it scheduled, because he didn't
2    really have access to his email all the time.
3    He was usually out in the field, so I would try
4    to give him a call first.
5  Q  Do you recall, for example, using your email to
6    ever provide any instructions to Air Tech?
7  A  Basically it was what I would have done.  If I
8    wanted to do the IBO, because I would have to
9    tell them what I needed done in order for him to
10    schedule the right amount of people.  Because if
11    I did the IBO and the PIN oven, we would have to
12    bring in more people.  So that's basically what
13    it would have consisted of, yeah.
14  Q  So it is scheduling --
15  A  Yeah.
16  Q  -- what you want done?
17  A  Uh-huh.
18  Q  And that's basically it, via email?
19  A  Correct.
20  Q  You said you would have called, you think you
21    would have called Paul.  And I guess the
22    question I have is, it sounds like you don't
23    have a specific memory of a conversation with
24    Paul that precedes this email, but you think it
25    happened?

166

1  A  Oh, I am sure it did, yeah.
2  Q  But you don't specifically remember it?
3  A  No.
4  Q  So I guess what I am getting at is, you don't
5    remember what you might have said to Paul that
6    would have led to this email?
7  A  Well, I would have made him -- called him up and
8    made him aware of the fire.
9  Q  Right.
10  A  Yeah.  But the specifics around it, no.
11  Q  Right.  So if you look up above, there is a
12    message from Paul Scholten to an R. Marler?
13  A  Uh-huh.
14  Q  Do you know who R. Marler?
15  A  I have no idea.
16  Q  So if I represented it is Rodney Marler and he
17    is with Ball Corp., you have no reason to
18    dispute that?
19  A  No.
20  Q  All right.  And you agree he has got a Ball
21    email address?
22  A  Okay.  Yes.
23  Q  And it sounds like you don't have any knowledge
24    of how Paul got in touch with Mr. Marler?
25  A  No.

167

1  Q  All right.  Just to close that loop.  You didn't
2    refer Paul to Mr. Marler?
3  A  No.
4  Q  You didn't have any conversations about the fire
5    with Mr. Marler?
6  A  No.  I don't even know who he is.
7  Q  Trying to nail down the time frame you would
8    have informed Paul a little bit here.  This is a
9    Tuesday, May 27th email.
10  A  Uh-huh.
11  Q  Obviously, he knows about it at this point.
12    The fire occurred on a Friday, I will
13    represent to you.
14  A  Right.
15  Q  You're in there on Saturday as -- oh, I'm sorry,
16    Friday I think was -- yeah, Friday, May 23rd.
17  A  Uh-huh.
18  Q  So May 23rd is a Friday.  And I think I might
19    have misspoke earlier in telling you it was
20    Saturday.  I think May 23rd was a Friday.  Any
21    reason to dispute that?
22  A  Right.  You was saying I was off on a Saturday.
23  Q  Right.
24  A  Yeah.
25  Q  So does that change things?  Would you have had

168

1    to work on May 23rd, 2014?
2  A  The Saturday?
3  Q  Well, I have it written down here as a Friday.
4    And this is certainly something we can sort out.
5  A  Would I have had to work on a Friday?  Yes.
6  Q  Do you recall whether you worked on the day
7    after the night of the fire?
8  A  I was -- I don't know what time I left.  I know
9    we were there till late in the morning.
10  Q  So I guess what I am really trying to get at
11    here is, do you wait till Monday to call Paul?
12    Is this something that happens the day after the
13    fire?
14    Generally, when do you think you would have
15    contacted Paul?
16  A  I probably would have contacted him fairly
17    quick.  I don't think I would have waited till a
18    Monday to contact him.
19  Q  And you contacted him and you let him know a
20    fire happened.  Is there anything else?
21  A  Not to my knowledge, I don't know.
22  Q  So, for example, you're not at that point being
23    critical of any specific aspect of his work?
24  A  No.  I just let him know that there was a fire.
25  Q  And you don't recall anything he said in



169

1  response at that time?
2  A  No.
3  Q  Do you recall any other emails from him of a
4     similar nature to this one, where he is
5     explaining kind of the circumstances relating to
6     the fire?
7  A  Not to my knowledge.
8  Q  Okay.
9  A  Of course, I don't remember this one.
10 Q  Sure.  Did Paul have your cell phone number?
11 A  Yes.
12 Q  Did you guys ever engage in text messaging?
13 A  We may have.  We may have.  We used to text.
14 Q  Okay.
15 A  We had texted over the time.
16 Q  So it is possible that some of these
17    communications may be in a text message?
18 A  Could have been, yeah.
19 Q  All right.
20 A  I don't know with the circumstances surrounding
21    the fire there would have been a text message.
22    It was more of phone calls and communication
23    through that, I would believe.  I don't think I
24    would have text messaged him on that.
25 Q  Sure.

170

1  A  I mean, I could have.
2  Q  Is there any way you would be able to access
3     those text messages if they exist today?
4  A  No.
5  Q  You don't have the same phone?
6  A  No.
7  Q  Do you recall having a meeting with Paul in
8     person at all, in these days following the fire?
9  A  No.
10 Q  It says in this email, it says, "Dale I had a
11    meeting with the guys to go over the cleaning
12    for line 2."
13    Does that help refresh your recollection at
14    all, did you request that Paul get the guys
15    together that worked on the line and have a
16    meeting or is that just something Paul is doing
17    on his own?
18 A  That's what he is doing on his own initiative.
19 Q  You don't recall making that specific request
20    that he do that?
21 A  No.
22 Q  It says, "Everything in the 2 fan housings was
23    cleaned as normal and all the debris was
24    vacuumed out."
25    Now understanding that -- without

171

1  commenting on the factual accuracy of
2  that -- well, strike that.
3     Does that -- I think that is in line with
4  what you said, your understanding of what
5  Air Tech was supposed to do on the cleaning of
6  an IBO?
7  A  Correct.
8  Q  This description here, this "Everything about
9     the fan housings was cleaned as normal and the
10    debris was vacuumed out," that's the typical
11    process?
12 A  That's the expectation.
13 Q  And that's everything they are supposed to do?
14 A  Correct.
15 Q  And it says, "What was also discussed is" -- and
16    I am just reading the email, if you want to
17    follow along.
18 A  Uh-huh.
19 Q  "What was also discussed is maybe what should
20    happen from now on is to have maintenance unbolt
21    and remove the section of the duct above the fan
22    housing so we can get higher up into the
23    ductwork above."
24    Okay.  So what he just described in that
25    sentence, do you agree that that was not what

172

1  Air Tech was supposed to be doing on a typical
2  oven cleaning?
3     MR. SENAK:  Objection to form and
4  foundation.  Go ahead.
5  A  What, unbolting?
6  Q  Right.  What he is describing and what I just
7     read to you.
8  A  We did not unbolt the duct and so you can get up
9     inside it, no, we don't do.  That's not
10    something we typically did.
11 Q  And he would have to do that in order for
12    Air Tech to do what he is referring to here;
13    right?
14    MR. SENAK:  Same objections.
15 A  To get up higher than what they typically get,
16    yes.
17 Q  Okay.  And you were aware of that as of
18    May 22nd, 2014?
19 A  Well, I never really thought much of it.
20 Q  Sure.
21 A  I mean, I never had a duct fire like that.
22 Q  Sure.  But you were aware if they were going to
23    clean the ductwork above higher, there was going
24    to be extra steps required?
25 A  Correct.  Asking me that now, if you are asking

173

1  me would there have to be extra steps to get
2  higher, I would say yes.
3  Q  Right. And so I guess the point that I am, I
4     guess I am getting at is, what he's describing
5     was not what they were asked to do on May 22nd,
6     2014, it is above and beyond that, correct?
7     MR. SENAK: Object to form.
8  A  Correct.
9  Q  He says, "I have to believe," just continuing
10    on, "I have to believe that is where the
11    fire started more in the duct that goes into the
12    main higher above the fan which is not a normal
13    oven cleaning." Do you agree with that
14    statement?
15 A  No. I don't know.
16 Q  Okay.
17 A  I don't know if it started in the blower or if
18    it started in the ductwork.
19 Q  Okay.
20 A  It definitely got into the ductwork, because it
21    is connected to the blower, but I can't speak to
22    where it actually started.
23 Q  Sure. And we know it got in the ductwork
24    because it was on fire?
25 A  Yeah.

174

1  Q  So it is not that you necessarily disagree, you
2     just don't know?
3  A  Correct.
4  Q  Okay.
5  A  Neither does he.
6  Q  Sure. To your knowledge, had Ball or anyone
7     from Ball reached any conclusions about where
8     the fire started?
9  A  No. We didn't discuss that.
10    After the fire, once the insurance,
11    everybody got involved in it, it was kind of
12    hands-off for everybody else and it was taken
13    care of that way.
14    I didn't have any conversation or -- I
15    mean, there was speculation of where it could
16    have started, you know, just from us talking
17    amongst ourselves, but there was no discussion
18    of where it started.
19 Q  Okay.
20 A  I mean, obviously, it was in the ductwork,
21    because it went all through the plant.
22 Q  So we know it got to the ductwork, and I think
23    earlier you said, based on your understanding,
24    you didn't have any knowledge of there being an
25    open flame in the oven itself; right?

175

1  A  Correct.
2  Q  But you think maybe it is possible, you know,
3     maybe it starts in the squirrel cage, something
4     like that?
5  A  Yeah.
6  Q  That's what you're referring to?
7  A  Correct. They would have started in the oven,
8     inside the oven itself. It wouldn't have just
9     went out.
10 Q  Okay.
11 A  It would have been more disastrous.
12 Q  And what do you mean by that? Why is that?
13 A  Because it would have caught up with everything
14    that was inside the oven.
15    I mean, like I said, you don't know
16    100 percent. It is like when you -- the dust
17    debris on the board we run through there to get
18    the buildup out, I mean, there's still scraping
19    and cleaning, but there is still a certain
20    amount in there, if they would have caught up in
21    there. And there's areas, I am sure, up inside
22    the recirc blower that they can't reach that
23    would have caught on. It would have caught
24    the -- the oven would have caught on fire.
25 Q  And what you saw, that didn't happen?

176

1  A  No, it did not happen.
2  Q  Okay.
3  A  It wasn't in the oven.
4  Q  In response to the fire and kind of what's
5     outlined in Paul's email to you on May 27th, did
6     the new company that -- did the procedure change
7     at all, as far as what Ball is asking them to do
8     when the new company, Premier Maintenance, comes
9     in?
10    MR. SENAK: Object to form.
11 A  Did the procedure change as far as we need to
12    clean the ovens?
13 Q  Well, so let's just look at specifically what
14    Paul said here. He is asking, you know, maybe
15    we need to unbolt, remove the section of the
16    duct above the housing. So let's just start
17    with that.
18    Did that start happening as a result of the
19    fire when Premier Maintenance would come in and
20    do cleanings?
21 A  No.
22 Q  So did anything change about what Ball was
23    asking the contractor to do, the contractor
24    being Premier Maintenance, after the fire?
25 A  No.

177

1  Q  Based on your conversation with Paul, he says
2     here he has to believe, I think -- I have to
3     believe the fire started in the ductwork is what
4     he effectively says.
5         Did you have any understanding of how he is
6     reaching that conclusion?
7  A  No.
8  Q  That wasn't communicated to you?
9  A  No.
10  Q  And based on I think what you said earlier, you
11     don't necessarily disagree, you don't know one
12     way or the other whether that's the case?
13  A  Right.
14  Q  This message up above on Exhibit 1, the
15     Rodney Marler message.
16  A  Uh-huh.
17  Q  Had you ever seen that before today?  And when I
18     say "Rodney Marler message" --
19  A  No.
20  Q  -- what I mean is Paul Scholten to
21     Rodney Marler.
22  A  No.  What's his role?
23  Q  I believe, Mark may be able to shed more light
24     on it than I do, but I believe he is the
25     director of corporate risk for Ball.

178

1  A  He's pretty much saying to him what he said to
2     me down here.
3  Q  Right.  I agree with you.  I think the
4     communication is basically the same.  I guess
5     what I am trying to figure out is how this
6     communication comes about and to the extent you
7     know.
8  A  I don't know.
9  Q  Okay.
10  A  I don't know.  I can understand this one,
11     because I'm sure I contacted Ball.  I mean, I
12     contacted Paul during this time.
13  Q  Air Tech, you mean?
14  A  Yeah.  I know I would have.  I mean, it would
15     have been my responsibility.  His team was
16     involved in it.
17  Q  As we sit here today, you still don't know what
18     role Mr. Marler had with respect to Ball's kind
19     of handling of the fire?
20  A  I have no idea.
21  Q  Okay.
22     MR. SENAK:  I have him as the director of
23     corporate risk, but I think he has another title
24     in addition to that.
25     MR. O'BRIEN:  Okay.

179

1     MR. SENAK:  But that's the best I can do
2     with what I have right now.
3  A  Unless he contacted, Rodney contacted Paul.
4  Q  Okay.
5  A  You know what, unless Rodney from corporate
6     contacted Paul about the -- during this.
7     MR. SENAK:  That, I just don't know beyond
8     what you see.
9     MR. O'BRIEN:  Okay.
10     (Defendant's Deposition Exhibit 2 was
11     marked for identification.)
12  Q  Hand you what's been marked as Defendant's
13     Exhibit 2.  And it looks to me like this is a
14     letter from Rodney Marler to Paul Scholten.
15     Does it appear that way to you?
16  A  What was your question?
17  Q  Just purely asking you if this appears to be a
18     letter from Rodney Marler to Paul Scholten of
19     Air Tech.  And you will note the date is
20     May 24th, 2014.
21  A  Sure.  Yeah.
22  Q  So that would be sometime the day after the fire
23     he contacts Paul Scholten via letter?
24  A  Correct.
25  Q  Okay.

180

1  A  But, again, I don't have any knowledge of this
2     communication between Rodney and Paul.
3  Q  Right.  And I guess --
4  A  And I wouldn't have.
5  Q  Right.  And I guess -- so that's what I wanted
6     to confirm, that you wouldn't have -- or, I
7     guess, learn whether you know what this
8     communication was between these two and then
9     also kind of link these together.
10  A  Uh-huh.
11  Q  Because you agree, does it look like Paul may
12     be responding to this letter in Exhibit --
13     Exhibit 1, the top email to Rodney Marler, it
14     looks like it may be a response to Exhibit 2?
15  A  Yeah, it could be, yeah.
16  Q  If you look at the first line of Mr. Marler's
17     letter, it says, "On May 23rd a fire which
18     appears to have started in the ductwork."
19     Do you see that?
20  A  Uh-huh.
21  Q  So do you agree then that Mr. Marler, at least,
22     is basically taking the same position that
23     Mr. Scholten is taking, that the fire started in
24     the ductwork?
25  A  He said --

181

1       MR. SENAK: Object to foundation. Sorry.
2  A  He said it appears. I don't think he has come
3     to any conclusions yet.
4  Q  Fair.
5  A  Yeah.
6  Q  Maybe he hasn't decided completely --
7  A  Yeah.
8  Q  -- but at this time he is thinking the fire
9     started in the ductwork?
10      MR. SENAK: Same objection.
11  Q  Is that right?
12  A  I don't think he's saying that. It says it
13     appears to be. I don't think he is really
14     saying it is.
15  Q  Okay.
16  A  Maybe I am not answering your question right.
17      MR. SENAK: You're doing fine.
18  Q  When he says it appears to have started in the
19     ductwork, what does that mean to you?
20  A  What does it mean?
21      MR. SENAK: Same objection.
22  Q  Yeah.
23  A  It means based on the fire, that's where the
24     most amount of damage was done.
25  Q  Okay.

182

1  A  Now it could have started -- you know, it could
2     have started from the blower, which is attached
3     to the ductwork.
4     I mean, he is basing -- he hasn't been -- I
5     don't think he has been in the plant at this
6     point to do any kind of investigation on where
7     the fire actually started.
8  Q  Sure.
9  A  Or if anybody at this point has done an
10     investigation on where the fire started.
11  Q  And that may be the case.
12  A  It is speculation.
13  Q  Sure. You don't know what Mr. Marler knows when
14     he writes this letter --
15  A  No.
16  Q  -- is that fair?
17  A  Correct.
18  Q  And, you know, as far as you said, maybe he's
19     saying it started somewhere else or he thinks it
20     started somewhere else. But you agree that the
21     letter says he thinks the fire appears to have
22     started in the ductwork?
23  A  It appears to have started in the ductwork,
24     correct.
25  Q  So beyond what is at face value of this letter,

183

1     you just don't know anything about the basis of
2     that statement?
3  A  Correct.
4  Q  But do you agree that it is consistent with what
5     Paul said in his email to you?
6      MR. SENAK: Object to foundation.
7      MR. O'BRIEN: Well, that's -- okay.
8  Q  Can you answer the question?
9      MR. SENAK: Go ahead.
10  A  Well, Paul doesn't know at this point. I mean,
11     it is -- it was a duct fire, yes.
12  Q  I am not asking you if they know.
13  A  Yeah.
14  Q  What I am asking you is, is it consistent with
15     what Paul is saying?
16      MR. SENAK: Same objection.
17  A  It appears to be the same, yes.
18  Q  So after the fire, was it your understanding
19     that the Monticello kind of leadership, the
20     management in Monticello, is now kind of, it is
21     going over their head now at that point?
22  A  Yes.
23  Q  So maybe that's what Mr. Marler is doing here?
24  A  Yeah.
25  Q  Is he is coming in and taking the lead here?

184

1  A  Yeah.
2  Q  Okay.
3  A  Because, you know, corporate engineering was
4     contacted immediately and the vice presidents
5     were all contacted immediately. So I would say
6     yes.
7  Q  And it would appear to you, based on Exhibit 2,
8     would it not, that Rodney Marler is now the
9     point person with respect to this?
10      MR. SENAK: Object to foundation.
11  A  I don't know what his role was in it.
12  Q  Fair enough. Fair enough. It seems to me,
13     based on Paul's email, and at least as far as we
14     can see from these emails here, that he was --
15     you know, he worked cooperatively with Ball.
16     Was that your experience, that after the
17     fire he is cooperative in trying to sort this
18     out?
19  A  I think so. I mean, from -- I didn't personally
20     talk to him after our original conversation.
21     And from my knowledge, once it got out of our
22     hands, it got into the corporate hands, it got
23     into the insurance company's hands, I didn't
24     really have any conversation with him.
25     I know he was in the plant after the fire.

185

1    I do know he came in there and was looking
2    around. I think he was with his attorney at the
3    time.
4  Q  Okay.
5  A  But I don't -- I mean, I would say I don't know,
6    I mean. I can't say he was or he wasn't.
7  Q  Up until the point that you are out of the
8    picture, at least, he is cooperative and at that
9    point you don't know?
10 A  Yeah. But I didn't see him, after the oven
11   cleaning, I didn't see him to discuss this, just
12   based on conversation, emails or whatever, phone
13   calls.
14 Q  Did you not speak with Paul further after that
15   first conversation, maybe after this email?
16 A  I could have. I don't recall.
17 Q  What I was going to ask you is, did you not
18   speak with him based on some instruction you
19   received from Ball Corporate or anything like
20   that or was it just somebody else is handling
21   this now?
22 A  I don't recall.
23 Q  Okay.
24 A  I didn't know who was handling it. So I
25   didn't -- I don't recall.

186

1  Q  All right.
2  A  Like I said, I don't recall that conversation.
3  Q  And you said you know he came back to the plant.
4    And I will represent to you there were
5    inspections of the plant that kind of ensued
6    after the fire, when there were attorneys
7    present. I think there were representatives
8    from, I think from both Factory Mutual and from
9    Ball and from Air Tech as well.
10 A  I know there was a group in there, yeah.
11 Q  Were you present for those inspections?
12 A  I was not involved in those inspections. I was
13   in the plant, but I was not involved in the
14   inspections.
15 Q  I thought that was the case. I just wanted to
16   make sure.
17 A  Uh-huh.
18 Q  Did you have any discussions with any other
19   employees that may have been involved in those
20   inspections about those inspections?
21 A  I don't even know if there was employees
22   involved in it other than the engineer. I think
23   Freddie was involved in it. I am not sure. But
24   there was no -- I don't know what employees were
25   involved in it. I think maybe the corporate

187

1    office was involved in it. But, no, I had no
2    conversation regarding the inspection.
3  Q  All right. Have you ever discussed or had any
4    conversations about the fire or Air Tech's work
5    or the cleaning with an individual named
6    Scott Howell?
7  A  I don't know who that is.
8  Q  What about an Otto Soyk?
9  A  I don't -- who is he?
10 Q  If you don't know him then --
11 A  Yeah.
12 Q  If you don't know him, I take it you don't
13   remember any conversations with him?
14 A  No.
15     MR. SENAK: He often goes by Bill too.
16 Q  Okay. Bill Soyk?
17 A  No, I don't.
18 Q  Does that ring a bell?
19 A  No.
20 Q  And some of this stuff, it is not necessarily
21   I'm expecting you to know. I just got to
22   confirm. Okay?
23 A  Okay. Who are these guys?
24 Q  Well --
25     MR. SENAK: We will tell you later.

188

1  A  It don't matter.
2  Q  I can represent to you that they are experts
3    that have been retained by Ball Corp.
4  A  Okay.
5  Q  Okay.
6     MR. SENAK: I think that's a fair
7    statement.
8  Q  Did you provide any information to any fire
9    investigator?
10 A  No.
11 Q  Did you talk to any member of the fire
12   department at all about the incident?
13 A  Not that -- no.
14 Q  Whose decision was it, if you recall, to not
15   hire Air Tech to do any further cleanings at the
16   Monticello facility after the May 23rd fire?
17 A  I think it was a group decision.
18 Q  Were you part of that decision?
19 A  Yes.
20 Q  Did you have the ultimate decision or -- you say
21   it is a group decision.
22 A  Yes.
23 Q  Is there somebody in that group that's, you
24   know, kind of the end all be all?
25 A  I could have said we are going to use them,

189

1    continue using them, and I could have been
2    overruled on that.
3  Q  You could have been overruled?
4  A  Oh, yes.
5  Q  All right.
6  A  Yeah.
7  Q  By who?
8  A  There's several.  I mean, it could have been the
9     engineering manager to Chris, the plant manager,
10    production manager, I mean.
11  Q  But your memory is that everyone kind of agreed?
12  A  We agreed that -- yeah.
13  Q  What was the --
14  A  And at this point I personally would have made a
15    decision at this time, until we figure out
16    what's going on, we are not going to utilize
17    them.
18  Q  Was there a specific reason or specific thing
19    that, hey, this is the reason we are not going
20    to hire them again other than the fact that a
21    fire occurred?
22  A  Well, because we cleaned an oven and it caught
23    on fire.  I mean, it's -- there was nothing
24    wrong with the oven prior to that.  I mean, it
25    was running fine, with no issues.

190

1        So the fact that, you know, we cleaned --
2     you know, that Paul's group cleaned the oven and
3     it caught on fire would have been enough for me
4     to say, no, we are not going to utilize them at
5     this time.
6  Q  And earlier I thought you said the oven didn't
7     catch on fire?
8  A  Well, I called it an oven fire.  It is a duct
9     fire, yeah.
10  Q  But Air Tech didn't clean the ducts on May 22nd?
11  A  No.  But they cleaned the exhaust blower going
12    into the duct.
13  Q  And so at this time you know the fire happened,
14    you don't know why it happened?
15  A  Correct.
16  Q  But you're just making the decision we are not
17    even going to mess with this --
18  A  Correct.
19  Q  -- is that right?
20  A  Correct.
21  Q  So there is no specific kind of smoking gun that
22    says, hey, this is the reason we are not hiring
23    them other than the fact that just a fire
24    occurred?
25  A  Well, the fact that they cleaned the oven, a

191

1     fire occurred after they cleaned the oven was
2     why the decision was made.
3  Q  Sure.  That's it?
4  A  Correct.
5  Q  All right.  Did anything change about your role
6     once Premier Maintenance comes in?  Did anything
7     change about your role, as far as I guess kind
8     of overseeing the fact that they're, you know,
9     scheduling them, progress checks, things like
10    that?  Did anything change?
11  A  I didn't do anything different, no.
12  Q  Did Premier Maintenance also -- I assume,
13    although I shouldn't assume, did Premier
14    Maintenance also assume responsibilities for the
15    ductwork cleanings after the fire?
16  A  I know they done some duct -- I am not sure.  I
17    don't have the answer to that, but I would
18    assume.
19  Q  Okay.
20  A  Yes.
21  Q  So, obviously, you're aware that Ball has sued
22    Air Tech; correct?
23  A  Correct.
24  Q  Do you have an understanding of what
25    specifically Ball is claiming in this lawsuit?

192

1  A  No.
2  Q  Do you personally have any opinions as to what
3     caused the May 23rd, 2014 fire?
4  A  I have an opinion.
5  Q  What is it?
6  A  A couple of assumptions, opinions, is that
7     either something was left in the exhaust blower
8     or a spark was created during the cleaning that
9     smoldered to a point that once we put the air to
10    it, it caught on fire.
11  Q  And with the spark, are you referring to in the
12    oven?
13  A  No.
14  Q  Where are you referring to?
15  A  In the ductwork.
16  Q  So --
17  A  Or the spark got into the ductwork during the
18    cleaning of the exhaust blower.
19  Q  And I think I know the answer, but you don't
20    have any training as far as cause and origin of
21    fires; right?
22  A  Be more specific.
23  Q  Well, you're never acted as a fire investigator;
24    right?
25  A  No.

193

1  Q   You have never been hired to determine the cause
2      of origin of a fire; correct?
3  A   No.
4  Q   Would you agree that you have opinions, but they
5      are kind of speculative?
6  A   Well, not really.
7        MR. SENAK: Object to form.
8  A   Not really. Because I know the extent of
9      the -- I mean, I have been around IBOs for my
10     entire career.
11       I know what can -- you know, based on I
12     have seen, using the tools that we use around
13     ovens, you know, when we have fire watches, when
14     we have -- I mean, we have to -- anytime we do
15     anything around an oven you have to stay there
16     for -- and watch it until it cools off for a
17     certain amount of time to make sure there isn't.
18       I know there is a high risk. There can be
19     a high risk of fire in an oven if you're not
20     doing the right things, if something happens.
21 Q   So your opinion, I guess what facts is your
22     opinion based on?
23       And let's exclude the fact that just a fire
24     occurred. Are there any other facts that you
25     base that opinion on?

194

1  A   Just the experience with the ovens and knowing
2      what's inside of them and what can create it.
3  Q   Okay.
4  A   And like I said earlier in one of my statements,
5      all it takes is one spark to sit there and
6      smolder for -- it can sit there and smolder for
7      the entire time you're cleaning the oven.
8  Q   What I am hearing is you don't know factually
9      that that's what happened?
10 A   No.
11 Q   You're just saying that could have been --
12 A   That's my opinion.
13 Q   Yeah. Right. Right. That's what I asked you
14     for.
15 A   That's my opinion.
16 Q   That's what could have happened?
17 A   Yes.
18 Q   Based on our previous kind of discussions and
19     your testimony, I think I know the answer to
20     this, but I want you to tell me if you agree
21     with this statement, when an IBO is in operation
22     for 24 hours a day, a cleaning should be
23     performed once a month?
24       MR. SENAK: Object to foundation.
25 A   What was the question again?

195

1  Q   The question is whether you agree with this
2      statement. Okay? Just straight do you agree or
3      don't you agree. And the statement is, when an
4      IBO is in use for 24 hours a day, a cleaning
5      should be performed once a month?
6  A   No.
7  Q   You do not agree?
8  A   No.
9  Q   What about if, let's say, an IBO is being
10     operated every day for, let's say, 16 hours a
11     day, would you agree that it should be cleaned
12     once every two months?
13 A   No.
14 Q   Is it that you think it should be cleaned less
15     frequently?
16 A   No, I'm not saying that. I mean, the schedule
17     that we are on is once every six months. I
18     mean, that's --
19 Q   So you agree that would be less frequently than
20     once a month when you are running 24 hours a
21     day?
22 A   That's less frequent, yes.
23 Q   So I guess what you're saying is, you do not
24     agree with the statement that when it runs
25     24 hours a day it needs to be cleaned monthly,

196

1      because you think that's too frequently?
2        MR. SENAK: Object to form.
3  A   Correct. And that's based on reliability
4      studies that's been done over time where the
5      oven is performing.
6  Q   The six month?
7  A   Yeah.
8  Q   Same deal, I want you to tell me whether you
9      disagree or disagree. The risk of fire
10     resulting from operation of an IBO is
11     substantially higher when fume extract ducts are
12     not regularly cleaned?
13       MR. SENAK: Form and foundation.
14 A   Say that again now.
15 Q   The risk of fire resulting from operation of an
16     IBO, like the one in Ball's Monticello facility,
17     is substantially higher when fume extract ducts
18     are not regularly cleaned. Do you agree or
19     disagree?
20 A   I don't know.
21       MR. SENAK: Same objection.
22 Q   Okay.
23       MR. SENAK: Go ahead.
24 A   Yeah.
25 Q   Would you agree that the risk of fire is



197

1    substantially reduced when extract ducts are
2    regularly cleaned?
3        MR. SENAK: Same objection.
4  A  I don't know.
5  Q  Do you know whether buildup of deposits in
6    extract ductwork can give rise to contamination
7    in combustion chambers?
8        MR. SENAK: Same objection.
9  A  I do not know.
10  Q  Do not know. Okay. Earlier I think you said
11    Ball would check on the perforation sheets?
12  A  Uh-huh.
13  Q  To make sure that they are not clogged --
14  A  Uh-huh.
15  Q  -- right?
16        And I think the reason you said was to make
17    sure you got the right air flow?
18  A  Correct.
19  Q  So do you agree that correct air flow balance is
20    vital to correct and good performance of an
21    oven, of an IBO?
22  A  It is vital to cure the product.
23  Q  And that's what the oven is used for; right?
24  A  Yeah.
25  Q  All right. Again, based on your testimony, I

198

1    think I know the answer, but I want to ask you,
2    do you agree or disagree that a thorough
3    cleaning of duct passages should be a part of
4    any oven cleaning?
5  A  No.
6        MR. SENAK: Object to form and foundation.
7    Go ahead.
8  A  I don't know, but I would say not.
9  Q  So you would disagree with the statement?
10  A  Yeah. If you are looking -- I mean, if you look
11    at this operation, there is always going to be
12    buildup, I mean, in the ductwork. I mean, you
13    would have to go in there and clean it every day
14    if you wanted to prevent buildup in the ductwork
15    or in an oven, which is not something you can
16    do. And, you know, so it is not uncommon to
17    have buildup in ductworks or to a degree.
18  Q  Let me touch on something you said there. I
19    think you said you could remove deposits from
20    ductwork every day. Is that what you said?
21  A  No. I am just saying is you could inspect them
22    on a daily basis and based on, you know, the
23    operation of the oven, you could see some kind
24    of residue. I mean, that's nothing. When you
25    are cleaning a stove and you are getting stuff

199

1    on your stove, you know, it is just the way
2    it -- you know, it is part of the operation.
3  Q  Are you familiar with the term "film weight"?
4  A  Uh-huh.
5  Q  What's that mean?
6  A  That's the inside spray. You put it inside the
7    can.
8  Q  Is that just the amount of spray that goes in?
9  A  Yeah, it is amount that's in a can.
10  Q  Do you agree that, and I think that you
11    basically just said it, ductwork is highly prone
12    to accumulation from the lacquer deposit, the
13    internal can, spray deposit?
14        MR. SENAK: Object to form.
15  A  Yeah. It could be, yeah.
16  Q  As far as this film weight issue, would you say
17    that Ball was using high film weights?
18  A  Well, it depends on --
19        MR. SENAK: I will object to foundation.
20    Go ahead.
21        MR. O'BRIEN: He knows what film weights
22    are.
23  A  They have a target to run to on what the film
24    weights are. So it depends on what size can
25    you're running. You know, if you're running a

200

1    bigger can, the film weight is different. If
2    you're running a smaller can, the film weight is
3    different.
4        There is a specification, and it is a cost,
5    if you run in high film. If you are running
6    them to high, it is a cost to the company,
7    because you're giving away product basically.
8    And it is expensive.
9        So, yeah, they don't run anything -- we try
10    to control our process, based on our control
11    charts of where the inside spray, like the film
12    weights are.
13  Q  Okay.
14  A  And that's the reason we weigh them, that's the
15    reason we do film weights, is not because of the
16    oven or because of the ductwork, we are doing it
17    because of the cost of the spray that we need to
18    maintain our target.
19  Q  Do you know what Ball's relative film weight
20    levels were in the time leading up to the fire?
21  A  No. I mean, it is a 12-ounce can. So depending
22    on what product they run, some products run --
23    if you run a higher acidic product, then you're
24    running a higher film weight. You know, if
25    you're running like a regular product, it is

201

1    going to be lower.

2  Q  To your knowledge, did Ball maintain records
3     showing what film weights they are using at any
4     given time?

5  A  Of course.

6  Q  That's what I would assume.

7        So Ball should have records of that, if we
8     were to request them, they should be able to
9     produce them?

10  A  Correct.

11  Q  Okay.

12        MR. SENAK:  I don't want to jump in here,
13     but I am going to anyway.  You know, he said he
14     has got to leave at 2:00.  We are at 1:30 right
15     now.

16        MR. O'BRIEN:  We're almost done.

17        THE WITNESS:  Okay.

18        MR. SENAK:  Okay.  Because I have a little
19     bit I would like to ask him.

20        THE WITNESS:  Okay.

21        MR. O'BRIEN:  Sure.

22        THE WITNESS:  Give me two minutes here to
23     send a text.

24        MR. O'BRIEN:  Yeah.  Let's take a break
25     real quick.

202

1        (A recess was taken between 1:37 p.m. and
2     1:38 p.m.)

3        MR. O'BRIEN:  Just go ahead and mark this.

4        (Defendant's Exhibit 3 was marked for
5     identification.)

6  Q  Dale, I am handing you what's been marked as
7     Defendant's Exhibit 3.

8  A  Uh-huh.

9  Q  And I will represent to you what this is,
10     because I don't think you're going to be able to
11     tell just by looking at it.

12  A  I have no idea.

13  Q  Well, I will just ask the question.  You don't
14     know what that's a picture of, do you?

15  A  No.

16  Q  I will represent to you this is a picture taken,
17     I believe, by one of Ball Corporation's experts.

18  A  Uh-huh.

19  Q  I believe it is a picture of a can, although,
20     admittedly, I wasn't there when the picture was
21     taken.  I understand that that's what it is
22     being claimed to be.

23        Knowing that, can you tell what this is a
24     picture of?

25  A  No.  I have no idea.

203

1  Q  You see the little speck kind of in the ----?

2  A  Uh-huh.  This is magnified, I am assuming?

3  Q  Well, and I was going to make the same
4     assumption.  I was going to say, let's assume,
5     because it looks to me, you agree, that either
6     the camera has been zoomed in or it's been taken
7     very close to the surface.

8  A  Right.

9  Q  So what has been represented is that this is a
10     photograph of a can that was at the end of the
11     line after the fire.  It had run through the
12     line and it was pulled and I think taken as a
13     documented photograph.  And what I want to ask
14     you is, does that speck, that little speck right
15     there, can you identify what that is?

16  A  I have no idea what it is.

17  Q  Just looking at it, would you have any ability
18     to be able to identify where it came from inside
19     of the plant?

20  A  This was after the fire?

21  Q  It was after the fire.

22  A  It could have came from anywhere.  It could have
23     came off the ceiling.  It could have came off
24     the top of the IBO.

25        And, like, as I mentioned earlier, there

204

1     was a fireman standing right next to that IBO
2     with a high pressure water hose spraying
3     everything.  I mean, it was going everywhere.
4     And there was four inches of water.  I am
5     assuming it was about four inches of water in
6     the plant.  So the entire plant was just
7     dripping wet.  I mean, there was insulation
8     hanging off the ceiling.  There was insulation
9     hanging off -- I mean, it was a mess in there.
10     So that could have came from anywhere.

11  Q  I don't have any other questions right you.
12     Thank you.

13  A  Uh-huh.

14

15  CROSS-EXAMINATION,

16  QUESTIONS BY MARK N. SENAK:

17  Q  So, Mr. Spencer, I am going to ask you some
18     questions.  Some of these, I got to tell you,
19     are going to be rather basic and they are going
20     to seem like why are you asking them.  But I do
21     need to get it on the record.

22        THE WITNESS:  Do you need these back?

23        MR. O'BRIEN:  Keep them.  She is going to
24     take them.

25        THE WITNESS:  Okay.

205

1  Q  So just kind of bear with me, if you would.
2       Your supervisor you mentioned at the time
3     of the fire was who?
4  A  I don't know who was on at the time.
5  Q  But at the time that you are working there, you
6     reported to, you mentioned the gentleman's name.
7  A  Oh, I reported to Harry Monroe.
8  Q  So Harry Monroe was a Ball employee; correct?
9  A  Correct.
10  Q  Harry Monroe did not work for Air Tech?
11  A  No.
12  Q  Did anyone at Air Tech ever supervise your work?
13  A  Supervise my work?
14  Q  Yeah.
15  A  No.
16  Q  And I take it you were not at the time employed
17     by Air Tech?
18  A  No.
19  Q  And you have never been employed by Air Tech?
20  A  No.
21  Q  Have you ever been an independent contractor for
22     Air Tech?
23  A  No.
24  Q  Did anyone at Air Tech have the right to control
25     how you did your job?

206

1  A  No.
2  Q  Did anyone at Air Tech control the manner in
3     which you did your work?
4  A  No.
5  Q  Did anyone at Air Tech control the method by
6     which you did your work?
7  A  No.
8  Q  Who did your performance reviews?
9  A  Harry Monroe.
10  Q  Did anyone at Air Tech have any input into your
11     performance reviews?
12  A  No.
13  Q  Did anyone at Air Tech ever perform any
14     performance reviews for you?
15  A  No.
16  Q  Did anyone at Air Tech have a right to fire or
17     terminate you at the time prior to this fire?
18  A  No.
19  Q  When you got paid, did you get paid by Ball
20     Corporation?
21  A  Yes.
22  Q  Did anyone at Air Tech ever pay you?
23  A  No.
24  Q  Did Air Tech ever supply you with any tools to
25     do your job?

207

1  A  No.
2  Q  Did you use any of the tools that Air Tech used
3     to clean the oven when you were doing your job?
4  A  No.
5  Q  Did Air Tech decide what tools it would use to
6     clean the oven, IBO #2?
7  A  Yes.
8  Q  Did you or Ball tell Air Tech how to clean the
9     oven?
10  A  Just our expectations on what was to be done.
11  Q  Meaning that you wanted the oven cleaned?
12  A  Correct.
13  Q  But did you tell them the method by which they
14     should clean it?
15  A  No.
16  Q  Did you or anyone at Ball ever tell them what
17     tools to use to clean the oven?
18  A  No.
19  Q  Did you believe you were an Air Tech employee?
20  A  No.
21  Q  Did you believe you were an independent
22     contractor of Air Tech?
23  A  No.
24  Q  Did you believe that you somehow were an agent
25     of Air Tech?

208

1  A  No.
2  Q  Did anyone at Air Tech ever say to you that you
3     had been assigned by Ball to work for Air Tech
4     during the oven cleaning?
5  A  No.
6  Q  Did anyone tell you you had ever been assigned
7     to work for Air Tech or with Air Tech?
8  A  No.
9  Q  Who determined the hours that you worked?
10  A  I did.
11  Q  All right.  Meaning someone at Ball
12     Corporation --
13  A  Yeah.  Correct.
14  Q  -- determined when you worked, the hours you
15     worked?
16  A  Correct.
17  Q  No one at Air Tech determined the hours you
18     worked; correct?
19  A  Correct.
20  Q  Who determined what days you worked?
21       MR. O'BRIEN:  Mark, would it be easier if
22     we just stipulated he didn't work for Air Tech?
23     Because, I mean, it is not really a dispute.  It
24     is not a dispute.
25       MR. SENAK:  It wouldn't.  I would like it

209

1    on the record.
2  Q  So let's go back to, who determined the days
3     that you worked?
4  A  Ball.
5  Q  Did Air Tech have any input into what days you
6     worked?
7  A  No.
8  Q  Your job duties at Ball did not include cleaning
9     IBOs; true?
10  A  True.
11  Q  Ever clean an IBO oven before?
12  A  No.
13  Q  Did you do any cleaning of IBO #2 when Air Tech
14     was cleaning the oven prior to the fire?
15  A  No.
16  Q  How did you find out that Air Tech had finished
17     cleaning the oven?
18  A  Paul came and told me.
19  Q  That was his decision as to when the cleaning
20     was done, not your decision?
21  A  Correct.
22  Q  You have no confined space training?
23  A  No.
24  Q  So you cannot enter the oven without a confined
25     space training; correct?

210

1  A  Correct.
2  Q  And if you do that, that's a violation of not
3     only Ball's safety rules, but also OSHA rules
4     too?
5  A  Correct.
6  Q  The purpose that you were trying to accomplish
7     when you looked at the oven after the cleaning
8     was done was to make sure that the oven was
9     properly reassembled?
10  A  Correct.
11  Q  And that was to make sure that the area was
12     cleaned up also?
13  A  Correct.
14  Q  It was not your purpose to determine whether the
15     oven was properly cleaned?
16  A  Correct.
17  Q  Were you ever given any information on what
18     Air Tech's scope of work would be?
19  A  Uh-huh.
20  Q  When you came to see if Air Tech had finished
21     cleaning the oven, did Air Tech take you up on
22     top of the oven and show you the top of the
23     oven?
24  A  No.
25  Q  Did they show you the area where the squirrel

211

1    cage is?
2  A  No.
3  Q  Did they show you the exhaust blowers on the top
4     of the oven?
5  A  No.
6  Q  When you do your examination of the oven to see
7     whether the work is done, are the side panels on
8     the oven?
9  A  Yes.
10  Q  Okay.  So you can't see in the oven at that
11     point?
12  A  Correct.
13  Q  Was the purpose of your examination of the oven,
14     after Air Tech finished its completion, was that
15     to determine that the work had actually been
16     completed?
17  A  Yes.
18  Q  I take it the purpose was not to determine
19     whether the cleaning was done properly?
20  A  Correct.
21  Q  You mentioned there was a fire in the RTO?
22  A  Correct.
23  Q  All right.  What is the purpose of the RTO, if
24     you know?
25  A  To burn emissions.

212

1  Q  That's not the purpose of an internal bake oven;
2     right?
3  A  No.
4  Q  There's two different purposes between those
5     two?
6  A  Correct.
7  Q  Where is the RTO located?
8  A  Outside the plant and in the north side of the
9     plant.
10  Q  And the IBO is located on the inside of the
11     plant?
12  A  Correct.
13  Q  Does the RTO and the IBO do a completely
14     different task or purpose?
15  A  Yes.
16  Q  One thing I am curious about, you mentioned
17     there was a recirculating blower on the oven;
18     right?
19  A  Uh-huh.
20  Q  And I take it the recirculating blower takes air
21     from inside the oven and returns it back up to
22     the burner box?
23  A  It recirculates it throughout the oven.
24  Q  Does the recirculating blower take air from
25     inside the oven, circulate it up to the blower,

213

1  and then -- or up to the burner and then back
2  into the oven?
3  A  Correct.  It circulates and then exhausts.
4  Q  Let me try it again, so we make sure I get it
5  down.
6  A  Yeah.
7  Q  The recirculating blower will take air that's
8  inside the oven, pull it up into the burner box,
9  and then back down into the oven?
10 A  Well, its purpose is to recirculate it
11    throughout the oven, not inside the burner box.
12 Q  Does it pass through the burner box --
13 A  It does.
14 Q  -- as it is going back into the oven?
15 A  Yes.
16 Q  So the recirculating blower takes air from the
17    oven, pulls it up into the burner box, and
18    then pushes it back into the oven?
19 A  Well, it pulls it up inside the recirc blower,
20    yes.
21 Q  But does it go through the burner box at that
22    point?
23 A  Not sure.  The burner box is up there.  I am not
24    sure if it circulates back to the burner box.
25 Q  And from there, it would go into the exhaust?

214

1  A  Yes.
2  Q  I mean, it would go out of the oven into the
3  exhaust?
4  A  Yes.
5  Q  From there it would go into the exhaust; true?
6  A  Correct.
7  Q  And then that would go past the squirrel cage?
8  A  Correct.
9  Q  So there is -- your understanding of the IBOs,
10    there is a recirculating blower that takes air
11    from the oven and then recirculates it back
12    through the oven and back through the exhaust?
13 A  Correct.
14 Q  What you don't know is whether, in fact, that
15    recirculation involves that air passing through
16    the burner box?
17 A  Well, you have the burner box up there in the
18    same location.  It is just the blowers, it is
19    pulling air from -- the heat from the burner,
20    circulating it through the oven.
21 Q  And then back out through the exhaust?
22 A  Yeah, correct.
23 Q  So there is air in the oven that gets pulled out
24    of the oven and then across the burner box back
25    into the oven and out the exhaust?

215

1  A  Correct.
2     MR. SENAK:  That's all I have.
3
4  REDIRECT EXAMINATION,
5     QUESTIONS BY JACOB O'BRIEN:
6  Q  Just to clarify on that, I think what you said
7     is that oven air, that internal oven air, when
8     it goes through this recirculation fan, I just
9     want to make sure I understand, you don't know
10    one way or the other whether it actually goes
11    into the burner box, you do know it goes into
12    the recirc fan?
13 A  Well, the burner -- the air has to be heated.
14    So it is heated.  The air flow, it is heated, up
15    in the burner box.  But my point is I don't
16    think the burner box and the recirc blower are
17    like -- I don't think you have fire in the
18    recirc blower is my point.
19 Q  Right.  So --
20 A  It is pulling heat from --
21 Q  But the heat gets pulled, and sorry to -- the
22    heat gets pulled from the burner box?
23 A  (Witness nods head up and down.)
24 Q  Down into the oven?
25 A  Correct.

216

1  Q  Up from the air it will come back into the
2     recirc and it stays in this kind of area and
3     goes back through?
4  A  Correct.
5  Q  And then at that point it goes --
6  A  It is exhausting.
7  Q  Okay.  And there is no flame in this recirc fan
8     area?
9  A  Yeah.  There has to be air flow in and air flow
10    out.  You can't have it, you can't have the oven
11    deadheaded.  If the oven is deadheaded, it's
12    going to overheat.
13 Q  Got you.
14 A  So to maintain the temperature, you got to
15    continuously circulate the air.
16 Q  Makes sense.  Okay.  Just one more point.
17    You said, I think in response to a question
18    Mark asked you, that Air Tech wouldn't
19    specifically show you, for example, the squirrel
20    cage fan, that you wouldn't get up on top of the
21    oven and look at it?
22 A  No.  I have seen it.  I am not going to say I
23    haven't seen it.  I have gone up there and
24    looked at it.
25 Q  Right.

217

1　A　Typically when he would call me back there for
2　　an oven inspection, it was already closed up.
3　Q　Sure. And you were talking also, you did these
4　　progress checks. And I think you said at that
5　　point you could have got up there, you either
6　　had to tie up, I think you said, because of
7　　fall -- I assume OSHA regulations --
8　A　Correct.
9　Q　-- about fall heights and things like that?
10　　You would have had to tie up up there to do
11　　it?
12　A　Correct.
13　Q　And I think you said your memory was I don't
14　　think that you had done it during a cleaning?
15　A　Yeah. I have been up there. And, like I said,
16　　I have been on the ovens, I have looked inside
17　　the recirc blowers. So I know what they look
18　　like and have been up there through them. But
19　　it wasn't something I consistently did, was go
20　　up on the oven and inspect the exhaust blowers.
21　Q　And I guess what I am getting at is, Air Tech
22　　may not have said, hey, go look at the squirrel
23　　cage?
24　A　Correct.
25　Q　It is something you could have done?

218

1　A　I could have, yes.
2　Q　That's all I have.
3　A　But, like I said, typically when he calls me up
4　　and says, okay, we are done cleaning the oven,
5　　ready for you to inspect, everything is buttoned
6　　up at that point. There is nothing opened up at
7　　that point.
8　Q　Okay.
9
10　RECROSS-EXAMINATION,
11　　QUESTIONS BY MARK N. SENAK:
12　Q　A couple more.
13　　Did Air Tech ever ask you to see the
14　　maintenance manual for the -- I am sorry, did
15　　Air Tech ever ask you to see the user's manual
16　　for the oven?
17　A　No.
18　Q　Did Air Tech ever ask you to see any documents
19　　about the oven?
20　A　No.
21　Q　From the time Air Tech finished cleaning the
22　　oven on or about May 22nd, 23rd of 2014, up
23　　until the time of the fire, did Ball do any
24　　maintenance, service, cleaning, or alteration of
25　　the oven?

219

1　A　Not to my knowledge.
2　Q　Let's go back to this recirc blower, the
3　　recirculation blower.
4　A　Uh-huh.
5　Q　When it pulls air out of the oven, that air gets
6　　heated; true?
7　A　Correct.
8　Q　What heats that air?
9　A　The burners.
10　Q　So that air goes through the burners?
11　A　Uh-huh.
12　Q　Then back into the oven?
13　A　Right.
14　Q　That's all I have.
15
16　FURTHER REDIRECT EXAMINATION,
17　　QUESTIONS BY JACOB O'BRIEN:
18　Q　Well, I think what you just -- what you just
19　　said is a little different than what I
20　　understood from what I thought you said
21　　previously.
22　A　Okay.
23　Q　So the question I think that we are trying to
24　　get at is, does the air from the oven go through
25　　the burner box --

220

1　A　Well --
2　Q　And I think at times you said -- hold on. At
3　　times you said it is going through the recirc
4　　fan.
5　A　Right.
6　Q　Which I understand. And I think what he just
7　　asked you, does the air from inside the oven --
8　　let me back up --
9　A　Uh-huh.
10　Q　-- just one small bit.
11　　I know that the heat from the burner box is
12　　being pushed down --
13　A　Correct.
14　Q　-- into the oven; right?
15　A　Correct.
16　Q　So the question is, so we know that air is
17　　coming from the burner box, the air that then
18　　gets forced down into the oven comes back into
19　　the recirc fan is what you testified to?
20　A　Correct.
21　Q　Does that air from inside of the oven make it
22　　back into a situation where it is exposed to
23　　open flame? And I think what you have said is
24　　that your understanding is it does not; is that
25　　fair?

---

**221**

1  A  Well, it is constantly recirculating now. But
2     you got an air intake and you got an air
3     exhaust. Like if you got an air -- you got air
4     coming in that heats up that gets circulated
5     through the oven. It is creating like a vortex
6     in there. Air does go back through but air also
7     exhausts. So it is a constant circulation
8     through the oven.
9  Q  I understand through the oven.
10 A  Yeah.
11 Q  The air that gets forced down from the burner
12    box is in the burner box, obviously?
13 A  Correct.
14 Q  And then it recirculates into the recirc fan?
15 A  Yes.
16 Q  Do you know factually whether that air that gets
17    forced down into the oven, do you know whether
18    it goes back into the burner box?
19 A  Well, the majority of it would get exhausted.
20 Q  Okay.
21 A  But you got a continuous air flow in there. I
22    mean, you can't count the volume of air and say,
23    okay, we are exhausting everything we push in
24    there. I mean, it's a --
25    MR. O'BRIEN: Mark. No. No. I am sorry.

---

**222**

1     MR. SENAK: I didn't say anything.
2     MR. O'BRIEN: Well, your commentary is
3  you're agreeing with what he's saying. You're
4  egging him on. He is looking directly at you as
5  he is testifying.
6     MR. SENAK: Let the record reflect that
7  that is a complete fabrication of Mr. O'Brien's
8  effort to try and construct the record to serve
9  his purpose.
10    The witness is answering the questions. I
11 think the record is clear.
12    MR. O'BRIEN: Respectfully, I disagree.
13 Q  Please continue.
14 A  Just think of the way what I am calling it, so I
15    am calling it a recirc blower. Okay?
16 Q  Yeah.
17 A  You're constantly recirculating air through the
18    oven. So you got this vortex going through
19    there. Yes, it is going to pick up air and
20    bring it back through, but it is also going to
21    exhaust air. But it is not the same air. I
22    mean, you have an air intake that's coming in
23    and that's being heated up as well that's going
24    through the oven.
25    Now, hot air has to be exhausted or you're

---

**223**

1  going to deadhead the oven and it's going to
2  overheat.
3  Q  I think we're not on the same page exactly.
4  A  Okay.
5  Q  Because I understand what you're saying is that
6     it can't just go through the recirc?
7  A  Right.
8  Q  Because then you're just having constant heat?
9  A  Uh-huh.
10 Q  It has to exhaust, I understand that part. But
11    what I think what you're saying is some air from
12    inside the oven gets into this recirc fan?
13 A  Uh-huh.
14 Q  The question is, does it go further -- the
15    question I'm asking, does it go further than
16    that? Does it go into the burner box? As you
17    just testified, we know there is air coming in
18    from the outside to the burner box that's forced
19    down into the oven?
20 A  Right.
21 Q  And I guess the question is, do you know one way
22    or the other whether that air goes back into the
23    burner box?
24    MR. SENAK: This has been asked and
25    answered.

---

**224**

1  A  It is my opinion --
2     MR. O'BRIEN: Three different ways.
3  A  And it is my opinion that -- and if I have
4     answered it three different ways, I apologize.
5     I think I am probably trying to say the thing
6     but three different ways of saying it.
7     You got air, fresh air coming in being
8     heated up, going through --
9  Q  Let me clarify. From outside --
10    MR. SENAK: You have to let him finish
11 answering the question too.
12    MR. O'BRIEN: I want to make sure we're on
13 the same page.
14    MR. SENAK: You can't interrupt him.
15 A  So that air is being heated and it is being
16    circulated through the oven. Okay? As it
17    vortexes through the oven, yes, it can pick it
18    back up, but it is being exhausted out through
19    the exhaust blower.
20 Q  Okay. I think that's about as clear as we are
21    going to get.
22    Earlier we were talking about -- or I am
23    sorry, you were asked about whether Air Tech
24    ever asked for any documents or any user manual.
25    You were aware that Air Tech had performed

---



225

1    cleanings on the oven before you got there;
2    right?
3  A  Correct.
4  Q  Do you know whether they ever asked for it, one
5    way or the other, before you were --
6  A  No.
7  Q  -- employed there?
8  A  No.
9  Q  And just to confirm, Air Tech doesn't have any
10    ownership of the oven itself, right, to your
11    knowledge?
12  A  No.
13        MR. O'BRIEN:  Okay.  That's all I have.
14
15  FURTHER RECROSS-EXAMINATION,
16    QUESTIONS BY MARK N. SENAK:
17  Q  I have some more.
18        Air comes from two sources that are put
19    into the oven; true?
20  A  No.  It has an air intake, fresh air intake.
21  Q  So there is a fresh air intake and then there is
22    a recirculation blower?
23  A  Correct.
24  Q  So air that's going to go through the oven comes
25    from outside the oven?

226

1  A  Yes.
2  Q  And then inside the oven?
3  A  Correct.
4  Q  The air that is inside the oven then goes
5    through two -- goes to two different
6    destinations, let's say, one is it goes -- some
7    of it goes out the exhaust; true?
8  A  Yes.
9  Q  Some of it then is recirculated back into the
10    oven?
11  A  Yes.  It is getting circulated inside the oven,
12    correct.
13  Q  The air that's getting recirculated back into
14    the oven goes through the burner box; true?
15  A  The fresh air intake is going through the burner
16    box.
17  Q  All right.  Does the --
18  A  Now this is --
19  Q  Oh, go ahead.
20  A  You got the -- I hope I don't make this sound
21    like I'm trying to do it a different way.  But
22    it is coming in through the fresh air intake.
23  Q  Right.
24  A  It is going through the recirc blower that
25    recirculates the air throughout the oven.  You

227

1    got to keep an air flow through there.  You
2    can't just have dead air.
3  Q  Yeah.
4  A  So that air flow is circulating through the oven
5    and then it is exhausting out through the
6    exhaust blower.
7  Q  Understood.  What I think we want to know is
8    whether there is air that comes -- that is
9    pulled out of the oven, right, not fresh air,
10    the air that is pulled out of the oven, even if
11    it mixes with fresh air, does it go back through
12    the recirculation blower through the burner box
13    and back into the oven?
14  A  It is in that area being recirculated as it is
15    being blown through.
16  Q  Right.
17  A  Once it goes down and circulates through the
18    oven, it goes all the way through the oven, then
19    it is exhausted.  Did I confuse that?
20  Q  Well, in that recirculation process, does that
21    air go through the burner box?
22  A  It is going through the burner box on the fresh
23    air intake.
24  Q  Right.  But is there air from inside the oven
25    that is recirculated through the burner box even

228

1    if it is mixed with fresh air?
2  A  I am sure there is air that gets in there, but
3    that's not typically how it works, because it is
4    recirculating the air inside the blower, where
5    it is being heated.  So it is getting circulated
6    in there and heated and blowing through.  So it
7    is coming around and getting blown through and
8    then it is circulating through the oven, coming
9    through, out the exhaust.
10  Q  Is that air that's getting recirculated a
11    mixture of fresh air and air from inside the
12    oven?
13  A  It could possibly be.
14  Q  All right.
15  A  It is getting up there.
16  Q  And does that go through the burner box?
17        MR. O'BRIEN:  Object.  Asked and answered
18    and foundation at this point.
19  A  Once the air is coming through the fresh air
20    intake, I think it is beyond the burner box at
21    that point.  Now it could be getting circulated
22    back up through as the squirrel cage is coming
23    around.  Let me try to explain this so it is not
24    confusing, I don't confuse myself.
25  Q  Okay.

229

1  A  But imagine trying to blow air back through a
2     fan, you know, you got a fan sitting here on the
3     table. I mean, it is different, because it is a
4     squirrel cage and it is constantly turning,
5     recirculating. But if you are trying to -- it
6     is difficult, because you can't push air back
7     through a fan that's blowing out.
8  Q  Understood. And that's the exhaust?
9  A  Yeah. No. That's the intake.
10 Q  Okay.
11 A  That's the intake.
12 Q  Well, let me try this.
13 A  And the exhaust is the same way. I mean, you're
14    not going to push air back down through the
15    exhaust.
16 Q  Air that goes through the furnace comes from
17    either the fresh air intake or the recirculation
18    blower?
19 A  Well, it is already in the recirculation blower
20    at that point, once it comes for fresh air.
21 Q  It is pulled up into the -- is there air from
22    inside the furnace that gets pulled into the
23    recirculation?
24 A  I wouldn't think there would be a lot of it.
25    And I am not saying it is impossible to get up

230

1     there if it wants to pull it back around,
2     because you got a continuous vortex going
3     through the oven.
4  Q  All right.
5  A  I mean, that's the purpose of the perf plates is
6     you're -- then it's when they call it a
7     recirculation blower, because you're constantly
8     recirculating air through the oven.
9  Q  Right. That's what I am trying to figure out is
10    whether there is -- is the source of air in the
11    oven only fresh air from outside the oven --
12    MR. O'BRIEN: Asked and answered.
13 Q  -- or is it also air that is recirculated from
14    inside the oven mixed with fresh air and then
15    circulated back into the oven?
16    MR. O'BRIEN: Asked and answered. Go
17    ahead.
18 A  No. I would say it is recirculating in there,
19    but it is -- like I said, it is fresh air coming
20    in, heated up, circulated through the oven. You
21    got this big fan. Is it possible that you're
22    pulling -- you could pull air back through that?
23    It is not -- it is not going to --
24 Q  No. No. I actually get it now.
25 A  Let me answer this. You're not going to take

231

1     the hot air in the oven and run it back through
2     the burner box.
3  Q  That may be the best way to deal with it; right?
4  A  I mean, does that make sense?
5     MR. SENAK: All right. That's it.
6     So you have a choice now, you can either
7     waive or reserve signature. If you reserve
8     signature, then our court reporter types it up
9     and you get to review the transcript and make
10    any corrections that you believe are necessary.
11    THE WITNESS: Uh-huh.
12    MR. SENAK: Keeping in mind that
13    corrections in this regard does not mean that
14    you can change your testimony, it just means
15    that you can correct errors and spellings or
16    something of that nature.
17    THE WITNESS: Okay.
18    MR. SENAK: You can waive signature and
19    then you won't have that right or that
20    opportunity and you would be relying upon our
21    court reporter to have accurately taken down
22    everything that we have said.
23    THE WITNESS: Well, you are going to review
24    it anyway; right?
25    MR. SENAK: That's up to you.

232

1     THE WITNESS: Yeah.
2     MR. SENAK: So you get to make the call.
3     THE WITNESS: It doesn't matter. I mean, I
4     don't need to sign it.
5     MR. SENAK: Then he's going to waive, I
6     guess.
7     THE WITNESS: Yes.
8     (Time Noted: 2:04 p.m.)
9
10
11    AND FURTHER DEPONENT SAITH NOT.
12
13
14    (Signature waived.)

15    _____
      DALE SPENCER
16
17
18
19
20
21
22
23
24
25



233

```
1    STATE OF INDIANA        )
                             ) SS:
2    COUNTY OF HAMILTON      )

3

4         I, Diane Zeyen, RPR, a Notary Public in and for
5    the County of Hamilton, State of Indiana, at large,
6    do hereby certify that DALE SPENCER, the deponent
7    herein, was by me first duly sworn to tell the
8    truth, the whole truth, and nothing but the truth in
9    the aforementioned matter;
10        That the foregoing deposition was taken on
11   behalf of the Defendant, at the Monticello Public
12   Library, 321 West Broadway Street, Monticello,
13   White County, Indiana, on the 3rd day of November,
14   2017, at 9:56 a.m., pursuant to the Federal Rules of
15   Trial Procedure;
16        That said deposition was taken down in
17   stenograph notes and afterwards reduced to
18   typewriting under my direction, and that the
19   typewritten transcript is a true record of the
20   testimony given by the said deponent; and that the
21   signature by said deponent to his deposition was
22   waived;
23        That the parties were represented by their
24   counsel as aforementioned.
25        I do further certify that I am a disinterested
```

234

```
1    person in this cause of action, that I am not a
2    relative or attorney of either party or otherwise
3    interested in the event of this action, and that I
4    am not in the employ of the attorneys for any party.
5         IN WITNESS WHEREOF, I have hereunto set my hand
6    and affixed my notarial seal on this _____ day of
7    November, 2017.

8

9

10            N O T A R Y   P U B L I C

11

12   My Commission Expires:
13   September 2, 2024
14   County of Residence:
15   Hamilton County

16

17

18

19

20

21

22

23

24

25
```



**Exhibits**

**D SPENCER_1** 3:15 161:21, 24 177:14 180:13

**D SPENCER_2** 3:16 179:10, 13 180:14 184:7

**D SPENCER_3** 3:17 202:4,7

---

**#**

**#2** 40:22 52:17 58:12,15,21 59:1,5 60:5 62:6,13 68:18,20 82:18,19 88:19 124:14 126:18 127:17 128:3 138:8 146:13,15 147:18,25 207:6 209:13

---

**1**

**1** 130:18 148:21 161:21,24 177:14 180:13

**10** 45:23 96:8,13 133:4 145:20

**100** 101:20 175:16

**10:08** 15:4

**10:09** 15:5

**11:00** 145:20

**11:09** 76:21

**11:22** 76:22

**12** 45:23 96:8,13 133:4 139:1 148:14

**12-hour** 43:17,24

**12-ounce** 152:20 200:21

**12:19** 131:12

**12:23** 131:13

**16** 12:24 195:10

**16th** 11:6

**1984** 12:15

**1988** 12:16 59:8

**1998** 59:20

**1:00** 148:14,20

**1:30** 201:14

**1:37** 202:1

**1:38** 202:2

---

**2**

**2** 68:17 120:23 126:25 127:19 128:10 136:23 152:21 170:12, 22 179:10,13 180:14 184:7

**2.4** 47:3

**20** 147:2

**200** 108:25

**2011** 6:23 13:3,4 14:12 23:2 58:10,18 63:21 77:15 87:2 124:12 161:1

**2012** 15:14,16 16:9 17:12,21 18:7 63:21

**2013** 16:22,23 128:10 130:24 137:23

**2014** 4:21 16:25 17:13 21:7,24 59:19 62:5 113:1,3 116:12 117:14 120:3 121:4,14 124:13 126:7 132:1 133:15 136:23 138:8,14,22 139:16 141:2 155:21 168:1 172:18 173:6 179:20 192:3 218:22

**2015** 16:25

**2016** 10:2 59:18 77:15

**22** 136:20

**22nd** 113:1 120:3 121:4,13,22, 25 124:8 125:18 126:7 128:10 129:9 132:14 133:10,15,19 134:7,13,19,23 136:23 138:8, 14,21 139:16 140:5,22 141:1,16 142:1 143:13 144:17 145:5,8 147:21 148:19 155:20 161:10 172:18 173:5 190:10 218:22

**23rd** 4:21 17:13 21:7,24 59:19 62:5 113:3 124:8,13 132:1 148:18,19 150:23 151:6 167:16, 18,20 168:1 180:17 189:16 192:3 218:22

**24** 13:2,7 43:6,7,18 44:3 194:22 195:4,20,25

**24th** 179:20

**2504** 55:10

**27th** 167:9 176:5

**2:00** 201:14

**2nd** 11:16

---

**3**

**3** 43:6,21 202:4,7

**30** 126:22 127:15 128:1 147:2

**30-day** 129:8

**350** 41:7,12

---

**4**

**400** 41:7,12 155:11

**4805** 11:16

---

**5**

**5** 141:7

**574-278-7202** 7:8

**574-870-7883** 7:11

---

**6**

**640** 55:9

**6:00** 138:23,24 141:8 145:19

---

**7**

**7107** 6:21

---

**8**

**8** 44:4

**8-hour** 43:22 44:2

---

**9**

**90** 35:10

**90s** 60:17

**9:00** 145:2

---

**A**

**A-z-k-o** 55:25

**a.m.** 15:4,5 76:21,22 138:16

**AB** 12:18

**ability** 78:5 89:8 116:20 203:17

**absent** 162:15,23

**absolutely** 111:10 162:18

**acceptable** 111:12 114:11

**access** 125:15 165:2 170:2

**accomplish** 210:6

**accounts** 10:22

**accumulate** 90:20 92:6

**accumulated** 109:2

**accumulation** 35:2,16 36:15 71:5 74:6 90:9 91:1,3,6,12,22 109:14 111:2 199:12

**accumulations** 36:14 70:24 92:21

**accuracy** 171:1

**accurately** 231:21

**acidic** 200:23

**acted** 192:23

**acting** 30:11 31:15

**active** 154:23 155:1

**actual** 92:14

**addition** 178:24

**additional** 120:10,16,23 121:24

**address** 6:20 11:15 26:14 55:2 103:15 107:22 118:3 122:9 163:18,23 164:1 166:21

**addressed** 146:15

**adjust** 89:24

**admittedly** 202:20

**advance** 126:18

**agent** 207:24

**agree** 44:1 109:6 120:3 148:18 166:20 171:25 173:13 178:3 180:11,21 182:20 183:4 193:4 194:20 195:1,2,3,7,11,19,24 196:18,25 197:19 198:2 199:10 203:5

**agreed** 189:11,12

**agreeing** 222:3

**ahead** 60:22 61:18 69:21 71:8, 23 79:15 82:23 83:25 102:18 121:10 155:6 172:4 183:9 196:23 198:7 199:20 202:3, 226:19 230:17

**ahold** 164:25

**air** 4:19 35:7 36:1 48:7,10,20,21 50:3,8,13 68:16 71:20 73:1 75:15 76:6,12,15,16,25 77:8,11, 16 78:7,16,21,23 79:1,6,25 80:23,25 81:12,18 82:3,8,25 83:4,9,19 84:3,8 85:4,14,24 86:2,5,8,18,24 88:21 90:24 92:8,20,21 93:18,20,22 96:16, 24 97:1,2,16 102:6,15 105:10 106:8 107:7,8,12,21 108:11 109:6,10,12 110:9,11 112:21,25 113:4 115:20 116:5,7,14,19 117:6,14 118:9 119:6,15,20 120:6,10 121:3,10 122:1 124:6, 14 126:5,19 131:16 132:14,19 133:7,18 134:14,18 135:23 136:17,20,23 139:7,12,17 140:13 141:1,4,25 142:19,24 143:6 145:12,19,24 146:3,11,12 156:2,7 158:11 160:20 161:10 165:6 171:5 172:1,12 178:13 179:19 186:9 187:4 188:15 190:10 191:22 192:9 197:17,19



205:10,12,17,19,22,24 206:2,5, 10,13,16,22,24 207:2,5,8,19,22, 25 208:2,3,7,17,22 209:5,13,16 210:18,20,21 211:14 212:20,24 213:7,16 214:10,15,19,23 215:7,13,14 216:1,9,15,18 217:21 218:13,15,18,21 219:5, 8,10,24 220:7,16,17,21 221:2,3, 6,11,16,21,22 222:17,19,21,22, 25 223:11,17,22 224:7,15,23,25 225:9,18,20,21,24 226:4,13,15, 22,25 227:1,2,4,8,9,10,11,21, 23,24 228:1,2,4,10,11,19 229:1, 6,14,16,17,20,21 230:8,10,11, 13,14,19,22 231:1

**Akzo** 55:8,22

**Alabama** 9:25 11:14,16

**allowed** 30:20

**alteration** 218:24

**alterations** 60:20

**altogether** 82:7

**aluminum** 9:23 10:15,17 11:3 22:19 39:15 53:7 60:6,18 61:4, 16,24 147:4

**ambiguous** 84:15

**amount** 82:2 165:10 175:20 181:24 193:17 199:8,9

**Anheuser-busch** 9:13

**annual** 56:9 68:25 69:2 73:18, 21

**annually** 68:24 69:3,8

**answering** 8:7 181:16 222:10 224:11

**answers** 5:8

**anticipated** 115:18 140:9

**anymore** 56:17

**anytime** 130:17 193:14

**apologize** 224:4

**appearance** 143:10

**appears** 179:17 180:18 181:2, 13,18 182:21,23 183:17

**applying** 57:17

**approached** 23:17 81:2,6

**approved** 144:19 145:11

**approximately** 15:13 44:13 124:13 141:4

**area** 16:6 72:21 79:17 80:16 99:7 103:7 106:14 157:9 210:11,25 216:2,8 227:14

**areas** 72:6 83:8 87:24 135:8

**144:6** 155:11 175:21

**arose** 134:15

**arrange** 93:11

**arrangement** 86:7

**arranges** 45:21

**arranging** 84:5

**arrive** 78:2 97:16

**arrived** 58:13 63:9 75:25 78:9 89:1,8 98:2 132:14 138:16

**arrives** 97:16

**Ashworth** 8:24

**aspect** 168:23

**aspects** 47:25

**assigned** 208:3,6

**associate's** 7:15 8:21 12:8,10

**assume** 26:16 60:3 121:9 126:4 133:21 143:13 158:5 191:12,13, 14,18 201:6 203:4 217:7

**assuming** 29:7 43:21 58:10 65:18,19 95:20 203:2 204:5

**assumption** 203:4

**assumptions** 192:6

**attached** 52:20 83:14 182:2

**attaches** 52:5

**attorney** 21:14 185:2

**attorneys** 4:19 186:6

**audibly** 119:11

**August** 10:2 11:6

**automotive** 10:16

**availability** 93:21

**average** 44:15 45:23 46:14,18 47:1,16

**avoid** 8:10

**aware** 21:19 28:14 35:13 38:19 62:10,19 63:5,6,9 65:11 69:10 73:13 74:1,5,17 75:20 82:10 83:4 84:8 87:5 88:17 105:4 118:19 119:3,14,18 129:20 134:17 147:23 149:22 155:18 166:8 172:17,22 191:21 224:25

**awareness** 80:17,18 116:1

**awhile** 17:8 20:10

### B

**back** 12:4 13:19 16:4,5,8,9,23 17:8,16,20 19:5 29:17 45:15

62:17 68:23 78:2,20 80:11 98:11 99:8 102:3 105:19 110:3, 10,18,22 111:4,18,19,23 112:23 127:23 135:2,12 142:10 143:3, 24 144:7 149:8,10 152:12,14,18 157:25 159:5 186:3 204:22 209:2 212:21 213:1,9,14,18,24 214:11,12,21,24 216:1,3 217:1 219:2,12 220:8,18,22 221:6,18 222:20 223:22 224:18 226:9,13 227:11,13 228:22 229:1,6,14 230:1,15,22 231:1

**background** 7:14 23:8 25:7,12

**bad** 55:3 113:9,11,15 114:8 150:6 155:7 157:16

**bake** 39:10 212:1

**baked** 91:4,25

**bakes** 90:4

**balance** 197:19

**Ball** 4:20,23 6:7,8,9 9:9,14,15, 16 10:14 12:1,23,25 13:3,4,12, 18 14:12,17,20 15:7,22,25 16:13,15 17:21 18:6 19:19,21 20:22 21:22 22:11,15,23 23:1, 25 24:5,13 25:21 26:11 27:4,5, 10,11 28:14,19,23 29:7,21 30:10,19 31:2,18 32:10,19 33:3, 12,19 35:1,14 36:20 37:10,12 38:12 40:22 42:6,23 45:18,21 56:1,19 57:25 58:10,25 59:7 61:15 62:20 63:10 64:19,22 65:11,21 66:19 68:3 69:16 70:22 71:3,19 73:17,20 74:4,11, 18,24 75:14 77:2,7,10,17,20 78:3,5,23 79:7 30:23 81:17 84:9 85:15 86:4,7,20,24 87:14,15 88:10,17 92:19 93:11,17 95:21 96:21 97:4,6,17 104:22 105:11 107:7 109:7 116:10,13,14,15, 19,25 117:9,13 119:15,19 122:12,16,19 123:9 124:17 125:19,22 126:14 129:19 131:4 140:24 143:9 147:4,24 148:3 151:15,24 152:3 155:19 163:17 164:1 166:17,20 174:6,7 176:7, 22 177:25 178:11 184:15 185:19 186:9 188:3 191:21,25 197:11 199:17 201:2,7 202:17 205:8 206:19 207:8,16 208:3,11 209:4,8 218:23

**Ball's** 27:4 39:5 70:16 76:6 78:22 79:3 110:14 116:8 122:1 123:5 124:5 178:18 196:16 200:19 210:3

**base** 134:25 193:25

**based** 22:22 25:7,11 29:24 30:23 33:16 42:9 48:16 50:18 51:8 82:14 85:3 87:12 89:14,24 94:8,13,20 102:5 105:14 126:4

**145:21** 154:7 155:1 159:20,23 174:23 177:1,10 181:23 184:7, 13 185:12,18 193:11,22 194:18 196:3 197:25 198:22 200:10

**bases** 104:17

**basic** 5:4 10:11 48:1 118:15 204:19

**basically** 25:15,20 30:1 82:10 94:17 111:12 112:8 123:19 133:21 152:11 165:7,12,18 178:4 180:22 199:11 200:7

**basing** 182:4

**basis** 29:16 65:8,12,23 67:11, 18 68:25 73:18 154:10 183:1 198:22

**bear** 205:1

**bearing** 25:10 101:1

**bearings** 29:14 66:13,14,15,16 67:17

**began** 138:17

**beginning** 93:14

**believed** 81:18

**bell** 187:18

**benefit** 8:2

**big** 57:10 74:6 97:23 99:3 230:21

**bigger** 200:1

**biggest** 96:3 151:17

**Bill** 187:15,16

**bit** 13:14 24:2,3 27:19 31:10 42:13 84:15 106:24 111:11 123:15 167:8 201:19 220:10

**blast** 157:25 159:5

**blasting** 158:2

**blow** 229:1

**blower** 25:10 41:22,23 49:21, 22,23 51:20 52:8 79:19 83:8,10, 15 109:18 154:17 173:17,21 175:22 182:2 190:11 192:7,18 212:17,20,24,25 213:7,16,19 214:10 215:16,18 219:2,3 222:15 224:19 225:22 226:24 227:6,12 228:4 229:18,19 230:7

**blowers** 48:6,14 52:8 67:20 79:12,15 100:7 109:18,19,21 114:6 115:5 140:19 211:3 214:18 217:17,20

**blowing** 158:1 228:6 229:7

**blown** 227:15 228:7

**board** 175:17



**body** 14:20 49:24 92:14

**bolts** 115:2

**books** 38:14

**boss** 149:1,3

**bottleneck** 98:18

**bottom** 160:3 162:1,4

**box** 49:2,4,5,16,18,21,24 50:4, 20,21 51:2,5,12,19,25 71:21 73:5,9 212:22 213:8,11,12,17, 21,23,24 214:16,17,24 215:11, 15,16,22 219:25 220:11,17 221:12,18 223:16,18,23 226:14, 16 227:12,21,22,25 228:16,20 231:2

**boxes** 71:12 72:4

**brand** 55:8

**brands** 23:11 55:8

**break** 5:17,18 15:3 76:19,24 109:12 117:21,22 131:10 201:24

**breaking** 87:25

**Briefly** 18:17

**bring** 27:21 111:22 117:20 165:12 222:20

**bringing** 25:20 112:2

**broke** 57:7

**broken** 34:6

**Budget** 46:13

**build** 75:4,6 90:14

**build-** 147:1

**buildup** 35:6 36:4,5 79:11,13 82:16 92:12,13 106:15,23 157:13 175:18 197:5 198:12,14, 17

**bunch** 34:2

**burn** 211:25

**burner** 49:2,4,5,16,18,21,24 50:4,20,21 51:2,5,12,19,25 71:12,21 72:4,12 73:5,9 212:22 213:1,8,11,12,17,21,23,24 214:16,17,19,24 215:11,13,15, 16,22 219:25 220:11,17 221:11, 12,18 223:16,18,23 226:14,15 227:12,21,22,25 228:16,20 231:2

**burners** 219:9,10

**burns** 52:10

**business** 7:16 10:12 11:15,23, 24 22:15

**buttoned** 103:18 104:6,7 218:5

**byproduct** 90:9

---

**C**

**C-o-n-s-t-e-l-l-i-u-m** 10:5

**C-z-a-j-k-o-w-s-k-i** 20:13

**cage** 41:18,24 42:2,3 51:17,20, 22,24 52:5,16 79:20 83:1,5,22 91:9 100:3 101:13 138:10 175:3 211:1 214:7 216:20 217:23 228:22 229:4

**cages** 51:18 52:21

**call** 4:15 20:18 27:20 39:7 40:23,24 43:6 148:7,10 150:2 163:10,11,12,14 164:19,21 165:4 168:11 217:1 230:6 232:2

**called** 39:9 40:4 48:25 64:2,3 156:20 165:20,21 166:7 190:8

**calling** 222:14,15

**calls** 169:22 185:13 218:3

**camera** 203:6

**cans** 10:14,15 22:19 39:15 46:9,24 47:12 48:5 55:13 57:18 60:6,11,14 61:16,23,24 89:16, 21 90:4 94:16 108:20 109:23 111:4,8,16 143:11 144:1,9 156:22,25 157:7,15 158:15,19, 20,25 159:8,11,13 160:17

**car** 148:12

**care** 26:8 52:12 57:13 65:17 66:6 67:10 69:14 145:22 174:13

**career** 9:7 113:10 193:10

**carrying** 70:16

**case** 11:25 19:4,10 20:24 22:1 26:16 75:15 77:19 97:3 98:5 109:5,6 114:20 115:14 123:23 143:15 177:12 182:11 186:15

**cases** 134:4

**catch** 115:9 190:7

**caught** 115:24 175:13,20,23,24 189:22 190:3 192:10

**caused** 63:25 64:16 114:21 117:11 152:25 160:5 192:3

**ceiling** 160:1 203:23 204:8

**cell** 7:8,9 11:24 169:10

**certified** 30:20 88:6

**chambers** 197:7

**change** 15:21 16:12 133:22 167:25 176:6,11,22 191:5,7,10

**231**:14

**changed** 11:7 56:24 61:14,20

**changing** 100:25

**charge** 13:20,24

**charts** 200:11

**check** 93:20 97:5,17,18 98:1,6 99:8,10,16,17 101:10,13 102:11,12 103:13 105:25 112:4 132:16 156:7 197:11

**checked** 43:1 133:9,14 134:7

**checking** 97:13 98:10,13,19 102:22,25 103:8 133:11

**checklist** 123:9,18

**checks** 99:13 100:19 101:8 104:8 106:9 134:22 140:4,12 145:16,17 156:3 191:9 217:4

**chemical** 56:13

**choice** 231:6

**Chris** 19:22,25 20:8,18 189:9

**Christmastime** 130:11

**circle** 29:17 45:15 68:23 78:2

**circulate** 212:25 216:15

**circulated** 221:4 224:16 226:11 228:5,21 230:15,20

**circulates** 213:3,24 227:17

**circulating** 214:20 227:4 228:8

**circulation** 49:17 221:7

**circumstances** 10:25 124:9 154:3 169:5,20

**city** 11:17

**claimed** 202:22

**claiming** 191:25

**clarification** 146:5

**clarified** 43:20

**clarify** 5:12 72:25 127:20 145:12 146:2 215:6 224:9

**clean** 68:17,20 71:21 72:6 74:7 76:14 77:17 79:2,10,18 80:21 82:18,25 83:11,16,22,23 84:8 85:12,15,19,20 86:2 88:2 93:23 98:16 100:7 104:23 108:5 110:6 111:6,7 112:10 116:13,14 118:6 135:25 137:11,13 138:9,10 159:6 172:23 176:12 190:10 198:13 207:3,6,8,14,17 209:11

**cleaned** 28:16 68:14,15 69:8 73:18 82:3 83:5 88:15 93:1 95:14 98:13 99:6 101:25 105:5 125:24 128:10 130:5,21 140:17,

**19** 170:23 171:9 189:22 190:1, 2,11,25 191:1 195:11,14,25 196:12,18 197:2 207:11 210:12, 15

**cleaner** 75:16

**cleaners** 73:3 80:6 96:6 113:8

**cleaning** 28:2 30:8 45:10,11, 16,18,21,22 46:5 69:6 71:12 72:17,19 73:21 75:5,24 77:1 79:8,9 80:4,12 82:19 83:6 84:6 85:4 86:6,13 87:16,19 89:1 95:3,22 96:8,20 97:24 98:24 101:3 108:17 109:2,3 113:16 114:10,19 115:6,11,23 116:25 118:14 119:21 120:3,6,9,10,16, 23 121:5,12,15,24 122:3,15,18 125:18 126:2,7,19,24 130:24 135:13 136:12,21,23 137:1,18 138:8,13,17 139:5,6,16 146:19 156:6 161:8 164:14,24 170:11 171:5 172:2 173:13 175:19 185:11 187:5 192:8,18 194:7,22 195:4 198:3,4,25 208:4 209:8, 13,14,17,19 210:7,21 211:19 217:14 218:4,21,24

**cleanings** 28:11 29:22 45:19 67:25 68:8 77:21 78:6,17,21 80:1,23 81:19 85:10 88:22 93:12 98:6 112:22 113:4,19 116:8,9 117:14 118:9 124:14 129:20 176:20 188:15 191:15 225:1

**cleans** 147:3

**cleanup** 108:4

**clear** 17:15 38:9 222:11 224:20

**clogged** 197:13

**close** 37:5 143:6 147:12 167:1 203:7

**closed** 71:16 217:2

**closer** 148:20,22

**closing** 76:5

**coating** 14:11

**coincidence** 22:7

**collect** 109:1,23

**collects** 109:22

**Colorado** 152:1,8

**combustion** 197:7

**comfortable** 112:12

**commentary** 222:2

**commenting** 171:1

**communicate** 81:18



**communicated** 164:6 177:8

**communication** 169:22 178:4, 6 180:2,8

**communications** 169:17

**company** 4:21 21:18 22:2 77:11,24 78:16 88:18 107:12 117:17 118:8 131:16 160:23 176:6,8 200:6

**company's** 184:23

**compared** 92:22 118:9

**complete** 161:17 222:7

**completed** 108:11 161:15 211:16

**completely** 99:1 181:6 212:13

**completion** 104:18 211:14

**complimenting** 119:19

**component** 29:6 49:2 79:3 120:25 146:12

**components** 17:25 48:3 127:20 147:19

**computer-based** 56:8

**concern** 84:14 159:9

**concerned** 65:10 81:11 129:6 139:19

**concerns** 11:3 80:24 81:8 112:20 113:4 116:20 121:2,13, 25 122:5,9 147:20,24 155:19

**conclusion** 177:6

**conclusions** 174:7 181:3

**condensate** 75:4,6

**condensation** 74:12,15,17,20, 24 90:12

**configured** 52:6

**confined** 30:19,21 31:1,3 88:6 209:22,24

**confirm** 51:9 120:21 149:19 180:6 187:22 225:9

**confuse** 227:19 228:24

**confusing** 228:24

**connected** 42:15 173:21

**connects** 51:21,22

**consisted** 14:6 165:13

**consistency** 91:17 92:3

**consistent** 183:4,14

**consistently** 217:19

**constant** 221:7 223:8

**constantly** 221:1 222:17 229:4 230:7

**Constellium** 9:23 10:3,8,10, 12,14 11:12 12:2 22:24

**constitutes** 82:23

**construct** 222:8

**contact** 28:3 78:22 81:23 133:7 135:18 149:2 160:19 161:4 163:3 168:18

**contacted** 21:14 135:16 148:13,24 163:3,7,9 168:15,16, 19 178:11,12 179:3,6 184:4,5

**contacting** 57:9

**contacts** 164:15 179:23

**contained** 57:12

**Container** 9:11 12:17,21,25 13:2,6,12 14:14,25 15:9 17:18 18:3 22:14 114:15

**containment** 57:3,5

**contamination** 197:6

**continue** 116:19 189:1 222:13

**continued** 116:13,14 153:22 154:6

**continuing** 173:9

**continuous** 50:15,17,18 221:21 230:2

**continuously** 216:15

**contractor** 27:6,25 71:20 76:14 80:18 176:23 205:21 207:22

**contractors** 26:17,21 27:14,17 28:4,25 29:3 68:4 88:5 103:10

**contributing** 157:20

**control** 200:10 205:24 206:2,5

**conversation** 18:18 134:11 150:8 161:12,18 165:23 174:14 177:1 184:20,24 185:12,15 186:2 187:2

**conversations** 19:11 21:23 150:3 151:13 161:9 167:4 187:4,13

**converted** 61:4

**conveying** 160:2

**cool** 96:5,11,18,22 127:14

**cooling** 134:2,3

**cools** 193:16

**cooperative** 184:17 185:8

**cooperatively** 184:15

**coordinating** 78:24

**copy** 86:24

**Corp** 9:15 13:7,12 22:14 109:7 166:17 188:3

**corporate** 151:18,21,25 152:7 177:25 178:23 179:5 184:3,22 185:19 186:25

**Corporation** 4:20,23 6:7 9:10 12:17 13:1 31:2 163:17 206:20 208:12

**Corporation's** 202:17

**correct** 6:1,12 8:19,22 9:17 10:18 11:5,13 13:5,8,10 14:15 15:12,19 17:14 18:2,5,10 20:20 22:25 23:24 24:1,4,9 25:4,19,24 26:13,15,19 27:13,15,18 28:1 29:1,9 30:6,9 34:15 36:9 40:9, 12,14,16,18 42:16 43:19,25 44:20 45:17 46:6,23,25 49:10, 25 50:2,11 51:14,22,23 52:1,3, 13,15 53:7 54:4 55:14,18 56:15 58:14 59:2,22 61:11 62:4 63:4, 22 64:12,14 65:13 66:25 68:2,5, 19 69:7,9,11 70:18,21 72:13 73:6,16,19 74:2 81:15,16,24 84:2 85:21,22 89:18,22 90:5,7, 11,15 91:2,8,11 92:2,15 93:8,10 94:2 96:9,12,23,25 97:15 99:25 100:14,17 102:9,13 103:16 107:15,19 110:8,12 111:14 117:8,15,16 118:1 120:8 126:3 130:19 131:19 132:2 133:24 134:4 136:24,25 137:21 138:5, 7,15,25 139:9,20 143:12 145:25 146:17 148:6 149:18,21,25 151:2,12 152:4,6 154:9 155:17 156:14,24 158:13 162:6,10 164:2 165:19 171:7,14 172:25 173:6,8 174:3 175:1,7 179:24 182:17,24 183:3 190:15,18,20 191:4,22,23 193:2 196:3 197:18,19,20 201:10 205:8,9 207:12 208:13,16,18,19 209:21, 25 210:1,5,10,13,16 211:12,20, 22 212:6,12 213:3 214:6,8,13, 22 215:1,25 216:4 217:8,12,24 219:7 220:13,15,20 221:13 225:3,23 226:3,12 231:15

**corrections** 231:10,13

**correspond** 133:22

**corrode** 39:16

**corroding** 55:17

**cost** 200:4,6,17

**count** 221:22

**counting** 152:15

**couple** 77:5 97:1 149:23 150:16 192:6 218:12

**court** 8:2 231:8,21

**covered** 108:14

**cracked** 34:14

**Craig** 32:17

**crawl** 98:25

**create** 90:8,14 114:3,5 115:1,8 194:2

**created** 15:20 153:18 192:8

**creates** 90:4 108:19

**creating** 221:5

**crews** 43:14

**critical** 119:15 140:16 152:14 168:23

**CROSS-EXAMINATION** 204:15

**crossed** 160:16

**cue** 142:24

**cure** 35:20 39:8,11,20 40:8 41:14 48:7,10,19,23 94:17 197:22

**cured** 39:14

**cures** 40:6

**curing** 41:16

**curious** 21:12 114:17 212:16

**current** 6:20 22:24 117:25

**curve** 39:12,13 41:17 48:17

**customer** 10:9,24

**customers** 152:15

**cut** 79:16

**cutting** 113:24 157:24

**Czajkowski** 20:3

**D**

**daily** 65:8,12,22 69:17 70:7 198:22

**Dale** 4:12,13,15,17,25 6:20 7:12 18:11 39:2 41:2 76:24 78:19 131:15 132:13 161:23 170:10 202:6

**dale.spencer@constellium. com.** 11:22

**damage** 34:2 89:21 157:7 159:3 181:24

**dancing** 90:1

**date** 18:7 63:14,18 179:19



**day** 43:3,6,18 44:8 46:11 47:16, 17,18 59:11 103:4 106:18 120:4,6 132:17 133:3,5 134:6 135:1,19 137:2,11,13 139:5,6 141:10 151:4,11 152:11 161:10 163:8 168:6,12 179:22 194:22 195:4,10,11,21,25 198:13,20

**day-to-day** 149:9

**days** 44:10,13,16 45:2 126:23 127:15 128:1 144:13 170:8 208:20 209:2,5

**dead** 227:2

**deadhead** 223:1

**deadheaded** 216:11

**deal** 196:8 231:3

**debris** 35:2,17 115:8 170:23 171:10 175:17

**December** 130:13

**decide** 112:8,9 207:5

**decided** 89:20 181:6

**decision** 26:20 27:8,20 76:6 77:7 78:15 110:21 112:7,12 188:14,17,18,20,21 189:15 190:16 191:2 209:19,20

**decisions** 27:3

**decline** 94:19

**decorator** 16:6

**decorators** 13:20

**deep** 158:6

**defendant's** 161:21,24 179:10, 12 202:4,7

**degree** 8:21 12:8,10 84:15,21 113:14 198:17

**degrees** 7:15 41:7 108:25 155:11

**delayed** 19:8 106:24

**demand** 94:9

**dented** 89:16

**deny** 120:21

**department** 13:17 16:16,22 17:1,10 23:14 64:2 70:11 82:2,7 85:25 93:19 113:12 157:10,17 158:10 161:3 188:12

**depended** 31:21 133:1

**depending** 10:25 47:7 55:10 97:20 140:1 141:12 143:23 200:21

**depends** 47:4,14 134:4 199:18, 24

**deposed** 97:2

**deposit** 199:12,13

**deposition** 4:25 5:25 6:15 18:12,23 19:7,21,23,24 20:19, 22 21:2,3,13,17,20 161:21 179:10

**deposits** 197:5 198:19

**describe** 7:13 39:2 41:21 47:25 52:23 56:6 57:4 62:22 78:19 79:5 91:12,13 123:14

**describing** 105:11 172:6 173:4

**description** 171:8

**destinations** 226:6

**destroyed** 157:10

**detail** 19:24

**detect** 153:16

**detected** 153:6

**determination** 64:16 111:15 114:20

**determine** 27:23 144:3 193:1 210:14 211:15,18

**determined** 208:9,14,17,20 209:2

**determines** 143:9

**determining** 29:22

**develop** 15:10

**deviation** 127:11

**difference** 23:15

**differences** 23:19

**differently** 92:23

**difficult** 8:6 229:6

**diploma** 7:15 8:20

**direction** 102:23

**directly** 222:4

**director** 177:25 178:22

**disagree** 174:1 177:11 196:9, 19 198:2,9 222:12

**disastrous** 175:11

**discharge** 112:1

**discovered** 148:4 155:16,22 156:19,23

**discovery** 153:14

**discretion** 27:23 28:3 29:2 78:4

**discuss** 79:1 163:4 174:9 185:11

**discussed** 171:15,19 187:3

**discussion** 129:18 174:17

**discussions** 186:18 194:18

**dispose** 147:5,6

**dispute** 166:18 167:21 208:23, 24

**document** 123:4 147:13,16

**documented** 128:20 203:13

**documents** 18:22 19:14 37:1,5 86:12 147:10 218:18 224:24

**doors** 105:22

**draw** 48:15

**drilling** 113:25

**dripping** 204:7

**Drive** 6:21

**drop** 92:3,4,10

**dropping** 144:9 157:23

**drove** 148:12 153:25 156:8

**duct** 83:9 138:12 171:21 172:8, 21 173:11 176:16 183:11 190:8, 12 191:16 198:3

**ducts** 190:10 196:11,17 197:1

**ductwork** 14:8 18:4,9 28:6,11, 16 42:12,14,20 51:22 52:4,9,20 53:1,2,14 54:5,16 61:14 62:13 63:2 69:2,5,8,14 73:17 74:5,7, 12,13,18 82:19,23 83:10,14 84:4,6,9,15,19 85:15,20 86:2, 91:23 92:1,22 93:1 95:13,15 104:23 105:5 127:6 129:5,9,23 130:5,20,24 137:13,17 153:24 154:5,8,13 156:3,8 157:12,18, 25 158:1,6,8 171:23 172:23 173:18,20,23 174:20,22 177:3 180:18,24 181:9,19 182:3,22,23 191:15 192:15,17 197:6 198:12, 14,20 199:11 200:16

**ductworks** 198:17

**dust** 90:14,16 91:15 99:19 108:19 109:1,15,24 158:11,19 159:13 160:7 175:16

**duties** 53:10 209:8

**E**

**earlier** 37:4 62:25 65:2 70:22 75:13 81:22 82:24 84:4 88:25 90:13 96:7 123:6 126:4,17 134:22 138:9 140:11 141:14,24 142:15 154:24 160:18 167:19 174:23 177:10 190:6 194:4 197:10 203:25 224:22

**early** 60:17 63:17 134:5 151:14

**easier** 8:15 208:21

**easily** 115:9

**education** 9:6

**educational** 7:13,14

**effect** 132:10

**effectively** 177:4

**effort** 110:20 222:8

**egging** 222:4

**EHS** 56:9 58:2,3

**either/or** 41:2

**elaborate** 89:11

**electrician** 145:15

**electronic** 123:16,17 124:3

**email** 11:19 162:2,9,16,23 163:17,23 164:1,6,24 165:2,5, 18,24 166:6,21 167:9 170:10 171:16 176:5 180:13 183:5 184:13 185:15

**emailed** 163:15

**emailing** 164:13

**emails** 169:3 184:14 185:12

**emissions** 52:11 211:25

**employed** 9:20 32:19 64:11 152:2 205:16,19 225:7

**employee** 6:9 35:14 77:2 205:8 207:19

**employees** 19:20 27:4 28:23 30:19 31:2 32:10 35:1 38:19 40:23 56:9 87:15 97:2 105:10 136:17 186:19,21,24

**employer** 10:17 22:24

**employment** 12:1,9 21:22 38:11,17 56:1,19 59:7 62:11 63:7 79:24 83:4 86:20

**encounter** 106:23

**encountered** 134:18

**end** 12:19 13:19 14:19,21 15:24 16:1,4,5,9,23 17:8,16,20 43:14 52:2 63:1 68:13 113:2 144:6 149:8,10 157:2 159:8 188:24 203:10

**engage** 169:12

**engineer** 151:21 186:22

**engineering** 21:1 28:8 31:22 53:16,21,23,24 61:5 69:14 151:18,23 184:3 189:9



**ensued** 186:5

**entail** 10:20 17:21

**enter** 209:24

**entire** 68:11 103:3 135:7,12 139:11 143:23 144:7 151:22 159:3,7 193:10 194:7 204:6

**entry** 88:7

**Environment** 58:4

**equipment** 13:24 14:1 29:25 48:5 103:9 153:19

**equivalent** 44:1,3

**error** 114:13

**errors** 231:15

**escapes** 52:14

**estimating** 15:17

**evening** 155:21

**event** 28:17

**eventually** 14:17 15:9

**exact** 119:4 133:17 164:4

**examination** 211:6,13 215:4 219:16

**excessive** 106:15,23

**exclude** 193:23

**exhaust** 48:14 50:9,16 51:16, 21 52:5,8,16 63:3 79:12,15,19 83:1,8,10,15 91:10 100:3,7 109:20 154:17 190:11 192:7,18 211:3 213:25 214:3,5,12,21,25 217:20 221:3 222:21 223:10 224:19 226:7 227:6 228:9 229:8,13,15

**exhausted** 90:6,18,19 221:19 222:25 224:18 227:19

**exhausting** 216:6 221:23 227:5

**exhausts** 213:3 221:7

**Exhibit** 161:21,24 177:14 179:10,13 180:12,13,14 184:7 202:4,7

**exist** 170:3

**expect** 108:6

**expectation** 26:7 79:10 80:2 82:15,25 83:3 111:21 135:25 171:12

**expectations** 26:9 101:17 136:11 207:10

**expected** 155:4 159:20,22

**expecting** 187:21

**expensive** 200:8

**experience** 23:9,23 25:7 30:24 33:16 155:2 184:16 194:1

**expert** 136:2 160:12

**experts** 101:18 135:15,23 136:8 188:2 202:17

**explain** 45:5 87:18 228:23

**explaining** 169:5

**explanation** 64:19

**exposed** 220:22

**extensive** 117:3 161:17

**extent** 58:21 60:24 63:25 69:3, 12 72:16 73:13 87:17 88:5 93:6 102:14 104:12,13 138:13 140:1 178:6 193:8

**extinguishers** 114:1

**extra** 172:24 173:1

**extract** 196:11,17 197:1,6

---

**F**

**fabrication** 222:7

**face** 182:25

**facilities** 116:10,11,15

**facility** 22:12 24:7 37:10 62:20 63:11 64:4 74:11 77:17 84:9 85:16 97:17 102:10,16 107:9 113:1,11 116:9,16 117:15 122:2 148:4 149:16 188:16 196:16

**fact** 19:8 20:19 21:4 116:3 153:13 189:20 190:1,23,25 191:8 193:23 214:14

**Factory** 4:20 21:24,25 22:2 186:8

**facts** 193:21,24

**factual** 171:1

**factually** 194:8 221:16

**fail** 127:10

**failed** 115:20,22 116:2

**failing** 66:14

**failures** 89:25

**fair** 46:22 61:10 65:10 77:13 87:8 93:9 95:20 117:7 119:9 151:1 153:7 164:16 181:4 182:16 184:12 188:6 220:25

**fairly** 111:6 168:16

**fall** 100:15 217:7,9

**familiar** 5:5 26:5,6 36:21 38:24 112:9 199:3

**fan** 41:22,24 48:24 49:13,17 50:3,12,16,21 51:16,22,24 72:9 83:1,5,22 91:9 100:3 138:10 170:22 171:9,21 173:12 215:8, 12 216:7,20 220:4,19 221:14 223:12 229:2,7 230:21

**fans** 50:9 52:16 110:2

**farthest** 159:1

**fasteners** 115:6

**feels** 91:13

**field** 165:3

**figure** 25:14 61:12 178:5 189:15 230:9

**figuring** 132:11

**file** 64:22

**filling** 124:11

**film** 199:3,16,17,21,23 200:1,2, 5,11,15,19,24 201:3

**final** 101:10 102:11 103:17,18 107:6,21 108:11 110:21

**find** 37:14 38:15 120:14 142:8 209:16

**fine** 4:16 9:19 108:12 109:25 112:16 181:17 189:25

**finish** 8:11 224:10

**finished** 209:16 210:20 211:14 218:21

**finishing** 99:12

**fire** 4:21 16:7 17:3,5,13 18:7 21:7,24 57:1 59:19 62:22 63:13, 15,23 64:2,7,16,20,23 77:16,19 82:6 83:21 113:3,12 114:1,14, 17,21 115:9,17,21,24 116:3,12 117:3,7,11,13 119:16 120:4 121:17,19,20 122:14 126:23 148:4,10,15 149:24 150:2,4,8, 10 151:16 152:18,25 153:4,5, 14,24 154:4,7,13,16,21,23 155:1,9,16,23 156:19,23 157:7, 10,17,18,23,25 158:9,23,24 159:15 163:6 164:7 166:8 167:4,12 168:7,13,20,24 169:6, 21 170:8 172:21 173:11,24 174:8,10 175:24 176:4,19,24 177:3 178:19 179:22 180:17,23 181:8,23 182:7,10,21 183:11,18 184:17,25 186:6 187:4 188:8, 11,16 189:21,23 190:3,7,8,9,13, 23 191:1,15 192:3,10,23 193:2, 13,19,23 196:9,15,25 200:20 203:11,20,21 205:3 206:16,17 209:14 211:21 215:17 218:23

**firehose** 157:11

**fireman** 204:1

**fires** 62:6,17,19 63:10 113:9,16 192:21

**flaky** 91:16

**flame** 51:3,7,10,12 174:25 216:7 220:23

**flammable** 56:14,20

**flangers** 14:7

**flashes** 41:15

**flashlight** 35:23 105:15,24

**Florida** 7:20,21 8:17

**flow** 35:7 36:1 48:7,21 156:3,7 197:17,19 215:14 216:9 221:21 227:1,4

**foam** 52:25

**focus** 124:7 151:17

**focused** 135:7

**focusing** 135:9

**follow** 120:9 171:17

**forced** 220:18 221:11,17 223:18

**forces** 50:3

**forcing** 50:13

**form** 27:16 65:14 69:20 82:22 83:25 102:17 116:22 119:8 121:6 155:6 158:22 159:16 160:11 172:3 173:7 176:10 193:7 196:2,13 198:6 199:14

**formal** 23:13

**forward** 23:2

**found** 144:19 147:15 154:15,20

**foundation** 60:22 61:17 69:20 71:7,23 73:10 82:22 83:25 84:13 92:5 102:17 116:22 119:8 121:6 155:6 158:22 159:16 160:11 172:4 181:1 183:6 184:10 194:24 196:13 198:6 199:19 228:18

**frame** 60:14 63:15 70:1 88:25 95:7 99:11 106:24 124:15 129:16 130:9,25 137:17 138:20 140:2 167:7

**Freddie** 20:25 21:3 22:4 33:6,8 53:23,24 54:14 131:6,7 138:6 186:23

**free** 84:24

**frequency** 134:24



**frequent** 195:22

**frequently** 129:21 195:15,19 196:1

**fresh** 92:8 224:7 225:20,21 226:15,22 227:9,11,22 228:1, 11,19 229:17,20 230:11,14,19

**Friday** 167:12,16,18,20 168:3,5

**front** 14:19 15:24,25 16:4 68:13 144:5,7 162:20

**fume** 196:11,17

**fumes** 52:12 63:2 90:4,6,8

**function** 39:3

**furnace** 229:16,22

**future** 6:25 7:1

---

**G**

**Gainesville** 12:18

**galvanized** 53:4,7

**gap** 37:5

**gas** 114:7

**gave** 5:25 102:4 106:16

**gears** 124:10

**general** 29:18 31:9 36:8 44:7 45:1 63:15 79:5 80:17,18 95:7 112:18 118:21 129:17 137:17 141:25

**generally** 37:23 44:23 119:5 124:4,6 132:22 168:14

**gentleman's** 205:6

**Georgia** 9:1

**get all** 73:8 79:12 108:17

**give** 5:3 7:10,12 10:11,21 11:21 19:3 22:17 33:19 44:12 52:4 53:22 63:13 86:11 95:7 96:15 123:14 144:14 164:21 165:4 197:6 201:22

**giving** 19:23 21:1 200:7

**glad** 43:20

**good** 4:9 12:11 40:19 53:15,17 86:9 94:18 111:4 121:18 143:4, 5 146:5 147:15 160:6 197:20

**gooey** 91:19,24 92:3,9,13

**gooey-type** 91:17

**Grandstaff** 32:17,18

**grease** 25:10 29:13

**greasing** 66:14,15 128:4

**grind** 82:9

**grinders** 80:5 118:24,25

**grinding** 119:1

**gritty** 108:21

**ground** 5:4

**group** 28:9 69:14 110:20 111:24 151:22,23 186:10 188:17,21,23 190:22

**guess** 25:5 27:19 28:16 29:6 38:6 39:5 42:12 43:20 49:22 55:19 67:1 69:25 70:15 73:7 75:21,22 79:24 80:3 89:11 92:20 100:12 104:21 109:5 115:19,25 116:18 128:23 146:19 154:12 155:1,21 157:6 158:14 159:10,20 160:25 163:16 165:21 166:4 168:10 173:3,4 178:4 180:3,5,7 191:7 193:21 195:23 217:21 223:21 232:6

**gun** 190:21

**guy** 31:22 54:1,2 112:13,14 135:20

**guys** 30:17 31:25 33:21 100:9 103:9 107:3,10,11,18 110:17 111:17,23,25 112:1 133:4 156:13 169:12 170:11,14 187:23

---

**H**

**hand** 161:23 179:12

**hand-off** 144:12

**handing** 202:6

**handle** 57:7

**handling** 56:2,4,25 92:21,23 122:20 178:19 185:20,24

**hands** 184:22,23

**hands-off** 174:12

**hands-on** 24:8

**hanging** 54:12,13 204:8,9

**happen** 15:13 66:24 87:3,5 100:18 104:13 107:20 119:23 171:20 175:25 176:1

**happened** 17:2 64:10 74:8 95:2 105:9 115:15 116:3 121:20 123:24 137:23 138:4 150:2 154:2 155:24 163:2 165:25 168:20 190:13,14 194:9,16

**happening** 20:19 28:15 150:6 176:18

**happy** 103:14

**hard** 91:16,24,25 115:11 153:16 160:4

**Harry** 149:5 205:7,8,10 206:9

**hazardous** 56:7 57:8

**head** 8:16 129:14 183:21 215:23

**head-on** 90:2

**health** 58:4

**heard** 140:6

**hearing** 30:3 111:9 153:10 164:11 194:8

**heat** 48:15 50:22,25 51:9,15 52:14 63:3 108:23 157:23 214:19 215:20,21,22 220:11 223:8

**heated** 215:13,14 219:6 222:23 224:8,15 228:5,6 230:20

**heats** 51:12 219:8 221:4

**heights** 217:9

**held** 17:12

**helpful** 5:21

**hey** 54:13 71:5 74:6 79:2 86:12 89:9 93:23 94:15,21 99:18,19 100:6 107:8,16 108:6 112:9,15 117:10 125:23 135:20 140:13, 18 141:5 147:14 154:13 157:7 189:19 190:22 217:22

**high** 7:15,17,18 8:18,20 52:25 127:3 155:5 158:1 193:18,19 199:17 200:5,6 204:2

**higher** 171:22 172:15,23 173:2, 12 196:11,17 200:23,24

**highly** 199:11

**hire** 26:17 27:6 28:24 29:3 68:3 76:6 77:7 78:5,16 116:19 188:15 189:20

**hired** 75:14 76:8,11,12,17,25 77:20 79:6 82:18 83:20 85:14 86:2 90:25 135:24 193:1

**hires** 26:20 27:8 68:3 71:19

**hiring** 27:3 88:18 92:20 190:22

**history** 12:7,9,11 58:21

**hit** 109:18 113:20 114:12,23 115:20,22

**hitting** 92:8

**hold** 220:2

**holes** 35:25

**holiday** 28:10 130:6,23

**holidays** 130:10

**home** 7:2 113:20 114:12,23 115:20,22 150:23,25

**hooked** 83:9

**hope** 226:20

**hose** 158:2 204:2

**hot** 48:9,21 50:3,8,9,13 127:12, 13 154:25 222:25 231:1

**hour** 96:19 143:2 145:17

**hourly** 111:17 112:14

**hours** 43:5,6,7,11,18 44:3,4 45:23 96:8 114:6 139:1,25 143:3 145:17 149:23 150:16 153:1,3,4,15 194:22 195:4,10, 20,25 208:9,14,17

**house** 151:24

**housecleaning** 104:5

**housekeeping** 79:17 99:6 102:2 108:2 141:15

**houses** 51:2

**housing** 49:7,14 50:1 171:22 176:16

**housings** 170:22 171:9

**Howell** 187:6

**huge** 92:12

**Huh-uh** 64:21

**hundred** 46:13,15,24 47:3,4, 20,21

**hung** 34:5 106:14 148:11

**hypothetically** 145:19

---

**I**

**IBO** 17:22,25 36:25 38:1,10,25 39:10,11 40:17,22,24 44:13,16 45:3,6 46:10 48:2 49:16 52:17 58:12,15,19,21 59:1,5 60:5,20, 21 62:3,6,13 68:15,18,20 78:17 82:18,19 85:6,9 86:25 88:19 98:15,16 105:5 109:17 120:6,23 124:14 126:18,25 127:17,19 128:3,10 129:2 133:2 136:23 137:6 138:8,9 142:12 144:3 146:13,15,17 147:18,25 153:19, 20 159:8 165:8,11 171:6 194:21 195:4,9 196:10,16 197:21 203:24 204:1 207:6 209:11,13 212:10,13

**IBOS** 23:3,9,10 24:11,15 28:20 29:7,8 36:22 37:10,15 41:4 42:12,15 43:3 61:24 122:13,17, 20 137:11 193:9 209:9 214:9



**IC** 14:6,10 36:1 39:7,8,18,40:13, 15,23 55:4,6,8 56:14 57:14 90:3

**idea** 7:12 10:11 12:6 19:3 22:17 30:22 32:18 35:16 42:4 44:12 46:9 52:4 58:20 65:6 96:15 106:16 123:15 124:16 135:20 157:22 166:15 178:20 202:12, 25 203:16

**identification** 161:22 179:11 202:5

**identify** 97:4 131:16 203:15,18

**ignited** 153:4

**ignition** 57:14,18,21

**imagine** 229:1

**immediately** 5:14 148:11 184:4,5

**implicitly** 22:21

**impossible** 229:25

**in-depth** 101:6

**in-feed** 92:7

**in-house** 87:15

**inappropriate** 80:25 81:2,12, 20

**inch** 106:4

**inches** 158:4 204:4,5

**incident** 13:19 163:5 188:12

**include** 18:3 57:1 152:21 209:8

**including** 83:20

**independent** 205:21 207:21

**indicating** 97:9

**individual** 134:6 187:5

**industrial** 23:8

**industry** 155:2

**infeed** 112:1

**information** 117:10 124:18,24 125:2,16 128:15,17,24 131:5 188:8 210:17

**informed** 167:8

**initiate** 102:11

**initiative** 170:18

**ink** 40:6,10,11

**input** 206:10 209:5

**inside** 14:11 30:18 31:6 34:9 39:8,10,19,21 41:23 42:2 48:7, 10,21 51:4,5,10,14 55:7 66:12 70:23 71:13 72:1,3,5,6 73:12 74:4,18 79:11 83:12 88:1,4

90:16,21.91:19,20,23 92:1,6,11, 14,22 96:6 98:25 105:20,23 128:8 154:21,23 155:1 172:9 175:8,14,21 194:2 199:6 200:11 203:18 212:10,21,25 213:8,11, 19 217:16 220:7,21 223:12 226:2,4,11 227:24 228:4,11 229:22 230:14

**inspect** 80:20 98:24 99:1 118:20 161:17 198:21 217:20 218:5

**inspected** 147:14

**inspection** 29:21 30:13,15 66:11,16 87:23 88:19,23 99:14 101:7 103:17,18 107:6,21 108:10,11 128:5 141:15 142:4 187:2 217:2

**inspections** 29:7,8,11,13 30:10,12 31:14,20 32:12 33:14 36:8 38:22 66:6 100:1 126:17 140:4 186:5,11,12,14,20

**installed** 59:20,23 99:5 102:1 104:5

**instance** 35:13 74:3 87:14 95:2 105:4 106:6 119:14 164:23

**instances** 27:5 73:20 95:12 164:5

**instruct** 26:12

**instructed** 25:3

**instruction** 185:18

**instructions** 18:25 86:4,18 106:7 165:6

**insulation** 52:21,23,25 53:1,6, 9,10,14 54:3,8,9,11,15,20 75:11 158:6,7 204:7,8

**insurance** 4:20 21:18 22:2 174:10 184:23

**intake** 221:2 222:22 225:20,21 226:15,22 227:23 228:20 229:9, 11,17

**internal** 41:3 199:13 212:1 215:7

**interrupt** 117:24 224:14

**introduction** 160:25

**investigation** 182:6,10

**investigator** 188:9 192:23

**involved** 69:4,13,23 82:4 145:24 174:11 178:16 186:12, 13,19,22,23,25 187:1

**involves** 214:15

**issue** 10:24 27:24 30:23 34:16, 17 35:20 57:6 65:15,19 66:4

102:24 107:22 114:10 127:7 199:16

**issues** 19:9 33:25 89:25 134:17 136:20 146:15 153:8,18,20 155:18 156:10 189:25

**items** 33:20 145:21,23

---

**J**

**Jacob** 4:18 215:5 219:17

**January** 130:18

**job** 13:15 15:22 53:11 80:16 81:1 82:16 89:15 101:21 114:11 135:9 136:1 205:25 206:25 207:3 209:8

**jobs** 93:5

**Jonathan** 4:12

**jump** 201:12

---

**K**

**K-** 33:2

**keeping** 123:10 231:12

**kick** 110:3

**kicked** 110:2

**kicking** 158:10

**Kidney** 32:22,24

**kind** 5:5 7:13 8:6,7 10:11 12:6,8 15:7,10 16:9,17:22,22 14.21 24:7,26:26:11,12,18 27:2,23 28:16,22 29:8,17,18 30:7,14 33:13 35:14,15 38:19,22 39:22 40:21 42:14 45:5 46:1 47:7,24 48:1,2 49:7,11 50:12 52:12,14 54:23 56:13 57:1,4 58:20 60:20 64:18 65:2,5,7 66:9 68:6,21 69:12,16 70:7 71:4 74:5 75:15, 20 76:25 77:7 78:22 80:14,15 85:1,25 88:23 89:5 90:1,9 91:12 94:4 95:8,20 97 4 100:1,15,18, 24 101:9 102:11 105:25 106:16, 18 107:6 108:15 112:6,18 113:24 115:7 118:16 124:5,8,10 126:14,15 127:15,19 128:17 129:1,16,17 130:17 134:17,21 136:13 137:18 140:4 141:14,15 142:24 143:10,17 145:23 148:19 151:14 159:1 160:18 169:5 174:11 176:4 178:18 180:9 182:6 183:19,20 186:5 188:24 189:11 190:21 191:7 193:5 194:18 198:23 203:1 205:1 216:2

**kinds** 159:3

**knew** 21:1,20 25:8,12 33:21 37:23 38:13 80:7,8 97:22 101:7 111:23 142:9 153:24

**knowing** 30:14 140:16 194:1 202:23

**knowledge** 21:8 28:18 30:14 31:4 38:23 42:7,8,18,23,24 53:13 54:2 57:19,20 58:22 59:24,25 60:7 61:13,23 62:1,5, 7,15,16 64:15,22,24 65:21 66:2 69:12,22,23 71:10,13,25 73:23 74:7,10 75:17 76:9,11,12,18 77:6,18 79:25 81:17,21 84:10 85:5,9,11,14,24 86:1,3,23 87:1, 9 88:24 91:18 92:18,24,25 93:6 104:20,22 105:7 116:1,7 117:2, 3 118:4,13 122:15 127:1,18,22, 23 129:4,10,13,22 134:16 147:23 155:3 157:6 166:23 168:21 169:7 174:6,24 180:1 184:21 201:2 219:1 225:11

**knowledgeable** 42:6 58:1 69:16 70:2,4,16 140:25

---

**L**

**label** 47:11

**Lack** 73:10

**lacquer** 39:23 108:15 199:12

**late** 130:13,17 134:5 151:4 168:9

**lawsuit** 64:23 191:25

**lawyer** 6:3

**lay** 24:20

**laying** 115:4

**layout** 48:2 85:12

**lead** 155:25 183:25

**leadership** 9:7 183:19

**leading** 83:21 115:20 124:9 126:23 129:9 154:3 200:20

**learn** 180:7

**learned** 77:10

**learning** 24:7

**leased** 59:3

**leave** 102:10 115:4,7,12 116:6 139:12 142:24 144:3,16 149:20 155:14 201:14

**leaves** 145:13 146:3

**led** 70:12 166:6

**ledge** 87:24



**left** 12:1,25 13:11 16:12,20, 21:22 22:22 32:14 79:18 98:21 115:2 143:20,21,25 144:20,25 168:8 192:7

**lets** 63:2

**letter** 179:14,18,23 180:12,17 182:14,21,25

**letting** 21:11,12 161:16

**level** 111:12

**levels** 200:20

**liaison** 11:2 78:23

**light** 32:2 108:24 158:21 177:23

**limit** 86:9

**lines** 152:20

**lining** 39:17,18,21

**link** 180:9

**liquid** 55:4,6 56:12 57:6 91:4

**liquids** 55:16 56:4,14,15,20 57:1,15,17

**litigation** 40:21

**live** 124:2

**lived** 6:22

**located** 212:7,10

**location** 38:1 214:18

**locations** 13:9

**long** 6:22 10:1 18:18 43:9 45:21 59:5 60:14 63:17 75:23 96:15 104:20 128:9 144:18,20 150:13, 14 152:17

**longer** 98:20 117:14 139:22 152:22

**longest** 95:8 98:16,17

**looked** 29:14 32:17,23 33:6,7 54:11 100:20,24 158:19 159:11 210:7 216:24 217:16

**loop** 76:5 143:6 147:12 167:1

**loose** 88:14 109:13 157:21 158:8

**lost** 85:1

**lot** 32:7 34:1 36:3 58:24 101:4 150:7 158:10 229:24

**loud** 97:11 119:11

**lower** 201:1

---

**M**

**M-u-s-c-l-e** 11:18

**machines** 39:9

**made** 29:14 53:2 61:5 65:2 70:14 77:7 78:15 149:2 166:7,8 189:14 191:2

**magnified** 203:2

**main** 38:14 81:22 101:24 133:7 151:17 160:19 173:12

**maintain** 200:18 201:2 216:14

**maintained** 25:21

**maintaining** 65:11 69:1

**maintenance** 13:21,22,25 17:22 18:8 24:11,15,16,25 25:16,17 26:4,8,11,18,23 27:4,7 29:13 30:2,17 31:22,25 37:1,18 38:21 45:3,8,12,13 46:1 65:3,7, 22 66:4,9 67:3,8,13,21 68:9,12 69:17,23 70:6,8,19 71:3 84:6 87:21 89:25 98:17,18 103:6 110:17 111:22 112:13 122:11, 15,19 123:1,11,12,17 128:2,7, 18 129:11 131:21,22 135:6,20 141:12,13 144:14 146:15 149:9 171:20 176:8,19,24 191:6,12,14 218:14,24

**maintenances** 66:5

**majority** 221:19

**make** 8:14 10:15 16:21 17:15 23:22 26:8,20 27:2,8 34:12,19 35:24 38:9 46:20 47:12 48:9,17, 22 54:8,10 61:15 67:19 83:18 87:13 88:8 94:22 98:11 99:2 101:3,24 105:3 111:15 112:7 114:2,25 120:13 142:12 144:15, 146:6,14 147:12 186:16 193:17 197:13,16 203:3 210:8,11 213:4 215:9 220:21 224:12 226:20 231:4,9 232:2

**makers** 14:21

**makes** 10:14 61:15 110:21 216:16

**making** 35:8 36:2 53:10,14 66:13 79:17 89:19 97:23 98:14 99:4,5 102:2,25 103:22 112:12 136:13 170:19 190:16

**management** 7:16 183:20

**manager** 13:17 16:16,20,22 17:1,10 20:1 21:1 58:2 103:5 149:14 189:9,10

**manner** 206:2

**manual** 36:21,25 37:6,9,13 38:2,11,25 86:25 218:14,15 224:24

**manuals** 37:22,23

**manufacturer** 55:19,22

**manufacturers** 55:20

**manufacturing** 39:5 79:3 136:2

**Marines** 12:15,16

**mark** 6:5,11,14 20:5 21:17 84:17 123:19 161:19 177:23 202:3 204:16 208:21 216:18 218:11 221:25 225:16

**marked** 161:22,23 179:11,12 202:4,6

**Marler** 166:12,14,16,24 167:2,5 177:15,18,21 178:18 179:14,18 180:13,21 182:13 183:23 184:8

**Marler's** 180:16

**mat** 34:10,19 48:5 92:11,13 105:23

**material** 52:24 56:7 91:16

**Matt** 58:6

**matter** 44:7 58:25 79:5 95:8 141:25 188:1 232:3

**Meaning** 114:25 121:17 207:11 208:11

**means** 144:10 181:23 231:14

**meant** 161:14

**measure** 36:14,15 122:19

**measures** 56:3 65:8 70:8,19 122:16

**mechanical** 33:25 35:12 89:25

**mechanically** 87:23

**mechanics** 23:9 24:21

**meeting** 19:6 26:9 106:17 135:2 144:12,13 170:7,11,16

**meetings** 103:4 106:17

**member** 188:11

**memory** 32:11 95:13 126:9 141:18 162:15 165:23 189:11 217:13

**mention** 7:23 157:7

**mentioned** 7:24 22:4 106:3 203:25 205:2,6 211:21 212:16

**mess** 157:18,20 158:12 160:4 190:17 204:9

**message** 166:12 169:17,21 177:14,15,18

**messaged** 169:24

**messages** 162:2 170:3

**messaging** 169:12

**messed** 159:4

**messy** 157:16

**met** 161:6

**metal** 9:11 12:17,21,25 13:1,6, 11 14:14,24 15:9 17:18 18:3 22:14 48:18 114:15

**method** 206:5 207:13

**mid** 98:10

**mid-work** 100:1 140:3

**midnight** 148:16

**mill** 11:2

**million** 46:13,14,15,24 47:2,3,4, 12

**millwright** 31:21

**millwrights** 30:16 31:25 32:22 54:14 67:9 154:18 155:22 156:18

**mind** 133:13 152:23 158:21 159:2 160:16 231:12

**minute** 162:21

**minutes** 18:19 147:2 201:22

**missed** 94:4 99:19

**missing** 104:9

**misspoke** 95:16 167:19

**mixed** 228:1 230:14

**mixes** 227:11

**mixture** 228:11

**model** 14:24 16:3

**Monday** 168:11,18

**Monroe** 149:5 205:7,8,10 206:9

**month** 44:14 45:2,4 66:19 67:4 71:4 89:12 94:11 152:22 194:23 195:5,20 196:6

**monthly** 66:18,22 123:6 195:25

**months** 45:8,11,16 46:7 67:12, 24 68:7 74:4 89:2 93:15,23 94:11 125:20 195:12,17

**Monticello** 4:24 6:21 12:23 15:25 22:12 24:7 31:3 37:10 63:10 74:11,19 77:17 84:9 85:15 102:15 116:8,15 117:4,15 122:2 152:5 183:19,20 188:16 196:16

**mopping** 108:7

**morning** 4:9,10 135:1 168:9

**move** 6:24 109:19

**moved** 16:3



**moving** 109:20

**Muscle** 9:25 11:16

**Mutual** 4:20 21:24,25 22:2 186:8

**N**

**N-o-b-e-l** 55:25

**nail** 167:7

**named** 187:5

**names** 32:10,15

**narrow** 129:16

**nature** 80:6 119:5 169:4 231:16

**necessarily** 28:12 88:9 129:24 174:1 177:11 187:20

**necker** 144:6

**neckers** 14:7

**needed** 16:1 37:12,13 165:9

**neglect** 129:17

**neglected** 7:23

**Newburgh** 12:21

**nice** 118:6

**Nick** 125:10,11 128:12,15

**night** 148:7,10,19 150:4,21 151:14 168:7

**nights** 144:13

**Nobel** 55:8,22

**nods** 8:16 215:23

**noise** 67:19

**nonferrous** 80:3

**normal** 41:3 42:1,11,18,19 139:22 170:23 171:9 173:12

**north** 212:8

**Northeast** 6:21

**note** 179:19

**noted** 84:20 155:18

**notice** 113:7

**noticed** 154:4,19 156:4

**notified** 141:5

**November** 130:17

**nuance** 24:3

**number** 7:2,8,10 11:23,24 44:15 126:25 132:24 169:10

**numbers** 112:15

**O**

**O'brien** 4:18 15:6 20:5,15 76:20,23 84:17,24 97:12 125:9 131:9,14 132:6 161:19 178:25 179:9 183:7 199:21 201:16,21, 24 202:3 204:23 208:21 215:5 219:17 221:25 222:2,12 224:2, 12 225:13 228:17 230:12,16

**O'brien's** 222:7

**object** 60:22 61:17 65:14 69:20 71:7,23 82:22 84:12,24 92:5 102:17 116:22 119:8 121:6 183:6 184:10 193:7 194:24 196:2 198:6 199:14,19 228:17

**objecting** 84:23

**objection** 65:25 84:20 172:3 181:10,21 183:16 196:21 197:3, 8

**objections** 121:16 122:4 172:14

**observe** 86:5 95:21

**occupied** 15:9 17:12 18:6

**occur** 28:12 67:25 74:20 93:12 114:17 137:18

**occurred** 16:7 63:10,16 114:19 130:25 148:15 155:24 167:12 189:21 190:24 191:1 193:24

**occurring** 62:19 74:17

**occurs** 124:12 161:11

**office** 21:15 37:18,19 38:3 151:25 187:1

**official** 36:16

**Ohio** 132:4

**on-line** 7:16 143:3

**open** 51:2,7,10 87:22 105:22 174:25 220:23

**opened** 218:6

**operate** 85:6,9 154:6

**operated** 195:10

**operating** 41:3 42:18

**operation** 23:3,20 24:19,22 26:5 44:16,17 46:11 59:6 153:18 155:20 194:21 196:10, 15 198:11,23 199:12

**operational** 126:25 129:5 149:9 156:10

**operations** 42:3,20 50:12 65:19 104:23 139:8 149:10

**opinion** 192:4 193:21,22,25 194:12,15 224:1,3

**opinions** 152:25 192:2,6 193:4

**Opportunities** 12:24

**opportunity** 22:23 231:20

**order** 85:10 165:9 172:11

**origin** 192:20 193:2

**original** 59:9 184:20

**originally** 15:24

**OSHA** 210:3 217:7

**Otto** 187:8

**outcome** 114:22

**outlined** 176:5

**outset** 76:7

**oven** 23:21 24:18 29:21 30:4, 11,22 31:15 34:3,9,10,17 35:11, 15,17,25 39:3,4,7,8,9,10,20,25 40:2,4,8,15,23 41:9,17 45:22 46:2,4 48:2,7,16,17,18 49:5,9, 24 50:21,25 51:10,13,14 58:11 59:9,10,20 61:5 65:19 66:11,21 67:16 68:20 69:1 72:2,6,12 73:3 79:11,12,13 80:21 82:16 83:5 85:12,19 86:6 87:16,22 88:1,4 90:17 91:6,19,20 92:4,6,7,11, 14,22 93:7,12 94:14 95:16,22 96:16,20 99:1 101:19 102:3 103:24 104:2,18 105:19 106:4 108:4,8,14,18,23,24 109:1,8 110:12 111:13,22 113:8,9,16,18 115:2,23 118:9,14 121:11,12 125:23 126:18 128:8 129:20 133:1,2,3 134:1,3 135:6,8,12, 21,25 136:9,10,12 137:3,6,7,8 139:11 143:1 145:8,13,14,18 146:3,4 152:17 154:2,6,8,14,19, 21,23 155:1,4,11 156:5,22 157:12,14 159:4,6,7 164:14 165:11 172:2 173:13 174:25 175:7,8,14,24 176:3 185:10 189:22,24 190:2,6,8,25 191:1 192:12 193:15,19 194:7 196:5 197:21,23 198:4,15,23 200:16 207:3,6,9,11,17 208:4 209:11, 14,17,24 210:7,8,15,21,22,23 211:4,6,8,10,13 212:1,17,21,23, 25 213:2,8,9,11,14,17,18 214:2, 11,12,20,23,24,25 215:7,24 216:10,11,21 217:2,20 218:4, 16,19,22,25 219:5,12,24 220:7, 14,18,21 221:5,8,9,17 222:18, 24 223:1,12,19 224:16,17 225:1,10,19,24,25 226:2,4,10, 11,14,25 227:4,9,10,13,18,24 228:8,12 230:3,8,11,14,15,20 231:1

**ovens** 14:6 17:23 18:1 23:16,23 24:2,6,19 26:6 28:2,11,15 31:7, 12 44:7 50:4 65:12 66:10 67:13 68:13 70:6,23 71:5 75:24 76:14 77:17 80:12 82:3 85:5,10 89:2, 14 91:4 113:25 114:4,10 115:16 116:25 126:16 127:3 140:16 161:8 176:12 193:13 194:1 217:16

**overarching** 12:6

**overheat** 216:12 223:2

**overruled** 189:2,3

**oversaw** 13:21 38:20 149:12

**oversee** 18:8 25:17 28:19 110:16,17,18 149:11

**overseeing** 17:22 191:8

**owner** 160:23

**ownership** 225:10

**owns** 59:1

**oxidizer** 52:10,12 62:23,24 90:20

**P**

**p.m.** 131:12,13 202:1,2

**Packaging** 12:18

**packing** 107:11

**paid** 206:19

**palletizer** 144:6,9

**palletizers** 14:4

**pallets** 144:9

**panels** 23:17 31:11,15 32:1 34:12 99:4 101:4 102:1 103:21, 23 107:2 158:1 211:7

**part** 12:18 25:18,20 31:14 41:22 53:9 56:1,25 75:1,2 79:22,24 83:9 90:19 96:3,13 98:17 140:16 147:19 158:9 188:18 198:3 199:2 223:10

**particles** 111:2

**particulate** 35:17 111:12 158:11 159:12

**particulates** 109:25

**pass** 213:12

**passages** 198:3

**passing** 214:15

**past** 99:18 214:7

**Paul** 100:6 101:16 102:19,22 133:5 134:6 142:7,8 160:18,24



161:4,10 162:11 163:4,7,22
164:5,12 165:21,24 166:5,12,24
167:2,8 168:11,15 169:10
170:7,14,16 176:14 177:1,20
178:12 179:3,6,14,18,23 180:2,
11 183:5,10,15 185:14 209:18

**Paul's** 176:5 184:13 190:2

**pay** 206:22

**paying** 6:17

**peak** 48:18

**people** 26:1 27:21 32:8 38:21,
23 57:9 93:5 101:21 114:2
132:19,24 165:10,12

**percent** 35:10 101:20 175:16

**perf** 34:10,18 35:6,18,24 36:6,
13 48:22 87:24 98:12 99:2
230:5

**perfect** 47:9

**perforation** 197:11

**perform** 27:4 29:21 77:20
78:17 81:13 85:10 86:19 87:16
88:19 116:20 121:3,11 206:13

**performance** 29:25 30:4 34:17
65:18 89:14 94:13 113:5 134:18
197:20 206:8,11,14

**performed** 30:11 31:20 32:12
119:16 122:1 124:14 126:14
127:17 128:2 129:8 139:17
141:1 194:23 195:5 224:25

**performing** 47:15 65:21 85:4
112:22 116:8,9 122:16 134:21
161:11 196:5

**performs** 29:8 117:14

**period** 127:15 129:8

**periodic** 69:17 70:8,17 71:3
123:11

**person** 19:12 69:16 70:5,11
78:22 125:5 161:6 170:8 184:9

**personal** 163:23

**personally** 81:8 184:19 189:14
192:2

**phone** 7:2,9 11:23,24 19:12,13
117:20 150:1 163:10,11,12,14
164:15,25 169:10,22 170:5
185:12

**photograph** 203:10,13

**physical** 89:21

**physically** 30:21 31:6 83:16

**pick** 222:19 224:17

**picture** 185:8 202:14,16,19,20,
24

**piece** 48:4 117:10

**pile** 99:19

**PIN** 40:4,8 68:13,20 133:2,3
137:3,5,7,8 159:6 165:11

**place** 19:11 24:17 25:1 26:2,12
27:9,12 36:5 57:9 59:17 76:3
89:1,7 95:22 115:3 124:1
125:19 128:23 129:21

**plaintiff** 22:1

**plan** 151:19 152:12

**planned** 139:19

**plans** 6:24

**plant** 4:23 11:2 12:19,22,23
14:21 20:1 23:15 31:3 52:9
56:13 57:11 59:8 68:9 74:19
93:4 97:21 103:5 113:12,14
114:18 117:2 135:5,7,9 148:11,
12 149:12 151:18 152:12
156:16 157:19 158:3,7,25
160:4 174:21 182:5 184:25
186:3,5,13 189:9 203:19 204:6
212:8,9,11

**plant's** 54:7,10

**plants** 10:15,23 11:1

**plates** 34:11,18 35:6,18,24,25
36:6,13 48:22 87:24 98:12 99:2
230:5

**play** 39:25 76:4,5

**plugged** 34:20,23,24 35:8 36:3

**PM** 25:8 122:25 123:17 124:3

**PMS** 122:24

**point** 12:11 40:19 54:17 57:21
67:7 80:22 81:23 86:9 94:12
99:18,22 103:14 104:14 114:9
121:18 132:18 133:7 143:20
145:14 154:4 158:25 160:6,19
167:11 168:22 173:3 182:6,9
183:10,21 184:9 185:7,9 189:14
192:9 211:11 213:22 215:15,18
216:5,16 217:5 218:6,7 228:18,
21 229:20

**points** 57:14,18

**policies** 124:5

**policy** 122:14,21

**poor** 30:4

**poorly** 67:1

**pop** 77:25

**portion** 86:25

**position** 14:13,22 17:11,12
180:22

**possibly** 95:17 125:3,17 145:4
163:11 228:13

**post** 141:14

**post-work** 142:4

**PPE** 57:12

**precautionary** 56:3

**precedes** 165:24

**preceding** 119:16

**predecessor** 125:1,4,5

**Premier** 131:21,22 176:8,19,24
191:6,12,13

**preparation** 18:22 37:6

**prepare** 18:11

**prepared** 96:4,16,20

**preparing** 25:16

**present** 11:9 132:13 148:3
186:7,11

**presidents** 184:4

**pressing** 94:15

**pressure** 158:2 204:2

**presume** 75:22

**pretty** 10:21 11:1 13:21,24
24:17,20 25:8 29:15 39:18
41:14 48:4,20 71:17 109:24
150:6 155:9,13 157:16 158:5
178:1

**prevent** 198:14

**Preventative** 123:1

**prevention** 57:2

**preventive** 24:16 37:1

**prevents** 55:15

**previous** 63:9 87:13 194:18

**previously** 15:8 35:1 42:10
117:18 137:16 139:6 219:21

**printer** 40:6 68:11 144:5

**printers** 14:3,6

**prior** 39:9 40:2 62:5,10 76:15
92:7 127:16 128:1 135:1 189:24
206:17 209:14

**priority** 159:12

**problem** 54:25 74:11,14 114:4
125:23

**problems** 102:6 104:2 126:25
127:2 129:5 141:21 155:19

**procedure** 24:25 25:22 96:1
118:13 156:5,6 176:6,11

**procedures** 86:5 95:21 124:5

**process** 5:6 13:13,16,19 14:17,
24,25 16:1,2 23:9 25:25 35:21
39:6 41:16 75:2 79:3 93:13
108:13 112:9 143:1 171:11
200:10 227:20

**produce** 60:5 201:9

**produced** 60:14 62:3 147:16

**producing** 22:15

**product** 39:16 55:10 94:18
159:1 197:22 200:7,22,23,25

**production** 16:20 35:11
143:24 147:21 149:14,17,22
152:19 153:2,13,15 155:14,20
189:10

**products** 22:16 62:2 200:22

**profession** 136:5,7

**program** 9:2 24:16 123:17
124:3

**progress** 97:5 98:14 99:10,13,
17 100:2,18 101:8 102:25
103:5,11,13 104:8,17 106:8
134:22 140:4,12 191:9 217:4

**progressing** 140:8

**project** 59:17

**promoted** 16:16,22 17:1,6,9
161:5

**prompted** 153:23

**prone** 199:11

**proper** 48:23 57:12

**properly** 34:13 99:5 102:1
104:1,5 210:9,15 211:19

**protection** 100:15

**provide** 33:12 64:18 86:4,24
131:20 165:6 188:8

**provided** 18:25 106:7

**pull** 32:1 109:21 213:8 230:1,22

**pulled** 98:12 203:12 214:23
215:21,22 227:9,10 229:21,22

**pulling** 112:1 214:19 215:20
230:22

**pulls** 213:17,19 219:5

**purchased** 58:15

**purely** 126:1 179:17

**purpose** 39:4,7,11 41:13
108:16 110:5 210:6,14 211:13,
18,23 212:1,14 213:10 222:9
230:5



USDC IN/ND case 4:16-cv-00042-TLS   document 105-1   filed 10/07/19   page 959 of
12
Dale Spencer
November 03, 2017
Index: purposes..restroom

purposes .29:22 212:4.

pursuant 125:19

pursue 22:23

push 94:11,20 221:23 229:6,14

pushed 19:8 220:12

pushes 213:18

put 34:12 39:15 59:17 73:17
95:21 99:4 104:1 108:22 115:19
130:23 150:10 158:18 192:9
199:6 225:18

puts 157:17

putting 158:9

## Q

qualifications 136:14,16

quality 10:9,19 11:11 94:16,19

quarterly 67:11

question 5:11,14 8:12 23:16
24:11 25:5 27:19 38:6,8 42:17
43:2 44:5 66:7 69:25 70:15
90:22 101:16 106:12 115:18
128:1 129:11,23 156:13 165:22
179:16 181:16 183:8 194:25
195:1 202:13 216:17 219:23
220:16 223:14,15,21 224:11

questioning 100:10

questions 5:7,8,9,20,23 58:24
77:5 102:8 134:14 136:19
204:11,16,18 215:5 218:11
219:17 222:10 225:16

quick 15:3 168:17 201:25

quota 46:22

quote 149:3

## R

rail 34:5

rails 34:11

rained 157:13

raise 40:19

ran 153:4

range 73:17

rank 112:6

rate 140:8

reach 83:24 87:20,25 88:11
93:20 138:11 175:22

reached 126:5 174:7

reaching 48:18 93:17 .177:6

read 162:17 172:7

reading 171:16

ready 95:22 99:3 145:18 146:16
218:5

real 108:21 201:25

reason 75:5 85:8 89:19 90:24
166:17 167:21 189:18,19
190:22 197:16 200:14,15

reasons 35:12

reassembled 210:9

recall 21:9 32:16 41:6 63:23,24
64:1,2 67:5 77:24 95:10,11
106:6 107:23,24 114:22 117:17,
18 119:18,22,24,25 120:2,9,20
125:18 126:22 127:16,24 128:3
132:20,21 133:17 134:20,21
135:3 136:19,22 138:21 139:14,
21,23 140:2,7,11,21 141:4,21,
24 144:18 145:7,10 147:20
148:13,24 150:1,3 151:13
153:25 161:9,12 162:14,23
164:23 165:5 168:6,25 169:3
170:7,19 185:16,22,25 186:2
188:14

recalled 150:17,18

receive 23:1 24:13 56:2 86:15,
18

received 185:19

recess 15:4 76:21 131:12 202:1

recirc 48:6,9,11 49:21,22,23
50:3,12,21 51:20,24 52:7 72:9
109:18 114:6 175:22 213:19
215:12,16,18 216:2,7 217:17
219:2 220:3,19 221:14 222:15
223:6,12 226:24

recirculate 213:10

recirculated 226:9,13 227:14,
25 228:10 230:13

recirculates 212:23 214:11
221:14 226:25

recirculating 212:17,20,24
213:7,16 214:10 221:1 222:17
228:4 229:5 230:8,18

recirculation 48:11,24 49:13,
17 214:15 215:8 219:3 225:22
227:12,20 229:17,19,23 230:7

recollection 106:22 132:9
144:24 170:13

record 4:11 76:20 124:22
147:10 204:21 209:1 222:6,8,11

records 95:19 147:7 201:2,7

recover 151:20

recovery 152:12

**RECROSS-EXAMINATION**
218:10 225:15

**REDIRECT** 215:4 219:16

reduced 197:1

redundant 67:14,21

refer 9:15 41:18 55:6 167:2

reference 37:13 65:2 120:1,12,
15

referenced 101:9

referencing 17:2

referred 9:14 17:20 40:17
135:22

referring 33:8 40:20,21 50:6
62:25 79:20 92:1 101:8 127:19
172:12 175:6 192:11,14

reflect 222:6

refresh 170:13

regard 231:13

regular 151:5 164:12 200:25

regularly 45:12 164:13 196:12,
18 197:2

regulations 217:7

reignited 150:17

relate 147:24

related 17:25 22:4 90:13
136:20

relates 147:18 164:14

relating 169:5

relation 4:21 64:23 159:14

relationship 76:7

relationships 27:11,16

relative 200:19

reliability 196:3

relying 231:20

remain 107:9

remember 32:21 95:4 105:8
120:14,18 121:8 124:2 134:9,10
137:9,10 142:15 145:5 151:22
164:4 166:2,5 169:9 187:13

remove 31:15 79:11 82:15
171:21 176:15 198:19

removed 31:11

rep 10:9,19 11:11

repair 53:15,17

repairs 28:20,24 38:21 127:16
128:18 129:8

repeat 5:13 121:7

rephrase 5:13 23:6 83:7 100:22
108:1

replace 54:21 55:3

replaced 59:16,18 125:6

replacement 118:8

report 149:6

reported 13:23 149:8 205:6,7

reporter 8:4 231:8,21

represent 6:3,14,17 10:22 11:1
167:13 186:4 188:2 202:9,16

representation 120:13

representative 105:11

representatives 19:20 186:7

represented 166:16 203:9

request 140:12 170:14,19
201:8

require 18:8 46:2 60:19 71:12
85:5,9 86:4

required 24:14 36:21 38:24
56:10 172:24

requires 27:24

rescheduled 122:8

reserve 231:7

residue 82:9 198:24

resolve 30:25

respect 24:6 25:16 40:1 56:3
61:14 63:13 74:12 78:21,24
116:2 122:13,16,20 128:16,17
129:1 178:18 184:9

Respectfully 222:12

responding 180:12

response 64:19 169:1 176:4
180:14 216:17

responsibilities 13:15 15:22
17:17 78:4 135:10 191:14

responsibility 25:18 26:7,24
27:2 54:8,10 79:22 129:25
135:14 136:1 178:15

responsible 13:16 53:13 70:10
146:13

rest 110:6 144:4

restroom 131:10



**result** 106:8 141:22 147:16, 152:18 176:18

**resulting** 196:10,15

**results** 91:3

**resume** 139:8

**resumed** 149:23 153:2,13

**resumes** 149:17 153:15 155:14

**resuming** 147:21

**retain** 147:4

**retained** 6:3,5,11,13 188:3

**returns** 212:21

**review** 18:22 37:4,6 231:9,23

**reviewed** 19:14 37:2

**reviews** 206:8,11,14

**rid** 63:2 90:25

**ride** 48:5

**ring** 187:18

**rip** 158:5

**ripped** 158:7

**ripping** 157:24

**rise** 197:6

**risk** 177:25 178:23 193:18,19 196:9,15,25

**Rodney** 166:16 177:15,18,21 179:3,5,14,18 180:2,13 184:8

**role** 14:18 15:6,11,15,18,19 17:21 18:6 25:25 26:8 28:19 36:20 39:25 76:4,6 135:11 160:20 177:22 178:18 184:11 191:5,7

**Ron** 32:22,24

**room** 114:12

**roped** 80:15

**routine** 10:24 29:18 65:3 67:10 156:2

**routinely** 29:11

**RTO** 52:10 62:23 63:13 64:20 211:21,23 212:7,13

**ruler** 36:17

**rules** 5:4 210:3

**run** 43:3 47:8 48:17 108:14,22, 25 109:21 110:11,24 111:7,9,16 113:20 114:12,23 115:20,22 127:10 142:19,21 143:14 144:18 145:13 146:20,24 147:2 149:8 153:22 156:22 175:17 199:23 200:5,9,22,23 203:11

231:1

**running** 46:10 47:8 55:11 93:5, 19 111:18 139:4 142:16,23 143:7,11,21 144:1,10 145:7,14, 20 146:4 152:13,14 153:1,19 155:10,15 157:1 189:25 195:20 199:25 200:2,5,24,25

**runs** 50:15,17,18 52:9 92:8 102:6 143:9 147:5 195:24

### S

**S-a-u-l** 58:8

**S-h-o-a-l-s** 11:18

**safe** 56:2

**safes** 127:10

**safety** 58:4 145:15,17 210:3

**satisfactory** 143:10,18 144:19

**satisfied** 89:12 146:21

**Saturday** 151:6 167:15,20,22 168:2

**Saturdays** 151:9

**Saul** 58:6

**schedule** 54:19 68:7 69:10 89:5,9 93:21 94:1 121:10 123:5 125:19 126:7 164:24 165:10 195:16

**scheduled** 13:22 28:8 30:2,8 45:7 75:16 96:1 120:16 121:4, 15,17 122:3 126:1 151:5 165:1,

**schedules** 122:12

**scheduling** 19:6 94:8 120:9 121:24 165:14 191:9

**Scholten** 133:5 160:18 161:10 162:11 163:22 166:12 177:20 179:14,18,23 180:23

**school** 7:15,17,18 8:18,20

**scope** 210:18

**Scott** 187:6

**scrape** 82:8 88:4 136:9

**scrapers** 80:5 88:10 118:22

**scraping** 175:18

**screws** 115:3

**season** 130:23

**section** 171:21 176:15

**secure** 36:1

**SENAK** 6:7 18:20 20:4,7,12,16 60:22 61:17 65:14,25 69:20 71:7,23 72:24 73:2,10 82:22

83:25 84:12,21,92:5 97:9,11, 102:17 116:22 117:24 118:2 119:8,10 121:6,16 122:4 125:7 131:11 132:3,7,9 143:4 155:6 158:22 159:16 160:11 162:8 172:3,14 173:7 176:10 178:22 179:1,7 181:1,10,17,21 183:6,9, 16 184:10 187:15,25 188:6 193:7 194:24 196:2,13,21,23 197:3,8 198:6 199:14,19 201:12,18 204:16 208:25 215:2 218:11 222:1,6 223:24 224:10, 14 225:16 231:5,12,18,25 232:2,5

**send** 201:23

**sending** 163:21

**Senek** 18:14 19:4,20

**sense** 216:16 231:4

**sentence** 171:25

**separate** 71:22 82:20

**separated** 49:9

**serve** 222:8

**service** 218:24

**set** 33:20 48:16 107:4

**Shafer** 6:21

**shaft** 128:4

**shafts** 66:13,16 67:17

**shakes** 129:14

**shed** 177:23

**sheet** 109:22 147:14

**sheets** 108:13 110:5,11,23,25 111:5,9 112:10 142:16,20,21,23 143:7,9,14,17 144:18 145:8,13 146:20,24 147:4 197:11

**shelf** 38:15

**shift** 45:24 47:12 133:22 144:2 151:5

**shifts** 43:4,7,8,9,10,13,15,17, 21,22,24 44:2

**shine** 32:1

**shingled** 103:25

**Shoals** 9:25 11:16

**shop** 37:21,22 67:8

**show** 133:21,25 134:3 147:13 163:17,20 210:22,25 211:3 216:19

**showed** 133:19

**showing** 162:15,23 201:3

**shows** 93:22 123:2,4

**shut** 44:18 45:3,6 46:2,4 50:13 66:21 96:1,5,10,21 104:22,25 113:14 127:8,13,14 155:5

**shutdown** 93:3 94:10 104:24 130:6,8

**shutdowns** 28:10

**shuts** 154:25

**shutting** 96:3 127:12

**sic** 55:25

**side** 23:17 34:11 99:4 103:21, 23,24 129:14 211:7 212:8

**sides** 31:12

**sign** 232:4

**signature** 231:7,8,18

**significance** 116:18

**significant** 152:23 153:11 155:9,13 158:21 159:14,19

**similar** 12:22 13:18 14:13 169:4

**simple** 48:4 116:6

**sir** 44:5

**sit** 114:5 178:17 194:5,6

**site** 86:8 97:20,24 107:13,14

**sits** 50:20

**sitting** 49:11,12 150:5 159:8 229:2

**situation** 28:22 126:22 150:7 159:21,23 220:22

**six-month** 94:4 95:9 126:1

**size** 199:24

**small** 103:25 220:10

**smaller** 200:2

**smoking** 190:21

**smolder** 114:3,5 194:6

**smoldered** 114:3

**smoothly** 65:20 149:20

**snuff** 53:11

**solvents** 41:15

**sort** 23:1 33:12 64:22 123:9 168:4 184:17

**sorts** 22:16

**sound** 226:20

**sounds** 15:10 20:14,16 32:5,7 40:22 54:18 55:12 73:7 87:18 106:21 109:24 123:21 141:18



156:11 165:22 166:23

**source** 50:22,25 51:9 230:10

**sources** 225:18

**Soyk** 187:8,16

**space** 30:19,21 31:1,3 209:22, 25

**spark** 113:22 114:3,5 115:8,16 192:8,11,17 194:5

**spark-resistant** 80:4

**sparks** 115:1

**speak** 7:24 18:14 19:19 69:4 173:21 185:14,18

**speaking** 19:9 145:19

**specific** 14:1 24:5,13 33:19 37:9 41:5 44:25 55:5 63:18 84:16 95:7 106:7 116:1,2 126:9 141:18 165:23 168:23 170:19 189:18 190:21 192:22

**specifically** 6:11,13 38:1,10,13 58:11 88:20 95:5 119:4 126:18 145:7 164:4 166:2 176:13 191:25 216:19

**specification** 200:4

**specifications** 39:13

**specifics** 116:23 128:11 166:10

**speck** 203:1,14

**speculating** 138:19

**speculation** 174:15 182:12

**speculative** 193:5

**speed** 25:21 106:13

**spell** 10:4 11:17 20:4,7,9 55:23 58:7 125:13

**Spelled** 33:1

**spellings** 231:15

**Spencer** 4:12 20:25 22:4,5 33:8 53:23 131:7 138:6 204:17

**spend** 5:4 80:11 135:11

**spill** 57:6,10,11

**spoke** 18:15 20:17,18 134:6

**spoken** 19:4

**spot** 99:19 104:10

**spotless** 111:11

**spray** 14:6,10 39:8,9,11,14 40:13 55:7,15 90:3 199:6,8,13 200:11,17

**spraying** 157:21 204:2

**sprays** 55:12,21

**squirrel** 41:18,24 42:2 51:16, 18,20,22,24 52:5,16,21 79:20 83:1,5,22 91:9 100:3 101:13 138:10 175:3 210:25 214:7 216:19 217:22 228:22 229:4

**stable** 16:5

**stand** 58:3

**standing** 204:1

**stands** 97:11

**start** 7:17 16:9 34:1 60:21 93:13 97:25 104:2 111:4,5,16 112:10 113:23 128:23 134:2 142:23 143:1,11 176:16,18

**started** 11:6 22:11 59:6,8 77:15 124:12 131:25 144:1 153:5 160:24 173:11,17,18,22 174:8, 16,18 175:7 177:3 180:18,23 181:9,18 182:1,2,7,10,19,20,22, 23

**starting** 12:7

**starts** 146:4 149:24 175:3

**startup** 146:2

**state** 4:11

**statement** 136:13 173:14 183:2 188:7 194:21 195:2,3,24 198:9

**statements** 194:4

**stay** 80:14 143:17 149:16 193:15

**stayed** 80:15

**staying** 98:15

**stays** 216:2

**steel** 60:10,11,14 61:16,23

**step** 66:17

**steps** 172:24 173:1

**stick** 115:15 133:13 156:12

**sticks** 140:5

**stipulated** 208:22

**stop** 5:11 15:2

**stove** 198:25 199:1

**straight** 195:2

**stray** 89:20

**strayed** 73:21 95:8

**Street** 11:16

**strictly** 88:12 99:24

**strike** 62:17 171:2

**structure** 48:1 50:19

**studies** 196:4

**stuff** 21:19 29:18 92:12 107:4 109:8 110:6 157:21,23,24 158:10,20 160:3,9 187:20 198:25

**substance** 134:10

**substantially** 196:11,17 197:1

**substantive** 5:23 99:14

**substantively** 21:6

**successor** 125:7,8 131:16

**sued** 4:19 191:21

**sufficient** 89:13

**suggested** 129:19

**summary** 12:7

**summer** 150:25

**superintendent** 13:13,16,20 14:18,24 15:1 16:3 25:25

**supervise** 205:12,13

**supervising** 102:14,19

**supervisor** 112:14 205:2

**supervisors** 57:9 149:2

**supplies** 10:14

**supply** 206:24

**support** 10:21

**supposed** 19:1 33:13 89:15 171:5,13 172:1

**surface** 203:7

**surmise** 51:8

**surprise** 116:24

**surrounding** 169:20

**suspect** 163:20

**sweep** 108:7

**switch** 60:19 61:15

**switched** 60:17

**switching** 124:10

**synonym** 139:15

**system** 52:2 110:3

---

**T**

**T-r-e-j-o** 125:14

**table** 229:3

**takes** 52:12 96:8 113:22 115:15

194:5 212:20 213:16 214:10

**taking** 19:11 23:14 66:17 139:21 180:22,23 183:25

**talk** 20:21 21:3,6 31:10 42:13 49:4 54:1,2 58:11 100:6 144:14 184:20 188:11

**talked** 17:17 19:22 22:9 47:24 90:2 122:11 134:22 140:11 141:14,24 142:16 154:24

**talking** 8:8 15:7 16:10 33:14 36:10 41:19 50:19 54:9 69:18 70:9 76:24 84:18 85:18 88:21 90:12 100:15 117:25 123:6 124:4 126:17 128:19 137:16 146:8 174:16 217:3 224:22

**target** 199:23 200:18

**task** 82:20 97:25 98:15 103:1 110:14 113:5 212:14

**tasks** 65:20 66:18,24 123:10

**team** 13:22 26:4,11 106:19 151:18 178:15

**tear** 71:18

**Tech** 4:19 68:16 71:20 73:1 75:15 76:6,12,15,16,25 77:8,16 78:7,16,21,23 79:1,6,25 80:23, 25 81:12,18 82:3,8,25 83:4,19 84:3,8 85:4,14,24 86:2,5,8,18, 24 88:21 90:24 92:20,21 93:18, 20,22 96:17,24 97:2,16 102:6 105:10 106:8 107:7,8,12,21 108:11 109:7 110:9,11 112:21, 25 115:20 116:5,7,14,19 117:6, 14 118:10 119:6,15,20 120:8,10 121:3,10 122:1 124:6,14 126:5 131:16 132:14,19 133:7,18 134:14,18 135:23 136:20,23 139:7,12,17 140:13 141:1,4,25 142:19 143:6 145:12,19,24 146:3,11,12 160:20 161:10 165:6 171:5 172:1,12 178:13 179:19 186:9 188:15 190:10 191:22 205:10,12,17,19,22,24 206:2,5,10,13,16,22,24 207:2,5, 8,19,22,25 208:2,3,7,17,22 209:5,13,16 210:20,21 211:14 216:18 217:21 218:13,15,18,21 224:23,25 225:9

**Tech's** 77:11 102:15 112:21 113:4 126:19 136:17 142:24 187:4 210:18

**technical** 10:21

**telling** 167:19

**temp** 52:25

**temperature** 41:4,11 42:1,11, 19,20 48:16,19 127:11 154:24 155:5 216:14

USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 962 of
1167
Dale Spencer
15    November 03, 2017    Index: temperatures..waive

**temperatures** 127:3

**tenure** 23:2 28:14 29:10 32:13
36:24 37:12 39:5 42:5 44:12
46:12 57:25 58:16 62:8,20
65:22 69:15 70:1,20 73:22
77:14 78:12 80:22 83:20 85:23
86:9 87:3 88:17 94:3 95:1,9,13
106:6,21 107:20 112:19 113:2
116:6 118:6,7 119:13,20
123:23,24 124:23

**term** 46:22 84:14 199:3

**terminate** 206:17

**terribly** 44:24

**testified** 220:19 223:17

**testify** 19:1

**testifying** 222:5

**testimony** 87:13 105:14,15
194:19 197:25 231:14

**text** 169:12,13,17,21,24 170:3
201:23

**texted** 169:15

**Thanksgiving** 130:14 137:19

**themes** 29:19

**theory** 23:20 24:19,22

**thereabout** 16:25

**thereabouts** 59:21

**thermal** 52:10 62:23,24 90:20

**thick** 35:16

**thing** 7:23 22:9,20 51:14 67:13
97:23 99:3 101:24 109:12 116:2
117:1 156:11 189:18 212:16
224:5

**things** 9:8 25:22 28:3 29:25
34:25 53:19 54:6 65:3,4 67:2
68:24 89:17 99:8,22 100:24
101:25 113:7,19 122:12 123:2,
5,7 128:18 146:8,9 149:6 155:3
159:2 167:25 191:9 193:20
217:9

**thinking** 29:6 72:4 181:8

**thinks** 182:19,21

**thought** 85:1 172:19 186:15
190:6 219:20

**thousand** 47:4,21

**threshold** 58:25

**throwing** 114:7

**tie** 100:4,12 217:6,10

**till** 8:11 59:19 168:9,11,17

**time** 5:5 14:18 16:5 17:13
28:10,12 29:9 31:24 34:8,16
35:5,10 46:4 47:18 50:14 55:17
56:16,18 59:6,23 60:13,25 61:3
63:15,18 64:13 66:5 68:10,15
69:25 71:1 75:25 76:11,13,17,
25 77:3,8 78:12 80:9,11,20 82:2
83:21 84:23 85:21 88:25 93:4
95:7 99:11 101:13,23 105:6
106:24 108:2 109:4 110:18
111:3 112:13,20 113:20 114:12,
24 120:10 124:1,15 127:15
129:16,18 130:9,25 133:18
135:12,22 137:7,17 138:19,23
139:7,12 140:2 143:23 144:11,
24 148:13 149:4,14 150:23
153:11 155:15 156:23 159:9
160:24 161:6 164:4 165:2 167:7
168:8 169:1,15 178:12 181:8
185:3 189:15 190:5,13 193:17
194:7 196:4 200:20 201:4
205:2,4,5,16 206:17 218:21,23

**times** 19:3 28:24 29:24 34:1
68:14,16,22 89:24 91:24,25
94:3 101:4 106:10,22 111:19
112:15 113:23 135:3,16,17,18
220:2,3

**tip-overs** 34:2

**title** 10:3,8 11:7 13:11 14:16
15:20 178:23

**today** 4:15,17 6:4,15,18 9:16
18:12 19:1,21 37:7 105:15
127:24 170:3 177:17 178:17

**told** 107:7 126:4 129:15 148:2
209:18

**tools** 79:25 80:2,4,7,8,20,24
81:3,12,19 118:16,17,19,20
119:4 193:12 206:24 207:2,5,17

**top** 35:24 49:5,11,12,19,21
50:20 135:9 180:13 203:24
210:22 211:3 216:20

**topics** 70:3

**total** 160:4

**touch** 104:17 166:24 198:18

**touched** 112:17 134:25

**track** 123:11

**train** 85:1

**training** 9:7 23:1,12,13 24:5,13
25:6 31:2,4 33:12 56:2,8,9,25
57:2 192:20 209:22,25

**transcript** 231:9

**transferred** 12:21

**Trejo** 125:10,11 128:12,15

**trick** 44:5

**trouble** 84:18

**true** 103:17 209:9,10 214:5
219:6 225:19 226:7,14

**truth** 20:8

**Tuesday** 167:9

**turn** 114:6

**turning** 229:4

**Twelve** 43:11

**Twenty-four** 9:2

**two-year** 9:3

**type** 149:6

**types** 31:20 32:12 123:7 231:8

**typical** 43:3 45:22 46:11 47:16,
18 132:24 146:19 171:10 172:1

**typically** 35:4 45:22 98:15
100:4,5,9 130:5 132:23 133:3,
25 137:25 138:19 140:17 141:7,
10 142:9 156:1 172:10,15 217:1
218:3 228:3

---

## U

**Uh-huh** 4:22 5:10,16 7:22 8:9,
13 9:3 10:7 12:5 16:11 17:19
24:12 29:20 32:9 36:7 41:20
45:25 49:1 72:11 89:3 93:16
97:7 105:1,13,17 125:12 129:3
130:22 131:8,17 142:18 162:3,5
165:17 166:13 167:17 170:17
171:18 177:16 180:10,20
186:17 197:12,14 199:4 202:8,
18 203:2 204:13 212:19 219:4,
11 220:9 223:9,13 231:11

**ultimate** 188:20

**unable** 117:18

**unbolt** 171:20 172:8 176:15

**unbolting** 172:5

**uncommon** 198:16

**underneath** 49:17

**understand** 5:11,22 16:21
42:14 44:18 46:21 56:20 58:23
61:8 66:23 70:1 73:7 77:2 78:3
83:18 84:3 85:24 88:8 89:19
90:3,8 92:20 95:6 108:12
113:21 120:18 131:15 147:18
154:12 159:10 160:14,19
178:10 202:21 215:9 220:6
221:9 223:5,10

**understanding** 20:21 27:10
31:9 39:3 45:1 58:9,18,25 60:13
71:2 76:10 77:5 79:6 83:19
84:18 85:3 87:2 89:4 112:25
121:8 126:15 129:23 142:19

**150:1 154:7,10,18,159:11 164:3
170:25 171:4 174:23 177:5
183:18 191:24 214:9 220:24

**understood** 39:22 84:21
127:24 146:6 151:3 219:20
227:7 229:8

**unique** 139:15

**unit** 72:14

**University** 8:24

**unquote** 149:3

**update** 106:18 144:15

**updating** 103:4

**upset** 108:18

**upstream** 47:15

**user** 36:21,25 37:6,9,13 38:11,
24 224:24

**user's** 86:25 218:15

**utilize** 189:16 190:4

---

## V

**vacuum** 79:13 80:5 82:9 87:25
88:1,9,12,13 109:13,15

**vacuumed** 109:9 170:24
171:10

**varied** 107:5 135:16

**varies** 141:12 146:22 147:3

**varnish** 39:24,25 40:7,9 108:22

**vary** 57:15

**varying** 57:18

**vibrations** 29:15

**vice** 184:4

**violation** 210:2

**visible** 99:24

**visits** 10:25

**vital** 197:20,22

**volume** 221:22

**vortex** 48:9 221:5 222:18 230:2

**vortexes** 224:17

---

## W

**wait** 8:11 94:22 168:11

**waited** 168:17

**waive** 231:7,18 232:5



walk  12:9 93:12 104:13 142:10

walked  129:1

walking  105:19

wanted  142:10 146:6 165:8
    180:5 186:15 198:14 207:11

washer  144:5

washing  157:11

waste  57:8

watch  114:1 115:10 193:16

watches  193:13

watching  114:2

water  158:2,4 204:2,4,5

ways  224:2,4,6

week  43:14 44:10 66:20,24
    67:14 120:17 121:5,13 122:3
    151:15

weekend  151:14

weekly  29:16 45:13 46:1 65:4
    66:5,9,23 67:3,18,22 69:17 70:7
    123:6 128:4

weigh  200:14

weight  199:3,16 200:1,2,19,24

weights  199:17,21,24 200:12,
    15 201:3

wet  39:19 204:7

Williston  7:18,20,21 8:17

window  94:5 95:9 130:20

wipe  109:16

wiping  115:7

words  139:16 163:22

work  9:22,23 11:19 12:1,7,11,
    17 14:20 58:10 61:20 81:13
    85:3 86:19 96:24 97:6,14 98:7,
    10 99:10,14 102:7,15,20 108:12
    109:7 112:25 116:21 119:15,20,
    21 121:3 122:1,5 132:13
    134:13,15,19 138:21 139:1,4
    141:1,15 151:5,9 155:3 161:11,
    14 168:1,5,23 187:4 205:10,12,
    13 206:3,6 208:3,7,22 210:18
    211:7,15

worked  10:1 12:20,24 13:1,6,
    23 16:6 26:4 161:3 168:6
    170:15 184:15 208:9,14,15,18,
    20 209:3,6

working  16:7 21:18 22:11
    64:13 99:17 100:8 103:10
    160:25 205:5

works  33:3 228:3

wrapped  53:5

wraps  53:1

writes  182:14

writing  123:2

written  122:14,21,24 123:7
    168:3

wrong  41:1 101:21 189:24

wrote  20:10

Y

year  14:23 15:18 16:17,19 17:3,
    5,9 32:14 56:8 73:18 74:1 82:2,
    5,7 95:14 130:6 137:20 161:5

year's  47:18 137:19

years  12:20,24 13:2,7 54:20
    63:19

yesterday  18:15

York  12:22 114:18

Z

zone  41:11,14 52:7

zones  23:18 41:9,13,17

zoomed  203:6



## Paul Scholten

**From:** Paul Scholten <pscholten@sbcglobal.net>
**Sent:** Tuesday, May 27, 2014 4:04 PM
**To:** 'rmarler@ball.com'
**Subject:** FW: Paul with Air tech

Rodney I did talk Dale Spencer at Monticello after the fire and went over the cleaning with my guys as well. There are 2 fan housings that we clean on top of the IBO ovens that lead to the main exhaust. The cleaning requires us to open the access panel to the fan and clean out the fan and fan housing. This is a process we do every time and did do this time as well. I believe the fire started in the area above the fan housing where we cannot reach unless the duct above the fan housing is removed by maintenance giving access to the main duct. Cleaning above the fan housing is not part of a normal IBO cleaning process. I hate that this happen and maybe from now on the section above the fan housing should be removed so it can be checked and prevent a reoccurrence of this situation. Because we did a normal cleaning I do not feel that this is our responsibility but there needs to be a determination as to where the fire actually started. If you have any questions or need more information my number is 616-836-2352.

Thank you,
Paul Scholten
Air Tech

**From:** Paul Scholten [mailto:pscholten@sbcglobal.net]
**Sent:** Tuesday, May 27, 2014 2:47 PM
**To:** 'Spencer, Jonathan D (Dale)'
**Subject:** Paul with Air tech

Dale I had a meeting with the guys to go over the cleaning for line 2. Everything in the 2 fan housings was cleaned as normal and all the debris was vacuumed out. What was also discussed is maybe what should happen from now on is to have maintenance unbolt and remove the section of the duct above the fan housing so we can get higher into the ductwork above. I have to believe that is where the fire started more in the duct that goes into the main higher above the fan which is not on a normal oven cleaning. I just want to make sure that something like this never happens again. We do good work and I hate to see something like this happen

Paul



0067

1



**Ball Corporation**
10 Longs Peak Drive, Broomfield, CO 80021-2510 (303) 469-3131 Fax (303) 469-0000
Reply to: P.O. Box 5000, Broomfield, CO 80038-5000

Via E-mail and Overnight Mail

May 24, 2014

Air Tech of Michigan Inc.
Attn: Paul Scholten
4652 49th Street
Holland, MI 49923
Tel: (616) 396-0244
pscholten@sbcglobal.net

Re:  Formal notice of potential responsibility regarding May 23, 2014 fire
     at our Monticello, IN plant

Dear Mr. Sholten:

On May 23, 2014 a fire which appears to have started in ductwork that was recently worked on by Air Tech of Michigan Inc, occurred at our Monticello, IN plant. We are currently investigating the cause of this incident and are formally advising you of the potential for responsibility in this matter. We expect full reimbursement for any loss and costs incurred by us as a result of Air Tech of Michigan Inc. work. Please feel free to notify your insurance carrier(s). Any questions in regards to this incident should be referred to Rodney Marler at the contact information below.

Regards,

Rodney Marler
Director Corporate Risk
Ph#:  303-460-2193
Cell#: 303-489-2419
rmarler@ball.com


DEFENDANT'S
EXHIBIT



DEFENDANT'S
EXHIBIT
3

# Exhibit 30

# Material Safety Data Sheet

WB SPRAY LNR 640C692



**AkzoNobel**

---

## 1. Product and company identification

| | | |
|---|---|---|
| **Product name** | : | WB SPRAY LNR 640C692 |
| **Manufacturer** | : | Akzo Nobel Packaging Coatings |
| | | A Division of Akzo Nobel Coatings Inc |
| | | 16651 West Sprague Road |
| | | Strongsville, OH 44136 |
| | | U.S.A. |
| **Validation date** | : | **2013-03-12.** |
| **Print date** | : | 2013-03-12. |
| **Responsible name** | : | Product Safety and Compliance |
| **In case of emergency** | : | 1-800-545-2643 |

---

## 2. Hazards identification

**Emergency overview**

| | | |
|---|---|---|
| **Physical state** | : | Liquid. |
| **Signal word** | : | WARNING! |
| **Hazard statements** | | COMBUSTIBLE LIQUID AND VAPOR. HARMFUL IF INHALED, ABSORBED THROUGH SKIN OR SWALLOWED. CAUSES RESPIRATORY TRACT, EYE AND SKIN IRRITATION. MAY CAUSE ALLERGIC RESPIRATORY AND SKIN REACTION. CONTAINS MATERIAL THAT MAY CAUSE TARGET ORGAN DAMAGE, BASED ON ANIMAL DATA. CANCER HAZARD - CONTAINS MATERIAL WHICH CAN CAUSE CANCER. NOTICE: This product contains solvents. Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. |
| **Precautionary measures** | : | Do not handle until all safety precautions have been read and understood. Obtain special instructions before use. Do not breathe vapor or mist. Do not ingest. Use only with adequate ventilation. Do not eat, drink or smoke when using this product. Avoid contact with eyes, skin and clothing. Keep away from heat and flame. Keep container tightly closed. Use personal protective equipment as required. Wash thoroughly after handling. |

**Potential acute health effects**

| | | |
|---|---|---|
| **Inhalation** | : | Toxic by inhalation. Irritating to respiratory system. May cause sensitization by inhalation. Exposure to decomposition products may cause a health hazard. Serious effects may be delayed following exposure. |
| **Ingestion** | : | Toxic if swallowed. |
| **Skin** | : | Toxic in contact with skin. Severely irritating to the skin. May cause sensitization by skin contact. |
| **Eyes** | : | Severely irritating to eyes. Risk of serious damage to eyes. |

**Potential chronic health effects**

| | | |
|---|---|---|
| **Chronic effects** | : | Contains material that may cause target organ damage, based on animal data. Once sensitized, a severe allergic reaction may occur when subsequently exposed to very low levels. NOTICE: This product contains solvents. Reports have associated repeated and prolonged occupational overexposure to solvents with permanent brain and nervous system damage. Intentional misuse by deliberately concentrating and inhaling the contents may be harmful or fatal. |
| **Carcinogenicity** | : | Contains material which can cause cancer. Risk of cancer depends on duration and level of exposure. |
| **Mutagenicity** | : | No known significant effects or critical hazards. |
| **Teratogenicity** | : | No known significant effects or critical hazards. |

2013-03-12.

CONFIDENTIAL

RIMKUS000057

*WB SPRAY LNR 640C692*

## 2. Hazards identification

| | | |
|---|---|---|
| **Developmental effects** | : | No known significant effects or critical hazards. |
| **Fertility effects** | : | No known significant effects or critical hazards. |
| **Target organs** | : | Contains material which may cause damage to the following organs: blood, kidneys, liver, mucous membranes, lymphatic system, upper respiratory tract, skin, central nervous system (CNS), ears, eye, lens or cornea. |

**Over-exposure signs/symptoms**

| | | |
|---|---|---|
| **Inhalation** | : | Adverse symptoms may include the following: respiratory tract irritation coughing wheezing and breathing difficulties asthma |
| **Ingestion** | : | No specific data. |
| **Skin** | : | Adverse symptoms may include the following: irritation redness |
| **Eyes** | : | Adverse symptoms may include the following: pain or irritation watering redness |

See toxicological information (Section 11)

## 3. Composition/information on ingredients

| Name | CAS number | % |
|---|---|---|
| 2-butoxyethanol | 111-76-2 | 5-<10 |
| butan-1-ol | 71-36-3 | 5-<10 |
| reaction product: bisphenol-A-(epichlorhydrin); epoxy resin | 25068-38-6 | 1-<5 |
| 2-dimethylaminoethanol | 108-01-0 | 1-<5 |
| Formaldehyde | 50-00-0 | <0.1 |
| water | 7732-18-5 | 60-100 |
| 2-PROPENOIC ACID, 2-METHYL-, POLYMER WITH (CHLOROMETHYL) OXIRANE, ETHENYLBENZENE AND 4,4'-(1-METHYLETHYLIDENE)BIS(PHENOL) | 28262-39-7 | 5-<10 |
| 2-PROPENOIC ACID, 2-METHYL-, POLYMER WITH ETHENYLBENZENE, ETHYL 2-PROPENOATE AND N-((2-ME | 64112-61-4 | 5-<10 |

## 4. First aid measures

| | | |
|---|---|---|
| **Eye contact** | : | Check for and remove any contact lenses. Immediately flush eyes with plenty of water for at least 15 minutes, occasionally lifting the upper and lower eyelids. Get medical attention immediately. |
| **Skin contact** | : | In case of contact, immediately flush skin with plenty of soap and water for at least 15 minutes while removing contaminated clothing and shoes. If any product remains, gently rub with petroleum jelly, vegetable or mineral/baby oil then wash again with soap and water. Repeat as needed. Wash clothing before reuse. Clean shoes thoroughly before reuse. Get medical attention immediately. |
| **Inhalation** | : | Move exposed person to fresh air. If not breathing, if breathing is irregular or if respiratory arrest occurs, provide artificial respiration or oxygen by trained personnel. Loosen tight clothing such as a collar, tie, belt or waistband. Get medical attention immediately. |
| **Ingestion** | : | Wash out mouth with water. Do not induce vomiting unless directed to do so by medical personnel. Never give anything by mouth to an unconscious person. Get medical attention immediately. |

2013-03-12.

2/9

**CONFIDENTIAL**

RIMKUS000058

*WB SPRAY LNR.640C692*

## 5. Fire-fighting measures

| | | |
|---|---|---|
| Flammability of the product | : | Combustible liquid. In a fire or if heated, a pressure increase will occur and the container may burst, with the risk of a subsequent explosion. |

**Extinguishing media**

| | | |
|---|---|---|
| Suitable | : | Use dry chemical, $CO_2$, water spray (fog) or foam. |
| Not suitable | : | Do not use water jet. |
| Special exposure hazards | : | Promptly isolate the scene by removing all persons from the vicinity of the incident if there is a fire. No action shall be taken involving any personal risk or without suitable training. Move containers from fire area if this can be done without risk. Use water spray to keep fire-exposed containers cool. |
| Hazardous thermal decomposition products | : | Decomposition products may include the following materials: carbon dioxide carbon monoxide nitrogen oxides halogenated compounds |
| Special protective equipment for fire-fighters | : | Fire-fighters should wear appropriate protective equipment and self-contained breathing apparatus (SCBA) with a full face-piece operated in positive pressure mode. |

## 6. Accidental release measures

| | | |
|---|---|---|
| Personal precautions | : | No action shall be taken involving any personal risk or without suitable training. Evacuate surrounding areas. Keep unnecessary and unprotected personnel from entering. Do not touch or walk through spilled material. Shut off all ignition sources. No flares, smoking or flames in hazard area. Do not breathe vapor or mist. Provide adequate ventilation. Wear appropriate respirator when ventilation is inadequate. Put on appropriate personal protective equipment (see Section 8). |
| Environmental precautions | : | Avoid dispersal of spilled material and runoff and contact with soil, waterways, drains and sewers. Inform the relevant authorities if the product has caused environmental pollution (sewers, waterways, soil or air). |

**Methods for cleaning up**

| | | |
|---|---|---|
| Small spill | : | Stop leak if without risk. Move containers from spill area. Dilute with water and mop up if water-soluble. Alternatively, or if water-insoluble, absorb with an inert dry material and place in an appropriate waste disposal container. Use spark-proof tools and explosion-proof equipment. |
| Large spill | : | Stop leak if without risk. Move containers from spill area. Approach release from upwind. Prevent entry into sewers, water courses, basements or confined areas. Wash spillages into an effluent treatment plant or proceed as follows. Contain and collect spillage with non-combustible, absorbent material e.g. sand, earth, vermiculite or diatomaceous earth and place in container for disposal according to local regulations (see section 13). Use spark-proof tools and explosion-proof equipment. Contaminated absorbent material may pose the same hazard as the spilled product. Note: see section 1 for emergency contact information and section 13 for waste disposal. |

## 7. Handling and storage

| | | |
|---|---|---|
| Handling | : | Put on appropriate personal protective equipment (see Section 8). Eating, drinking and smoking should be prohibited in areas where this material is handled, stored and processed. Workers should wash hands and face before eating, drinking and smoking. Remove contaminated clothing and protective equipment before entering eating areas. Persons with a history of skin sensitization problems or asthma, allergies or chronic or recurrent respiratory disease should not be employed in any process in which this product is used. Avoid exposure - obtain special instructions before use. Do not get in eyes or on skin or clothing. Do not breathe vapor or mist. Do not ingest. Use only with adequate ventilation. Wear appropriate respirator when ventilation is inadequate. Do not enter storage areas and confined spaces unless adequately ventilated. Keep in the original container or an approved alternative made from a compatible material, kept tightly closed when not in use. Store and use away from heat, sparks, open flame or any other ignition source. Use explosion-proof electrical (ventilating, lighting and material handling) equipment. Use non-sparking tools. Take precautionary measures against electrostatic discharges. To avoid fire or explosion, dissipate static electricity during |

2013-03-12.

**CONFIDENTIAL**

RIMKUS000059

| WB SPRAY LNR 640C692 |
| --- |

## 7. Handling and storage

transfer by grounding and bonding containers and equipment before transferring material. Empty containers retain product residue and can be hazardous. Do not reuse container. Keep out of the reach of children.

Storage                    :   Store in accordance with local regulations. Store in a segregated and approved area. Store in original container protected from direct sunlight in a dry, cool and well-ventilated area, away from incompatible materials (see section 10) and food and drink. Eliminate all ignition sources. Separate from oxidizing materials. Keep container tightly closed and sealed until ready for use. Containers that have been opened must be carefully resealed and kept upright to prevent leakage. Do not store in unlabeled containers. Use appropriate containment to avoid environmental contamination. Keep from freezing.

## 8. Exposure controls/personal protection

| Ingredient | Exposure limits |
| --- | --- |
| 2-butoxyethanol | **ACGIH TLV (United States, 1/2011). Notes: 2002 Adoption.**<br>  TWA: 20 ppm 8 hour(s).<br>**NIOSH REL (United States, 6/2009). Absorbed through skin.**<br>  TWA: 24 mg/m³ 10 hour(s).<br>  TWA: 5 ppm 10 hour(s).<br>**OSHA PEL (United States, 6/2010). Absorbed through skin.**<br>  TWA: 240 mg/m³ 8 hour(s).<br>  TWA: 50 ppm 8 hour(s).<br>**OSHA PEL 1989 (United States, 3/1989). Absorbed through skin.**<br>  TWA: 120 mg/m³ 8 hour(s).<br>  TWA: 25 ppm 8 hour(s). |
| butan-1-ol | **ACGIH TLV (United States, 1/2011). Notes: 2002 Adoption.**<br>  TWA: 20 ppm 8 hour(s).<br>**NIOSH REL (United States, 6/2009). Absorbed through skin.**<br>  CEIL: 150 mg/m³<br>  CEIL: 50 ppm<br>**OSHA PEL (United States, 6/2010).**<br>  TWA: 300 mg/m³ 8 hour(s).<br>  TWA: 100 ppm 8 hour(s).<br>**OSHA PEL 1989 (United States, 3/1989). Absorbed through skin.**<br>  CEIL: 150 mg/m³<br>  CEIL: 50 ppm |
| Formaldehyde | **ACGIH TLV (United States, 1/2011). Skin sensitizer. Notes: Substance identified by other sources as a suspected or confirmed human carcinogen. Refers to Appendix A -- Carcinogens. 2000 Adoption.**<br>  C: 0.37 mg/m³<br>  C: 0.3 ppm<br>**NIOSH REL (United States, 6/2009). Notes: See Appendix A - NIOSH Potential Occupational Carcinogen**<br>  CEIL: 0.1 ppm 15 minute(s).<br>  TWA: 0.016 ppm 10 hour(s).<br>**OSHA PEL (United States, 6/2010).**<br>  STEL: 2 ppm 15 minute(s).<br>  TWA: 0.75 ppm 8 hour(s).<br>**OSHA PEL 1989 (United States, 3/1989). Notes: See Table Z-2 for operations or sectors excluded from section 1910.1048 or for which limit(s) is(are) stayed. Sec. 1910.1048 Formaldehyde.**<br>  STEL: 2 ppm 15 minute(s).<br>  TWA: 0.75 ppm 8 hour(s).<br>**OSHA PEL Z2 (United States, 11/2006). Notes: Sec. 1910.1048 Formaldehyde.**<br>  STEL: 2 ppm 15 minute(s).<br>  TWA: 0.75 ppm 8 hour(s). |

2013-03-12.

**CONFIDENTIAL**

RIMKUS000060

WB SPRAY LNR 640C692

## 8. Exposure controls/personal protection

| | | |
|---|---|---|
| Recommended monitoring procedures | : | If this product contains ingredients with exposure limits, personal, workplace atmosphere or biological monitoring may be required to determine the effectiveness of the ventilation or other control measures and/or the necessity to use respiratory protective equipment. |
| Engineering measures | : | Use only with adequate ventilation. Use process enclosures, local exhaust ventilation or other engineering controls to keep worker exposure to airborne contaminants below any recommended or statutory limits. The engineering controls also need to keep gas, vapor or dust concentrations below any lower explosive limits. Use explosion-proof ventilation equipment. |
| Hygiene measures | : | Wash hands, forearms and face thoroughly after handling chemical products, before eating, smoking and using the lavatory and at the end of the working period. Appropriate techniques should be used to remove potentially contaminated clothing. Contaminated work clothing should not be allowed out of the workplace. Wash contaminated clothing before reusing. Ensure that eyewash stations and safety showers are close to the workstation location. |

Personal protection

| | | |
|---|---|---|
| Hands | : | Chemical-resistant, impervious gloves complying with an approved standard should be worn at all times when handling chemical products if a risk assessment indicates this is necessary. |
| Eyes | : | Safety eyewear complying with an approved standard should be used when a risk assessment indicates this is necessary to avoid exposure to liquid splashes, mists or dusts. |
| Skin | : | Personal protective equipment for the body should be selected based on the task being performed and the risks involved and should be approved by a specialist before handling this product. |
| Environmental exposure controls | : | Emissions from ventilation or work process equipment should be checked to ensure they comply with the requirements of environmental protection legislation. In some cases, fume scrubbers, filters or engineering modifications to the process equipment will be necessary to reduce emissions to acceptable levels. |

## 9. Physical and chemical properties

| | | |
|---|---|---|
| Physical state | : | Liquid. |
| Flash point | : | Closed cup: 52°C (125.6°F) |
| Auto-ignition temperature | : | Not available. |
| Flammable limits | : | Not available. |
| Color | : | Not available. |
| Odor | : | not available |
| pH | : | Not available. |
| Boiling/condensation point | : | 93°C (199.4°F) |
| Melting/freezing point | : | 0°C (32°F) |
| Specific gravity | : | 1.014 |
| Density (lbs/gal) | : | 8.462 |
| Vapor pressure | : | Not available. |
| Vapor density | : | Not available. |
| Volatility | : | 83.55% (v/v), 79.94% (w/w) |
| Viscosity | : | Dynamic: 63 mPa·s (63 cP) |
| Dispersibility properties | : | Easily dispersible in the following materials: cold water. |
| Solubility | : | Easily soluble in the following materials: cold water. |
| VOC g/l | : | 447 g/l [Method 24] |

2013-03-12.

CONFIDENTIAL

RIMKUS000061

*WB SPRAY LNR 640C692*

## 10. Stability and reactivity

| | | |
|---|---|---|
| Chemical stability | : | The product is stable. |
| Conditions to avoid | : | Avoid all possible sources of ignition (spark or flame). Do not pressurize, cut, weld, braze, solder, drill, grind or expose containers to heat or sources of ignition. |
| Incompatible materials | : | Reactive or incompatible with the following materials: oxidizing materials |
| Hazardous decomposition products | : | Under normal conditions of storage and use, hazardous decomposition products should not be produced. |
| Possibility of hazardous reactions | : | Under normal conditions of storage and use, hazardous reactions will not occur. |

## 11. Toxicological information

Acute toxicity

| Product/ingredient name | Result | Species | Dose | Exposure |
|---|---|---|---|---|
| 2-butoxyethanol | LC50 Inhalation Gas. | Rat | 450 ppm | 4 hours |
| | LD50 Dermal | Rabbit | 220 mg/kg | - |
| | LD50 Oral | Rat | 250 mg/kg | - |
| butan-1-ol | LC50 Inhalation Gas. | Rat | 8000 ppm | 4 hours |
| | LC50 Inhalation Vapor | Rat | 24000 mg/m3 | 4 hours |
| | LD50 Dermal | Rabbit | 3400 mg/kg | - |
| | LD50 Oral | Rat | 0.79 g/kg | - |
| 2-dimethylaminoethanol | LC50 Inhalation Gas. | Rat | 1641 ppm | 4 hours |
| | LD50 Oral | Rat | 2 g/kg | - |
| Formaldehyde | LC50 Inhalation Gas. | Rat | 250 ppm | 4 hours |
| | LD50 Dermal | Rabbit | 270 mg/kg | - |
| | LD50 Oral | Rat | 100 mg/kg | - |

Conclusion/Summary   :  Not available.

Chronic toxicity

Conclusion/Summary   :  Not available.

Irritation/Corrosion

| Product/ingredient name | Result | Species | Score | Exposure | Observation |
|---|---|---|---|---|---|
| 2-butoxyethanol | Eyes - Moderate irritant | Rabbit | - | 24 hours 100 milligrams | - |
| | Eyes - Severe irritant | Rabbit | - | 100 milligrams | - |
| | Skin - Mild irritant | Rabbit | - | 500 milligrams | - |
| butan-1-ol | Eyes - Severe irritant | Rabbit | - | 24 hours 2 milligrams | - |
| | Eyes - Severe irritant | Rabbit | - | 0.005 Milliliters | - |
| | Skin - Moderate irritant | Rabbit | - | 24 hours 20 milligrams | - |
| reaction product: bisphenol-A-(epichlorhydrin); epoxy resin | Eyes - Mild irritant | Rabbit | - | 100 milligrams | - |
| | Eyes - Moderate irritant | Rabbit | - | 24 hours 20 milligrams | - |
| | Eyes - Severe irritant | Rabbit | - | 24 hours 5 milligrams | - |
| | Skin - Moderate irritant | Rabbit | - | 24 hours 500 microliters | - |
| | Skin - Severe irritant | Rabbit | - | 24 hours 2 milligrams | - |
| 2-dimethylaminoethanol | Eyes - Severe irritant | Rabbit | - | 5 microliters | - |
| | Skin - Mild irritant | Rabbit | - | 445 milligrams | - |
| Formaldehyde | Eyes - Mild irritant | Human | - | 6 minutes 1 parts per | - |

2013-03-12.

CONFIDENTIAL

RIMKUS000062

WB SPRAY LNR 640C692

## 11. Toxicological information

| | | | | | million | |
| | Eyes - Severe irritant | Rabbit | - | 24 hours 750 Micrograms | - |
| | Eyes - Severe irritant | Rabbit | - | 750 Micrograms | - |
| | Skin - Mild irritant | Human | - | 72 hours 150 Micrograms Intermittent | - |
| | Skin - Severe irritant | Human | - | 0.01 Percent | - |
| | Skin - Mild irritant | Rabbit | - | 540 milligrams | - |
| | Skin - Moderate irritant | Rabbit | - | 24 hours 50 milligrams | |
| | Skin - Severe irritant | Rabbit | - | 24 hours 2 milligrams | |

Conclusion/Summary         : Not available.
**Sensitizer**
Conclusion/Summary         : Not available.
**Carcinogenicity**
Conclusion/Summary         : Not available.
**Classification**

| Product/ingredient name | ACGIH | IARC | EPA | NIOSH | NTP | OSHA |
|---|---|---|---|---|---|---|
| 2-butoxyethanol | A3 | 3 | - | None. | - | - |
| butan-1-ol | - | - | - | None. | - | - |
| Formaldehyde | A2 | 1 | - | + | Proven. | + |

**Mutagenicity**
Conclusion/Summary         : Not available.
**Teratogenicity**
Conclusion/Summary         : Not available.
**Reproductive toxicity**
Conclusion/Summary         : Not available.

## 12. Ecological information

**Ecotoxicity**                 : No known significant effects or critical hazards.
**Aquatic ecotoxicity**

| Product/ingredient name | Result | Species | Exposure |
|---|---|---|---|
| 2-butoxyethanol | Acute EC50 >1000 mg/L Fresh water | Daphnia - Daphnia magna - <24 hours | 48 hours |
| | Acute LC50 800000 to 1000000 ug/L Marine water | Crustaceans - Crangon crangon | 48 hours |
| | Acute LC50 1250000 ug/L Marine water | Fish - Menidia beryllina - 40 to 100 mm | 96 hours |
| | Chronic NOEC 1000 mg/L Fresh water | Daphnia - Daphnia magna - <24 hours | 48 hours |
| butan-1-ol | Acute EC50 1983000 to 2072000 ug/L Fresh water | Daphnia - Daphnia magna - 6 to 24 hours | 48 hours |
| | Acute LC50 100 to 500 mg/L Fresh water | Fish - Lepomis macrochirus - 0.1 g | 96 hours |
| Formaldehyde | Acute EC50 0.788 mg/L Marine water | Algae - Ulva pertusa | 96 hours |
| | Acute EC50 12.98 mg/L Fresh water | Crustaceans - Ceriodaphnia dubia - Neonate - <24 hours | 48 hours |
| | Acute EC50 5800 to 7800 ug/L Fresh water | Daphnia - Daphnia pulex - Neonate - <24 hours | 48 hours |
| | Acute LC50 1.41 ppm Fresh water | Fish - Oncorhynchus mykiss | 96 hours |

2013-03-12.

CONFIDENTIAL

RIMKUS000063

*WB SPRAY LNR 640C692*

## 12. Ecological information

Conclusion/Summary          : Not available.

Persistence/degradability

   Conclusion/Summary    : Not available.

## 13. Disposal considerations

Disposal should be in accordance with applicable regional, national and local laws and regulations.  Refer to Section 7: HANDLING AND STORAGE and Section 8: EXPOSURE CONTROLS/PERSONAL PROTECTION for additional handling information and protection of employees.

## 14. Transport information

| Regulatory information | UN number | Proper shipping name | Classes | PG* | Label | Additional information |
|---|---|---|---|---|---|---|
| DOT Classification | UN1263 | PAINT | 3 | III | | - |
| IMDG Class | UN1263 | PAINT | 3 | III | | - |

PG* : Packing group

## 15. Regulatory information

U.S. Federal regulations          : **United States inventory (TSCA 8b)**: Not determined.

   **SARA 302/304/311/312 extremely hazardous substances**: No components were found.

   **SARA 302/304 emergency planning and notification**: No components were found.

   **SARA 302/304/311/312 hazardous chemicals**: 2-butoxyethanol; butan-1-ol; 2-dimethylaminoethanol

   **SARA 311/312 MSDS distribution - chemical inventory - hazard identification**: 2-butoxyethanol: Fire hazard, Immediate (acute) health hazard, Delayed (chronic) health hazard; butan-1-ol: Fire hazard, Immediate (acute) health hazard, Delayed (chronic) health hazard; 2-dimethylaminoethanol: Fire hazard, Immediate (acute) health hazard

State regulations

   **Massachusetts**    : The following components are listed: 2-BUTOXYETHANOL; N-BUTYL ALCOHOL; 2-(DIMETHYLAMINO) ETHANOL

   **New York**    : The following components are listed: 1-Butanol

   **New Jersey**    : The following components are listed: 2-BUTOXY ETHANOL; BUTYL CELLOSOLVE; n-BUTYL ALCOHOL; 1-BUTANOL; DIMETHYLAMINOETHANOL; DIMETHYLETHANOLAMINE

   **Pennsylvania**    : The following components are listed: ETHANOL, 2-BUTOXY-; 1-BUTANOL; ETHANOL, 2-(DIMETHYLAMINO)-

California Prop. 65

   **WARNING:** This product contains a chemical known to the State of California to cause cancer.

International regulations

   **Canada inventory**    : Not determined.

2013-03-12.                                                                 8/9

CONFIDENTIAL                                      RIMKUS000064

WB SPRAY LNR 640C692

## 16. Other information

Hazardous Material                  :
Information System (U.S.A.)



| | |
|---|---|
| | * 2 |
| **Flammability** | 2 |
| | 0 |

Caution: HMIS® ratings are based on a 0-4 rating scale, with 0 representing minimal hazards or risks, and 4 representing significant hazards or risks Although HMIS® ratings are not required on MSDSs under 29 CFR 1910.1200, the preparer may choose to provide them. HMIS® ratings are to be used with a fully implemented HMIS® program. HMIS® is a registered mark of the National Paint & Coatings Association (NPCA). HMIS® materials may be purchased exclusively from J. J. Keller (800) 327-6868.

The customer is responsible for determining the PPE code for this material.

Prepared by                         :  Product Safety and Compliance Akzo Nobel Paints LLC

<u>Notice to reader</u>

The information contained herein is based on data available at the time of preparation of this data sheet and which Akzo Nobel Paints LLC believes to be reliable.  However, no warranty is expressed or implied regarding the accuracy of this data.  Akzo Nobel Paints LLC shall not be responsible for the use of this information, or of any product, method or apparatus mentioned and you must make your own determination of its suitability and completeness for your own use, for the protection of the environment, and the health and safety of your employees and users of this material.

Complies with OSHA Hazard Communication Standard 29CFR1910.1200.

CONFIDENTIAL                                                                                RIMKUS000065

# Exhibit 31

# HMIS LABELING SYSTEM

Calvin uses the HMIS (Hazardous Materials Identification System) to rate chemical hazards. These labels will be found throughout campus but primarily in the Science Building and DeVries Hall. The labels provide the user and responder with a quick summary of the chemical hazards. The label does not include ALL pertinent information. Consult the MSDS to be certain that all hazardous/potentially hazardous properties of the chemical are considered.

The labels have color coded bars that relate to the following hazards:

Blue = Health
Red = Flammability
Yellow = Reactivity
White = Personal Protective Equipment

Labels rate hazards in the Health, Flammability and Reactivity sections on a scale from 0 to 4, 0 being the least hazardous and 4 being very hazardous.

## HEALTH

**0.MINIMAL HAZARD** This material poses no significant risk to health. The materials are listed on the MSDS with the following minimal hazard warning: May be harmful by inhalation, ingestion, or skin absorption. May cause eye irritation. May cause skin irritation.

**1.SLIGHT HAZARD** This material causes irritation or minor, reversible injury on contact with eyes, skin, mucous membranes, or upper respiratory tract. This category includes materials, which are listed on the MSDS as harmful only if swallowed.

**2.MODERATE HAZARD** This material causes temporary or minor, reversible injury. This category includes materials, which are listed on the MSDS as harmful if swallowed, inhaled, or absorbed through the skin.

**3. SERIOUS HAZARD** This material causes major injury upon contact unless prompt remedial action is taken and medical treatment is given. This category includes materials, which are listed on the MSDS as causing severe irritation, or extensive tissue damage.

**4. SEVERE HAZARD** This material causes permanent tissue damage, major tissue damage, or may be life threatening upon a single exposure or with repeated exposures. This category includes materials, which are listed on the MSDS as being extremely destructive to at least one type of tissue, or which may be fatal is swallowed, inhaled, or absorbed through the skin.

**[ ]1 or [ ]\* CHRONIC HEALTH EFFECTS** This material may cause chronic (long-term) health effects or may be carcinogenic (may cause cancer). This superscript designation is in addition to the number listing outlined above.

(A higher rating is awarded to material which is harmful through inhalation or skin contact than that which is harmful through oral ingestion – a type of exposure less likely to occur under routine working conditions. Note that ratings 1 and 2 apply to effects that are largely reversible, while ratings 3 and 4 indicate that exposure may cause permanent damage.)

## FLAMMABILITY

**0. MINIMAL HAZARD** This material is normally stable and will not burn unless heated.

**1. SLIGHT HAZARD** This material must be preheated before ignition will occur. Flammable liquids in this category will have flash points (the lowest temperature at which ignition will occur) at or above 200° F (NFPA Class IIIB).

**2. MODERATE HAZARD** This material must be moderately heated before ignition will occur. Flammable liquids in this category have flash points between 100° and 200° F (NFPA Class II &

Class IIIA).

**3. SERIOUS HAZARD** This material is capable of ignition under almost all normal temperature conditions, and includes flammable liquids with flash points below 100° and boiling point above 100° F (NFPA Class IB & Class IC).

**4. SEVERE HAZARD** This category includes very flammable gases or very volatile liquids with flash points below 73° and boiling points below 100° F (NFPA Class IA).

## REACTIVITY

**0. MINIMAL HAZARD** This material is normally stable, even under fire conditions, and will not react with water.

**1. SLIGHT HAZARD** This material is normally stable, but can become unstable at high temperatures and pressures. This material may react with water but it will not release energy violently. This category includes materials which are listed as being sensitive to moisture.

**2. MODERATE HAZARD** This material is normally unstable and will readily undergo violent chemical change, but will not detonate. This material may react violently with water or may form potentially explosive mixtures with water.

**3. SERIOUS HAZARD** This material is capable of detonation or explosive reaction but requires a strong initiating source or must be heated under confinement before initiation. The category also includes materials which react explosively with water.

**4. SEVERE HAZARD** This material is readily capable of detonation or explosive decomposition at normal temperatures and pressures.

**[ ]1 SPECIFIC CONDITION EFFECTS** This material may react violently or explosively under certain storage conditions or when used in combinations or mixtures with specific other materials. Consult the MSDS (including the footnotes found there) for details.

## PERSONAL PROTECTION

**A:** Safety glasses should be worn when handling this material. This is the minimal rating given to any material.

**B:** Safety glasses and protective gloves should be worn when handling this material. This rating is given to materials which have the potential for skin irritation, or which may be harmful if absorbed through the skin.

**C:** Goggles, protective gloves, and a laboratory apron should be worn when handling this material. This rating is given to materials which have the potential for splashing and which are listed as having a HEALTH HAZARD RATING of 2 or higher.

**D:** A face shield, goggles, protective gloves, a laboratory apron, and an exhaust fume hood should be used when handling this material. This rating is given to materials which are capable of detonation or of explosive reaction. This rating would apply to all materials which receive a REACTIVITY HAZARD rating of 3 or 4.

**E:** Safety glasses, protective gloves, and an exhaust fume hood should be used when handling this material. This rating is given to materials which have the potential for releasing harmful vapor, mist, or dust into the air.

**H:** Splash goggles, a laboratory apron, protective gloves, and an exhaust fume hood should be used when handling this material. This rating is given to materials which, in addition to having the potential for releasing harmful vapor, mist, or dust into the air, also have the potential for splashing. Strong acids, strong bases, and strong organic solvents would fall into this category.

**PLEASE NOTE: SOME PERTINENT INFORMTATION ABOUT REACTIVITY WITH SPECIFIC MATERIALS MAY BE LISTED UNDER FOOTNOTES AT THE END OF EACH MSDS**

# Exhibit 32



Reproduced from Exhibit 1, Rimkus June 2017 Report, Photo 17.

# Exhibit 33

**A** | 91006 | **IN** | MM 05 | DD 23 | YYYY 2014 | 01 | 14-0001281 | 000 | ☐ Delete ☐ Change ☐ No Activity | NFIRS -1 Basic
State | Incident Date | Station | Incident Number | Exposure

**B** Location*

☒ Street address
☐ Intersection
☐ In front of
☐ Rear of
☐ Adjacent to
☐ Directions

Census Tract | 9111 | - | 1

501 | N | SIXTH | ST
Number/Milepost | Prefix | Street or Highway | Street Type | Suffix

Apt./Suite/Room | Monticello | IN | 47960 | -
City | State | Zip Code

**C** Incident Type *

111 | Building fire

**E1** Date & Times          Midnight is 0000

|  | Month | Day | Year | Hr Min Sec |
|---|---|---|---|---|
| Alarm * | 05 | 23 | 2014 | 00:48:00 |
| ☒ Arrival * | 05 | 23 | 2014 | 00:53:00 |
| ☐ Controlled |  |  |  |  |
| ☒ Last Unit Cleared | 05 | 23 | 2014 | 05:33:00 |

**E2** Shift & Alarms

C | 01 | MONT
Shift or Platoon | Alarms | District

**E3** Special Studies

Special Study 1# | Special Study Value

**D** Aid Given or Received *

1 ☒ Mutual aid received
2 ☐ Automatic aid recv.
3 ☐ Mutual aid given
4 ☐ Automatic aid given
5 ☐ Other aid given
N ☐ None

**F** Actions Taken *

11 | Extinguishment by fire
12 | Salvage & overhaul
81 | Incident command

**G1** Resources *

☐ Check this box and skip this section if an Apparatus or Personnel form is used.

|  | Apparatus | Personnel |
|---|---|---|
| Suppression | 0018 | 0049 |
| EMS |  |  |
| Other |  |  |

☐ Check box if resource counts include aid received resources.

**G2** Estimated Dollar Losses & Values

LOSSES: Required for all fires if known. Optional for non fires.

|  |  |  | None |
|---|---|---|---|
| Property $ |  | ,000 ,000 | ☐ |
| Contents $ |  | ,000 ,000 | ☐ |

PRE-INCIDENT VALUE: optional

| Property $ | 003 ,434 ,500 |
| Contents $ | ,000 ,000 |

**Completed Modules**

☒ Fire-2
☒ Structure-3
☐ Civil Fire Cas.-4
☒ Fire Serv. Cas.-5
☐ EMS-6
☐ HazMat-7
☐ Wildland Fire-8
☐ Apparatus-9
☒ Personnel-10
☐ Arson-11

**H1** Casualties ☐ None

|  | Deaths | Injuries |
|---|---|---|
| Fire Service |  | 004 |
| Civilian |  |  |

**H2** Detector

Required for confined fires.

1 ☐ Detector alerted occupants
2 ☐ Detector did not alert them
U ☐ Unknown

**H3** Hazardous Materials Release

N ☒ None
1 ☐ Natural Gas: slow leak, no evacuation or HazMat actions
2 ☐ Propane gas: <21 lb. tank (as in home BBQ grill)
3 ☐ Gasoline: vehicle fuel tank or portable container
4 ☐ Kerosene: fuel burning equipment or portable storage
5 ☐ Diesel fuel/fuel oil: vehicle fuel tank or portable storage
6 ☐ Household solvents: home/office spill, cleanup only
7 ☐ Motor oil: from engine or portable container
8 ☐ Paint: from paint cans totaling < 55 gallons
0 ☐ Other: Special HazMat actions required or spill > 55gal., Please complete the HazMat form

**I** Mixed Use Property

NN ☐ Not Mixed
10 ☐ Assembly use
20 ☐ Education use
33 ☐ Medical use
40 ☐ Residential use
51 ☐ Row of stores
53 ☐ Enclosed mall
58 ☐ Bus. & Residential
59 ☐ Office use
60 ☐ Industrial use
63 ☐ Military use
65 ☐ Farm use
00 ☐ Other mixed use

**J** Property Use*   Structures

131 ☐ Church, place of worship
161 ☐ Restaurant or cafeteria
162 ☐ Bar/Tavern or nightclub
213 ☐ Elementary school or kindergarten
215 ☐ High school or junior high
241 ☐ College, adult education
311 ☐ Care facility for the aged
331 ☐ Hospital

341 ☐ Clinic, clinic type infirmary
342 ☐ Doctor/dentist office
361 ☐ Prison or jail, not juvenile
419 ☐ 1-or 2-family dwelling
429 ☐ Multi-family dwelling
439 ☐ Rooming/boarding house
449 ☐ Commercial hotel or motel
459 ☐ Residential, board and care
464 ☐ Dormitory/barracks
519 ☐ Food and beverage sales

539 ☐ Household goods, sales, repairs
579 ☐ Motor vehicle/boat sales/repair
571 ☐ Gas or service station
599 ☐ Business office
615 ☐ Electric generating plant
629 ☐ Laboratory/science lab
700 ☒ Manufacturing plant
819 ☐ Livestock/poultry storage(barn)
882 ☐ Non-residential parking garage
891 ☐ Warehouse

Outside

124 ☐ Playground or park
655 ☐ Crops or orchard
669 ☐ Forest (timberland)
807 ☐ Outdoor storage area
919 ☐ Dump or sanitary landfill
931 ☐ Open land or field

936 ☐ Vacant lot
938 ☐ Graded/care for plot of land
946 ☐ Lake, river, stream
951 ☐ Railroad right of way
960 ☐ Other street
961 ☐ Highway/divided highway
962 ☐ Residential street/driveway

981 ☐ Construction site
984 ☐ Industrial plant yard

Lookup and enter a Property Use code only if you have NOT checked a Property Use box.

Property Use | 700

Manufacturing, processing

NFIRS-1 Revision 03/11/99

## K1 Person/Entity Involved

Business name (if applicable)  Area Code  Phone Number

☐ Mr., Ms., Mrs., First Name  MI  Last Name  Suffix

Number  Prefix  Street or Highway  Street Type  Suffix

Post Office Box  Apt./Suite/Room  City

State  Zip Code

☐ More people involved? Check this box and attach Supplemental Forms (NFIRS-1S) as necessary

## K2 Owner

Business name (if Applicable): **Ball Corp.**  Area Code  Phone Number

☒ Mr., Ms., Mrs., First Name  MI  Last Name  Suffix

**501**  **N**  **SIXTH**  **ST**
Number  Prefix  Street or Highway  Street Type  Suffix

Post Office Box  Apt./Suite/Room  City: **Monticello**

**IN**  **47960**  State  Zip Code

## L Remarks

Responded to report of an oven fire at Ball Corp. Upon arrival there was nothing showing from exterior. Employees were evacuating the plant. I located a maintenance person and had him show me where the fire was. He directed me back the ovens. I had him secure the power to the ovens. I asked him if anything in or around the ovens reacted with water. He stated no that we could use our hose lines. He was then instructed to leave the building. There was a small amount of visible fire burning the insulation at the top of the eastern most oven. There was almost no smoke in the air. E-2 crew advised to stretch a yard lay. While waiting for the hose line I used dry powder extinguisher to try to extinguish the fire. Hose team arrived and began applying water to the fire. We noticed then that there was also fire on the western oven and the connection between them. T-21 was ordered to get a 35' extension ladder and hand tools so we could access the ventilation tubes directly. We were spraying the ventilation tubes when we heard a loud explosion. I radioed command to advise him of the explosion. We did not have any change of conditions at our location. After a couple of minutes a noticed that we now had black smoke coming out of the seams were the ventilation tubes connected to the ovens. I advised Lt. Hill to stay with the crew while I traced the path of the ventilation pipes. As I was walking the path of the ventilation tubes to the north of our location, I saw a large amount of fire and heavy black smoke rapidly pushing toward the floor. The fire appeared to be very close the walkway we entered through. I radioed command to advise him of the situation and requested evacuation alert be sounded. I ran back E-2 & T-21 crews. I advised that we were evacuation the building. All anterior crews evacuated the building through the same entry door.

End of Initial Officer arrival report.
Rocky Strange

## L Authorization

| | | | | | | |
|---|---|---|---|---|---|---|
| 6572 | Hickman, Robert W. | AC | | 05 | 26 | 2014 |
| Member in charge ID | Signature | Position or rank | Assignment | Month | Day | Year |
| ☒ 6572 | Hickman, Robert W. | AC | | 05 | 26 | 2014 |
| | Signature | Position or rank | Assignment | Month | Day | Year |

| 91006 | IN | MM 5 | DD 23 | YYYY 2014 | 01 | 14-0001281 | 000 | Complete Narrative |
|---|---|---|---|---|---|---|---|---|
| * | State * | \_Incident Date\_ * | | | Station | Incident Number * | Exposure * | |

**Narrative:**

Responded to report of an oven fire at Ball Corp. Upon arrival there was nothing showing from exterior. Employees were evacuating the plant. I located a maintenance person and had him show me where the fire was. He directed me back the ovens. I had him secure the power to the ovens. I asked him if anything in or around the ovens reacted with water. He stated no that we could use our hose lines. He was then instructed to leave the building. There was a small amount of visible fire burning the insulation at the top of the eastern most oven. There was almost no smoke in the air. E-2 crew advised to stretch a yard lay. While waiting for the hose line I used dry powder extinguisher to try to extinguish the fire. Hose team arrived and began applying water to the fire. We noticed then that there was also fire on the western oven and the connection between them. T-21 was ordered to get a 35' extension ladder and hand tools so we could access the ventilation tubes directly. We were spraying the ventilation tubes when we heard a loud explosion. I radioed command to advise him of the explosion. We did not have any change of conditions at our location. After a couple of minutes a noticed that we now had black smoke coming out of the seams were the ventilation tubes connected to the ovens. I advised Lt. Hill to stay with the crew while I traced the path of the ventilation pipes. As I was walking the path of the ventilation tubes to the north of our location, I saw a large amount of fire and heavy black smoke rapidly pushing toward the floor. The fire appeared to be very close the walkway we entered through. I radioed command to advise him of the situation and requested evacuation alert be sounded. I ran back E-2 & T-21 crews. I advised that we were evacuation the building. All anterior crews evacuated the building through the same entry door.

End of Initial Officer arrival report.
Rocky Strange


0105  I responded off duty to a reported fire in an oven at Ball Metal, 501 N Sixth Street. I arrived to find Engine 2 and Truck 21 on scene. Engine 2 had gone to fast attack and Truck 21 crew also deployed into the building. I contacted Captain R. Strange for a sit-rep. Strange advised of a fire in the duct work above a heat treat oven. I asked about the need for Mutual Aid and a second alarm. Strange advised affirmative on both. No water supply had been established by Engine 2. I assumed Command and Captain Strange continued as interior operational command, designated Engine 2. FF Durflinger reported a back injury and was assigned to MPO duties.

0110  Dispatch was advised to issue a second alarm and request a mutual aid Engine for both Idaville and Reynolds FD. Engine 2 began requesting resources, but there were no un-assigned apparatus or personnel on scene.

0102  Engine 1 arrived on scene and was ordered to lay a line from the yard hydrant on the north side of the facility, midway between the building and the Hanawalt Street entrance. Because the sprinkler system had been activated, the yard hydrants were pressurized at 175 psi. Engine 2 intake relief valve was adjusted accordingly. Engine 1 was ordered to take a 35' extension ladder to Truck 21. Engine 1 then supported the fire attack

0119  Engine 2 reported fire under control

0120  Rescue 1 on scene and ordered to render aid to FF Durflinger. She was evaluated and refused further treatment

| 91006 | IN | MM 5 | DD 23 | YYYY 2014 | 01 | 14-0001281 | 000 | Complete Narrative |
|---|---|---|---|---|---|---|---|---|

**Narrative:**

0123   Reynolds Engine 1 on scene and ordered to report to Monticello FD and respond a Medic (for FF Durflinger)

0131   There was an extremely loud explosion from inside the building.  Flames shot through the roof, the external ducting became involved in fire, and smoke conditions immediately worsened by become darker, thicker, and settling to floor level.  An evacuation was ordered for all firefighters.  Initial reports indicated part of the crew was cut off.  Command and Aide deployed into the building to assist in locating Engine 2 and Truck 21.

0132   Mandatory recall for all Monticello Firefighters

0133   Dispatch was ordered to notify Buffalo, Chalmers, and Monon for mutual aid Engine company as well as Monon First Response for mutual aid EMS staffing.

0133 Medic 9 , staffed by Reynolds FD, along with Reynolds Engine 1.  Ordered to staging

0134   Engine 2 and Truck 21 out of the building and PAR all present and accounted for.  Lt Hill and FF Henderson reported smoke inhalation suffered in the egress from the building.  They advised little to no smoke in their area of operation at the time of the explosion so they were not on SCBA.  They encountered rapidly deteriorating smoke conditions on the way out.  Both were offered medical care and both refused.

0135   Idaville Engine 1 on scene and assigned to attack the fire in the external duct system

0136   Engine 2 and Truck 21 were ordered back into the building to locate and attack the fire.  Rescue 1 crew was ordered to staff Truck 21, throw the stick and check the roof.  Fire was reported throughout the duct work but no structural involvement.  Duct work heavily damaged by explosion.  Sprinkler heads in 2 areas were open and flowing.  Rescue  was ordered to vent the roof.  Rescue also reported fire in the ductwork above the roof line.  Engine 2 stretched a 3" line to Truck 21 and T21 used the ladder pipe for a stand pipe and attack the fire.  Rescue also reported the foam insulation between the old and new roof decking was on fire.

0144   Engine 3 on scene and ordered to staging to support the fire attack.

0152   Monon Engine 6 on scene and was ordered to staging to support the fire attack

0156   Buffalo Pump 2 on scene and ordered to staging to support the fire attack.  All crews were rotated through attack, RIT, and roof as needed.  Maintenance staff was consulted about access points for ducting system.  It was decided to cut the ducts open as needed with the K12 saws.

0202   Chalmers Engine 1 on scene and ordered to Level II staging at Monticello FD

0211   Lost radio contact with the roof crew.  RIT was deployed.

0214   Roof crew was located, PAR all present and accounted for.  RIT was ordered to stand down.

0215   Idaville Engine 1 reported fire in the external duct system was out.

| 91006 | IN | MM 5 | DD 23 | YYYY 2014 | 01 | 14-0001281 | 000 | Complete Narrative |
|---|---|---|---|---|---|---|---|---|
| FDID * | State * | Incident Date * | | | Station * | Incident Number * | Exposure * | |

**Narrative:**

0230   Capt Strange of Engine 2 reported an eye injury caused by blow back from hose stream forcing debris into his eyes.   He was treated on scene with ocular irrigation and then returned to work.

0239   Dispatch ordered to contact Mayor Houston of the fire and mandatory recall.

0300   Engine 2 reported fire in the duct work was out.   Began working with maintenance on shutting down the PIV for the open sprinkler head.   One head was shut down quickly, the other continued to run.   After further investigation it was determined the second water flow was caused by damage to overhead plumbing rather than a sprinkler head.   Reynolds Metals staff continued to work on isolating the supply

0301   Rescue 1 (roof) reported fire on the roof was out

0506   Chalmers Engine and Monon First Response were released from staging at Monticello FD. Began atmospheric monitor for Carbon Monoxide.   The main production area was 5 ppm peak.   The warehouse was 40 ppm.   This information was relayed to Ball officials and they were advised to re-enter the building and work on property conservation.   They were advised of the standing water and risk of electrocution and the vent hole that had been cut into the roof

0540   Engine 2 cleared the scene


Robert W. Hickman
Asst. Chief, Monticello FD

**A** | 91006 | IN | MM 05 | DD 23 | YYYY 2014 | Station 01 | Incident Number 14-0001281 | Exposure 000 | ☐ Delete ☐ Change ☐ No Activity | NFIRS -2 Fire

State *   Incident Date *

---

## B  Property Details

### C  On-Site Materials or Products  ☐ None

Complete if there were any significant amounts of commercial, industrial, energy, or agricultural products or materials on the property, whether or not they became involved

Enter up to three codes.  Check one or more boxes for each code entered.

**B1** | ☒ Not Residential
Estimated Number of residential living units in building of origin whether or not all units became involved

On-Site Material (1): 611 | Industrial
1 ☐ Bulk storage or warehousing
2 ☒ Processing or manufacturing
3 ☐ Packaged goods for sale
4 ☐ Repair or service

**B2** | 001 | ☐ Buildings not involved
Number of buildings involved

On-Site Material (2):
1 ☐ Bulk storage or warehousing
2 ☐ Processing or manufacturing
3 ☐ Packaged goods for sale
4 ☐ Repair or service

**B3** | ☒ None
Acres burned (outside fires) | ☐ Less than one acre

On-Site Material (3):
1 ☐ Bulk storage or warehousing
2 ☐ Processing or manufacturing
3 ☐ Packaged goods for sale
4 ☐ Repair or service

---

## D  Ignition

**D1** | 60 | Equipment or service
Area of Fire Origin *

**D2** | 10 | Heat from powered
Heat Source *

**D3** | 66 | Pipe, duct, conduit,
Item First Ignited * ☐ 1 ☐ Check Box if fire spread was confined to object of origin

**D4** | 00 | Type of material first
Type of Material First Ignited * Required only if item first ignited code is 00 or <70

### E1  Cause of Ignition

☐ Check box if this is an exposure report. Skip to section G

1 ☐ Intentional
2 ☐ Unintentional
3 ☐ Failure of equipment or heat source
4 ☐ Act of nature
5 ☒ Cause under investigation
U ☐ Cause undetermined after investigation

### E2  Factors Contributing To Ignition

Factor Contributing To Ignition (1): NN | None | ☒ None

Factor Contributing To Ignition (2):

### E3  Human Factors Contributing To Ignition

Check all applicable boxes

1 ☐ Asleep   ☒ None
2 ☐ Possibly impaired by alcohol or drugs
3 ☐ Unattended person
4 ☐ Possibly mental disabled
5 ☐ Physically Disabled
6 ☐ Multiple persons involved
7 ☐ Age was a factor

Estimated age of person envolved

1 ☐ Male   2 ☐ Female

---

## F1  Equipment Involved In Ignition

☐ None If Equipment was not involved, Skip to Section G

Equipment Involved:
Brand:
Model:
Serial #:
Year:

### F2  Equipment Power

Equipment Power Source:

### F3  Equipment Portability

1 ☐ Portable
2 ☐ Stationary

Portable equipment normally can be moved by one person, is designed to be use in multiple locations, and requires no tools to install.

### G  Fire Suppression Factors

Enter up to three codes.  ☒ None

Fire Suppression Factor (1): NNN | None

Fire Suppression Factor (2):

Fire Suppression Factor (3):

---

## H1  Mobile Property Involved

☐ None

1 ☐ Not involved in ignition, but burned
2 ☐ Involved in ignition, but did not burn
3 ☐ Involved in ignition and burned

Mobile property maker:

License Plate Number:   State   VIN Number

### H2  Mobile Property Type & Make

Mobile property type:
Mobile property make:
Year

### Local Use

☐ Pre-Fire Plan Available
Some of the information presented in this report may be based upon reports from other Agencies

☐ Arson report attached
☐ Police report attached
☐ Coroner report attached
☐ Other reports attached

NFIRS-2 Revision 01/19/99

**I1  Structure Type** *
*If fire was in enclosed building or a portable/mobile structure complete the rest of this form*

1 [X] Enclosed Building
2 [ ] Portable/mobile structure
3 [ ] Open structure
4 [ ] Air supported structure
5 [ ] Tent
6 [ ] Open platform (e.g. pier)
7 [ ] Underground structure (work area)
8 [ ] Connective structure (e.g. tunnel)
0 [ ] Other type of structure

**I2  Building Status** *

1 [ ] Under construction
2 [X] Occupied & operating
3 [ ] Idle, not routinely used
4 [ ] Under major renovation
5 [ ] Vacant and secured
6 [ ] Vacant and unsecured
7 [ ] Being demolished
0 [ ] Other
U [ ] Undetermined

**I3  Building** *
**Height**
Count the ROOF as part of the highest story

| 001 |
Total number of stories at or above grade

| | |
Total number of stories below grade

**I4  Main Floor Size** *

| | , 260 , 000 |
Total square feet

OR

| , | | BY | , |
Length in feet    Width in feet

NFIRS-3
Structure
Fire

---

**J1  Fire Origin** *

| 001 |   [ ] Below Grade
Story of fire origin

**J2  Fire Spread** *

1 [ ] Confined to object of origin
2 [ ] Confined to room of origin
3 [ ] Confined to floor of origin
4 [X] Confined to building of origin
5 [ ] Beyond building of origin

**J3  Number of Stories Damaged By Flame**
Count the ROOF as part of the highest story

| | Number of stories w/ minor damage (1 to 24% flame damage)

| 001 | Number of stories w/ significant damage (25 to 49% flame damage)

| | Number of stories w/ heavy damage (50 to 74% flame damage)

| | Number of stories w/ extreme damage (75 to 100% flame damage)

**K  Material Contributing Most To Flame Spread**

[ ] Check if no flame spread OR same as material first ignited OR unable to determine

Skip To Section L

**K1** | 66 | Pipe, duct, conduit,
Item contributing most to flame spread

**K2** | 35 | Paint, varnish –
Type of material contributing most of flame spread
Required only if item contributing most of flame spread req code is unknown

---

**L1  Presence of Detectors** *
(In area of the fire)

N [ ] None Present ——  Skip to section M

1 [X] Present

U [ ] Undetermined

**L2  Detector Type**

1 [ ] Smoke
2 [ ] Heat
3 [ ] Combination smoke – heat
4 [ ] Sprinkler, water flow detection
5 [X] More than 1 type present
O [ ] Other
U [ ] Undetermined

**L3  Detector Power Supply**

1 [ ] Battery only
2 [ ] Hardwire only
3 [ ] Plug in
4 [ ] Hardwire with battery
5 [ ] Plug in with battery
6 [ ] Mechanical
7 [ ] Multiple detectors & power supplies
0 [ ] Other _____
U [X] Undetermined

**L4  Detector Operation**

1 [ ] Fire too small to activate
2 [X] Operated (Complete Section L5)
3 [ ] Failed to Operate (Complete Section L6)
U [ ] Undetermined

**L5  Detector Effectiveness**
Required if detector operated

1 [X] Alerted Occupants, occupants responded
2 [ ] Occupants failed to respond
3 [ ] There were no occupants
4 [ ] Failed to alert occupants
U [ ] Undetermined

**L6  Detector Failure Reason**
Required if detector failed to operate

1 [ ] Power failure, shutoff or disconnect
2 [ ] Improper installation or placement
3 [ ] Defective
4 [ ] Lack of maintenance, includes cleaning
5 [ ] Battery missing or disconnected
6 [ ] Battery discharged or dead
0 [ ] Other _____
U [ ] Undetermined

---

**M1  Presence of Automatic Extinguishment System** *

N [ ] None Present

1 [X] Present —— Complete rest of Section M

**M2  Type of Automatic Extinguishment System** *
Required if fire was within designed range of AES

1 [ ] Wet pipe sprinkler
2 [ ] Dry pipe sprinkler
3 [ ] Other sprinkler system
4 [ ] Dry chemical system
5 [ ] Foam system
6 [ ] Halogen type system
7 [ ] Carbon dioxide ($CO_2$) system
O [ ] Other special hazard system
U [ ] Undetermined

**M3  Automatic Extinguishment System Operation**
Required if fire was within designed range

1 [ ] Operated & effective (Go to M4)
2 [ ] Operated & not effective (M5)
3 [ ] Fire too small to activate
4 [ ] Failed to operate (Go to M5)
0 [ ] Other
U [ ] Undetermined

**M4  Number of Sprinkler Heads Operating**
Required if system operated

| | Number of sprinkler heads operating

**M5  Automatic Extinguishment System Failure Reason**
Required if system failed

1 [ ] System shut off
2 [ ] Not enough agent discharged
3 [ ] Agent discharged but did not reach fire
4 [ ] Wrong type of system
5 [ ] Fire not in area protected
6 [ ] System components damaged
7 [ ] Lack of maintenance
8 [ ] Manual Intervention
0 [ ] Other _____
U [ ] Undetermined

NFIRS-3 Revision 01/19/99

**A** | 91006 | IN | MM 5 DD 23 YYYY 2014 | 01 | 14-0001281 | 000 | □ Delete □ Change | NFIRS – 5 Fire Service Casualty

FDID * | State * | Incident Date * | Station | Incident Number | Exposure *

**B** Injured Person

Identification Number

1 □ Male  * 1 ☒ Career
2 ☒ Female  2 □ Volunteer

**C** Casualty Number *

First Name: Jennifer
MI: J
Last Name: Durflinger
Suffix

Casualty Number: 1

**D** Age or Date of Birth *

Age: 36 In years  OR  Date Of Birth: Month 7 Day 31 Year 1977

**E** Date & Time of Injury  Midnight is 0000

Date of Injury: Month 5 Day 23 Year 2014
Time of Injury: Hour 01 Minutes 00:00

**F** Responses

Number of prior responses during past 24 hours: 3

**G1** Usual Assignment

1 ☒ Suppression
2 □ EMS
3 □ Prevention
4 □ Training
5 □ Maintenance
6 □ Communications
7 □ Administration
8 □ Fire investigation
O □ Other

**G2** Physical Condition Just Prior To Injury

1 □ Rested
2 ☒ Fatigued
4 □ ILL or Injured
0 □ Other
U □ Undetermined

**G3** Severity

1 □ Report only, including exposure
2 ☒ First aid only
3 □ Treated by physician (no lost time)
4 □ Moderate (lost time)
5 □ Severe (lost time)
6 □ Life threatening (lost time)
7 □ Death

**G4** Taken To

1 □ Hospital
4 □ Doctor's office
5 □ Morgue/funeral home
6 □ Residence
7 □ Station or quarters
0 □ Other
N ☒ Not transported

**G5** Activity at Time of Injury

31 | Handling charged hose
Activity at time of injury

**H1** Primary Apparent Symptom

98 | Pain only
Primary Apparent Symptom

**I1** Cause of Firefighter Injury

Cause of Injury

**I3** Object Involved in Injury

□ None

**H2** Primary Area of Body Injured

31 | Back, except spine
Primary injured body part or area

**I2** Factor Contributing to Injury

Contributing Factor

Object involved in injury

**J1** Where Injury Occurred

1 □ Enroute to FD Location
2 □ At FD location
3 □ Enroute to incident scene
4 □ Enroute to medical facility
5 □ At scene in structure
6 □ At scene outside
7 □ At medical facility
8 □ Returning from incident
9 □ Returning from med facility
O □ Other

**J2** Story Where Injury Occurred

Check this box and enter the story if the injury occurred inside or on a structure

1 □ _____ □ Below grade
Story of Injury

2 □ Injury occurred outside

**J3** Specific Location  Complete as Applicable

65 □ In aircraft
64 □ In boat or ship or barge
63 □ In rail vehicle
61 □ In motor vehicle
54 □ In sewer
53 □ In tunnel
49 □ In structure
45 □ In attic
36 □ In water
35 □ In well
34 □ In ravine
33 □ In quarry or mine
32 □ In ditch or trench
31 □ In open pit
28 □ On steep grade
27 □ On fire escape/outside stairs
26 □ On vertical surface or ledge
25 □ On ground ladder
24 □ On aerial ladder or in basket
23 □ On roof
22 □ Outside at grade
00 □ Other

**J4** Vehicle Type  Vehicle entry is specific to certain case type only

1 □ Suppression vehicle
2 □ EMS vehicle
3 □ Other FD vehicle
4 □ Non-FD vehicle

Remarks

If protective equipment failed and was a factor in this injury, please complete the other side of this form.

NFIRS-5 Revision 8/18/99

**A** 91006 | **IN** | MM **5** DD **23** YYYY **2014** | **01** | 14-0001281 | 000 | ☐ Delete ☐ Change | NFIRS – 5
FID * | State * | Incident Date * | Station | Incident Number * | Exposure * | | Fire Service Casualty

**B** Injured Person
Identification Number
1 ☒ Male * 1 ☒ Career
2 ☐ Female   2 ☐ Volunteer

**C** Casualty Number *

Allan | Roc MI | Strange II | II | 2
First Name | | Last Name | Suffix | Casualty Number

**D** Age or Date of Birth *

Age **41** In years   OR   Date Of Birth **8** Month **18** Day **1972** Year

**E** Date & Time of Injury Midnight is 0000

Date of Injury **5** Month **23** Day **2014** Year   Time of Injury **02:30:00** Hour : Minutes

**F** Responses

**0**
Number of prior responses during past 24 hours

**G1** Usual Assignment
1 ☒ Suppression
2 ☐ EMS
3 ☐ Prevention
4 ☐ Training
5 ☐ Maintenance
6 ☐ Communications
7 ☐ Administration
8 ☐ Fire investigation
O ☐ Other

**G2** Physical Condition Just Prior To Injury
1 ☐ Rested    O ☐ Other
2 ☒ Fatigued  U ☐ Undetermined
4 ☐ ILL or Injured

**G3** Severity
1 ☐ Report only, including exposure
2 ☒ First aid only
3 ☐ Treated by physician (no lost time)
4 ☐ Moderate (lost time)
5 ☐ Severe (lost time)
6 ☐ Life threatening (lost time)
7 ☐ Death

**G4** Taken To
1 ☐ Hospital
4 ☐ Doctor's office
5 ☐ Morgue/funeral home
6 ☐ Residence
7 ☒ Station or quarters
O ☐ Other
N ☐ Not transported

**G5** Activity at Time of Injury
**31** Handling charged hose
Activity at time of injury

**H1** Primary Apparent Symptom
Primary apparent symptom

**I1** Cause of Firefighter Injury
Cause of injury

**I3** Object Involved in Injury
☐ None

**H2** Primary Area of Body Injured
Primary injured body part or area

**I2** Factor Contributing to Injury
Contributing Factor

Object involved in injury

**J1** Where Injury Occurred
1 ☐ Enroute to FD Location
2 ☐ At FD location
3 ☐ Enroute to incident scene
4 ☐ Enroute to medical facility
5 ☐ At scene in structure
6 ☐ At scene outside
7 ☐ At medical facility
8 ☐ Returning from incident
9 ☐ Returning from med facility
O ☐ Other

**J2** Story Where Injury Occurred
Check this box and enter the story if the injury occurred inside or on a structure
1 ☐ ☐ Below grade
2 ☐ Injury occurred outside

**J3** Specific Location Complete as Applicable
65 ☐ In aircraft
64 ☐ In boat or ship or barge
63 ☐ In rail vehicle
61 ☐ In motor vehicle
54 ☐ In sewer
53 ☐ In tunnel
49 ☐ In structure
45 ☐ In attic
36 ☐ In water
35 ☐ In well
34 ☐ In ravine
33 ☐ In quarry or mine
32 ☐ In ditch or trench
31 ☐ In open pit
28 ☐ On steep grade
27 ☐ On fire escape/outside stairs
26 ☐ On vertical surface or ledge
25 ☐ On ground ladder
24 ☐ On aerial ladder or in basket
23 ☐ On roof
22 ☐ Outside at grade
00 ☐ Other

**J4** Vehicle Type Complete ONLY if specified location code used
1 ☐ Suppression vehicle
2 ☐ EMS vehicle
3 ☐ Other FD vehicle
4 ☐ Non-FD vehicle

Remarks

If protective equipment failed and was a factor in this injury, please complete the other side of this form.

NFIRS-5 Revision 8/18/99

# Exhibit 34

*In the Matter Of:*

# BALL CORPORATION

-vs-

# AIR TECH OF MICHIGAN, INC.

# MICHAEL VERGON

October 11, 2017



**CONNOR REPORTING**
111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

3

1                INDEX OF EXAM

2                                          Page

3    DIRECT EXAMINATION . . . . . . . . . . . .5
        Questions by Mark Senak

4

5                INDEX OF EXHIBITS

6                                          Page

     Deposition Exhibits:

7

     Exhibit 1  - CV of Michael A. Vergon, CFI . . . .6
8                 (updated)

9    Exhibit 2  - CV of Michael A. Vergon, CFI . . . .7

10   Exhibit 3  - Rate Schedule and Agreement, . . . 33
                  Vergon and Associates Fire
11                Investigation, LLC

12   Exhibit 4  - Notice of Deposition and . . . . . 35
                  Subpoena

13

14   Exhibit 5  - Schematic of Ball Monticello . . . 37
                  plant

15   Exhibit 6  - Letter from Jacob M. O'Brien . . . 38
                  to Mark Senak, 5-17-17

16

     Exhibit 7  - Handwritten notes, 8-8-17  . . . . 39

17

18   Exhibit 8  - Report of Findings, Michael A. . . 48
                  Vergon, IAAI-CFI

19   Exhibit 9  - Handwritten notes, 5-22 . . . . . .101

20   Exhibit 10 - Monticello Fire Department . . . . .102
                  report

21

     Exhibit 11 - Color Photographs 1-14 . . . . . .111

22

23   Exhibit 12 - Monticello Fire Department . . . .121
                  report for the 10-9-11 fire

24   Exhibit 13 - Monticello Fire Department . . . .129
                  report for the 4-3-13 fire

25

---

1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF INDIANA
2
        CAUSE NO. 4:16-CV-00042-PPS-APR
3

4
     BALL CORPORATION, an Indiana    )
5    Corporation, AND FACTORY        )
     MUTUAL INSURANCE COMPANY, a     )
6    Rhode Island Corporation, as    )
     Subrogee,                       )
7                                    )
          Plaintiffs,                )
8                                    )
          -vs-                       )
9                                    )
     AIR TECH OF MICHIGAN, INC., a   )
10   Michigan Corporation,           )
                                     )
11        Defendant.                 )
12

13
14        DEPOSITION OF MICHAEL A. VERGON, CFI
15
          The deposition upon oral examination of
16   MICHAEL A. VERGON, CFI, a witness produced and sworn
     before me, Tamara J. Brown, CSR, RMR, CRR, Notary
17   Public in and for the County of Marion, State of
     Indiana, taken on behalf of the Plaintiffs, at the
18   offices of Connor & Associates, Suite 4350, 111
     Monument Circle, Indianapolis, Marion County,
19   Indiana, on the 11th day of October, 2017,
     scheduled to commence at 10:00 a.m., pursuant to the
20   Federal Rules of Civil Procedure with written notice
     as to time and place thereof.
21
22
23
24
25

---

2

1              A P P E A R A N C E S
2    FOR THE PLAINTIFF(S):
3         Mark Senak
          SENAK, KEEGAN, GLEASON,
4         SMITH & MICHAUD, LTD
          621 South Plymouth Court, Suite 100
5         Chicago, IL  60605
          312.214.1400
6         msenak@skgsmlaw.com
7
8    FOR THE DEFENDANT(S):
9         Jacob O'Brien
          STARR AUSTEN & MILLER, LLP
10        201 South Third
          Logansport, IN  46947
11        574.722.6676
          obrien@starrausten.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

4

1                INDEX OF EXHIBITS

2                                          Page

     Deposition Exhibits:

3

     Exhibit 14 - Monticello Fire Department . . . .135
4                 report for the 7-11-13 fire

5    Exhibit 15 - Data collection details . . . . .155

6    Exhibit 16 - Envista Forensic . . . . . . . .157
                  Investigation report, Robert
7                 Honaker

8    Exhibit 17 - Color Photographs (5) . . . . .163

9    Exhibit 18 - Color Photographs (10) . . . .167

10   Exhibit 19 - Invoice . . . . . . . . . . . .190

11   Exhibit 20 - Material Safety Data Sheet . . . .190

12   Exhibit 21 - Statement, Mike Rogers, . . . . .192
                  5-22-14

13

     Exhibit 22 - Statement, Robert Pellegrini, . .192
14                5-22-14

15   Exhibit 23 - Statement, Wes Krintz, . . . . . .192
                  5-22-14

16

     Exhibit 24 - Statement, Justin Stout . . . . .192
17                Rogers, 5-22-14

18   Exhibit 25 - Statement, Randy Crume, . . . . .193
                  5-22-14

19
20
21
22
23
24
25



5

1    (Time Noted 9:59 a.m.)
2         MICHAEL A. VERGON, CFI,
3    having been duly sworn to tell the truth, the whole
4    truth, and nothing but the truth relating to said
5    matter, was examined and testified as follows:
6    DIRECT EXAMINATION,
7    QUESTIONS BY MARK SENAK:
8  Q  Would you just state your name and spell your
9     last name for the court reporter.
10 A  Sure. It's Michael A. Vergon, V-E-R-G-O-N.
11 Q  Mike, you have been deposed quite a bit, I take
12    it, over the course of your professional career?
13 A  I have.
14 Q  So I'm going to dispense with all the things we
15    should or shouldn't do with these things,
16    because I assume you know most of those by
17    virtue of your experience.
18       So let me go on to this point: Are you
19    represented today by Mr. O'Brien?
20 A  Represented by him? Yeah, I guess, so to speak,
21    I kind of am, yes.
22 Q  I mean, have you retained him as your attorney?
23 A  Oh, no.
24       MR. O'BRIEN: Object to form, relevance.
25    Go ahead.

6

1  Q  I mean, I know he has retained your firm or his
2     firm has retained your firm.
3  A  Right.
4  Q  But I'm just curious if you have retained either
5     he or his firm to function as your counsel in
6     this deposition.
7  A  No.
8        MR. O'BRIEN: Same objection.
9        (Deposition Exhibit 1 was marked for
10    identification.)
11 Q  Showing you what's been marked as Vergon
12    Exhibit 1, would you just identify it for the
13    record.
14 A  Yes. Before I do that, you want to use the new
15    ones?
16       MR. SENAK: You know what, good point,
17    let's substitute, if we could.
18       THE WITNESS: And you could use this one if
19    you would like.
20       MR. SENAK: You keep that one, if you would
21    like, it will be easier. Let's start with the
22    idea of just identify Exhibit 1 for the record.
23 A  This is a copy of my CV.
24 Q  And is that your current CV?
25 A  Yes, it is.

7

1  Q  And that's up to date as of today?
2  A  Yes.
3        MR. SENAK: I'm going to actually mark this
4     now as No. 2 because this will make it easier
5     for me.
6        (Deposition Exhibit 2 was marked for
7     identification.)
8  Q  Mr. Vergon, showing you Exhibit No. 2, just
9     identify Exhibit No. 2 for me.
10 A  Exhibit 2 is a copy of my CV, but it's not up to
11    date, as much as Exhibit 1 is.
12 Q  So to avoid me having to do this, can you tell
13    me the difference between Exhibit 1 and
14    Exhibit 2.
15 A  Yes. The only difference is that I have added
16    several expert witness testimonies to my CV.
17 Q  That would be reflected on what page?
18 A  Page 2.
19 Q  Can you just tell me the ones that have been
20    added by name, if you would.
21 A  So going from most current to the oldest, the
22    new additions are AMCO Insurance Company versus
23    Lamont Fells and Christy Watts. You want the
24    cause number and all?
25 Q  No, I just want to know some way that we can

8

1     identify which ones are the new ones.
2  A  And then the second one is Davion Allen versus
3     Allstate Insurance Company. Third is Ronald D.
4     Liggett, L-I-G-G-E-T-T, and Francis C. Liggett
5     versus United Farm Family Mutual Insurance
6     Company. And then the fourth that I added is
7     State of Indiana, County of Warrick, versus
8     Dylan Wood.
9        And actually let me look a second. I've
10    got at least three different presentations I
11    provided since I submitted my old CV to you.
12 Q  Would you just identify them, please.
13 A  Sure. So actually it's going to be two new
14    ones. 2017 presentation to Indiana Farm Bureau
15    Insurance and 2017 presentation at International
16    Association of Special Investigations Units
17    Conference in New Orleans. And that would be
18    it.
19 Q  And that was my next question. Any other
20    differences other than what you previously noted
21    between Exhibit 1 and Exhibit 2?
22 A  No, that's it.
23 Q  Have you ever been denied the opportunity to
24    testify as an expert witness?
25 A  I have not.

9

1  Q  Have you ever failed to qualify as an expert?
2  A  No.
3  Q  Have you ever been disqualified as an expert?
4  A  No.
5  Q  The list of either -- of expert witness
6     testimony that is shown in Exhibit No. 1, can
7     you just go down the line and tell us briefly
8     what each of the cases was about.
9  A  Would you like me to start oldest to newest?
10 Q  However you wish, I mean, whichever is easiest
11    for you.
12 A  We'll go oldest to newest.  2006, USA versus
13    Romandine, R-O-M-A-N-D-I-N-E, was a criminal
14    case, arson for profit, when I was with ATF.  A
15    guy had burned his restaurant down for insurance
16    money and was convicted.
17       2010, still with ATF, State of Indiana,
18    County of Marion, versus Brandon Burns, that was
19    a deposition in a criminal offense, arson.
20       2013, Benjamin H. Durr, D-U-R-R, and Wendy
21    A. Durr versus USAA Casualty Insurance Company,
22    was a case in federal court in the Northern
23    District of Indiana, civil litigation.  And I
24    testified in deposition on behalf of the
25    plaintiff, plaintiffs, which would be the Durrs.

10

1       2013, State of Indiana --
2  Q  May I interrupt?
3  A  Yes.
4  Q  What was the Durr case about?
5  A  That was, that involved a fire at their
6     residence, and the insurance company and the
7     state fire marshal determined it was a set fire.
8     The Durrs were initially arrested and then
9     charges were dropped.  USAA Insurance did not
10    pay the claim initially.  And so I testified on
11    behalf of the Durrs that it was an accidental
12    fire or undetermined fire at best, and the case
13    was settled.
14 Q  I'm sorry, if we go back to the Burns, what was
15    that case about?
16 A  Brandon Burns?
17 Q  Yeah.
18 A  That was actually a downtown Indianapolis
19    Cosmopolitan on the Canal fire, a very large
20    downtown fire, and Brandon Burns was arrested
21    for that fire.  And I testified in the
22    deposition.
23 Q  He was arrested for arson, I take it?
24 A  Yes.
25 Q  All right.  I'm sorry to interrupt.

11

1  A  Okay.  So we talked about the Durrs.  2013,
2     State of Indiana, County of Hamilton, versus --
3     I'll spell it, it's K-A-U-R, Kaur.  That was
4     another arson fire in Carmel, Indiana, involving
5     a restaurant.  And I testified in state court in
6     a criminal trial.
7  Q  For the State or for --
8  A  For the State, on behalf of the State.  I
9     actually worked the fire scene when I was with
10    ATF and retired, and then testified as a private
11    entity when the trial occurred.
12       And then 2013, it's Ohrn, that's O-H-R-N,
13    versus JDPHD.  That was a civil matter in the
14    Southern District of Indiana, federal court.
15    That case involved a fire in Bloomington that
16    involved the death of a 19-year-old college
17    student, and her family was suing the owner of
18    the apartment complex.
19 Q  Who did you testify for?
20 A  On behalf of the Ohrn family.
21       2014, State of Indiana, County of Brown,
22    versus James D. Bowyer, B-O-W-Y-E-R.  That was
23    another criminal matter in Brown County in
24    Nashville, Indiana.  And that involved the
25    Little Opry, Little Nashville Opry House fire.

12

1     So that case was when I was with ATF and was
2     involved in the arrest of James D. Bowyer, and I
3     testified for the State in that criminal
4     proceeding.
5  Q  I take it that was an arson case, too?
6  A  Yes.  2015, State of Indiana, County of Marion,
7     versus Flaherty & Collins Construction
8     Development, LLC, this is civil litigation in
9     federal court, Southern District of Indiana.
10    Let me make sure, it might have been Marion
11    County -- no, I'm sorry, I said Marion County
12    case.  Sorry.
13       That case also involved The Cosmopolitan on
14    the Canal fire.  I guess there was subsequent
15    litigation between -- oh, let's see what that
16    was.  There was a landmark Historical Society
17    building next to the development that burned,
18    and owned by the State, I think, and they were
19    suing Flaherty & Collins, the developers of The
20    Cosmopolitan on the Canal project for damages.
21    And I testified on behalf of Flaherty & Collins
22    Construction and Westfield Insurance.
23       2015, State of Indiana, County of Starke,
24    versus James Campbell, that was a fire in -- I
25    think it's Knox, Indiana, a criminal case.

13

1  James Campbell was a defendant arrested
2  initially in the investigation of a fire that
3  the state fire marshal determined was a set
4  fire. And then I conducted my own investigation
5  with an electrical engineer, determined that it
6  was actually an accidental fire, and testified
7  on behalf of James Campbell.
8      2016, State of Indiana, County of Marion,
9  versus Anthony R-O-T-H-H-A-A-S, Rothhaas. That
10  was a fire investigation that I conducted on a
11  house in Indianapolis, set fire, and then this
12  Marion County prosecutor's office subsequently
13  filed charges against them, and I testified on
14  behalf of the State of Indiana in that case in a
15  trial.
16      2016, Travelers Property Casualty Company
17  of America versus Flaherty & Collins
18  Construction.
19  Q  So second time with Flaherty then.
20  A  Second. So now that I have read the second one,
21  back up. The second one, 2015, was actually, I
22  testified -- that doesn't seem right. I might
23  have an error in my -- I'm not sure why I have
24  two in there. I would have to go back and check
25  my records.

14

1  Q  Understood.
2  A  2016 is the same as I said 2015 was. So I
3  testified on behalf of Flaherty & Collins in a
4  deposition.
5  Q  So the Flaherty & Collins. Those may be just
6  duplicative?
7  A  They may be. But I testified in two separate
8  depositions in that case, so, like I said, I
9  would have to go back and check my records on
10  that.
11      2017, American Family Insurance Company
12  versus Ye Olde Chimney Sweep, LLC, and Jim
13  Voightschild, V-O-I-G-H-T-S --
14  Q  Jim is Ye Olde Chimney Sweep, I take it?
15  A  Yes, Voightschild. That was in the Southern
16  District of Indiana, federal court, deposition
17  testimony on behalf of American Family Insurance
18  Company. And that case was, Jim Voightschild
19  did install a chimney in the house, and then the
20  house subsequently caught fire, chimney fire,
21  and burned down.
22  Q  I'm sorry. You said he installed the chimney?
23  A  He did the chimney work, right. It was -- I
24  represented American Family, who represented the
25  homeowner.

15

1  Q  A subrogation matter.
2  A  Yes.
3  Q  Well, in that one he didn't clean the chimney,
4  he installed the chimney?
5  A  He installed the chimney, yes.
6      2017, State of Indiana, County of Warrick,
7  versus Dylan Wood state court case in
8  Booneville, Indiana, a set fire to a house in
9  which Dylan Wood was the tenant and occupant,
10  and I testified on behalf of the State of
11  Indiana.
12      2017, Ronald D. Liggett, L-I-G-G-E-T-T, and
13  Frances C. Liggett versus United Farm Family
14  Mutual Insurance Company, and that's an ongoing
15  matter, testified in deposition just a couple
16  years ago, a set fire at a house owned by the
17  Liggetts. And I testified on behalf of Indiana
18  Farm Bureau Insurance.
19      2017, Davion Allen versus Allstate
20  Insurance Company, testified last week in
21  federal court in Hammond, Indiana, again, a set
22  fire at a house owned by Davion Allen, and I
23  testified on behalf of Allstate Insurance
24  Company.
25      And then the last one is 2017, just last

16

1  week again, AMCO, A-M-C-O, Insurance Company
2  versus Lamont Fells and Christy Watts. That's
3  an ongoing case, testified in deposition on.
4  It's a subrogation matter against Lamont Fells
5  and Christy wells, who were renting a home, and
6  AMCO Insurance must be the parent company of
7  Nationwide Insurance because that's who I was
8  there for, representing Nationwide Insurance.
9  And that's it.
10  Q  I recall reading somewhere that you -- oh, you
11  have testified in 700 to 750 -- or you have
12  investigated, I'm sorry, 700 to 750 fires?
13  A  I would say at least. I probably put a
14  conservative number on there. I didn't want to
15  overestimate.
16  Q  Has any of those involved a fire in an internal
17  bake oven?
18  A  No.
19  Q  Any of those involve a fire in a ductwork in a
20  manufacturing plant?
21  A  Not that I recall, I don't think so.
22  Q  What is your area of expertise?
23  A  Fire and explosion investigation.
24  Q  By that do you mean in determining the cause and
25  origin of fires or explosions?



---

17

1   A  Yes.
2   Q  Do you consider yourself an expert in any other
3       area?
4   A  Well, I mean, with respect to ordinary people, I
5       would probably consider myself an expert in
6       interviewing, certainly in investigations in
7       general, maybe firearms since I was an ATF agent
8       for 24 years, maybe to a certain degree in
9       explosives but not so much as fire
10      investigation.  I've had some post blast
11      training.  When I say explosives, more post
12      blast type investigation.
13  Q  That's "post blast"?
14  A  Yes.
15  Q  Okay.  Anything else?
16  A  I don't -- I don't believe so.
17  Q  Have you ever been retained or testified as an
18      expert in any area other than fire and explosion
19      investigation?
20  A  I'm sorry, I missed the first part of that
21      question.
22  Q  You know, you listed a number of different areas
23      of expertise other than fire and explosion
24      investigation.  And so my question is have you
25      ever been retained or have you ever testified in

---

18

1       trial or in a deposition in any of those areas
2       as an expert witness?
3   A  Yes.  When I was with ATF, regarding forearms,
4       and these testimonies aren't listed on this CV.
5       When I was with ATF, and I didn't know yet that
6       I was going to be doing this on my own, I didn't
7       really keep track of my depositions and trial
8       testimonies so they are not listed.
9   Q  So the two areas you have been retained and/or
10      testified as an expert are fire and explosion
11      investigation and firearms?
12  A  Yes.
13  Q  In no other area have you been retained or
14      testified as an expert?
15  A  That's correct.
16  Q  I take it you don't consider yourself to be an
17      expert in the field of chemistry?
18  A  No.  I know a lot about fire chemistry, but I
19      wouldn't consider myself an expert in chemistry.
20  Q  How about in physics?
21  A  Again, I know physics as it relates to fire
22      investigation, but I wouldn't consider myself an
23      expert in physics.
24  Q  Any branch of engineering?
25  A  No.

---

19

1   Q  Material science?
2   A  No.
3   Q  Explain to me what you consider makes you an
4       expert in fire and explosion investigation.
5   A  Well, it would be my training and experience
6       primarily going back to when I first got into
7       ATF, when I started receiving training in fire
8       and explosion investigation, and then later in
9       my career in ATF when I specifically got into
10      ATF's certified fire investigator program, which
11      is much more intensive training regarding fire
12      and explosion investigation; and then when I was
13      certified as an ATF CFI, maintaining my
14      certifications every year for about 15 years;
15      and then subsequently retired from ATF and then
16      started my own company in fire and explosion
17      investigation, going to training, continuing
18      education, my experience and different
19      presentations and instructions that I provided.
20  Q  You are a certified fire investigator with the
21      International Association of Arson --
22  A  Investigators.
23  Q  -- Investigators.  Correct?
24  A  Yes.
25  Q  Any other certifications?

---

20

1   A  No.
2   Q  Just explain to me what you needed to do to get
3       that certification.
4   A  For that certification it's, you have to take an
5       exam and pass.  And that's based, that exam can
6       only be taken if you meet the minimum
7       requirements to take the exam.  And that's on a
8       point system.  So that point system is based on
9       your years of experience, how many fire scenes
10      you have conducted, how many training hours you
11      have received, presentations or hours of
12      instruction, number of times an expert witness,
13      either deposition or trial testimony, and so I
14      met those point requirements and then took the
15      exam, passed the exam, and then received my
16      certification.
17  Q  And that certification gets renewed -- I don't
18      know if it's annually or biannually -- through a
19      similar process?
20  A  Yes.  It's every five years.
21  Q  You list on your CV, "Licensed in Indiana," and
22      then it has a license number.  What is that
23      license for?
24  A  That's license for a private investigator.  In
25      Indiana and in most states, you have to be a

21

1  private investigator, hold a private
2  investigator's license to conduct fire
3  investigations. There is no fire investigation
4  license in any state that I know of.
5  **Q  To be licensed as a fire investigator in**
6  **Indiana, what do you need to do?**
7  A  Just have your state license as a private
8  investigator. There are really no other
9  requirements.
10 **Q  You just apply for it, you fill out the**
11 **application, you pay the fee, and you get the**
12 **license?**
13 A  Yes.
14 **Q  You are a member of a number of professional**
15 **organizations?**
16 A  A couple, yes.
17 **Q  Do any of those organizations, other than the**
18 **AIA -- the IAAI, require you to take an exam to**
19 **be a member?**
20 A  No.
21 **Q  Does the IAAI require you to take an exam to be**
22 **a member?**
23 A  To be a member, no.
24 **Q  I take it for those it's much like many, which**
25 **is you apply, you pay the fee, and you become a**

22

1  **member?**
2  A  Yes. And I think there's some minimal
3  background check done or some approval process.
4  **Q  To be certified by the IAAI, you do have to take**
5  **the exam, and you've done that, and you are**
6  **certified?**
7  A  Yes. Actually I was just recertified last year.
8  **Q  I note in your CV you've taken a number of**
9  **classes in how to testify as a witness?**
10 A  I wouldn't classify them as classes, but some
11 training blocks in testimony perhaps. I know
12 that there was one course in particular, I think
13 it was called advanced origin and cause in court
14 techniques class.
15 **Q  Yeah, that's one that I kind of looked at. And**
16 **so in that course it was intended to sort of**
17 **teach you how to testify in court. True?**
18     MR. O'BRIEN:  Object to form, vague.
19 A  With respect to fire and explosion
20 investigation, yes.
21 **Q  What were some of the points that were made to**
22 **you?**
23 A  Oh, I don't recall specifically, it was so long
24 ago I took that class. I think that was back in
25 '90 something, late '90s, mid '90s. But I think

23

1  really the point of that class was, more had to
2  do with conducting and documenting your
3  examination and preparation to testify as an
4  expert witness, and then the actual testimony
5  part was really just kind of going through the
6  motions at the end of the week and just some
7  basic feedback. They put you up on the stand in
8  a mock trial for 10 to 15 minutes and kind of
9  messed with you and then they said here's where
10 you may need to brush up on a couple of things.
11 **Q  Okay. You have testified -- or I'm sorry -- you**
12 **have been an instructor or given presentations**
13 **to a number of insurance organizations.**
14 A  Yes.
15 **Q  This would include presentations at the National**
16 **Society of Professional Insurance Investigators?**
17 A  Yes, and also at the IAAI.
18 **Q  I'm glad I'm not the only one that gets confused**
19 **with that.**
20 A  Well, when you say it really fast.
21 **Q  I understand.**
22 A  Yes, actually I was the keynote speaker at the
23 IAAI this year in Las Vegas, and so gave a
24 presentation there for about 700-something
25 people.

24

1  **Q  What was it on?**
2  A  On fire investigation, but also more
3  specifically on a large case I did when I was
4  with ATF, about a two-and-a-half-year
5  investigation, in which we ended up -- it was
6  about a 50-defendant case in the end, and we
7  cleared 73 fires that had previously been
8  determined as accidental or undetermined fires,
9  and each one of these fires was actually set, a
10 set fire for insurance purposes, insurance
11 fraud. So I speak specifically about the -- a
12 little background on the case and about origin
13 and cause and about, I do talk about some
14 interviewing, origin and cause interviewing in
15 there. And I just talk about different things
16 to look for, different hurdles we had to
17 overcome in the investigation, and so talk also
18 about working with the insurance companies and
19 cooperation between the insurance companies, law
20 enforcement, and fire investigation personnel.
21 **Q  You've given, you know, seminars including that**
22 **one, just on the idea of conducting interviews**
23 **of witnesses?**
24 A  Yes.
25 **Q  Is interviewing witnesses an important part of**



25

1    the investigation?
2    A  Absolutely, yes.
3    Q  And relative to some of the other factors, how
4        would you rank witness interviewing in terms of
5        its significance to determining cause and
6        origin?
7          MR. O'BRIEN:  Object to form.  Go ahead.
8    A  Well, I would say it's equally important.  But
9        the outcome just depends on what information the
10       witness may or may not have to tell you.  So it
11       is an equal part of the pie, so to speak.  It's
12       something to take into consideration in kind of
13       analyzing or rationalizing through the totality
14       of the data that you gather in the
15       investigation.
16   Q  I take it when you are interviewing someone, one
17       of the important parts you are trying to decide
18       is how reliable the information is that you are
19       being provided from that witness.
20   A  That's one of the things.  That's one of the
21       things, yes.
22   Q  And you make some assessment as to whether that
23       witness is a reliable witness, meaning they are
24       telling the truth, or that they have some
25       interest that might affect their truth and

26

1    veracity?
2    A  Well, more to the fact that I want to know what
3        they saw or what they know, and so I'm asking
4        questions like where did you first see the fire,
5        how big were the flames, you know, how tall were
6        the flames; was -- you know, typically in a room
7        fire, when you first saw the fire was it all the
8        way at the floor level; was it higher up on the
9        wall; was it in the ceiling.
10         So I'm trying to gauge, as I'm going
11       through the interview process, I'm also kind of
12       thinking through the fire dynamics, you know,
13       what are the things in the area of origin they
14       might be describing that are involved in fire,
15       things like that.
16   Q  If you have a reliable eye witness to the fire,
17       I take it that would be an important part of
18       your investigation in determining cause and
19       origin?
20   A  Yes.
21   Q  What percentage of the work that you do is for
22       insurance companies?
23   A  I would say probably about at least 90 percent,
24       maybe over 90s, mid 90s, high 90s.  I don't know
25       for sure, but I know it's up there.  The vast

27

1    majority is insurance work.
2    Q  When I say you, I mean you individually and your
3        company.  Because you have got some other people
4        that work with you, true?
5    A  Yes.
6    Q  And so for you and your company, is it upwards
7        of 90 percent?
8    A  I would say it's well into the 90s.
9    Q  Is that also true for the revenue that you or
10       your company make?
11   A  Yes, I would think so.
12   Q  Within that 90 percent, how much of that is for
13       the defense?
14   A  Well, I'm not really sure.  It just all depends
15       on which fires I go to and what my findings are
16       at the scene, and which way the -- now,
17       when you say defense, are you speaking about the
18       insured or maybe a product issue?
19   Q  It's kind of an interesting question, because I
20       understand why it is a bit ambiguous for you.
21       Because sometimes you are testifying for the
22       insurance company but as a plaintiff in like
23       subrogation cases.  So that's not really
24       testifying for the defense, that's testifying
25       for the plaintiff.

28

1    A  Right.
2    Q  So can you just break down for me how often you
3        testify for the plaintiff or the defendant in
4        civil litigation; do you have a number that you
5        can provide me?
6          MR. O'BRIEN:  Are you asking him within his
7        insurance cases?
8          MR. SENAK:  Yes.
9          MR. O'BRIEN:  Because I think that's what
10       he -- the 90 percent of insurance cases, what's
11       the breakdown.
12         MR. SENAK:  Exactly.
13   A  Well, I can go back to my list of expert witness
14       testimony, because talking about just
15       testifying, I can tell you off this list how
16       many times I have testified for the defense and
17       how much time would be a plaintiff.
18   Q  Okay.  I take it that won't take you much time.
19       Why don't you just go down the list.  I think I
20       have that, but --
21   A  Yeah, I think we maybe covered that when I broke
22       these down.  But just give me a second and I'll
23       just count them out here.  So, again, USAA
24       versus Romandine was criminal, so USAA was
25       plaintiff, I testified on behalf of the

29

1  plaintiff.
2      Indiana versus Brandon Burns, again, the
3  plaintiff was Indiana, and I testified on behalf
4  of Indiana.
5      Now, the Durr case, that was, I testified
6  on behalf of the plaintiff. They were the
7  homeowners suing the insurance company.
8      State of Indiana versus Kaur, that was a
9  criminal case, I testified on behalf of the
10 plaintiff, State of Indiana.
11     Ohrn case was a civil litigation, I
12 testified against the insurance company on
13 behalf of the plaintiff.
14     The Little Opry fire, that was State of
15 Indiana, plaintiff, testified on behalf of
16 Indiana.
17     State of Indiana, Starke, versus James
18 Campbell, testified on behalf of the defense.
19     State of Indiana versus Rothhaas, that
20 was -- testified on behalf of the plaintiff,
21 State of Indiana.
22     Travelers Property and Casualty versus
23 Flaherty & Collins, testified on behalf of the
24 defense.
25     American Family versus Ye Olde Chimney

30

1      Sweep, testified on behalf of the plaintiff,
2  American Family Insurance.
3      State of Indiana versus Dylan Wood, again,
4  a criminal case, State of Indiana, plaintiff, I
5  testified on behalf of the plaintiff.
6      Ronald D. Liggett versus United Farm
7  Family, testifying currently on behalf of the
8  defense, which is the insurance company.
9      Allen versus Allstate, civil litigation is
10 over in that case, testified on behalf of the
11 defense, which is Allstate.
12     And AMCO Insurance versus Lamont Fells,
13 subrogation case, and I'm testifying on behalf
14 of the plaintiff, which is the insurance
15 company.
16 Q  Well, thank you. I note that you have done a
17    presentation to Cincinnati Insurance regarding
18    arson for profit investigation, in 2012.
19 A  Yes.
20 Q  How often have you been retained to testify in
21    cases in which Cincinnati Insurance was the
22    insurer?
23 A  To testify?
24 Q  Testify or otherwise, investigate or testify?
25 A  Investigated quite a few cases for Cincinnati

31

1      Fire & Insurance. I would say they are one of
2  my more frequent clients. Maybe those clients
3  would include Cincinnati Insurance, Farm Bureau,
4  used to do a lot of work for Allstate until they
5  changed their vendor process, and then that was
6  probably their biggest vendor here in Indiana,
7  and then Nationwide is a pretty big regular
8  client of mine as well.
9  Q  Well, for Cincinnati, can you give me some
10    estimate on the number of cases or percentage of
11    your matters that are assigned to you by
12    Cincinnati Insurance?
13 A  It's hard to say. Some months I may get one
14    fire from them, other months I might get three
15    or four fires from them.
16 Q  Is it an accurate statement that on a monthly
17    basis you get one to three assignments from
18    Cincinnati Insurance?
19 A  That may be close, close to accurate.
20 Q  Have you ever been retained by Starr Austen
21    Miller before, or any of its predecessors?
22 A  Yes.
23 Q  How often or how frequently?
24 A  Well, the Durr case was one case, and I'm
25    involved in another ongoing case with them at

32

1      the moment, and then this case, I think.
2  Q  What's the other one?
3  A  It's the -- it's a case in Flora, Indiana, where
4      there were four young girls killed in a house
5      fire.
6  Q  Not on the list?
7  A  No. There's been no testimony yet.
8  Q  You know the name?
9  A  Of the case, no.
10     MR. O'BRIEN: Mark, I'll represent I don't
11 think there's been a case filed yet.
12 Q  Do you know the matter number, or do you have
13    some way of identifying it other than just the
14    description you have given me?
15 A  It is a house fire involving four young girls in
16    Flora, Indiana -- I'll call it the Flora,
17    Indiana case. The family name is Rose, but
18    that's all I know.
19 Q  And in that case you were required to do a cause
20    and origin investigation?
21 A  To participate in a couple of joint scene
22    examinations and just render an opinion.
23 Q  That's a death case?
24 A  Yes.
25 Q  And I take it you are representing the defendant

33

1    in that case?
2  A  No.
3  Q  Representing the plaintiff in that case?
4  A  No, because I don't think there's a lawsuit
5     filed yet, or if there will be a lawsuit filed.
6     So far it's just very preliminary.
7  Q  In that case you have been retained by Starr
8     Austen and Miller.  Is there an insurance
9     company involved in that case?
10        MR. O'BRIEN:  Object to form.
11  A  Well, there is an insurance company involved in
12     the case, and then I'm more or less, I guess,
13     representing the family at the moment, but they
14     are not insured.
15  Q  What percentage of your files have been --
16     involved Starr Austen and Miller or any of its
17     predecessors?
18  A  What percentage?  Oh, very few.  I think it was
19     just the three cases we just mentioned.
20  Q  Are those the only three, or have there been
21     others?
22  A  No, just those three.
23        (Deposition Exhibit 3 was marked for
24     identification.)
25  Q  Mr. Vergon, I'm showing you Exhibit No. 3.

34

1     Would you just identify it for me?
2  A  Yes.  This is a copy of my rate schedule and
3     agreement.
4  Q  Is it up to date and true and accurate?
5  A  Yes.
6  Q  Couple of things.  If you go into, I think it's
7     page 3, is it accurate that your rate for
8     depositions and testimony is 350 an hour?
9  A  Yes.
10  Q  But your rate for investigation services is 175?
11  A  Yes.
12  Q  You indicate that you require a retainer on
13     unestablished accounts.
14  A  I do for the most part, yes.
15  Q  In this case have you required a retainer?
16  A  I did initially.
17  Q  That retainer would have been paid by Starr
18     Austen Miller?
19  A  Yes.  Let me go back and say I think I did.  I
20     don't recall exactly.  I would have to go back
21     and look.  I think I typically do.
22  Q  Going to page 5, your electronic mail retention
23     policy --
24  A  Yes.
25  Q  -- I understand this to say that you don't

35

1     retain any emails unless you are asked to do so.
2     Is that an accurate statement about your
3     electronic mail retention policy?
4  A  Well, it started out being that, but I pretty
5     much retain most of my emails now on ongoing
6     cases or even in some older cases.
7  Q  So just a basic question here, have you retained
8     all the emails in this case?
9  A  As far as I know I have, yes.
10  Q  All right.  Are there any documents that you
11     either have not retained or destroyed relative
12     to this case?
13  A  No.
14        (Deposition Exhibit 4 was marked for
15     identification.)
16  Q  Mr. Vergon, I'm showing you Exhibit No. 4.  This
17     is a notice for today's deposition and with a
18     subpoena attached to it.
19        Do you recall receiving this subpoena?
20  A  Yes, I do.
21  Q  Now, you received a previous subpoena in this
22     case also, correct?
23  A  I probably did.  I received a lot of stuff in
24     this case.
25  Q  Have you produced all the documents that are

36

1     requested by this subpoena?
2  A  All except one, I brought it with me, because it
3     was -- there was also -- yes, I have, and I
4     brought some stuff today so those are being
5     produced today, and then I have another large,
6     very large schematic of the plant layout that I
7     didn't have a way to copy.
8  Q  I know this is odd, I think I know which one
9     you're talking about, and you got it from Ball
10     Corporation way back when?
11        MR. O'BRIEN:  He did bring it today.
12        MR. SENAK:  Could I just look at it to make
13     sure it's the same one that I think is the
14     schematic that I recall.
15        MR. O'BRIEN:  Go off the record for a
16     second.
17        (A discussion was held off the record.)
18  Q  Mr. Vergon, you have produced a schematic
19     diagram of what I believe is the Ball Monticello
20     plant?
21  A  A portion of it at least, yes.
22  Q  What I would like to do is just mark that as an
23     exhibit.  You can keep it, but let's just put an
24     exhibit sticker on it so we have some sense of
25     which one it is.  Okay?

---

**37**

1       THE WITNESS: Okay.
2       MR. SENAK: Can you just mark it as
3   Exhibit No. 5.
4       (Deposition Exhibit 5 was marked for
5   identification.)
6   Q   So Mr. Vergon, we've marked the schematic
7       diagram, which is a rather large blueprint size
8       document, as Exhibit No. 5, and we'll just make
9       a copy of an eight-and-a-half-by-eleven portion
10      of that.
11          There's some handwritten notes on this
12      particular document; do you see that?
13  A   Yes.
14  Q   What is the significance of those notes?
15  A   Well, if I recall correctly -- now, this is
16      probably three years at least since I've,
17      probably three and a half years since I have
18      written on this thing -- these are, I think when
19      I was walking around the plant, I had this with
20      me and I was taking photographs, and these may
21      be my photograph numbers with arrows of what I
22      was taking photographs of, different parts of
23      the different production lines.
24  Q   Okay. Anything other than that, relative to the
25      handwritten notes that are on there?

**38**

1   A   No.
2       (Deposition Exhibit 6 was marked for
3   identification.)
4   Q   All right. Mr. Vergon, showing you Exhibit 6
5       which is a letter from Starr Austen Miller from
6       myself dated May 17, 2017, which reads,
7       "Pursuant to our recent conversation, enclosed
8       please find a flash drive containing the file
9       materials of Michael Vergon." And oddly enough,
10      there's a copy of the flash drive attached to
11      it.
12          Now, I have the flash drive in the original
13      letter here, and it's really a simple question,
14      which is in response to the earlier subpoena did
15      you take all the documents that were responsive
16      and put it on the flash drive that's here today
17      and shown, a copy of which is attached to
18      Exhibit 6?
19  A   I probably emailed the entirety of my documents
20      in some form, and they probably put that on a
21      flash drive and sent it to you.
22  Q   You didn't create this flash drive?
23  A   Right.
24  Q   What you would have done is taken all the
25      documents that were responsive to the earlier

**39**

1       subpoena, and sent it to counsel as -- to comply
2       with the subpoena?
3   A   Yes.
4   Q   Are there any documents that are responsive to
5       Exhibit No. 4, the current subpoena, that are
6       not on the flash drive that you provided in
7       compliance with the prior subpoena?
8   A   Yes, probably. And those are probably the large
9       schematic we just looked at, and then there are
10      a couple documents that I brought today, and
11      those -- there are some handwritten notes
12      regarding a conversation I had with Paul
13      Scholten, who was the Air Tech supervisor, I
14      believe, and then that's on -- those are on the
15      first page -- and then the second page is, are
16      some notes that I took when I was speaking with
17      another retired ATF CFI, who is also a fire
18      protection engineer friend of mine in
19      California.
20  Q   And you have brought copies of those notes with
21      you?
22  A   Yes.
23      MR. SENAK: So let's mark those as the next
24      exhibit.
25      (Deposition Exhibit 7 was marked for

**40**

1   identification.)
2   Q   Mr. Vergon, showing you Exhibit No. 7, which
3       are -- why don't we just have you identify
4       Exhibit 7.
5   A   Okay. Exhibit 7 is a two-page document of my
6       handwritten notes. The first page I have a date
7       at the top, 8-8-17, and my notes are those that
8       were taken subsequent to a couple of
9       back-to-back-to-back conversations with Paul
10      Scholten regarding some of the work he did for
11      Ball Manufacturing.
12  Q   And then you mentioned the second page.
13  A   Right. And so the second page, I called a
14      friend of mine out in California who is another
15      retired guy like me and just talked through some
16      of the fire dynamics of the, of this fire, and
17      some of the -- he brought up a couple of points
18      that I might want to take into consideration.
19      So I just made some notes regarding our
20      conversation.
21  Q   So let me see if I get this correct. Between
22      what's on the jump drive that is shown as an
23      attachment to Exhibit 6 and Exhibit 7, and the
24      large schematic diagram that was marked as
25      Exhibit 5, that is all the documents that are

---

41

1  responsive to the subpoena that is marked as
2  Exhibit 4.
3  A  I think so.  And I have a copy of my opinion
4    here, but I assume that you have got that, and
5    that's already part of that file that you have.
6  Q  That would be your report.
7  A  Yes.
8  Q  Right.  Other than that, is there any other
9    document that you are aware of that's responsive
10   to the subpoena that you have not produced?
11 A  No.
12     MR. O'BRIEN:  With the -- obviously we've
13   got the Howell materials that we talked about.
14     MR. SENAK:  Right.  And let's just try and
15   cover that.
16 Q  There's some -- you have reviewed some
17   additional material.
18 A  Yes, the deposition testimony from Mr. Howell
19   and then the Rimkus report.
20 Q  And we'll get to that when we look at your
21   report.  I think that's probably a good spot for
22   that.
23     Let me ask you this question:  Do you know
24   a guy named Dirk Hedglin?
25     THE REPORTER:  I'm sorry, say that name

42

1    again.
2      MR. SENAK:  Hedglin.  I believe it's
3    H-E-D-G-L-I-N.
4  A  Yes.
5  Q  Have you communicated with Mr. Hedglin regarding
6    this case?
7  A  I have.
8  Q  Have those communications been verbal or in
9    writing?
10 A  Verbal, I think for the most part.  I don't
11   remember.  I may have emailed him.  It's been so
12   long.  I know that I have spoke with him a
13   couple times about this.
14 Q  I'm going to tell you, I didn't see any email in
15   here between you two, Mr. Hedglin and you.
16 A  Right.  I think that's because -- I think our
17   conversations were mostly over the phone.
18 Q  What was the purpose for you contacting
19   Mr. Hedglin?
20 A  Well, initially I contacted him -- it's been a
21   couple years at least -- when I first contacted
22   him on this case about the possibility of
23   conducting or doing some testing with respect to
24   the -- I don't know what you call it, the
25   tarry-like substance removed from the ductwork

43

1    at Ball Manufacturing.
2  Q  Did you retain him to do that testing?
3  A  Well, I retained him to look into it, because he
4    said he couldn't do the testing at his
5    laboratory and he was going to find someone
6    somewhere else in the United States that could
7    do the testing.
8  Q  Do you know if he ultimately did the testing?
9  A  I think the testing was done, and we haven't
10   received a report from him yet.
11 Q  What was the purpose of the testing?
12 A  The main purpose was to determine, if we could,
13   the ignition temperature of the residue that was
14   left in the ductwork.
15     MR. SENAK:  I'm sorry, can you read the
16   answer back?
17     (The previous answer was read back by the
18   reporter as follows:  "The main purpose was to
19   determine, if we could, the ignition temperature
20   of the residue that was left in the ductwork.")
21 Q  Were you ever able to determine the ignition
22   temperature of the residue?
23 A  I think there was some determination made, and I
24   don't recall the exact numbers he told me,
25   because he said he had to look at the data

44

1    himself first and do some checking on a couple
2    of things and then issue a report, but he said
3    preliminarily it looked like it was in the range
4    of, I'm kind of guessing, in the mid 300s I
5    think, Celsius, which would have put it in the
6    700-something degree Fahrenheit range.
7  Q  The ignition temperature that you are referring
8    to was for the -- you referred to it -- I call
9    it the tar-like substance that's on the inside
10   of the ductwork.
11 A  Yes.
12 Q  Did he do any testing on what the autoignition
13   temperature would be for the debris that is
14   vacuumed up by Air Tech after they cleaned the
15   oven?
16 A  No.
17 Q  I call that the dust or the powder.  So he
18   tested the tar, but he didn't test any of the
19   powdery substance.
20 A  Correct.
21 Q  The ignition temperature that you are referring
22   to, I take it, means the autoignition
23   temperature?
24 A  No, ignition temperature and autoignition
25   temperature are two separate temperatures, so it



**45**

1    is just the ignition temperature.
2  **Q  Did he test the autoignition temperature?**
3  A  I don't think so, no.
4  **Q  Tell me the difference between autoignition**
5     **temperature and ignition temperature.**
6  A  All right.  Well, let's say we have a piece of
7     paper and you hold, have a heat source held to
8     the paper.  What does the temperature of that
9     heat source have to be to ignite the paper.
10        Autoignition temperature is if the paper is
11     just sitting out in the room and the ambient
12     environment in the room gets to a certain
13     temperature that the paper will ignite, and that
14     would be the autoignition temperature.
15  **Q  Is it that ignition temperature is often lower**
16     **than autoignition temperature?**
17  A  I would have to research for what kind of
18     materials we're talking about.  But I would
19     think that -- I was just trying to think of some
20     examples right off.  I think the ignition would
21     probably be lower.
22  **Q  Has Mr. Hedglin been asked to do any other**
23     **testing?**
24  A  No, I don't believe so.
25  **Q  Are you relying on any information or data**

**46**

1     **provided by Mr. Hedglin in formulating any of**
2     **your opinions in this case?**
3  A  No.
4  **Q  The information Mr. Hedglin provided you**
5     **regarding the ignition temperature of the**
6     **tar-like substance, is it that he called you and**
7     **told you that was what he found?**
8  A  I actually called him on another matter.  He was
9     doing some testing in another case for me, and
10     he said, hey, by the way, I got my preliminary
11     results back from I think a company in Texas who
12     did the actual testing, and these are what I
13     have so far, but I have to do a little more
14     research myself and process through some stuff
15     before I get my report out to you.
16  **Q  And you just have never received a report from**
17     **him?**
18  A  No.
19  **Q  With respect to this case, when were you first**
20     **contacted?**
21  A  I think it was sometime in May of 2014.
22  **Q  And who contacted you?**
23  A  It was Andrew Miller of Starr Austen Miller.
24  **Q  And what were you requested to do?**
25  A  Go to Ball Manufacturing to schedule a joint

**47**

1    examination with the Rimkus investigators.
2  **Q  What was the purpose of that?**
3  A  So I could also be there to document the scene
4     and eventually likely render an opinion myself,
5     if I had one, regarding the cause of the fire.
6  **Q  Did you complete that assignment?**
7  A  Yes.
8  **Q  Have you requested any additional material to**
9     **complete that assignment?**
10  A  I don't believe I have, no.
11  **Q  Is there anything else that you need to complete**
12     **that assignment?**
13  A  No.
14  **Q  Do you plan on doing any further work on this**
15     **case?**
16  A  Not that I'm aware of yet, no.
17  **Q  Do you plan on doing any further testing on the**
18     **case?**
19  A  No.
20  **Q  Have you requested any testing be performed that**
21     **hasn't been completed?**
22  A  No.
23        MR. O'BRIEN:  Can we take a quick break?
24        MR. SENAK:  Oh, sure, go right ahead.
25     That's probably a good time for that.

**48**

1        (A recess was taken between 11:00 a.m. and
2     11:04 a.m.)
3        (Deposition Exhibit 8 was marked for
4     identification.)
5  BY MARK SENAK:
6  **Q  Mr. Vergon, Exhibit No. 8 is, I take it, a copy**
7     **of your report.**
8  A  Yes, it is.
9  **Q  Is Exhibit 8 a true and accurate copy of your**
10     **report?**
11  A  Yes, looks like it.
12  **Q  Were there any prior drafts of this report?**
13  A  Yes.
14  **Q  Did you save them or have they been retained in**
15     **any way?**
16  A  No.
17  **Q  Explain to me sort of how you go about the**
18     **process of drafting the report.**
19  A  Well, I'll write up -- have my notes out and my
20     photographs where I can see them or on the
21     computer, and then so I'll just start going
22     through and start drafting up the introduction,
23     usually cover my witness interviews section
24     next, and then I get into the scene
25     documentation.  And then in my conclusions I'll

49

1    read it a half dozen times looking for anything
2    that doesn't sound right, grammatical mistakes,
3    editing, checking my photographs to make sure
4    they are all numbered correctly, and then like
5    in this case, I talked to Mr. Scholten again,
6    it's like on Exhibit 7, and so then I added some
7    information on the interview, on his interview.
8    But that's pretty much the process.
9    Q   Did you provide a draft of the report to defense
10       counsel?
11   A   I did.
12   Q   And did you discuss with them the content of the
13       report?
14   A   Yes.
15   Q   Did they provide you with any comments about the
16       content of the report?
17       MR. O'BRIEN:  Object, confidential
18   communications.
19       MR. SENAK:  You can answer it, or you -- I
20   mean, you can decide whether you want to answer
21   the question or not.
22       THE WITNESS:  Probably -- could you
23   actually read the question back to me, please?
24       (The previous question was read back by the
25   reporter as follows: "Did they provide you with

50

1    any comments about the content of the report?")
2    A   I mean, there was some conversation about the
3    content.  I don't recall exactly about what
4    parts of the content at this point, but there
5    were, yes.
6    Q   Did you amend the report after you spoke with
7        defense counsel?
8    A   I did in a couple cases, and sometimes it was
9    just simply that, hey, you have a misspelled
10   word here or you have this word added twice in a
11   row, and I just missed it on my edits.  Simple
12   things like that I may change, yes.
13   Q   Do you have any recollection of what changes
14       were made to Exhibit No. 8 after you spoke with
15       defendant's counsel?
16   A   I don't.
17       MR. O'BRIEN:  I'm going to object, just for
18   the record, any prior drafts are protected by
19   the Federal Rules.
20   Q   If you go to page 2, I think it's page 2 --
21   A   Yes.
22   Q   -- it indicates documents reviewed?
23   A   Yes.
24   Q   Are these all the documents that you reviewed to
25       prepare your report?

51

1    A   Yes.
2    Q   Did you rely upon the documents that are listed
3        on page 2 in preparing your report?
4    A   I did.
5    Q   Were there any documents that are listed on
6        page -- I'm sorry -- were there any documents
7        that are not listed on page 2 that you relied
8        upon in preparing your report?
9    A   No -- oh, well, on the documents, yes, but that
10   actually goes to the interviews that are also in
11   my report.
12   Q   Good point, good point.  So let's say this:
13       With respect to just the documents reviewed that
14       you relied upon in preparing your report, there
15       is nothing that's listed on page 2 of your
16       report -- let me strike that and start over.
17       All the documents you reviewed and relied
18       upon in formulating your opinions in your report
19       are shown on page 2.
20   A   Yes.
21   Q   You referenced NFPA 921.
22   A   I did.
23   Q   You consider that to be authoritative on the
24       subject of fire investigation?
25   A   I think it's generally accepted as authoritative

52

1    maybe, but it's not what I consider the ultimate
2    authority on fire investigation.  It's, I use
3    921 as more of a reference.  I have an entire
4    library of books that I reference, and 921 sits
5    on my shelf just like the other books do.
6    Q   So let me ask you this:  Do you have an opinion
7        as to whether NFPA 921 is authoritative on the
8        issue of fire investigation?
9    A   I don't know that I have really an opinion on
10   that.  I'm not a big fan of 921 in some
11   respects.  It has some good points, makes some
12   good points, but I wouldn't, for the sake of
13   argument, I would say that it's not
14   authoritative to the point that this is how you
15   must do a fire or explosion investigation.  But
16   then I would maybe consider it as authoritative
17   to the point there are some very -- there is
18   some very good information in there, especially
19   with respect to the scientific method that, you
20   know, you pretty much have to follow to do an
21   accurate investigation.
22       So kind of to sum that up --
23   Q   Yes and no.
24   A   -- the one part of 921, I think, that is
25   authoritative, that I think really embodies all

53

1    of fire and explosion investigation, is the
2    scientific method of investigation. And I think
3    that's the backbone of 921.
4  **Q**  Do you know what chapter that is?
5  A  Well, it's mentioned in a couple of chapters.
6    It's in Chapter 4, then it's brought up again in
7    Chapters 18 and 19.
8  **Q**  **So is it accurate that the only portions of NFPA**
9    **921 that you consider authoritative would be the**
10    **sections in Chapter 4, 18, and 19 on the**
11    **scientific method?**
12  A  I would say yes.
13  **Q**  **Other than that you don't consider the other**
14    **parts to be authoritative?**
15  A  No, because I just know that there are some
16    errors, and I can't go to them specifically, but
17    I have talked to electrical engineers who said
18    there are mistakes in the electrical section. I
19    don't agree with the depth of char studies, and
20    I don't agree with the depth of calcination
21    studies, so I would say I don't consider,
22    because of the rest of it, authoritative.
23  **Q**  **Is there any publication that you consider**
24    **authoritative?**
25      MR. O'BRIEN: Object to form.

54

1  A  No. No, I think in totality, I can go through
2    quite a few documents and look at some reference
3    material and research -- and actually I'll maybe
4    retract that a little bit and say that, like,
5    something like the Fire Protection Handbook or
6    Ignition Handbook by -- the guy's last's name is
7    Babrauskas, and I think he's in California.
8      So those are actual scientific studies and
9    scientific calculations that are -- that have to
10    do with fire investigation. So I would think
11    that would probably be more authoritative. But
12    it goes directly to the study of the ignition
13    properties of certain materials.
14  **Q**  **Did you rely upon any of the information**
15    **contained in the publication you just described**
16    **in formulating your opinion?**
17  A  No.
18  **Q**  **Was there anything else that you needed to**
19    **formulate your opinion that you did not have?**
20  A  No.
21  **Q**  **Was there anything that you asked for that you**
22    **were not provided?**
23  A  No.
24  **Q**  **So let's go to the witness statements that are**
25    **shown on Exhibit 8, page 2. Are these all the**

55

1    **people that you interviewed?**
2  A  Yes.
3  **Q**  **Is there anyone that you spoke with about this**
4    **case that you are relying upon in formulating**
5    **your opinion that is not shown in Exhibit No. 8?**
6  A  No.
7  **Q**  **Exhibit No. 6 reflects two conversations, one**
8    **with Mr. Scholten, true?**
9  A  Yes.
10  **Q**  **Are you relying upon the content of that**
11    **conversation in formulating your opinions?**
12  A  I'll take a look at it for a second.
13  **Q**  **Go ahead.**
14  A  Yes, to some extent I would say yes.
15  **Q**  **Explain to me what it is that is in Exhibit No.**
16    **-- sorry --**
17  A  Exhibit 7.
18  **Q**  **-- that you are relying upon in formulating your**
19    **opinions.**
20  A  Well, I think the information in my notes here
21    really goes more to substantiate what I already
22    thought so it's added to the report, and that
23    would be that there's possibly or likely a
24    problem, more so a problem with airflow at the
25    Ball Corporation facility in Monticello that led

56

1    to the cause of the fire than what is presumed
2    by the Rimkus investigators.
3  **Q**  **Anything else?**
4  A  No, again, just substantiating that origin
5    possibly, that I don't believe the fire was
6    started in the squirrel cage or below it.
7  **Q**  **The second page of Exhibit No. 7 is a**
8    **conversation you had with one of your former**
9    **colleagues at ATF?**
10  A  Yes. His name is Steve Carman, C-A-R-M-A-N.
11  **Q**  **Is there anything in that conversation that you**
12    **are relying upon for purposes of formulating**
13    **your opinion?**
14  A  No.
15  **Q**  **So subject to the notes that are on the first**
16    **page of Exhibit No. 7, all the witness**
17    **information that you're relying upon in**
18    **formulating your opinion is reflected in**
19    **Exhibit No. 8?**
20  A  Yes.
21  **Q**  **In addition to the documents reviewed and the**
22    **witness information that's shown in**
23    **Exhibit No. 8, I take it you're relying upon**
24    **your scene examinations that are also reflected**
25    **in Exhibit No. 8?**

57

1  A  That's correct.
2  Q  So in addition to your education and experience,
3     is everything that you are relying upon in
4     formulating your opinion shown in Exhibit No. 8
5     and considering the first page of Exhibit No. 7?
6  A  Yes, I would think so, yes.
7  Q  Anything else other than what's shown in
8     Exhibit No. 8 that you are relying upon in
9     formulating your opinions?
10 A  No.
11 Q  You have not reviewed any of the deposition
12    testimony of any of the Air Tech employees,
13    true?
14 A  I'm trying to recall if I did.  No, I don't
15    think I did, because they are not in my file.
16 Q  I was just going to say, I didn't see that
17    copies of the transcripts were produced, so I
18    assume that you weren't provided them, you
19    didn't read them.
20 A  Correct.
21 Q  Did you rely upon or have you reviewed any
22    statements that were made by Ball employees?
23 A  Only those that were contained within the Rimkus
24    report.
25 Q  Do you recall what those were, or who they were?

58

1  A  I don't recall their names as we sit here today,
2     no.
3  Q  Do you know whether Rimkus reviewed any
4     documents relating to those statements?
5        MR. O'BRIEN:  Object to foundation.
6  A  I'm not sure.  I think I recall somewhere in the
7     report or the testimony of Mr. Howell that they
8     did.
9  Q  Meaning that Mr. Howell or Rimkus had
10    handwritten statements from the witnesses --
11    from Ball employees who witnessed the fire?
12 A  Yes.
13 Q  You understand that to be true?
14 A  Yes.
15 Q  You have not reviewed those?
16       MR. O'BRIEN:  Object to form and to the
17    extent it mischaracterizes what he already said
18    about what was in the Howell materials.
19       MR. SENAK:  Let me try to make it a little
20    clearer.
21 Q  You have not reviewed the handwritten statements
22    of the Ball employees that Mr. Howell reviewed?
23 A  If they were in the totality of the Rimkus file
24    that I received, I may have seen them and read
25    them, but if they weren't any different than

59

1     what was in the Rimkus report or what was
2     reflected in Mr. Howell's deposition testimony,
3     I just relied on the report and the deposition
4     testimony of Mr. Howell.
5  Q  Did you get a copy of the Rimkus file?
6  A  I did.
7  Q  And by that I mean Rimkus responded to a
8     subpoena, they produced a body of documents, and
9     that was provided to you.
10 A  Yes.
11 Q  I know that that's not reflected in your report.
12    Or am I missing it?
13 A  No, it's not in the report.  But again, if the
14    information was the same, I did review them but
15    I didn't -- other than what was put in the
16    Rimkus report and Mr. Howell's testimony, I
17    didn't consider it anymore for the basis of my
18    opinion.
19 Q  Understood.  And I'm just, you know, we're
20    looking at what you label as documents reviewed,
21    and I just want to make sure I get the complete
22    universe out there.
23       And so what's shown in Exhibit No. 8 on
24    page 2 is an incomplete statement.  Is that --
25 A  Well, it is, but I reviewed the entire Rimkus

60

1     file, but I looked at their billing statement, I
2     looked at everything else, and that's not in my
3     report either.
4  Q  Look, it would surprise me if you didn't, right?
5     I mean, I would think that in the course of the
6     investigation, because given what your report
7     shows, I think you would have probably reviewed
8     the Rimkus file.  I'm just curious why it wasn't
9     listed in Exhibit No. 8.
10 A  Because in my exhibit, in my report that's
11    Exhibit 8, the documents reviewed, maybe I
12    should have put documents reviewed that support
13    my opinion, would have been more accurate.  But
14    those are the documents that support my opinion.
15 Q  Yeah.  So let me try and draw the distinction.
16    You review a lot of documents, but there are
17    some that you rely upon for purposes of
18    formulating your opinion.
19 A  Yes.
20 Q  The ones you rely upon for purposes of
21    formulating your opinion are what's shown in
22    Exhibit No. 8 on page 2 under the heading
23    "Documents Reviewed."
24 A  Yes.
25 Q  But there are documents that you reviewed that

61

1    you're not relying upon in formulating your
2    opinion that are not shown in Exhibit No. 8.
3  A  Correct.
4  Q  One of those would have been the Rimkus file,
5    true?
6  A  Yes.
7  Q  Within the Rimkus file would have been the
8    handwritten statements of the Ball employees who
9    were present at the time of the fire?
10  A  Yes.
11  Q  So you have those documents but you're not
12    relying upon them?
13  A  Well, I am to the extent that what's in those
14    documents is also in the Rimkus report, detailed
15    employee by employee.
16  Q  Let's say this:  What you list as one of the
17    documents you are relying upon is the Rimkus
18    Consulting Group report of findings dated June
19    9th of 2017 and the Rimkus Consulting Group
20    diagrams and notes.  True?
21  A  Yes, and the deposition of Scott Howell.
22  Q  And deposition of Scott Howell.  With respect to
23    the Rimkus Consulting Group report, you are
24    relying upon that in formulating your opinions.
25    True?

62

1  A  Yes.
2  Q  Would you rely upon documentation, in
3    formulating your opinions, that in your
4    assessment was unreliable?
5       MR. O'BRIEN:  I'm going to object to the
6    form of the question.
7  A  Yeah, I'm not sure that I understand that
8    question exactly.  But I think the basis for
9    Mr. Howell's opinion is not reliable information
10    in the extent that I don't think he got all the
11    information that I think he should have gotten.
12  Q  Well, your criticism of Mr. Howell is he's
13    relying upon information that is unreliable.
14    True?
15  A  To some extent, yes.
16  Q  You're relying upon Mr. Howell's report in
17    formulating your opinion?
18  A  Well, to some extent.
19  Q  If you felt Mr. Howell's report was unreliable,
20    I take it you wouldn't rely upon it in
21    formulating your opinion.
22  A  No, I wouldn't.  But in my report I'm commenting
23    on his conclusions based on his investigation.
24  Q  Did you review the operations manual for the
25    oven?

63

1  A  I did not.
2  Q  Did you review the oven curve data regarding the
3    oven?
4  A  No.
5  Q  If we could take a look at your report, on
6    the first page you, I think in the third
7    paragraph, you say "The fire was reported by
8    Ball employees who observed smoke and eventually
9    flames above IBO No. 2 at the east end exhaust
10    blower."
11       Do you see that?
12  A  Yes.
13  Q  What is the source of that information?
14  A  Well, when I was there on, in those first two
15    dates in 2014, I think we had somewhat of a
16    general overall briefing of how the fire was
17    discovered.  And then, again, that information
18    was contained within the Rimkus report,
19    Mr. Howell's deposition testimony, but also from
20    the fire department investigator or chief that I
21    spoke with.
22  Q  Well, this one says that the fire was reported
23    by Ball employees.  Do you know who those
24    employees were that you're referring to?
25  A  Not off the top of my head, no.

64

1  Q  Did you interview any Ball employees?
2  A  I did not, no.
3  Q  Is what you're referring to here the information
4    that's contained is the Rimkus report about the
5    handwritten statements of the Ball employees?
6  A  I'm not sure I follow you on that one.
7  Q  We talked about the idea that the Rimkus report
8    reflects information that was provided by Ball
9    employees.  True?
10  A  Yes, yes.
11  Q  That information was -- the source of that
12    information was handwritten statements that were
13    given by Ball employees who witnessed the fire?
14  A  Yes.
15  Q  Is what you are referring to here, is the source
16    of that information, "The fire was reported by
17    Ball employees who observed smoke and eventually
18    flames above IBO No. 2 at the east end exhaust
19    blower," is the source of that information those
20    handwritten statements of Ball employees?
21  A  No.
22  Q  Then what is it?
23  A  Well, I think, again, it goes to that initial
24    briefing we had at the Ball plant, and then also
25    I spoke with Captain Rocky Strange at the

**65**

1    Monticello Fire Department.
2  **Q  And so what you're saying is one of the sources**
3     **would be your conversations with Rocky Strange?**
4  A   That would be one.
5  **Q  Then the briefing that was done at the time of**
6     **the fire?**
7  A   In early June of 2014.
8  **Q  Right.  Is it -- is another source the**
9     **handwritten statements that were provided that**
10    **were in the Rimkus file?**
11       MR. O'BRIEN:  Asked and answered.  Go
12    ahead.
13 A   That's just, I mean, that just kind of affirms
14    what we already know, that's where the fire --
15    general area of origin of the fire was at that
16    end of the plant.
17 **Q  I'm just trying to get some sense of what the**
18    **source of this was.  And I think there's three,**
19    **right, there's the general statement at the**
20    **time, the statement by Fire Marshal Rocky**
21    **Strange, and then the handwritten statements?**
22       MR. O'BRIEN:  Object to form,
23    mischaracterizes the testimony.
24 A   The handwritten statements, yes, but that was
25    after probably I already knew this information.

**66**

1    So I already knew that information, but then I
2    was aware of the Rimkus report and the Ball
3    employees' handwritten notes.
4  **Q  Understood.  Obviously you get information from**
5     **a variety of different sources, true?**
6  A   Yes.
7  **Q  And in fact, the reliability of the information**
8     **is a function of whether you can verify it from**
9     **other sources.**
10 A   For the most part, yes.
11 **Q  And so the three sources that provide a basis**
12    **for the statement on page 1 about where the fire**
13    **was reported would be the information provided**
14    **during the general briefing right after the**
15    **fire, the information provided to you by**
16    **Firefighter Strange, and the handwritten**
17    **statements.  Is that true?**
18       MR. O'BRIEN:  Same objection, asked and
19    answered.
20 A   Yeah, I would say for the most part, yes.
21 **Q  Okay.  Anything else other than those three?**
22 A   Not that I'm aware of, no.
23 **Q  On the second page of your report you indicate**
24    **that the oven operates at 400 degrees**
25    **Fahrenheit.**

**67**

1  A   Yes.
2  **Q  All right.  What's the source of that**
3     **information?**
4  A   Again, it may have been information I got from
5     the, at the briefing, but also from -- well,
6     from Ken Wall or Mr. Paul Scholten -- and also
7     again from another guy I spoke to at the scene
8     who was there from MEGTEC.  His name is Lloyd
9     Hensley.
10 **Q  Okay.  Anything else?**
11 A   Maybe some, when I documented photographically
12    the, I guess the instrument panel on the IBO,
13    that had temperature readings that substantiated
14    the 400 degree temperature range.
15 **Q  Other than what you have identified, any other**
16    **source of information that you are relying upon**
17    **to conclude that the oven temperature operates**
18    **at approximately 400 degrees Fahrenheit?**
19 A   No, I don't think so.
20 **Q  On that same page in that same paragraph it**
21    **says, "Mr. Scholten advised that goo would**
22    **always drop down into the blower from the**
23    **ductwork above, so they would clean above the**
24    **blower as far as they could reach."**
25       **Do you see that?**

**68**

1  A   Yes.
2  **Q  Is it your understanding -- well, let's go back.**
3     **What is your understanding of what the Air Tech**
4     **scope of work was?**
5  A   To clean the scale, and that's that residue
6     buildup that's on the inside of the IBO, which
7     is the bake oven, as far as the squirrel cage.
8     And the squirrel cage is the blower that blows
9     the exhaust, it's positioned above the IBO and
10    it kind of channels that exhaust out into the
11    ductwork and outside the plant.
12 **Q  If you look at page 6 of your report, photo**
13    **No. 4, the IBO No. 2, and you just described**
14    **what you believe the scope of work is for**
15    **Air Tech; does the photo No. 4 reflect the areas**
16    **of the IBO that Air Tech was supposed to clean?**
17 A   Probably not all of it, but at the base, bottom
18    of the photograph, is the IBO, so it shows that
19    part of it, and then shows a portion of the
20    squirrel cage, so yes, for the most part, it
21    does.
22 **Q  I'm just going to give you a pencil or marker.**
23    **Can you just draw a line where you believe the**
24    **scope of work for the Air Tech cleaning would**
25    **have started or stopped?**

---

**69**

1   A   Well, how about if I just do stopped?
2   Q   Yeah, that's fine.
3   A   Okay. So how best can I do this? So I'm going
4       to draw a line where the exhaust blower is
5       connected to the ductwork, and that's about
6       where the work ended. So everything -- I'll
7       draw an arrow downward -- so everything from the
8       line downward is what they were supposed to
9       clean, including the oven at the bottom of the
10      photograph.
11  Q   Can you just put your initials and the date
12      there?
13  A   What is today, 12th?
14          THE REPORTER:  11th.
15  Q   So it's your understanding their scope of work
16      would have included the blower, the squirrel
17      cage, and the housing that those things were in?
18  A   Yes.
19  Q   Now, Mr. Scholten, in your report, he says "so
20      they would clean above the blower as far as they
21      could reach." That's on page 2.
22  A   Yes.
23  Q   What's your understanding of what he was
24      describing?
25  A   So they would actually reach as far up as they

**70**

1       could into the ductwork directly above the
2       blower, and he explained that he would do that
3       and go above and beyond what they were hired to
4       do just to make sure that -- because at this
5       particular plant he explained that they had a
6       problem with this, what you call goo, dropping
7       down into the blower. So they cleaned as much
8       of that as they could reach up into the
9       ductwork.
10  Q   There is an elbow that is shown in page No. --
11      I'm sorry -- photo No. 4 on page 6 of your
12      report.
13  A   Yes.
14  Q   Do you see the ductwork elbow? Do you know if
15      they were able to clean up to that elbow?
16  A   You know, he didn't say how far they cleaned,
17      and he didn't mention the elbow, he just said
18      they cleaned as far as they could reach above.
19  Q   Back on page 2 of your report it talks about --
20      this is towards the bottom of the page -- "Once
21      the scale has been cleaned from the surfaces,
22      five-gallon shop vacs were utilized to vacuum
23      all the residue from within the IBO and blower."
24  A   Yes.
25  Q   Is that information that was provided to you by

**71**

1       Mr. Scholten or Mr. Wall?
2   A   Yes.
3   Q   What was the purpose of doing that?
4   A   Of using the shop vacs?
5   Q   Yes.
6   A   Because as they cleaned the scale with their
7       tools from the IBO and the blower, this debris
8       that adhered to the sides or surfaces would drop
9       down and settle in the bottom layers of wherever
10      they were working, so they shop vac'd that all
11      out of there.
12  Q   Do you know what the size of the particulate
13      matter was that would drop down when they would
14      conduct that cleaning?
15  A   No, not exactly. It would be -- it's all
16      relative, large pieces to small pieces to very
17      fine pieces.
18  Q   Would some of it be in the form of dust or
19      powder?
20  A   Could be.
21          MR. O'BRIEN:  Object to foundation.
22  Q   Is that what you were told by either
23      Mr. Scholten or Mr. Wall?
24  A   No, I think that was just more me using common
25      sense, figuring, like, when they scraped sides

**72**

1       of things off before and it comes off in varying
2       sizes down to a fine material.
3   Q   Right. You would assume that to be true based
4       on the type of tools that they were using to
5       remove the scale or residue from inside the
6       oven?
7   A   Yes.
8   Q   Did you meet personally with Mr. Wall and
9       Mr. Scholten, or did you talk to them on the
10      phone?
11  A   I know there was at least one. I think maybe
12      they were both there on whatever date that was
13      in early June when we had our initial
14      examination.
15  Q   At the Monticello plant?
16  A   Yes.
17  Q   Other than that conversation and the one that's
18      reflected -- I take it that date on
19      Exhibit No. 7 is August 8th of 2017?
20  A   Yes. And then that date is actually the date
21      that I probably wrote those notes. But I had --
22      I called, as I was finalizing my report, I
23      called Mr. Scholten, I think that week he was at
24      a camp up in Michigan somewhere with his family,
25      so I called him on that day and left a message,

73

1　he called me back, and then we were playing
2　phone tag back and forth leaving messages, so
3　then I remember the next day I might have had a
4　follow-up question for him, then had another
5　follow-up conversation with him, so this
6　reflects a series of conversations I had with
7　him in a short span of time.
8　Q　All right. I was just going to actually ask the
9　　question, how many conversations did you have
10　　with him, that you can recall?
11　A　Oh, I'd say at the most maybe, I know at the
12　　initial point of the investigation, maybe a
13　　couple follow-up conversations to our meeting,
14　　called him on the telephone, and then maybe on
15　　this Exhibit 7 date reflects a total of maybe
16　　three short conversations that I had in those
17　　because I had some follow-up questions.
18　Q　Understood. You have not reviewed his
19　　deposition, though?
20　A　No.
21　Q　Your report indicates you spoke with Lloyd
22　　Hensley about the incident.
23　A　Yes.
24　Q　Did you interview him?
25　A　It wasn't what I would say a formal interview.

74

1　He was there at the scene with me on one of
2　those early dates in June, and it was more of a
3　conversation we had as parts of the ductwork
4　were being removed by the crew that was there
5　and me just taking some notes as he was talking
6　or soon after we had our conversation.
7　Q　Are you relying upon the information that
8　　Mr. Hensley provided you in formulating your
9　　opinion?
10　A　To some extent.
11　Q　What information is it that you are relying upon
12　　that he provided to you in formulating your
13　　opinion?
14　A　Well, in my report he mentions -- I say that he
15　　talked about -- well, specifically what I would
16　　rely on is that, you know, he's been a long time
17　　MEGTEC employee -- I think at the time he was
18　　actually retired but they brought him back and
19　　he did contract work for them at the time -- but
20　　his vast amount of experience, and he was
21　　talking about how long he had been in the
22　　business, but that he's seen that kind of thing
23　　happen on numerous occasions and that it was
24　　always a result of, in my report it says the
25　　result of poor maintenance and buildup of

75

1　solvent on the ductwork.
2　Q　He indicates, in the text of your report, that
3　　he provided information to you that the ovens
4　　may have been originally designed to operate at
5　　350 degrees. Do you see that?
6　A　Yes.
7　Q　When he says "may" do you construe that to mean
8　　that he has personal knowledge of that?
9　A　Yeah. I mean, he has a lot of experience in
10　　these types of operations, so, I mean, he's
11　　saying it may have been designed, but he's
12　　basing that on his educated knowledge and
13　　background.
14　Q　Does he know? I mean, did you ask him whether
15　　he knows what the temperature of the ovens were
16　　at the Ball Monticello plant?
17　A　No.
18　Q　You didn't ask?
19　A　No.
20　Q　Is there any indication that he actually knows?
21　　　MR. O'BRIEN: Object to form.
22　A　I don't know if he knows. I mean, I would think
23　　he probably knows, but I didn't get that from
24　　him.
25　Q　Let's say this: You don't know whether he knows

76

1　what the temperatures were or not?
2　A　No. I strongly believe that he probably knows,
3　　but I don't know for a fact that he knows.
4　Q　In terms of, we talked about like reliability of
5　　witnesses, you wouldn't rely upon the testimony
6　　of someone if you didn't believe that they knew
7　　what -- whether the information they were
8　　providing was true?
9　A　Right, I would consider it, but I would also
10　　consider that, you know, what's the probability
11　　it's true or not true.
12　Q　Is it -- so with respect to the temperature
13　　information that he provided, would you consider
14　　that to be reliable?
15　A　Yes, to some degree, yes, I would say it's
16　　reliable.
17　Q　Why do you think it's reliable?
18　A　Because, again, this is his business, it's what
19　　he's been involved in for a long time, and he
20　　has done more than work for just Ball
21　　Corporation, and his experience in this kind of
22　　ductwork and experienced these kind of fires
23　　before, and so based on his experience, in our
24　　conversation it sounded like he knew what he was
25　　talking about.



77

1   Q   Yeah, I understand that, but did you ask him
2       whether he has personal knowledge what the
3       operating temperatures of the ovens were?
4   A   No.
5   Q   So you don't know whether he does or doesn't?
6   A   No, I don't.
7   Q   And in the absence of some knowledge on your
8       part that he actually knows what the operating
9       temperature is, would you consider the
10      information he provides about operating
11      temperature reliable?
12  A   Yes.
13  Q   For the reasons that you stated?
14  A   Yes.
15  Q   It indicates here he told you that Ball may have
16      increased the temperature.
17  A   He did say that, yes.
18  Q   Do you know whether he knows that to be true?
19  A   No, I don't know if he knows that to be true.
20  Q   Would you rely upon that information then in
21      formulating your opinion?
22  A   Well, I mean, I said in here, he said even that
23      they may have.  So that, I'm just stating what
24      he told me.
25  Q   Right.  You're stating that he doesn't know for

78

1   sure.
2   A   Correct.
3   Q   And you wouldn't rely upon someone who doesn't
4       know for sure whether the information they are
5       providing you is true or not.
6   A   No, I mean, just one bit of information that he
7       provided me in this part, no, I wouldn't -- I
8       didn't really hold any weight to what he told me
9       on that, I just put in there that's a
10      possibility.
11  Q   Right.  I'm just trying to get a sense, when you
12      talk about what you rely upon, you wouldn't rely
13      upon information that you thought was not
14      accurate.
15  A   Correct.
16  Q   And since he has no personal knowledge, to your
17      understanding, of what the -- of whether the
18      increased oven temperatures at the Monticello
19      plant, whether that's a true statement, I take
20      it you wouldn't rely upon that?
21  A   No, that one sentence, I wouldn't rely on that
22      being part of my opinion.  I just put that in
23      there because I was including what he told me.
24  Q   So at least on the part where it says Ball may
25      have increased the temperatures, you're not

79

1       relying upon what Mr. Hensley told you in
2       formulating your opinion.
3   A   No, not overall, no.
4   Q   The statement that higher temperatures are
5       required for higher production demands, do you
6       know whether he had any personal knowledge of
7       whether that was true or not?
8   A   It sounded like he did.
9   Q   When you say "it sounded like he did," did he
10      tell you that he did?
11  A   Well, it was a statement that he was making to
12      me.  So I took it that he knew what he was
13      talking about.
14  Q   Well, let's say this:  You know Mr. Hensley
15      doesn't work at Ball Corporation.
16  A   I do.
17  Q   And do you know that he has -- do you know
18      whether he has any knowledge whatsoever of the
19      Ball production process?
20  A   Based on the conversation, it sounded like he
21      did.
22  Q   Do you know whether he has any experience in the
23      production of metal beverage cans at the plant?
24  A   Well, I don't know that specifically, but he
25      sounded like he knew the operation of the ball

80

1       process.
2   Q   Well, did you ask him if he had that knowledge?
3   A   I didn't ask him.
4   Q   So you don't know whether he did or didn't?
5   A   No.  It sounded like he did.
6   Q   I understand it sounded like he did, but I'm
7       just asking you did you ask him whether he did
8       or he didn't?
9   A   I didn't ask him that.
10          MR. O'BRIEN:  Asked and answered.
11  Q   Do you know whether he knows how IBOs are
12      operated?
13  A   I did not specifically ask him that question.
14  Q   So you don't know whether he knows what the
15      operating temperatures of the IBOs are or are
16      not?
17          MR. O'BRIEN:  Asked and answered.
18  A   No, but again, I took his information as
19      reliable.
20  Q   When he says that higher temperatures are
21      required for higher production demands, did you
22      rely upon that information in formulating your
23      opinion?
24  A   Not, I mean, not totally.  That really wasn't
25      that relevant.  It was maybe -- it could be

81

1  relevant, but I don't know that it is relevant.
2  Q  Well, I understand you put it into your report,
3     and so obviously I'm interested in knowing
4     whether that information is something that you
5     relied upon in formulating your opinion.
6  A  I mean, it might play a small part, but overall
7     I would say it's a very small part, if anything.
8  Q  I mean, is it accurate to say you did not rely
9     upon the information provided by Mr. Hensley
10    regarding the higher temperatures were required
11    for higher production demands?
12 A  No, I think it was more of a consideration.
13 Q  Not something you would have relied upon?
14 A  No, overall in the greater scheme of things, no,
15    probably wouldn't rely on that when I formed my
16    opinion.
17 Q  Okay.  He talks about line speed, so line speed
18    would have to also be considered.  Do you know
19    whether he knew what the line speed was of the
20    lines?
21 A  I don't know.
22 Q  I take it you wouldn't have relied upon any
23    testimony or any information he provided about
24    line speed in formulating your opinion.
25 A  That's correct.

82

1  Q  He told you the ovens were installed in 1988?
2     That's up a little higher.
3  A  Yes, yes.
4  Q  Did you ever verify whether that was true or
5     not?
6  A  I didn't.
7  Q  Do you know whether IBO No. 2 was installed in
8     1988?
9  A  I do not.
10 Q  I take it you wouldn't have relied upon that in
11    formulating your opinion then?
12 A  No.
13 Q  You wouldn't?
14 A  I would not.
15 Q  Okay.  Now, he goes on to say, and he advised
16    you that he has known of many similar type duct
17    fires since his time with MEGTEC.  Correct?
18 A  Correct.
19 Q  Were any of those at the Ball plant?
20 A  I did not ask him that.
21 Q  Did you ask him where those fires were at?
22 A  No.  It was more of a general statement.
23 Q  Did you ask him when those fires occurred?
24 A  Did not.
25 Q  Did you ask him what caused those fires?

83

1  A  Well, no, because he actually told me that
2     without me asking.
3  Q  Do you know whether he has any experience or
4     education regarding maintenance of IBOs?
5  A  That certainly sounded like he did, but I can't
6     say for sure because I didn't ask him.
7  Q  When we're talking about maintenance, do you
8     know whether he ever cleaned an IBO such like
9     the Air Tech people did?
10 A  I don't know if he ever personally cleaned one.
11 Q  Do you know whether he has any cause and origin
12    training or background?
13 A  I do not.
14 Q  Is it your understanding that he has none?
15 A  I wouldn't think they would have any.
16 Q  He certainly doesn't have the level that you
17    have --
18       MR. O'BRIEN:  Objection to foundation.
19 A  I wouldn't know, but I didn't take it that he
20    had any background in fire investigation.
21 Q  So when he provided you information about cause
22    and origin of fires, and you have reason to
23    believe he does not have the education or
24    experience to formulate an opinion on cause and
25    origin, would you rely upon that testimony in

84

1     formulating your opinion?
2  A  Well, to some extent, yes.  I mean, just because
3     he is not an origin and cause investigator, I
4     mean, he has some working knowledge of these
5     types of operations.  And it's like a mechanic
6     might know what caused a fire in a certain part
7     of a car, he is not an origin and cause
8     investigator, but he is certainly more
9     knowledgeable in mechanics than I am and he
10    could certainly tell me what caused the fire.
11 Q  Do you know whether he ever operated an IBO?
12 A  I don't know.
13       MR. O'BRIEN:  Asked and answered.
14 Q  Did you ever ask him what the basis for his
15    opinions are that fire is a result of poor
16    maintenance and the buildup of solvent?
17 A  No, I'm taking -- I took it at the time that he
18    was basing that comment on his experience.
19 Q  And what is his education or experience?
20 A  I don't know.  I mean, I know that he had been
21    from MEGTEC and retired from MEGTEC after a
22    longtime career and then he still worked for
23    MEGTEC on a contractual basis.  And they worked
24    in these plants, facilities that utilized
25    ductwork, and so I knew he had a longtime career



85

1  in these type of facilities.
2  Q  So you have no knowledge of his education, his
3     experience, you have no understanding that he
4     has any cause and origin investigation, you
5     don't know whether these fires actually occurred
6     at the Ball plant or not, is it your
7     testimony that you are relying upon that
8     information in formulating your opinion?
9        MR. O'BRIEN: Object to form.
10 A  Only a small part, that these fires do happen in
11    ductwork operations, and that he talks about the
12    condensation on the ductwork, which we know
13    there was condensation that happened in the
14    process of this Ball operation. We know there's
15    buildup of solvent on the ductwork because there
16    was buildup on the solvent in the ductwork
17    present.
18       So, you know, what he's telling me is more
19    substantiating some of the things we know, but
20    he's also got years if not decades of experience
21    in this type of thing, so I did take a little
22    bit of what he had to say into consideration.
23 Q  When you say he has years or decades of
24    experience, did you ask him what his experience
25    was?

86

1  A  No.
2     MR. O'BRIEN: Asked and answered.
3  Q  So you don't know whether he has years or
4     decades of experience?
5     MR. O'BRIEN: Asked and answered.
6  A  No not for a fact, no.
7  Q  So help me out here -- I mean, you don't -- you
8     don't know whether he has any education,
9     experience, that has anything to do with either
10    the Ball Corporation or similar fires, but yet
11    you would rely upon his information to formulate
12    your opinion?
13    MR. O'BRIEN: Object to form and
14    mischaracterizes the testimony.
15 A  No, no, I do know to some extent. I mean, I
16    don't know for a fact. I haven't looked into
17    his personal background, didn't interview him
18    about his background, but when he's there
19    running the operation on this ductwork
20    replacement, I would assume that he knows what
21    he's doing and he's been around for a long time
22    and kind of knows.
23       So in one respect I do know. In a another
24    more factual respect, I mean, the way you are
25    asking me, I don't know.

87

1  Q  And if you were following, you know, 921 or any
2     other protocol for fire investigation, it would
3     be improper to rely upon unreliable evidence or
4     unreliable sources of information.
5        MR. O'BRIEN: Object to form.
6  A  Well, I think in every case it's separate and
7     distinct, and you have to determine what's
8     reliable, more reliable or less reliable.
9  Q  Right. And would you consider Mr. Hensley's
10    information that he provided to you, given that
11    you don't really know anything about his
12    background or anything, would you consider it to
13    be more or less reliable?
14       MR. O'BRIEN: Form.
15 A  More reliable. If I grabbed some guy off the
16    street and asked him what do you think caused
17    this fire, what do you think caused this fire,
18    he would be less reliable. If I take someone
19    like Mr. Hensley and asked his opinion, he would
20    be much more reliable.
21 Q  I agree with that statement, I'm just curious as
22    to why you believe Mr. Hensley has some
23    knowledge or experience when, as I understand
24    it, you never asked him whether he did.
25       MR. O'BRIEN: Object to form and asked and

88

1     answered. I think he's answered this question
2     four or five times now.
3  A  Yeah, and again, I'll stick with the answer that
4     in my conversation with him -- and he's the guy
5     in charge there running the operation -- he
6     knows what he's talking about.
7  Q  The only basis for your conclusion that
8     Mr. Hensley has some knowledge about what he's
9     talking about is the fact that he was actually
10    there at the plant and was involved in replacing
11    the ductwork?
12       MR. O'BRIEN: Form.
13 A  Well, just overall conversation, I mean, he
14    sounded like based on his experience and work
15    that he's done he knew what he was talking
16    about, yes.
17 Q  Other than that you have no knowledge of what
18    his education, experience, background or
19    knowledge would be?
20       MR. O'BRIEN: Form, asked and answered.
21    Can we move on now, Mark?
22       MR. SENAK: Go ahead.
23 A  I mean, factually, the way you're asking, no.
24    But, I mean, if I had to weigh on a scale
25    whether I thought he knew what he was talking



89

1    about or not, I think he knew what he was
2    talking about.
3  Q  You just, other than what you have already
4    testified to, there is no other basis for your
5    assumption that he knew what he was talking
6    about?
7  A  No. And I'm just going to answer the same way
8    that I have been.
9  Q  Understood. You go on and you also talk about
10    Mr. Hensley provided you with some information
11    that condensation was a problem in the ductwork.
12  A  Yes.
13  Q  How often was he at the plant, to your
14    knowledge?
15  A  Well, in this statement, I don't know that he
16    was talking specifically about Ball Corporation,
17    but in general terms, based on his experience,
18    the condensation on ductwork is a problem.
19  Q  Right. But he has no personal knowledge of
20    whether that's actually true for the Ball
21    Monticello plant?
22    MR. O'BRIEN: Object to foundation.
23  A  No, but that's -- that's more, based on my
24    experience, an accurate statement. I mean, I
25    know what happens with condensation in these

90

1    type of operations, so I would know that he
2    knows what he's talking about and it would be a
3    true statement.
4  Q  Well, it's a little bit of a difference, in my
5    view, in the following way: He has no personal
6    knowledge of whether there is or is not
7    condensation at the Ball plant ductwork, true,
8    to your knowledge?
9    MR. O'BRIEN: Object to foundation.
10  A  No, I would say that's not true.
11  Q  Then why is it you believe he has that
12    knowledge?
13  A  Because I saw the evidence of condensation, and
14    he saw -- he was standing there looking at the
15    same evidence of condensation I was.
16  Q  Well, your observations I understand. Okay.
17    His observations, what I'm trying to figure out
18    is whether you are relying on yours or relying
19    on his.
20  A  Relying on mine. But what he's telling me is
21    factual based on what I'm seeing.
22  Q  And what is it that you were seeing that led you
23    to conclude there was condensation?
24  A  Because you don't have the buildup of that
25    material inside the ductwork unless you have

91

1    condensation.
2  Q  Why is that true?
3  A  Why is what true?
4  Q  Why is the buildup on the inside of the ductwork
5    a function of condensation?
6  A  Well, because we know what the process is at the
7    Ball Manufacturing plant; they spray on the
8    liner in the cans that is baked off as it runs
9    through the IBO; that liquid material has to go
10    somewhere so it's progressing through the
11    ductwork in the form of condensation. It's
12    evaporating, it's going up.
13    If the conduct, if -- not conduct, sorry --
14    if the flue pipes aren't properly insulated,
15    they are cool, we know that condensation adheres
16    to surfaces, and so then if you get enough
17    condensation over time and more and more
18    adhering, you're going to have a buildup of what
19    we saw in the ductwork.
20  Q  Any measurements of the condensation in the
21    ductwork that you are aware of?
22  A  Well, the residue I took measurements of. I
23    think we all did.
24  Q  I'm talking about condensation, right, is
25    moisture, true?

92

1  A  Right.
2  Q  Any measurements of the amount of moisture or
3    condensation that is in the ductwork that you
4    are aware of?
5  A  No, I think we can -- that was only evidenced by
6    how much buildup of material there was in the
7    ductwork.
8  Q  Right. Do you know of any reliable source of
9    information that correlates the amount of
10    condensation to the amount of ductwork or the
11    amount of buildup of residue in the ductwork?
12  A  No. That would probably have to be a very
13    complex engineering mathematical problem someone
14    would have to figure out.
15  Q  I would agree. But you didn't do that
16    calculation, did you?
17  A  No, I just saw the end result of the
18    condensation.
19  Q  Right. Your conclusion that there's
20    condensation in the ductwork is based upon the
21    fact that there is a residue in the ductwork?
22  A  Yes.
23  Q  And that's it.
24  A  Yes.
25  Q  There's no scientific method by which you



93

1    reached that conclusion beyond simply observing
2    it?
3        MR. O'BRIEN:  Object to form.
4   A   Well, I mean, I did use the scientific method of
5    reasoning and investigation to come to that
6    conclusion.  I understood the manufacturing
7    process, I understood what was used in the
8    process, I saw the end result of what happened
9    in the process with the buildup of materials, so
10    I mean, it's more than just looking.  I mean,
11    it's looking at and knowing what the process is
12    that causes that.
13  Q   Right.  But we talked earlier about the idea
14    that you have no background in chemistry,
15    materials science, physics, or otherwise by
16    which you could actually determine what the
17    process was that results in the condensation
18    that you attribute to causing the buildup?
19        MR. O'BRIEN:  Object to form and to the
20    extent it mischaracterizes what he said earlier.
21  A   No, that's incorrect.  Because understanding the
22    process, I know what causes the buildup of
23    material, I know.  Everyone that was
24    there, investigators, know what caused the
25    buildup.  So I'm not saying I don't know.  I'm

94

1    not sure what you are getting at.
2   Q   Well, you don't know how much condensation is in
3    the ductwork to begin with, true?
4   A   I know there's enough condensation to create the
5    residue that we saw there.  That's the bottom
6    line.
7   Q   And that's all I'm trying to kind of get my arms
8    around, is the idea that the way you reached the
9    conclusion that there's condensation is not
10    through any measurement or testing, it's simply
11    because you observed residue in the ductwork.
12  A   Well, it's cognitive testing.
13  Q   When you say "cognitive testing" what do you
14    mean?
15  A   I mean reasoning through the process.
16  Q   And that reasoning is based upon your
17    understanding of what scientific principle?
18  A   The scientific method of investigation.
19  Q   Yeah, but does that involve some knowledge of
20    what the chemical composition of the spray liner
21    would be relative to the ambient air temperature
22    and the amount of condensation that would
23    generate as a result of that?
24  A   I can't give you mathematical figures or
25    anything like that, but I can tell you that

95

1    there was residue, there was condensation, there
2    was a buildup of condensation.
3   Q   Let's say this:  Your conclusion there's
4    condensation is based on the fact that you
5    observed the residue, true?
6        MR. O'BRIEN:  Asked and answered.
7   A   Yes.
8   Q   And other than that observation, is there any
9    qualitative or quantitative data on which you're
10    relying to reach that conclusion?
11        MR. O'BRIEN:  Form.
12  A   Yeah, I'm not sure I understand.  I just
13    explained to you, and I don't think I can
14    explain it any clearer, that I know the process,
15    I know what they used, I know that the cans were
16    run through at a certain temperature, I know
17    that there was condensation and residue.  I
18    don't know that I can answer any differently.
19  Q   I, you know, I appreciate that, by the way.
20        MR. O'BRIEN:  Mark, we have been going
21    about another hour.  Everybody still good?  Mike
22    you need a break?
23        MR. SENAK:  Yeah, let's take a little
24    break.
25        (A recess was taken between 12:01 p.m. and

96

1    12:08 p.m.)
2   Q   So Mr. Vergon, is it true that condensation is
3    caused by a difference in temperature?
4   A   Yes.
5   Q   I take it the greater the difference in
6    temperature, the more condensation is, develops?
7   A   Typically, I think, yes.
8   Q   Do you know of any measurement that was taken of
9    the temperature in the ductwork?
10  A   No.
11  Q   Do you know of any measurement that was taken of
12    the temperature in the plant?
13  A   I do not.
14  Q   Are you aware that there are methods for
15    measuring moisture or condensation?
16  A   Yeah, I think so, probably, yes.
17  Q   Were any measurements taken, to your knowledge,
18    of the moisture level or condensation level in
19    the ductwork?
20  A   No, not that I'm aware of.
21  Q   When you put into your report, "Mr. Hensley
22    advised the condensation in the ductwork is a
23    problem and more condensation leads to more
24    buildup of the residue," is that your opinion or
25    his opinion?



97

1   A   Well, that's what he was stating to me, but
2       that's also something I know to be true.
3   Q   So is that your opinion or his opinion?
4       MR. O'BRIEN:  Object to form.
5   A   Well, I'm not sure he was giving me his opinion
6       and I wrote his opinion down, but I know that
7       fact, what he was saying, so I put it in my
8       report.
9   Q   Let me just understand that what you are saying
10      is you have that opinion and it is based on
11      something other than Mr. Hensley's statement?
12  A   Yes, yeah.
13  Q   And what it's based on is your sort of personal
14      knowledge of the Monticello plant operations.
15  A   Well, that and it's just my knowledge about
16      condensation and residue in fireplace fires,
17      chimney fires, or flue fires.
18  Q   Oh, I understand that.  But is it your opinion
19      that at least in the Ball plant in Monticello,
20      the condensation on the ductwork is a problem?
21  A   Well, that's what he was -- he was giving me his
22      opinion in general regarding his experience.
23  Q   But is it your opinion?
24  A   My opinion what?
25  Q   That condensation on the ductwork at the Ball

98

1       plant in Monticello is a problem.
2   A   Well, I mean, it is my opinion that it could
3       factor in.
4   Q   Well, is that, when you say "could," is that
5       based on a reasonable degree of certainty?
6   A   Yes.  I mean, we get into -- if you skip ahead
7       of the fire department reports, some of the Ball
8       employees made statements about the fires in the
9       ductwork.
10  Q   Do any of them make any statements about
11      condensation?
12  A   Well, I think one of them does -- they don't
13      refer to condensation, but what they are
14      probably talking about refers to condensation.
15  Q   You know, I'm just trying to get a sense of
16      what's your opinion and what's Hensley's
17      opinion, and if it is your opinion, what the
18      basis of the opinion is.  All right?
19          So is it your opinion that the condensation
20      was a problem in the ductwork at the Ball
21      Monticello plant?
22  A   It would be my opinion that condensation was
23      probably most likely a problem at the Monticello
24      plant which led to the --
25  Q   What is that based on?

99

1   A   The occurrence of the fire, the buildup of the
2       residue, and then in my experience in other
3       chimney flue fires, other types of fires that
4       involve mostly chimney, fireplace fires, flue
5       fires.
6   Q   And that's, you know, that's what I want to just
7       sort of make sure of.  That opinion is based on
8       your observation of the residue?
9   A   And the fact that there was a fire, yes.
10  Q   And nothing else?
11  A   And the overall knowledge of the plant
12      operations.
13  Q   Your overall knowledge of the plant operations?
14  A   Yes, and the interviews conducted, and then the
15      fire department reports, yes.
16  Q   What is it about your knowledge of the plant
17      operations that leads you to that conclusion?
18  A   That -- I'm sorry -- which conclusion?  I lost
19      you.
20  Q   That condensation was a problem at the Ball
21      plant.
22  A   Because there was that much buildup on the
23      ductwork.
24  Q   So that's again just your observation of the
25      ductwork?

100

1   A   Yes.
2   Q   Anything other than that, relating to plant
3       operations, I think you termed?
4   A   No, not specifically.
5   Q   Other than what you have already described, any
6       other basis for your opinion that condensation
7       was a problem at the Ball plant?
8   A   Other than there was a fire and what was
9       observed in the ductwork?
10  Q   Right.
11  A   No.
12  Q   You also go on to interview Captain Rocky
13      Strange, true?
14  A   Yes.
15  Q   Did you actually interview him?
16  A   Via telephone.
17  Q   You have no notes of that interview?
18  A   I don't, no.
19  Q   I note on your billing statement you have no
20      billing entry that you conducted that interview.
21  A   No.  It was a very short conversation.
22      Actually, I mean, you can see how long my notes
23      are with him, very short.  He didn't really say
24      too much other than what I had heard by this
25      time, except for where they made entry, and

---

101

1    there was fire extending out from the ceiling
2    level, you know, in another part of the plant.
3  Q  Do you have any notes of conversations with
4    Rocky Strange?
5  A  I don't know.  I would have to look, review my
6    notes.  I haven't seen anything in quite a
7    while.
8  Q  Let's say this:  On Exhibit 7, I hope -- is it
9    7?  Yeah.  Exhibit 7 does not reflect any
10    conversations with Rocky Strange?
11  A  No.  And I may have gotten this information
12    based on what he told me, but also it was just,
13    the exact same thing was contained in the fire
14    department report of that fire.
15  Q  Yeah, I understand that.
16    (Deposition Exhibit 9 was marked for
17    identification.)
18  Q  Showing you Exhibit No. 9, from what I can find,
19    these are the balance of the notes that you
20    produced in response to the subpoena.  So
21    between Exhibit No. 7 and Exhibit No. 9, it's my
22    understanding that those are all the notes that
23    have been produced by you in this case.
24  A  Yes.
25  Q  Do you have any reason to disagree with that

---

102

1    statement?
2  A  No.  I think maybe -- I might have missed one.
3    There was -- I think I had a piece of paper
4    somewhere, and if I left it out I wasn't aware
5    of it.  It looks like I may have.  There was one
6    piece of paper, I think it has conversation with
7    Rocky Strange, and it says something like six
8    minutes.
9  Q  So there's at least notes of your conversation
10    with Rocky Strange that have not been produced
11    today?
12  A  It looks like there probably is.  I can send
13    that to you when we leave here.
14  Q  We can get that.  But you at least recall, I
15    mean, you have independent recollection that you
16    spoke with him on the phone?
17  A  I do, yeah.
18  Q  Apart from that conversation, I take it you
19    would have read the fire report.
20  A  Yes.
21    (Deposition Exhibit 10 was marked for
22    identification.)
23  Q  Showing you Exhibit No. 10, is it your
24    understanding Exhibit No. 10 is the Monticello
25    Fire Department report for the incident at the

---

103

1    Ball plant on May 23rd, 2014?
2  A  Yes.
3  Q  This shows that the alarm was received by the
4    fire department at 12:48 a.m.  True?
5  A  Yes.
6  Q  And then it shows that the fire department
7    arrived at the plant at 12:53 a.m.
8  A  Correct.
9  Q  I note you interviewed -- is it Assistant Chief
10    Strange?
11  A  I think it's Captain.
12  Q  Captain Strange.  Did you review any of the
13    other firemen?  I'm sorry.  Did you interview
14    any of the other firemen who were at the scene?
15  A  No, I just interviewed him and then read the
16    narrative, or all the narratives from the
17    report.  There's multiple narratives, it looked
18    like, authored by several people.
19  Q  What portion of the, if any, of Exhibit No. 10
20    are you relying upon in formulating your
21    opinions?
22  A  I think just the entire document, just getting
23    an overall feel for the response to the fire and
24    what was observed, the time.
25  Q  When you say "the time" you're talking about the

---

104

1    time that's reflected on the first page in terms
2    of when the alarm was received and when they
3    arrived?
4  A  Yes.
5  Q  Are you relying upon any of the narrative that's
6    shown on page 2 and page 3 and page 4?
7    MR. O'BRIEN:  Asked and answered.
8  A  Well, yeah, I said the overall document.
9  Q  Can you tell me what portions of the narrative
10    you are relying upon?
11  A  Again, the overall narrative, just taking in the
12    response, what was observed, where was entry
13    made, what were the observations, so I looked at
14    the entire document and took it all into
15    consideration.
16  Q  On page 4 of your report you indicate -- you
17    have "Summary of Ball Corporation Employees" --
18    I take it that's their statements, and you put,
19    "At approximately 12:45 smoke was exhausting
20    from the east end exhaust fan of IBO No. 2.
21    Flames were observed at this same location."
22    Do you see that?
23  A  Yes.
24  Q  Do you rely upon that as being the first
25    indication that there was a fire at the plant?

---

105

1  A  No, because earlier, a couple lines up, I talk
2     about the Ball employees smelling smoke.
3  Q  And that occurs at 12:20?
4  A  Yes.
5  Q  Is that what you are relying upon as the first
6     indication that there's a fire?
7  A  It looks like it, yes.
8  Q  So the dates in the fire report,
9     Exhibit No. 10 -- I'm sorry -- the times
10    reflected in the fire report in Exhibit No. 10,
11    you're not relying upon as the times when the
12    fire started?
13 A  No.  That's just the response times and the
14    arrival time.
15 Q  Is it your understanding that the fire
16    department arrives at the scene after smoke and
17    flames are observed?
18 A  It looks like it, yes.
19 Q  Do you know who was the first person to observe
20    smoke?
21 A  I don't exactly know.
22 Q  Do you know who was the first person to observe
23    fire?
24 A  I don't exactly know, just that it was Ball
25    employees, and I probably saw that in, oh, the

106

1     Rimkus report.  But it's listed in there.
2  Q  Do you know where they first observed smoke?
3  A  It looks like I say where in my report.
4  Q  And where is it?
5  A  Well, under the "Summary of Ball Corporation
6     Employees" it said approximately 12:20 a.m. --
7     there was smoke exhausting in the building at or
8     near IBO 2.
9  Q  Do you see the entry below that in your report?
10 A  Yes.
11 Q  All right.  It indicates that smoke was
12    exhausting from the east end exhaust fan.
13 A  Yes.
14 Q  Is that your understanding of where smoke was
15    observed by the Ball employees?
16 A  Yes.  I mean, that's all that's documented, and
17    that's what I put in the report, that's all I
18    know they saw or what was --
19 Q  And that would have been before the fire
20    department was called?
21 A  Yes.
22 Q  And flames were observed in this same location?
23 A  Yes.
24 Q  If you go back to photo No. 4 on page 6 of your
25    report, what's your understanding of where the

107

1     flames were first observed?
2  A  At or near the exhaust fan that we marked on the
3     document.
4  Q  Can you just put a No. 1 and draw a circle
5     around it, as your understanding of where --
6     let's just start with the smoke, where the smoke
7     was observed.
8  A  Well, the smoke was observed in the area of IBO
9     2.  So that's a pretty broad area.
10 Q  Was there smoke observed exhausting from the
11    east end of the exhaust fan?
12 A  Yes, about five minutes after the initial smoke
13    was seen.
14 Q  Well, let's just, on page 6, photo No. 4, just
15    put a 1 where it's your understanding that smoke
16    was exhausting from the east end of the exhaust
17    fan.
18 A  It would be -- well, partially blocked -- but
19    I'll just put a 1 on it, if that's all right.
20 Q  Yeah, if you have to put an arrow on it --
21 A  Yeah, I'll just put a 1 on it right here.
22 Q  So 1 on photo No. 4, page 6 of your report, is
23    the area where smoke was observed at the east
24    end of the exhaust fan.
25 A  Right, like, again, five minutes after smoke was

108

1     observed in the area of IBO 2, generally
2     speaking.  I mean, that's a big area.
3  Q  Right.  The more specific description where the
4     smoke was relates to the east end of the exhaust
5     fan of IBO No. 2?
6  A  Right.
7  Q  Now, it says "Flames were then observed at this
8     same location."
9  A  Yes.
10 Q  Can you put a 2 on photo No. 4 where you believe
11    the flames were observed?
12 A  Well, no, I can't.  I mean, it's -- really it
13    says -- I mean, I can, but I don't know exactly
14    where they saw them.
15 Q  Well, you write in your report, "Flames were
16    then observed at this same location."  I'm just
17    asking you to put a No. 2 at the location where
18    you understand flames were observed on IBO
19    No. 2.
20    MR. O'BRIEN:  Mark, I'm going to object.
21    He says it's the same location, and he just
22    marked it.  It's not going to be the exact
23    same --
24 A  1 and 2 would be the same.
25 Q  If that's the case, then all you need to tell me

109

1   is that's true.
2       What you have done is you have marked on
3   photo No. 4, page 6 of your report, with a 1
4   where smoke and flames were observed by Ball
5   employees at the time the fire was discovered.
6  A   Yes.  That's the information that was obtained
7      from Ball employees.
8  Q   Do you conclude from that information that that
9      is the area where the fire originated?
10 A   No, I do not.
11 Q   You believe it originated some other location?
12 A   Yes.
13 Q   What location do you believe the fire originated
14     in?
15 A   Above the area that's marked, that I marked here
16     in this photograph, is in the ductwork.
17 Q   Why don't you mark on Exhibit -- what is that,
18     that's photo No. 4?
19 A   Yes.
20 Q   -- where you believe the fire originated.
21     MR. O'BRIEN:  I'm going to object.  I think
22     it's mischaracterizing his testimony.  He says
23     generally above, and I don't think he ever
24     identified or said that he can identify with
25     specificity where the location is.

110

1      MR. SENAK:  Fair enough.  You would agree,
2   I take it.
3      THE WITNESS:  Yes.
4  Q   Now, if you go to page 13 of your report.
5  A   Okay.
6  Q   In the third paragraph you state, "There is no
7      evidence, witness information, fire pattern,
8      physical evidence, nor is there any scientific
9      evidence, fire dynamics, to support this finding
10     regarding the origin that merely seems to be
11     predicated on the unfounded findings regarding
12     cause."
13     Do you see that?
14 A   Yes.
15 Q   Are you referring to the Rimkus conclusion that
16     the fire originated in the area where you have
17     marked as 1 on the exhibit?
18 A   That's where, if I'm understanding you
19     correctly --
20     MR. O'BRIEN:  Mark, can you repeat the
21     question?  I'm not sure I'm understanding.
22     MR. SENAK:  Sure.  Let me try again.
23 Q   Where is -- what is your understanding of
24     Rimkus, Mr. Howell, concluded the fire
25     originated?

111

1  A   My understanding is that he believes the fire
2      originated in the IBO itself.
3  Q   Is it your understanding of his testimony that
4      he believes that the fire was seen by Ball
5      employees in the location that you have marked
6      as Exhibit No. 1?
7  A   All I can say about that is where Ball employees
8      saw fire and smoke.
9  Q   And that's in the area where you marked as
10     Deposition Exhibit No. 1?
11 A   Yes.
12 Q   Is it your understanding Mr. Howell concluded
13     that debris inside the oven, dust or powder from
14     the residue that was removed from the Air Tech
15     employees ignited?
16 A   Is it my understanding that is Mr. Howell's
17     opinion?
18 Q   Yes.
19 A   Yes.  Well, no, not removed, because then it
20     would have caused it.  But he believes there was
21     something there that they left, they missed, is
22     what he puts in his report.
23     (Deposition Exhibit 11 was marked for
24     identification.)
25 Q   Mr. Vergon, showing you Exhibit 11, it is a

112

1   series of infrared photographs?
2  A   Yes.
3  Q   I take it you relied upon infrared photographs
4      or thermal images taken on May 23rd, 2014, and
5      September 18th, 2014, in formulating your
6      opinion?
7  A   Yes.
8  Q   Do you know whether these photographs are the
9      photographs you are referencing in your report?
10 A   These are the photographs, yes.
11 Q   So tell me what it is about these photographs
12     that provide you with information that is used
13     to formulate your opinion.
14 A   Well, with respect to formulating my opinion,
15     they only go to show that -- well, they go to
16     support my opinion that they don't lend any
17     support to the cause of the fire or to the
18     origin of the fire as stated by Mr. Howell in
19     the Rimkus report.  They are almost really
20     completely irrelevant, except for the fact that
21     when compared to the thermal images we took on a
22     subsequent date, it is roughly the same
23     temperatures except for one, it is a little
24     higher.
25     Then there were other photographs taken on



113

1  a subsequent date that, No. 1, I think were
2  missing, but I would have liked to have seen the
3  temperature of the underside of the ductwork.
4  So whoever took these photographs, like here's
5  one showing -- now, this is well after the fire
6  on a subsequent date -- shows 96.9 degrees
7  Fahrenheit. But why take that? I mean, it's
8  glowing red hot down in the bottom of the
9  ductwork where that residue accumulates. Why
10  didn't we get that photograph?
11      And I recall when I was there and I
12  actually operated the thermal imaging camera
13  myself, I took photographs of the hot surfaces
14  that were showing red. I wanted to see what
15  those temperatures were. But those photographs
16  we never got. I don't know what happened to
17  them.
18      MR. O'BRIEN: For purposes of the record,
19  can we mark the page that you are referring to?
20      MR. SENAK: Let's do this. And I think
21  yours is a good suggestion. Can you just go
22  through and number the pages of Exhibit 11, just
23  in the bottom corner, just 1, 2, 3, 4, 5, 6, 7.
24  And when you get done tell me how many you have
25  so I make sure I have the same number. I have

114

1  14, by the way.
2      MR. O'BRIEN: As do I.
3      THE WITNESS: I have 14.
4      MR. O'BRIEN: The one you were referring to
5  was 10, correct?
6      THE WITNESS: Yes, 10 is what I was
7  referring to, the 96.9 degrees Fahrenheit.
8      And then if we go back to the actual date
9  of the fire, my question is where are the
10  photographs of the ductwork temperatures, or
11  where are the other thermal images that could
12  have possibly been taken? And these to me don't
13  really reflect any different temperatures than
14  normal operating temperatures compared to the
15  dates, other dates we took of images.
16  BY MARK SENAK:
17  Q  Do you know what the normal operating
18     temperature of the ductwork is?
19  A  No, I don't. That's why I would have liked to
20     have seen someone maybe make an adjustment where
21     they took this photograph. That's my point.
22     While we were there that's why I took a
23     photograph, but I don't have that photograph.
24  Q  I understand -- let's say this -- the
25     photographs that are shown in Exhibit No. 11, to

115

1      your understanding, are not the photographs that
2      you would have taken?
3      MR. O'BRIEN: That he would have taken?
4      MR. SENAK: Right.
5  A  Well, in part. In part, right. Photographs 1,
6     2 and 3, that's the day of the fire. Right? We
7     know from the other date that we took --
8  Q  I think 4 or 2.
9  A  It's the same photograph, it looks like.
10  Q  You know what, you may be right.
11  A  It is the same photograph.
12  Q  But at least 1 through 4 were taken on the day
13     of the fire.
14  A  Right. So we don't know what the temperature is
15     at the ductwork above the squirrel cage, at the
16     bottom side of the ductwork, and then that's why
17     when we went back on a subsequent date and had
18     the thermal imaging camera, actually I think we
19     had the same camera, that I specifically did
20     take photographs of some of these hotspots like
21     on Figure 10 where it's glowing red at the
22     bottom. And somehow we don't have those.
23  Q  The photographs 1 through 4 were taken, to your
24     knowledge, on the day of the fire. And they are
25     date and time stamped.

116

1  A  Yes.
2  Q  Do you have any reason to believe that date and
3     time are inaccurate?
4  A  No.
5  Q  Particularly photographs 3 and 4 show a
6     temperature of 274.2 degrees, I believe it's
7     Fahrenheit, at the east end blower.
8  A  I assume that's the east end blower, because
9     that was the focus of where they were seeing
10     some activity going on. So, and again, 3 and 4
11     look to be this exact same photograph.
12  Q  I think they are.
13  A  With the same time stamp. So yes, 274.2 degrees
14     Fahrenheit.
15  Q  And 3 and 4 are photographs of the area that you
16     marked as Exhibit No. 1 in photo No. 4.
17  A  Yes.
18      MR. O'BRIEN: Just to clarify, not as an
19  exhibit, but you actually literally wrote a
20  No. 1 in Exhibit 7, I think, or 8.
21      MR. SENAK: That's 8.
22      THE WITNESS: Yeah, that's correct.
23  BY MARK SENAK:
24  Q  The presence of flames would suggest that there
25     is fire at the location where the flames are.

117

1    True?
2  A  Yes.
3  Q  And the presence of smoke would be an indication
4     that there is fire at the location where the
5     smoke is observed.
6  A  Somewhere in the area, either smoldering
7     combustion or flaming combustion, yes.
8  Q  Both flame and smoke were observed in the area
9     that is shown by the thermal image on pages 3
10    and 4 of Exhibit 11?
11 A  I'm sorry, what was that one more time, please?
12 Q  Smoke and flame were observed by Ball employees
13    in the area shown on Exhibit No. 11, pages 3 and
14    4; is that your understanding?
15    MR. O'BRIEN:  Object to foundation.
16 A  It's my understanding eventually at some point
17    flame and smoke were seen at this area where
18    they were taking thermal images.
19 Q  That would be, when you say at some point, it
20    would appear that would be 12:45, based on
21    what's in your report?
22 A  Yes.
23 Q  And the time stamp on page -- on photographs 3
24    and 4 of Exhibit No. 11, is 12:37?
25 A  Correct, almost 12:38, because it's 12:37:56.

118

1  Q  So seven minutes after the smoke and flames were
2     observed by the Ball employees on the east end
3     of the exhaust fan, photographs 3 and 4 were
4     taken?
5  A  Yes.
6  Q  And they show a temperature of 274.2 degrees?
7  A  Yes.  And if I can go back to a previous answer,
8     we talked about temperatures in the ductwork,
9     and I know we had a long discussion about
10    Mr. Hensley's expertise or not expertise, but he
11    did mention to me, he said the temperature
12    typically in that ductwork is about 300, I think
13    he said 350 degrees, if I go back and look at
14    his information.
15    MR. O'BRIEN:  Page 3.
16 A  "He advised ductwork temperatures vary but are
17    close to 350 to 375 degrees Fahrenheit."
18 Q  Do you know whether he ever measured the
19    temperatures of the ductwork?
20 A  I don't.
21 Q  Do you know what the basis for his conclusion
22    was about what the temperature in the ductwork
23    was?
24 A  I just assumed it was his experience.
25 Q  One of the things you mentioned in your report

119

1     is that there was prior incidents of fires at
2     the Ball plant.
3  A  Yes.
4  Q  And you come to that information because you
5     requested from the Monticello Fire Department
6     all the fire reports for the Ball plant over a
7     period of time.
8  A  Yes.
9  Q  There are three incidents that you list in your
10    report, and they are dated October 11th, 2011,
11    April 3rd, 2013, and July 11th, 2013.  True?
12 A  Yes, true.
13    MR. O'BRIEN:  I just want to -- I think you
14    misspoke -- I think you said October 11, it's
15    October 9.  No big deal.
16    MR. SENAK:  Sorry.
17 Q  You received more fire reports for prior
18    incidents at the Ball plant than the three you
19    listed.  Is that true?
20 A  Yes.
21 Q  These three you picked out because, in your
22    opinion, I guess, they have some similarity to
23    the incident on May 23rd of 2014.
24 A  Actually I picked these three because these were
25    actual incidents of fire when the fire

120

1     department got there -- well, not all when they
2     got there, but they were actually incidents of
3     fire.
4  Q  Let's say this:  You picked these three because
5     you thought these were in some way similar to
6     the events that took place on May 23rd of 2014?
7     MR. O'BRIEN:  Asked and answered,
8     mischaracterizes the testimony.
9  A  I thought they were relevant to my opinion, yes.
10 Q  The ones that you didn't pick, I take it you
11    didn't pick because you didn't think they were
12    similar or that they were relevant?
13 A  Well, no, some were false alarms, some were
14    something else that really didn't figure into my
15    opinion.
16 Q  Right.  The reason why you're not relying upon
17    the other incidents is because they are not
18    similar to what you believe occurred on May
19    11th -- or I'm sorry -- May 23rd, 2014?
20    MR. O'BRIEN:  Asked and answered.
21 A  Again, I put the ones in my report that I
22    thought were relevant to basing my opinion.
23 Q  What do you mean by relevant?
24 A  Well, they were fires that were at the plant.
25    October 9, 2011, the fire actually occurred in

121

1  the ductwork, but it was upon arrival, so that
2  was observed and witnessed by Ball employees.
3      April 3rd, 2013, fire in the ductwork.
4  Q  Let's say this:  The ones that you haven't
5     listed here you're not relying upon in
6     formulating your opinion?
7  A  Correct.
8  Q  The only three that you believe are relevant are
9     the three that you have listed?
10 A  Yes.
11 Q  And you believe they are relevant because they
12    actually involve fire?
13 A  And the ductwork.
14 Q  And the ductwork.
15 A  And also based on Ball employee comments on some
16    of these by the fire department.
17 Q  I'm sorry, I interrupted.  You have more that
18    you wanted to --
19 A  I was just saying also, I mean, fire in the
20    ductwork, and then based on Ball employee
21    statements in at least one of these, maybe two.
22      (Deposition Exhibit 12 was marked for
23      identification.)
24 Q  Exhibit No. 12 is the fire -- Monticello Fire
25    Department report for the October 9th, 2011

122

1     fire?
2  A  Yes.
3  Q  You indicate one of the reasons why you believe
4     this is relevant is because there was -- it
5     reflects that there was fire in the ductwork.
6  A  Yes.
7  Q  Do you know whether the ductwork connected to
8     the IBO?
9  A  I do not.  I mean, they were all connected in
10    some way, so they exhausted the gas, gases, out
11    of the IBO.
12 Q  Do you know whether the fire that's reported in
13    the October 9th, 2011 one, was this ductwork
14    that exhausted an IBO?
15 A  I don't know for sure.
16 Q  Do you know whether it was ductwork that
17    exhausted -- you're familiar with what a PIN
18    oven is?
19 A  Not overly familiar.
20 Q  You and me both, I might add.  But as I
21    understand it, there are two types of ovens
22    there, there are PIN ovens and there are IBOs.
23    Is that your understanding, too?
24 A  Yes.
25 Q  And there is no other kind of oven?

123

1  A  Right.
2  Q  Do you know whether the ductwork that's
3     reflected here in the October 9, 2011, whether
4     that ductwork connected to any oven at the
5     plant?
6  A  I don't.  I just assumed that it probably would,
7     but I don't -- it doesn't say.
8  Q  Do you know what the heat source for the fire
9     was that was reflected in the October 9th, 2011
10    report?
11 A  I do not.
12 Q  Do you know what the first fuel that was ignited
13    in the ductwork was in the October 9th, 2011
14    report?
15 A  Well, there's only -- I mean, in the ducts that
16    serviced the ovens, there is only one fuel load
17    and that is really any residue that would be
18    adhered to the surface of the interior of the
19    ductwork.
20 Q  Understood.  But you would agree that is not
21    reflected in the October 9, 2011 fire report?
22 A  It's not.
23 Q  Do you know whether there was any determination
24    as to what the cause of the October 9th, 2011
25    fire was?

124

1  A  It doesn't say in here, but it's kind of
2     inferred or implied that the residue in the
3     ductwork -- or anyway, it's my opinion that it's
4     the residue in the ductwork becoming overheated
5     and igniting.
6  Q  Well, you didn't conduct any cause and origin
7     investigation into the October 9th, 2011 fire,
8     did you?
9  A  I did not.
10 Q  Hence I take it your opinion isn't based on a
11    reasonable degree of certainty?
12 A  No, but I think when you take all this
13    information into consideration, I think it's
14    likely.  But no, I can't say for certain this
15    fire was caused by that, no.
16 Q  So you have no opinion as to what the fire that
17    occurred on October 9th, 2011, what the cause or
18    the origin of the fire was?
19 A  That's correct.
20 Q  I take it, then, as to Exhibit 12, you have no
21    opinion on whether the fire that occurred on
22    October 9th, 2011, was substantially similar to
23    the fire that occurred on May 23rd of 2014?
24 A  Somewhat similar.
25 Q  Somewhat in the sense that it was -- they were



125

1    both in ductwork?
2  A  Yes, and the Ball representative, and it's
3    documented as stating in the fire report,
4    "Believed that the system overheated due to lack
5    of airflow and was burning off accumulated
6    debris inside the flues."
7       So to me, in my opinion, this is where all
8    these pieces of the puzzle are starting to come
9    together.  We talked about Mr. Hensley, worked
10    with Ball for a long time, his knowledge and
11    opinion of the evaporation and debris
12    accumulation in the ductwork flues;
13    Mr. Scholten's opinion that it is an airflow
14    problem at the Ball plant; now this employee,
15    they have had two fires at this point, now this
16    employee is saying that he believes -- and he's
17    familiar, he's a Ball employee, he's there all
18    the time -- believes this was overheated due to
19    lack of airflow and burning off of accumulated
20    debris inside the flue.
21       So, you know, taking Mr. Hensley's
22    statement in and of itself, it's a small piece,
23    and then you take Mr. Scholten, looking at what
24    he says, then you start to have more fires, now
25    you have a Ball employee saying there are fires

126

1    in the ductwork, so this is where I'm starting
2    to form my opinion it's not just any one of
3    those things.
4  Q  Understood.  The Ball employee you are referring
5    to in Exhibit 12, I take it they have no, to
6    your knowledge, education, experience, or
7    training in determining the cause and origin of
8    fires?
9       MR. O'BRIEN:  Object to foundation.  I
10    don't know how he would know that.
11       MR. SENAK:  That's what I would like to
12    know.
13  A  No, I wouldn't.  But again, it goes to the
14    analogy I used of a mechanic or anyone who is an
15    expert in their trade having intimate knowledge
16    of that environment and what can happen or
17    doesn't happen.
18  Q  Understood.  I just want to make sure that we
19    understand each other in the sense that you're
20    relying upon the testimony of someone who has no
21    experience, training, understanding about what
22    the cause and origin of the fire is, in
23    formulating your opinion on what the cause and
24    origin of the fire is?
25       MR. O'BRIEN:  Form, foundation, it's

127

1    assuming facts that aren't presently in
2    evidence.
3  A  Well, no, I don't agree with that overall,
4    because someone who works at a Ball plant for
5    however many years would be an expert in the
6    operation of what their job is.  And if this is
7    something they know, or sounds like he knows
8    what happened, I'm not an expert in that
9    operation, I wouldn't, coming in as an origin
10    and cause investigator, unless I do an interview
11    and talk to someone like that who knows.  I'm
12    basing my opinion on his expertise.
13  Q  You don't know who this person was that is
14    reflected in the Exhibit 12 as the Ball
15    employee?
16  A  No.
17  Q  So I don't -- I take it you don't know whether
18    he has any expertise in anything relative to the
19    operation of the Ball plant.  Is that true?
20  A  Well, he knows something of the operation of the
21    Ball plant or he wouldn't be working there.
22  Q  That's an assumption that you make.
23  A  Well, I think it's a fair assumption.
24  Q  On what basis?
25  A  Well, he's working there and he must know or

128

1    have some kind of -- I'm assuming he would have
2    some kind of, I don't know what you call it --
3  Q  Knowledge.
4  A  -- knowledge, initiation, a briefing of how the
5    plant operated, what his responsibilities were
6    before he could work there, and then he would be
7    competent enough to maintain a job there.
8  Q  All right.  Let's say this:  You don't know his
9    name; you don't know his job title; you don't
10    know his education or experience; you don't know
11    how long he worked there; you have no background
12    information on him on which to determine whether
13    he has any knowledge about the Ball plant beyond
14    the fact that he merely is present there?
15       MR. O'BRIEN:  I'm going to object to form.
16    It clearly indicates he was more than just
17    present.
18       MR. SENAK:  If that's true you just show me
19    where it says that and I'll be happy to move on.
20  Q  And I don't -- you know, I understand what
21    you're saying.  But you understand what I'm
22    saying?  He's just a person who is referenced in
23    the report.  There's no indication that he knows
24    anything about anything there.
25  A  Other than he's listed as a Ball representative,

129

1   which would maybe infer he's in a supervisory
2   capacity, because he's speaking on behalf of
3   Ball Corporation to the fire department.
4  Q  I know you say it infers he has a supervisory
5     capacity, but it doesn't say that, does it?
6  A  It doesn't. It says "Ball representative."
7        (Deposition Exhibit 13 was marked for
8     identification.)
9  Q  Let's go on to the April 3rd, 2013 fire report.
10     What is it about this report that you're relying
11     upon to formulate your opinion?
12  A  I'm sorry, which one we going to?
13  Q  This is the April 13, 2013. It should be
14     Exhibit 13.
15  A  Yes, this is the same one we've just been --
16  Q  No, we had October 9th, 2011. This should be
17     April 3rd, 2013.
18        MR. O'BRIEN: April 3rd, 2013, is
19     Exhibit 12. I don't think we've had 13 yet.
20     That's 12.
21  A  April 3rd, 2013.
22  Q  Right, should be Exhibit 13.
23        MR. O'BRIEN: It's 13? I must have missed
24     it.
25  A  I have 12. So when I have been talking about

130

1   the Ball representative, I'm talking about this
2   fire that we're now getting to.
3  Q  Okay. As opposed to the one that's reflected in
4     the July 11, 2013 -- or I'm sorry --
5        MR. O'BRIEN: He doesn't have it.
6        MR. SENAK: Let me turn that over so I
7     don't make that mistake again.
8  Q  As opposed to what's reflected in the October
9     9th, 2011 one.
10  A  Yes. Somehow I jumped ahead.
11        MR. O'BRIEN: I did too.
12        MR. SENAK: That's okay. I get it. We get
13     a lot of fire reports.
14  Q  As to Exhibit 12, which is the October 9th,
15     2011, the point of that is that information was
16     not provided by a Ball employee, to your
17     knowledge?
18  A  Yeah, it was a very short narrative and just
19     said there was a fire in the ductwork, it was
20     out on arrival.
21  Q  So at least as to the October 9th, 2011 report,
22     there is nothing in there from any Ball employee
23     that you are relying upon in formulating your
24     opinion.
25  A  Right.

131

1        MR. SENAK: You can put that one away.
2  Q  So let's go to the April 3rd, 2013 one. This
3     one indicates that -- well, let me start with
4     this -- what is it about this report you are
5     relying upon, what factual information from this
6     report do you rely upon in formulating your
7     opinion?
8  A  I probably covered this prematurely already, but
9     fire, fire in the ductwork, the Ball
10     representative giving his opinion and telling
11     the fire department that this person believed
12     that the system overheated due to lack of
13     airflow and was burning off accumulated debris
14     inside the flues, so that entire conversation we
15     had just had a few minutes ago about who this
16     guy is and I said he was a representative is all
17     I know, that he must have been speaking on
18     behalf of Ball, that's my opinion.
19  Q  Do you know whether, when he talked about the
20     flue, do you know whether he's referring to the
21     ductwork?
22  A  That's my opinion on that. I mean, that's my
23     take on that, is the flue and ductwork could be
24     used interchangeably.
25  Q  You don't know whether that's what he meant,

132

1     you're just assuming that to be true?
2  A  Yes.
3  Q  Do you know whether -- let's just assume that's
4     true -- do you know whether that ductwork would
5     have connected to an IBO?
6  A  I do not for sure know that it would have been
7     to an IBO.
8  Q  Do you know that it would have been connected to
9     any other oven at the Ball plant?
10  A  Well, it appears that it would be, because he's
11     talking about the lack of airflow burning off
12     accumulated debris, so there's obviously an oven
13     involved. And there is probably or likely some
14     accumulation of debris based on the condensation
15     and the use of the oven.
16  Q  I take it, it does not say that in the report --
17     let me try it again. It doesn't say in the
18     report that the ductwork or the flue was
19     connected to any oven at the Ball plant?
20  A  It doesn't say that, no.
21  Q  Does it indicate in here what the heat source
22     was what caused the fire?
23  A  It does not say what the heat source is.
24  Q  Does it indicate what the first fuel was that
25     ignited?

---

133

1    A    The fire department report doesn't say that; it
2        just says fire in the ductwork, and they are
3        relying on the Ball representative -- or at
4        least they write what was relayed to them by the
5        Ball representative.
6    Q    And what he's saying is that they were burning
7        off accumulated debris inside the flues, is what
8        caused it?
9    A    That lack of airflow was burning off accumulated
10       debris inside the flues.
11   Q    Correct me if I'm wrong, there was no indication
12       that the statements by the Ball representative
13       are from someone who has the education,
14       experience, or conducted any kind of
15       investigation to determine what the actual cause
16       of the fire was?
17   A    No, but it doesn't say he doesn't either.
18   Q    I understand.  I'm just trying to, you know,
19       conclude that the information provided here
20       isn't based upon any effort to determine the
21       cause and origin of the fire.
22            MR. O'BRIEN:  Object to form.
23   A    Again, working knowledge.  I mean, I base it on
24       his working knowledge and presumed working
25       knowledge of the Ball plant.

---

134

1    Q    That's a presumption you make.
2    A    Yes.
3    Q    That presumption is not based upon any knowledge
4        of what his job duties were, education and
5        experience, length of service at the Ball plant,
6        or anything other than the mere fact that he
7        actually worked there on this day.
8    A    Yes.
9    Q    The reference here is that that they were having
10       trouble with the blower system.  Do you see
11       that?
12   A    Where are you?
13   Q    I'm sorry.  This is Exhibit 13.  This is the
14       April 3rd, 2013 fire.  It's on page 2, second
15       paragraph.
16   A    Yes, I see that.
17   Q    Is it your understanding that the trouble with
18       the blower system was a cause of this fire?
19   A    Yes.
20   Q    Is it your understanding that the blower,
21       trouble with the blower system, had anything to
22       do with the May 23rd, 2014 fire?
23   A    I don't know.
24   Q    Meaning that the blower system on May 23rd,
25       2014, was operating properly, to your knowledge?

---

135

1    A    I don't know if it was or was not.
2    Q    There's no indication in any document or from
3        any source that the May 23rd, 2014 fire was the
4        result of improper blower operation?
5    A    I haven't seen anything.  But going to that same
6        part of this report, going back to the question
7        of was there an oven involved, if there is a
8        blower system involved then I presume there is
9        an oven involved.
10   Q    And again, that's just a presumption that you
11       make?
12   A    Well, yeah, I think it's a pretty good one.
13   Q    Well, it doesn't say that an oven is involved in
14       the report.
15   A    No, but where else do they have blowers at the
16       plant?
17   Q    You know, let's say this:  Do you know whether
18       all the blowers at the plant are connected to
19       the ovens?
20   A    I know all the ovens have blowers.
21   Q    I understand that.  But do you know whether
22       there are blowers at the plant that are not
23       connected to the oven?
24   A    No.
25            (Deposition Exhibit 14 was marked for

---

136

1        identification.)
2    Q    Exhibit 14 is the fire report for the July 11,
3        2013 fire?
4    A    Yes.
5    Q    Okay.  So this fire was not in the ductwork,
6        true?
7    A    It appears that is true.
8    Q    This says, "Responded to above address for a
9        fire in an industrial furnace designed to heat
10       metal cans."
11   A    Yes, which I would take that as the IBO.
12   Q    So --
13   A    Or an IBO.
14   Q    So what you're saying is that your understanding
15       of this one is that there was a fire in the IBO.
16   A    Yes.
17   Q    Do you know whether any investigation was
18       undertaken to determine the cause and origin of
19       this fire?
20   A    I do not.
21   Q    So your understanding is that other than the
22       fact it originated in a fire, in an IBO, there's
23       no evidence as to what caused this fire?
24   A    Well, there is some evidence.  I mean, you have
25       some evidence taken into consideration, again,

---

137

1  stated by a Ball representative that the furnace
2  has a buildup of can lubrication on and inside
3  it that ignited.  He also stated that the air
4  compressor that blows air through the furnace
5  was not operational and led to the furnace
6  overheating and causing an oily buildup to catch
7  fire.
8      Again, it looks like an airflow problem,
9  and again, there's reference to condensation,
10  else there wouldn't be an oily buildup on the
11  internal surface of the oven.
12 Q  The oily buildup that's referenced here, do you
13    know whether that's oily buildup from either the
14    spray liner or the varnish that is used on the
15    cans?
16 A  It would be one of those or possibly both, as
17    far as I know.
18 Q  Does it say that that's true here?
19 A  It doesn't say.
20 Q  You're just making that assumption?
21 A  Yes.
22 Q  "The air compressor that blows the air through
23    the furnace was not operational."  Do you see
24    that?
25 A  Yes.

138

1  Q  Is there any indication that the air compressor,
2    any air compressor, was not operational at the
3    time of the May 23rd, 2014 fire?
4  A  No information either way.
5  Q  You would, if -- there's nothing that you saw in
6    your investigation, from whatever source it may
7    have come, that would indicate that the failure
8    of the air compressor to blow air through the
9    furnace was either a cause or contributing cause
10   of the May 23rd, 2014 fire?
11 A  That's correct.  And again, either way, yes or
12   no, I don't know.  There's no information.
13 Q  Right.  I mean, you actually investigated the
14   May 23rd, 2014 fire, correct?
15 A  Yes.
16 Q  And you didn't see anything that indicated that
17   an compressor was -- caused or contributed to
18   the fire?
19 A  Correct.
20 Q  If we go back to your report which is
21   Exhibit No. 8, on the last page on Exhibit 16
22   you indicate that there is insufficient data by
23   which to substantiate a definitive cause.  Do
24   you see that statement?
25 A  Yes, I do.

139

1  Q  And on that basis you conclude that the proper
2    classification of the fire is undetermined.
3  A  Yes.
4  Q  Is it your opinion that you can't tell what the
5    cause of this fire was based on a reasonable
6    degree of certainty?
7  A  Yes.
8  Q  Now, that's cause.  On origin, do you have an
9    opinion on origin?
10 A  I do have an opinion on origin.
11 Q  Is that opinion, is there sufficient data by
12   which to substantiate a definitive origin of the
13   fire?
14 A  Yes, I believe there is.
15 Q  And first of all, let's say what is your opinion
16   as to origin?
17 A  That the fire's more probable or most probably
18   to have occurred or originated in the ductwork
19   above the blower.
20 Q  If we go back to that same photograph which is
21   Exhibit No. 4 -- or frankly maybe even Exhibit 3
22   might be better in your report -- what I'm
23   interested in --
24 A  Photograph No. 3?
25 Q  Photograph No. 3, or 4, or any of the other

140

1  ones, if you can just indicate on whatever
2  photograph you feel is best where you think the
3  point of origin was of the fire.
4  A  I can't determine a point of origin.
5  Q  How about an area?
6  A  Just within the ductwork, that's all I can say.
7  Q  You can't identify exactly where in the ductwork
8    that either point or area of origin would be
9    based on a degree of certainty?
10 A  No, but I can more certainly argue where I think
11   the fire did not start.
12 Q  I understand that.  I mean, I read the report
13   and I think that's clear.  I'm just curious as
14   to whether you can say, based on a reasonable
15   degree of certainty, the specific location in
16   the ductwork where you believe the fire started.
17 A  Well, if I -- my best guess, or my best opinion,
18   however you want to phrase it, would be above
19   the blower in the ductwork in that area, and say
20   from that area to somewhere in the horizontal
21   section before the two sections of the ductwork
22   where the east and west ends converge.
23 Q  Is there any way that you can reflect what you
24   just said by circling that area that you just
25   described in a photograph that's in your report?



141

1　A　Sure, I can do that.

2　Q　And if you could just identify the photograph
3　　that you're going to circle.

4　A　Photograph 4 on page 6 is one that's already
5　　been marked, and this is a very broad area.

6　Q　I understand. Just do your best.

7　A　Kind of in there. (Indicating.)

8　Q　The area that you circled, there's a T that
9　　occurs in the ductwork where the ductwork from
10　　the east and west blower meet and then it goes
11　　up in a vertical position.

12　A　Yes.

13　Q　Is it your opinion that that T is outside of the
14　　area of origin that you just marked?

15　A　It could be. It's more likely to me that it
16　　probably is. But a hundred percent certainty, I
17　　can't say.

18　Q　You can't say based on a reasonable degree of
19　　certainty?

20　　　MR. O'BRIEN: Object, mischaracterizes his
21　　testimony.

22　A　No, I just -- it's just less probable that it
23　　originated there, but I'm not ruling it out
24　　completely.

25　Q　I get that. But you get what the standard is,

142

1　　too, it's reasonable degree of certainty. So
2　　you have got to tell me whether it's either --
3　　you have an opinion based on a reasonable degree
4　　of certainty that it occurred, you know, in the
5　　T, area of the T, or not?

6　　　MR. O'BRIEN: Object to form.

7　A　Again, I can only answer like I answered. I
8　　think probably not.

9　Q　So it's -- let's say this -- your opinion is
10　　that the fire did not originate in the area of
11　　the T where the two horizontal pieces of the
12　　ductwork meet.

13　A　Well, it depends on what area specifically. I
14　　would think that if some debris ignited
15　　somewhere that it's going to be debris that's
16　　accumulated on a surface, so that would be on
17　　the bottom of the horizontal surface of the
18　　ductwork, if anywhere. That would be my most
19　　likely, most likely area of fire origin.

20　Q　All right.

21　A　Where it's accumulated en masse.

22　Q　Which would be on the bottom of the horizontal
23　　stretch.

24　A　Where, yes, where it would accumulate because of
25　　gravity.

143

1　Q　Do you know what the heat source would be that
2　　would have ignited the material in the area that
3　　you have circled?

4　A　I don't exactly know.

5　Q　I take it then you have no opinion, based on a
6　　reasonable degree of certainty, what the heat
7　　source would be that ignited the fire?

8　A　Well, the heat source would be, I mean, there's
9　　only one heat source, and it would be the heat
10　　that exhausts through the ductwork. I mean, at
11　　some point obviously it's evidenced in other
12　　fire cases here at the plant that there was
13　　enough heat to ignite this material in the
14　　ductwork.

15　Q　And by heat we mean heat from the burner?

16　A　Well, that's what generated the heat, yes.

17　Q　Right. That's the only heat source that is
18　　there?

19　A　Yes.

20　Q　So it is your opinion the burner would generate
21　　enough heat to ignite the debris residue in the
22　　ductwork?

23　A　By some means, yes.

24　Q　With the area of origin that you circled on
25　　Exhibit 8, photograph No. 4, would you just do

144

1　　me a favor and in the circle that you just drew
2　　would you put like a 2 or something so that we
3　　know what you're referring to.

4　A　(Indicating.)

5　Q　You put a 2 inside the circle where you think
6　　the area of origin was, correct?

7　A　Yes. It's within that complete area that I
8　　circled.

9　Q　Are there any witness statements that support
10　　your conclusion?

11　A　Sure. It would be the same witnesses, the Ball
12　　employees who saw smoke in the area of IBO 2.
13　　More likely they saw smoke and flames venting up
14　　the squirrel cage, because that's where there
15　　are actual venting openings, there's airflow in
16　　places where something could vent out. The
17　　ductwork, for the most part, is wrapped in
18　　insulation and it has seams, so there might have
19　　been a little bit of smoke escape there, but you
20　　are not going to see it there as much as where
21　　something could actually vent out of.

22　Q　Let me ask you this question: Do you know where
23　　the airflow is in that ductwork?

24　A　Yes.

25　Q　Which way?



---

145

1   A   It flows from -- well, in this part it flows
2       upward through the squirrel cage and then
3       through the ductwork initially upward to the
4       elbow and then laterally, horizontally across to
5       where they combine and then flows upward at the
6       joint.
7   Q   So let's use some of the numbers that we have
8       there.  Your understanding is the airflow would
9       go from No. 1 to No. 2?
10  A   Yes.
11  Q   So if there was a fire located at where No. 1
12      is, you might see smoke in the area where No. 2
13      is because the airflow is going in that
14      direction, correct?
15  A   I might see smoke where?
16  Q   If the fire originated where No. 1 is on the
17      diagram, you might see smoke in the area where
18      you have circled No. 2, because that is where
19      the airflows would be blowing the smoke from
20      No. 1 to No. 2, correct?
21  A   Well, you may, but if the ductwork is intact and
22      there is no vent openings, you may not see it
23      and then you may have a buildup of smoke where
24      it kind of backflows at some point of this
25      thing.  It just depends how much smoke there is

---

146

1       and what's going on there.  I can't tell.
2   Q   But you would agree airflow is going from No. 1
3       to No. 2?
4   A   Yes.
5   Q   So if there is -- if the fire originates at the
6       location you have marked as No. 2, do you
7       believe the smoke would go backwards against the
8       airflow and show up in the area you have marked
9       as No. 1?
10  A   Well, the smoke may not initially go that way.
11      But as the burning and fire progresses on the
12      residue that's left in the ductwork, the portion
13      of the ductwork that hadn't been cleaned in I
14      don't know how many months, that flame, that
15      flame front is still going to go counter to
16      airflow.  I mean, it may be slower than it
17      normally would be, but it's going to progress.
18  Q   You're talking about the flame?
19  A   Yes, the flame.  And as the flame, as it
20      progresses counterflow to the air is going to
21      produce smoke itself.
22  Q   So what you're saying is the flame will actually
23      go against the flow of the air.
24  A   Yes.
25  Q   You would agree that the flame will also go with

---

147

1       the flow of the air?
2   A   More so, but it will still go counterflow.
3   Q   Right, it will flow faster in the direction the
4       air is flowing.
5   A   Right.  And then especially then when you get to
6       this elbow section, if there is some accumulated
7       debris that's burning right there, that's going
8       to drip down as we evidenced in the ductwork, we
9       saw when we disconnected this section of the
10      squirrel cage that there was a bunch of debris
11      and goo down there that accumulated.  So
12      hypothetically if this stuff is burning in this
13      ductwork and then it hits this vertical section,
14      it's going to drop right down into the blower
15      and burn as well.
16  Q   Do you know when the last time the ductwork was
17      cleaned?
18  A   Well, the reports that I have seen, I think,
19      show around November of 2013 sometime.
20  Q   And the fire occurred in May of 2014?
21  A   Yes.
22  Q   Do you know who cleaned the ductwork in November
23      of 2013?
24  A   I think it was Air Tech.
25  Q   And do you know whether the cleaning of the

---

148

1       ductwork in November of 2013 would have included
2       the area that you have circled in Exhibit No. 2?
3   A   I assume it would, yes.
4   Q   Is it your conclusion, do you have an opinion as
5       to what the first fuel was that was ignited in
6       this fire?
7   A   I don't really.  I mean, I know at some point
8       this material ignited, and I guess really if I
9       had to say, it's probably the buildup of
10      material in the ductwork.
11  Q   And with a reasonable degree of certainty, can
12      you say that based on a reasonable degree of
13      certainty?
14  A   Yes.
15  Q   And what is that based on?
16  A   Based on what other fuel load is there anywhere.
17      We've gone through a process now of cleaning the
18      squirrel cage; we've gone through the process of
19      the IBO being be cleaned; we've done the quality
20      control, I guess if you want to call it that,
21      system that Ball does after Air Tech leaves
22      where they run sheets of aluminum through to see
23      if there is any loose particulate matter left.
24      And I guess they got the thumbs up that
25      everything checked out.  Then they operated the

149

1    system.
2        So if there's anything left to burn, it's
3    going to be the residue that's in the ductwork
4    that wasn't cleaned at the direction of Ball.
5  Q   You believe, based on a reasonable degree of
6      certainty, that the residue that's in the
7      ductwork is a fuel source for the fire?
8  A   Yes.
9  Q   And that residue is the same residue that would
10     have been scraped off from inside the furnace by
11     Air Tech?
12 A   Yes.
13 Q   In your report you talk about airflow problems
14     on page 16.
15 A   Yes.
16 Q   You're familiar with a device, I take it, called
17     an anemometer?
18 A   Measures wind speed, airflow.
19 Q   Right.  Am I wrong that is a device that is used
20     to measure the velocity of air in ductwork?
21 A   It could be used for that.
22 Q   Do you have any data showing what the airflow
23     readings were in the ductwork before the fire?
24 A   I don't.
25 Q   Any data that shows what the proper or correct

150

1      airflow was or should have been in the ductwork?
2  A   No.
3  Q   Do you have any data that shows how the airflow
4      fell below a certain point and that would cause
5      or contribute to combustion?
6  A   I don't.
7  Q   Any education or experience in designing
8      ventilation systems?
9  A   No.
10 Q   Given that's true, the idea that the cause of
11     the fire is related to either airflow, can you
12     say that based on a reasonable degree of
13     certainty?
14 A   I can mention it, like I do in my report, based
15     on the other fires that occurred there, the
16     comments by the Ball employees, and my also
17     conversations with Mr. Honaker, who is the
18     engineer in this case, work that I have
19     communicated with, that, you know, based on a
20     portion of Mr. Scholten's comments and opinions,
21     and also based on information provided by
22     Mr. Hensley, so I'm taking the totality of all
23     my data and applying it to what I think is a
24     reasonable degree of certainty.
25 Q   So what you're saying is that you can say that

151

1      airflow was a problem based on a reasonable
2      degree of certainty?
3  A   It could have been, I'm saying.
4  Q   Could have been.  If you go up to your -- under
5      "Determination" you'll see mention of NFPA 921,
6      and it says, "If the level of certainty is
7      merely suspected, the opinion does not qualify
8      as an expert opinion.  It must be probable
9      essentially to be based on a reasonable degree
10     of certainty."
11         Is it your testimony that it is probable
12     that airflow was a problem that caused or
13     contributed to the fire?
14         MR. O'BRIEN:  Mark, I'm going to object.  I
15     mean, the document speaks for itself, and he
16     says in the document it's undetermined.
17         MR. SENAK:  Okay.
18 Q   Is that -- you would agree?
19 A   Yes.  And also I think you're taking the
20     totality of what I'm saying a little out of
21     context, because there is a paragraph between
22     those two paragraphs that I'm talking about as
23     well.
24 Q   Understood.  You talk about the lack of cleaning
25     as a potential cause of the fire.

152

1  A   Yes.
2  Q   What's the basis of that?
3  A   Well, the basis is that there was a large amount
4      of accumulated residue left in the ductwork.
5  Q   Meaning the basis for the opinion is your
6      observation of residue in the ductwork?
7  A   Yes, and Mr. Scholten's opinion that they do
8      work at four other Ball facilities, that this is
9      the only plant where they have that much
10     accumulation of debris and what he called goo,
11     it's the only plant that had the issue with the
12     goo dropping down.  And again, my, all the data
13     I collected goes to that opinion.
14 Q   Had you ever examined the ductwork before the
15     fire?
16 A   No.
17 Q   So I take it you have no way of knowing whether
18     what you saw in the ductwork was a lot of
19     debris, or a little debris, or what -- whether
20     it was an acceptable amount of debris.
21 A   No.  It's all relative, I guess.  But it looked
22     like a lot of debris to me.
23 Q   Right.  But you have nothing to compare it
24     against?
25 A   No, I don't -- Mr. Scholten's conversation with

153

1  him that this is more than normal type
2  accumulation compared to other plants he
3  services.
4  Q  Do you know how frequently the ductwork is
5     cleaned?
6  A  I don't.
7  Q  So I take it you have no method of determining
8     what's an acceptable level of debris?
9  A  I don't.
10 Q  Do you have any knowledge of how frequently
11    ductwork should be cleaned?
12 A  No, I think it's all going to be relative to
13    what kind of ductwork it is, what is being
14    processed and manner of operations. So no, I
15    don't.
16 Q  Let's say this: I haven't found any, I don't
17    know if you have, but there's no standards or
18    rules or regulations on how frequently ductwork
19    should be cleaned.
20 A  No, I think it's going to be based on experience
21    and, you know, if a company comes every six
22    months and cleans and says hey, this is really a
23    lot of stuff here, we probably need to come more
24    often and clean this out, I think you base it on
25    each particular circumstance.

154

1  Q  Have you seen any communication from
2     Mr. Scholten to any Ball people in Monticello or
3     otherwise where he indicates that the ductwork
4     should be cleaned more frequently?
5  A  No. I do recall a conversation with him that
6     they were cleaning them more often, more
7     frequent basis, and it got -- their cleanings at
8     the direction of Ball were spaced out over
9     longer periods of time.
10 Q  You recall this in some conversation, true?
11 A  Yes.
12 Q  Have you seen any documentation that's been
13    produced by Air Tech that would reflect that's
14    true?
15 A  No.
16 Q  Were you able to rule out electrical malfunction
17    as a cause of the fire?
18 A  I'm pretty sure we were. There was no
19    electrical except for the blower motor in the
20    general area of origin, and there was no failure
21    of the motor or the motor still turned, so no
22    mechanical or electrical failure that we could
23    --
24 Q  And that's actually going to be my next one,
25    right, I mean, you were able to eliminate

155

1  electrical as a potential cause, true?
2  A  Yes.
3  Q  And you were able to eliminate mechanical
4     failure of the blower as a potential cause.
5  A  Yes.
6  Q  Were you able to eliminate some malfunction in
7     the oven as a potential cause?
8  A  No, actually not. I don't know -- have any
9     reports that it malfunctioned or it didn't
10    malfunction?
11 Q  You have no, let's say you have no opinion,
12    based on a reasonable degree of certainty, that
13    a malfunction in the oven either caused or
14    contributed to the fire.
15 A  I don't.
16    (Deposition Exhibit 15 was marked for
17    identification.)
18 Q  Showing you what's been marked as Exhibit 15,
19    have you ever seen this document?
20 A  I've seen it, but I didn't really study it or
21    examine it that closely. This is something I
22    left for Mr. Honaker to look at and comment on.
23 Q  This document does not form the basis for your
24    opinion?
25 A  Does not.

156

1  Q  Do you know whether this document shows any
2     abnormal operation of the oven?
3  A  I don't know that it does, but looking at it
4     now, I'm looking at the air temperature, so that
5     400 degree range seems to be accurate that we
6     were talking about on the oven temperature. And
7     other than that, I don't see anything else that
8     jumps out at me.
9  Q  All right. Any evidence that the oven was
10    improperly operated and either caused or
11    contributed to the fire?
12 A  I haven't seen any.
13 Q  Any evidence there was some kind of foreign
14    object in the oven that caused or contributed to
15    the fire?
16 A  No, not at all.
17 Q  Any evidence that this was the result of arson
18    as a cause or contributing factor of the fire?
19 A  No.
20 Q  Any evidence that this was the result of some
21    type of sabotage or, you know, nefarious act by
22    a Ball employee?
23 A  No, thus my opinion of undetermined.
24 Q  Good. You know me, I'm just trying to get it
25    all in there.



157

1        MR. SENAK: 16.
2        (Deposition Exhibit 16 was marked for
3    identification.)
4  Q  Mr. Vergon, showing you Exhibit 16, this is a
5    copy of, I believe, of the Envista report
6    prepared by Mr. Honaker. Is that true?
7  A  Yes.
8  Q  Did you rely upon Mr. Honaker's report in
9    formulating your opinion?
10 A  I did not.
11 Q  On page 4 of his report, below the photograph it
12    says, "It is Envista's opinion that loose debris
13    discovered in the fan blower is the result of
14    the fire that occurred in the vertical duct
15    above the fan blower, and this debris fell down
16    the vertical duct and accumulated in the lower
17    housing of the fan blower."
18        Do you see that?
19 A  Yes.
20 Q  Did you observe debris in the lower housing of
21    the fan blower after the fire?
22 A  Yes.
23 Q  And is it your opinion that that debris was the
24    result of drop-down from above?
25 A  Yes.

158

1  Q  What is the basis for that opinion?
2  A  Well, because there is just so much of it, and
3    it had just been cleaned and it just passed
4    inspection, that this shouldn't have been there.
5    So we have debris in the vertical rise of the
6    squirrel cage in the ductwork that wasn't
7    cleaned because we know that Air Tech wasn't
8    directed to clean above that. They reached as
9    far as they could to clean what they could. But
10    there would have been some still there. So any
11    residue -- and we know there was a fire -- so
12    any fire we know was in there would have dropped
13    down.
14 Q  Mr. Honaker points out, he characterizes this as
15    loose debris that was discovered in that area?
16 A  There was some loose debris and then some, call
17    it goo.
18 Q  Is it accurate to say that, like, one of the
19    reasons why you conclude it was drop-down is
20    that it was loose, true?
21 A  Yeah, I guess so, yes.
22 Q  And I know this may seem somewhat obvious, but
23    if, in order for it to drop down, it would have
24    to be loose, otherwise it wouldn't have moved?
25        MR. O'BRIEN: I'll just object to the form.

159

1        Go ahead.
2  A  At some point it would have become lose, right,
3    we don't know when.
4  Q  I mean, it couldn't move if it didn't become
5    loose.
6  A  Correct.
7  Q  And therefore it couldn't have dropped down if
8    it didn't become loose.
9  A  Correct.
10 Q  If the debris was attached to the wall of the
11    oven or of the ductwork, I take it you wouldn't
12    consider that to be drop-down debris.
13 A  If it was still attached?
14 Q  Yeah.
15 A  No, it would not.
16 Q  It would not be drop-down?
17 A  If it was still attached to the ductwork then
18    no.
19 Q  It would not be drop-down debris if it was still
20    attached to the ductwork, correct?
21 A  Yes.
22 Q  He goes on to say, "Envista discovered that the
23    walls and fan blade surfaces are clean of
24    debris, an indication that Air Tech's cleaning
25    of the fan blower prior to the fire."

160

1        Do you see that area? It's on that page 4
2    below the photograph.
3  A  I'm sorry, what was that section you were
4    reading?
5  Q  Sure. It's like the second line beginning with,
6    "Envista discovered that the walls and the fan
7    blade surfaces are clean of debris, an
8    indication of Air Tech's cleaning of the fan
9    blowers prior to the fire."
10        Do you see that?
11 A  I see that, yes.
12 Q  What Mr. Honaker is concluding is that if
13    there's no debris on either the fan blades or
14    the surface of the interior blower housing, it's
15    an indication that they have been cleaned.
16 A  Yes.
17 Q  I take it, then, if there is debris on the
18    inside of the fan blade or the blower housing,
19    that's an indication that it had not been
20    cleaned.
21 A  Well, it depends. I mean, hypothetically
22    because if something had fallen down there like
23    that goo and then baked on during the fire, it's
24    possible.
25 Q  It's possible.

161

1  A  It's possible.
2  Q  But you would be able to sort of see the drip or
3     the movement of that goo down onto the wall.
4  A  Maybe, maybe not.
5  Q  Yeah, good point.  That goo, if it were the
6     product of the fire, I take it, it would have to
7     be heated up and then it would migrate in a
8     liquid form.
9  A  It appears so, yes.
10 Q  On page 8 of his report he makes the statement
11    that, below the -- well, below the photograph --
12    "Envista discovered scrape marks on the wall and
13    evidence that it was cleaned of creosote like
14    material."
15       Do you see that?
16 A  Yes.
17 Q  You would agree with that?
18 A  Yes.
19       MR. O'BRIEN:  Hold on.  What are we
20    referring to?
21       MR. SENAK:  It's the last sentence on page
22    8.  "Envista discovered scrape marks on the wall
23    and evidence it was creosote like material."
24 Q  So the scrape marks would indicate that area had
25    been cleaned?

162

1  A  Yes.
2  Q  I take it the absence of scrape marks would be
3     some indication that the area hadn't been
4     cleaned.
5  A  I mean, it could.  Were there scrape marks over
6     the entire thing?  I mean, I don't know.  I can
7     only comment on what he wrote.
8  Q  Exactly.  So do you have any opinion as to
9     whether scrape marks show that it's been
10    cleaned, if there were no scrape marks that
11    would indicate that it hadn't been cleaned?
12 A  No, I left this part up to him.
13 Q  If we go back to, at the bottom of page 7 --
14       MR. O'BRIEN:  Still with Honaker?
15       MR. SENAK:  Yes.
16 Q  -- the last sentence on the page, "It is
17    Envista's opinion that Rimkus' conclusion that
18    Air Tech failed to clean the fan blower is again
19    speculative, as it would have been expected to
20    find creosote like material on the inside wall
21    and the fan blades."
22       Do you see that?
23 A  I do.
24 Q  Is your understanding that what this means is
25    that there would be creosote buildup on the

163

1     inside wall and the fan blades even after
2     Air Tech had cleaned the area?
3  A  I'm just reading this and trying to understand
4     here what he's saying.
5  Q  Understood.
6        MR. O'BRIEN:  You're asking him for his
7     understanding?
8        MR. SENAK:  Right.
9  Q  I mean, do you share Mr. Honaker's kind of like
10    conclusion that even after the cleaning there
11    would still be a buildup on the inside of the
12    wall and fan blades of the blower housing?
13       MR. O'BRIEN:  To the extent you're asking
14    him to interpret Mr. Honaker's statement and his
15    frame of mind and then compare it to his own,
16    I'm going to make a foundation objection.
17 A  Yeah, I don't know how to answer that question.
18 Q  All right.  Fair enough.
19       (Deposition Exhibit 17 was marked for
20    identification.)
21 Q  Mr. Vergon, I'm going to show you some
22    photographs.  And if you'll note what I have
23    tried to do is I have put the number up on the
24    right-hand side or on the lower right-hand side
25    or somewhere else on the photograph.  That is

164

1     the -- it is the Rimkus photograph number.
2  A  I see it.
3  Q  So this Exhibit 17 is a series of photographs
4     marked Rimkus 2626, Rimkus 39 --
5  A  396.
6  Q  Rimkus 395, Rimkus -- help me out here --
7  A  6483.
8  Q  6483 and Rimkus 400.
9  A  Yes.
10 Q  Do you know with respect to Exhibit 17, Rimkus
11    2626, do you know what that shows?
12 A  This shows a bunch of accumulated debris in what
13    looks like the blower housing.
14 Q  Would you characterize this as drop-down debris?
15 A  I'm trying to determine if this is looking from
16    one of the side panels or looking straight down
17    at it.
18 Q  You'll see -- some people refer to that squirrel
19    cage, the fan portion of it --
20 A  Yes.
21 Q  But I think my understanding of this is we're
22    looking straight into the base of the blower
23    housing where the squirrel cage is.  But that's
24    just me.
25       MR. O'BRIEN:  So you're not making that

165

1    representation that's what this photo is?
2        MR. SENAK: I'm just saying what I see.
3    You tell me what you see.
4    A  Well, it looks like we're possibly looking at a
5    side panel removed.  I can't say for sure, but
6    it looks like that.  And it looks like that
7    could be drop-down debris from above which
8    somehow got in there post fire.
9    **Q  Right.  And we talked about this a little bit.**
10   **This is the kind of loose debris you would see**
11   **at the base, I mean, you would expect to see at**
12   **the base because it's falling down from above.**
13   A  Yes.  This one looks like one of those murky
14   undersea photos.
15   **Q  You know, that's so funny, I'm looking at it, is**
16   **it this way, this way, or --**
17   A  Yeah, I don't know what it is.
18   **Q  We'll skip Rimkus 396.  Let's say this:  Do you**
19   **know whether Rimkus 396 is further evidence of**
20   **drop-down debris?**
21   A  It appears to be, but I don't know where.
22   **Q  And if you go to the next page, Rimkus 395, I**
23   **think it is, one over --**
24   A  Yeah I'm looking.  Actually this is 395 and this
25   is 396.  This looks like --

166

1    **Q  You know, I think you are right.**
2    A  -- debris that's inside this piece of conduit.
3    **Q  396 is a close-up of the debris shown in the**
4    **ductwork in 395.**
5    A  Yes.
6    **Q  All right.  Do you know whether that is**
7    **drop-down debris or how would you characterize**
8    **that?**
9    A  I would say that is the remnants of the
10   accumulated residue, the charred residue that
11   accumulates on the bottom of the ductwork.
12   **Q  And I take it that's because I believe this is a**
13   **horizontal piece of ductwork that we're looking**
14   **at in 395.**
15   A  Yes.
16   **Q  And then if you go to the next one, which is**
17   **Rimkus -- help me out there --**
18   A  6483.
19   **Q  -- 6483, do you know what that is a picture of?**
20   A  It looks like, because I can see a portion of
21   the fan, and so it looks like it's a picture or
22   photograph of the -- a portion of the fan
23   housing.
24   **Q  Do you know whether that's drop-down debris or**
25   **not?**

167

1    A  I don't know.  Some of it looks like it may be.
2    I don't know.
3    **Q  You don't know one way or the other?**
4    A  I don't know.  I can't tell from this
5    photograph.
6    **Q  If you look at Rimkus 400, do you know whether**
7    **that reflects drop-down debris or not?**
8    A  Honestly I can't even tell you what this, what
9    I'm looking at.  I don't know if this is -- it's
10   in some part of the ductwork.  I don't see the
11   fan there.  It's just a bad photograph.  I don't
12   know what it is.
13   **Q  Were you present -- you were present --**
14   A  I was.
15   **Q  -- when the blower motor, the east blower motor**
16   **was examined, right?**
17   A  Yes.
18       MR. SENAK:  I numbered these 1 through 10.
19       (Deposition Exhibit 10 was marked for
20   identification.)
21       THE WITNESS:  Might this be a good time to
22   take a break, short restroom break?
23       MR. SENAK:  I'm good with that.
24       (A recess was taken between 1:44 p.m. and
25   1:52 p.m.)

168

1    BY MARK SENAK:
2    **Q  Mr. Vergon, showing you what has been marked as**
3    **Exhibit 18, which is a series of photographs**
4    **numbered 1 through 10, you were present at the**
5    **inspection of the blower from the east side of**
6    **the oven, correct?**
7    A  Yes.
8    **Q  And that was on September 1st of 2014?**
9    A  That's correct.
10   **Q  Do you know whether these are your photographs?**
11   A  I don't know.  I took photographs.  They are on
12   my computer.  I don't know whether they are mine
13   or not.
14   **Q  There were a lot of photographs taken.  In any**
15   **event, if you take a look at these and just tell**
16   **me if these are photographs of the east blower,**
17   **to your knowledge.**
18   A  I think these are Rimkus photographs.
19   **Q  You know, you may be right.  But in any event,**
20   **are they --**
21   A  It looks like the east blower.  I know we
22   marked -- I can't quite read that, but it's
23   probably the east blower.
24   **Q  Okay.  So at least photograph No. 1 is a picture**
25   **of the blower.**



169

1  A  Yes.
2  Q  That includes the housing and then the motor?
3  A  Is that a question?  Yes.
4  Q  Let's get rid of that one.  Photograph No. 2 is
5     a picture inside the blower housing.  True?
6  A  Yes.
7  Q  Does that show any drop-down debris that you can
8     tell?
9  A  I mean, I can't tell really from the photograph.
10    It's kind of a bad copy.  But no, I can't tell.
11 Q  Exhibit No. 3 is, I think -- well, you tell
12    me -- if you can tell me what that is.
13 A  Well, this is looking into the housing
14    through -- I don't know if we're looking at it,
15    again, straight down or through a side panel,
16    but we're looking into the housing fan blades.
17 Q  I'm going to circle a section of this.  All
18    right?  And I'm going to put the No. 1 by that.
19    You see that black piece inside the circle?
20 A  I see a black area inside the circle, yeah.
21 Q  Do you know whether that's residue that was from
22    the varnish and spray liner?
23 A  I don't know if it's that or this other area.
24    Some is oxidized, some of the fan is oxidized
25    from the fire and some is not.

170

1  Q  Right.  I'm sorry.
2  A  It looks like maybe this is a part that's not
3     oxidized.  I don't know if that's residue.  But
4     again, you have all these areas that look like
5     it's the exact same.
6  Q  Is it your understanding that is or is not
7     residue?
8        MR. O'BRIEN:  Form.
9  A  I don't know that it is residue.  It doesn't
10    look like it is.
11 Q  Let's say this:  What we do know is that's not
12    drop-down debris?
13 A  Not that I know of, no.
14 Q  And the reason that's true is because it's
15    affixed to the side of the blower.
16 A  Well, I don't know if it's anything affixed to
17    it.  Again, you have a lot of oxidation on the
18    metal surface of this entire thing, so the
19    oxidation isn't uniform, so is it really just
20    metal we're seeing or is it something else?
21 Q  Well, the oxidation that you refer to, I take it
22    the oxidation is really rust, right?
23 A  Yes.
24 Q  And rust customarily or orange or brown in
25    color.

171

1  A  Yes.
2  Q  And so the area that I'm putting, I've marked in
3     the circle 1, is black?
4  A  Yes.
5  Q  Right?  And that black is consistent with what
6     the residue was that is shown or that was
7     removed by you and others from the inside of the
8     ductwork.  True?
9  A  Yes.  But it could also be area that is just not
10    oxidized.  You can't tell from the photograph.
11 Q  Is the reason it wouldn't be oxidized because it
12    wouldn't be exposed to air and water?
13 A  It could be.
14 Q  And is one of the reasons why it wasn't exposed
15    to air and water because there was residue over
16    the metal that prevented it from being exposed
17    to air and water that would have resulted in
18    oxidation?
19       MR. O'BRIEN:  Foundation.
20 A  No, not necessarily.  I mean, I have been to
21    hundreds of fire scenes now, and I see all kinds
22    of metal that's oxidized.  And then it's
23    oxidized a certain way at the scene when we get
24    there, but then if you do a joint scene
25    examination weeks down the road, months down the

172

1     road, in this case more than a year down the
2     road, oxidation will occur even more on surfaces
3     and then it doesn't even look the same as when
4     you first saw it.  So I don't know if this is a
5     section that just hasn't been oxidized yet, or I
6     don't know how much this was oxidized at the
7     time of the fire.  I would need some other
8     information.
9  Q  Well, when you examined the inside of the
10    blower, did you note whether there was residue
11    on the inside of the blower that was not
12    drop-down debris?
13 A  I did not note that, no.
14 Q  Is it your understanding that there was no
15    residue on the inside of the blower that was not
16    drop-down debris?
17 A  Not to my knowledge.
18 Q  You don't know one way or another?
19 A  No, I don't know, no.  My opinion is I haven't
20    seen any evidence that there was any residue on
21    the inside of the blower.
22 Q  Well, and that's kind of what my question was,
23    is whether when you looked at the blower,
24    whether you saw whether there was any residue
25    that remained on the side of the blower that was

173

1   not drop-down debris as shown -- and I'm not
2   sure, I'm not going to say it's shown in the
3   photograph -- but just asking you, based on your
4   recollection and your knowledge, was there
5   residue in whatever amount on the inside of the
6   blower that was not the result of drop-down
7   debris?
8  A   No, not that I could determine.  All the residue
9      I saw looked like it was something that would
10     have dropped down or most likely would have
11     dropped down.
12 Q   So what you're saying is that when you looked at
13     the inside of the blower, what you saw was no
14     residue, completely cleaned?
15 A   No.  There was residue in there.
16 Q   I'm sorry?
17 A   There was residue in there.
18 Q   Drop-down residue.
19 A   Yes.
20 Q   But if you took out the drop-down residue, what
21     you're saying is the inside of the blower was
22     completely cleaned?
23 A   Well, no, because there was also the goo.  So
24     there was goo that had dropped down and adhered
25     to certain surfaces of the blower.  So no, you

174

1   can't tell by this photograph especially that
2   there was anything adhered to this thing at the
3   time of the fire.
4  Q   Do you know whether in photograph No. 4 that
5      reflects any drop-down debris?
6  A   I don't see any.  I see some particle -- a lot
7      of soot, it looks like, essentially, byproducts
8      of the fire progression, some oxidation, but I
9      don't see too much else.
10 Q   If you look at Exhibit No. 4 -- or I'm sorry,
11     Exhibit No. 5 -- let me try that again.  On
12     Exhibit 18, photograph No. 5, any drop-down
13     debris that you see there?
14 A   What is probably most likely some drop-down, I
15     see -- now, again, depending on what angle we're
16     looking at -- but I see some at what looks like
17     the very bottom of the photograph, some debris,
18     I see a little bit of the same kind of material
19     inside the housing, if this is looking straight
20     on it's the lower level, you can see some stuff
21     in there.
22 Q   When you look at the fan blades that are shown
23     in photograph No. 5, do you know whether that's
24     residue that was on the fan blades from the
25     spray liner and the varnish?

175

1  A   I don't know.
2  Q   You don't know one way or another?
3  A   No.
4  Q   And again, I'm just going to circle a section of
5      this Exhibit No. 5, and put a 1 there.  Do you
6      know whether that's residue that was left inside
7      the blower or whether that's something else?
8  A   That looks like, to me, metal that is just not
9      oxidized yet.
10 Q   Again, if you take a look at exhibit or
11     photograph No. 6, if you look to the left -- I'm
12     going to circle that piece and put a 1 by it --
13     do you know whether that's residue that was left
14     on the inside of the blower housing?
15 A   I don't know if that happened, I don't know when
16     that got there.
17 Q   I understand you don't know when it got there,
18     but do you know whether that's residue that was
19     left inside the blower housing?
20         MR. O'BRIEN:  Form, foundation.
21 A   You said left inside.  So I would have to know
22     left inside when.
23 Q   After cleaning.
24 A   Well, the fire was after the cleaning, too, so I
25     don't know exactly when that was left there.

176

1  Q   Well, I'm just trying to determine whether you
2      know whether what was circled in Exhibit No. 1
3      is residue that was on the inside of the blower
4      housing prior to the fire.
5  A   I don't think it's -- I don't think I could
6      tell.  Some of this stuff looks like just from
7      at flake there, so I don't know if this is
8      something that adhered to the surface at the
9      time of the fire, during the fire, or after the
10     fire, I don't know.  This is a year, more than a
11     year after the fire.
12 Q   Let's sigh this:  The material you see in
13     Exhibit No. 1, is it accurate that is not
14     drop-down debris?
15 A   Yes.
16 Q   And we're on photograph No. 7.  Does that show
17     any drop-down debris?
18 A   This is a little more obvious that it looks like
19     probably drop-down debris.
20 Q   And the drop-down debris, I take it, is at the
21     bottom of the photograph.  And I'll just draw a
22     large number around that and put No. 1.
23 A   Yes.
24 Q   That's in the bottom of the blower housing.
25 A   It looks like it, yes.



177

1  Q  All right. If you now take a look at the
2     section marked No. 2, would you agree that is
3     not drop-down debris?
4  A  Well, it didn't drop down, so yes, it's not
5     drop-down debris.
6  Q  That's because it's affixed to the side of the
7     housing.
8  A  Right. But again, is it goo that could have
9     run? I can't say definitively it's not goo that
10    ran down and adhered and that's what's left
11    after a year, I just don't know.
12 Q  Understood. But we know it's not drop-down
13    debris, at least in your opinion.
14 A  Well, when I say drop-down debris, I'm including
15    what could be goo, residue, so I don't know.
16 Q  So when you say the goo that would have dropped
17    down during the fire, right, that would have
18    been in a liquid state?
19 A  Yes, and it would have adhered to the sides
20    wherever it stuck to and then stayed there.
21 Q  And if you look at the section marked No. 3, do
22    you think that's the goo that you referred to
23    that would have dripped down after it had
24    liquefied during the fire?
25 A  It looks like it could be.

178

1  Q  In exhibit photograph No. 7, in the circle
2     No. 2, labeled No. 2, do you know whether that
3     is residue that was left inside the blower
4     housing after it was cleaned but before the
5     fire?
6  A  I don't know. I can't today look at this
7     photograph and tell you.
8  Q  One way or another.
9  A  Right.
10 Q  Again, if we look at Exhibit No. 8, you'll see
11    there's a section -- and again, I'll circle and
12    mark No. 1 -- do you see that?
13 A  Yes.
14    THE REPORTER: You mean page 8?
15    MR. O'BRIEN: Page 8. Thank you.
16 Q  In that circle on page 8, does that reflect
17    residue that liquefied during the fire and
18    dripped down into the top of the blower housing?
19    MR. O'BRIEN: Foundation.
20 A  It looks like it could have, but I don't know.
21    I mean, it looks like the tarry substance,
22    residue-type material, but this looks like it's
23    looking down into from above. So that's
24    possible.
25 Q  And again, if we -- circling No. 2 and No. 3 --

179

1     do you know whether that's drop-down debris?
2  A  Again, I can't tell the difference between this
3     entire -- all of this dark area compared to the
4     oxidation, what's metal and what's oxidized and
5     what's just not yet oxidized. I can't tell.
6  Q  And I appreciate that. But I'm just asking in
7     exhibit, page 8, in the circles marked 2 and 3,
8     do you know whether that's drop-down debris?
9  A  It doesn't look like it, no.
10 Q  And that's because it is affixed to the side of
11    the blower housing?
12 A  Or it could be the actual side of the blower
13    housing. That's what I'm saying, I don't know.
14 Q  Well, understood, but we know one thing, that is
15    not drop-down debris.
16 A  Right.
17 Q  Now, Exhibit No. 10 --
18    MR. O'BRIEN: Page 10.
19 Q  I'm sorry, page 10 -- do you know what that is?
20 A  It appears to be some of the baked on or baked
21    residue taken from --
22 Q  Go ahead. I'm sorry.
23 A  -- taken from, like, similar to what was found
24    in some of the ductwork.
25 Q  When you say "baked on," what do you mean?

180

1  A  I mean, it looks like it was at some point
2     subjected to extreme heat and baked as charry,
3     looks like it's possibly a goo that had
4     solidified during the heating process or fire,
5     because it has some characteristics, it looks
6     like, just my opinion, it looks like it maybe
7     flowed a little bit and then solidified in a
8     certain position. So I don't know.
9  Q  Do you know where that was found?
10 A  I don't.
11 Q  Were you present when this was found?
12 A  Well, I was present on this day. But I don't
13    know if I was present when this was found -- I
14    assume this is Mr. Howell.
15 Q  I think so. You know, I'm with you on this
16    sometimes. It's been a long time.
17 A  So I don't know for sure.
18 Q  What I'm trying to just figure out is whether
19    you know where that piece of debris came from.
20 A  I don't.
21 Q  You have no recollection whether it came from
22    inside the housing or not?
23 A  I don't.
24 Q  And you have no recollection whether it was
25    attached to the side of the housing or whether



181

1  it was found loose in the bottom?
2  A  I don't. I'm trying to see if this is actually
3     me, but it doesn't look like me. That's not
4     something I recognize. So that's not my camera,
5     so that's not me.
6  Q  Oh, just do me a favor, if you would. You have
7     like two pages of notes. Can you just read them
8     so in case one day I want to know what your
9     handwriting is like I'll actually be able to do
10    that?
11 A  Read?
12 Q  Yeah, if you could just read -- let's start with
13    Exhibit 7 and just read Exhibit 7 into the
14    record.
15 A  You can't read that?
16 Q  I'm asking the questions here.
17 A  All right.
18    MR. O'BRIEN: Mark, we're not looking at
19    photos anymore. I don't think you need to hover
20    over the witness like that.
21    MR. SENAK: I don't think I'm hovering. I
22    just want to follow along. Am I hovering? Is
23    this a problem for you? Go ahead.
24    THE WITNESS: Well, if you want to see
25    where I'm reading.

182

1     MR. SENAK: Yeah, I think I have a copy
2  somewhere. I'm just trying to follow along.
3  You're on 7. Okay. Go ahead.
4  A  Three lines down it says 8-8-17, and then I'll
5     start reading the narrative. "Works/contracts
6     at other Ball plants." Now this is
7     Mr. Scholten, my notes on my interview with him.
8     "Never a fire. Also regular cleaning
9     schedules."
10 Q  By the way, was this cleaning schedule, to your
11    knowledge, at any other Ball plant different
12    than it was at the Monticello plant?
13 A  Yes.
14 Q  Meaning it was --
15 A  They had very regular cleaning schedules, and he
16    explained to me that Monticello was always --
17    well, it says, I'll read -- "Monticello not the
18    same. Erratic scheduling. Sometimes last
19    minute and wanted to have done as fast as
20    possible. Also Monticello plant is the only one
21    of the four in which the residue was an issue.
22    "When cleaning a squirrel cage, goo from
23    ductwork above would drip down and would have to
24    clean as far above squirrel cage as they could
25    reach."

183

1     Then I have a little arrow with a comment
2  that says "above what was required." Then
3  another little statement, "Thinks problem is
4  airflow related."
5     And then at the bottom it says, "Manager at
6  other Ball plant worked temporarily at
7  Monticello commented how bad, dirty it was."
8  Q  Do you know who the manager was that's referred
9     to there?
10 A  No. I asked him that question, and he couldn't
11    recall his name. But he said they could
12    probably find out.
13 Q  All right. Going on to the second page.
14 A  The second page are my notes with Steve Carman
15    in California, the other retired ATF CFI. And
16    these are just -- I'm just making just random
17    notes based on our conversation, so they may not
18    mean anything at all to anybody here.
19    But it says, "Oven driving off
20    spray/vaporized."
21 Q  Up directly to the right of that, what is that
22    word?
23 A  I think that's "material."
24 Q  Okay.
25 A  "What particulate matter is left? Airflow

184

1  through duct? What is inside of oven? Looked
2  like before cleaning. Piloted ignition versus
3  autoignition of contaminants."
4  Q  I'm sorry. What is the difference between the
5     piloted ignition versus autoignition?
6  A  It's what we had talked about earlier, like
7     piloted like using a match to light something or
8     just something ignited based on the ambient
9     temperature in the environment.
10    Then "In IBO? How was it ignited? Small
11    particle versus big particle."
12 Q  What is the significance of that?
13 A  Of?
14 Q  Small particles versus big particles.
15 A  Well, we're talking about, you know, if
16    particulate matter is being discussed, how big
17    are the particles? Do we know the size of the
18    particles, bigger versus smaller, you know, what
19    are going to be their ignition temperatures, how
20    hard will they be to ignite versus how hard, you
21    know, if it is a big particle is it going to
22    move through the duct system just by airflow?
23    Is it small? You know, what's --
24 Q  Am I wrong to conclude that smaller particles
25    have a lower autoignition temperature generally?

185

1  A  Well, no, it just depends on the material
2     itself, material properties of that material.
3  Q  Right. But if you take any material, the
4     smaller the particle the lower the autoignition
5     temperature is?
6  A  Well, I don't know, if you have a big piece of
7     steel in the room as big as this table and a
8     small piece of steel, I mean, is --
9  Q  Well, like, for instance, if you have a big
10    piece of steel and then you have -- well, let's
11    try it a different way -- if you have a big
12    piece of aluminum and then you have aluminum
13    dust, wouldn't you say the aluminum dust has a
14    lower autoignition temperature?
15 A  Well, then you are changing its chemical
16    composition. You change the state of the
17    matter. So yes, so finely divided material is
18    going to ignite faster than solid. And a lot of
19    it comes down to surface mass ratio.
20 Q  Understood. Go ahead.
21 A  So then I have, "Does larger particle get broken
22    up in squirrel cage? Exothermic decomposition
23    of material?"
24 Q  What does that mean?
25 A  Is the material heating up to the point that it

186

1     is decomposing based on heat to the point of
2     ignition.
3  Q  Did you ever get an answer to that question?
4  A  No. And that would be like your stain rag fires
5     kind of.
6  Q  I'm sorry?
7  A  Like stain rag fires.
8  Q  Okay. Sort of spontaneous combustion?
9  A  Yes. Then "Coal/tar creosote, 635 degrees
10    Fahrenheit AIT" -- which is autoignition
11    temperature -- then I have, "Wood creosote 680
12    degrees Fahrenheit," and then I have, "What is
13    AIT of contaminant, contaminant/particulate
14    matter?"
15       And that's something that we just don't
16    know. So my point here was if something was
17    left in the IBO that didn't get cleaned or
18    sucked out, vacuumed out, what's its
19    autoignition temperature, what its ignition
20    temperature? We have to identify what the
21    material is first before we can say that it
22    could have ignited, and then if it's small, if
23    it's small particulate matter, then how much
24    energy would it have retained as it traveled
25    through the ductwork in the airflow to ignite

187

1     anything else, combustible material that may be
2     in the ductwork itself.
3        So there's just so many things we don't
4     know.
5  Q  Understood. Okay. So now Exhibit No. 9, if you
6     could just read that into the record, please.
7  A  It's a lot of stuff here. May 22nd, and I have
8     at the top "Ball Manufacturing."
9        So "Ken Wall, Paul Scholten," and then I
10    have a marked notation next to "Ken Wall,
11    foreman on job" and then a lot of bullet points,
12    "Clean oven, pull screens from oven, used for
13    cans to bake finish on cans (beer and soda), get
14    oven and clean scale from sides, finishes on
15    inside of cans so taste of aluminum." I know
16    what I'm saying, so that's all that counts.
17       "Clean screens to airflow, 400 degrees when
18    on, no chemical used, air hammer guns and
19    scrapers, pneumatic operated," and I say "and
20    wire brushes."
21       "Scaling varies in thickness." I have a
22    star next to "PIN oven and internal combustion
23    oven, No. 2, fire."
24       Next page, these are all bullet points:
25    "Cleaned south below squirrel cage, 6:00 a.m.

188

1     and finished by 3:00 p.m. Fire approximately
2     midnight. Second shift starts at 6:00 p.m.,
3     12-hour shifts."
4  Q  Do you know whether the -- when the oven was
5     started up again?
6  A  I think sometime after the next shift came,
7     after 6:00 p.m. or is it 7:00 p.m.? Sometime in
8     that timeframe between 6:00 to 8:00 p.m., in
9     that range, maybe a little later. I don't know
10    for sure.
11 Q  So it's your understanding that Air Tech
12    finished at 3:00, but 3:00 didn't restart the
13    oven, they waited for the next shift to begin at
14    either 6:00 or 7:00 restart the oven?
15 A  I think so. It could have been later than that.
16    I just don't recall.
17 Q  Understood.
18 A  Next bullet point, "Cleaning oven since 2005.
19    Started cleaning quarterly, but Ball had
20    changed, call when want cleaned, maybe as long
21    as a year.
22       "Vacuum with five-gallon shop vac when done
23    cleaning. Everything off when left. Clean
24    everything that can be seen. Oven still hot
25    when arrived. Two access panels, squirrel cage,

189

1    inner part of squirrel cage."
2 Q  Do you know how long -- I mean, do you know when
3    they started cleaning the oven, how long they
4    had to wait for it to cool off?
5 A  I do not know that, no.
6 Q  I'm sorry, go ahead.
7 A  "Fall 2013, last cleaning above squirrel cage,
8    much more product debris."
9        And then these are, looks like, questions
10   to myself. "What is spray-on finish? What
11   chemicals? Operating temps oven?" I have the
12   word "ductwork."
13       "Previous repairs to ovens, squirrel
14   cages?"
15 Q  Did you find anything that was done in the
16   repair of the oven that would have caused or
17   contributed to the fire?
18 A  No.
19       The last page, it says "Lloyd Hensley,
20   865-384-6254 cell, MEGTEC. Oven installed 1988,
21   may have been designed to operate at 350 degrees
22   but may have increased temp based on change of
23   product (steel to aluminum) over time."
24       New bullet point, "Also consider line
25   speed, faster the line, higher production but

190

1    need higher temps. Many fires with MEGTEC,
2    always same thing, poor maintenance and buildup
3    of solvent on ductwork. Ductwork temps vary,
4    but close to 350 degrees to 375 degrees.
5        "Condensation on ductwork is a problem,
6    more condensation, more buildup. If consistent
7    buildup then ducts in oven cabinet need to be
8    insulated."
9 Q  Okay. Thanks.
10       (Deposition Exhibit 19 was marked for
11   identification.)
12 Q  Mr. Vergon, showing you Exhibit 19, these are
13   copies of the invoices I found in your file. Is
14   that true?
15 A  Yes.
16 Q  True and accurate copies of the invoices?
17 A  Yes.
18 Q  Are there any other invoices that you have that
19   are not in Exhibit 19?
20 A  No.
21       (Deposition Exhibit 20 was marked for
22   identification.)
23 Q  Mr. Vergon, showing you Exhibit 20, which I
24   believe is the MSDS sheet for the spray liner
25   that is applied to the inside of the cans.

191

1 A  Yes.
2 Q  And you would have relied on this document in
3    formulating your opinion?
4 A  I mean, to some extent I know that it's in
5    there, just the fact that it was sprayed on the
6    cans, yes.
7 Q  Is the fact that this is a combustible liquid
8    and vapor, did you rely upon that in formulating
9    your opinion?
10 A  Yes, I know it's in my opinion. So, I mean, to
11   some extent I know that's -- the residue is the
12   byproduct of this stuff that's in condensation
13   form, so yes.
14 Q  The residue on the inside of the ductwork is
15   made up of the material that is shown in
16   Exhibit 20. True?
17 A  It's the byproduct of it being baked off, yes.
18 Q  All right. If you go to page 6 of 9 on
19   "Stability and Reactivity," it talks about
20   avoiding possible sources of ignition spark and
21   flame.
22 A  Yes.
23 Q  Is there a difference between an ignition from a
24   spark or a flame?
25 A  I mean, they are both viable ignition sources,

192

1    so I'm not sure I understand your question.
2 Q  Yeah, is there something -- they specify spark
3    or flame. Is there some reason why they would
4    do that? I'm like you, which is they have the
5    same potential as an ignition source, but they
6    seem to make a distinction between the spark or
7    the flame. Is there any significance to that?
8 A  I just think --
9        MR. O'BRIEN: Foundation. Go ahead.
10 A  I just think they are saying that either a spark
11   or flame could do it. I mean, a spark, if you
12   are working in a setting where you are grinding
13   operations, they throw sparks so they are saying
14   be careful probably because a spark could ignite
15   it as well.
16 Q  They go on to talk about, do not pressurize,
17   cut, weld, braze, solder, drill, grind, or
18   expose containers to heat or sources of
19   ignition.
20       Is it your understanding that exposing this
21   material to heat would cause it to ignite?
22 A  Yes, that's what it says.
23       (Deposition Exhibits 21-24 were marked for
24   identification.)
25       MR. SENAK: And Randy Crume will be 25.

193

1    (Deposition Exhibit 25 was marked for
2    identification.)
3  Q  Mr. Vergon, showing you Exhibits 21, 22, 23, 24,
4    25, have you seen these before?
5  A  These look like they are the employee, the Ball
6    employee notes or statements regarding the fire.
7  Q  Did you receive copies of these in the Rimkus
8    production?
9  A  I'm pretty sure I did.
10 Q  And by that I mean there's a typewritten page
11    and then there's a handwritten page that's
12    attached to it.
13 A  Yes.
14 Q  Would you have received both of them?
15 A  You know, I don't really recall. I think I saw
16    these, maybe the handwritten ones, but I don't
17    know.
18 Q  You at least recall receiving the handwritten
19    ones?
20 A  Yes.
21 Q  And you would have reviewed these and considered
22    these in formulating your opinion?
23 A  Well, I would have reviewed these to see if they
24    said anything different than what was written in
25    the Rimkus report, I think, and then relied on

194

1    the Rimkus report because it seemed to be
2    accurate.
3  Q  And you make a good distinction. Because these
4    are not listed as documents that you would have
5    relied upon, true?
6  A  True.
7  Q  But they have been documents that you would have
8    reviewed?
9  A  Yes.
10    MR. SENAK: That's all I have.
11    MR. O'BRIEN: No questions. We'll reserve
12    signature.
13    THE REPORTER: Transcript orders?
14    MR. SENAK: I'll take one, just regular
15    delivery, e-tran.
16    MR. O'BRIEN: E-tran, condensed.
17    MR. SENAK: Yeah, condensed if you would.
18    I think I can do that.
19    (Time Noted 2:29 p.m.)
20    AND FURTHER THE DEPONENT SAITH NOT.
21
22
    _____
    MICHAEL A. VERGON, CFI
23
24
25

195

1  STATE OF INDIANA      )
                         ) SS:
2  COUNTY OF MARION      )
3        I, Tamara J. Brown, CSR, RMR, CRR, a
4  Notary Public in and for the County of Marion,
5  State of Indiana at large, do hereby certify
6  that MICHAEL A. VERGON, CFI, the deponent
7  herein, was by me first duly sworn to tell the
8  truth, the whole truth, and nothing but the
9  truth in the aforementioned matter;
10        That the foregoing deposition was
11  taken on behalf of the Plaintiffs, at the
12  offices of Connor & Associates, Suite 4350, 111
13  Monument Circle, Indianapolis, Marion County,
14  Indiana, on the 11th day of October, 2017,
15  commencing at the hour of 9:59 a.m., pursuant to
16  the Federal Rules of Civil Procedure;
17        That said deposition was taken down
18  stenographically and transcribed under my
19  direction, and that the typewritten transcript
20  is a true record of the testimony given by the
21  said deponent; and thereafter presented to said
22  deponent for his/her signature;
23        That the parties were represented by
24  their counsel as aforementioned.
25        I do further certify that I am a

196

1  disinterested person in this cause of action;
2  that I am not a relative or attorney of either
3  party, or otherwise interested in the event of
4  this action, and am not in the employ of the
5  attorneys for any party.
6        IN WITNESS WHEREOF, I have hereunto
7  set my hand and affixed my notarial seal this
8  _____ day of _____, 2017.
9
10    _____
11    N O T A R Y   P U B L I C
12
13  My Commission Expires:
14  September 5, 2025
15  County of Residence:
16  Marion
17
18
19
20
21
22
23
24
25



**Exhibits**

M VERGON_1  3:7 6:9,12,22
7:11,13 8:21 9:6 111:6,10
116:16 176:2,13

M VERGON_2  3:9 7:6,8,9,10,
14 8:21 148:2

M VERGON_3  3:10 33:23,25
139:21 169:11

M VERGON_4  3:12 35:14,16
39:5 41:2 139:21 174:10

M VERGON_5  3:13 37:3,4,8
40:25 174:11 175:5

M VERGON_6  3:15 38:2,4,18
40:23 55:7

M VERGON_7  3:16 39:25
40:2,4,5,23 49:6 55:17 56:7,16
57:5 72:19 73:15 101:8,9,21
116:20 181:13

M VERGON_8  3:17 48:3,6,9
50:14 54:25 55:5 56:19,23,25
57:4,8 59:23 60:9,11,22 61:2
138:21 143:25 178:10

M VERGON_9  3:19 101:16,18,
21 187:5

M VERGON_10  3:20 102:21,
23,24 103:19 105:9,10 167:19
179:17

M VERGON_11  3:21 111:23,
25 113:22 114:25 117:10,13,24

M VERGON_12  3:22 121:22,
24 124:20 126:5 127:14 129:19
130:14

M VERGON_13  3:24 129:7,14,
22 134:13

M VERGON_14  4:3 135:25
136:2

M VERGON_15  4:5 155:16,18

M VERGON_16  4:6 138:21
157:2,4

M VERGON_17  4:8 163:19
164:3,10

M VERGON_18  4:9 168:3
174:12

M VERGON_19  4:10 190:10,
12,19

M VERGON_20  4:11 190:21,
23 191:16

M VERGON_21  4:12

M VERGON_22  4:13

M VERGON_23  4:15

M VERGON_24  4:16

M VERGON_25  4:18 193:1

---

**1**

1  6:9,12,22 7:11,13 8:21 9:6
66:12 107:4,15,19,21,22 108:24
109:3 110:17 111:6,10 113:1,23
115:5,12,23 116:16,20 145:9,
11,16,20 146:2,9 167:18 168:4,
24 169:18 171:3 175:5,12
176:2,13,22 178:12

10  23:8 102:21,23,24 103:19
105:9,10 114:5,6 115:21
167:18,19 168:4 179:17,18,19

11  111:23,25 113:22 114:25
117:10,13,24 119:14 130:4
136:2

11:00  48:1

11:04  48:2

11th  69:14 119:10,11 120:19

12  121:22,24 124:20 126:5
127:14 129:19,20,25 130:14

12-hour  188:3

12:01  95:25

12:08  96:1

12:20  105:3 106:6

12:37  117:24

12:37:56  117:25

12:38  117:25

12:45  104:19 117:20

12:48  103:4

12:53  103:7

12th  69:13

13  110:4 129:7,13,14,19,22,23
134:13

14  114:1,3 135:25 136:2

15  19:14 23:8 155:16,18

16  138:21 149:14 157:1,2,4

17  38:6 163:19 164:3,10

175  34:10

18  53:7,10 168:3 174:12

18th  112:5

19  53:7,10 190:10,12,19

19-year-old  11:16

1988  82:1,8 189:20

---

1:44  167:24

1:52  167:25

1st  168:8

---

**2**

2  7:4,6,8,9,10,14,18 8:21 50:20
51:3,7,15,19 54:25 59:24 60:22
63:9 64:18 68:13 69:21 70:19
82:7 104:6,20 106:8 107:9
108:1,5,10,17,19,24 113:23
115:6,8 134:14 144:2,5,12
145:9,12,18,20 146:3,6 148:2
169:4 177:2 178:2,25 179:7
187:23

20  190:21,23 191:16

2005  188:18

2006  9:12

2010  9:17

2011  119:10 120:25 121:25
122:13 123:3,9,13,21,24 124:7,
17,22 129:16 130:9,15,21

2012  30:18

2013  9:20 10:1 11:1,12 119:11
121:3 129:9,13,17,18,21 130:4
131:2 134:14 136:3 147:19,23
148:1 189:7

2014  11:21 46:21 63:15 65:7
103:1 112:4,5 119:23 120:6,19
124:23 134:22,24 135:3 138:3,
10,14 147:20 168:8

2015  12:6,23 13:21 14:2

2016  13:8,16 14:2

2017  8:14,15 14:11 15:6,12,19,
25 38:6 61:19 72:19

21  193:3

21-24  192:23

22  193:3

22nd  187:7

23  193:3

23rd  103:1 112:4 119:23 120:6,
19 124:23 134:22,24 135:3
138:3,10,14

24  17:8 193:3

25  192:25 193:1,4

2626  164:4,11

274.2  116:6,13 118:6

---

**3**

3  33:23,25 34:7 104:6 113:23
115:6 116:5,10,15 117:9,13,23
118:3,15 139:21,24,25 169:11
177:21 178:25 179:7

300  118:12

300s  44:4

350  34:8 75:5 118:13,17 189:21
190:4

375  118:17 190:4

39  164:4

395  164:6 165:22,24 166:4,14

396  164:5 165:18,19,25 166:3

3:00  188:1,12

3rd  119:11 121:3 129:9,17,18,
21 131:2 134:14

---

**4**

4  35:14,16 39:5 41:2 53:6,10
68:13,15 70:11 104:6,16 106:24
107:14,22 108:10 109:3,18
113:23 115:8,12,23 116:5,10,
15,16 117:10,14,24 118:3
139:21,25 141:4 143:25 157:11
160:1 174:4,10

400  66:24 67:14,18 156:5 164:8
167:6 187:17

---

**5**

5  34:22 37:3,4,8 40:25 113:23
174:11,12,23 175:5

50-defendant  24:6

---

**6**

6  38:2,4,18 40:23 55:7 68:12
70:11 106:24 107:14,22 109:3
113:23 141:4 175:11 191:18

635  186:9

6483  164:7,8 166:18,19

680  186:11

6:00  187:25 188:2,7,8,14

---

**7**

7  39:25 40:2,4,5,23 49:6 55:17
56:7,16 57:5 72:19 73:15 101:8,
9,21 113:23 116:20 162:13



176:16,178:1 181:13 182:3

**700** 16:11,12

**700-something** 23:24 44:6

**73** 24:7

**750** 16:11,12

**7:00** 188:7,14

---

**8**

**8** 48:3,6,9 50:14 54:25 55:5 56:19,23,25 57:4,8 59:23 60:9, 11,22 61:2 116:20,21 138:21 143:25 161:10,22 178:10,14,15, 16 179:7

**8-8-17** 40:7 182:4

**865-384-6254** 189:20

**8:00** 188:8

**8th** 72:19

---

**9**

**9** 101:16,18,21 119:15 120:25 123:3,21 187:5 191:18

**90** 22:25 26:23 27:7,12 28:10

**90s** 22:25 26:24 27:8

**921** 51:21 52:3,4,7,10,24 53:3,9 87:1 151:5

**96.9** 113:6 114:7

9th 61:19 121:25 122:13 123:3, 13,24 124:7,17,22 129:16 130:9,14,21

---

**A**

**A-m-c-o** 16:1

**a.m.** 48:1,2 103:4,7 106:6 187:25

**abnormal** 156:2

**absence** 77:7 162:2

**Absolutely** 25:2

**acceptable** 152:20 153:8

**accepted** 51:25

**access** 188:25

**accidental** 10:11 13:6 24:8

**accounts** 34:13

**accumulate** 142:24

**accumulated** 125:5,19 131:13 132:12 133:7,9 142:16,21

**147**:6,11 152:4 157:16 164:12 166:10

**accumulates** 113:9 166:11

**accumulation** 125:12 132:14 152:10 153:2

**accurate** 31:16,19 34:4,7 35:2 48:9 52:21 53:8 60:13 78:14 81:8 89:24 156:5 158:18 176:13 190:16 194:2

**act** 156:21

**activity** 116:10

**actual** 23:4 46:12 54:8 114:8 119:25 133:15 144:15 179:12

**add** 122:20

**added** 7:15,20 8:6 49:6 50:10 55:22

**addition** 56:21 57:2

**additional** 41:17 47:8

**additions** 7:22

**address** 136:8

**adhered** 71:8 123:18 173:24 174:2 176:8 177:10,19

**adheres** 91:15

**adhering** 91:18

**adjustment** 114:20

**advanced** 22:13

**advised** 67:21 82:15 96:22 118:16

**affect** 25:25

**affirms** 65:13

**affixed** 170:15,16 177:6 179:10

**agent** 17:7

**agree** 53:19,20 87:21 92:15 110:1 123:20 127:3 146:2,25 151:18 161:17 177:2

**agreement** 34:3

**ahead** 5:25 25:7 47:24 55:13 65:12 88:22 98:6 130:10 159:1 179:22 181:23 182:3 185:20 189:6 192:9

**AIA** 21:18

**air** 39:13 44:14 57:12 68:3,15, 16,24 83:9 94:21 111:14 137:3, 4,22 138:1,2,8 146:20,23 147:1, 4,24 148:21 149:11,20 154:13 156:4 158:7 159:24 160:8 162:18 163:2 171:12,15,17 187:18 188:11

**airflow** .55:24 125:5,13,19 131:13 132:11 133:9 137:8 144:15,23 145:8,13 146:2,8,16 149:13,18,22 150:1,3,11 151:1, 12 183:4,25 184:22 186:25 187:17

**airflows** 145:19

**AIT** 186:10,13

**alarm** 103:3 104:2

**alarms** 120:13

**Allen** 8:2 15:19,22 30:9

**Allstate** 8:3 15:19,23 30:9,11 31:4

**aluminum** 148:22 185:12,13 187:15 189:23

**ambient** 45:11 94:21 184:8

**ambiguous** 27:20

**AMCO** 7:22 16:1,6 30:12

**amend** 50:6

**America** 13:17

**American** 14:11,17,24 29:25 30:2

**amount** 74:20 92:2,9,10,11 94:22 152:3,20 173:5

**analogy** 126:14

**analyzing** 25:13

**and/or** 18:9

**Andrew** 46:23

**anemometer** 149:17

**angle** 174:15

**annually** 20:18

**Anthony** 13:9

**anymore** 59:17 181:19

**apartment** 11:18

**appears** 132:10 136:7 161:9 165:21 179:20

**application** 21:11

**applied** 190:25

**apply** 21:10,25

**applying** 150:23

**approval** 22:3

**approximately** 67:18 104:19 106:6 188:1

**April** 119:11 121:3 129:9,13,17, 18,21 131:2 134:14

**airflow** .55:24 ...

**area** 16:22 17:3,18 18:13 26:13 65:15 107:8,9,23 108:1,2 109:9, 15 110:16 111:9 116:15 117:6, 8,13,17 140:5,8 141:2,24 141:5, 8,14 142:5,10,13,19 143:2,24 144:6,7,12 145:12,17 146:8 148:2 154:20 158:15 160:1 161:24 162:3 163:2 169:20,23 171:2,9 179:3

**areas** 17:22 18:1,9 68:15 170:4

**argue** 140:10

**argument** 52:13

**arms** 94:7

**arrest** 12:2

**arrested** 10:8,20,23 13:1

**arrival** 105:14 121:1 130:20

**arrived** 103:7 104:3 188:25

**arrives** 105:16

**arrow** 69:7 107:20 183:1

**arrows** 37:21

**arson** 9:14,19 10:23 11:4 12:5 19:21 30:18 156:17

**assessment** 25:22 62:4

**assigned** 31:11

**assignment** 47:6,9,12

**assignments** 31:17

**Assistant** 103:9

**Association** 8:16 19:21

**assume** 5:16 41:4 57:18 72:3 86:20 116:8 132:3 148:3 180:14

**assumed** 118:24 123:6

**assuming** 127:1 128:1 132:1

**assumption** 89:5 127:22,23 137:20

**ATF** 9:14,17 11:10 12:1 17:7 18:3,5 19:7,9,13,15 24:4 39:17 56:9 183:15

**ATF'S** 19:10

**attached** 35:18 38:10,17 159:10,13,17,20 180:25 193:12

**attachment** 40:23

**attorney** 5:22

**attribute** 93:18

**August** 72:19

**Austen** 31:20 33:8,16 34:18 38:5 46:23

**authored** 103:18



USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 1045 of
1167
Michael Vergon
3                                    October 11, 2017                    Index: authoritative..case

**authoritative** 51:23,25 52:7, 14,16,25 53:9,14,22,24 54:11

**authority** 52:2

**autoignition** 44:12,22,24 45:2, 4,10,14,16 184:3,5,25 185:4,14 186:10,19

**avoid** 7:12

**avoiding** 191:20

**aware** 41:9 47:16 66:2,22 91:21 92:4 96:14,20 102:4

---

**B**

**B-o-w-y-e-r** 11:22

**Babrauskas** 54:7

**back** 10:14 13:21,24 14:9 19:6 22:24 28:13 34:19,20 36:10 43:16,17 46:11 49:23,24 68:2 70:19 73:1,2 74:18 106:24 114:8 115:17 118:7,13 135:6 138:20 139:20 162:13

**back-to-back-to-back** 40:9

**backbone** 53:3

**backflows** 145:24

**background** 22:3 24:12 75:13 83:12,20 86:17,18 87:12 88:18 93:14 128:11

**backwards** 146:7

**bad** 167:11 169:10 183:7

**bake** 16:17 69:7 187:13

**baked** 91:8 160:23 179:20,25 180:2 191:17

**balance** 101:19

**ball** 36:9,19 40:11 43:1 46:25 55:25 57:22 58:11,22 61:8 63:8, 23 64:1,5,8,13,17,20,24 66:2 75:16 76:20 77:15 78:24 79:15, 19,25 82:19 85:6,14 86:10 89:16,20 90:7 91:7 97:19,25 98:7,20 99:20 100:7 103:1 104:17 105:2,24 106:5,15 109:4,7 111:4,7 117:12 118:2 119:2,6,18 121:2,15,20 125:2, 10,14,17,25 126:4 127:4,14,19, 21 128:13,25 129:3,6 130:1,16, 22 131:9,18 132:9,19 133:3,5, 12,25 134:5 137:1 144:11 148:21 149:4 150:16 152:8 154:2,8 156:22 182:6,11 183:6 187:8 188:19 193:5

**base** 68:17 133:23 153:24 164:22 165:11,12

**based** 20:5,8 62:23 72:3 76:23

79:20 88:14 89:17,23 90:21 92:20 94:16 95:4 97:10,13 98:5, 25 99:7 101:12 117:20 121:15, 20 124:10 132:14 133:20 134:3 139:5 140:9,14 141:18 142:3 143:5 148:12,15,16 149:5 150:12,14,19,21 151:1,9 153:20 155:12 173:3 183:17 184:8 186:1 189:22

**basic** 23:7 35:7

**basing** 75:12 84:18 120:22 127:12

**basis** 31:17 59:17 62:8 66:11 84:14,23 88:7 89:4 98:18 100:6 118:21 127:24 139:1 152:2,3,5 154:7 155:23 158:1

**beer** 187:13

**begin** 94:3 188:13

**beginning** 160:5

**behalf** 9:24 10:11 11:8,20 12:21 13:7,14 14:3,17 15:10,17,23 28:25 29:3,6,9,13,15,18,20,23 30:1,5,7,10,13 129:2 131:18

**believed** 125:4 131:11

**believes** 111:1,4,20 125:16,18

**Benjamin** 9:20

**beverage** 79:23

**biannually** 20:18

**big** 26:5 31:7 52:10 108:2 119:15 184:11,14,16,21 185:6, 7,9,11

**bigger** 184:18

**biggest** 31:6

**billing** 60:1 100:19,20

**bit** 5:11 27:20 54:4 78:6 85:22 90:4 144:19 165:9 174:18 180:7

**black** 169:19,20 171:3,5

**blade** 159:23 160:7,18

**blades** 160:13 162:21 163:1,12 169:16 174:22,24

**blast** 17:10,12,13

**blocked** 107:18

**blocks** 22:11

**Bloomington** 11:15

**blow** 138:8

**blower** 63:10 64:19 67:22,24 68:8 69:4,16,20 70:2,7,23 71:7 116:7,8 134:10,18,20,21,24 135:4,8 139:19 140:19 141:10 147:14 154:19 155:4 157:13,15,

17,21 159:25 160:14,18 162:18. 163:12 164:13,22 167:15 168:5, 16,21,23,25 169:5 170:15 172:10,11,15,21,23,25 173:6, 13,21,25 175:7,14,19 176:3,24 178:3,18 179:11,12

**blowers** 135:15,18,20,22 160:9

**blowing** 145:19

**blows** 68:8 137:4,22

**blueprint** 37:7

**body** 59:8

**books** 52:4,5

**Booneville** 15:8

**bottom** 68:17 69:9 70:20 71:9 94:5 113:8,23 115:16,22 142:17,22 162:13 166:11 174:17 176:21,24 181:1 183:5

**Bowyer** 11:22 12:2

**branch** 18:24

**Brandon** 9:18 10:16,20 29:2

**braze** 192:17

**break** 28:2 47:23 95:22,24 167:22

**breakdown** 28:11

**briefing** 63:16 64:24 65:5 66:14 67:5 128:4

**briefly** 9:7

**bring** 36:11

**broad** 107:9 141:5

**broke** 28:21

**broken** 185:21

**brought** 36:2,4 39:10,20 40:17 53:6 74:18

**brown** 11:21,23 170:24

**brush** 23:10

**brushes** 187:20

**building** 12:17 106:7

**buildup** 68:6 74:25 84:16 85:15,16 90:24 91:4,18 92:6,11 93:9,18,22,25 95:2 96:24 99:1, 22 137:2,6,10,12,13 145:23 148:9 162:25 163:11 190:2,6,7

**bullet** 187:11,24 188:18 189:24

**bunch** 147:10 164:12

**Bureau** 8:14 15:18 31:3

**burn** 147:15 149:2

**burned** 9:15 12:17 14:21

17,21 159:25 160:14,18 162:18. 163:12 164:13,22 167:15 168:5, 16,21,23,25 169:5 170:15 172:10,11,15,21,23,25 173:6, 13,21,25 175:7,14,19 176:3,24 178:3,18 179:11,12

**burner** 143:15,20

**burning** 125:5,19 131:13 .132:11 133:6,9 146:11 147:7,12

**Burns** 9:18 10:14,16,20 29:2

**business** 74:22 76:18

**byproduct** 191:12,17

**byproducts** 174:7

---

**C**

**C-a-r-m-a-n** 56:10

**cabinet** 190:7

**cage** 56:6 68:7,8,20 69:17 115:15 144:14 145:2 147:10 148:18 158:6 164:19,23 182:22, 24 185:22 187:25 188:25 189:1, 7

**cages** 189:14

**calcination** 53:20

**calculation** 92:16

**calculations** 54:9

**California** 39:19 40:14 54:7 183:15

**call** 32:16 42:24 44:8,17 70:6 128:2 148:20 158:16 188:20

**called** 22:13 40:13 46:6,8 72:22,23,25 73:1,14 106:20 149:16 152:10

**camera** 143:12 115:18,19 181:4

**camp** 72:24

**Campbell** 12:24 13:1,7 29:18

**Canal** 10:19 12:14,20

**cans** 79:23 91:8 95:15 136:10 137:15 187:13,15 190:25 191:6

**capacity** 129:2,5

**Captain** 64:25 100:12 103:11, 12

**car** 84:7

**career** 5:12 19:9 84:22,25

**careful** 192:14

**Carman** 56:10 183:14

**Carmel** 11:4

**case** 9:14,22 10:4,12,15 11:15 12:1,5,12,13,25 13:14 14:8,18 15:7 16:3 24:3,6,12 29:5,9,11 30:4,10,13 31:24,25 32:1,3,9, 11,17,19,23 33:1,3,7,9,12 34:15 35:8,12,22,24 42:6,22 46:2,9,19



47:15,18 49:5 55:4 87:6 101:23 108:25 150:18 172:1 181:8

**cases** 9:8 27:23 28:7,10 30:21, 25 31:10 33:19 35:6 50:8 143:12

**Casualty** 9:21 13:16 29:22

**catch** 137:6

**caught** 14:20

**caused** 82:25 84:6,10 87:16,17 93:24 96:3 111:20 124:15 132:22 133:8 136:23 138:17 151:12 155:13 156:10,14 189:16

**causing** 93:18 137:6

**ceiling** 26:9 101:1

**cell** 189:20

**Celsius** 44:5

**certainty** 98:5 124:11 139:6 140:9,15 141:16,19 142:1,4 143:6 148:11,13 149:6 150:13, 24 151:2,6,10 155:12

**certification** 20:3,4,16,17

**certifications** 19:14,25

**certified** 19:10,13,20 22:4,6

**CFI** 19:13 39:17 183:15

**change** 50:12 185:16 189:22

**changed** 31:5 188:20

**changing** 185:15

**channels** 68:10

**chapter** 53:4,6,10

**chapters** 53:5,7

**char** 53:19

**characteristics** 180:5

**characterize** 164:14 166:7

**characterizes** 158:14

**charge** 88:5

**charges** 10:9 13:13

**charred** 166:10

**charry** 180:2

**check** 13:24 14:9 22:3

**checked** 148:25

**checking** 44:1 49:3

**chemical** 94:20 185:15 187:18

**chemicals** 189:11

**chemistry** 18:17,18,19 93:14

**chief** 63:20 103:9

**chimney** 14:12,14,19,20,22,23 15:3,4,5 29:25 97:17 99:3,4

**Christy** 7:23 16:2,5

**Cincinnati** 30:17,21,25 31:3,9, 12,18

**circle** 107:4 141:3 144:1,5 169:17,19,20 171:3 175:4,12 178:1,11,16

**circled** 141:8 143:3,24 144:8 145:18 148:2 176:2

**circles** 179:7

**circling** 140:24 178:25

**circumstance** 153:25

**civil** 9:23 11:13 12:8 28:4 29:11 30:9

**claim** 10:10

**clarify** 116:18

**class** 22:14,24 23:1

**classes** 22:9,10

**classification** 139:2

**classify** 22:10

**clean** 15:3 67:23 68:5,16 69:9, 20 70:15 153:24 158:8,9 159:23 160:7 162:18 182:24 187:12,14, 17 188:23

**cleaned** 44:14 70:7,16,18,21 71:6 83:8,10 146:13 147:17,22 148:19 149:4 153:5,11,19 154:4 158:3,7 160:15,20 161:13,25 162:4,10,11 163:2 173:14,22 178:4 186:17 187:25 188:20

**cleaning** 68:24 71:14 147:25 148:17 151:24 154:6 159:24 160:8 163:10 175:23,24 182:8, 10,15,22 184:2 188:18,19,23 189:3,7

**cleanings** 154:7

**cleans** 153:22

**clear** 140:13

**cleared** 24:7

**clearer** 58:20 95:14

**client** 31:8

**clients** 31:2

**close** 31:19 118:17 190:4

**close-up** 166:3

**closely** 155:21

**Coal/tar** 186:9

**cognitive** 94:12,13

**colleagues** 56:9

**collected** 152:13

**college** 11:16

**Collins** 12:7,19,21 13:17 14:3,5 29:23

**color** 170:25

**combine** 145:5

**combustible** 187:1 191:7

**combustion** 117:7 150:5 186:8 187:22

**comment** 84:18 155:22 162:7 183:1

**commented** 183:7

**commenting** 62:22

**comments** 49:15 50:1 121:15 150:16,20

**common** 71:24

**communicated** 42:5 150:19

**communication** 154:1

**communications** 42:8 49:18

**companies** 24:18,19 26:22

**company** 7:22 8:3,6 9:21 10:6 13:16 14:11,18 15:14,20,24 16:1,6 19:16 27:3,6,10,22 29:7, 12 30:8,15 33:9,11 46:11 153:21

**compare** 152:23 163:15

**compared** 112:21 114:14 153:2 179:3

**competent** 128:7

**complete** 47:6,9,11 59:21 144:7

**completed** 47:21

**completely** 112:20 141:24 173:14,22

**complex** 11:18 92:13

**compliance** 39:7

**comply** 39:1

**composition** 94:20 185:16

**compressor** 137:4,22 138:1,2, 8,17

**computer** 48:21 168:12

**conclude** 67:17 90:23 109:8 133:19 139:1 158:19 184:24

**concluded** 110:24 111:12

**concluding** 160:12

**conclusion** 88:7 92:19 93:1,6 94:9 95:3,10 99:17,18 110:15 118:21 144:10 148:4 162:17 163:10

**conclusions** 48:25 62:23

**condensation** 85:12,13 89:11, 18,25 90:7,13,15,23 91:1,5,11, 15,17,20,24 92:3,10,18,20 93:17 94:2,4,9,22 95:1,2,4,17 96:2,6,15,18,22,23 97:16,20,25 98:11,13,14,19,22 99:20 100:6 132:14 137:9 190:5,6 191:12

**condensed** 194:16,17

**conduct** 21:2 71:14 91:13 124:6

**conducted** 13:4,10 20:10 99:14 100:20 133:14

**conducting** 23:2 24:22 42:23

**conduit** 166:2

**Conference** 8:17

**confidential** 49:17

**confused** 23:18

**connected** 69:5 122:7,9 123:4 132:5,8,19 135:18,23

**conservative** 16:14

**consideration** 25:12 40:18 81:12 85:22 104:15 124:13 136:25

**considered** 81:48 193:21

**consistent** 171:5 190:6

**Construction** 12:7,22 13:18

**construe** 75:7

**Consulting** 61:18,19,23

**contacted** 42:20,21 46:20,22

**contacting** 42:18

**contained** 54:15 57:23 63:18 64:4 101:13

**containers** 192:18

**contaminant** 186:13

**contaminant/particulate** 186:13

**contaminants** 184:3

**content** 49:12,16 50:1,3,4 55:10

**context** 151:21

**continuing** 19:17



**contract** 74:19

**contractual** 84:23

**contribute** 150:5

**contributed** 138:17 151:13 155:14 156:11,14 189:17

**contributing** 138:9 156:18

**control** 148:20

**converge** 140:22

**conversation** 38:7 39:12 40:20 50:2 55:11 56:8,11 72:17 73:5 74:3,6 76:24 79:20 88:4,13 100:21 102:6,9,18 131:14 152:25 154:5,10 183:17

**conversations** 40:9 42:17 55:7 65:3 73:6,9,13,16 101:3,10 150:17

**convicted** 9:16

**cool** 91:15 189:4

**cooperation** 24:19

**copies** 39:20 57:17 190:13,16 193:7

**copy** 6:23 7:10 34:2 36:7 37:9 38:10,17 41:3 48:6,9 59:5 157:5 169:10 182:1

**corner** 113:23

**Corporation** 36:10 55:25 76:21 79:15 86:10 89:16 104:17 106:5 129:3

**correct** 18:15 19:23 35:22 40:21 44:20 57:1,20 61:3 78:2 15 81:25 82:17,18 103:8 114:5 116:22 117:25 121:7 124:19 133:11 138:11,14,19 144:6 145:14,20 149:25 159:6,9,20 168:6,9

**correctly** 37:15 49:4 110:19

**correlates** 92:9

**Cosmopolitan** 10:19 12:13,20

**counsel** 6:5 39:1 49:10 50:7,15

**count** 28:23

**counter** 146:15

**counterflow** 146:20 147:2

**counts** 187:16

**County** 8:7 9:18 11:2,21,23 12:6,11,23 13:8,12 15:6

**couple** 15:15 21:16 23:10 32:21 34:6 39:10 40:8,17 42:13,21 44:1 50:8 53:5 73:13 105:1

**court** 5:9 9:22 11:5,14 12:9

14:16 15:7,21 22:13,17

**cover** 41:15 48:23

**covered** 28:21 131:8

**create** 38:22 94:4

**creosote** 161:13,23 162:20,25 186:9,11

**crew** 74:4

**criminal** 9:13,19 11:6,23 12:3, 25 28:24 29:9 30:4

**criticism** 62:12

**Crume** 192:25

**curious** 6:4 60:8 87:21 140:13

**current** 6:24 7:21 39:5

**curve** 63:2

**customarily** 170:24

**cut** 192:17

**CV** 6:23,24 7:10,16 8:11 18:4 20:21 22:8

---

**D**

**D-u-r-r** 9:20

**damages** 12:20

**dark** 179:3

**data** 25:14 43:25 45:25 63:2 95:9 138:22 139:11 149:22,25 150:3,23 152:12

**date** 7:1,11 34:4 40:6 69:11 72:12,18,20 73:15 112:22 113:1,6 114:8 115:7,17,25 116:2

**dated** 38:6 61:18 119:10

**dates** 63:15 74:2 105:8 114:15

**Davion** 8:2 15:19,22

**day** 72:25 73:3 115:6,12,24 134:7 180:12 181:8

**deal** 119:15

**death** 11:16 32:23

**debris** 44:13 71:7 111:13 125:6,11,20 131:13 132:12,14 133:7,10 142:14,15 143:21 147:7,10 152:10,19,20,22 153:8 157:12,15,20,23 158:5,15,16 159:10,12,19,24 160:7,13,17 164:12,14 165:7,10,20 166:2,3, 7,24 167:7 169:7 170:12 172:12,16 173:1,7 174:5,13,17 176:14,17,19,20 177:3,5,13,14 179:1,8,15 180:19 189:8

**decades** 85:20,23 86:4

**decide** 25:17 49:20

**decomposing** 186:1

**decomposition** 185:22

**defendant** 13:1 28:3 32:25

**defendant's** 50:15

**defense** 27:13,17,24 28:16 29:18,24 30:8,11 49:9 50:7

**definitive** 138:23 139:12

**definitively** 177:9

**degree** 17:8 44:6 67:14 76:15 98:5 124:11 139:6 140:9,15 141:18 142:1,3 143:6 148:11,12 149:5 150:12,24 151:2,9 155:12 156:5

**degrees** 66:24 67:18 75:5 113:6 114:7 116:6,13 118:6,13, 17 186:9,12 187:17 189:21 190:4

**delivery** 194:15

**demands** 79:5 80:21 81:11

**denied** 8:23

**department** 63:20 65:1 98:7 99:15 101:14 102:25 103:4,6 105:16 106:20 119:5 120:1 121:16,25 129:3 131:11 133:1

**depending** 174:15

**depends** 25:9 27:14 142:13 145:25 160:21 185:1

**deposed** 5:11

**deposition** 6:6,9 7:6 9:19,24 10:22 14:4,16 15:15 16:3 18:1 20:13 33:23 35:14,17 37:4 38:2 39:25 41:18 48:3 57:11 59:2,3 61:21,22 63:19 73:19 101:16 102:21 111:10,23 121:22 129:7 135:25 155:16 157:2 163:19 167:19 190:10,21 192:23 193:1

**depositions** 14:8 18:7 34:8

**depth** 53:19,20

**describing** 26:14 69:24

**description** 32:14 108:3

**designed** 75:4,11 136:9 189:21

**designing** 150:7

**destroyed** 35:11

**detailed** 61:14

**determination** 43:23 123:23 151:5

**determine** 43:12,19,21 87:7 93:16 128:12 133:15,20 136:18 140:4 164:15 173:8 176:1

**determined** 10:7 13:3,5 24:8

**determining** 16:24 25:5 26:18 126:7 153:7

**developers** 12:19

**development** 12:8,17

**develops** 96:6

**device** 149:16,19

**diagram** 36:19 37:7 40:24 145:17

**diagrams** 61:20

**difference** 7:13,15 45:4 90:4 96:3,5 179:2 184:4 191:23

**differences** 8:20

**differently** 95:18

**directed** 158:8

**direction** 145:14 147:3 149:4 154:8

**directly** 54:12 70:1 183:21

**Dirk** 41:24

**dirty** 183:7

**disagree** 101:25

**disconnected** 147:9

**discovered** 63:17 109:5 157:13 158:15 159:22 160:6 161:12,22

**discuss** 49:12

**discussed** 184:16

**discussion** 36:17 118:9

**dispense** 5:14

**disqualified** 9:3

**distinct** 87:7

**distinction** 60:15 192:6 194:3

**District** 9:23 11:14 12:9 14:16

**divided** 185:17

**document** 37:8,12 40:5 41:9 47:3 103:22 104:8,14 107:3 135:2 151:15,16 155:19,23 156:1 191:2

**documentation** 48:25 62:2 154:12

**documented** 67:11 106:16 125:3

**documenting** 23:2



USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 1048 of 1167
Michael Vergon
October 11, 2017
6
Index: documents..expert

**documents** 35:10,25 38:15,19, 25 39:4,10 40:25 50:22,24 51:2, 5,6,9,13,17 54:2 56:21 58:4 59:8,20 60:11,12,14,16,23,25 61:11,14,17 194:4,7

**downtown** 10:18,20

**downward** 69:7,8

**dozen** 49:1

**draft** 49:9

**drafting** 48:18,22

**drafts** 48:12 50:18

**draw** 60:15 68:23 69:4,7 107:4 176:21

**drew** 144:1

**drill** 192:17

**drip** 147:8 161:2 182:23

**dripped** 177:23 178:18

**drive** 38:8,10,12,16,21,22 39:6 40:22

**driving** 183:19

**drop** 67:22 71:8,13 147:14 158:23 177:4

**drop-down** 157:24 158:19 159:12,16,19 164:14 165:7,20 166:7,24 167:7 169:7 170:12 172:12,16 173:1,6,18,20 174:5, 12,14 176:14,17,19,20 177:3,5, 12,14 179:1,8,15

**dropped** 10:9 158:12 159:7 173:10,11,24 177:16

**dropping** 70:6 152:12

**duct** 82:16 157:14,16 184:1,22

**ducts** 123:15 190:7

**ductwork** 16:19 42:25 43:14,20 44:10 67:23 68:11 69:5 70:1,9, 14 74:3 75:1 76:22 84:25 85:11, 12,15,16 86:19 88:11 89:11,18 90:7,25 91:4,11,19,21 92:3,7, 10,11,20,21 94:3,11 96:9,19,22 97:20,25 98:9,20 99:23,25 100:9 109:16 113:3,9 114:10,18 115:15,16 118:8,12,16,19,22 121:1,3,13,14,20 122:5,7,13,16 123:2,4,13,19 124:3,4 125:1,12 126:1 130:19 131:9,21,23 132:4,18 133:2 136:15 139:18 140:6,7,16,19,21 141:9 142:12, 18 143:10,14,22 144:17,23 145:3,21 146:12,13 147:8,13, 16,22 148:1,10 149:3,7,20,23 150:1 152:4,6,14,18 153:4,11, 13,18 154:3 158:6 159:11,17,20 166:4,11,13 167:10 171:8

**due** 125:4,18 131:12

**duplicative** 14:6

**Durr** 9:20,21 10:4 29:5 31:24

**Durrs** 9:25 10:8,11 11:1

**dust** 44:17 71:18 111:13 185:13

**duties** 134:4

**Dylan** 8:8 15:7,9 30:3

**dynamics** 26:12 40:16 110:9

---

**E**

**e-tran** 194:15,16

**earlier** 38:14,25 93:13,20 105:1 184:6

**early** 65:7 72:13 74:2

**easier** 6:21 7:4

**easiest** 9:10

**east** 63:9 64:18 104:20 106:12 107:11,16,23 108:4 116:7,8 118:2 140:22 141:10 167:15 168:5,16,21,23

**editing** 49:3

**edits** 50:11

**educated** 75:12

**education** 19:18 57:2 83:4,23 84:19 85:2 86:8 88:18 126:6 128:10 133:13 134:4 150:7

**effort** 133:20

**eight-and-a-half-by-eleven** 37:9

**elbow** 70:10,14,15,17 145:4 147:6

**electrical** 13:5 53:17,18 154:16,19,22 155:1

**electronic** 34:22 35:3

**eliminate** 154:25 155:3,6

**email** 42:14

**emailed** 38:19 42:11

**emails** 35:1,5,8

**embodies** 52:25

**employee** 61:15 74:17 121:15, 20 125:14,16,17,25 126:4 127:15 130:16,22 156:22 193:5, 6

**employees** 57:12,22 58:11,22

**179**:24 182:23 186:25 187:2 189:12 190:3,5 191:14

**employees'** 66:3

**en** 142:21

**enclosed** 38:7

**end** 23:6 24:6 63:9 64:18 65:16 92:17 93:8 104:20 106:12 107:11,16,24 108:4 116:7,8 118:2

**ended** 24:5 69:6

**ends** 140:22

**energy** 186:24

**enforcement** 24:20

**engineer** 13:5 39:18 150:18

**engineering** 18:24 92:13

**engineers** 53:17

**entire** 52:3 59:25 103:22 104:14 131:14 162:6 170:18 179:3

**entirety** 38:19

**entity** 11:11

**entry** 100:20,25 104:12 106:9

**environment** 45:12 126:16 184:9

**Envista** 157:5 159:22 160:6 161:12,22

**Envista's** 157:12 162:17

**equal** 25:11

**equally** 25:8

**Erratic** 182:18

**error** 13:23

**errors** 53:16

**escape** 144:19

**essentially** 151:9 174:7

**estimate** 31:10

**evaporating** 91:12

**evaporation** 125:11

**event** 168:15,19

**events** 120:6

**eventually** 47:4 63:8 64:17 117:16

**evidence** 87:3 90:13,15 110:7, 8,9 127:2 136:23,24,25 156:9, 13,17,20 161:13,23 165:19 172:20

**61**:8 63:8,23,24 64:1,5,9,13,17, 20 98:8 104:17 105:2,25 106:6, 15 109:5,7 111:5,7,15 117:12 118:2 121:2 144:12 150:16

**evidenced** 92:5 143:11 147:8

**exact** 43:24 101:13 108:22 116:11 170:5

**exam** 20:5,7,15 21:18,21 22:5

**examination** 23:3 47:1 72:14 171:25

**examinations** 32:22 56:24

**examine** 155:21

**examined** 152:14 167:16 172:9

**examples** 45:20

**exhaust** 63:9 64:18 68:9,10 69:4 104:20 106:12 107:2,11, 16,24 108:4 118:3

**exhausted** 122:10,14,17

**exhausting** 104:19 106:7,12 107:10,16

**exhausts** 143:10

**exhibit** 6:9,12,22 7:6,8,9,10,11, 13,14 8:21 9:6 33:23,25 35:14, 16 36:23,24 37:3,4,8 38:2,4,18 39:5,24,25 40:2,4,5,23,25 41:2 48:3,6,9 49:6 50:14 54:25 55:5, 7,15,17 56:7,16,19,23,25 57:4, 5,8 59:23 60:9,10,11,22 61:2 72:19 73:15 101:8,9,16,18,21 102:21,23,24 103:19 105:9,10 109:17 110:17 111:6,10,23,25 113:22 114:25 116:16,19,20 117:10,13,24 121:22,24 124:20 126:5 127:14 129:7,14,19,22 130:14 134:13 135:25 136:2 138:21,139:21 143:25 148:2 155:16,18 157:2,4 163:19 164:3,10 167:2,4 168:3 169:11 174:10,11,12 175:5,10 176:2,13 178:1,10 179:7,17 181:13 187:5 190:10,12,19,21,23 191:16 193:1

**Exhibits** 192:23 193:3

**Exothermic** 185:22

**expect** 165:11

**expected** 162:19

**experience** 5:17 19:5,18 20:9 57:2 74:20 75:9 76:21,23 79:22 83:3,24 84:18,19 85:3,20,24 86:4,9 87:23 88:14,18 89:17,24 97:22 99:2 118:24 126:6,21 128:10 133:14 134:5 150:7 153:20

**experienced** 76:22

**expert** 7:16 8:24 9:1,3,5 17:2,5, 18 18:2,10,14,17,19,23 19:4 20:12 23:4 28:13 126:15 127:5, 8 151:8



**expertise** 16:22 17:23 118:10 127:12,18

**explain** 19:3 20:2 48:17 55:15 95:14

**explained** 70:2,5 95:13 182:16

**explosion** 16:23 17:18,23 18:10 19:4,8,12,16 22:19 52:15 53:1

**explosions** 16:25

**explosives** 17:9,11

**expose** 192:18

**exposed** 171:12,14,16

**exposing** 192:20

**extending** 101:1

**extent** 55:14 58:17 61:13 62:10, 15,18 74:10 84:2 86:15 93:20 163:13 191:4,11

**extreme** 180:2

**eye** 26:16

**F**

**facilities** 84:24 85:1 152:8

**facility** 55:25

**fact** 26:2 66:7 76:3 86:6,16 88:9 92:21 95:4 97:7 99:9 112:20 128:14 134:6 136:22 191:5,7

**factor** 98:3 156:18

**factors** 25:3

**facts** 127:1

**factual** 86:24 90:21 131:5

**factually** 88:23

**Fahrenheit** 44:6 66:25 67:18 113:7 114:7 116:7,14 118:17 186:10,12

**failed** 9:1 162:18

**failure** 138:7 154:20,22 155:4

**fair** 110:1 127:23 163:18

**Fall** 189:7

**fallen** 160:22

**falling** 165:12

**false** 120:13

**familiar** 122:17,19 125:17 149:16

**family** 8:5 11:17,20 14:11,17,24 15:13 29:25 30:2,7 32:17 33:13 72:24

**fan** 52:10 104:20 106:12 107:2, 11,17,24 108:5 118:3 157:13, 15,17,21 159:23,25 160:6,8,13, 18 162:18,21 163:1,12 164:19 166:21,22 167:11 169:16,24 174:22,24

**Farm** 8:5,14 15:13,18 30:6 31:3

**fast** 23:20 182:19

**faster** 147:3 185:18 189:25

**favor** 144:1 181:6

**federal** 9:22 11:14 12:9 14:16 15:21 50:19

**fee** 21:11,25

**feedback** 23:7

**feel** 103:23 140:2

**fell** 150:4 157:15

**Fells** 7:23 16:2,4 30:12

**felt** 62:19

**field** 18:17

**figure** 90:17 92:14 115:21 120:14 180:18

**figures** 94:24

**figuring** 71:25

**file** 38:8 41:5 57:15 58:23 59:5 60:1,8 61:4,7 65:10 190:13

**filed** 13:13 32:11 33:5

**files** 33:15

**fill** 21:10

**finalizing** 72:22

**find** 38:8 43:5 101:18 154:23 162:20 183:12 189:15

**finding** 110:9

**findings** 27:15 61:18 110:11

**fine** 69:2 71:17 72:2

**finely** 185:17

**finish** 187:13 189:10

**finished** 188:1,12

**finishes** 187:14

**fire** 10:5,7,12,19,20,21 11:4,9, 15,25 12:14,24 13:2,3,4,6,10,11 14:20 15:8,16,22 16:16,19,23 17:9,18,23 18:10,18,21 19:4,7, 10,11,16,20 20:9 21:2,3,5 22:19 24:2,10,20 26:4,7,12,14,16 29:14 31:1,14 32:5,15 39:17 40:16 47:5 51:24 52:2,8,15 53:1 54:5,10 56:1,5 58:11 61:9 63:7, 16,20,22 64:13,16 65:1,6,14,15,

20 66:12,15 83:20 84:6,10,15 87:2,17 98:7 99:1,9,15 100:8 101:1,13,14 102:19,25 103:4,6, 23 104:25 105:6,8,10,12,15,23 106:19 109:5,9,13,20 110:7,9, 16,24 111:1,4,8 112:17,18 113:5 114:9 115:6,13,24 116:25 117:4 119:5,6,17,25 120:3,25 121:3,12,16,19,24 122:1,5,12 123:8,21,25 124:7,15,16,18,21, 23 125:3 126:22,24 129:3,9 130:2,13,19 131:9,11 132:22 133:1,2,16,21 134:14,18,22 135:3 136:2,3,5,9,15,19,22,23 137:7 138:3,10,14,18 139:2,5, 13 140:3,11,16 142:10,19 143:7,12 145:11,16 146:5,11 147:20 148:6 149:7,23 150:11 151:13,25 152:15 154:17 155:14 156:11,15,18 157:14,21 158:11,12 159:25 160:9,23 161:6 165:8 169:25 171:21 172:7 174:3,8 175:24 176:4,9, 10,11 177:17,24 178:5,17 180:4 182:8 187:23 188:1 189:17 193:6

**fire's** 139:17

**firearms** 17:7 18:11

**Firefighter** 66:16

**firemen** 103:13,14

**fireplace** 97:16 99:4

**fires** 16:12,25 24:7,8,9 27:15 31:15 76:22 82:17,21,23,25 83:22 85:5,10 86:10 97:16,17 98:8 99:3,4,5 119:1 120:24 125:15,24,25 126:8 150:15 186:4,7 190:1

**firm** 6:1,2,5

**five-gallon** 70:22 188:22

**Flaherty** 12:7,19,21 13:17,19 14:3,5 29:23

**flake** 176:7

**flame** 117:8,12,17 146:14,15, 18,19,22,25 191:21,24 192:3,7, 11

**flames** 26:5,6 63:9 64:18 104:21 105:17 106:22 107:1 108:7,11,15,18 109:4 116:24,25 118:1 144:13

**flaming** 117:7

**flash** 38:8,10,12,16,21,22 39:6

**floor** 26:8

**Flora** 32:3,16

**flow** 146:23 147:1,3

**flowed** 180:7

**flowing** 147:4

**flows** 145:1,5

**flue** 91:14 97:17 99:3,4 125:20 131:20,23 132:18

**flues** 125:6,12 131:14 133:7,10

**focus** 116:9

**follow** 52:20 64:6 181:22 182:2

**follow-up** 73:4,5,13,17

**forearms** 18:3

**foreign** 156:13

**foreman** 187:11

**form** 5:24 22:18 25:7 33:10 38:20 53:25 58:16 62:6 65:22 71:18 75:21 85:9 86:13 87:5,14, 25 88:12,20 91:11 93:3,19 95:11 97:4 126:2,25 128:15 133:22 142:6 155:23 158:25 161:8 170:8 175:20 191:13

**formal** 73:25

**formed** 81:15

**formulate** 54:19 83:24 86:11 112:13 129:11

**formulating** 46:1 51:18 54:16 55:4,11,18 56:12,18 57:4,9 60:18,21 61:1,24 62:3,17,21 74:8,12 77:21 79:2 80:22 81:5, 24 82:11 84:1 85:8 103:20 112:5,14 121:6 126:23 130:23 131:9,15 157:9 191:3,8 193:22

**found** 46:7 153:16 179:23 180:9,11,13 181:1 190:13

**foundation** 58:5 71:21 83:18 89:22 90:9 117:15 126:9,25 163:16 171:19 175:20 178:19 192:9

**fourth** 8:6

**frame** 163:15

**Frances** 15:13

**Francis** 8:4

**frankly** 139:21

**fraud** 24:11

**frequent** 31:2 154:7

**frequently** 31:23 153:4,10,18 154:4

**friend** 39:18 40:14

**front** 146:15

**fuel** 123:12,16 132:24 148:5,16 149:7



**function** 6:5 66:8 91:5

**funny** 165:15

**furnace** 136:9 137:1,4,5,23
138:9 149:10

**G**

**gas** 122:10

**gases** 122:10

**gather** 25:14

**gauge** 26:10

**gave** 23:23

**general** 17:7 63:16 65:15,19
66:14 82:22 89:17 97:22 154:20

**generally** 51:25 108:1 109:23
184:25

**generate** 94:23 143:20

**generated** 143:16

**girls** 32:4,15

**give** 28:22 31:9 68:22 94:24

**giving** 97:5,21 131:10

**glad** 165:12

**glowing** 113:8 115:21

**goo** 67:21 70:6 147:11 152:10,
12 158:17 160:23 161:3,5
173:23,24 177:8,9,15,16,22
180:3 182:22

**good** 6:16 41:21 47:25 51:12
52:11,12,18 95:21 113:21
135:12 156:24 161:5 167:21,23
194:3

**grabbed** 87:15

**grammatical** 49:2

**gravity** 142:25

**greater** 81:14 96:5

**grind** 192:17

**grinding** 192:12

**Group** 61:18,19,23

**guess** 5:20 12:14 33:12 67:12
119:22 140:17 148:8,20,24
152:21 158:21

**guessing** 44:4

**guns** 187:18

**guy** 9:15 40:15 41:24 67:7
87:15 88:4 131:16

**guy's** 54:6

**H**

**H-e-d-g-l-i-n** 42:3

**half** 24:4 37:17 49:1

**Hamilton** 11:2

**hammer** 187:18

**Hammond** 15:21

**Handbook** 54:5,6

**handwriting** 181:9

**handwritten** 37:11,25 39:11
40:6 58:10,21 61:8 64:5,12,20
65:9,21,24 66:3,16 193:11,16,
18

**happen** 74:23 85:10 126:16,17

**happened** 85:13 93:8 113:16
127:8 175:15

**happy** 128:19

**hard** 31:13 184:20

**head** 63:25

**heading** 60:22

**heard** 100:24

**heat** 45:7,9 123:8 132:21,23
136:9 143:1,6,8,9,13,15,16,17,
21 180:2 186:1 192:18,21

**heated** 161:7

**heating** 180:4 185:25

**Hedglin** 41:24 42:2,5,15,19
45:22 46:1,4

**held** 36:17 45:7

**Hensley** 67:9 73:22 74:8 79:1,
14 81:9 87:19,22 88:8 89:10
96:21 125:9 150:22 189:19

**Hensley's** 87:9 97:11 98:16
118:10 125:21

**hey** 46:10 50:9 153:22

**high** 26:24

**higher** 26:8 79:4,5 80:20,21
81:10,11 82:2 112:24 189:25
190:1

**hired** 70:3

**Historical** 12:16

**hits** 147:13

**hold** 21:1 45:7 78:8 161:19

**home** 16:5

**homeowner** 14:25

**homeowners** 29:7

**Honaker** 150:17 155:22 157:6
158:14 160:12 162:14

**Honaker's** 157:8 163:9,14

**Honestly** 167:8

**hope** 101:8

**horizontal** 140:20 142:11,17,
22 166:13

**horizontally** 145:4

**hot** 113:8,13 188:24

**hotspots** 115:20

**hour** 34:8 95:21

**hours** 20:10,11

**house** 11:25 13:11 14:19,20
15:8,16,22 32:4,15

**housing** 69:17 157:17,20
160:14,18 163:12 164:13,23
166:23 169:2,5,13,16 174:19
175:14,19 176:4,24 177:7
178:4,18 179:11,13 180:22,25

**hover** 181:19

**hovering** 181:21,22

**Howell** 41:13,18 58:7,9,18,22
59:4 61:21,22 62:12 110:24
111:12 112:18 180:14

**Howell's** 59:2,16 62:9,16,19
63:19 111:16

**hundred** 141:16

**hundreds** 171:21

**hurdles** 24:16

**hypothetically** 147:12 160:21

**I**

**IAAI** 21:18,21 22:4 23:17,23

**IBO** 63:9 64:18 67:12 68:6,9,13,
16,18 70:23 71:7 82:7 83:8
84:11 91:9 104:20 106:8 107:8
108:1,5,18 111:2 122:8,11,14
132:5,7 136:11,13,15,22 144:12
148:19 184:10 186:17

**IBOS** 80:11,15 83:4 122:22

**idea** 6:22 24:22 64:7 93:13 94:8
150:10

**identification** 6:10 7:7 33:24
35:15 37:5 38:3 40:1 48:4
101:17 102:22 111:24 121:23
129:8 136:1 155:17 157:3
163:20 167:20 190:11,22
192:24 193:2

**identified** 67:15 109:24

**identify** 6:12,22 7:9 8:1,12 34:1
40:3 109:24 140:7 141:2 186:20

**identifying** 32:13

**ignite** 45:9,13 143:13,21 184:20
185:18 186:25 192:14,21

**ignited** 111:15 123:12 132:25
137:3 142:14 143:2,7 148:5,8
184:8,10 186:22

**igniting** 124:5

**ignition** 43:13,19,21 44:7,21,24
45:1,5,15,20 46:5 54:6,12
184:2,5,19 186:2,19 191:20,23,
25 192:5,19

**image** 117:9

**images** 112:4,21 114:11,15
117:18

**imaging** 113:12 115:18

**implied** 124:2

**important** 24:25 25:8,17 26:17

**improper** 87:3 135:4

**improperly** 156:10

**inaccurate** 116:3

**incident** 73:22 102:25 119:23

**incidents** 119:1,9,18,25 120:2,
17

**include** 23:15 31:3

**included** 69:16 148:1

**includes** 169:2

**including** 24:21 69:9 78:23
177:14

**incomplete** 59:24

**incorrect** 93:21

**increased** 77:16 78:18,25
189:22

**independent** 102:15

**Indiana** 8:7,14 9:17,23 10:1
11:2,4,14,21,24 12:6,9,23,25
13:8,14 14:16 15:6,8,11,17,21
20:21,25 21:6 29:2,3,4,8,10,15,
16,17,19,21 30:3,4 31:6 32:3,
16,17

**Indianapolis** 10:18 13:11

**Indicating** 141:7 144:4

**indication** 75:20 104:25 105:6
117:3 128:23 133:11 135:2
138:1 159:24 160:8,15,19 162:3

**individually** 27:2



**industrial** 136:9

**infer** 129:1

**inferred** 124:2

**infers** 129:4

**information** 25:9,18 45:25 46:4 49:7 52:18 54:14 55:20 56:17,22 59:14 62:9,11,13 63:13,17 64:3,8,11,12,16,19 65:25 66:1,4,7,13,15 67:3,4,16 70:25 74:7,11 75:3 76:7,13 77:10,20 78:4,6,13 80:18,22 81:4,9,23 83:21 85:8 86:11 87:4,10 89:10 92:9 101:11 109:6,8 110:7 112:12 118:14 119:4 124:13 128:12 130:15 131:5 133:19 138:4,12 150:21 172:8

**infrared** 112:1,3

**initial** 64:23 72:13 73:12 107:12

**initially** 10:8,10 13:2 34:16 42:20 145:3 146:10

**initials** 69:11

**initiation** 128:4

**inside** 44:9 68:6 72:5 90:25 91:4 111:13 125:6,20 131:14 133:7,10 137:2 144:5 149:10 160:18 162:20 163:1,11 166:2 169:5,19,20 171:7 172:9,11,15, 21 173:5,13,21 174:19 175:6, 14,19,21,22 176:3 178:3 180:22 184:1 187:15 190:25 191:14

**inspection** 158:4 168:5

**install** 14:19

**installed** 14:22 15:4,5 82:1,7 189:20

**instance** 185:9

**instruction** 20:12

**instructions** 19:19

**instructor** 23:12

**instrument** 67:12

**insufficient** 138:22

**insulated** 91:14 190:8

**insulation** 144:18

**insurance** 7:22 8:3,5,15 9:15, 21 10:6,9 12:22 14:11,17 15:14, 18,20,23 16:1,6,7,8 23:13,16 24:10,18,19 26:22 27:1,22 28:7, 10 29:7,12 30:2,8,12,14,17,21 31:1,3,12,18 33:8,11

**insured** 27:18 33:14

**insurer** 30:22

**intact** 145:21

**intended** 22:16

**intensive** 19:11

**interchangeably** 131:24

**interest** 25:25

**interested** 81:3 139:23

**interesting** 27:19

**interior** 123:18 160:14

**internal** 16:16 137:11 187:22

**International** 8:15 19:21

**interpret** 163:14

**interrupt** 10:2,25

**interrupted** 121:17

**interview** 26:11 49:7 64:1 73:24,25 86:17 100:12,15,17,20 103:13 127:10 182:7

**interviewed** 55:1 103:9,15

**interviewing** 17:6 24:14,25 25:4,16

**interviews** 24:22 48:23 51:10 99:14

**intimate** 126:15

**introduction** 48:22

**investigate** 30:24

**investigated** 16:12 30:25 138:13

**investigation** 13:2,4,10 16:23 17:10,12,19,24 18:11,22 19:4,8, 12,17 21:3 22:20 24:2,5,17,20 25:1,15 26:18 30:18 32:20 34:10 51:24 52:2,8,15,21 53:1,2 54:10 60:6 62:23 73:12 83:20 85:4 87:2 93:5 94:18 124:7 133:15 136:17 138:6

**investigations** 8:16 17:6 21:3

**investigator** 19:10,20 20:24 21:1,5,8 63:20 84:3,8 127:10

**investigator's** 21:2

**investigators** 19:22,23 23:16 47:1 56:2 93:24

**invoices** 190:13,16,18

**involve** 16:19 94:19 99:4 121:12

**involved** 10:5 11:15,16,24 12:2,13 16:16 26:14 31:25 33:9, 11,16 76:19 88:10 132:13 135:7,8,9,13

**involving** 11:4 32:15

**irrelevant** 112:20

**issue** 27:18 44:2 52:8 152:11 182:21

---

**J**

**James** 11:22 12:2,24 13:1,7 29:17

**JDPHD** 11:13

**Jim** 14:12,14,18

**job** 127:6 128:7,9 134:4 187:11

**joint** 32:21 46:25 145:6 171:24

**July** 119:11 130:4 136:2

**jump** 40:22

**jumped** 130:10

**jumps** 156:8

**June** 61:18 65:7 72:13 74:2

---

**K**

**K-a-u-r** 11:3

**Kaur** 11:3 29:8

**Ken** 67:6 187:9,10

**keynote** 23:22

**killed** 32:4

**kind** 5:21 22:15 23:5,8 25:12 26:11 27:19 44:4 45:17 52:22 65:13 68:10 74:22 76:21,22 86:22 94:7 122:25 124:1 128:1, 2 133:14 141:7 145:24 153:13 156:13 163:9 165:10 169:10 172:22 174:18 186:5

**kinds** 171:21

**knew** 65:25 66:1 76:6,24 79:12, 25 81:19 84:25 88:15,25 89:1,5

**knowing** 81:3 93:11 152:17

**knowledge** 75:8,12 77:2,7 78:16 79:6,18 80:2 84:4 85:2 87:23 88:8,17,19 89:14,19 90:6, 8,12 94:19 96:17 97:14,15 99:11,13,16 115:24 125:10 126:6,15 128:3,4,13 130:17 133:23,24,25 134:3,25 153:10 168:17 172:17 173:4 182:11

**knowledgeable** 84:9

**Knox** 12:25

---

**L**

**L-i-g-g-e-t-t** 8:4 15:12

**label** 59:20

**labeled** 178:2

**laboratory** 43:5

**lack** 125:4,19 131:12 132:11 133:9 151:24

**Lamont** 7:23 16:2,4 30:12

**landmark** 12:16

**large** 10:19 24:3 36:5,6 37:7 39:8 40:24 71:16 152:3 176:22

**larger** 185:21

**Las** 23:23

**last's** 54:6

**late** 22:25

**laterally** 145:4

**law** 24:19

**lawsuit** 33:4,5

**layers** 71:9

**layout** 36:6

**leads** 96:23 99:17

**leave** 102:13

**leaves** 148:21

**leaving** 73:2

**led** 55:25 90:22 98:24 137:5

**left** 43:14,20 72:25 102:4 111:21 146:12 148:23 149:2 152:4 155:22 162:12 175:6,11,13,19, 21,22,25 177:10 178:3 183:25 186:17 188:23

**lend** 112:16

**length** 134:5

**letter** 38:5,13

**level** 26:8 83:16 96:18 101:2 151:6 153:8 174:20

**library** 52:4

**license** 20:22,23,24 21:2,4,7,12

**licensed** 20:21 21:5

**Liggett** 8:4 15:12,13 30:6

**Liggetts** 15:17

**light** 184:7

**liner** 91:8 94:20 137:14 169:22 174:25 190:24

**lines** 37:23 81:20 105:1 182:4

**liquefied** 177:24 178:17

**liquid** 91:9 161:8 177:18 191:7



**list** 9:5 20:21 28:13,15,19 32:6 61:16 119:9

**listed** 17:22 18:4,8 51:2,5,7,15 60:9 106:1 119:19 121:5,9 128:25 194:4

**literally** 116:19

**litigation** 9:23 12:8,15 28:4 29:11 30:9

**LLC** 12:8 14:12

**Lloyd** 67:8 73:21 189:19

**load** 123:16 148:16

**located** 145:11

**location** 104:21 106:22 108:8, 16,17,21 109:11,13,25 111:5 116:25 117:4 140:15 146:6

**long** 22:23 42:12 74:16,21 76:19 86:21 100:22 118:9 125:10 128:11 180:16 188:20 189:2,3

**longer** 154:9

**longtime** 84:22,25

**looked** 22:15 39:9 44:3 60:1,2 86:16 103:17 104:13 152:21 172:23 173:9,12 184:1

**loose** 148:23 157:12 158:15,16, 20,24 159:5,8 165:10 181:1

**lose** 159:2

**lost** 99:18

**lot** 18:18 31:4 35:23 60:16 75:9, 130:13 152:18,22 153:23 168:14 170:17 174:6 185:18 187:7,11

**lower** 45:15,21 157:16,20 163:24 174:20 184:25 185:4,14

**lubrication** 137:2

--- M ---

**made** 22:21 40:19 43:23 50:14 57:22 98:8 100:25 104:13 191:15

**mail** 34:22 35:3

**main** 43:12,18

**maintain** 128:7

**maintaining** 19:13

**maintenance** 74:25 83:4,7 84:16 190:2

**majority** 27:1

**make** 7:4 12:10 25:22 27:10 36:12 37:8 49:3 58:19 59:21

**makes** 19:3 52:11 161:10

**making** 79:11 137:20 164:25 183:16

**malfunction** 154:16 155:6,10, 13

**malfunctioned** 155:9

**manager** 183:5,8

**manner** 153:14

**manual** 62:24

**manufacturing** 16:20 40:11 43:1 46:25 91:7 93:6 187:8

**Marion** 9:18 12:6,10,11 13:8,12

**mark** 7:3 32:10 36:22 37:2 39:23 48:5 88:21 95:20 108:20 109:17 110:20 113:19 114:16 116:23 151:14 168:1 178:12 181:18

**marked** 6:9,11 7:6 33:23 35:14 37:4,6 38:2 39:25 40:24 41:1 48:3 101:16 102:21 107:2 108:22 109:2,15 110:17 111:5, 9,23 116:16 121:22 129:7 135:25 141:5,14 146:6,8 155:16,18 157:2 163:19 164:4 167:19 168:2,22 171:2 177:2,21 179:7 187:10 190:10,21 192:23 193:1

**marker** 68:22

**marks** 161:12,22,24 162:2,5,9, 10

**marshal** 10:7 13:3 65:20

**mass** 185:19

**masse** 142:21

**match** 184:7

**material** 19:1 41:17 47:8 54:3 72:2 90:25 91:9 92:6 93:23 143:2,13 148:8,10 161:14,23 162:20 174:18 176:12 178:22 183:23 185:1,2,3,17,23,25 186:21 187:1 191:15 192:21

**materials** 38:9 41:13 45:18 54:13 58:18 93:9,15

**mathematical** 92:13 94:24

**matter** 11:13,23 15:1,15 16:4 32:12 46:8 71:13 148:23 183:25 184:16 185:17 186:14,23

**matters** 31:11

**meaning** 25:23 58:9 134:24 152:5 182:14

**means** 44:22 143:23 162:24

**meant** 131:25

**measure** 149:20

**measured** 118:18

**measurement** 94:10 96:8,11

**measurements** 91:20,22 92:2 96:17

**Measures** 149:18

**measuring** 96:15

**mechanic** 84:5 126:14

**mechanical** 154:22 155:3

**mechanics** 84:9

**meet** 20:6 72:8 141:10 142:12

**meeting** 73:13

**MEGTEC** 67:8 74:17 82:17 84:21,23 189:20 190:1

**member** 21:14,19,22,23 22:1

**mention** 70:17 118:11 150:14 151:5

**mentioned** 33:19 40:12 53:5 118:25

**mentions** 74:14

**mere** 134:6

**message** 72:25

**messages** 73:2

**messed** 23:9

**met** 20:14

**metal** 79:23 136:10 170:18,20 171:16,22 175:8 179:4

**method** 52:19 53:2,11 92:25 93:4 94:18 153:7

**methods** 96:14

**Michael** 5:10 38:9

**Michigan** 72:24

**mid** 22:25 26:24 44:4

**midnight** 188:2

**migrate** 161:7

**Mike** 5:11 95:21

**Miller** 31:21 33:8,16 34:18 38:5 46:23

**mind** 163:15

**mine** 31:8 39:18 40:14 90:20 168:12

**minimal** 22:2

**minimum** 20:6

**minute** 182:19

**minutes** 23:8 102:8 107:12,25 118:1 131:15

**mischaracterizes** 58:17 65:23 86:14 93:20 120:8 141:20

**mischaracterizing** 109:22

**missed** 17:20 50:11 102:2 111:21 129:23

**missing** 59:12 113:2

**misspelled** 50:9

**misspoke** 119:14

**mistake** 130:7

**mistakes** 49:2 53:18

**mock** 23:8

**moisture** 91:25 92:2 96:15,18

**moment** 32:1 33:13

**money** 9:16

**monthly** 31:16

**months** 31:13,14 146:14 153:22 171:25

**Monticello** 36:19 55:25 65:1 72:15 75:16 78:18 89:21 97:14, 19 98:1,21,23 102:24 119:5 121:24 154:2 182:12,16,17,20 183:7

**motions** 23:6

**motor** 154:19,21 187:15 169:2

**move** 88:21 128:19 159:4 184:22

**moved** 158:24

**movement** 161:3

**MSDS** 190:24

**multiple** 103:17

**murky** 165:13

**Mutual** 8:5 15:14

--- N ---

**named** 41:24

**names** 58:1

**narrative** 103:16 104:5,9,11 130:18 182:5

**narratives** 103:16,17

**Nashville** 11:24,25

**National** 23:15

**Nationwide** 16:7,8 31:7

**necessarily** 171:20

**needed** 20:2 54:18

**nefarious** 156:21

**newest** 9:9,12

**NFPA** 51:21 52:7 53:8 151:5

**normal** 114:14,17 153:1

**Northern** 9:22

**notation** 187:10

**note** 22:8 30:16 100:19 103:9 163:22 172:10,13

**noted** 8:20

**notes** 37:11,14,25 39:11,16,20 40:6,7,19 48:19 55:20 56:15 61:20 66:3 72:21 74:5 100:17, 22 101:3,6,19,22 102:9 181:7 182:7 183:14,17 193:6

**notice** 35:17

**November** 147:19,22 148:1

**number** 7:24 16:14 17:22 20:12,22 21:14 22:8 23:13 28:4 31:10 32:12 113:22,25 163:23 164:1 176:22

**numbered** 49:4 167:18 168:4

**numbers** 37:21 43:24 145:7

**numerous** 74:23

---

**O**

**O'brien** 5:19,24 6:8 22:18 25:7 28:6,9 32:10 33:10 36:11,15 41:12 47:23 49:17 50:17 53:25 58:5,16 62:5 65:11,22 66:18 71:21 75:21 80:10,17 83:18 84:13 85:9 86:2,5,13 87:5,14,25 88:12,20 89:22 90:9 93:3,19 95:6,11,20 97:4 104:7 108:20 109:21 110:20 113:18 114:2,4 115:3 116:18 117:15 118:15 119:13 120:7,20 126:9,25 128:15 129:18,23 130:5,11 133:22 141:20 142:6 151:14 158:25 161:19 162:14 163:6,13 164:25 170:8 171:19 175:20 178:15,19 179:18 181:18 192:9 194:11,16

**O-h-r-n** 11:12

**object** 5:24 22:18 25:7 33:10 49:17 50:17 53:25 58:5,16 62:5 65:22 71:21 75:21 85:9 86:13 87:5,25 89:22 90:9 93:3,19 97:4 108:20 109:21 117:15 126:9 128:15 133:22 141:20 142:6

**objection** 6:8 66:18 83:18 163:16

**observation** 95:8 99:8,24 152:6

**observations** 90:16,17 104:13

**observe** 105:19,22 157:20

**observed** 63:8 64:17 94:11 95:5 100:9 103:24 104:12,21 105:17 106:2,15,22 107:1,7,8, 10,23 108:1,7,11,16,18 109:4 117:5,8,12 118:2 121:2

**observing** 93:1

**obtained** 109:6

**obvious** 158:22 176:18

**occasions** 74:23

**occupant** 15:9

**occur** 172:2

**occurred** 11:11 82:23 85:5 120:18,25 124:17,21,23 139:18 142:4 147:20 150:15 157:14

**occurrence** 99:1

**occurs** 105:3 141:9

**October** 119:10,14,15 120:25 121:25 122:13 123:3,9,13,21,24 124:7,17,22 129:16 130:8,14,21

**odd** 36:8

**oddly** 38:9

**offense** 9:19

**office** 13:12

**Ohrn** 11:12,20 29:11

**oily** 137:6,10,12,13

**Olde** 14:12,14 29:25

**older** 35:6

**oldest** 7:21 9:9,12

**ongoing** 15:14 16:3 31:25 35:5

**openings** 144:15 145:22

**operate** 75:4 189:21

**operated** 80:12 84:11 113:12 128:5 148:25 156:10 187:19

**operates** 66:24 67:17

**operating** 77:3,8,10 80:15 114:14,17 134:25 189:11

**operation** 79:25 85:14 86:19 88:5 127:6,9,19,20 135:4 156:2

**operational** 137:5,23 138:2

**operations** 62:24 75:10 84:5 85:11 90:1 97:14 99:12,13,17 100:3 153:14 192:13

**opinion** 32:22 41:3 47:4 52:6,9 54:16,19 55:5 56:13,18 57:4 59:18 60:13,14,18,21 61:2 62:9, 17,21 74:9,13 77:21 78:22 79:2 80:23 81:5,16,24 82:11 83:24 84:1 85:8 86:12 87:19 96:24,25 97:3,5,6,10,18,22,23,24 98:2, 16,17,18,19,22 99:7 100:6 111:17 112:6,13,14,16 119:22 120:9,15,22 121:6 124:3,10,16, 21 125:7,11,13 126:2,23 127:12 129:11 130:24 131:7,10,18,22 139:4,9,10,11,15 140:17 141:13 142:3,9 143:5,20 148:4 151:7,8 152:5,7,13 155:11,24 156:23 157:9,12,23 158:1 162:8,17 172:19 177:13 180:6 191:3,9,10 193:22

**opinions** 46:2 51:18 55:11,19 57:9 61:24 62:3 84:15 103:21 150:20

**opportunity** 8:23

**opposed** 130:3,8

**Opry** 11:25 29:14

**orange** 170:24

**order** 158:23

**orders** 194:13

**ordinary** 17:4

**organizations** 21:15,17 23:13

**origin** 16:25 22:13 24:12,14 25:6 26:13,19 32:20 56:4 65:15 83:11,22,25 84:3,7 85:4 110:10 112:18 124:6,18 126:7,22,24 127:9 133:21 136:18 139:8,9, 10,12,16 140:3,4,8 141:14 142:19 143:24 144:6 154:20

**original** 38:12

**originally** 75:4

**originate** 142:10

**originated** 109:9,11,13,20 110:16,25 111:2 136:22 139:18 141:23 145:16

**originates** 146:5

**Orleans** 8:17

**outcome** 25:9

**oven** 16:17 44:15 62:25 63:2,3 66:24 67:17 68:7 69:9 72:6 78:18 111:13 122:18,25 123:4 132:9,12,15,19 135:7,9,13,23 137:11 155:7,13 156:2,6,9,14 159:11 168:6 183:19 184:1

**operations** 187:12,14,22,23 188:4,13,14, 18,24 189:3,11,16,20 190:7

**ovens** 75:3,15 77:3 82:1 122:21,22 123:16 135:19,20 189:13

**overcome** 24:17

**overestimate** 16:15

**overheated** 124:4 125:4,18 131:12

**overheating** 137:6

**overly** 122:19

**owned** 12:18 15:16,22

**owner** 11:17

**oxidation** 170:17,19,21,22 171:18 172:2 174:8 179:4

**oxidized** 169:24 170:3 171:10, 11,22,23 172:5,6 175:9 179:4,5

---

**P**

**p.m.** 95:25 96:1 167:24,25 188:1,2,7,8

**pages** 113:22 117:9,13 181:7

**paid** 34:17

**panel** 67:12 165:5 169:15

**panels** 164:16 188:25

**paper** 45:7,8,9,10,13 102:3,6

**paragraph** 63:7 67:20 110:6 134:15 151:24

**paragraphs** 151:22

**parent** 16:6

**part** 17:20 23:5 24:25 25:11 26:17 34:14 41:5 42:10 52:24 66:10,20 68:19,20 77:8 78:7,22, 24 81:6,7 84:6 85:10 101:2 115:5 135:6 144:17 145:1 162:12 167:10 170:2 189:1

**partially** 107:18

**participate** 32:21

**particle** 174:6 184:11,21 185:4, 21

**particles** 184:14,17,18,24

**particulate** 71:12 148:23 183:25 184:16 186:23

**parts** 25:17 37:22 50:4 53:14 74:3

**pass** 20:5

**passed** 20:15 158:3

**151:14 156:14 158:25**



USDC IN/ND case 4:16-cv-00042-TLS     document 105-1     filed 10/07/19     page 1054 of 1167
Michael Vergon
October 11, 2017
12                                                                    Index: pattern..puts

pattern 110:7

Paul 39:12 40:9 67:6 187:9

pay 10:10 21:11,25

pencil 68:22

people 17:4 23:25 27:3 55:1 83:9 103:18 154:2 164:18

percent 26:23 27:7,12 28:10 141:16

percentage 26:21 31:10 33:15, 18

performed 47:20

period 119:7

periods 154:9

person 105:19,22 127:13 128:22 131:11

personal 75:8 77:2 78:16 79:6 86:17 89:19 90:5 97:13

personally 72:8 83:10

personnel 24:20

phone 42:17 72:10 73:2 102:16

photo 68:12,15 70:11 106:24 107:14,22 108:10 109:3,18 116:16 165:1

photograph 37:21 68:18 69:10 109:16 113:10 114:21,23 115:9, 11 116:11 139:20,24,25 140:2, 25 141:2,4 143:25 157:11 160:2 161:11 163:25 164:1 166:22 167:5,11 168:24 169:4,9 171:10 173:3 174:1,4,12,17,23 175:11 176:16,21 178:1,7

photographically 67:11

photographs 37:20,22 48:20 49:3 112:1,3,8,9,10,11,25 113:4,13,15 114:10,25 115:1,5, 20,23 116:5,15 117:23 118:3 163:22 164:3 168:3,10,11,14, 16,18

photos 165:14 181:19

phrase 140:18

physical 110:8

physics 18:20,21,23 93:15

pick 120:10,11

picked 119:21,24 120:4

picture 166:19,21 168:24 169:5

pie 25:11

piece 45:6 102:3,6 125:22 166:2,13 169:19 175:12 180:19 185:6,8,10,12

pieces 71:16,17 125:8 142:11

piloted 184:2,5,7

PIN 122:17,22 187:22

pipes 91:14

place 120:6

places 144:16

plaintiff 9:25 27:22,25 28:3,17, 25 29:1,3,6,10,13,15,20 30:1,4, 5,14 33:3

plaintiffs 9:25

plan 47:14,17

plant 16:20 36:6,20 37:19 64:24 65:16 68:11 70:5 72:15 75:16 78:19 79:23 82:19 85:6 88:10 89:13,21 90:7 91:7 96:12 97:14, 19 98:1,21,24 99:11,13,16,21 100:2,7 101:2 103:1,7 104:25 119:2,6,18 120:24 123:5 125:14 127:4,19,21 128:5,13 132:9,19 133:25 134:5 135:16,18,22 143:12 152:9,11 182:11,12,20 183:6

plants 84:24 153:2 182:6

play 81:6

playing 73:1

pneumatic 187:19

point 5:18 6:16 20:8,14 23:1 50:4 51:12 52:14,17 73:12 114:21 117:16,19 125:15 130:15 140:3,4,8 143:11 145:24 148:7 150:4 159:2 161:5 180:1 185:25 186:1,16 188:18 189:24

points 22:21 40:17 52:11,12 158:14 187:11,24

policy 34:23 35:3

poor 74:25 84:15 190:2

portion 36:21 37:9 68:19 103:19 146:12 150:20 164:19 166:20,22

portions 53:8 104:9

position 141:11 180:8

positioned 68:9

possibility 42:22 78:10

possibly 55:23 56:5 114:12 137:16 165:4 180:3

post 17:10,11,13 165:8

potential 151:25 155:1,4,7 192:5

powder 44:17 71:19 111:13

powdery 44:19

predecessors 31:21 33:17

predicated 110:11

preliminarily 44:3

preliminary 33:6 46:10

prematurely 131:8

preparation 23:3

prepare 50:25

prepared 157:6

preparing 51:3,8,14

presence 116:24 117:3

present 61:9 85:17 128:14,17 167:13 168:4 180:11,12,13

presentation 8:14,15 23:24 30:17

presentations 8:10 19:19 20:11 23:12,15

presently 127:1

pressurize 192:16

presume 135:8

presumed 56:1 133:24

presumption 134:1,3 135:10

pretty 31:7 35:4 49:8 52:20 107:9 135:12 154:18 193:9

prevented 171:16

previous 35:21 43:17 49:24 118:7 189:13

previously 8:20 24:7

primarily 19:6

principle 94:17

prior 39:7 48:12 50:18 119:1,17 159:25 160:9 176:4

private 11:10 20:24 21:1,7

probability 76:10

probable 139:17 141:22 151:8, 11

problem 55:24 70:6 89:11,18 92:13 96:23 97:20 98:1,20,23 99:20 100:7 125:14 137:8 151:1,12 181:23 183:3 190:5

problems 149:13

proceeding 12:4

process 20:19 22:3 26:11 31:5 46:14 48:18 49:8 79:19 80:1 85:14 91:6 93:7,8,9,11,17,22 94:15 95:14 148:17,18 180:4

processed 153:14

produce 146:21

produced 35:25 36:5,18 41:10 57:17 59:8 101:20,23 102:10 154:13

product 27:18 161:6 189:8,23

production 37:23 79:5,19,23 80:21 81:11 189:25 193:8

professional 5:12 21:14 23:16

profit 9:14 30:18

program 19:10

progress 146:17

progresses 146:11,20

progressing 91:10

progression 174:8

project 12:20

proper 139:1 149:25

properly 91:14 134:25

properties 54:13 185:2

Property 13:16 29:22

prosecutor's 13:12

protected 50:18

protection 39:18 54:5

protocol 87:2

provide 28:5 49:9,15,25 66:11 112:12

provided 8:11 19:19 25:19 39:6 46:1,4 54:22 57:18 59:9 64:8 65:9 66:13,15 70:25 74:8,12 75:3 76:13 78:7 81:9,23 83:21 87:10 89:10 130:16 133:19 150:21

providing 76:8 78:5

publication 53:23 54:15

pull 187:12

purpose 42:18 43:11,12,18 47:2 71:3

purposes 24:10 56:12 60:17, 20 113:18

Pursuant 38:7

put 16:13 23:7 36:23 38:16,20 44:5 59:15 60:12 69:11 78:9,22 81:2 96:21 97:7 104:18 106:17 107:4,15,19,20,21 108:10,17 120:21 131:1 144:2,5 163:23 169:18 175:5,12 176:22

puts 111:22



**putting** 171:2

**puzzle** 125:8

**Q**

**qualify** 9:1 151:7

**qualitative** 95:9

**quality** 148:19

**quantitative** 95:9

**quarterly** 188:19

**question** 8:19 17:21,24 27:19 35:7 38:13 41:23 49:21,23,24 62:6,8 73:4,9 80:13 88:1 110:21 114:9 135:6 144:22 163:17 169:3 172:22 183:10 186:3 192:1

**questions** 26:4 73:17 181:16 189:9 194:11

**quick** 47:23

**R**

**R-o-m-a-n-d-i-n-e** 9:13

**R-o-t-h-h-a-a-s** 13:9

**rag** 186:4,7

**ran** 177:10

**random** 183:16

**Randy** 192:25

**range** 44:3,6 67:14 156:5 188:9

**rank** 25:4

**rate** 34:2,7,10

**ratio** 185:19

**rationalizing** 25:13

**reach** 67:24 69:21,25 70:8,18 95:10 182:25

**reached** 93:1 94:8 158:8

**Reactivity** 191:19

**read** 13:20 43:15,17 49:1,23,24 57:19 58:24 102:19 103:15 140:12 168:22 181:7,11,12,13, 15 182:17 187:6

**reading** 16:10 160:4 163:3 181:25 182:5

**readings** 67:13 149:23

**reads** 38:6

**reason** 83:22 101:25 116:2 120:16 170:14 171:11 192:3

**reasonable** 98:5 124:11 139:5 140:14 141:18 142:1,3 143:6 148:11,12 149:5 150:12,24 151:1,9 155:12

**reasoning** 93:5 94:15,16

**reasons** 77:13 122:3 158:19 171:14

**recall** 16:10,21 22:23 34:20 35:19 36:14 37:15 43:24 50:3 57:14,25 58:1,6 73:10 102:14 113:11 154:5,10 183:11 188:16 193:15,18

**receive** 193:7

**received** 20:11,15 35:21,23 43:10 46:16 58:24 103:3 104:2 119:17 193:14

**receiving** 19:7 35:19 193:18

**recent** 38:7

**recertified** 22:7

**recess** 48:1 95:25 167:24

**recognize** 181:4

**recollection** 50:13 102:15 173:4 180:21,24

**record** 6:13,22 36:15,17 50:18 113:18 181:14 187:6

**records** 13:25 14:9

**red** 113:8,14 115:21

**refer** 98:13 164:18 170:21

**reference** 52:3,4 54:2 134:9 137:9

**referenced** 51:21 128:22 137:12

**referencing** 112:9

**referred** 44:8 177:22 183:8

**referring** 44:7,21 63:24 64:3,15 110:15 113:19 114:4,7 126:4 131:20 144:3 161:20

**refers** 98:14

**reflect** 68:15 101:9 114:13 140:23 154:13 178:16

**reflected** 7:17 56:18,24 59:2,11 72:18 104:1 105:10 123:3,9,21 127:14 130:3,8

**reflects** 57:6 64:8 73:6,15 122:5 167:7 174:5

**regular** 31:7 182:8,15 194:14

**regulations** 153:18

**related** 150:11 183:4

**relates** 18:21 108:4

**relating** 58:4 100:2

**relative** 25:3 35:11 37:24 71:16 94:21 127:18 152:21 153:12

**relayed** 133:4

**relevance** 5:24

**relevant** 80:25 81:1 120:9,12, 22,23 121:8,11 122:4

**reliability** 66:7 76:4

**reliable** 25:18,23 26:16 62:9 76:14,16,17 77:11 80:19 87:8, 13,15,18,20 92:8

**relied** 51:7,14,17 59:3 81:5,13, 22 82:10 112:3 191:2 193:25 194:5

**rely** 51:2 54:14 57:21 60:17,20 62:2,20 74:16 76:5 77:20 78:3, 12,20,21 80:22 81:8,15 83:25 86:11 87:3 104:24 131:6 157:8 191:8

**relying** 45:25 55:4,10,18 56:12, 17,23 57:3,8 61:1,12,17,24 62:13,16 67:16 74:7,11 79:1 85:7 90:18,20 95:10 103:20 104:5,10 105:5,11 120:16 121:5 126:20 129:10 130:23 131:5 133:3

**remained** 172:25

**remember** 42:11 73:3

**remnants** 166:9

**remove** 22:5

**removed** 42:25 74:4 111:14,19 165:5 171:7

**render** 32:22 47:4

**renewed** 20:17

**renting** 16:5

**repair** 189:16

**repairs** 189:13

**repeat** 110:20

**replacement** 86:20

**replacing** 88:10

**report** 41:6,19,21 43:10 44:2 46:15,16 48:7,10,12,18 49:9,13, 16 50:1,6,25 51:3,8,11,14,16,18 55:22 57:24 58:7 59:1,3,11,13, 16 60:3,6,10 61:14,18,23 62:16, 19,22 63:5,18 64:4,7 66:2,23 68:12 69:19 70:12,19 72:22 73:21 74:14,24 75:2 81:2 96:21 97:8 101:14 102:19,25 103:17 104:16 105:8,10 106:1,3,9,17,

25 107:22 108:15 109:3 110:4 111:22 112:9,19 117:21 118:25 119:10 120:21 121:25 123:10, 14,21 125:3 128:23 129:9,10 130:21 131:4,6 132:16,18 133:1 135:6,14 136:2 138:20 139:22 140:12,25 149:13 150:14 157:5, 8,11 161:10 193:25 194:1

**reported** 63:7,22 64:16 66:13 122:12

**reporter** 5:9 41:25 43:18 49:25 69:14 178:14 194:13

**reports** 98:7 99:15 119:6,17 130:13 147:18 155:9

**represent** 32:10

**representation** 165:1

**representative** 125:2 128:25 129:6 130:1 131:10,16 133:3,5, 12 137:1

**represented** 5:19,20 14:24

**representing** 16:8 32:25 33:3, 13

**requested** 36:1 46:24 47:8,20 119:5

**require** 21:18,21 34:12

**required** 32:19 34:15 79:5 80:21 81:10 183:2

**requirements** 20:7,14 21:9

**research** 45:17 46:14 54:3

**reserve** 194:11

**residence** 10:6

**residue** 43:13,20,22 68:5 70:23 72:5 91:22 92:11,21 94:5,11 95:1,5,17 96:24 97:16 99:2,8 111:14 113:9 123:17 124:2,4 143:21 146:12 149:3,6,9 152:4, 6 158:11 166:10 169:21 170:3, 7,9 171:6,15 172:10,15,20,24 173:5,8,14,15,17,18,20 174:24 175:6,13,18 176:3 177:15 178:3,17 179:21 182:21 191:11, 14

**residue-type** 178:22

**respect** 17:4 22:19 42:23 46:19 51:13 52:19 61:22 76:12 86:23, 24 112:14 164:10

**respects** 52:11

**responded** 59:7 136:8

**response** 38:14 101:20 103:23 104:12 105:13

**responsibilities** 128:5



**responsive** 38:15,25 39:4 41:1,9

**rest** 53:22

**restart** 188:12,14

**restaurant** 9:15 11:5

**restroom** 167:22

**result** 74:24,25 84:15 92:17 93:8 94:23 135:4 156:17,20 157:13,24 173:6

**resulted** 171:17

**results** 46:11 93:17

**retain** 35:1,5 43:2

**retained** 5:22 6:1,2,4 17:17,25 18:9,13 30:20 31:20 33:7 35:7, 11 43:3 48:14 186:24

**retainer** 34:12,15,17

**retention** 34:22 35:3

**retired** 11:10 19:15 39:17 40:15 74:18 84:21 183:15

**retract** 54:4

**revenue** 27:9

**review** 59:14 60:16 62:24 63:2 101:5 103:12

**reviewed** 41:16 50:22,24 51:13,17 56:21 57:11,21 58:3, 15,21,22 59:20,25 60:7,11,12, 23,25 73:18 193:21,23 194:8

**rid** 169:4

**right-hand** 163:24

**Rimkus** 41:19 47:1 56:2 57:23 58:3,9,23 59:1,5,7,16,25 60:8 61:4,7,14,17,19,23 63:18 64:4,7 65:10 66:2 106:1 110:15,24 112:19 164:1,4,6,8,10 165:18, 19,22 166:17 167:6 168:18 193:7,25 194:1

**Rimkus'** 162:17

**rise** 158:5

**road** 171:25 172:1,2

**Rocky** 64:25 65:3,20 100:12 101:4,10 102:7,10

**Romandine** 9:13 28:24

**Ronald** 8:3 15:12 30:6

**room** 26:6 45:11,12 185:7

**Rose** 32:17

**Rothhaas** 13:9 29:19

**roughly** 112:22

**row** 50:11

**rule** 154:16

**rules** 50:19 153:18

**ruling** 141:23

**run** 95:16 148:22 177:9

**running** 86:19 88:5

**runs** 91:8

**rust** 170:22,24

**S**

**sabotage** 156:21

**sake** 52:12

**save** 48:14

**scale** 68:5 70:21 71:6 72:5 88:24 187:14

**Scaling** 187:21

**scene** 11:9 27:16 32:21 47:3 48:24 56:24 67:7 74:1 103:14 105:16 171:23,24

**scenes** 20:9 171:21

**schedule** 34:2 46:25 182:10

**schedules** 182:9,15

**scheduling** 182:18

**schematic** 36:6,14,18 37:6 39:9 40:24

**scheme** 81:14

**Scholten** 39:13 40:10 49:5 55:8 67:6,21 69:19 71:1,23 72:9,23 125:23 154:2 182:7 187:9

**Scholten's** 125:13 150:20 152:7,25

**science** 19:1 93:15

**scientific** 52:19 53:2,11 54:8,9 92:25 93:4 94:17,18 110:8

**scope** 68:4,14,24 69:15

**Scott** 61:21,22

**scrape** 161:12,22,24 162:2,5,9, 10

**scraped** 71:25 149:10

**scrapers** 187:19

**screens** 187:12,17

**seams** 144:18

**section** 48:23 53:18 140:21 147:6,9,13 160:3 169:17 172:5 175:4 177:2,21 178:11

**sections** 53:10 140:21

**seminars** 24:21

**SENAK** 6:16,20 7:3 28:8,12 36:12 37:2 39:23 41:14 42:2 43:15 47:24 48:5 49:19 58:19 88:22 95:23 110:1,22 113:20 114:16 115:4 116:21,23 119:16 126:11 128:18 130:6,12 131:1 151:17 157:1 161:21 162:15 163:8 165:2 167:18,23 168:1 181:21 182:1 192:25 194:10,14, 17

**send** 102:12

**sense** 36:24 65:17 71:25 78:11 98:15 124:25 126:19

**sentence** 78:21 161:21 162:16

**separate** 14:7 44:25 87:6

**September** 112:5 168:8

**series** 73:6 112:1 164:3 168:3

**service** 134:5

**serviced** 123:16

**services** 34:10 153:3

**set** 10:7 13:3,11 15:8,16,21 24:9,10

**setting** 192:12

**settle** 71:9

**settled** 10:13

**share** 163:9

**sheet** 190:24

**sheets** 148:22

**shelf** 52:5

**shift** 188:2,6,13

**shifts** 188:3

**shop** 70:22 71:4,10 188:22

**short** 73:7,16 100:21,23 130:18 167:22

**show** 112:15 116:5 118:6 128:18 146:8 147:19 162:9 163:21 169:7 176:16

**showing** 6:11 7:8 33:25 35:16 38:4 40:2 101:18 102:23 111:25 113:5,14 149:22 155:18 157:4 168:2 190:12,23 193:3

**shown** 9:6 38:17 40:22 51:19 54:25 55:5 56:22 57:4,7 59:23 60:21 61:2 70:10 104:6 114:25 117:9,13 166:3 171:6 173:1,2 174:22 191:15

**shows** 60:7 68:18,19 103:3,6

113:6 149:25 150:3 156:1 164:11,12

**side** 115:16 163:24 164:16 165:5 168:5 169:15 170:15 172:25 177:6 179:10,12 180:25

**sides** 71:8,25 177:19 187:14

**sigh** 176:12

**signature** 194:12

**significance** 25:5 37:14 184:12 192:7

**similar** 20:19 82:16 86:10 120:5,12,18 124:22,24 179:23

**similarity** 119:22

**simple** 38:13 50:11

**simply** 50:9 93:1 94:10

**sit** 58:1

**sits** 52:4

**sitting** 45:11

**size** 37:7 71:12 184:17

**sizes** 72:2

**skip** 98:6 165:18

**slower** 146:16

**small** 71:16 81:6,7 85:10 125:22 184:10,14,23 185:8 186:22,23

**smaller** 184:18,24 185:4

**smelling** 105:2

**smoke** 63:8 64:17 104:19 105:2,16,20 106:2,7,11,14 107:6,8,10,12,15,23,25 108:4 109:4 111:8 117:3,5,8,12,17 118:1 144:12,13,19 145:12,15, 17,19,23,25 146:7,10,21

**smoldering** 117:6

**Society** 12:16 23:16

**soda** 187:13

**solder** 192:17

**solid** 185:18

**solidified** 180:4,7

**solvent** 75:1 84:16 85:15,16 190:3

**soot** 174:7

**sort** 22:16 48:17 97:13 99:7 161:2 186:8

**sound** 49:2

**sounded** 76:24 79:8,9,20,25 80:5,6 83:5 88:14



**sounds** 127:7

**source** 45:7,9 63:13 64:11,15, 19 65:8,18 67:2,16 92:8 123:8 132:21,23 135:3 138:6 143:1,7, 8,9,17 149:7 192:5

**sources** 65:2 66:5,9,11 87:4 191:20,25 192:18

**south** 187:25

**Southern** 11:14 12:9 14:15

**spaced** 154:8

**span** 73:7

**spark** 191:20,24 192:2,6,10,11, 14

**sparks** 192:13

**speak** 5:20 24:11 25:11

**speaker** 23:22

**speaking** 27:17 39:16 108:2 129:2 131:17

**speaks** 151:15

**Special** 8:16

**specific** 108:3 140:15

**specifically** 19:9 22:23 24:3,11 53:16 74:15 79:24 80:13 89:16 100:4 115:19 142:13

**specificity** 109:25

**speculative** 162:19

**speed** 81:17,19,24 149:18 189:25

**spell** 5:8 11:3

**spoke** 42:12 50:6,14 55:3 63:21 64:25 67:7 73:21 102:16

**spontaneous** 186:8

**spot** 41:21

**spray** 91:7 94:20 137:14 169:22 174:25 190:24

**spray-on** 189:10

**spray/vaporized** 183:20

**sprayed** 191:5

**squirrel** 56:6 68:7,8,20 69:16 115:15 144:14 145:2 147:10 148:18 158:6 164:18,23 182:22, 24 185:22 187:25 188:25 189:1, 7,13

**Stability** 191:19

**stain** 186:4,7

**stamp** 116:13 117:23

**stamped** 115:25

**stand** 23:7

**standard** 141:25

**standards** 153:17

**standing** 90:14

**star** 187:22

**Starke** 12:23 29:17

**Starr** 31:20 33:7,16 34:17 38:5 46:23

**start** 6:21 9:9 48:21,22 51:16 107:6 125:24 131:3 140:11 181:12 182:5

**started** 19:7,16 35:4 56:6 68:25 105:12 140:16 188:5,19 189:3

**starting** 125:8 126:1

**starts** 188:2

**state** 5:8 8:7 9:17 10:1,7 11:2,5, 7,8,21 12:3,6,18,23 13:3,8,14 15:6,7,10 21:4,7 29:8,10,14,17, 19,21 30:3,4 110:6 177:18 185:16

**stated** 77:13 112:18 137:1,3

**statement** 31:16 35:2 59:24 60:1 65:19,20 66:12 78:19 79:4, 11 82:22 87:21 89:15,24 90:3 97:11 100:19 102:1 125:22 138:24 161:10 163:14 183:3

**statements** 54:24 57:22 58:4, 10,21 61:8 64:5,12,20 65:9,21, 24 66:17 98:8,10 104:18 121:21 133:12 144:9 193:6

**states** 20:25 43:6

**stating** 77:23,25 97:1 125:3

**stayed** 177:20

**steel** 185:7,8,10 189:23

**Steve** 56:10 183:14

**stick** 88:3

**sticker** 36:24

**stopped** 82:25 69:1

**straight** 164:16,22 169:15 174:19

**Strange** 64:25 65:3,21 66:16 100:13 101:4,10 102:7,10 103:10,12

**street** 87:16

**stretch** 142:23

**strike** 51:16

**strongly** 76:2

**stuck** 177:20

**student** 11:17

**studies** 53:19,21 54:8

**study** 54:12 155:20

**stuff** 35:23 36:4 46:14 147:12 153:23 174:20 176:6 187:7 191:12

**subject** 51:24 56:15

**subjected** 180:2

**submitted** 8:11

**subpoena** 35:18,19,21 36:1 38:14 39:1,2,5,7 41:1,10 59:8 101:20

**subrogation** 15:1 16:4 27:23 30:13

**subsequent** 12:14 40:8 112:22 113:1,6 115:17

**subsequently** 13:12 14:20 19:15

**substance** 42:25 44:9,19 46:6 178:21

**substantially** 124:22

**substantiate** 55:21 138:23 139:12

**substantiated** 67:13

**substantiating** 56:4 85:19

**substitute** 6:17

**sucked** 186:18

**sufficient** 139:11

**suggest** 116:24

**suggestion** 113:21

**suing** 11:17 12:19 29:7

**sum** 52:22

**Summary** 104:17 106:5

**supervisor** 39:13

**supervisory** 129:1,4

**support** 60:12,14 110:9 112:16, 17 144:9

**supposed** 68:16 69:8

**surface** 123:18 137:11 142:16, 17 160:14 170:18 176:8 185:19

**surfaces** 70:21 71:8 91:16 113:13 159:23 160:7 172:2 173:25

**surprise** 60:4

**suspected** 151:7

**Sweep** 14:12,14 30:1

**system** 20:8 125:4 131:12 134:10,18,21,24 135:8 148:21 149:1 184:22

**systems** 150:8

**T**

**table** 185:7

**tag** 73:2

**taking** 37:20,22 74:5 84:17 104:11 117:18 125:21 150:22 151:19

**talk** 24:13,15,17 72:9 78:12 89:9 105:1 127:11 149:13 151:24 192:16

**talked** 11:1 40:15 41:13 49:5 53:17 64:7 74:15 76:4 93:13 118:8 125:9 131:19 165:9 184:6

**talking** 28:14 36:9 45:18 74:5, 21 76:25 79:13 83:7 88:6,9,15, 25 89:2,5,16 90:2 91:24 98:14 103:25 129:25 130:1 132:11 146:18 151:22 156:6 184:15

**talks** 70:19 81:17 85:11 191:19

**tall** 26:5

**tar** 44:18

**tar-like** 44:9 46:6

**tarry** 178:21

**tarry-like** 42:25

**taste** 197:15

**teach** 22:17

**Tech** 39:13 44:14 57:12 68:3, 15,16,24 83:9 111:14 147:24 148:21 149:11 154:13 158:7 162:18 163:2 188:11

**Tech's** 159:24 160:8

**techniques** 22:14

**telephone** 73:14 100:16

**telling** 25:24 85:18 90:20 131:10

**temp** 189:22

**temperature** 43:13,19,22 44:7, 13,21,23,24,25 45:1,2,5,8,10, 13,14,15,16 46:5 67:13,14,17 75:15 76:12 77:9,11,16 94:21 95:16 96:3,6,9,12 113:3 114:18 115:14 116:6 118:6,11,22 156:4,6 184:9,25 185:5,14 186:11,19,20

**temperatures** 44:25 76:1 77:3 78:18,25 79:4 80:15,20 81:10



112:23 113:15 114:10,13,14 118:8,16,19 184:19

**temporarily** 183:6

**temps** 189:11 190:1,3

**tenant** 15:9

**termed** 100:3

**terms** 25:4 76:4 89:17 104:1

**test** 44:18 45:2

**tested** 44:18

**testified** 9:24 10:10,21 11:5,10 12:3,21 13:6,13,22 14:3,7 15:10,15,17,20,23 16:3,11 17:17,25 18:10,14 23:11 28:16, 25 29:3,5,9,12,15,18,20,23 30:1,5,10 89:4

**testify** 8:24 11:19 22:9,17 23:3 28:3 30:20,23,24

**testifying** 27:21,24 28:15 30:7, 13

**testimonies** 7:16 18:4,8

**testimony** 9:6 14:17 20:13 22:11 23:4 28:14 32:7 34:8 41:18 57:12 58:7 59:2,4,16 63:19 65:23 76:5 81:23 83:25 85:7 86:14 109:22 111:3 120:8 126:20 141:21 151:11

**testing** 42:23 43:2,4,7,8,9,11 44:12 45:23 46:9,12 47:17,20 94:10,12,13

**Texas** 46:11

**text** 75:2

**thermal** 112:4,21 113:12 114:11 115:18 117:9,18

**thickness** 187:21

**thing** 37:18 74:22 85:21 101:13 145:25 162:6 170:18 174:2 179:14 190:2

**things** 5:14,15 23:10 24:15 25:20,21 26:13,15 34:6 44:2 50:12 69:17 72:1 81:14 85:19 118:25 126:3 187:3

**thinking** 26:12

**Thinks** 183:3

**thought** 55:22 78:13 88:25 120:5,9,22

**throw** 192:13

**thumbs** 148:24

**time** 13:19 28:17,18 47:25 61:9 65:5,20 73:7 74:16,17,19 76:19 82:17 84:17 86:21 91:17 100:25 103:24,25 104:1 105:14 109:5

**115:25** 116:3,13 117:11,23 119:7 125:10,18 138:3 147:16 154:9 167:21 172:7 174:3 176:9 180:16 189:23

**timeframe** 188:8

**times** 20:12 28:16 42:13 49:1 88:2 105:9,11,13

**title** 128:9

**today** 5:19 7:1 36:4,5,11 38:16 39:10 58:1 69:13 102:11 178:6

**today's** 35:17

**told** 43:24 46:7 71:22 77:15,24 78:8,23 79:1 82:1 83:1 101:12

**tools** 71:7 72:4

**top** 40:7 63:25 178:18 187:8

**total** 73:15

**totality** 25:13 54:1 58:23 150:22 151:20

**totally** 80:24

**track** 18:7

**trade** 126:15

**training** 17:11 19:5,7,11,17 20:10 22:11 83:12 126:7,21

**Transcript** 194:13

**transcripts** 57:17

**traveled** 186:24

**Travelers** 13:16 29:22

**trial** 11:6,11 13:15 18:1,7 20:13 23:8

**trouble** 134:10,17,21

**true** 22:17 27:4,9 34:4 48:9 55:8 57:13 58:13 61:5,20,25 62:14 64:9 66:5,17 72:3 76:8,11 77:18,19 78:5,19 79:7 82:4 89:20 90:3,7,10 91:2,3,25 94:3 95:5 96:2 97:2 100:13 103:4 109:1 117:1 119:11,12,19 127:19 128:18 132:1,4 136:6,7 137:18 150:10 154:10,14 155:1 157:6 158:20 169:5 170:14 171:8 190:14,16 191:16 194:5,6

**truth** 25:24,25

**turn** 130:6

**turned** 154:21

**two-page** 40:5

**type** 17:12 72:4 82:16 85:1,21 90:1 153:1 156:21

**types** 75:10 84:5 99:3 122:21

**typewritten** 193:10

**typically** 26:6 34:21 96:7 118:12

---

**U**

**ultimate** 52:1

**ultimately** 43:8

**undersea** 165:14

**underside** 113:3

**understand** 23:21 27:20 34:25 58:13 62:7 77:1 80:6 81:2 87:23 90:16 95:12 97:9,18 101:15 108:18 114:24 122:21 126:19 128:20,21 133:18 135:21 140:12 141:6 163:3 175:17 192:1

**understanding** 68:2,3 69:15, 23 78:17 83:14 85:3 93:21 94:17 101:22 102:24 105:15 106:14,25 107:5,15 110:18,21, 23 111:1,3,12,16 115:1 117:14, 16 122:23 126:21 134:17,20 136:14,21 145:8 162:24 163:7 164:21 170:6 172:14 188:11 192:20

**understood** 14:1 59:19 66:4 73:18 89:9 93:6,7 123:20 126:4, 18 151:24 163:5 177:12 179:14 185:20 187:5 188:17

**undertaken** 136:18

**undetermined** 10:12 24:8 139:2 151:16 156:23

**unestablished** 34:13

**unfounded** 110:11

**uniform** 170:19

**United** 8:5 15:13 30:6 43:6

**Units** 8:16

**universe** 59:22

**unreliable** 62:4,13,19 87:3,4

**upward** 145:2,3,5

**upwards** 27:6

**USA** 9:12

**USAA** 9:21 10:9 28:23,24

**utilized** 70:22 84:24

---

**V**

**V-e-r-g-o-n** 5:10

**V-o-i-g-h-t-s** 14:13

**vac.** 188:22

**vac'd** 71:10

**vacs** 70:22 71:4

**vacuum** 70:22 188:22

**vacuumed** 44:14 186:18

**vague** 22:18

**vapor** 191:8

**varies** 187:21

**variety** 66:5

**varnish** 137:14 169:22 174:25

**vary** 118:16 190:3

**varying** 72:1

**vast** 26:25 74:20

**Vegas** 23:23

**velocity** 149:20

**vendor** 31:5,6

**vent** 144:16,21 145:22

**ventilation** 150:8

**venting** 144:13,15

**veracity** 26:1

**verbal** 42:8,10

**Vergon** 5:10 6:11 7:8 33:25 35:16 36:18 37:6 38:4,9 40:2 48:6 96:2 111:25 157:4 163:21 168:2 190:12,23 193:3

**verify** 66:8 82:4

**versus** 7:22 8:2,5,7 9:12,18,21 11:2,13,22 12:7,24 13:9,17 14:12 15:7,13,19 16:2 28:24 29:2,8,17,19,22,25 30:3,6,9,12 184:2,5,11,14,18,20

**vertical** 141:11 147:13 157:14, 16 158:5

**viable** 191:25

**view** 90:5

**virtue** 5:17

**Voightschild** 14:13,15,18

---

**W**

**wait** 189:4

**waited** 188:13

**walking** 37:19

**wall** 26:9 67:6 71:1,23 72:8 159:10 161:3,12,22 162:20 163:1,12 187:9,10



**walls** 159:23 160:6

**wanted** 113:14 121:18 182:19

**Warrick** 8:7 15:6

**water** 171:12,15,17

**Watts** 7:23 16:2

**week** 15:20 16:1 23:6 72:23

**weeks** 171:25

**weigh** 88:24

**weight** 78:8

**weld** 192:17

**wells** 16:5

**Wendy** 9:20

**west** 140:22 141:10

**Westfield** 12:22

**whatsoever** 79:18

**whichever** 9:10

**wind** 149:18

**wire** 187:20

**witnessed** 58:11 64:13 121:2

**witnesses** 24:23,25 58:10 76:5
144:11

**Wood** 8:8 15:7,9 30:3 186:11

**word** 50:10 183:22 189:12

**work** 14:23 26:21 27:1,4 31:4
40:10 47:14 68:4,14,24 69:6,15
74:19 76:20 79:15 88:14 126:6
150:18 152:8

**worked** 11:9 84:22,23 125:9
128:11 134:7 183:6

**working** 24:18 71:10 84:4
127:21,25 133:23,24 192:12

**works** 127:4

**Works/contracts** 182:5

**wrapped** 144:17

**write** 48:19 108:15 133:4

**writing** 42:9

**written** 37:18 193:24

**wrong** 133:11 149:19 184:24

**wrote** 72:21 97:6 116:19 162:7

────────────────

Y

────────────────

**Ye** 14:12,14 29:25

**year** 19:14 22:7 23:23 24:4
172:1 176:10,11 177:11 188:21

**years** 15:16 17:8 19:14 20:9,20
37:16,17 42:21 85:20,23 86:3
127:5

**young** 32:4,15

# Exhibit 35



**CONNOR**REPORTING

111 Monument Circle, Suite 4350 • Indianapolis, IN 46204 • 800-554-3376

RE: Indiana Rules of Procedure, Trial Rule 30 (E) and/or Federal Rules of Civil Procedure

*PAGE  121  LINE# 1
CHANGE "upon arrival"
TO "out upon arrival"
REASON FOR CHANGE  missed word "out"


*PAGE 149 LINE# 12
CHANGE Add to "Yes."
TO  "Yes. The same type of residue."
REASON FOR CHANGE  clarification


*PAGE  159   LINE# 2
CHANGE "lose"
TO  "loose"
REASON FOR CHANGE   wrong word


*PAGE 180  LINE# 20
CHANGE  "I don't"
TO  "I do.  It came from the west blower."
REASON FOR CHANGE  Review of my photographs after deposition.


*PAGE  181  LINE# 4-5
CHANGE  delete "So that's not my camera, so that's not me."
TO
REASON FOR CHANGE   Clarification.  It was my camera, and I identified photographs taken sequentially.  Photographs 8144 – 8151 are all of west blower and debris collected from it by Mr. Howell.


*PAGE  185  LINE# 15
CHANGE delete word "chemical?
TO
REASON FOR CHANGE  to correct answer


     I am, therefore, signing my deposition conditioned on the fact that the above noted shall be entered upon the deposition by the notary public

_(Signature of Deponent)_

727

# Exhibit 36

1           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF INDIANA
2

3   BALL CORPORATION, an Indiana
    corporation and FACTORY MUTUAL
    INSURANCE COMPANY, a Rhode
4   Island corporation, as subrogee,

5                 Plaintiffs,
    vs.                                    1:16-CV-00042
6

7   AIR TECH OF MICHIGAN, INC.,
    a Michigan corporation

8                 Defendant.
                                    /
9

10        DEPOSITION OF PAUL SCHOLTEN

11        Taken by the Plaintiffs on Thursday,

12   August 30, 2018, at 625 Kenmoor Avenue,

13   Suite 301, Grand Rapids, Michigan, commencing

14   at 10:10 a.m.

15

16   APPEARANCES:

17   For the Plaintiffs: MR. MARK N. SENAK
                         SENAK, KEEGAN, GLEASON, SMITH &
18                       MICHAUD, LTD.
                         566 West Adams Street
19                       Suite 750
                         Chicago, Illinois 60661
20                       312-214-1400

21   For the Defendant:  MR. JACOB O'BRIEN
                         STARR, AUSTEN & MILLER, LLP
22                       201 South 3rd Street
                         Logansport, Indiana 46947
23                       574-722-6676

24
     REPORTED BY:        Mr. Carl M. DePerro, CSR-4284
25                       Certified Shorthand Reporter

```
 1                    TABLE OF CONTENTS

 2     WITNESS:                                    PAGE

 3     PAUL SCHOLTEN

 4     Examination by Mr. Senak                      3

 5     EXHIBITS:                               REFERENCED
                      (Exhibits Attached.)
 6
       Deposition Exhibit Number 1,                  4
 7     Deposition Notice

 8     Deposition Exhibit Number 2,                 12
       Invoice #13787
 9
       Deposition Exhibit Number 3,                 13
10     Invoice #13466

11     Deposition Exhibit Number 4,                 13
       Invoice #14171
12
       Deposition Exhibit Number 5,                 14
13     Invoice #14511

14     Deposition Exhibit Number 6,                 14
       Invoice #14638
15
       Deposition Exhibit Number 7,                 15
16     blueprint

17     Deposition Exhibit Number 8,                 26
       photograph
18
       Deposition Exhibit Number 9,                 24
19     Invoice #13897

20

21

22

23

24

25
```

```
 1              Grand Rapids, Michigan

 2              Thursday, August 30, 2018

 3              At 10:10 a.m.

 4         DEPOSITION EXHIBIT NUMBERS 1-6

 5         WERE PRE-MARKED BY THE REPORTER

 6         FOR IDENTIFICATION.

 7              THE REPORTER:  Would you raise your right

 8    hand, please?  Do you solemnly swear or affirm that the

 9    testimony you are about to give in this matter shall be

10    the truth, the whole truth, and nothing but the truth,

11    so help you God?

12              PAUL SCHOLTEN:  Yes.

13              PAUL SCHOLTEN,

14    HAVING BEEN CALLED BY THE PLAINTIFFS, AND AFTER HAVING

15    BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

16    FOLLOWS:

17                   EXAMINATION

18    BY MR. SENAK:

19  Q.  Would you just state your name and spell it for the

20      court reporter?

21  A.  It's Paul, P-a-u-l, Scholten.  S-c-h-o-l-t-e-n.

22  Q.  So Paul, you were deposed once before, and I don't know

23      if you remember like the two sort of rules of the

24      deposition, which is, let me finish my question before

25      you begin to answer it, and I will try to do the same.
```

```
 1          Because if we speak at the same time the court reporter

 2          has trouble taking down both words.  And secondly, just

 3          answer out loud because, again, the court reporter is

 4          taking down what we say, and if you don't answer out

 5          loud it makes it difficult for him to reflect what the

 6          answer to the question is.  Okay?

 7     A.   Okay.

 8     Q.   I am going to show you Exhibit Number 1 and ask you, are

 9          the Rule 30(b)(6) designate for Air Tech regarding the

10          subject matters that are listed on third page of

11          Exhibit 1?

12     A.   Yes.

13     Q.   I am going to hand you Exhibits 2 through 6 and ask you

14          if Exhibits 2 through 6 are the documents that reflect

15          categories 1 through 5 on Exhibit 1.  Does that make

16          sense?

17     A.   Yes.

18     Q.   And so are you the person most knowledgeable at Air Tech

19          regarding the subject matters 1 through 6 on Exhibit 1,

20          including Exhibits 2 through 6?

21               MR. O'BRIEN:  Form.

22               MR. SENAK:  2 through 4, thank you.

23               MR. O'BRIEN:  Form.

24               MR. SENAK:  Exhibits 2 through 6.  Let me

25          start it over.
```

```
1                    THE WITNESS:  Earlier you said 2 to 6.

2                    MR. SENAK:  That's okay.

3        BY MR. SENAK:

4    Q.  I see what the problem is.  Sometimes I am referring to

5        the deposition exhibits and other times I may be

6        referring to the numbers on the Rider to Exhibit Number

7        1.  So I will try to keep that clear for you.

8                    So let's go first with are you the person most

9        knowledgeable regarding the categories 1 through 6 on

10       Exhibit 1?

11   A.  Yes.

12                   MR. O'BRIEN:  Form.  Just for the record.  You

13       can go ahead.

14       BY MR. SENAK:

15   Q.  And are you the person most knowledgeable regarding the

16       content of Exhibits 2, 3, 4, 5 and 6?

17                   MR. O'BRIEN:  Same.  Go ahead.

18                   THE WITNESS:  Yes.

19       BY MR. SENAK:

20   Q.  Is it accurate to say that you are the person most

21       knowledgeable regarding cleaning of the ductwork -- let

22       me strike it and start over.

23                   Are you the person most knowledgeable at

24       Air Tech regarding the cleaning of the ductwork at the

25       Ball Monticello plant?
```

```
 1              MR. O'BRIEN:  Same objection.  Go ahead.

 2              THE WITNESS:  Yes.

 3     BY MR. SENAK:

 4  Q.  When did Air Tech first begin cleaning ductwork at Ball

 5      Monticello?

 6  A.  You mean the exact date?

 7  Q.  Do you know the first time that Air Tech was hired to

 8      clean the ductwork at the Monticello plant?

 9  A.  Sometime in 2006.

10  Q.  Do Exhibits 2 through 6 reflect that work?

11              MR. O'BRIEN:  Object to form.  Are you asking

12      him if the exhibits show the 2006 work?

13              MR. SENAK:  Yes.

14     BY MR. SENAK:

15  Q.  Let me rephrase it so you understand it.

16      You indicated that Air Tech started in 2006.

17      I take it they would have sent invoices to Ball

18      Corporation for that work, correct?

19  A.  Correct.

20  Q.  Are any of those invoices shown in Exhibit 2 through 6?

21  A.  Okay.  Just so I understand the question, for the year

22      2006 do these represent any of that?

23  Q.  Right.

24  A.  No.

25  Q.  Did Air Tech send an invoice to Ball for that work?
```

```
 1              MR. O'BRIEN:  For what work?

 2              MR. SENAK:  For the work done cleaning the

 3       ductwork in 2006.

 4              MR. O'BRIEN:  At this point I am going to

 5       object.  None of the categories are invoices from 2006.

 6       Category 6 says it's from 2010 to 2014.  We are not

 7       going to talk about 2006 today.  And I am going to

 8       instruct you not to answer.

 9              THE WITNESS:  Yeah.  I really don't have an

10       answer for that, because I don't -- that's so long ago.

11       BY MR. SENAK:

12   Q.  I understand that.  By the way, that may not be one of

13       the invoices, but that's what I would like to hear from

14       you, which is, whether the work in 2006 is reflected on

15       any invoice.

16              MR. O'BRIEN:  Any invoice whatsoever?

17              MR. SENAK:  Right.

18              MR. O'BRIEN:  I am going to object because

19       it's beyond the scope of these topics, and we agreed

20       before the deposition he wasn't going to answer personal

21       knowledge questions beyond the scope of the dep.

22              MR. SENAK:  I understand.

23       BY MR. SENAK:

24   Q.  Do you want to answer the question or not?

25   A.  No.
```

1    MR. O'BRIEN:  I am going to instruct him not

2    to answer.

3    MR. SENAK:  If the idea is that you are going

4    to instruct him not to answer questions regarding the

5    cleaning of the ductwork that I think are reasonably

6    related to the subject matter, then we are going to have

7    to have that ultimately ruled on.

8    MR. O'BRIEN:  Well, Mark, to be fair, you have

9    very specific invoices with very specific dates, and

10   then you have a topic that states it's from the 2010 to

11   2014.  If you want to ask him general questions about

12   the time frame 2010 to 2014, I think that's totally

13   appropriate.

14   MR. SENAK:  And I will certainly get there.  I

15   just want to know what the earliest date is so that I

16   know whether there is work that was done outside the

17   2010 to 2014 time frame.  Maybe that's a good way of

18   asking it.

19   BY MR. SENAK:

20   Q.   Did Air Tech do work outside cleaning the ductwork at

21   the Ball plant outside the 2010 to 2014 time frame?

22   MR. O'BRIEN:  In Monticello?

23   MR. SENAK:  In Monticello.

24   MR. O'BRIEN:  Again, I don't think that that

25   is encompassed by any of these topics.

```
 1                  MR. SENAK:  I think it's just a yes or no

 2       question.

 3                  MR. O'BRIEN:  And I am going to instruct you

 4       not to answer it.

 5       BY MR. SENAK:

 6   Q.  I take it Air Tech did work for Ball Monticello from

 7       2010 to 2014.

 8   A.  Yes.

 9                  MR. SENAK:  Just so we are clear, while I

10       appreciate the objection, I don't think I am prohibited

11       from asking questions outside the scope of the

12       deposition topics on 1 through 6 that are reasonably

13       related to the ductwork cleaning.

14                  MR. O'BRIEN:  In the time frame you have

15       identified.

16                  MR. SENAK:  If you are going to instruct him

17       not to answer, that's fine.  We can take that up at

18       another time with the judge, okay?

19                  MR. O'BRIEN:  And I will just state for the

20       record my understanding was that we had agreed if it's

21       not on these topics he is not answering them based on

22       his personal knowledge.  It's not on these topics.

23                  MR. SENAK:  Look, you made your objection, I

24       get mine.  So we will sort that out at another time.

25                  MR. O'BRIEN:  Fair enough.
```

```
 1        BY MR. SENAK:
 2   Q.   So in 2010 to 2014 did Air Tech do cleaning of the
 3        ductwork at the Ball Monticello plant?
 4   A.   Yes.
 5   Q.   Is that work reflected in Exhibits 2 through 6?
 6   A.   It's reflected in there, yes.
 7   Q.   Are there instances in which Air Tech would have cleaned
 8        the ductwork at the Ball Monticello plant from 2010 to
 9        2014 that are not reflected on Exhibits 2 through 6?
10   A.   You are talking strictly ductwork now, right?
11   Q.   Yes.
12   A.   Would you repeat the question?
13             MR. SENAK:  Why don't you read it back?
14             (Requested portion of the record was read
15              by the reporter.)
16             THE WITNESS:  Yes.
17        BY MR. SENAK:
18   Q.   What were the dates when that work was done?
19   A.   I don't know.
20   Q.   As part of preparing for the deposition did you go back
21        and look at invoices for work done on ductwork at the
22        Ball Monticello plant for 2010 through May 22nd, 2014?
23   A.   No.  Basically I looked at what you had here.
24   Q.   Other than looking at Exhibits 1 through 6 did you do
25        anything else to prepare for the deposition?
```

```
 1   A.   No.

 2   Q.   Now, I asked you about whether there was work done by

 3        Air Tech cleaning the ductwork from 2010 through 2014

 4        that is not reflected on an invoice that has been marked

 5        as an exhibit and you indicated that there was.

 6   A.   Yes.

 7   Q.   Do you have copies of those?

 8   A.   Not with me, no.

 9   Q.   Good point.

10             Does Air Tech have copies of those?

11   A.   Yes.

12   Q.   Do you have knowledge as to the scope of work that those

13        invoices covered?

14   A.   I would have to look at them.  You know, obviously, I

15        would have -- that's the answer.  I have some knowledge,

16        but I would have to look at them.

17   Q.   If you looked at them you would be able to determine

18        what the scope of work was, true?

19   A.   Yes.  I would know what was done by looking at the

20        invoice.

21   Q.   As you sit here today do you have sort of a general

22        knowledge of what Air Tech did relative to ductwork

23        cleaning at the Ball Monticello plant from 2010 to 2014?

24   A.   Yes.

25   Q.   Do you know whether any other entity was involved or
```

```
 1    cleaned any of the ductwork from 2010 to 2014 other than

 2    Air Tech?

 3              MR. O'BRIEN:  Foundation.  Go ahead.

 4              THE WITNESS:  Not aware.

 5    BY MR. SENAK:

 6    Q.   To your knowledge Air Tech was the sole vendor used by

 7         Ball to clean ductwork at the Monticello plant from 2010

 8         to 2014?

 9              MR. O'BRIEN:  Same objection.

10              THE WITNESS:  I really don't know that.  They

11         call us and we come and clean it.

12    BY MR. SENAK:

13    Q.   If you look at Exhibits 2 through 6 do they all reflect

14         work performed by Air Tech cleaning the ductwork at the

15         Ball Monticello plant?

16    A.   Of what you got in front of me here?

17    Q.   Right.

18    A.   No.

19    Q.   Let's just start with Exhibit 2 and tell me if Exhibit 2

20         reflects ductwork cleaning by Air Tech at the Ball

21         plant.

22    A.   This reflects, yeah -- I forgot my glasses again, but I

23         can see it.  The RTO cleaning outside, or oxidizer.

24    Q.   Anything else?

25    A.   That's it.
```

1  Q.  Cleaning of the RTO is not part of the ductwork at Ball

2      Monticello.

3  A.  That's the end game.

4  Q.  All the ductwork leads to the RTO?

5  A.  Eventually, yeah, outside.

6  Q.  Do you consider the RTO to be part of the ductwork?

7  A.  No.

8  Q.  Exhibit 3, does that reflect cleaning of ductwork?

9  A.  No.

10 Q.  What does it reflect?

11 A.  It's cleaning the oxidizer RTO.

12 Q.  It says cleaning completion of the oxidizer ducts

13     exhaust and fire boxes on 8/10.  Do you see that on

14     Exhibit 3?

15 A.  Yes.

16 Q.  Am I to conclude that Exhibit 3 is the completion of the

17     work shown on Exhibit 2?

18 A.  Yes.

19 Q.  Exhibit Number 4, does Exhibit Number 4 reflect the

20     cleaning of ductwork at the Ball Monticello plant?

21 A.  No.

22 Q.  What does it involve?

23 A.  Again, it's the oxidizer or RTO outside.

24 Q.  And within the scope of work shown on Exhibit 4 ductwork

25     would not be included in that scope of work?

```
 1   A.   No, it would not be included.

 2   Q.   Exhibit Number 5, does that involve cleaning of ductwork

 3        at the Ball Monticello plant?

 4   A.   No.

 5   Q.   And just tell me what that one involves.

 6   A.   Same as the ones before.  It's just the oxidizer and the

 7        RTO, or RTO.

 8   Q.   And then Exhibit 6, does that involve the cleaning of

 9        ductwork at the Ball Monticello plant?

10   A.   Yes.

11   Q.   And just give me a description of what that involved.

12   A.   That involves cleaning the ductwork from the oxidizer

13        back to the pin, back to the tops of the pin and tops of

14        the IBOs.

15   Q.   Does Exhibit 6 reflect cleaning of all the ductwork at

16        the Monticello plant?

17             MR. O'BRIEN:  Form.  Go ahead.

18             THE WITNESS:  For the ductwork that goes to

19        the pins and the 1 through 3 IBO.

20   BY MR. SENAK:

21   Q.   Is there ductwork at the Ball Monticello plant that was

22        excluded from the scope of work of Exhibit Number 6?

23   A.   Yes.

24   Q.   Can you describe that for me?

25   A.   They had other ovens that they had added, which I
```

```
 1        believe it was 4 and 5, and those ducts that lead into

 2        that, those were not included.

 3   Q.   You are familiar with the Ball Monticello plant?

 4   A.   I am getting less familiar every year.

 5             MR. SENAK:  I am going to mark this as

 6        Exhibit 7, and it is a large blueprint size diagram

 7        which I believe is of the ductwork at the Ball

 8        Monticello plant.  It's too large to attach to the

 9        transcript, but we will mark it and make a copy of the

10        page that we mark and I think that should do it.

11             So if you would mark this as Exhibit 7.

12             DEPOSITION EXHIBIT NUMBER 7

13             WAS MARKED BY THE REPORTER

14             FOR IDENTIFICATION.

15   BY MR. SENAK:

16   Q.   I am going to show you Exhibit Number 7.  Do you

17        recognize this exhibit?

18   A.   Where does that lead?

19   Q.   I wish I could tell you.

20             MR. O'BRIEN:  I am sorry, I forgot the

21        question.  Are you asking him if he --

22             MR. SENAK:  If he recognizes the exhibit.

23             MR. O'BRIEN:  This specific diagram?

24             MR. SENAK:  Yes.

25             THE WITNESS:  It's a little hard for me to
```

```
 1        determine what is what here.

 2        BY MR. SENAK:

 3   Q.   I don't know that this is going to help at all, but

 4        there is some printing at the bottom of the document

 5        that might help you orient yourself to the situation.

 6   A.   I somewhat recognize this, yes.

 7   Q.   Tell me what you recognize.

 8   A.   Okay.  This goes to the pins or IBOs, excuse me.  And

 9        this one here goes to the pins.

10   Q.   So does Exhibit 7 reflect portions of the ductwork at

11        the Ball Monticello plant as of 2014?

12   A.   Yes.

13   Q.   The fire at issue here occurs in IBO Number 2.

14             MR. O'BRIEN:  Form.

15        BY MR. SENAK:

16   Q.   Is that shown on Exhibit Number 7?

17             MR. O'BRIEN:  Form.  Go ahead.

18             THE WITNESS:  Are you asking me if it shows

19        the IBO oven?

20   Q.   Right.  Does Exhibit Number 7 show the location of IBO

21        Number 2?  Can you tell?

22   A.   I can make an assumption by this.

23   Q.   Tell me what that assumption would be.

24   A.   The assumption would be right there (indicating).

25   Q.   If you could just mark the location of IBO Number 2
```

1    based on your knowledge with a circle or an X, however

2    you wish, and then just your initials and the date.

3              MR. O'BRIEN:   Form.

4              THE WITNESS:   (Complies.)

5    BY MR. SENAK:

6    Q.   Do you want to change it at all?

7    A.   What are these little blue square boxes here, do you

8         know?   That's what's a little confusing on this print.

9    Q.   I don't really want to tell you what that is.

10   A.   This is a little confusing to me.

11   Q.   I can tell you what I think it is, but I don't know that

12        that's going to do anything for you.   I am more

13        interested in whether you can orient yourself to the

14        document, and then if not, we will try to deal with

15        that.

16   A.   To me that looks like IBO 2 there.

17   Q.   Is it correct to say that the orange part or the orange

18        depictions on Exhibit Number 7 is the ductwork that goes

19        to the IBOs and pit ovens and other parts of the plant?

20              MR. O'BRIEN:   Form, foundation.   Go ahead.

21              THE WITNESS:   Yes.   There is some more

22        ductwork there that goes to the other parts of the plant

23        as well, yes.

24   BY MR. SENAK:

25   Q.   We mentioned the RTO.   Do you know where the RTO would

1    be located relative to Exhibit Number 7?

2              MR. O'BRIEN:  Form, foundation.

3              THE WITNESS:  It would be located about where

4    you are sitting.

5              MR. SENAK:  I think that's true.  It's not

6    shown on the diagram.

7              THE WITNESS:  Right.

8    BY MR. SENAK:

9    Q.   Can you just put the word RTO and your initials on the

10        section of the document where the RTO would be shown?

11             MR. O'BRIEN:  Same objection.

12             THE WITNESS:  (Complies.)

13   BY MR. SENAK:

14   Q.   Exhibits 2 through 6, I am sorry, 2 through 5, all

15        related as I understand it to cleaning of the RTO?

16   A.   Uh-huh (affirmative).  RTO.  Some call it the oxidizer,

17        I am sorry.

18   Q.   So those invoices would not reflect cleaning of any of

19        the ductwork shown in Exhibit Number 7?

20             MR. O'BRIEN:  Foundation.

21             THE WITNESS:  That is correct.

22             MR. O'BRIEN:  Foundation.  Go ahead.

23   BY MR. SENAK:

24   Q.   Other than Exhibit, I believe it is 6.  Other than

25        Exhibit 6 -- well, let me strike it and start over.

```
 1              Exhibit 6 reflects cleaning of the ductwork

 2        that was done on 11/3/2013, true?

 3   A.   True.

 4   Q.   Do you know the dates when Air Tech would have cleaned

 5        the ductwork at the Ball Monticello plant from 2010

 6        through 2014 other than what's shown in Exhibit 6?

 7   A.   I don't know the dates, no.

 8   Q.   That information would be available to you if you looked

 9        at the invoices, right?

10   A.   Correct.

11   Q.   But you didn't look at those for this deposition?

12   A.   No.

13   Q.   Exhibit 6, the scope of work of Exhibit 6, was to clean

14        the ductwork at the Ball plant, true?

15              MR. O'BRIEN:  Form.  Go ahead.

16              THE WITNESS:  Not all the ductwork.

17   BY MR. SENAK:

18   Q.   Okay, good point.  When you look at Exhibit 7 does it

19        reflect ductwork that would have been within the scope

20        of work of Exhibit 6?

21              MR. O'BRIEN:  Form, foundation.  Go ahead.

22              THE WITNESS:  Yes.

23   BY MR. SENAK:

24   Q.   Is all of the ductwork shown in Exhibit 7 within the

25        scope work of Exhibit 6?
```

1          MR. O'BRIEN:  Same objections.

2          MR. SENAK:  And just so we are clear, the

3     ductwork you are showing --

4          THE WITNESS:  The ductwork we are required to

5     clean is in here, yes.

6     BY MR. SENAK:

7   Q.   And what I want to know is all the orange ductwork that

8        is shown on Exhibit 7, is that within the scope of work

9        of Exhibit 6?

10  A.   No.

11         MR. O'BRIEN:  Same objections.

12    BY MR. SENAK:

13  Q.   I am going to give you a yellow highlighter, and so what

14       I am just interested in knowing is what ductwork on

15       Exhibit 7 was within the scope of work of Exhibit Number

16       6.  And if you could just highlight the ductwork I would

17       appreciate it.

18         MR. O'BRIEN:  Same objections.  Go ahead.

19         THE WITNESS:  Highlight this?

20         MR. SENAK:  Yes.

21         THE WITNESS:  Okay. (Complies.)

22    BY MR. SENAK:

23  Q.   Let's start --

24  A.   That's my best understanding just looking at this print.

25  Q.   Okay.  So let's just say at the beginning this I believe

```
 1        would be another IBO, true?

 2   A.   (Nods head.)

 3   Q.   And you would have cleaned the ductwork up to where on

 4        that IBO?

 5   A.   Up to the top of the blower.

 6   Q.   And is that true for IBO 2?

 7   A.   Yes.

 8   Q.   Could you just reflect that by highlighting that

 9        section?

10   A.   (Complies.)

11   Q.   Well, there is a section that goes further, that goes to

12        the IBO.  Was that included?

13   A.   Yes.  I am not sure where they all stopped on this

14        print.

15   Q.   Is it any different from IBO 1?

16             MR. O'BRIEN:  Mark, can we just note a

17        continuing objection on foundation that he said he is

18        not exactly sure what this is showing so I don't have to

19        keep objecting?

20             MR. SENAK:  That's fine.

21             MR. O'BRIEN:  Thank you.

22             THE WITNESS:  I don't know what this is here,

23        but it's all this right here.  I am assuming that that's

24        the fan housing.

25        BY MR. SENAK:
```

1    Q.    Just draw a square upon what you assume to be the fan

2          housing.

3    A.    (Complies.)

4    Q.    The fan housing would have been within the scope of work

5          of cleaning the IBO, true?

6    A.    To the bottom of it.

7    Q.    And then the scope of work for cleaning the ductwork

8          would have been everything above the bottom of the fan

9          housing?

10   A.    Yeah, from the top.  Actually from the top of the fan on

11         up.

12   Q.    Was there any part of the ductwork of IBO Number 2 from

13         the oven up through the fan housing up through what you

14         have shown on Exhibit Number 7 that Air Tech did not

15         clean?

16                   MR. O'BRIEN:  Objects to form.  Go ahead.

17                   THE WITNESS:  What are you referring to again?

18   BY MR. SENAK:

19   Q.    Was there any part of the exhaust system, which would

20         include the fan housing and the ductwork for IBO Number

21         2, that Air Tech did not clean?

22                   MR. O'BRIEN:  Same objection.  Go ahead.

23                   THE WITNESS:  You are referring to this date

24         here?

25                   MR. SENAK:  No, I mean at any time.

```
 1                    THE WITNESS:  We cleaned it when they required
 2           us to clean the ductwork.  That all got cleaned.
 3      BY MR. SENAK:
 4      Q.   Exhibit Number 6 reflects cleaning of the ductwork up to
 5           the fan housing, true?
 6      A.   True.
 7      Q.   And the scope of work for cleaning the oven would have
 8           been the fan housing through the oven?
 9                    MR. O'BRIEN:  I am going to object, because
10           now we are talking about ovens, and all these topics
11           relate to ductwork.  So again, I am going to instruct
12           you not to answer.  It's beyond the scope of these
13           topics.
14      BY MR. SENAK:
15      Q.   I take it you are going to abide by the instruction not
16           to answer the question?
17      A.   Yes.
18      Q.   Does the ductwork that Air Tech cleaned and is reflected
19           in Exhibit Number 6, does that extend all the way to the
20           beginning of the fan housing?
21      A.   The ductwork is to the top of the fan housing.
22                    DEPOSITION EXHIBIT NUMBERS 8 AND 9
23                    WERE MARKED BY THE REPORTER
24                    FOR IDENTIFICATION.
25                    MR. SENAK:  I am going to take a quick break
```

1   here.

2                  (Brief recess taken.)

3   BY MR. SENAK:

4   Q.  Showing you what's been marked Exhibit Number 9.  Can

5       you just tell us does Exhibit 9 reflect the cleaning of

6       ductwork at the Ball Monticello plant from 2010 to 2014?

7   A.  Yes.

8   Q.  Can you describe what the scope of work is of Exhibit

9       Number 9?

10  A.  Cleaning the ductwork from the oxidizer to the tops of

11      the pin ovens and the three IBOs.

12  Q.  Does Exhibit Number 9 reflect the same scope of work for

13      ductwork cleaning as Exhibit Number 6?

14  A.  Yes.

15  Q.  And does Exhibit Number 9 reflect the same scope of work

16      that is shown on Exhibit Number 7 in the highlighted

17      areas?

18  A.  Yes.

19              MR. O'BRIEN:  I am sorry.  You were referring

20      to the highlighted areas on Exhibit --

21              MR. SENAK:  Exhibit 7.

22              MR. O'BRIEN:  Foundation.  Go ahead.

23  BY MR. SENAK:

24  Q.  Is it accurate to say that Exhibit Number 9 and the

25      Exhibit Number 6 reflect the same scope of work?

```
1    A.    When you are referring to the ductwork.

2    Q.    Yes.

3    A.    Yes.

4    Q.    Relative to the ductwork, essentially Exhibit 9 and

5          Exhibit 6 show work, the same scope of work.

6    A.    Yes.

7    Q.    We talked about whether there was cleaning of ductwork

8          at the Ball plant from 2010 through 2014 and documents

9          would have reflected that.  Do you recall that?

10   A.    Yes.

11   Q.    Are Exhibit 9 and Exhibit 6 the only documents that

12         reflect cleaning of ductwork at the Ball plant from 2010

13         through 2014 by Air Tech?

14   A.    I am pretty sure it is, yes.

15   Q.    So during that period of time Air Tech would have

16         cleaned the ductwork at the Ball plant that's shown on

17         Exhibit Number 7 on November 28, 2011, and then

18         November 3rd, 2013, true?

19               MR. O'BRIEN:  Foundation.  Go ahead.

20               THE WITNESS:  True.

21   BY MR. SENAK:

22   Q.    Do you know whether during that time period Air Tech

23         cleaned ductwork at the Ball plant on any other

24         occasions?

25               MR. O'BRIEN:  In Monticello now?
```

```
 1                    MR. SENAK:   In Monticello, relative to the

 2          highlighted areas shown on Exhibit 7.

 3                    MR. O'BRIEN:   Foundation.

 4                    THE WITNESS:   Prior to what?  What dates?

 5                    MR. SENAK:   2010 to 2014.

 6                    THE WITNESS:   No.  These are the two.

 7     BY MR. SENAK:

 8     Q.   These would have been the only two occasions where in

 9          2010 through 2014 Air Tech would have cleaned the

10          ductwork that you have highlighted on Exhibit 7?

11     A.   Yes, I am pretty sure.

12     Q.   Now I am going to show you Exhibit Number 8.  We talked

13          about where the scope of work for Exhibit Number 9 and

14          Exhibit 6 would have started, and I think the idea was

15          it starts somewhere by the exhaust fan.

16     A.   Uh-huh (affirmative).

17     Q.   So if you could just take and draw a line --

18     A.   This is so dark.

19     Q.   So if you could just draw a line, I want to know just

20          where the scope of work for Exhibit Number 6 and Exhibit

21          Number 9 would have begun.

22     A.   Would have begun?  It's going to be right here in this

23          area somewhere.

24     Q.   And if you could just again put your initials and the

25          date on Exhibit Number 8?
```

```
 1   A.    (Complies.)

 2   Q.    So everything above the line would have been included in

 3         the scope of work of Exhibit Number 9 and Exhibit Number

 4         6?

 5   A.    That is correct.

 6   Q.    And that would have then extended to the areas which you

 7         have highlighted on Exhibit Number 7?

 8               MR. O'BRIEN:  Foundation.

 9               THE WITNESS:  If we could back up, I think you

10         said Exhibit Number 6.  That's not right, is it?

11               MR. SENAK:  It's these two.

12               THE WITNESS:  Okay, yes.

13               MR. SENAK:  I get it.  There's a lot of them

14         and they get a little confusing.

15   BY MR. SENAK:

16   Q.    So Exhibit 6 and Exhibit 9 show the scope of work that

17         begins at the line that you have marked on Exhibit 8 and

18         would have extended to include all the highlighted

19         ductwork on Exhibit Number 7?

20               MR. O'BRIEN:  Form and foundation.  Go ahead.

21               THE WITNESS:  Yes, assuming this print is

22         correct.

23   BY MR. SENAK:

24   Q.    Did Air Tech ever recommend to Ball that they clean the

25         ductwork more frequently during 2010 through 2014?
```

```
 1   A.   Yes.

 2              MR. O'BRIEN:  Form.  Sorry.

 3        BY MR. SENAK:

 4   Q.   Did they do that in writing?

 5   A.   No.

 6   Q.   Do you know who did that?

 7   A.   I have.  Mainly I have.  And it was all verbal, after

 8        showing them what we got out of there.

 9   Q.   Do you know how many times you would have done this?

10   A.   Typically after the cleaning I would point areas out

11        that I felt should have been cleaned more often.

12   Q.   Given that Air Tech would have cleaned the ductwork at

13        Ball Monticello during the period period of 2010 through

14        2014, on two occasions is it accurate that you would

15        have on both of those occasions told Ball that they

16        should clean the ductwork more frequently?

17   A.   I would say that's true.

18   Q.   Do you recall any other occasions other than those two?

19   A.   I don't know.

20   Q.   You just can't recall?

21   A.   I just can't recall.

22   Q.   On those two occasions do you recall who you would have

23        told?

24   A.   Well, I know one time I told Jerry.

25   Q.   Do you know his last name?
```

```
 1              MR. O'BRIEN:  Morgan?

 2              THE WITNESS:  Morgan, you are right.  Thank

 3       you.

 4       BY MR. SENAK:

 5    Q.  Anyone else?

 6    A.  I believe I have told, his last name is Spencer, first

 7        name --

 8    Q.  Dale?

 9    A.  Dale.

10    Q.  Anyone else that you can recall?

11    A.  Not that I can recall.  There were several people in

12        charge at different times.

13    Q.  Understood.  Did you ever send any written proposals to

14        Ball Corporation to clean the ductwork more frequently

15        than what's shown in the exhibit?

16    A.  No.

17    Q.  Why did you believe that the ductwork should be cleaned

18        more frequently?

19    A.  Because of how much we would get out each time.

20    Q.  You are talking about how much residue would be removed

21        from the ductwork?

22    A.  Right.

23    Q.  Other than that was there any reason you believed that

24        the ductwork should be cleaned more frequently?

25    A.  Not only the debris, the kind of debris it was.
```

```
 1   Q.   Explain to me what you mean by the kind.
 2   A.   Anytime some of the debris up there was quite gooey, and
 3        a pretty good indication when that happens that means
 4        that the draw isn't good.
 5   Q.   You are talking about the air flow?
 6   A.   The air flow.
 7   Q.   Do you know what the required air flow was for that
 8        ductwork to serve the purpose for which it was intended?
 9   A.   No.
10               MR. O'BRIEN:  Foundation.  Go ahead.
11   BY MR. SENAK:
12   Q.   Did you ever take any air flow measurements before the
13        ductwork was cleaned?
14   A.   No.
15   Q.   Take any air flow measurements after the ductwork was
16        cleaned?
17   A.   No.
18   Q.   Have any knowledge of what the volume of air flow that
19        those ducts would transport when they were brand new?
20   A.   No.
21   Q.   Any idea what the required air flow was for the
22        operation of the IBOs?
23   A.   No.
24   Q.   Your recommendation to clean the ductwork more
25        frequently was not based upon the ductwork's inability
```

1      to perform the function that it was intended to do?

2                  MR. O'BRIEN:  Form.

3      BY MR. SENAK:

4  Q.  Do you understand the question?  I can try it again if

5      you want.

6  A.  No.  It was strictly on how much was in there.

7  Q.  Right.  You weren't recommending that the ductwork be

8      cleaned more frequently because the ductwork wasn't able

9      to transmit the necessary air flow for the operation of

10     the IBOs?

11 A.  No.

12 Q.  It appears to me looking at the two exhibits that during

13     the 2010 through 2014 time frame Air Tech would clean

14     the ductwork every other year; is that true?

15 A.  That's invoices we have, yes.

16 Q.  That frequency, did it ever change during the period of

17     time Air Tech cleaned ductwork at the Ball plant?

18                 MR. O'BRIEN:  From 2010 to 2014?

19                 MR. SENAK:  I am going to ask you at any time.

20                 MR. O'BRIEN:  I am going to object to the

21     scope of the question.  Again, we have got a limited

22     scope of 2010 to 2014.  If you want to ask him about

23     that, absolutely.

24                 MR. SENAK:  I think I did.  I did through

25     2014.  I just want to know whether that changed from

```
 1        when Air Tech did it earlier, the frequency.

 2              THE WITNESS:  I don't really know what the

 3        frequency before that was.

 4     BY MR. SENAK:

 5  Q.  You are not sure what the frequency of the air flow was

 6        before 2010.  I am sorry, strike that.

 7              You don't know what the frequency of the

 8        cleaning of the ductwork was before 2010?

 9  A.  No, I don't.

10  Q.  When you would finish, when Air Tech would finish

11        cleaning the ductwork did Ball inspect the work?

12  A.  The only -- anytime there was a big opening I could show

13        them exactly what was going on.  The only thing is, on

14        top of the IBOs they would put it back together.  So

15        then they could, you know.

16  Q.  Meaning they would connect the ductwork back to the top

17        of the exhaust blower, true?

18  A.  Right.

19  Q.  Then that junction, is that the line that you have drawn

20        on Exhibit 8?

21  A.  Yes.

22  Q.  Other than what you have described, did Ball Corporation

23        undertake any other effort to inspect the ductwork that

24        Air Tech cleaned at the Monticello plant from 2010

25        through 2014?
```

```
 1              MR. O'BRIEN:  Foundation.  Go ahead.

 2              THE WITNESS:  No.

 3      BY MR. SENAK:

 4  Q.   You are not responsible for supervising the Ball

 5       employees, true?

 6  A.   True.

 7  Q.   And if Air Tech has no duty to inspect the work of the

 8       Ball employees, isn't it true that Ball would have no

 9       duty to inspect the Air Tech employee work?

10              MR. O'BRIEN:  Form, foundation.

11              THE WITNESS:  You are referring to the

12       ductwork again itself?

13              MR. SENAK:  Yes.

14              THE WITNESS:  They did, but no, I wouldn't.

15      BY MR. SENAK:

16  Q.   When you say I wouldn't, you would agree they have no

17       duty to do that?

18              MR. O'BRIEN:  Same objections.  Go ahead.

19              THE WITNESS:  No.

20      BY MR. SENAK:

21  Q.   Just so I am sure, because it's somewhat of a double

22       negative, Ball does not have a duty to inspect the work

23       of Air Tech relative to the ductwork cleaning, true?

24              MR. O'BRIEN:  Same objection.

25              THE WITNESS:  Can I say that we couldn't leave
```

 1      until they checked certain areas out, no.

 2      BY MR. SENAK:

 3   Q.  I understand that, and they may have decided to do that

 4      on their own, but they weren't obligated to do that

 5      under the terms of the scope of work?

 6   A.  No.

 7           MR. O'BRIEN:  Same objections.

 8      BY MR. SENAK:

 9   Q.  I just want to make sure one thing, and I think we have

10      got this done.  You don't have any other documents that

11      reflect cleaning of the ductwork shown on Exhibit Number

12      7 during the period of 2010 through 2014, correct?

13   A.  I don't believe so, no.

14   Q.  And just so I get this, I want you to, if you could,

15      highlight the inside of the ductwork that was within the

16      scope of work just so we have a better highlighting of

17      that.

18           MR. O'BRIEN:  I will make the same foundation

19      objection.

20           THE WITNESS:  (Complies.)  And I just want to

21      add, that's assuming that this ductwork goes to the

22      pins, and these are the IBOs.

23           MR. SENAK:  I understand.  And that's why I

24      wanted you to put the IBO up here.

25      BY MR. SENAK:

```
 1   Q.   You would have included the IBO, you would go right up

 2        to the IBO, right?

 3   A.   Yes.  There is a damper outside just coming down to --

 4             MR. O'BRIEN:  I want the record to reflect

 5        Mark, are you marking on the document now?

 6             MR. SENAK:  I am just highlighting what he has

 7        highlighted, all right?  You can finish it.

 8   BY MR. SENAK:

 9   Q.   Is there anything that is inaccurate on Exhibit Number 7

10        relative to the ductwork that you are highlighting?

11             MR. O'BRIEN:  Same foundation objection.  But

12        subject to that, go ahead.

13             MR. SENAK:  If you could just color it in so

14        we can see.

15             THE WITNESS:  I think that's pretty clear,

16        isn't it?

17             MR. SENAK:  All right.  That's all I have.

18             MR. O'BRIEN:  Just a single question for you,

19        Paul.

20                       EXAMINATION

21   BY MR. O'BRIEN:

22   Q.   You were talking about when Air Tech finishes its

23        cleaning Ball puts the ductwork back on the top of the

24        IBO; is that right?

25   A.   Uh-huh (affirmative).
```

1   Q.   And was it the case that when you, you being Air Tech,

2        did ductwork cleaning, that Ball was also the ones that

3        would remove the ductwork from the oven before you

4        started your work?

5   A.   That is correct.

6                  MR. O'BRIEN:  No further questions.

7                  MR. SENAK:  I think that's it.

8                  (At 11:00 a.m., deposition concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   STATE OF MICHIGAN          )

 2                              ) SS

 3   COUNTY OF KALAMAZOO        )

 4

 5

 6          I, certify that this transcript, consisting of

 7   37 pages, is a complete, true, and correct record of the

 8   testimony of PAUL SCHOLTEN, held in the case on

 9   August 30, 2018.

10

11          I also certify that prior to taking this

12   deposition, PAUL SCHOLTEN, was duly sworn to tell the

13   truth.

14

15   Dated:  9-5-2018

16

17                      _____

18                      Carl M. DePerro, CSR-4284

19                      O'Brien & Bails

20                      141 East Michigan, Suite 206

21                      Kalamazoo, Michigan 49007

22                      1-800-878-8750

23                      My commission expires:  10-16-19

24

25
```

**Exhibits**

**Scholten Exhibit 1** 2:6 4:8, 11,15,19 5:6, 7,10

**Scholten Exhibit 2** 2:8 6:20 12:19 13:17 16:13,21,25 22:12,20,21

**Scholten Exhibit 3** 2:9 13:8, 14,16

**Scholten Exhibit 4** 2:11 13:19,24

**Scholten Exhibit 5** 2:12 14:2

**Scholten Exhibit 6** 2:14 14:8,15,22 18:25 19:1,6, 13,20,25 20:9, 15,16 23:4,19 24:13,25 25:5, 11 26:14,20 27:3,4,10,16

**Scholten Exhibit 7** 2:15 15:6,11,12,16 16:10,16,20 17:18 18:1,19 19:18,24 20:8, 15 22:14 24:16,21 25:17 26:2,10 27:7,19 34:11, 12 35:9

**Scholten Exhibit 8** 2:17 26:12,25 27:17 32:20

**Scholten Exhibit 9** 2:18 24:4,5,8,9,12, 15,24 25:4,11 26:13,20,21

---

27:3,16

---

**1**

---

**1** 4:8,11,15,19 5:7,9,10 9:12 10:24 14:19 21:15

**1-6** 3:4

**10:10** 3:3

**11/3/2013** 19:2

**11:00** 36:8

---

**2**

---

**2** 4:13,14,20, 22,24 5:1,16 6:10,20 10:5,9 12:13,19 13:17 16:13, 21,25 17:16 18:14 21:6 22:12,21

**2006** 6:9,12, 16,22 7:3,5,7, 14

**2010** 7:6 8:10, 12,17,21 9:7 10:2,8,22 11:3,23 12:1,7 19:5 24:6 25:8,12 26:5,9 27:25 28:13 31:13,18,22 32:6,8,24 34:12

**2011** 25:17

**2013** 25:18

**2014** 7:6 8:11, 12,17,21 9:7 10:2,9,22 11:3,23 12:1,8 16:11 19:6 24:6 25:8,13 26:5,9 27:25 28:14 31:13, 18,22,25 32:25 34:12

---

**2018** 3:2

**22nd** 10:22

**28** 25:17

---

**3**

---

**3** 5:16 13:8,14, 16 14:19

**30** 3:2

**30(b)(6)** 4:9

**3rd** 25:18

---

**4**

---

**4** 4:22 5:16 13:19,24 15:1

---

**5**

---

**5** 4:15 5:16 14:2 15:1 18:14

---

**6**

---

**6** 4:13,14,19, 20,24 5:1,9,16 6:10,20 7:6 9:12 10:5,9,24 12:13 14:8,15, 22 18:14,24, 25 19:1,6,13, 20,25 20:9,16 23:4,19 24:13, 25 25:5,11 26:14,20 27:4, 10,16

---

**7**

---

**7** 15:6,11,12, 16 16:10,16, 20 17:18 18:1, 19 19:18,24 20:8,15 22:14 24:16,21 25:17 26:2,10 27:7,19 34:12 35:9

---

**8**

---

**8** 23:22 26:12, 25 27:17 32:20

**8/10** 13:13

---

**9**

---

**9** 23:22 24:4,5, 9,12,15,24 25:4,11 26:13, 21 27:3,16

---

**A**

---

**a.m.** 3:3 36:8

**abide** 23:15

**absolutely** 31:23

**accurate** 5:20 24:24 28:14

**add** 34:21

**added** 14:25

**affirm** 3:8

**affirmative** 18:16 26:16 35:25

**agree** 33:16

**agreed** 7:19 9:20

**ahead** 5:13,17 6:1 12:3 14:17 16:17 17:20 18:22 19:15, 21 20:18 22:16,22 24:22 25:19 27:20 30:10 33:1,18 35:12

**air** 4:9,18 5:24 6:4,7,16,25 8:20 9:6 10:2, 7 11:3,10,22 12:2,6,14,20 19:4 22:14,21 23:18 25:13,

---

15,22 26:9 27:24 28:12 30:5,6,7,12, 15,18,21 31:9, 13,17 32:1,5, 10,24 33:7,9, 23 35:22 36:1

**answering** 9:21

**anytime** 30:2 32:12

**appears** 31:12

**area** 26:23

**areas** 24:17, 20 26:2 27:6 28:10 34:1

**assume** 22:1

**assuming** 21:23 27:21 34:21

**assumption** 16:22,23,24

**attach** 15:8

**August** 3:2

**aware** 12:4

---

**B**

---

**back** 10:13,20 14:13 27:9 32:14,16 35:23

**Ball** 5:25 6:4, 17,25 8:21 9:6 10:3,8,22 11:23 12:7,15, 20 13:1,20 14:3,9,21 15:3,7 16:11 19:5,14 24:6 25:8,12,16,23 27:24 28:13, 15 29:14 31:17 32:11, 22 33:4,8,22 35:23 36:2

**based** 9:21

---

17:1 30:25

**Basically** 10:23

**begin** 3:25 6:4

**beginning** 20:25 23:20

**begins** 27:17

**begun** 26:21, 22

**believed** 29:23

**big** 32:12

**blower** 21:5 32:17

**blue** 17:7

**blueprint** 15:6

**bottom** 16:4 22:6,8

**boxes** 13:13 17:7

**brand** 30:19

**break** 23:25

---

**C**

**call** 12:11 18:16

**CALLED** 3:14

**case** 36:1

**categories** 4:15 5:9 7:5

**Category** 7:6

**change** 17:6 31:16

**changed** 31:25

**charge** 29:12

**checked** 34:1

**circle** 17:1

**clean** 6:8 12:7,11 19:13

---

20:5 22:15,21 23:2 27:24 28:16 29:14 30:24 31:13

**cleaned** 10:7 12:1 19:4 21:3 23:1,2,18 25:16,23 26:9 28:11,12 29:17,24 30:13,16 31:8, 17 32:24

**cleaning** 5:21,24 6:4 7:2 8:5,20 9:13 10:2 11:3,23 12:14, 20,23 13:1,8, 11,12,20 14:2, 8,12,15 18:15, 18 19:1 22:5,7 23:4,7 24:5, 10,13 25:7,12 28:10 32:8,11 33:23 34:11 35:23 36:2

**clear** 5:7 9:9 20:2 35:15

**color** 35:13

**completion** 13:12,16

**Complies** 17:4 18:12 20:21 21:10 22:3 27:1 34:20

**conclude** 13:16

**concluded** 36:8

**confusing** 17:8,10 27:14

**connect** 32:16

**content** 5:16

**continuing** 21:17

**copies** 11:7, 10

---

**copy** 15:9

**Corporation** 6:18 29:14 32:22

**correct** 6:18, 19 17:17 18:21 19:10 27:5,22 34:12 36:5

**court** 3:20 4:1,3

**covered** 11:13

---

**D**

**Dale** 29:8,9

**damper** 35:3

**dark** 26:18

**date** 6:6 8:15 17:2 22:23 26:25

**dates** 8:9 10:18 19:4,7 26:4

**deal** 17:14

**debris** 29:25 30:2

**decided** 34:3

**dep** 7:21

**depictions** 17:18

**deposed** 3:22

**deposition** 3:4,24 5:5 7:20 9:12 10:20,25 15:12 19:11 23:22 36:8

**describe** 14:24 24:8

**description** 14:11

**designate** 4:9

---

**determine** 11:17 16:1

**diagram** 15:6, 23 18:6

**difficult** 4:5

**document** 16:4 17:14 18:10 35:5

**documents** 4:14 25:8,11 34:10

**double** 33:21

**draw** 22:1 26:17,19 30:4

**drawn** 32:19

**ducts** 13:12 15:1 30:19

**ductwork** 5:21,24 6:4,8 7:3 8:5,20 9:13 10:3,8, 10,21 11:3,22 12:1,7,14,20 13:1,4,6,8,20, 24 14:2,9,12, 15,18,21 15:7 16:10 17:18, 22 18:19 19:1, 5,14,16,19,24 20:3,4,7,14,16 21:3 22:7,12, 20 23:2,4,11, 18,21 24:6,10, 13 25:1,4,7, 12,16,23 26:10 27:19, 25 28:12,16 29:14,17,21, 24 30:8,13,15, 17 32:8,11,16, 23 33:12,23 34:11,15,21 35:10,23 36:2, 3

**ductwork's** 30:25

**DULY** 3:15

**duty** 33:7,9,

---

17,22

---

**E**

**earlier** 5:1 32:1

**earliest** 8:15

**effort** 32:23

**employee** 33:9

**employees** 33:5,8

**encompasse d** 8:25

**end** 13:3

**entity** 11:25

**essentially** 25:4

**Eventually** 13:5

**exact** 6:6

**EXAMINATIO N** 3:17 35:20

**EXAMINED** 3:15

**excluded** 14:22

**excuse** 16:8

**exhaust** 13:13 22:19 26:15 32:17

**exhibit** 3:4 4:8,11,15,19 5:6,10 6:20 11:5 12:19 13:8,14,16,17, 19,24 14:2,8, 15,22 15:6,11, 12,16,17,22 16:10,16,20 17:18 18:1,19, 24,25 19:1,6, 13,18,20,24, 25 20:8,9,15 22:14 23:4,19, 22 24:4,5,8,

---

12,13,15,16,
20,21,24,25
25:4,5,11,17
26:2,10,12,13,
14,20,25 27:3,
7,10,16,17,19
29:15 32:20
34:11 35:9

**exhibits** 4:13,
14,20,24 5:5,
16 6:10,12
10:5,9,24
12:13 18:14
31:12

**Explain** 30:1

**extend** 23:19

**extended**
27:6,18

**F**

**fair** 8:8 9:25

**familiar** 15:3,
4

**fan** 21:24
22:1,4,8,10,
13,20 23:5,8,
20,21 26:15

**felt** 28:11

**fine** 9:17
21:20

**finish** 3:24
32:10 35:7

**finishes**
35:22

**fire** 13:13
16:13

**flow** 30:5,6,7,
12,15,18,21
31:9 32:5

**forgot** 12:22
15:20

**form** 4:21,23
5:12 6:11
14:17 16:14,
17 17:3,20
18:2 19:15,21
22:16 27:20

28:2 31:2
33:10

**foundation**
12:3 17:20
18:2,20,22
19:21 21:17
24:22 25:19
26:3 27:8,20
30:10 33:1,10
34:18 35:11

**frame** 8:12,
17,21 9:14
31:13

**frequency**
31:16 32:1,3,
5,7

**frequently**
27:25 28:16
29:14,18,24
30:25 31:8

**front** 12:16

**function** 31:1

**G**

**game** 13:3

**general** 8:11
11:21

**give** 3:9 14:11
20:13

**glasses** 12:22

**God** 3:11

**good** 8:17
11:9 19:18
30:3,4

**gooey** 30:2

**Grand** 3:1

**H**

**hand** 3:8 4:13

**hard** 15:25

**head** 21:2

**hear** 7:13

**highlight**

20:16,19
34:15

**highlighted**
24:16,20 26:2,
10 27:7,18
35:7

**highlighter**
20:13

**highlighting**
21:8 34:16
35:6,10

**hired** 6:7

**housing**
21:24 22:2,4,
9,13,20 23:5,
8,20,21

**I**

**IBO** 14:19
16:13,19,20,
25 17:16 21:1,
4,6,12,15
22:5,12,20
34:24 35:1,2,
24

**IBOS** 14:14
16:8 17:19
24:11 30:22
31:10 32:14
34:22

**idea** 8:3 26:14
30:21

**IDENTIFICAT
ION** 3:6 15:14
23:24

**identified**
9:15

**inability**
30:25

**inaccurate**
35:9

**include** 22:20
27:18

**included**
13:25 14:1
15:2 21:12
27:2 35:1

**including**
4:20

**indicating**
16:24

**indication**
30:3

**information**
19:8

**initials** 17:2
18:9 26:24

**inside** 34:15

**inspect**
32:11,23 33:7,
9,22

**instances**
10:7

**instruct** 7:8
8:1,4 9:3,16
23:11

**instruction**
23:15

**intended** 30:8
31:1

**interested**
17:13 20:14

**invoice** 6:25
7:15,16 11:4,
20

**invoices**
6:17,20 7:5,13
8:9 10:21
11:13 18:18
19:9 31:15

**involve** 13:22
14:2,8

**involved**
11:25 14:11

**involves**
14:5,12

**issue** 16:13

**J**

**Jerry** 28:24

**judge** 9:18

**junction**
32:19

**K**

**kind** 29:25
30:1

**knowing**
20:14

**knowledge**
7:21 9:22
11:12,15,22
12:6 17:1
30:18

**knowledgeab
le** 4:18 5:9,15,
21,23

**L**

**large** 15:6,8

**lead** 15:1,18

**leads** 13:4

**leave** 33:25

**limited** 31:21

**listed** 4:10

**located** 18:1,
3

**location**
16:20,25

**long** 7:10

**looked** 10:23
11:17 19:8

**lot** 27:13

**loud** 4:3,5

**M**

**made** 9:23

**make** 4:15
15:9 16:22
34:9,18

**makes** 4:5

**mark** 8:8 15:5,

9,10,11 16:25
21:16 35:5

**marked** 11:4
15:13 23:23
24:4 27:17

**marking** 35:5

**matter** 3:9 8:6

**matters** 4:10,
19

**Meaning**
32:16

**means** 30:3

**measuremen
ts** 30:12,15

**mentioned**
17:25

**Michigan** 3:1

**mine** 9:24

**Monticello**
5:25 6:5,8
8:22,23 9:6
10:3,8,22
11:23 12:7,15
13:2,20 14:3,
9,16,21 15:3,8
16:11 19:5
24:6 25:25
26:1 28:13
32:24

**Morgan** 29:1,
2

**N**

**negative**
33:22

**nods** 21:2

**note** 21:16

**November**
25:17,18

**Number** 4:8
5:6 13:19
14:2,22 15:12,
16 16:13,16,
20,21,25
17:18 18:1,19

20:15 22:12,
14,20 23:4,19
24:4,9,12,13,
15,16,24,25
25:17 26:12,
13,20,21,25
27:3,7,10,19
34:11 35:9

**numbers** 3:4
5:6 23:22

**O**

**O'BRIEN**
4:21,23 5:12,
17 6:1,11 7:1,
4,16,18 8:1,8,
22,24 9:3,14,
19,25 12:3,9
14:17 15:20,
23 16:14,17
17:3,20 18:2,
11,20,22
19:15,21 20:1,
11,18 21:16,
21 22:16,22
23:9 24:19,22
25:19,25 26:3
27:8,20 28:2
29:1 30:10
31:2,18,20
33:1,10,18,24
34:7,18 35:4,
11,18,21 36:6

**object** 6:11
7:5,18 22:16
23:9 31:20

**objecting**
21:19

**objection** 6:1
9:10,23 12:9
18:11 21:17
22:22 33:24
34:19 35:11

**objections**
20:1,11,18
33:18 34:7

**obligated**
34:4

**occasions**
25:24 26:8

28:14,15,18,
22

**occurs** 16:13

**opening**
32:12

**operation**
30:22 31:9

**orange** 17:17
20:7

**orient** 16:5
17:13

**oven** 16:19
22:13 23:7,8
36:3

**ovens** 14:25
17:19 23:10
24:11

**oxidizer**
12:23 13:11,
12,23 14:6,12
18:16 24:10

**P**

**P-A-U-L** 3:21

**part** 10:20
13:1,6 17:17
22:12,19

**parts** 17:19,22

**Paul** 3:12,13,
21,22 35:19

**people** 29:11

**perform** 31:1

**performed**
12:14

**period** 25:15,
22 28:13
31:16 34:12

**person** 4:18
5:8,15,20,23

**personal** 7:20
9:22

**pin** 14:13
24:11

**pins** 14:19
16:8,9 34:22

**pit** 17:19

**PLAINTIFFS**
3:14

**plant** 5:25 6:8
8:21 10:3,8,22
11:23 12:7,15,
21 13:20 14:3,
9,16,21 15:3,8
16:11 17:19,
22 19:5,14
24:6 25:8,12,
16,23 31:17
32:24

**point** 7:4 11:9
19:18 28:10

**portion** 10:14

**portions**
16:10

**PRE-
MARKED** 3:5

**prepare** 10:25

**preparing**
10:20

**pretty** 25:14
26:11 30:3
35:15

**print** 17:8
20:24 21:14
27:21

**printing** 16:4

**Prior** 26:4

**problem** 5:4

**prohibited**
9:10

**proposals**
29:13

**purpose** 30:8

**put** 18:9 26:24
32:14 34:24

**puts** 35:23

**Q**

**question** 3:24
4:6 6:21 7:24
9:2 10:12
15:21 23:16
31:4,21 35:18

**questions**
7:21 8:4,11
9:11 36:6

**quick** 23:25

**R**

**raise** 3:7

**Rapids** 3:1

**read** 10:13,14

**reason** 29:23

**recall** 25:9
28:18,20,21,
22 29:10,11

**recess** 24:2

**recognize**
15:17 16:6,7

**recognizes**
15:22

**recommend**
27:24

**recommenda
tion** 30:24

**recommendi
ng** 31:7

**record** 5:12
9:20 10:14
35:4

**referring** 5:4,
6 22:17,23
24:19 25:1
33:11

**reflect** 4:5,14
6:10 12:13
13:8,10,19
14:15 16:10
18:18 19:19
21:8 24:5,12,
15,25 25:12

34:11 35:4

reflected 7:14
10:5,6,9 11:4
23:18 25:9

reflects
12:20,22 19:1
23:4

relate 23:11

related 8:6
9:13 18:15

relative 11:22
18:1 25:4 26:1
33:23 35:10

remember
3:23

remove 36:3

removed
29:20

repeat 10:12

rephrase
6:15

reporter 3:5,
7,20 4:1,3
10:15 15:13
23:23

represent
6:22

requested
10:14

required 20:4
23:1 30:7,21

residue 29:20

responsible
33:4

Rider 5:6

RTO 12:23
13:1,4,6,11,23
14:7 17:25
18:9,10,15,16
29:13

Rule 4:9

ruled 8:7

rules 3:23

**S**

S-C-H-O-L-T-
E-N 3:21

Scholten
3:12,13,21

scope 7:19,21
9:11 11:12,18
13:24,25
14:22 19:13,
19,25 20:8,15
22:4,7 23:7,12
24:8,12,15,25
25:5 26:13,20
27:3,16 31:21,
22 34:5,16

section 18:10
21:9,11

SENAK 3:18
4:22,24 5:2,3,
14,19 6:3,13,
14 7:2,11,17,
22,23 8:3,14,
19,23 9:1,5,9,
16,23 10:1,13,
17 12:5,12
14:20 15:5,15,
22,24 16:2,15
17:5,24 18:5,
8,13,23 19:17,
23 20:2,6,12,
20,22 21:20,
25 22:18,25
23:3,14,25
24:3,21,23
25:21 26:1,5,7
27:11,13,15,
23 28:3 29:4
30:11 31:3,19,
24 32:4 33:3,
13,15,20 34:2,
8,23,25 35:6,
8,13,17 36:7

send 6:25
29:13

sense 4:16

serve 30:8

show 4:8 6:12
15:16 16:20
25:5 26:12

27:16 32:12

showing 20:3
21:18 24:4
28:8

shown 6:20
13:17,24
16:16 18:6,10,
19 19:6,24
20:8 22:14
24:16 25:16
26:2 29:15
34:11

shows 16:18

single 35:18

sit 11:21

sitting 18:4

situation 16:5

size 15:6

sole 12:6

solemnly 3:8

sort 3:23 9:24
11:21

speak 4:1

specific 8:9
15:23

spell 3:19

Spencer 29:6

square 17:7
22:1

start 4:25 5:22
12:19 18:25
20:23

started 6:16
26:14 36:4

starts 26:15

state 3:19
9:19

states 8:10

stopped
21:13

strictly 10:10
31:6

strike 5:22

18:25 32:6

subject 4:10,
19 8:6 35:12

supervising
33:4

swear 3:8

SWORN 3:15

system 22:19

**T**

taking 4:2,4

talk 7:7

talked 25:7
26:12

talking 10:10
23:10 29:20
30:5 35:22

Tech 4:9,18
5:24 6:4,7,16,
25 8:20 9:6
10:2,7 11:3,
10,22 12:2,6,
14,20 19:4
22:14,21
23:18 25:13,
15,22 26:9
27:24 28:12
31:13,17 32:1,
10,24 33:7,9,
23 35:22 36:1

terms 34:5

TESTIFIED
3:15

testimony
3:9

thing 32:13
34:9

Thursday 3:2

time 4:1 6:7
8:12,17,21
9:14,18,24
22:25 25:15,
22 28:24
29:19 31:13,
17,19

times 5:5 28:9
29:12

today 7:7
11:21

told 28:15,23,
24 29:6

top 21:5 22:10
23:21 32:14,
16 35:23

topic 8:10

topics 7:19
8:25 9:12,21,
22 23:10,13

tops 14:13
24:10

totally 8:12

transcript
15:9

transmit 31:9

transport
30:19

trouble 4:2

true 11:18
18:5 19:2,3,14
21:1,6 22:5
23:5,6 25:18,
20 28:17
31:14 32:17
33:5,6,8,23

truth 3:10

Typically
28:10

**U**

Uh-huh 18:16
26:16 35:25

ultimately 8:7

understand
6:15,21 7:12,
22 18:15 31:4
34:3,23

understandin
g 9:20 20:24

Understood

29:13

**undertake**
32:23

---

### V

**vendor** 12:6

**verbal** 28:7

**volume** 30:18

---

### W

**wanted** 34:24

**whatsoever**
7:16

**word** 18:9

**words** 4:2

**work** 6:10,12,
18,25 7:1,2,14
8:16,20 9:6
10:5,18,21
11:2,12,18
12:14 13:17,
24,25 14:22
19:13,20,25
20:8,15 22:4,7
23:7 24:8,12,
15,25 25:5
26:13,20 27:3,
16 32:11 33:7,
9,22 34:5,16
36:4

**writing** 28:4

**written** 29:13

---

### Y

**year** 6:21 15:4
31:14

**yellow** 20:13

# Exhibit 37

# Inside a Ball Beverage Can Plant



PRIVILEGE AND CONFIDENTIAL

BALL 001136

# Exhibit 38

extraction fan

gas header

air header

direct gas burners

combustion air fan

extraction ducts

**PRIVILEGE AND CONFIDENTIAL**

**BALL 001137**

# Exhibit 39

*In the Matter Of:*

BALL CORPORATION, ET AL.

-vs-

AIR TECH OF MICHIGAN, INC.

ROCKY STRANGE

August 29, 2018



**CONNOR REPORTING**
111 Monument Circle, Suite 4350
Indianapolis, IN 46204
Phone: 317-236-6022
Fax: 317-236-6015
Toll Free: 800-554-3376

1       IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF INDIANA
2             LAFAYETTE DIVISION
3      CAUSE NO. 4:16-cv-00042-PPS-APR
4  BALL CORPORATION, an Indiana  )
   Corporation, and FACTORY     )
5  MUTUAL INSURANCE COMPANY, a   )
   Rhode Island Corporation, as  )
6  subrogee,               )
                      )
7     Plaintiffs,       )
                      )
8     -vs-             )
                      )
9  AIR TECH OF MICHIGAN, INC., a )
  Michigan Corporation,      )
10                   )
      Defendants.       )
11
12
13       DEPOSITION OF ROCKY STRANGE
14
15   The deposition upon oral examination of
ROCKY STRANGE, a witness produced and sworn before me,
16 Christine L. Obermeyer, Notary Public in and for the
County of Lake, State of Indiana, taken on behalf of
17 the Plaintiffs, at the offices of Ball Corporation, 501
North 6th Street, Monticello, White County, Indiana, on
18 Wednesday, August 29, 2018, scheduled to commence at
11:00 a.m. pursuant to Rule 30(b) of the Federal Rules
19 of Civil Procedure with written notice as to time and
place thereof.
20
21
22
23
24
25

---

3

1          INDEX OF EXAMINATION
2
3  DIRECT EXAMINATION.......................   4
    Questions By Mark Senak
4  CROSS-EXAMINATION........................  39
    Questions By Jacob O'Brien
5  REDIRECT EXAMINATION..................... 137
    Questions By Mark Senak
6  RECROSS-EXAMINATION...................... 154
    Questions By Jacob O'Brien
7  REDIRECT EXAMINATION..................... 157
    Questions By Mark Senak
8  RECROSS-EXAMINATION...................... 159
    Questions By Jacob O'Brien
9
10
11         INDEX OF EXHIBITS
12
   Deposition Exhibit No.:
13
   EXHIBIT 1  - Fire Report dated 05-23-2014......   9
14  EXHIBIT 2  - Black and white photograph........  22
   EXHIBIT 3  - Black and white photograph........  22
15  EXHIBIT 4  - Black and white photograph........  27
   EXHIBIT 5  - Fire Report dated 10-09-2011......  55
16  EXHIBIT 6  - Fire Report dated 04-03-2013......  68
   EXHIBIT 7  - Fire Report dated 07-11-2013......  87
17  EXHIBIT 8  - Fire Report dated 11-19-2013...... 100
   EXHIBIT 9  - Second Fire Report dated ......... 107
18           05-23-2014
   EXHIBIT 10 - Online article from May 23, 2014.. 124
19  EXHIBIT 11 - Images of sprinkler heads......... 130
   EXHIBIT 12 - Black and white photograph........ 156
20
21
22
23
24
25

---

2

1         A P P E A R A N C E S
2
   FOR THE PLAINTIFFS:
3
4      Mark Senak
      SENAK KEEGAN GLEASON SMITH & MICHAUD, LTD.
      566 West Adams Street
5     Suite 750
      Chicago, IL 60605
6     312.214.1400
      Msenak@skgslaw.com
7
8  FOR THE DEFENDANTS:
9     Jacob O'Brien
      STARR AUSTEN & MILLER, LLP
10     201 South Third Street
      Logansport, IN 46947
11     574.722.6676
      Obrien@starrausten.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

4

1  (Time noted: 10:51 a.m.)
2            ROCKY STRANGE,
3  having been duly sworn to tell the truth, the whole
4  truth, and nothing but the truth relating to said
5  matter, was examined and testified as follows:
6
7  DIRECT EXAMINATION
8     QUESTIONS BY MARK SENAK:
9  Q   Would you just state your name and spell your last
10     name for the court reporter.
11 A  Allan Rocky Strange, II.  S-t-r-a-n-g-e.
12 Q   Have you ever given a deposition before?
13 A  Yes.
14 Q   Just a couple ground rules that I always pass
15     along.  One is that you have to answer the
16     questions out loud because she's taking down what
17     we say, so she can't take down a shrug of the
18     shoulders or a nod of the head.
19         Secondly, I will try to let you finish your
20     answer before I ask my next question.  I'd ask that
21     you do the same, again, for the benefit of our
22     court reporter.  It's hard when we both talk at the
23     same time for her take down what we're saying.
24     Finally, if you want to take a break at any time,
25     just let me know.



**Page 5**

1    You're employed by the Monticello Fire
2    Department?
3  A    Yes.
4  Q    Is that a full-time or part-time position?
5  A    Full time.
6  Q    And I take it it's a paid position?
7  A    Yes, sir.
8  Q    Your rank is currently captain?
9  A    Yes, sir.
10 Q    When did you start with the Monticello Fire
11    Department?
12 A    I started in April of 1991. I started as a
13    volunteer, and then in June of 1995, I was hired
14    full time as a firefighter/paramedic.
15 Q    I'm sorry. The date, again, when you were hired
16    full time?
17 A    June 1995.
18 Q    When you started with the fire department, did you
19    receive any training?
20 A    Yes.
21 Q    Can you just describe what it was.
22 A    I've been through the Indiana state mandatory
23    firefighter course, the Indiana state Firefighter I
24    and Firefighter II course. I've been through Fire
25    Instructor I and II, Fire Investigator, Fire

**Page 6**

1    Officer I and II, the National Fire Academy
2    Strategy and Tactics, hazmat, rope rescue, swift
3    water rescue.
4  Q    Anything else that you can remember?
5  A    Vehicle machinery technician.
6  Q    I want to just talk about just fires in general.
7    And when a fire has a suspicious origin, do you
8    conduct a cause and origin investigation?
9    MR. O'BRIEN: Object to form.
10 MR. SENAK:
11 Q    You can go ahead and answer. That's for purposes
12    of the record.
13 A    Can I clarify? Do you mean me specifically or our
14    department?
15 Q    Let's start with you specifically.
16 A    Okay.
17 Q    So if the fire has some suspicious origin, do you
18    conduct a cause and origin investigation?
19    MR. O'BRIEN: Same objection.
20 A    No, I do not.
21 Q    Does the department conduct a cause and origin
22    investigation?
23 A    Yes, they do.
24 Q    That investigation, is it conducted by the
25    Monticello Fire Department or by the state fire

**Page 7**

1    marshal?
2  A    Both, determining on what the — what our local
3    investigator determines that he would like to have.
4    Unless there's a civilian injury, firefighter
5    injury, or if it's a commercial business, then
6    usually we'll call in the state fire marshal.
7  Q    Who is the person in Monticello who would
8    coordinate that investigation?
9  A    Lieutenant Mike Hill. He's our current
10    investigative lead.
11 Q    When you say he's the current investigative lead,
12    does that mean he's the one who conducts the cause
13    and origin investigations?
14 A    Yes, sir.
15 Q    And how long has he performed that function?
16 A    You know, honestly I can't say, but, I mean, over a
17    decade at least.
18 Q    At the time of the fire here at the Ball plant, was
19    he the one who conducted cause and origin
20    investigations on behalf of Monticello?
21 A    Yes, sir.
22 Q    Is the reason a cause and origin investigation is
23    undertaken when there is a suspicious origin of the
24    fire because there's a concern that the fire was
25    caused by arson?

**Page 8**

1    MR. O'BRIEN: Object to form.
2  A    I don't know if I completely understand your
3    question, but maybe if I answered — well, the
4    reason that I'm trained as a fire investigator is
5    not to investigate fires. It's to — as a company
6    officer because I'm usually making the interior
7    attack on the fire. It's to know what to look for
8    for suspicious fires, things like that. Just to
9    know enough information to say, "Hey, this is where
10    I think it started. It looked a little suspicious.
11    I need to call the investigator in."
12 Q    So is it accurate that your training in fire
13    investigation is to allow you to do your job as a
14    firefighter?
15 A    Yes. As a company officer, yes.
16 Q    Was there any suspicious origin about the fire here
17    at the Ball plant?
18    MR. O'BRIEN: Form.
19 A    No, sir. Not that I would characterize as
20    suspicious.
21 Q    And I take it because of that, Monticello did not
22    conduct a formal cause and origin investigation of
23    this fire?
24 A    Honestly, I can't answer that. I don't know if
25    Lieutenant Hill ordered an investigation into it or

9

1   if he called the state fire marshals or if they
2   just routinely formally declared this as an
3   accidental.
4  Q   You didn't conduct any cause and origin
5       investigation of this?
6  A   That is correct.
7  Q   If Lieutenant Hill had conducted a cause and origin
8       investigation, would he have included that as part
9       of the fire report?
10 A   Yes, it should have been included in the
11      investigation section.
12      (Deposition Exhibit 1 was marked for
13      identification.)
14 Q   Can you look at Exhibit 1 and tell me whether you
15      can tell, looking at the report, whether Lieutenant
16      Hill conducted a cause and origin investigation of
17      the fire.
18 A   No, I do not see a narrative for the cause and
19      origin.
20 Q   Would such a narrative be there if one was done?
21 A   Not if he determined that this was what we would
22      call an unintentional.  He could have -- there is a
23      box on the NFIRS form that the investigators fill
24      out where they list the type of fire it was, and
25      one of the boxes, I believe, is unintentional or

11

1       see if I can get you the -- what I'll do -- that's
2       not going to help.  Let's try this again.  You have
3       184?
4       MR. O'BRIEN:  I have 184 is the first page.
5       (A brief discussion was held off the record.)
6  MR. SENAK:
7  Q   Let's go back on the record and let's try to
8       straighten this out a little bit.  Exhibit No. 1 is
9       Ball 184 through Ball 207.  And Captain Strange, if
10      you can go back now and tell us the page number on
11      the re-marked Exhibit 1 that you were referring to
12      when you gave the prior answer.
13 A   Ball 00189.
14      MR. O'BRIEN:  Thank you.
15 MR. SENAK:
16 Q   And you were indicating that under E1, the cause of
17      ignition was under investigation?
18 A   Yes.
19 Q   Do you know whether any subsequent report indicated
20      what the cause of ignition was at Monticello?
21 A   Not to my knowledge.
22 Q   If in fact a subsequent report was done that
23      reflected what the cause of the ignition was, would
24      it have been appended to Exhibit 1?
25 A   Should have been, yes.

10

1   accidental.  And if that was his ruling, then
2   sometimes he may or may not have written an actual
3   narrative of what led him to determine that.
4  Q   Let me try it in sort of a way that will hopefully
5       capture this.
6       If you look at Exhibit 1, can you tell whether
7       Monticello conducted a cause and origin
8       investigation?
9  A   Let me see if I can find -- I have -- I don't know.
10 Q   And just take your time.  It's not a race.
11 A   There should have been because honestly I don't
12      think you can complete this type of report on our
13      software -- yes, okay.  Right here in page --
14 Q   If you look at the lower right-hand side, there are
15      numbers.  Ball 001282, and if you could just refer
16      to --
17 A   1287.
18 Q   1287.  Okay?
19 A   Under E1, cause of ignition, he has indicated that
20      the cause is under investigation.
21      MR. O'BRIEN:  I'm sorry.  I don't think my
22      pages say --
23      MR. SENAK:  1287.
24      MR. O'BRIEN:  Mine say 184.
25      MR. SENAK:  My apologies.  Hold on.  Let me

12

1  Q   So if you look at the balance of Exhibit 1, the
2       remaining pages, is it accurate to say that since
3       there is no further investigative report that is
4       attached to Exhibit No. 1 that reflects the cause
5       of the ignition, that there would have been no
6       further cause and origin investigation conducted by
7       Monticello?
8  A   I can't say that for sure because I don't know --
9       when the front office staff prints this type of
10      report, it gives you the option to check which
11      boxes you want to print.  In theory, the
12      investigator's report might not have been printed,
13      so I can't say with any certainty that it was or
14      wasn't done.
15 Q   I guess what we --
16 A   She should have printed everything for you so.
17 Q   Let me try my question --
18 A   Sorry.  Not trying to be difficult or anything.
19 Q   No, no.  I appreciate you giving us the
20      information.
21      Is there any part of Exhibit 1 that shows that
22      a subsequent cause and origin investigation was
23      conducted that concluded what the cause of ignition
24      was?
25 A   No.  I've read through the report.  There's no



13

1    mention in the incident commander's note of his
2    narrative assigning an investigation team.
3  Q   Do you have a recollection of whether any
4       subsequent investigation was done of the fire at
5       the Ball plant to determine the cause of the fire?
6  A   No, not to my knowledge.
7  Q   Do you have any recollection of whether the state
8       fire marshal was asked to perform a cause and
9       origin investigation of the fire here?
10 A   No, I have no idea.
11 Q   If the state fire marshal had performed a cause and
12      origin investigation, would that report be included
13      in the Monticello file?
14 A   Probably not.  That probably would have stayed with
15      the state fire marshal.
16 Q   You indicated that you didn't do a cause and origin
17      investigation yourself; true?
18 A   Correct.
19 Q   Is it accurate that because of that, you don't have
20      an opinion on what the cause and origin of the fire
21      was?
22 A   That's correct.
23 Q   Do you have an independent recollection of this
24      fire apart from what's written in the fire report?
25 A   Yes.

14

1  Q   Can you just tell us what your recollection is.
2  A   You just want me tell you the whole story?
3  Q   Just tell us what you recall without looking at the
4       whole report for now.
5  A   I don't remember what time it came in.  I think it
6       was the middle of the night.  I was the first
7       arriving engine officer.  The plant was being
8       evacuated as normal.  The first thing we usually do
9       is try to establish contact with some maintenance
10      personnel.  They usually have the best knowledge of
11      what's going on and where it's at.
12          So we made contact with maintenance personnel.
13      He said we had a fire above one of the ovens in the
14      vent, so he walks me and my engine crew back to
15      where this fire was.  The ovens are pretty big.  So
16      we had a flame around the vent coming out, so we
17      start to work on that with extinguishers.  Then I
18      radioed back and told the guys at the truck to go
19      ahead and drop a hose line.  Let's bring it in.
20          When my truck company arrived, I ordered them
21      to bring some ladders in so we could easily access
22      the top of those ovens.  I ordered hand tools,
23      ladders, and then had them bring their crew in.
24      And then while we were in there, we forced a hole
25      in the side of the ventilation.  We checked with

15

1    maintenance, and he said, "Nothing's going to react
2    with water.  Go ahead and use your hose lines."  So
3    we forced an opening in there and were spraying
4    water into the exhaust ducts.
5        We noticed we had a little bit of fire on the
6    other one too.  There's about six of us inside, so
7    we kind of split up and went over to other one,
8    were spraying back and forth on that.  Then we
9    heard a tremendous explosion, but we had no -- when
10   this explosion went off, it shook the building, and
11   it was pretty startling.  But we didn't really have
12   a change in conditions where we were operating, and
13   we were pretty deep in the building.
14       So I radioed out to command, said we heard an
15   explosion in here.  Command confirmed; he said they
16   witnessed the explosion outside.  I told him, "We
17   have no change in condition, so we're just going to
18   keep working."  So as we kept going, I noticed that
19   we're getting a lot more black smoke production
20   coming out of the vents, which is not what I would
21   expect to see.  If I'm putting the fire out, I
22   would expect white smoke or steam, not black smoke.
23 Q   What did you conclude from the fact that there was
24      black smoke versus white smoke coming out of the
25      vents at the time you saw it?

16

1  A   The black smoke tells me that I have free-burning
2    fire someplace that I'm not putting out; it's still
3    producing.  So I told Lieutenant Hill, "You stay
4    here with the crew.  You keep an eye on them.  I'm
5    going to try to follow this exhaust duct back to
6    see where it leads," because I wanted to know
7    exactly where it was and if there was any smoke
8    coming out anyplace else along the line.
9        I made it back to the first bend -- where our
10   hose line made its first bend -- and that's when I
11   could see a huge ball of fire up by the ceiling,
12   and I could see black smoke starting to just push
13   down to the floor.  I radioed command, told him our
14   exit's cut off the by the fire.  I asked him to
15   activate the evacuation signal; call a mayday.
16       Went back to the crew.  Said, "Hey, we're cut
17   off by fire.  There's fire between us and the exit.
18   Everybody get masked up.  We're getting out of here
19   in a hurry."  Then we formed a line.  I took the
20   lead.  Lieutenant Hill -- put him at the end.  So
21   then we just proceeded out.  When we got to the
22   first turn on the hose line, everybody got down on
23   their hands and knees and crawled out following the
24   hose line.
25       As we made that turn -- that first right-hand



17

1  turn -- by that time, visibility was zero. We had
2  smoke down the to the floor, so we all just crawled
3  along the hose line until we came to Captain
4  Hickman -- he's captain now. At the time,
5  Assistant Chief Hickman -- whose command had set up
6  tripod lights by the entry to give us some type of
7  visual indicator of where we should be heading.
8      And then we all exited, took accountability,
9  made sure we were all -- everybody was out and
10 everybody was safe. We had a couple guys that
11 couldn't get masked up in time and got overtaken by
12 a little bit of smoke, so they were throwing up to
13 the side. And Chief Hickman pulled them out and
14 grabbed me. He said, "What did you see?"
15     I told him what I saw. He said, "Do you think
16 you can get it?"
17     I said, "Yeah, I think we can get back in there
18 and push on it, but we're going to need another
19 hose line," because we just dropped ours in place
20 and used it as an evacuation route.
21     So we pulled a secondary hose line off the
22 engine and I took John Huff with me, one of the
23 firemen, and him and I went back in the building
24 through the same door and made a push all the way
25 back to where we originally saw the ball of fire.

18

1  It wasn't as big now. The smoke was clearing a
2  little bit.
3      So we hit it with some water. And then once we
4  got that knocked down, radioed command and said,
5  "Hey, I think we got it knocked back down. Send me
6  the crew and we can go back to the original fire
7  area and start working on that." So we went back
8  there and started working on that until we were
9  rotated out.
10 Q  And I take it that's where your involvement ended?
11 A  No. I mean, when we rotate crews out, they'll take
12     us out. We'll change air bottles, get a drink,
13     take our coats off, get our blood pressures
14     checked, make sure that we're fit to go back in. I
15     think I rotated back in two or three different
16     times throughout the night and just was assigned
17     different tasks each time I would go in.
18 Q  Anything else that you can sort of independently
19     recall?
20 A  No, nothing really comes to mind.
21 Q  If we could go back and take a look at your report,
22     the one thing I'm interested in knowing is you
23     indicated the fire started in the middle of the
24     night.
25     Do you know what time Monticello received the

19

1      call that there was a fire at the Ball plant?
2  A  Yeah, it says 0048.
3  Q  I take it that would be 12:48 in the morning?
4  A  Yes.
5  Q  Do you know whether that was the first time --
6      strike that. Let me start over.
7      Do you know whether there was any delay from
8      the period of time when the fire was first observed
9      at the plant until the call was made to the
10     Monticello Fire Department?
11 A  No, I do not know.
12 Q  Did you discuss or interview anyone either during
13     or after the fire to determine whether any effort
14     had been made to try to extinguish the fire before
15     fire department was called?
16 A  No.
17 Q  So the 12:48 on your report is the time Monticello
18     received a call from the Ball plant that there was
19     a fire; correct?
20 A  Yes, that's what -- it would go to the White County
21     dispatching but that's what they would call the
22     time of alarm -- the time that dispatch received
23     the call.
24 Q  That time does not indicate the time that the fire
25     was first observed by someone at the Ball plant?

20

1  A  No, that is when the first person from here
2      contacted the dispatching center.
3  Q  The last unit cleared -- and I'm looking at Ball
4      184, Box E indicates that the last unit cleared the
5      site at 5:33 a.m.; true?
6  A  Yes.
7  Q  Is that consistent with your recollection that the
8      amount of time that the Monticello Fire Department
9      was on scene was from 12:48 through 5:33 a.m.?
10 A  Yes.
11 Q  If you could look at the next page, which is Ball
12     185, there is a notation under L, which is the
13     narrative portion of the report.
14 A  Yes.
15 Q  First of all, it shows that the narrative -- your
16     name is at the end of that section; correct?
17 A  Yes.
18 Q  Did you write this?
19 A  Yes.
20 Q  In about the fourth line down, the sentence starts
21     over to the right -- let me strike that and go back
22     up.
23     When you arrived, it indicates that employees
24     were evacuating the plant at the time; true?
25 A  Yes.

21

1  Q   Were you the first group -- were you in the first
2      group of firefighters from the Monticello Fire
3      Department who arrived at the scene?
4  A   Yes.
5  Q   Were you in charge of that group?
6  A   Yes.
7  Q   You indicated that you located a maintenance
8      personnel or a maintenance person?
9  A   Yes.
10 Q   Do you know who that person was?
11 A   No, I do not.
12 Q   And do you recall where he showed you the fire was
13     at?
14 A   Do you mean, like, within the factory?
15 Q   Let me try it again.
16     The fire was located in an oven or by an oven?
17 A   Yes.
18 Q   Do you know what the name of the oven was or what
19     designation was used for that oven?
20 A   No.
21     MR. O'BRIEN:  Object to form.
22 MR. SENAK:
23 Q   As you go on in your report, you say, "There was a
24     small amount of visible fire burning the insulation
25     at the top of the easternmost oven."

22

1      Do you see that?
2  A   Yes.
3  Q   Can you describe for me where you first observed
4      that fire.
5  A   Yes.  So the ovens sat east to west, two of them,
6      connected by joint ventilation tubes at the top.
7      Where those vent tubes secure to the top of the
8      oven, they're wrapped in -- it looked like aluminum
9      insulation, like aluminum-backed, foil-backed
10     wrapped insulation -- and it was right where the
11     tube connected to the machine or the oven.
12 Q   You say on the easternmost oven.
13     Are you speaking of the oven itself, or where
14     the tubes connect to the oven?
15 A   The eastern side of the tube that connects to the
16     oven.
17 Q   So let me see what I can do with a couple
18     photographs here.  Let's mark these to begin
19     with.
20     (Deposition Exhibit 2 was marked for
21     identification.)
22     (Deposition Exhibit 3 was marked for
23     identification.)
24 Q   First, what I'm going to give you is Exhibits 2 and
25     3, which are two photographs.

23

1      MR. O'BRIEN:  Just so I know, are you able to
2      identify -- I'm assuming these were produced.
3      MR. SENAK:  Yeah, there were numbers actually
4      on the lower right-hand side.  They didn't come out
5      because the photographs didn't copy too great.
6      MR. O'BRIEN:  If we can just get that resolved
7      after this is over.
8      MR. SENAK:  Yeah.  Right.
9  MR. SENAK:
10 Q   So Captain Strange, I'm going to show you now
11     Exhibits 2 and 3.
12     Do you recognize these photographs?
13 A   Yes, yeah.
14 Q   Just tell me what's your understanding of what the
15     two photographs show?
16 A   It appears to be both the ovens and the ventilation
17     tubes that's coming out of them here and here.
18     Sorry that you can't see that.
19 Q   Understood.  Does either Exhibit 2 or 3 show the
20     location where you first observed the fire?
21 A   Yes.  I would believe -- if this is sitting in --
22     as they're sitting in the plant taken from the
23     north.
24 Q   Yeah, I believe what you're looking at is east and
25     west.  2 is east; 3 is west.

24

1  A   Initially, first fire, here.  And then this one.
2      MR. O'BRIEN:  When you say here, can you just
3      clarify --
4      THE WITNESS:  Oh, sorry.  East side of
5      west-hand oven; east side of the tube.
6      MR. O'BRIEN:  And which number is that?  3?
7      THE WITNESS:  Yes.
8  MR. SENAK:
9  Q   Do you know whether, on the oven, there were two
10     exhaust tubes, which are shown in Exhibits 2 and 3,
11     that went up vertically, then made a 90-degree bend
12     horizontally, and connected in the middle?
13 A   Yes, that's how I believe -- my recollection of
14     what the layout was is that they connected in the
15     middle and then proceeded north through the
16     factory.
17 Q   Your recollection is that you saw the fire on the
18     east side of the ventilation tubes?
19 A   Yes.
20 Q   And that's reflected in your report on Ball 185?
21 A   Yes.
22 Q   I'm going to give you a pen and just ask you --
23     well, let me go back.
24     Do you know whether Exhibit No. 2 shows the
25     eastern ventilation tube?

25

1  A   I believe this is the eastern ventilation tube.
2  Q   Exhibit 3 would be the west?
3  A   Yes.
4  Q   So on Exhibit 2, can you just show me where you
5      would have seen the first fire that you observed
6      when you came to the plant?
7  A   The very first one was here.  And then --
8  Q   So that's on Exhibit --
9  A   -- 3.
10 Q   Okay.
11 A   And then the second one was here.
12 Q   Can you just put your initials and then the date.
13 A   (The witness complies.)
14     MR. O'BRIEN:  I'm just trying to make sure I'm
15 on the same page with you and following you.
16     You marked Exhibit 3 as the first place you saw
17 fire?
18     THE WITNESS:  Yes.
19 MR. SENAK:
20 Q   And when you made these observations on where the
21     fire was on Exhibits 2 and 3, I take it you were
22     walking towards the oven?
23 A   Yes.
24 Q   And that would have been after your arrival at the
25     scene?

26

1  A   Yes.
2  Q   And your arrival at the scene would have been at
3      12:53 a.m.?
4  A   Yes.
5  Q   Your report indicates that the first thing you did
6      was use the dry powder extinguisher to try to
7      extinguish the fire.
8  A   Yes.
9  Q   Where did you apply that extinguisher?  To what
10     area?
11 A   Right to where I -- the seat of the fire that I
12     saw, the exterior visible flames.
13 Q   When you say you also observed fire on the western
14     oven and connection between them in your report,
15     are you referring to a different oven or a
16     different location of the ventilation system of the
17     same oven?
18 A   No, I'm referring to the oven next to it.  Directly
19     next to it.
20 Q   So a completely different oven?
21 A   Yes.
22 Q   So when you come to the scene, you see fire not
23     only on the oven that's shown in Exhibits 2 and 3;
24     you also see fire on the oven next to it?
25 A   No, no.  Maybe I don't understand if these are

27

1      considered one oven with two ventilation ducts or
2      if these are considered two ovens.
3  Q   As I understand it, it's one oven with two
4      ventilation ducts.
5  A   Okay.  Then no, it was one oven fire on both
6      ventilation ducts.
7  Q   So if we go back to your report, you indicate there
8      was a small amount of visible fire burning in the
9      insulation at the top of the easternmost oven.
10     What you mean is that there was fire in the
11     insulation of the easternmost ventilation duct?
12 A   Yes.
13 Q   Of one oven?
14 A   Yes.
15 Q   You then go on to say after that, "We noticed that
16     there was also fire on the western oven and the
17     connection between them."
18     What you mean by that is you also then observed
19     fire on the western ventilation duct and the
20     connection between the two ventilation ducts?
21 A   Yes.  Yes, that's correct.
22     (Deposition Exhibit 4 was marked for
23     identification.)
24 Q   Now I'm going to show you Exhibit No. 4, which I
25     hope will provide a little bit more context to

28

1      this.  You'll see in Exhibit 4 there is a junction
2      of two ventilation ducts that run horizontally into
3      kind of an upside down T, and then a duct that runs
4      vertically up to the roof.  You see that?
5  A   Yes.
6  Q   Is it your understanding that the ventilation ducts
7      shown in Exhibit 2 and 3 that run horizontally
8      would have connected at a connection shown in
9      Exhibit No. 4?
10 A   Yes.
11 Q   And then that ventilation duct would have gone
12     vertically up through the roof?
13 A   I don't remember it going vertically through the
14     roof, but it could have.
15 Q   It just went vertically?
16 A   Yes.
17 Q   Let's say that.  In your report, the first part of
18     it says there was a small amount of visible fire
19     burning in the insulation at the top of the
20     easternmost ventilation duct; correct?
21 A   Yes.
22 Q   That eastern ventilation duct is shown in
23     Exhibit 2?
24 A   No, east side of this ventilation duct.
25 Q   So your understanding is that the ventilation duct



**29**

1  shown in Exhibit No. 3, is that the eastern or the
2  western ventilation duct?
3  A   That is the western ventilation duct, eastern side
4  of the ventilation pipe.
5  Q   And there you observed smoke and -- I'm sorry --
6  fire and then you also observed smoke -- or fire at
7  the same time on the eastern ventilation duct?
8  A   Yes.  West side; eastern ventilation duct.  It's
9  very confusing directionally.
10  Q   Understood.  Let's say this.
11      When you come to the scene, what you observed
12  is fire at the locations that you've shown on
13  Exhibit 2 and 3, and you make that observation at
14  the same time?
15  A   Yes.
16  Q   So there's fire at the ventilation duct of exhibit
17  -- shown in Exhibit 2 and Exhibit 3 at the same
18  time?
19  A   Yes.
20  Q   And then there's also fire shown at the insulation
21  of the connection of those two ducts shown in
22  Exhibit 4?
23  A   Later, yes.
24  Q   All right.  That's what I wanted to make sure.
25  A   Yes.

**30**

1  Q   The first observation is that there is fire at the
2  ventilation duct shown in Exhibit 2 and 3?
3  A   Yes.
4  Q   And then later, you see fire shown at the junction
5  of those two ventilation ducts shown in
6  Exhibit No. 4?
7  A   Yes, that's correct.
8  Q   You indicated there was a point at which there was
9  an explosion.
10  A   Yes.
11  Q   How long after you were at the scene did the
12  explosion occur?
13  A   I can't say for sure, and I don't know if command
14  noted it.  0131, command notified, "There was an
15  extremely loud explosion from inside the building."
16  Q   This would have been about an hour after you would
17  have arrived at the scene?
18      MR. O'BRIEN:  I'm sorry.  What page were you
19  looking at?
20      THE WITNESS:  Ball 00187.
21      MR. O'BRIEN:  Thank you.  And you said 0131?
22      THE WITNESS:  Yes.
23  A   About 40 minutes.
24  Q   About 40 minutes.  At about 1:30 in the morning is
25  when the explosion occurs?

**31**

1  A   Yes.
2  Q   Forgive me if I've asked this question.
3      Any determination made as to what caused the
4  explosion?
5  A   No.
6  Q   After you make the observation about the presence
7  of the fire in both of the ventilation ducts going
8  out of the oven, you further make the notation that
9  you observed black smoke coming out of the seams
10  where the ventilation tubes connected to the oven?
11  A   Yes.
12  Q   Is that in the same locations that are shown on
13  Exhibits 2 and 3?
14  A   Yes.
15  Q   Was there a point at which the building's sprinkler
16  system activated?
17  A   No, not to my knowledge.  I don't remember the
18  sprinklers ever being --
19  Q   If you look at your report, do you know whether
20  there are any notations in your report as to
21  whether the building's sprinkler system engaged?
22      Let me just direct you to Exhibit No. 1,
23  page 187, the notation at 0102.
24      MR. O'BRIEN:  You said 187?
25      MR. SENAK:  186.  I'm sorry.

**32**

1  MR. SENAK:
2  Q   There's a notation at 0102.
3      Do you see that particular notation?
4  A   Yes.
5  Q   There's a notation in that particular section that
6  states, "Because the sprinkler system had been
7  activated."
8      Does that refresh your recollection as to
9  whether the sprinkler system activated?
10  A   No.  No, I really don't remember the sprinkler
11  system going off.
12  Q   Do you have any recollection that there was water
13  on the floor of the building?
14  A   Yes.
15  Q   Do you know -- you were applying water with a hand
16  line to the area of the fire; correct?
17  A   Correct.
18  Q   After the fire, do you know whether anybody would
19  have checked to see if the sprinkler system had
20  activated?
21  A   Yes, I would assume the fire command would have
22  been notified.
23  Q   Do you know whether that would have been reflected
24  in the fire report?
25  A   No, it may not have.



33

1  Q   Can you just take a look through the fire report
2      and see if there's any indication of whether the
3      fire suppression system did or did not activate?
4  A   Well, command advised the sprinkler system had been
5      activated.
6  Q   And just can you tell me where you're looking.
7  A   Oh, sorry.  00186.  0102 again, he says they've
8      been activated and the yard lays were pressurized,
9      but it doesn't say if we continued to support the
10     sprinkler system from that point on.
11 Q   Would you just look through Exhibit No. 1 and tell
12     me if there are any further notations of whether
13     the sprinkler system was activated.
14         If you look at page 187 of Exhibit No. 1 under
15     the notation 0136, it indicates, "Sprinkler heads
16     in two areas were open and flowing."
17 A   Okay.
18 Q   Would that indicate to you that that -- as well as
19     the notation at 0102 -- that the sprinkler systems
20     had been activated?
21 A   Yes.
22 Q   The portions of the fire report on 186 below your
23     name that -- and continuing on through 188, I take
24     it those were made by, I believe, current Chief
25     Hickman?

34

1  A   He was chief at the time -- he was our assistant
2      chief at the time of the fire.
3  Q   That portion of the report was completed by him?
4  A   Yes.
5  Q   You don't have any specific recollection of either
6      seeing the sprinkler systems operating or not?
7  A   No.  And just judging by what he's read here is
8      that he -- sprinkler heads in two different areas
9      were open and flowing.  My assumption is that the
10     fire suppression system is zoned so that we could
11     have sprinkler heads going off in one section and
12     not in another section of the building.
13 Q   And based on what's written in the report, is it
14     your recollection that, at least in two zones, the
15     sprinkler heads were open and flowing?
16 A   Yes.
17 Q   After the fire ended, did you interview any of the
18     employees at the plant?
19 A   No.
20 Q   Did you undertake any investigation into either the
21     cause or origin of the fire?
22 A   No.
23 Q   If you look at Exhibit No. 1, there's a section
24     that talks about the origin of the fire, I believe,
25     as being in the ductwork?

35

1         MR. O'BRIEN:  What are you looking at, Mark?
2  A   00190, section K?
3  Q   Yes.  Is that based on your observation of the fire
4      when you first came to see it?
5  A   That would be based on my observation when I first
6      came in and gave my company officer's report to
7      command.  And then obviously command will, at the
8      -- once the fire is out and the smoke's vented,
9      command himself will actually go in and look at it
10     and say, "Is this where you were at?"
11        "Yes, this is where I was at."
12 Q   Do you know whether that notation was made based on
13     your first observations that you made when you came
14     in?
15 A   No, I do not know.  I can assume it was based on my
16     report and probably -- incident command deals
17     directly with the maintenance personnel once they
18     were safely outside the building, so he would have
19     got a more comprehensive interview of what
20     happened, what did the employees first see.
21 Q   That portion of the report you didn't complete?
22 A   That's correct.
23 Q   That would have been completed by Chief Hickman?
24 A   Yes.
25 Q   The custom practice would be that Chief Hickman

36

1      would consult a variety of different sources and
2      come to a conclusion that would be reflected in the
3      report?
4  A   Yes.
5  Q   Do you know whether anyone from Monticello, after
6      the fire was extinguished, went back and examined
7      the oven where the fire started?
8         MR. O'BRIEN:  From the fire department?
9         MR. SENAK:  From the fire department.
10 A   Not to my knowledge.
11 Q   You didn't make that examination; true?
12 A   No, I did not.
13 Q   Do you know whether anyone from Monticello, either
14     you or someone else from the fire department, would
15     have examined the inside of the ductwork?
16 A   No, not that I know of.
17 Q   Do you know whether anyone, including yourself,
18     would have taken any samples of the material inside
19     the ductwork?
20 A   No, I do not.
21 Q   Do you know whether anyone would have done any
22     testing of any of the materials from the fire
23     scene?
24 A   No, I do not believe so.
25 Q   If any interviews of any of the Ball employees had

**37**

1  been undertaken, would it be reflected in the fire
2  report?
3  A  Not necessarily.  Both investigators and incident
4  commanders typically use field notes that would
5  have -- could have been written down in field
6  notes.
7  Q  Would the field notes then be used to complete the
8  narrative or other portions of the fire report?
9  A  Yes, that's correct.
10 Q  If you look at Ball 00189, down on the lower
11  right-hand side it talks about whether there was an
12  arson report attached, a police report attached, or
13  other report attached.
14 A  Yes.
15 Q  Those are all left blank?
16 A  Yes.
17 Q  Would that indicate to you that there was no other
18  reports that were prepared either by the state fire
19  marshal or the police report or anything that would
20  have determined the cause and origin of the fire?
21 A  No, because that's -- we would not -- we have no
22  capability to attach a report from another agency
23  into our system.  So that would just be generally
24  left.
25 Q  Would a notation be made there if another report

**38**

1  was put into the file?
2  A  That would be up to the investigator if he would --
3  there should have been some type of notification in
4  there that -- if the state fire marshal had been
5  called, if our department had been assigned to
6  investigate, there should be some notation made
7  somewhere in the report that that's what had
8  happened.
9  Q  If you go up on that same page under box D, it
10  talks about ignition.
11 A  Yes.
12 Q  And the notation is made, "equipment or service."
13 A  Yes.
14 Q  That's not a determination you made; is that true?
15 A  Not me personally, no.
16 Q  So with respect to the sections of the report that
17  begin on 189 through 191, that information you did
18  not put into the report?
19 A  That is correct.
20 Q  Do you know whether you were consulted about that
21  information?
22 A  No, I was not.  Captain Hickman asked me when we
23  left the scene to fill in the times, the
24  attendance, the apparatus, who was on which
25  apparatus, and do my company officer's initial

**39**

1  report, and then he would come back in and complete
2  it.
3  Q  That's all the questions I have right now.
4
5  CROSS-EXAMINATION
6  QUESTIONS BY JACOB O'BRIEN:
7  Q  Rocky, I am Jacob O'Brien.  I represent Air Tech,
8  the defendant in this case.
9  First of all, we've been going only about 45
10  minutes or so.  Are you okay?  Do you need a break?
11 A  No, I'm good.
12  (A recess was taken from 11:42 a.m. to 11:45
13  a.m.)
14 MR. O'BRIEN:
15 Q  Rocky, we just took a short break.  You're still
16  under oath; same obligation.
17  You understand that?
18 A  Yes, sir.
19 Q  Thank you.  So Rocky, I did not arrange for your
20  deposition today.  I'm just trying to get a little
21  bit of an understanding of how it came to be that
22  you're testifying here today.
23  Can you explain that to me a little bit, how
24  this came to be?
25 A  A little bit.  I was kind of wondering the same

**40**

1  thing myself.  All I know is I got a Fed Ex package
2  at the fire station, and the receptionist called me
3  and said, "You have an urgent Fed Ex package at the
4  fire station."  So I came in; I was off the day it
5  came.  And I arrived, opened it up, and it was a
6  subpoena to come to a deposition.
7  Q  Was that all that was in the package?
8  A  There was a check for testifying, yeah.
9  Q  Was that kind of the standard witness fee was it
10  your understanding?
11 A  Yeah, honestly I don't really know.
12 Q  Did you have any conversations with Mark before
13  today?
14 A  Yes.
15 Q  When did those occur?  Let's walk through those.
16  Were there more than one?
17 A  Yes.
18 Q  Let's start with the earliest and just kind of walk
19  me through them.
20 A  It was the day that was scheduled for the first
21  deposition.  Apparently there was some confusion in
22  my contact information, so he wasn't able to make
23  contact with me.  I had came here on the 13th of
24  August.
25 Q  So you were here on the 13th ready to testify?

41

1  A    Yes.  So then one of the plant managers or office
2        managers contacted him, gave him my cell phone
3        number and all my contact information, and he
4        called me and said, "Sorry we had some wires
5        crossed.  Can we reschedule?"  And then he called
6        me back later on that afternoon so we could set
7        this date, and then he called me yesterday to
8        confirm that I would be here today.
9  Q    Are those all the conversations that you just
10       described?  All the conversations you had with
11       Mark?
12 A    Yes.
13 Q    So the first time you spoke with him was after you
14       had come here in compliance with an original
15       subpoena that you had received?
16 A    Yes.
17 Q    You never heard from him before that?
18 A    No.
19 Q    It was after that time?
20 A    That's correct.
21 Q    So during those few conversations you had with
22       Mark, did you have any discussions about what you
23       were going to testify about today?
24 A    No.
25 Q    Was it just purely scheduling?

42

1  A    Purely scheduling.
2  Q    Have you talked to anybody else that you understood
3        to be from Mark's firm?
4  A    No.
5  Q    Was he the only one as far as you know?
6  A    Yes.
7  Q    Were there any other participants in any of those
8        conversations that you've had with Mark?
9  A    No.
10 Q    Did Mark ask you to look at any documents before
11       you came here today?
12 A    No.
13 Q    Did you have any conversations with anyone from
14       Ball Corporation in preparation for your testimony
15       today?
16 A    No.
17 Q    And what about from Factory Mutual Insurance
18       Company?
19 A    No.
20 Q    I think I overheard you mention as I was walking
21       out of the room that you maybe discussed this with
22       some of your colleagues?
23 A    Yes.
24 Q    Can you just tell me about those conversations?
25       First of all, who did you speak with?

43

1  A    My shift was on duty last night, and we were just
2        talking after supper.  "What are you guys doing
3        tomorrow?"  Just generally that.  I said, "I have
4        to go for my deposition for the Ball Corp. fire."
5        And I have some new firefighters on shift that
6        weren't even on the department when the Ball Corp.
7        fire happened, so we just sat around discussing it.
8        The guys that were on when it happened were
9        explaining to the new guys kind of, "Hey, this is
10       what happened.  Here's what we can pull from this.
11       Let's use this as a training talk, not just passing
12       on stories."  Little bit of both, you know.
13 Q    Sure.  So you talked about the fire itself?
14 A    Yeah.
15 Q    Anything stick out about that conversation that you
16       recall?  What specific things were talked about in
17       relation to the fire?
18 A    Mainly we just talked about that it was the first
19       time that I'd ever been involved in a mayday where
20       we had to evacuate a commercial building.
21 Q    And that's where you were referring to crawling
22       along the hose line?
23 A    Yes.
24 Q    Do you have any understanding as to why plaintiffs
25       wanted to take your deposition today?

44

1  A    No.  I was going to ask that.
2  Q    There's currently no trial setting in this case.
3        Has anyone asked you to testify at trial in
4        this matter?
5  A    No.
6  Q    Do you live in Monticello?
7  A    Yes.
8  Q    How long have you lived here?
9  A    Since 1978.
10 Q    A long time.
11 A    Yes, sir.
12 Q    What's your current home address?
13 A    6548 East 250 North, Monticello.
14 Q    How long have you lived at that address?
15 A    14 years.
16 Q    Is that a house?
17 A    Yes.
18 Q    Do you own the house?
19 A    Yes.
20 Q    Do you have any present intention to move?
21 A    No.
22 Q    And you have been with the Monticello Fire
23       Department since -- I think you said you've been
24       full time since '95?
25 A    '95, yes.



45

1  Q   What's the street address for the fire department?
2  A   The new address is 911 West South Street.
3  Q   And do you have any present intentions of leaving
4      your employment with the fire department in the
5      foreseeable future?
6  A   No.
7  Q   No plans to retire in the next couple years or
8      anything like that?
9  A   No.  Maybe six to eight years.
10 Q   And I know it's a full-time position.
11 A   Yes, sir.
12 Q   Is this your only job?  Do you have any other jobs?
13 A   No.  I work part time for a land surveying company.
14 Q   Have you ever been a fireman at any other fire
15     departments aside from Monticello's?
16 A   No.
17 Q   I think you said your current position is captain?
18 A   Yes.
19 Q   Was that the same at the time of the May 23, 2014
20     fire?
21 A   Yes.
22 Q   Can you just give me an idea, as a captain, what
23     your job responsibilities are.
24 A   As a captain, I run a shift.  We have three shifts
25     on the fire department: A, B, and C shift.  Each

46

1      shift has a captain that oversees it and a
2      lieutenant underneath him.  We have nine people on
3      the shift, so my job is to just handle all
4      day-to-day activities, making sure all the reports
5      are done, the building's clean.  My job's to train
6      the crews.  And then as a captain, my primary
7      responsibility as far as emergency response I'm
8      assigned to the rescue truck, the primary engine,
9      and the third-out ambulance.
10 Q   Thank you.  I think you said earlier Monticello
11     Fire Department has someone on staff who conducts
12     cause and origin investigations; is that right?
13 A   Yes, that's correct.
14 Q   Was that Mike Hill?  Was that the name?
15 A   Yes, sir.
16 Q   Was he occupying that same position as of the time
17     of the May 23, 2014 fire?
18 A   Yes.
19 Q   And he's still there today?
20 A   Yes.
21 Q   This fire on May 23, 2014, that wasn't the first
22     time you'd ever been to Ball Monticello's facility,
23     was it?
24 A   No.
25 Q   Just describe for me your familiarity with the Ball

47

1      plant:
2  A   We do safety tours here.  We try to do safety
3      walk-throughs of all the industry in our response
4      area.  We had, prior to that, other fires in the
5      vent exhaust tubes.  I'm also on the technical
6      rescue team, so we've done some confined space
7      inspections here on site.  Ball Corp.'s very good
8      about calling us and notifying us any time they do
9      a confined space injury, so we can put the confined
10     space team on stand by.
11 Q   Did I hear you say the fire department does
12     confined inspections?
13 A   Not really like an inspection.
14 Q   Tell me about it.
15 A   We went through with the technical rescue team.  We
16     try to do it -- as long as the plant doesn't
17     change, we like to go through every industry and
18     have the safety coordinator meet with the tech
19     rescue team and say, "Show me all your confined
20     spaces.  Show me your permit required spaces, your
21     non-permit required spaces, and explain to us what
22     you do.  How often do you put people in these?  And
23     if you put people in them, what are they doing?
24     How long are you in them?  What kind of safety
25     precautions you have?  What kind of equipment do

48

1      you have?  What do you need from us in the event of
2      a response?"
3  Q   When they give you this information, what do you do
4      with it?
5  A   Usually, as a team we just go back and preplan it.
6      We design training scenarios based on it.
7  Q   You design training scenarios for the fire
8      department or for Ball?
9  A   For the fire department.
10 Q   Do you make any kind of recommendations to Ball or
11     anything like that?
12 A   Not unless they would ask or if we would see a
13     glaring safety hazard where we would say, "You
14     really -- you should not be doing this."
15 Q   Recall anything like that happening?
16 A   No.
17 Q   If the fire department were to make some sort of
18     recommendations -- talking about this confined
19     space inspections I'll call it for lack of a better
20     word -- would that be in writing or would that just
21     be conveyed orally?
22 A   Just depends on what it was.  If it was serious
23     enough, the tech rescue team would notify the fire
24     chief and say, "Hey, we were doing this training
25     walk-through.  This is what we saw.  We informed



49

1  them. We feel like you should follow up with a
2  letter or something."
3 Q  Any recollection of anything like that happening
4  with respect to Ball?
5 A  Oh, no. Never.
6 Q  How frequently were these kind of confined space
7  inspections? I'm not expecting an exact number,
8  but approximately.
9 A  Every other year maybe.
10 Q  And you also mentioned safety tours and
11  walk-throughs.
12      Would that be something separate than the
13  confined space inspections you were talking to me
14  about?
15 A  Yes.
16 Q  Just give me a kind of description of these safety
17  tours and walk-throughs.
18 A  That's where we try to get the whole entire
19  department to come up and -- what we would call a
20  department drill. Bring all the guys in and show
21  them hydrant locations, where the alarm panel is,
22  where the alarm panel shutoff -- where the fire
23  department connections are. They'd talk with the
24  safety people and here's the -- here's our
25  evacuation procedure. So that's how I knew that

50

1  when I rolled in here, I knew that a maintenance
2  man was going to meet me outside of the bay door.
3  That's just the way they --
4 Q  It's a preplan?
5 A  Yeah, and it's what we establish in these
6  department drills is we know where the employees
7  are going to be evacuated to and we know where the
8  maintenance people are going to meet us.
9 Q  I think you said you didn't remember who met you?
10 A  No.
11 Q  You don't know the name?
12 A  No idea.
13 Q  Had you met him before? Did you recognize him?
14 A  I can't remember.
15 Q  Was it a man?
16 A  Yeah, I believe so.
17 Q  How frequently were these safety tour walk-throughs
18  conducted?
19 A  Here at Ball or in general?
20 Q  Here at Ball.
21 A  Probably every three years or so. We try to rotate
22  between all the industry in the area.
23 Q  I kind of asked you about -- would there be any
24  written document that would be prepared as a result
25  of these safety walk-throughs?

51

1 A  Just would be a training report that just lists
2  people that participated. There wouldn't be a
3  narrative that said, "We did this, this, and this."
4 Q  And that would be a document that is maintained by
5  the fire department?
6 A  Yes.
7 Q  You mentioned that you meet with a safety
8  coordinator. Is that what you said?
9 A  Yes. I don't know if that's the official term.
10 Q  I understand. Whoever it was, whatever the
11  technical position title would have been, that was
12  your understanding that was your primary contact
13  with respect to these safety walk-throughs and
14  maybe these confined space inspections; is that
15  right?
16 A  Yes. Generally, we would call up here and say,
17  "Hey, this is Captain Strange from the fire
18  department. I would like to bring my confined
19  space team in. Who do I need to get ahold of?"
20  And then they would put me in touch with whoever
21  was in charge of that, and they'd usually call me
22  back and say, "Yeah, what do you want to do?"
23 Q  Do you recall who that was?
24 A  No.
25 Q  Don't know the name?

52

1 A  No. It's been a while since we've done one that
2  was here.
3 Q  So prior to the May 23, 2014 fire, fair to say
4  you've been inside the plant and you're generally
5  familiar with layout and things like that; right?
6 A  Yes.
7 Q  And try to wait until I'm done asking the question.
8  I'm not taking any offense to it. It makes it
9  easier for her. All right? Thank you.
10      Do you have any familiarity with Ball's
11  manufacturing process?
12 A  No.
13 Q  You know what they make?
14 A  Cans.
15 Q  You never worked for Ball Monticello yourself?
16 A  No.
17 Q  Are you personal friends -- do you have any
18  personal friends that are employed here at Ball?
19 A  No, not personal friends. I mean, I know people
20  that work here.
21 Q  Those people that you know that have worked here,
22  have any of those people described to you Ball's
23  manufacturing process?
24 A  No.
25 Q  You're aware that they use these ovens that are



53

1    connected to ventilation ductwork? We've been
2    talking about that; right?
3 A   Yes.
4 Q   Do you understand what the purpose of those ovens
5    -- we'll start with the ovens.
6       Do you understand what the purpose of those
7    ovens is?
8 A   No.
9 Q   No clue?
10 A   No, sir.
11 Q   And so I guess I would presume the answer would be
12    the same with respect to the ductwork?
13 A   Correct.
14 Q   You know it's exhausting something, but you don't
15    know exactly --
16 A   Yes, sir.
17 Q   Do you know what the ductwork is -- what's it
18    constructed of?
19 A   Some type of metal, but I don't know specifically.
20    I don't know if it's aluminum; I don't know if it's
21    steel.
22 Q   Is it your understanding that inside of the
23    ductwork, you just have a bare metal surface?
24 A   Correct.
25 Q   As it's installed at least?

54

1 A   Yes, that would be my understanding.
2 Q   So would it be your understanding as well then that
3    there's nothing on the internal surfaces of the
4    ductwork itself that would be flammable as
5    manufactured?
6 A   Yes, I would say that.
7 Q   You mentioned one of the ways in which you were
8    familiar with the Ball Monticello facility was
9    prior fires.
10 A   Yes.
11 Q   Can you just give me an idea of how many fires you
12    had been involved with here at the Ball Monticello
13    facility?
14 A   I'm guessing two actual fires where we cut the
15    ducts and actually sprayed water in them.
16 Q   Would that include the May 23, 2014 fire?
17 A   No.
18 Q   You did cut into the ducts and spray water into the
19    ducts on May 23, 2014?
20 A   Yes.
21 Q   So two others in addition to that?
22 A   Yes.
23 Q   Do you recall approximately when those two other
24    fires where you would have cut into the ductwork
25    would have been?

55

1 A   No.
2 Q   Understanding that would have been more than
3    ten years prior to the May 23, 2014 fire?
4 A   Yes, at least one of them because I wasn't even a
5    captain at the time.
6 Q   With those prior fires, do you have any
7    recollection independently sitting here today of
8    any determination as to cause or origin of those
9    fires?
10 A   No, sir.
11       (Deposition Exhibit 5 was marked for
12    identification.)
13 Q   Captain Strange, I'm going to hand you what's been
14    marked as Exhibit 5.
15       Do you recognize this to be a fire incident
16    report?
17 A   Yes, sir.
18 Q   And we've walked through one already from the May
19    23, 2014 fire, so you're generally familiar with
20    the content of these reports?
21 A   Yes, sir.
22 Q   If you would, turn to the last page just for a
23    moment. Are you there?
24 A   Yes.
25 Q   I guess I should note this. You see there's

56

1    handwritten numbers down in the lower right-hand
2    corner?
3 A   Yes.
4 Q   My staff put that on there just so we can make sure
5    we're on the same page.
6       So if you look at page 6, do you see that
7    bottom box that indicates Allan Strange, II. Do
8    you see that?
9 A   Yes.
10 Q   And that's you?
11 A   Yes.
12 Q   Is this indicating you were there on site?
13 A   Yes.
14 Q   That's what I thought. I just wanted to make sure.
15       So if we go back to the first page, October 9,
16    2011. You see that? And then we see -- you
17    recognize that to be the Ball Monticello address
18    right underneath that; correct?
19 A   Yes.
20 Q   Looks like an arrival of 1628 -- I'm sorry -- 1631.
21    Last unit cleared, 1750.
22       So you're on site a little over an hour? Hour
23    and 20 minutes or so; right?
24 A   Yes, sir.
25 Q   And over on the left, it says, "Incident type:

57

1    Chimney or flue fire, confined," and then there's a
2    little number to next to that. I want to ask you
3    about that.
4        What does this number indicate? This 114 right
5    next to the --
6  A    That is the NFIRS -- which is what this type of
7    report is -- National Fire Incident Reporting
8    System. The federal government classifies all of
9    these things in drop-down tabs with numbers on
10   them, so we have a choice when we fill this out and
11   we have to click certain numbers.
12 Q    That's what it looked like.
13       So making sure I understand correctly, chimney
14   or flue fire, that's kind of a predetermined
15   description that's in a drop-down box that has an
16   associated number?
17 A    Yes, sir.
18 Q    So when this portion of the report gets populated,
19   Monticello Fire Department's not choosing the
20   verbiage that goes into this box; it's
21   predetermined?
22 A    That is correct.
23 Q    That being the case, do you know the description of
24   chimney or flue fire -- what that would be
25   referencing with respect to the Ball facility

58

1    specifically?
2  A    I can speculate. I don't know for sure. I would
3    assume that they're talking about the ventilation
4    ducts as a flue.
5  Q    Let me ask you this.
6        Do you have any understanding of what else it
7    could be if it's not the ductwork?
8  A    No.
9  Q    And then box F right underneath that -- still on
10   the first page -- says, "Actions taken:
11   Extinguishment by fire --" I'm assuming it's cut
12   off department?
13 A    Yes, extinguishment by fire personnel.
14 Q    So this just doesn't capture the entire field?
15 A    Yes, sir.
16 Q    I've heard of fighting fire with fire, but I didn't
17   think that was quite a literal statement.
18       All right. Let's turn to the second page then
19   if you would. The first sentence says, "Responded
20   to report of a fire in the ductwork at Ball
21   Corporation."
22       Do you see that?
23 A    Yes, sir.
24 Q    We've got a date. We've got an approximate amount
25   of time you were there. We've got an incident

59

1    type.
2        Now that you've seen these things, do you have
3    a memory of this October 2011 event in which there
4    was apparently a fire in the ductwork?
5  A    No. Let me check, if I may, and see what apparatus
6    I was even responding on.
7  Q    Sure.
8  A    It doesn't have listed what apparatus I was even
9    on.
10 Q    So would it be the case you don't remember exactly
11   what your role was with respect to this fire?
12 A    That would be correct.
13 Q    You were there, but you don't know exactly what you
14   did?
15 A    Yes.
16 Q    Back to page 2 if you would. Authorization in box
17   -- underneath box L, "Remarks," Stephen B. Fisher.
18       Do you see that?
19 A    Yes, sir.
20 Q    And CP. That's captain; correct?
21 A    Yes, that's correct.
22 Q    Is Mr. Fisher still with the fire department?
23 A    Yes.
24 Q    And is this indicating that he was the author of
25   this section of the report -- of this remarks

60

1    section?
2  A    Yes. Actually, it also indicates that he would
3    have been the incident commander for the overall
4    incident.
5  Q    That's what his name in this box indicates?
6  A    Yes.
7  Q    So not only did he write these remarks, he was also
8    the incident commander?
9  A    Yes, sir. Sorry if I'm talking over you.
10 Q    No, it's okay. I have a bad habit of -- it seems
11   like I'm done and then I throw something in, so my
12   apologies.
13       There's a reference on the second line,
14   "Established command. Requested mutual aid engine
15   companies from Idaville and Buffalo."
16       Understanding that you don't have an
17   independent memory of this, can you tell me what
18   that means?
19 A    We have a standing mutual aid agreement with every
20   fire department that adjoins us -- our response
21   area. We're the only paid full-time fire
22   department here, so the volunteer departments rely
23   on us to mutual aid with them. So if they get a
24   house fire, especially during the day when their
25   volunteer firefighters are at work, they rely on us



61

1  to automatically respond to their area to assist
2  with their fires. So we have a mutual aid system
3  where we also call them automatically when we have
4  a large-scale incident, and so because it's a
5  commercial manufacturing plant, we would
6  automatically call them just in case it did turn
7  out to be a big fire.
8  Q   So to make sure I understand you, any time you
9      would have a fire at a manufacturing facility like
10     Ball, this request for mutual aid engine companies
11     would automatically be put out?
12 A   Yes, sir.
13 Q   And so I assume that on May 23, 2014, the same
14     request would have been put out?
15 A   Yes, sir.
16 Q   I don't recall seeing that in the report. Maybe
17     it's in there.
18         Would it be your expectation that it would be
19     included in the narrative remarks of the report?
20 A   Yes, sir. It's in this one.
21 Q   You're referring to Exhibit 1?
22 A   Yeah, sorry.
23 Q   That's okay. Can you point me to it just so I know
24     where it's at.
25 A   Yes, Ball 00187, starting at 0132. "Mandatory

62

1  recall for all Monticello firefighters. 0133,
2  Dispatch was ordered to notify Buffalo, Chalmers,
3  and Monon for mutual aid engine company as well as
4  Monon First Response for mutual aid EMS staffing."
5  Q   So then this request for mutual aid engine
6      companies was made at around 1:33 in the morning;
7      is that right?
8  A   For those particular companies. If you go back to
9      the previous page to 186, at 0110 the assistant
10     chief requested mutual aid engine from Idaville and
11     Reynolds. So he made two different calls for more
12     -- he made an initial call for help from two
13     departments, and later on, 20 minutes later, he
14     called said, "I need the rest of the county to come
15     help."
16 Q   Still on Exhibit 1, if we looked at the first page,
17     the arrival was at 12:53 a.m.?
18 A   Yes, sir.
19 Q   So within approximately 20 minutes, this request
20     had been made?
21 A   Yes.
22 Q   And that was kind of standard procedure for a fire
23     at Ball Monticello?
24 A   Yes, sir.
25 Q   Back to -- this is Exhibit 5, and I'm still on the

63

1  second page. It's the second to last sentence. It
2  says, "Interior reports fire is out and maintenance
3  personal" -- I think that means personnel. You
4  agree?
5  A   Yes.
6  Q   -- "will be disassembling the furnace to check for
7      extension." Do you see that?
8  A   Yes, sir.
9  Q   And, again, I understand you weren't there, but do
10     you understand what this sentence is saying?
11 A   Yes, sir.
12 Q   Can you please explain to me what that is saying.
13 A   Generally, when you have any type of fire in an
14     industrial piece of equipment, once the fire is
15     out, then maintenance usually comes in and takes it
16     apart. I mean, nuts and bolts. Just undoes it.
17     And then usually it's for a repair and sometimes
18     it's -- we'll stay on scene if they say, "Hey, I
19     don't know if there's fire down deeper. Can you
20     guys stay while we take this apart just in case?"
21 Q   So specifically when it says checking for
22     extension -- first of all, what does that mean?
23         Is it checking to see if the fire had spread?
24     Is that what extension means?
25 A   Yes.

64

1  Q   So aside from the location where we saw fire and
2      fought the fire and put it out, we're checking to
3      see if it had spread to other areas. That's what
4      that means?
5  A   Yes.
6  Q   Okay. And in this situation, the first sentence
7      says there was a fire in the ductwork. And so here
8      this is indicating maintenance personnel were
9      disassembling the furnace.
10         Would you understand that to be the oven?
11 A   Yes.
12 Q   So they're checking to make sure that the fire
13     hadn't spread or extended from the ductwork into
14     the oven?
15 A   Correct.
16 Q   Is this something that the fire department
17     personnel would have -- I think you said that Ball
18     personnel would have actually done this inspection;
19     is that right?
20 A   Correct.
21 Q   Is this something that the fire department would
22     have instructed Ball to do or Ball would have just
23     done as a matter of course?
24 A   They just would have done.
25 Q   Do you have any knowledge or memory of any events

---

**65**

1  in which a fire interior to the ductwork extended
2  into an oven?
3 A  Not to my knowledge, no.
4 Q  You have no personal first-hand experience with
5  that --
6 A  That's correct.
7 Q  -- at Ball Monticello?
8 A  Yes, that's correct. I don't.
9 Q  Now, this says that there was a fire in the
10  ductwork.
11      You agree there was a lot of ductwork in this
12  facility; right?
13 A  Yes, sir.
14 Q  So is there anything in this report that would
15  allow you to determine with any more specificity
16  where in the ductwork this fire was?
17 A  No.
18 Q  You don't see that anywhere?
19 A  No, sir.
20 Q  And it doesn't appear to me as though any further
21  investigation as to the cause of this fire is noted
22  in this report.
23      Do you agree with that?
24 A  Yes, I would agree there's no investigator's report
25  and there is no -- there's not even the page that

**66**

1  lists the cause.
2 Q  I think you said earlier that -- typically that
3  further investigation would only occur in the case
4  of a suspicious fire I think was the term you used.
5 A  Yes, that's correct.
6 Q  And what would constitute a suspicious fire?
7 A  Generally, we would see that more in, like, a
8  residential fire. I mean, you could see it in a
9  commercial building, but you're looking for things
10  like pour patterns of gasoline on the floor, fires
11  in buildings that have no utilities, fires in
12  vacant buildings.
13 Q  So if you just have a fire that occurs while in a
14  manufacturing facility while production is ongoing,
15  there's nothing inherently suspicious about that;
16  is that right?
17 A  That's correct.
18 Q  On the last page of Exhibit 5 -- so that would be
19  page 6 -- there's a number of names there. And I
20  think you said earlier if their name's here, this
21  would indicate that they were present at this
22  particular fire?
23 A  Yes, that's correct.
24 Q  Are any of these individuals no longer with the
25  Monticello Fire Department?

**67**

1 A  Yes.
2 Q  Can you identify which of those are no longer
3  there?
4 A  Mark McKean, no longer there. Trevor Stinson, Matt
5  Schroeder, Cole Gilbert.
6 Q  So the only remaining individuals then who were
7  present -- and I note Mr. Fisher is not listed
8  here, but he would have been there as well?
9 A  Correct.
10 Q  So the only remaining individuals then that would
11  have been present at the 10-9-2011 fire described
12  in this report would have been you, Mr. Huff, and
13  Mr. Fisher?
14 A  That's correct.
15 Q  And all of those people are still employed by
16  Monticello Fire Department?
17 A  Yes, that is correct.
18 Q  Do you know the circumstances of these individuals
19  that are no longer there; why they left?
20 A  Yes.
21 Q  Can you explain those?
22 A  Absolutely. Mark McKean left to be a sheriff's
23  deputy. He's now on the White County Sheriff's
24  Department. Trevor Stinson left to go to Purdue
25  Fire for a higher salary. Matt Schroeder left the

**68**

1  state with his fiance to South Carolina, and he
2  took a job at a fire department in South Carolina.
3  Cole Gilbert left the fire service completely and
4  went into carpentry.
5 Q  All of these were -- they voluntarily left there?
6 A  Yes.
7 Q  Thank you. So this was a duct fire as documented;
8  correct?
9 A  Yes.
10 Q  And at least to some extent, we had a duct fire on
11  May 23, 2014 also; correct?
12 A  Correct.
13      MR. SENAK: Object to foundation.
14 MR. O'BRIEN:
15 Q  So at least in that respect, from a macro level,
16  there's some similarity between the October 9, 2011
17  event as documented here and the May 23, 2014 event
18  which we looked at in Exhibit 1; correct?
19 A  Correct.
20      (Deposition Exhibit 6 was marked for
21  identification.)
22 Q  Captain Strange, I'm going to hand you what's been
23  marked as Exhibit 6.
24      Do you recognize that this is also one of these
25  fire events or investigation kind of reports that

---



69

1  we've been looking at in Exhibit 1 and Exhibit 5?
2  A   Yes, sir.
3  Q   Just with a different date?
4  A   Yes, sir.
5  Q   This date is April 3rd, 2013.  If you look to the
6     -- I think it's going to be the second to last
7     page.  This list looks a little different.  There
8     it is, yeah.
9        Page 10, there's a list of individuals.  Is
10    this a list of individuals that were present at the
11    scene during this event?
12 A   Yes, sir.
13 Q   And basically smack dab in the middle, do you see
14    your name there?
15 A   Yes, sir.
16 Q   So you would have been present at the scene of the
17    fire on May 3rd, 2013 [sic]?
18 A   Yes, that's correct.
19 Q   Go back to the first page.
20       First of all, this is a little more than a year
21    predating the May 23rd event; correct?
22 A   Yes.
23 Q   And on this particular event, based on the arrival
24    time and the last cleared time, it looks like the
25    fire department was there for about two hours;

70

1  right?
2  A   Yes, that's correct.
3  Q   Incident type, we see the same as we saw on
4     Exhibit 5; correct?
5  A   Correct.
6  Q   And, again, that's a predetermined description?
7  A   Correct.
8  Q   Your understanding is that that refers to the
9     ductwork?
10 A   Yes, sir.
11 Q   Second page of Exhibit 6, just looking at the name
12    down here on the bottom in box L under the
13    authorization.  You told me that indicates two
14    things with the previous report:  that he wrote the
15    remarks and narrative and that he was also incident
16    command?
17 A   Yes, that's correct.
18 Q   Is that going to be the same with respect to all
19    the reports that we might see?
20 A   Yes.  Unless there was an error made, that's our
21    general operating procedures of how we would write
22    our reports.
23 Q   And Mr. Hickman, is that who the assistant chief
24    was at the time of the May 23rd fire?
25 A   Yes, sir.

71

1  Q   May 2014 I should say.
2        Is this indicating that -- this AC, is that
3     also assistant chief on Exhibit 6?
4  A   Yes, sir.
5  Q   So he was assistant chief back in April 3rd, 2013
6     as well?
7  A   Yes, sir.
8  Q   The third page has the full narrative.  I think
9     it's cut off on the second page.
10       If you look to page 3, first let me ask you --
11    just looking at the date, the amount of time that
12    was spent there, who was in command, do you have an
13    independent recollection before we get into this
14    narrative of this fire event in April of 2013?
15 A   No, sir.  But if it lists what apparatus I was on,
16    I might be able to.
17 Q   Sure.  Take your time.
18 A   0980, okay.  I came on the rescue truck.  No, sir.
19    That doesn't.
20 Q   Let's kind of look through the narrative -- some of
21    the specific statements -- and see if you can
22    remember anything or at least tell me what is being
23    indicated here.  Okay?
24       So page 3, second paragraph, "Most of the smoke
25    coming from the chimney stack."

72

1        Do you see that second sentence?
2  A   Yes, sir.
3  Q   Do you know what the chimney stack is?  What's
4     being referenced?
5  A   No, sir.  I do not.
6  Q   Next sentence says, "There was burnt material on
7     the pavement adjacent to the exhaust for system."
8        You see that?
9  A   Yes.
10 Q   Do you have any recollection of any burnt material
11    being on the pavement of any instance in your
12    responses to fires at Ball Monticello?
13 A   No, sir.
14 Q   So you don't have any recollection of yourself
15    observing this burnt material that's being
16    referenced here?
17 A   No, sir.
18 Q   Do you understand what is being referenced when it
19    says, "exhaust for system"?
20 A   I believe -- I think what he's referencing is that
21    on the north side of the building, there is the
22    exhaust box that comes out where these vent tubes
23    exhaust out of the building.
24 Q   So your understanding of what this report is
25    indicating is that the external part of the

73

1  building where the internal ducts exhaust out,
2     that's what this is referring to?
3        MR. SENAK:  Object to foundation.
4  MR. O'BRIEN:
5  Q    Your understanding?
6        MR. SENAK:  Same.
7  A    That would be my speculation that that's what he's
8     referring to.
9  Q    A little further on, it says that "Ball advised
10    they were having trouble with the blower system and
11    they believe the system overheated due to lack of
12    air flow and was burning off accumulated debris
13    inside the flues."
14       You see that?
15 A    Yes, sir.
16 Q    This accumulated debris inside the -- first of all,
17    with respect to flues, on the incident type, it
18    used the same word; right?
19 A    Yes, sir.
20 Q    And you understand that to mean ductwork?
21 A    Yes.
22       MR. SENAK:  Object to foundation.
23 MR. O'BRIEN:
24 Q    And you're not aware of what else it would be
25    referring to if it's not referring to ductwork;

74

1     true?
2        MR. SENAK:  Same objection.
3  A    That's true.
4  Q    Did you have any experience with-- yourself --
5     observing this kind of accumulated debris in
6     ductwork at Ball Monticello?
7  A    No.
8  Q    Had you ever seen accumulated debris of any kind at
9     any location at Ball Monticello?
10 A    No, not to my knowledge.
11 Q    Did you ever look inside of the ductwork yourself?
12 A    Yes, one time.
13 Q    And when was that?
14 A    At one of these fires, they put us up in a scissor
15    lift and we air chiseled a hole in the duct because
16    the fire was right in the duct.  And we used what
17    we call a cellar nozzle --
18 Q    And what is that?
19 A    A cellar nozzle is what we use to fight basement
20    fires.  It's basically a spinning ball that screws
21    onto the end of the hose line and it has holes that
22    come out in all different directions.  So then we
23    lower it down into a basement, pressurize it, it
24    spins, and puts the fire out.  Less dangerous for
25    us than going down into a basement fire.  We had

75

1     used that in the duct to see -- we put that cellar
2     nozzle up into the duct to extinguish the fire.
3  Q    So this time that you were kind of looking -- able
4     to see inside of the ductwork, there was actually
5     an ongoing fire?
6  A    Yes, sir.
7  Q    In the ductwork?
8  A    Yes, sir.
9  Q    So you weren't exactly concerned with what your --
10    you know, your immediate surroundings or whether
11    there was any accumulations in the ductwork at that
12    time?
13 A    Yes, sir.
14 Q    You're more focused on, "I got to get this fire
15    out"?
16 A    Yes, sir.
17 Q    Do you recall when that event that you're referring
18    to approximately was -- let me ask it this way
19    first.
20       Would it have been before the May 23, 2014
21    fire?
22 A    Yes, sir.
23 Q    And do you recall approximately how long before the
24    May 23, 2014 fire this event that you're referring
25    to where you actually cut into the ductwork

76

1     occurred?
2  A    At least a decade because if I was doing the
3     cutting, I was still a firefighter and not an
4     officer.
5  Q    So as a captain, you yourself wouldn't be doing
6     that task that you just described to me?
7  A    Correct.
8  Q    So that may have happened after this event that
9     you're referring to.  You just don't know because
10    it wouldn't have been you doing it?
11 A    That's correct.
12       MR. SENAK:  Object to foundation.
13 MR. O'BRIEN:
14 Q    To your knowledge -- we've seen the word flues
15    used, and you understand that to mean ductwork --
16    are there any other words or terms that you're
17    aware of that the fire department personnel use
18    synonymously with ductwork?
19       MR. SENAK:  Object to foundation.
20 A    Exhaust system.
21 Q    So if -- any reference to an exhaust system, you
22    would understand that to mean ductwork?
23 A    Yes.
24 Q    It was your understanding that other fire
25    department personnel also used the same term; true?



77

1  A  Yes, that's correct.
2  Q  There's been a reference in this case to the fact
3     that when Ball produces its cans, as part of that
4     process, it sprays the cans with an internal
5     coating, and part of the purpose of some of the
6     ovens is to bake that spray on. When that happens,
7     some of the spray is converted into a gas and it's
8     supposed to be exhausted through the ductwork,
9     ideally out of the system, out of the building.
10        There's been reference in the case to the fact
11    that it didn't always make it out of the building,
12    and sometimes that gas would form -- kind of
13    condense it or accumulations of a particular solid
14    within the ductwork and within the ovens
15    themselves.
16        If I'm making that representation to you of
17    everything I just said, were you aware of anything
18    to that effect prior to me just making that
19    representation to you?
20        MR. SENAK:  Object to form and foundation.
21 A  No, sir.
22 Q  Not aware of that?
23 A  No, sir.
24 Q  Back on Exhibit 6, the last sentence.  Looks like
25    Ball is advising that "the fire damper had been

78

1     properly closed and there was no extension into the
2     building."
3        So this is just indicating, first of all,
4     there's no spread of the fire from the ductwork to
5     the inside of the building; right?
6  A  That's correct.
7  Q  And then I want to ask you about the fire damper.
8     What is the purpose of a fire damper?
9  A  To prevent fire from backflowing or traveling in a
10    direction you don't want it to travel.
11 Q  Basically like a door that you can close and try to
12    keep a fire in one area?
13 A  Yes, that's correct.
14        MR. SENAK:  Can you just tell me where that
15    reference was?
16        MR. O'BRIEN:  Sure.  It's on page 3, and it is
17    the last sentence of the second paragraph.
18        MR. SENAK:  Thank you.
19 MR. O'BRIEN:
20 Q  So when you have an event like this in ductwork --
21    a fire event in ductwork -- is it important that
22    fire dampers be closed?
23 A  Yes.
24 Q  Can you explain why that is.
25 A  The same as the fire doors in a building.

79

1     Basically you're trying to stop the forward
2     progression of a fire to an area that's not burned.
3  Q  Are fire dampers generally pretty effective in
4     confining a fire to a given location?
5  A  Yes.
6  Q  Are you aware of any instance in which a fire
7     damper has been closed and a fire was still able to
8     spread to other, kind of, undesired locations?
9  A  I can't give you a personal, "Yes, I remember this
10    happening this one time," but --
11 Q  Would that have been at Ball facility?
12 A  No, I'm saying I can't remember --
13 Q  Just in general?
14 A  No, I don't know that that's ever happened.
15 Q  That was my question.  So you personally don't know
16    of that ever happening?
17 A  That's correct.
18 Q  And the risks of a fire damper being left open is
19    kind of -- I take it from what you've told me, the
20    fire is going to spread to places you don't want it
21    to spread?
22 A  Correct.
23 Q  The very next paragraph, second sentence says, "The
24    air system was shut down and access doors into the
25    flue were opened."

80

1     When it talks about an air system, do you know
2     what that's referring to?
3        MR. SENAK:  Object to foundation.
4  A  No, sir.  I don't.
5  Q  Is it important -- if you have a suspected
6     developing or ongoing fire -- to cut off the air
7     source to that fire?
8  A  Yes.
9  Q  Why is that?
10 A  Because that's one of the ways we can extinguish
11    fire is we can remove the oxygen from the fire.
12 Q  So understanding you don't know exactly what an air
13    system is -- what this is referring to -- if
14    there's anything providing air to a suspected
15    ongoing or developing fire, the first thing you
16    need to do is shut off that air; right?
17 A  That is correct.
18 Q  And you would want to do that before you would open
19    up any access doors into the ductwork?
20 A  Yes, that is correct.
21 Q  Why is that?
22 A  Because in a system where you have forced air
23    pushing through, if you open that, basically it's
24    almost like a furnace.  I mean, it becomes a blast
25    furnace because the fire can be fueled and pushed



81

1    by the forced air.

2 Q    This refers to access doors.

3        Did the ductwork -- are you familiar with

4    access doors on the ductwork in the Ball facility?

5    Are you aware that those were there?

6 A    Yes, I am.

7 Q    And just generally, where are these access doors

8    located?

9 A    The only ones that I can recall are up on the big

10    vent tubes themselves.

11 Q    The ductwork?

12 A    Yes, the ductwork. There's side access panels

13    that --

14 Q    So let's use -- you've got some exhibits in front

15    of you -- 2, 3, and 4; is that correct?

16 A    Yes.

17 Q    So there's vertical stretches of ductwork from a

18    given oven; right? Would there be access panels on

19    the vertical portion of the ductwork that you were

20    aware of?

21 A    Not that I'm aware of.

22 Q    The ones that you would be aware of would be on the

23    horizontal portions of the ductwork; is that right?

24 A    Yes, that is correct.

25 Q    To your knowledge, would those have been on the

82

1    ductwork associated with each oven?

2 A    I can't answer that. I don't know.

3 Q    Okay. So I take it -- a little further down, the

4    second to last paragraph. "Four access doors were

5    opened."

6        You don't know which access doors are being

7    referenced here, do you?

8 A    No, sir. I do not.

9 Q    One thing I neglected to ask you on the previous --

10    is there anything on Exhibit 5 that would allow you

11    to determine which line -- which production line

12    this fire was associated with?

13 A    No, sir.

14 Q    And is the same also true with respect to

15    Exhibit 6? Is there anything on there that would

16    allow you to determine what production line at

17    Ball's facility was involved in this event?

18 A    No, sir.

19 Q    Earlier -- so we've seen two reports now that refer

20    to fire in the ductwork. And when we started this,

21    you told me it was your understanding that there's

22    nothing on the internal surfaces of the ductwork

23    which would be flammable.

24        Do you have an understanding of how a fire

25    inside the ductwork can occur given that the

83

1    internal surfaces are not flammable?

2        MR. SENAK: Object to foundation.

3 A    Yes, sir. Because the inside of the ductwork is

4    not actually burning. It's only -- solids don't

5    burn; only gases burn. So somewhere in this, they

6    have -- some particle has converted from either

7    solid or liquid to gas, and as the vapors come off

8    of that, that's what actually burns. That's what

9    actually catches on fire.

10 Q    The bottom paragraph says -- I'm on page 3 of

11    Exhibit 6 -- "After investigation, the fire was

12    determined to be caused by an overheat in the flue

13    system due to a malfunction in the blower."

14        Is this indicating that the fire department's

15    investigation led the fire department to determine

16    that this was the cause of the fire?

17 A    Yes, that's correct.

18 Q    And I don't see Mike -- I didn't see -- let me

19    check. I didn't see Mike Hill's name in here.

20 A    It's on page 6.

21 Q    Is his first name actually Ronald?

22 A    Yes.

23 Q    Ronald M. Hill is Mike Hill?

24 A    Yes.

25 Q    And that's the cause and origin investigator?

84

1 A    Yes, sir.

2 Q    So would this have been a determination that Mike

3    Hill would have reached --

4 A    Yes, sir.

5 Q    In this case? Okay.

6        I'm guessing I know the answer to this, but

7    flip back to the first page, box H2. See that? It

8    says detector.

9 A    Yes.

10 Q    It says, "Detector did not alert them."

11        Could you just tell me what that means.

12        MR. SENAK: Object to foundation.

13 MR. O'BRIEN:

14 Q    You're familiar with these reports and the fields

15    that populate these fields; right?

16 A    Yes.

17 Q    Do you know what "Detector did not alert them"

18    means?

19        MR. SENAK: Same objection.

20 A    Yes, sir.

21 Q    If you know, then please tell me what it means.

22        MR. SENAK: Same objection.

23 A    The detector -- the smoke or fire detector, smoke

24    alarm, smoke detector system didn't alert the

25    occupants of the structure.

85

1 Q   And in this case, it did not?

2 A   That is correct.

3 Q   And is there anywhere in this report that would

4     have indicated why it did not that you can see?

5 A   No, sir. But that is just a generic. So if your

6     house -- if your stove catches on fire and you see

7     the stove catch on fire and you call the fire

8     department, then we would automatically check,

9     "Detector did not notify the occupants."

10     We would check that box -- that's for nighttime

11     fires. Did your smoke detectors work? Did they

12     wake you up?

13 Q   So this is not necessarily indicating detectors

14     didn't work. It's indicating, potentially, they

15     discovered it independently of any kind of fire

16     alarm system?

17 A   That's correct.

18 Q   Could be either or?

19 A   Correct.

20 Q   Do you agree that the earlier a fire is discovered,

21     the more likely it is that serious damage can be

22     avoided?

23 A   Yes.

24 Q   As a general proposition?

25 A   Yes, sir.

86

1 Q   And conversely, the longer it takes to discover or

2     to respond to a fire, potentially the worse or more

3     serious damage that can occur; correct?

4 A   Correct.

5 Q   Because that allows more time for a fire to spread

6     without intervention; right?

7 A   Correct.

8 Q   It's referenced on page 3 a blower malfunction.

9     Did you ever have any awareness in your

10     experiences with Ball of a blower -- any kind of a

11     blower system not functioning correctly and causing

12     or contributing to any fire events in which you

13     have a memory?

14 A   No --

15     MR. SENAK: Can you identify the exhibit and

16     page?

17     MR. O'BRIEN: Sure. Exhibit 6, page 3.

18 MR. O'BRIEN:

19 Q   And I'm sorry. I missed your answer.

20 A   No, sir.

21 Q   You don't recall personally dealing with any kind

22     of blower malfunction at Ball Monticello; true?

23 A   That's true.

24 Q   Once again, we have a report indicating fire in the

25     ductwork; true?

87

1 A   True.

2 Q   And, again, this is -- at least, from a macro

3     level, has common characteristics of what we saw on

4     the May 23, 2014 report as well with reporting a

5     duct fire; true?

6     MR. SENAK: Object to foundation.

7 A   True.

8     (Deposition Exhibit 7 was marked for

9     identification.)

10 Q   Captain Strange, I'm going to hand you Exhibit 7.

11     Do you see the date, July 11, 2013?

12 A   Yes.

13 Q   So that's just over three months after the previous

14     one we were looking at, Exhibit 6?

15 A   Yes.

16 Q   Same location, Ball Monticello. Now, feel free to

17     look at this document on the last couple pages

18     where we see the identities. I did not see where

19     it indicated you were present.

20     Just tell me if you agree with that.

21 A   Yes, sir. I agree with that.

22 Q   So according to this document, you would not have

23     been present during the event described in this

24     report?

25 A   Correct.

88

1 Q   Do you have any knowledge or memory of a fire

2     occurring at Ball Monticello on July 11, 2013?

3 A   No, sir.

4 Q   Again, you're familiar with these reports in

5     general and perhaps you can kind of -- you're

6     familiar with their content, and maybe you can kind

7     of shed light on some things in here.

8     MR. SENAK: So I don't interrupt you, just a

9     standing objection of foundation given his prior

10     testimony.

11     MR. O'BRIEN: Sure.

12 Q   Page 2, it indicates -- down at the bottom, it says

13     Ronald M. Hill.

14     And that is who you referred to as Mike Hill,

15     the cause and origin investigator?

16 A   Yes, sir.

17 Q   If Mike Hill is authoring the narrative, does that

18     tell you anything in particular about the fire?

19 A   No, sir.

20     MR. SENAK: Object to foundation.

21 MR. O'BRIEN:

22 Q   So the fact that he has authored this doesn't mean

23     that necessarily Monticello Fire Department did

24     kind of one of these extensive cause and origin

25     investigations; is that right?



89

1  A    That's correct.  He is also a lieutenant; so he
2       would be a company officer.  So if he was incident
3       command at that incident, then he would write that
4       report.
5  Q    Has overlapping responsibilities?
6  A    Yes, sir.
7  Q    If you turn to the third page -- the first
8       paragraph about halfway through it -- there's a
9       line that starts with factory representative.
10        Do you see that?
11        MR. SENAK:  I'm sorry.  Third page?
12        MR. O'BRIEN:  Yeah, it's at the top paragraph.
13      It's about halfway through.
14        MR. SENAK:  Okay.
15  MR. O'BRIEN:
16  Q    Are you there?
17  A    Yeah.
18  Q    "The factory representative reported that the
19      furnace has a buildup of can lubrication on and
20      inside it that ignited."
21        I just want to make sure.  When it refers to
22      can lubrication in here, do you know what that's
23      referring to?
24  A    No, sir.
25  Q    That's what I thought.  I just wanted to make sure.

90

1       "He also stated that the air compressor that blows
2       air through the furnace was not operational and
3       that led to the furnace overheating and causing the
4       oily buildup to catch fire."
5         Do you see that?
6  A    Yes, sir.
7  Q    Do you know what this air compressor is that's
8       being referenced here?  Do you know what that's
9       referring to?
10  A    No, sir.
11  Q    I take it you wouldn't know whether this air
12      compressor would relate at all to the blower issue
13      we saw in the previous Exhibit 6?
14  A    No, sir.
15  Q    You just don't know one way or the other?
16  A    No, sir.
17  Q    Thank you.  Beginning of next paragraph says, "The
18      furnace unit was smoking heavily and the east end
19      of the unit showed signs of high heat.  The unit
20      was scanned with a TIC and showed temperatures in
21      the 600-degree range."
22        Do you see that?
23  A    Yes, sir.
24  Q    What is a TIC?
25  A    Thermal imaging camera.

91

1  Q    Is that something that you have personally used, a
2       thermal imaging camera, in your firefighting
3       experience?
4  A    Yes, sir.  All the time.
5  Q    And other folks at the Monticello Fire Department
6       also use that tool as well; correct?
7  A    Yes, sir.
8  Q    Do you have training that's particularly applicable
9       to the use of a thermal imaging camera -- did I get
10      that right?
11  A    Yes, sir.
12  Q    Okay.  Can you describe that training for me.
13  A    Whenever we have either an updated model of our
14      thermal imaging cameras or if we switched to a
15      different manufacturer, we will have them come in
16      and they will put on a -- basically what we would
17      call an in-service training session on the
18      functions of the camera, how to properly operate
19      the camera.
20        And then from that point, that's what we would
21      do with the manufacturer of it.  And we as company
22      officers then incorporate that into our regular
23      shift training.  So if we would do a mayday or a
24      rescue scenario where we would black out an area,
25      we will use all thermal cameras to try to simulate

92

1       rescuing victims and things like that.
2  Q    So I want to make sure I understand.
3         You get training from the manufacturer when you
4       get a new model and then you kind of take that
5       information and develop your own kind of hands-on
6       training to how you anticipate using it in the
7       field; is that right?
8  A    Yes, that's correct.
9  Q    And you said you used thermal imaging cameras all
10      the time?
11  A    Yes, sir.
12  Q    What are some of the things that you use them for?
13  A    We use them on almost every fire we have because
14      prior to the invention of thermal cameras -- or
15      when they introduced them into the fire service --
16      if we had a fire in this room, we would have to
17      tear the drywall completely down from all four
18      walls to check to make sure there was no extension
19      of fire behind the wall.
20        Now, with the invention of thermal cameras, we
21      can sweep the whole entire room.  And if we find
22      one hot spot, we can cut a small hole in the
23      drywall, check for extension, pull out the
24      insulation, and we can significantly reduce the
25      amount of damage we do.  That's the main use for

93

1  them.
2       Secondary use is for use to locate fires when
3  we're inside houses because there's zero visibility
4  inside a house fire.  So we use the thermal cameras
5  to locate victims and locate the seat of the fire.
6  Q   Do you have any knowledge -- I'll represent to you
7      there were thermal images taken in this case of
8      some of the ductwork.
9           Did you know that?
10 A  No, sir.
11 Q  You never saw those thermal images; is that true?
12 A  That is correct.
13 Q  Did you even know that -- maybe I just asked you
14     this.
15          Did you know that thermal images were taken?
16 A  No, sir.
17 Q  Do you know one way or another whether Ball has any
18     employees that are trained in the use -- proper use
19     of thermal imaging cameras?
20 A  I have no idea.
21 Q  Do you have any knowledge of what the normal
22     operating temperature range for the ovens are?
23 A  No, sir.
24 Q  I wouldn't think so.  I just want to make sure.  So
25     I think one of the uses you described for the

94

1      thermal imaging camera is to identify or kind of
2      investigate where a fire is ongoing.
3           Is that one of the uses?
4  A  Yes, that's correct.
5  Q  And that would be in a situation where maybe you
6      can't see inside behind a wall for example.
7           You can't see the fire, but you want to check
8      to see if there may be a hot spot that would
9      indicate a fire is going on there; is that right?
10 A  That's correct.
11 Q  Can you kind of walk me through how you do that
12     with a thermal imaging camera?  Are there certain
13     steps you have to do?
14          Just walk me what you would do in that
15     situation where you're using a thermal imaging
16     camera to kind of tease out or discover whether
17     there is a fire at a suspected location.
18 A  Really, it's pretty simple.  I mean, our thermal
19     imaging cameras are handheld, have about a 4-inch
20     screen on them.  It's just a push button on.  Has a
21     temperature thermometer on the side.  And our
22     newest one has actually a color indicator, so the
23     higher the temperature goes, you'll get a red dot
24     at the highest point once it exceeds a certain
25     degree mark.

95

1       So then what we would do is we would just start
2  from where we were either told the fire was, or if
3  it was, like, a residential fire, we would just
4  begin our regular search.  And just as --
5  everything on the screen shows up black except hot.
6  The hotter something is, it shows up white until it
7  turns red.  And then as soon as you see the red and
8  orange, you know that you've hit exactly the seat
9  of the fire.
10 Q  You said it has a screen.  Is that screen live
11     action?  Like as you move it around, you can see
12     almost like a video?
13 A  Yes, that's correct.
14 Q  And then you can capture actual images with the
15     camera as well; right?  Or is that not the case?
16 A  Not on our models.  But yes, the manufacturers do
17     have thermal imaging cameras that actually are
18     wired that you can capture not only live images,
19     you can capture still screenshots.  Now they're
20     Bluetooth'd; you can do that.
21 Q  I imagine they get pretty high tech?
22 A  Yes.
23 Q  But if I understand you correctly, the way the
24     Monticello Fire Department uses them, you just use
25     them to scan.  You're not actually capturing

96

1      images; is that right?
2  A  That's correct.
3  Q  And you're not recording any sort of video of what
4      you're looking at.  It's just purely to look at the
5      temperatures?
6  A  That's correct.
7  Q  Let's say you have a suspected fire -- a suspected
8      developing or ongoing fire and you point the
9      thermal imaging camera at that and you observe it
10     over time and the temperature is coming down.
11          What does that tell you?
12 A  That there's no longer an active, free-burning
13     fire.
14 Q  At that location?
15 A  Yes.
16 Q  Back to Exhibit 7.  Skip a sentence after the one
17     about the thermal -- actually, it's the same
18     sentence.  A couple lines down it says, "There's no
19     good way to access the interior of the machine."
20          Do you see that?
21 A  Yes.
22 Q  With respect to the ovens, was there any good way
23     for -- in response to any fire event -- for
24     Monticello Fire Department to see inside of the
25     ovens?



97

1    MR. SENAK:  Object to foundation.
2 MR. O'BRIEN:
3 Q    In your experience?
4 A    Not that I'm aware of, no, sir.
5 Q    You'd have to open it up; right?
6 A    Yes.
7 Q    And if it's been operating, you can't really open
8      it up because it's too hot; true?
9          MR. SENAK:  Object to foundation.
10 A    Honestly, I don't really know if it'd be too hot or
11      just -- it's not something we would -- we normally
12      don't mess with industry's equipment.
13 Q    Sure.  So put a different way, you're not going in
14      there and opening it up; right?
15 A    That is correct.
16 Q    And you would have to open it up if you were to be
17      able to see what's going on inside?
18 A    That's correct.
19 Q    You can't see it from the external of the oven?
20 A    That would be correct.
21 Q    If you turn to page 5 of Exhibit 7, do you see
22      there's some boxes there we didn't see on Exhibit 6
23      or 5 but we did see on Exhibit 1, and those boxes
24      are D, E1, C, things like that.
25          Do you see those?

98

1 A    Yes, sir.
2 Q    All right.  Now, understanding you weren't present
3      at this, I also understand these are prepopulated
4      fields; true?
5 A    True.
6 Q    So with respect to C, when it says, "515, heavy
7      oils," as far as onsite materials or products, what
8      is this indicating?
9          MR. SENAK:  Object to foundation.
10 A    What it's indicating is that any time we would go
11      to a industry that has heavy oils or hazardous
12      materials or anything like that that's on site.
13 Q    It's just indicating they store these products on
14      site?
15 A    I didn't write the report.
16 Q    I understand.
17 A    So I would not have clicked that because my
18      understanding is what federal government wants, the
19      NFIRS, is that only to be checked if that is part
20      of the incident.
21 Q    But you weren't there, so maybe this was part of
22      the incident; true?
23 A    That's true.
24 Q    So your understanding is this should only be here
25      if it's involved in the incident?

99

1 A    That's correct.
2 Q    And then with respect to ignition, can you just
3      tell me what these prepopulated fields indicate.
4          Understanding you may not know the specificity
5      of what they're indicating with respect to this
6      specific event, in general, what are these
7      categories referring to?
8 A    It's -- the "processing/manufacturing" is that
9      something in the machinery ignited the fire.  The
10      "radiated, conducted" means that the heat spread
11      from the initial source of ignition and started a
12      secondary fire or spread the fire to a different
13      location.
14 Q    So it extended as the -- kind of the terminology
15      we've seen in the other reports?
16 A    Yes, sir.  And the "film, residue" is indicating
17      that there was some type of film or residue or
18      something that was flammable on the machinery that
19      also caused the extension of the fire.
20 Q    And then under "Cause of ignition:  failure of
21      equipment or heat source," does that tell you
22      anything beyond just what it says right there?
23 A    No, sir.
24 Q    All you know is there's some equipment issue?
25 A    Yes, sir.

100

1 Q    And then if we look at the names again, if you
2      would just indicate for me which, if any, of these
3      individuals are no longer with fire department.  I
4      think the names begin on page 7.
5 A    Eric Lamb, no longer with the department.  David
6      Berkshire, no longer with the department.  Eric
7      Wheeldon, no longer with the department.  Cole
8      Gilbert, no longer with the department.  Brooks
9      Ingle, no longer with the department.  Joseph Goad,
10      no longer with the department.
11 Q    That's it; right?
12 A    Yes, sir.
13 Q    The rest or remainder would still be employed with
14      Monticello Fire Department?
15 A    That's correct.
16 Q    Thank you.
17          (A recess was taken from 1:02 p.m. to 1:06
18      p.m.)
19          (Deposition Exhibit 8 was marked for
20      identification.)
21 MR. O'BRIEN:
22 Q    Captain Strange, we took another short break.
23      You should have in front of you now what's
24      marked as Exhibit 8.  Do you have that?
25 A    Yes.



101

1 Q   And that is a November 19, 2013 -- another incident
2   report for Ball Monticello; true?
3 A   True.
4 Q   And this is -- the last one was in July, so now
5   we're about a little more than four months after
6   the previous incident report; true?
7 A   True.
8 Q   If you look at page 9, I think it indicates you
9   were present at the scene.
10 A   Yes, that's correct.
11 Q   And what does POV mean?
12 A   Personally-owned vehicle.
13 Q   So were you off duty at the time?
14 A   Yes.
15 Q   So you just came to the scene of your own -- tell
16   me about that.
17       Is that typical for you to come in a personal
18   vehicle?
19 A   Yes.  Officers are allowed to take our fire gear
20   home with us, if we choose to, and respond directly
21   to the scene instead of to the fire station to get
22   our gear and get on an apparatus.
23 Q   Given that you came in a personal vehicle, does
24   that tell you anything about your kind of
25   involvement with this fire?

102

1 A   No, sir.
2 Q   I guess what I was getting at is does this indicate
3   that you wouldn't have gone inside?  Or you still
4   could have done that?
5 A   I still could have been assigned to do that.
6 Q   The incident type is one I don't think we've seen
7   before.  "Excessive heat, scorch burns."
8       Do you see that?
9 A   Yes, sir.
10 Q   As a general matter, what is that indicating with
11   this field description?
12       MR. SENAK:  Object to foundation.
13 MR. O'BRIEN:
14 Q   Well, you were at the scene also; true?
15 A   Yes.
16       MR. SENAK:  Same objection.
17 MR. O'BRIEN:
18 Q   And this is a prepopulated field; right?
19 A   Yes, sir.
20 Q   And as a general matter, what does this description
21   indicate to you?
22 A   We would use this if there was some type of arcing
23   or, like, excessive heat where there was no flame,
24   but it would scorch something, blacken it.
25 Q   So you didn't necessarily see flames, and in that

103

1   circumstance, this would be a description that
2   would fit?
3 A   Yes, sir.
4 Q   We saw a reference in previous reports to
5   overheating.
6       Excessive heat and overheating sound similar to
7   me, and, I guess, what would the difference between
8   those terms be?
9 A   Overheating, my understanding would be is -- what
10   the NFIRS wants is a piece of equipment that's
11   actually overheated and caused the fire, whereas
12   excessive heat could be excessive heat from an
13   external source.
14 Q   And so I guess what I wanted to make sure was
15   overheating doesn't -- the difference isn't that
16   there's actually flames observed.
17       They may or may not be observed in either one
18   of those scenarios of overheat or excessive heat;
19   is that true?
20 A   Yes, that's true.
21 Q   On page 2, Mr. Hickman is there indicated again.
22       See that?
23 A   Yes, sir.
24 Q   So he would have been incident command.  He's still
25   assistant chief as of this time; true?

104

1 A   Yes, sir.
2 Q   Looking at kind of the date, seeing who the
3   incident command was, before we get into the
4   narrative, do you have any memory of this
5   November 19, 2013 fire -- or I should say incident.
6 A   No, sir.
7 Q   Page 2, first paragraph.  Last sentence talks about
8   "reported a smell of something burning but to
9   visible flame or smoke."
10       Did you ever, in any of your experiences with
11   Ball Monticello, smell anything unusual or
12   distinctive or --
13 A   No -- well, I mean, I think the factory itself has
14   a manufacturing smell.  But no, nothing that would
15   -- out of what's --
16 Q   Maybe I should have asked a little bit better
17   question.
18       As far as something that's burning, that would
19   have a distinctive or unique smell when it burns,
20   did you ever experience anything like that at Ball
21   Monticello?
22 A   No, sir.
23 Q   And I take it you don't have any memory of smelling
24   anything burning on this particular incident?
25 A   That's correct.



105

1  Q   In the third paragraph, I think second sentence,
2      "FD actions at further investigation could result
3      in damage to the oven."
4          Do you see that?
5  A   Yes, sir.
6  Q   Do you know what that's referring to?
7  A   Yes, sir.
8  Q   Please explain what that's referring to.
9  A   He's talking about -- that in order to further
10     investigate inside -- and honestly I don't even
11     know if they were at an oven or what they were at.
12     But whatever piece of equipment they were at, for
13     us to get inside it, probably the only way for us
14     to get inside it would be to break it open.
15 Q   Would this be another way in which it's a difficult
16     piece of equipment to access with respect to the
17     ovens?
18 A   Yes.
19 Q   Up at the top, the first sentence. "Responded to
20     Ball Metal for a reported fire in an oven."
21         Do you see that?
22 A   Yes, sir.
23 Q   So that tells you this is talking about an oven?
24 A   (Nods head.)
25 Q   I thought this has the cause and ignition boxes,

106

1      but I don't think it -- it doesn't appear that
2      those boxes are present in this report, does it?
3  A   No, because they should have been --
4  Q   Well, then I don't think I need to talk about that
5      with you any further.
6          So we've looked at four different incidents.
7      Are there any others that you can recall personally
8      being involved in that we haven't talked about?
9  A   Just the one that I explained about cutting the --
10 Q   Before you were an officer?
11 A   Yes, sir.
12 Q   Aside from that, any others that you can recall?
13 A   No, sir.
14 Q   Let's look back at Exhibit 1, which was the May
15     23rd, 2014 report.
16         On the first page -- hopefully it won't take
17     too long -- box G2. Do you see that?
18 A   Yes, sir.
19 Q   And that would be Ball 184. There's an estimated
20     dollar losses and values. It says, "pre-incident
21     value" property, and it says basically around 3.4
22     million.
23         Do you know where that number is coming from?
24 A   No, sir.
25 Q   This wouldn't have been a portion of the report

107

1      that you input?
2  A   That's correct.
3  Q   Let's actually go ahead and mark this as well.
4          (Deposition Exhibit 9 was marked for
5      identification.)
6  Q   Captain Strange, I'm handing you what's marked as
7      Exhibit 9.
8          And if you look at the top of Exhibit 9 and
9      compare it to Exhibit 1, see we've got the same
10     date, same location. We've got a different
11     incident number. Do you see that?
12 A   Yes, sir.
13 Q   So is it the case that -- I guess can you just
14     explain why there are two incident reports for this
15     particular date?
16 A   Because we came back a second time after the
17     initial fire was put out.
18 Q   That's what I thought. I just wanted to make sure.
19         So because you left -- this first visit you had
20     determined, "We've got it under control," or,
21     "We're safe to leave." Things start back up.
22         Even though you've already been there, you're
23     going to create a second incident report on this
24     second trip to Ball Monticello?
25 A   Yes, that's correct.

108

1  Q   Now, the first line -- on Exhibit 1 the first line
2      of the remarks on page 2 indicates that it was a
3      report of an oven fire.
4          And if I understood your previous testimony,
5      your observations were that the actual fire was
6      observed on the ventilation ductwork at the
7      juncture with the oven; is that right?
8  A   Yes, that's correct.
9  Q   You didn't ever actually observe flames inside of
10     the oven in this instance, did you?
11 A   No, sir.
12 Q   I wanted to clarify something with you. Same page
13     pretty much smack dab in the middle. "We were
14     spraying the ventilation tubes."
15         Do you see that?
16 A   Yes, sir.
17 Q   Ventilation tubes is your term; correct?
18 A   Yes, sir.
19 Q   Are you referring to ductwork when you say
20     ventilation tubes?
21 A   Yes, sir.
22 Q   You've already kind of discussed with Mark the
23     statement, "There was a small amount of visible
24     fire" -- I'm up a little higher in the paragraph --
25     "There was a small amount of visible fire burning



109

1    the insulation at the top of the easternmost oven."
2    And the next sentence says, "There was almost no
3    smoke in the air."
4        Do you see that?
5 A   Yes, sir.
6 Q   What does the fact -- what, if anything, does the
7    fact that there was almost no smoke in the air,
8    what did that tell you?
9 A   That the fire was venting through the exhaust
10    system or through the ductwork.
11 Q   So it wasn't surprising necessarily to you that you
12    didn't see smoke at that time?
13 A   No.
14 Q   I think maybe you said this earlier.
15        Did you know how this fire was discovered by
16    Ball?
17 A   No, sir.  I don't.
18 Q   So you don't know whether they observed smoke as
19    the first indication of a developing fire?
20 A   That's correct.
21 Q   And it talks about this visible fire.
22        Was it external to the ductwork at this
23    location, or were you able to see into the ductwork
24    at that location?
25 A   External.

110

1 Q   It was external?
2 A   Yes.
3 Q   Was it actually burning that insulation you
4    described earlier?
5 A   Yes, sir.
6 Q   If I understood you correctly earlier, from the
7    time you arrived, you were able to see flames at
8    those two locations at the same time?
9 A   Yes, sir.
10 Q   And then when I say those two locations, I'm
11    referring to the eastern side and the western side
12    of the oven where -- well, the ventilation where it
13    intersects with the oven.
14 A   Yes, that is correct.
15 Q   Was the fire -- and maybe you said this, and if you
16    did, I apologize.
17        You later refer to the fact that -- I think
18    that there's reference to the fact that there was
19    also a fire observed in the connecting ductwork
20    between those two locations; is that right?
21 A   Yes, that is correct.
22 Q   Was that ongoing at the time you arrived, or did
23    that happen later?
24 A   That happened later.
25 Q   Do you recall approximately how long after you

111

1    arrived it was before you observed fire in that
2    connecting ductwork between the eastern and western
3    sides of the oven?
4 A   No, sir.  I don't recall.
5 Q   Did the fact that you saw these flames on either
6    side of the oven, did that tell you anything about
7    what was causing the fire?
8 A   No, sir.
9 Q   Did it tell you anything about where the origin of
10    the fire was?
11 A   Yes, sir.  It would lead me to believe that the
12    origin was someplace in or near this oven and that
13    -- I guess I shouldn't say that.  Obviously there's
14    fire inside of the oven and the fire is traveling
15    through the vented area.  The fire goes from --
16 Q   And just explain to me what it is that leads you to
17    believe that.
18 A   Because the fire's going to travel from, one, where
19    there's fuel, and, two, if there's forced air, so
20    from someplace inside the oven, if that's where it
21    started, which I would assume because we had fire
22    coming out both vents.  If the air handling system
23    is still running and it's forcing air, it's pushing
24    that fire into those ducts.
25 Q   If I understand your previous testimony correctly,

112

1    the cause and origin is more of Mr. Hill's
2    specialty; is that right?
3 A   Yes, sir.
4 Q   So you wouldn't have been asked to actually perform
5    a cause and origin investigation in this case?
6 A   That's correct.
7 Q   Would you consider yourself qualified to do that?
8 A   No, sir.
9 Q   Let's talk about this explosion.  And it's actually
10    -- that sentence we referred to earlier, "We were
11    spraying ventilation tubes and we heard a loud
12    explosion."  We talked a little bit about it
13    earlier.
14        Now, if I understood you correctly, you heard
15    but did not see the explosion; is that correct?
16 A   That is correct.
17 Q   Were you able to determine where the explosion had
18    occurred?
19 A   No.  No, sir.
20 Q   You didn't know at that time?
21 A   To our back.  That's pretty much all we could tell.
22    From where I was standing, it was behind me.
23 Q   Today, do you know where that explosion occurred?
24 A   I believe so.  I believe it was right by the wall
25    -- and I don't know -- by the north wall where that



113

1  tube actually exited the building. I don't know if
2  that's exactly where the explosion occurred. I
3  don't know if that's where it blew out.
4  Q   To your knowledge, did the explosion occur in the
5     ductwork?
6  A   I don't know.
7  Q   To your knowledge, did the explosion damage any
8     ductwork?
9  A   Yes.
10 Q   It did?
11 A   Yes.
12 Q   And as part of the damage to the ductwork that was
13    sustained in this explosion, was any portion -- I
14    guess was the inside of the ductwork exposed to the
15    factory atmosphere?
16       In other words, did it blow a hole in the
17    ductwork?
18 A   Yes.
19 Q   It did?
20 A   Where the ductwork connected to some type of square
21    metal -- and I don't know even what that would be
22    -- it blew out the whole entire side of it.
23 Q   So at that point in the system then, you have the
24    inside of the ductwork being exposed to the outside
25    air of the factory?

114

1  A   Yes, that's correct.
2  Q   Now, this explosion you said was to your back.
3       Just to make absolutely clear, was it close to
4       you?
5  A   No.
6  Q   So it was at a distant location; fair to say?
7  A   Yes.
8  Q   And if we just continue on in your narrative here,
9     after the explosion, at least for a couple of
10    minutes, things didn't change at your location;
11    true?
12 A   True.
13 Q   But then subsequently things did get a lot worse;
14    is that fair?
15 A   Yes, that is.
16 Q   You had -- I think the quote is "had black smoke
17    coming out of the seams where the ventilation tubes
18    connected to the oven."
19 A   Correct.
20 Q   So that, in this location -- I think maybe you
21    already said this -- is where you had seen the
22    flames.
23       Now you're seeing black smoke push out?
24 A   Yes, that's correct.
25 Q   Are you also still seeing flames at that location?

115

1  A   No.
2  Q   At that time it's just black smoke?
3  A   Yes, sir. That's correct.
4  Q   Were you ever able to determine whether the
5     explosion was what caused things to kind of get
6     worse?
7  A   No, sir.
8  Q   Temporally, they got worse after the explosion?
9  A   Yes, sir.
10 Q   But you don't know for sure whether the explosion
11    had anything to do with it?
12 A   That is correct.
13 Q   To your knowledge, did anybody at the fire
14    department -- Mr. Hill particularly -- reach any
15    conclusions about the impact of that explosion on
16    any subsequent events in the fire?
17 A   No conclusions that were ever brought to our
18    attention. Assistant Chief Hickman stated that
19    when the explosion occurred, it blew fire through
20    the roof, blew fire out the side wall of the
21    building. And he told us later on that instantly
22    then black smoke started pushing down, and then the
23    whole garage door where we entered was -- the smoke
24    was just banking down to the floor.
25 Q   And just -- you said the explosion was at a distant

116

1  location to you. I think it's already been said,
2  but I want to be absolutely sure.
3       Where you were at was at this location where
4  Ball had first reported a fire or signs of a fire?
5  A   Yes.
6  Q   That particular oven?
7  A   Yes, that is correct.
8  Q   And you may not know what exact oven that was, but
9     the way I described it to you is accurate?
10 A   Yes, sir.
11 Q   So you heard the explosion. Things are getting
12    worse. If you continue on in your narrative, as
13    you're walking the path of the ventilation tubes
14    to the north of your location, you saw a large amount
15    of fire and heavy black smoke rapidly pushing
16    toward the floor?
17 A   Yes, sir.
18 Q   I think we've kind of already talked about this,
19    but, again, is that pushing towards the floor from
20    the location where you had previously seen flames?
21 A   No, sir.
22 Q   No? Okay. So from where is it pushing down
23    towards the floor?
24 A   From when we were at this oven and I walked the
25    ventilation path back to the north almost the exact

117

1    way we came into the building. So the black smoke
2    and the heavy fire there was on the clear far north
3    wall of the factory.
4 Q   So this is a separate, I guess, view of black smoke
5    being pushed down?
6 A   Yes, sir.
7 Q   At the location where you had originally viewed the
8    flames on either side of the oven, is the black
9    smoke being pushed down at that location?
10 A   No. The black smoke there is just starting to kind
11    of seep out of the seams and around the bottom
12    where it attaches to the oven.
13 Q   And you couldn't tell, I take it, which way that
14    black smoke was coming from, whether it's further
15    up the system or inside the oven.
16    You just couldn't tell from where you were at;
17    true?
18 A   That's correct.
19 Q   You were asked some questions about the sprinklers.
20    Do you recall that?
21 A   Yes.
22 Q   I think there was some indication that they had
23    gone off in some locations. But you were in the
24    specific vicinity of this particular oven, and you
25    don't have a memory of any sprinklers in that area

118

1    going off while you were in that area; is that
2    true?
3 A   Yes, sir.
4    MR. SENAK:  Object to foundation.
5 MR. O'BRIEN:
6 Q   And you were spraying a hand line into the ductwork
7    at that location; true?
8 A   True.
9 Q   Had the -- are you aware of whether there were
10    sprinklers in that area above the oven that you
11    were working with?
12 A   I'm not aware.
13 Q   Don't know?
14 A   Yeah, I don't.
15 Q   Just to be absolutely clear, you have no memory of
16    sprinklers above that oven going off while you were
17    in the vicinity on May 23, 2014?
18    MR. SENAK:  Object to foundation.
19 A   No, sir. I mean, I'm used to being inside
20    buildings when sprinklers are going off while we're
21    fighting fires, so honestly I don't -- it's just
22    probably not something that registers with me. I'm
23    used to being wet, and, I mean, if they're going
24    off, they're going off.
25 Q   You just don't recall one way or the other?

119

1 A   Yeah, I just don't recall.
2 Q   Did you observe -- yourself -- did you observe any
3    sprinklers?  I mean, did you see -- I imagine you
4    probably didn't. You have bigger concerns.
5    But do you remember seeing any sprinkler heads
6    and noticing anything that stuck out to you?
7 A   No, sir.
8 Q   Do you know whether there were any internal
9    sprinklers in the ductwork at this facility?
10 A   No, sir. I have no idea.
11 Q   So if I represent to you there weren't, you
12    wouldn't disagree with that?
13 A   That's correct.
14 Q   In your opinion, would the presence of internal
15    sprinklers in the ductwork have played any role in
16    mitigating the damage of this fire?
17    MR. SENAK:  Object to foundation.
18 A   In my opinion, yes, I believe so.
19 Q   You think it would have?
20 A   Yes.
21 Q   And why is that?
22 A   Any time you have a sprinkler system -- I mean, the
23    sprinkler systems are designed to contain fire
24    early and catch it and hold it in place until the
25    fire department can come extinguish it.

120

1 Q   Can you turn to page 6 of Exhibit 1 for me. I
2    think maybe you talked some about this. I'm
3    looking at box D, and we talked about equipment or
4    service in the context of previous reports and what
5    that generally indicates.
6 A   I'm sorry --
7 Q   Oh, I said 6 and I'm looking at my copy. Let me
8    get you the right page. My apologies. It's Ball
9    189, and I'm looking at box D, ignition.
10    Do you recall talking a little bit about that
11    earlier?
12 A   Yes, sir.
13 Q   And in the context some of other reports as well.
14    We talked about that equipment or service entry
15    on one of those previous reports. You agree?
16 A   Yes, sir.
17 Q   Can you just kind of indicate for me what are these
18    other prepopulated descriptions indicating in this
19    case?
20 A   I would have to check for sure to see why he has
21    four of them listed. But equipment or service, I
22    think this is the pre-population from the -- where
23    the fire has originated, like the origin of the
24    fire. And then the heat source is -- they're
25    saying from powered. D2, 10 is heat from a powered



121

1  unit. And then the D3 is the material that's first
2  ignited in the pipe, the conduit, or the ductwork.
3  And then D4, type of material first ignited, that's
4  obviously -- I don't know. He put a 00 in there,
5  so he must not have even checked that one.
6 Q  Again, with this -- you've indicated D3, item first
7  ignited, pipe, duct conduit.
8      But if I understood your previous testimony
9  correctly, the duct itself is not flammable; true?
10 A  True.
11 Q  So there has to be something in the duct, either a
12  gas or perhaps some sort of accumulation that is
13  flammable in order for a fire to occur there; true?
14 A  Correct.
15 Q  If you turn the page to Ball 190, box J says fire
16  origin. And the way I understand this is that all
17  this is really identifying is what story of a
18  building was the origin.
19      Was that the case?
20 A  J -- which one? J1 or J2?
21 Q  J1.
22 A  Yes, sir. It's signifying it's a one-story
23  building.
24 Q  This isn't specifically identifying the point of
25  origin. It's just saying it's on the first floor

122

1  of this building?
2 A  Correct.
3 Q  And J2 is simply indicating it was confined to this
4  particular building; it didn't spread to any other
5  building?
6 A  That's correct.
7 Q  And aside from those kind of determinations with
8  respect to origin, there wasn't any other origin
9  determination made by Monticello Fire Department;
10  true?
11 A  True.
12 Q  Material contributing most to flame spread, box K.
13      Do you see that?
14 A  Yes.
15 Q  The pipe, duct, conduit, we've already seen that on
16  the ignition box; right?
17 A  Yes.
18 Q  So let's skip over that one.
19      The paint varnish, this is also a prepopulated
20  entry?
21 A  Yes.
22 Q  Do you know what this is referring to with respect
23  to this incident?
24 A  No, sir.
25 Q  And this would have been something that Mr. Hickman

123

1  would have input into this report?
2 A  Yes, sir.
3 Q  Do you have any knowledge of whether there was any
4  determination made by anyone at Monticello Fire
5  Department of which of these two identified
6  contributing materials, if either one, was
7  contributing more than the other one?
8 A  No, sir.
9 Q  Let's take a look at the -- briefly -- the second
10  incident report from the same date. So that would
11  be Exhibit 9. If you'd just take a moment to flip
12  through, on the second page it says, "unknown staff
13  member."
14      We do see the individuals identified at the
15  scene on page 4, and your name is there; correct?
16 A  Correct.
17 Q  But you would agree, as a general matter, there's a
18  lot less information about what was going on in the
19  second visit than we just saw on the previous
20  report from the same day?
21 A  Correct.
22 Q  And I assume that's just a product of the fact that
23  you were just there. Basically we have a
24  re-ignition situation. All the details we need are
25  in that prior report.

124

1      Is that the case?
2 A  I don't know if we had a re-ignition or if it was
3  just a smoke scare or a, "Hey, we know the fire
4  department just left. Something doesn't feel right
5  again. Let's call them right back."
6 Q  So I take it then because there is no -- you agree
7  there is no narrative on this report?
8 A  Correct.
9 Q  Do you know if there would have been any narrative
10  prepared with respect to this second visit by
11  anyone? If it's not here, is it possible that one
12  exists?
13 A  No.
14 Q  And without that narrative, even though you were
15  there -- let me ask it differently.
16      Are you able to describe for us kind of
17  generally what happened to lead to the fire
18  department being called back to the scene on May
19  23, 2014 a second time?
20 A  No, I don't remember.
21 Q  Don't recall?
22 A  No.
23 Q  Well, that being the case, I don't think we need to
24  look at that.
25      (Deposition Exhibit 10 was marked for



125

1    identification.)
2  Q   Captain Strange, I'm going to hand you what's been
3    marked as Exhibit 10.
4        Now given -- Monticello's not a huge community;
5    true?
6  A   Correct.
7  Q   I imagine this attracted some local media
8    attention, this event -- this May 23, 2014 event?
9  A   Correct.
10  Q   And did you personally speak with any member of the
11    media regarding the event?
12  A   Not that I can recall.
13  Q   Is this something where the fire department would
14    kind of have a designated person to kind of
15    interact with the media about the event?
16  A   Usually the chief or the assistant chief will be
17    the ones designated to speak with the media.
18  Q   Well, I'll represent to you I found this article
19    with a Google search within the last couple weeks
20    just in preparing to talk to you today.  Okay?
21        If you look at the second page, I think we've
22    kind of already talked about this a little bit.
23        MR. SENAK:  Can I just ask if this was
24    produced?
25        MR. O'BRIEN:  No.  It's a Google document,

126

1    Mark.
2        MR. SENAK:  I understand that, but I just want
3    to make it clear that the defendant has not
4    produced this document in the course of discovery; a
5    true?
6        MR. O'BRIEN:  True.  Defendant pulled this
7    document from the internet, which is equally
8    available to plaintiffs --
9        MR. SENAK:  I understand --
10        MR. O'BRIEN:  -- within the last two weeks.
11    And actually, I think it was a couple days before
12    you cancelled the deposition at 11:30 --
13        MR. SENAK:  I just want to make it clear that
14    it was not produced in the course of discovery by
15    the defendant.
16        MR. O'BRIEN:  That is true.
17  MR. O'BRIEN:
18  Q   All right.  Second page, fourth paragraph.  "The
19    fight was made difficult" -- and I should back up.
20        It looks like this is quoting Assistant Chief
21    Hickman.  Do you see that in the previous
22    paragraph?
23  A   Yes, sir.
24  Q   "'The fight was made difficult by the fact that all
25    of the ductwork was at ceiling level and

127

1    intertwined with plumbing and piping,' Hickman
2    said.  'The fire was fueled by accumulated residue
3    from the ovens caked inside of the ductwork.'"
4        Did I read that correctly?
5  A   Yes, sir.
6  Q   First of all, do you agree with the statement that
7    the fighting of this fire was difficult?
8  A   Yes.
9  Q   And what were some of the things that made fighting
10    this fire difficult?
11  A   Accessing the ductwork and the explosion.
12  Q   I understand the access to the ductwork because you
13    can't get inside of there very readily; is that --
14  A   Correct.
15  Q   With respect to the explosion, what added
16    difficulty did that contribute to fighting the
17    fire?
18  A   Because we had to break off from fighting the fire
19    at its origin, from where it was, and then all of a
20    sudden, we have an explosion and we have to
21    evacuate the building.  We have to pull everybody
22    out, have accountability, treat injured
23    firefighters, and then try to remount a second
24    attack.
25  Q   And with respect to the second statement, "The fire

128

1    was fueled by accumulated residue from the ovens
2    caked inside of the ductwork," do you personally
3    agree, disagree, or have no opinions as to that
4    statement?
5        MR. SENAK:  Object to foundation.
6  A   I have no opinion right now.
7  Q   Do you have any reason to disagree with the
8    statement of Assistant Chief Hickman?
9        MR. SENAK:  Same objection.
10  A   No, I would have no reason to agree or disagree I
11    guess.
12  Q   Understood.  I want to make sure I got this
13    correct.
14        You are not personally aware or you never
15    personally observed any accumulations in the
16    ductwork or the ovens?  It's not something that you
17    ever looked for; is that fair?
18  A   That is correct.
19  Q   Skip the next paragraph on Exhibit 10.  The next
20    paragraph is just one line.  It says, "'The fire
21    did not do much damage to the plant, but the
22    plant's ductwork, which is essential for operation,
23    suffered considerable damage,' Hickman said."
24        Do you agree with that statement?
25  A   Yes, I would.

129

1  Q   That's consistent with what your observations were
2      in your work at the May 23rd, 2014 fire?
3  A   Yes.  I think the explosion did more damage than
4      the fire, but yes, that explosion in the ductwork.
5  Q   I think you answered this already as well, but I
6      want to make sure.
7          Did you personally conduct any interviews of
8      any Ball employees?
9  A   No, sir.  I did not.
10 Q   Are you aware of anyone from the fire department
11     doing that?
12 A   I'm assuming that the incident command at some
13     point must have been interviewing somebody.
14 Q   But you wouldn't know who that would be?
15 A   No, sir.
16 Q   Wouldn't know what they would have asked or what
17     was talked about; true?
18 A   No, sir.  True.
19 Q   Have you ever heard of an individual named Scott
20     Howell?
21 A   No, sir.
22 Q   Don't know him?
23 A   Doesn't sound familiar.
24 Q   What about Bill -- also known as Otto Soik?
25 A   No, sir.

130

1  Q   Never spoken with them about the events of May 23,
2      2014?
3  A   Not that I -- no, I don't know even know who they
4      are.
5  Q   I understand.  After the fire occurred -- or since
6      the fire occurred, this May 23, 2014 fire, have you
7      had any informal conversations with anybody from
8      Ball about anything to do at all with the fire or
9      your response to the fire?
10 A   No, sir, not to my recollection.
11 Q   As part of your work with the fire department, do
12     you ever perform any sort of inspections -- maybe
13     just visual inspections -- of sprinkler heads or
14     anything to do with sprinkler systems?
15 A   No, I don't.
16 Q   You don't?  Are you generally familiar with what a
17     normal sprinkler head is supposed to look like?
18 A   Yes.
19     (Deposition Exhibit 11 was marked for
20     identification.)
21 Q   Rocky, I'm going to hand you what has been marked
22     as Exhibit 11, and I will represent to you that
23     these images are images of sprinkler heads that
24     were taken from various locations in the Ball
25     facility following the May 23, 2014 fire.  Okay?

131

1          Do you have any reason to disagree with that
2      representation?
3  A   No, sir.
4  Q   Do you see that -- do you agree that these
5      sprinkler heads are coated with some sort of
6      material?
7          MR. SENAK:  Object to foundation.
8  A   Yes.
9  Q   Do they appear to be coated with some sort of
10     material?
11         MR. SENAK:  Same.
12 A   Coated or burnt.  I can't really tell from --
13 Q   You don't have any reason to dispute the notion
14     that the sprinkler heads in the Ball facility were
15     coated with some sort of accumulation, do you?
16         MR. SENAK:  Same objection.
17 A   No, sir.
18 Q   No reason to dispute that?
19 A   (Shakes head.)
20 Q   Assuming that this coating, and not just burnt --
21     would a coating like we see in these images, in
22     your opinion, have a capacity to impact the proper
23     function of the sprinklers?
24         MR. SENAK:  Object to foundation.
25 A   I would just be guessing, but theoretically, yes,

132

1      it could impact it.
2  Q   And your belief that it could do that, what is that
3      based on?
4  A   Just the operation of the sprinkler head itself.
5      It just appears that it's being blocked in some of
6      the photos.
7  Q   Anything else, aside from that, that you would
8      expect?
9  A   Uh-uh.  (Shakes head.)
10 Q   Have you ever encountered, in your experience,
11     sprinkler heads where you saw this sort of
12     accumulation of any sort of debris -- and I guess I
13     should say condensed, particulate, whatever synonym
14     you want to use.
15         Have you ever encountered something like this
16     before in your experience?
17 A   Before or after a fire?
18 Q   Let's say before?
19 A   No.
20 Q   What about after a fire?
21 A   Yes, sir.
22 Q   When you see them after, would I be correct in
23     assuming you had fire damage to some sprinklers?
24 A   Yes, that's correct.
25 Q   Barring fire damage, you've never seen accumulation

133

1    that would make a sprinkler head look like this?
2  A   That is correct.
3  Q   We've talked about sprinklers a little bit.
4        To your knowledge, what -- did Ball Monticello
5    have other sort of firefighting tools or devices
6    that were available on site to your knowledge?
7  A   Fire extinguishers.
8  Q   Did they have onsite firehoses?
9  A   Not that I know of.
10  Q   To your knowledge, did Ball have any sort of onsite
11    firefighting team?
12  A   Not to my knowledge.
13  Q   So they would have been totally reliant upon
14    Monticello Fire Department to fight the fire?
15  A   Yes.
16  Q   So the fire was eventually put out, at least
17    initially, and maybe we have a rekindling or
18    something to that effect.  But eventually it's out,
19    and you had been there.
20        Are you able to describe kind of the state of
21    the facility, what it looks like after this event
22    has kind of reached its conclusion?
23  A   Not that I really remember.  I mean, a lot of
24    debris on the ground, especially wherever it blew
25    out the ductwork on that overhanging thing.  A lot

134

1    of debris around that.
2  Q   Just lots of debris in general; right?
3  A   Yeah.  Water on the floor.
4  Q   Had the -- the ductwork had been actually cut into
5    in this May 23, 2014 event as well; correct?
6  A   Correct.
7  Q   And to do that, you have to get through the
8    insulation?
9  A   Yes, that's correct.
10  Q   Does the insulation rip up and cause more debris --
11    contribute to this debris problem?
12  A   Yes.
13  Q   What other things contributed to the debris that
14    was present in the facility after the event?
15  A   I think a lot of it was the explosion, obviously,
16    as it goes through the roof.  And then our roof
17    crews that are actually cutting holes to ventilate
18    and check for extension because we need to make
19    sure there's no fire within the roof deck itself,
20    so cutting holes in that is causing debris.
21  Q   Anything else that you can think of?
22  A   No, not off the top of my head.
23  Q   As you're kind of looking at the aftermath of this,
24    you see debris everywhere, do you have any ability
25    to say, "This debris came from here.  This debris

135

1    came from here."  Or is it just kind of a mess?
2  A   No, there's a little bit of ability to do that.
3  Q   Okay.  Describe that to me.
4  A   Assistant Chief Hickman took us back inside and
5    showed us where the big blowout was on the inside
6    of the -- whatever that square air unit was.  I
7    have no idea what it even was, but right there
8    where it connected to the ductwork.
9  Q   And I want to make sure I understand.
10        That's the site where you understand that the
11    explosion occurred?
12  A   Yes, that's correct.
13  Q   Please continue.
14  A   And then he showed us that, and then you could see
15    the debris field.  And then he would say, "Okay.
16    Where was your hose line at from here?"
17        And I'm like, "Well, our hose line was here,"
18    and then obviously the debris field completely
19    covers the hose line placement.  And we just kind
20    of walked around that area to see how big of an
21    explosion it was and how far it blew out the metal
22    and stuff.
23  Q   Is there any way for you to quantify for us -- and
24    I'm not looking for anything specific, but
25    approximately how far that kind of radius -- the

136

1    explosion radius was with respect to the debris?
2  A   I'm guessing 50 feet or more.
3  Q   Was there debris from the explosion, to your
4    knowledge, in the vicinity where you had been
5    originally near that oven where you had seen the
6    flames start?
7  A   No.
8  Q   You didn't see that debris from the explosion in
9    that area?
10  A   No, sir.
11  Q   Did you ever observe any debris in that area?
12  A   Just the debris that we had made from removing
13    insulation and cutting the hole in the --
14  Q   So that would be from the insulation on the
15    ductwork, cutting into the ductwork, and spraying
16    around would kick up some debris; true?
17  A   Correct.
18  Q   Anything else that sticks out in your mind?
19  A   We discharged the dry chemical extinguisher so
20    there's that powder.
21  Q   That would contribute as well?
22  A   Yes.
23  Q   Anything else you can think of?
24  A   No.
25  Q   All right.  I don't have any other questions at



137

1    this point.
2         MR. SENAK:  Do you want to take a break now?
3    You tell me.
4         THE WITNESS:  We can keep going.
5
6  REDIRECT EXAMINATION
7    QUESTIONS BY MARK SENAK:
8  Q    Let's take a look at Exhibit 5, which is the
9    October 9, 2011 Monticello Fire report.
10         So as I understand it, you have no independent
11    of recollection of this event?
12  A    That is correct.
13  Q    And you did not complete this report?
14  A    That is correct.
15  Q    And you didn't speak to anyone about the content of
16    this report?
17  A    That is correct.
18  Q    On the date and time shown where the Monticello
19    Fire Department arrived, again, on the alarm
20    section, that would be the time that the alarm is
21    received at the Monticello Fire Department;
22    correct?
23  A    That would be the time -- our alarms are actually
24    received at the White County Sheriff's Department,
25    but yes.

138

1  Q    That would not be the time that the fire was
2    actually discovered at the plant?
3  A    That is correct.
4  Q    Is there any indication in this report of when the
5    fire was actually discovered at the plant?
6  A    No, sir.
7  Q    Is it accurate that this report does not reflect
8    where the fire was first observed by Ball company
9    personnel at the plant?
10  A    That is correct.
11  Q    And so you don't know where the fire was first
12    observed for this event, and you also don't know
13    where it was first observed for the May 23, 2014
14    fire?
15         MR. O'BRIEN:  Object to form.
16  A    You're going to have to -- this fire, I have no --
17    yes, I can speak to that.  The May 23rd, is that
18    the first one?
19  Q    Right.  May 23rd is Exhibit 1.
20  A    All right.
21  Q    And, again, where that fire was first observed --
22    the May 23, 2014 fire, where that fire was first
23    observed by Ball personnel is not reflected in
24    Exhibit 1?
25  A    That's correct.  I don't know if that's where they

139

1    first observed it.  That's just where they took me
2    to where the fire was.
3  Q    Right.
4  A    Yes.
5  Q    It could have been in some other location that was
6    there before you got there?
7  A    That is correct.
8  Q    So you don't know whether the fire that was
9    reported in Exhibit No. 5 was in the same location
10    as the fire shown in Exhibit No. 1?
11  A    That's correct.  I do not know.
12  Q    And there's no indication whether they were even in
13    similar locations; true?
14  A    True.
15  Q    Exhibit No. 5 states that there was a report of
16    fire in ductwork at the Ball Corporation; true?
17  A    True.
18  Q    Does it indicate where within the plant that
19    ductwork was located?
20  A    No, sir.
21  Q    And so is it accurate that the fire that was
22    reported in Exhibit No. 5 was not in the same
23    location as the fire that was reported in Exhibit
24    No. 1?
25         MR. O'BRIEN:  Foundation.

140

1  A    I have no idea.
2  Q    You can't tell?
3  A    I can't tell if it's --
4  Q    You can't tell whether the fire in the ductwork in
5    Exhibit No. 5 was in a similar location as the fire
6    reported in Exhibit No. 1?
7  A    That's correct.
8  Q    Do you know what the heat source of the fire in
9    Exhibit 5 was?
10  A    No, sir.
11  Q    So you can't tell whether the heat source that
12    caused the fire in Exhibit No. 5 was similar to the
13    heat source that would have caused the fire in
14    Exhibit No. 1?
15  A    That's correct.
16  Q    Do you know whether an oven was involved in the
17    fire in Exhibit 5?
18  A    No, sir.  I do not.
19  Q    Do you know whether there was any cause and origin
20    investigation conducted to determine the cause and
21    origin of the fire in Exhibit No. 5?
22  A    No, sir.  I do not know.
23  Q    Is it then accurate to say that you can't tell
24    whether the cause and origin of the fire in Exhibit
25    No. 5 was the same or similar to the cause and

141

1    origin of the fire in Exhibit No. 1?
2  A   That's true.
3  Q   Do you know whether there was any flame that was
4      observed at the metal seam near the top of an
5      internal bake oven -- that that was either the
6      source or cause or origin of the fire in Exhibit
7      No. 5?
8  A   No, sir. I don't know that.
9  Q   You don't know whether that statement is correct or
10     incorrect?
11 A   That is correct. I do not know.
12 Q   Do you know whether the fire in Exhibit No. 5 was
13     caused by restricted air flow in an internal bake
14     oven?
15 A   No, sir. I do not know that.
16 Q   Do you know whether the fire in Exhibit No. 5 had
17     been extinguished by plant personnel before the
18     fire department arrived?
19 A   No, sir. I don't know.
20 Q   You don't know one way or another?
21 A   No.
22 Q   Exhibit No. 6. That is the fire report from the
23     April 3, 2013 fire.
24     Again, you have no independent recollection of
25     this fire?

142

1  A   That is correct.
2  Q   And you didn't complete this fire report?
3  A   That is correct.
4  Q   And you didn't speak with anyone who completed the
5      fire report?
6  A   That is correct.
7  Q   You would have arrived at the scene -- I'm sorry.
8      The alarm shown on this report would have been
9      the time that the call was phoned to the Monticello
10     Fire Department?
11 A   That is correct.
12 Q   And the time that you arrived at the scene is shown
13     on this report as 3:19?
14 A   Yes, that's correct.
15 Q   And so you have no knowledge as to where the fire
16     was first observed that is reported in Exhibit
17     No. 6?
18 A   That is correct.
19 Q   You have no knowledge of whether the fire that's
20     reported in Exhibit No. 6 was in the same or
21     similar location as the fire that's reported in
22     Exhibit No. 1?
23 A   That is correct.
24 Q   Exhibit No. 6 reports a fire on the north end of
25     the building. Do you see that? It's on the second

143

1    page of the exhibit.
2  A   Yes.
3  Q   That is not the same location as where the fire
4      that is reported in Exhibit No. 1 was located;
5      true?
6  A   True.
7  Q   In the second paragraph, it indicates, "Most of the
8      smoke coming from chimney stack."
9      Do you see that particular notation?
10 A   Yes.
11 Q   Do you know whether that chimney stack was the same
12     chimney stack or ventilation system that's shown in
13     Exhibit No. 1?
14 A   I have no idea.
15 Q   Do you know whether the chimney stack that's
16     reported in Exhibit No. 6 is connected to the
17     ventilation system for the fire that was caused in
18     Exhibit No. 1?
19 A   No, sir. I don't know.
20 Q   Do you know whether an oven was involved in the
21     fire reported in Exhibit No. 6?
22 A   No, sir. I do not know.
23 Q   Do you know whether anyone performed a cause and
24     origin investigation as to the fire in Exhibit
25     No. 6?

144

1  A   No, sir. I do not know.
2  Q   Is it accurate then that you can't say whether the
3      cause and origin of the fire in Exhibit No. 6 is
4      the same or similar to the fire that's reported in
5      Exhibit No. 1?
6  A   That's correct. I cannot say.
7  Q   You were asked some questions about backflow and
8      dampers.
9  A   Yes, sir.
10 Q   Am I correct to assume that the damper prevents the
11     fire from flowing backwards into the ductwork;
12     correct?
13 A   Correct.
14 Q   The damper doesn't -- and it can't -- prevent the
15     flow of air going in the opposite direction out
16     towards the outside of the building; true?
17 A   I don't know. I'd -- I don't know what type of
18     damper it is. I don't know if it's a one-way
19     opening damper or a two-way opening damper.
20 Q   If the purpose of the system is to ventilate to the
21     outside of the building, would it be proper for the
22     design of the damper to prevent air from flowing to
23     the outside of the building?
24     MR. O'BRIEN: Foundation.
25 A   No, sir. You would think that it would prevent air



145

1  from flowing back into the building.
2  Q   If it prevented air from flowing out of the
3     building, it would create a hazardous situation?
4  A   Yes, sir.
5  Q   Because it would allow the vapor to be confined
6     inside the building?
7  A   Yes, sir.
8  Q   Is there any indication that the fire that is shown
9     in Exhibit No. 1 involved any operation of the
10    damper system in the building?
11 A   Not that I know of.
12 Q   Meaning that there's no indication that the damper
13    or a damper system would have either prevented the
14    fire from occurring or limited the spread of the
15    fire to your knowledge?
16 A   No, not to my knowledge.
17 Q   Exhibit No. 8 -- I'm sorry.  Exhibit No. 7.
18       If I may go back for a moment to the April 3,
19    2013 fire, which is Exhibit No. 6, do you know
20    whether the fire originated outside the plant?
21 A   No, sir.  I don't know.
22 Q   Do you know whether the fire originated in the
23    regenerative thermal oxidizer?
24 A   No, sir.  I do not know.
25 Q   Do you know what a regenerative thermal oxidizer

146

1     is?
2  A   No, sir.  I don't.
3  Q   Do you know whether the cause of the fire in the
4     April 3, 2013 fire report shown as Exhibit No. 6
5     was a loose wire connection which reduced the speed
6     of the exhaust fan and allowed the unit to
7     overheat?
8  A   No, sir.  I do not know that.
9  Q   If that is true, is it accurate to say that that is
10    not the same or similar to what caused the fire in
11    Exhibit No. 1?
12       MR. O'BRIEN:  Object to form.
13 A   It does not sound the same, no.
14 Q   And is it accurate to say you would have no way of
15    knowing because there was no cause and origin
16    investigation done for either of those fires?
17 A   That is correct.
18 Q   Exhibit No. 7 is the July 11, 2013 fire.
19       And, again, you have no independent
20    recollection of this fire?
21 A   Correct.
22 Q   And you didn't complete this fire report?
23 A   That's correct.
24 Q   And neither you nor anyone at Monticello conducted
25    a cause and origin investigation into this fire?

147

1  A   I did not.
2  Q   Do you know whether anyone at Monticello did?
3  A   I do not know that.
4  Q   Does Exhibit No. 7 reflect that one was done?
5  A   No, sir.  There is no investigation narrative.
6  Q   Again, this one shows that the alarm went off at
7     2315 and that Monticello Fire Department arrived on
8     the scene at 2320; true?
9  A   True.
10 Q   So you would have no knowledge of where the fire
11    was first observed that's reflected in Exhibit
12    No. 7?
13 A   That's correct.
14 Q   So you would have no knowledge of whether the fire
15    that was first observed -- the location of the fire
16    that was observed in Exhibit No. 7 was at the same
17    or similar location as Exhibit No. 1?
18 A   That's correct.
19 Q   This fire report, which is Exhibit No. 7, indicates
20    that there was a fire in an industrial furnace.
21       Do you see that?  It's in the first line.
22 A   "Fire in industrial furnace designed to heat metal
23    cans." Yes, sir.
24 Q   Do you know whether there are different types of
25    industrial furnaces that perform the function

148

1     that's described here?
2  A   Oh, I have no knowledge of industrial furnaces at
3     all.
4  Q   So you would't know whether the industrial furnace
5     that's referenced in Exhibit No. 7 is the same or
6     similar to the oven that was involved in the fire
7     shown in Exhibit No. 1?
8  A   No, I have no idea.
9  Q   And do you know whether the cause and origin of the
10    fire that's reported in Exhibit No. 7 is the same
11    or similar to the cause and origin of the fire
12    reported in Exhibit 1?
13 A   I have no idea.
14       MR. O'BRIEN:  Form and foundation.
15 MR. SENAK:
16 Q   Exhibit No. 7 states that there was a buildup of
17    can lubrication on the inside that ignited.
18       Do you see that reference?  It's about a third
19    of the way down on the second page of the exhibit.
20 A   Okay.  Yes.  "Buildup of can lubrication on the
21    inside." Yes, I see that.
22 Q   Is it accurate that since no cause and origin
23    investigation was done as to the fire in Exhibit
24    No. 1, you don't know whether that condition, a
25    buildup of can lubrication on the inside of the

149

1   industrial furnace, either caused or contributed to
2   the fire shown in Exhibit No. 1?
3 A   That is correct.
4 Q   This one indicates that an -- I'm sorry.  Exhibit
5       No. 7 indicates that an air compressor that blows
6       air through the furnace was not operational.
7           Do you see that?
8 A   Yes.
9 Q   Do you know whether that condition existed with
10      respect to the fire reported in Exhibit No. 1?
11 A  No, I have no idea.
12 Q   Exhibit No. 7 indicates that there was some report
13      that the furnace was overheating and causing an
14      oily buildup to catch fire.
15           Do you see that?
16 A  Yes.
17 Q   Was there ever any indication or evidence that the
18      fire reported in Exhibit No. 1 -- that the furnace
19      was overheating prior to that fire?
20 A  No, sir.
21 Q   So I take it that the condition that may have
22      resulted in the fire in Exhibit No. 7, you have no
23      way of knowing whether that was the same or similar
24      conditions that was involved in the fire in Exhibit
25      No. 1?

150

1 A   That is correct.
2 Q   If you go to page 3 of Exhibit No. 7, it's about a
3       quarter of the way from the bottom.  The page
4       begins, "The roof crew found no fire spread through
5       the ventilation system or on the roof."
6           Do you see that?
7 A   Yes, sir.
8 Q   I take it in Exhibit No. 1, there was fire spread
9       through the ventilation system up through the roof?
10 A  Yes.
11       MR. O'BRIEN:  Form.
12 MR. SENAK:
13 Q   And so the condition that was reported in Exhibit
14      No. 7 is not the same or similar to that condition
15      that was reported in Exhibit No. 1?
16       MR. O'BRIEN:  Form.
17 A  That's correct.
18 Q   If you look at Exhibit No. 8, this reports on the
19      second page -- indicates that there was a fire
20      reported in an oven.
21           Do you see that notation?
22 A  Yes, sir.
23 Q   Is it accurate that you can't say whether the type
24      of oven that was involved in the fire in Exhibit
25      No. 8 is the same or similar to the type of oven

151

1       that was involved in Exhibit No. 1?
2 A   That's correct.  I have no idea.
3 Q   In Exhibit No. 8, the incident that's reported here
4       was the result of somebody smelling smoke or
5       smelling something burning; true?
6 A   Correct.
7 Q   But there was no visible flame or smoke?
8 A   Correct.
9 Q   So Exhibit No. 8 doesn't even effectively report a
10      fire?
11 A  That is correct.
12 Q   And that would be different -- substantially
13      different than what is reported in Exhibit No. 1?
14 A  Correct.
15 Q   I just want to make clear that when you talked
16      about whether there was a fire in the oven in this
17      particular case, which is the May 23, 2014
18      incident, you never observed any fire actually in
19      the oven itself; true?
20 A  That is correct.
21 Q   You're just assuming or speculating that if there
22      was fire up above the oven that it may have
23      originated in the oven?
24 A  Correct.
25 Q   But you have no evidence of that?

152

1 A   That is correct.
2 Q   With respect to the sprinkler system, you indicated
3       you just don't know whether it was on or off; true?
4 A   That's correct.
5 Q   And then the -- whether sprinklers in the ductwork
6       would have prevented or reduced the spread of this
7       fire -- do you recall that testimony?
8 A   Yes, sir.
9 Q   Did you have any education or training in fire
10      engineering science?
11 A  I mean, just my Firefighter I and II.  I don't have
12      a fire science degree or anything, no.
13 Q   Do you have any education in the design,
14      installation, or maintenance of sprinkler systems?
15 A  No.
16 Q   Any experience in the design, installation, or
17      maintenance of sprinkler systems?
18 A  No.
19 Q   I take it you're not a fire protection engineer?
20 A  That is correct.
21 Q   I take it you made no analysis of the ductwork in
22      this particular case to determine whether a
23      sprinkler system in the ductwork either would have
24      prevented the ignition of the fire or the spread of
25      the fire?



153

1  A   Correct.
2  Q   Are you familiar with NFPA 13?
3  A   No. I'm familiar with NFPA, but I can't tell you
4      exactly what NFPA 13 says.
5  Q   NFPA 13 deals with the installation of sprinkler
6      systems.
7          I take it you've never read it nor are you
8      familiar with it?
9  A   No, sir. I've never read it.
10 Q   You've been involved in fighting fires in a number
11     of manufacturing facilities; true?
12 A   True.
13 Q   Do you know whether any of those manufacturing
14     facilities that you've been involved in had
15     sprinkler systems in the ductwork?
16 A   No, I have no idea.
17 Q   Have you seen a manufacturing facility with
18     sprinkler systems in the ductwork?
19 A   No, not to my knowledge.
20 Q   I take it you don't consider yourself an expert in
21     sprinkler system installation, design, maintenance,
22     repair, any of those things?
23 A   No, I do not.
24 Q   With respect to the sprinkler heads shown in
25     Exhibit No. 11, you have no knowledge of where they

154

1      came from; true?
2  A   True.
3  Q   You have no knowledge whether they did or did not
4      operate during the fire?
5  A   That is correct.
6  Q   I take it you didn't do any testing of any
7      sprinkler heads at the plant?
8  A   No, I did not.
9  Q   And don't have any knowledge of whether any testing
10     was ever done to determine whether they did or did
11     not operate during the fire?
12 A   No, I have no idea.
13 Q   That's all I have.
14
15 RECROSS-EXAMINATION
16     QUESTIONS BY JACOB O'BRIEN:
17 Q   You've talked a lot about the reports now. Mark
18     has kind of reviewed them with you.
19         But the reports don't identify, as a general
20     matter, specifically where in the facility these
21     events were occurring, as a general matter; true?
22 A   True.
23 Q   So it may say there's fire in the ductwork, for
24     example, but it doesn't say there's fire in the
25     ductwork of line 2 above IBO No. 2 for example?

155

1      That's not in these reports; right?
2  A   That is correct.
3  Q   You don't necessarily know what caused these fires
4      across the various reports; fair?
5  A   That's correct.
6  Q   But we saw more than one involving fires inside
7      ductwork; true?
8  A   Correct.
9  Q   And you told me almost at the beginning of our kind
10     of exchange that as -- your understanding of the
11     structure of that ductwork, the internal surfaces
12     themselves are not flammable; true?
13 A   Right.
14 Q   So there has to be some sort of fuel inside the
15     ductwork for a fire to occur inside the ductwork;
16     true?
17 A   True.
18 Q   And at least with respect to that, we do see
19     similarities across these reports, do we not, of
20     some sort of fire occurring in ductwork; correct?
21     MR. SENAK: Object to foundation.
22 A   Yes, most of those reports do mention fire in the
23     ductwork.
24 Q   And some of them also mention fire in relation to
25     accumulation of certain debris which you're not

156

1      familiar with; right?
2  A   Correct.
3  Q   But we've seen mention of that in more than one
4      report, have we not?
5  A   That is correct.
6  Q   So understanding that you may not be able to say
7      with any certainty whether there is a common cause
8      or a common origin, there are, at least on some
9      levels, similarities between some of these events
10     we've been looking at; true?
11 A   True.
12     MR. SENAK: Object to form and foundation.
13 MR. O'BRIEN:
14 Q   And that, if nothing else, is in the fact that
15     we've seen fires inside of ductwork on more than
16     one of these reports; true?
17 A   True.
18     MR. SENAK: Same objections.
19     MR. O'BRIEN: I don't have anything else.
20     MR. SENAK: One second.
21     (Deposition Exhibit 12 was marked for
22     identification.)
23     MR. O'BRIEN: Just for the record again, I
24     assume these photographs were produced, but if not
25     -- I can't see the number on them, so if we could



157

1    get that resolved after the conclusion.
2        MR. SENAK: I can tell you that all of them
3    are from the Rimkus --
4        MR. O'BRIEN: From Howell's file?
5        MR. SENAK: Yeah.
6
7  REDIRECT EXAMINATION
8        QUESTIONS BY MARK SENAK:
9  Q    Showing you Exhibit No. 12, do you recognize this
10   as the ductwork above the oven where the fire
11   originated?
12 A    No, I can't say 100 percent for sure that's what it
13   is, but it looks similar to Exhibits 2 and 3.
14 Q    When you first came to the scene -- you'll see the
15   ductwork in Exhibit No. 12 has sustained a
16   substantial amount of damage; is that true?
17 A    Yes.
18 Q    When you first got to the scene and you observed
19   the fire, was the ductwork in this particular
20   condition?
21 A    No, sir.
22 Q    Is it accurate that what you see in Exhibit No. 12
23   shows the ductwork after the firefighting effort?
24 A    That's correct.
25 Q    And as part of the firefighting effort, your crew

158

1    would have cut into the ductwork to apply water?
2  A    Yes, that's correct.
3  Q    And that ductwork would have been subject to the --
4    was the location where the explosion that you
5    described took place?
6  A    This ductwork?
7  Q    Right.
8  A    No, sir.
9  Q    I'm sorry. Do you know where the explosion
10   occurred?
11 A    Along the north wall someplace. Or at least that's
12   where the -- I shouldn't say -- I don't know where
13   the explosion occurred; I know where it vented the
14   building.
15 Q    I see. The ductwork that vents the building is at
16   the north wall?
17 A    The explosion traveled -- either it originated
18   along the north wall or that's the weakest point
19   and that's where it blew out through the ceiling
20   and the wall. I don't know which one. It could
21   have been either one.
22 Q    The damage to the ductwork that you see in
23   Exhibit No. 12, is that a result of the
24   firefighting effort or the fire to your knowledge?
25 A    I would say that's firefighting effort damage.

159

1  Q    Okay. That's all I have.
2
3  RECROSS-EXAMINATION
4        QUESTIONS BY JACOB O'BRIEN:
5  Q    Just one quick follow-up. You're talking about the
6    location of the explosion -- if I understood what
7    you just said correctly, what you're saying -- and
8    correct me if I'm wrong -- what you're saying is
9    you don't know exactly where the explosion
10   occurred, but you know where the damage manifested;
11   is that right?
12 A    Correct.
13 Q    And that's on that north wall where the -- near the
14   box that you're not sure what it is, but where the
15   -- I'm sorry -- where the ductwork is near that
16   box?
17 A    That's correct.
18 Q    That's the point where the ductwork actually itself
19   came apart?
20 A    Yes, that is correct.
21 Q    But you don't know that the explosion happened at
22   that specific location?
23 A    Correct.
24 Q    Got it. Thank you. Nothing further.
25       MR. SENAK: I don't know if you're familiar

160

1    with the concept of waiving or reserving signature.
2    If you reserve signature, the court reporter will
3    type up the deposition, you'll have a chance to
4    review it, and you can make any changes to the
5    portions of the deposition that are sort of
6    grammatical. You can't change your testimony, but
7    you can make corrections to spellings or
8    punctuation and things of that nature.
9        If you waive signature, you give up that
10   opportunity. I think you just have to let her know
11   which of those two you'd like to do.
12       THE WITNESS: Okay. I have no interest in
13   correcting grammar.
14       MR. SENAK: So you'd like to waive signature?
15       THE WITNESS: Yes, that is correct.
16       THE REPORTER: Did you want to order a copy of
17   this?
18       MR. SENAK: I do. I'd like a mini script and
19   Etran if you could.
20       MR. O'BRIEN: Etran condensed.
21       (Time noted: 2:26 p.m.)
22
23
24
25



161

```
 1   STATE OF INDIANA. . . . . . .)
                                  )  SS:
 2   COUNTY OF LAKE            )

 3

 4          I, Christine L. Obermeyer, Notary Public in

 5   and for the County of Lake, State of Indiana, at

 6   large, do hereby certify that ROCKY STRANGE, the

 7   deponent herein, was by me first duly sworn to tell

 8   the truth, the whole truth, and nothing but the

 9   truth in the aforementioned matter;

10          That the foregoing deposition was taken on

11   behalf of the Plaintiffs, at the offices of Ball

12   Corporation, 501 North 6th Street, Monticello,

13   Indiana, on Wednesday, August 29, 2018, pursuant to

14   Rule 30(b) of the Federal Rules of Civil Procedure;

15          That said deposition was taken down in

16   stenograph notes and afterwards reduced to

17   typewriting under my direction, and that the

18   typewritten transcript is a true record of the

19   testimony given by the said deponent; and that

20   signature was waived by the deponent and all

21   parties present;

22          That the parties were represented by their

23   counsel as aforementioned.

24          I do further certify that I am a disinterested

25   person in this cause of action, that I am not a
```

162

```
 1   relative or attorney of either party or otherwise

 2   interested in the event of this action, and that I

 3   am not in the employ of the attorneys for any

 4   party.

 5          IN WITNESS WHEREOF, I have hereunto set my

 6   hand and affixed my notarial seal this ___ day of

 7   September, 2018.

 8

 9

10          _____

11

12          Christine L. Obermeyer

13          Notary Public

14

15

16   My Commission Expires:

17   June 05, 2024

18   County of Residence:

19   Lake County, Indiana

20

21

22

23

24

25
```



USDC IN/ND case 4:16-cv-00042-TLS    document 105-1    filed 10/07/19    page 1153 of 1167
Rocky Strange
August 29, 2018
1                                                                                            Index: 00..a.m.

**Exhibits**

**R STRANGE_1** 3:13 9:12,14
10:6 11:8,11,24 12:1,4,21 31:22
33:11,14 34:23 61:21 62:16
68:18 69:1 97:23 106:14 107:9
108:1 120:1 138:19,24 139:10,
23,24 140:6,14 141:1 142:22
143:4,13,18 144:5 145:9 146:11
147:17 148:7,12,23,24 149:2,
10,18,24,25 150:8,15 151:1,13

**R STRANGE_2** 3:14 22:20
23:19 24:24 25:4 28:7,23 29:13,
17 30:2

**R STRANGE_3** 3:14 22:22
25:2,16 29:1,17

**R STRANGE_4** 3:15 27:22,24,
28:1,9 29:22 30:6

**R STRANGE_5** 3:15 55:11,14
62:25 66:18 69:1 70:4 82:10
137:8 139:9,15,22 140:5,9,12,
17,21,24,25 141:6,7,12,16

**R STRANGE_6** 3:16 68:20,23
70:11 71:3 77:24 82:15 83:11
86:17 87:14 90:13 97:22 141:22
142:16,17,20,24 143:16,21,24,
25 144:3 145:19 146:4

**R STRANGE_7** 3:16 87:8,10
96:16 97:21 145:17 146:18
147:4,11,12,16,19 148:5,10,16
149:4,5,12,22 150:2,13,14

**R STRANGE_8** 3:17 100:19,
24 145:17 146:24,25 151:3,9

**R STRANGE_9** 3:17 107:4,7,8
123:11

**R STRANGE_10** 3:18 124:25
125:3 128:19

**R STRANGE_11** 3:19 130:19,
22 153:25

**R STRANGE_12** 3:19 156:21
157:9,15,22 158:23

---

**0**

**00** 121:4

**001282** 10:15

**00186** 33:7

**00187** 30:20 61:25

**00189** 11:13 37:10

**00190** 35:2

**0048** 19:2

**0102** 31:23 32:2 33:7,19

---

**0110** 62:9

**0131** 30:14,21

**0132** 61:25

**0133** 62:1

**0136** 33:15

**0980** 71:18

---

**1**

**1** 9:12,14 10:6 11:8,11,24 12:1,
4,21 31:22 33:11,14 34:23
61:21 62:16 68:18 69:1 97:23
106:14 107:9 108:1 120:1
138:19,24 139:10,24 140:6,14
141:1 142:22 143:4,13,18 144:5
145:9 146:11 147:17 148:7,12,
24 149:2,10,18,25 150:8,15
151:1,13

**10** 69:9 120:25 124:25 125:3
128:19

**10-9-2011** 67:11

**100** 157:12

**11** 87:11 88:2 130:19,22 146:18
153:25

**114** 57:4

**11:30** 126:12

**11:42** 39:12

**11:45** 39:12

**12** 156:21 157:9,15,22 158:23

**1287** 10:17,18,23

**12:48** 19:3,17 20:9

**12:53** 26:3 62:17

**13** 153:2,4,5

**13th** 40:23,25

**14** 44:15

**1628** 56:20

**1631** 56:20

**1750** 56:21

**184** 10:24 11:3,4,9 20:4 106:19

**185** 20:12 24:20

**186** 31:25 33:22 62:9

**187** 31:23,24 33:14

**188** 33:23

**189** 38:17 120:9

**19** 101:1 104:5

**190** 121:15

---

**191** 38:17

**1978** 44:9

**1991** 5:12

**1995** 5:13,17

**1:02** 100:17

**1:06** 100:17

**1:30** 30:24

**1:33** 62:6

---

**2**

**2** 22:20,24 23:11,19,25 24:10,24
25:4,21 26:23 28:7,23 29:13,17
30:2 31:13 59:16 81:15 88:12
103:21 104:7 108:2 154:25
157:13

**20** 56:23 62:13,19

**2011** 56:16 59:3 68:16 137:9

**2013** 69:5,17 71:5,14 87:11 88:2
101:1 104:5 141:23 145:19
146:4,18

**2014** 45:19 46:17,21 52:3 54:16,
19 55:3,19 61:13 68:11,17 71:1
75:20,24 87:4 106:15 118:17
124:19 125:8 129:2 130:2,6,25
134:5 138:13,22 151:17

**207** 11:9

**23** 45:19 46:17,21 52:3 54:16,19
55:3,19 61:13 68:11,17 75:20,
24 87:4 118:17 124:19 125:8
130:1,6,25 134:5 138:13,22
151:17

**2315** 147:7

**2320** 147:8

**23rd** 69:21 70:24 106:15 129:2
138:17,19

**250** 44:13

---

**3**

**3** 22:22,25 23:11,19,25 24:6,10
25:2,9,16,21 26:23 28:7 29:1,
13,17 30:2 31:13 71:10,24
78:16 81:15 83:10 86:8,17
141:23 145:18 146:4 150:2
157:13

**3.4** 106:21

**3:19** 142:13

**3rd** 69:5,17 71:5

---

**4**

**4** 27:22,24 28:1,9 29:22 30:6
81:15 123:15

**4-inch** 94:19

**40** 30:23,24

**45** 39:9

---

**5**

**5** 55:11,14 62:25 66:18 69:1
70:4 82:10 97:21,23 137:8
139:9,15,22 140:5,9,12,17,21,
25 141:7,12,16

**50** 136:2

**515** 98:6

**5:33** 20:5,9

---

**6**

**6** 56:6 66:19 68:20,23 70:11
71:3 77:24 82:15 83:11,20
86:17 87:14 90:13 97:22 120:1,
7 141:22 142:17,20,24 143:16,
21,25 144:3 145:19 146:4

**600-degree** 90:21

**6548** 44:13

---

**7**

**7** 87:8,10 96:16 97:21 100:4
145:17 146:18 147:4,12,16,19
148:5,10,16 149:5,12,22 150:2,
14

---

**8**

**8** 100:19,24 145:17 150:18,25
151:3,9

---

**9**

**9** 56:15 68:16 101:8 107:4,7,8
123:11 137:9

**90-degree** 24:11

**911** 45:2

**95** 44:24,25

---

**A**

**a.m.** 20:5,9 26:3 39:12,13 62:17



USDC IN/ND case 4:16-cv-00042-TLS     document 105-1     filed 10/07/19     page 1154 of
1167
2
Rocky Strange
August 29, 2018
Index: ability..blank

**ability** 134:24 135:2

**absolutely** 67:22 114:3 116:2 118:15

**AC** 71:2

**Academy** 6:1

**access** 14:21 79:24 80:19 81:2, 4,7,12,18 82:4,6 96:19 105:16 127:12

**Accessing** 127:11

**accidental** 9:3 10:1

**accountability** 17:8 127:22

**accumulated** 73:12,16 74:5,8 127:2 128:1

**accumulation** 121:12 131:15 132:12,25 155:25

**accumulations** 75:11 77:13 128:15

**accurate** 8:12 12:2 13:19 116:9 138:7 139:21 140:23 144:2 146:9,14 148:22 150:23 157:22

**action** 95:11

**actions** 58:10 105:2

**activate** 16:15 33:3

**activated** 31:16 32:7,9,20 33:5, 8,13,20

**active** 96:12

**activities** 46:4

**actual** 10:2 54:14 95:14 108:5

**added** 127:15

**addition** 54:21

**address** 44:12,14 45:1,2 56:17

**adjacent** 72:7

**adjoins** 60:20

**advised** 33:4 73:9

**advising** 77:25

**aftermath** 134:23

**afternoon** 41:6

**agency** 37:22

**agree** 63:4 65:11,23,24 85:20 87:20,21 120:15 123:17 124:6 127:6 128:3,10,24 131:4

**agreement** 60:19

**ahead** 6:11 14:19 15:2 107:3

**ahold** 51:19

**aid** 60:14,19,23 61:2,10 62:3,4, 5,10

**air** 18:12 39:7 73:12 74:15 79:24 80:1,6,12,14,16,22 81:1 90:1,2, 7,11 109:3,7 111:19,22,23 113:25 135:6 141:13 144:15,22, 25 145:2 149:5,6

**alarm** 19:22 49:21,22 84:24 85:16 137:19,20 142:8 147:6

**alarms** 137:23

**alert** 84:10,17,24

**Allan** 4:11 56:7

**allowed** 101:19 146:6

**aluminum** 22:8 53:20

**aluminum-backed** 22:9

**ambulance** 46:9

**amount** 20:8 21:24 27:8 28:18 58:24 71:11 92:25 108:23,25 116:14 157:16

**analysis** 152:21

**anticipate** 92:6

**anyplace** 16:8

**apologies** 10:25 60:12 120:8

**apologize** 110:16

**apparatus** 38:24,25 59:5,8 71:15 101:22

**apparently** 40:21 59:4

**appears** 23:16 132:5

**appended** 11:24

**applicable** 91:8

**apply** 26:9 158:1

**applying** 32:15

**approximate** 58:24

**approximately** 49:8 54:23 62:19 75:18,23 110:25 135:25

**April** 5:12 69:5 71:5,14 141:23 145:18 146:4

**arcing** 102:22

**area** 18:7 26:10 32:16 47:4 50:22 60:21 61:1 78:12 79:2 91:24 111:15 117:25 118:1,10 135:20 136:9,11

**areas** 33:16 34:8 64:3

**arrange** 39:19

**arrival** 25:24 26:2 56:20 62:17 69:23

**arrived** 14:20 20:23 21:3 30:17 40:5 110:7,22 111:1 137:19 141:18 142:7,12 147:7

**arriving** 14:7

**arson** 7:25 37:12

**article** 125:18

**assigned** 18:16 38:5 46:8 102:5

**assigning** 13:2

**assist** 61:1

**assistant** 17:5 34:1 62:9 70:23 71:3,5 103:25 115:18 125:16 126:20 128:8 135:4

**assume** 32:21 35:15 58:3 61:13 111:21 123:22 144:10 156:24

**assuming** 23:2 58:11 129:12 131:20 132:23 151:21

**assumption** 34:9

**atmosphere** 113:15

**attach** 37:22

**attached** 12:4 37:12,13

**attaches** 117:12

**attack** 8:7 127:24

**attendance** 38:24

**attention** 115:18 125:8

**attracted** 125:7

**August** 40:24

**author** 59:24

**authored** 88:22

**authoring** 88:17

**authorization** 59:16 70:13

**automatically** 61:1,3,6,11 85:8

**avoided** 85:22

**aware** 52:25 73:24 76:17 77:17, 22 79:6 81:5,20,21,22 97:4 118:9,12 128:14 129:10

**awareness** 86:9

---

**B**

**back** 11:7,10 14:14,18 15:8 16:5,9,16 17:17,23,25 18:5,6,7, 14,15,21 20:21 24:23 27:7 36:6 39:1 41:6 48:5 51:22 56:15 59:16 62:8,25 69:19 71:5 77:24 84:7 96:16 106:14 107:16,21 112:21 114:2 116:25 124:5,18 126:19 135:4 145:1,18

**backflow** 144:7

**backflowing** 78:9

**backwards** 144:11

**bad** 60:10

**bake** 77:6 141:5,13

**balance** 12:1

**ball** 7:18 8:17 10:15 11:9,13 13:5 16:11 17:25 19:1,18,25 20:3,11 24:20 30:20 36:25 37:10 42:14 43:4,6 46:22,25 47:7 48:8,10 49:4 50:19,20 52:15,18 54:8,12 56:17 57:25 58:20 61:10,25 62:23 64:17,22 65:7 72:12 73:9 74:6,9,20 77:3, 25 79:11 81:4 86:10,22 87:16 88:2 93:17 101:2 104:11,20 105:20 106:19 107:24 109:16 116:4 120:8 121:15 129:8 130:8,24 131:14 133:4,10 138:8,23 139:16

**Ball's** 52:10,22 82:17

**banking** 115:24

**bare** 53:23

**Barring** 132:25

**based** 34:13 35:3,5,12,15 48:6 69:23 132:3

**basement** 74:19,23,25

**basically** 69:13 74:20 78:11 79:1 80:23 91:16 106:21 123:23

**bay** 50:2

**begin** 22:18 38:17 95:4 100:4

**beginning** 90:17 155:9

**begins** 150:4

**behalf** 7:20

**belief** 132:2

**bend** 16:9,10 24:11

**benefit** 4:21

**Berkshire** 100:6

**big** 14:15 18:1 61:7 81:9 135:5, 20

**bigger** 119:4

**Bill** 129:24

**bit** 11:8 15:5 17:12 18:2 27:25 39:21,23,25 43:12 104:16 112:12 120:10 125:22 133:3 135:2

**black** 15:19,22,24 16:1,12 31:9 91:24 95:5 114:16,23 115:2,22 116:15 117:1,4,8,10,14

**blacken** 102:24

**blank** 37:15



**blast** 80:24

**blew** 113:3,22 115:19,20 133:24 135:21 158:19

**blocked** 132:5

**blood** 18:13

**blow** 113:16

**blower** 73:10 83:13 86:8,10,11, 22 90:12

**blowout** 135:5

**blows** 90:1 149:5

**Bluetooth'd** 95:20

**bolts** 63:16

**bottles** 18:12

**bottom** 56:7 70:12 83:10 88:12 117:11 150:3

**box** 9:23 20:4 38:9 56:7 57:15, 20 58:9 59:16,17 60:5 70:12 72:22 84:7 85:10 106:17 120:3, 9 121:15 122:12,16 159:14,16

**boxes** 9:25 12:11 97:22,23 105:25 106:2

**break** 4:24 39:10,15 100:22 105:14 127:18 137:2

**briefly** 123:9

**bring** 14:19,21,23 49:20 51:18

**Brooks** 100:8

**brought** 115:17

**Buffalo** 60:15 62:2

**building** 15:10,13 17:23 30:15 32:13 34:12 35:18 43:20 66:9 72:21,23 73:1 77:9,11 78:2,5,25 113:1 115:21 117:1 121:18,23 122:1,4,5 127:21 142:25 144:16,21,23 145:1,3,6,10 158:14,15

**building's** 31:15,21 46:5

**buildings** 66:11,12 118:20

**buildup** 89:19 90:4 148:16,20, 25 149:14

**burn** 83:5

**burned** 79:2

**burning** 21:24 27:8 28:19 73:12 83:4 104:8,18,24 108:25 110:3 151:5

**burns** 83:8 102:7 104:19

**burnt** 72:6,10,15 131:12,20

**business** 7:5

**button** 94:20

---

**C**

**caked** 127:3 128:2

**call** 7:6 8:11 9:22 16:15 19:1,9, 18,21,23 48:19 49:19 51:16,21 61:3,6 62:12 74:17 85:7 91:17 124:5 142:9

**called** 9:1 19:15 38:5 40:2 41:4, 5,7 62:14 124:18

**calling** 47:8

**calls** 62:11

**camera** 90:25 91:2,9,18,19 94:1,12,16 95:15 96:9

**cameras** 91:14,25 92:9,14,20 93:4,19 94:19 95:17

**cancelled** 126:12

**cans** 52:14 77:3,4 147:23

**capability** 37:22

**capacity** 131:22

**captain** 5:8 11:9 17:3,4 23:10 38:22 45:17,22,24 46:1,6 51:17 55:5,13 59:20 68:22 76:5 87:10 100:22 107:6 125:2

**capture** 10:5 58:14 95:14,18,19

**capturing** 95:25

**Carolina** 68:1,2

**carpentry** 68:4

**case** 39:8 44:2 57:23 59:10 61:6 63:20 66:3 77:2,10 84:5 85:1 93:7 95:15 107:13 112:5 120:19 121:19 124:1,23 151:17 152:22

**catch** 85:7 90:4 119:24 149:14

**catches** 83:9 85:6

**categories** 99:7

**caused** 7:25 31:3 83:12 99:19 103:11 115:5 140:12,13 141:13 143:17 146:10 149:1 155:3

**causing** 86:11 90:3 111:7 134:20 149:13

**ceiling** 16:11 126:25 158:19

**cell** 41:2

**cellar** 74:17,19 75:1

**center** 20:2

**certainty** 12:13 156:7

**Chalmers** 62:2

**chance** 160:3

**change** 15:12,17 18:12 47:17 114:10 160:6

**characteristics** 87:3

**characterize** 8:19

**charge** 21:5 51:21

**check** 12:10 40:8 59:5 63:6 83:19 85:8,10 92:18,23 94:7 120:20 134:18

**checked** 14:25 18:14 32:19 98:19 121:5

**checking** 63:21,23 64:2,12

**chemical** 136:19

**chief** 17:5,13 33:24 34:1,2 35:23,25 48:24 62:10 70:23 71:3,5 103:25 115:18 125:16 126:20 128:8 135:4

**chimney** 57:1,13,24 71:25 72:3 143:8,11,12,15

**chiseled** 74:15

**choice** 57:10

**choose** 101:20

**choosing** 57:19

**circumstance** 103:1

**circumstances** 67:18

**civilian** 7:4

**clarify** 6:13 24:3 108:12

**classifies** 57:8

**clean** 46:5

**clear** 114:3 117:2 118:15 126:3, 13 151:15

**cleared** 20:3,4 56:21 69:24

**clearing** 18:1

**click** 57:11

**clicked** 98:17

**close** 78:11 114:3

**closed** 78:1,22 79:7

**clue** 53:9

**coated** 131:5,9,12,15

**coating** 77:5 131:20,21

**coats** 18:13

**Cole** 67:5 68:3 100:7

**colleagues** 42:22

**color** 94:22

**command** 15:14,15 16:13 17:5 18:4 30:13,14 32:21 33:4 35:7, 9,16 60:14 70:16 71:12 89:3 103:24 104:3 129:12

**commander** 60:3,8

**commander's** 13:1

**commanders** 37:4

**commercial** 7:5 43:20 61:5 66:9

**common** 87:3 156:7,8

**community** 125:4

**companies** 60:15 61:10 62:6,8

**company** 8:5,15 14:20 35:6 38:25 42:18 45:13 62:3 89:2 91:21 138:8

**compare** 107:9

**complete** 10:12 35:21 37:7 39:1 137:13 142:2 146:22

**completed** 34:3 35:23 142:4

**completely** 8:2 26:20 68:3 92:17 135:18

**compliance** 41:14

**complies** 25:13

**comprehensive** 35:19

**compressor** 90:1,7,12 149:5

**concept** 160:1

**concern** 7:24

**concerned** 75:9

**concerns** 119:4

**conclude** 15:23

**concluded** 12:23

**conclusion** 36:2 133:22 157:1

**conclusions** 115:15,17

**condense** 77:13

**condensed** 132:13 160:20

**condition** 15:17 148:24 149:9, 21 150:13,14 157:20

**conditions** 15:12 149:24

**conduct** 6:8,18,21 8:22 9:4 129:7

**conducted** 6:24 7:19 9:7,16 10:7 12:6,23 50:18 99:10 140:20 146:24

**conducts** 7:12 46:11

**conduit** 121:2,7 122:15



**confined** 47:6,9,12,19 48:18 49:6,13 51:14,18 57:1 122:3 145:5

**confining** 79:4

**confirm** 41:8

**confirmed** 15:15

**confusing** 29:9

**confusion** 40:21

**connect** 22:14

**connected** 22:6,11 24:12,14 28:8 31:10 53:1 113:20 114:18 135:8 143:16

**connecting** 110:19 111:2

**connection** 26:14 27:17,20 28:8 29:21 146:5

**connections** 49:23

**connects** 22:15

**considerable** 128:23

**considered** 27:1,2

**consistent** 20:7 129:1

**constitute** 66:6

**constructed** 53:18

**consult** 36:1

**consulted** 38:20

**contact** 14:9,12 40:22,23 41:3 51:12

**contacted** 20:2 41:2

**content** 55:20 88:6 137:15

**context** 27:25 120:4,13

**continue** 114:8 116:12 135:13

**continued** 33:9

**continuing** 33:23

**contribute** 127:16 134:11 136:21

**contributed** 134:13 149:1

**contributing** 86:12 122:12 123:6,7

**control** 107:20

**conversation** 43:15

**conversations** 40:12 41:9,10, 21 42:8,13,24 130:7

**conversely** 86:1

**converted** 77:7 83:6

**conveyed** 48:21

**coordinate** 7:8

**coordinator** 47:18 51:8

**copy** 23:5 120:7 160:16

**corner** 56:2

**Corp** 43:4,6

**Corp.'s** 47:7

**Corporation** 42:14 58:21 139:16

**correct** 9:6 13:18,22 19:19 20:16 27:21 28:20 30:7 32:16, 17 35:22 37:9 38:19 41:20 46:13 53:13,24 56:18 57:22 59:12,20,21 64:15,20 65:6,8 66:5,17,23 67:9,14,17 68:8,11, 12,18,19 69:18,21 70:2,4,5,7,17 76:7,11 77:17 78:7,12 79:17,22 80:17,20 81:15,24 83:17 85:2, 17,19 86:3,4,7 87:25 89:1 91:6 92:8 93:12 94:4,10 95:13 96:2,6 97:15,18,20 99:1 100:15 101:10 104:25 107:2,25 108:8,17 109:20 110:14,21 112:6,15,16 114:1,19,24 115:3,12 116:7 117:18 119:13 121:14 122:2,6 123:15,16,21 124:8 125:6,9 127:14 128:13,18 132:22,24 133:2 134:5,6,9 135:12 136:17 137:12,14,17,22 138:3,10,25 139:7,11 140:7,15 141:9,11 142:1,3,6,11,14,18,23 144:6,10, 12,13 146:17,21,23 147:13,18 149:3 150:1,17 151:2,6,8,11,14, 20,24 152:1,4,20 153:1 154:5 155:2,5,8,20 156:2,5 157:24 158:2 159:8,12,17,20,23 160:15

**correcting** 160:13

**corrections** 160:7

**correctly** 57:13 86:11 95:23 110:6 111:25 112:14 121:9 127:4 159:7

**county** 19:20 62:14 67:23 137:24

**couple** 4:14 17:10 22:17 45:7 87:17 96:18 114:9 125:19 126:11

**court** 4:10,22 160:2

**covers** 135:19

**CP** 59:20

**crawled** 16:23 17:2

**crawling** 43:21

**create** 107:23 145:3

**crew** 14:14,23 16:4,16 18:6 150:4 157:25

**crews** 18:11 46:6 134:17

**CROSS-EXAMINATION** 39:5

**crossed** 41:5

**current** 7:9,11 33:24 44:12 45:17

**custom** 35:25

**cut** 16:14,16 54:14,18,24 58:11 71:9 75:25 80:6 92:22 134:4 158:1

**cutting** 76:3 106:9 134:17,20 136:13,15

### D

**D2** 120:25

**D3** 121:1,6

**D4** 121:3

**dab** 69:13 108:13

**damage** 85:21 86:3 92:25 105:3 113:7,12 119:16 128:21 129:3 132:23,25 157:16 158:22, 25 159:10

**damage,'** 128:23

**damper** 77:25 78:7,8 79:7,18 144:10,14,18,19,22 145:10,12, 13

**dampers** 78:22 79:3 144:8

**dangerous** 74:24

**date** 5:15 25:12 41:7 58:24 69:3,5 71:11 87:11 104:2 107:10,15 123:10 137:18

**David** 100:5

**day** 40:4,20 60:24 123:20

**day-to-day** 46:4

**days** 126:11

**dealing** 86:21

**deals** 35:16 153:5

**debris** 73:12,16 74:5,8 132:12 133:24 134:1,2,10,11,13,20,24, 25 135:15,18 136:1,3,8,11,12, 16 155:25

**decade** 7:17 76:2

**deck** 134:19

**declared** 9:2

**deep** 15:13

**deeper** 63:19

**defendant** 39:8 126:3,6,15

**degree** 94:25 152:12

**delay** 19:7

**department** 5:2,11,18 6:14,21, 25 19:10,15 20:8 21:3 36:8,9,14 38:5 43:6 44:23 45:1,4,25 46:11 47:11 48:8,9,17 49:19,20,23 50:6 51:5,18 58:12 59:22 60:20, 22 64:16,21 66:25 67:16,24 68:2 69:25 76:17,25 83:15 85:8 88:23 91:5 95:24 96:24 100:3,5, 6,7,8,9,10,14 115:14 119:25 122:9 123:5 124:4,18 125:13 129:10 130:11 133:14 137:19, 21,24 141:18 142:10 147:7

**department's** 57:19 83:14

**departments** 45:15 60:22 62:13

**depends** 48:22

**deposition** 4:12 9:12 22:20,22 27:22 39:20 40:6,21 43:4,25 55:11 68:20 87:8 100:19 107:4 124:25 126:12 130:19 156:21 160:3,5

**deputy** 67:23

**describe** 5:21 22:3 46:25 91:12 124:16 133:20 135:3

**description** 49:16 57:15,23 70:6 102:11,20 103:1

**descriptions** 120:18

**design** 48:6,7 144:22 152:13,16 153:21

**designated** 125:14,17

**designation** 21:19

**designed** 119:23 147:22

**details** 123:24

**detector** 84:8,10,17,23,24 85:9

**detectors** 85:11,13

**determination** 31:3 38:14 55:8 84:2 122:9 123:4

**determinations** 122:7

**determine** 10:3 13:5 19:13 65:15 82:11,16 83:15 112:17 115:4 140:20 152:22 154:10

**determined** 9:21 37:20 83:12 107:20

**determines** 7:3

**determining** 7:2

**develop** 92:5

**developing** 80:6,15 96:8 109:19



**devices** 133:5

**difference** 103:7,15

**differently** 124:15

**difficult** 12:18 105:15 126:19, 24 127:7,10

**difficulty** 127:16

**direct** 31:22

**direction** 78:10 144:15

**directionally** 29:9

**directions** 74:22

**directly** 26:18 35:17 101:20

**disagree** 119:12 128:3,7,10 131:1

**disassembling** 63:6 64:9

**discharged** 136:19

**discover** 86:1 94:16

**discovered** 85:15,20 109:15 138:2,5

**discovery** 126:4,14

**discuss** 19:12

**discussed** 42:21 108:22

**discussing** 43:7

**discussion** 11:5

**discussions** 41:22

**dispatch** 19:22 62:2

**dispatching** 19:21 20:2

**dispute** 131:13,18

**distant** 114:6 115:25

**distinctive** 104:12,19

**document** 50:24 51:4 87:17,22 125:25 126:4,7

**documented** 86:7,17

**documents** 42:10

**dollar** 106:20

**door** 17:24 50:2 78:11 115:23

**doors** 78:25 79:24 80:19 81:2, 4,7 82:4,6

**dot** 94:23

**drill** 49:20

**drills** 50:6

**drink** 18:12

**drop** 14:19

**drop-down** 57:9,15

**dropped** 17:19

**dry** 26:6 136:19

**drywall** 92:17,23

**duct** 16:5 27:11,19 28:3,11,20, 22,24,25 29:2,3,7,8,16 30:2 68:7,10 74:15,16 75:1,2 87:5 121:7,9,11 122:15

**ducts** 15:4 27:1,4,6,20 28:2,6 29:21 30:5 31:7 54:15,18,19 58:4 73:1 111:24

**ductwork** 34:25 36:15,19 53:1, 12,17,23 54:4,24 58:7,20 59:4 64:7,13 65:1,10,11,16 70:9 73:20,25 74:6,11 75:4,7,11,25 76:15,18,22 77:8,14 78:4,20,21 80:19 81:3,4,11,12,17,19,23 82:1,20,22,25 83:3 86:25 93:8 108:6,19 109:10,22,23 110:19 111:2 113:5,8,12,14,17,20,24 118:6 119:9,15 121:2 126:25 127:11,12 128:2,16,22 129:4 133:25 134:4 135:8 136:15 139:16,19 140:4 144:11 152:5, 21,23 153:15,18 154:23,25 155:7,11,15,20,23 156:15 157:10,15,19,23 158:1,3,6,15, 22 159:15,18

**ductwork.'** 127:3

**due** 73:11 83:13

**duty** 43:1 101:13

**E**

**E1** 10:19 11:16 97:24

**earlier** 46:10 66:2,20 82:19 85:20 109:14 110:4,6 112:10,13 120:11

**earliest** 40:18

**early** 119:24

**easier** 52:9

**easily** 14:21

**east** 22:5 23:24,25 24:4,5,18 28:24 44:13 90:18

**eastern** 22:15 24:25 25:1 28:22 29:1,3,7,8 110:11 111:2

**easternmost** 21:25 22:12 27:9, 11 28:20 109:1

**education** 152:9,13

**effect** 77:18 133:18

**effective** 79:3

**effectively** 151:9

**effort** 19:13 157:23,25 158:24,

25

**emergency** 46:7

**employed** 5:1 52:18 67:15 100:13

**employees** 20:23 34:18 35:20 36:25 50:6 93:18 129:8

**employment** 45:4

**EMS** 62:4

**encountered** 132:10,15

**end** 16:20 20:16 74:21 90:18 142:24

**ended** 18:10 34:17

**engaged** 31:21

**engine** 14:7,14 17:22 46:8 60:14 61:10 62:3,5,10

**engineer** 152:19

**engineering** 152:10

**entered** 115:23

**entire** 49:18 58:14 92:21 113:22

**entry** 17:6 120:14 122:20

**equally** 126:7

**equipment** 38:12 47:25 63:14 97:12 99:21,24 103:10 105:12, 16 120:3,14,21

**Eric** 100:5,6

**error** 70:20

**essential** 128:22

**establish** 14:9 50:5

**Established** 60:14

**estimated** 106:19

**Etran** 160:19,20

**evacuate** 43:20 127:21

**evacuated** 14:8 50:7

**evacuating** 20:24

**evacuation** 16:15 17:20 49:25

**event** 48:1 59:3 68:17 69:11,21, 23 71:14 75:17,24 76:8 78:20, 21 82:17 87:23 96:23 99:6 125:8,11,15 133:21 134:5,14 137:11 138:12

**events** 42:25 68:25 86:12 115:16 130:1 154:21 156:9

**eventually** 133:16,18

**evidence** 149:17 151:25

**exact** 49:7 116:8,25

**examination** 36:11 137:6 157:7

**examined** 36:6,15

**exceeds** 94:24

**excessive** 102:7,23 103:6,12, 18

**exchange** 155:10

**exhaust** 15:4 16:5 24:10 47:5 72:7,19,22,23 73:1 76:20,21 109:9 146:6

**exhausted** 77:8

**exhausting** 53:14

**exhibit** 9:12,14 10:6 11:8,11,24 12:1,4,21 22:20,22 23:19 24:24 25:2,4,8,16 27:22,24 28:1,7,9, 23 29:1,13,16,17,22 30:2,6 31:22 33:11,14 34:23 55:11,14 61:21 62:16,25 66:18 68:18,20, 23 69:1 70:4,11 71:3 77:24 82:10,15 83:11 86:15,17 87:8, 10,14 90:13 96:16 99:7 21,22,23 100:19,24 106:14 107:4,7,8,9 108:1 120:1 123:11 124:25 125:3 128:19 130:19,22 137:8 138:19,24 139:9,10,15,22,23 140:5,6,9,12,14,17,21,24 141:1, 6,12,16,22 142:16,20,22,24 143:1,4,13,16,18,21,24 144:3,5 145:9,17,19 146:4,11,18 147:4, 11,16,17,19 148:5,7,10,12,16, 19,23 149:2,4,10,12,18,22,24 150:2,8,13,15,18,24 151:1,3,9, 13 153:25 156:21 157:9,15,22 156:23

**exhibits** 22:24 23:11 24:10 25:21 26:23 31:13 81:14 157:13

**existed** 149:9

**exists** 124:12

**exit** 16:17

**exit's** 16:14

**exited** 17:8 113:1

**expect** 15:21,22 132:8

**expectation** 61:18

**expecting** 49:7

**experience** 65:4 74:4 91:3 97:3 104:20 132:10,16 152:16

**experiences** 86:10 104:10

**expert** 153:20

**explain** 39:23 47:21 63:12 67:21 78:24 105:8 107:14 111:16

**explained** 106:9

**explaining** 43:9

**explosion** 15:9,10,15,16 30:9,
12,15,25 31:4 112:9,12,15,17,
23 113:2,4,7,13 114:2,9 115:5,
8,10,15,19,25 116:11 127:11,
15,20 129:3,4 134:15 135:11,21
136:1,3,8 158:4,9,13,17 159:6,
9,21

**exposed** 113:14,24

**extended** 64:13 65:1 99:14

**extension** 63:7,22,24 78:1
92:18,23 99:19 134:18

**extensive** 88:24

**extent** 68:10

**exterior** 26:12

**external** 72:25 97:19 103:13
109:22,25 110:1

**extinguish** 19:14 26:7 75:2
80:10 119:25

**extinguished** 36:6 141:17

**extinguisher** 26:6,9 136:19

**extinguishers** 14:17 133:7

**extinguishment** 58:11,13

**extremely** 30:15

**eye** 16:4

---

**F**

**facilities** 153:11,14

**facility** 46:22 54:8,13 57:25
61:9 65:12 66:14 79:11 81:4
82:17 119:9 130:25 131:14
133:21 134:14 153:17 154:20

**fact** 11:22 15:23 77:2,10 88:22
109:6,7 110:17,18 111:5 123:22
126:24 156:14

**factory** 21:14 24:16 42:17 89:9,
18 104:13 113:15,25 117:3

**failure** 99:20

**fair** 52:3 114:6,14 128:17 155:4

**familiar** 52:5 54:8 55:19 81:3
84:14 88:4,6 129:23 130:16
153:2,3,8 156:1 159:25

**familiarity** 46:25 52:10

**fan** 146:6

**FD** 105:2

**Fed** 40:1,3

**federal** 57:8 98:18

**fee** 40:9

**feel** 49:1 87:16 124:4

**feet** 136:2

**fiance** 68:1

**field** 37:4,5,7 58:14 92:7
102:11,18 135:15,18

**fields** 84:14,15 98:4 99:3

**fight** 74:19 126:19,24 133:14

**fighting** 58:16 118:21 127:7,9,
16,18 153:10

**file** 13:13 38:1 157:4

**fill** 9:23 38:23 57:10

**film** 99:16,17

**Finally** 4:24

**find** 10:9 92:21

**finish** 4:19

**fire** 5:1,10,18,24,25 6:1,7,17,25
7:6,18,24 8:4,7,12,16,23 9:1,9,
17,24 13:4,5,8,9,11,15,20,24
14:13,15 15:5,21 16:2,11,14,17
17:25 18:6,23 19:1,8,10,13,14,
15,19,24 20:8 21:2,12,16,24
22:4 23:20 24:1,17 25:5,17,21
26:7,11,13,22,24 27:5,8,10,16,
19 28:18 29:6,12,16,20 30:1,4
31:7 32:16,18,21,24 33:1,3,22
34:2,10,17,21,24 35:3,8 36:6,7,
8,9,14,22 37:1,8,18,20 38:4
40:2,4 43:4,7,13,17 44:22 45:1,
4,14,20,25 46:11,17,21 47:11
48:7,9,17,23 49:22 51:5, 52:3
54:16 55:3,15,19 57:1,7,14,19,
24 58:11,13,16,20 59:4,11,22
60:20,21,24 61:7,9 62:22 63:2,
13,14,19,23 64:1,2,7,12,16,21
65:1,9,16,21 66:4,6,8,13,22,25
67:11,16,25 68:2,3,7,10,25
69:17,25 70:24 71:14 74:16,24,
25 75:2,5,14,21,24 76:17,24
77:25 78:4,7,8,9,12,21,22,25
79:2,3,4,6,7,18,20 80:6,7,11,15,
25 82:12,20,24 83:9,11,14,15,
16 84:23 85:6,7,11,15,20 86:2,5,
12,24 87:5 88:1,18,23 90:4 91:5
92:13,15,16,19 93:4,5 94:2,7,9,
17 95:2,3,9,24 96:7,8,13,23,24
99:9,12,19 100:3,14 101:19,21,
25 103:11 104:5 105:20 107:17
108:3,5,24,25 109:9,15,19,21
110:15,19 111:1,7,10,14,15,21,
24 115:13,16,19,20 116:4,15
117:2 119:16,23,25 120:23,24
121:13,15 122:9 123:4 124:3,17
125:13 127:2,7,10,17,18,25
128:20 129:2,4,10 130:5,6,8,9,
11,25 132:17,20,23,25 133:7,
14,16 134:19 137:9,19,21

**138**:1,5,8,11,14,16,21,22 139:2,
8,10,16,21,23 140:4,5,8,12,13,
17,21,24 141:1,6,12,16,18,22,
23,25 142:2,5,10,15,19,21,24
143:3,17,21,24 144:3,4,11
145:8,14,15,19,20,22 146:3,4,
10,18,20,22,25 147:7,10,14,15,
19,20,22 148:6,10,11,23 149:2,
10,14,18,19,22,24 150:4,8,19,
24 151:10,16,18,22 152:7,9,12,
19,24,25 154:4,11,23,24
155:15,20,22,24 157:10,19
158:24

**fire's** 111:18

**firefighter** 5:23,24 7:4 8:14
76:3 152:11

**firefighter/paramedic** 5:14

**firefighters** 21:2 43:5 60:25
62:1 127:23

**firefighting** 91:2 133:5,11
157:23,25 158:24,25

**firehoses** 133:8

**fireman** 45:14

**firemen** 17:23

**fires** 6:6 8:5,8 47:4 54:9,11,14,
24 55:6,9 61:2 66:10,11 72:12
74:14,20 85:11 93:2 118:21
146:16 153:10 155:3,6 156:15

**firm** 42:3

**first-hand** 65:4

**Fisher** 59:17,22 67:7,13

**fit** 18:14 103:2

**flame** 14:16 102:23 104:9
122:12 141:3 151:7

**flames** 26:12 102:25 103:16
108:9 110:7 111:5 114:22,25
116:20 117:8 136:6

**flammable** 54:4 82:23 83:1
99:18 121:9,13 155:12

**flip** 84:7 123:11

**floor** 16:13 17:2 32:13 66:10
115:24 116:16,19,23 121:25
134:3

**flow** 73:12 141:13 144:15

**flowing** 33:16 34:9,15 144:11,
22 145:1,2

**flue** 57:1,14,24 58:4 79:25
134:3

**flues** 73:13,17 76:14

**focused** 75:14

**foil-backed** 22:9

**folks** 91:5

**follow** 16:5 49:1

**follow-up** 159:5

**forced** 14:24 15:3 80:22 81:1
111:19

**forcing** 111:23

**foreseeable** 45:5

**Forgive** 31:2

**form** 6:9 8:1,18 9:23 21:21
77:12,20 138:15 146:12 148:14
150:11,16 156:12

**formal** 8:22

**formally** 9:2

**formed** 16:19

**forward** 79:1

**fought** 64:2

**found** 125:18 150:4

**foundation** 68:13 73:3,22
76:12,19 77:20 80:3 83:2 84:12
87:6 88:9,20 97:1,9 98:9 102:12
118:4,18 119:17 128:5 131:7,24
139:25 144:24 148:14 155:21
156:12

**fourth** 20:20 126:18

**free** 87:16

**free-burning** 16:1 96:12

**frequently** 49:6 50:17

**friends** 52:4 118:19

**front** 12:9 81:14 100:23

**fuel** 111:19 155:14

**fueled** 80:25 127:2 128:1

**full** 5:5,14,16 44:24 71:8

**full-time** 5:4 45:10 60:21

**function** 7:15 131:23 147:25

**functioning** 86:11

**functions** 91:18

**furnace** 63:6 64:9 80:24,25
89:19 90:2,3,18 147:20,22
148:4 149:1,6,13,18

**furnaces** 147:25 148:2

**future** 45:5

---

**G**

**G2** 106:17

**garage** 115:23



**gas** 77:7,12 83:7 121:12

**gases** 83:5

**gasoline** 66:10

**gave** 11:12 35:6 41:2

**gear** 101:19,22

**general** 6:6 50:19 70:21 79:13 85:24 88:5 99:6 102:10,20 123:17 134:2 154:19,21

**generally** 37:23 43:3 51:16 52:4 55:19 63:13 66:7 79:3 81:7 120:5 124:17 130:16

**generic** 85:5

**Gilbert** 67:5 68:3 100:8

**give** 17:6 22:24 24:22 45:22 48:3 49:16 54:11 79:9 160:9

**giving** 12:19

**glaring** 48:13

**Goad** 100:9

**good** 39:11 47:7 96:19,22

**Google** 125:19,25

**government** 57:8 98:18

**grabbed** 17:14

**grammar** 160:13

**grammatical** 160:6

**great** 23:5

**ground** 4:14 133:24

**group** 21:1,2,5

**guess** 12:15 53:11 55:25 102:2 103:7,14 107:13 111:13 113:14 117:4 128:11 132:12

**guessing** 54:14 84:6 131:25 136:2

**guys** 14:18 17:10 43:2,8,9 49:20 63:20

**H**

**H2** 84:7

**habit** 60:10

**halfway** 89:8,13

**hand** 14:22 32:15 55:13 68:22 87:10 118:6 125:2 130:21

**handheld** 94:19

**handing** 107:6

**handle** 46:3

**handling** 111:22

**hands** 16:23

**hands-on** 92:5

**handwritten** 56:1

**happen** 110:23

**happened** 35:20 38:8 43:7,8, 10 76:8 79:14 110:24 124:17 159:21

**happening** 48:15 49:3 79:10, 16

**hard** 4:22

**hazard** 48:13

**hazardous** 98:11 145:3

**hazmat** 6:2

**head** 4:18 105:24 130:17 131:19 132:4,9 133:1 134:22

**heading** 17:7

**heads** 33:15 34:8,11,15 119:5 130:13,23 131:5,14 132:11 153:24 154:7

**hear** 47:11

**heard** 15:9,14 41:17 58:16 112:11,14 116:11 129:19

**heat** 90:19 99:10,21 102:7,23 103:6,12,18 120:24,25 140:8, 11,13 147:22

**heavily** 90:18

**heavy** 98:6,11 116:15 117:2

**held** 11:5

**Hey** 8:9 16:16 18:5 43:9 48:24 51:17 63:18 124:3

**Hickman** 17:4,5,13 33:25 35:23,25 38:22 70:23 103:21 115:18 122:25 126:21 127:1 128:8,23 135:4

**high** 90:19 95:21

**higher** 67:25 94:23 108:24

**highest** 94:24

**Hill** 7:9 8:25 9:7,16 16:3,20 46:14 83:23 84:3 88:13,14,17 115:14

**Hill's** 83:19 112:1

**hired** 5:13,15

**hit** 18:3 95:8

**hold** 10:25 119:24

**hole** 14:24 74:15 92:22 113:16 136:13

**holes** 74:21 134:17,20

**home** 44:12 101:20

**honestly** 7:16 8:24 10:11 40:11 97:10 105:10 118:21

**hope** 27:25

**horizontal** 81:23

**horizontally** 24:12 28:2,7

**hose** 14:19 15:2 16:10,22,24 17:3,19,21 43:22 74:21 135:16, 17,19

**hot** 92:22 94:8 95:5 97:8,10

**hotter** 95:6

**hour** 30:16 56:22

**hours** 69:25

**house** 44:16,18 60:24 85:6 93:4

**houses** 93:3

**Howell** 129:20

**Howell's** 157:4

**Huff** 17:22 67:12

**huge** 16:11 125:4

**hurry** 16:19

**hydrant** 49:21

**I**

**IBO** 154:25

**Idaville** 60:15 62:10

**idea** 13:10 15:22 50:12 54:11 93:20 119:10 135:7 140:1 143:14 148:8,13 149:11 151:2 153:16 154:12

**ideally** 77:9

**identification** 9:13 22:21,23 27:23 55:12 68:21 87:9 100:20 107:5 125:1 130:20 156:22

**identified** 123:5,14

**identify** 23:2 67:2 86:15 94:1 154:19

**identifying** 121:17,24

**identities** 87:18

**ignited** 89:20 99:9 121:2,3,7 148:17

**ignition** 10:19 11:17,20,23 12:5,23 38:10 99:2,11,20 105:25 120:9 122:16 152:24

**II** 4:11 5:24,25 6:1 56:7 152:11

**images** 93:7,11,15 95:14,18 96:1 130:23 131:21

**imagine** 95:21 119:3 125:7

**imaging** 90:25 91:2,9,14 92:9 93:19 94:1,12,15,19 95:17 96:9

**impact** 115:15 131:22 132:1

**important** 78:21 80:5

**in-service** 91:17

**incident** 13:1 35:16 37:3 55:15 56:25 57:7 58:25 60:3,4,8 61:4 70:3,15 73:17 89:2,3 98:20,22, 25 101:1,6 102:6 103:24 104:3, 5,24 107:11,14,23 122:23 123:10 129:12 151:3,18

**incidents** 106:6

**include** 54:16

**included** 9:8,10 13:12 61:19

**including** 36:17

**incorporate** 91:22

**incorrect** 141:10

**independent** 13:23 60:17 71:13 137:10 141:24 146:19

**independently** 18:18 55:7 85:15

**Indiana** 5:22,23

**indicating** 11:16 56:12 59:24 64:8 71:2 72:25 78:3 83:14 85:13,14 86:24 98:8,10,13 99:5, 16 102:10 120:18 122:3

**indication** 33:2 109:19 117:22 138:4 139:12 145:8,12 149:17

**indicator** 17:7 94:22

**individual** 129:19

**individuals** 66:24 67:6,10,18 69:9,10 100:3 123:14

**industrial** 63:14 147:20,22,25 148:2,4 149:1

**industry** 47:3,17 50:22 98:11

**industry's** 97:12

**informal** 130:7

**information** 8:9 12:20 38:17, 21 40:22 41:3 48:3 92:5 123:18

**informed** 48:25

**Ingle** 100:9

**inherently** 66:15

**initial** 38:25 62:12 99:11 107:17

**initially** 24:1 133:17

**initials** 25:12

**injured** 127:22



**injury** 7:4,5 47:9

**input** 107:1 123:1

**inside** 15:6 30:15 36:15,18 52:4 53:22 73:13,16 74:11 75:4 78:5 82:25 83:3 89:20 93:3,4 94:6 96:24 97:17 102:3 105:10,13,14 108:9 111:14,20 113:14,24 117:15 118:19 127:3,13 128:2 135:4,5 145:6 148:17,21,25 155:6,14,15 156:15

**inspection** 47:13 64:18

**inspections** 47:7,12 48:19 49:7,13 51:14 130:12,13

**installation** 152:14,16 153:5, 21

**installed** 53:25

**instance** 72:11 79:6 108:10

**instantly** 115:21

**instructed** 64:22

**Instructor** 5:25

**insulation** 21:24 22:9,10 27:9, 11 28:19 29:20 92:24 109:1 110:3 134:8,10 136:13,14

**Insurance** 42:17

**intention** 44:20

**intentions** 45:3

**interact** 125:15

**interest** 160:12

**interested** 18:22

**interior** 8:6 63:2 65:1 96:19

**internal** 54:3 73:1 77:4 82:22 83:1 119:8,14 141:5,13 155:11

**internet** 126:7

**interrupt** 88:8

**intersects** 110:13

**intertwined** 127:1

**intervention** 86:6

**interview** 19:12 34:17 35:19

**interviewing** 129:13

**interviews** 36:25 129:7

**introduced** 92:15

**invention** 92:14,20

**investigate** 8:5 38:6 94:2 105:10

**investigation** 6:8,18,22,24 7:8, 22 8:13,22,25 9:5,8,11,16 10:8, 20 11:17 12:6,22 13:2,4,9,12,17

34:20 65:21 66:3 68:25 83:11, 15 105:2 112:5 140:20 143:24 146:16,25 147:5 148:23

**investigations** 7:13,20 46:12 88:25

**investigative** 7:10,11 12:3

**investigator** 5:25 7:3 8:4,11 38:2 83:25 88:15

**investigator's** 12:12 65:24

**investigators** 9:23 37:3

**involved** 43:19 54:12 82:17 98:25 106:8 140:16 143:20 145:9 148:6 149:24 150:24 151:1 153:10,14

**involvement** 18:10 101:25

**involving** 155:6

**issue** 90:12 99:24

**item** 121:6

## J

**J1** 121:20,21

**J2** 121:20 122:3

**Jacob** 39:6,7 154:16 159:4

**job** 8:13 45:12,23 46:3 68:2

**job's** 46:5

**jobs** 45:12

**John** 17:22

**joint** 22:6

**Joseph** 100:9

**judging** 34:7

**July** 87:11 88:2 101:4 146:18

**junction** 28:1 30:4

**juncture** 108:7

**June** 5:13,17

## K

**kick** 136:16

**kind** 15:7 28:3 39:25 40:9,18 43:9 47:24,25 48:10 49:6,16 50:23 57:14 62:22 68:25 71:20 74:5,8 75:3 77:12 79:8,19 85:15 86:10,21 88:5,6,24 92:4,5 94:1, 11,16 99:14 101:24 104:2 108:22 115:5 116:18 117:10 120:17 122:7 124:16 125:14,22 133:20,22 134:23 135:1,19,25 154:18 155:9

**knees** 16:23

**knew** 49:25 50:1

**knocked** 18:4,5

**knowing** 18:22 146:15 149:23

**knowledge** 11:21 13:6 14:10 31:17 36:10 64:25 65:3 74:10 76:14 81:25 88:1 93:6,21 113:4, 7 115:13 123:3 133:4,6,10,12 136:4 142:15,19 145:15,16 147:10,14 148:2 153:19,25 154:3,9 158:24

## L

**lack** 48:19 73:11

**ladders** 14:21,23

**Lamb** 100:5

**land** 45:13

**large** 116:14

**large-scale** 61:4

**layout** 24:14 52:5

**lays** 33:8

**lead** 7:10,11 16:20 111:11 124:17

**leads** 16:6 111:16

**leave** 107:21

**leaving** 45:3

**led** 10:3 83:15 90:3

**left** 37:15,24 38:23 56:25 67:19, 22,24,25 68:3,5 79:18 107:19 124:4

**letter** 49:2

**level** 68:15 87:3 126:25

**levels** 156:9

**lieutenant** 7:9 8:25 9:7,15 16:3,20 46:2 89:1

**lift** 74:15

**light** 88:7

**lights** 17:6

**limited** 145:14

**lines** 15:2 96:18

**liquid** 83:7

**list** 9:24 69:7,9,10

**listed** 59:8 67:7 120:21

**lists** 51:1 66:1 71:15

**literal** 58:17

**live** 44:6 95:10,18

**lived** 44:8,14

**local** 7:2 125:7

**locate** 93:2,5

**located** 21:7,16 81:8 139:19 143:4

**location** 23:20 26:16 64:1 74:9 79:4 87:16 94:17 96:14 99:13 107:10 109:23,24 114:6,10,20, 25 116:1,3,14,20 117:7,9 118:7 139:5,9,23 140:5 142:21 143:3 147:15,17 158:4 159:6,22

**locations** 29:12 31:12 49:21 79:8 110:8,10,20 117:23 130:24 139:13

**long** 7:15 30:11 44:8,10,14 47:16,24 75:23 106:17 110:25

**longer** 66:24 67:2,4,19 86:1 96:12 100:3,5,6,7,8,9,10

**looked** 8:10 22:8 57:12 62:16 68:18 106:6 128:17

**loose** 146:5

**losses** 16:20

**lot** 15:19 65:11 114:13 123:18 133:23,25 134:15 154:17

**lots** 134:2

**loud** 4:16 30:15 112:11

**lower** 10:14 23:4 37:10 56:1 74:23

**lubrication** 89:19,22 148:17, 20,25

## M

**machine** 22:11 96:19

**machinery** 6:5 99:9,18

**macro** 68:15 87:2

**made** 14:12 16:9,10,25 17:9,24 19:9,14 24:11 25:20 31:3 33:24 35:12,13 37:25 38:6,12,14 62:6, 11,12,20 70:20 122:9 123:4 126:19,24 127:9 136:12 152:21

**main** 92:25

**maintained** 51:4

**maintenance** 14:9,12 15:1 21:7,8 35:17 50:1,8 63:2,15 64:8 152:14,17 153:21

**make** 18:14 25:14 29:13,24 31:6,8 36:11 40:22 48:10,17 52:13 56:4,14 61:8 64:12 77:11 89:21,25 92:2,18 93:24 103:14



107:18 114:3 126:3,13 128:12 129:6 133:1 134:18 135:9 151:15 160:4,7

**makes** 52:8

**making** 8:6 46:4 57:13 77:16, 18

**malfunction** 83:13 86:8,22

**man** 50:2,15

**managers** 41:1,2

**mandatory** 5:22 61:25

**manifested** 159:10

**manufactured** 54:5

**manufacturer** 91:15,21 92:3

**manufacturers** 95:16

**manufacturing** 52:11,23 61:5, 9 66:14 104:14 153:11,13,17

**mark** 22:18 35:1 40:12 41:11,22 42:8,10 67:4,22 94:25 107:3 108:22 126:1 137:7 154:17 157:8

**Mark's** 42:3

**marked** 9:12 22:20,22 25:16 27:22 55:11,14 68:20,23 87:8 100:19,24 107:4,6 124:25 125:3 130:19,21 156:21

**marshal** 7:1,6 13:8,11,15 37:19 38:4

**marshals** 9:1

**masked** 16:18 17:11

**material** 36:18 72:6,10,15 121:1,3 122:12 131:6,10

**materials** 36:22 98:7,12 123:6

**Matt** 67:4,25

**matter** 44:4 64:23 102:10,20 123:17 154:20,21

**mayday** 16:15 43:19 91:23

**Mckean** 67:4,22

**Meaning** 145:12

**means** 60:18 63:3,24 64:4 84:11,18,21 99:10

**media** 125:7,11,15,17

**meet** 47:18 50:2,8 51:7

**member** 123:13 125:10

**memory** 59:3 60:17 64:25 86:13 88:1 104:4,23 117:25 118:15

**mention** 13:1 42:20 155:22,24 156:3

**mentioned** 49:10 51:7 54:7

**mess** 97:12 135:1

**met** 50:9,13

**metal** 53:19,23 105:20 113:21 135:21 141:4 147:22

**middle** 14:6 18:23 24:12,15 69:13 108:13

**Mike** 7:9 46:14 83:18,19,23 84:2 88:14,17

**million** 106:22

**mind** 18:20 136:18

**Mine** 10:24

**mini** 160:18

**minutes** 30:23,24 39:10 56:23 62:13,19 114:10

**missed** 86:19

**mitigating** 119:16

**model** 91:13 92:4

**models** 95:16

**moment** 55:23 123:11 145:18

**Monon** 62:3,4

**months** 87:13 101:5

**Monticello** 5:1,10 6:25 7:7,20 8:21 10:7 11:20 12:7 13:13 18:25 19:10,17 20:8 21:2 36:5, 13 44:6,13,22 46:10 52:15 54:8, 12 56:17 57:19 62:1,23 65:7 66:25,67:16 72:12 74:6,9 86:22 87:16 88:2,23 91:5 95:24 96:24 100:14 101:2 104:11,21 107:24 122:9 123:4 133:4,14 137:9,18, 21 142:9 146:24 147:2,7

**Monticello's** 45:15 46:22 125:4

**morning** 19:3 30:24 62:6

**move** 44:20 95:11

**mutual** 42:17 60:14,19,23 61:2, 10 62:3,4,5,10

---

**N**

**name's** 66:20

**named** 129:19

**names** 66:19 100:1,4

**narrative** 9:18,20 10:3 13:2 20:13,15 37:8 51:3 61:19 70:15 71:8,14,20 88:17 104:4 114:8 116:12 124:7,9,14 147:5

**National** 6:1 57:7

**nature** 160:8

**necessarily** 37:3 85:13 88:23 102:25 109:11 155:3

**neglected** 82:9

**newest** 94:22

**NFIRS** 9:23 57:6 98:19 103:10

**NFPA** 153:2,3,4,5

**night** 14:6 18:16,24 43:1

**nighttime** 85:10

**nod** 4:18

**nods** 105:24

**non-permit** 47:21

**normal** 14:8 93:21 130:17

**north** 23:23 24:15 44:13 72:21 112:25 116:14,25 117:2 142:24 158:11,16,18 159:13

**notation** 20:12 31:8,23 32:2,3,5 33:15,19 35:12 37:25 38:6,12 143:9 150:21

**notations** 31:20 33:12

**note** 13:1 55:25 67:7

**noted** 30:14 65:21

**notes** 37:4,6,7

**Nothing's** 15:1

**noticed** 15:5,18 27:15

**noticing** 119:6

**notification** 38:3

**notified** 30:14 32:22

**notify** 48:23 62:2 85:9

**notifying** 47:8

**notion** 131:13

**November** 101:1 104:5

**nozzle** 74:17,19 75:2

**number** 11:10 24:6 41:3 49:7 57:2,4,16 66:19 106:23 107:11 153:10 156:25

**numbers** 10:15 23:3 56:1 57:9, 11

**nuts** 63:16

---

**O**

**O'BRIEN** 6:9,19 8:1,18 10:21, 24 11:4,14 21:21 23:1,6 24:6,2 25:14 30:18,21 31:24 35:1 36:8 39:6,7,14 68:14 73:4,23 76:13 78:16,19 84:13 86:17,18 88:11,

21 89:12,15 97:2 100:21 102:13,17 118:5 125:25 126:6, 10,16,17 138:15 139:25 144:24 146:12 148:14 150:11,16 154:16 156:13,19,23 157:4 159:4 160:20

**oath** 39:16

**Object** 6:9 8:1 21:21 68:13 73:3,22 76:12,19 77:20 80:3 83:2 84:12 87:6 88:20 97:1,9 98:9 102:12 118:4,18 119:17 128:5 131:7,24 138:15 146:12 155:21 156:12

**objection** 6:19 74:2 84:19,22 88:9 102:16 128:9 131:16

**objections** 156:18

**obligation** 39:16

**observation** 29:13 30:1 31:6 35:3,5

**observations** 25:20 35:13 108:5 129:1

**observe** 96:9 108:9 119:2 136:11

**observed** 19:8,25 22:3 23:20 25:5 26:13 27:18 29:5,6,11 31:9 103:16,17 108:6 109:18 110:19 111:1 128:15 138:8,12,13,21,23 139:1 141:4 142:16 147:11,15, 16 151:18 157:18

**observing** 72:15 74:5

**occupants** 84:25 85:9

**occupying** 46:16

**occur** 30:12 40:15 66:3 82:25 86:3 113:4 121:13 155:15

**occurred** 76:1 112:18,23 113:2 115:19 130:5,6 135:11 158:10, 13 159:10

**occurring** 88:2 145:14 154:21 155:20

**occurs** 30:25 66:13

**October** 56:15 59:3 68:16 137:9

**offense** 52:8

**office** 12:9 41:1

**officer** 6:1 8:6,15 14:7 76:4 89:2 106:10

**officer's** 35:6 38:25

**officers** 91:22 101:19

**official** 51:9

**oils** 98:7,11



Connor Reporting
www.connorreporting.com

317.236.6022

oily 90:4 149:14

one-story 121:22

one-way 144:18

ongoing 66:14 75:5 80:6,15 94:2 96:8 110:22

onsite 98:7 133:8,10

open 33:16 34:9,15 79:18 80:18,23 97:5,7,16 105:14

opened 40:5 79:25 82:5

opening 15:3 97:14 144:19

operate 91:18 154:4,11

operating 15:12 34:6 70:21 93:22 97:7

operation 128:22 132:4 145:9

operational 90:2 149:6

opinion 13:20 119:14,18 128:6 131:22

opinions 128:3

opportunity 160:10

opposite 144:15

option 12:10

orally 48:21

orange 95:8

order 105:9 121:13 160:16

ordered 8:25 14:20,22 62:2

origin 6:7,8,17,18,21 7:13,19, 22,23 8:16,22 9:4,7,16,19 10:7 12:6,22 13:9,12,16,20 34:21,24 37:20 46:12 55:8 83:25 88:15, 24 111:9,12 112:1,5 120:23 121:16,18,25 122:8 127:19 140:19,21,24 141:1,6 143:24 144:3 146:15,25 148:9,11,22 156:8

original 18:6 41:14

originally 17:25 117:7 136:5

originated 120:23 145:20,22 151:23 157:11 158:17

Otto 129:24

oven 21:16,18,19,25 22:8,11, 12,13,14,16 24:5,9 25:22 26:14, 15,17,18,20,23,24 27:1,3,5,9, 13,16 31:8,10 36:7 64:10,14 65:2 81:18 82:1 97:19 105:3,11, 20,23 108:3,7,10 109:1 110:12, 13 111:3,6,12,14,20 114:18 116:6,8,24 117:8,12,15,24 118:10,16 136:5 140:16 141:5, 14 143:20 148:6 150:20,24,25 151:16,19,22,23 157:10

ovens 14:13,15,22 22:5 23:16 27:2 52:25 53:4,5,7 77:6,14 93:22 96:22,25 105:17 127:3 128:1,16

overhanging 133:25

overheard 42:20

overheat 83:12 103:18 146:7

overheated 73:11 103:11

overheating 90:3 103:5,6,9,15 149:13,19

overlapping 89:5

oversees 46:1

overtaken 17:11

oxidizer 145:23,25

oxygen 80:11


**P**

p.m. 100:17,18

package 40:1,3,7

pages 10:22 12:2 87:17

paid 5:6 60:21

paint 122:19

panel 49:21,22

panels 81:12,18

paragraph 71:24 78:17 79:23 82:4 83:10 89:8,12 90:17 104:7 105:1 106:24 126:18,22 126:19, 20 143:7

part 9:8 12:21 28:17 45:13 72:25 77:3,5 98:19,21 113:12 130:11 157:25

part-time 5:4

participants 42:7

participated 51:2

particle 83:6

particulate 132:13

pass 4:14

passing 43:11

path 116:13,25

patterns 66:10

pavement 72:7,11

pen 24:22

people 46:2 47:22,23 49:24 50:8 51:2 52:19,21,22 67:15

percent 157:12

perform 13:8 112:4 130:12 147:25

performed 7:15 13:11 143:23

period 19:8

permit 47:20

person 7:7 20:1 21:8,10 125:14

personal 52:17,18,19 63:3 65:4 79:9 101:17,23

personally 38:15 79:15 86:21 91:1 106:7 125:10 128:2,14,15 129:7

Personally-owned 101:12

personnel 14:10,12 21:8 35:17 58:13 63:3 64:8,17,18 76:17,25 138:9,23 141:17

phone 41:2

phoned 142:9

photographs 22:18,25 23:5, 12,15 156:24

photos 132:6

piece 63:14 103:10 105:12,16

pipe 29:4 121:2,7 122:15

piping,' 127:1

place 17:19 25:16 119:24 158:5

placement 135:19

places 79:20

plaintiffs 43:24 126:8

plans 45:7

plant 7:18 8:17 13:5 14:7 19:1, 9,18,25 20:24 23:22 25:6 34:18 41:1 47:1,16 52:4 61:5 128:21 138:2,5,9 139:18 141:17 145:20 154:7

plant's 128:22

played 119:15

plumbing 127:1

point 30:8 31:15 33:10 61:23 91:20 94:24 96:8 113:23 121:24 129:13 137:1 158:18 159:18

police 37:12,19

populate 84:15

populated 57:18

portion 20:13 34:3 35:21 57:18 81:19 106:25 113:13

portions 33:22 37:8 81:23 160:5

position 5:4,6 45:10,17 46:16

51:11

potentially 85:14 86:2

pour 66:10

POV 101:11

powder 26:6 136:20

powered 120:25

practice 35:25

pre-incident 106:20

pre-population 120:22

precautions 47:25

predating 69:21

predetermined 57:14,21 70:6

preparation 42:14

prepared 37:18 50:24 124:10

preparing 125:20

preplan 48:5 50:4

prepopulated 98:3 99:3 102:18 120:18 122:19

presence 31:6 119:14

present 44:20 45:3 66:21 67:7, 11 69:10,16 87:19,23 98:2 101:9 106:2 134:14

pressures 18:13

pressurize 74:23

pressurized 33:8

presume 53:11

pretty 14:15 15:11,13 79:3 94:18 95:21 108:13 112:21

prevent 78:9 144:14,22,25

prevented 145:2,13 152:6,24

prevents 144:10

previous 62:9 70:14 82:9 87:13 90:13 101:6 103:4 108:4 111:25 120:4,15 121:8 123:19 126:21

previously 116:20

primary 46:6,8 51:12

print 12:11

printed 12:12,16

prints 12:9

prior 11:12 47:4 52:3 54:9 55:3, 6 77:18 88:9 92:14 123:25 149:19

problem 134:11

procedure 49:25 62:22



procedures 70:21

proceeded 16:21 24:15

process 52:11,23 77:4

processing/manufacturing 99:8

produced 23:2 125:24 126:4, 14 156:24

produces 77:3

producing 16:3

product 123:22

production 15:19 66:14 82:11, 16

products 98:7,13

progression 79:2

proper 93:18 131:22 144:21

properly 78:1 91:18

property 106:21

proposition 85:24

protection 152:19

provide 27:25

providing 80:14

pull 43:10 92:23 127:21

pulled 17:13,21 126:6

punctuation 160:8

Purdue 67:24

purely 41:25 42:1 96:4

purpose 53:4,6 77:5 78:8 144:20

purposes 6:11

push 16:12 17:18,24 94:20 114:23

pushed 80:25 117:5,9

pushing 80:23 111:23 115:22 116:15,19,22

put 16:20 25:12 38:1,18 47:9, 22,23 51:20 56:4 61:11,14 64:2 74:14 75:1 91:16 97:13 107:17 121:4 133:16

puts 74:24

putting 15:21 16:2

**Q**

qualified 112:7

quantify 135:23

quarter 150:3

question 4:20 8:3 12:17 31:2 52:7 79:15 104:17

questions 4:16 39:3,6 117:19 136:25 137:7 144:7 154:16 157:8 159:4

quick 159:5

quote 114:16

quoting 126:20

**R**

race 10:10

radiated 99:10

radioed 14:18 15:14 16:13 18:4

radius 135:25 136:1

range 90:21 93:22

rank 5:8

rapidly 116:15

re-ignition 123:24 124:2

re-marked 11:11

reach 115:14

reached 84:3 133:22

react 15:1

read 12:25 34:7 127:4 153:7,9

readily 127:13

ready 40:25

reason 7:22 8:4 128:7,10 131:1,13,18

recall 14:3 18:19 21:12 43:16 48:15 51:23 54:23 61:16 62:1 75:17,23 81:9 86:21 106:7,12 110:25 111:4 117:20 118:25 119:1 120:10 124:21 125:12 152:7

receive 5:19

received 18:25 19:18,22 41:15 137:21,24

receptionist 40:2

recess 39:12 100:17

recognize 23:12 50:13 55:15 56:17 68:24 157:9

recollection 13:3,7,23 14:1 20:7 24:13,17 32:8,12 34:5,14 49:3 55:7 71:13 72:10,14 130:10 137:11 141:24 146:20

recommendations 48:10,18

record 6:12 11:5,7 156:23

recording 96:3

**RECROSS-EXAMINATION** 154:15 159:3

red 94:23 95:7

REDIRECT 137:6 157:7

reduce 92:24

reduced 146:5 152:6

refer 10:15 82:19 110:17

reference 60:13 76:21 77:2,10 78:15 103:4 110:18 148:18

referenced 72:4,16,18 82:7 86:8 90:8 148:5

referencing 57:25 72:20

referred 88:14 112:10

referring 11:11 26:15,18 43:21 61:21 73:2,8,25 75:17,24 76:9 80:2,13 89:23 90:9 99:7 105:6,8 108:19 110:11 122:22

refers 70:8 81:2 89:21

reflect 138:7 147:4

reflected 11:23 24:20 32:23 36:2 37:1 138:23 147:11

reflects 12:4

refresh 32:8

regenerative 145:23,25

registers 118:22

regular 91:22 95:4

rekindling 133:17

relate 90:12

relation 43:17 155:24

reliant 133:13

rely 60:22,25

remainder 100:13

remaining 12:2 67:6,10

remarks 59:17,25 60:7 61:19 70:15 108:2

remember 6:4 14:5 28:13 31:17 32:10 50:9,14 59:10 71:22 79:9,12 119:5 124:20 133:23

remount 127:23

remove 80:11

removing 136:12

repair 63:17 153:22

report 9:9,15 10:12 11:19,22 12:3,10,12,25 13:12,24 14:4 18:21 19:17 21:23 24:20 26:5, 14 27:7 28:17 31:19,20 32:24 33:1,22 34:3,13 35:6,16,21 36:3 37:2,8,12,13,19,22,25 38:7,16, 18 39:1 51:1 55:16 57:7,18 58:20 59:25 61:16,19 65:14,22, 24 67:12 70:14 72:24 85:3 86:24 87:4,24 89:4 98:15 101:2, 6 106:2,15,25 107:23 108:3 123:1,10,20,25 124:7 137:9,13, 16 138:4,7 139:15 141:22 142:2,5,8,13 146:4,22 147:19 149:12 151:9 156:4

reported 89:18 104:8 105:20 116:4 139:9,22,23 140:6 142:16,20,21 143:4,16,21 144:4 148:10,12 149:10,18 150:13,15, 20 151:3,13

reporter 4:10,22 160:2,16

reporting 57:7 87:4

reports 37:18 46:4 55:20 63:2 68:25 70:19,22 82:19 84:14 88:4 99:15 103:4 107:14 120:4, 13,15 142:24 150:18 154:17,19 155:1,4,19,22 156:16

represent 39:7 93:6 119:11 125:18 130:22

representation 77:16,19 131:2

representative 89:9,18

request 61:10,14 62:5,19

requested 60:14 62:10

required 47:20,21

reschedule 41:5

rescue 6:2,3 46:8 47:6,15,19 48:23 71:18 91:24

rescuing 92:1

reserve 160:2

reserving 160:1

residential 66:8 95:3

residue 99:16,17 127:2 128:1

resolved 23:6 157:1

respect 38:16 49:4 51:13 53:12 57:25 59:11 68:15 70:18 73:17 82:14 96:22 98:6 99:2,5 105:16 122:8,22 124:10 127:15,25 136:1 149:10 152:2 153:24 155:18

respond 61:1 86:2 101:20

Responded 58:19 105:19

**responding** 59:6

**response** 46:7 47:3 48:2 60:20 62:4 96:23 130:9

**responses** 72:12

**responsibilities** 45:23 89:5

**responsibility** 46:7

**rest** 62:14 100:13

**restricted** 141:13

**result** 50:24 105:2 151:4 158:23

**resulted** 149:22

**retire** 45:7

**review** 160:4

**reviewed** 154:18

**Reynolds** 62:11

**right-hand** 10:14 16:25 23:4 37:11 56:1

**Rimkus** 157:3

**rip** 134:10

**risks** 79:18

**Rocky** 4:11 39:7,15,19 130:21

**role** 59:11 119:15

**rolled** 50:1

**Ronald** 83:21,23 88:13

**roof** 28:4,12,14 115:20 134:16, 19 150:4,5,9

**room** 42:21 92:16,21

**rope** 6:2

**rotate** 18:11 50:21

**rotated** 18:9,15

**route** 17:20

**routinely** 9:2

**rules** 4:14

**ruling** 10:1

**run** 28:2,7 45:24

**running** 111:23

**runs** 28:3

**S**

**S-T-R-A-N-G-E** 4:11

**safe** 17:10 107:21

**safely** 35:18

**safety** 47:2,18,24 48:13 49:10, 16,24 50:17,25 51:7,13

**salary** 67:25

**samples** 36:18

**sat** 22:5 43:7

**scan** 95:25

**scanned** 90:20

**scare** 124:3

**scenario** 91:24

**scenarios** 48:6,7 103:18

**scene** 20:9 21:3 25:25 26:2,22 29:11 30:11,17 36:23 38:23 63:18 69:11,16 101:9,15,21 102:14 123:15 124:18 142:7,12 147:8 157:14,18

**scheduled** 40:20

**scheduling** 41:25 42:1

**Schroeder** 67:5,25

**science** 152:10,12

**scissor** 74:14

**scorch** 102:7,24

**Scott** 129:19

**screen** 94:20 95:5,10

**screenshots** 95:19

**screws** 74:20

**script** 160:18

**seam** 141:4

**seams** 31:9 114:17 117:11

**search** 95:4 125:19

**seat** 26:11 93:5 95:8

**secondary** 17:21 93:2 99:12

**section** 9:11 20:16 32:5 34:11, 12,23 35:2 59:25 60:1 137:20

**sections** 38:16

**secure** 22:7

**seep** 117:11

**SENAK** 6:10 10:23,25 11:6,15 21:22 23:3,8,9 24:8 25:19 31:25 32:1 36:9 68:13 73:3,6,22 74:2 76:12,19 77:20 78:14,18 80:3 83:2 84:12,19,22 86:15 87:6 88:8,20 89:11,14 97:1,9 98:9 102:12,16 118:4,18 119:17 125:23 126:2,9,13 128:5,9 131:7,11,16,24 137:2,7 148:15 150:12 155:21 156:12,18,20 157:2,5,8 159:25 160:14,18

**Send** 18:5

**sentence** 20:20 58:19 63:1,10

.64:6 72:1,6 77:24 78:17 79:23 96:16,18 104:7 105:1,19 109:2 112:10

**separate** 49:12 117:4

**service** 38:12 68:3 92:15 120:4, 14,21

**session** 91:17

**set** 17:5 41:6

**setting** 44:2

**shakes** 131:19 132:9

**shed** 88:7

**sheriff's** 67:22,23 137:24

**shift** 43:1,5 45:24,25 46:1,3 91:23

**shifts** 45:24

**shook** 15:10

**short** 39:15 100:22

**shoulders** 4:18

**show** 23:10,15,19 25:4 27:24 47:19,20 49:20

**showed** 21:12 90:19,20 135:5, 14

**Showing** 157:9

**shown** 24:10 26:23 28:7,8,22 29:1,12,17,20,21 30:2,4,5 31:12 137:18 139:10 142:8,12 143:12 145:8 146:4 148:7 149:2 153:24

**shows** 12:21 30:15,24,24 95:5, 8 147:6 157:23

**shrug** 4:17

**shut** 79:24 80:16

**shutoff** 49:22

**sic** 69:17

**side** 10:14 14:25 17:13 22:15 23:4 24:4,5,18 28:24 29:3,8 37:11 72:21 81:12 94:21 110:11 111:6 113:22 115:20 117:8

**sides** 111:3

**signal** 16:15

**signature** 160:1,2,9,14

**significantly** 92:24

**signifying** 121:22

**signs** 90:19 116:4

**similar** 103:6 139:13 140:5,12, 25 142:21 144:4 146:10 147:17 148:6,11 149:23 150:14,25 157:13

**similarities** 155:19 156:9

**similarity** 68:16

**simple** 94:18

**simply** 122:3

**simulate** 91:25

**sir** 5:7,9 7:14,21 8:19 39:18 44:11 45:11 46:15 53:10,16 55:10,17,21 56:24 57:17 58:15, 23 59:19 60:9 61:12,15,20 62:18,24 63:8,11 65:13,19 69:2, 4,12,15 70:10,25 71:4,7,15,18 72:2,5,13,17 73:15,19 75:6,8, 13,16,22 77:21,23 80:4 82:8,13, 18 83:3 84:1,4,20 85:5,25 86:20 87:21 88:3,16,19 89:6,24 90:6, 10,14,16,23 91:4,7,11 92:11 93:10,16,23 97:4 98:1 99:16,23, 25 100:12 102:1,9,19 103:3,23 104:1,6,22 105:5,7,22 106:11, 13,18,24 107:12 108:11,16,18, 21 109:5,17 110:5,9 111:4,8,11 112:3,8,19 115:3,7,9 116:10,17, 21 117:6 118:3,19 119:7,10 120:12,16 121:22 122:24 123:2, 8 126:23 127:5 129:9,15,18,21, 25 130:10 131:3,17 132:21 136:10 138:6 139:20 140:10,18, 22 141:8,15,19 143:19,22 144:1,9,25 145:4,7,21,24 146:2, 8 147:5,23 149:20 150:7,22 152:8 153:9 157:21 158:8

**site** 20:5 47:7 56:12,22 98:12,14 133:6 135:10

**sitting** 23:21,22 55:7

**situation** 64:6 94:5,15 123:24 145:3

**skip** 96:16 122:18 128:19

**smack** 69:13 108:13

**small** 21:24 27:8 28:18 92:22 108:23,25

**smell** 104:8,11,14,19

**smelling** 104:23 151:4,5

**smoke** 15:19,22,24 16:1,7,12 17:2,12 18:1 29:5,6 31:9 71:24 84:23,24 85:11 104:9 109:3,7, 12,18 114:16,23 115:2,22,23 116:15 117:1,4,9,10,14 124:3 143:8 151:4,7

**smoke's** 35:8

**smoking** 90:18

**software** 10:13

**Soik** 129:24

**solid** 77:13 83:7



**solids** 83:4

**someplace** 16:2 111:12,20 158:11

**sort** 10:4 18:18 48:17 96:3 121:12 130:12 131:5,9,15 132:11,12 133:5,10 155:14,20 160:5

**sound** 103:6 129:23 146:13

**source** 80:7 99:11,21 103:13 120:24 140:8,11,13 141:6

**sources** 36:1

**South** 45:2 68:1,2

**space** 47:6,9,10 48:19 49:6,13 51:14,19

**spaces** 47:20,21

**speak** 42:25 125:10,17 137:15 138:17 142:4

**speaking** 22:13

**specialty** 112:2

**specific** 34:5 43:16 71:21 99:6 117:24 135:24 159:22

**specifically** 6:13,15 53:19 58:1 63:21 121:24 154:20

**specificity** 65:15 99:4

**speculate** 58:2

**speculating** 151:21

**speculation** 73:7

**speed** 146:5

**spell** 4:9

**spellings** 160:7

**spent** 71:12

**spinning** 74:20

**spins** 74:24

**split** 15:7

**spoke** 41:13

**spoken** 130:1

**spot** 92:22 94:8

**spray** 54:18 77:6,7

**sprayed** 54:15

**spraying** 15:3,8 108:14 112:11 118:6 136:15

**sprays** 77:4

**spread** 63:23 64:3,13 78:4 79:8,20,21 86:5 99:10,12 122:4, 12 145:14 150:4,8 152:6,24

**sprinkler** 31:15,21 32:6,9,10,19 33:4,10,13,15,19 34:6,8,11,15 119:5,22,23 130:13,14,17,23 131:5,14 132:4,11 133:1 152:2, 14,17,23 153:5,15,18,21,24 154:7

**sprinklers** 31:18 117:19,25 118:10,16,20 119:3,9,15 131:23 132:23 133:3 152:5

**square** 113:20 135:6

**stack** 71:25 72:3 143:8,11,12, 15

**staff** 12:9 46:11 56:4 123:12

**staffing** 62:4

**stand** 47:10

**standard** 40:9 62:22

**standing** 60:19 88:9 112:22

**start** 5:10 6:15 14:17 18:7 19:6 40:18 53:5 95:1 107:21 136:6

**started** 5:12,18 8:10 18:8,23 36:7 82:20 99:11 111:21 115:22

**starting** 16:12 61:25 117:10

**startling** 15:11

**starts** 20:20 89:9

**state** 4:9 5:22,23 6:25 7:6 9:1 13:7,11,15 37:18 38:4 68:1 133:20

**stated** 90:1 115:18

**statement** 58:17 108:23 127:6, 25 128:4,8,24 141:9

**statements** 71:21

**states** 32:6 139:15 148:16

**station** 40:2,4 101:21

**stay** 16:3 63:18,20

**stayed** 13:14

**steam** 15:22

**steel** 53:21

**Stephen** 59:17

**steps** 94:13

**stick** 43:15

**sticks** 136:18

**Stinson** 67:4,24

**stop** 79:1

**store** 98:13

**stories** 43:12

**story** 14:2 121:17

**stove** 85:6,7

**straighten** 11:8

**Strange** 4:11 11:9 23:10 51:17 55:13 56:7 68:22 87:10 100:22 107:6 125:2

**Strategy** 6:2

**street** 45:1,2

**stretches** 81:17

**strike** 19:6 20:21

**structure** 84:25 155:11

**stuck** 119:6

**stuff** 135:22

**subject** 158:3

**subpoena** 40:6 41:15

**subsequent** 11:19,22 12:22 13:4 115:16

**subsequently** 114:13

**substantial** 157:16

**substantially** 151:12

**sudden** 127:20

**suffered** 128:23

**supper** 43:2

**support** 33:9

**supposed** 77:8 130:17

**suppression** 33:3 34:10

**surface** 53:23

**surfaces** 54:3 82:22 83:1 155:11

**surprising** 109:11

**surroundings** 75:10

**surveying** 45:13

**suspected** 80:5,14 94:17 96:7

**suspicious** 67:1 7:23 8:8,10, 16,20 66:4,6,15

**sustained** 113:13 157:15

**sweep** 92:21

**swift** 6:2

**switched** 91:14

**synonym** 132:13

**synonymously** 76:18

**system** 26:16 31:16,21 32:6,9, 11,19 33:3,4,10,13 34:10 37:23 57:8 61:2 72:7,19 73:10,11 76:20,21 77:9 79:24 80:1,13,22 83:13 84:24 85:16 86:11 109:10

**.111:22** 113:23 117:15 119:22 143:12,17 144:20 145:10,13 150:5,9 152:2,23 153:21

**systems** 33:19 34:6 119:23 130:14 152:14,17 153:6,15,18

---

T

**tabs** 57:9

**Tactics** 6:2

**takes** 63:15 86:1

**taking** 4:16 52:8

**talk** 4:22 6:6 43:11 49:23 106:4 112:9 125:20

**talked** 42:2 43:13,16,18 106:8 112:12 116:18 120:2,3,14 125:22 129:17 133:3 151:15 154:17

**talking** 43:2 48:18 49:13 53:2 58:3 60:9 105:9,23 120:10 159:5

**talks** 34:24 37:11 38:10 80:1 104:7 109:21

**task** 76:6

**tasks** 18:17

**team** 13:2 47:6,10,15,19 48:5, 23 51:19 133:11

**tear** 92:17

**tease** 94:16

**tech** 39:7 47:18 48:23 95:1

**technical** 47:5,15 51:11

**technician** 6:5

**tells** 16:1 105:23

**temperature** 93:22 94:21,23 96:10

**temperatures** 90:20 96:5

**Temporally** 115:8

**ten** 55:3

**term** 51:9 66:4 76:25 108:17

**terminology** 99:14

**terms** 76:16 103:8

**testify** 40:25 41:23 44:3

**testifying** 39:22 40:8

**testimony** 42:14 88:10 108:4 111:25 121:8 152:7 160:6

**testing** 36:22 154:6,9

**theoretically** 131:25



**theory** 12:11

**thermal** 90:25 91:2,9,14,25 92:9,14,20 93:4,7,11,15,19 94:1,12,15,18 95:17 96:9,17 145:23,25

**thermometer** 94:21

**thing** 14:8 18:22 26:5 40:1 80:15 82:9 133:25

**things** 8:8 43:16 52:5 57:9 59:2 66:9 70:14 88:7 92:1,12 97:24 107:21 114:10,13 115:5 116:11 127:9 134:13 153:22 160:8

**third-out** 46:9

**thought** 56:14 89:25 105:25 107:18

**throw** 60:11

**throwing** 17:12

**TIC** 90:20,24

**time** 4:23,24 5:5,14,16 7:18 10:10 14:5 15:25 17:1,4,11 18:17,25 19:5,8,17,22,24 20:8, 24 29:7,14,18 34:1,2 41:13,19 43:19 44:10,24 45:13,19 46:16, 22 47:8 55:5 58:25 61:8 69:24 70:24 71:11,17 74:12 75:3,12 79:10 86:5 91:4 92:10 96:10 98:10 101:13 103:25 107:16 109:12 110:7,8,22 112:20 115:2 119:22 124:19 137:18,20,23 138:1 142:9,12

**times** 18:16 38:23

**title** 51:11

**today** 39:20,22 40:13 41:8,23 42:11,15 43:25 46:19 55:7 112:23 125:20

**told** 14:18 15:16 16:3,13 17:15 70:13 79:19 82:21 95:2 115:21 155:9

**tomorrow** 43:3

**tool** 91:6

**tools** 14:22 133:5

**top** 14:22 21:25 22:6,7 27:9 28:19 89:12 105:19 107:8 109:1 134:22 141:4

**totally** 133:13

**touch** 51:20

**tour** 50:17

**tours** 47:2 49:10,17

**train** 46:5

**trained** 8:4 93:18

**training** 5:19 8:12 43:11 48:6,7, 24 51:1 91:8,12,17,23 92:3,6 152:9

**travel** 78:10 111:18

**traveled** 158:17

**traveling** 78:9 111:14

**treat** 127:22

**tremendous** 15:9

**Trevor** 67:4,24

**trial** 44:2,3

**trip** 107:24

**tripod** 17:6

**trouble** 73:10

**truck** 14:18,20 46:8 71:18

**true** 13:17 20:5,24 36:11 38:14 74:1,3 76:25 82:14 86:22,23,25 87:1,5,7 93:11 97:8 98:4,5,22, 23 101:2,3,6,7 102:14 103:19, 20,25 114:11,12 117:17 118:2, 7,8 121:9,10,13 122:10,11 125:5 126:5,16 129:17,18 136:16 139:13,14,16,17 141:2 143:5,6 144:16 146:9 147:8,9 151:5,19 152:3 153:11,12 154:1,2,21,22 155:7,12,16,17 156:10,11,16,17 157:16

**tube** 22:11,15 24:5,25 25:1 113:1

**tubes** 22:6,7,14 23:17 24:10,18 31:10 47:5 72:22 81:10 108:14, 17,20 112:11 114:17 116:18

**turn** 16:22,25 17:1 55:22 58:18 61:6 89:7 97:21 120:1 121:15

**turns** 95:7

**two-way** 144:19

**type** 9:24 10:12 12:9 17:6 38:3 53:19 56:25 57:6 59:1 63:13 70:3 73:17 99:17 102:6,22 113:20 121:3 144:17 150:23,25 160:3

**types** 147:24

**typical** 101:17

**typically** 37:4 66:2

**U**

**Uh-uh** 132:9

**underneath** 46:2 56:18 58:9 59:17

**understand** 8:2 26:25 27:3 39:17 51:10 53:4,6 57:13 61:8

63:9,10 64:10 72:18 73:20 76:15,22 92:2 95:23 98:3,16 111:25 121:16 126:2,9 127:12 130:5 135:9,10 137:10

**understanding** 23:14 28:6,25 39:21 40:10 43:24 51:12 53:22 54:1,2 55:2 58:6 60:16 70:8 72:24 73:5 76:24 80:12 82:21, 24 98:2,18,24 99:4 103:9 155:10 156:6

**understood** 23:19 29:10 42:2 108:4 110:6 112:14 121:8 128:12 159:6

**undertake** 34:20

**undertaken** 7:23 37:1

**undesired** 79:8

**undoes** 63:16

**unintentional** 9:22,25

**unique** 104:19

**unit** 20:3,4 56:21 90:18,19 121:1 135:6 146:6

**unknown** 123:12

**unusual** 104:11

**updated** 91:13

**upside** 28:3

**urgent** 40:3

**utilities** 66:11

**V**

**vacant** 66:12

**values** 106:20

**vapor** 145:5

**vapors** 83:7

**variety** 36:1

**varnish** 122:19

**vehicle** 6:5 101:12,18,23

**vent** 14:14,16 22:7 47:5 72:22 81:10

**vented** 35:8 111:15 158:13

**ventilate** 134:17 144:20

**ventilation** 14:25 22:6 23:16 24:18,25 25:1 26:16 27:1,4,6, 11,19,20 28:2,6,11,20,22,24,25 29:2,3,4,7,8,16 30:2,5 31:7,10 53:1 58:3 108:6,14,17,20 110:12 112:11 114:17 116:13, 25 143:12,17 150:5,9

**venting** 109:9

**vents** 15:20,25 111:22 158:15

**verbiage** 57:20

**versus** 15:24

**vertical** 81:17,19

**vertically** 24:11 28:4,12,13,15

**vicinity** 117:24 118:17 136:4

**victims** 92:1 93:5

**video** 95:12 96:3

**view** 117:4

**viewed** 117:7

**visibility** 17:1 93:3

**visible** 21:24 26:12 27:8 28:18 104:9 108:23,25 109:21 151:7

**visit** 107:19 123:19 124:10

**visual** 17:7 130:13

**voluntarily** 68:5

**volunteer** 5:13 60:22,25

**W**

**wait** 52:7

**waive** 160:9,14

**waiving** 160:1

**wake** 85:12

**walk** 40:15,18 94:11,14

**walk-through** 48:25

**walk-throughs** 47:3 49:11,17 50:17,25 51:13

**walked** 55:18 116:24 135:20

**walking** 25:22 42:20 116:13

**walks** 14:14

**wall** 92:19 94:6 112:24,25 115:20 117:3 158:11,16,18,20 159:13

**walls** 92:18

**wanted** 16:6 29:24 43:25 56:14 89:25 103:14 107:18 108:12

**water** 6:3 15:2,4 18:3 32:12,15 54:15,18 134:3 158:1

**ways** 54:7 80:10

**weakest** 158:18

**weeks** 125:19 126:10

**west** 22:5 23:25 25:2 29:8 45:2

**west-hand** 24:5



USDC IN/ND case 4:16-cv-00042-TLS     document 105-1     filed 10/07/19     page 1167 of
15                                   Rocky Strange
                                   August 29, 2018                    Index: western..zones

**western** 26:13 27:16,19 29:2,3,
  110:11 111:2

**wet** 118:23

**Wheeldon** 100:7

**white** 15:22,24 19:20 67:23
  95:6 137:24

**wire** 146:5

**wired** 95:18

**wires** 41:4

**witnessed** 15:16

**wondering** 39:25

**word** 48:20 73:18 76:14

**words** 76:16 113:16

**work** 14:17 45:13 52:20 60:25
  85:11,14 129:2 130:11

**worked** 52:15,21

**working** 15:18 18:7,8 118:11

**worse** 86:2 114:13 115:6,8
  116:12

**wrapped** 22:8,10

**write** 20:18 60:7 70:21 89:3
  98:15

**writing** 48:20

**written** 10:2 13:24 34:13 37:5
  50:24

**wrong** 159:8

**wrote** 70:14

---

**Y**

**yard** 33:8

**year** 49:9 69:20

**years** 44:15 45:7,9 50:21 55:3

**yesterday** 41:7

---

**Z**

**zoned** 34:10

**zones** 34:14

