IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

BALL CORPORATION, AN INDIANA )
CORPORATION AND FACTORY MUTUAL )
INSURANCE COMPANY, A RHODE )
ISLAND CORPORATION, AS SUBROGEE, )
    Plaintiff, )
     )
    v. ) CAUSE NO. 4:16-CV-00042-TLS-
     )
AIR TECH OF MICHIGAN, INC., )
A MICHIGAN CORPORATION, )
    Defendant. )

---

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

**INTRODUCTION**

Plaintiffs' theory of the May 23, 2014 is not based in fact or empirical evidence, but in unfounded assumption, speculation, and conjecture. Their theory starts with the presence of combustible dust which they claim was left by Air Tech, but there is no reliable evidence that any dust was present at the time of the fire and, moreover and in any event, Air Tech was not expected to return a completely dust-free oven to Ball upon completion of its task. Their theory then hinges upon the presence of a honeycomb "chunk" which the purportedly ignited dust encountered in the eastern squirrel cage, but, problematically, there is no evidence that any such "chunk" was present there. The fact that Plaintiffs offer an expert who is willing to adopt their patently speculative theory rather than perform the analysis contemplated by NFPA 921 does not transform Plaintiffs' self-interested guesswork into a triable theory of causation. Air Tech is entitled to judgment as a matter of law.

**ARGUMENT**

**I.   There is no competent evidence that Air Tech breached any duty to Plaintiffs.**

  **A. There is no reliable evidence that combustible dust was present inside of IBO 2 at the time of the fire.**

Plaintiffs' entire theory of the fire builds from the premise that combustible dust was improperly left inside of the body of IBO 2 by Air Tech and ignited therein in the vicinity of the burner box. *See* Dkt. No. 97-1, AT App. 475 (Howell's opinion is that "[t]he cause of this fire was the ignition of combustible contaminants left in IBO 2 following the cleaning of the unit by Airtech, Inc. [*sic*]"). However, the only empirical evidence collected from the scene which Plaintiffs' expert cited to support the presence of dust *inside* of IBO 2 at the time of the fire is a speck of dust found on one of the cans from Line 2 collected *outside* of IBO 2 days after the fire, and efforts to fight it, made an utter mess of Ball's facility. *See* Dkt. No. 97-2, AT App. 544:21-

545:3; *see also* Dkt. No. 97, AT App. 207:22-211:17, 218:6-220:10, 236; Dkt. No. 97-2, 571:23-572:16, 583:16-585:24. Notably, no chemical or composition testing was ever performed on the dust Plaintiffs' expert claims to have found and neither Plaintiffs nor their expert offer any explanation for this omission. Dkt. No. 97-2, AT App. 549:16-551:19.

Even Dale Spencer – Ball's former Production Supervisor and primary liaison between Ball and Air Tech as of the time of the May 2014 events in question – acknowledges a speck of dust collected outside of IBO 2 after the fire "could have c[o]me from anywhere." Dkt No. 97, AT App. 218:6-220:10. The fire department tore into the ductwork directly above IBO 2 which necessarily shredded the foam-based insulating wrap that encapsulated the ducts and exposed the interior of the ducts where the fire burned accumulated, combustible deposits lining the ducts' interior surfaces. Dkt. No. 97, AT App. 207:22-211:17, 218:6-220:10, 236; Dkt. No. 97-2, 571:23-572:16, 583:16-585:24. The Monticello Fire Department sprayed a high-powered hose directly into the ductwork, as well as other areas in an effort to douse the flames. *Id.* Chemical extinguishers, which generate a foamy / powdery substance, were also employed in the vicinity of IBO 2 as part of the firefight. *Id.* Moreover, it would be plainly unreasonable to suggest that the atmosphere of the manufacturing floor in an industrial plant was completely free of any dust or particulate even before all of the foregoing events. Indeed, there were seemingly innumerable sources of potential dust from which the speck found on the cans at the end of Line 2 (*i.e.* outside of IBO 2) might have come. It is flatly unreasonable to infer solely from the claimed presence of dust on cans outside of IBO 2 that said dust must have come from inside of IBO 2, let alone that it was there at the time of the fire.

Plaintiffs offer nothing to dispute the foregoing. Nevertheless, they maintain that there is sufficient evidence to present a triable issue as to whether there was dust present inside of IBO 2

at the time of the fire. In doing so, they rely upon three undisputed (at least for purposes of summary judgment) facts: (1) the cans collected from the end of Line 2 passed through IBO 2 before they got there, Dkt. No. 105, p. 25; (2) Ball employee Wes Krintz observed burning embers *in the ductwork* (*i.e.* not in the oven), Dkt. No. 106, p. 6, 12; and (3) it was known that, immediately after a scraping and an initial round of vacuuming, dust and particulate would still be present in IBO 2's atmosphere. *Id.* at p. 6, 11.

Notably, none of these facts provide direct evidence of the presence of dust inside of IBO 2. While the lack of direct evidence is not dispositive of the issue, this purported circumstantial evidence must "give rise to **non-speculative** inferences" favoring Plaintiffs' theory lest their claims be subject to summary judgment. *See e.g. Harper v. United States Beef Corp.*, 2018 U.S. Dist. LEXIS 139096 *14-25 (C.D. Ill. July 23, 2018) ("Plaintiffs *could* survive summary judgment based solely on circumstantial evidence if that evidence gives rise to non-speculative inferences") (emphasis in original). Unfortunately for Plaintiffs, their attempts to tie the foregoing facts to their theory of the May 23, 2014 fire entail patent speculation, not reasonable inference.

### *(1) The Cans' Passage Through IBO 2*

As to the fact that the cans passed through IBO 2 prior to reaching the destination where they were collected, this does nothing to overcome the threshold problem that the cans were exposed to virtually innumerable sources of dust at the latter location. At most, this fact merely evinces that it is *possible* that the dust *might* have come from inside of IBO 2, a showing that is insufficient to overcome summary judgment. *See e.g. Dana Corp. v. American Standard*, 886 F. Supp. 1481, 1497-1498 (N.D. Ind. 1994) (in any summary judgment case, evidence showing merely that something is possible is insufficient and "plaintiffs must make their

3

showing…through evidence that has probative value, meaning that there must be something more than testimony [or evidence] that something "could be" or "might be"). Indeed, the passage of the cans through IBO 2 at some imprecisely defined time prior to their collection is a far cry from evidence indicating that it is likely the dust came from inside of IBO 2 at the time of the fire, let alone evidence that would support a jury finding that this was more likely than not.

### *(2) Krintz's Observation*

There is similarly no evidentiary or reasonable inferential link between Krintz's observation of embers in the ductwork and Plaintiffs' theory of dust inside of IBO 2 at the time of the fire. The pitot tube hole through which Krintz claims to have made his observation was located on the horizontal stretch of ductwork directly above IBO 2. Dkt. No. 97, AT App. 241:13-22, 245:22-247:16; Dkt. No. 97-1, AT App. 255:7-256:8, 259:3-25, 261:8-262:3, 263:2-264:15, 267:7-22, 268:21-269:12, 419:13-422:21, 458:3-22. Between the interior of IBO 2 and the referenced pitot tube hole, there was (1) the squirrel cage exhaust assembly blowing air into the ducts toward the pitot tube hole, (2) a stretch of vertical ductwork, and (3) a stretch of horizontal ductwork. *See* Dkt. No. 105, p. 5 (photograph depicting basic configuration of exhaust above IBO 2). There is no dispute that at least these stretches of the ductwork – upstream (based upon the flow of air) of the pitot tube hole – were affected by fire which burned the accumulated condensate lining its interior surfaces. *See* Dkt. No. 97-1, AT App. 261:8-262:22, 266:2-16.[1] Common knowledge and experience dictates that the destruction of organic material by fire

---

[1] In their statement of genuine disputes, Plaintiffs spuriously disavow that the ducts sustained the most direct physical impact of the fire and, incredibly claim "the damage to the ductwork was a result of the firefighting effort, ***not*** the fire itself." Dkt. No. 106, p. 27. FMIC's own loss report states, unequivocally, that "the majority of the interior and exterior ductwork to the ovens was exposed to heating from flames inside the ductwork." Dkt. No. 97, AT App. 9. FMIC's Rule 30(b)(6) designee further confirmed that the report reflected FMIC's finding to that effect in its own investigation. *Id.* at AT App. 43:21-44:14. Howell's investigation confirmed the same. Dkt. No. 97-2, AT App. 545:8-17.

produces embers and ash. Kritnz's observation does not reliably confirm anything more than the uncontested fact that a fire burned in the ducts.

Furthermore, Plaintiffs' contention that Krintz's testimony regarding embers in the ducts confirms that dust ignited inside of IBO 2 is curious given that Plaintiffs' theorized ignition sequence posits that a honeycombed "chunk of debris" obstructed the supposed ignited dust from traversing the eastern squirrel cage exhaust assembly and, in turn, caused the aflame dust to ignite the "chunk."[2] *See e.g.* Dkt. No. 106, p. 24 ("*[b]ut for* the presence of the chunk of debris, the ignited dust and particulate from the oven *would have* been blown into the ductwork"). In other words, Plaintiffs simultaneously argue that the ignited dust was not allowed to pass from inside of IBO 2 into the ductwork, but what Krintz saw in that very ductwork was, nevertheless, ignited dust from inside of IBO 2.

Any potential reconciliation of these incompatible theories yields further questions which neither Plaintiffs nor their experts have ever, whether through evidence or argument, endeavored to address. For example, assuming that Plaintiffs' would respond that some, but not all, ignited dust from IBO 2 was obstructed, this raises the question of how Plaintiffs' or their expert reliably exclude the ductwork as the location where the ignited dust first came into contact with a combustible fuel load and commenced the growth and spread of the fire. Not only do Plaintiffs fail to reliably exclude this, they make no effort to show that it is any less likely than the theory they adopt, which conveniently directs focus to areas Air Tech cleaned and away from those it did not (*i.e.* the ducts). Indeed, Plaintiffs' (and their expert's) analysis blatantly ignore this question.

---

[2] By no means does Air Tech concede that this accurately describes the development of this fire, or that there is any reliable evidence to support this sequence.

5

In any case, that Krintz might have seen embers during a fire is no reliable evidence that dust was present inside of IBO 2 at the time said fire commenced. Absent a cogent and scientific "bridg[ing] of the analytical gap," between Krintz's testimony and the conclusion Plaintiffs seek to draw therefrom, the Court is faced with pure conjecture, not reasonable inference. *Gaskin v. Sharp. Elecs. Corp.*, 2007 U.S. Dist. LEXIS 65532 *21-27, *30-31 (N.D. Ind. Aug. 31, 2007). The former does not suffice to overcome summary judgment. *See e.g. Gabb v. Wexford Health Sources, Inc.*, 2019 U.S. App. LEXIS 18097 *12 (7th Cir. June 17, 2019) (speculation and conjecture cannot overcome a motion for summary judgment).

### *(3) Presence of Dust After Scraping and Vacuuming*

Plaintiffs also contend that Howell's observation of a separate cleaning of a different IBO on a different day by a different cleaning contractor (*i.e.* not Air Tech) somehow "established" the presence of dust inside of IBO 2 at the time of the fire 6 ½ hours after Ball dismissed Air Tech from its premises on May 22, 2014. Dkt No. 106, p. 6. This obvious *non sequitur* aside, there is no genuine dispute that after Air Tech scraped the debris loose the combustible accumulations from the interior surfaces of the oven and swept all of the dust and particulate that settled on the lower surfaces of IBO 2, it was known and expected by Ball that dust and particulate would remain present in the atmosphere if IBO 2's interior. *See i.e.* Dkt. No. 97, AT App. 183:10-186:14; Dkt. No. 97-1, 284:12-24, 405:23-409:21. Indeed, the instructions for cleaning IBO 2 set forth in its Operator's Manual contemplate that that such dust would be present in the oven's atmosphere even after the scraping and initial vacuuming process (*i.e.* Air Tech's work) was complete. Dkt. No. 97-1, 319 (at § 4.5).

However, the foregoing notwithstanding, even the probable presence of dust immediately post-cleaning is not, perforce, evidence of its presence (or even of its reasonably

likely presence) 6 ½ hours later. As the IBO's Operator's Manual reflects, "any dust which remains in the oven atmosphere" could generally be removed via raising the oven's temperature to a low setting and running heavily lacquered scrap through the oven until they were satisfactorily free of debris. Dkt. No. 97-1, AT App. 319 (at § 4.5). Ball was responsible for this task and cannot identify any problems it encountered in completing it on May 22, 2014 after Air Tech was dismissed. Dkt. No. 97, AT App. 198:14-205:25.

Additionally, after running scrap through the oven, Ball returned IBO 2 to normal operation for several hours without incident. *Id.* The fact that Ball resumed operation of IBO 2 amounts to a tacit admission that Ball, itself, confirmed that the interior of the oven was free of dust and particulate, as Ball would not have run cans and jeopardized contamination (and, therefore, spoilage) of finished goods were that not the case. But beyond that, IBO 2's recirculating exhaust fans were constantly running during normal operation. *See* Dkt. No 97, AT App. 153:24-158:3, 228:21-234:2; Dkt. No. 97-1, AT App. 294 (at ¶ 2), 378:2-12, 387:18-388:2, 437:16-439:6. By design, this network of fans ultimately forced the oven's atmosphere to be purged into the ductwork. *See* Dkt. No. 97-1, AT App. 294 (at ¶ 2). After hours of running, and absent any empirical evidence to the contrary, the only reasonable inference is that any dust remaining after Ball ran its sheets of scrap (assuming some was there notwithstanding a complete dearth of evidence to that effect) would have long-been purged by the time employees first reported signs of fire hours later.

Once again, Plaintiffs offer only speculation, not evidence, that dust was present inside of IBO 2 at the time of the fire. That does not suffice. *Dana Corp.*, 886 F. Supp. at 1497-1498; *Gabb*, 2019 U.S. App. LEXIS 18097 at *12. There is no triable issue as to the presence of dust in IBO 2 at the time of the fire.

B. **Even if there was dust present inside the body of IBO 2 at the time of the fire, that would provide no triable issue regarding Air Tech's breach.**

After Air Tech scraped all accumulations loose, vacuumed as much of the settled dust as possible, and reassembled the IBO's panels, its task was done. As Ball's 30(b)(6) designee plainly and unequivocally testified, Ball knew that when Air Tech reassembled IBO 2, there was likely dust and particulate in the oven's atmosphere which could not be readily vacuumed. Dkt. No. 97, AT App. 183:10-186:14; Dkt. No. 97-1, AT App. 284:12-24, 319 (at § 4.5), 405:23-409:21. The same designee further confirmed that, as reflected in IBO 2's Operator's Manual, after the initial efforts to vacuum, the cleaning process required three (3) more steps: (1) running of the recirculating fans to force airborne particulate to the floor of the oven; (2) another round of vacuuming to collect any settled particulate from the prior step; and (3) heating the oven to a low temperature and running heavily varnished scrap to catch lingering particulate. *Id.*; *see also* Dkt. No. 97, AT App. 185:23-187:16; Dkt. No. 97-1, AT App. 278:18-279:3, 278:18-279:3; Dkt. No. 97-2, 668:20-670:5. He also admitted that Ball, and Ball alone, was responsible for these tasks. *Id.*; *see also* Dkt. No. 95, p. 6.

Critically, Ball did not expect Air Tech to operate any component of IBO 2, and there is no dispute that Air Tech had no knowledge how to operate the oven, including the recirculating fans. *Id.*; *see also* Dkt. No. 95, p. 6 (p. 5 internally). With that being the case, Ball absolutely knew and understood that Air Tech's scope of work did not encompass the entire cleaning process set forth by the IBO Operator's Manual, and that Ball had a significant role still to play in that process when it dismissed Air Tech from the premises. And while Ball did run the recirculating fans and lacquered scrap through the IBO after Air Tech left, it admits that it never vacuumed. *Id.*; *see also* Dkt. No. 95, p. 13. Given that the second round of vacuuming was not necessary or recommended by the Operator's Manual until the recirculating fans had been run

8

and that Ball admits Air Tech would be dismissed *before* the recirculating fans were ever run by Ball, Plaintiffs' suggestion that Air Tech was responsible for the second round of vacuuming is a non-starter.

There is no genuine dispute that Ball did not expect Air Tech to render IBO 2 completely free of dust and particulate. Ball itself had three tasks left to perform to complete the cleaning process, and there is no dispute it did not perform the second. Even if there was dust present in IBO 2 at the time of the fire, that dust would not provide any reliable evidence of any breach by Air Tech.

### C.  **There is no evidence that a rag was left inside of IBO 2 by Air Tech.**

Plaintiffs simultaneously claim that their expert confirmed that the first fuel was dust and particulate (although he admits he could not do so) but that there remains a triable issue as to whether Air Tech breached a duty of reasonable care by leaving a rag inside of IBO 2. *See* Dkt. No. 106, p. 15 (Plaintiffs suggest that "[a] jury could conclude the Defendant's failure to remove the rag was…negligent"). This inconsistency aside, there is no evidence to support the notion that a rag had anything to do with this fire. For one, Howell confirmed that the presence of a rag was merely "a possibility," and he acknowledged he had "no physical evidence" one was actually left inside of IBO 2 at the time of the fire. Dkt. No. 97-2, 548:25-550:11. That is not enough to present a triable issue. *Dana Corp.*, 886 F. Supp. at 1497-1498. Also critical in light of Plaintiffs' and Howell's theory that the fire started inside of the oven is that while Air Tech used rags in the squirrel cage, Air Tech *did not* utilize rags inside the body of IBO 2. Dkt. No. 97-2, 661:19-662:6. Plaintiffs' rag theory is non-viable.

### D. There is no reliable evidence that the honeycomb "chunk" was a result of any breach.

There is no dispute that the purported "chunk" of debris Plaintiffs rely upon as part of their theory on breach was never tested to confirm that it was, in fact, the condensate by-product of Ball's manufacturing process. *See* Dkt. No. 97-2, AT App. 557:4-24. Howell's investigation of the squirrel cage from which the "chunk" was purportedly recovered revealed a significant amount of debris from various sources, including debris generated by the firefighting efforts, which, in turn, included destruction of the ductwork and its foam-based insulation. Dkt. No. 97-1, AT App. 494 (at Photograph 14); Dkt. No. 97-2, AT App. 553:14-556:6. Indeed, the fire and the efforts to control it introduced a significant amount of foreign debris from a variety of different sources into the ducts and squirrel cage assembly.

The foregoing precludes any reliable differentiation of the source of any particular "chunk" of charred material by pure cognitive reasoning; the scientific method and, therefore, NFPA 921 require a more rigorous and thorough effort. *See* Dkt. No. 97-3, AT App. 802 (at § 1.3.2 ("[t]he scientific method…should be applied in every instance"); *see also Cummins v. Lyle Indus.*, 96 F.3d 362, 369 (7th Cir. 1996) (while hands-on testing is not an absolute prerequisite to admission, a testifying expert must still "adhere to the same standards of intellectual rigor that are demanded in their professional work"). Plaintiffs' and their expert's failure to confirm, via scientific analysis, the composition of the "chunk" precludes said "chunk's" reliability as competent evidence that Air Tech improperly performed its work, particularly because neither Plaintiffs nor Howell provide any justification for this omission.[3] *See Westfield Ins. Co. v. Regal Beloit Corp.*, 2015 U.S. Dist. LEXIS 82058 *10-11 (C.D. Ill. Mar. 31, 2015) (even Plaintiffs'

---

[3] Plaintiffs seek to distract from their failure by stating that Air Tech did not arrange for testing of the "chunk." However, aside from the fact that the "chunk" was taken by Howell and stored at his direction, Air Tech bears no burden to prove or disprove the composition of the material. Plaintiffs do.

authority reflects that deviation from the scientific method and NFPA 921 is only proper where the departure is "justified").

## II. There is no competent evidence that Air Tech caused the May 23, 2014 fire.

### A. Plaintiffs' cannot establish causation without reliable expert testimony.

There is no dispute that without competent expert testimony as to the origin and cause of the May 23, 2014 fire, Plaintiffs cannot prevail on their claims. *See e.g. State Farm Fire & Cas. Co. v. Niswander*, 7 N.E.3d 295, 299 (Ind. Ct. App. 2014); *Lytle v. Ford Motor Co.*, 814 N.E.2d 301, 308 (Ind. Ct. App. 2004); *see also* Dkt. No. 106, p. 22 ("Plaintiffs do not dispute that in most cases expert testimony is needed to establish the origin and cause of a fire"). Expert testimony or opinions are insufficient to overcome summary judgment unless they meet the requirements for admissibility at trial. *Id.* As explained more thoroughly in Air Tech's motion to exclude[4] and materials in support thereof, Plaintiffs' expert, Howell, performed an analysis that ran afoul (in a number of ways) of NFPA 921, the leading, recognized authority on fire cause and origin investigations which Howell claimed to have followed. Because his analysis and methodologies were unreliable, so too are his opinions. Howell's would-be testimony is inadmissible. Summary judgment for Air Tech should be entered accordingly.

### B. Without competent evidence that the ignition of combustible dust inside of IBO 2 started the fire, Plaintiffs' entire claim unravels.

The ignition of dust inside the main body of IBO 2 is absolutely critical to Plaintiffs' entire case. Without reliable indication that the dust (a) was present and ignited inside of IBO 2 and (b) was capable of retaining sufficient heat energy to ignite the purported "chunk" once the dust reached the squirrel cage, there is only one conceivable basis to hold Air Tech responsible

---

[4] To the extent it has not already done so, Air Tech incorporates by reference as if fully stated herein its Motion to Exclude and all supporting briefs and materials.

for the May 23, 2014 fire. Plaintiffs would have to show that it is more likely than not that the "chunk" (1) was comprised of the condensate accumulations, (2) was present at the time of the fire in an area Air Tech was responsible for cleaning, and (3) reached temperatures which allowed for autoignition. Setting aside that there's no reliable evidence to support either (1) or (2), Howell unequivocally dismissed autoignition of deposits as a cause of the fire. Dkt. No. 97-2, AT App. 558-12-16.

The reason for Howell's conclusory dismissiveness of autoignition is clear. A causal theory involving autoignition of combustible deposits renders his exclusion of the ductwork (which Air Tech did not clean) as a competent origin for the fire highly suspect; there is no genuine dispute that the ducts contained an ample fuel load of combustible accumulations and sustained more direct heat damage than any other component of Ball's facility. *See* Dkt. No. 97, AT App. 9, 43:21-44:14; Dkt. No. 97-1, AT App. 475; Dkt. No. 97-2, 535:25-536:7, 545:8-17. This bespeaks the inherently biased approach Howell employed. He did not investigate the cause and origin of the fire in conformance with NFPA 921; he improperly started from the premise that Air Tech was responsible for the fire and worked backwards. In doing so, he filled evidentiary gaps with layered speculation and conjecture which ultimately generated his "ignited dust" theory for which there is zero reliable, empirical support. Without the dust, Plaintiffs' have no viable theory and, therefore, no case.

### C. **There is no genuine dispute that the honeycomb "chunk" of debris did not come from the eastern squirrel cage.**

Another critical piece of Howell's (and Plaintiffs') theory of the May 23, 2014 fire is the ignition of an unidentified honeycomb "chunk" of debris which they claim to have collected from the eastern squirrel cage of IBO 2. *See* Dkt. No. 97-2, AT App. 553:14-553:11. Howell's report included a photograph of the alleged "chunk," which is below:



Dkt. No. 97-1, AT App. 496. While Air Tech's cause and origin expert, Michael Vergon, could not tell, during his deposition, which exhaust assembly the sample had been taken from when presented with a few photographs which were hand-picked by Plaintiffs' counsel (out of the more than 1,000 photographs taken in connection with the investigation of this fire), Vergon *was* able to confirm that the chunk was pulled from the *west* squirrel cage assembly upon review of his own photographs after the deposition. Dkt. No. 97-2, AT App. 725:19-726:10, 727 (errata changes to page 180 and 181); *see also* Dkt. No. 97-2, AT App. 734-740. Indeed, a review of some of the photographs taken of both exhaust assemblies removes any doubt about the location of the "chunk."

The east exhaust assembly had no portion of the ductwork insert still attached while the west exhaust assembly did, both on its top and side.



Dkt. No. 97-3, AT App. 752, 755, 757[5]; *see also id.* at 756 (zoomed in image of writing on assembly with duct insert attached which reads, in part, "*west* blower oven #2"). In the

---

[5] All images are snipped using Microsoft snipping tool to make them fit in this brief. The second two were also rotated to give an idea of what the assembly looked like standing upright. The original images are cited and designated.

photographs from the inspection, one of the investigators is seen examining the inside of the west exhaust assembly at 11:20 a.m. Note the distinctive marking on the duct insert on the side of the west assembly.



Photograph #8 (DSC_8150, taken at 11:20:45); West blower.

Dkt. No. 97-3, AT App. 738. Less than a minute later, the investigators are shown photographing the honeycomb "chunk." The photograph from Howell's report reflects some of the distinctive markings on the duct insert on the side of the western exhaust assembly.



Dkt. No. 97-1, AT App. 496; Dkt. No. 97-2, 738-739. The photographs unmistakably reflect that Howell's "chunk" of debris came from the western squirrel cage; it did not come from the eastern squirrel cage.

Incredibly, Plaintiffs summarily dismiss the foregoing as "pure fiction." See Dkt. No. 105, p. 17. In doing so, they completely ignore the photographs and contend that the notion that the "chunk" came from the western exhaust is based solely upon Vergon's deposition testimony

and errata sheet, which they further claim are contradictory since Vergon did not recall where the "chunk" was collected during his deposition, but disclosed in his errata sheet that his file allowed him to do so. Of course, the reason investigators inspecting a fire scene take numerous photographs is precisely because it is unreasonable and unrealistic to expect that they will recall each and every aspect of their investigation purely from memory.

Vergon's credibility aside, the photographs show what they show. Indeed, notably absent from Plaintiffs' response is any effort to assert that the photographs are somehow inaccurate or incomplete, meaning there is no genuine dispute as to their accuracy. Plaintiffs' spurious and conclusory insistence that the "chunk" came from the eastern squirrel cage is not enough to withstand summary judgment. *See e.g. Door Sys. V. Pro-Line Door Sys.*, 83 F.3d 169, 172-173 (7th Cir. 1996) (where designated evidence evinces yields a high degree of confidence that any disagreement over the facts is spurious, summary judgment is appropriate).

Like the dust, the presence of the "chunk" of debris in the eastern squirrel cage is critical to Howell's theory and ignition sequence. Without it, he is left to rely solely upon the speculative contention that dust was left in the oven through some fault of Air Tech, ignited near the burner, and retained sufficient heat energy to ignite accumulations encountered in the ductwork once exhausted from the body of IBO 2. But the presence of dust does not reliably indicate any fault of Air Tech due to the normal cleaning sequence set forth by the Operator's Manual and acknowledged by Ball. Accordingly, the lack of any evidence or non-spurious contention that the "chunk" came from the eastern squirrel cage is dispositive.

## CONCLUSION

For all of the above and foregoing reasons, Plaintiffs claims do not entail triable issues as to either breach or causation. Air Tech is entitled to judgment as a matter of law.

          Respectfully submitted,


          */s/ Jacob M. O'Brien*
          Jacob M. O'Brien, ID # 31445-09
          Andrew B. Miller, ID # 18795-45
          Starr Austen & Miller, LLP
          201 South Third Street
          Logansport, IN 46947
          P:  (574) 722-6676
          Email:  obrien@starrausten.com
               miller@starrausten.com


          *ATTORNEYS FOR DEFENDANT*
          *AIR TECH OF MICHIGAN, INC.*


## **CERTIFICATE OF SERVICE**

 I hereby certify that on November 25, 2019, I served the foregoing on counsel of record via electronic mail.
  Mark N. Senak
  msenak@skgsmlaw.com


          s/ Jacob M. O'Brien
          Jacob M. O'Brien