IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA

BALL CORPORATION, AN INDIANA )
CORPORATION AND FACTORY MUTUAL )
INSURANCE COMPANY, A RHODE )
ISLAND CORPORATION, AS SUBROGEE, )
    Plaintiff, )
     )
    v. ) CAUSE NO. 4:16-CV-00042-TLS-
     )
AIR TECH OF MICHIGAN, INC., )
A MICHIGAN CORPORATION, )
    Defendant. )

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY**

**INTRODUCTION**

Rather than squarely and narrowly addressing the problems with the analytical methodologies of their proffered expert, Plaintiffs devote a substantial portion of their effort in response towards a recitation of what Howell did to gather information and artifacts about the May 23, 2014 fire at Ball's Monticello facility. Plaintiffs' objective is clear; by discussing, in broad strokes, all the various things that Howell did ostensibly in observance of NFPA 921's requirements, Plaintiffs seek to distract from the critical areas in which Howell ignored the analytical framework and investigative principles set forth by that very same authoritative publication. Unfortunately for Plaintiffs, even assuming Howell might have appropriately gathered data about the fire, that does nothing to rectify his material and irredeemable departure from NFPA 921 in his analysis of said data.

As to the latter, Plaintiffs have comparatively little to say. They do not, for example, explain how Howell could permissibly (*i.e.* within the confines of NFPA 921) develop a hypothesis that this fire originated in the vicinity of IBO 2's burner in the face of a complete dearth of empirical evidence that there was *any* ignition or uncontrolled fire in that area. Relatedly, they cite no explanation as to how Howell meaningfully considered and effectively ruled out the ductwork as a potential origin where overwhelming empirical evidence renders it a prime candidate for same, an omission that the NFPA characterizes as a "serious error." Plaintiffs further build no bridges for the numerous informational and logical gaps in Howell's hypothesized ignition sequence; indeed, by and large, Plaintiffs ignore the problems Air Tech previously identified with Howell's theorized sequence. And finally, Plaintiffs make no effort to demonstrate the reliability of Howell's opinions via specific discussion or application of the ten-

1

factored analysis contemplated by *Daubert*[1] and Federal Rule of Evidence 702.

Howell's opinions of both the origin and cause of the May 23, 2014 fire are unreliable. His analysis departs significantly from that required by the NFPA and fails to satisfy the requirements of *Daubert* and Rule 702. This Court should exclude his testimony.

**ARGUMENT**

I.  **Howell's analysis of the fire's origin is unreliable.**

   A. **There is no physical evidence which lends any credibility to Howell's opinion of origin.**

Howell confirmed in his deposition that, aside from dust collected from cans at the end of Line 2 *after* the fire, and efforts to fight it, were concluded, there was no other physical evidence collected at the scene which purportedly lends support to his theory that dust and particulate were present and ignited inside of IBO 2 at the commencement of the fire. But that purported speck of dust "could have c[o]me from anywhere," as the entire plant (and particularly the vicinity of IBO 2) was a complete mess following the events of May 23, 2014. *See* Dkt. No. 97, AT App. 218:6-220:10. Even assuming – as Plaintiffs contend – that scientific testing is not a strict prerequisite to admissibility in general, the significance of Howell's failure to even attempt any chemical or composition analysis of the dust or to provide any logical explanation for this omission is underscored here in light of its numerous potential sources. *See* Dkt. No. 97-2, AT App. 549:16-551:19. Indeed, absent scientific testing, there is no way for Howell to reliably opine that the dust purportedly present on the cans was even the same dust generated by the combustible deposits which were the by-product of the flammable vapors exhausted from IBO 2 (and through its associated ductwork) as part of Ball's manufacturing process.

---

[1] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).

Apparently recognizing that Howell's entire theory of origin (and, for that matter, cause) completely unravels unless he can place combustible dust and particulate sourced in Air Tech's scraping efforts inside of IBO 2 at the commencement of the fire, Plaintiffs unsurprisingly seek to prop up Howell's wildly speculative opinion regarding the dust he claims he found on the cans. However, their efforts to do so are far from convincing. The best that they muster is that although the cans were collected outside of IBO 2, they had been inside of IBO 2 "only moments before the fire." *See* Dkt. No. 105, p. 25 (p. 24 internally). But that does nothing to ameliorate the glaring problem that the cans remained outside of the oven, exposed to the factory atmosphere, for the entire duration of the fire, including the firefight, and at least for the commencement of the cleanup and investigative efforts before they were collected, days after the fire. *See* Dkt. No. 96 (at p. 12 internally).

The fact remains that Howell can only speculate that the dust purportedly found on the cans was from inside of the oven and, by extension, that there was, in fact, dust and particulate in the vicinity of the oven's burner just prior to the commencement of the fire. And since Howell's entire opinion of origin (and cause) turns on the presence and ignition of the same dust, his origin hypothesis amounts to nothing more than conjecture. Even from an expert, testimony based in speculation is not admissible. This Court should rule accordingly.

### B. Howell's origin analysis conflates the development of a hypothesis with its testing.

Plaintiffs confirm and acknowledge that once Howell gathered information and artifacts relating to the May 23, 2014 fire, he then developed a theory of origin based upon potential ignition and fuel sources. *See* Dkt. No. 105, p. 10-13. They note that Howell ruled out oven malfunction and the blower motor as potential ignition sources, leading Howell to deduce that the flame of the oven's burner was the only thing that might foot that bill and, ultimately, to

3

conclude that the vicinity of the burner must, therefore, have been the area of origin. *Id.* Plaintiffs claim it is "illogical" to suggest that this approach ran afoul of NFPA 921 and its investigative methodologies in an origin inquiry based upon the definition of "Point of Origin" and the fact that NFPA 921's Chapter 18 regarding a proper origin analysis contemplates consideration of ignition and fuel sources. *Id.* at 19-21. Plaintiffs are wrong.

As perhaps the most obvious example of Plaintiffs misapplication and / or misinterpretation of NFPA 921, Ball and FMIC blatantly ignore the distinction between *developing* (via *inductive* reasoning) as opposed to *testing* (via *deductive* reasoning) a hypothesis of origin. *See* Dkt. No. 97-3, AT App. pp. 805, 811. The two are, indeed, separate and distinct tasks to be undertaken in an origin investigation. *Id.*; *see also id.* AT App. 810 (§ 18.1 ("The origin of a fire is one of the most important hypotheses that an investigator *develops and tests*") (emphasis supplied); *id.* at AT App. 832. Critically, the former is to be based **_solely_** on the empirical data observed and collected from the scene and **_not_** from theory or inference, which are to be employed only in the process of the latter. *Id.* at AT App. p. 832 (at § 18.5). To that point, NFPA 921 identifies four categories of empirical data that inform the development of an origin hypothesis or group of origin hypotheses: (1) witness information and/or electronic data; (2) fire patterns; (3) arc mapping (which does not appear to have any bearing on this particular case); and (4) fire dynamics. *Id.* at AT App. p. 810 (§ 18.1.2). Notably, ignition and fuel sources are not among these factors.

It is abundantly clear from his report and testimony (as well as from Plaintiffs' efforts to defend his work product) that Howell did not develop his origin theory based upon empirical data relating to the four origin factors set forth in NFPA 921. He identifies no witness statement indicating a fire in the vicinity of IBO 2's burner. He personally inspected the interior of the

4

oven and saw no signs that an uncontrolled fire was ever ongoing therein. Dkt. No. 97-2, AT App. p. 545:4-25. He does not identify any fire patterns or principles of fire dynamics that lead him to conclude the vicinity of the burner was the fire's origin. *See generally* Dkt. No. 97-1, AT App. 472-498. Indeed, the damage and fire patterns he observed were on and in the oven's ductwork, not within the main body of the oven itself or its adjacent burner box. *Id.*

Instead of first examining the empirical evidence relating to the foregoing factors to develop his hypotheses of origin, Howell opted to take different approach. Howell asked himself, as the threshold question in hypothesizing an origin, "what are the potential ignition sources, what are the competent ignition sources for any potential [flame]." Dkt. No. 97-2, AT App. 533:5-534:8. Plaintiffs are correct that this question is not entirely out of place in an origin analysis (and Air Tech never asserted the contrary); however, the question can only be properly applied to *test* an existing theory of origin, not as a basis to form a theory of origin in the first instance. Dkt. No. 97-3, AT App. p. 832 (at § 18.6.1 "Means of Hypothesis *Testing*") (emphasis supplied); *id* (at § 18.6.1.1, "Is there a competent ignition source *at the hypothetical origin*?"). That is, the presence of a potential ignition source is not the proper basis for *developing* a theory of origin at that location, particularly where there is no empirical evidence that a fire occurred there. *See id.* (§18.6.1.2); *see also* Dkt. No. 97-2, AT App. p. 545:4-25. Howell's consideration of ignition sources is, therefore, out of sequence. *Id.*

Equally misguided is Plaintiffs' characterization of the role that identification of potential fuels plays in an origin analysis. *See* Dkt. No. 105, p. 3-4, 7 (p. 2-3, 6 internally). Before developing hypotheses of origin, NFPA 921 instructs that an investigator should inventory all potential fuels in the vicinity and determine their core characteristics. Dkt. No. 97-3, AT App. p. 818 (§ 18.3.3.2 "Description of Fuels"); *see also* Dkt. No. 105, p. 7 (p. 6 internally). However,

5

the purpose of doing this as part of an *origin* investigation is "to assist in the analysis of fire patterns, fire growth, and spread characteristics." Dkt. No. 97-3, AT App. p. 818); *see also id* at AT App. p. 835 (§ 19.1.2 (demonstrating that the first fuel analysis is part of the cause inquiry). That is not what Howell did; indeed, nowhere does he express any opinion that he observed fire patterns or spread behavior that empirically support the notion that the fire started inside of the oven, generally, or near the burner, specifically, let alone that any such fire pattern, growth, or spread characteristics were consistent with an ignition of dust and particulate at that location (or anywhere). Instead, Howell reasoned that dust and particulate *might* have been present in the oven and that the same dust possessed characteristics that *could* have allowed it to ignite *if* it came in the vicinity of the oven's most competent heat source in order to develop his hypothesis that the fire's origin was in the vicinity of IBO 2's burner. *See* Dkt. No. 105, at p. 7, 10-14.

Aside from revealing Howell's layered speculation, the foregoing evinces precisely how Howell "put the cart before the horse" in his origin analysis. *See i.e. Chester Valley Coach Works v. Fisher-Price, Inc.*, 2001 U.S. Dist. LEXIS 15902 *16-18 (E.D. Pa. Aug. 29, 2001) (district court excluded fire expert's testimony and granted summary judgment because expert "put[] the cart before the horse" by allowing his theory on causation to inform his analysis of origin). Howell relied upon causal factors useful in *testing* a hypothetical origin to, instead, *develop* his hypothesis that the fire started inside of the oven near the burner. Dkt. No. 96, p. 7; Dkt. No. 105, p. 19. Of course, it makes perfect sense that, in testing the viability of an origin hypothesis, one would do well to consider whether there is any plausible cause (*i.e.* ignition source and first fuel) at that hypothesized location. Dkt. No. 97-3, AT App. p. 832 (at § 18.6.1). However, the same cannot be said for relying upon a causal inquiry (*i.e.* the presence of an ignition and/or fuel source) in arriving upon the origin hypothesis in the first instance. Dkt. No.

97-3, AT App. 810 (at § 18.1, stating that "[g]enerally, if the origin cannot be determined, the cause cannot be determined, and generally, if the correct origin is not identified, the subsequent cause determination will also be incorrect"); *id.* at 835 (at § 19.1, noting that "[f]ire cause determination generally follows origin determination" and "[ge]nerally, a fire cause determination can be considered reliable only if the origin has been correctly determined"). This is why NFPA 921 demands that a testable origin hypothesis be based ***solely*** upon empirical, verifiable data and observations. Again, Howell points to no such information which supports the hypothesis that the origin of the fire was inside of the main body of the oven in the vicinity of the burner box.

      Ultimately, Howell's methodology in determining origin entailed:

    (1)    singling out the most competent ignition source and adopting its vicinity as his hypothetical area of origin despite a lack of empirical evidence to that effect;

    (2)    asking himself whether there might have been some fuel in that vicinity that *could* have ignited near the ignition source; and

    (3)    upon theorizing that a fire *could* occur at the location of the most competent ignition source, concluding that it did.

*See e.g.* Dkt. No. 105, p. 11-14 (p. 10-13 internally). Thus, Howell's origin hypothesis was not developed from empirical observations or data, but instead, solely from Howell's "thought experiments" and inferences. *See* Dkt. No. 97-2, AT App. 551:10-19. From this, it inevitably follows that Howell's method was incongruous with the guidelines for origin analyses set forth in NFPA 921. *See i.e. id.* Dkt. No. 97-3, AT App. p. 832 (development of an origin hypothesis "should be based ***solely*** on the empirical data that the investigator has collected") (emphasis

7

supplied). By conflating the concepts of hypothesis development and hypothesis testing, Howell allowed his theory of cause to inform (and irreparably taint) his hypothesis of origin. *See Chester Valley Coach*, 2001 U.S. Dist. LEXIS 15902 at *16-18. Indeed, Howell landed upon his conclusion of origin "just because [he could theorize] a readily ignitable fuel and potential ignition source" at a particular location, which entails a line of reasoning that the NFPA explicitly condemns. Dkt. No. 97-3, AT App. 832 (§18.6.1.2 ("The investigator should be cautious about deciding on an origin just because a readily ignitable fuel and potential ignition source are present")).

Howell did not follow the proper analytical methodology set forth in NFPA 921 in reaching his opinion of origin. This flawed method yields a flawed conclusion; one that the NFPA does not view as reliable. *See Chester Valley Coach*, 2001 U.S. Dist. LEXIS 15902 at *16-18. Neither should this Court.

### C. Plaintiffs identify no cogent explanation for Howell's exclusion of the ductwork as a potential area of origin.

Howell testified that he excluded the ductwork as a hypothetical area of origin based upon his belief that, historically, the ambient temperatures in the ducts had never been sufficient to ignite the fuel (*i.e.* the accumulated, combustible deposits) present there. Dkt. No. 97-2, AT App. 558:12-16. By extension, Howell assumed that autoignition of the combustible deposits was not possible in the ducts because, according to him, it had never happened before. *Id.* As Air Tech pointed out in its prior briefing, this explanation falls well short of providing a basis to properly (*i.e.* in conformance with the NFPA) exclude the ductwork from consideration.

Not only is Howell's suggestion that there were no prior events of autoignition of deposits demonstrably incorrect, but further, this precise risk was well known to both Ball and FMIC alike. *See* Dkt. No. 96 (at p. 9-11 internally). Moreover, the empirical data and

8

observations from the scene confirm, beyond dispute, that the ductwork sustained by far the most direct physical damage in the fire. *See* Dkt. No. 95 (at p. 1 internally); Dkt. No. 97, AT App. 9, 43:21-44:14; Dkt. No. 97-2, AT App. 545:8-17.

These facts taken in tandem render Howell's conclusory dismissiveness of the ductwork as a potential origin wholly inappropriate under the NFPA. *See State Farm Fire & Cas. Co. v. Steffen*, 948 F. Supp. 2d 434, 445 (E.D. Pa 2013) (expert's failure to reliably eliminate alternative hypotheses as contemplated by NFPA 921 supported exclusion of his opinions and summary judgment against the party proffering them). Indeed, NFPA 921 expressly warns that "[w]hen using the scientific method, the failure to consider alternative hypotheses is a serious error." Dkt. No. 97-3, AT App. 833 (§ 18.7). Howell's analysis entails a series of such errors.

Tellingly, Plaintiffs do nothing to provide further justification or explanation in defense of Howell's failure to meaningfully consider (let alone effectively rule out) the ductwork in his origin analysis. Considering the above as well as its significance in this case (*i.e.* Air Tech was not hired to clean the ductwork), this was, indeed, a "serious error." *Id.; see also Steffen*, 948 F. Supp. 2d at 445. It renders Howell's opinion unreliable and inadmissible. *Id.*

**II. Howell's analysis of cause is unreliable.**

    **A. Absent a reliable determination of origin, Howell's opinion of cause is unreliable.**

NFPA 921 contemplates that cause cannot be reliably determined unless an origin has first been established. Dkt. No. 97-3, AT App. 810 (§ 18.1); *id.* at 835 (§ 19.1); *see also Philmar Dairy, LLC v. Armstrong Farms*, 2019 U.S. Dist. LEXIS 116228 *33-35 (D.N.M. July 12, 2019) (expert's failure to reliably identify fire's origin in conformance with NFPA 921 supported exclusion of his testimony on fire's cause). Plaintiffs provide the Court with no applicable exception which might shield Howell's analysis of cause from application of this general

9

principle of fire investigation. Absent such, and because Howell's analysis of origin is unreliable, this Court should follow NFPA 921's guidance and exclude Howell's opinion of cause. *Philmar Dairy*, 2019 U.S. Dist. LEXIS 116228 *33-35.

### B. Howell's reliance upon negative corpus reasoning to determine an ignition source and first fuel is inappropriate.

While process of elimination reasoning may be appropriately employed in "certain circumstances," *see* Dkt. No. 105 at p. 15 (citing *Superior Aluminum Alloys, LLC v. United States Fire Ins. Co.*, 2007 WL 1850860, 2007 U.S. Dist. LEXIS 46688 (N.D. Ind. June 25, 2007))[2], the NFPA expressly warns that it is readily susceptible to misapplication and may be inconsistent with the scientific method in other circumstances. Dkt. No. 97-3, AT App. 842 (§ 19.6.5); *see also* Dkt. No. 96 (at p. 14 internally); *Steffen*, 948 F. Supp. 2d at 443-444 (expert's testimony excluded based, in part, on use of negative corpus reasoning). The NFPA specifically cautions that "[i]dentifying the ignition source for a fire by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists…. is not consistent with the scientific method." *Id.* It further declares that *negative corpus* reasoning "is inappropriate and[] should not be used because it generates untestable hypotheses, and may result in incorrect determinations of the ignition source and first fuel ignited." *Id.*[3]

Howell's analysis suffers from the precise defective reasoning to which the NFPA alludes. Howell points to no empirical evidence suggesting that an ignition of dust and

---

[2] It should be observed that the scrutinized expert analysis in *Superior Aluminum* was not one of a fire's cause and origin but, rather, of an equipment failure. 2007 U.S. Dist. LEXIS 46688 at *4-5. Obviously, NFPA 921 had no application to the investigative and analytical methodologies employed by the expert in that case. It certainly does here.

[3] These passages of the NFPA further underscore the point that the identification of the ignition source and first fuel are causal inquiries which presuppose that an area of origin has already been determined.

particulate occurred in the vicinity of the oven's burner, instead offering only suspect deductive reasoning and "thought experiments." Howell nevertheless concludes that the burner's flame was the fire's ignition source and the dust was the first fuel simply based upon his claim that he could not identify any other potential ignition source or potential fuel at the particular location that he determined to be the fire's origin.[4] [5] While process of elimination may have its place within the context of a scientific analysis, Howell's application of *negative corpus* reasoning is, by express declaration of the NFPA, "[in]consistent with the scientific method." Dkt. No. 97-3, AT App. 842 (§ 19.6.5). It is, therefore, inadmissible. *See Steffen*, 948 F. Supp. 2d at 443-444.

### C. Setting aside Howell's negative corpus reasoning, his opinion regarding the fire's first fuel is unscientific and speculative.

Howell opines that the fire's first fuel was dust and particulate (*i.e.* "combustible contaminants") left in IBO 2 by Air Tech. Dkt. No. 97-1, AT App. 475. Aside from the fact that the presence of dust would not indicate any fault of Air Tech given that Ball performed the last three (3) steps of the oven cleaning which were necessary to remove dust and particulate from the oven's interior atmosphere (a fact which Howell never mentions and Plaintiffs conspicuously and repeatedly sidestep), the only "evidence" Howell identifies to support the presence of dust near the burner at the time of the fire is the purported dust he found on cans *outside* of the oven well *after* the fire had wreaked havoc on Ball's facility. Dkt. No. 97, AT App. 218:6-220:10. Just as this purported dust provides no credible support to Howell's theory of origin, it is equally

---

[4] It is hardly surprising that Howell found this ignition source at his hypothesized origin given that said hypothesis was based solely on the location of that very same ignition source in the first place. Once again, this is a clear illustration of how Howell's analysis was out of sequence, circular, and inherently flawed. And conveniently, it focuses all attention on an area Air Tech cleaned while completely ignoring areas it did not.

[5] Moreover, this demonstrates the fact that an incorrect and / or unreliable determination of origin taints the causal inquiry. There were other potential fuels (*i.e.* accumulations of combustible deposits) and other potential ignition mechanisms (*i.e.* ambient heat generated by the system overheating the deposits) at other locations (*i.e.* the ductwork), but Howell does not consider them in his causal inquiry into the fire's ignition source and first fuel because they were not present together in the vicinity of the area he baselessly opined to be the fire's origin.

deficient in the context of his theory of cause.

The flawed and feeble reasoning used to arrive at this conclusion necessitated that Howell ultimately, and reluctantly, admit that he could not identify the fire's first fuel with anything approaching certainty. *See* Dkt. No. 97-2, AT App. 549:16-551:19, 559:10-17. Howell simply could not provide any scientific explanation linking the dust allegedly collected from the cans to the inside of IBO 2 at the time of the fire. Plaintiffs are equally unsuccessful in their briefing. Indeed, it is not science that yields Howell's and Plaintiffs' theory of the fire's first fuel, but rather, speculation and conjecture about *possible* conditions in the vicinity of IBO 2's burner (for which there is no corroborative, empirical evidence) coupled with an inappropriate and unfounded assumption that the dust could not possibly have come from some other source or location, the fire's destructive chaos notwithstanding.

Neither Howell nor Plaintiffs "bridge the analytical gap" between the purported presence of dust on cans outside of the oven to Howell's conclusion that the same not only evinces the presence of dust inside of IBO 2 at the time of the fire but establishes said dust as the fire's first fuel. *See Gaskin v. Sharp Elecs. Corp.*, 2007 U.S. Dist. LEXIS 65532 *21 (N.D. Ind. Aug. 31, 2007). Instead, Howell performs a monumental leap of logic in offering said opinions. This Court should preclude him from testifying to this effect.

### D. **Plaintiffs offer no meaningful defense of Howell's patently speculative ignition sequence**.

In Air Tech's initial briefing on this matter, it set forth, in enumerated fashion, a summary of Howell's opinion of the ignition sequence of this fire. In their response, Plaintiffs make no effort to rebut this recitation, nor do plaintiffs meaningfully counter numerous, fundamental problems Air Tech identified with it. Those problems include *inter alia*:

(1) Howell's imprecise opinion that "*whatever fuel* was left up there [in the vicinity of the burner]" was "*somehow* ignited" is not only vague, but completely speculative;

(2) Howell cannot reliably identify the fire's first fuel, and therefore, cannot reliably opine that "*whatever fuel*" purportedly ignited near the burner possessed characteristics that would have allowed it to retain enough heat energy to subsequently ignite any purported obstructive deposits it encountered after being exhausted from the body of the oven and into the squirrel cage;

(3) Even assuming the honeycomb material Howell relies upon was present in the eastern squirrel cage at the time of the fire (and Air Tech maintains there is no genuine dispute that it was not), Howell provides no scientific explanation for his opinion that any ignited dust must have ignited the honeycomb material *first* in order for the fire to spread into the ducts; and

(4) Related to the prior point, Howell provides no scientific basis upon which he was able to rule out the possibility that any ignited dust that was exhausted out of IBO 2's body was expelled directly into the ducts (*i.e.* without igniting any honeycomb material present in the squirrel cage) where it ignited the accumulated deposits known to be present there.

*See* Dkt. No. 96 (at p. 16-21 internally); see also Dkt. No. 97-1, AT App. 475 (Howell's report acknowledges combustible buildup was present in the ducts); Dkt. No. 97-3, AT App. 535:25-536:7 (Howell testified there was ample fuel for a fire in the ductwork).

The NFPA's emphasis on ruling out viable alternative hypotheses as part of any cause investigation renders the foregoing defects of critical importance in determining the reliability

and completeness of Howell's analysis. See Dkt. No. 97-3, AT App. 842 (§ 19.7 ("the failure to consider alternate hypotheses is a serious error"); *see also Steffen*, 948 F. Supp. 2d at 445. And given the significance of these points to the viability of Howell's analysis, Plaintiffs surely would have mounted some sort of direct defense or explanation were such available. Accordingly, Plaintiffs' silence on these points speaks volumes.

Howell's ignition sequence is the product of layered speculation, not the application of the scientific method contemplated by the NFPA. This sort of testimony is unreliable and inadmissible. The Court should not allow its admission.

### III. Plaintiffs do not counter or directly address the contention that Howell's opinions are inadmissible under *Daubert* and Federal Rule of Evidence 702.

While the NFPA provides a very context-specific reference as to the methodologies Howell was required to observe in his investigation of the May 23, 2014 fire, Howell's opinions must ultimately be scrutinized under the framework established by *Daubert* and Rule 702. Incredibly, Plaintiffs mention neither these authorities, nor the ten-factored reliability analysis they collectively require *a single time* in their briefing. As Air Tech previously explained, none of the factors support the admissibility of Howell's opinions, and several are decidedly against it. Plaintiffs failure to directly respond regarding the *Daubert* factors provides yet further indication that Howell's opinions are indefensible on any scientific basis. This Court should exclude them.

## CONCLUSION

For all of the above and foregoing reasons, as well as the reasons set forth in Air Tech's previous briefing, Dkt. No. 96, this Court should exclude the unreliable and unscientific opinions of Plaintiffs' proffered fire expert, Scott Howell.

Respectfully submitted,

/s/ Jacob M. O'Brien
Jacob M. O'Brien, ID # 31445-09
Andrew B. Miller, ID # 18795-45
Starr Austen & Miller, LLP
201 South Third Street
Logansport, IN 46947
P:  (574) 722-6676
Email:  obrien@starrausten.com
        miller@starrausten.com


*ATTORNEYS FOR DEFENDANT
AIR TECH OF MICHIGAN, INC.*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2019, I served the foregoing on counsel of record via electronic mail.

Mark N. Senak
msenak@skgsmlaw.com

s/ Jacob M. O'Brien
Jacob M. O'Brien
Starr Austen & Miller, LLP
201 South Third Street
Logansport, IN  46947
(574) 722-6676
(574) 753-3299
obrien@starrausten.com

100114.006/mte-reply