UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| BALL CORPORATION, an Indiana Corporation, and FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island Corporation, <br><br> Plaintiffs, <br><br> v. <br><br> AIR TECH OF MICHIGAN, INC., a Michigan Corporation, <br><br> Defendant. | CAUSE NO.: 4:16-CV-42-TLS |

**OPINION AND ORDER**

This matter is before the Court on a Motion for Summary Judgment [ECF No. 98], filed by the Defendant Air Tech of Michigan, Inc. (Air Tech), and a Motion for Partial Summary Judgment [ECF No. 100], filed by the Plaintiffs Ball Corporation (Ball) and Factory Mutual Insurance Company (FMIC). The Court also addresses the Motion to Exclude [ECF No. 99], filed by the Defendant. The motions are fully briefed and ripe for ruling. For the reasons below, the Court denies the parties' motions for summary judgment and denies the motion to exclude.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a court must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Yeatts v. Zimmer Biomet Holdings, Inc.*, 940 F.3d 354, 358 (7th Cir. 2019). When the movant seeks summary judgment on a claim for which the non-movant bears the burden of proof at trial, the

movant may demonstrate that it is entitled to judgment as a matter of law by "either: (1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1015–16 (7th Cir. 2016). At the end of the day, a court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

## FACTUAL BACKGROUND

This case involves a fire that occurred at a Ball manufacturing plant located in Monticello, Indiana, on May 23, 2014. Compl. ¶ 7, ECF No. 1. The Ball plant manufactures aluminum cans for beverage companies. Def. App. 2, ECF No. 97; *see* Pl. Ex. 37, ECF No. 105-1. During the manufacturing process, the cans are sprayed with various liquids to treat the cans. Def. App. 477; Pl. Ex. 29, at 39:18–24. Relevant here, the inside of the cans is sprayed with an "IC spray" and sent through an "internal bake oven" (IBO) to be cured through the IBO's four heat zones. Def. App. 2, 294, 477; Pl. Ex. 29, at 39:2–20. The IBOs are heated by natural gas flames that are housed in "burner boxes" resting on top of the body of the oven. Pl. Ex. 21, at 83:13–84:21. The ovens also have various fans that assist with airflow both within the burner boxes and the body of the oven. Pl. Ex. 29, at 47:24–49:3. There is an intake fan that brings in air from outside the oven into the burner boxes, and there are recirculating fans that move heated air from the burner box to the oven and recirculate the heated air within the oven. *Id.* at 47:24–48:10, 50:3–5, 226:13–16. Additionally, there are exhaust blowers with fan mechanisms (commonly referred to as "squirrel cages") that remove air out of the oven, where the air then

travels through ductwork, a regenerative thermal oxidizer (RTO), and out of the plant. *Id.* at 48:14–15, 51:16–52:13.

As the sprayed cans travel through an IBO and are cured, they produce combustible vapors. Def. App. 39. Although that vapor mostly gets expelled out of the plant after passing through the RTO, it also condensates and forms combustible deposits within the oven and connected ductwork. *See id.* at 477; Pl. Ex. 29, at 52:4–13, 90:1–92:2. Those accumulations vary in form from solid deposits that are hard and flaky to a less solid state that is gooey and tar-like. Def. App. 384; Pl. Ex. 9, at 96:2–13; Pl. Ex. 29, at 91:12–92:2. Most of the time the deposits are hardened, but they can be gooey inside the ductwork. Pl. Ex. 29, at 91:12–92:2.

Given these accumulations, it was recommended in the IBO manual to have the oven and ductwork regularly cleaned. Def. App. 314, 317–18. The manual suggests that the oven be cleaned once a month if it is operated 24 hours per day, seven days per week, as was the case here. *See id.* at 314, 398–99. However, Ball had the ovens cleaned approximately every 6 months and the ductwork cleaned about once a year. *Id.* at 397–98, 403. Regular cleaning was recommended because of the risk of fire caused by the combustible deposits created during the curing process. *Id.* at 318. Indeed, there had been previous fires at the Monticello plant, *id.* at 610–12, 616–18, 627–29; however, the precise cause of those fires is unclear, *see* Pl. Ex. 22, at ¶¶ 8–21.

Ball regularly hired Air Tech to do the cleaning of the ovens and ductwork. Pl. Ex. 20, at 9:13–17; Pl. Ex. 36, at 10:2–4. When cleaning an oven, Air Tech workers would remove parts of the oven and clean off all the surfaces and components of the combustible deposits. Pl. Ex. 21, at 110:21–111:11; Pl. Ex. 29, at 79:5–23. Over the course of eight or nine hours, they would use scrapers, wire brushes, and air chisels to scrape off the deposits; they would then vacuum up as

3

much dust and debris as they could; and finally, they would reassemble the oven. Pl. Ex. 21, at 110:21–111:11; Pl. Ex. 28, at 7:2–3; Pl. Ex. 29, at 79:5–80:6. Once the cleaning was finished, a Ball employee would check the IBO to makes sure everything was complete before Air Tech would leave. Pl. Ex. 21, at 110:6–18; Pl. Ex. 29, at 103:12–104:15. After Air Tech finished, it was understood that there would be some dust and particulates that remained inside the oven. Pl. Ex. 29, at 109:5–16. Thus, Ball would turn on the fans, set the oven to around 200 degrees Fahrenheit, and run heavily lacquered metal sheets (known as "flypaper") through the oven to collect the remaining particulates. *Id.* at 108:10–109:4; Pl. Ex. 9, at 108:13–25. Once the flypaper started coming out of the oven dust free, Ball would begin running cans through. Pl. Ex. 29, at 110:23–111:14.

On May 22, 2014, Air Tech was hired to clean IBO 2. Pl. Ex. 29, at 136:23–25. On this occasion, Air Tech was going to clean the oven and the squirrel cages but not the connected ductwork (except as far as they could reach above the squirrel cage). *Id.* at 138:8–12. Air Tech went through its cleaning process for IBO 2 and, after Air Tech was done, Ball ran flypaper through the oven to collect the remaining particulates. *See id.* at 143:13–19. Nothing seemed unusual about the cleaning process that day, *id.* at 139:14–18, and Ball was able to resume production around 6:00 P.M. Def. App. 20.

Things started going awry after midnight. It started when some Ball employees received reports that something smelled hot and there was light smoke near IBO 2's east exhaust blower. Def. App. 20; Pl. Ex. 7; Pl. Ex. 9, at 74:20–75:4. Wes Krintz and Bob Pellegrini went to investigate IBO 2 and confirmed there was light smoke and a hot smell. Pl. Ex. 7; Pl. Ex. 9, at 85:4–11; Pl. Ex. 10, at 68:14–16. Mr. Krintz observed smoke coming from the small "pitot tube" hole in the ductwork. Pl. Ex. 9, at 75:18–22, 85:15–22. Mr. Pellegrini checked IBO 2's control

4

panel but found no issues with temperature and air flow. Pl. Ex. 10, at 68:17–71:10. He also grabbed a "heat gun" that takes thermal images to check the temperature of various components of the oven. *Id.* at 49:14–18, 73:22–74:4.

Mr. Pellegrini initially determined that the temperature of the east exhaust blower was slightly cooler than a nearby IBO's exhaust blower. *Id.* at 49:14–50:4. Mr. Krintz and Randy Crume used a scissor lift to get a better view of the exhaust blower and nearby smoke. Pl. Ex. 8, at 65:17–25, 68:20–23; Pl. Ex. 9, at 119:13–17. When Mr. Krintz looked into the pitot tube hole, he saw sparks and embers flowing through the ductwork. Pl. Ex. 9, at 116:3–12. Mr. Crume witnessed more smoke from the exhaust blower and noticed that the paint on the outside had started to bubble. Pl. Ex. 8, at 73:4–20. At some point around this time (although it is a bit unclear), Ball employees seemed to have shut down IBO 2's burners and some of the fans. *See* Def. App. 20–21; Pl. Ex. 7. After that occurred, the heat gun showed that the temperature started rising fast, approaching somewhere between 500–700 degrees Fahrenheit. Def. App. 20; Pl. Ex. 7. Mr. Krintz, and Mr. Crume then attempted to spray a fire extinguisher into the pitot hole, but that was not effective at controlling the fire. Def. App. 21; Pl. Ex. 7; Pl. Ex. 9, at 119:17–22. As a result, the Ball employees evacuated the plant and called the fire department. Def. App. 20; Pl. Ex. 7.

When the fire department arrived, they observed fire above the oven in a vent as well as the insulation that covered the ductwork. Def. App. 566, 572, 588. The fire crew cut open the duct and sprayed water into the ductwork and ovens, and they also used dry chemical extinguishers. *Id.* at 566–67, 588. While they attempted to put out the fire, there was an explosion in the facility and the firefighters had to evacuate and regroup. *Id.* at 567–69, 588–89. Eventually, the fire was put out around 3:00 A.M. *Id.* at 590.

After the fire, both parties retained experts to determine the cause and origin of the fire. *Id.* at 472, 733. The Plaintiffs' expert, Scott Howell, concluded that the fire originated in the body of IBO 2 and was caused by the ignition of contaminants left in the IBO by Air Tech, which then ignited combustible accumulations in the blower (which Air Tech also failed to clean) and the ductwork. *Id.* at 475; Pl. Ex. 2, at 23:9–13. The Defendant's expert, Michael Vergon, concluded that (1) the fire originated in the ductwork above the squirrel cage and (2) the cause is undetermined, suggesting the fire could have been caused by a lack of airflow, lack of cleaning, or both. Def. App. 750.

Overall, the fire caused extensive damage at the facility, many cans were rendered unusable, and Ball's business operations were disrupted. *Id.* at 9–11. The total damage was assessed at $12,157,474 by Ball's insurer, FMIC. Compl. ¶ 20; Pl. Ex. B, at 1, ECF No. 101-1. FMIC paid Ball $10,157,474 in accordance with the insurance policy, and Ball covered the remaining $2,000,000 of the deductible. Pl. Ex. B, at 1.

## PROCEDURAL BACKGROUND

On May 23, 2016, the Plaintiffs filed their Complaint [ECF No. 1] against the Defendant asserting three counts: (1) breach of contract, (2) breach of implied duty of workmanlike performance, and (3) negligence. Following discovery, both parties filed motions for summary judgment and the Defendant filed a motion to exclude the Plaintiffs' expert on August 19, 2019.[1] ECF Nos. 98, 99, 100. The Defendant requests judgment on each of the claims asserted by the Plaintiffs, *see* Def. Mot. Summ. J. 1, ECF No. 98, while the Plaintiffs seek partial judgment that Ball is the real party in interest and that FMIC can be removed as a Plaintiff, *see* Pl. Mot. Partial

---

[1] The Defendant filed its Memorandum in Support of its Motion for Summary Judgment, a Memorandum in Support of its Motion to Exclude, and its Designation of Evidence three days prior to filing its actual motions. *See* ECF Nos. 95–97.

Summ. J. 2, ECF No. 100. The Court first addresses the motion to exclude before turning to the motions for summary judgment.

## ANALYSIS

A.   **The Defendant's Motion to Exclude**

The Court begins with the Defendant's Motion to Exclude [ECF No. 99] the testimony of the Plaintiffs' expert Scott Howell, who provided an opinion about the cause and origin of the fire at issue in this case. The Defendant's motion for summary judgment relies heavily on excluding Mr. Howell's testimony to show that summary judgment is proper; thus, the Court addresses the merits of the motion here.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). In analyzing the reliability of proposed expert testimony, a court's role is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert used in reaching his conclusions. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. When acting as a gatekeeper under Rule 702 and *Daubert*, a court engages in a three-part analysis, that assesses (1) whether the expert is qualified, (2) whether the expert's methodology is scientifically reliable, and (3) whether the testimony will help the jury understand the evidence or determine a fact at issue. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (quoting *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)).

Here, the Defendant contests whether Mr. Howell's reasoning and methodology are reliable.[2] In assessing reliability, courts consider a non-exhaustive, non-mandatory list of factors—for example, whether a method is tested and peer-reviewed, has known error rates, and is generally accepted by the relevant scientific community—but it is ultimately a flexible approach. *See id.* at 779–80. At bottom, courts scrutinize the testimony and decide "if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire*, 526 U.S. at 152).

The Defendant argues broadly that Mr. Howell's opinion is not reliable under Rule 702 and *Daubert*, as well as asserts specific arguments related to Mr. Howell's method of determining the origin and cause of the fire. None of these arguments justify exclusion.

### 1. Whether Mr. Howell's Overall Methodology Was Reliable

The Court begins with the Defendant's broadest argument that, when considering the relevant factors, Mr. Howell's expert testimony is unreliable under Rule 702 and *Daubert*. Mr. Howell and Otto William Soyk—both of Rimkus Consulting Group, Inc.—were retained by the Plaintiffs to investigate the cause and origin of the fire at the Ball facility. *See* Def. App. 474. Following the investigation, they prepared a report dated June 9, 2017, *id.* at 472, which they supplemented three times with new information, *id.* at 763, 777, 790. Overall, they concluded:

1. This fire originated in internal body oven 2 (IBO 2) at the east end. The fire then extended into the ductwork servicing IBO 2.

2. The cause of this fire was the ignition of combustible contaminants left in IBO 2 following the cleaning of the unit by Airtech, Inc. The burners ignited the contaminants which then ignited combustible build-up material in the blower

---

[2] As the gatekeeper, the Court notes that the Defendant does not object to Mr. Howell's qualifications or whether his testimony is helpful. This makes sense given Mr. Howell's decades of experience investigating fires as a certified fire investigator and registered professional engineer, *see* Pl. Ex. 4, and the clear relevance that his opinion has on whether the Defendant is liable for the fire.

>assembly and ductwork above the oven that should have been removed by Airtech, Inc. The contaminants included small particulate material scraped off of the interior of IBO 2 just prior to the fire.

*Id.* at 475; *see also id.* at 764, 778, 790. Mr. Howell affirmed these conclusions in his deposition, Pl. Ex. 2, at 22:17–23:3, and elaborated that "implied in that second conclusion is that that blower was not cleaned properly," which is why "the material that was ignited and came through the oven was able to spread to the blower and then ultimately into the ductwork." *Id.* at 23:9–13.

While investigating the fire, Mr. Howell and Mr. Soyk said they followed the investigative approach in NFPA 921. Def. App. 485; *see* National Fire Protection Association, *NFPA 921: Guide for Fire and Explosion Investigations* (2017 ed.) (hereinafter "NFPA 921"); Def. App. 801–43. NFPA 921 is "a comprehensive, peer-reviewed, and detailed guide for fire investigation, and [courts] have held that its methodology is reliable for purposes of Rule 702." *United States v. Thomas*, No. 3:18-CR-45, 2022 WL 36098, at *9 (N.D. Ind. Jan. 3, 2022) (quoting *State Farm Fire & Cas. Co. v. Electrolux Home Prods., Inc.*, No. 3:08-CV-436, 2013 WL 3013531, at *17 (N.D. Ind. June 17, 2013)); *see Abu-Hashish v. Scottsdale Ins. Co.*, 88 F. Supp. 2d 906, 908 (N.D. Ill. 2000) (stating that NFPA 921 is "a recognized guide for use by fire investigators in the fire investigation process"). NFPA 921 recommends that fire investigators use a "systematic approach" that is based on the scientific method used in the physical sciences. NFPA 921 § 4.2; *Abu-Hashish*, 88 F. Supp. 2d at 908. That approach tells fire investigators to follow several steps, which are: "(1) identify the problem; (2) define the problem; (3) collect data; (4) analyze the data; (5) develop a hypothesis; (6) test the hypothesis; and (7) following any repeated rounds of refining and testing the hypothesis, select the final conclusion." *Electrolux Home Prods.*, 2013 WL 3013531, at *18 (quoting *United States v. Aman*, 748 F. Supp. 2d 531,

9

535 (E.D. Va. 2010)). With that said, a failure to strictly follow the NFPA guidelines, does not automatically make the methodology unreliable. *See Thomas*, 2022 WL 36098, at *9.

As to the investigation in this case, it appears Mr. Howell and Mr. Soyk followed NFPA 921. The problem was clear from the outset: determine the cause and origin of the fire. Pl. Ex. 3; *see* Pl. Ex. 2, at 8:13–16. Once they were retained, Mr. Howell and Mr. Soyk investigated the scene and evidence over the course of seven days. Def. App. 474. Throughout their investigation they inspected IBO 2, its component parts, and the attached ductwork, which they documented with photographs and video, and they collected various artifacts. *Id.* at 481–83, 488–96; Pl. Ex. 2, at 8:17–9:12, 14:9–15, 34:4–7, 67:4–11; *see* Pl. Exs. 13–14. The investigators later had parts of the oven removed for further inspection, including the exhaust blower and ductwork. *See, e.g.*, Def. App. 735–38, 746. They received statements from Ball employees who witnessed the fire, and the fire department also provided reports from its officers. *Id.* at 477–81, 484; Pl. Ex. 2, at 38:22–39:17. Mr. Howell and Mr. Soyk obtained additional information including, among other things, infrared photographs, "oven curve" reports, reports on cleaning and maintenance, and the operations manual. *See* Pl. Exs. 11, 15–18.

While analyzing the fire, Mr. Howell and Mr. Soyk considered the data collected as well as information about how the IBO operated, the flammability of residue in the oven and ductwork, and the temperature of the burners. Def. App. 484, 778, 791; Pl. Ex. 2, at 51:18–52:7. They ruled out competing theories for the fire's cause and origin, including the possibility of an oven malfunction or friction caused by the blower motor. Def. App. 483, 791, 792–93; Pl. Ex. 2, at 19:12–20:8, 77:18–78:11. Ultimately, they determined that the fire originated in IBO 2 and was caused by contaminants left in IBO 2 following the Defendant's cleaning of the oven. Def.

App. 483; Pl. Ex. 2, at 18:15–20:8. Mr. Howell and Mr. Soyk's report was reviewed by Thomas Young, a Vice President at Rimkus Consulting Group. Def. App. 474.

Given this extensive investigation and Mr. Howell's reliance on NFPA 921 as a guide, the Court is satisfied that his opinion meets the Rule 702 and *Daubert* reliability threshold. Furthermore, the reliability factors generally support the admission of his testimony because Mr. Howell followed a comprehensive, widely accepted, and peer-reviewed guide and accounted for alternative theories. *See Gopalratnam*, 877 F.3d at 779–80 (listing reliability factors). Simply because Mr. Howell's opinion does not meet every reliability factor does not mean his testimony should be excluded. *See C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015) (explaining that the list of factors "is neither exhaustive nor mandatory"). Therefore, the Defendant has failed to show that Mr. Howell's overall opinion is unreliable under *Daubert*.

2.      *Whether Mr. Howell's Methodology for Determining Origin Was Reliable*

Turning to the arguments related to Mr. Howell's origin determination, the Defendant first argues that Mr. Howell improperly addressed issues of cause before origin by focusing on the ignition source and he failed to consider relevant information under NFPA 921. However, an ignition source is pertinent to determining both the fire's origin as well as the fire's cause, and it does not mean he took the NFPA 921 steps out of order. *See, e.g.*, NFPA 921 § 3.3.142 (defining "Point of Origin" as "[t]he exact physical location within the area of origin where a heat source and a fuel first interact, resulting in a fire or explosion"); *id.* § 18.6.1.1 (asking "[i]s there a competent ignition source at the hypothetical origin?"). Moreover, Mr. Howell considered witness information, infrared photographs, data about the oven temperature, and the effect fans and the ventilation system had on the fire when deciding on origin. *See, e.g.*, Def. App. 477–81, 484, 764, 777–78, 791; Pl. Ex. 2, at 39:8–14. That is precisely the type of information NFPA 921

11

identifies as relevant to an origin determination. *See* NFPA 921 § 18.1.2 (listing (1) witness information and/or electronic data, (2) fire patterns, (3) arc mapping, and (4) fire dynamics as sources of information relevant the origin determination).

The Defendant next argues that Mr. Howell improperly eliminated the ductwork as the origin by failing to adequately consider all the facts. While the ductwork may be a viable theory of origin, it is not clear why facts supporting that theory render Mr. Howell's methodology unreliable. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013) (explaining that a court "abuses its discretion[] if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology"). Mr. Howell did not ignore this theory altogether, but rather dismissed it because residue buildup had not previously caused a fire, it was not hot enough for autoignition, there was a hardened deposit in the exhaust fan, and witnesses first observed the fire in the exhaust fan. *See* Def. App. 764–65, 791; Pl. Ex. 2, at 21:25–22:12, 47:10–24, 77:18–25, 78:12–16. For purposes of its gatekeeping role, the Court finds that Mr. Howell's use of the process of elimination is sufficiently reliable and comports with NFPA 921. *See* NFPA § 4.3.7 (explaining investigators should ensure that "all feasible alternate hypotheses have been considered and eliminated"); *see also St. Paul Mercury Ins. Co. v. The Viking Corp.*, 539 F.3d 623, 628 (7th Cir. 2008) (viewing the process of elimination favorably).

The Defendant's last argument about origin is that there is no physical evidence to support Mr. Howell's opinion other than "specks of dust" that were untested. This argument fails to undermine the methodology's reliability because, as already discussed, Mr. Howell explained the range of evidence he relied on in reaching his conclusion, and the Court will not weigh the "factual underpinnings" of Mr. Howell's conclusion at this stage. *See Smith*, 215 F.3d at 718.

Likewise, the purported lack of "physical evidence" is not problematic given this case involved a fire, where evidence is often destroyed. *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1028 (9th Cir. 2022); *see Thomas*, 2022 WL 36098, at *9 ("[A] cause-and-origin expert need not gather physical samples and subject them to laboratory testing to conform with the scientific method."). These issues ultimately go to the weight afforded to Mr. Howell's opinion by a factfinder, not the reliability of his methodology.

Therefore, the Defendant's arguments related to Mr. Howell's origin determinations do not warrant exclusion.

### 3. *Whether Mr. Howell's Methodology for Determining Cause Was Reliable*

As for the arguments about Mr. Howell's cause determination, the Defendant argues that Mr. Howell adopted a "negative corpus" analysis that has been discredited by NFPA 921. That provision provides, in relevant part:

> The process of elimination is an integral part of the scientific method. . . . However, the process of elimination can be used inappropriately. Identifying the ignition source for a fire by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists, is referred to by some investigators as *negative corpus*. . . . The negative corpus process is not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses, and may result in incorrect determinations of the ignition source and first fuel ignited.

NFPA 921 § 19.6.5. Although Mr. Howell used the process of elimination in reaching his conclusion, he had supporting evidence and, therefore, did not engage in "negative corpus." *See Thomas*, 2022 WL 36098, at *11 (explaining that negative corpus is "determining an ignition source by eliminating sources when having '*no* supporting evidence'" and concluding that the fire investigator "used a process of elimination *with* additional supporting evidence" (citation omitted)). The evidence supporting his theory included witness accounts of the fire, evidence

that dust was left in the oven after cleaning, dust adhered to cans after going through the oven, and the deposit discovered in the exhaust blower. *See* Def. App. 477–83; Pl. Ex. 2, at 36:13–19, 39:8–14, 76:3–78:11, 79:10–20. The "negative corpus" argument does not merit exclusion.

The remainder of the Defendant's arguments about causation relates to what it considers to be "speculative" reasoning, ignoring or misconstruing evidence, and failing to adequately consider alternative hypotheses. Again, the Court has difficulty understanding how these arguments are anything other than questioning the underlying facts or the correctness of Mr. Howell's opinion. That is not the Court's role under Rule 702 and *Daubert*. *See Manpower*, 732 F.3d at 806; *Smith*, 215 F.3d at 718. Like many of the Defendant's arguments, these are potential lines of inquiry for cross-examination.

The Defendant's Motion to Exclude [ECF No. 99] is denied.

**B.     The Defendant's Motion for Summary Judgment**

Turning to the Defendant's Motion for Summary Judgment [ECF No. 98], the Court applies Indiana law when considering the state-law claims in this case. *See Officer v. Chase Ins. Life & Annuity Co.*, 541 F.3d 713, 715 (7th Cir. 2008). Under Indiana law, a breach of contract claim requires that a plaintiff show a contract existed, the defendant breached the contract, and the plaintiff suffered damage as a result. *Collins v. McKinney*, 871 N.E.2d 363, 370 (Ind. Ct. App. 2007). A negligence claim requires a plaintiff to show a duty owed by the defendant to the plaintiff, breach of that duty, and injury resulting from the breach. *Podemski v. Praxair, Inc.*, 87 N.E.3d 540, 546–47 (Ind. Ct. App. 2017). Although the Plaintiffs also brought a claim for breach of workmanlike performance, the Court can ignore this claim because it is subsumed by the contract and negligence claims. *Nat'l Fire & Cas. Co. v. Kessler Tank Co.*, No. 4:13-cv-82, 2017 WL 3034974, at *1 (N.D. Ind. July 18, 2017). This is because, "[i]n a contract for work or

services, there is a duty to perform the work skillfully, carefully, diligently, and in a workmanlike manner; failure to carry out that duty may constitute either a breach of contract or negligence." *Farah, LLC v. Architura Corp.*, 952 N.E.2d 328, 336 (Ind. Ct. App. 2011) (citing *INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 577–78 (Ind. Ct. App. 2003)).

With this in mind, the parties' briefs focus on whether a reasonable jury could conclude that Air Tech failed to properly clean IBO 2 and its component parts and, thus, caused the fire. *See* Def. Br. 11, ECF No. 95; Pl. Resp. 3, ECF No. 106. The Court concludes that sufficient evidence exists in this case of the Defendant's breach and that the breach caused the fire. Accordingly, summary judgment on the Plaintiffs' claims is denied.

The most important evidence supporting the Plaintiffs' case is the report and opinion of Mr. Howell, who concludes that the fire was caused by the ignition of contaminants left in the IBO by Air Tech, which then ignited combustible accumulations in the blower that Air Tech also failed to properly clean. Realizing the importance of this opinion, the Defendant mostly seeks to discredit and exclude Mr. Howell's testimony from consideration. Granted, had the Defendant succeeded in excluding that testimony, there may have been a strong argument that summary judgment is warranted. *See Gopalratnam*, 877 F.3d at 790. However, the Court concluded above that Mr. Howell's opinion should not be excluded and can be considered at summary judgment. And in light of his opinion and the underlying facts supporting it, a reasonable jury could find that the Defendant failed to properly clean IBO 2, which resulted in the fire. *See Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 648 (7th Cir. 2016) (explaining that an expert opinion on causation that has support in the record was sufficient to defeat summary judgment).

Moreover, other facts indicate poor workmanship on behalf of the Defendant. This includes, among other things: Ball employees observing that the fire started in the exhaust

blower that the Defendant was supposed to have cleaned; burning embers flowing through the ductwork; the accumulated deposit recovered from the east blower; dust adhered to cans that passed through IBO 2 just prior to the fire; and the timing between the cleaning and the start of the fire. This evidence precludes summary judgment because a fire case "must often be proven through a combination of common sense, circumstantial evidence and expert testimony." *Elosu*, 26 F.4th at 1028 (quoting *Ricci v. Alt. Energy Inc.*, 211 F.3d 157, 162–63 (1st Cir. 2000)); *Westchester Fire Ins. Co. v. Am. Wood Fibers, Inc.*, No. 2:03-CV-178, 2006 WL 752584, at *13 (N.D. Ind. Mar. 21, 2006). Viewing this evidence in the Plaintiffs' favor, a jury could reasonably find the Defendant breached its duty.

In response to this evidence, the Defendant argues that, even if dust remained in IBO 2 after the cleaning, this was expected to occur by the parties and does not demonstrate a failure to clean the oven in a workmanlike manner. But this fails to account for the deposit discovered in the exhaust blower, which presumably should have been removed by the Defendant during cleaning. Additionally, although Ball employees ran flypaper through IBO 2, evidence suggests there were particulates in the oven more than six hours after the cleaning—specifically, the dust adhered to cans and embers flowing through the ductwork. So even if the Defendant was not expected to perfectly clean IBO 2, there is still a reasonable inference the cleaning was not done in a proper manner. *See Farah*, 952 N.E.2d at 336 (stating that work must be done "skillfully, carefully, diligently, and in a workmanlike manner").

The remainder of the Defendant's arguments dispute various facts and inferences that favor the Plaintiffs' case. For example, the Defendant claims that it is entirely speculative that dust was ignited inside IBO 2, there are alternative explanations for the evidence, and the "honeycomb" deposit came from the west exhaust blower instead of the east exhaust blower.

These arguments ignore the Court's role at summary judgment, which is to construe all facts and draw all reasonable inferences in the light most favorable to the Plaintiffs. The evidence—especially as it was analyzed by Mr. Howell—takes the Plaintiffs' case well beyond speculation in showing that the Defendant breached its duty and caused the fire. *See Blasius*, 839 F.3d at 648 (explaining that an expert opinion in conjunction with a written report and personal observations, goes beyond "speculation or mere hypothesis").

Accordingly, the Court denies the Defendant's Motion for Summary Judgment [ECF No. 98].

C.  **The Plaintiffs' Motion for Partial Summary Judgment**

Finally, as for the Plaintiffs' Motion for Partial Summary Judgment [ECF No. 100], they seek a judgment that (1) Ball is the real party in interest under Federal Rule of Civil Procedure 17, (2) the lawsuit may be maintained in the name of Ball alone, and (3) removes FMIC as a named Plaintiff or, in the alternative, grants the Plaintiffs leave to file an amended complaint. The Defendant responds that the motion is not properly brought under Rule 56 and that FMIC is the real party in interest.

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). The purpose of a motion for partial summary judgment is to help narrow the claims and defenses in a case and move the litigation toward a resolution. *See Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 606 (7th Cir. 2015); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ."). A review of the Plaintiffs' motion shows that they have not identified a "claim or defense" or any part thereof on which

they seek judgment. Ball's request to be identified as the "real party in interest" and to have FMIC dismissed as a co-Plaintiff has no relation to proving any part of their claims. *See* Compl. 2–6 (asserting claims for breach of contract, breach of workmanlike duty, and negligence). Nor does the motion appear to relate to any of the Defendant's affirmative defenses. *See* Answer 12–13, ECF No. 9 (listing Defendant's affirmative defenses). Simply put, the Plaintiffs' motion misunderstands the purpose of a motion for summary judgment and granting their motion would not facilitate the resolution of this case.

In their Reply, the Plaintiffs argue that courts have properly addressed the "real party in interest" issue at summary judgment. However, in each of the cases the Plaintiffs cite, it was the defendant moving for summary judgment based on the named plaintiff not being the real party in interest. *See Gravel Trucking Co. v. Beelman Truck Co.*, No. 2:11-cv-490, 2014 WL 12781288, at *2 (N.D. Ind. June 17, 2014); *Massey v. Rumsfeld*, No. IP 00-41-CH/G, 2001 WL 1397309, at *4 (S.D. Ind. Nov. 5, 2001); *Cosid, Inc., ex rel. La Fortune Ins. Co. v. VESSEL ROLWI*, No. 71-1482, 1972 WL 327807, at *1 (7th Cir. July 26, 1972). This distinction is important because if the plaintiffs in those cases were not the real party in interest, then they could not recover on their claims as a matter of law. *See, e.g.*, *Gravel Trucking*, 2014 WL 12781288, at *6–7 (concluding that summary judgment was proper because the plaintiff is not a real party in interest and could not show it was entitled to the fruits of the action). In contrast, the Plaintiffs have not shown how their requested relief would affect any of the claims or defenses.

The Plaintiffs have also not explained why Rule 17 would require FMIC to be dismissed if Ball was a real party in interest. That Rule states that "[a]n action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a)(1). It further contemplates that if the real party in interest is not prosecuting the action, an opportunity will be provided to allow the real

party in interest to "ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). Rule 17 says nothing that would require the Court to dismiss FMIC as a Plaintiff just because Ball is a real party in interest. *See, e.g.*, *Krueger v. Cartwright*, 996 F.2d 928, 932–33 (7th Cir. 1993) (explaining that both the insured and insurer can be real parties in interest when there is partial subrogation). Moreover, Rule 17 is generally meant to protect parties that made an honest mistake about who the real party in interest is as opposed to those making a "strategic and tactical decision." *Metal Forming Techs., Inc. v. Marsh & McLennan Co.*, 224 F.R.D. 431, 437 (S.D. Ind. 2004). The filing of this lawsuit under both Ball's and FMIC's name and litigating this case for years as co-Plaintiffs suggest this motion was merely a strategic decision. The Court is not convinced Rule 17 justifies granting the Plaintiffs' motion.

Finally, the Plaintiffs request in the alternative that the Court grant them leave to file an amended complaint. A request for leave to amend a complaint is properly brought under Federal Rule of Civil Procedure 15. Although a "court should freely give leave when justice so requires," Fed. R. Civ. P. 15(a)(2), there are circumstances where leave may be appropriately denied, *see, e.g.*, *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). Therefore, the Court will only consider the Plaintiffs' request for leave to amend their complaint in a motion brought under Rule 15, which will also allow the Defendant to adequately respond.

Accordingly, the Plaintiffs' Motion for Partial Summary Judgment [ECF No. 100] is denied.

## CONCLUSION

Based on the foregoing, the Court hereby DENIES the Defendant's Motion to Exclude [ECF No. 99], the Defendant's Motion for Summary Judgment [ECF No. 98], and the Plaintiffs'

Motion for Partial Summary Judgment [ECF No. 100]. The Plaintiffs' claims remain pending for trial.

      SO ORDERED on June 2, 2022.

s/ Theresa L. Springmann
JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
